## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 19-20052-JAR-JPO |
| | ) | |
| FENG TAO | ) | |
| a/k/a "Franklin Tao," | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO DISMISS THE INDICTMENT

### INTRODUCTION

The government has alleged that Dr. Franklin Tao, a tenured engineering professor at the University of Kansas (KU), failed to disclose to KU that he had taken a teaching job in China and that, as a result of this failure to disclose, Dr. Tao was able to retain his professorship and receive a salary, some of which was funded by federal grants. Dr. Tao's receipt of his salary, according to the government, therefore constitutes wire fraud and program fraud, in violation of 18 U.S.C. §§ 1343 and 666—notwithstanding that there is no allegation that Dr. Tao failed to perform any of his employment responsibilities as a KU professor.

The government's investigation into Dr. Tao grew out of fabricated allegations by a disgruntled, unpaid visiting scholar at KU, who, after failing to extort Dr. Tao for $300,000, later admitted to the FBI that she hacked into Dr. Tao's email account to fish for "evidence" she could provide to the FBI and then, using phony aliases, fabricated complaints to both KU and the FBI regarding Dr. Tao. Given this origin of the government's investigation, it is not surprising that the central premise of the government's allegations is factually incorrect: Dr. Tao never accepted a teaching position in China and, therefore, he had no obligation to make any disclosure to KU. Dr. Tao's Conflict of Interest form was completely accurate when he represented that he had no

conflict that would interfere with his teaching responsibilities at KU, and it would have been false had he certified otherwise.

For purposes of this Motion to Dismiss, however, even if the facts alleged in the Indictment were true and Dr. Tao had, in fact, accepted a teaching position in China, the Indictment still fails to state an offense for several reasons.

*First,* the Indictment fails to allege that Dr. Tao ever actually "engag[ed] in" any teaching or other work assignment in China that "interfere[d] with him meeting his faculty teaching and research responsibilities at [KU]," which would have been required for his alleged statement in the Conflict of Interest form to have been false or misleading.

*Second,* the scheme alleged in the Indictment was one to "continue his employment with KU," yet, as multiple courts have held, the maintenance of employment is not "money or property" as is required for the scheme to violate the wire fraud or program fraud statutes.

*Third,* the program fraud counts allege that Dr. Tao schemed to continue in his employment and therefore receive salary, but the program fraud statute itself exempts from criminal liability receipt of "bona fide salary [or] wages," which is exactly what the Indictment alleges Dr. Tao received.

*Fourth,* the program fraud counts must be dismissed or consolidated because they collectively allege a single scheme by Dr. Tao to continue his employment at KU by making a single misrepresentation, which alleges a single offense. The division of this alleged conduct into three separate counts merely because KU allegedly received federal funds from three different federal grants constitutes improper multiplicity that would violate the Double Jeopardy Clause and prejudice Dr. Tao before a jury. Thus, these counts must be dismissed or consolidated under Federal Rule of Criminal Procedure 12(b)(3)(B)(ii).

*Fifth,* the Indictment's prosecution theory under the wire fraud and program fraud statutes, if adopted by the Court, would turn garden-variety employment disputes into wire and program fraud criminal cases. This result would violate the fair warning requirement of the Due Process Clause because no employee of common intelligence would believe that a mundane, workaday misrepresentation to an employer could violate those statutes and net up to a twenty-year prison sentence.

For all of these reasons, the Indictment must be dismissed under Federal Rules of Criminal Procedure 12(b)(3)(B)(ii) and (v).

## BACKGROUND

Dr. Franklin Tao is a tenured associate professor of engineering at KU. He was born in China in 1971, and, after obtaining an undergraduate and Master's Degree in Material Science in China, he moved to the United States in 2002 to study at Princeton University, where he received his PhD in Chemistry. After Princeton, Dr. Tao worked for four years as a post-doctoral student at the University of California at Berkeley, and then became a tenure-track assistant professor of Chemistry and Biochemistry at the University of Notre Dame. In 2014, Dr. Tao was hired as a tenured professor of Chemical Engineering at KU. Dr. Tao has been a full-time Miller associate professor at KU since that time, teaching chemistry and chemical engineering courses.

The government's investigation of Dr. Tao was instigated by a slew of fabricated tips made to the FBI and to KU by an unpaid visiting scholar at KU, Huimin Liu, under her own name, a fictitious name, and also while posing as at least two other individuals known to Dr. Tao. In the Spring of 2019, Liu was angry with Dr. Tao because she thought that she should have received greater attribution from Dr. Tao as a co-author on certain manuscripts of research works at KU. Upset that Dr. Tao would not change her attribution, she demanded that he pay her $300,000—an

3

amount she said "is not much"—or else she would falsely accuse him of economic espionage. Incredibly, Liu put these threats and extortionate demands in emails that she sent to Dr. Tao.

For example, on April 21, 2019, Liu wrote: "If you are no[t] sure how much you should compensate me, I could suggest a level. It should be in the level of millions of RMB. For example, 2 million RMB. Do not consider it [ ] too much. You ruined my future. Do not consider it [ ] too much.  It is also your future." [1] Ex. A.[2] The next day, Liu emailed Dr. Tao again: "I am not mindful of narrow personal gains and losses. But when anything that belongs to me is taken away, my counterattack will be very strong and very extreme. I think that you wanted to have this experience, so I am satisfying your wish. I am very busy, but I can always spare some time to do something." Ex. B.

