IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(Kansas City Docket)

**UNITED STATES OF AMERICA**

    **Plaintiff,**

        **v.**

                                              Case No. 19-20052-JAR/JPO

**FENG TAO,**
**a/k/a "Franklin Tao,"**

    **Defendant.**

## SUPERSEDING INDICTMENT

The Grand Jury charges:

At all times relevant to this indictment:

### Introductory Allegations

#### *The Chinese Talent Plan Program*

1.      The People's Republic of China (PRC) was a country of approximately 1.4 billion people, making it the most populous country in the world.  In recent years, the PRC has invested heavily in growing its economy, especially industrial sectors it considers important to its autonomy and national security.  In 2010, PRC leaders pledged to double China's Gross Domestic Product (GDP) by 2020.  The PRC Government's 13th Five-Year Plan, unveiled in March 2016, emphasized the need to increase innovation and included annual economic growth targets to achieve the goal of doubling its economy.  By 2019, the PRC had the world's largest GDP.

2.      The PRC achieved such rapid growth partially by offering scholarships or funding to foreign students or visiting professors studying or working at U.S. universities, and partially through "talent plans" designed to encourage the transfer of original ideas and intellectual property from U.S. universities to PRC Government institutions in order to enhance the PRC's scientific

development, economic prosperity, and national security.  Talent plans offered competitive salaries, state-of-the-art research facilities, and honorific titles to lure experts into bringing their knowledge and experience (or that of advisors and colleagues) to the PRC.

3.      PRC talent plans have existed since the early 1990s.  However, the PRC government reemphasized them in 2007 as part of a national strategy to enhance its economic development.  In conjunction, the Communist Party of China ("CPC") added "talent development" to its Constitution around the same time.  The CPC conducts the final review of all talent plan applicants.  In addition, the Chinese government directly administers and funds the talent plans, using other agencies within the government to ensure implementation of strategic national objectives.

4.      The PRC government sponsored dozens of talent plans, including plans tailored for ethnic Chinese, non-ethnic Chinese, established scientists, young scientists, and entrepreneurs, among other recruitment targets.  Each talent plan included the same basic requirements: experience in cutting-edge foreign science or engineering research; a degree from a prestigious university; and several years of overseas work or research experience at prestigious universities, research institutes, corporations, or well-known enterprises.  As of 2016, the PRC had recruited more than 56,000 talent program participants.

5.      In general, the PRC talent plan application process was conducted almost exclusively via digital communications, and primarily occurred through email.  Various websites provided the necessary information to apply, including digital application forms.  Talent plan applicants completed applications and sent them electronically to individuals identified by the Chinese government as talent recruiters in the United States and China.  Talent recruits and talent recruiters then refined the draft applications using various forms of digital communication.

6.      To entice high-caliber applicants—particularly applicants willing to relocate to the PRC—the PRC Government generally rewarded recruits with significant financial and social incentives.  Talent recruits typically drew a salary from a Chinese employing unit, such as a laboratory or research organization, which sponsored or facilitated applications.

7.      Generally, talent recruits signed contracts covering their participation in talent plans.  These contracts obligated the recruits to work for a specified period of time in the PRC, and often detailed the specific research the recruit would perform or the business to be developed through the recruit's efforts.  The contractual obligation closely resembled or replicated the work the recruit performs or performed for his or her U.S. or non-PRC employer.  In many cases, talent plan contracts required recruits to identify additional overseas talent to join his or her talent plan research team in the PRC.  Further, rather than merely conducting scientific research, talent recruits were frequently contractually obligated to perform services for the PRC in support of its strategic national development goals and economic revitalization.

8.      The Changjiang Professorship was one such talent program sponsored by the PRC Government and the CPC.  The PRC used the Changjiang Professorship to attract talented academics, in order to bolster the PRC's scientific and technical knowledge and benefit the PRC. "Yangtze River" was an alternate name for the Changjiang Scholarship program.

9.      Fuzhou University (FZU) was a university located in Fuzhou, China.  Fuzhou University was established by the PRC's Ministry of Education in 1958 to research science and technology.  The PRC Ministry of Education continued to manage FZU at all times relevant to the conduct described herein.

10.      Professor 1 was the Chairman of FZU's Chemistry Department.  He was also a 2016 Changjiang Scholarship awardee, Vice Chairman of the PRC State Key Laboratory of Energy

and Environmental Photocatalysis, and a member of the CPC.

