1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,

4         Plaintiff,

5    v.                              Docket No. 19-20052-01-JAR

6    FENG TAO,                       Kansas City, Kansas
                                     Date:   01/06/2020
7         Defendant.
     ....................
8

9                          TRANSCRIPT OF
                          MOTION HEARING
10          BEFORE THE HONORABLE JULIE A. ROBINSON
                  UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Plaintiff:      Mr. Anthony W. Mattivi
                             United States Attorney's Office
14                           290 U.S. Courthouse
                             444 Southeast Quincy
15                           Topeka, Kansas 66683

16                           Mr. Nathan M. Charles
                             U.S. Department of Justice
17                           950 Pennsylvania Ave, NW
                             Washington, DC 20530
18
     For the Defendant:      Mr. Peter R. Zeidenberg
19                           Mr. Michael F. Dearington
                             Arent Fox, LLC
20                           1717 K Street NW
                             Washington, DC 20006
21

22   Interpreter:           Ms. Lih Chia Yu

23

24

25

1          (1:32 p.m., proceedings commenced).

2          THE COURT:  All right.  You can be seated.

3          All right.  We're here in United States versus Feng

4   Tao, 19-20052.  Your appearances, please.

5          MR. MATTIVI:  Good afternoon, Your Honor.  Tony

6   Mattivi and Nate Charles for the government.

7          MR. ZEIDENBERG:  Good afternoon, Your Honor.  Peter

8   Zeidenberg and Michael Dearington on behalf of Mr. Tao, who is

9   present.

10         THE COURT:  All right.  And we have a stand-by

11  interpreter.  Mr. Tao is going to signal to her, as I

12  understand it, if he needs your assistance, but we'll go ahead

13  and swear you in as the interpreter.

14         THE INTERPRETER:  Yes, Your Honor.

15                    (Interpreter sworn).

16         THE COURT:  Thank you.

17         THE INTERPRETER:  Thank you.

18         THE COURT:  All right.  So we are here for a hearing

19  on several motions.  The defendant has filed a motion to

20  dismiss indictment, which is Document 30.  The government has

21  filed a motion to strike Document 30, and the government's

22  motion is Document 35.

23         There was also Document 43, which is a motion for

24  briefing on Doctor Tao's motion to dismiss indictment.  I think

25  that particular motion has been rendered moot.  So essentially

1    we're here for a hearing on the motion to dismiss and the

2    motion to strike.

3          Let's start with the defendant's motion to dismiss.  I

4    must say you all have briefed this pretty extensively, although

5    there may be one issue that I would like some additional-- to

6    do some additional research and I don't know if I'll need

7    additional briefing on.

8          So I think the purpose of this hearing is just to, you

9    know, point me to anything in particular that you would like me

10   to consider.  I say all that just to say that the briefing is

11   good, and I appreciate that from all parties.

12         MR. ZEIDENBERG:  Thank you, Your Honor.  If I may,

13   briefly I would like to just take the opportunity without

14   necessarily trying not to reiterate everything we have in our

15   papers, which I know the court has read, but to make this

16   point, which is that it is not a violation of the wire fraud or

17   program fraud statutes for an individual employee to lie to his

18   employer to maintain his employment.

19         And if the court were to find otherwise or if it were

20   to be otherwise, then literally every and any misrepresentation

21   made by an employee about why they were late for work, why they

22   didn't have an assignment in, what they-- whether they have

23   another job on the side, any misrepresentation -

24   notwithstanding the fact that they're still employed and still

25   doing their job - would subject them to a 20-year felony

1    charge.

2          And we submit, Your Honor, that the government has

3    pointed to no similar cases anywhere in the country ever

4    brought under this statute, these statutes, under similar

5    facts.  Nor have they suggested any limiting principle that

6    would say, well, we're only doing it in these circumstances.

7          And so it suggests, Your Honor, that-- you know, this

8    is the-- the argument we made fifth, that has to do with fair

9    warning was our fifth argument.  But I just want to raise it

10   because, you know, the government has suggested, well, we're

11   going to be-- we may be bringing additional charges.

12         But I would like to make the point, and I think it's

13   important, that this theory is faulty.  It's just not the case

14   that any misrepresentation made to your boss to maintain

15   employment, and that's important because there's a distinction

16   between-- in the cases between obtaining employment or getting

17   a bonus or something like that.  This is to maintain his

18   employment, as they say in the words of the statute-- of the

19   indictment, to continue employment.

20         And let's face it, people in the workplace every day

21   are asked questions which are uncomfortable about why they may

22   be late, where else they're working and what have you.  And

23   those misrepresentations if they're made should subject them

24   perhaps to discipline in the office, perhaps being fired, but

25   they are not under any notice that that would subject them to a

1   20-year felony.

2        Your Honor, on the-- going to the arguments, shifting

3   to the front-- the first argument we made.  The indictment is

4   faulty because it doesn't allege any misrepresentation.  What

5   it alleges, it says that he signed the conflict of interest

6   statement that said he would get approval prior to engaging in

7   activities that would interfere with his teaching and research

8   responsibilities.  And then they say he signed a contract.

9        But, of course, as we point out, he didn't sign a

10   contract.  The government doesn't refute that.  The indictment

11   is simply wrong when it says he signed the contract.

12        But putting that aside, if the court feels, well, I

13   can't delve into, you know, the facts that's alleged, we'll

14   give that to the trial, fine.  Signing a contract does not

15   cause an interference with your job responsibilities.

16   Fulfilling that contract certainly might, but they don't allege

17   that.  All they allege is he signed a contract.  And that does

18   not necessarily mean that you are engaging in activities

19   because, as we all know, a lot of times contracts get signed

20   and they're never-- they're never followed through on for a

21   whole variety of reasons.

22        So we say there is no misrepresentation, which would

23   knock out both the wire fraud charges and the program fraud

24   charges.

25        THE COURT:  As you know, the general rule - and

1    there's only rare exception - is on a motion to dismiss

2    indictment for failure to state an offense, the court is

3    confined to the four corners of the indictment.

4            I don't have the conflict of interest form that was

5    signed.  I guess it was done online as a certification.

6            I'll ask Mr. Mattivi or counsel from the Justice

7    Department.  Do you all dispute what the conflict of interest

8    form says?  Is that something that would be appropriate for me

9    to look at, if you agree, if all parties agree, on the question

10   of whether the conflict of interest form itself effectuates a

11   misrepresentation?

12           MR. ZEIDENBERG:  Your Honor, I fully understand and we

13   don't dispute that the court is confined to the four corners of

14   the indictment.  But the indictment describes the conflict of

15   interest statement in Paragraph 10, and it says that he

16   understood that any external personal professional activities

17   in which he engaged that take time away from the university

18   must not interfere with him meeting his faculty teaching and

19   research responsibilities at the university.

20           So that is what they have alleged that he violated.

21   He said that he did-- that he signed this form attesting to

22   this and-- when, in fact, he signed a contract.

23           THE COURT:  Well, maybe this is a question better

24   directed to the government, but I'm not clear on whether that

25   is what the government-- or the grand jury alleges that

1    represents the false representation or that's just the

2    effectuating part of the scheme.

3            MR. ZEIDENBERG:  Well, that-- I mean, I can represent

4    that is the conflict of interest form, but that is also what

5    the government alleges is the conflict of interest form.  I

6    don't think there's any other way you can read it.

7            He says, for the purpose of executing the scheme,

8    caused to be transmitted a certification, that he read the

9    policy concerning conflicts of interest, that he understood

10   that external personal professional activities that-- in which

11   he engaged to take away from the university must not interfere

12   with meeting his faculty and teaching-- faculty teaching and

13   research responsibilities, and agreed to secure prior approval.

