IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(Kansas City Docket)

**UNITED STATES OF AMERICA**

    **Plaintiff,**

        **v.**

**FENG TAO,**
**a/k/a "Franklin Tao,"**

    **Defendant.**

Case No. 19-20052-JAR/JPO

## SECOND SUPERSEDING INDICTMENT

The Grand Jury charges:

At all times relevant to this indictment:

### Introductory Allegations

*The Defendant's Employment at the University of Kansas*

1. The University of Kansas (KU) was a public research university governed by the Kansas Board of Regents (KBOR) with a campus in Lawrence, Kansas.

2. The Center for Environmentally Beneficial Catalysis (CEBC) was a component of KU, located at the Life Science Research Lab in Lawrence, Kansas. CEBC's research focused on sustainable technology to conserve natural resources and energy. Among other things, the CEBC performed research funded by grants from the United States Government (USG).

3. Since in or about August 2014, the defendant, **FENG TAO** (a/k/a **FRANKLIN TAO**), a citizen of the People's Republic of China (PRC), was a full-time professor and researcher at KU who worked in the CEBC on projects involving renewable energy, including shale gas.

4. In his capacity as a researcher at KU, **TAO** was responsible for submitting USG

grant proposals through KU and for managing USG-funded research projects at KU.  As described below, between at least in or about December 2017 and August 2019, **TAO** obtained funds from the U.S. Department of Energy (DOE) and the National Science Foundation (NSF) to support his research at KU, while concealing his participation in a PRC "talent plan," his employment at a PRC research university, and his PRC-funded research.

## *University Of Kansas Conflict Policies*

5. As a KU employee, **TAO** owed a fiduciary duty and a duty of truthfulness to KU. KBOR and KU policies required **TAO** to disclose any current or prospective situations that involved potential conflicts of interest or time as soon as they became known.

6. The policies further required **TAO** to disclose conflicts of interest or time on an annual basis using KU's "Institutional Responsibilities" form.  Among other things, the form required **TAO** to certify that (1) his statements were true, correct, and complete to the best of his knowledge and belief; (2) he had read and complied with KBOR and KU policies; (3) he agreed to secure approval prior to engaging in any external personal, professional activities; and (4) he agreed to report any changes as soon as they become known to him and no later than 30 days after acquiring a new significant financial interest.

7. KU used the information, in part, to determine whether **TAO** had any financial interests or commitments of time that conflicted with his responsibilities to manage USG-funded research projects.

8. At various times between in or about August 2014 and August 2019, **TAO** certified that he read and understood KBOR and KU's conflict policies and that he had made all necessary disclosures.  Further, in connection with his USG grant proposals, **TAO** assured KU that he would take the steps necessary to ensure that others involved with the proposed research

read and understood and complied with all relevant conflict policies.

### *U.S. Department of Energy Grant*

9.     DOE was a federal agency whose mission was to ensure America's security and prosperity by addressing its energy, environmental, and nuclear challenges through transformative science and technology solutions.  Within DOE, the Office of Science supported research in the physical sciences and fundamental scientific research for America's energy future by funding such research through grants.  DOE programs were a crucial part of America's national security apparatus.

10.     On or about December 11, 2017, **TAO** caused KU to submit an application to DOE's Office of Science for renewed funding to support his ongoing research at KU.  As part of the application, DOE required **TAO** to identify his institutional affiliations and his current and pending support, to include funding from foreign governments and institutions.  **TAO** identified his affiliation with KU and only his USG funding sources.  Relying on **TAO's** representations, KU certified, under penalty of law, that the statements contained in the application were true and accurate.  On or about July 10, 2018, while **TAO's** grant application was under review, DOE asked **TAO** to update his current and pending support, to include any submissions planned in the future.  Thereafter, on or about July 16, 2018, in response to DOE's request, **TAO** provided DOE with a document identifying only his USG funding sources.

11.     On or about September 18, 2018, relying on **TAO's** representations, DOE's Office of Science awarded the grant to KU and agreed to continue funding **TAO's** research at KU through at least September 2019.

### *National Science Foundation Grants*

12.     NSF was a federal agency that was created by Congress to promote the progress

3

of science; to advance the national health, prosperity, and welfare; and to secure the national defense of the United States. NSF's mission was to support all fields of fundamental science and engineering (except for medical sciences) and to keep the United States at the leading edge of discovery. NSF fulfilled its mission by funding research and education through grants and cooperative agreements.

