**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 19-20052-JAR-JPO |
| | ) | |
| FENG TAO | ) | |
| a/k/a "Franklin Tao," | ) | |
| | ) | |
| Defendant. | ) | |

---

**MEMORANDUM OF DR. FRANKLIN TAO IN SUPPORT OF HIS
MOTION TO DISMISS THE SECOND SUPERSEDING INDICTMENT
FOR FAILURE TO STATE AN OFFENSE AND LACK OF VENUE**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

BACKGROUND ................................................................................. 4

THE SECOND SUPERSEDING INDICTMENT ................................ 5

LEGAL STANDARD ......................................................................... 9

ARGUMENT ................................................................................... 10

I.     The Court should dismiss the Second Superseding Indictment under Rule 12(b)(3)(B)(v) because it fails to state an offense. ........................................ 10

     A.     The wire fraud charges in Counts 1 through 7 must be dismissed because the Indictment fails to allege a scheme to deprive KU, NSF, or DOE of money or property. ...................................................... 10

         1.     KU, NSF, and DOE had no property interest in KU's receipt of accurate information about Dr. Tao's professional external activities. ......................................................... 11

         2.     The Indictment cannot artfully plead a fraud scheme merely by alleging that Dr. Tao continued to receive salary after he allegedly lied to KU. ...................................................... 14

         3.     Dr. Tao's alleged nondisclosure does not constitute fraud because there is no allegation that he failed to perform any KU job duties, including grant work, in exchange for his salary. ................... 16

     B.     The wire fraud and false statement charges in Counts 1 through 10 must be dismissed because the Indictment fails to allege an actual misrepresentation. ................................................ 18

         1.     To survive dismissal, Counts 1 through 10 must allege facts that, if true, render the representations at issue false. .......................... 18

         2.     Counts 1 through 4 and Counts 6 through 9 must be dismissed because they fail to allege facts that, if true, render the representations in the Conflict of Interest forms false. ........................... 20

         3.     Counts 5 and 10 fail to allege facts that, if true, render the July 16, 2018 email to DOE false. .................................... 23

     C.     The wire fraud charges in Counts 1 through 4 and Count 7 must be dismissed because none of the charged uses of interstate wires, as alleged, were "for the purpose of executing" the fraud scheme. ...................... 25

         1.     To survive dismissal, each charged use of interstate wires must have been "for the purpose of executing" the fraud scheme. ................. 25

2. Counts 1 through 4 and 7 must be dismissed because none of the charged uses of the wires, as alleged, were "for the purpose of executing" the scheme to defraud KU, NSF, or DOE of money or property. ...................................................................................... 27

D. The false statements charges in Counts 8 and 9 must be dismissed because they were not made in a "matter within the jurisdiction of" the Executive Branch of the United States Government. ........................................... 31

E. The wire fraud and false statements charges in Counts 1 through 10 must be dismissed because they violate the Due Process Clause's fair warning requirement. ..................................................................................... 36

II. The Court should dismiss Count 10 of the Second Superseding Indictment under Rule 12(b)(3)(A)(i) due to lack of venue in the District of Kansas. ............................... 44

CONCLUSION.................................................................................................. 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Carpenter v. United States*,
484 U.S. 19 (1987)................................................................................................11

*Cleveland v. United States*,
531 U.S. 12 (2000)..........................................................................11, 12, 13, 16, 40

*Dietz v. Cypress Semiconductor Corp.*,
711 F. App'x 478 (10th Cir. 2017) ......................................................................13

*Johnson v. United States*,
135 S. Ct. 2551 (2015)..........................................................................................37

*United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*,
929 F.3d 721 (D.C. Cir. 2019) .............................................................................13

*Kelly v. United States*,
140 S. Ct. 1565 (2020).........................................................................10, 11, 12, 16

*Kolender v. Lawson*,
461 U.S. 352 (1983)..........................................................................................37, 38

*McNally v. United States*,
483 U.S. 350 (1987), *superseded by statute as recognized in Skilling v. United States*, 561 U.S. 358 (2010) .............................................................................12, 13, 14

*Moskal v. United States*,
498 U.S. 103 (1990).............................................................................................39

*Parr v. United States*,
363 U.S. 370 (1960).........................................................................25, 28, 29, 30, 31

*United States v. Acosta-Gallardo*,
656 F.3d 1109 (10th Cir. 2011) ...........................................................................45

*United States v. Baer*,
92 F. App'x 942 (4th Cir. 2004) ......................................................................20, 24

*United States v. Beech-Nut Nutrition Corp.*,
871 F.2d 1181 (2d Cir. 1989)...............................................................................45

*United States v. Billmyer*,
No. 94-29-01-JD, 1995 WL 54471 (D.N.H. Feb. 3, 1995).........................14, 15, 16

*United States v. Binday*,
  804 F.3d 558 (2d Cir. 2015)................................................................16

*United States v. Blankenship*,
  382 F.3d 1110 (11th Cir. 2004) ...............................................33, 34, 35, 36

*United States v. Blechman*,
  782 F. Supp. 2d 1238 (D. Kans. 2011) ...............................................45

*United States v. Cabrales*,
  524 U.S. 1 (1998).........................................................................45

*United States v. Camick*,
  796 F.3d 1206 (10th Cir. 2015) ........................................................10

*United States v. Cardall*,
  885 F.2d 656 (10th Cir. 1989) ....................................................26, 31

*United States v. Castile*,
  795 F.2d 1273 (6th Cir. 1986) ........................................................30

*United States v. Cochran*,
  109 F.3d 660 (10th Cir. 1997) .....................................................9, 24

*United States v. Deffenbaugh Indus., Inc.*,
  957 F.2d 749 (10th Cir. 1992) ........................................................32

*United States v. DeMizio*,
  No. 08-CR-336 JG, 2012 WL 1020045 (E.D.N.Y. Mar. 26, 2012), *aff'd*, 741
  F.3d 373 (2d Cir. 2014).................................................................14

*United States v. Facchini*,
  874 F.2d 638 (9th Cir. 1989) (en banc) ...............................................35

*United States v. Facteau*,
  1:15-cr-10076-ADB, 2016 WL 4445741 (D. Mass. Aug. 22, 2016)...................15, 16

*United States v. Ford*,
  639 F.3d 718 (6th Cir. 2011) ..........................................................34

*United States v. Gatewood*,
  173 F.3d 983 (6th Cir. 1999) ....................................................19, 23, 24, 25

*United States v. Good*,
  326 F.3d 589 (4th Cir. 2003) ....................................................19, 20, 23, 24, 25

*United States v. Holmes*,
  No. 5:18-cr-00258-EJD, 2020 WL 666563 (N.D. Cal. Feb. 11, 2020) ..............12, 13

*United States v. Holstrom*,
   242 F. App'x 397 (9th Cir. 2007) ....................................................................34, 35

*United States v. Jackson*,
   No. 3:16–CR–31, 2017 WL 1129941 (N.D. W. Va. Mar. 24, 2017) ..............12, 13

*United States v. John*,
   477 F. App'x 570 (11th Cir. 2012) .............................................................45

*United States v. Jones*,
   676 F. Supp. 2d 500 (W.D. Tex. 2009).........................................................27

*United States v Kozminski*,
   487 U.S. 931 (1988).........................................................................41

*United States v. Kurtz*,
   No. 04-CR-0155A, 2008 WL 1820903 (W.D.N.Y. Apr. 21, 2008) ....................17, 18

*United States v. Lanier*,
   520 U.S. 259 (1977)..................................................................37, 38, 40

*United States v. London*,
   550 F.2d 206 (5th Cir. 1977) ..................................................................8

*United States v. Mann*,
   884 F.2d 532 (10th Cir. 1989) .................................................................26

*United States v. Maze*,
   414 U.S. 395 (1974)..........................................................................30

*United States v. Miller*,
   111 F.3d 747 (10th Cir. 1997) .................................................................45

*United States v. Novak*,
   443 F.3d 150 (2d Cir. 2006)...................................................................17

*United States v. Pace*,
   314 F.3d 344 (9th Cir. 2002) ..................................................................25

*United States v. Pope*,
   613 F.3d 1255 (10th Cir. 2010) ..........................................................6, 9, 10

*United States v. Redcorn*,
   528 F.3d 727 (10th Cir. 2008) .......................................................25, 26, 30, 31

*United States v. Regent Office Supply Co.*,
   421 F.2d 1174 (2d Cir. 1970)................................................................17, 18

*United States v. Rodgers*,
466 U.S. 475 (1984)................................................................32, 33, 34, 35

*United States v. Sadler*,
750 F.3d 585 (6th Cir. 2014) ...................................................................12, 13

*United States v. Santos*,
553 U.S. 507 (2008)...................................................................................39

*United States v. Shellef*,
507 F.3d 82 (2d Cir. 2007)....................................................................17, 18

*United States v. Slay*,
717 F. Supp. 689 (E.D. Mo. 1989) ..........................................................12, 13

*United States v. Slay*,
858 F.2d 1310 (8th Cir. 1988) ................................................................12, 13

*United States v. Smith*,
641 F.3d 1200 (10th Cir. 2011) ..........................................................44, 45, 46

*United States v. Starr*,
816 F.2d 94 (2d Cir. 1987).........................................................................17

*United States v. Takhalov*,
827 F.3d 1307 (11th Cir. 2016) ..............................................................16, 18

*United States v. Thompson*,
484 F.3d 877 (7th Cir. 2007) ......................................................................46

*United States v. Todd*,
446 F.3d 1062 (10th Cir. 2006) ....................................................................9

*United States v. Trammell*,
133 F.3d 1343 (10th Cir. 1998) ...................................................................25

*United States v. Warme*,
No. 09-CR-19A, 2010 WL 125846 (W.D.N.Y. Jan. 7, 2010) ....................27, 28, 29

*United States v. Webb*,
24 F. Supp. 3d 432 (M.D. Pa. 2014) .............................................................26

*United States v. Weimert*,
819 F.3d 351 (7th Cir. 2016) ......................................................................47

*United States v. Weiss*,
630 F.3d 1263 (10th Cir. 2010) ........................................................25, 28, 29, 30

*United States v. Williams*,
934 F.3d 1122 (10th Cir. 2019) ...................................................18

*United States v. Wright*,
988 F.2d 1036 (10th Cir. 1993) ...............................................32, 35

*United States v. Zander*,
794 F.3d 1220 (10th Cir. 2015) ...................................................18

**Constitution, Statutes, and Rules**

18 U.S.C. § 666(a)(1)(A) ...............................................................4

18 U.S.C. § 1001 .............................................................. *passim*

18 U.S.C. § 1343 ......................................2, 4, 8, 10, 18, 25, 27, 28

Economic Espionage Act, 18 U.S.C. §§ 1831–39 ..........................41

Fed. R. Crim. P. 12(b)(3)(A)(i) ...................................................44

Fed. R. Crim. P 12(b)(3)(B)(v) ...............................................9, 10

Fed. R. Crim. P. Rule 18 .............................................................44

U.S. Const. amend. V ..................................................................37

U.S. Const. amend. VI .................................................................44

U.S. Const. art. III § 2, cl. 3 ........................................................44

U.S. Constitution.........................................................................44

**Other Authorities**

Aruna Viswanatha & Kate O'Keeffe, *U.S. Struggles to Stem Chinese Efforts to Recruit Scientists*, Wall Street Journal, Nov. 17, 2019 ..........................2

Attorney General Jeff Sessions Announces New Initiative to Combat Chinese Economic Espionage, Dep't of Justice (Nov. 1, 2018), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-announces-new-initiative-combat-chinese-economic-espionage....................................1

China Initiative Conference, Ctr. for Strategic & Int'l Studies at 3:23:51 (Feb. 6, 2020), https://www.csis.org/events/china-initiative-conference?utm_medium=email&utm_source=govdelivery..................................40

China Initiative Fact Sheet, Dep't of Justice (Nov. 1, 2018), https://www.justice.gov/opa/speech/file/1107256/download ...................................1

*Chinese Scientists & Security*, Science, July 5, 2019,
https://science.sciencemag.org/content/365/6448/9 ..............................................................39

Press Release, On Senate Floor, Portman Outlines Upcoming Bipartisan
Legislation to Stop China's Theft of U.S. Taxpayer-Funded Intellectual
Property (May 13, 2020), https://www.portman.senate.gov/newsroom/press-
releases/senate-floor-portman-outlines-upcoming-bipartisan-legislation-stop-
chinas ......................................................................................................................................2

Aruna Viswanatha & O'Keeffe, *China's Funding of U.S. Research Raises Red
Flags*, Wall Street Journal, Jan. 30, 2020 ..............................................................39

**INTRODUCTION**

On November 1, 2018, the Department of Justice launched "The China Initiative."[1] Its purported goal was to combat the national security threat posed by China by focusing prosecutorial attention on "identifying and prosecuting those engaged in trade secret theft, hacking and economic espionage."[2] According to then–Attorney General Jeff Sessions, "Chinese economic espionage against the United States has been increasing—and it has been increasing rapidly. Enough is enough. We're not going to take it anymore."[3] The Attorney General announced a task force dedicated to rooting out the suspected malefactors who were targeting American intellectual property.

