# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 19-20052-JAR-JPO |
| | ) | |
| FENG TAO | ) | |
| a/k/a "Franklin Tao," | ) | |
| | ) | |
| Defendant. | ) | |

---

**MEMORANDUM OF DR. FRANKLIN TAO IN SUPPORT OF HIS
MOTION TO DISMISS THE SECOND SUPERSEDING INDICTMENT
DUE TO THE GOVERNMENT'S FALSE, MISLEADING, AND PREJUDICIAL
<u>STATEMENTS TO THE GRAND JURY</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 3

    A.    The government charged Dr. Tao with several offenses based on his alleged failure to disclose to KU in his employee Conflict of Interest forms that he had accepted a position at another university. ............................................ 3

    B.    The Conflict of Interest forms included specific disclosure criteria, and did not require disclosure of all outside positions........................................................ 4

    C.    The government misled the grand jury about the Conflict of Interest form disclosure criteria in order to persuade the grand jurors to return an indictment against Dr. Tao for failing to disclose the alleged position at FZU. .................................................................................................................... 6

    D.    The FBI Case Agent misled the third grand jury about Dr. Tao's KU responsibilities in the spring of 2019 in order to obtain the pending Indictment. ........................................................................................................... 8

    E.    The prosecutor made inappropriate statements to the third grand jury to obtain the pending Indictment. ......................................................................... 10

ARGUMENT ........................................................................................................ 12

I.     The Court should dismiss the Second Superseding Indictment because the government's materially false and misleading testimony, and prejudicial comments, substantially influenced the grand jury's decision to indict. ...................... 12

    A.    The Court should dismiss the Indictment if government misconduct before the grand jury "substantially influenced" the decision to indict, or gives rise to "grave doubt" that the decision to indict was not free of such influence.............................................................................................................. 12

    B.    The FBI Case Agent's materially false and misleading testimony, and the prosecutor's highly prejudicial and irrelevant questions and comments, substantially influenced the grand jury's decision to indict Dr. Tao, or at least give rise to "grave doubt" that they did.................................................... 15

CONCLUSION..................................................................................................... 18

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988)........................................................................................................1, 13

*In re Special Grand Jury 89-2*,
    143 F.3d 565 (10th Cir. 1998) ...............................................................................................12

*United States v. Brito*,
    907 F.2d 392 (2d Cir. 1990)....................................................................................................15

*United States v. Brown*,
    5:19-CR-40081-HLT, 2020 WL 4347258 (D. Kan. July 29, 2020) ...........................12, 13, 15

*United States v. Cooper*,
    396 F. Supp. 3d 992 (D. Kan. 2019)........................................................................13, 14, 15, 18

*United States v. Hillman*,
    642 F.3d 929 (10th Cir. 2011) ...............................................................................................13

*United States v. Leeper*,
    No. 06-CR-58A, 2006 WL 1455485 (W.D.N.Y. May 22, 2006) ...........................................16

*United States v. Pino*,
    708 F.2d 523 (10th Cir. 1983) ...............................................................................................13

**Statutes**

18 U.S.C. § 1001.............................................................................................................................3

18 U.S.C. § 1343.............................................................................................................................3

**Other Authorities**

Fed. R. Crim. P. 6(e)(3)(E)............................................................................................................12

Federal Rule of Criminal Procedure 12(b)(3)...............................................................................12

Federal Rule of Criminal Procedure 52(a)....................................................................................13

## INTRODUCTION

A prosecutor has extraordinary influence over the grand jury. The prosecutor selects the target, drafts the indictment, and determines which witnesses to examine. The prosecutor—outside the presence of the defendant or defense counsel—can disregard most evidentiary rules, withhold exculpatory evidence, and unilaterally decide how to advise the grand jury as to the law. But even within these broad bounds, there are limits beyond which a prosecutor may not go.

The prosecution *cannot* obtain an indictment based on testimony that it knows is false or misleading, or by unfairly inflaming the grand jury against the accused, as these types of misconduct infringe upon the grand jury's ability to exercise independent judgment. If the government commits these types of misconduct, the court should dismiss the indictment if the misconduct "substantially influenced" the grand jury's decision to indict, or gives rise to "grave doubt" that the decision was not free from influence. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988).

This principle warrants dismissal of the pending Indictment against Dr. Franklin Tao. The government charged Dr. Tao with a host of federal offenses due to his alleged failure to disclose in Conflict of Interest forms submitted to the University of Kansas ("KU"), his employer, that he had purportedly accepted a position at another university in China, Fuzhou University ("FZU"). To properly obtain the indictments, and putting aside the defects in the government's legal theory,[1] the government would have needed to persuade the grand jury that Dr. Tao's alleged FZU position met the disclosure criteria specified in the Conflict of Interest forms, which included monetary thresholds and a requirement that the outside position interfere with his KU

---

[1] Dr. Tao has also filed a parallel Motion to Dismiss the Indictment for Failure to State an Offense and Lack of Venue, submitted on the same day as the instant motion.

responsibilities. But the government had no evidence that the position met that criteria, so it committed three categories of misconduct to obtain the indictments.

