# UNITED STATES DISTRICT COURT

## District of Kansas

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                            Case No.   **19-20052-01-JAR**

FENG TAO,

        Defendant.

## GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE AN OFFENSE AND LACK OF VENUE
### (Doc. 82)

COMES NOW the United States, by and through Anthony W. Mattivi, Assistant United States Attorney for the District of Kansas, and Benjamin J. Hawk, Trial Attorney for the Counterintelligence and Export Control Section of the U.S. Department of Justice's National Security Division, and respectfully requests the Court DENY the defendant's Motion to Dismiss the Indictment for Failure to State an Offense and Lack of Venue (Doc. 82.)

## I.     INTRODUCTION

The defendant is charged with lying to and defrauding the U.S. government and his American employer, the University of Kansas ("KU"), to obtain federal grants and an annual salary derived, in part, from those grants and to benefit the People's Republic of China ("PRC").

While conducting federally funded research at KU, the defendant secretly obtained employment at Fuzhou University ("FZU"), a Chinese research institution associated with the Chinese government. At the same time, the defendant was accepted into the Chinese government's Chang Jiang Scholar Program to serve as a Chang Jiang Distinguished Professor at FZU, based on his research involving renewable energy, a core scientific field of strategic importance to the PRC. Through his association with the Chang Jiang Scholar Program and FZU, the defendant entered into an agreement with the Chinese government to further the PRC's major strategic needs, and he sought to make the PRC a world leader in the field of renewable energy. In return, the defendant received a handsome annual salary from FZU, substantial funding and support from FZU and the PRC, a well-equipped laboratory, research staff, and integration into Chinese Communist Party circles as a scientific expert, resulting in significant reputational gains. Rather than disclose his concurrent Chinese employment and supported research efforts, as he was required to do – and risk losing his six-figure KU salary and access to hundreds of thousands of dollars in federal research funds – the defendant instead schemed to conceal that information from KU and the U.S. government for his own personal gain and to advance the interests of the PRC.

The defendant's motion raises various legal challenges to the Second Superseding Indictment.[1] His primary argument is that the charges fail to allege the necessary elements of 18

---

[1] In his original motion to dismiss, the defendant introduced information extraneous to the legal issues he was raising at that time. Here, too, he does the same, reaching beyond the issues to advance wholly irrelevant arguments. For example, he unnecessarily provides a skewed perspective of the Department of Justice's China Initiative, inaccurately portraying himself as the victim of a sweeping government dragnet. The China Initiative is a legitimate law enforcement initiative that prioritizes the Department's resources to combat a national security threat. Of course, it has no bearing on whether the charges against the defendant are legally sufficient or whether he is guilty or innocent. Curiously, several organizations and individuals have requested leave from Court to file an *amicus curiae* brief in support of the defendant's motion, and their

U.S.C. §§ 1343 (Wire Fraud) and 1001 (False Statements). He further argues that the charges violate the Due Process Clause's fair warning requirement and that venue for Count 10 is not appropriate in the District of Kansas.

As discussed herein, the defendants' claims are meritless. The indictment sets forth the elements of the offenses charged and puts him on fair notice of those charges. Rather than take the allegations as true, as the law requires, the defendant distorts a limited set of facts, asks the Court to draw numerous inferences in his favor, inaccurately characterizes the charged conduct as a "garden-variety employment issue," and unreasonably describes this case as a "breathtaking example of prosecutorial overreach." There is nothing about the defendant's conduct as alleged that can be accurately described as a private employment dispute involving no federal interest, nor does it involve a novel construction of the statutes that would result in the criminalization of every instance of workplace dishonesty, as the defendant wrongly warns the Court. His transparent efforts to litigate the evidence on paper are further misplaced. There is no equivalent to a motion for summary judgment in the criminal context. Rather, it is for the jury to decide whether the government has met its burden of proof at trial, when the entirety of the evidence is presented. At this stage, the Court need only decide if the indictment is legally sufficient and whether the defendant had fair warning that his conduct was illegal. For the reasons set forth below, the Court should deny the defendant's motion.

## II.      BACKGROUND

### A.      Indictment and Procedural History

The Federal Bureau of Investigation ("FBI") initiated an investigation of the defendant,

---

arguments also relate to the Department's China Initiative. (Doc. 86.) The government has opposed their request for leave to enter an appearance in this case. (Doc. 87.)

an experienced research professor at KU, after receiving information from an anonymous source. The FBI's ensuing investigation – which included, among other things, search warrants for the defendant's office, residence, electronic devices, and email accounts – developed evidence independent from the source's information to prove the charged crimes.

On August 21, 2019, a grand jury sitting in the District of Kansas returned an Indictment, charging the defendant with one count of wire fraud, in violation of 18 U.S.C. § 1343, and three counts of program fraud, in violation of 18 U.S.C. § 666. (Doc. 1.) Following the defendant's initial motion to dismiss, on January 15, 2020, the grand jury returned a Superseding Indictment, which effectively added a wire fraud count and combined the three program fraud charges into a single count. (Doc. 50.) Then, on June 24, 2020, the grand jury returned a Second Superseding Indictment, charging the defendant with seven wire fraud counts, including the two counts from the Superseding Indictment, and three counts of making false statements, in violation of 18 U.S.C. § 1001. (Doc. 75.)

### B.    The Defendant's Scheme to Defraud the U.S. Government and KU of Money and Property

The wire fraud and false statement charges stem from allegations that the defendant, an experienced research professor, intentionally lied to and defrauded two federal agencies that funded his scientific research and the American university where he conducted that research as a fulltime, salaried employee. (Doc. 75 at ¶¶ 32-39.) The defendant concealed from those agencies and his employer the fact that he was also employed fulltime at a Chinese university and that he was receiving financial benefits and foreign research support as a result of that employment and his participation in a Chinese government talent plan. (*Id.*) Through his scheme, the defendant sought to enrich himself while advancing the strategic interests of the Chinese government. (*Id.*)

1.  *The Defendant's Employment at KU and Intentional Failure to Disclose His Prospective and Concurrent Fulltime Employment by FZU*

As alleged in the Second Superseding Indictment, KU hired the defendant as a research professor in August 2014.[2] (Doc. 75 at ¶ 3.) Until the time of his arrest in August 2019, he remained a fulltime employee of KU, teaching chemistry and conducting federally funded research, focused on renewable energy, at KU's Center for Environmentally Beneficial Catalysis. (*Id.*)

When hired by KU, the defendant signed a policy acknowledgement form, agreeing to abide by and follow all of KU's policies, including the Kansas Board of Regent's ("KBOR") commitment of time and conflict of interest policy and KU's financial conflict of interest policy (hereinafter, "KU's policies").[3] (*Id.* at ¶8.) The defendant further certified that he read and complied with those policies on an annual basis, and he acknowledged that he would ensure that his research teams complied with the policies when submitting federal research and grant proposals to KU. (*Id.*)

KU's policies required the defendant to disclose on an *ad hoc* basis current or prospective situations that involved potential conflicts of interest as soon as they became known.[4] (*Id.* at ¶ 5.) The policies further required the defendant to disclose conflicts of interest and time commitments on an annual basis using KU's "Institutional Responsibilities" form (also referred to as a "conflict disclosure form" and "conflict of interest form"). (*Id.* at ¶ 6.)

---

[2] The defendant earned an annual base salary of approximately $105,000.

[3] *See generally* https://policy.ku.edu/provost/commitment-of-time-conflict-of-interest; https://policy.ku.edu/chancellor/individual-conflict-of-interest.

[4] With respect to prospective situations, the policies informed the defendant that the appearance of a conflict of interest could be as damaging or detrimental as an actual conflict. He was therefore asked to report potential conflicts so that appearances could be separated from reality.

The defendant completed these forms each year of his employment including for the 2018 and 2019 academic years. He submitted his 2018 form on January 9, 2018, which appears to have been late, likely due to the time he spent applying to the Chang Jiang Scholar Program at FZU. (*Id.* at ¶ 39(A).) He submitted his 2019 form on September 25, 2018. (*Id.* at ¶ 39(A).) Counts Three, Six, Eight, and Nine relate to the defendant's misrepresentations on those forms. (*Id.* at ¶¶ 42 and 44.)

On the first part of the 2018 and 2019 conflict disclosure forms, the defendant identified that he was "responsible for the design, conduct, or reporting of externally sponsored research" (*i.e.,* his federally funded research at KU). As noted on each form, that information helped KU "in determining whether [the defendant's] disclosed financial interests or time commitments . . . could potentially conflict with [his] university responsibilities" (to include his federally funded research at KU).[5] (*Id.* at ¶ 7.)

The second part of each form reminded the defendant that, per KU's policies, he owed his primary professional responsibility to KU; his primary commitment of time and intellectual effort should be to his research and teaching at KU; and he should maintain a presence on campus consistent with those responsibilities. The form further recited the disclosure criteria set forth in the policies.

For both his 2018 and 2019 conflict disclosure forms, the defendant misrepresented that he had no conflicts of interest or time commitments, despite his association with FZU and the Chang Jiang Scholar Program and the related benefits and research support he was receiving and

---

[5] As described below, DOE and NSF relied on KU to manage the defendant's conflicts and time commitments, and NSF explicitly required KU to establish conflict policies to receive federal funds.

planned to receive. (*Id.* ¶ at 39(A) and (E).) He further certified that this information was true, accurate, and complete; that he had read, understood, and complied with KU's conflict policies; that he agreed to secure approval regarding outside employment, prior to engaging in that activity;[6] and that he agreed to report any changes as soon as they become known but no later than 30 days after acquiring a new significant financial interest. (*Id.* ¶ at 6.)

