# UNITED STATES DISTRICT COURT

## District of Kansas

UNITED STATES OF AMERICA,

        Plaintiff,

      v.                  Case No.  **19-20052-01-JAR**

FENG TAO,

        Defendant.

## GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTION TO DISMISS CONCERNING THE GRAND JURY
### (Doc. 83)

COMES NOW the United States, by and through Anthony W. Mattivi, Assistant United States Attorney for the District of Kansas, and Benjamin J. Hawk, Trial Attorney for the Counterintelligence and Export Control Section of the U.S. Department of Justice's National Security Division, and respectfully requests the Court DENY the defendant's Motion to Dismiss concerning statements to the grand jury (Doc. 83).

## I.    INTRODUCTION

The defendant is charged with lying to and defrauding the U.S. government and his American employer, the University of Kansas ("KU"), to obtain federal grants and an annual salary derived, in part, from those grants and to benefit the People's Republic of China ("PRC").

While conducting federally funded research at KU, the defendant secretly obtained employment at Fuzhou University ("FZU"), a Chinese research institution associated with the Chinese government. At the same time, the defendant was accepted into the Chinese government's Chang Jiang Scholar Program to serve as a Chang Jiang Distinguished Professor at FZU, based on his research involving renewable energy, a core scientific field of strategic importance to the PRC. Through his association with the Chang Jiang Scholar Program and FZU, the defendant entered into an agreement with the Chinese government to further the PRC's major strategic needs, and he sought to make the PRC a world leader in the field of renewable energy. In return, the defendant received an annual salary from FZU and substantial funding and support from FZU and the PRC, among other benefits. Indeed, according to the contract between the defendant and FZU, the defendant was to teach and conduct research in physical chemistry, recruit and mentor young professors and doctoral students, and cater to the major strategic needs of the PRC. In exchange, the defendant was to receive benefits ranging from a well-appointed villa on the FZU campus for him and his spouse for the rest of his life, a generous relocation allowance, a handsome yearly base salary, substantial living and housing allowances, well-equipped laboratories and experiment rooms, approximately ten support personnel, research funds equivalent to approximately $1.5 million (USD), and the same amount in equipment expenses. Fuzhou University also agreed to integrate the defendant into Chinese Communist Party circles. Rather than disclose his concurrent Chinese employment and research efforts, as he was required to do—and risk losing his six-figure KU salary and access to hundreds of thousands of dollars in federal grant funds—the defendant instead schemed to conceal that information from KU and the U.S. government for his own personal gain and to advance the interests of the PRC.

The defendant's motion challenges testimony and comments presented to the grand jury

in support of the Second Superseding Indictment. He argues that the government presented false and misleading testimony to the grand jury, and that the prosecutor made irrelevant and prejudicial statements to the grand jurors, and that as a result there is "grave doubt" whether the grand jury's decision to indict him was free from improper influence.

The defendants' claims have no merit. As he does in his motion to dismiss for failure to state an offense and lack of venue (Doc. 82), the defendant distorts a limited set of facts and inaccurately characterizes both the evidence presented to the grand jury and the statements made by the prosecutor and the agent. Nothing happened at the grand jury that was either inaccurate or improper. The testimony by the agent was factually correct, and the comments by the prosecutor and the agent were both accurate and legally permissible. As a result, the Second Superseding Indictment is legally sound. The Court should DENY the defendant's motion.

## II.      BACKGROUND

### A.      Indictment and Procedural History

The The Federal Bureau of Investigation ("FBI") initiated an investigation of the defendant, an experienced research professor at KU, after receiving information from an anonymous source. The FBI's ensuing investigation – which included, among other things, search warrants for the defendant's office, residence, electronic devices, and email accounts – developed evidence independent from the source's information to prove the charged crimes.

On August 21, 2019, a grand jury sitting in the District of Kansas returned an Indictment, charging the defendant with one count of wire fraud, in violation of 18 U.S.C. § 1343, and three counts of program fraud, in violation of 18 U.S.C. § 666. (Doc. 1.) Following the defendant's initial motion to dismiss, on January 15, 2020, the grand jury returned a Superseding Indictment, which effectively added a wire fraud count and combined the three program fraud charges into a

single count. (Doc. 50.) Then, on June 24, 2020, the grand jury returned a Second Superseding Indictment, charging the defendant with seven wire fraud counts, including the two counts from the Superseding Indictment, and three counts of making false statements, in violation of 18 U.S.C. § 1001. (Doc. 75.)

**B.** **The Defendant's Scheme to Defraud the U.S. Government and KU of Money and Property**

The wire fraud and false statement charges stem from allegations that the defendant, an experienced research professor, intentionally lied to and defrauded two federal agencies that funded his scientific research and the American university where he conducted that research as a fulltime, salaried employee. (Doc. 75 at ¶¶ 32-39.) The defendant concealed from those agencies and his employer the fact that he was also employed fulltime at a Chinese university and that he was receiving financial benefits and foreign research support as a result of that employment and his participation in a Chinese government talent plan. (*Id.*) Through his scheme, the defendant sought to enrich himself while advancing the strategic interests of the Chinese government. (*Id.*)

1. *The Defendant's Employment at KU and Intentional Failure to Disclose His Prospective and Concurrent Fulltime Employment by FZU*

As alleged in the Second Superseding Indictment, KU hired the defendant as a research professor in August 2014.[1] (Doc. 75 at ¶ 3.) Until the time of his arrest in August 2019, he remained a fulltime employee of KU, teaching chemistry and conducting federally funded research, focused on renewable energy, at KU's Center for Environmentally Beneficial Catalysis. (*Id.*)

When hired by KU, the defendant signed a policy acknowledgement form, agreeing to abide by and follow all of KU's policies, including the Kansas Board of Regent's ("KBOR")

_____

[1] The defendant earned an annual base salary of approximately $105,000.