On April 30, 2019, Liu submitted an anonymous complaint to KU's Environment, Health and Safety System, alleging that Dr. Tao took "another full term paid position in his home country China." Ex. C. On May 12, Liu, using the name of a former post-doctoral student of Dr. Tao's, emailed the FBI about Dr. Tao, falsely claiming that Dr. Tao had taken a position in China. Ex. D. On June 3, Liu, using the fictitious name "Chris Liang," emailed KU and claimed that Dr. Tao submitted similar and overlapping research proposals in the U.S. and China. Ex. E. On the following day, June 4, Liu, this time using her own name, filed two complaints with KU—one with the Office of Integrity and Compliance and one with the Internal Audit Office—about her authorship dispute with Dr. Tao. Ex. F. Within fifteen minutes of making these complaints to KU on June 4, 2019, Liu e-mailed Dr. Tao and threatened to accuse him of economic espionage: "I

---

[1] Two million RMB is roughly equivalent to $300,000.

[2] Although the Court need not consider this background and the attached exhibits to decide this Motion, the defense submits these exhibits to provide helpful context for the unprecedented prosecution theory charged in the Indictment.

know that the issue with [your] tenure position in the United States cannot be solved even if I haven't reported you about your byline being incorrect. However, it seems the term 'tech spy' is very popular nowadays." Ex. G. On June 9, Liu, this time using the name of a post-doctoral student of Dr. Tao's, made good on her threat to accuse Dr. Tao of espionage. She filed a false complaint about Dr. Tao with the FBI and accused him of economic espionage for giving intellectual property to China. Ex. H.

During this same time frame, Liu was also sending Dr. Tao apologies for her threatening behavior. For example, on April 30, Liu wrote: "I know my temper is not good occasionally and I also know offending words are not polite. However, it is difficult for me to change it." Ex. I. On May 3, Liu wrote: "I am sorry for what I did in this year, especially yesterday. I am sorry for my bad temper to you." Ex. J. And on May 3, Liu's "mother" wrote an email to Dr. Tao, purportedly apologizing on behalf of Liu: "She is too young and not mature. She has … caused so much trouble for you. I am really sorry! I hope that you can be kind and forgive her. We have already spoken to her. She will personally apologize to you in a moment, and promise that this will not happen again." Ex. K.

It was Liu who supplied the "evidence"—in the form of the unsigned offer of employment from Fuzhou University—to the FBI that spurred it to open this investigation. Initially, Liu told the FBI she obtained this "evidence" from Dr. Tao's secretary, a fact she later admitted to the FBI was a lie. In actuality, she obtained the unsigned contract by hacking into Dr. Tao's computer and accessing his emails. Ex. L. Liu also admitted to the FBI that she used fictitious names in sending her complaints about Dr. Tao to KU and the FBI and that she had hacked into Dr. Tao's e-mail account to download the research proposals she provided to the FBI as "evidence" of Dr. Tao's wrong-doing. *Id.*

Liu's lies to the FBI succeeded in wreaking her revenge on Dr. Tao. The FBI immediately opened a grand jury investigation involving the National Security Division of the Department of Justice, which culminated in the arrest and Indictment of Dr. Tao. Rather than prosecute Huimin Liu for extortion, false statements, and computer fraud—and notifying Dr. Tao that he was the victim of a federal computer crime under the Computer Fraud and Abuse Act—the government has instead charged Dr. Tao with fraud for allegedly failing to disclose a job offer to KU. Remarkably, Liu has not been charged with any offenses, despite her admission to the FBI of knowingly making false statements and spelling out her extortion demands in writing.

## THE INDICTMENT

The government alleges that, on September 25, 2018, Dr. Tao failed to disclose in a KU Conflict of Interest form that he had taken a teaching job at Fuzhou University in China even though the form required that he "secure approval prior to engaging in" "any external professional activities" that "interfere with him meeting his faculty teaching and research responsibilities at [KU]." Indictment ¶ 10, No. 2:19-CR-20052 (Aug. 21, 2019), ECF No. 1 (the "Indictment"). The government further alleges that, as a result of this failure to disclose, Dr. Tao "was able to continue his employment with KU," and KU paid Dr. Tao his regular salary. *Id.* ¶ 7. According to the government, this alleged misrepresentation constituted wire fraud, in violation of 18 U.S.C. § 1343, because it permitted Dr. Tao to continue to earn his salary from KU, and program fraud, in violation of 18 U.S.C. § 666(a)(1)(A), because KU allegedly received three federal grants over the prior year. Critically, however, the government does *not* allege that Dr. Tao failed to perform any of his employment responsibilities that he was required to perform in exchange for his salary. *Id.* ¶¶ 8–10.

As a *factual* matter, the central premise of these allegations is simply incorrect: Dr. Tao

never accepted a teaching position at Fuzhou University in China, or anywhere else, let alone moved to China and shirked his obligations at KU, and, therefore, he had no obligation to make any disclosure to KU. Indeed, in the Fall of 2018—when, according to the Indictment, Dr. Tao worked full-time in China—Dr. Tao instead taught Chemical Engineering Thermodynamics at KU on Monday, Wednesday, and Friday to more than 90 students, and he held office hours on Wednesday and Friday afternoons. His Conflict of Interest form was completely accurate, and it would have been inaccurate if he had instead indicated that he had a conflict of interest due to his acceptance of a job to work at another university.