*TAO's Employment at the University of Kansas*

11.     The University of Kansas (KU) was a public research university with campuses located in Lawrence, Kansas; Kansas City, Kansas; and Overland Park, Kansas. It was a Kansas Board of Regents institution.   During each one-year period described below, KU was an organization, government, and agency receiving benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance.

12.     The Center for Environmentally Beneficial Catalysis (CEBC), located at the Life Science Research Lab (LSRL) Building B, 1501 Wakarusa Drive, Lawrence, Kansas was a component of KU.   CEBC's research focused on sustainable technology to conserve natural resources and energy.   The CEBC performed proprietary research as well as United States Government (USG)-funded research, including research under grants from the United States Department of Energy (DOE) and the National Science Foundation (NSF).

13.     Defendant **Feng TAO** (a/k/a "**Franklin Tao**") was an associate professor and researcher at KU, who worked in the CEBC.   KU hired him in or around August 2014.   In or around May 2019, in his capacity as a member of the KU/CEBC faculty and staff, TAO conducted research under contracts with agencies of the U.S. Government.   During the period at issue, at least some of TAO's research was funded by DOE.

14.     The Kansas Board of Regents (KBOR) had a policy requiring faculty and staff of Regents' institutions to notify it of conflicts of interest.   The policy regarded any employment outside the University that did or could impact a faculty or staff member's commitment of time or effort to his or her university duties as a conflict of interest.

15.     As a part of its reporting requirements, KU required its faculty and staff members to submit a KU Institutional Responsibilities form upon entry on duty and at least annually thereafter.  The acknowledgement required faculty and staff members to disclose conflicts of interest with respect to their time commitments and significant financial interests.  Submission of the online form required faculty and staff members to certify that they "declare that this report of significant financial interests and time commitments has been examined by me and to the best of my knowledge and belief is a true, correct, and complete statement."  As a member of the KU faculty, TAO was required to file these reports, and did file such reports as described further herein. At all times, TAO owed a fiduciary duty and a duty of candor and honesty to KU.

16.     KU and KBOR employed an outside firm to maintain and administer the online system by which faculty and staff submitted their KU Institutional Responsibilities forms.  The servers the outside firm used to receive and store the data from the KU Institutional Responsibilities forms were located in Illinois.  Thus, each time a member of the KU faculty or staff submitted a KU Institutional Responsibilities form, the data was transmitted from his/her physical location to a server in Illinois, in interstate commerce.

### *The Scheme to Defraud KU*

17.     On or about January 5, 2018, TAO was informed of his selection for the Changjiang Scholarship.

18.     On or about January 9, 2018, TAO submitted to the University of Kansas false statements in the District of Kansas and elsewhere for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted signals and sounds by means of wire communication in interstate commerce.  Specifically, TAO submitted a KU Institutional Responsibilities form online.  The form required him to disclose "significant financial interests" including "salary and any payment for services not otherwise identified as salary such as

consulting fees, honoraria, paid authorship, etc., or other payment for services."  "Significant financial interests" also included "sponsored travel," any equity interest in a business association, and any monetized intellectual property to include patents, copyrights, and trade secrets.  TAO did not disclose any financial award accompanying his selection for the Changjiang Scholarship or salary for his appointment to FZU.  The form also required TAO to disclose "time commitments in external professional activities."  TAO did not disclose his full time appointment at FZU.  TAO also certified to the following statement: "I Feng Tao, declare that this report of significant financial interests and time commitments has been examined by me and to the best of my knowledge and belief is a true, correct, and complete statement."  TAO also certified that he had read and complied with "Kansas Board of Regents and University of Kansas policies on commitment of time, conflict of interest, consulting and other employment."  TAO agreed to obtain permission prior to consulting and engaging in outside employment.  TAO also certified his understanding that he had a continuing obligation to "report any changes to this statement as soon as they become aware to me and no later than 30 days after acquiring a new significant financial interest (e.g. through marriage, inheritance or purchase)."

19.     Beginning in 2015, TAO engaged in a scheme to defraud KU by misrepresenting and concealing his affiliation with FZU.