14           That's the certification which he submitted.  And he

15   did not inform-- according to the government, he did not say--

16   he said he didn't have a conflict.  And what, you know, our

17   argument is, Your Honor, there is no facts alleged which

18   indicate that he did have a conflict.

19           The facts that would indicate that he had a conflict

20   would be facts which demonstrated that he had engaged in

21   personal-- external personal professional activities that took

22   away from his teaching responsibilities.  And there's no

23   allegation of that.

24           Your Honor, No. 3, the government completely ignores

25   the argument that we make in which we cite to case law, which

1   is the maintenance of employment, which is what is alleged

2   here, same in the indictment, that this misrepresentation

3   allowed him to continue his employment.

4          The continuance of employment or maintenance of

5   employment is not money or property under the wire fraud or

6   program fraud statutes.  That's-- the government ignores that

7   argument and they do so at their peril.  That leads to a

8   dismissal.  And the court must dismiss because they haven't

9   properly alleged money or property because what they've alleged

10  is this is a scheme to maintain employment.  A scheme to

11  maintain employment is not a wire fraud or a program fraud

12  under the case law that we cite.

13         And No. 4, Your Honor, they allege in Counts 2, 3, and

14  4 that Doctor Tao received salary.  They say it in each and

15  every count, he received salary.  Salary is excluded from the

16  statute 666 explicitly.  You can't violate 666 if you're being

17  paid a salary.

18         Now, there are times when a salary is obtained

19  fraudulently, for instance when there is a no-show job.  And

20  so, you know, the person has never gone to the job and it's--

21  it's labeled on the books as a salary.  But that's not alleged

22  here.  There is no allegation that he didn't do his job at KU

23  or do the research that was required of him.  They say he was

24  paid his salary.  That doesn't satisfy the statute.  And for

25  those reasons, those counts must be dismissed.

1         And finally, Your Honor, those counts involving 666

2    are multiplicitous.  There was one allegation, there is one

3    allegation of one misrepresentation, one conflict of interest

4    form that was submitted.  The fact that his salary was paid as

5    a result of different grants that funneled into KU and KU paid

6    out of those different buckets of money his salary, it's--

7    doesn't change the fact that there was one act done by Doctor

8    Tao.

9         And as we say in our papers, Your Honor, a contrary

10   result would mean that if there were 50 grants that were paying

11   into his salary, then submitting that one conflict of interest

12   form would-- would result potentially in 50 counts against him.

13   And that's not the law.  And we cite cases, specifically the

14   *Urlacher* case which was out of New York where-- a case on

15   point, a 666 case, in which a police chief was paid from

16   various buckets of money but there was one misrepresentation,

17   and the court threw out the other counts.

18        And, Your Honor, importantly on the 666 as for a

19   remedy, we would recite to the *Swan* case in our papers.  But in

20   that case, one-- one section of it that I would like to

21   highlight which we didn't highlight in our papers, which is the

22   remedy which is-- the remedy is dismissal of all the counts

23   when it's multiplicitous.  It's not:  Let's let the jury go and

24   sort it out and we'll see what they do and then if there's any

25   prejudice, we'll try and mollify it or rectify it at the end by

1  only sentencing him on one.  He can only be convicted of one

2  count.  You don't-- you don't send to the jury an indictment

3  alleging multiple counts when he can only be convicted of one.

4        And what the judge said in the *Swan* case is that

5  whenever the court is presented with redundant counts charging

6  the same statutory violation, it would be erroneous to ask the

7  jury to determine whether the defendant committed five separate

8  violations of 666 because, in fact, there could be only one

9  conviction for the alleged crime.  And for that reason, the

10 better remedy is to dismiss all five counts and give leave to

11 the government to re-allege.

12       And that's what we suggest, Your Honor, is the remedy

13 here.  The court should order those counts dismissed.  If the

14 government wants to re-allege, then we'll deal with that then.

15 But it's not for the court to take up the government's

16 invitation to somehow consolidate these cases and for the court

17 to re-form the indictment in some way that is appropriate.

18 That's not the role for the court, it's the role for the

19 government.  And if they've-- if they have charged it

20 improperly, then the remedy is dismissal.

21       THE COURT:  All right.  Thank you.

22       MR. ZEIDENBERG:  Thank you.

23       MR. CHARLES:  Good afternoon, Your Honor.  Nathan

24 Charles for the United States.  Pleasure to be back in your

25 courtroom.

1          Most of the defense's arguments are addressed in our

2    brief and I don't think there's any need to belabor those

3    points.  I just want to point out that the United States does

4    have an intent to supersede the current indictment.

5          THE COURT:  How soon?

6          MR. CHARLES:  Within the next few weeks, Your Honor, I

7    can't give you a specific--

8          THE COURT:  Well, I guess I'm wanting to kind of nail

9    you down before I spend a lot of time making a decision that

10   could ultimately be mooted by a superseding indictment to some

11   degree.  I do think there are probably some arguments the

12   defendant raises that may not be cured by a superseding

13   indictment in that sense but perhaps some things will be, I

14   don't know.

15         MR. MATTIVI:  Judge, I apologize for interrupting.

16   We're on the schedule for January 15th.

17         THE COURT:  Okay.

18         MR. CHARLES:  So assuming everything goes as planned

19   with that grand jury presentation, the 15th you will get a

20   superseding indictment.

21         We think that this motion was a little bit premature

22   because we are still planning to supersede and I think a lot of

23   the points the defendants raised will be-- will be mooted by

24   that superseding indictment.

25         I do need to also point out, though, that the defense

1   has mischaracterized the nature of the conflict of interest

2   disclosures that KU asked Doctor Tao to make.  Unfortunately, I

3   do not have a copy of them with me here today.  I will

4   certainly provide them to the court as soon as humanly

5   possible, but I have reviewed them extensively over the last

6   few weeks.

7          Those conflict of interest forms gave the

8   opportunity-- it gave the defendant the opportunity to disclose

9   any conflicts of interest with respect to his time and also

10  significant financial interests.  Not only did it give him the

11  opportunity to disclose those, it asked him to certify that the

12  disclosures that he made or omitted from the form were a full

13  and complete representation of the things that they were asking

14  him to disclose, significant interest in his time and money.

15         It also put a continuing duty on him to make those

16  disclosures as he continued in his employment with KU.  The

17  defendant has violated both of those-- both of those duties;

18  the duty to disclose it as he was filling out the form and then

19  the duty to come forward with amplifying and additional

20  information as he continued on in his employment.

21         We do recognize-- beg your pardon, Your Honor.

22  Please.

23         THE COURT:  I was going to say none of which is in the

24  four corners of the indictment.  I asked Mr. Zeidenberg if you

25  all would agree to provide to me the conflict of interest form.

1    I assume it's just one form that was used repeatedly, but I

2    don't know.  I could at least consider what that language is

3    but-- but only by agreement.  Otherwise I think I'm confined to

4    the four corners of the indictment.

5            MR. CHARLES:  Okay.  We are happy to provide it with

6    defense's agreement.  It was several different-- the forms did

7    undergo some evolution through the number of years that he

8    worked at KU but the substance of the form remained the same.

9    You can get an idea of what he was obligated to disclose from

10   looking at any of the years' disclosures.

11           THE COURT:  I don't know if Mr. Zeidenberg will agree

12   to that.  I asked him, I'm not sure he answered that question.

13           Mr. Zeidenberg.

14           MR. ZEIDENBERG:  Your Honor, I believe that the court

15   should decide this based on the allegations in the indictment.

16           THE COURT:  All right.

17           MR. ZEIDENBERG:  And that's my understanding, that the

18   indictment correctly summarizes or paraphrases the conflict of

19   interest statement, the one that we pulled off of the website.