13. In order to receive its funds, NSF required KU to maintain a written, enforceable conflict of interest policy. Among other things, KU's policy had to ensure that researchers like **TAO** made all necessary disclosures at the time they submitted their proposals and that they updated their disclosures during the period of the award, either on an annual basis or as new reportable conflicts became known. NSF further required KU to manage, reduce, or eliminate all conflicts of interest for each grant before the expenditure of the grant funds. KBOR and KU's policies, as described above, complied with NSF's requirements.

14. Between in or about July 2013 and August 2014, while employed by the University of Notre Dame, **TAO** applied for an NSF grant and obtained NSF funding. In or about September 2014, after being hired by KU, **TAO** caused KU to submit a request to NSF to transfer the grant from Notre Dame to KU. On or about December 1, 2014, NSF approved the grant transfer and agreed to fund **TAO's** research at KU through June 2019.

15. On or about October 2, 2017, **TAO** caused KU to submit a separate grant application to NSF to fund his research at KU. As part of the application, **TAO** identified his affiliation with KU and his current and pending USG funding sources. Relying on **TAO's** representations, KU certified, under penalty of law, that the statements contained in the application were true and accurate. On or about June 28, 2018, relying on **TAO's** representations, NSF awarded the grant to KU and agreed to fund **TAO's** research at KU from in

4

or about September 2018 through August 2021.

### *The People's Republic of China's Talent Plans*

16.     The People's Republic of China (PRC) was the most populous country in the world.  In recent years, the PRC Government invested heavily in growing its economy, especially industrial sectors it considered important to its autonomy and national security.

17.     The PRC achieved rapid economic growth, in part, through "talent plans," which were designed to encourage the transfer of original ideas and intellectual property from U.S. universities to PRC Government institutions.  Talent plans offered competitive salaries, state-of-the-art research facilities, and honorific titles to entice experts to bring their knowledge and experience to the PRC to enhance the PRC's economic prosperity and national security.

18.     The PRC's talent plans typically required applicants to have experience in cutting-edge science or engineering research; a degree from a prestigious university; and several years of overseas work or research experience at prestigious universities, research institutes, corporations, or well-known enterprises.

19.     To entice high-caliber applicants, the PRC Government generally provided talent plan participants with significant financial and social incentives.  For example, participants typically drew a salary from a PRC employing entity, such as a university, laboratory, or research organization, which sponsored or facilitated the participants' applications.  Because of the nature of the PRC political system, these employing entities were, functionally, extensions of the PRC Government and the Chinese Communist Party.

20.     Participants typically entered into contracts covering their involvement in the talent plans.  These contracts obligated the participants to work for a specified time in the PRC and often detailed the specific research the participants would perform or the businesses the

5

participants would develop. The contractual obligation closely resembled or replicated the work the participants performed or continued to perform for their U.S. or non-PRC employers. In many cases, talent plan contracts required participants to identify additional overseas talent to join their research teams in the PRC. Further, rather than merely conducting scientific research, participants were frequently obligated contractually to perform services for the PRC in support of its strategic national development goals and economic revitalization.

21. The Chang Jiang Scholar Program, also known as the Yangtze River Scholar Program, was one such talent plan sponsored by the PRC Government. The PRC Government used the Chang Jiang Scholar Program to attract talented academics to bolster the PRC's scientific and technical knowledge and for the benefit of the PRC. Individuals accepted into the Chang Jiang Scholar Program received the title of Chang Jiang Distinguished Professor at their universities in the PRC, as well as other benefits.

*Defendant's PRC Talent Plan Applications*

22. In 2016, **TAO** applied to the Chang Jiang Scholar Program through Xiamen University in the PRC. He was not selected at that time. Between on or about May 23, 2017, and July 2, 2017, **TAO** communicated with individuals affiliated with Xiamen University about a different PRC talent plan known as the Thousand Talents Program. In those communications, **TAO** expressed his intention to apply to the Thousand Talents Program through Xiamen University and asked that the individuals keep his intention confidential due to his full-time employment at KU.

23. Around the same time, between on or about June 9 and July 1, 2017, **TAO** traveled from the United States to the PRC, where he met with the head of Fuzhou University's (FZU) Chemistry Department who encouraged **TAO** to apply to the Chang Jiang Scholar

Program through FZU.