Fast forward two years to the arrest and prosecution of Dr. Franklin Tao, a Princeton-educated and highly respected and accomplished tenured chemical engineering professor at the University of Kansas (KU). Dr. Tao was swept up in the China Initiative dragnet even though he is not alleged to have engaged in any of the activities the initiative was meant to punish and deter. He is not alleged to have stolen trade secrets; or committed economic espionage; or improperly shared sensitive information with anyone who was not entitled to receive it. His charged offense? He allegedly failed to disclose on two KU Conflict of Interest forms an affiliation he had with a university in China and a Talent Program aimed at recruiting professors to work in China. According to the government, the consequence of this nondisclosure was that Dr. Tao was able to maintain his employment at KU, where his salary was sponsored in part by

---

[1] Attorney General Jeff Sessions Announces New Initiative to Combat Chinese Economic Espionage, Dep't of Justice (Nov. 1, 2018), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-announces-new-initiative-combat-chinese-economic-espionage.

[2] *See, e.g.*, Attorney General Jeff Session's [sic] China Initiative Fact Sheet, Dep't of Justice (Nov. 1, 2018), https://www.justice.gov/opa/speech/file/1107256/download.

[3] *Id.*

grants from the Department of Energy (DOE) and the National Science Foundation (NSF). In a breathtaking example of prosecutorial overreach, the government has contrived a 10-count Indictment—including seven counts of wire fraud—on the basis of these two allegedly false Conflict of Interest forms that it contends Dr. Tao submitted to his employer.

But as the current Chairman of the Senate Permanent Subcommittee on Investigations recently observed, a professor's nondisclosure to an employer or a federal agency of a relationship with a Chinese university is "not a crime," even if the professor has received funding from the foreign university.[4] And "association with a Talent Program is not illegal," as Assistant Attorney General and National Security Division Chief John Demers recently stated.[5] The government, undeterred by these seemingly non-controversial observations, reportedly now seeks to use this prosecution as "a potential blueprint" wherein prosecutors could "test[] out a new approach" of prosecuting professors affiliated with Talent Programs "without having to produce evidence of intellectual property theft or export control violations."[6] Even though working for a Chinese University or a Chinese Talent Program is legal—indeed, it was strongly encouraged by KU and other U.S. universities and the government until very recently—the government has taken those two allegedly false Conflict of Interest forms and wrung out 10 felony charges: seven counts of wire fraud, in violation of 18 U.S.C. § 1343, and three counts of making false statements in a matter within the jurisdiction of Executive Branch agencies, in

---

[4] Press Release, On Senate Floor, Portman Outlines Upcoming Bipartisan Legislation to Stop China's Theft of U.S. Taxpayer-Funded Intellectual Property (May 13, 2020), https://www.portman.senate.gov/newsroom/press-releases/senate-floor-portman-outlines-upcoming-bipartisan-legislation-stop-chinas.

[5] *See* Aruna Viswanatha & Kate O'Keeffe, *U.S. Struggles to Stem Chinese Efforts to Recruit Scientists*, Wall Street Journal, Nov. 17, 2019, https://www.wsj.com/articles/u-s-struggles-to-crack-down-on-chinese-efforts-to-recruit-scientists-11574010542.

[6] *Id.*

violation of 18 U.S.C. § 1001.

As remarkable as these charges are, even more striking is what is not alleged: Not only is Dr. Tao not alleged to have misappropriated any intellectual property from KU, let alone given it to China, there is no allegation that he failed in *any* way in his performance as a KU professor, including in his work on federal grants.[7] Nor is there any allegation that Dr. Tao misused grant funds by, for example, diverting it to his personal benefit. Nor is there any allegation that DOE or NSF were dissatisfied or unhappy, even now, with the grant work he performed.

Nevertheless, the government has turned a garden-variety employment issue that is well within the jurisdiction of a Human Resources department—and could be resolved with enhanced disclosure forms, basic compliance training, or in a worst-case scenario a letter of reprimand—into a federal case involving nearly a dozen felony charges. Not surprisingly, the government's attempt to criminalize an employer–employee dispute over Dr. Tao's affiliations cannot withstand legal scrutiny. The Indictment must therefore be dismissed.

As this Motion makes clear, the Indictment cannot stand because (1) the alleged object of the scheme was not to deprive KU, DOE, or NSF of money or property, as required to constitute wire fraud, and mere acts of deception are insufficient to state an offense if they are not meant to fraudulently obtain money or property; (2) the Indictment fails to allege facts that, if true, render the Conflict of Interest forms actually false; (3) the wire fraud charges in Counts 1 through 4 and Count 7 fail to allege that the charged uses of interstate wires were "for the purpose of executing" the fraud scheme; (4) the false statements charges in Counts 8 and 9 were not made in

---

[7] Indeed, Dr. Tao was awarded the University Scholarly Achievement Award by KU's Chancellor for 2018, the year he allegedly defrauded KU of his salary. *See Chancellor to Present Four University Scholar Achievement Awards on April 24* (KU Office of Research), Apr. 3, 2019, https://research.ku.edu/news/chancellor-present-four-university-scholarly-achievement-awards-april-24.

a "matter within the jurisdiction of" the Executive Branches of the United States Government; (5) the Indictment violates the Due Process Clause's fair warning requirement, because no person of common intelligence would think that submitting a false Conflict of Interest form to one's employer would subject him or her to 10 felony charges and potentially decades in prison; and (6) Count 10, alleging false statements, must be dismissed because there is no venue in the District of Kansas for this charge, as the Indictment alleges that the statement was made while Dr. Tao was "outside the United States," and it is well-settled that the proper venue for a false statement charge is where the false statement was allegedly made. In short, the government's "blueprint" is defective, and the Indictment upon which it is built must be dismissed.

## BACKGROUND

On August 21, 2019, Dr. Tao was charged in a four-count indictment with one count of wire fraud, in violation of 18 U.S.C. § 1343, and three counts of program fraud, in violation of 18 U.S.C. § 666(a)(1)(A), for allegedly failing to disclose to KU that he had accepted a job at Fuzhou University ("FZU") in China. ECF No. 1. After Dr. Tao moved to dismiss the indictment, ECF No. 30, the government mooted that motion by filing a much-lengthier superseding indictment, on January 15, 2020, charging Dr. Tao with two counts of wire fraud and one count of program fraud. The government also added an allegation that Dr. Tao had failed to disclose to KU that he had accepted a job at Nagoya University in Japan. ECF No. 50. In light of the new indictment, the Court denied Dr. Tao's motion to dismiss as moot, without prejudice to re-filing it. ECF No. 51.

On June 24, 2020, the government filed the operative Second Superseding Indictment, asserting the same core allegations as the prior two indictments, but abandoning the program fraud counts and the allegations regarding Nagoya University in Japan, and added five more wire

fraud counts and three false statements counts. ECF No. 75 ("Indictment"). Despite the

government's repeated attempts to fix its prosecution theory, however, the third indictment still

fails to state an offense.

## THE SECOND SUPERSEDING INDICTMENT[8]

The operative Indictment charges Dr. Tao with seven counts of wire fraud (Counts 1

through 7) and three counts of false statements (Counts 8 through 10) based on his alleged failure

to disclose in two KU Conflict of Interest forms his recruitment by a Chinese scholars program

and FZU.

The Indictment alleges the following: In 2017, Dr. Tao applied for a professorship at

FZU, which was a research-and-technology university. Indictment ¶¶ 26–27. In July 2017, Dr.

Tao also applied for a scholars program at the encouragement of the head of the Chemistry

Department at FZU. *Id.* ¶¶ 23–24. On November 11, 2017, Dr. Tao emailed the Consulate

General of China in Illinois to obtain documents for a trip to China, *id.* ¶ 42, and between

November 18 and 24, 2017, he visited FZU to prepare materials to defend his scholars program

application, *id.* ¶ 25. Dr. Tao returned to China to defend his application between December 6

and 13, 2017. *Id.* ¶ 25. At the end of December 2017, Dr. Tao was accepted into the scholars

program. *Id.* ¶ 26.

In March 2018, following months of negotiation, Dr. Tao allegedly entered into a

contract to work for FZU, though he is not alleged to have performed any work for FZU until

some identified time between May 2018 and August 2019. *Id.* ¶¶ 28–31. Under the unsigned

---

[8] This Motion to Dismiss accepts as true the allegations in the Indictment. Thus, the numerous
factual misrepresentations and distortions in the Indictment—first and foremost that Dr. Tao ever
accepted a job at a Chinese university (which explains why the government bases its case on
evidence of an *unsigned contract offer*)—are outside the scope of this Motion to Dismiss.

contract with FZU, Dr. Tao was to have received salary and have access to resources to conduct research. *Id.* ¶ 29(B). Dr. Tao allegedly visited China periodically between May 2018 and August 2019, and at unidentified times during that period he allegedly helped recruit post-doctoral researchers to FZU and submitted one or more grant applications to a Chinese agency, including an application submitted in March 2019. *Id.* ¶ 31. The Indictment does not allege that the Chinese agency awarded any grants. *See id.*

The Indictment further alleges that despite Dr. Tao's application, offer, and acceptance of a professorship at FZU, he never disclosed his position at FZU in his annual "Institutional Responsibilities" (or "Conflict of Interest") forms, which he submitted to KU on January 9 and September 25, 2018. Indictment ¶¶ 6, 42, 44. Those forms are attached hereto as Exhibits A and B.[9] KU allegedly required professors to submit these forms to assist it "in determining whether … disclosed financial interests or time commitments (if applicable) could potentially conflict with … university responsibilities." Ex. A at 1; Ex. B at 1. According to the Indictment, another reason KU used these forms was so that it could determine whether faculty "had any financial interests or commitments of time that conflicted with [their] responsibilities to manage [United States Government]-funded research projects." Indictment ¶ 7. Consistent with NSF requirements, KU's policy allowed it to "manage, reduce, or eliminate conflicts of interest for each grant before the expenditure of the grant funds." *Id.* ¶ 13.

---

[9] At the January 6, 2020 hearing on the first Motion to Dismiss, the Court expressed interest in reviewing the Conflict of Interest forms in connection with the Motion if the parties agreed to provide them. The government responded that it was "happy to provide them with [the] defense's agreement." Mot. Hearing Tr. at 13, Jan. 6, 2020. The defense hereby agrees that the Court can consider these forms in deciding this Motion to Dismiss. *See, e.g.*, *United States v. Pope*, 613 F.3d 1255, 1260 (10th Cir. 2010) (explaining limited circumstances in which court can consider facts outside the indictment). Nevertheless, the defense maintains that the Court can dismiss the Indictment without reference to copies of the forms.

The Conflict of Interest forms required Dr. Tao to disclose "Significant Financial Interests" and "Time Commitments in External Professional Activities," and provided definitions of each. Ex. A at 4; Ex. B at 4; *see* Indictment ¶¶ 6–7. Specifically, Dr. Tao was required to disclose the names of entities in which he had a financial interest that was worth $5,000 or more in the preceding year as a "Significant Financial Interest," and the names of entities with which he "engage[s] in personal professional activities that take time away from [his] University responsibilities" as "Time Commitments." Ex. A at 4; Ex. B at 4; *see* Indictment ¶¶ 6–7. Dr. Tao allegedly certified on the final page of the forms that he read and understood KU policies, that the forms were complete and correct, that he would promptly report changes to KU, that he would obtain approval before engaging in reportable time commitments, and that he understood that he could be subject to discipline if he intentionally filed a form containing misrepresentations. *See* Ex. A at 8; Ex. B at 8; *see* Indictment ¶ 6.

The Indictment alleges that Dr. Tao's January 9 and September 25 Conflict of Interest forms were false because he was required, but failed, to disclose his position at FZU on each form. *Id.* ¶¶ 39(A), 39(E), 42, 44. The Indictment does *not* allege, however, that Dr. Tao actually received $5,000 or more from FZU, or that the amount of time he spent working for FZU impacted his ability to take care of his KU responsibilities, such that he would have needed to report his position at FZU in the forms. It also does not allege that his position at FZU actually constituted a conflict of interest that needed to be "manage[d], reduce[d], or eliminate[d]" by KU. *Id.* ¶ 13. Nor does it allege that KU would have fired Dr. Tao, reduced his pay, or even reassigned him from his federal grant work sponsored by NSF or DOE if it had learned that he had applied for or accepted a position at FZU. All it alleges is that he did not disclose the position to KU.