First, the government deliberately mischaracterized the Conflict of Interest forms' disclosure criteria, such that Dr. Tao's alleged position at FZU appeared to warrant disclosure in the forms, when it did not. The government's sole witness, the FBI Case Agent, did not show the grand jury the forms, and falsely testified that the Conflict of Interest forms required disclosure of *any* outside position, which is contrary to the actual disclosure criteria in the forms. The government never sought to correct or clarify this misleading testimony, which could only have been presented by design, since the tactic was repeated before three separate grand juries over the course of ten months.

Second, compounding the misleading testimony about the disclosure criteria, the FBI Case Agent misrepresented and drastically overstated Dr. Tao's KU responsibilities during the relevant time period in order to create the misimpression that the alleged FZU position interfered with Dr. Tao's KU responsibilities and thus needed to be reported in the Conflict of Interest forms. Indeed, although the FBI Case Agent had been informed by KU that Dr. Tao bought out his spring 2019 teaching responsibilities—such that he had no such responsibilities—the case agent, prompted by the prosecutor, falsely told the grand jury that Dr. Tao's buy-out attempt was unsuccessful.

Third, the government needlessly made irrelevant and highly prejudicial statements to the grand jury that returned the pending Indictment, in an effort to inflame the grand jury against Dr. Tao. Without any valid reason, the government elicited testimony from the FBI Case Agent that an earlier grand jury had already found probable cause that Dr. Tao had committed crimes. This could only have been meant to predispose the new grand jury to believing there was probable

cause that Dr. Tao had committed crimes. Separately, the government strongly and falsely implied to the grand jury that Dr. Tao was a spy for China.

The cumulative effect of the foregoing misconduct is that the government improperly influenced the grand jury to indict Dr. Tao. At the very least, this misconduct gives rise to "grave doubt" about whether the grand jury's decision to indict Dr. Tao was free from the government's influence. Accordingly, Dr. Tao respectfully requests that the Court dismiss the Indictment. Due to the pattern of misconduct, moreover, dismissal should be with prejudice.

## BACKGROUND

A.   **The government charged Dr. Tao with several offenses based on his alleged failure to disclose to KU in his employee Conflict of Interest forms that he had accepted a position at another university.**

On June 24, 2020, the government filed the operative Second Superseding Indictment (the "Indictment"), returned by a grand jury sitting in Topeka, Kansas, charging Dr. Tao with seven counts of wire fraud, in violation of 18 U.S.C. § 1343, and three counts of making false statements in a matter within the jurisdiction of Executive Branch agencies, in violation of 18 U.S.C. § 1001. ECF No. 77.

The legal theories among the original Indictment, the Superseding Indictment, and the Second Superseding Indictment have varied, but the central factual allegations have remained the same: (1) Dr. Tao allegedly accepted a position at FZU in May 2018, (2) KU's Conflict of Interest forms in January and September 2018 required Dr. Tao to disclose the alleged position he took at FZU, and (3) Dr. Tao knowingly failed to disclose the position to KU in the Conflict of Interest forms in order to defraud KU. *See* ECF Nos. 1, 50, 77. For each grand jury to find probable cause, therefore, the government had to demonstrate that the Conflict of Interest form disclosure criteria encompassed the alleged position at FZU.

3

**B.    The Conflict of Interest forms included specific disclosure criteria, and did not require disclosure of all outside positions.**

The January and September 2018 Conflict of Interest forms at issue in this case, attached hereto as Exhibits A and B, included specific disclosure criteria that determined whether an employee needed to disclose an outside position, which turned on whether the position met the definition of a reportable "Significant Financial Interest" or a reportable "Time Commitment." *See generally* Ex. A; Ex. B.

Under "What to Disclose," Section 1 of the Conflict of Interest forms provided "Disclosure Criteria for Significant Financial Interests (SFI)." Ex. A at 4; Ex. B at 4. In pertinent part, this section provided that the employee should determine whether to disclose a position as a "Significant Financial Interest" based on the following criteria:

**1. Disclosure Criteria for Significant Financial Interests (SFI)**

Disclose financial interests held by you or family members, including your spouse, dependent children and/or other member of your personal household, in any entity that a) reasonably appears to be related to your University responsibilities, and b) meets one or more of the following criteria:

   A.  A financial interest worth $5,000 or more in any entity, where the value is the aggregate of:
       i.  any remuneration received from the entity in the twelve months preceding the disclosure <u>plus</u>
       ii. any equity or other legal interest in the entity as of the date of disclosure <u>or</u>, if not owned on the date of disclosure, as of the date of liquidation.