At no time did the defendant seek approval from KU to work at FZU, as required. (*Id.* ¶¶ at 26, 31, and 36.) Nor did he otherwise report to KU, as required, his employment by FZU or any remuneration, sponsored travel, or time commitments related to his work for FZU on behalf of the Chinese government and his participation in the Chang Jiang Scholar Program.[7] (*Id.* ¶¶ at 26, 31, 36, and 39.)

### 2.    *The Defendant's Federally Funded Research at KU*

The defendant was not just a KU employee. He was the principal investigator ("PI"), or lead researcher, in charge of multiple research projects at KU that were funded by the U.S. government. (Doc. 75 at ¶¶ 4, 9-11, 12, and 15.) As PI, the defendant was responsible for the scope of work of each project, its fiscal administration, meeting the terms and conditions of the award, and representing the project to the sponsoring agency.[8] (*Id.*) In other words, while KU received the grants to support the defendant's research at KU, the defendant was solely

---

[6] The policies expressly prohibited the defendant from obtaining outside employment and performing research at another institution without prior approval. The policies further informed the defendant that it was inappropriate to engage in gainful outside employment that was incompatible with his institutional commitments.

[7] The defendant also never sought approval from KU to work at Nagoya University in Japan in June and July 2018. Nor did he otherwise report that employment and the salary he received he from it.

[8] *See generally* https://research.ku.edu/principal_investigator_ designation.

responsible for the projects, from conception to completion, and he was required to keep the sponsoring agencies informed of his progress (*id.* at ¶ 39(E)), among other things. The defendant's attempt to dissociate himself from the U.S. government grant process is unpersuasive. (*See* Doc. 82 at 8 n.10.)

Generally, PIs, such as the defendant, are responsible for identifying funding sources for their proposed research at KU.[9] (Doc. 75 at ¶¶ 4, 9-11, 12, 15.) Certain federal agencies, such as DOE and NSF, post funding announcements that solicit research proposals from universities. (*Id.* ¶¶ 9 and 12.) These grants are highly competitive, limited in number, and are not intended to fund research merely for the sake of research.

Once PIs identify funding sources, they are responsible for drafting and submitting proposals to KU, which then reviews the proposals before submitting them to the federal agencies. (*Id.* ¶¶ 4, 10, and 15.) As part of KU's review process, PIs acknowledge that they will take the steps necessary to ensure that the members of their research teams have reviewed and complied with all relevant conflicts policies and made all necessary disclosures. (*Id.* ¶ 8 and 39(B).) PIs further review the grant applications prior to KU submitting them. Most, if not all, of the applications require KU to certify under criminal penalty that the contents are true and accurate; to do so, KU relies on the truthfulness of the PIs. (*Id.* ¶¶ 10 and 15.) Grants that are approved by a federal agency, such as DOE or NSF, are awarded to KU but are, of course, directly tied to the PI who proposed the research and who is responsible for managing it.

Relevant to the charges, the defendant caused KU to apply for, and receive, at a minimum, hundreds of thousands of dollars in grants from DOE's Office of Science and NSF to

---

[9] *See generally* https://research.ku.edu/grants-process.

fund his research at KU involving renewable energy. (*Id. ¶¶* 4, 10, and 15). Counts Two and Three, Five and Six, and Eight to Ten all directly relate to these federal grants and the defendant's false statements and misrepresentations pertaining to his association with FZU and the Chinese government.

Both DOE and NSF required the defendant to submit, as part of KU's grant application, a biographical sketch, to include his current and past employers, and a list of current and pending research support. (*Id. ¶¶* 10 and 15). The current and pending support was to include all of the defendant's sponsored activities and awards requiring a measurable commitment of effort, whether paid or unpaid, including any pending support and support planned for the future. As the defendant well knew, DOE and NSF used this information to help identify potential scientific, budgetary, and/or commitment overlap between the defendant's proposal and his current or planned research projects. It is illegal to receive funds from two sources for the same research, and it is the responsibility of DOE and NSF's program managers to confirm that there is no duplication of effort and support. In at least one instance, which forms the basis for Count Five (*id.* at ¶ 42), a DOE program manager directly asked the defendant for his updated current and pending research support while his December 2017 DOE grant application for research funding at KU was pending. (*Id.* at ¶¶ 10-11 and 39(D).)

At no time did the defendant inform DOE or NSF that he was employed by FZU or that he was receiving or planned to receive funds and other support for his research from FZU and the Chinese government. (*Id. ¶¶* at 26, 31, and 36.) DOE and NSF also relied on KU, as the institution applying for and receiving the grant funds, to identify and manage the defendant's conflicts of interest and time commitments, which KU did through its conflicts policies and annual conflict disclosure forms, as described above. NSF explicitly required KU to maintain

such policies in order to receive federal funds.[10] (*Id.* ¶¶ at 13.)

        3.      *The Defendant's Clandestine Chinese Employment, Chinese Supported Research, and Agreement with FZU and the Chinese Government*

In May 2017, while employed by KU and using federal grant funds, the defendant contacted Xiamen University, a research university in China, to express his interest in applying for the Chinese government's Thousand Talents Program ("TTP") through that university.[11] (Doc. 75 at ¶ 22.) The TTP and the Chang Jiang Scholar Program are PRC talent plans, a means by which the PRC recruits researchers, like the defendant, through financial and reputational incentives to work in the PRC for a PRC institution. (Doc. 75 at ¶¶16-21.)

Around the same time, in July 2017, the defendant applied to the PRC Ministry of Education's Chang Jiang Scholar Program, which is intended for individuals employed by Chinese universities, such as FZU.[12] (*Id.* at ¶¶ 23-24.) By November 2017, the PRC Ministry of

---

[10] *See* https://www.nsf.gov/pubs/manuals/gpm05_131/gpm5.jsp#510. Furthermore, all federal grants are regulated by the Uniform Administrative Requirements, Cost Principals, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200.

[11] During a court-authorized search of the defendant's KU computer, the FBI located the defendant's TTP application on a partition of the hard drive, which the defendant created. In sum, the lengthy application is dated July 6, 2017, and includes a signed intent to work contract. It further details the defendant's KU employment and DOE and NSF grants and expresses the defendant's intent to conduct research of value to the PRC to help the PRC dominate the market in the field of renewable energy.

[12] The FBI also located the defendant's Chang Jiang Scholar Program application on the same partitioned hard drive as his TTP application. Similarly, it is dated July 6, 2017, and includes information about his DOE and NSF grants and his work at KU. Moreover, it includes a signed commitment by the defendant to work fulltime at FZU, make all of his research the property of FZU, and resign from his current employer, KU. It further includes a recommendation from FZU that provided for the following: the defendant would conduct research in his field; build a team of researchers who would apply for PRC-funded projects; establish his field as a world-class discipline at FZU; focus on research of value to the PRC to help the PRC achieve its strategic goals; design and develop groundbreaking technology to give the PRC technological superiority and help the PRC dominate the international markets. The recommendation further described the funding, equipment, laboratories, personnel, and other research assistance and support FZU

Education, which was responsible for the Chang Jiang Scholar Program, had advanced the defendant in the process and required him to defend his application in person. (*Id.* at ¶ 25.) As a result, the defendant sought to travel to FZU to prepare the necessary materials. (*Id.*) In order to do so, on November 11, 2017, he sent an email to the Chinese Consulate General in Chicago, Illinois, with the subject line "Urgently need Passport," which forms the basis for Count One. (*Id.* at ¶ 42.)

Near the end of December 2017, but no later than January 5, 2018, while the defendant remained employed by KU and continued to apply for, use, and receive federal funds, the PRC's Ministry of Education accepted him into the Chang Jiang Scholar Program at FZU, where he was expected to conduct research involving renewable energy for the benefit of the PRC. (*Id.* at ¶ 26.) In or about January or February 2018, the defendant negotiated an employment contract with FZU to serve as a Chang Jiang Distinguished Professor. (*Id.* at ¶ 28.) In or around March 2018, the defendant entered into a formal contract with FZU, and he officially commenced his employment as a Chang Jiang Distinguished Professor on May 1, 2018.[13] (*Id.* at 29-30.)

According to the unsigned contract and a signed addendum to the contract,[14] which are

---

intended to provide the defendant, including the approximately one million dollars in funding.

[13] While the defendant's official start date was May 1, 2018, the evidence at trial will show that he accepted employment at FZU when he applied for, and was accepted into, the Chang Jiang Scholar Program and that he worked to establish his research team at FZU prior to May 1, 2018. The contract memorialized many of the details set forth by FZU in its recommendation to the PRC Ministry of Education for the defendant to become a Chang Jiang Distinguished Professor.

[14] The defendant acknowledges the Court must accept the allegations in the indictment as true, but he nonetheless claims he was never employed by FZU, pointing to just the unsigned contract, while ignoring the weight of the rest of the evidence. (Doc. 82 at 6 n.8.) Further, the fact that the defendant did not store a copy of a signed contract in his email accounts, on his electronic devices, or at his residence or KU office does not mean that one does not exist, nor does it explain the existence of the signed addendum.

generally summarized in the indictment (*id.* at 29), one of the objectives of the defendant's employment at FZU was to cater to the PRC's major strategic needs by actively undertaking major PRC scientific research projects. In return, the contract and addendum entitled him to an annual salary of 550,000 yuan (approx. $80,000), which included the PRC Ministry of Education's Distinguished Professor award of 220,000 yuan (approx. $32,000). It further entitled him to a residence on campus, staff, lab space, equipment, and the equivalent of millions of U.S. dollars in research funds. And, it provided that FZU would integrate the defendant into Communist Party Committee circles as a key scientific expert, strengthen his ideological and emotional identification, and imbue him with feelings of patriotism, ambition for a strong PRC, and dedication to the service of the PRC.