4

commitment of time and conflict of interest policy and KU's financial conflict of interest policy (hereinafter, "KU's policies").[2] (*Id.* at ¶8.) The defendant further certified that he read and complied with those policies on an annual basis, and he acknowledged that he would ensure that his research teams complied with the policies when submitting federal research and grant proposals to KU. (*Id.*)

KU's policies required the defendant to disclose on an *ad hoc* basis current or prospective situations that involved potential conflicts of interest as soon as they became known.[3] (*Id.* at ¶ 5.) The policies further required the defendant to disclose conflicts of interest and time commitments on an annual basis using KU's "Institutional Responsibilities" form (also referred to as a "conflict disclosure form" and "conflict of interest form"). (*Id.* at ¶ 6.)

The defendant completed these forms each year of his employment including for the 2018 and 2019 academic years. He submitted his 2018 form on January 9, 2018, which appears to have been late, likely due to the time he spent applying to the Chang Jiang Scholar Program at FZU. (*Id.* at ¶ 39(A).) He submitted his 2019 form on September 25, 2018. (*Id.* at ¶ 39(A).) Counts Three, Six, Eight, and Nine relate to the defendant's misrepresentations on those forms. (*Id.* at ¶¶ 42 and 44.)

On the first part of the 2018 and 2019 conflict disclosure forms, the defendant identified that he was "responsible for the design, conduct, or reporting of externally sponsored research" (*i.e.,* his federally funded research at KU). As noted on each form, that information helped KU

---

[2] *See generally* https://policy.ku.edu/provost/commitment-of-time-conflict-of-interest; https://policy.ku.edu/chancellor/individual-conflict-of-interest.

[3] With respect to prospective situations, the policies informed the defendant that the appearance of a conflict of interest could be as damaging or detrimental as an actual conflict. He was therefore asked to report potential conflicts so that appearances could be separated from reality.

"in determining whether [the defendant's] disclosed financial interests or time commitments . . . could potentially conflict with [his] university responsibilities" (to include his federally funded research at KU).[4] (*Id.* at ¶ 7.)

The second part of each form reminded the defendant that, per KU's policies, he owed his primary professional responsibility to KU; his primary commitment of time and intellectual effort should be to his research and teaching at KU; and he should maintain a presence on campus consistent with those responsibilities. The form further recited the disclosure criteria set forth in the policies.

For both his 2018 and 2019 conflict disclosure forms, the defendant misrepresented that he had no conflicts of interest or time commitments, despite his association with FZU and the Chang Jiang Scholar Program and the related benefits and research support he was receiving and planned to receive. (*Id.* ¶ at 39(A) and (E).) He further certified that this information was true, accurate, and complete; that he had read, understood, and complied with KU's conflict policies; that he agreed to secure approval regarding outside employment, prior to engaging in that activity;[5] and that he agreed to report any changes as soon as they become known but no later than 30 days after acquiring a new significant financial interest. (*Id.* ¶ at 6.)

At no time did the defendant seek approval from KU to work at FZU, as required. (*Id.* ¶¶ at 26, 31, and 36.) Nor did he otherwise report to KU, as required, his employment by FZU or

---

[4] As described below, DOE and NSF relied on KU to manage the defendant's conflicts and time commitments, and NSF explicitly required KU to establish conflict policies to receive federal funds.

[5] The policies expressly prohibited the defendant from obtaining outside employment and performing research at another institution without prior approval. The policies further informed the defendant that it was inappropriate to engage in gainful outside employment that was incompatible with his institutional commitments.

any remuneration, sponsored travel, or time commitments related to his work for FZU on behalf of the Chinese government and his participation in the Chang Jiang Scholar Program.[6] (*Id.* ¶¶ at 26, 31, 36, and 39.)

        2.     *The Defendant's Federally Funded Research at KU*

The defendant was not just a KU employee. He was the principal investigator ("PI"), or lead researcher, in charge of multiple research projects at KU that were funded by the U.S. government. (Doc. 75 at ¶¶ 4, 9-11, 12, and 15.) As PI, the defendant was responsible for the scope of work of each project, its fiscal administration, meeting the terms and conditions of the award, and representing the project to the sponsoring agency.[7] (*Id.*) In other words, while KU received the grants to support the defendant's research at KU, the defendant was solely responsible for the projects, from conception to completion, and he was required to keep the sponsoring agencies informed of his progress (*id.* at ¶ 39(E)), among other things. The defendant's attempt to dissociate himself from the U.S. government grant process is unpersuasive. (*See* Doc. 82 at 8 n.10.)

Generally, PIs, such as the defendant, are responsible for identifying funding sources for their proposed research at KU.[8] (Doc. 75 at ¶¶ 4, 9-11, 12, 15.) Certain federal agencies, such as DOE and NSF, post funding announcements that solicit research proposals from universities. (*Id.* ¶¶ 9 and 12.) These grants are highly competitive, limited in number, and are not intended to fund research merely for the sake of research.

---

[6] The defendant also never sought approval from KU to work at Nagoya University in Japan in June and July 2018. Nor did he otherwise report that employment and the salary he received he from it.

[7] *See generally* https://research.ku.edu/principal_investigator_ designation.

[8] *See generally* https://research.ku.edu/grants-process.

Once PIs identify funding sources, they are responsible for drafting and submitting proposals to KU, which then reviews the proposals before submitting them to the federal agencies. (*Id. ¶¶* 4, 10, and 15.) As part of KU's review process, PIs acknowledge that they will take the steps necessary to ensure that the members of their research teams have reviewed and complied with all relevant conflicts policies and made all necessary disclosures. (*Id. ¶* 8 and 39(B).) PIs further review the grant applications prior to KU submitting them. Most, if not all, of the applications require KU to certify under criminal penalty that the contents are true and accurate; to do so, KU relies on the truthfulness of the PIs. (*Id. ¶¶* 10 and 15.) Grants that are approved by a federal agency, such as DOE or NSF, are awarded to KU but are, of course, directly tied to the PI who proposed the research and who is responsible for managing it.

Relevant to the charges, the defendant caused KU to apply for, and receive, at a minimum, hundreds of thousands of dollars in grants from DOE's Office of Science and NSF to fund his research at KU involving renewable energy. (*Id. ¶¶* 4, 10, and 15.) Counts Two and Three, Five and Six, and Eight to Ten all directly relate to these federal grants and the defendant's false statements and misrepresentations pertaining to his association with FZU and the Chinese government.