But even assuming the facts alleged in the Indictment were true for purposes of this Motion to Dismiss, the Indictment must be dismissed because it fails to properly allege the offenses charged.

## ARGUMENT

## I.    The Indictment must be dismissed under Rule 12(b)(3)(B)(v) and (ii) because it fails to state an offense and also suffers from multiplicity.

A motion to dismiss an indictment pursuant to Rule 12(b)(3)(B)(v) for failure to state an offense turns on "whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offense." *United States v. Todd*, 446 F.3d 1062, 1068 (10th Cir. 2006). The Indictment in this case fails that test.

The Indictment attempts to transform what is, at best, a garden-variety employment dispute—alleging that Dr. Tao did not inform his employer, KU, that he had accepted employment at another university and then continued to work and draw salary from KU—into a string of federal fraud offenses, which convictions provide for a statutory maximum of fifty years in prison. Not only did Congress not intend this draconian result, but the plain language of the wire fraud and program fraud statutes does not allow it. Because the Indictment fails to allege conduct that violates

the wire fraud or program fraud statutes, this Court should dismiss the Indictment under Federal Rule of Criminal Procedure 12(b)(3)(B)(v). The Court should also dismiss the Indictment under Rule 12(b)(3)(B)(ii) because it charges one offense in three separate counts and therefore suffers from multiplicity.

### A. The Indictment fails to allege a misrepresentation as required to state the offenses of wire fraud and program fraud.

The government must allege that Dr. Tao made a *misrepresentation* to obtain money or property in order to properly plead its wire fraud and program fraud counts. *See* Indictment ¶¶ 9–16 (alleging that Dr. Tao made "false statements concerning his lack of a conflict of interest" in order to obtain salary in violation of the wire fraud and program fraud statutes); *see generally* 18 U.S.C. §§ 1343, 666(a)(1)(A).[3] The Indictment fails to adequately allege this crucial element.

The wire fraud and program fraud counts in the Indictment are based on a single purported misrepresentation that Dr. Tao allegedly made to KU through an online certification in a Conflict of Interest form on September 25, 2018. Indictment ¶ 10. The online certification allegedly stated that Dr. Tao "agreed to secure approval prior to engaging in" "any external personal professional activities" that would "interfere with him meeting his faculty teaching and research responsibilities." *Id.*[4] This certification was false, the Indictment asserts, because Dr. Tao allegedly signed a contract four months earlier to work at another university: "Beginning on or about May

---

[3] To be sure, not all program fraud counts may require a misrepresentation, such as when a defendant embezzles from a bank account over which he has control. But the government's program fraud theory in this case is that Dr. Tao obtained continued employment and salary due to his alleged misrepresentation on the Conflict of Interest form. Indictment ¶¶ 9–16. These counts therefore require proof of a misrepresentation.

[4] The government does not appear to contend that Dr. Tao's certification that he "read and understood" the Conflict of Interest policy was false or misleading. Indictment ¶ 10. If it does, these alleged certifications also fail to constitute misrepresentations because the Indictment does not allege that Dr. Tao did *not* read and understand the policy.

1, 2018, Tao signed a five-year 'Changjiang Scholar Distinguished Professor Employment Contract.' The contract required Tao to be a 'full time' employee at Fuzhou University." *Id.* ¶ 7.

Even taking these allegations as true, the Indictment fails to allege that Dr. Tao made a misrepresentation to KU because the Indictment fails to allege the single fact that would be necessary to render the certification false or misleading: that Dr. Tao actually *engaged in* an external professional activity that interfered with his faculty teaching and research responsibilities at KU without obtaining prior approval from KU. Critically, the Indictment does *not* allege that Dr. Tao actually taught at Fuzhou University. It also does not allege that Dr. Tao's responsibilities at Fuzhou University—and, in fact, there were none—interfered with his faculty teaching and research responsibilities at KU.[5]

The allegation that Dr. Tao signed a contract to work for Fuzhou University, moreover, does not render the certification false or misleading. Putting aside that Dr. Tao never actually signed the contract with Fuzhou University,[6] even if the allegation were true, signing a contract to

---

[5] Even if the Indictment had alleged that Dr. Tao worked at Fuzhou University, this would not be sufficient to render his certification false unless the job interfered with his faculty teaching and research responsibilities at KU. Indictment ¶ 10. The Indictment itself alleges that "employment outside [KU] *can* result in real or apparent conflicts of interest regarding commitment of time or effort," not that it is a *per se* conflict of interest for which an employee must seek prior approval from KU. *Id.* ¶ 6.