20.     The purposes of TAO's scheme were: (1) for TAO to provide the FZU with technical training, scientific expertise, and research capacity; (2) for TAO to obtain funds to which he was not legitimately entitled, specifically funds derived from his fraudulently maintained second full-time job; and (3) to conceal his relationship and agreement with the FZU so that he could maintain his position, access to facilities, and access to the benefits of scientific research at KU.

21.     On or about September 7, 2016, to on or about July 2, 2017, TAO exchanged a series of emails with three individuals.  The subject line of the emails was initially, "Changjiang Professor Selection Results" but later changed to "Meeting."  In an email TAO sent on or about May 23, 2017, TAO stated that he "arranged a trip to visit [his] family and attend a conference in China in the middle of June."  TAO also discussed possible collaboration opportunities.  TAO closed the email by stating, "I also open to discuss some opportunity in apply for some positions. But please keep my intention confidential as I have full time appointment at University of Kansas."

22.     On or about June 9, 2017, TAO departed the United States for the PRC.  While he was in the PRC, TAO visited Professor 1.  On June 19, 2017, Professor 1 emailed TAO and instructed him to travel to Beijing to meet the FZU representative in charge of the Changjiang Scholarship applications.  Professor 1 encouraged TAO to apply for a Changjiang Scholarship and join the faculty at FZU.  Attached to the email was Professor 1's Changjiang Scholarship application documents.  Professor 1 instructed TAO to prepare TAO's own application.  TAO returned to the United States on or about July 1, 2017.

23.     On or about November 18, 2017, TAO departed the United States for the PRC. While in the PRC, TAO prepared for his defense in his application for the Changjiang Scholarship. TAO returned to the United States on or about November 24, 2017.

24.     In or around November 17, 2017, an unknown party emailed TAO, on Professor 1's behalf, and provided advice for TAO's Changjiang Scholarship application defense.  On or about November 20, 2017, an unknown party emailed TAO a PowerPoint file titled "Tao-Changjian-PPT-new-[Professor 1's name]-1.ppt" via an email originating from Fuzhou, China. The first slide of the PowerPoint shows TAO as the presenter, Fuzhou University as the applicant employer, and a month and year of December 2017.

25.     On or about December 6, 2017, TAO departed the United States for the PRC.  At or around this time, he defended his Changjiang Scholarship application.  He returned to the United States on or about December 13, 2017.

26.     On or about February 1, 2018, TAO departed the United States for the PRC.  He returned to the United States on or about February 20, 2018.

27.     Around March 5-May 15, 2018, TAO applied for, and was accepted for, employment at Nagoya University in Japan during the period of June 5-July 24, 2018.

28.     On or about May 5, 2018, TAO departed the United States for the PRC.  At or around this time, TAO was formally inducted into the Changjiang Scholarship program and entered into a five-year agreement outlined in a document titled, "Changjiang Scholar Distinguished Professor Employment Contract" (hereinafter "Changjiang Contract").  The Changjiang Contract required TAO to be a "full time" employee at FZU.  The Changjiang Contract also required TAO to recruit two to three doctoral students and three to four master's students per year, lead *in situ* catalysis research and innovation teams in applying for innovative research groups and seeking approval by the NSFC [National Natural Science Foundation of China], and develop internationally cooperative research programs and academic programs with international peers.  TAO returned to the United States on or about May 8, 2018.

29.     On or about May 26, 2018, TAO departed the United States for the PRC.  While in the PRC, TAO performed the duties of a FZU faculty member and executed his duties under the Changjiang Contract.  At or around this time, TAO also performed some duties at Nagoya University in Japan.  He returned to the United States on or about August 1, 2018.

30.     Around June 1, 2018, to June 26, 2018, three post-doctoral researchers (Researchers 1 – 3) expressed interest in TAO's research group at FZU.  TAO referred the three researchers to

Researcher 4 with whom Tao explained he had a collaborative project.  Researcher 4 was not an employee of FZU, but rather collaborated with TAO to recruit an employee to FZU.  The purpose of the referral emails was for TAO to recruit additional researchers to work with him at FZU.

31.     On or about July 3, 2018, TAO exchanged several emails with a researcher at a Chinese institution.  In one of the emails, TAO wrote, "I need you to provide a contact list of people (name, email, current institution) in STM who plan to go back to China to work in a group of a Changjiang scholar."