20           THE COURT:  All right.  We'll leave it there.  I mean,

21   I agree that I have to-- I have to decide this on the basis of

22   the four corners of the indictment.  That may change if you

23   supersede and add more.  But again, I mean, based on the record

24   I have now, I'll need to decide it on the basis of the way the

25   indictment currently reads unless you supersede-- frankly, I'm

1    going to wait and see if you do and then decide do we need

2    another round of argument or-- probably we do.  I mean, I don't

3    know but we'll see.

4            MR. CHARLES:  Okay.  In that case, Your Honor, I point

5    only-- I would point out that the definition of a scheme to

6    defraud in the wire fraud statute is very broad, and I think

7    that that should be accounted for.

8            We also do recognize that there is-- that the 18 U.S.

9    Code 666 does have an exception for salary, but it's for bona

10   fide salary.  You know, there is a very unique set of

11   circumstances with regard to the way the members of a

12   university faculty are paid.  They are paid in different ways

13   that vary between what's called a hard-money position and a

14   soft-money position.

15           I am not well-versed on this.  It's something that's

16   probably going to require some expert testimony to unpack, but

17   we-- the government takes a position that that is a question of

18   fact for the jury, whether Professor Tao's money that he was

19   receiving from KU is bona fide salary or was something more

20   akin to payment on a contract as an independent contractor

21   might receive for services rendered.  It, we think, is a

22   question of fact for the jury that we would like to put to

23   them.

24           THE COURT:  As currently constituted, though, the

25   indictment just says salary.  It doesn't say anything about

1   bona fide salary or contract payments or any other form of

2   payment, it just says salary.

3          And notably, I don't know what to make of this, but

4   Counts 2, 3, 4 speak to the amount of salary and it's, you

5   know, markedly different from year-to-year.  It doesn't seem to

6   be based on some sort of standard rate of pay or salary

7   year-by-year unless he was working less than full-time or

8   different hours or something year-to-year.  Again, obviously

9   outside the scope of the language of the indictment, but at

10  this point all it says is a certain amount of money each year

11  in salary.

12         MR. CHARLES:  I guess, Your Honor, I can speak to the

13  distinctions between those numbers if you'd like me to, but we

14  can also hold off on that.

15         THE COURT:  Let's hold off.

16         MR. CHARLES:  Understood, Your Honor.

17         We also take issue with the defense's characterization

18  of the remedy for multiplicitous counts.  Certainly it is

19  within your power, Your Honor, to remedy that as you see fit,

20  but you do not have to dismiss the entire indictment.  In fact,

21  that would be a rather unusual remedy.  And you can actually

22  defer consolidating multiplicitous counts until all the way to

23  sentencing.  That is within your power, that is within your

24  discretion.

25         So we take issue with the defense's representation

1    that you have to dismiss this indictment and you have to

2    dismiss it now, even if you do find that the counts are

3    multiplicitous.

4            More importantly, we don't think that the counts are

5    multiplicitous.  We think that the-- each count represents a

6    material misrepresentation that was made by the defendant in

7    the course of his duties and, therefore, each constitutes a

8    different count and that they are not--

9            THE COURT:  I mean, would it be fair to say these

10   counts, 2, 3, and 4-- the way the indictment reads, they're the

11   same time period charged, May of 2018 through June of 2019,

12   same time period, same status of Mr. Tao in terms of being an

13   agent of the University of Kansas.

14           The difference as articulated between these counts are

15   the source of the particular grant is different in each count,

16   but the grant seems to be based on-- or seems to be-- well, in

17   two of the counts-- no, really, the different sources of grant

18   and for the studies for the-- that the grant is funding is

19   articulated differently and the salary amount alleged is

20   different.

21           MR. CHARLES:  Yes, Your Honor.  To get into something

22   I was going to mention previously, these were all-- these three

23   charges are derived from material misrepresentations that were

24   made in effort reporting.  Effort reporting is something that

25   professors typically do in order to receive money under a

1   federal grant to continue on with their-- with their research.

2          Each one of the counts represented in the indictment,

3   Counts 2, 3, 4, were different material misrepresentations.  So

4   we used each one of those misrepresentations as the unit of

5   prosecution for purposes of those counts.

6          THE COURT:  So Counts 2, 3, and 4 are not based on the

7   conflict of interest certification?

8          MR. CHARLES:  No, Your Honor.

9          THE COURT:  Are they based on the same effort report?

10         MR. CHARLES:  They are based on different

11  misrepresentations, Your Honor.

12         THE COURT:  But those aren't identified.  So it sounds

13  like your theory on Counts 2, 3, and 4 is obtained by fraud but

14  you don't identify what the representation is that you say was

15  fraudulent.

16         MR. CHARLES:  Beg your pardon, Your Honor.  I don't

17  actually have the indictment in front of me, I probably should.

18         THE COURT:  Okay.  Go ahead.

19         MR. CHARLES:  Thank you, Your Honor.

20         In closing we would just want to point out that we

21  believe-- the government believes that the indictment does put

22  the defendant sufficiently on notice for him to begin preparing

23  his defense and adequately points to the misconduct that is at

24  issue in the case.  Thank you, Your Honor.

25         THE COURT:  So an element-- so 18 U.S.C. 666 has to do

1    with-- it's called a program fraud statute.  It has to do with

2    obtaining monies improperly in some way from-- federal monies,

3    you know, that are appropriated and/or paid out or whatever

4    through some sort of federal program, and improper in the sense

5    that they're either stolen, embezzled, or obtained by fraud.

6          But the statute doesn't require the government to

7    place the defendant on notice as to how the fraud-- I mean,

8    most fraud statutes, and I realize this is kind of a

9    multiple-theory statute, 666, but most fraud statutes require

10   as an element what the fraud is, what the representation is

11   that's fraudulent.

12         MR. CHARLES:  Your Honor, I think that is identifiable

13   by the amounts.  Those amounts that are identified in the

14   indictment are-- indicate particular monies that the defendant

15   obtained as a result of his misstatements, and that puts him on

16   notice of the activity that's at issue.

17         THE COURT:  Okay.  I don't follow that, but-- I don't

18   know.  I guess there's not-- you know, this is somewhat of a

19   speaking indictment, but there's not an explanation as to how

20   this funding works in a way that tells me that when he reads in

21   that particular time period he received approximately $21,235

22   in salary based on a National Science Foundation for studies of

23   blah, blah, blah, that he can tell from reading that what the

24   misrepresentation was in connection with that particular grant.

25         MR. CHARLES:  At a minimum, Your Honor, I can promise

1    you that the superseding indictment will be more artfully

2    drafted.

3              THE COURT:  Okay.  Thank you.

4              MR. CHARLES:  Thank you, Your Honor.

5              MR. ZEIDENBERG:  Well, this was news to me, Your

6    Honor.  Counts 2, 3, and 4 re-allege Paragraphs 1 through 10.

7    And Paragraphs 1 through 10 allege a misrepresentation

8    concerning the conflict of interest statement.

9              So now we're being told that this misrepresentation is

10   not the misrepresentation.  There isn't any misrepresentation

11   identified.  So I would submit, Your Honor, that either the

12   indictment says what it says and the misrepresentation, as any

13   fair reading of this, is the conflict of interest statement,

14   which for the reasons we've laid out in our papers isn't a

15   misrepresentation actually, it's not an actual-- because the

16   conflict of interest statement doesn't constitute a

17   misrepresentation, they don't have any other facts that show

18   that that is false.  It's also salary, and for the other

19   reasons.

20             But in addition, Your Honor, if the government-- if

21   the court is going to accept the government's representation

22   that there was some other fraud which we don't identify, then

23   this has to be dismissed because it fails to set out any facts

24   which if proven true would constitute a misrepresentation,

25   because he just told you that the conflict of interest

1    statement isn't the misrepresentation.