24. In or about July 2017, **TAO** applied to the Chang Jiang Scholar Program with the expectation that he would join the faculty and staff at FZU, in the PRC, while maintaining his employment at KU, obtaining USG grant funds, and concealing his FZU and PRC affiliations from KU and the USG.

25. Between on or about November 18 and November 24, 2017, **TAO** traveled to FZU in the PRC to prepare the materials necessary to defend his Chang Jiang Scholar Program application before the PRC's Ministry of Education. He then returned to the PRC to defend his application between on or about December 6 and 13, 2017.

26. In or about the end of December 2017, **TAO** was accepted into the Chang Jiang Scholar Program with the understanding that he would be employed full time at FZU, where he would conduct research involving renewable energy for the benefit of the PRC. At no time did **TAO** disclose this information to KU or any USG agency.

### *Defendant's Employment at Fuzhou University*

27. FZU was a university located in Fuzhou, in the PRC, that was established by the PRC's Ministry of Education to research science and technology. The State Key Laboratory of Photocatalysis on Energy and Environment was a component of FZU. The PRC's Ministry of Education continued to manage FZU jointly with the Fuzhou Provincial Government through at least in or about August 2019.

28. Between in or about January and February 2018, **TAO** negotiated an employment contract with FZU. On or about January 23, 2018, an FZU representative invited **TAO** to the PRC to discuss the terms of his contract, including his salary and benefits. Between on or about February 1 and February 20, 2018, **TAO** traveled to the PRC to meet with FZU representatives,

including the head of FZU's Chemistry Department.

29. In or around March 2018, **TAO** entered into a contract with FZU to serve as a Chang Jiang Distinguished Professor for a period of five years from May 1, 2018, to April 30, 2023. The contract included the following terms:

(A) **TAO** agreed to perform the following duties, among other things: 1) teach chemistry at FZU; 2) support the PRC's strategic needs by, for example, conducting major scientific research projects for the PRC; 3) recruit post-doctoral researchers to FZU; 4) actively apply for the PRC's major scientific research projects and host three such projects; and 5) publish at least 60 research articles identifying FZU as his primary employer.

(B) FZU agreed to provide **TAO** with the following, among other things: 1) a salary every year, some of which would come from the PRC's Ministry of Education; 2) research funds; 3) post-doctoral researchers and a secretary to facilitate research; 4) lab space and equipment, a residence, and relocation expenses; and 5) to strengthen **TAO's** ideological and emotional identity, patriotism, ambition for a strong PRC and his dedication to the service of the PRC.

30. Between on or about May 5 and May 8, 2018, **TAO** traveled to the PRC. At or around that time, TAO formally started his employment at FZU as a Chang Jiang Distinguished Professor, without disclosing to KU or the USG that he was engaged in such employment.

31. At various times between in or about May 2018 and December 2018, and for the majority of time between on or about December 11, 2018, and August 20, 2019, **TAO** traveled to the PRC. During that period, **TAO** fulfilled his contractual obligations to FZU, while remaining employed by KU and obtaining USG grant funds. For example, **TAO** attempted to recruit and

did recruit post-doctoral researchers to work for him at FZU.  As another example, **TAO** applied for grants from the National Natural Science Foundation of China to fund his research at FZU, including an application submitted on or about March 17, 2019.  At no time did **TAO** disclose his affiliation with FZU to KU or any USG agency.

### *The Defendant's Scheme to Defraud*

32.     From in or about May 2017 through on or about August 21, 2019, **TAO** engaged in a scheme to defraud KU and the USG to obtain money and property from KU, DOE, and NSF, to include USG grant funds and his KU salary.

### *Purpose of the Scheme*

33.     The purposes of the scheme were for **TAO** to benefit the PRC by participating in a "talent plan," to obtain USG grant funds and his KU salary under false pretenses, and to conceal the scheme.

### *Manners and Means of the Scheme*

34.     As part of the scheme to defraud KU and the USG, **TAO** provided FZU and the PRC with technical training, scientific expertise, and research as a Chang Jiang Distinguished Professor at FZU, while purporting to remain loyal to KU, his employer.