Based on this alleged conduct, the Indictment charges Dr. Tao with seven counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 1 through 7). Indictment ¶ 42. The wire fraud charges are based on the theory that, by failing to disclose his position at FZU to KU, Dr. Tao "fraudulently maintained his employment with KU," and thereby received his KU salary, which was paid for by KU in part by using NSF and DOE grant funds.[10] *Id.* ¶ 37. KU also allegedly requested grant funds from NSF and DOE in reliance on Dr. Tao's nondisclosures. *Id.* ¶ 38. There is no allegation, however, that Dr. Tao avoided disclosing his alleged FZU position in order to obtain money from KU or the federal agencies—rather than merely to maintain two jobs at the same time—or that KU would have fired him or taken any other action if he had disclosed a position at FZU.

The Indictment also charges Dr. Tao with three counts of making false statements, in violation of 18 U.S.C. § 1001 (Counts 8 through 10). *See* Indictment ¶¶ 43–46. Although the Indictment does not specify which of the three provisions of § 1001 it charges Dr. Tao with violating, the counts most closely track the language of § 1001(a)(2), which criminalizes certain materially false statements. *See* 18 U.S.C. § 1001(a)(2).[11] The false statements charges in

---

[10] The mechanism by which Dr. Tao allegedly received grant funds is not spelled out in the Indictment, but the government's opposition to Dr. Tao's first Motion to Dismiss dedicated three pages to explaining this process, *see* ECF No. 44 at 6–8, which boils down to one in which universities pay faculty salaries in part by using their grant awards. *See, e.g.*, *id.* at 6 ("In general, grant money provided by a federal agency to a university is deposited into a holding account controlled by the institution. Generally, a researcher only gets one paycheck, and it comes from the institution. However, the money going into the check can come from the institutions accounts, from a grant, or from some combination of the two."). Thus, the federal agencies do not pay KU employees like Dr. Tao directly. Nor is Dr. Tao the awardee of the grants; KU is.

[11] None of the three false statement counts alleges that Dr. Tao "falsifies[d] conceal[ed], or cover[ed] up by any trick, scheme, or device a material fact," which would be necessary co charge a violation of § 1001(a)(1). *See United States v. London*, 550 F.2d 206, 208 n.1 (5th Cir. 1977) (noting that "trick, scheme, or device" is an element of a § 1001(a)(1) charge). Nor do these counts, or the Indictment writ large, allege that Dr. Tao had a legal duty to disclose his alleged affiliation with FZU to NSF or DOE, which would be necessary to state a § 1001(a)(1)

Counts 8 and 9 are based on the theory that, when Dr. Tao submitted allegedly false Conflict of Interest forms to KU, those submissions were within the jurisdiction of NSF and DOE because KU received grant funds from those agencies, despite that KU used Conflict of Interest forms to collect information about its staff to ensure that they were able to fulfill their duties to the university, and that neither NSF nor DOE had statutory or other authority over KU's employee forms, or the management possible employee conflicts. *Id.* ¶ 44. The false statements charge in Count 10 is based on an allegation that Dr. Tao did not disclose his alleged position at FZU in an email to DOE on July 16, 2018, despite that it does not allege that the email itself was false. *Id.* ¶¶ 10, 39(D), 42, 46. It also alleges that Dr. Tao sent the email while he was outside the District of Kansas, and does not give a basis why Dr. Tao was charged with the offense here.

## LEGAL STANDARD

A motion to dismiss an indictment pursuant to Rule 12(b)(3)(B)(v) for failure to state an offense turns on "whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offense." *United States v. Todd*, 446 F.3d 1062, 1068 (10th Cir. 2006). Courts should "dismiss the indictment if its allegations fail that standard." *United States v. Pope*, 613 F.3d at 1260 (quoting *Todd*, 446 F.3d at 1068). Dismissal based on flaws in the Indictment are appropriate because "it focuses solely on the facts alleged in the indictment and their *legal* adequacy." *Id.* In considering such motions, courts can also resolve "pure questions of law." *Id.*

---

charge as to Count 10. *See United States v. Cochran*, 109 F.3d 660, 665 (10th Cir. 1997) (holding that government failed to prove duty of disclosure to support omission theory of fraud because "the government could not [identify] any statute, regulation, common law or contractual provision that required disclosure," or a fiduciary duty that required disclosure). Similarly, none of three counts alleges that Dr. Tao made or used "any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry," which would be necessary to allege a violation of § 1001(a)(3). Accordingly, to the extent the government intended to charge a § 1001(a)(1) or (a)(3) violation, the counts should be dismissed for these reasons as well.

In limited circumstances, courts can further consider certain "facts outside the indictment" if the government does not object to or dispute them. *Id.* As noted, those circumstances exist here with respect to the two Conflict of Interest forms alleged in the Indictment. *See supra* note 9.

## ARGUMENT

I.  **The Court should dismiss the Second Superseding Indictment under Rule 12(b)(3)(B)(v) because it fails to state an offense.**

The Indictment attempts to transform Dr. Tao's alleged omissions from his employer's Conflict of Interest forms, which is not a federal crime, into a string of federal wire fraud and false statements offenses. Even accepting the allegations in the Indictment as true, however, the Indictment fails to state either of these offenses. The Court should therefore dismiss the Indictment in its entirety.

### A.  The wire fraud charges in Counts 1 through 7 must be dismissed because the Indictment fails to allege a scheme to deprive KU, NSF, or DOE of money or property.

To state the offenses of wire fraud, the government must allege that the *object* of Dr. Tao's scheme was to deprive KU, NSF, or DOE of money or property. 18 U.S.C. § 1343; *see Kelly v. United States*, 140 S. Ct. 1565, 1568 (2020) (holding that both the wire fraud and program fraud statutes "target fraudulent schemes for obtaining property"); *United States v. Camick*, 796 F.3d 1206, 1214 (10th Cir. 2015) ("[I]t is now settled that, by including the phrase 'obtain money or property,' Congress intended to limit the reach of [the fraud statutes] to the protection of property rights. (internal quotation marks omitted)); Indictment ¶ 41 (alleging that Dr. Tao committed wire fraud by scheming to deprive KU, NSF, and DOE of "money and property"). The Indictment comes nowhere close to satisfying this critical pleading requirement for three reasons, each of which is addressed in turn below.

1.    <u>KU, NSF, and DOE had no property interest in KU's receipt of accurate information about Dr. Tao's professional external activities.</u>

The Indictment alleges that Dr. Tao concealed his position at FZU from KU on his Conflict of Interest forms, which KU uses to identify and manage possible employee conflicts of interest, so that KU would not know he had two jobs simultaneously. Courts have held, however, that withholding information from an entity, as alleged here, is not fraud unless the purpose of the concealment is to obtain money or property, which is not alleged here.

This is because the federal fraud statutes do not "criminalize" mere acts of "deception." *Kelly*, 140 S. Ct. at 1568. Instead, they are "limited in scope to protection of property rights," *Cleveland v. United States*, 531 U.S. 12, 18 (2000) (analyzing mail fraud statute) (internal quotation marks omitted)); *see Kelly*, 140 S. Ct. at 1571 ("[U]nder [the wire fraud statute], the Government had to show not only that [the defendants] engaged in deception, but that an object of the[ir] fraud [was] 'property." (internal quotation marks omitted)); *Carpenter v. United States*, 484 U.S. 19, 27 (1987) ("[T]he words 'to defraud' in the mail fraud statute have the common understanding of wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." (internal quotation marks omitted)). In *Cleveland*, the Supreme Court further refined this concept, holding that "the thing obtained must be property *in the hands of the victim*," and not merely something that "become[s] property in the recipient's hands." *Cleveland*, 531 U.S. at 15, 26–27 (emphasis added) (reversing business owner's mail-fraud conviction for "obtaining money or property" through misrepresentations made in an application for a video-poker license issued by the State of Louisiana, because the licenses were not "property in the hands" of the State). The Court cautioned that fraud scheme involving novel theories of property rights should be rejected because they would invite "a sweeping expansion of federal criminal jurisdiction in the

absence of a clear statement by Congress" and subject to federal fraud laws "a wide range of conduct traditionally regulated by state and local authorities." *Id.* at 24.[12]

Based on these principles, courts have agreed that the right to accurate information is not a "property right" under the federal fraud statutes. *See, e.g.*, *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014) (holding that the wire fraud statute is "limited in scope to the protection of *property rights*, and the ethereal right to accurate information doesn't fit that description," as it cannot "plausibly be said that the right to accurate information amounts to an interest that has long been recognized as property"); *United States v. Slay*, 858 F.2d 1310, 1316 (8th Cir. 1988) ("Withholding valuable information from the [alleged victim] is not the same as depriving the [victim] of its property, and only the latter conduct violates the mail fraud statutes."); *United States v. Holmes*, No. 5:18-cr-00258-EJD, 2020 WL 666563, *17 (N.D. Cal. Feb. 11, 2020) (holding that the "ethereal right to accurate information doesn't fit within limited property rights protected by [the] wire fraud statute" (brackets and internal quotation marks omitted)); *United States v. Jackson*, No. 3:16–CR–31, 2017 WL 1129941, at *4 (N.D. W. Va. Mar. 24, 2017) (stating that "alleged victims do not have a property right, as recognized by § 1341, to the truth," and "[c]learly, mail fraud does not punish mere deceit of another person or entity"); *United States v. Slay*, 717 F. Supp. 689, 692 (E.D. Mo. 1989) (holding on remand that the "interest in accurate information . . . does not rise to a property interest within the meaning of [the Supreme Court's decision in *McNally v. United States*]"); *see also McNally v. United States*, 483 U.S. 350,

---

[12] This past term in *Kelly*, the Supreme Court reiterated its "oft-repeated instruction" that "Federal prosecutors may not use property fraud statutes to 'set[ ] standards of disclosure and good government for local and state officials.'" 140 S. Ct. at 1574. Writing for a unanimous Court, Justice Kagan explained that if prosecutors "could prosecute as property fraud every lie . . . the result would be . . . 'a sweeping expansion of federal criminal jurisdiction,'" and "the Federal Government could use its criminal law to enforce (its view of) integrity," an outcome "[t]he property fraud statutes do not countenance …." *Id.* (quoting *Cleveland*, 531 U.S. at 24).

360 (1987) (holding that the mail fraud statute is limited to protection of money or property rights and not the intangible right to honest services)*, superseded by statute as recognized in Skilling v. United States*, 561 U.S. 358, 402 (2010); *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 727 (D.C. Cir. 2019) (relying on *Cleveland* and holding that the "right to be informed . . . does not constitute a traditional property right" under the False Claims Act).

Here, Counts 1 through 7 must be dismissed because the Indictment alleges—at best—that Dr. Tao deprived KU of accurate information about his alleged position at FZU, which is not money or property. *See Sadler*, 750 F.3d at 591; *Slay*, 858 F.2d at 1316; *Kasowitz*, 929 F.3d at 727; *Holmes*, 2020 WL 666563, at *17; *Jackson*, 2017 WL 1129941, at *4; *Slay*, 717 F. Supp. at 692; *see also McNally*, 483 U.S. at 360. This is true even if KU were unable to properly manage Dr. Tao's potential conflicts of interest as a result of his nondisclosure. *See Dietz v. Cypress Semiconductor Corp.*, 711 F. App'x 478, 483 (10th Cir. 2017) ("[I]t is not enough [under the mail and wire fraud statutes] merely to fraudulently induce the victim to take some action—there must be a conscious objective to *deprive* the victim of property."). This conclusion applies *a fortiori* as to NSF and DOE, as the Indictment does not allege that those agencies had any legal interest—let alone a property interest—in the accuracy of the Conflict of Interest forms Dr. Tao submitted to KU.

Notably, the Supreme Court has already rejected the very fraud theory the Indictment seeks to advance here. Following the Supreme Court's decision in *McNally v. United States*, which held that the federal fraud statutes did not extend to schemes to deprive an entity of the intangible right to honest services, 483 U.S. at 360, Congress enacted the honest services fraud statute in an attempt to criminalize such schemes. *See* Anti-Drug Abuse Act of 1988, Pub. L.