2. *<u>Remuneration</u>* means salary and any payment for services not otherwise identified as salary such as consulting fees, honoraria, paid authorship, etc., or other payments for services;

Ex. A at 4 (Jan. 9, 2018 COI form); Ex. B at 4 (Sept. 25, 2018 COI form)

Under this criteria, for an employee to have a reportable "Significant Financial Interest" in an outside entity, the interest must be worth at least $5,000. Ex. A at 4; Ex. B at 4. In addition, if the financial interest consisted of "remuneration," such as "salary" or "other payments for services," the remuneration must have amounted to at least $5,000 received by the employee "in the twelve

months preceding the disclosure." Ex. A at 4; Ex. B at 4. Thus, if the employee received salary through an outside position that did not amount to $5,000 in the twelve months preceding the disclosure, the employee would have no Significant Financial Interest to report. *See* Ex. A at 4; Ex. B at 4.

Also under "What to Disclose," Section 2 provided "Disclosure Criteria for Time Commitments in External Professional Activities." Ex. A at 4; Ex. B at 4. In pertinent part, this section provided that the employee should determine whether to disclose a position as a "Time Commitment" based on the following criteria:

> **2.  Disclosure Criteria for Time Commitments in External Professional Activities**
>
> Disclose any entity with which you engage in personal professional activities that take time away from your University responsibilities, whether or not you receive compensation, except for Single Occasion Activities as described below.
>
> > ***External time commitment reporting does not***
> > i.   extend to family members of employees required to file.
> > ii.  apply to investigators who are not employees of the University.

Ex. A at 4 (Jan. 9, 2018 COI form); Ex. B at 4 (Sept. 25, 2018 COI form)

Under this criteria, for an employee to have a reportable "Time Commitment in External Professional Activities," the person must have a *current* time commitment (*i.e.*, "with which you engage," in the present tense) that "take[s] time away from [the employee's] University responsibilities." Ex. A at 4; Ex. B at 4. Thus, if the employee *previously* engaged or might in the *future* engage in external professional activities that did or could potentially take time away from the employee's KU responsibilities, those would not be reportable. *See* Ex. A at 4; Ex. B at 4. And if the employee currently engages in personal professional activities, but the activities do not "take time away from" the employee's KU responsibilities, the employee would have nothing to report. Ex. A at 4; Ex. B at 4.

The disclosure criteria in the Conflict of Interest forms thus inform the employee about which outside positions or affiliations he or she should disclose. To determine if the forms required disclosure of an outside position, a grand juror would need to compare the disclosure criteria in the forms to the details of the outside position, including the amount of remuneration received in the preceding twelve months and whether the position interfered with the employee's ability to satisfy his or her KU responsibilities.

C.   **The government misled the grand jury about the Conflict of Interest form disclosure criteria in order to persuade the grand jurors to return an indictment against Dr. Tao for failing to disclose the alleged position at FZU.**

Rather than introducing the Conflict of Interest forms to the grand jury or, alternatively, accurately describing their requirements, the FBI Case Agent—the sole witness to testify—misled the grand jury about the disclosure criteria in the forms. He testified that the Conflict of Interest forms required employees to disclose *any* outside position—irrespective of the remuneration or time commitment involved—such that Dr. Tao would have needed to disclose the alleged position at FZU even though the government possessed, and had presented, no evidence that he received pay from FZU or that the alleged position interfered with his KU responsibilities.

The FBI Case Agent's testimony to the third grand jury fit the pattern of how the government misled the previous two grand juries on this critical point, demonstrating that it was not due to inadvertence or mistake. During the first grand jury hearing, on August 21, 2019, the FBI Case Agent testified that KU employees were required to submit "a conflict of interest statement," and "if you have another job as a professor somewhere … that's a conflict of interest," and Dr. Tao "would have been required to disclose" the position in the forms, which Dr. Tao "would have known" because "he signed" the forms. Ex. C, Grand Jury Hearing Tr. at 6–8, Aug. 21, 2019. The FBI Case Agent emphasized that "the crux of the scheme" was that Dr.

6

Tao "knowingly and intentionally submitted [a] false statement denying a lack of conflict of interest," when in fact he had one. *Id.* at 18. The grand jury was neither shown the actual Conflict of Interest form nor even read precisely what was required.

The government reprised this deceptive tactic during the second grand jury hearing, on January 15, 2020.[2] The FBI Case Agent testified that KU's Conflict of Interest policy was "very broad and allows *anything – any time commitment* outside of the university to be considered a conflict of interest, *any salary* or significant financial interest gained outside the university as a conflict of interest." *See* Ex. D, Grand Jury Hearing Tr. at 16, Jan. 15, 2020 (emphasis added). He testified in absolute terms that the forms required Dr. Tao to disclose "salary and payments for services outside the university," and that any "[c]ommitment of time and money" must also be disclosed. *Id.* at 21, 38. He also testified that employees must "declare any outside employment" in the forms, without qualification, and any "salary from somebody else," without mentioning that the employee only needed to disclose the salary if it amounted to $5,000 in the preceding twelve months before the employee submitted the form. *Id.* at 55–56, 62. Once again, the Conflict of Interest forms were neither introduced nor recited verbatim.