In May 2018, the defendant traveled to China to officially commence his appointment at FZU. (Doc. 75 at ¶¶ 29-30.) He thereafter regularly traveled to China, including for extended periods of time, to fulfil his contractual obligations to FZU and the Chinese government. (*Id.* at 30-31.) The indictment offers several non-exhaustive examples, including the defendant's March 2019 application for funding from the Chinese government for his research at FZU, which forms the basis of Count Seven. (*Id.* at 31 and 42.)

The indictment further alleges that, on or about May 17, 2018, shortly after the defendant traveled to China to start his work at FZU, he submitted a proposal to KU for what he represented to be a collaborative research project between KU and FZU. (*Id.* at ¶ 39(C).) The proposal included a $90,000 budget, which FZU apparently would fund for two years from September 2018 to August 2020. (*Id.*) Importantly, the defendant sought to use those funds to "buyout" his teaching responsibilities at KU for the spring 2019 semester (approx. January to

May 2019).[15] (*Id.*) At no time, in connection with this proposal or otherwise, did the defendant disclose or report to KU that he was, in fact, employed fulltime by FZU. (*Id.* at ¶¶ 26, 31, 36, and 39(C).) Instead, he concealed that information and used this proposal to manufacture a cover story to mislead KU about his association with FZU and his frequent and extended travel to China.

On June 25, 2018, after a series of emails and meetings between the defendant and KU, the chair of KU's chemistry department approved a buyout for one course for the spring 2019 semester but with explicit conditions. Specifically, the defendant was advised that his other duties at KU would continue as usual and that he was expected to be in attendance on campus during the semester in accordance with KU policy. While outside the United States,[16] on June 26, 2018, the defendant sent an email to KU in an effort to finalize his manufactured cover story, which forms the basis of Count Four. (*Id.* at ¶ 42.) The defendant, however, ultimately failed to approve his purported KU-FZU research proposal in KU's electronic system, and therefore, the buyout remained unapproved and unfunded.[17] Furthermore, despite the clear direction from his department chair, the defendant traveled to China for almost the entirety of the spring 2019 semester, and he did so to work at FZU unbeknownst to KU.

---

[15] A buyout refers to the use of grant funds to pay a professor's salary for teaching a course to allow the professor to work on the funded research project.

[16] Travel records show that the defendant flew to China for the summer of 2018. However, emails obtained pursuant to legal process reveal that, during that time, the defendant traveled between Fuzhou, where FZU is located, and Japan, where he also worked for Nagoya University.

[17] Consequently, KU paid the defendant a teaching salary of approximately $18,000 for the spring 2019 semester, which he did not earn. KU alerted the defendant to the error and asked him to identify the research funds he intended to use to cover the debt. Instead of pointing to the KU-FZU proposal, the defendant directed KU to use his NSF grant funds. This is just one example of how federal grant funds are used to pay a researcher's salary at KU.

### III.    LEGAL STANDARD

The defendant moves the Court to dismiss the Second Superseding Indictment pursuant to Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure. Rule 12 provides, in relevant part, that certain "objections . . . must be raised by pretrial motion if the basis of the motion is then reasonably available and the motion can be determined without a trial on the merits." Among the objections listed is "a defect in the indictment," including "a failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v).

It is well settled law that "[a]n indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (reversing district court's decision to dismiss indictment based on insufficient evidence and holding that the indictment was legally sufficient). Moreover, as the Tenth Circuit has explained, "[c]hallenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence." *Id.*; *see also Pope*, 613 F.3d at 1260-61 (10th Cir. 2010) (explaining that "Rule 12 is not a parallel to civil summary judgment procedures"). Instead, "[a]n indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *Todd*, 446 F.3d at 1067; *see also United States v. Jeronimo-Bautista*, 425 F.3d 1266, 1267 (10th Cir. 2005) (explaining that he court "make[s] all factual inferences in favor of the government, assuming it could prove the facts alleged"). Courts, therefore, are to "avoid considering evidence outside the indictment when testing the indictment's legal sufficiency." *Todd*, 446 F.3d at 1067. While the defendant acknowledges this legal standard (*see, e.g.*, Doc. 82 at 5 n.8.), he fails to put it into practice throughout his motion, instead regularly arguing the facts and evidence, asking the

Court to draw various inferences in his favor, and wrongly claiming that the charges involve a simple employment dispute with no federal interest.

In describing the legal standard for the Court, the defendant cites *Pope*, which is instructive for several reasons. In that case, the Tenth Circuit affirmed the district court's denial of the defendant's motion to dismiss the indictment, which the court described as a "model of Spartan prose." 613 F.3d at 1257-58. The indictment, which charged the defendant with unlawful possession of a firearm, was "silent about the reason for his possession." *Id.* at 1257. The defendant attempted to "fill the void" through "an evidentiary proffer." *Id.*

In ruling against the defendant, the Tenth Circuit reiterated the well-established principle that, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *Id.* at (emphasis in original). The court then recited the various "reasons that have been offered for this longstanding rule," including "respect for the role of the jury." *Id.* As the court explained, "[f]act-finding by the district court based on evidence that goes to [the general issue of a defendant's guilt or innocence] can risk trespassing on territory reserved to the jury as the ultimate finder of fact in our criminal justice system." *Id.* And, it "disserved judicial economy to hold a separate 'mini-trial' . . . only to repeat the same exercise . . . a short time later at the trial itself." *Id.*

The court further described a category of motions that "may implicate the general issue [of guilt or innocence]" but otherwise "present themselves for resolution before trial because they don't require a *trial* of the general issue." *Id.* at 1260 (emphasis in original). The court offered, as an example, a motion to dismiss that requires a district court to ask "whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offence

[sic]." *Id.* (quoting *Todd*, 446 F.4d at 1068). The court explained that "[e]ven if this question can be fairly said to implicate the general issue, it doesn't require a *trial* because it focuses solely on the facts alleged in the indictment and their *legal* adequacy." *Id.* (emphasis in original).

The court acknowledged that, in "limited circumstances," district courts may entertain motions that "require resort to facts outside the indictment and bearing on the general issue [of guilt or innocence]." *Id.* Such limited circumstances exist where "the operative facts are undisputed" and "the government fails to object to the district court's consideration of those undisputed facts," and "the district court can determine from them that, '*as a matter of law*, the government is incapable of proving its case beyond a reasonable doubt." *Id.* (emphasis in original). The court explained that "dismissals under this . . . rubric are the 'rare exception,'" because they are not made on account of "the government's refusal to come forward with evidence to support its case." *Id.*

Here, the defendant cleverly tries to rely on *Pope* to argue that the Court can consider the defendant's 2018 and 2019 conflicts of interest forms – without any other evidence to provide the necessary context – in deciding the instant motion. (Doc. 82 at 5 n. 8, 6 n.9, and 10). While the government did express its willingness for the Court to see those forms at an earlier hearing, the government also would gladly have the Court see the rest of the evidence that proves the defendant's guilt beyond a reasonable doubt. However, a motion to dismiss is not the proper forum for it. Simply put, the exception to the rule, as outlined in *Pope*, does not apply to this case. The government strongly disputes the defendant's characterization of the facts and evidence in his motion and otherwise objects to the Court's consideration of undisputed facts, to the extent those exist, which the defendant has selectively chosen to present to fit his narrative and theory of defense. The facts of this case should not be litigated on paper, but rather, at trial.

## IV.     ARGUMENT

The defendant challenges the legal sufficiency of the seven wire fraud counts and the three false statement counts. He further argues that the charges violate due process, and that Count Ten does not properly allege venue. Each argument fails, as discussed below.

### A.       The Second Superseding Indictment Sufficiently Alleges Wire Fraud

Counts One to Seven, which incorporate by reference the factual allegations set forth in the introduction, sufficiently apprise the defendant of the charges against him, and the Court should deny his motion to dismiss. See *Pope*, 613 F.3d at 1257-58 (affirming denial of motion to dismiss an indictment the court described as "a model of Spartan prose."). Each count properly "sets forth the elements of the offense charged." *See Todd*, 446 F.3d at 1067. And, the factual allegations "put[] the defendant on fair notice of the charges against which he must defend" and "enable[] [him] to assert a double jeopardy defense." *Id.* That is all the law requires. The defendant's challenges to the facts underlying the charges are irrelevant and unnecessary.

### 1.       Wire Fraud Elements and Relevant Legal Concepts

In the Tenth Circuit, to establish a violation of the wire fraud statute, the government must prove four elements beyond reasonable doubt: 1) the defendant devised or intended to devise a scheme to defraud; 2) the defendant acted with specific intent to defraud; 3) the defendant used, or caused another person to use, interstate wire communications facilities for the purpose of carrying out the scheme; and 4) the scheme employed false or fraudulent pretenses, representations, or promises that were material or involved omissions or concealment of material facts with a duty to disclose. *See, e.g.*, *United States v. Zar*, 790 F.3d 1036, 1049 (10th Cir. 2015).

A "scheme to defraud" is conduct intended to or reasonably calculated to deceive persons

of ordinary prudence or comprehension. *United States v. Cochran*, 109 F.3d 660, 664-65 (10th Cir. 1997) (noting that "deceitful concealment of material facts may constitute actual fraud"). It includes a scheme to deprive another of money or property, as the Second Superseding Indictment alleges. *Zar*, 790 F.3d at 1050 (clarifying that "the first element of wire fraud is a scheme to defraud and that element includes a scheme to obtain [money or] property by means of false or fraudulent pretenses, representations, or promises"). Furthermore, "[n]othing in the . . . wire fraud statute[] requires that the party deprived of money or property be the same party who is actually deceived." *United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998); *see also United States v. Seidling*, 737 F.3d 1155, 1160-61 (7th Cir. 2013) (affirming mail fraud conviction where defendant sent false documents to small claims court while hiding the filings from the named defendants; explaining that "the small claims courts were merely a conduit in [the defendant's] scheme to defraud his victims").