Both DOE and NSF required the defendant to submit, as part of KU's grant application, a biographical sketch, to include his current and past employers, and a list of current and pending research support. (*Id. ¶¶* 10 and 15.) The current and pending support was to include all of the defendant's sponsored activities and awards requiring a measurable commitment of effort, whether paid or unpaid, including any pending support and support planned for the future. As the defendant well knew, DOE and NSF used this information to help identify potential scientific, budgetary, and/or commitment overlap between the defendant's proposal and his current or

planned research projects. It is illegal to receive funds from two sources for the same research, and it is the responsibility of DOE and NSF's program managers to confirm that there is no duplication of effort and support. In at least one instance, which forms the basis for Count Five (*id.* at ¶ 42), a DOE program manager directly asked the defendant for his updated current and pending research support while his December 2017 DOE grant application for research funding at KU was pending. (*Id.* at ¶¶ 10-11 and 39(D).)

At no time did the defendant inform DOE or NSF that he was employed by FZU or that he was receiving or planned to receive funds and other support for his research from FZU and the Chinese government. (*Id.* ¶¶ at 26, 31, and 36.) DOE and NSF also relied on KU, as the institution applying for and receiving the grant funds, to identify and manage the defendant's conflicts of interest and time commitments, which KU did through its conflicts policies and annual conflict disclosure forms, as described above. NSF explicitly required KU to maintain such policies in order to receive federal funds.[9] (*Id.* ¶¶ at 13.)

3.      *The Defendant's Clandestine Chinese Employment, Chinese Supported Research, and Agreement with FZU and the Chinese Government*

In May 2017, while employed by KU and using federal grant funds, the defendant contacted Xiamen University, a research university in China, to express his interest in applying for the Chinese government's Thousand Talents Program ("TTP") through that university.[10]

---

[9] *See* https://www.nsf.gov/pubs/manuals/gpm05_131/gpm5.jsp#510. Furthermore, all federal grants are regulated by the Uniform Administrative Requirements, Cost Principals, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200.

[10] During a court-authorized search of the defendant's KU computer, the FBI located the defendant's TTP application on a partition of the hard drive, which the defendant created. In sum, the lengthy application is dated July 6, 2017, and includes a signed intent to work contract. It further details the defendant's KU employment and DOE and NSF grants and expresses the defendant's intent to conduct research of value to the PRC to help the PRC dominate the market in the field of renewable energy.

(Doc. 75 at ¶ 22.) The TTP and the Chang Jiang Scholar Program are PRC talent plans, a means by which the PRC recruits researchers, like the defendant, through financial and reputational incentives to work in the PRC for a PRC institution. (Doc. 75 at ¶¶16-21.)

Around the same time, in July 2017, the defendant applied to the PRC Ministry of Education's Chang Jiang Scholar Program, which is intended for individuals employed by Chinese universities, such as FZU.[11] (*Id.* at ¶¶ 23-24.) By November 2017, the PRC Ministry of Education, which was responsible for the Chang Jiang Scholar Program, had advanced the defendant in the process and required him to defend his application in person. (*Id.* at ¶ 25.) As a result, the defendant sought to travel to FZU to prepare the necessary materials. (*Id.*) In order to do so, on November 11, 2017, he sent an email to the Chinese Consulate General in Chicago, Illinois, with the subject line "Urgently need Passport," which forms the basis for Count One. (*Id.* at ¶ 42.)

Near the end of December 2017, but no later than January 5, 2018, while the defendant remained employed by KU and continued to apply for, use, and receive federal funds, the PRC's Ministry of Education accepted him into the Chang Jiang Scholar Program at FZU, where he was expected to conduct research involving renewable energy for the benefit of the PRC. (*Id.* at ¶

_____

[11] The FBI also located the defendant's Chang Jiang Scholar Program application on the same partitioned hard drive as his TTP application. Similarly, it is dated July 6, 2017, and includes information about his DOE and NSF grants and his work at KU. Moreover, it includes a signed commitment by the defendant to work fulltime at FZU, make all of his research the property of FZU, and resign from his current employer, KU. It further includes a recommendation from FZU that provided for the following: the defendant would conduct research in his field; build a team of researchers who would apply for PRC-funded projects; establish his field as a world-class discipline at FZU; focus on research of value to the PRC to help the PRC achieve its strategic goals; design and develop groundbreaking technology to give the PRC technological superiority and help the PRC dominate the international markets. The recommendation further described the funding, equipment, laboratories, personnel, and other research assistance and support FZU intended to provide the defendant, including the approximately one million dollars in funding.

26.) In or about January or February 2018, the defendant negotiated an employment contract with FZU to serve as a Chang Jiang Distinguished Professor. (*Id.* at ¶ 28.) In or around March 2018, the defendant entered into a formal contract with FZU, and he officially commenced his employment as a Chang Jiang Distinguished Professor on May 1, 2018.[12] (*Id.* at 29-30.)

According to the unsigned contract and a signed addendum to the contract,[13] which are generally summarized in the indictment (*id.* at 29), one of the objectives of the defendant's employment at FZU was to cater to the PRC's major strategic needs by actively undertaking major PRC scientific research projects. In return, the contract and addendum entitled him to an annual salary of 550,000 yuan (approx. $80,000), which included the PRC Ministry of Education's Distinguished Professor award of 220,000 yuan (approx. $32,000). It further entitled him to a residence on campus, staff, lab space, equipment, and the equivalent of millions of U.S. dollars in research funds. And, it provided that FZU would integrate the defendant into Communist Party Committee circles as a key scientific expert, strengthen his ideological and emotional identification, and imbue him with feelings of patriotism, ambition for a strong PRC, and dedication to the service of the PRC.