[6] Special Agent Lampe of the FBI made it abundantly clear to the grand jury that the contract from Fuzhou University was not signed by Dr. Tao, notwithstanding the allegation in paragraph 7 of the Indictment to the contrary:

> **The Witness:** The series of complaints also provided a contract, albeit unsigned, between Tao and this university, the Fuzhou University. . . .
> **Grand Juror**: So he didn't sign his own contract or the university didn't sign a contract?
> **A.** So we were provided with a contract, an unsigned contract anonymously.
>  \*\*\*\*\*
> **Grand Juror**:  So the contract with Fuzhou University was not signed? There is no evidence of any signed contracts?
> **The Witness:** No.

teach at another university does not equate to *engaging* in an external professional *activity* that could itself *interfere* with Dr. Tao's faculty teaching and research responsibilities. The review and execution of a simple teaching contract would take mere minutes. Entry into a contract also does not establish performance of the contract. Indeed, parties to a contract routinely rescind or breach contracts by failing to perform. Thus, as alleged, Dr. Tao would not have been required to disclose and secure prior approval from KU before entering into the contract—only before actually performing under the contract by teaching full-time at Fuzhou University while obligated to teach at KU. The Indictment fails to allege any such performance of the contract, which is fatal to its charges.

In sum, because the Indictment lacks any allegation that Dr. Tao engaged in an external professional activity that interfered with his work at KU without securing prior approval from KU, the Indictment fails to include an allegation that rendered Dr. Tao's online certification false or misleading. The Indictment must therefore be dismissed in its entirety, as this deficiency infects all counts.

### B. The Indictment fails to allege a scheme to obtain money or property as required to state the offenses of wire fraud and program fraud.

To state the offenses of wire fraud and program fraud, the government must allege that Dr. Tao obtained or sought to obtain *money or property* from KU. *See* Indictment ¶ 9 (alleging that Dr. Tao committed wire fraud by scheming to deprive KU of "money and property"); *id.* ¶¶ 12, 14, 16 (alleging that Dr. Tao committed program fraud by embezzling, stealing, or obtaining by fraud "property worth at least $5,000"); *see also* 18 U.S.C. § 1343 (proscribing schemes involving uses of the wires "to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises"); *id.* § 666(a)(1)(A) (proscribing embezzlement, theft, or

---

Grand Jury Tr. at 8–9, 26.

obtaining by fraud "property" that is "valued at $5,000 or more"). The government failed to meet this pleading obligation because its Indictment alleges that Dr. Tao schemed to maintain only his employment—not to obtain money or property—and subsequently received salary in exchange for full performance of his teaching and research obligations.

The Indictment alleges that Dr. Tao schemed to falsely certify the Conflict of Interest form in order to "continue his employment at KU." Indictment ¶ 7. The Indictment further alleges that his continuation of his employment at KU led to his continued receipt of salary. *Id.* ¶¶ 7, 9, 12, 14, 16. These allegations do not establish the required element that Dr. Tao schemed to obtain money or property, even if Dr. Tao's continuation of his job led to salary payments. Dr. Tao's alleged misrepresentation is not what led to his salary. He *earned* his salary by fully performing his teaching and research obligations at KU and the Indictment fails to allege otherwise.

Courts have agreed that a so-called "scheme" to maintain employment is not a scheme to obtain money or property, even if continued employment leads to continued salary payments. For example, in *U.S. v. Billmyer*, No. 94-29-01-JD, 1995 WL 54471, at *9 (D.N.H. Feb. 3, 1995), the court held that allegations in an indictment failed to state the offense of mail fraud where the defendant Honda employee concealed from Honda that he accepted kickbacks in violation of Honda's conflict-of-interest policy but continued to receive salary from Honda that he would not have received if he had disclosed his conduct to Honda. The court rejected the government's argument that "fraudulent obtainment of salary" satisfied the "money or property" element. *Id.* The court distinguished between a scheme "undertaken for purposes of obtaining the salaried positions" where "the defendants were directly charged with fraudulently procuring their positions for purposes of defrauding their employers of salary payments," which could satisfy the money-or-property element, with a scheme by a current employee to "continue[ ] to accrue [ ] salary,"

which cannot satisfy the element. *Id.*

In *United States v. Facteau*, No. 1:15-cr-10076-ADB, 2016 WL 4445741, at *10 (D. Mass. Aug. 22, 2016), the district court agreed with the *Billmyer* court. The court also distinguished between a defendant's mere maintenance of a job and salary—such as is alleged here—and a fraudulent attempt to obtain increased compensation: "[W]hile the mere maintenance of a preexisting salary or employment did not satisfy the 'money or property' requirement of the wire fraud statute, obtaining a new position, an increase in salary, or the payment of a bonus could be sufficient, as long as the benefits were obtained through the fraudulent scheme, and the defendant was not otherwise entitled to receive those benefits." *Id.*

Here, like the indictments in *Billmyer* and *Facteau*, the Indictment merely alleges a scheme by Dr. Tao to "continue his employment at KU," not a scheme to obtain money or property. Indictment ¶ 7. As the Indictment makes clear, Dr. Tao had already been employed by KU for four years at the time he submitted the online certification in the Conflict of Interest form. *See id.* ¶ 3 (alleging that Dr. Tao had been a professor at KU since August 2014). The Indictment does not allege that Dr. Tao was an unqualified job applicant who fraudulently procured a job by making misrepresentations about his credentials in order to receive salary. Nor does it allege that he was an existing employee who made a misrepresentation in order to receive increased compensation in the form of a bonus, *e.g.*, by inflating the number of hours he worked. By alleging a "scheme" to merely maintain his job, the Indictment runs headlong into the legal defects articulated in *Billmyer* and *Facteau*. *See Billmyer*, 1995 WL 54471, at *9; *Facteau*, 2016 WL 4445741, at *10.