32.     Around June 13, 2018-July 12, 2018, TAO and Researcher 4 exchanged emails with Researcher 1.  The purpose of the emails was for TAO to recruit Researcher 1 to work with him at FZU.

33.     Around July 3, 2018, to July 5, 2018, TAO exchanged emails with Researcher 4. Researcher 4 requested TAO check her application to FZU. Additionally, Researcher 4 requested TAO's assistance titling research projects on an attached post-doctoral application form.  Fuzhou University was listed as the sponsoring "institution" and TAO and Researcher 4 were listed as "supervisors" for the research plans disclosed on the form.  TAO responded on or about the same day with suggested titles.

34.     On or about August 15, 2018, TAO left the United States for the PRC.  He returned to the United States on or about August 18, 2018.

35.     On or about September 25, 2018, TAO submitted to the University of Kansas false statements in the District Kansas and elsewhere for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted signals and sounds by means of wire communication in interstate commerce.   Specifically, TAO submitted a KU Institutional Responsibilities form online.  The form required him to disclose "significant financial interests"

including "salary and any payment for services not otherwise identified as salary such as consulting fees, honoraria, paid authorship, etc., or other payment for services." "Significant financial interests" also included "sponsored travel," any equity interest in a business association, and any monetized intellectual property to include patents, copyrights, and trade secrets. TAO did not disclose any award accompanying his selection for the Changjiang Scholarship, salary or other remuneration provided by FZU, salary or other remuneration provided by Nagoya University, or travel sponsored by Nagoya University. The form also required TAO to disclose "time commitments in external professional activities." TAO did not disclose his full-time appointment at FZU or his obligations to Nagoya University. He also certified to the following statement: "I Feng Tao, declare that this report of significant financial interests and time commitments has been examined by me and to the best of my knowledge and belief is a true, correct, and complete statement." He also certified that he had read and complied with "Kansas Board of Regents and University of Kansas policies on commitment of time, conflict of interest, consulting and other employment." He agreed to obtain permission prior to consulting and engaging in outside employment. Finally, he certified his understanding that he had a continuing obligation to "report any changes to this statement as soon as they become aware to me and no later than 30 days after acquiring a new significant financial interest (e.g. through marriage, inheritance or purchase)."

36.     On or about October 25, 2018, TAO left the United States for the PRC. He returned to the United States on October 29, 2018.

37.     On or about December 11, 2018, TAO departed the United States for the PRC. While in the PRC, he performed the duties of a FZU faculty member and executed his duties under the Changjiang Contract. TAO retuned to the United States on or about March 28, 2019.

10

38.     Around December 13-17, 2018, TAO exchanged a series of emails with Researcher 5, in an effort to recruit Researcher 5 to work with TAO at FZU.

39.     On or about January 28, 2019, TAO successfully recruited Researcher 6 to work as a postdoctoral researcher at FZU.

40.     On or about April 12, 2019, TAO departed the United States for the PRC.  He returned to the United States on or about April 27, 2019.

41.     On or about May 11, 2019, TAO departed the United States for the PRC.  He returned to the United States on or about June 1, 2019.

42.     On or about June 7, 2019, TAO departed the United States for the PRC.  He returned to the United States on or about June 23, 2019.

43.     On or about July 7, 2019, TAO departed the United States for the PRC.  He returned to the United States on or about July 23, 2019.

44.     On August 4, 2019, TAO departed the United States for the PRC.  He returned to the United States on or about August 20, 2019.

45.     TAO was arrested on August 21, 2019.  Prior to his arrest, TAO was prominently listed as a member of the FZU faculty on its website.  Shortly after his arrest, an individual unknown to the grand jury deleted all mention of TAO from the FZU website.

46.     During the period relevant to this Indictment, TAO sponsored at least four researchers and students visiting KU from the PRC.  At least one of TAO's researchers at KU joined TAO's research team at FZU.

47.     At no time did TAO request permission from KU to engage in outside employment at FZU or Nagoya University.

48.     At no time did TAO disclose to KU the income that came with his selection for the Changjiang Scholarship or his employment at FZU.  Tao knew and understood that the Changjiang employment contract was a reportable conflict of interest per KBOR and KU policies. Nevertheless, TAO also knew that reporting his affiliations to KU he would result in the loss of his position at FZU, KU, or both.  Therefore, TAO intentionally declined to disclose his FZU appointment or his selection for the Changjiang Scholarship to KU.