2         So there is no other misrepresentation alleged.  So if

3    there's no misrepresentation alleged, there's no facts from

4    which - even accepted as true - anyone could find a

5    misrepresentation, then 2, 3, and 4 have to be dismissed for

6    that reason as well.  There's no fraud alleged.

7         THE COURT:  All right.  Thank you.

8         Let me hear from the government on its motion to

9    strike.

10        MR. CHARLES:  Your Honor, with the court's indulgence

11   may I correct the record?

12        THE COURT:  Yes.

13        MR. CHARLES:  Your Honor, I've just been informed by

14   co-counsel that at least for Count 1 the-- the conflict of

15   interest form was absolutely the basis for the wire fraud

16   charge.  Apparently it is also the basis for Counts 2, 3, and

17   4.  But if I could have the court's indulgence just to confer

18   with co-counsel, I will provide a better explanation as to how

19   that is.

20        THE COURT:  Okay.

21        MR. CHARLES:  I believe that I unintentionally

22   misinformed you, Your Honor.

23        THE COURT:  Okay.  You want to confer with co-counsel?

24        MR. CHARLES:  Yes, please.

25        THE COURT:  Okay.

1          (Government counsel confer).

2          MR. CHARLES:  Beg your pardon, Your Honor.  The

3     material misrepresentation that is at issue in Counts 2, 3, and

4     4 under 18 United States Code, Section 666 is the conflict of

5     interest statement.  The unit of prosecution was actually the

6     three different grants that he was working on at the time that

7     he submitted that fraudulent conflict of interest form.  I

8     apologize.  I was confused.

9          THE COURT:  Okay.  All right.  Let me hear from the

10    government on the motion to strike.

11         MR. MATTIVI:  Judge, the thing about the motion that

12    was so troubling is that I don't think the court can draw any

13    conclusion other than-- let me back up.

14         Look, we all mess up.  Right?  We all--

15    unintentionally I have put PII into an attachment without

16    redacting it.  I've missed it.  But I think there's a

17    difference between a situation like that and a situation like

18    this.

19         And what's troubling about this is two-fold.  No. 1,

20    the defense admitted in their pleading that all of that

21    information they included about the informant, naming the

22    informant, identifying the informant and disclosing the story

23    line about the defendant having been framed, Mr. Zeidenberg

24    didn't have to refer to any of that in his argument to you

25    today because it's not relevant.  And they even admitted in

1    their motion to dismiss that those facts weren't relevant to

2    any of the five legal issues that they argued to you.

3            When you put that together with the timing of the

4    motion and the fact that there was no motion due-- we didn't

5    have a motion deadline.  This wasn't something that somebody

6    was hurrying to get filed at the last minute and they just

7    missed redacting a date of birth.  This is something that they

8    filed early in the morning on a Sunday morning.

9            And within minutes there were questions from the media

10   being directed to public affairs officers from our district and

11   at Main Justice.  And within hours that informant was named for

12   the first time anywhere in a newspaper article online and it

13   ran in the print edition the next morning.

14           And I submit to you that the only inference you can

15   draw between the irrelevant information that was included and

16   the timing of the motion is that this was an attempt by the

17   defense to get their case out in front of the media, to educate

18   the jury pool, and to educate the nation on what they say is

19   the other side of this case.

20           And it has worked so well that if you were to look

21   right now, Your Honor, on the *New York Times* website, you would

22   see an article about this hearing and this case that, again,

23   portrays the defense's view of what happened.  And it's not

24   relevant to the motion.

25           Now, the difficulty with that is-- what we come back

1    to is whether that's a violation of the order, of the case

2    management order.  And even if we disagree about this practice

3    of putting in obviously and blatantly irrelevant information to

4    get it out in the public, we can disagree I suppose over

5    whether or not that's a violation of the order.  I submit that

6    it is.  Mr. Zeidenberg is a very reasonable man, he submits

7    that it's not.  We leave that to your discretion.

8         But there's one thing that I submit is not up for

9    debate and that's whether they actually did disclose PII.  And

10   they did.  They disclosed it, as I indicated in my reply, in

11   the form of an FBI report from a person who really does exist

12   with the date of birth that really corresponds to that person.

13   And that was in their motion.  It was in an attachment to their

14   motion.

15        And even if we disagree about whether this practice of

16   getting their case in front of the media violates the spirit of

17   the case management order, we should not be disagreeing about

18   the fact that there really was PII in there and that really is

19   a violation of the order.

20        Now, when it comes to what the remedy is, as I

21   mentioned in my reply, their offer to just redact the motion

22   and refile it in redacted form was hollow because by then an

23   article had run in the online edition and the print edition of

24   the *Wall Street Journal* naming the informant.  So at that point

25   redacting does no good.

1          The court has sealed the motion, which we appreciate,

2    but we didn't feel that that sent a strong enough message.

3          Now, the other end of the spectrum is sanctions.

4    We're not asking for that.  We think a motion to strike is an

5    appropriate remedy for what took place, for what I submit is

6    reckless disclosure of personal identifying information of an

7    actual person which is unquestionably a violation of the case

8    management order, especially in light of the fact that we have

9    indicated to you that the government plans to supersede.

10         We're scheduled to supersede.  We could be back here

11   on another round anyway, that means there's nothing about

12   striking that motion to dismiss that is draconian in any way.

13   We submit it sends an appropriate message that that is not the

14   way discoverable information is to be handled on cases in this

15   district.

16              THE COURT:  Mr. Dearington.

17              MR. DEARINGTON:  Good afternoon, Your Honor.

18              THE COURT:  Good afternoon.

19              MR. DEARINGTON:  Respectfully, the defense is puzzled

20   by the government's motion to strike and the arguments therein.

21   Now, before I get into the numerous flaws in that motion to

22   strike and the numerous admissions that foreclose the relief

23   the government seeks, I just wanted to reiterate the fact that

24   the defense, as soon as the government filed the motion to

25   strike, offered to submit a redacted version of the motion to

1    dismiss.

2         The government-- and this is four-and-a-half days

3    after it first saw the motion and decided to file its motion to

4    strike.  Prior to that it had discussions with the defense and

5    never mentioned that it thought that the information should've

6    been redacted.  Moreover, the government denied the defense's

7    request and continues to deny the defense's request.

8         This is puzzling among other reasons because, as we

9    stand here today, the government seeks relief that is

10   tantamount to what the defense has been offering since the

11   moment the government filed its motion to strike.  We're

12   willing to submit a redacted version of the motion to dismiss

13   that redacts the information that the government thinks should

14   be redacted.

15        The only difference between what the government seeks

16   today and what the defense has already offered in a showing of

17   good faith is that the defense would get-- the government would

18   be entitled to a particular delay because the government

19   doesn't think we should file a redacted version of the

20   already-submitted motion to dismiss.  The government thinks we

21   should have to submit a new version with redactions that would

22   delay the court's decision.

23        Speaking to the actual arguments in the motion to

24   strike, there are at least four reasons why the motion to

25   strike is meritless, each of which independently requires the

1   motion to be denied.

2        The central premise of the motion to strike is that

3   the motion to dismiss violated Judge O'Hara's August 27th, 2019

4   case management order.  Yet six pages into the government's

5   motion to strike brief, the government admits that the very

6   prohibition upon which it relies excludes motions.  And

7   indisputably, the motion to dismiss is a motion.

8        The government says - once the defense raised this in

9   its opposition brief - and it says again today that it

10  disagrees, but it provides no reason why it disagrees.  And

11  that's tantamount to a concession and an abandonment of the

12  central premise in its motion to strike.