35.     It was a further part of the scheme to defraud KU and the USG that **TAO** traveled to the PRC for a significant period of time between May 2018 and August 2019 to fulfill his contractual obligations to FZU, while remaining employed by KU and obtaining USG grant funds through that employment.

36.     It was a further part of the scheme to defraud KU and the USG that **TAO**, having a duty to disclose, concealed from KU and USG agencies his affiliation with FZU, his participation in the PRC's Chang Jiang Scholar Program, and the associated financial and other benefits.

37. It was a further part of the scheme to defraud KU and the USG that **TAO** fraudulently maintained his employment with KU to obtain access to KU's research facilities and equipment and USG grant funds.

38. It was a further part of the scheme to defraud KU and the USG that **TAO** caused KU to rely on his material misrepresentations and omissions to request funds from DOE and NSF for expenditures associated with his USG-funded research at KU.

39. It was a further part of the scheme to defraud KU and the USG that **TAO** made the following material misrepresentations and omissions, among others:

(A) On or about January 9, 2018, **TAO** falsely stated on his 2018 Institutional Responsibilities form that he did not have any conflicts of interest or time; when in truth, as **TAO** then knew, he had been selected for the Chang Jiang Scholar Program at FZU, and he intended to work at FZU and receive funding from FZU and the PRC, in addition to other financial benefits.

(B) On or about January 29, 2018, in connection with a proposal for funds to perform work at the National Renewal Energy Laboratory (a USG-owned, contractor-operated facility funded through DOE) **TAO** falsely certified to KU that he had made all relevant financial and other disclosures as required by KBOR, KU, and DOE policies; when in truth, as **TAO** then knew, he had been selected for the Chang Jiang Scholar Program at FZU, and he intended to work at FZU and receive funding from FZU and the PRC, in addition to other financial benefits.

(C) On or about May 17, 2018, **TAO** submitted a proposal to KU for a collaborative research project with FZU, to be funded by FZU, and thereafter requested to use part of the project's budget to absolve him from his KU teaching responsibilities

for the Spring 2019 semester. In doing so, **TAO** concealed his employment by FZU and his plan to travel to the PRC to fulfill his contractual obligations to FZU between in or about December 2018 and August 2019.

(D)     On or about July 16, 2018, in connection with the above-described DOE grant, **TAO** falsely represented to DOE that he was only receiving, and only expected to receive, USG funding; when in truth, as **TAO** then knew, he was working for FZU as a Chang Jiang Distinguished Professor and was receiving, and expected to receive, funding from FZU and the PRC.

(E)     On or about September 25, 2018, **TAO** falsely stated on his 2019 Institutional Responsibilities form that he did not have any conflicts of time or interest; when in truth, as **TAO** then knew, he was working for FZU as a Chang Jiang Distinguished Professor and was receiving, and expecting to receive, funding from FZU and the PRC, in addition to other financial benefits.

(F)     On or about June 15, 2019, in connection with the above-described DOE grant, **TAO** submitted a Progress Report to DOE's Office of Science, in which he falsely represented that he had no changes to his current support; when in truth, as **TAO** then knew, he was working for FZU as a Chang Jiang Distinguished Professor and was receiving, and expected to receive, funding from FZU and the PRC.

## COUNTS ONE THROUGH SEVEN
### (Wire Fraud)

40.     Paragraphs 1 to 39 are incorporated herein by reference.

41.     From in or about May 2017 through on or about August 21, 2019, in the District of Kansas and elsewhere, the defendant, **FENG TAO**, did knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property

by means of materially false and fraudulent pretenses, representations, promises, and half-truths, and by omissions and concealment of material facts with a duty to disclose.

42. On or about the dates set forth below, in the District of Kansas and elsewhere, the defendant, for the purpose of executing such scheme and artifice and attempting to do so, transmitted, and caused to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, and signals, to wit, the wire communications described below:

| COUNT | DATE | DESCRIPTION OF WIRE |
|---|---|---|
| ONE | November 11, 2017 | Email from Kansas to the Consulate General of the People's Republic of China in Illinois regarding **TAO's** travel to Fuzhou University |
| TWO | December 11, 2017 | Electronic submission of **TAO's** U.S. Department of Energy grant application from Kansas to a location outside Kansas |
| THREE | January 9, 2018 | Electronic submission of **TAO's** 2018 Institutional Responsibilities form from Kansas to a location outside Kansas |
| FOUR | June 26, 2018 | Email from outside the United States to the University of Kansas regarding **TAO's** proposal for a collaborative research project with Fuzhou University |
| FIVE | July 16, 2018 | Email from outside the United States, through Kansas, to the U.S. Department of Energy regarding **TAO's** updated current and pending support |
| SIX | September 25, 2018 | Electronic submission of **TAO's** 2019 Institutional Responsibilities form from Kansas to a location outside Kansas |
| SEVEN | March 17, 2019 | Email from outside the United States, through Kansas, to a location outside Kansas regarding **TAO's** application for National Natural Science Foundation of China funding |

Each count a separate offense, in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS EIGHT AND NINE
### (False Statements)

43.     Paragraphs 1 to 39 are incorporated herein by reference.

44.     On or about the dates set forth below, in the District of Kansas and elsewhere, the defendant, **FENG TAO**, willfully and knowingly made materially false, fictitious, and fraudulent statements, representations, and omissions in a matter within the jurisdiction of the executive branch of the United States Government, to wit: through his submission of an Institutional Responsibilities form, **TAO** falsely represented to the University of Kansas, an institution that requested and received funds from the U.S. Department of Energy and the National Science Foundation, that he had no conflicts of time or interest; when in truth, as **TAO** then knew, he was affiliated with FZU as a Chang Jiang Distinguished Professor and was receiving financial and other benefits, which he had a duty to disclose.

| COUNT | DATE | DESCRIPTION OF FALSE STATEMENT |
|---|---|---|
| EIGHT | January 9, 2018 | **TAO's** 2018 Institutional Responsibilities form |
| NINE | September 25, 2018 | **TAO's** 2019 Institutional Responsibilities form |

Each count a separate offense, in violation of Title 18, United States Code, Sections 1001 and 2.

## COUNT TEN
### (False Statements)

45.     Paragraphs 1 to 39 are incorporated herein by reference.

46.     On or about July 16, 2018, in the District of Kansas and elsewhere, the defendant, **FENG TAO**, willfully and knowingly made materially false, fictitious, and fraudulent statements, representations, and omissions in a matter within the jurisdiction of the executive branch of the United States Government, to wit: in connection with a University of Kansas grant application, **TAO** falsely represented to the U.S. Department of Energy that he was receiving, and expected to receive, funding from U.S. Government agencies only; when in truth, as **TAO**

then knew, he was receiving, and expected to receive, funding from the People's Republic of China and Fuzhou University.

In violation of Title 18, United States Code, Sections 1001 and 2.

## **FORFEITURE NOTICE**

47. The allegations contained in paragraphs 1 to 46 of this Superseding Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

48. Upon conviction of the offenses identified in Counts 1 through 7, the defendant,

**FENG TAO,
A/K/A FRANKLIN TAO,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses, including, but not limited to, the following:

> A forfeiture money judgment for each Count in amounts equal to the amount of proceeds that the defendant obtained from Counts 1 through 7 in the Second Superseding Indictment.

49. If any of the property described above, as a result of any act or omission of the defendant:

  A. cannot be located upon the exercise of due diligence;

  B. has been transferred or sold to, or deposited with, a third party;

  C. has been placed beyond the jurisdiction of the court;

  D. has been substantially diminished in value; or

  E. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

                                          A TRUE BILL.

Dated: June 24, 2020                      s/Foreperson
                                                  FOREPERSON

s/ Anthony W. Mattivi, #17082 for
STEPHEN R. McALLISTER
United States Attorney
District of Kansas
500 State Ave., Suite 360
Kansas City, KS 66101
(913) 551-6730
(913) 551-6541 (fax)
stephen.mcallister@usdoj.gov
Ks. S. Ct. No. 15845

(It is requested that trial of the above captioned case be held in Kansas City, Kansas.)

**PENALTIES:**

Cts. 1 - 7:    18 U.S.C. § 1343

- NMT 20 Years Imprisonment,
- NMT $250,000 Fine,
- NMT 3 Years Supervised Release
- $100 Special Assessment, and
- Forfeiture

Ct. 8 - 10:    18 U.S.C. § 1001

- NMT 5 Years Imprisonment,
- NMT $250,000 Fine,
- NMT 3 Years Supervised Release, and
- $100 Special Assessment