100-690 § 7603, 102 Stat 4184 (1988) (codified at 18 U.S.C. § 1346). In *United States v. Skilling*, however, the Supreme Court held that the new statute was void for vagueness except as applied to situations involving kickbacks or bribes. 561 U.S. at 404, 409–10. In doing so, the Court expressly rejected the government's argument that nondisclosure of conflicts of interest— as alleged here—was a constitutionally sound fraud theory. *Id.* at 404, 409–10 (rejecting government's argument that Congress sought to revive "nondisclosure of a conflicting financial interest" as a cognizable fraud theory); *see, e.g.*, *United States v. DeMizio*, No. 08-CR-336 JG, 2012 WL 1020045, at *6 (E.D.N.Y. Mar. 26, 2012) ("The [Supreme] Court rejected some theories of honest services fraud that many lower courts had accepted, such as undisclosed self-dealing or conflicts of interest, because the scope of such theories could not be defined with sufficient precision."), *aff'd*, 741 F.3d 373 (2d Cir. 2014). The Indictment's attempt to revive this theory is unavailing.

2.   <u>The Indictment cannot artfully plead a fraud scheme merely by alleging that Dr. Tao continued to receive salary after he allegedly lied to KU.</u>

The Indictment cannot circumvent the well-established principles set forth above, and contrive a fraud scheme where there is none, merely by alleging that Dr. Tao continued to receive a salary from KU, some of which KU paid using federal grant money, after he allegedly failed to disclose his position at FZU to KU. *See* Indictment ¶¶ 32–33, 37. Indeed, even maintenance of salary—which is, at most, what is alleged here—is not "money or property" under the wire-fraud statute.

Courts have agreed that a scheme to maintain employment is not a scheme to deprive a person of money or property, even though it leads to salary. For example, in *United States v. Billmyer*, No. 94-29-01-JD, 1995 WL 54471, at *9 (D.N.H. Feb. 3, 1995), a case with far more egregious facts than are alleged here, the court held that allegations that an employee concealed

from his employer that he accepted kickbacks in violation of a conflict-of-interest policy and then continued to receive salary, despite that he would have been fired if he disclosed the kickbacks, did not state the offense of mail fraud. *Id.* The court rejected the government's argument that "fraudulent obtainment of salary" satisfied the "money or property" element. *Id.* The court distinguished between, on one hand, a scheme "undertaken for purposes of *obtaining* the salaried positions" and where "the defendants were directly charged with *fraudulently procuring* their positions for purposes of defrauding their employers of salary payments," which could satisfy the money-or-property element, and, on the other hand, a scheme by a current employee to "*continue*[ ] to accrue [ ] salary," which cannot satisfy the element. *Id.* (emphasis added).

The court in *United States v. Facteau*, 1:15-cr-10076-ADB, 2016 WL 4445741, at *10 (D. Mass. Aug. 22, 2016), similarly held that a scheme to maintain employment is not a scheme to obtain money or property. *Id.* (citing *Billmyer*, 1995 WL 54471, at *9). The court distinguished between a defendant's mere maintenance of a job and salary—such as is alleged here—and a fraudulent attempt to obtain increased compensation: "[W]hile the mere maintenance of a preexisting salary or employment did not satisfy the 'money or property' requirement of the wire fraud statute, obtaining a new position, an increase in salary, or the payment of a bonus could be sufficient, as long as those benefits were obtained through the fraudulent scheme, and the defendant was not otherwise entitled to receive those benefits." *Id.*[13]

Even if the allegations could be construed to imply that Dr. Tao schemed to maintain his

---

[13] The government simply ignored these cases when the defense raised them in its first Motion to Dismiss, refusing even to acknowledge them. *See* ECF No. 30 at 10–14; ECF No. 44 at 5–8.

position and salary at KU[14]—as opposed to fraudulently obtaining the job in the first place, or fraudulently obtaining a bonus—that would not be a scheme whose object is to obtain money or property from KU, even if a byproduct is the continued receipt of salary and other benefits. *See Billmyer*, 1995 WL 54471, at *9; *Facteau*, 2016 WL 4445741, at *10; *see also Kelly*, 140 S. Ct. 1573 (holding that the property at issue "must be an 'object of the fraud,'" and thus "a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme").[15]

3.  <u>Dr. Tao's alleged nondisclosure does not constitute fraud because there is no allegation that he failed to perform any KU job duties, including grant work, in exchange for his salary.</u>

Even if a scheme to "maintain employment" could, contrary to the case law cited above, be a scheme to deprive an employer of "money or property," the Indictment would still fail to adequately allege such a scheme because there is no allegation that Dr. Tao did not fully perform his job duties, including as to work sponsored by federal grants, in exchange for his salary.

Courts have routinely held that a defendant does not deprive an alleged victim of money or property merely by making a misrepresentation during the course of a bargain, if the alleged victim still gets what he or she paid for. *See, e.g.*, *United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016) (stating that, "even if a defendant lies . . . a wire-fraud case must end in acquittal if the jury nevertheless believes that the alleged victims received exactly what they paid for" (internal quotation marks omitted)); *United States v. Binday*, 804 F.3d 558, 570 (2d Cir.

---

[14] And even this construction is unsupported by the Indictment, since there is no allegation that Dr. Tao's KU employment or salary decisions hinged on the disclosures made in his Conflict of Interest forms.

[15] This theory of "money or property" would also contravene the Supreme Court's holding in *Cleveland*, because Dr. Tao's maintenance of employment is not "property in the hands" of KU. 531 U.S. at 15, 26–27.

2015) ("[W]e have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain."); *United States v. Shellef*, 507 F.3d 82, 109 (2d Cir. 2007) (holding that indictment was legally insufficient where it failed to allege a "discrepancy between benefits reasonably anticipated and actual benefits received" (internal quotation marks omitted)); *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) (holding that "[a]n intent to harm a party to a transaction cannot be found where the evidence merely indicates that the services contracted for were dishonestly completed," and reversing conviction where the defendant's "conduct did not affect an essential element of [the] bargains"); *United States v. Starr*, 816 F.2d 94, 99 (2d Cir. 1987) (reversing mail and wire fraud convictions because, although "customers were deceived," the "customers received exactly what they paid for," and "there was no discrepancy between benefits 'reasonably anticipated' and actual benefits received"); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir. 1970) (holding that intentional falsehoods do not establish fraud absent "proof that the defendants expected to get 'something for nothing,' or that they intended to get more for their merchandise than it was worth to the average customer," and rejecting the government's theory that "false representations, in the context of a commercial transaction, are per se fraudulent despite the absence of any proof of actual injury to any customer" (citation omitted)); *United States v. Kurtz*, No. 04-CR-0155A, 2008 WL 1820903, *2–3 (W.D.N.Y. Apr. 21, 2008) (holding that an indictment failed to allege a scheme by defendant buyer of chemicals to deprive victim seller of "money or property" because, although the buyer misrepresented his identity to buy the chemicals in violation of the seller's policy, the seller "got what it bargained for" once it was paid).

Here, the Indictment does not allege that Dr. Tao defrauded KU of his salary, which KU

paid for in part with federal grants, because it does not allege that Dr. Tao failed to earn that salary by performing all job duties in exchange for it—including those related to his work on KU's federal grants—to the complete satisfaction of KU, NSF, or DOE.[16] *See Takhalov*, 827 F.3d at 1314; *Shellef*, 507 F.3d at 109; *Regent Office Supply*, 421 F.2d at 1181; *Kurtz*, 2008 WL 1820903, at *2. Absent this allegation, the Indictment fails to allege wire fraud.[17]

* * * * *

In sum, because the Indictment fails to allege a scheme to fraudulently deprive KU, NSF, or DOE of money or property, the wire fraud charges in Counts 1 through 7 of the Indictment must be dismissed.

**B.    The wire fraud and false statement charges in Counts 1 through 10 must be dismissed because the Indictment fails to allege an actual misrepresentation.**

1.    <u>To survive dismissal, Counts 1 through 10 must allege facts that, if true, render the representations at issue false.</u>

To allege wire fraud and false statements, the government must allege that Dr. Tao made a misrepresentation. *See United States v. Zander*, 794 F.3d 1220, 1230 (10th Cir. 2015) (elements of wire fraud in violation of 18 U.S.C. § 1343 are: "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of interstate wire or radio communications to execute the scheme"); *United States v. Williams*, 934 F.3d 1122, 1128 (10th Cir. 2019) (elements of false statements in

---

[16] Far from failing to earn his salary, Dr. Tao was awarded the University Scholarly Achievement Award by KU's Chancellor for 2018, the year he allegedly defrauded KU of his salary. *See Chancellor to Present Four University Scholar Achievement Awards on April 24*, supra note 7.

[17] The Indictment also alleges that Dr. Tao schemed to "benefit the PRC by participating in a 'talent plan,' … and to conceal the scheme." Indictment ¶ 33. These allegations also fail to describe a scheme whose object was to deprive a victim of money or property. Indeed, benefitting a third party, or concealing that aim, are not fraud schemes whose objects are to obtain money or property. 18 U.S.C. § 1343.

violation of 18 U.S.C. § 1001(a)(2) are: "(1) the defendant made a statement; (2) the statement was false, fictitious, or fraudulent as the defendant knew; (3) the statement was made knowingly and willfully; (4) the statement was within the jurisdiction of the federal agency; and (5) the statement was material"); *see also* Indictment ¶ 41 (wire fraud count); Indictment ¶¶ 44, 46 (false statements counts).

To allege a false representation sufficient to survive dismissal, an indictment must allege facts that, if true, render the representation false. For example, in *United States v. Gatewood*, 173 F.3d 983, 987 (6th Cir. 1999), the government alleged that the defendant falsely certified that "he had made payments to subcontractors and suppliers," which the government alleged was untrue because the defendant "had not made *full* payment to the subcontractors and suppliers." *Id.* (emphasis added). The Sixth Circuit reversed the defendant's conviction because the indictment's false-certification theory relied on a "false dichotomy," as "certifying that one has made payments to subcontractors is not inconsistent with having yet to pay the subcontractors in full." *Id.* Because the indictment did not actually "present a false statement" or "raise a direct conflict between the certification" and "the actual facts," the indictment failed to state an offense. *Id.*

Similarly, in *United States v. Good*, 326 F.3d 589, 592 (4th Cir. 2003), the government alleged that the defendant falsely certified in a government application that she had never been convicted of certain disqualifying crimes, including theft, fraud, dishonesty, and misrepresentation, despite that she had been convicted of embezzlement. *Id.* at 591–92. The Fourth Circuit upheld the district court's dismissal of the indictment because, although embezzlement may *involve* dishonesty, fraud, and misrepresentation, embezzlement is a different crime. *Id.* The indictment therefore failed to allege an actual false certification sufficient to

survive dismissal. *Id.* at 592; *see also United States v. Baer*, 92 F. App'x 942, 944, 946 (4th Cir. 2004) (affirming dismissal of indictment where the defendant's statement about past convictions in a government application was "literally true," because a conviction cannot stand "on the basis of a statement that is literally true, even if that statement is misleading").

        2.      <u>Counts 1 through 4 and Counts 6 through 9 must be dismissed because they fail to allege facts that, if true, render the representations in the Conflict of Interest forms false.</u>

The wire fraud charges in Counts 1 through 7 and the false statement charges in Counts 8 and 9 are premised on the assumption that Dr. Tao submitted false Conflict of Interest forms to KU, on January 9, 2018 and September 25, 2018, because he allegedly omitted from those forms information about his application to FZU and acceptance of a position there. These counts must be dismissed, however, because the Indictment does not allege facts that, if true, rendered Dr. Tao's Conflict of Interest forms false.

Beginning with the January 9, 2018 form, there is no allegation that, as of that date, Dr. Tao had a reportable "Significant Financial Interest" or a reportable "Time Commitment in External Professional Activities" with respect to FZU. *See* Ex. A at 4; Ex. B at 4; *see* Indictment ¶¶ 6–7.[18] Far from alleging that Dr. Tao had received $5,000 or more in the preceding year from

---

[18] The government cannot reasonably argue that Dr. Tao had a reportable Conflict of Interest as of January 9, 2018. Indeed, the case agent himself testified to the grand jury:

    **Q.** [T]he date that [Dr.] Tao entered into the contract with Fuzhou was May 1st, 2018, correct? … That's the moment that he sort of developed this conflict of interest that he later did not disclose, correct?

    **A.** Correct.

Grand Jury Hearing Tr. at 17–18, Aug. 21, 2020. Lest there be any doubt, later in the hearing, the case agent reaffirmed this testimony:

    **The Witness:** [N]ot until May 1st of 2018 was there a conflict which he should have disclosed.

*Id.* at 35.