On June 24, 2020, in order to obtain the instant Second Superseding Indictment, the government once again provided the same false and misleading testimony to the grand jury. The FBI Case Agent testified that Dr. Tao was required "to disclose *any* current *or prospective situations* that involved *potential conflicts* of interest or time as soon as they became known."

---

[2] The government's deception during the January 15, 2020 grand jury appearance was even more aggravated than on August 21, 2019, since the defense had argued in its then-pending Motion to Dismiss that the alleged position at FZU did not meet the disclosure criteria in the forms. *See* ECF No. 30 at 8–10.

Ex. E, Grand Jury Hearing Tr. at 6, June 24, 2020 (emphasis added).[3] He further testified that Dr. Tao "falsely stated" in his January 9 and September 25, 2018 Conflict of Interest forms "that he did not have any conflicts" of time or financial interest when in fact his alleged FZU position constituted a conflict that the form required to be reported. *Id.* at 27, 29. But, just as with the prior two grand jury hearings, the FBI Case Agent never informed the grand jury that the Conflict of Interest forms included specific disclosure criteria that were significantly narrower than the criteria he described, and the forms themselves were never introduced. Based on this misleading testimony, the grand jury returned the Second Superseding Indictment, now pending before the Court.

> **D.**   **The FBI Case Agent misled the third grand jury about Dr. Tao's KU responsibilities in the spring of 2019 in order to obtain the pending Indictment.**

Apart from misrepresenting the Conflict of Interest form disclosure criteria during the third grand jury proceeding, the government also presented false testimony to the third grand jury about Dr. Tao's KU responsibilities in the spring of 2019, and created the false impression that the alleged FZU position interfered with those responsibilities and created a reportable Time Commitment that Dr. Tao needed to disclose in the forms.

During the June 24, 2020 grand jury hearing, a grand juror asked the FBI Case Agent about Dr. Tao's responsibilities at KU during the spring of 2019. In response, the FBI Case Agent indicated that Dr. Tao had asked to "buy out" his teaching responsibilities in the spring of 2019, such that he would have *no* teaching obligations during that time:

> **GRAND JUROR** So it says here [in the Second Superseding Indictment] that for the

---

[3] During the June 24, 2020 hearing, the vast majority of the FBI Case Agent's testimony consisted of his reading from the Indictment and affirming that he was "personally familiar with all of the facts" alleged in the Indictment and "everything that [he was] reading to the Grand Jury," and he had "painstakingly check[ed] every fact" alleged in the Indictment. Ex. E at 5–6.

> majority of time between December 11th, 2018 and August 20th, 2019, [Dr. Tao] traveled to the PRC where he fulfilled his contractual obligations [at FZU]. What did KU think he was doing during that time? Did they think he was on sabbatical or what did they think he was doing? Because he obviously wasn't in Lawrence.
>
> **[FBI CASE AGENT]:** I don't know that I can speak to what KU thinks he was doing. He did request a semester buy-out from KU. … So professors … are required to teach classes. And if they want to focus more on their research, they can request a buy-out of their course. So that's what was going on during that period.

Ex. E at 22–23. Apparently dissatisfied with this highly exculpatory testimony, the prosecutor

promptly interjected and encouraged the FBI Case Agent to reverse his testimony:

> **[PROSECUTOR]:** *Hang on. Let me focus that just a little bit*, if you don't mind. So he requested a buy-out, but you didn't say that KU granted him a buy-out, correct?
>
> **[FBI CASE AGENT]:** *I did not … They did not grant him a buy-out.*
>
> **[PROSECUTOR]:** So although Dr. Tao applied for a buy-out of his teaching obligations that semester, KU never granted it, correct?
>
> **[FBI CASE AGENT]:** That is – I can't say – *they did not grant it from the department chair* or the Provost, which is the normal process. *I don't know how it ended up, but they didn't.*
>
> **[PROSECUTOR]:** Would it be accurate to say, though, that from KU's perspective Dr. Tao was contractually obligated to be a full-time professor at KU during that time period?
>
> **[FBI CASE AGENT]:** Yes.

*Id.* (emphasis added). Having received this obvious prompt, the FBI Case Agent thus reversed

his testimony and stated that although Dr. Tao had sought a buy-out from KU, his department

chair never approved it. *See id.*

The FBI Case Agent's testimony was false, as the government well knew. Indeed, on

June 25, 2018, well before Dr. Tao had to submit his September 25, 2018 Conflict of Interest

form, the Chair of the Chemical and Petroleum Engineering Department at KU approved Dr.