An "intent to defraud" means an intent to deceive or cheat someone. *United States v. Welch*, 327 F.3d 1081, 1105 (10th Cir. 2003). The government is not required to prove intent to harm or actual harm.[18] *Id.* As the Tenth Circuit has explained, "[t]he notion of harm . . . is important only in the sense that proof of contemplated or actual harm . . . is one means of establishing the necessary intent to defraud." *Id.* at 1104-05. Moreover, the government is not required to prove an intent to gain or actual gain. *Id.* at 1106. "Like proof of harm, proof of potential, actual, or contemplated gain simply is one means of establishing the necessary intent to defraud." *Id.*

---

[18] As discussed below, the defendant relies exclusively on Second and Eleventh Circuit cases to argue that Counts One to Seven fail to allege an offense, because they do not allege that KU was harmed. That is not the standard in the Tenth Circuit; nor do the Second and Eleventh Circuits require proof of actual harm or ignore the importance of intent to gain and actual gain.

A representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity. *United States v. Sharp*, 749 F.3d 1267, 1288 (10th Cir. 2014). A representation is also "false" when it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud. *Id.* at 1288-89; *Cochran*, 109 F.3d at 665 ("[A] misleading omission is actionable as fraud if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled."); *see also Neder v. United States*, 527 U.S. 1, 22 (1999) (noting that, at common law, fraud required misrepresentation, concealment, or omission of material fact). Whether or not a statement is false is a question of fact for the jury to decide.

A false statement or omission is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed. *United States v. Camick*, 796 F.3d 1206, 1214 (10th Cir. 2015). "[A] statement can be objectively material even if the decision maker did not consider it." *United States v. Williams*, 865 F.3d 1302, 1316 (10th Cir. 2017). Materiality requires the jury to determine (1) what statement was made and (2) what decision was the decision-making body trying to make. *Camick*, 796 F.3d at 1214-15. After answering those questions, "the jury must determine whether the relevant statement could influence the relevant decision." *Id.* at 1215. Some of the defendant's factual arguments, particularly those focused on how KU and the federal agencies would have responded to the information concealed by the defendant, involve materiality, which is a question for the jury.

A defendant commits wire fraud when he uses, or causes another to use, an interstate wire facility in furtherance of the scheme to defraud. The wire need not be an "essential element of the scheme, as long as it is incident to an essential part of the scheme or a step in the plot." *Weiss*, 630 F.3d at 1269; *see also United States v. Zander*, 794 F.3d 1220, 1226 (10th Cir. 2015)

(explaining that "the mail fraud statute does not require a direct connection between fraudulent misrepresentations and the use of the mails"); *United States v. Cardall*, 885 F.2d 656, 679-82 (10th Cir. 1989) (collecting Supreme Court cases and noting that the Supreme Court distinguishes between the use of the mail or wires after a scheme has reached fruition and the use of the mail or wires prior to, and as one step toward, the receipt of the fruits of the fraud). It does not have to be the "heart of a scheme, nor necessary or even helpful for its success," and "it need not itself be false or deceptive." *United States v. Redcorn*, 528 F.3d 727, 738 (10th Cir. 2008). Furthermore, "[t]he defendant need not have made the transmission personally." *Id.* It is sufficient that he "merely caused it to be made." *Id.* To "cause" a wire to be used is to do an act with knowledge that the use of the wire facilities will follow in the ordinary course of business or where such use can reasonably be foreseen, even though not actually intended. *See Zander*, 794 F.3d at 1226.

### 2.   The Second Superseding Indictment Sufficiently Alleges a Scheme to Deprive Another of Money or Property

The indictment sufficiently alleges that the defendant engaged in a scheme to defraud the U.S. government and KU "to obtain money and property," to include federal grants that funded the defendant's research at KU and his KU salary, which was derived, in part, from those same grants. (Doc. 75 at ¶ 32.) It further alleges that one of the purposes of the scheme was to obtain federal money and money from KU under false pretenses. (*Id.* at ¶ 33.)

Despite that clear and unambiguous language, the defendant claims that "the alleged object of the scheme *was not* to deprive KU, DOE, or NSF of money or property as required to constitute wire fraud." (Doc. 82 at 3 (emphasis added).) In fact, throughout his motion, the defendant repeatedly mischaracterizes the object of the scheme, incorrectly arguing that it does not allege the deprivation of money or property. (*See, e.g.*, *id.* at 8 (claiming that "[t]here is no

allegation . . . that [the defendant] avoided disclosing his alleged FZU position in order to obtain money from KU or the federal agencies"); *id.* at 10 (claiming that "[t]he Indictment comes nowhere close to [alleging that the object of the defendant's scheme was to derive KU or the U.S. government of money or property]"); *id.* at 11 ("[W]ithholding information from an entity, as alleged here, is not fraud unless the purpose of the concealment is to obtain money or property, which is not alleged here.").)

The defendant's reading of the indictment strains credibility and is nothing more than a thinly veiled attempt to force his theory of defense – that his criminal conduct is merely a private employer-employee dispute with no federal interest – into the indictment, while ignoring its plain language. (*See, e.g.*, *id.* at 1 (minimizing the indictment to a claim that the "charged offense" is that the defendant "allegedly failed to disclose on two KU Conflict of Interest forms an affiliation he had with university in China and a Talent Program"); *id.* at 3 (claiming that the government's purported "attempt to criminalize an employer-employee dispute over [the defendant's] affiliations [with a PRC research university] cannot withstand legal scrutiny").)

Unsurprisingly, then, the vast majority of the defendant's arguments focus almost exclusively on KU and his two annual conflict disclosures to KU.[19] (*See e.g., id.* at 2 (claiming that "the government has taken . . . two allegedly false Conflict of Interest forms and wrung out 10 felony charges"); *id.* at 8 ("The wire fraud charges are based on the theory that, by failing to disclose his position at FZU to KU, [the defendant] 'fraudulently maintained his employment with KU.'"); *id.* at 10 ("The Indictment attempts to transform [the defendant's] alleged

---

[19] While the defendant's annual disclosure forms are important evidence to proving the charged crimes, the defendant was required to notify KU of his conflicts of interest and time commitments whenever they arose, not just once a year, and he was required to obtain approval prior to obtaining outside employment or engaging in outside research; and importantly, those requirements directly related to his use of federal funds at KU.

omissions from his employer's Conflict of Interest forms, which is not a crime, into a string of federal wire fraud and false statements offenses.").) Because it does not fit neatly within his narrative, the defendant largely ignores the allegations that he unlawfully obtained hundreds of thousands of dollars in federal grant funds to perform research at KU and that some of that money was used to pay his six-figure salary. He further ignores the clear connection between his disclosures to KU, his role as a principal investigator at KU, and his ability to receive and use federal grant funds to further his research at KU. To the extent he does acknowledge the federal grants, which is rare, he does so in a cursory manner, typically as an afterthought with no further discussion.

The defendant raises several claims with respect to this element of wire fraud. Each is addressed in turn.

a.  The Second Superseding Indictment Does Not Merely Allege a Scheme to Deprive KU of Its Right to Accurate Information

The indictment plainly alleges that the defendant devised and executed a scheme to obtain money and property. Nonetheless, the defendant spends almost four pages arguing that "Counts 1 through 7 must be dismissed because the Indictment alleges – at best – that [he] deprived KU of accurate information about his alleged position at FZU, which is not money or property." (Doc. 82 at 11-14.) Those arguments, which are based on the defendant's mischaracterization of the indictment, do not require a lengthy response. At this stage of the proceedings, the allegations contained in the indictment are sufficient to end the analysis.

If the defendant is to be believed, the wire fraud charges involve a "[n]ovel theor[y] of property rights" that seeks "a sweeping expansion of federal criminal jurisdiction." (Doc. 82 at 11.) The defendant cites *Cleveland v. United States*, 531 U.S. 12, 18 (2000), for this proposition. *Cleveland* is a case at the margins of "money or property," but the instant prosecution falls well

within the heartland of traditional money and property fraud. There are no ephemeral regulatory interests or licenses at stake here; the indictment alleges a scheme to obtain money.

The defendant's discussion of *Cleveland* curiously omits the later Supreme Court case of *Pasquantino v. United States*, 544 U.S. 349 (2005), which is typically discussed together with *Cleveland*. In *Pasquantino*, the Supreme Court distinguished *Cleveland* and held that a scheme to defraud a victim of property that involves "straightforward 'economic' interest[s]" violates the wire fraud statute. 544 U.S. at 357 (explaining that "[t]here was no suggestion in *Cleveland* that the defendant aimed at depriving the State of any money due under the license," whereas the "petitioners' scheme aimed at depriving Canada of money"). Here, consistent with *Cleveland* and *Pasquantino*, Counts One to Seven allege, among other things, that the defendant deprived the U.S. government and KU of grant funds and the money used to pay his salary, which clearly involve a straightforward economic interest. While some of the facts underlying the charges may be unique, the government's charging theory certainly is not novel, nor does it seek a sweeping expansion of federal criminal jurisdiction and property rights, as the defendant suggests.

The defendant also incorrectly claims that the government is attempting to revive the honest services theory rejected by the Supreme Court in *Skilling v. United States*, 561 U.S. 358, 402 (2010). (Doc. 82 at 14.) This is a complete non-sequitur. In *Skilling*, the Supreme Court narrowed honest services fraud under 18 U.S.C. § 1346 to fraud involving bribes and kickback. Here, however, the indictment does not allege honest services fraud, in violation of § 1346. Rather, as discussed above, it specifically charges a scheme to defraud the U.S. government and KU of money and property. *See Stinn v. United States*, 856 F. Supp. 2d 531 (E.D.N.Y. 2012) (noting that the "*Skilling* Court said nothing about the sufficiency of the government's evidence to establish traditional money or property fraud"), *aff'd*, 515 F. App'x 4 (2d Cir. 2013). This case

23

has nothing to do with honest services fraud, bribery, or kickbacks; it has everything to do with the defendant's scheme to obtain money and property.