In May 2018, the defendant traveled to China to officially commence his appointment at

---

[12] While the defendant's official start date was May 1, 2018, the evidence at trial will show that he accepted employment at FZU when he applied for, and was accepted into, the Chang Jiang Scholar Program and that he worked to establish his research team at FZU prior to May 1, 2018. The contract memorialized many of the details set forth by FZU in its recommendation to the PRC Ministry of Education for the defendant to become a Chang Jiang Distinguished Professor.

[13] The defendant acknowledges the Court must accept the allegations in the indictment as true, but he nonetheless claims he was never employed by FZU, pointing to just the unsigned contract, while ignoring the weight of the rest of the evidence. (Doc. 82 at 6 n.8.) Further, the fact that the defendant did not store a copy of a signed contract in his email accounts, on his electronic devices, or at his residence or KU office does not mean that one does not exist, nor does it explain the existence of the signed addendum.

FZU. (Doc. 75 at ¶¶ 29-30.) He thereafter regularly traveled to China, including for extended periods of time, to fulfil his contractual obligations to FZU and the Chinese government. (*Id.* at 30-31.) The indictment offers several non-exhaustive examples, including the defendant's March 2019 application for funding from the Chinese government for his research at FZU, which forms the basis of Count Seven. (*Id.* at 31 and 42.)

The indictment further alleges that, on or about May 17, 2018, shortly after the defendant traveled to China to start his work at FZU, he submitted a proposal to KU for what he represented to be a collaborative research project between KU and FZU. (*Id.* at ¶ 39(C).) The proposal included a $90,000 budget, which FZU apparently would fund for two years from September 2018 to August 2020. (*Id.*) Importantly, the defendant sought to use those funds to "buyout" his teaching responsibilities at KU for the spring 2019 semester (approx. January to May 2019).[14] (*Id.*) At no time, in connection with this proposal or otherwise, did the defendant disclose or report to KU that he was, in fact, employed fulltime by FZU. (*Id.* at ¶¶ 26, 31, 36, and 39(C).) Instead, he concealed that information and used this proposal to manufacture a cover story to mislead KU about his association with FZU and his frequent and extended travel to China.

On June 25, 2018, after a series of emails and meetings between the defendant and KU, the chair of KU's chemistry department approved a buyout for one course for the spring 2019 semester but with explicit conditions. Specifically, the defendant was advised that his other duties at KU would continue as usual and that he was expected to be in attendance on campus

---

[14] A buyout refers to the use of grant funds to pay a professor's salary for teaching a course to allow the professor to work on the funded research project.

during the semester in accordance with KU policy. While outside the United States,[15] on June 26, 2018, the defendant sent an email to KU in an effort to finalize his manufactured cover story, which forms the basis of Count Four. (*Id.* at ¶ 42.) The defendant, however, ultimately failed to approve his purported KU-FZU research proposal in KU's electronic system, and therefore, the buyout remained unapproved and unfunded.[16] Furthermore, despite the clear direction from his department chair, the defendant traveled to China for almost the entirety of the spring 2019 semester, and he did so to work at FZU unbeknownst to KU.

## III.     LEGAL STANDARD

The defendant moves the Court to dismiss the Second Superseding Indictment pursuant to Rule 12(b)(3)(A)(v) of the Federal Rules of Criminal Procedure. Rule 12 provides, in relevant part, that certain "objections . . . must be raised by pretrial motion if the basis of the motion is then reasonably available and the motion can be determined without a trial on the merits." Among the objections listed is "an error in the grand-jury proceeding…" Fed. R. Crim. P. 12(b)(3)(A)(v).

Whether couched in terms of a due process violation or presented as matters relating to the Court's supervisory power over the grand jury, claims of grand jury misconduct are subject to an exacting standard of review by the courts. There are several legal thresholds that a party raising such a claim must overcome in order to prevail on a motion to dismiss an indictment due

---

[15] Travel records show that the defendant flew to China for the summer of 2018. However, emails obtained pursuant to legal process reveal that, during that time, the defendant traveled between Fuzhou, where FZU is located, and Japan, where he also worked for Nagoya University.

[16] Consequently, KU paid the defendant a teaching salary of approximately $18,000 for the spring 2019 semester, which he did not earn. KU alerted the defendant to the error and asked him to identify the research funds he intended to use to cover the debt. Instead of pointing to the KU-FZU proposal, the defendant directed KU to use his NSF grant funds. This is just one example of how federal grant funds are used to pay a researcher's salary at KU.

to alleged misconduct before the grand jury. At the outset, in advancing a grand jury misconduct claim, a defendant must overcome the presumption of regularity that attaches as a matter of law to grand jury proceedings. *See, e.g., United States v. R Enterprises, Inc.*, 498 U.S. 292, 301 (1991); *United States v. Neha*, 376 F.Supp.2d 1222 (D.N.M. 2005); *United States v. Loc Tien Nguyen*, 314 F.Supp.2d. 612 (E.D.Va. 2004).

To defeat this presumption, courts have set a demanding legal threshold, holding that a person alleging grand jury misconduct can typically only obtain relief by demonstrating misconduct of a grave nature that substantially influenced in an improper way the grand jury's decision to indict. *In re United States*, 441 F.3d 44 (1st Cir. 2006). Thus, the mere presence of irregularities or misconduct before the grand jury is insufficient to warrant relief. *United States v. Chapman*, 2006 WL 3539146 (6th Cir. 2006) (unpublished). Rather, to successfully challenge an indictment on grounds of grand jury misconduct, a defendant must also show that the misconduct was of such a profound nature that it caused "the grand jury to no longer be a grand jury." *United States v. Reyes-Echevarria*, 345 F.3d 1, 4 (1st Cir. 2003). In short, the defendant must show misconduct that substantially influenced the decision to indict or cast grave doubt over whether the decision to indict was free from some substantial, and improper, influence. *In re United States*, 441 F.3d 44 (1st Cir. 2006); *United States v. Verbitskaya*, 406 F.3d 1324 (11th Cir. 2004); *United States v. Reyes-Echevarria*, 345 F.3d 1 (1st Cir. 2003).