The absence of a scheme to obtain money or property is particularly problematic here, where there is no allegation that Dr. Tao failed to perform his teaching or research obligations at KU, and he instead earned his salary by fully performing those obligations. Dr. Tao received no

improper windfall, and KU received everything it bargained for when it continued to employ and pay salary to Dr. Tao in exchange for his teaching and research. It cannot be said, therefore, that Dr. Tao fraudulently obtained that salary.

Even if continued employment could constitute money or property due to the receipt of salary—and it cannot—there is also no allegation that the alleged misrepresentation was directly linked to Dr. Tao's receipt of salary. The Indictment does *not* allege that, had Dr. Tao disclosed the alleged contract with Fuzhou University to KU in the Conflict of Interest form, KU would have terminated Dr. Tao's employment and stopped paying him salary. To the contrary, had Dr. Tao disclosed the alleged contract, KU would have told Dr. Tao that he needed to choose either KU or Fuzhou University, and he could not work full-time at both.[7] Perhaps, Dr. Tao could have delayed having to have this awkward conversation by failing to disclose the contract, but the outcome of that action would not have resulted in Dr. Tao receiving unearned money or property either.[8]

---

[7] Special Agent Lampe testified that if Dr. Tao had disclosed the contract KU would not have automatically fired him; instead, the university would have made him choose where he wanted to work:

> **The Witness:** If he did tell the truth, if went to the University and said, hey, I got a new job at Fuzhou University, what would have happened?
>
> **Grand juror:** He wouldn't be working.
>
> **The Witness:** They would have said you can't work here anymore, or you can quit that job and stay here, take your pick. So if he doesn't disclose that, then he can maintain both jobs and he can maintain his access to the U.S. job.

Grand Jury Tr. at 32.

[8] Special Agent Lampe's testimony before the grand jury is illustrative of this point, as he struggled to explain how KU was damaged as a result of the alleged scheme:

> **The Witness:** The nondisclosure is the fraudulent part which leads to the program fraud.
>
> **Grand juror:** Did he share the research information with the Chinese University?
>
> **A:** I don't know. I don't know.
>
> **Grand Juror:** How is KU damaged in this, I guess, is what I'm not clear about?

Because the Indictment fails to allege a scheme to obtain money or property as to any of the wire fraud and program fraud counts, the Indictment must be dismissed in its entirety.

**C. The program fraud counts fail to state an offense for the additional reason that they allege conduct that meets the statutory exemption for *bona fide* salary.**

The program fraud counts in the Indictment fail to state an offense for the additional reason that, even if a scheme to maintain employment leads to salary that could satisfy the money or property element, which it cannot, the program fraud statute exempts such schemes from liability so long as the salary is "bona fide" and paid "in the usual course of business." *Compare* Indictment ¶¶ 12, 14, 16 (alleging embezzlement, theft, or fraud of "property" consisting of Dr. Tao's "salary" in violation of § 666(a)(1)(A))*, with* 18 U.S.C. § 666(c) (stating that § 666 "does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business"). Because the program fraud counts allege conduct that fits squarely within the *bona fide* salary exemption in § 666(c), those counts do not state an offense and must be dismissed.

To survive dismissal, "[a]n accusation for a statutory offense need only charge enough facts to show that the accused is not within any exception in the statute; and it is sufficient when it negates an exception in the statute, even though the negation is not phrased in the words of the statute." *United States v. Anderson*, No. 98–20030–01/07–JWL, 1999 WL 79654, at *5 (D. Kan. Jan. 19, 1999) (quoting *Wharton's Crim. P.* § 268 (13th ed. 1990)).

---

**The Witness:** It's not so much that KU is damaged, it's the fact that the U.S. government is damaged. . . . [I]f he had disclosed that he was working for Fuzhou University as well, he would not be employed by the University of Kansas or he would have had to choose.

Grand Jury Tr. at 24–25; *see also* Ex. M.

Courts routinely dismiss program fraud counts where the allegations fit within the statutory exemption in § 666(c) because the money or property at issue constitutes *bona fide* salary. *See, e.g.*, *United States v. Mills*, 140 F.3d 630, 634 (6th Cir. 1998) (affirming dismissal of § 666(a)(1)(B) counts in indictment where allegations met § 666(c)'s salary exemption because Congress "saw fit to exclude from the reach of the federal statute those individuals and those transactions that involved only the payment of bona fide salaries, wages, fees, and other compensation"); *United States v. Mann*, 172 F.3d 50 (6th Cir. 1999) (unpublished decision) (affirming dismissal of § 666(a)(1)(A) counts in indictment where allegations met § 666(c)'s salary exemption); *United States v. Harloff*, 815 F. Supp. 618, 620 (W.D.N.Y. 1993) (dismissing § 666(a)(1)(A) counts in indictment where allegations met § 666(c)'s salary exemption).