### COUNTS ONE AND TWO
### (Wire Fraud)

49.     Paragraphs 1-48 are incorporated herein.

50.     From in or about 2015 through in or about 2019, in the District of Kansas and elsewhere, the defendant, **FENG TAO**, did knowingly, and with intent to defraud, devise and intend to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by omissions and concealment of material facts with a duty to disclose.

51.     On or about the dates set forth below, in the District of Kansas and elsewhere, the defendant did, for the purpose of executing such scheme and artifice and attempting to do so, transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, to wit, the wire communications described below:

| COUNT | DATE | DESCRIPTION OF WIRE |
|---|---|---|
| ONE | January 9, 2018 | Electronic submission of conflicts form from outside the State of Illinois to a server located in Illinois |
| TWO | September 25, 2018 | Electronic submission of conflicts form from outside the State of Illinois to a server located in Illinois |

Each count a separate offense, in violation of Title 18, United States Code, Sections 1343, 1349

and 2.

## COUNT THREE
### (Program Fraud)

52.     Paragraphs 1 through 51 are incorporated herein by reference.

53.     On or about January 9, 2018, TAO submitted a KU Institutional Responsibilities form online.  In so doing, he made material misstatements about his conflicts of interest with respect to his time and significant financial interests.  TAO also failed to disclose such information while under a duty to do so.

54.     On or about September 25, 2018, TAO submitted a KU Institutional Responsibilities form online.  In so doing, he made material misstatements about his conflicts of interest with respect to his time and significant financial interests.  TAO also failed to disclose such information while under a duty to do so.

55.     From on or about January 5, 2018 to August 21, 2019, TAO submitted multiple effort reports to KU in order to obtain funds derived from numerous federal grants to which he was not entitled by virtue of his material misrepresentations and omissions on or about January 9, 2018 and September 25, 2018, and by virtue of his failure to perform on his continuing duty to disclose conflicts of interest with respect to his time and significant financial interests.

56.     In so doing, from on or about January 5, 2018 to August 21, 2019, in the District of Kansas and elsewhere, the defendant, TAO, being an agent of the University of Kansas (a State agency), said agency receiving in the one year period beginning May 1, 2018, benefits in excess of $10,000 under Federal grants sponsored by the National Science Foundation, U.S. Department of Energy, and other federal departments and agencies, embezzled, stole, and obtained by fraud, property worth at least $5,000 that was under the care, custody and control of such agency.

In violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

13

## FORFEITURE NOTICE

57.     The allegations contained in paragraphs 1- 56 of this Superseding Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

58.     Upon conviction of the offenses identified in Counts 1 through 3, the defendant,

**FENG TAO,**
**A/K/A FRANKLIN TAO,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses, including, but not limited to, the following:

> Forfeiture money judgments in amounts equal to the amount of proceeds that the defendant obtained from each of the Counts in the Superseding Indictment.

59.     If any of the property described above, as a result of any act or omission of the defendant:

A.     cannot be located upon the exercise of due diligence;

B.     has been transferred or sold to, or deposited with, a third party;

C.     has been placed beyond the jurisdiction of the court;

D.     has been substantially diminished in value; or

E.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United

States Code, Section 2461(c).

                                                    A TRUE BILL.


Dated:  January 15, 2020                            s/Foreperson
                                                    FOREPERSON


s/ Anthony W. Mattivi, #17082 for
STEPHEN R. MCALLISTER
United States Attorney
District of Kansas
500 State Ave., Suite 360
Kansas City, KS 66101
(913) 551-6730
(913) 551-6541 (fax)
stephen.mcallister@usdoj.gov
Ks. S. Ct. No. 15845

(It is requested that trial of the above captioned case be held in Kansas City, Kansas.)

15

**PENALTIES:**

Cts. 1 & 2:       18 U.S.C. § 1343

- NMT 20 Years Imprisonment,
- NMT $250,000 Fine,
- NMT 3 Years Supervised Release
- $100 Special Assessment, and
- Forfeiture

Ct. 3:            18 U.S.C. § 666

- NMT 10 Years Imprisonment,
- NMT $250,000 Fine,
- NMT 3 Years Supervised Release
- $100 Special Assessment, and
- Forfeiture