13       It's also worth noting that Judge O'Hara's exception

14  that applies to motions is not arbitrary and it is not trivial.

15  It embodies the entrenched and well-established principle that

16  the public has a common law right of access to judicial

17  records.  And the reason for that right of access, as nearly

18  every court to have considered the question has held, is

19  because it's important to the integrity of the judicial system

20  and the law enforcement process.  This is not an exception that

21  the government can simply disagree with.

22       Second--

23       THE COURT:  You talk about judicial records, what are

24  you referring to?

25       MR. DEARINGTON:  A motion filed with the court.  The

1   public has a well-established common law right of access to

2   that motion and all information included in that motion.  And

3   I'll get to the one exception to that rule a little later.

4           THE COURT:  Because I-- I'm not thinking that an FBI

5   302 is a judicial record.  It's not even admissible in court

6   in, you know, a public trial.

7           MR. DEARINGTON:  Well, Your Honor--

8           THE COURT:  It might be discoverable either because

9   the government has an open file policy or because the contents

10  in that 302 are *Jencks* statements or something like that or

11  *Brady* or whatever, but the report itself is never admissible at

12  trial.  So I'm struggling with-- if that's what you're

13  referring to as part of, you know, the public's right of access

14  to a judicial record, I disagree with respect to a 302.

15          MR. DEARINGTON:  Your Honor, it's a good question and

16  I'm glad you raised it so that I can clarify our argument

17  there.  A 302 in a vacuum is not a judicial record to which the

18  public has a common law right of access.  If the defense had

19  simply taken a 302 that had been provided in discovery and for

20  no reason given it to the public, just published it on a

21  website for the public's information--

22          THE COURT:  But didn't you attach it to your motion?

23          MR. DEARINGTON:  And, Judge, that's what I'm getting

24  to.  The moment that a 302 or any other piece of information

25  that's not already prohibited under a protective order from

1   disclosure is attached to a motion, courts have held that that

2   becomes a judicial document to which the public has a right of

3   access.  In fact, at least one court--

4           THE COURT:  Well, I guess I want to stop you there

5   because I'm not convinced that it was appropriate for you to

6   attach it.  I mean, and when you-- you started your argument

7   about, you know, the public has a right of access to judicial

8   records, that's undeniable.

9           But the mere fact that you receive something in

10  discovery does not necessarily translate that particular piece

11  of information to something that should go into the public

12  domain.  Now, I understand there wasn't a protective order

13  entered in this case, but the identity of the informant is

14  something that sometimes the government holds on to.

15          And I will tell you this court-- the judges of this

16  court have, you know, over the years repeatedly - and I don't

17  think this is unique to the District of Kansas - encouraged the

18  government to engage in open file discovery, encouraged the

19  early disclosure of everything, including the identity of

20  informants.  But that does not translate I think into a

21  corollary right of the defendant to share all of that in the

22  public domain when it's unnecessary to do so.

23          I'm not convinced that the identity of this informant

24  was at all necessary for the public to know in terms of

25  evaluating your motion which should've been filed in the public

1    domain.

2         MR. DEARINGTON:  Your Honor, I've-- if I may address

3    those, each of those points in turn.  As an initial matter, the

4    proper way for the government to protect information that it

5    deems warrants protection through discovery that's not covered

6    by the CMO - and I think we can all agree that this particular

7    document was not covered by the CMO once it was attached to a

8    motion - would be for the government to have entered into a

9    protective order and then designated that particular document

10   as confidential.

11        So if the government insists that the identity of

12   this-- of this graduate student was worth protecting, it should

13   have actually sought to protect the information.

14        As to whether this is actually a confidential

15   informant, the defense respectfully disagrees with that

16   characterization.  The term "confidential informant" is a

17   loaded term, and confidential informants typically are credible

18   sources of law enforcement information.  And that's why the

19   government often seeks to protect and even refuses to disclose

20   in certain circumstances the identity of an informant.

21        The particular person at issue here, whom I'll just

22   call the grad student, the government declines-- fails to

23   refute that that person sought to extort our client and

24   provided information, after violating several federal laws, to

25   the government in order to seek revenge upon our client.

1          So that actually brings me to my next point, which is

2    not only is this person not a confidential informant who's

3    entitled to certain protections that were never even sought in

4    this case, but third, it is relevant that this person brought

5    about the investigation by the government in the manner in

6    which this person did so.

7          THE COURT:  It's not relevant at this point in the

8    proceeding.  It may very well be relevant at trial,

9    particularly if this person, this grad student, is a witness.

10   It will be very-- you know, it's *Brady* information perhaps.  I

11   mean, it's certainly something you may want to cross examine.

12         But when you're filing a motion to dismiss on the

13   grounds that you have, whatever problems there might be with

14   respect to this informant or confidential subject or however

15   the government wants to characterize it, I'm not in a position

16   to label this person, but they relied on information.  The

17   credibility of that person is not at issue at this point.

18         I have to decide your motion to-- or your motion to

19   dismiss the indictment on the four corners of the indictment,

20   not on the credibility of people that gave the government

21   information.

22         MR. DEARINGTON:  Your Honor, just a couple of

23   responses to that point.  So as an initial matter, I think

24   we've gone down the road of relevance perhaps improperly here.

25   The standard for a motion to strike is not a question of

1    whether material that the party seeks to strike is relevant.

2    That's not in any case law.  That's not in any--

3            THE COURT:  I'm not saying that.  I'm just pointing

4    out, and I don't know that I'm going to-- I guess the feedback

5    I'm giving you is not so much on the motion to strike and the

6    standards for the motion to strike but that I'm troubled by

7    your disclosure of this person's identity unnecessarily.

8            If it were necessary, I think I'd be hearing a

9    different set of arguments from both sides.  But it's

10   unnecessary for purposes of the motion that I do need to

11   decide, which is the motion to dismiss.  Why do I need to know

12   the name of the grad student?  I'm not even sure I needed to

13   know that you have a defense in terms of the credibility of

14   that person because that's evidence.  That goes beyond the four

15   corners of the indictment.  It has nothing to do with the legal

16   arguments that are raised to me in your motion to dismiss.

17           MR. DEARINGTON:  Your Honor, as an initial matter, if

18   the defense could go back in time when it was filing its motion

19   and had thought maybe this was something that the government

20   would have such substantial concerns about, notwithstanding

21   that it communicated no such concerns when it disclosed

22   discovery, the defense would've likely sought to redact the

23   information and left it to the court to decide whether those

24   redactions were appropriate.

25           The defense had no interest in creating trouble or

1    disclosing information that the court may not need for its

2    motion to dismiss.  But now as we stand here today, the defense

3    included such information and the question is what to do about

4    it.  And the answer to that question is, well, the defense

5    violated no case management order, contrary to what the

6    government is arguing, and nor did the defense violate any

7    local orders.

8              And I will caveat that with one point, which is that

9    the government seems to concede that the disclosure of

10   information about this grad student is PII.  The defense

11   disagrees with that proposition.  It seems that the only PII

12   that the government has actually identified is the date of

13   birth of a particular person whom the government has not

14   refuted was in the context of a form submitted under that

15   person's name by a different person using that name as a

16   pseudonym.

17             So it is news to the defense that the date of birth in

18   that form is correct.  And, in fact, the government has

19   confirmed that there's a real person who has the name on the

20   particular form at issue and who has that birth date, but

21   that's not something the defense was aware of.  The defense's

22   information was that the form was submitted by the grad student

23   under someone else's name.  And it's news to us that it was a

24   correct date of birth in that information.