FZU, the Indictment does not even allege that he had accepted an offer from FZU until two months later, in March 2018. Indictment ¶¶ 28–30. In addition, while the Indictment alleges that a scholars program accepted Dr. Tao at the end of December 2017, it does not allege that the scholars program paid him any money before January 9, 2018, or ever, let alone $5,000. Nor does it allege that the program required any work by Dr. Tao that would have impacted his KU responsibilities. To the contrary, it alleges that the scholars program conferred an honorific title, which is distinct from employment. *Id.* ¶ 21. Nor does the Indictment allege that Dr. Tao had a reportable time commitment as to FZU as of January 9, 2018 that would have interfered with his KU responsibilities, as he had not even taken the position by then. Thus, even accepting the allegations as true, the Indictment does not adequately allege that Dr. Tao had anything to report on the Conflict of Interest forms as of January 9, 2018, such that this nondisclosure of FZU in the January 9, 2018 form rendered it false. The wire fraud charge in Counts 1 through 4 must therefore be dismissed because they are all premised on a false statement in the January 9, 2018 Conflict of Interest form (or, for Counts 1 and 2, which predate the January 9 form, the failure to volunteer the same information that was allegedly absent from the January 9 form). And the false statements charge in Count 8, which alleges that the January 9, 2018 form constituted a false statement within the jurisdiction of an Executive Branch agency, must also be dismissed.

The Indictment also fails to allege facts that, if true, would render September 25, 2018 Conflict of Interest form false. Although the Indictment alleges that Dr. Tao had accepted a position and entered into a contract with FZU in March 2018 that *promised* to pay him salary beginning in May 2018, *id.* ¶ 29(B), it conspicuously fails to allege that he received $5,000 or more (or any specified amounts) from FZU or anyone else prior to September 25, 2018 such that it was a reportable "Significant Financial Interest." Ex. A at 4; Ex. B at 4; *see* Indictment ¶¶ 6–7.

A careful reading of the Indictment reveals that it fails to allege that Dr. Tao had a reportable time commitment as of September 25, 2018. The Indictment alleges that Dr. Tao traveled to China between May 2018 and August 2019, and at some *unidentified* time during that period "fulfilled his contractual obligations to FZU," including by recruiting and submitting grants, *id.* ¶ 31, but it conspicuously fails to allege that he had performed any such work for FZU prior to September 25, 2018. To the contrary, the only work for FZU specifically identified in the Indictment occurred when Dr. Tao helped submit a grant application in China on March 17, 2019, *after* he had submitted the September 25, 2018 Conflict of Interest form. Moreover, regardless of when the alleged work occurred within this time frame, there is no allegation that the work would have materially impacted Dr. Tao's job responsibilities at KU, which is the prerequisite for disclosure in the Conflict of Interest form. Thus, even accepting the allegations as true, the Indictment does not adequately allege that Dr. Tao's nondisclosure regarding FZU in the September 25, 2018 form rendered the form false. The wire fraud charges in Counts 6 and 7 must be dismissed because they are premised on a false statement in the September 25, 2018 Conflict of Interest form.[19] And the false statements charge in Count 9, which alleges that the September 25, 2018 form constituted a false statement within the jurisdiction of an Executive Branch agency, must also be dismissed for this same reason.[20]

---

[19] The September 25, 2018 Conflict of Interest form also cannot form the basis of charges that Dr. Tao somehow defrauded NSF and DOE, because KU did not submit any grant applications on or after September 25, 2018. *See* Indictment ¶ 15 (alleging that KU submitted its grant application to NSF in October 2017, and NSF awarded the grant in June 2018); *id.* ¶ 10–11 (alleging that KU submitted its grant application to DOE in December 2017, and DOE awarded the grant on September 18, 2018). Thus, the alleged misrepresentations could not have been made to obtain grant awards, which had already been awarded.

[20] Although the January 9 and September 25, 2018 Conflict of Interest forms are the fulcrum of the Indictment's allegations that Dr. Tao lied to KU, the Indictment alleges other purported misrepresentations that warrant brief consideration. The Indictment alleges that, on January 29, 2018, Dr. Tao falsely certified to KU that he had no disclosures to report since the date he had

Accordingly, because the Indictment does not allege facts that, if true, rendered Dr. Tao's January 9, 2018 or September 25, 2018 Conflict of Interest forms false, Counts 1 through 4 and Counts 6 through 9 should be dismissed. *See Gatewood*, 173 F.3d at 987; *Good*, 326 F.3d at 592.

### 3. Counts 5 and 10 fail to allege facts that, if true, render the July 16, 2018 email to DOE false.

Counts 5 and 10 are premised on the assumption that Dr. Tao made a false statement in a July 16, 2018 email to DOE. The Indictment alleges: "As part of the [DOE grant] application, DOE required [Dr. Tao] to identify his institutional affiliations and his current and pending support, to include funding from foreign governments and institutions. … On or about July 10, 2018, while [KU's] grant application was under review, DOE asked [Dr. Tao] to update his current and pending support, to include any submissions planned in the future. Thereafter, on or about July 16, 2018, in response to DOE's request, [Dr. Tao] provided DOE with a document identifying only his USG funding sources." Indictment ¶ 10. The Indictment avers that Dr. Tao's submission was false because he "was receiving, and expected to receive, funding from FZU and the PRC." *Id.* ¶ 39(D); *accord id.* ¶ 46.

Taking the allegations as true, the July 16, 2018 email did not include a statement that was actually false. Rather than alleging that Dr. Tao falsely told DOE in his email that he had nothing to report besides his U.S. grants, or that he had falsely reported that he had no position at

---

submitted his form on January 9, 2018. *Id.* ¶ 39(B). This representation was not false for the same reason that the January 9, 2018 form was not false. On May 17, 2018, Dr. Tao allegedly proposed a collaborative research project to KU involving FZU, and thereafter asked if FZU could buy out his KU teaching responsibilities for the Spring 2019 semester. *Id.* ¶ 39(C). Putting aside the fact that this allegation is untethered to a fraud scheme or federal agency jurisdiction, this allegation does not include a misrepresentation. There is no allegation that Dr. Tao stated he had *not* accepted a position at FZU, or that he had a legal duty to report his position to FZU at that time. Thus, these other extraneous allegations do not constitute actual misrepresentations that can stand in for the faulty Conflict of Interest form allegations.

another university, the Indictment merely alleges that Dr. Tao omitted from the email and list of current and pending support his position at FZU. Indictment ¶ 10. But provision of a list of "current and pending support" that is incomplete does not constitute an actually false statement. *See, e.g.*, *Gatewood*, 173 F.3d at 987 (defendant certification that "he had made payments to subcontractors and suppliers" was not untrue merely because defendant "had not made *full* payment to the subcontractors and suppliers" (emphasis added)). Listing some current and pending support "is not inconsistent with having" other current and pending support. *Id.* It is also "literally true" that Dr. Tao's "current and pending support" included U.S. grants, even if the Indictment alleges that he should have *also* listed his alleged position at FZU to be more complete. *See Good*, 326 F.3d at 592; *Baer*, 92 F. App'x at 944, 946. Without an affirmative false statement, Dr. Tao's July 16, 2018 email cannot form the basis of a misrepresentation in violation of the wire fraud statute or § 1001(a)(2).

To the extent the Indictment attempts to allege concealment of a material fact in violation of § 1001(a)(1), rather than an affirmative false statement in violation of § 1001(a)(2), these counts also fail. As an initial matter, Count 10 does not allege concealment of a material fact in violation of § 1001(a)(1). *See supra* note 11. But to the extent Count 10 meant to charge a § 1001(a)(1) concealment violation, the count would still be defective because there is no allegation that Dr. Tao "falsifie[d], conceal[ed], or cover[ed] up by any trick, scheme, or device a material fact." 18 U.S.C. § 1001(a)(1). Even more problematic, it would still be defective because there is no allegation that Dr. Tao had a legal duty to disclose his position at FZU to DOE in the email. *See, e.g.*, *Cochran*, 109 F.3d at 665 (holding that government failed to prove duty of disclosure to support omission theory of fraud because "the government could not [identify] any statute, regulation, common law or contractual provision that required disclosure,"

or a fiduciary duty that required disclosure). The Indictment alleges that Dr. Tao owed a fiduciary duty to KU since he was a KU employee, Indictment ¶ 5, but it does *not* allege that he owed a fiduciary or other legal duty to DOE that would have rendered the omission an actionable false statement.

Thus, Counts 5 and 10 must be dismissed because they fail to allege an actual, actionable false statement or misrepresentation. *See Gatewood*, 173 F.3d at 987; *Good*, 326 F.3d at 592.

**C. The wire fraud charges in Counts 1 through 4 and Count 7 must be dismissed because none of the charged uses of interstate wires, as alleged, were "for the purpose of executing" the fraud scheme.**

The wire fraud charges in Counts 1 through 4 and Count 7 must be dismissed because, as alleged, none of the charged uses of interstate wires in those counts were in furtherance of the charged scheme to defraud KU, NSF, or DOE of money or property.

1. <u>To survive dismissal, each charged use of interstate wires must have been "for the purpose of executing" the fraud scheme.</u>

The wire fraud statute proscribes uses of the interstate wires "for the purpose of executing" a fraud scheme. 18 U.S.C. § 1343; *see United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002) (stating that "it is using wires and causing wires to be used in furtherance of the fraudulent scheme that constitutes the prohibited conduct").

Thus, as the Supreme Court has explained in the context of the mail fraud statute, the use of the wires must have been "a part of the execution of the fraud" or "incident to an essential part of the scheme." *Parr v. United States*, 363 U.S. 370, 390 (1960) (internal quotation marks omitted); *accord United States v. Trammell*, 133 F.3d 1343, 1353 (10th Cir. 1998). This requirement must be met "as conceived by the perpetrator at the time" of the offense. *United States v. Weiss*, 630 F.3d 1263, 1269 (10th Cir. 2010). "It is therefore not correct … that use of the wires is illegal if at all 'in relation to' a scheme to defraud." *United States v. Redcorn*, 528

F.3d 727, 741 (10th Cir. 2008) (citation omitted).

For example, in *United States v. Cardall*, 885 F.2d 656, 682 (10th Cir. 1989), the Tenth Circuit held that a defendant did not commit mail fraud when he used fraudulently obtained investor funds to apply for an oil-property lease from the Bureau of Land Management, which mailed him notification of the award. *Id.* The mailing "was not necessary in maintaining the ongoing viability of defendant's fraud," the court explained, because "the success of defendants' fraudulent scheme in no way depended upon the receipt of a [Bureau of Land Management] bid award." *Id.* Similarly, in *United States v. Redcorn*, the Tenth Circuit held that a defendant's transfer of the proceeds from his fraud scheme to a personal account did not constitute wire fraud because it was not "necessary to gain control over the funds or to conceal the nature of [the] fraud …." 528 F.3d at 741–42. The court explained that the transfers actually made the fraud scheme "*more*, not less, obvious" because it undermined the defendant's claim that he was holding the funds on behalf of the victim. *Id.* at 742. And in *United States v. Mann*, 884 F.2d 532, 536 (10th Cir. 1989), the Tenth Circuit held that a defendant's use of a radio spot to express his views that people did not need to pay income taxes was not in furtherance of his fraud scheme to advertise and sell bogus materials that could purportedly be used to avoid paying taxes. *Id.* The court held that the radio spot, which did not itself solicit any funds or refer to the advertisements, was not "incident to the accomplishment of an essential part of the scheme." *Id.* (internal quotation marks omitted).

This requirement is what distinguishes legal from illegal uses of the wires, and thus courts have frequently dismissed wire and mail fraud counts from indictments where the charged uses of the wires, as alleged, were not incident to an essential part of a fraud scheme. *See, e.g.*, *United States v. Webb*, 24 F. Supp. 3d 432, 438 (M.D. Pa. 2014) (dismissing indictment alleging

that the defendant committed wire fraud by giving his racing horse performance enhancing drugs, which allowed him to fraudulently win races and prize money, but also caused losses to bettors who used interstate wires to place wagers, because "the wire communications were not for the purpose of executing the scheme" to fraudulently obtain prize money); *United States v. Warme*, No. 09-CR-19A, 2010 WL 125846, at *2 (W.D.N.Y. Jan. 7, 2010) (dismissing honest services wire fraud count in indictment that alleged that a police officer used interstate wires via an ATM machine to buy and use illegal drugs while on duty, because the use of the ATM machine did not further the fraud offense of concealing his criminal activity, even if it furthered the underlying conduct that he failed to disclose); *United States v. Jones*, 676 F. Supp. 2d 500, 509, 516 (W.D. Tex. 2009) (dismissing mail fraud count in indictment that alleged that the defendant created a rigged government-contract bid request that was fraudulently structured so that his client would win, which led to mailings of honest bids by other vendors, because "the mailing allegedly came about as a *result* of fraud, but neither mailing perpetrated or perpetuated the fraud," and rejecting argument that the mailings were in furtherance of the scheme because they made the bid process appear legitimate).