Tao's buy-out request for the spring of 2019, in writing, contrary to the FBI Case Agent's

testimony. *See* Ex. F. Both the FBI Case Agent and the prosecutor were well aware of this fact

because KU had emailed the government a copy of the communication on December 23, 2019,

and the FBI Case Agent also interviewed Dr. Tao's Department Chair on January 7, 2020, who

told the FBI Case Agent that he "believed the buyout was successful." Ex. G. According to the FBI Case Agent's notes from the meeting, moreover, the Department Chair stated during the interview that he understood that Dr. Tao was not on campus during the spring of 2019, and, if Dr. Tao were not present when he should have been, the Department Chair would have received reports from students to that effect, but received none. Ex. H. Thus, despite both the witness and the prosecutor knowing that Dr. Tao's Department Chair had approved Dr. Tao's buy-out for the spring of 2019, the FBI Case Agent testified just the opposite to the grand jury in response to a grand juror's specific question on this topic. Ex. E at 22–23. This testimony led the grand jury to falsely believe that Dr. Tao had teaching responsibilities at KU in the spring of 2019, when in fact the government knew he did not, thereby influencing the grand jury's judgment as to whether Dr. Tao's alleged position at FZU interfered with Dr. Tao's KU responsibilities at that time.

**E.    The prosecutor made inappropriate statements to the third grand jury to obtain the pending Indictment.**

In addition to the false and misleading testimony recounted above, the prosecutor made inappropriate comments to the grand jury during the June 24, 2020 hearing that led to the pending Indictment.

At the outset of the June 24, 2020 hearing, without any legitimate reason, the prosecutor elicited testimony from the FBI Case Agent that Dr. Tao had been "originally indicted" in August 2019. Ex. E at 3. The only conceivable reason to elicit this testimony would be to help convince the new grand jury that because a prior grand jury had already found probable cause that Dr. Tao had committed crimes, the new grand jury should do the same.[4]

---

[4] This was no fluke. The prosecutor had *also* told the *second* grand jury that Dr. Tao had been indicted by the *first* grand jury. *See* Ex. D at 3 ("Q. And you presented an indictment to a

Also during the June 24, 2020 grand jury hearing, the FBI Case Agent gave the false impression that the Department of Justice believed Dr. Tao was a spy for China. At the beginning of the hearing, the FBI Case Agent told the grand jury that he was "assigned to the counterintelligence squad out of Kansas City *that deals with violations that you will see here*." Ex. E at 2 (emphasis added). Of course, as most civilians appreciate, counterintelligence involves the investigation, identification, and prosecution of spies. By testifying that Dr. Tao's "violations" were the business of the Counterintelligence Squad, the FBI Case Agent implied to the grand jury that Dr. Tao was a spy. Further promoting this false impression, the FBI Case Agent then testified at length about the "rapid growth" of China, achieved through "talent plans, which were designed to encourage the transfer of original ideas and intellectual property from the U.S. universities to the PRC Government institutions," and the Chinese Communist Party, and "enhance" China's "economic prosperity and national security." *Id.* at 13–16. He also showed the grand jury the Second Superseding Indictment, which included seven irrelevant paragraphs about China and the Communist Party. ECF No. 75 ¶¶ 16–21. Having given the impression that the government believed Dr. Tao was a spy for China—despite their being no evidence that Dr. Tao improperly disclosed any information to anyone, or that he was a member of the Communist party—a grand juror naturally asked: "So is he being charged with double-dipping or *espionage*?" Ex. E at 24 (emphasis added). Rather than immediately disabusing the grand jury of the notion that the government suspected Dr. Tao to be a spy for China—an impression that it had deliberately and artfully conveyed to the grand jury—the prosecutor

---

different grand jury in Topeka a few months ago, correct? A. That is correct. Q. And we're back today with a superseding indictment, correct? That is correct.").

refused to give a direct answer to this question and instead said: "Well, if you'll give us a little

time, we'll work our way through the rest of the Indictment. Okay? Any other questions?" *Id.*[5]

## ARGUMENT

I.    <u>**The Court should dismiss the Second Superseding Indictment because the**</u>
      <u>**government's materially false and misleading testimony, and prejudicial comments,**</u>
      <u>**substantially influenced the grand jury's decision to indict.**</u>

The government's deliberately false and misleading testimony regarding its central

factual allegations, combined with its highly prejudicial and irrelevant statements about Dr. Tao

meant to inflame the jury, substantially influenced the grand jury's decision to return the pending

Indictment. At the very least, this misconduct gives rise to grave doubt about whether the grand

jury's decision to indict Dr. Tao was free from the government's improper influence. The Court

should therefore dismiss the Indictment under Federal Rule of Criminal Procedure 12(b)(3).