Finally, in the briefest of nods to DOE and NSF, the defendant asserts that "the Indictment does not allege that those agencies had any legal interest – let alone a property interest – in the accuracy of the Conflict of Interest forms [the defendant] submitted to KU." (Doc. 82 at 13.) But, the indictment alleges that the defendant schemed to obtain money, not an undefined and vague "property interest." Moreover, the government expects the evidence at trial to show that DOE and NSF did, in fact, have an interest in the accuracy of the defendant's disclosures to KU, as those disclosures related to the money the agencies awarded KU for the defendant's research. The idea that the agencies would have no interest in the conflicts of a principal investigator using federal funds defies logic.

           b.   The Second Superseding Indictment Properly Alleges a Scheme to Deprive KU of Money

The defendant also incorrectly argues that the "maintenance of salary – which is at most, what is alleged here – is not 'money or property.'" (Doc. 82 at 14.) He relies on two out-of-circuit district court orders to conclude that "[c]ourts have agreed that a scheme to maintain employment is not a scheme to deprive a person of money or property, even though it leads to property." *Id.* As discussed above, however, the defendant's scheme was not so narrow or limited in scope. Moreover, the two out-of-circuit district court cases he cites – *Billmyer* and *Facteau* – involved materially different facts, and other courts and jurists, including the Honorable John W. Lungstrum, Senior Judge in this District, have held that salary constitutes money or property.

In *United States v. Billmyer*, No. CRIM. 94-29-01-JD, 1995 WL 54471 (D.N.H. Feb. 3, 1995), the defendants were charged with a scheme to defraud their employer, American Honda,

and the U.S. government. The indictment alleged, among other things, that the defendants "solicited and accepted money and gifts in violation of American Honda's conflict of interest policy, thereby defrauding American Honda of its right to the salary paid to the defendants." *Id.* at *6. One of the defendants argued that, on those facts, the "salary paid to him . . . [did] not to constitute a sufficient property loss for purposes of the mail fraud statute." *Id.* at *7. The district court agreed, given that the salary was tangential to the scheme, and concluded that the portion of the indictment relating to salary should be excised. *Id.* at *8-9.

In reaching its conclusion, the court analyzed *United States v. Richerson*, 833 F.2d 1147 (5th Cir. 1987) (holding that an employee causes property harm to his or her employer whenever the employee conceals material information from the employer), and several First Circuit cases. The court distinguished *Richerson* by explaining that the Fifth Circuit "ultimately rested its decision on the defendant's failure provide material information to his employer." *Id.* at *9. The court then stated that "[i]n this case, the indictment charges that the defendants defrauded their employer of salary and employment benefits not because they failed to provide material information, but because they continued to accrue of salary even though they knowingly acted outside American Honda's conflict of interest policy [involving the receipt of gifts]." *Id*. Thus, the court's decision in *Billmyer* is limited to its facts, which are readily distinguishable. Here, unlike *Billmyer*, the defendant concealed material information from his employer (*e.g.*, the fact that he was also employed fulltime by a second university) to obtain a salary. Thus, his "continued receipt of salary" was not some "incidental byproduct" of the scheme, as the defendant frames it – it was one of the primary objects. Moreover, this case is not about the receipt of gifts and conflicts of interest, it is about material misrepresentations and lies.

The district court in *United States v. Facteau*, No. 1:15-cr-10076-ADB, 2016 WL

4445741, at *10 (D. Mass. Aug. 22, 2016), simply reiterated the *Billmyer* court's analysis and conclusion regarding preexisting salary payments. However, the court ultimately denied the defendant's motion after determining that the government was "required to prove that the compensation, payments, and/or bonuses allegedly sought by Defendants were benefits to which they were not otherwise entitled, and that these benefits were to be obtained through the allegedly fraudulent scheme." *Id.*

Curiously, while the defendant relies heavily on two district court opinions, he fails to acknowledge a decision from Judge Lungstrum. In that case, *United States v. Ransom*, No. 09-20057-JWL, 2009 WL 3756977 (D. Kan. Nov. 9, 2009), the court denied a similar motion to dismiss. The defendant, an employee of HUD, was charged with failing to accurately record the number of hours he worked. *Id.* at *1. The court reasoned that, had the defendant done so,

> HUD would have had the opportunity to exercise its right to terminate [the defendant's] employment if it so chose. But it was deprived of valuable information about [his] work habits by virtue of his false reports. Therefore, regardless of whether the submission of falsified T & A Reports impacted the amount [he] received in any given paycheck, it did help permit [the defendant] to continue his employment despite his reduced work hours and to continue to receive a paycheck. Therefore, if the government can establish the requisite intent at trial, the submission of the Reports could be said to have resulted in a deprivation of something of value to the United States – namely, the amount paid [to the defendant] in salary – by means of deceit.

*Id.* at *3. Here, like *Ransom*, the defendant's misrepresentations and omissions about his fulltime employment at FZU and participation in the PRC's Chang Jiang Scholar Program at FZU deprived KU of its ability to terminate him if it so chose, and therefore, deprived KU of the money paid to the defendant in salary. Other circuits have reached similar conclusions. *See, e.g.*, *United States v. Turner*, 551 F.3d 657 (7th Cir. 2008) (noting that "'courts have found salaries fraudulently obtained' are 'money or property' for purposes of a traditional mail- or wire-fraud offense").

c.  <u>Counts One to Seven Sufficiently Allege the Defendant's Intent to Defraud the U.S. Government and KU</u>

Relying exclusively on cases from the Second and Eleventh Circuits, the defendant argues that the alleged scheme to defraud the U.S. government and KU is legally insufficient, because it does not allege that KU was harmed.[20] (Doc. 82 at 16-18.) The defendant further claims that KU could not have been harmed, because, according to him, KU received what it paid for. However, as discussed above, in the Tenth Circuit, the government does not have to allege or prove a defendant's intent to harm or actual harm. *See Welch*, 327 F.3d at 1104-05. Instead, evidence relating to harm and gain – such as the defendant's financial gain and the benefit to the PRC, which he decided not to address in his motion – is relevant to proving a defendant's intent to defraud, which is a question for the jury to decide. *Id.*

The Eleventh Circuit's decisions in *United States v. Maxwell*, 579 F.3d 1282 (11th Cir. 2009), and *United States v. Aldissi*, 758 F. App'x 695 (11th Cir. 2018), are analogous to this case and worthy of discussion. In *Maxwell*, the defendant, who was convicted of wire fraud and other charges related to a scheme to obtain construction contracts set aside for disadvantaged companies, argued that "he did not deprive [Miami-Dade] County or the United States of money or property, because, in the end, [they] received the electrical work they sought." 579 F.3d at 1302. In rejecting that argument, the Eleventh Circuit held that "financial loss is not at the core of these mail and wire frauds. Instead, the penal statutes also seek to punish the intent to obtain

---

[20] While the Second and Eleventh Circuits require the government to prove that a defendant contemplated harm, even in those circuits, proof of actual harm is not required. The cases cited by the defendant explain as much. *See, e.g.*, *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) ("It is not required that the victims of the scheme in fact suffered harm, but 'the government must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims.'"). Furthermore, the Eleventh Circuit explicitly allows for proof of intent to gain. *United States v. Aldissi*, 758 F. App'x 695, 703 (11th Cir. 2018).

money or property from a victim by means of fraud and deceit." *Id.*; *see also Carpenter*, 484 U.S. at 26 (unanimously rejecting the defendants' contention that a scheme to defraud under the mail fraud statute requires a monetary loss for the victim). The court further observed that "[t]he County and the United States were free to prescribe the rules of this contracting process, and the defendant was not free to dishonestly circumvent the worthy purpose of the [government's] programs." *Maxwell*, 579 F.3d at 1303.

In *Aldissi*, the defendants were convicted of wire fraud for their scheme to obtain federal grant funds set aside for qualifying small businesses by submitting fraudulent research proposals. 758 F. App'x at 697-98. Like the defendants in *Maxwell* and the defendant here, they maintained that "the government received exactly what it paid for." *Id.* at 701. They further argued "that they always intended to perform, and actually did fully perform, as evidenced by their research projects that were published in peer-reviewed scientific journals." *Id.* The court found that argument meritless, explaining that it was at odds with *Maxwell*. *Id.* The court reasoned that the grant programs at issue were "not job programs for unemployed scientists and do not fund research merely for the sake of research." *Id.* at 702. The court further observed that

> [the defendants'] deceptions deprived the United States not only of the money that should have been awarded to other researchers, but also of what it was actually paying for – the chance for eligible small businesses to commercialize their research and bring an actual product or service to the market. To be sure, the deception occurred the moment the [defendants] submitted false applications for the grants to which they were not entitled.

*Id.*

Similar to *Aldissi*, here, the defendant deprived the U.S. government of money that it would have awarded to other researchers, and he deprived KU, at a minimum, of the money that it would have paid another professor. *See United States v. Walters*, 711 F. Supp. 1435, 1444 (N.D. Ill. 1989) (rejecting identical argument that victim-universities "got exactly what they paid

for" and concluding that "[t]he universities need not experience a net financial loss to qualify them as mail fraud victims").

### 2. The Second Superseding Indictment Sufficiently Alleges Material Misrepresentations and Omissions

The indictment sufficiently alleges that the defendant devised and intended to devise a scheme to defraud to obtain money and property by means of "materially false and fraudulent pretenses, representations, promises, and half-truths, and by omissions and concealment of material facts with a duty to disclose." (Doc. 75 at ¶ 41.) The indictment goes further and identifies six examples of the defendant's material misrepresentations and omissions that he made in furtherance of his scheme, which are incorporated by reference into Counts One to Seven. (Doc. 75 at ¶ 39.)