Courts in the Tenth Circuit have said that, to obtain dismissal, a defendant must demonstrate prejudice by showing "that the alleged error 'substantially influenced the grand jury's decision to indict, or … there is grave doubt that the decision to indict was free from the substantial influence of such violations.'" *United States v. Brown*, 5:19-40081-HLT, 2020 WL 4347258, at *3 (D.Kan. July 29, 2020) (citing *Bank of Nova Scotia v. United States*, 487 U.S.

250, 256 (1988)).  Courts may dismiss an indictment for prosecutorial misconduct that "is flagrant to the point that there is some significant infringement on the grand jury's ability to exercise independent judgment."  *United States v. Hillman*, 642 F.3d 929, 933-34 (10th Cir. 2011) (quoting *United States v. Pino*, 708 F.2d 523, 530 (10th Cir. 1983)).  Typically, dismissal is appropriate only where there is "a showing that the government deliberately attempted to influence the grand jury with false testimony."  *United States v. Cooper*, 396 F.Supp.3d 992, 994 (D.Kan. 2019).

In order to try to reach that standard here, the defendant wrongly argues that the government presented testimony that was false and misleading, along with statements that were irrelevant and highly prejudicial, in order to substantially influence the grand jury's decision to return the indictment.  (Doc 83 at 12.)  As the government will demonstrate below, the defendant only arrives at this result by distorting the disclosure requirements that applied to him, misrepresenting his responsibilities at KU during the spring semester of 2019, and mischaracterizing statements by the agent and prosecutor.[17]  An objective analysis of the facts and the testimony reveals no impropriety by either the agent or the prosecutor.  Accordingly, the Court should deny the defendant's motion.

## IV.    ARGUMENT

The defendant asserts the agent misled the grand jury about the disclosure criteria in the defendant's Conflict of Interest forms (Doc. 83 at 6), the agent misled the grand jury about the defendant's teaching responsibilities during the spring semester of 2019 (*id*. at 8), and the

---

[17] The defendant engages in an identical – and unavailing – strategy in his motion to dismiss for failure to state a claim. (Doc. 82.) There, too, he distorts the facts and mischaracterizes the allegations to advance his claim that the government is prosecuting a garden-variety employment dispute with no federal interest.

prosecutor and the agent made inappropriate statements to the grand jury in order to obtain the indictment (*id*. at 10).  None of these assertions are true.

A.  **The Agent Testified Correctly About the Defendant's Conflict of Interest Forms and the Defendant's Teaching Responsibilities During Spring Semester 2019**

1.  Legal Standard Related to the Accuracy of Testimony

The defendant wants the Court to believe that the case agent provided "false and misleading testimony" to the grand jury about the disclosure criteria in the defendant's Conflict of Interest forms and about the defendant's teaching responsibilities during the spring semester of 2019 (*id*. at 12).  Essentially, the defendant argues that the case agent committed perjury, and that the government relied on the perjurious testimony to obtain an indictment.  Nothing of the sort happened here.  The agent testified accurately about the facts supporting the indictment, as demonstrated below.  Even if the agent's testimony was at odds with the defendant's theory of the case and his spin and his gloss on the facts, it was nevertheless accurate.  As a result, the defendant's motion falls well short of any legal standard requiring – or even allowing – dismissal of the indictment, and the Court must therefore reject the defendant's motion.

To be sure, the function of the grand jury is to search for the truth. It therefore follows that a defendant may establish grand jury abuse by demonstrating that the prosecutor obtained an indictment by knowingly submitting perjured testimony to the grand jury. *United States v. Rivera-Santiago*, 872 F.2d 1073, 1088 (1st Cir. 1989); *United States v. Claiborne*, 765 F.2d 784, 791 (9th Cir. 1985); *United States v. Basurto*, 497 F.2d 781, 785-86 (9th Cir. 1974).

Motions to dismiss indictments based upon claims of grand jury abuse through the knowing presentation of perjurious testimony, while frequently made, are rarely granted by the courts. *See, e.g*., *United States v. Casas*, 425 F.3d 23, (1st Cir. 2005); *United States v. Morgan*, 384 F.3d 439 (9th Cir. 2004); *United States v. Soto-Beniquez*, 356 F.3d 1 (1st Cir. 2003); *United*

*States v. Strouse*, 286 F.3d 767 (5th Cir. 2002); *United States v. Feurtado*, 191 F.3d 420 (4th Cir. 1999); *United States v. Mangual-Corchado*, 139 F.3d 34 (1st Cir. 1998); *United States v. Brooks*, 125 F.3d 484 (7th Cir. 1997); *United States v. Arana*, 13 F.Supp.2d 613 (E.D. Mich. 1998). Rather, these motions are judged against an exacting standard.

Before dismissal may be justified on these grounds, a defendant must meet several legal thresholds:

First, it must be shown that the perjury was knowingly procured by the government. It is well-settled that perjury before the grand jury which was not knowingly sponsored by the government will not provide a basis for challenge of an indictment. *See, e.g.*, *United States v. Soto-Beniquez*, 356 F.3d 1 (1st Cir. 2003); *United States v. Strouse*, 286 F.3d 767 (5th Cir. 2002).

In addition, the perjury must be "material." *Mangual- Corchado*, 139 F.3d at 41-42. Thus, a mere assertion that a single witness's statements were misleading or overstated the evidence will not vitiate an otherwise valid indictment. *See United States v. Yost*, 24 F.3d 99, 102 (10th Cir. 1994). Nor will the presentation of contradictory witnesses before the grand jury, standing alone, demonstrate a material use of perjurious testimony. *See United States v. Casas*, 425 F.3d 23 (1st Cir. 2005).

In the Tenth Circuit, a court may dismiss an indictment under these circumstances only if the court finds prosecutorial misconduct so flagrant that there was "some significant infringement on the grand jury's ability to exercise independent judgment." *United States v. Page*, 808 F.2d 723, 726 (10th Cir. 1987) (citing *Pino*, *supra*, 708 F.2d at 530). And in *Talamante v. Romero*, 620 F.2d 784 (10th Cir.), *cert. denied*, 449 U.S. 877, 66 L. Ed. 2d 99, 101 S. Ct. 223 (1980), the court discussed in detail the standard for dismissal in a case involving an

allegation of perjured testimony. There, petitioner asserted that he was deprived due process of law when forced to stand trial on an indictment the prosecutor knew to be partially based on perjured, material testimony. The court held that petitioner was required to prove the prosecutor knew the indictment was based on partially perjured testimony; and that the perjured testimony was material. The court found the perjured testimony was recanted at trial and was not material because it did not affect petitioner's conviction.