Courts have further held that salary payments received by a defendant are *bona fide* if the defendant actually performs his or her job. In *United States v. Mills*, the Sixth Circuit clarified at the outset that the exemption for "bona fide salaries, wages, fees, and other compensation" applies to salary payments that are "*received by*" a defendant. 140 F.3d at 633 (emphasis in original) (salary received by the defendant "fall[s] within the scope of the subsection (c) exception"); *accord Mann*, 172 F.3d at 50. The court further held that "the value of the yearly salary of [a defendant], if *bona fide*, should not be considered in establishing the $5,000" element in the program fraud statute. *Id.* Turning to the question of whether the salary alleged in the indictment was *bona fide*, the court concluded that "the salaries to be paid to [defendants] for actual performance of necessary . . . duties" constituted *bona fide* salary. *Mills*, 140 F.3d at 633. In *Mills¸* the government sought to skirt this requirement by arguing that the "illegal nature of the employment procurement process" tainted the salaries and placed them outside the § 666(c) exemption, but the court disagreed. The government failed to "allege that the jobs in question were unnecessary or that the individuals who

obtained those employment positions did not responsibly fulfill the duties associated with their employment." *Id.* Absent such allegations, the court explained, "the government has no support for its claims that the salaries paid to the [defendants] were not properly earned 'in the usual course of business.'" *Id.* at 633–34. The court therefore affirmed the district court's dismissal of the program fraud counts in the indictment. *Id.* at 634.

Other courts have agreed with this well-reasoned approach. *See United States v. Blagojevich*, 794 F.3d 729, 736–37 (7th Cir. 2015) ("[Section] 666(c) provides that the section as a whole does not apply 'to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.' Compensation for a job by someone other than a ghost worker is a 'bona fide salary' . . . . [B]ona fide employment also applies no matter who gets the job."); *Mann*, 172 F.3d at 50 (upholding dismissal of indictment because, as alleged, the defendant's "performance of duties as a principal in contravention of state regulations is not a federal crime under" § 666, reasoning that "[t]hough [the defendant] lacked appropriate credentials under state law, because he legitimately performed the functions of the necessary position of principal . . . his wages were 'bona fide'"); *see also Harloff*, 815 F. Supp. at 619 (holding that wages were *bona fide* under § 666(c) as alleged in the indictment where defendants were charged with embezzlement by working fewer hours than they claimed because the "plain language [of § 666(c)] would prevent making a federal crime out of an employee's working fewer hours than he or she is supposed to work").

These cases foreclose the program fraud counts here, where the Indictment fails to allege that Dr. Tao's salary was not *bona fide* and paid in the usual course of business, or that he did not actually perform his employment obligations to earn his salary. *Mills*, 140 F.3d at 633; *Blagojevich*, 794 F.3d at 736–37; *Mann*, 172 F.3d at 50. The Indictment does *not* allege that Dr.

Tao's position was unnecessary and a sham, such as a fraudulently procured no-show or low-show job where he was a "ghost worker." *Blagojevich*, 794 F.3d at 736–37. Nor does it allege that Dr. Tao fled to China with unearned salary in hand. To the contrary, the Indictment merely alleges that Dr. Tao should have disclosed to KU that he had purportedly taken a job at another university. The Indictment therefore meets § 666(c)'s exemption, rendering the program fraud counts defective.

Accordingly, the Court should dismiss Counts Two through Four because the charges fit squarely within the *bona fide* salary exemption and therefore do not state an offense in violation of § 666(a)(1)(A).

**D.  The program fraud counts also suffer from the defect of multiplicity because they collectively charge a single offense.**

The program fraud counts, Counts Two through Four, must be dismissed or consolidated for the additional reason that they collectively charge a single offense and therefore suffer from multiplicity under Rule 12(b)(3)(B)(ii). *See* Fed. R. Crim. P. 12(b)(3)(B)(ii) ("charging the same offense in more than one count (multiplicity)" is a "defect in the indictment" that typically must be raised by pretrial motion).

"Multiplicitous counts are separately charged counts that are based on the same criminal behavior." *United States v. Jenkins*, 313 F.3d 549, 557 (10th Cir. 2002). They are "improper because they allow multiple punishments for a single criminal offense," *id.*, which "raises double jeopardy implications," *United States v. Morehead*, 959 F.2d 1489, 1505 (10th Cir. 1992), and because they "may improperly suggest to the jury that the defendant has committed more than one crime," *id.*; *see United States v. McCullough*, 457 F.3d 1150, 1162 (10th Cir. 2006) ("This court's jurisprudence establishes that multiplicitous sentences violate the Double Jeopardy Clause." (internal quotation marks omitted)).

"The test for multiplicity is whether the individual acts alleged in the counts at issue are prohibited, or [if] the course of conduct which they constitute [is prohibited]." *McCullough*, 457 F.3d at 1162 (brackets and internal quotation marks omitted). If the individual acts alleged in the respective counts are prohibited by the statute, "then each act is punishable separately." *Id.* In contrast, if the course of conduct is prohibited, then "there can be but one penalty." *Id.* Stated another way, "the court must identify the unit of prosecution of the offense charged," by focusing "on the identification of the key element of the federal offense." *United States v. Jackson*, 850 F. Supp. 1481, 1497 (D. Kan. 1994) (internal quotation marks omitted). If multiple counts collectively charge a single unit of prosecution, they suffer from the pleading defect of multiplicity and must be dismissed or consolidated. *See id*.