25             We, of course, would not have submitted information if

1  we knew that there was a real person who had that date of birth

2  and saw the date of birth.  And we are, of course, happy to

3  submit our motion to dismiss with a redaction as to that

4  information.  And, again, we - since the moment that the

5  government filed its motion to strike - have agreed that we are

6  willing in good faith to redact the name of the grad student,

7  whether that's warranted or not, and the date of birth of the

8  pseudonym that happens to be a real person.

9          Your Honor, just a few more points on the motion to

10  strike.  And again, we are not trying to avoid-- we're not

11  trying to re-assert this person's name.  If we have to file

12  another motion to dismiss, we will, of course, redact that

13  information, and we appreciate the court's guidance on that

14  point.

15          But as to the motion to strike that's pending before

16  the court, not only does the government concede that the

17  defense's inclusion of information in its motion to dismiss did

18  not violate the case management order but also admits that that

19  information was in the defense's possession prior to discovery.

20  So it is-- and this is something that the government admits on

21  the second page of its reply brief.  The government admits that

22  Doctor Tao was aware of the identity of the grad student

23  because she had sought to extort him.

24          He has documents in his own possession, in fact the

25  majority of the exhibits that include information about that

1    grad student that were attached to the motion to dismiss were

2    Doctor Tao's documents.  They were not obtained exclusively

3    from the government.  And that is a critical concession

4    because, I mean, the case management order does not apply to

5    the information.

6          The government makes a distinction or seeks to make a

7    distinction between what Doctor Tao believed about this

8    particular grad student and how she successfully-- or how she

9    attempted to extort him and then submit information, as she

10   threatened, to the FBI in order to try to exact revenge upon

11   him.

12         And the government says that that is a belief and it

13   only became knowledge once discovery commenced, but the

14   government can't prevent the defense from using information in

15   its possession merely by confirming that information through

16   discovery.  And the government cites no cases to the contrary.

17         In addition, a motion to strike does not apply to a

18   motion to dismiss.  Several courts have held that motions to

19   strike can only apply to pleadings such as an indictment or a

20   criminal information under the criminal rules.  The government

21   has cited not a single case where a court has granted a motion

22   to strike a motion to dismiss an indictment.

23         And, in fact, courts very much disfavor motions to

24   strike as a general matter especially as to briefs that cannot

25   be stricken.  In fact, Judge Crabtree of the District of Kansas

1    pointed out in 2017 in the *Palmer* case in declining to strike a

2    brief this very point.  And Judge Crabtree-- Judge Crabtree

3    further stated that, "Motions to strike needlessly multiply the

4    motions before this court, waste judicial resources, and

5    needlessly clog the docket."  And the defense submits that this

6    motion to strike does just that.  As Judge Crabtree

7    recommended, parties should instead respond to the motion and

8    not seek to strike it improvidently.

9          THE COURT:  Have you entered into a protective order

10   now?  Have you entered into a protective order now?

11         MR. DEARINGTON:  We have not entered into a protective

12   order yet, and I think a little bit of history about that may

13   help inform some of the government's--

14         THE COURT:  No, that's okay.  I just wanted to know

15   whether you have.  Is discovery complete?

16         MR. MATTIVI:  Discovery is not complete.  And we have

17   negotiated over a protective order but have not been able to

18   come to an agreement.

19         THE COURT:  Okay.

20         MR. DEARINGTON:  Judge, if I may, just a few more

21   points on the currently sealed motion to dismiss-- motion to

22   dismiss, excuse me, and motion to strike.  Under the common law

23   right of public access to court filings, which include motions

24   and their attachments, the government has a substantial burden

25   to overcome if it wants to keep files, including their

1    attachments--

2             THE COURT:  You have not moved to unseal, have you?

3             MR. DEARINGTON:  Your Honor, frankly, we have not

4    moved to unseal.

5             THE COURT:  I don't want to hear argument about it

6    unless you've moved to unseal.  File a motion to unseal.

7             MR. DEARINGTON:  We've requested in our--

8             MR. ZEIDENBERG:  I guess-- unsealing, Your Honor?

9             THE COURT:  Unsealing the motion to dismiss.

10            MR. ZEIDENBERG:  We would ask that it be unsealed,

11   yes.  We wouldn't make any formal motion because we figure

12   we're going to have this argument before the court.

13            THE COURT:  Well, if I unseal it-- the information

14   hasn't been redacted, that's why it's sealed.

15            MR. ZEIDENBERG:  First step, we'd be happy to-- we

16   wanted to discuss with the court the proper sequence, but what

17   we would propose is to withdraw-- move to withdraw our motion

18   or we could leave that under seal or just file a new copy with

19   redacted information of the individuals' names.

20            And, you know, to that point, Your Honor, and Mr.

21   Dearington made this point, I've made it to the government, I'd

22   like to personally make it to the court.  The fact that this

23   was included was really an unforced error on our part.  On my

24   part.  I take responsibility for that.  And I've been kicking

25   myself ever since because, you know, perhaps we can disagree

1    about the-- you know, we think the context of how this case got

2    here is relevant and important.  The name is not.  The name is

3    not relevant or important.

4          And if I had thought of that, and I don't know why I

5    didn't think of it, but I would-- perhaps because there wasn't

6    a protective order and because it came from my client's own

7    e-mails.  He gave all these e-mails to us.

8          But out of an abundance of caution I should have just

9    done it.  And so I apologize.  And it's-- frankly, it's been

10   not only a burden put on the court but a burden on all the

11   parties to have to respond to all these papers that was really

12   unnecessary.

13         So I just want, you know, to reiterate what I told the

14   government, that there was no-- there was no ulterior agenda in

15   doing that and was really something that I regret having done

16   and wouldn't happen again.  But this is the-- the process by

17   which we suggest going forward from here.

18         THE COURT:  All right.  I'm going to take all of this

19   under advisement.  Let me just say sort of as an aside, you

20   know, when I was talking before about you don't unnecessarily

21   disclose the names of informants, if indeed this person is an

22   informant-- I'm not going to get into a debate about that.  I

23   don't have enough information to know one way or the other.

24   You know, there's all these terms of art that investigative

25   agencies use.

1          But when there comes a point in litigation where

2     perhaps there is litigation about the informant, a *Roviaro*

3     issue for example, you still don't refer to the person by name.

4     It may be necessary for the court to dig in about what the

5     informant said and who they are and what the problem with that

6     is, but the name still remains protected for obvious reasons.

7          Now, if that person testifies at trial, their identity

8     is public.  You can't-- all trials, all hearings are public.

9     And so, you know, but I don't know if the government is going

10    to call this person as a witness.  I mean, this person's

11    identity if-- if they're not ever a witness for the

12    government-- now, maybe they'll be a witness for the defense in

13    which case their identity will become public at that time.

14         But I'm going to take all of this under advisement.

15    I'm not going to rush to decide this because, frankly, some of

16    this may be mooted by a superseding indictment if it comes out

17    next week.

18         If that happens, I'll take a look at it and then I'll

19    decide whether I need to get you all back on the phone, whether

20    I need to ask for any additional briefing.  It could mean that

21    you all would want to submit additional briefing.  You may want

22    to file a new motion to dismiss because the indictment may

23    radically change, I don't know.  But I will at least start to

24    work on this.

25         In the meantime, I really want you all to get across

1    the table from each other and fashion a protective order,

2    because my concern is without a protective order the government

3    is going to start withholding-- holding back discovery.  And my

4    preference in any case is the government give early discovery,

5    but they have to be assured that it's going to be used

6    appropriately and not misused.  So you all need to reach a

7    decision as soon as you can on a protective order so that

8    discovery can continue because what I'm hearing is discovery is

9    not completed.

10         We don't have motions deadlines set in this case yet,

11   we weren't really there yet.  That does not mean that you can't

12   file a motion to dismiss whenever you want to file it.  Nothing

13   can-- I can't preclude you from that, nor can the government.