2. <u>Counts 1 through 4 and 7 must be dismissed because none of the charged uses of the wires, as alleged, were "for the purpose of executing" the scheme to defraud KU, NSF, or DOE of money or property.</u>

Applying the foregoing principles here, Counts 1 through 4 and Count 7 of the Indictment must be dismissed because they charge uses of interstate wires that, as alleged, were not "for the purpose of executing" the fraud scheme. 18 U.S.C. § 1343. Indeed, none of Counts 1 through 4 or Count 7 alleges a use of interstate wires incident to an essential part of the charged scheme to defraud KU, NSF, or DOE of money or property by secretly maintaining two jobs.

Count 1 alleges that Dr. Tao emailed the Chinese Consulate General on November 11,

2017 so that he could travel to China, Indictment ¶ 42, which he did the following week so that he could "prepare the materials necessary to defend his Chang Jiang Scholar Program application before the PRC's Ministry of Education," *id.* ¶ 25. Thus, the purpose of the charged use of the interstate wires was for Dr. Tao to obtain travel documents for a trip to China, where he ultimately worked on his application to a scholars program. *See id.* ¶¶ 25, 42. As alleged, this trip was not "incident to an essential part of the scheme" of allegedly lying to KU, NSF, or DOE about his position at FZU in order to maintain two jobs. *Parr*, 363 U.S. at 390. The illegal scheme alleged was *not* to obtain a job in China; the scheme was to *deceive* KU, NSF, and DOE about that employment.[21] Thus, taking steps to obtain travel documents was not in furtherance of misrepresentations made in furtherance of a scheme to obtain money or property. Indeed, Dr. Tao did not even have a position at FZU at this time, as he allegedly entered into a contract with FZU in March 2018. *See* Indictment ¶¶ 28–30; *see Weiss*, 630 F.3d at 1269 (use of interstate wires must be incident to an essential part of the scheme "as conceived by the perpetrator at the time" of the offense). Moreover, an alleged use of the wires in furtherance of activities that a defendant fraudulently fails to disclose is not tantamount to using the wires in furtherance of the nondisclosure itself. *See, e.g.*, *Warme*, 2010 WL 125846, at *2 (use of the wires to support activity whose nondisclosure constituted fraud was not in furtherance of the fraud scheme itself). Thus, even if Dr. Tao schemed to conceal his scholars program application from KU, his email

---

[21] To be sure, the Indictment does allege that Dr. Tao schemed "to benefit the PRC by participating in a 'talent plan," Indictment ¶ 33, but this allegation does not describe a scheme whose object was to obtain "money or property" in violation of the wire fraud statute. 18 U.S.C. § 1343; *see generally supra* § 1.A. Nor is it illegal to partake in a foreign scholars or talent program, which are not unique to China. *See, e.g.*, *supra* note 5 (statement of AAG John Demers of the National Security Division). Thus, to the extent the email in Count 1 could be construed to further a scheme to participate in a scholars/talent program in China, that allegation fails to state an offense due to the absence of an alleged scheme whose object was to deprive a victim of money or property.

to arrange travel to China to support that application could not have been in furtherance of the concealment scheme itself. *See id.*

Count 2 alleges that Dr. Tao caused KU to transmit a grant application to DOE on December 11, 2017, Indictment ¶ 42, in order to obtain renewed funding to support ongoing research, *id.* ¶ 10. The Indictment alleges that Dr. Tao was required to identify his institutional affiliations and pending support in the application, but it does not adequately allege that Dr. Tao had anything to report as of that time. *Id.* ¶ 10. Nor did he. As alleged, Dr. Tao had not even been accepted into the scholars program until the end of December 2017, *id.* ¶ 26, and he did not become affiliated with FZU until he allegedly accepted the position in March 2018, *id.* ¶ 29, both of which occurred *after* KU submitted the application on December 11, 2017, *id.* ¶¶ 10, 42. Thus, KU's submission of the grant application was not "incident to an essential part of the scheme" of allegedly lying to KU, NSF, or DOE about his position at FZU, which he did not yet have, in order to maintain two jobs. *Parr*, 363 U.S. at 390. Moreover, KU's application or receipt of a particular grant was not a necessary part of the alleged scheme of lying to KU about having a position at FZU in order to maintain two jobs at the same time.

Count 3 alleges that Dr. Tao used interstate wires to submit his January 9, 2018 Conflict of Interest form. Indictment ¶ 42. But, as discussed above, Dr. Tao did not even have a position at FZU as of January 9, 2018. *See supra* § I.B.2. Thus, submission of the January 9, 2018 Conflict of Interest form could not have been a necessary part of the scheme to conceal his position at FZU, which he did not yet have. *See Weiss*, 630 F.3d at 1269 (use of interstate wires must be incident to an essential part of the scheme "as conceived by the perpetrator at the time" of the offense).

Count 4 alleges that Dr. Tao emailed KU regarding his "proposal for a collaborative

research project with [FZU]." Indictment ¶ 42. The Indictment alleges that, two months earlier, Dr. Tao had "submitted a proposal to KU for a collaborative research project with FZU, to be funded by FZU, and thereafter requested to use part of the project's budget to absolve him from his KU teaching responsibilities for the Spring 2019 semester." *Id.* ¶ 39(C). It further alleges: "In doing so, [Dr. Tao] concealed his employment by FZU and his plan to travel to the PRC to fulfill his contractual obligations to FZU between in or about December 2018 and August 2019." *Id.* Dr. Tao's email regarding the alleged collaboration was not "incident to an essential part of the scheme" of allegedly lying to KU, NSF, or DOE about his position at FZU in order to maintain two jobs, *Parr*, 363 U.S. at 390, as he would not have needed for KU and FZU to collaborate on a project in order for him to execute the scheme. To the contrary, the proposed collaboration would pose a threat to the alleged fraud scheme, because it would relieve KU of its duty to pay Dr. Tao's salary—one of the purported objects of the fraud scheme—and it would have informed KU that Dr. Tao had a relationship with FZU, which would naturally increase the probability that KU would discover his alleged position there. Thus, as alleged, Dr. Tao's email was not in furtherance of the alleged fraud scheme. *See, e.g.*, *United States v. Maze*, 414 U.S. 395, 403 (1974) ("But the successful completion of the mailings from the motel owners here to the Louisville bank increased the probability that respondent would be detected and apprehended."); *Redcorn*, 528 F.3d at 742 (use of the wires was not in furtherance of fraud scheme because it made the fraud scheme "*more*, not less, obvious"); *United States v. Castile*, 795 F.2d 1273, 1278 (6th Cir. 1986) ("Similarly, where the purpose of a mailing conflicts with, rather than promotes, the scheme to defraud, the mailing will not support a conviction under the mail fraud statute.").

Count 7 alleges that Dr. Tao sent an email "regarding [his] National Natural Science Foundation of China funding" on March 17, 2019. Indictment ¶ 42; *see id.* ¶ 31 (alleging that Dr.

Tao applied for a grant to the National Natural Science Foundation of China on March 17, 2019). The Indictment provides no basis from which it can plausibly be inferred, however, that an attempt to obtain a grant in China was "incident to an essential part of the scheme" of allegedly lying to KU, NSF, or DOE about his position at FZU in order to maintain two jobs. *Parr*, 363 U.S. at 390. Dr. Tao would not have needed to apply for a grant in China in order to conceal his alleged position at FZU from KU, NSF, or DOE or maintain two jobs at the same time.

It should not come as a surprise that the government has failed in its attempts to convert the submission of two allegedly false Conflict of Interest forms into seven counts of wire fraud. At bottom, none of the alleged uses of the wires in Counts 1 through 4 and Count 7 were "necessary in maintaining the ongoing viability" of the alleged scheme to avoid disclosing work at FZU to KU, NSF, or DOE in order to maintain two jobs, and "the success of [the] fraudulent scheme in no way depended upon" these alleged uses of the wires. *Cardall*, 885 F.2d at 682. None of these five uses of the wires were "necessary to gain control over the funds or to conceal the nature of [the] fraud." *Redcorn*, 528 F.3d at 741–42. At most, these counts attempt to charge uses of the wires "'in relation to' a scheme to defraud," which the Tenth Circuit has held do not violate the wire fraud statute. *Redcorn*, 528 F.3d at 741. Accordingly, Counts 1 through 4 and Count 7 must be dismissed.

> **D.** **The false statements charges in Counts 8 and 9 must be dismissed because they were not made in a "matter within the jurisdiction of" the Executive Branch of the United States Government.**

Counts 8 and 9 charge Dr. Tao with making false statements "in a matter within the jurisdiction of the executive branch of the Government of the United States," when he submitted his January 9, 2018 and September 25, 2018 Conflict of Interest forms to KU, so that KU could ensure that he meets his job duties. Indictment ¶ 44; Ex. A at 1; Ex. B at 1; *see* 18 U.S.C. §

1001(a)(2). The Indictment purports to premise federal-agency jurisdiction on the allegation that KU was "an institution that requested and received funds from" NSF and DOE, which are federal agencies. Indictment ¶ 44. These counts must be dismissed because KU's employee Conflict of Interest forms are not matters within the jurisdiction NSF and DOE, and KU's alleged receipt of federal funding does not bring all false statements made to KU within their jurisdiction.

The Supreme Court has explained that "jurisdiction," though not defined in § 1001, "covers all matters confided to the authority of an agency or department." *United States v. Rodgers*, 466 U.S. 475, 479 (1984). This includes two circumstances: when the agency "has the power to exercise authority in a particular situation," or when there is a "statutory basis for an agency's request for [the] information." *Rodgers*, 466 U.S. at 479, 481 (internal quotation marks omitted); *see also United States v. Deffenbaugh Indus., Inc.*, 957 F.2d 749, 753 (10th Cir. 1992) (observing that "the Supreme Court has found jurisdiction under §1001 when there is either a *statutory* basis for an agency or department's request for information or when the agency or department has the power to exercise authority in a particular situation" (citation and internal quotation marks omitted)). Thus, while "the term 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001," a matter that is "peripheral to the business" of an agency is not within the "jurisdiction" of the agency. *Rodgers*, 466 U.S. at 479–80 (internal quotation marks omitted); *accord United States v. Wright*, 988 F.2d 1036, 1038 (10th Cir. 1993) (noting that "[t]he false statement need not be made directly to the federal agency to be within its jurisdiction," but the agency must have "the power to exercise authority in a particular situation," and its jurisdiction does not include "matters peripheral to the business of that body").

Here, there is no allegation that demonstrates that KU's employee Conflict of Interest forms are matters within the jurisdiction of NSF or DOE. KU required its professors to submit

Conflict of Interest forms to assist it "in determining whether … disclosed financial interests or time commitments (if applicable) could potentially conflict with … university responsibilities," Ex. A at 1; Ex. B at 1, and so that KU could manage, reduce, or eliminate employee conflicts of interest, *see* Indictment ¶ 13. This is the quintessential interest of an employer—to glean information from its employees about their job-related activities, ensure that the employees are well-positioned to perform their job duties without a conflict of interest, and manage possible conflicts of interest accordingly. It is not the business of federal agencies to manage KU's employees as though it were the employer, even if the agencies provided federal funding to KU. When KU received federal funding, it did not relinquish its jurisdiction over its employees to the federal government. For these reasons, the Indictment does not, and cannot, allege that Congress "confided to the authority" of NSF or DOE the responsibility of identifying and managing possible conflicts of interest of employees who work for employers that receive federal funds. *Rodgers*, 466 U.S. at 479.