    A.    **The Court should dismiss the Indictment if government misconduct before**
      **the grand jury "substantially influenced" the decision to indict, or gives rise**
      **to "grave doubt" that the decision to indict was not free of such influence.**

Federal Rule of Criminal Procedure 12(b)(3) "permits a criminal defendant to seek

pretrial dismissal based on 'an error in the grand-jury proceeding.'" *United States v. Brown*,

5:19-CR-40081-HLT, 2020 WL 4347258, at *3 (D. Kan. July 29, 2020) (quoting Fed. R. Crim.

---

[5] Given these improper statements, Dr. Tao has grave concerns that the prosecutor made other inappropriate statements to the grand jury that could have influenced its decision to return the pending Indictment. The government has largely obscured this information from the defense, however, as it heavily redacted the prosecutor's communications with the grand jurors from all three grand jury hearing transcripts. If the Court declines to grant the instant Motion to Dismiss on the existing record, therefore, the defense requests that the Court will alternatively require the government to submit unredacted versions of the transcripts *ex parte* to the Court for *in camera* review, so that the Court can determine if additional statements by the government may be improper and should be disclosed to the defense. *See* Fed. R. Crim. P. 6(e)(3)(E). The defense has a "particularized need" for such information in the circumstances so that it can see if additional statements by the prosecutor may have contributed to influencing the grand jury's decision to indict, a need that outweighs any public interest in keeping the prosecutor's improper statements secret. *In re Special Grand Jury 89-2*, 143 F.3d 565, 570 (10th Cir. 1998).

P. 12(b)(3)). To obtain dismissal, the defendant must demonstrate "that he was prejudiced as a result of the error," by showing "that the alleged error 'substantially influenced the grand jury's decision to indict, or … there is grave doubt that the decision to indict was free from the substantial influence of such violations.'" *Id.* (citing *Bank of Nova Scotia*, 487 U.S. at 256); *see also United States v. Cooper*, 396 F. Supp. 3d 992, 994 (D. Kan. 2019) (noting that the prejudice requirement "comport[s] with the harmless error inquiry prescribed by Federal Rule of Criminal Procedure 52(a)").

The Tenth Circuit has held that courts "may dismiss an indictment 'for prosecutorial misconduct which is flagrant to the point that there is some significant infringement on the grand jury's ability to exercise independent judgment.'" *United States v. Hillman*, 642 F.3d 929, 933–34 (10th Cir. 2011) (quoting *United States v. Pino*, 708 F.2d 523, 530 (10th Cir. 1983)). This includes situations where the "grand jury's independent judgment is compromised" because "the prosecutor's misconduct invade[d] the grand jury's independent deliberative process and substantially affect[ed] its decision to indict." *Id.* "The common thread" in cases where dismissal is appropriate "is that they require a showing the government deliberately attempted to influence the grand jury with false testimony." *Cooper*, 396 F. Supp. 3d at 994.

Dismissal is appropriate in these cases in part because the government is partially entrusted with maintaining the historic independence of the grand jury, which has eroded over time, and courts must ensure that the government strictly does so. As the Second Circuit explained in *United States v. Hogan*:

> It is true of course that prosecutors, by virtue of their position, have gained such influence over grand juries that these bodies' historic independence has been eroded. After all, it is the prosecutor who draws up the indictment, calls and examines the grand jury witnesses, advises the grand jury as to the law, and is in constant attendance during its proceedings. Nonetheless, there remain certain limitations on the presentation that a prosecutor may make to the grand jury. In fact

the gain in prosecutors' influence over grand juries is all the more reason to insist that these limitations be observed strictly. Due process considerations prohibit the government from obtaining an indictment based on known perjured testimony. Courts have also held that a prosecutor may not make statements or argue in a manner calculated to inflame the grand jury unfairly against an accused. Under the applicable guidelines prosecutors have an ethical obligation strictly to observe the status of the grand jury as an independent legal body. In short, a prosecutor as an officer of the court is sworn to ensure that justice is done, not simply to obtain an indictment.

712 F.2d 757, 759–60 (2d Cir. 1983) (citations omitted).

For example, this past year in *United States v. Cooper*, Judge Crabtree dismissed an indictment charging a defendant with aggravated sexual abuse because a witness made a misrepresentation to the grand jury about the results of an alleged victim's forensic exam, which the prosecutor did not correct. 396 F. Supp. 3d at 993, 997. The witness falsely testified that the results of the exam "were indicative of … some form of penetration," and the prosecution, which had access to the results, "did not correct [the agent's] testimony during the grand jury proceedings." *Id.* at 993, 995–96. The government argued that the defendant suffered no prejudice, because the agent also testified about the alleged victims' reports of the abuse, but the court rejected this argument, finding that the false testimony regarding penetration went "directly to an element" of the charged crime, giving the court "grave doubt" about "whether the grand jury's decision was free from [the agent's] uncorrected false statement." *Id.* at 996.