Rather than accept those allegations as true, as he purports to do, the defendant instead spends nearly seven pages arguing and distorting a limited set of facts, again, to fit his version of events. (Doc. 82 at 18-25.) Remarkably, he relegates some of the alleged misrepresentations and omissions to a footnote, claiming that they are "extraneous" and "warrant brief consideration." (Doc. 82 at 22 n.20.) While his factual arguments may be appropriate for trial, when the full weight of the evidence is before the jury, they are certainly unnecessary to resolving the instant motion. As such, the defendant's gloss and spin on the facts do not require a response at the time, as the indictment speaks for itself.

### 3. The Second Superseding Indictment Sufficiently Alleges the Use of Wires in Furtherance of Scheme

The defendant claims that Counts One through Four and Count Seven (but not Counts Five and Six) must be dismissed, because, according to him, none of the charged wires was incident "to an essential part of the charged scheme to defraud KU, NSF, or DOE of money or

property by secretly maintaining two jobs." (Doc. 82 at 27.) Notwithstanding that contention and the defendant's continued attempts to rewrite the object of the scheme, the wire fraud counts are legally sufficient, as they set forth this particular element and, through the incorporated introductory allegations, provide him with fair notice to defend against the charges.

The defendant spends nearly four pages arguing the facts for each count. (Doc. 82 at 27-31.) As previously stated, that effort may be appropriate for trial, but it is certainly not relevant here. As with virtually every argument in his motion, the defendant ignores most of the allegations, does not accept them as true, and/or mischaracterizes them. Again, such factual arguments do not require a response at this time.

Implicit in the defendant's factual arguments, however, are several inaccurate legal assertions that warrant mention: he infers that the wires themselves must be essential to the scheme; that they must have occurred after the victim was deceived (or as the defendant appears to frame it, after he obtained employment at FZU);[21] that they must be false or intended to conceal the scheme; and that they must be directed at the victim of the fraud. But, that is simply not the law, which is clear in the Tenth Circuit: "[The wire] need not be at the heart of a scheme, nor necessary or even helpful for its success; it need not itself be false or deceptive. Rather . . . the transmission [must be] incident to the accomplishment of an essential part of a scheme." *Redcorn*, 528 F.3d at 738 (quotation marks omitted).

---

[21] The defendant appears to asks this Court, incorrectly, to draw a hard line between conduct that occurred prior to his employment at FZU and conduct that occurred afterwards. Seemingly, that is why he does not challenge Counts Five or Six. The defendant fails to recognize, however, that the scheme as alleged started in May 2017 and continued through August 2019. (Doc. 75 at ¶ 32.) Even assuming, *arguendo*, that such a hard line exists, the defendant's claim that he did not accept employment at FZU until March 2018 is factually inaccurate, as the evidence at trial will show. The Chang Jiang Scholar Program is for employees of Chinese universities, and the defendant signed a notice of his intent to work at FZU when he applied in July 2017.

Here, each wire alleged was a step towards achieving the purposes of the defendant's scheme – to obtain money, to benefit the PRC, and to conceal the scheme (Doc. 75 at ¶ 33.) *See Weiss*, 630 F.3d at 1269 (10th Cir. 2010 (holding that a wire is in furtherance of a scheme if it is "a step in the plot"). And they were all incident to the following essential parts of the scheme: the defendant provided FZU and the PRC with his expertise and research, while purporting to remain loyal to KU; he traveled to the PRC between May 2018 and August 2019 to fulfil his contractual obligations to FZU; he concealed from KU and the U.S. government his association with FZU and the Chang Jiang Scholar Program and the related financial benefits; he fraudulently maintain his employment at KU to obtain access to research equipment and federal funds; and he made material misrepresentations and omissions and caused KU to rely on such when requesting funds from the federal agencies for expenditures related to his research at KU. (Doc. 75 at ¶¶ 34-39.)

Count One charges the defendant with sending a wire directly related to his efforts to conduct research for FZU and the PRC for his own financial gain and the benefit of the PRC, while remaining employed by, and receiving a salary from KU, and continuing to apply for, receive, and use U.S. grant funds. The fact that the wire communication occurred at the start of the scheme does not make it any less important to its success; to the contrary, without it, the defendant's scheme would have likely failed.

Similarly, Count Seven relates to the Defendant's efforts to benefit the PRC by obtaining Chinese government funds to conduct research at a Chinese university, while concealing those efforts from the U.S. government and his American employer. Remarkably, the defendant claims that "[t]he Indictment provides no basis from which it can plausibly be inferred . . . that an

attempt to obtain a grant in China was 'incident to an essential part of the scheme.'" (Doc. 82 at 31.)

Counts Two and Five (the latter of which the defendant does not challenge here) involve wire communications with DOE about the defendant's grant application and are clearly incident to the defendant's scheme to obtain U.S. government grant funds. Count Two charges the defendant with causing KU to submit a December 2017 DOE grant application, while he was in the final stages of applying for the Chang Jiang Scholar Program, and Count Five charges him with deceiving DOE in July 2018 in connection with the same grant application, after he officially commenced his employment at FZU as a Chang Jiang Distinguished Professor. Further, as alleged in the indictment, DOE did not award the grant to KU to support the defendant's research until September 2018, and the award period was to continue until at least September 2019, during which time he worked for FZU and the PRC. (Doc. 75 at ¶ 11.)

Finally, Counts Three, Four, and Count Six (the last of which the defendant does not challenge here) involve wire communications with KU and are directly related to an essential part of his scheme – his efforts to obtain a KU salary, access to research equipment, and federal grant funds through his employment at KU, by concealing his association with FZU and the PRC's Chang Jiang Scholar Program.

The cases described by the defendant do not support his arguments, as they primarily involve the use of an interstate facility after a scheme had ended, whereas here, the charges allege the use of wires during and in furtherance of the scheme. For example, in *United States v. Cardall*, the court concluded that the "scheme had 'reached fruition' at the point that [the] defendants" used the mail. 885 F.2d 656, 682 (10th Cir. 1989). Against that backdrop, the Tenth Circuit held the use of the mail "was not necessary in maintaining the ongoing viability of

defendant's fraud," which is the language from the *Cardall* opinion quoted by the defendant (Doc. 82. at 26.)

Similarly, in *United States v. Redcorn*, the defendants were convicted of using the wires to transfer funds after their scheme was completed. 523 F.3d at 793. The court "[r]eluctantly" reversed their convictions. *Id.* In doing so, the court explained that the "subsequent enjoyment of [the] fruits [of the scheme] – buying groceries, going to the movies, redecorating the bathroom – is not an 'essential' part of the scheme." *Id*. As with *Cardall*, it is against that backdrop that "the Tenth Circuit held that a defendant's transfer of the proceeds from his fraud scheme to a personal account did not constitute wire fraud because it was not 'necessary to gain control over the funds or to conceal the nature of [the] fraud.'" (Doc. 82 at 26 (quoting *Redcorn*, 528 F.3d at 741-42).)

Furthermore, *United States v. Mann* is clearly distinguishable on its facts. 884 F.2d 532 (10th Cir. 1989). In that case, the defendant believed he was not required to file tax returns based on his own research, and he was prosecuted for his failure to file returns. *Id.* at 534. The defendant also compiled the fruits of his research and advertised it for sale through a magazine. *Id.* Mailings of the magazines containing the defendant's ad formed the basis of his mail fraud convictions. *Id.* He further purchased a spot on a radio station and simply made statements about the IRS; unlike the mail fraud charges, he did not advertise his research or solicit funds. *Id.* In reversing the defendant's wire fraud conviction, the court concluded that there was not a "sufficient connection between the radio spot and the scheme underlying [the defendant's] mail fraud convictions," which the court held were "amply supported by the evidence." *Id.* at 536. Here, unlike *Mann*, each charged use of the wire is a "step in the plot" and sufficiently connected to the defendant's underlying scheme to defraud KU and the U.S. government.

**B.      The Second Superseding Indictment Sufficiently Alleges 18 U.S.C. § 1001**

Counts Eight to Ten, which incorporate by reference the factual allegations set forth in the introduction of the Second Superseding Indictment, sufficiently apprise the defendant of the charges against him, and the Court should deny his motion to dismiss on these grounds. Each count properly sets forth the elements of 18 U.S.C. § 1001(a)(2), puts the defendant on fair notice of the charges, and enables him to assert a double jeopardy defense.[22]

**1.   False Statement Elements and Relevant Legal Concepts**

To prove a violation of 18 U.S.C. § 1001(a)(2), the government must prove three elements beyond a reasonable doubt: 1) the defendant made a materially false, fictitious, or fraudulent statement or representation; 2) the statement or representation involved a matter within the jurisdiction of the executive branch; and 3) the defendant acted knowingly and willfully. *United States v. Meuli*, 8 F.3d 1481, 1484 (10th Cir. 1993) (affirming conviction of defendant who submitted false statements on IRS forms to a bank, which in turn provided them to the IRS, explaining that it was "not only reasonably foreseeable, but inevitable, that the recipient would contact the IRS concerning these false statements").

It is well settled law that a "false statement need not be made directly to [a] federal agency to be within its jurisdiction." *United States v. Wright*, 988 F.2d 1036, 1038 (10th Cir. 1993) (affirming conviction of defendant who filed false reports with state agency, where the reports contained data regulated by the federal government)*; see also United Sates v. Wolf*, 645 F.2d 23, 25 (10th Cir. 1981) (affirming conviction of defendant who provided false certification to oil company regulated by the federal government). In cases involving indirect statements to

---

[22] While the indictment does not specify the subsection of § 1001, the charged language is sufficient to put the defendant on notice that the violations involve § 1001(a)(2). He does not appear to contest as much.

federal agencies, the Tenth Circuit has observed that "[t]he issue of materiality may be intermixed with whether the matter was within the jurisdiction of the agency." *Wolf*, 645 F.2d at 25; *see also United States v. Brittain*, 931 F.2d 1413, 1417 (10th Cir. 1991) ("Our finding of materiality in this case . . . turns on the evidence that defendant's false statements had the tendency to influence or were capable of influencing an EPA enforcement action.").