## 2. The Defendant's Conflict of Interest Forms

The defendant's argument that the agent misled the grand jury about his Conflict of Interest forms relies on an interpretation of the forms under which the defendant needed only to disclose significant financial interests, which are defined in the form as remuneration that amounted to $5,000 or more, and time commitments in external professional activities that were current. The defendant attached the forms to his motion,[18] however, and all one need do is review those forms to see they encompass a far broader disclosure requirement than the defendant espouses.

When hired by KU, the defendant signed a policy acknowledgement form, agreeing to abide by and follow all of KU's policies, including the Kansas Board of Regent's ("KBOR") commitment of time and conflict of interest policy and KU's conflict policies.[19] The defendant further certified that he read and complied with those policies on an annual basis, and he acknowledged his understanding and compliance with the policies when submitting federal research and grant proposals to KU.

---

[18] Docs. 83-1 & 83-2, or what he refers to as Exhibits A and B to Doc. 83.

[19] *See* https://policy.ku.edu/provost/commitment-of-time-conflict-of-interest; https://policy.ku.edu/chancellor/individual-conflict-of-interest. Language quoted herein comes from the policies.

KU's conflict policies required the defendant, as a member of KU's faculty and staff, to disclose "on an ad hoc basis current or prospective situations that may raise questions of conflict of commitment or interest, as soon as such situations become known." With respect to prospective situations, the policies explained that "[t]he appearance of a conflict of interest can be as damaging or detrimental as an actual conflict. Thus, individuals are asked to report potential conflicts so that appearances can be separated from reality."

The policies further required the defendant to report annually any "consulting arrangements, significant financial or managerial interests, or employment in an outside entity whose financial or other interests would reasonably appear to be directly and significantly affected by their research or other university activities." Additionally, the defendant was required to notify KU "in writing" about "all external personal, professional activities" and "secure approval prior to engaging in the activities."

The policies expressly prohibited the defendant from obtaining outside employment and performing research at another institution without prior approval. Specifically, the policies stated that, "[w]ithout prior approval, faculty members on full-time appointments must not have significant outside managerial responsibilities nor act as principal investigators on sponsored projects that could be conducted at [KU] but instead are submitted and managed though another organization." The policies explained that "[f]aculty members and staff owe their primary professional responsibility to their employing institution[], and their primary commitment of time and intellectual effort should be to the education, service, research and scholarship missions of said institution[]. Faculty and staff should maintain a presence on campus commensurate with their appointments." Therefore, "it is . . . considered inappropriate to engage in gainful employment outside [KU] that is incompatible with institutional commitments."

Second, the Institutional Responsibilities form also included the following Certification

Statement:

## Certification Statement

I, Feng Tao, declare that this report of significant financial interests and time commitments has been examined by me and to the best of my knowledge and belief is a true, correct, and complete statement.

- I have read and complied with the Kansas Board of Regents and University of Kansas policies on commitment of time, conflict of interest, consulting and other employment.
- I understand that any external personal professional activities in which I engage that take time away from my University responsibilities must:
    - Contribute to my professional development as a faculty member and/or enable me to serve the community, state, or nation in a professional capacity;
    - Be consistent with the objectives of the University of Kansas;
    - Not interfere with meeting my faculty responsibilities in teaching, research, and service; and
    - Not use the name of the University of Kansas, its facilities, equipment, staff, or students.
- Regarding consulting and outside employment, I agree to secure approval, following the procedures specified on my campus, prior to engaging in these external activities.
- I understand that Regents policy states that failure to file this statement as required or intentionally filing a false statement may result in disciplinary action.
- I will report any changes to this statement as soon as they become known to me and no later than 30 days after acquiring a new significant financial interest (e.g. through marriage, inheritance or purchase).

**By clicking "Submit", you confirm that you understand and agree with the Certification Statement**

*See* Doc. 83-1 at 9, and Doc. 83-2 at 9.

The defendant takes issue with the agent's testimony to the grand jury that Dr. Tao was

required "to disclose any current or prospective situation that involved potential conflicts of

interest or time as soon as they became known."  (Doc. 83 at 10.)  But this testimony is wholly

consistent with KU's conflict of interest policy, which required the defendant to disclose "on an

ad hoc basis current or prospective situations that may raise questions of conflict of commitment

or interest, as soon as such situations become known," along with his certification on the

Institutional Responsibilities form that the defendant had read and complied with those conflict

of interest policies.  The agent's testimony is also consistent with the defendant's certification on

the Institutional Responsibilities form that he agreed to secure approval prior to engaging in

external activities, as well as the defendant's certification that he would report any changes to this statement as soon as they became known to him and no later than 30 days after acquiring a new financial interest.

The defendant understandably wants to argue that he was required to report only a narrow category of conflicts, and that his situation did not fall within that narrow band. But the fact that the defendant's theory of the case is different from the government's theory does not mean that the agent's testimony – which is consistent with the government's theory and therefore inconsistent with the defendant's theory – is false or misleading. Here, the agent's testimony appropriately aligns with the facts of the case.

The defendant has not shown any prosecutorial misconduct whatsoever, let alone any misconduct so flagrant that it "infringe[d] on the grand jury's ability to exercise independent judgment." *Page*, 808 F.2d at 726. And the defendant's claim collapses when considered in light of *Talamante*, *supra*. The defendant has not shown that the indictment is based on perjured, material testimony – in fact, all the defendant has shown is that the agent's testimony does not fit his theory of the case. And the defendant cannot show prejudice under the *Talamante* standard because he will be able to cross examine the agent at trial if he wishes about what he characterizes as "false and misleading testimony."