Counts Two through Four are multiplicitous because they collectively charge a single scheme and course of conduct by which Dr. Tao allegedly sought to maintain his job at KU through a single alleged misrepresentation. *See* Indictment ¶¶ 11–16. Indeed, each of these three counts relies on the same alleged misrepresentation in an "online certification" in the Conflict of Interest form submitted on September 25, 2018 that indicated that Dr. Tao lacked a conflict of interest. *Id.* ¶ 9. The counts do not allege three separate misrepresentations or even the same misrepresentation on three different dates or to three different recipients. *See id.* Each count also alleges that Dr. Tao made this single misrepresentation for the same singular purpose—to maintain his employment at KU. *See id.* ¶¶ 9, 11–16.

The only purported difference among the three program fraud counts is that KU allegedly received and used funds from three separate federal program grants to pay Dr. Tao his salary. *See id.* But the sources of the funds are not "individual acts" by Dr. Tao that are punishable as their own "units of prosecution" under § 666(a)(1)(A). *Jackson*, 850 F. Supp. at 1497. The "unit of

prosecution" under § 666(a)(1)(A) is embezzlement, theft, or fraud of funds greater than $5,000 from an entity that received more than $10,000 in benefits in that year from the federal government—irrespective of the sources of the stolen funds. *See* 18 U.S.C. § 666(a)(1)(A). The alleged separate sources from which KU received its funding do not transform Dr. Tao's alleged conduct into three separate crimes. Otherwise, a defendant who embezzles $5,000 a single time from a single entity that received federal benefits from 100 different federal grants could theoretically be charged with 100 different counts. That absurd result is not warranted by the plain language of the statute.

The district court in *United States v. Urlacher*, 784 F. Supp. 61 (W.D.N.Y. 1992), reached this same conclusion. In *Urlacher*, the government charged the defendant police chief with two counts of embezzlement under § 666(a)(1)(A) that were "identical" with the one exception "that the funds which the defendant allegedly embezzled came from different sources" within the City of Rochester: the police department and the probation office. *Id.* at 63. The court concluded that § 666(a)(1)(A) is not "source-specific" and thus does not permit "the government to charge the defendant with a separate violation based upon the source of the funds he is alleged to have embezzled." *Id.* at 63. The court explained that the "unit of prosecution" in § 666 is embezzlement of "$5,000 or more" within a "one year period in which the government or agency at issue receives more than $10,000 in Federal aid," and "[i]t makes no difference what the source of the money was." *Id.* at 64–65. The court therefore held that the counts were multiplicitous and ordered them consolidated. *Id.*

The same result in *Urlacher* holds *a fortiori* here, where the Indictment alleges that Dr. Tao fraudulently obtained funds from only one source, KU, despite that KU allegedly received

funds from three different federal grants.[9] Accordingly, because Counts Two through Four are multiplicitous and thus defective, the Court should either dismiss these counts or order them consolidated into a single program fraud count.

### E. The wire fraud and program fraud counts violate the fair warning requirement of the Due Process Clause of the Fifth Amendment.

As the above discussion demonstrates, the Government's theory of prosecution is truly remarkable. If allowed, it would set a dangerous precedent that any employee who makes a misrepresentation to his employer that the employer considers material could be subject to a 20-year felony for mail or wire fraud, if the misrepresentation was made by email or through the mails. That same employee could also be subject to a ten-year felony for program fraud, even absent use of the mails or wires, if his or her employer had received more than $10,000 in benefits over the prior year. The Court must dismiss these counts because the Indictment's novel and unsupported interpretation of the wire fraud and program fraud statutes would violate the Due Process Clause of the Fifth Amendment since the statutes failed to provide fair warning that Dr. Tao's alleged conduct would be criminal.

Due process of the law requires "fair warning . . . of what the law intends." *United States v. Lanier*, 520 U.S. 259, 266 (1997) (quoting *McBoyle v. United* States, 283 U.S. 25, 27 (1931)).

---

[9] Similarly, the government would not be able to charge each pay check as a different count under § 666(a)(1)(A), as these would be part of one alleged scheme to obtain salary using a single misrepresentation. *See United States v. Swan*, No. 1:12–cr–00027–JAW–1, 2012 WL 7219008, at *6 (D. Me. Nov. 26, 2012) (holding that § 666(a)(1)(A) counts were multiplicitous because "a single scheme that was accomplished by the device of one fraudulent representation" was properly charged as a single count, even if it resulted in multiple "installment payments" of ill-gotten funds), *report and recommendation adopted*, 2013 WL 685217 (Feb. 23, 2013); *see also United States v. Jewell*, 827 F.2d 586, 587–88 (9th Cir. 1987) (reversing convictions for counts charging defendant with being a government official with a personal interest in a government contract where each separate authorization of an invoice was charged as a separate count, because "there was only one contract, [and the defendant] was guilty of only one conflict of interest").

Indeed, it is a violation of the Due Process Clause to "tak[e] away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). "A criminal statute must clearly define the conduct it proscribes," and it exceeds a court's authority to "define new federal crimes." *Skilling v. United States*, 561 U.S. 358, 415 (2010) (Scalia, J., concurring in part and concurring in the judgment).

In addition, when a court interprets the bounds of a criminal statute, "the tie must go to the defendant," because "[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008); *see, e.g.*, *Cleveland v. United States*, 531 U.S. 12, 25 (2000) (holding that a state video poker licenses were not "property" within the meaning of the mail fraud statute because "to the extent that the word 'property' is ambiguous as placed in § 1341, [the Court has] instructed that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity'").