14   But I wonder-- normally what we do is we have a status

15   conference or two or even three.

16         And then depending on the status of discovery and how

17   things are proceeding, then we discuss-- you all discuss with

18   me what would be an appropriate schedule for motions, et

19   cetera, and whether they need to be staged.  And, I mean,

20   depending on the type of case, there may be experts.  I mean,

21   all of those sorts of things.

22         So we're fairly early into this.  I'm just wondering

23   what your thoughts are on having a status conference, and

24   perhaps we already had one scheduled, I don't remember now.

25         MR. ZEIDENBERG:  There is not one scheduled.

1        THE COURT:  There is not.  Okay.  And this has not

2   been designated a complex case, has it?

3        MR. MATTIVI:  It has not, Your Honor.

4        THE COURT:  Okay.

5        MR. MATTIVI:  Your Honor, would you indulge counsel

6   for just a moment?

7        THE COURT:  Sure.

8        MR. MATTIVI:  Thank you.

9        (Counsel confer).

10       MR. ZEIDENBERG:  So, Your Honor, we were last here in

11  October and, you know, we've gotten-- we think we've gotten

12  most of the discovery.  We have some issues, some of which I'd

13  like to raise now if it's appropriate.

14       But in the meantime, you know, we had waived speedy

15  trial until now.  But, you know, we'd like to get on the

16  calendar for trial and then, you know, we'll see what comes

17  down the pike and then, you know, we can adjust accordingly if

18  needed.

19       THE COURT:  Let me ask the government, when do you

20  anticipate that discovery will be completed?

21       MR. MATTIVI:  Judge, as you well know, we don't know

22  what we don't know and we continue looking and if-- all I can

23  talk about is what we have thus far.  And as of what we have

24  thus far, I have a drive that I just need to review and then

25  turn over to the defense.  And that will be all of the

1    investigative materials obtained to date relevant to the

2    charges.

3           THE COURT:  What's the size of the data if you know?

4           MR. MATTIVI:  Well, it's a one terabyte drive.  But

5    let me see if somebody who speaks tech can answer your question

6    better than I can.

7           (Counsel and the agent confer).

8           MR. MATTIVI:  So this disk has disclosed-- disclosure

9    to the defendant of his own e-mail account that we obtained

10   through a search warrant, that I think he was able to obtain

11   and he did obtain and turn over to Mr. Zeidenberg.  So much of

12   that he already has.  And then a handful of FBI reports.

13          THE COURT:  Mr. Zeidenberg, are you prepared to

14   suggest a motions deadline based on that information or would

15   you prefer to get the material and then we have a status

16   conference in the near future and discuss what a motions

17   deadline should be and then go from there in terms of setting a

18   trial date?

19          MR. ZEIDENBERG:  I'm not anticipating that the new

20   discovery will require additional motions.  So I think it can

21   be-- you know, we can set-- I think we can set a motions

22   deadline now.  And, you know, obviously we're keenly interested

23   in these FBI reports.  I don't know if the court wants to hear

24   anything else on outstanding discovery issues at this time.

25          THE COURT:  Well, what I'm hearing from the government

1    is they're prepared to give you complete discovery now,

2    although it sounds like they anticipate there may be more

3    discovery develop.  As you know, sometimes-- well, often

4    investigation continues, maybe more witnesses are identified.

5            Understanding that, I mean, that tends to be the

6    situation in a lot of cases.  But based on what they have now,

7    they're ready to turn it over to you.  And it sounds like you

8    anticipate you will be ready-- you may-- I mean, obviously we

9    have this pending motion, but it sounds to me like you don't

10   think you're going to need an extreme amount of time to

11   evaluate that and decide whether you want to file any

12   additional motions.

13           MR. ZEIDENBERG:  Correct.

14           THE COURT:  Okay.  So are we talking maybe a 45-day

15   time frame, a 30-day, 60, 90 for filing motions?

16           MR. ZEIDENBERG:  Well, they've indicated that they're

17   going to return a superseding indictment January 15th.

18           THE COURT:  Right.

19           MR. ZEIDENBERG:  So--

20           THE COURT:  And you may very well want to file another

21   motion to dismiss, so you need to factor in whatever time you

22   think you might need for that.

23           MR. ZEIDENBERG:  Could I have a moment?

24           THE COURT:  Sure.

25           (Defense counsel confer).

1          MR. MATTIVI:  Judge, while they're conferring, the

2    agent just reminded me that we-- we actually still have quite a

3    bit of data that's still at the RCFL being extracted from

4    devices that were in the defendant's lab at KU.  We haven't

5    turned that over and I had forgotten about that when I

6    represented to you that what's on this drive in my briefcase is

7    the rest of it.

8          There are partitioned drives and there may be quite a

9    bit of data from that KU scrape, and that hasn't even been

10   provided to us yet from the RCFL.

11         THE COURT:  What's the RCFL?

12         MR. MATTIVI:  The Regional Computer Forensics Lab, the

13   computer lab, Your Honor.

14         THE COURT:  Do you have a time frame on that?

15         MR. MATTIVI:  Yeah, that's-- it sounds like it's not

16   in the very distant future, but that's something that we

17   absolutely have to have a protective order on.  So I guess it

18   just depends on how long it takes us to negotiate that.

19         THE COURT:  This is documents that were on devices in

20   the lab itself?

21         MR. MATTIVI:  This is data off of devices that were in

22   the defendant's lab at KU.

23         THE COURT:  Which may be research data.

24         MR. MATTIVI:  Yes, Your Honor.

25         THE COURT:  Okay.  I understand.  Well, I mean, that's

1    why-- generally what I like to do is set another status

2    conference to kind of see where we're at maybe 30 days out,

3    before we commit to motions deadlines, because there's a lot of

4    balls in the air it sounds like.

5         MR. ZEIDENBERG:  Your Honor, I'm just concerned with

6    the amount of time that's elapsed.  And my client was arrested

7    in August and, you know, here we are in January.  We gave three

8    months so that discovery could be completed and we still don't

9    have discovery completed.

10        And, you know, we'd like to-- we'd like to get this

11   show on the road and we can get this case either dismissed,

12   which we think is what's appropriate, or if it can't be

13   dismissed then we get it on track to try it without-- you know,

14   I think that the government has to do what they got to do to

15   get this discovery done and simply just giving these-- you

16   know, giving several-month continuances so they can work on it,

17   I think it needs to be expedited.

18        I mean, my client has a speedy trial right.  And, you

19   know, if the government wasn't ready to arrest him and indict

20   him, they shouldn't have arrested him and indicted him.  They

21   should've waited until they had all of their investigation

22   completed.

23        THE COURT:  Well, I'm encouraging the government to

24   get this data and disclose it as soon as possible.  But I'm

25   also hearing that's not going to happen until a protective

1    order is entered into, so I'm encouraging both parties to enter

2    into a protective order as soon as possible.

3          I'm not going to require the government to disclose

4    matters that should be subject to a protective order if a

5    protective order hasn't been entered.  And I really don't want

6    to get in the middle of a protective order, I think you all

7    need to be reasonable and enter into a protective order.

8    There's kind of standard protective orders we use in this

9    district.

10          MR. ZEIDENBERG:  Well, that might be helpful to see

11   because the protective order that the government shared with us

12   previously was not a standard order but it was custom for this

13   case and covered material that was in my client's possession

14   before this case was ever brought.  So his own e-mails and own

15   documents that-- that he possessed before he was arrested

16   would've been brought within it and he wouldn't have been able

17   to use them.  For instance, if he wanted to have a civil

18   lawsuit against this grad student, he was prevented from doing

19   so.