The Indictment does not allege facts that meet either of the two circumstances described in *Rodgers* that bring false statements within the jurisdiction of the agencies. First, the Indictment fails to allege that a statute or implementing regulation provides NSF or DOE with "the power to exercise authority" with respect to employee submissions of Conflict of Interest forms to employers who receive federal funds. *Id*. at 479. Nor can it. As the Eleventh Circuit pointed out in *United States v. Blankenship*, 382 F.3d 1110, 1137 (11th Cir. 2004), the theory that an agency has jurisdiction over employees who work at companies that receive federal funds is "unacceptable" because it is contrary to *Rodgers*'s instruction "that the key issue in determining whether a statement is within the government's jurisdiction is the authority of the agency to act." *Id.* The court explained that "a federal agency only has the authority to take

action against the recipient of the federal funds—that is, the party with whom it has a contract," *id.*, which in this case is KU. While NSF or DOE could perhaps threaten to revoke KU's grants if KU did not properly identify and manage Dr. Tao's possible conflicts, or if it did not fire Dr. Tao for having certain irreconcilable conflicts, NSF and DOE did not have authority to take any of those actions themselves, underscoring their lack of jurisdiction over KU's Conflict of Interest forms. *See id.* (reasoning that the agency lacked jurisdiction over false statements made to a recipient of federal funds because, although the agency could pressure the recipient to take action as to the defendants, "[t]his embarrassingly weak and indirect avenue of recourse demonstrates the [the federal agency's] lack of authority, and hence lack of jurisdiction" over the defendants); *United States v. Ford*, 639 F.3d 718, 721 (6th Cir. 2011) (holding that "failures to disclose financial interests" to state senate and election registry was not within the jurisdiction of the federal government because, while the state government "likely could have exercised authority in this situation … no federal entity had similar authority in this situation"); *United States v. Holstrom*, 242 F. App'x 397, 398–99 (9th Cir. 2007) (unpublished decision) (holding that false time cards submitted by at-will employee of DOE contractor who worked at DOE lab to her employer were not within the jurisdiction of DOE because, while the employer had "a direct contractual relationship with DOE," DOE had no "power to act" with respect to the false time cards, which were "peripheral to DOE's obligations and not directly related to any DOE-authorized function"). Thus, the Indictment fails to meet the first prong of *Rodgers*.

Second, the Indictment does not, and cannot, allege that there is a "statutory basis" for NSF or DOE to "request" the Conflict of Interest forms submitted by Dr. Tao to KU. *Rodgers*, 466 U.S. at 481. The Indictment cites no statute, let alone one that provides that NSF and DOE have a right to inspect Conflict of Interest forms submitted by employees to their employers who

receive federal grant funds. Indeed, the Indictment does not even allege that NSF and DOE had *access* to the forms, let alone a statutory right, and even access would be insufficient to bring the forms within their jurisdiction. *See, e.g.*, *United States v. Facchini*, 874 F.2d 638, 642 (9th Cir. 1989) (en banc) (rejecting position "that the scope of jurisdiction for section 1001 purposes follows the federal government's access to information," and observing that "[o]therwise the scope of section 1001 jurisdiction would be virtually limitless"); *Holstrom*, 242 F. App'x at 398–99 (holding that DOE lacked jurisdiction over employee time cards where employer was a DOE contractor and employee worked at a DOE lab in part because "the government has not identified any express statutory authority conferring investigatory power on DOE, much less a nexus between such investigatory power and [the employee's] allegedly false statements," and "DOE's general contractual monitoring and investigatory authority" is not "sufficient to confer agency jurisdiction over [the employee's] allegedly false statements, as [m]ere access to information is not enough to establish jurisdiction" (internal quotation marks omitted)).[22] Thus, the Indictment fails to meet the first prong of *Rodgers*.

As the Eleventh Circuit aptly concluded, "a federal agency's agreement with a recipient of federal funds does not necessarily empower that agency to exercise authority over third parties …. [J]urisdiction does not simply follow federal money wherever it may lead." *Blankenship*, 382 F.3d at 1138. Otherwise, adopting the government's erroneous and expansive theory of federal-agency jurisdiction, § 1001 would criminalize all manner of mundane misstatements made to

---

[22] This case is thus a far cry from *Wright*, where the Tenth Circuit held that the defendant's false reports submitted to a state agency were within the jurisdiction of EPA because the defendant's reports were "required by regulations promulgated by the [EPA] pursuant to the Safe Drinking Water Act," and the Act expressly authorized EPA to enforce its regulations regarding the reports. *Wright*, 988 F.2d at 1036–37, 1039.

employers who receive federal funds.[23] In a country where the federal government expends trillions of dollars each year, prosecutors' authority to charge people with felonies would be boundless. "While Congress may be constitutionally empowered to criminalize this broad range of conduct," the Eleventh Circuit concluded, "we simply do not believe that it chose to do so, especially not through a statute such as § 1001." *Id.* This Court should not rule to the contrary.

Accordingly, because KU's private Conflict of Interest forms submitted by its employees are not matters within the jurisdiction of the federal agencies, the Court should dismiss Counts 8 and 9.

**E.** **The wire fraud and false statements charges in Counts 1 through 10 must be dismissed because they violate the Due Process Clause's fair warning requirement.**

The government's prosecution theory is truly remarkable. The wire fraud counts would treat as federal fraud any misrepresentation made in the workplace deemed material by an employer—even if not intended to cause a pecuniary loss—merely because the employee receives salary. The false statements counts multiply this absurdity by treating such workplace dishonesty the same as making false statements directly to a federal agency, merely because the employer received agency funds. Accepting the government's theory, employees could face

---

[23] The Eleventh Circuit noted that the government's untenable theory would treat the following individuals as federal felons, despite the lack of "any notice to the individual that her statements are a violation of federal law": (1) anyone who "padded his resume to obtain a job" with an entity that received federal funds or did work for the federal government, (2) a "person who lied about his address to get a local library card in a town in which he does not reside that happened to receive some funds under Congress's library subsidization program," (3) "any teachers in inner-city public schools that receive federal subsidies who take sick days when they're really going to the beach," (4) a "UPS driver who deliberately puts off delivering a package that the Government mailed second-day air until the third day," and (5) "[p]erhaps … most shocking … anyone who lies on an admissions application to any of the thousands of educational institutions in this nation that receive federal funds or participate in a federal financial aid program." *Blankenship*, 382 F.3d at 1138.

dozens of years in prison for mundane workplace misrepresentations, even though no person of common intelligence would think he had committed a federal crime, and despite that no court has ever endorsed such an overbroad theory of fraud or false statements. The prosecution theory therefore violates the fair warning requirement of the Due Process Clause, warranting dismissal of the Indictment. *See* U.S. Const. amend. V.

Due process of the law requires "fair warning . . . of what the law intends." *United States v. Lanier*, 520 U.S. 259, 265 (1977) (quoting *McBoyle v. United* States, 283 U.S. 25, 27 (1931)). It is a violation of the Due Process Clause to "tak[e] away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). "A criminal statute must clearly define the conduct it proscribes," and it exceeds a court's authority to "define new federal crimes." *Skilling*, 561 U.S. at 415 (Scalia, J., concurring in part and concurring in the judgment). A statute that lacks "sufficient definiteness that ordinary people can understand what conduct is prohibited" is unconstitutionally void and would "encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983).

The fair warning requirement embraces three related doctrines:

> First the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. Second, as a sort of junior version of the vagueness doctrine, the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. Third, although clarity on the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.

*Lanier*, 520 U.S. at 266 (citations and internal quotations omitted). "[T]he touchstone" of the inquiry, the Supreme Court has instructed, "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267.

The prosecution theory in the Indictment runs afoul of all three manifestations of the fair warning requirement. The government's construction of the wire fraud and false statements statutes would render the statutes unconstitutionally vague, as the Supreme Court has already held with respect to the wire fraud statute. *See Skilling*, 561 U.S. at 409–10 (holding that "a reasonable limiting construction" of the honest services fraud statute "must exclude [the] amorphous category of cases" involving a "mere failure to disclose a conflict of interest").

The government's theory would therefore "encourage arbitrary and discriminatory enforcement" due to its lack of a discernible standard, allowing "policemen, prosecutors, and juries to pursue their personal predilections," *Kolender*, 461 U.S. at 357–58 (internal quotation marks omitted), rather than culpable criminal offenders. This concern is heightened in this case where Dr. Tao, a professor of Chinese descent, has been charged by national-security prosecutors for lying to his employer without any allegation of espionage, intellectual property theft, or a cognizable nexus to national security. And yet the charges were brought in the midst of a politically charged trade war with China that rages on today and has subjected university professors with ties to China to intense scrutiny and suspicion for engaging in activities that were formerly encouraged and touted, such as collaborating with foreign research institutions and other academics by co-writing papers, attending meetings and conferences, giving seminars at overseas universities during the summer months, or performing collaborative experiments.[24] Far

---

[24] Former NIH Director Elias Zerhouni recently observed:

from an abstract concern that could affect *other* cases, *this case itself* presents indicia of an arbitrary and discriminatory enforcement, as professors routinely work with foreign universities, neglecting to disclose their work to their university employer, as alleged here, without facing federal fraud charges.[25]

Dismissal is also warranted under the rule of lenity. When a court interprets the bounds of a criminal statute, "the tie must go to the defendant," because "[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008); *see Moskal v. United States*, 498 U.S. 103, 108 (1990) (rule of lenity applies in "those situations in which a reasonable doubt persists about a statute's intended scope"). This is especially true when interpreting the federal fraud statutes. *See, e.g.*, *Skilling*, 561 U.S. at 410-11 ("Further dispelling doubt on [the government's prosecution theory] is the familiar principle that ambiguity concerning the ambit of criminal

---

"[T]enured Chinese-American scientists at top institutions of biomedical research were recently dismissed for purported violations of disclosure rules, breaches of confidentiality, or outright suspicion of espionage. … *We should remember that for years, scientific exchanges and collaborations with China were encouraged by U.S. policy-makers, including implicit support of China's Thousand Talents Program. Chinese-born as well as American-born federally funded scientists were publicly offered various positions in China over the years without opposition by relevant institutions. The 'rules,' now presented and enforced as severe violations of U.S. ethics and intellectual property regulations, were not rigorously implemented by officials at many U.S. institutions.* The consternation, sense of targeted discrimination, and fear in the Chinese-American scientific community are thus understandable."

Elias Zerhouni, *Chinese Scientists & Security*, Science, July 5, 2019, https://science.sciencemag.org/content/365/6448/9 (emphasis added).

[25] This is even true of professors who worked for Chinese universities, notwithstanding the current trade war and political climate that has since cast a pall over such work. For example, Texas A&M reportedly determined that more than 100 of its faculty members "were involved with a Chinese talent-recruitment program, even though only five had disclosed their participation." Viswanatha & O'Keeffe, *China's Funding of U.S. Research Raises Red Flags*, Wall Street Journal, Jan. 30, 2020, https://www.wsj.com/articles/chinas-funding-of-u-s-researchers-raises-red-flags-11580428915. None of these professors have been publicly charged, and the university reportedly "hasn't fired any researchers following [its] investigation …." *Id.*

statutes should be resolved in favor of lenity. This interpretive guide is especially appropriate in construction [§ 1346] because . . . mail [and wire] fraud [are] predicate offense[s] under [RICO] and the money laundering statute." (citations and internal quotation marks omitted)); *Cleveland*, 531 U.S. at 25 (holding that a state video poker licenses were not "property" within the meaning of the mail fraud statute because "to the extent that the word 'property' is ambiguous as placed in § 1341, [the Court has] instructed that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity'"). Lenity requires dismissal here, where no court has ever upheld the theories advanced in the Indictment. *See Lanier*, 520 U.S. at 266.

Most important, Dr. Tao could not have reasonably known that his alleged conduct would violate federal fraud and false statement laws.[26] A university faculty or staff member of ordinary intelligence might have assumed that submitting a false or misleading conflict-of-interest form to a university could subject him or her to disciplinary action or reprimand—or even, in the most draconian circumstance, dismissal. Indeed, the Conflict of Interest forms themselves indicate that "intentionally filing a false statement may result in disciplinary action," without any reference to possible criminal prosecution. *See* Ex. A at 8; Ex. B at 8. But no such employee could have reasonably concluded that submitting a misleading conflict-of-interest form could result in a 20-year prison sentence. On the other hand, if a professor intentionally concealed his work for a Chinese university so that he could steal intellectual property from his employer and transfer it to

---

[26] Dr. Doug Girod, KU's Chancellor, recently acknowledged during a "China Initiative Conference" that "what it means to violate a conflict of interest is really I think evolving at our institutions right now." China Initiative Conference, Ctr. for Strategic & Int'l Studies at 3:23:51 (Feb. 6, 2020), https://www.csis.org/events/china-initiative-conference?utm_medium=email&utm_source=govdelivery. The Deputy Director for Extramural Research at NIH, Dr. Michael Lauer, added that his agency is not concerned with "late forms or forms that have been filled out incorrectly," but rather "egregious ethical breaches." *Id.* at 3:47:30.