Similarly, in *United States v. Peralta*, a federal district court dismissed an indictment after the defense learned at trial that the sole case agent to testify before the grand jury had made inaccurate statements based on hearsay. 763 F. Supp. 14, 21 (S.D.N.Y. 1991). The court concluded that, in conjunction with misleading statements of law made by the prosecutor to the grand jury, the agent's inaccurate hearsay testimony to the grand jury "seriously prejudiced" the defendant, warranting dismissal. *Id.* at 21. In reaching its conclusion, the court in *Peralta* also expressed serious concern with the government's practice of presenting testimony of only a

14

single case agent, which may appear "smooth, well integrated and consistent, making even weak cases appear strong," but "threatens the independence of the grand jury function" and is also "indicative of an unduly casual attitude with respect to the presentation of evidence to a grand jury." *Id.* at 20 (internal quotation marks omitted); *accord United States v. Brito*, 907 F.2d 392 (2d Cir. 1990).

**B.    The FBI Case Agent's materially false and misleading testimony, and the prosecutor's highly prejudicial and irrelevant questions and comments, substantially influenced the grand jury's decision to indict Dr. Tao, or at least give rise to "grave doubt" that they did.**

Applying the principles set forth above, the Court should dismiss the pending Indictment because the government "deliberately attempted to influence the grand jury" with the FBI Case Agent's false and misleading testimony, *Cooper*, 396 F. Supp. 3d at 994, and through the prosecutor's irrelevant and highly prejudicial questions and comments about Dr. Tao, all during the June 24, 2020 hearing. Individually and cumulatively, this misconduct "substantially influenced" the grand jury's decision to indict Dr. Tao, or at least gives rise to "grave doubt" that it did. *Brown*, 2020 WL 4347258, at *3.

First, the FBI Case Agent's testimony that the Conflict of Interest forms required Dr. Tao to disclose *any* outside position—and his concealment of the actual Conflict of Interest forms and their specific disclosure criteria—left the grand jury with the false impression that the Conflict of Interest forms required Dr. Tao to disclose his alleged position at FZU, without needing to know the specific compensation Dr. Tao received, or whether the position took time away from Dr. Tao's KU responsibilities. In reality, however, the forms did not require disclosure of *any* outside position; they required disclosure of an outside position only if Dr. Tao had received $5,000 or more from the position in the twelve months preceding the disclosure (the disclosure criteria for a reportable "Significant Financial Interest"), or if the position took time

15

away from his KU responsibilities (the disclosure criteria for a reportable "Time Commitment"). The government misrepresented the disclosure criteria because it had no evidence that showed that the alleged FZU position satisfied the disclosure criteria. This was no innocent mistake. The government had repeated this same tactic before three consecutive grand juries over a ten-month period. *See* Ex. C at 6–8; Ex. D at 16, 21, 38, 55–56, 62.

Second, this misleading testimony was compounded when the FBI Case Agent provided false testimony about Dr. Tao's responsibilities at KU in the spring of 2019, giving the false impression that Dr. Tao's alleged FZU position interfered with those purported teaching duties and thus needed to be reported in the Conflict of Interest forms. The FBI Case Agent falsely testified that Dr. Tao's Department Chair had rejected his buy-out request for the spring of 2019—even though the FBI Case Agent and the prosecutor had both documentary and testimonial evidence that this was untrue—in order to persuade the grand jury that Dr. Tao's alleged work at FZU *must* have conflicted with his KU responsibilities and created a significant conflict of interest.

Third, the prosecutor's comment during the June 24, 2020 grand jury hearing—to a brand new grand jury—that Dr. Tao had already been indicted served to unfairly prejudice and inflame the grand jury against Dr. Tao. There was no valid reason to tell the new grand jury that a prior grand jury had already found probable cause to indict Dr. Tao for federal crimes. This comment had the effect of predisposing the new grand jury to indict Dr. Tao based on the prior grand jury's probable cause determination. *See, e.g.*, *United States v. Leeper*, No. 06-CR-58A, 2006 WL 1455485, at *4 (W.D.N.Y. May 22, 2006) (reasoning that the new grand jury was "most certainly predisposed to indict after hearing that a prior grand jury—upon hearing the same evidence—had found sufficient probable cause to indict"). And that prior probable cause finding

16

was *itself* flawed, as discussed above. This, too, was no innocent mistake, as the same prosecutor had made a substantially similar comment to the second grand jury during the January 15, 2020 hearing in order to obtain that indictment. *See* Ex. D at 3.