"A false statement falls within [the jurisdiction of the executive branch] when it concerns the 'authorized functions of an agency or department,' rather than 'matters peripheral to the business of that body.'" *United States v. Wright*, 988 F.2d 1036, 1038 (10th Cir. 1993). Relevant to the charges in this case, this jurisdictional element can be met when "a regulatory or contractual scheme" existed and "the federal government acted as a supervisor of disbursement or was to reimburse the defrauded non-federal agency." *Wolf*, 645 F.2d at 25; *see also United States v. Baker*, 626 F.2d 512, 514 n.5 (5th Cir. 1980) ("[T]he necessary link between deception of the non-federal agency and effect on the federal agency is provided by the federal agency's retention of 'the ultimate authority to see that the federal funds are properly spent.'").

### 2. The Second Superseding Indictment Sufficiently Alleges a Matter Within the Jurisdiction of the Executive Branch

The defendant wrongly claims that his false statements to KU about his conflicts of interest and time commitments are not matters within the jurisdiction of DOE and NSF. (Doc. 82 at 31-36.) Counts Eight and Nine sufficiently allege federal jurisdiction.

As described in indictment, KU used the defendant's disclosures – and in this case his misrepresentations and omissions – to determine "whether [he] had any financial interests or commitments of time that conflicted with his responsibilities to manage USG-funded research projects." (Doc. 75 at ¶ 7.) That language comes directly from KU's conflict of interest forms, which the defendant read and acknowledged each year of his employment. While the defendant

quotes that exact language elsewhere in his motion (Doc. 82 at 6.), he otherwise fails to address it with respect to this particular argument. Instead, he again attempts to recast the allegations as a mere employment dispute with no federal interest (*see* Doc. 82 at 33 ("It is not the business of federal agencies to manage KU's employees as though it were the employer . . . .").)

The defendant's argument is, of course, flawed. The federal agencies obligated and dispersed, at a minimum, hundreds of thousands of dollars to KU to fund the defendant's research. The defendant was not just a KU employee – he was the principal investigator in charge of multiple projects funded through federal grants. In addition to drafting the grant proposals, the defendant developed the budget for the projects and then oversaw the use of the federal funds. The defendant's conflicts of interest and time commitments directly affected his ability to manage federally funded projects at KU, and the agencies relied, in part, on KU to identify and resolve those conflicts.

As alleged, to receive NSF funds, the agency specifically required KU to maintain its conflicts policies and to ensure that principal investigators, like the defendant, made all necessary disclosures (Doc. 75 at ¶ 10.) – the defendant also acknowledges this language elsewhere in his motion (Doc. 82 at 6.) but again ignores it here. KU ensured the defendant's compliance by requiring him to disclose conflicts of interest and time commitments when they arose and annually through the conflict disclosure forms. Furthermore, KU required the defendant to acknowledge that he and others involved with his federally funded research understood and complied with all relevant conflicts policies. (*See* Doc. 75 at ¶ 8.)

The reason for such a requirement is obvious: it related directly to KU's application for federal grants to fund the defendant's research and to KU's receipt and the defendant's use of, and responsibility for, that money as the principal investigator. The defendant's efforts to

decouple the clear link between the federal agencies, the federal funds awarded to KU as a result of his proposals, his role as principal investigator, his use of those funds at KU, and his conflicts of interest and time commitments is unavailing. (*See* Doc. 82 at 33 (claiming, without recognizing the federal interest involved in the defendant's research at KU, that "the quintessential interests of an employer . . . [is] to glean information from its employees about their job-related duties").)

The defendant further ignores the alleged facts in the indictment to wrongly claim that the "government's erroneous and expansive theory . . . would criminalize all manner of mundane misstatements made to employers who receive federal funds." (*id.* at 35-36.) The problem with that argument is that the defendant's intentional misrepresentations to KU were not "mundane misstatements" tangentially tied to the mere receipt of federal funds. The government is not prosecuting the defendant for a misstatement made to any employer that "merely" received federal funds. (*See id,* at 36 n.23 (offering a list of clearly distinguishable fact patterns); *see also id.* at 36 (claiming, incorrectly, that "[t]he false statements counts multiply this absurdity by treating such workplace dishonesty the same as making false statements directly to a federal agency, merely because the employer received agency funds"). The defendant lied to KU about his conflicts as they directly related to his use of federal funds to conduct research at KU, and the federal agencies who funded that research relied on KU to identify and manage the defendant's conflicts of interest and time. *See United States v. Brittain*, 931 F.2d 1413, 1417 (10th Cir. 1991) (explaining that "[d]efendant's false statements served to undermine the integrity of the self-monitoring permit system"); *Wolf*, 645 F.2d at 26 (noting that the defendant's false statement to a private entity "was required by the [federal] agency and was a basic part of the [federal] regulatory structure which depended on the accuracy and truth of such [statements]"). While it

may or may not be the business of federal agencies to manage KU's employees (*see id.* at 33.), it is certainly the business of federal agencies to ensure that KU is properly managing federal research funds and that the principal investigator using those funds is operating without conflicts of interest and time.

The defendant's reliance on *United States v. Blankenship*, 382 F.3d 1138 (11th Cir. 2004), to argue that federal jurisdiction does not exist here is misplaced, as that case involved materially different circumstances. In *Blankenship*, the Florida Department of Transportation ("FDOT") contracted with a private firm to perform certain work funded by the U.S. Department of Transportation ("USDOT"). In turn, the firm subcontracted with the defendants to perform that work. The defendants were charged with false statements concerning their compliance with the terms of their contracts with the firm. The government argued that that "because the funds with which [the company] was paid had originated with the federal government, any matters pertaining to the construction project necessarily fall under federal jurisdiction." Understandably, the Eleventh Circuit rejected that argument, explaining:

> The fact that the FDOT may have contracted with [a] private firm[] . . . or that [the firm] in turn may have subcontracted with the defendants, does not somehow give the USDOT power over agreements between [the firm] and the defendants. If the USDOT was displeased with an agreement between [the firm] and the defendants, it lacked the power to compel either party to rescind or modify the agreement.

*Id.*

Here, defendant is not charged based on the theory that "an agency has jurisdiction over employees who work at companies that receive federal funds," and he is not simply a "third part[y]" in the equation (Doc. 82 at 33 and 35.) Unlike *Blankenship*, which involved at least three degrees of separation between the false statements and the federal government, there is direct and explicit link between the defendant's research at KU and the federal agencies funding

that research. While the defendant tries to minimize the authority that DOE and NSF had over the funds once allocated to the defendant's research at KU (Doc. 82. at 34.), the funds did not belong to KU or the defendant, and the agencies could revoke the grants. There is nothing remarkable about this theory.

### 3.   Misrepresentations and Omissions

As with the wire fraud counts, here, too, the defendant ignores the allegations set forth in the indictment and raises purely factual claims (Doc. 82 at 20-25.), which the Court need not address at this time. However, it is worth mentioning that the defendant wrongly asserts, without any legal support, that "an affirmative false statement" is necessary to "form the basis of a misrepresentation in violation of . . . § 1001(a)(2)." (*Id.* 82 at 24.) That is simply not the law and is just another thinly veiled attempt to argue the facts. *See United States v. Celis,* 128 F. App'x 819, 819 (2d Cir. 2005) (affirming conviction under § 1001(a)(2), where defendant failed to report his criminal history on a form and certified that it was "correct [and] without consequential omissions"); *United States v. Westover*, 107 F. App'x 840, 846 (10th Cir. 2004) *(*failing to report income to government agency was properly charged as a misrepresentation under § 1001(a)(2)). Counts Eight to Ten properly allege that the defendant "made materially false, fictitious, and fraudulent statements, representations, and omissions." (*See, e.g.*, Doc. 75 at ¶¶ 44 and 46.) Whether the evidence proves those allegations is a question for the jury.

### 4.   Venue for Count Ten Exists in the District of Kansas

Count Ten properly alleges venue in "the District of Kansas and elsewhere" (Doc. 75 at ¶ 46.) "Venue is a question of fact ordinarily decided by a jury." *United States v. Kelly*, 535 F.3d 1229, 1232 (10th Cir. 2008). The government is required to "prove[] by preponderance of direct or circumstantial evidence that the crimes charged occurred within the district." *Id.* at 1233. At

trial, the evidence will establish that the defendant was outside of the United States when he made the false statement at issue, *see* 18 U.S.C. § 3238, and alternatively, that the false statement was received in, and passed through, the District of Kansas, *see* 18 U.S.C. § 3237. Under the defendant's reading of the indictment and Tenth Circuit precedent, the government apparently should have charged him with Count Ten in China or not at all. (*See* Doc. 82 at 4 (arguing that there is "no venue in the District of Kansas" because "the Indictment alleges that the statement was made while [the defendant] was 'outside the United States'").)

For violations of 18 U.S.C. § 1001, venue ordinarily lies in the district where the false statement was made. *See United States v. Smith*, 641 F.3d 1200, 1209 (10th Cir. 2011). Where, as here, the crime occurred outside of the United States, venue lies in the district where the defendant was arrested. *See* 18 U.S.C. § 3238 ("The trial of all offenses begun or committed . . . out of the jurisdiction of any particular . . . district, shall be in the district in which the offender . . . is arrested or is first brought."); *see also United States v. Reumayr*, No. CR 99-1338 BB, 2008 WL 11451979 (D.N.M. Jan. 16, 2008) (finding venue was appropriate in district where defendant who committed crime outside the United States was first brought).