### 3. The Defendant's Teaching Responsibilities During the Spring of 2019

Similarly, the government and the defendant have clearly different theories about the defendant's attempt to buy out his teaching contract during the spring semester of 2019. Obviously, the defendant plans to argue at trial that he successfully bought out his teaching duties, as he says is indicated by the email he attached as Exhibit F to his motion – the single piece of evidence he selectively presented to the Court (of the thousands of emails uncovered

during the investigation).  (See Doc. 83-6.)  The evidence at trial, however, will be consistent with the agent's testimony to the grand jury.

The evidence will show that, on May 17, 2018, shortly after the defendant officially began to work at FZU, he submitted a proposal to KU, for what the defendant represented was a collaborative research project between KU and FZU.  But at no time, in connection with this proposal or otherwise, did the defendant disclose or report to KU that he was, in fact, employed fulltime by FZU, as he was required to do. Instead, he concealed that information and used this proposal to manufacture a cover story to mislead KU about his association with FZU and his frequent and extended travel to China. In other words, it was a means by which the defendant sought to obtain a second substantial salary and to conduct research supported by the Chinese government, while concealing that employment and research effort from KU and the U.S. government.

On June 25, 2018, after a series of emails and meetings between the defendant and KU, the chair of KU's chemistry department approved a buyout for one course for the spring 2019 semester but with explicit conditions. Specifically, the defendant was advised that his other duties at KU would continue as usual and that he was "expected to be in attendance on campus during the semester in accordance with KU policy."  In spite of those conditions, travel records show the defendant traveled to China for the majority of the spring 2019 semester to work fulltime for FZU.  In addition to other evidence, travel records will show that the defendant was in China for a significant period of time in late 2018 and early 2019, including between December 11, 2018, and March 28, 2019; April 12 to April 27, 2019; and May 11 to June 1, 2019.

And while the defendant received conditional approval from his department chair for a

course buyout, in addition to violating the conditions of the agreement by leaving the country for most of the semester, the defendant failed to approve his purported KU-FZU research proposal in KU's electronic system. As a result, the proposal remained unapproved and unfunded, and no money was available for the course buyout. Consequently, KU paid the defendant a teaching salary of approximately $18,000 for the spring 2019 semester, which he did not earn. KU alerted the defendant to the error and asked him to identify the research funds he intended to use to cover the debt. Instead of pointing to the KU-FZU proposal, the defendant directed KU to use his NSF grant funds.[20] Understanding that further scrutiny by KU could reveal his scheme, he further indicated that he was fine with no summer salary for 2019 if it was necessary.

The defendant understandably wants to argue that he successfully bought out his teaching duties for the spring semester of 2019. That argument is not consistent with the facts, however. The agent's testimony, on the other hand, is entirely consistent with the facts, and it therefore is neither false nor misleading (the defendant's mischaracterization of the prosecutor's clarifying questions notwithstanding).[21]

As with the defendant's argument about the conflict of interest forms, he has shown no prosecutorial misconduct here, let alone any misconduct so flagrant that it "infringe[d] on the grand jury's ability to exercise independent judgment." *Page*, 808 F.2d at 726. He further has not shown that the indictment is based on perjured, material testimony – again, all the defendant

---

[20] This is just one example of how federal grant funds are used to pay a researcher's salary at KU.

[21] The defendant characterizes the prosecutor as being "dissatisfied with [ ] highly exculpatory testimony" (Doc. 83 at 9) and "encourag[ing] the FBI Case Agent to reverse his testimony" (*id.*) and "prompt[ing]" the agent (also *id.*), but the government submits an objective reading of the transcript shows the prosecutor simply sought to clarify the agent's testimony in a complex and nuanced factual scenario.

has shown is that the agent's testimony doesn't fit his theory of the case. And the defendant cannot show prejudice under the *Talamante* standard because he will be able to cross examine the agent at trial if he wishes about what he characterizes as "false and misleading testimony."

**B.     The Prosecutor and the Agent Made Only Correct and Proper Statements to the Grand Jury**

The defendant next complains about several comments to the grand jury, by either the prosecutor or the agent, which he says were unduly prejudicial:  first, that the prosecutor mentioned the defendant had been previously indicted; second, that the case agent mentioned he was assigned to the FBI's counterintelligence squad, in combination with several allegations in the indictment about Chinese talent programs; and third, that the prosecutor – in response to a question from a grand juror – asked the grand juror to listen to the rest of the evidence before deciding what charges were appropriate in the case. The defendant offers no authority supporting his claim that statements of this nature infect the grand jury process so deeply that the grand jury was somehow prevented from acting as a grand jury or exercising its independent judgment. *See Hillman*, 642 F.3d at 933-34.

As to the defendant's first complaint, he seemingly ignores the fact that the prosecutor was introducing the grand jurors to a document entitled "Second Superseding Indictment." (*See* Doc. 75.) The defendant apparently believes the grand jury is incapable of understanding that a "superseding" indictment would replace or supplant a prior indictment.  There is nothing inherently prejudicial about the government presenting a "superseding" indictment, nor is there anything inherently or unduly prejudicial about the prosecutor mentioning the fact that the superseding indictment being presented was replacing or supplanting a prior indictment.

Although the defendant cites *United States v. Leeper*, No. 06-CR-58A, 2006 WL 1455485 (W.D.N.Y. May 22, 2006) in support of his assertion that mentioning a prior indictment

is grounds for dismissal, it is disappointing the defendant would so grievously misrepresent the holding of a case in order to attack the integrity of the prosecutor and agent. *Leeper* did not deal with a case where, like here, the prosecutor simply mentioned the prior presentation of a case in order to explain why the document was styled as a superseding indictment. Rather, *Leeper* involved a situation where, mid-trial, prosecutors hastily empaneled a grand jury and then presented a superseding indictment in order to cure a defect in the indictment on which the defendant was being tried. When the trial judge examined the transcript of the grand jury proceeding, he saw that the grand jurors had been informed not only that a prior grand jury had previously indicted the defendant, but that the grand jury had been empaneled specifically to fix a defect in the charging document, that the trial had already commenced, that a petit jury had already been empaneled, and that the original grand jury had expired so it was no longer available to supersede the indictment. The trial judge found it was "clear from the transcript that the grand jury was led to believe that its purpose that day was merely to correct a technical error that had occurred in an otherwise validly issued indictment." (*Id*. at *3.) Concerned that the second grand jury had served as nothing more than a "rubber stamp" for the original indictment, and that it most certainly was predisposed to indict as a result of the prosecutors' assurances that the requested change in the indictment was merely an oversight or an "omission in paperwork," the court found that dismissal of the indictment was warranted. (*Id*. at *4.) It's difficult to imagine how two cases could be more different than *Leeper* is from this case.