The fair warning requirement encompasses three related doctrines:

> There are three related manifestations of the fair warning requirement. First, the vagueness doctrine bars enforcement of "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. Second, as a sort of "junior version of the vagueness doctrine," the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. Third, although clarity on the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.

*Lanier*, 520 U.S. at 266 (citations omitted). "[T]he touchstone" of the inquiry, the Supreme Court has instructed, "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267.

Here, the prosecution theory in the Indictment would violate the fair warning requirement

because Dr. Tao could not have reasonably known that his alleged conduct would violate federal criminal laws. No state employee of common intelligence such as Dr. Tao could conceivably be on notice that any misrepresentation to his employer—even one like Dr. Tao's, which was not made under oath—would subject that employee to federal prosecution under the wire fraud and program fraud statutes with the possibility of a 20-year prison sentence. An employee who lies to his or her employer could reasonably expect to face discipline or even be fired, but in no case would he or she think that it would lead to a felony conviction and deprivation of liberty. For this reason, it is unsurprising that the defense has unearthed *no cases* where a court has endorsed such an overreaching theory by federal prosecutors in a garden-variety employment dispute like the one alleged here.

Permitting the criminalization of work-place communications in this fashion would result in truly bizarre and draconian situations. Take for example the following scenarios, each of which is analogous to the allegations in the Indictment:

- The office manager of a local doctor's office tells the receptionist that she will be fired if she falsely calls in sick again. The receptionist calls in sick after having car problems.
    - The doctor's office receives more than $10,000 per year in Medicaid reimbursements from CMS. Can the receptionist be charged with program fraud by calling in sick to keep his job?
    - The doctor's office was in Kansas City, MO, and the receptionist called in sick from her home in Kansas City, KS, across state lines. Can the receptionist be charged with wire fraud by making a misrepresentation to maintain her job?
- After rumors emerge of employee drug use, the president of a local environmental nonprofit orders employees to submit an online certification confirming that they have never used drugs while employed by the nonprofit. A computer programmer used marijuana six months before at a friend's party, but falsely certifies in order to keep his job.
    - The nonprofit receives more than $10,000 per year in funding from EPA. Can the programmer be charged with program fraud by misrepresenting to his employer that he never used drugs in order to maintain his job, even though he's a top performer?

> o  The computer programmer works from his home office in St. Louis, MO, and submitted the certification to the nonprofit's headquarters in Kansas City, KS, across state lines. Can the programmer be charged with wire fraud because he falsely certified in order to maintain his job?

Under the Indictment's expansive prosecution theory—which is untethered from the wire fraud and program fraud statutes themselves—the answer to each of these hypothetical scenarios would be 'yes.' If the Court permits this Indictment to proceed to trial, it would open the floodgates to a vast range of federal prosecutions for garden-variety employment disputes that otherwise would have, at most, subjected the employee to administrative discipline at work.

More important, the prosecution theory in the Indictment would violate Dr. Tao's rights under the Due Process Clause to have fair warning that his conduct could be subject to criminal prosecution. Dr. Tao had no such fair warning. To avoid running afoul of the Due Process Clause, the Court should therefore interpret the mail fraud and program fraud statutes in such a way that they do not criminalize Dr. Tao's alleged conduct of failing to disclose an alleged employment agreement to his employer.

### CONCLUSION

The government has stretched the mail fraud and program fraud statutes beyond recognition by transforming what is nothing more than an employment dispute between KU and Dr. Tao into a nefarious scheme to commit wire fraud and program fraud that could potentially deprive Dr. Tao of his liberty for fifty years.

The prosecution theory in this case calls to mind Judge Easterbrook's caution that "Sections 666 and 1346 have an open-ended quality that makes it possible for prosecutors to believe, and public employees to deny, that a crime has occurred, and for both sides to act in good faith with support in the case law." *United States v. Thompson*, 484 F.3d 877, 884 (7th Cir. 2007). Such statutory "[h]aziness designed to avoid loopholes through which bad persons can wriggle can

impose high costs on people the statute was not designed to catch," but courts "can curtail some effects of [that] statutory ambiguity." *Id.* Stated otherwise, "Federal mail and wire fraud statutes encompass a broad range of behavior. Their limits can be difficult to draw with certainty. But there are limits nonetheless, and they must be defined by more than just prosecutorial discretion." *United States v. Weimert*, 819 F.3d 351, 370 (7th Cir. 2016).

These warnings find particular currency in this case, where the government has disregarded the limits of the charged statutes and insinuated itself into a basic employment dispute. The Court must intercede to curtail clear government overreach. Dr. Tao therefore respectfully requests that the Court dismiss the Indictment.

Dated:  November 17, 2019

Respectfully submitted,

/s/ Thomas H. Johnson
Thomas H. Johnson #13688
Petefish, Immel, Hird, Johnson,
Leibold & Sloan, LLP
842 Louisiana
Lawrence, KS 66044
Tel: (785) 843-0450
Fax: (785) 843-0407
tjohnson@petefishlaw.com

Peter Zeidenberg
Michael F. Dearington
Laura Zell
Arent Fox LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
Peter.Zeidenberg@arentfox.com
Michael.Dearington@arentfox.com
Laura.Zell@arentfox.com

*Attorneys for Defendant Franklin Tao*