20          THE COURT:  But he could always seek court leave to

21   use it in other litigation.

22          MR. ZEIDENBERG:  I'm sorry?

23          THE COURT:  He could seek court leave to use it in

24   other litigation.  I think you all need to enter into a

25   protective order.  From what I know about this case and-- which

1   is based on the indictment and your pleadings, which don't tell

2   me a lot factually, nor should it, I can understand that there

3   is data that needs to be protected, and even including perhaps

4   information that is in Mr. Feng's e-mails because he was privy

5   to a lot of information that may be protectable.

6           So, I mean, he worked with it.  That's the nature of

7   the work he was doing at KU.  Am I correct?

8           MR. ZEIDENBERG:  Your Honor, I'm talking about

9   communications he's had with this individual that were e-mails

10  that she e-mailed him threatening him.  So, you know, those

11  types of communications, I don't see how they can be-- come

12  within the ambit.  Understanding the caveat of the court

13  doesn't want this individual's name publicized.  But the

14  information and the e-mails themselves are-- are his e-mails,

15  they were sent to him.

16          And just because the government took them from him and

17  then gave them back to him doesn't mean-- you know, shouldn't

18  mean that he is no longer able to use them for appropriate

19  purposes.  I mean, I don't see how that comes within the ambit

20  that the government can take all your stuff and then give it

21  back to you and say now it's protected, you can't use it.

22          THE COURT:  Well, this isn't teed up for me to decide,

23  and I hope it won't be because, again, I think that's something

24  that you all should be able to negotiate and agree based on the

25  nature of the information and the defendant's need to use it,

1    the government's need to use it, et cetera.

2              MR. ZEIDENBERG:  And I put in a-- a different category

3    information that the government contends belongs to KU and is

4    proprietary information.  I completely understand that.  And I

5    suggested to the government, they didn't get back to me on it,

6    the way I've done this in other cases is that the information

7    is provided to counsel and that it's only provided to the

8    client on a view-only computer, that they're not able to

9    download it or copy it and, you know, with strict instructions

10   on that point and with an understanding that it can't be

11   disseminated in any way.  You know, we're happy to sign that

12   agreement.

13             THE COURT:  Okay.  Again, I'm reluctant to jump into

14   it at this point because I don't really know what the-- what

15   the issues are nor the, you know, full extent of what it is

16   that you all are negotiating.  I just encourage you to get that

17   done so that the government can finish discovery and turn it

18   over to you as soon as possible.

19             Mr. Mattivi, can you put a time frame on when the

20   RCFL-- I mean, I think you need to put the fire under them if

21   that's what it takes.

22             (Government counsel and the agent confer).

23             MR. MATTIVI:  So here's the problem, Your Honor.  Some

24   of the information on those devices apparently is encrypted,

25   which adds a whole new twist to us getting to it.

1        I appreciate the court's suggestion with regard to a

2   protective order, I think that's absolutely crucial.  We're

3   supposed to meet with the defense immediately after this

4   hearing, let us take another run at that and let-- for now

5   let's say that we're estimating that discovery will be complete

6   within 30 days, but I hope the court will grant me a little bit

7   of leeway on that given the variables that we're trying to work

8   through.

9        THE COURT:  All right.  What we're going to do is

10  we're going to have a status conference in 30 days and we'll

11  see where we're at.  We'll see-- you need to put the fire under

12  RCFL's feet.  It may be encrypted but, you know, you knew it

13  had evidentiary value and he's entitled to discover it.  And

14  they need to put it on their expedited calendar or whatever it

15  might be.

16       So let's have a status conference in 30 days.  And

17  what I hope is accomplished by then is RCFL has done its work

18  or is very close to finishing it, that you all have entered

19  into a protective order and that you're prepared based on-- you

20  know, even if you don't have the RCFL data in hand, you have

21  the drive that Mr. Mattivi is giving you today that you'll be

22  prepared to tell me how much additional time, if any, you would

23  like for motions and then we'll get it on a trial calendar.

24       I mean, I just want to set a motions deadline and then

25  go from there.  I want to, you know, factor in enough time for

1    me to hear any additional motions and then make a decision,

2    particularly-- it would have to be a written decision, I need

3    to have time to accomplish that.

4            One thing that would be helpful to know now, though,

5    is what is the government's estimated trial time?  As I start

6    to look at the calendar for 2020 there's already trials set, so

7    I'd like to have some sense of maybe some tentative blocks of

8    time I might want to block off tentatively at this point just

9    in case.

10           MR. MATTIVI:  We think this is a one-week trial, Your

11   Honor.

12           THE COURT:  Five days?

13           MR. MATTIVI:  Yes, ma'am.

14           THE COURT:  Okay.  Okay.  I think that's very doable.

15   Yeah, we'll be fine.

16           Okay.  So let's-- January 6th.  So let's see you all

17   back on February 10th.  Does that work, Mr. Zeidenberg?  Are

18   you traveling from--

19           MR. ZEIDENBERG:  I have a sentencing that day in

20   district court in Washington, D.C.

21           THE COURT:  Where are you based?  You're in D.C.?

22           MR. ZEIDENBERG:  In D.C.

23           THE COURT:  Okay.

24           MR. ZEIDENBERG:  Could we do February 3rd?

25           THE COURT:  We could do February 3rd.

1          Mr. Mattivi?

2          MR. ZEIDENBERG:  Oh, I'm sorry, I'm sorry.  I think I

3    have-- I'm going to be out that week traveling.

4          THE COURT:  We could do the 18th, which is the day

5    after Washington's birthday, which is a federal holiday.

6    Tuesday the 18th.  I'm going to be in trial the rest of the

7    week of the 3rd, maybe wrapping into the next week.

8          MR. ZEIDENBERG:  Could we do later in the week of the

9    10th?

10         THE COURT:  Yeah, probably, unless we've-- there's a

11   trial that may wrap into that week.  So why don't we look at

12   maybe Thursday the 13th of February, if that works for you all.

13         MR. MATTIVI:  Works for the government, Your Honor.

14         THE COURT:  Okay.  Could we do-- do you want to do

15   1:30 again?

16         MR. ZEIDENBERG:  That would be very helpful, Your

17   Honor.

18         THE COURT:  Okay.  February 13th at 1:30 it is.

19         Okay.  Everybody has got a to-do list, including me,

20   because I've got to decide these pending motions.  But again,

21   I'll see what happens, if anything, on January 15th.  And then

22   I may get you on the phone before February 3rd, depending on

23   what the indictment-- the new indictment looks like or I may

24   wait until February 3rd and we figure it out from there, but...

25         All right.  We'll exclude speedy trial time between

```
 1   now and February 3rd, the next status hearing.  Discovery is
 2   not complete.  There is the pending motion-- February 13th, I'm
 3   sorry.
 4           Discovery is not complete.  There is a pending motion
 5   to dismiss as well that the court is entitled to have time to
 6   decide, so...
 7           All right.  What else?  Anything else we can talk
 8   about right now while we're all here?
 9           MR. MATTIVI:  Nothing known to the government, Your
10   Honor.  Thank you.
11           MR. ZEIDENBERG:  Nothing for the defense, Your Honor.
12           THE COURT:  Okay.  All right.  All right.  We'll be in
13   recess.  Thank you.
14           (2:44 p.m., proceedings concluded).
15
16
17
18
19
20
21
22
23
24
25
```

1                                 *  *  *

2

3

4                        C E R T I F I C A T E

5          I certify that the foregoing is a correct transcript

6     from the record of proceedings in the above-entitled matter.

7

8     February 13, 2020.

9

10                          /s/ Kelli Stewart _____
11                          KELLI STEWART, CSR, RPR, CRR, RMR
                            United States Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25