China without detection, he would be on notice of potential federal charges, for example under the Economic Espionage Act. *See generally* 18 U.S.C. §§ 1831–39. Trade secret theft is the type of conduct that the Department of Justice's "China Initiative" is purportedly focused upon. But there is no allegation that Dr. Tao, who publishes his research for worldwide consumption by academics, stole or even had access to trade secrets at KU. All that is alleged is that Dr. Tao failed to disclose to KU his work for another university so that he could keep doing that work without interruption—conduct that no reasonable KU faculty or staff member would think violates federal fraud laws and could result in decades in prison. *See United States v Kozminski*, 487 U.S. 931, 949 (1988) (rejecting government's construction of statute in part because its "interpretation would appear to criminalize a broad range of day-to-day activity" and thus "subject individuals to the risk of arbitrary or discriminatory prosecution and conviction").

That Dr. Tao lacked notice that his alleged conduct constituted a crime is made plain by recent statements by the Chairman of the United States Senate Permanent Subcommittee on Investigations ("PSI"), Senator Rob Portman (R-OH). After the PSI investigated the perceived failure of professors receiving federal grants to disclose foreign funding sources,[27] Chairman Portman acknowledged that this was "not a crime":

> None of this [a position at a Chinese university and related funding received by defendant Dr. Charles Lieber of Harvard University] was disclosed on his federal grant application where he got U.S. taxpayer money. . . . The criminal complaint [against Dr. Lieber] is based on his not telling the truth to the federal investigators, even though he was essentially defrauding Harvard and defrauding the U.S. government funding sources. But that's not a crime. Failing to

---

[27] *See* Staff on S. Permanent Subcomm. on Investigations (PSI), 116th Cong., Threats to the U.S. Research Enterprise: China's Talent Recruitment Plan (2019), https://www.hsgac.senate.gov/imo/media/doc/2019-11-18%20PSI%20Staff%20Report%20-%20China's%20Talent%20Recruitment%20Plans%20Updated2.pdf. Notably, the PSI Report cites Dr. Tao's case as an example of a relevant prosecution and parrots the DOJ press release's false statement that Dr. Tao "signed a five-year contract" with FZU. *Id.* at 49.

> disclose compensation from a foreign government is not currently a crime. We make it a crime. That's part of our legislation. The bill gives the Justice Department the ability to hold federal grant recipients accountable for hiding their financial ties to foreign governments by failing to disclose it on federal grant applications. (emphasis added).[28]

If the Chairman of the relevant Senate Committee responsible for enacting legislation to address this perceived harm does not believe that Dr. Tao's alleged conduct is covered by current law, it is manifestly unjust to expect that Dr. Tao should have concluded otherwise.[29]

The Court's endorsement of the prosecution theory in this case would also dramatically expand the Department of Justice's authority by criminalizing work-place communications. This would result in truly bizarre and draconian situations, setting a precedent that any employee who makes a misrepresentation to his employer that the employer considers material could be subject to a 20-year felony for mail or wire fraud, if the misrepresentation was made by email, mail, or telephonically. That same employee could also be subject to a five-year felony for making false statements—even if the misrepresentation was made verbally—if his or her employer received federal funds. Take for example the following scenarios, each of which is analogous to the theory in the Indictment that misrepresenting external activities to an employer constitutes fraud and false statements in matter within the jurisdiction of the federal government:

- A professional football team requires its players to disclose all external sports-related activities to the organization, so that management can decide whether they are acceptable or pose a significant risk of injury. A player participates in a weekly

---

[28] Press Release, On Senate Floor, Portman Outlines Upcoming Bipartisan Legislation to Stop China's Theft of U.S. Taxpayer-Funded Intellectual Property, *supra* note 4.

[29] Senator Portman has consequently introduced legislation to fill what he perceives as a gap in the law, which would require Principal Investigators and other key personnel to certify in grant applications whether they have affiliations with foreign institutions, and would provide that including knowingly false statements constitutes a new crime called "grant application fraud." Safeguarding Innovation Act §§ 3, 4, S. 3997, https://www.congress.gov/bill/116th-congress/senate-bill/3997/text?format=txt&r=8&s=1.

pick-up basketball game, but certifies to the organization that he has no sports-related activities to report so that he can continue playing in the game.

- o The player submits the certification online from his house in Kansas City, KS, but the sports team is based in Kansas City, MO, across state lines. Can the player be charged with wire fraud for making the misrepresentation despite continuing to receive salary from the team?

- o The sports team received a federal stadium subsidy. Can the player be charged with making false statements?

- A local doctor's office requires its employees to indicate whether an absence was due to vacation or sickness. An employee who has already used all of his vacation days falsely calls in sick so that he can visit a relative for a long weekend.

- o The doctor's office was in Kansas City, MO, and the employee called in sick from his home in Kansas City, KS, across state lines. Can the employee be charged with wire fraud for making the misrepresentation despite continuing to receive salary from his employer?

- o The doctor's office receives Medicaid reimbursements from CMS. Can the employee be charged with making false statements based on the same conduct?

- After rumors emerge of employee drug use, the president of a local environmental nonprofit orders employees to submit an online certification confirming that they have never used drugs while employed by the nonprofit. A computer programmer used marijuana six months before at a friend's party, but falsely certifies.

- o The computer programmer works from his home office in St. Louis, MO, and submitted the certification to the nonprofit's headquarters in Kansas City, KS, across state lines. Can the programmer be charged with wire fraud because he falsely certified but kept his job and continued to receive salary?

- o The nonprofit receives funding from EPA. Can the programmer be charged with making false statements?

Under the Indictment's expansive prosecution theory, the answer to each of these hypothetical questions would be "yes." This is because the Indictment equates dishonesty in the workplace with fraud, merely because all employees receive salary from their employers, and false statements, merely because an employer receives federal funding. If the Court permits this Indictment to proceed to trial, it would open the floodgates to a vast range of federal prosecutions for garden-variety employment disputes that otherwise would have, at most,

subjected the employee to administrative discipline at work. This government overreach would not be limited to university professors.

In sum, Dr. Tao had no fair warning that submitting a false or misleading Conflict of Interest form, as alleged here, could subject him to criminal prosecution. To avoid running afoul of the Due Process Clause, the Court should therefore interpret the wire fraud and false statements statutes in such a way that they do not criminalize Dr. Tao's alleged conduct of failing to disclose work for FZU to KU.

## II.    The Court should dismiss Count 10 of the Second Superseding Indictment under Rule 12(b)(3)(A)(i) due to lack of venue in the District of Kansas.

The Court should dismiss Count 10 of the Indictment, which charges Dr. Tao with making a false statement in a July 16, 2018 email—sent from outside the country to DOE in Washington, D.C.—for the independent reason that the District of Kansas lacks venue over that count, which is based on alleged acts that occurred outside of the District of Kansas. *See* Fed. R. Cr. P. 12(b)(3)(A)(i) (permitting dismissal due to "improper venue").

Both the U.S. Constitution and Rule 18 "require that a person be tried for an offense where that offense is committed." *United States v. Smith*, 641 F.3d 1200, 1207 (10th Cir. 2011); *see* U.S. Const. art. III § 2, cl. 3 ("Trial shall be held in the State where the said Crimes shall have been committed ...."); U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed...."); Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."). Thus, "[a]lthough venue is not the focal point in most criminal matters, it is 'not a mere technicality,'" and courts have therefore dismissed counts in an indictment where the allegations do not demonstrate that the court has venue over the charge.

*United States v. Blechman*, 782 F. Supp. 2d 1238, 1244 (D. Kans. 2011) (quoting *United States v. Miller*, 111 F.3d 747, 749 (10th Cir. 1997)). "[W]hen a defendant is charged in more than one count, venue must be proper with respect to each count." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989).

The Supreme Court and Tenth Circuit have explained that the "*locus delicti*," or place where the crime was committed, "'must be determined from the nature of the crime alleged and the location of the act or acts constituting it.'" *Smith*, 641 F.3d at 1207 (quoting *United States v. Cabrales*, 524 U.S. 1, 6–7 (1998)). In *Smith*, the Tenth Circuit held that "the *locus delicti*" of a § 1001(a)(2) violation "is where the defendant makes the false statement." 641 F.3d at 1207. There, the defendant made the allegedly false statements to federal agents in Minnesota, and thus Minnesota was the proper venue for the charges—not Oklahoma, even though the subject matter of the statements related to events that occurred in Oklahoma, the investigation was based in Oklahoma, and the agent prepared her report regarding the false statements when she returned to Oklahoma. *Id.* at 1208. Because the defendant was convicted of false statement charges in Oklahoma, not Minnesota, the court reversed the convictions with instructions to the district court to dismiss the counts for lack of venue. *Id.* at 1209.[30]

---

[30] *See also United States v. Acosta-Gallardo*, 656 F.3d 1109, 1121 (10th Cir. 2011) (emphasizing the Tenth Circuit's holding in *Smith* that "'making a false statement' was the only essential conduct element of a Section 1001(a)(2) offense," and thus "venue would have been proper only in Minnesota, where the false statement was made" in the *Smith* case, and not "in the Western District of Oklahoma, where the defendant was tried, even though the underlying crime for which the defendant was being questioned took place in the Western District of Oklahoma"); *accord United States v. John*, 477 F. App'x 570, 572 (11th Cir. 2012) ("The Tenth Circuit has concluded recently that, for purposes of venue under section 1001(a), 'the *locus delecti* is where the defendant makes the false statement.' Thus, venue is proper only in the district or districts where the defendant made the false statement." (quoting *Smith*, 641 F.3d at 1207)).

Here, the Indictment alleges that Dr. Tao made a false statement to DOE, which is in Washington, D.C., in an email that he sent while he was outside of the District of Kansas. *See* Indictment ¶ 46 (Count 10); *id.* ¶ 42 (alleging that the July 16, 2018 email was an "[e]mail [sent] from outside the United States"). Thus, under *Smith*, Dr. Tao committed the alleged offense outside of the District of Kansas, and the District of Kansas is therefore an improper venue for Count 10. *See Smith*, 641 F.3d at 1207. In fact, the lack of venue here is even more obvious than in *Smith*, where, although venue was lacking in Oklahoma, the false statement was at least made to an agent based in Oklahoma and who used it in an investigation in Oklahoma. Here, even the relevant federal agency to which Dr. Tao allegedly sent the false statement—DOE, which is in Washington, D.C.—was outside the District of Kansas. Accordingly, the Court must dismiss Count 10 for lack of venue.

## CONCLUSION

The government has a significant interest in prosecuting uses of the wires to commit fraud, and material false statements made in the jurisdiction of federal agencies. But the Department of Justice is not the Ministry of Truth, and it lacks authority to regulate routine, private miscommunications between employees and employers regarding employee activities. Human-resources departments—not national-security prosecutors—should resolve such disputes.

The government's overreach in this case calls to mind Judge Easterbrook's warning that the federal fraud statutes can "have an open-ended quality that makes it possible for prosecutors to believe … that a crime has occurred," but such statutory "[h]aziness designed to avoid loopholes through which bad persons can wriggle can impose high costs on people the statute was not designed to catch," and it is the court's responsibility to "curtail some effects of [that] statutory ambiguity." *United States v. Thompson*, 484 F.3d 877, 884 (7th Cir. 2007). The federal

fraud statutes "encompass a broad range of behavior," and "[t]heir limits can be difficult to draw with certainty," but "there are limits nonetheless, and they must be defined by more than just prosecutorial discretion." *United States v. Weimert*, 819 F.3d 351, 370 (7th Cir. 2016).

The government has disregarded those limits in this case, and the Court should dismiss the Indictment in its entirety because it fails to state an offense. In addition, since the government cannot cure the defects in the Indictment, and in light of the government's false and misleading statements to the grand jury discussed in the parallel Motion to Dismiss submitted herewith, dismissal should be with prejudice.

Dated:  August 14, 2020

Respectfully submitted,

/s/ Thomas H. Johnson
Thomas H. Johnson #13688
Petefish, Immel, Hird, Johnson,
Leibold & Sloan, LLP
842 Louisiana
Lawrence, KS 66044
Tel: (785) 843-0450
Fax: (785) 843-0407
tjohnson@petefishlaw.com

Peter Zeidenberg
Michael F. Dearington
Laura Zell
ARENT FOX LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
Peter.Zeidenberg@arentfox.com
Michael.Dearington@arentfox.com
Laura.Zell@arentfox.com

*Attorneys for Defendant Franklin Tao*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 14th day of August, 2020, I electronically filed the foregoing Memorandum in Support of Motion to Dismiss the Second Superseding Indictment with the Clerk of the Court using the CM/ECF system.

/s/ Thomas H. Johnson
Thomas H. Johnson