Fourth,  the FBI Case Agent and the prosecutor's collective statements to the grand jury deliberately gave the false impression that Dr. Tao was a spy for China, also prejudicing Dr. Tao and unfairly inflaming the grand jury against him. The FBI Case Agent told the grand jury that he was part of the Counterintelligence Squad, which most people understand to mean he tries to identify and prosecute spies. He then told the grand jury that the Counterintelligence Squad "deals with violations you will see here," Ex. E at 2, implying that Dr. Tao was a spy for China. Moreover, the FBI Case Agent testified, and showed seven paragraphs of an Indictment that alleged, that China had used talent programs to recruit scientists who might steal intellectual property and transfer it to China and the Chinese Communist Party, Ex. E at 13–16; ECF No. 75 ¶¶ 16–21, even though those allegations had nothing to do with the evidence presented against Dr. Tao. The testimony had its intended effect, as a grand juror asked whether Dr. Tao was accused of "espionage." Ex. E at 24. Rather than cure the obvious and prejudicial misimpression, the prosecutor refused to answer directly, permitting the suspicion to infect the proceedings. *Id.* Thus, the government deliberately led the grand jury to conclude that Dr. Tao was believed by the government to be a spy for China who had stolen intellectual property from KU, which is false. This implicit accusation was extraordinarily prejudicial to Dr. Tao, as the grand jury would naturally have believed that if it did not indict him on the fraud and false statements charges, it would be letting a Chinese spy, who had already been indicted once before, go free in the midst of a heated trade war with China. The cumulative effect of this testimony was thus devastating.

Like in *Cooper*, the FBI Case Agent's false and misleading testimony about the disclosure criteria in the Conflict of Interest forms, and about Dr. Tao's KU responsibilities in the spring of 2019, severely prejudiced Dr. Tao because the false testimony went "directly to an element" of the charged offenses. *Cooper*, 396 F. Supp. 3d at 996. Specifically, the government used this false and misleading testimony to convince the grand jury that Dr. Tao's Conflict of Interest forms included misrepresentations, which formed the basis for its charges, when in fact they did not. If the government had accurately described the disclosure criteria in the Conflict of Interest forms, the grand jury would likely have asked if there was evidence that FZU had paid Dr. Tao $5,000 or more in the twelve months preceding his submission of a Conflict of Interest form, or if the alleged FZU position had interfered with Dr. Tao's KU responsibilities. But by hiding the forms and their criteria from the grand jury, the government avoided these questions, which otherwise would have prevented it from establishing probable cause. The government's statements that Dr. Tao had already been indicted by a prior grand jury, and its insinuations that he was a spy for China, poured gasoline on the fire, inflaming the grand jury against Dr. Tao. Thus, just as in *Cooper*, the government's misconduct either "substantially influenced" the grand jury's decision to indict, or at least gives rise to "grave doubt" that its decision was not free from the government's improper influence.

Accordingly, because the government infringed upon the grand jury's independence by deliberately presenting materially false and misleading testimony, and making irrelevant and highly prejudicial statements about Dr. Tao meant to unfairly inflame the jury against him, the Court should dismiss the pending Indictment.

## CONCLUSION

As the court stated in *Hogan*, "a prosecutor as an officer of the court is sworn to ensure that justice is done, not simply to obtain an indictment." 712 F.2d at 760. The government in this

case disregarded that cornerstone of our criminal justice system, which protects the rights of the accused while ensuring that the citizenry has confidence in the propriety of the grand jury system as a whole.

With the government's misconduct exposed, it is incumbent upon the Court to safeguard Dr. Tao's rights and ensure that confidence in the grand jury system remains strong, by dismissing the pending Indictment *with prejudice*. Dismissal should be with prejudice because, in addition to the reasons stated in Dr. Tao's parallel Motion to Dismiss for Failure to State an Offense and Lack of Venue filed herewith, the government has repeatedly committed misconduct before *three different grand juries* to obtain indictments against Dr. Tao, protracting this case for a year and draining Dr. Tao's resources—all despite that an independent grand jury, free of the government's improper influence, never would have indicted him in the first place.

Although the existing record provides a sufficient basis for the Court to dismiss the Indictment, if the Court is not prepared to dismiss the Indictment on the existing record, Dr. Tao respectfully requests that the Court order the government to submit unredacted versions of the three grand jury transcripts *ex parte* for *in camera* review by the Court. *See supra* note 5. That way, the Court can determine if additional portions of the transcripts should be disclosed to the defense, such that the defense can supplement this Motion as appropriate before the Court rules.

*[Signature on following page]*

Dated:  August 14, 2020                    Respectfully submitted,

/s/ Thomas H. Johnson
Thomas H. Johnson #13688
Petefish, Immel, Hird, Johnson,
Leibold & Sloan, LLP
842 Louisiana
Lawrence, KS 66044
Tel: (785) 843-0450
Fax: (785) 843-0407
tjohnson@petefishlaw.com

Peter Zeidenberg
Michael F. Dearington
Laura Zell
ARENT FOX LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
Peter.Zeidenberg@arentfox.com
Michael.Dearington@arentfox.com
Laura.Zell@arentfox.com

*Attorneys for Defendant Franklin Tao*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of August, 2020, I electronically filed the foregoing

Memorandum in Support of Motion to Dismiss the Second Superseding Indictment with the Clerk

of the Court using the CM/ECF system.

/s/ Thomas H. Johnson
Thomas H. Johnson