As described above, the defendant was outside the United States – either in China or Japan – between May 26, 2018, and August 1, 2018. On July 10, 2018, DOE emailed him about his December 2017 DOE grant application and requested, among other things, his updated current and pending support. On July 16, 2018, the defendant emailed his updated current and pending support, which contained false statements, misrepresentations, and omissions. Thus, because the defendant's crime occurred outside the United States, and he was arrested in Kansas on August 21, 2019, Count Ten properly alleges venue in the District of Kansas.

Venue in this District is further supported by the fact that the defendant made his false

statement both to DOE and to KU's Office of Research, which the defendant copied on the email

due to its role in the grant application process, and he made the false statement using KU's email

servers. The fact that the defendant communicated his false statement by email means that he

made it (or it was simultaneously received) in more than one district, including the District of

Kansas. *See* 18 U.S.C. § 3237 ("[A]ny offense against the United States begun in one district and

completed in another, or committed in more than one district, may be inquired of and prosecuted

in any district in which such offense was begun, continued, or completed."); *see also United*

*States v. Wiles*, 102 F.3d 1043, 1064-65 (10th Cir. 1996) (concluding that venue for § 1001 is

proper in the districts where the false statement is made and received), *on reh'g in part*, 106 F.3d

1516 (10th Cir. 1997), and *cert. granted, judgment vacated sub nom. United States v.*

*Schleibaum*, 522 U.S. 945 (1997); *cf. United States v. Camick*, No. 13-10042-01-JTM, 2014 WL

1356056 (D. Kan. Apr. 7, 2014) (rejecting defendant's argument that venue was only appropriate

in district where false statement was received) (citing to *Wiles*).

      This case is distinguishable from *Smith*, the primary Tenth Circuit case cited by the

defendant. In *Smith*, the defendant was charged in the Western District of Oklahoma for making

false statements to FBI agents in Minnesota. 641 F.3d at 1208. Indeed, as the court observed,

"the only connection between Oklahoma and [the defendant's] statements [was] that the subject-

matter of the allegedly false statements relayed events that occurred in Oklahoma, and at the time

there was an investigation in Oklahoma." *Id.* In reaching its conclusion that venue was improper

in the Western District of Oklahoma, the court observed that it has "held that giving a false

statement may be a continuing offense where the statement is 'made' in more than one district,"

but it declined to apply that rationale to the facts before it. *Id.* at 1208-09 ("The false statements

began, continued, and ended during the interview."). Here, however, the defendant's false

statement began outside the United States, continued through the District of Kansas, and ended in the District of Kansas and elsewhere. Thus, for the reasons provided above, Count Ten properly alleges venue.

### C.   The Second Superseding Indictment Does Not Violate Due Process

Contrary to the defendant's assertions, there is nothing "remarkable" or "absurd" about this prosecution that warrants dismissal of the indictment under the Due Process Clause (Doc. 82 at 36-37.) The defendant, an experienced research professor who was well-versed in the federal grant making process, is charged with intentionally lying to and defrauding the two federal agencies that funded his research and the university that employed him to conduct that research and which applied for the grants on his behalf. While some of the particulars of this case may perhaps be unique, that alone does not amount to a due process violation. Due process only bars novel construction and application of criminal statutes, not novel factual circumstances. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). While the law at one point "required a scavenger hunt for prior cases with precisely the same facts," the proper inquiry is whether the defendant was on fair notice that his conduct was unlawful. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) (describing how *Hope* shifted the analysis).

As the defendant notes (Doc. 82 at 37.), there are three related manifestations of the due process fair warning requirement: 1) vagueness; 2) lenity; and 3) novel construction. *United States v. Lanier*, 520 U.S. 259, 266 (1997). In each instance, however, "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267.

The defendant claims this prosecution encourages arbitrary enforcement of the wire fraud

and false statement statutes, but that is simply not true.[23] (Doc. 82 at 38.) As with the rest of his arguments, the defendant's due process claim relies on his flawed reading of the indictment and his mischaracterization of the charged conduct and prosecution theory, which has been addressed at length and is not repeated in full here. Despite the defendant's repeated assertions otherwise, this case does not involve, nor does the government seek to treat as a federal felony, "any misrepresentation made in the workplace deemed material by an employer . . . merely because the employee receives a salary" or "merely because the employer received [federal] agency funds" (Doc. 82 at 36.) Furthermore, as previously discussed, this case does not involve "mere failure to disclose a conflict of interest" and otherwise does not implicate the Supreme Court's holding in *Skilling* (Doc. 82 at 38.)

Nor does this prosecution criminalize, deter, or encourage the charging of professors who are openly and honestly "collaborating with foreign research institutions," "performing collaborative experiments," or engaging in any other academic pursuits that are "encouraged and touted." (*Id.*) The problem with the defendant's premise is that he is not charged with collaborating with a Chinese university or Chinese researchers, as he has done openly in the past. Instead, he is charged because he clandestinely entered into an agreement with FZU and the Chinese government to enrich himself and further the PRC's major strategic needs and interests, and he knowingly and intentionally hid that fact from the federal agencies that granted him hundreds of thousands of dollars to fund his research and the American where he performed that

---

[23] Once again, the defendant introduces extraneous and wholly irrelevant information, this time about "politically charged trades wars," "national-security prosecutors," and the absence of "espionage, intellectual property theft, or a cognizable nexus to national security." This prosecution was not brought as a result of any trade wars, and the defendant, of course, is not charged with espionage or intellectual property crimes. Regardless of the charges, his conduct relates to an identified national security threat and how the Department of Justice chooses to prioritize its resources is irrelevant to the issues before the Court.

research.

Furthermore, there is no cause for the Court to apply the rule of lenity here. "[T]he rule of lenity is a rule of last resort that [courts] apply only if ambiguity remains after . . . exhaust[ing] all other tools of interpretation." *United States v. Richter*, 796 F.3d 1173, 1188 (10th Cir. 2015). The defendant does not offer any meaningful analysis or reasons to justify its use. Instead, he incorrectly portrays the prosecution as being at the outer bounds of the statutes and asks the Court to break a nonexistent tie in the interpretation of the statutes. There is no ambiguity here.

Finally, "a person of ordinary intelligence" would know that it was illegal to lie to and defraud one's employer and the federal government to obtain money and property. The defendant's reliance on the statements of a member of Congress, which were made in support of legislation intended to supplement existing law and strengthen the government's ability to prosecute similarly situated defendants (Doc 82 at 42 n.29.), does not advance his due process arguments. It is simply inaccurate to say that "the [Congressman] does not believe that Dr. Tao's alleged conduct is covered by current law." (*Id.* at 42.) The Congressman was commenting on an entirely separate case involving different circumstances for a very specific and intentional purpose.[24] It is a significant stretch to tie the Congressman's statements to the conclusion that "it is manifestly unjust to expect Dr. Tao [to] have concluded [his conduct was a crime]."[25] (*Id.* at 42.)

The defendant's bulleted list of farfetched and unrelated hypotheticals is also misguided.

---

[24] The defendant in that case – an American professor – was charged with two counts of 18 U.S.C. § 1001 for lying to federal agents and for causing an American university to lie to a federal agency about his involvement in the PRC's Thousand Talents Program.

[25] Interestingly, while the defendant writes at length about the Department's China Initiative, which was launched in November 2018, to make extraneous arguments, he fails to acknowledge that it would have contributed, arguably in some way, to the understanding that lying and defrauding one's employer and the federal government to benefit the PRC was a crime.

None of those examples bears any resemblance to the charges and facts before the Court, and the examples do not warrant an individualized response. The defendant offers a fairly dramatic – but ultimately untrue – warning to the Court: "[i]f this Indictment . . . proceed[s] to trial, it would open the floodgates to a vast range of federal prosecutions for garden-variety employment disputes that otherwise would have, at most, subjected the employee to administrative discipline at work." (*Id.* at 43-44.) Not only is that an incorrect assessment of the charges and evidence in this case, but the statutes themselves provide clear limits to criminal liability – for example, wire fraud requires intent to defraud and § 1001 requires willfulness.

Many of the cases cited above and by the defendant in his motion indicate that individuals are routinely prosecuted for defrauding their employers. This is true even when the material misrepresentations that underpin the scheme relate to a defendant's covert and hidden engagement with a foreign government. The defendant here engaged in a years-long scheme to deceive his government, the taxpayers, and his employer (incidentally also a taxpayer-funded public institution), and he did so in order to obtain money for himself and to benefit a foreign government. Such a scheme cannot be beyond the ambit of the flexible fraud statutes.

In sum, this case is relatively straightforward – an experienced research professor conducting federally funded research at an American university lied to and defrauded that university and the federal government to enrich himself and to benefit a foreign government. A person of ordinary intelligence would understand that conduct to be a crime, and at trial, evidence of the defendant's intent will show that he, too, knew it was unlawful. He had fair warning and this case does not require any novel construction or interpretation of the statutes charged. Therefore, due process does not require dismissal of the indictment.

## V.      CONCLUSION

In conclusion, the Court should deny the defendant's motion to dismiss. The Second

Superseding Indictment sets forth the elements of the offenses charged and puts him on fair

notice of those charges, which is all the law requires, and the wire fraud and false statement

charges do not involve a novel application of the law, so as to violate due process. Moreover,

venue for Count Ten, which the defendant committed while outside the United States, is proper

in the District of Kansas where he was arrested.

Respectfully submitted,

s/ *AW Mattivi*

ANTHONY W. MATTIVI
Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683
Telephone: (785) 295-2850
Anthony.Mattivi@usdoj.gov

s/ *Benjamin J. Hawk*

BENJAMIN J. HAWK
Trial Attorney
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 233-0986
Benjamin.Hawk@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the  11th  day of September, 2020, I caused the foregoing pleading to be filed with the Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

*AW Mattivi*
Anthony W. Mattivi