As to the defendant's second complaint, the defendant understandably continues to try to portray this case as a "garden-variety employment dispute." (*See* Doc. 82 at 3.) This case is anything but. The defendant clandestinely entered an agreement with the government of China to further the PRC's major strategic needs and interests, and he knowingly and intentionally hid

that fact not only from the American university that employed him but also from the U.S. government entities that granted him hundreds of thousands of dollars of funding for sensitive scientific research concerning a critical component of renewable energy production. While testifying before the grand jury, the agent appropriately introduced himself and explained where he worked and why he was involved in this investigation – his squad investigates these types of allegations given the national security nexus.

The defendant also complains that the grand jury was shown seven paragraphs of an indictment alleging that China "had used talent programs to recruit scientists who might steal intellectual property and transfer it to China and the Chinese Communist Party, [ ] even though those allegations had nothing to do with the evidence presented" against him. (Doc. 83 at 17.) But the seven paragraphs of allegations referred to by the defendant have everything to do with the evidence presented against the defendant, because those paragraphs provide the defendant's motive for hiding his participation in the Chang Jiang Scholar Program at FZU and thereby defrauding both his employer and the U.S. government. Tellingly, the defendant has not moved to strike those paragraphs, because they are entirely relevant to this case and to the government's proof at trial.

Finally, the defendant complains that the government didn't immediately answer a grand juror's question and instead suggested that the grand juror patiently listen to the rest of the evidence. The defendant suggests the prosecutor, when asked by the grand juror whether the defendant was being accused of "double-dipping or espionage" (Doc. 83 at 14, citing to his own Exhibit E at 24), somehow infected the deliberative process by encouraging the grand juror to listen to all of the evidence. The defendant has provided no authority for the proposition that a prosecutor commits misconduct by encouraging a juror – whether a grand juror or a petit juror –

to listen to the evidence before making a decision. *See Cooper*, *supra*, 396 F.Supp.3d at 994. It was entirely appropriate to encourage the juror, who asked a question prior to the conclusion of the testimony, to listen to all of the evidence before drawing any conclusions, particularly when the juror's question attempted to categorize the nuanced facts using conclusory labels. This case may not involve espionage in the traditional or commonly understood sense, but it is also not just a case of double-dipping.

    **C.**    **The Defendant's Request for Disclosure of the Redacted Portions of the Grand Jury Transcript**

    In a footnote, the defendant requests the Court require the government to provide an unredacted version of the grand jury transcript to the Court for *in camera* review. The defendant says he has "grave concerns" that the prosecutor may have made "other" inappropriate statements to the grand jury, and that his request is justified under *In re Special Grand Jury 89-2*, 143 f.3d 565 (10th Cir. 1998).

    *Grand Jury 89-2* does not support the defendant's request. First, the holding requires that the grand jury materials are needed in another judicial proceeding, not the instant proceeding. Second, the request to violate the secrecy of the grand jury requires a compelling reason, and that reason must be something more than a mere fishing expedition. The defendant has made it clear that what he requests is nothing more than an inquiry into whether the government may have done something improper – the very definition of a fishing expedition. Finally, the grand jury transcripts were provided to the defendant not because he is entitled to the production of grand jury transcripts, but because they may constitute Jencks statements of a possible witness. Because the transcripts are provided as Jencks statements, it is entirely appropriate that the government redacted the portions that are not prior statements of the possible witness.

    A similar request was made in *United States v. Jackson*, 863 F.Supp. 1449 (D. Kan.

1994).  After conducting a characteristically thorough review of Rule 6(e) and the cases interpreting it, Judge Crow denied the motion.  He noted that a review of grand jury transcripts is "rarely permitted without specific factual allegations of government misconduct."  (*Id*. at 1456, citing *United States v. Torres*, 901 F.2d 205, 233 (2nd Cir.) cert. denied, 498 U.S. 906 (1990). He then held:  "The defendants' arguments fall far short of showing a substantial likelihood of prosecutorial abuse of the grand jury process. The court declines to order the disclosure of grand jury materials or to conduct an in camera examination of the same on the weight of the defendants' baseless speculations. The defendants' motion is denied."  (*Id*., 863 F.Supp. at 1456)

Here, as in *Jackson*, the defendant has failed to show any likelihood of prosecutorial abuse of the grand jury process.  The Court should reject his request that the Court embark on a fishing expedition on his behalf by reviewing the redacted portions of the grand jury transcript.

## V.      CONCLUSION

In conclusion, the defendant has not shown any sort of government impropriety before the grand jury, let alone any that is flagrant or that significantly infringed on the grand jury's ability to exercise independent judgment, as the Tenth Circuit requires for dismissal of an indictment.  *See Hillman*, 642 F.3d at 933-34.  Because the defendant has not met his burden, the Court should DENY the defendant's motion to dismiss.

Respectfully submitted,

*s/* 𝓐𝓦 𝓜𝓪𝓽𝓽𝓲𝓿𝓲
ANTHONY W. MATTIVI
Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683
Telephone: (785) 295-2850
Anthony.Mattivi@usdoj.gov

*s/* **Benjamin J. Hawk**

BENJAMIN J. HAWK
Trial Attorney
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 233-0986
Benjamin.Hawk@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the __11th__ day of September, 2020, I caused the foregoing pleading to be filed with the Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

*AW Mattivi*

Anthony W. Mattivi