**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 19-20052-JAR-JPO |
| | ) | |
| FENG TAO | ) | |
| a/k/a "Franklin Tao," | ) | |
| | ) | |
| Defendant. | ) | |

---

**REPLY IN FURTHER SUPPORT OF DR. FRANKLIN TAO'S
MOTION TO DISMISS THE SECOND SUPERSEDING INDICTMENT
<u>FOR FAILURE TO STATE AN OFFENSE AND LACK OF VENUE</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.      The Opposition fails to shore up the Indictment's faulty legal theories and
        demonstrates that the Indictment must be dismissed for failure to state an offense.......... 2

        A.      The government flouts the motion-to-dismiss standard by presenting and
                relying on at least 45 factual assertions not alleged in the Indictment. ................ 2

        B.      The Opposition confirms that the Indictment fails to allege a scheme to
                deprive KU, NSF, or DOE of money or property.................................................... 3

        C.      The government concedes that the Indictment does not allege an actual
                misrepresentation by not responding to Dr. Tao's argument.............................. 11

        D.      The government applies the wrong standard in an attempt to support its
                defective wire fraud charges. .............................................................................. 13

        E.      The government disregards Supreme Court precedent in arguing that Dr.
                Tao's statements to KU in Conflict of Interest forms are within the federal
                government's jurisdiction. .................................................................................... 16

        F.      The government's argument for why its novel legal theory is consistent
                with the Due Process fair warning requirement falls short................................... 19

II.     The Opposition confirms that the District of Kansas is an improper venue for
        Count 10.................................................................................................................... 21

CONCLUSION........................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Carpenter v. United States*,
    484 U.S. 19 (1987)..............................................................................................4

*Kone v. D.C.*,
    808 F. Supp. 2d 80 (D.D.C. 2011) ....................................................................13

*McNally v. United States*,
    483 U.S. 350 (1987)............................................................................................8

*Mims v. United States*,
    332 F.2d 944 (10th Cir. 1964) ...........................................................................5

*Parr v. United States*,
    363 U.S. 370 (1960)....................................................................................13, 15

*Russell v. United States*,
    369 U.S. 749 (1962)........................................................................................5, 7

*Skilling v. United States*,
    561 U.S. 358 (2010)...................................................................1, 3, 4, 5, 8, 11

*Stinn v. United States*,
    856 F. Supp. 2d 531 (E.D.N.Y. 2012) ...............................................................4

*United States v. Aldissi*,
    758 F. App'x 695 (11th Cir. 2018) ..............................................................10, 11

*United States v. Baker*,
    626 F.2d 512 (5th Cir. 1980) ...........................................................................18

*United States v. Billmyer*,
    No. 94-29-01-JD, 1995 WL 54471 (D.N.H. Feb. 3, 1995)..................................7

*United States v. Blankenship*,
    382 F.3d 1110 (11th Cir. 2004) ...................................................................16, 17

*United States v. Brittain*,
    931 F.2d 1413 (10th Cir. 1991) .......................................................................18

*United States v. Camick*,
    No. 13-10042-01-JTM, 2014 WL 1356056 (D. Kan. Apr. 7, 2014) .................23

*United States v. Doherty*,
   867 F.2d 47 (1st Cir. 1989)..................................................................................9

*United States v. Dunne*,
   No. 98-CR-278 ST, 2000 WL 33710849 (D. Utah Oct. 5, 2000)...........................18

*United States v. Facteau*,
   1:15-cr-10076-ADB, 2016 WL 4445741 (D. Mass. Aug. 22, 2016)........................7

*United States v. Gatewood*,
   173 F.3d 983 (6th Cir. 1999) ..............................................................................12

*United States v. Good*,
   326 F.3d 589 (4th Cir. 2003) ..............................................................................12

*United States v. Holstrom*,
   242 F. App'x 397 (9th Cir. 2007) (unpublished opinion)......................................17

*United States v. Maxwell*,
   579 F.3d 1282 (11th Cir. 2009) ......................................................................10, 11

*United States v. Ochs*,
   842 F.2d 515 (1st Cir. 1988)............................................................................5, 8

*United States v. Pope*,
   613 F.3d 1255 (10th Cir. 2010) ...........................................................................3

*United States v. Ransom*,
   No. 09-20057-JWL, 2009 WL 3756977 (D. Kan. Nov. 9, 2009)........................8, 9

*United States v. Richerson*,
   833 F.2d 1147 (5th Cir. 1987) ..............................................................................8

*United States v. Rodgers*,
   466 U.S. 475 (1984)...............................................................................16, 17, 18

*United States v. Ruedlinger*,
   No. 97-40012-01-RDR, 1997 WL 807917 (D. Kan. Dec. 9, 1997)......................12

*United States v. Sanchez-Porras*,
   No. CR 19-1374 KG, 2019 WL 4727820 (D.N.M. Sept. 27, 2019), *report and
   recommendation adopted*, No. CR 19-1374 KG, 2019 WL 5288237 (D.N.M.
   Oct. 18, 2019) .............................................................................................12, 13

*United States v. Shellef*,
   507 F.3d 82 (2d Cir. 2007)..................................................................................10

*United States v. Smith*,
    641 F.3d 1200 (10th Cir. 2011) ...................................................................21, 22, 23

*United States v. Sorich*,
    523 F.3d 702 (7th Cir. 2008) ......................................................................................8

*United States v. Todd*,
    446 F.3d 1062 (10th Cir. 2006) ...........................................................................2, 17

*United States v. Trammell*,
    133 F.3d 1343 (10th Cir. 1998) ...............................................................................15

*United States v. Turner*,
    551 F.3d 657 (7th Cir. 2008) ......................................................................................8

*United States v. Warme*,
    No. 09-CR-19A, 2010 WL 125846 (W.D.N.Y. Jan. 7, 2010) ................................14

*United States v. Weimert*,
    819 F.3d 351 (7th Cir. 2016) ......................................................................................4

*United States v. Weiss*,
    630 F3d 1263 (10th Cir. 2010) ................................................................................14

*United States v. Welch*,
    327 F.3d 1081 (10th Cir. 2003) .................................................................................9

*United States v. Wiles*,
    102 F.3d 1043 (10th Cir. 1996) ...............................................................................23

*United States v. Wolf*,
    645 F.2d 23 (10th Cir. 1981) ....................................................................................18

*United States v. Wright*,
    988 F.2d 1036 (10th Cir. 1993) .........................................................................17, 18

**Statutes**

18 U.S.C. § 1343 ...............................................................................................................4

18 U.S.C. § 1346 ...........................................................................................................3, 4

18 U.S.C. § 3237 ...............................................................................................21, 22, 23

18 U.S.C. § 3238 ...................................................................................................21, 22

Fed. R. Crim. P. 12(b)(3)(A)(i) .....................................................................................23

Fed. R. Evid. 201(b) ..........................................................................................................2

**Other Authorities**

Andrew Silver, *US Political Crackdown Spurs Fears of Chinese Brain-Drain*,
    Nature (Sept. 7, 2020), https://www.nature.com/articles/d41586-020-02359-5 .....................21

Harvard University Professor Indicted on False Statement Charges, Dep't of
    Justice (June 9, 2020), https://www.justice.gov/opa/pr/harvard-university-
    professor-indicted-false-statement-charges .........................................................................20

# INTRODUCTION

The government's Opposition confirms that its "blueprint" for prosecuting professors with links to China in the name of national security cannot withstand legal scrutiny. The government fails to explain why its seven wire fraud charges—alleging that Dr. Tao concealed a conflict of interest—are not foreclosed by *Skilling v. United States*, 561 U.S. 358, 404, 409–10 (2010), which held that concealment of a conflict of interest is not a "scheme or artifice to defraud" someone of money or property under the wire fraud statute. *Id.* It also does not explain how its attempt to artfully plead around *Skilling*—by alleging that Dr. Tao's nondisclosure defrauded his employer, the University of Kansas (KU), of salary and defrauded the federal agencies of grant funds—is supported by the allegations in the Indictment, which do not allege a causal connection between the alleged nondisclosure and the deprivation of salary or grant funds. The government's responses to Dr. Tao's other arguments are equally meritless, sometimes non-existent, and largely rely on new allegations that appear nowhere in the Indictment and which would not cure the defects in the Indictment in any event.

At bottom, the government's novel legal theories are foreclosed by well-established precedents that the government apparently overlooked or disregarded when designing its prosecution blueprint, warranting dismissal of the Indictment. Critically, the Court's dismissal should be *with prejudice*. The government has unfairly subjected Dr. Tao to the dark cloud of an Indictment for the past 13 months by twice superseding its Indictment to revise its legal theories—including just nine days after Dr. Tao's first motion to dismiss was fully briefed, argued, and ripe for a decision by the Court in January 2020—without adding any new material facts. The government has experimented with its theories at Dr. Tao's expense for more than one year.  Dismissal with prejudice is the only way to prevent the government from continuing to test

new theories at Dr. Tao's significant expense.

## ARGUMENT

I.   __The Opposition fails to shore up the Indictment's faulty legal theories and__
     __demonstrates that the Indictment must be dismissed for failure to state an offense.__

   A.   **The government flouts the motion-to-dismiss standard by presenting and**
        **relying on at least 45 factual assertions not alleged in the Indictment.**

The government attempts to salvage its defective Indictment by making at least 45 new

allegations it failed to include in the Indictment. *See* Appendix A. Although the government

purports to cite to paragraphs in the Indictment for some of the 45 new allegations, a cursory

review of the cited paragraphs reveals that they provide no actual support. The government also

cites five different websites in an attempt to bolster its new factual assertions, *see* Gov't Opp'n,

ECF No. 88 (hereafter, "Opp.") at 5 n.3, 7 n.8, 8 n.9, 10 n.10, but fails to request judicial notice

of any of them, and there are no adjudicative facts in these websites that are the appropriate

subject of judicial notice. *See* Fed. R. Evid. 201(b). The Court must disregard the new

allegations, which are improper and merely emphasize that the allegations actually included in

the Indictment fail to state an offense. *See, e.g.*, *United States v. Todd*, 446 F.3d 1062, 1068 (10th

Cir. 2006).

The government's argument that Dr. Tao presented facts outside the Indictment is

erroneous and provides no excuse for its own assertion of dozens of new allegations. The

government cites two instances where it contends that Dr. Tao's opening brief cites facts outside

the Indictment. First, the government points to the two Conflict of Interest forms that Dr. Tao

attached to his brief. Opp. at 16. But the government concedes that it previously agreed, on the

record, that the Court could review the Conflict of Interest forms in deciding the sufficiency of

the charges, thereby waiving any eleventh-hour objection. *See* Opp. at 16 (noting that the

government "did express willingness for the Court to see those forms at an earlier hearing"); *see*

2

*also* Mot. Hearing Tr. at 12:23–14:3, Jan. 6, 2020.[1] Second, the government contends that Dr.

Tao "provides a skewed perspective of the Department of Justice's China Initiative." Opp. at 2

n.1. But Dr. Tao described the China Initiative in the introduction, based on DOJ press releases,

simply to contextualize the government's flawed charges. Dr. Tao has not argued that it

provides a basis for dismissal. Indeed, the Court can and should dismiss without regard to the

DOJ press releases cited in the introduction.

> **B.     The Opposition confirms that the Indictment fails to allege a scheme to
> deprive KU, NSF, or DOE of money or property.**

Dr. Tao's opening brief demonstrates that the Indictment fails to allege wire fraud as a

matter of law because the allegations, taken as true, do not state a scheme to deprive KU, NSF,

or DOE of money or property. *See* Motion to Dismiss the Second Superseding Indictment for

Failure to State an Offense and Lack of Venue, ECF No. 82 (hereafter, "Br.") at 10–25. The

government's arguments to the contrary are meritless.

First, the government fails to explain how its allegation that Dr. Tao's nondisclosure of a

conflict of interest is a "scheme or artifice to defraud," Second Superseding Indictment, ECF No.

75 (hereafter, "Indictment") ¶ 41, when the Supreme Court held just the opposite in *Skilling v.

United States*, 561 U.S. 358, 404, 409–10 (2010). The government seeks to distinguish the

holding in *Skilling* by contending that it involved "honest services fraud under 18 U.S.C. §

1346," and the Indictment here "does not allege honest services fraud, in violation of § 1346."

Opp. at 23. But this argument misreads both the fraud statutes and *Skilling*. The wire fraud

---

[1] The government also asserts that *United States v. Pope*, 613 F.3d 1255, 1260 (10th Cir. 2010),
does not apply because "[t]he government strongly disputes the defendant's characterization of
the facts." Opp. at 16. But Dr. Tao attached the Conflict of Interest forms only to demonstrate the
fact of what the forms said—a fact the government does not and cannot reasonably dispute. *See*
Mot. Hearing Tr. at 13:5–10, Jan. 6, 2020.

statute—charged here and in *Skilling*—criminalizes uses of the wires in furtherance of a "scheme or artifice to defraud," 18 U.S.C. § 1343, which means a scheme to deprive someone of money or property. *See, e.g.*, *Carpenter v. United States*, 484 U.S. 19, 27, (1987). In *Skilling*, the government argued that concealment of a conflict of interest from an employer is a "scheme or artifice to defraud" under the newly enacted § 1346 and thus could be charged as wire fraud. *See Skilling*, 561 U.S. at 409.[2] The Court in *Skilling* disagreed, holding that the term "scheme or artifice to defraud" in the wire fraud statute excluded the "amorphous category of cases" involving "conflict-of-interest prosecutions," notwithstanding the expanded definition of the term under § 1346, unless they involved bribes or kickbacks. *Skilling*, 561 U.S. at 410; *cf. United States v. Weimert*, 819 F.3d 351, 367 (7th Cir. 2016) ("[T]he *Skilling* Court also rejected the government's argument that self-dealing alone, *even undisclosed self-dealing*, would violate fraud statutes without a kickback or bribe." (citation omitted)). This holding is squarely on point here and forecloses the government's fraud counts. Tellingly, the government fails to cite a single post-*Skilling* case that sustained a fraud count or conviction based on an undisclosed conflict of interest absent bribes or kickbacks.[3]

Second, the government erroneously argues that it can charge concealment of a conflict

---

[2] *See* 18 U.S.C. § 1346 ("For purposes of this chapter [including the wire fraud statute], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services.").

[3] The government cites *Stinn v. United States*, 856 F. Supp. 2d 531 (E.D.N.Y. 2012), but that case provides no support. In *Stinn*, the defendant was convicted of defrauding investors by presenting falsified accounting data and investment information—not concealing a conflict of interest. The defendant petitioned for habeas corpus relief based on *Skilling*, but the court correctly held that *Skilling* did not foreclose convictions for defrauding investors by presenting false information.

of interest as fraud so long as it alleges in conclusory fashion that Dr. Tao sought to deprive KU of "money or property," "salary," or "grants." Opp. at 20, 24. The government is wrong. As an initial matter, the government cannot artfully plead around *Skilling*, and the Court's acceptance of the government's argument would render *Skilling* a dead letter.[4] Moreover, the Indictment fails to allege that the *object* of the nondisclosure was actually to deprive KU or the federal agencies of money or property. No causal relationship is alleged between the nondisclosure of a conflict of interest (*i.e.*, the alleged position at Fuzhou University (FZU)) and the deprivation of money or property from KU or the federal agencies. For example, there is no allegation that Dr. Tao avoided disclosing his alleged position at FZU with the object of obtaining an increased salary or with the object of avoiding being fired such that he would no longer receive any salary. Nor is there an allegation that he avoided disclosing the alleged position with the object of causing the federal agencies to release *increased* grant funds to KU, or with the object of avoiding an agency decision to terminate or reduce the grant awards KU would receive. In short, the failure to allege a causal chain between Dr. Tao's alleged decision to conceal the conflict and the deprivation of money—belying that the *object* of the nondisclosure was deprivation of money or property—is fatal to the fraud counts. The government's use of the magic words "money or property" in the Indictment does not alter that conclusion.[5]

---

[4] According to the government's logic, if the prosecution in *Skilling* had simply noted that the defendant received salary from his employer when he concealed his conflict of interest and self-dealing, the Supreme Court would not have reversed his wire fraud conviction. *Contra United States v. Ochs*, 842 F.2d 515, 527 (1st Cir. 1988) ("[W]e do not think courts are free simply to recharacterize every breach of fiduciary duty as a financial harm, and thereby to let in through the back door the very prosecution theory that the Supreme Court tossed out the front.").

[5] Notably, "[a]n indictment which is cast in the language of the statute is legally sufficient if, and only if, it states with requisite clarity the essential facts of the offense charged." *Mims v. United States*, 332 F.2d 944, 946 (10th Cir. 1964); *see Russell v. United States*, 369 U.S. 749, 768–69 (1962) (noting the "important … purpose" of informing "the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction").

Third, the government improperly asserts *new allegations* in an attempt to manufacture a causal chain—not alleged in the Indictment—from the alleged nondisclosure to the deprivation of money or property. For the very first time, the government contends that Dr. Tao might have been fired from KU if he disclosed the conflict of interest, and that he therefore avoided doing so because it would have "risk[ed] losing his six-figure KU salary and access to hundreds of thousands of dollars in federal research funds." Opp. at 2. The government also alleges for the first time that Dr. Tao "was the principal investigator ('PI'), or lead researcher" on the grants at issue, along with pages of new allegations regarding the purported role and responsibilities of a PI. *Id.* at 7–9. And the government also alleges, for the first time, that PIs had to submit information about their outside work to the agencies along with grant applications, and that Dr. Tao "well knew" that the federal agencies used this information "to help identify potential scientific, budgetary, and/or commitment overlap between the defendant's proposal and his current and planned research projects," since it was "illegal to receive funds from two sources for the same research." *Id.* at 9. The government relies on these new allegations, which it failed to include in the Indictment, to argue that there was a "clear connection between [Dr. Tao's] disclosures to KU, his role as a principal investigator at KU, and his ability to receive and use federal grant funds to further his research at KU." *Id.* at 22.

But the government's new allegations are improper and cannot save its flawed fraud theory. As an initial matter, none of the new allegations appear in the Indictment itself. The Indictment does not allege that Dr. Tao thought he would be fired by KU if he disclosed the alleged position at FZU, or that KU would have even considered firing him if he made that disclosure. And the term "principal investigator" does not even appear in the Indictment, let alone the expansive list of new allegations about what a PI's responsibilities are vis-à-vis the

federal agencies, which seek to manufacture a connection between Conflict of Interest forms and federal agency decision making. The Court should therefore disregard the new allegations and reject the arguments that rely on them. *See, e.g.*, *Russell*, 369 U.S. at 770 (observing that "an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form").[6]

Fourth, the government's argument that an employee defrauds his employer of salary anytime he makes a misrepresentation to the employer is contrary to prevailing case law. Courts generally hold that making a misrepresentation to an employer to receive *increased* salary or an *unearned* bonus or other funds can be fraud, but making a misrepresentation while earning salary or even in order to keep one's job—which is not even alleged here—is not fraud. *See* Br. at 14–15 (citing *United States v. Billmyer*, No. 94-29-01-JD, 1995 WL 54471, at *9 (D.N.H. Feb. 3, 1995); *United States v. Facteau*, 1:15-cr-10076-ADB, 2016 WL 4445741, at *10 (D. Mass. Aug. 22, 2016)). The government takes issue with the courts that decided *Billmyer* and *Facteau*, rather than challenging their logic, and provides no explanation why the reasoning in those cases should not apply here. *See* Opp. at 24 (arguing that *Billmyer* and *Facteau* are "out-of-circuit district court cases," but making no other argument to challenge them).[7] Thus, the fraud counts

---

[6] Even the new allegations are flawed. The allegation that Dr. Tao risked being fired and losing his salary at KU is contradicted by the allegation in the Indictment that KU "manage[d], reduce[d], or eliminate[d] all conflicts of interest," indicating it did not fire employees who had conflicts. Indictment ¶ 13. And the allegation that Dr. Tao was a PI who had substantial responsibilities vis-à-vis the agencies *still* fails to create a causal between the nondisclosure and grant funds. While the Opposition asserts that it was illegal for the agencies to award funds for projects that overlapped with other projects that had already received funding, Opp. at 9, it does not assert that the DOE and NSF grants at issue overlapped with any other projects at FZU or anywhere else.

[7] The government is correct that the court did not dismiss the fraud count at issue in *Facteau*, Opp. at 26, but only because the defendant there made a misrepresentation to seek *increased* compensation, unlike here. *Facteau*, 2016 WL 4445741, at *10 (explaining that "while the mere maintenance of a preexisting salary or employment did not satisfy the 'money or property'

cannot survive given the absence of any allegation that Dr. Tao failed to disclose his alleged position at FZU in order to receive increased compensation or an unearned bonus.

The decisions in *United States v. Richerson*, 833 F.2d 1147 (5th Cir. 1987), and *United States v. Ransom*, No. 09-20057-JWL, 2009 WL 3756977 (D. Kan. Nov. 9, 2009), cited by the government, do not hold otherwise. In *Richerson*, decades before *Skilling*, the Fifth Circuit upheld a mail fraud conviction where the defendant received bribes from vendors that were ultimately paid for by the employer. *Richerson*, 833 F.2d at 1157–58. The court concluded that the defendant had concealed material information from his employer about the arrangement, and that the concealment allowed him to indirectly steal money from the employer. *Id.*[8] The case is therefore inapposite. In *Ransom*, the government alleged that the defendant "failed to accurately record the number of hours he worked on the [time and attendance] records," which were "forwarded to the payroll administrative office," with the result that he was "paid in excess of th[e] amount he would otherwise have been entitled to." *Ransom*, 2009 WL 3756977, at *1. The court held that the indictment alleged fraud because, although the defendant was salaried, if he had told his employer how little he was actually working it could have "exercise[d] its right to terminate [his] employment." *Id.* at *3. The court held that this supported the conclusion that the defendant deprived the employer of his "salary … by means of deceit." *Id.*[9] But *Ransom* is

---

requirement of the wire fraud statute, obtaining a new position, an increase in salary, or the payment of a bonus could be sufficient, as long as those benefits were obtained through the fraudulent scheme, and the defendant was not otherwise entitled to receive those benefits," and the indictment charged the defendants with fraudulently seeking "increase[] … compensation and bonuses").

[8] Courts have criticized *Richerson* for misapplying the Supreme Court's holding in *McNally v. United States*, 483 U.S. 350 (1987), handed down the year before. As the First Circuit observed, the Fifth Circuit in *Richerson* erroneously based its holding "on a footnote in Justice Stevens's *McNally* dissent" that was not agreed with by the majority. *Ochs*, 842 F.2d at 526–27.

[9] The government contends that "[o]ther circuits have reached similar conclusions" as in *Ransom*, but cites only *United States v. Turner*, 551 F.3d 657 (7th Cir. 2008), which stated that

inapposite. Unlike in *Ransom*, the Indictment does not allege that Dr. Tao falsified time-and-attendance reports and submitted them to the payroll department in order to receive pay for work he never performed. To the contrary, there is no allegation that Dr. Tao failed to perform any of his obligations in exchange for his salary or KU's receipt of grant funds. *See* Br. at 16–18.[10]

Fifth, while the government appears to acknowledge that there is no allegation Dr. Tao fully performed all job functions in exchange for his salary, it erroneously contends that the Indictment still pleads fraud because no intent to harm must be alleged. Opp. at 27. This assertion misreads Dr. Tao's argument. Dr. Tao argues that there is no allegation that Dr. Tao made a misrepresentation whose object was to deprive KU or the federal agencies of money or property because the misrepresentation, as alleged, had no bearing on KU's and the agencies' ability to receive exactly what they bargained for in exchange for the salary and grants they paid. Br. at 16–18. Dr. Tao does *not* argue that the Indictment alleges deprivation of money or property but is missing the additional allegation that they were harmed as a result. Thus, contrary to the government's argument, the Tenth Circuit's decision in *United States v. Welch*, 327 F.3d 1081, 1006 (10th Cir. 2003), is consistent with dismissal. The court in *Welch* held that an indictment must adequately allege a scheme to "deceive in order to deprive one of property." *Id.*

---

salary can be fraudulently obtained in reference to a fraudulently obtained job. Indeed, *Turner* pointed to *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008), and *Sorich* pointed to *United States v. Doherty*, 867 F.2d 47, 56 (1st Cir. 1989), where the First Circuit held that fraudulently obtaining a job could form the basis of fraud charges.

[10] The government argues that Dr. Tao failed to disclose "fulltime employment at FZU" to KU in order to give the false impression that Dr. Tao had shirked his job duties at KU. Opp. at 26. But the Indictment does not allege that Dr. Tao worked full time at FZU, much less that he did not complete all job responsibilities at KU in exchange for his paycheck. The government also argues that Dr. Tao's nondisclosure "deprived KU of its ability to terminate him if it so chose," but there is no allegation in the Indictment that KU terminated employees who had conflicts of interest. *Id*. Rather, the Indictment alleges that KU managed, reduced, or eliminated the conflicts. Indictment ¶ 13.

at 1105. The Indictment in this case alleges nondisclosure of a conflict of interest, but fails to allege facts that, if true, would prove that the object of the nondisclosure was to deprive KU or the agencies of money or property.

The government's reliance on *United States v. Maxwell*, 579 F.3d 1282 (11th Cir. 2009), and *United States v. Aldissi*, 758 F. App'x 695 (11th Cir. 2018), is also misplaced. Those cases held that the defendants schemed to deprive government agencies of money because the defendants misrepresented that their companies were *eligible* and *qualified* for certain set-aside contracts intended for small and disadvantaged businesses, when in fact their companies were neither eligible nor qualified. *See Maxwell*, 569 F.3d at 1288 & n.3 (defendant falsely claimed that his company was a certified "Disadvantaged Business Enterprise," meaning it was majority-owned and controlled by one or more socially and economically disadvantaged individuals, in order to get contracts meant for others); *Aldissi*, 758 F. App'x at 699 (defendants falsely claimed that their business was a qualified small business by misrepresenting the number of employees, lab space, equipment, relationship with research institutions, and other eligibility criteria, while also forging letters of support and price quotes from subcontractors they did not intend to even use, in order to get contracts meant for others). The defendants in those cases argued that they did not commit fraud because they performed all the work under the set-aside contracts, but the courts rejected this argument because the federal agencies' purpose in awarding the set-aside contracts was to help fund qualified small or disadvantaged businesses, not just to complete contract work. *Maxwell*, 579 F.3d at 1303; *Aldissi*, 758 F. App'x at 702. As the court explained in *Aldissi*, however, a misrepresentation in the course of bargaining is *not* fraudulent if "the alleged victims 'received exactly what they paid for.'" *Aldissi*, 758 F. App'x at 701 (quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)). Here, unlike in *Maxwell* and *Aldissi*,

the Indictment fails to allege that either KU or the agencies did not receive exactly what they

paid for—teaching and research—just because Dr. Tao had an alleged conflict of interest. Thus,

*Maxwell* and *Aldissi* support dismissal here.

* * * * *

At bottom, neither Dr. Tao nor the government writes on a blank slate in debating

whether concealment of a conflict of interest from an employer constitutes fraud. The Supreme

Court in *Skilling* already decided that it does not. 561 U.S. at 409–10. But even if the

government could escape this precedent and revive conflict-of-interest prosecutions through

artful pleading—merely by alleging that the nondisclosure was meant to obtain money or

property—the Indictment *still* fails to allege such a scheme here. As alleged, the nondisclosure

had nothing to do with the disbursement of salary or grant funds, and Dr. Tao worked for his

salary. The Court should therefore dismiss Counts 1 through 7 for failure to state an offense.

### C.    The government concedes that the Indictment does not allege an actual misrepresentation by not responding to Dr. Tao's argument.

Dr. Tao's opening brief demonstrates that an indictment must allege an actual

misrepresentation to state the offenses of wire fraud and false statements, but that the Indictment

fails to allege facts that, if true, render the representations at issue false. *See* Br. at 18–25. For

example, the Indictment alleges that Dr. Tao falsely certified that he had no conflict of interest in

a January 9, 2018 Conflict of Interest form, *id.* Ex. A at 4, which forms the basis of Counts 1

through 4 and 8, but fails to allege that he actually had a conflict of interest at that time—instead

alleging that he entered into a contract with FZU *months later* in March 2018. *Id.* at 20–21.[11] The

---

[11] Indeed, the FBI Case Agent testified to the first grand jury that "not until May 1st of 2018 was there a conflict which [Dr. Tao] should have disclosed." Br. at 20 n. 18 (citing Grand Jury Hearing Tr. at 17–18, Aug. 21, 2019).

11

other counts suffer the same defect, as they are based on allegations that, if true, do not actually state a misrepresentation. *See id.* at 21–22 (Counts 6, 7, and 9); *id.* at 23–25 (Counts 5 and 10).

Since this pleading defect infects all ten counts, it mandates dismissal of the entire Indictment. *Id.* at 18–25; *see, e.g.*, *United States v. Good*, 326 F.3d 589, 592 (4th Cir. 2003) (dismissing indictment for failure to state an offense because allegations did not demonstrate that the certification at issue was actually false); *United States v. Gatewood*, 173 F.3d 983, 987 (6th Cir. 1999) (dismissing indictment for failure to state an offense because it did not actually "present a false statement" or "raise a direct conflict between the certification" and "the actual facts"); *cf. United States v. Ruedlinger*, No. 97-40012-01-RDR, 1997 WL 807917, at *4 (D. Kan. Dec. 9, 1997) ("In order to be sufficient, an indictment alleging perjury must set out the allegedly perjurious statements and the objective truth in stark contrast so that the claim of falsity is clear to all who read the charge." (internal quotation marks omitted)).

The government fails to address these pleading defects, however, instead asserting in conclusory fashion that Dr. Tao's argument "distort[s] a limited set of facts" and his "gloss and spin on the facts do not require a response at this time, as the indictment speaks for itself." Opp. at 29 (regarding fraud counts); *accord id.* at 39 (regarding false statement counts). Yet the government does not identify any allegation from the Indictment that Dr. Tao's argument purportedly distorted, let alone rebut Dr. Tao's argument. *Id.*

The government's failure to present a developed argument constitutes a concession and waiver, warranting dismissal of all ten counts to which the argument applied. *See* Br. at 18–25. The government is not free to pick and choose which bases for dismissal "require a response," *id.*, or to silently hope that the Court will find a way to rebut Dr. Tao's arguments and bail it out. *See, e.g.*, *United States v. Sanchez-Porras*, No. CR 19-1374 KG, 2019 WL 4727820, at *7 n.13

12

(D.N.M. Sept. 27, 2019) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (internal quotation marks omitted)), *report and recommendation adopted*, No. CR 19-1374 KG, 2019 WL 5288237 (D.N.M. Oct. 18, 2019). Indeed, "the failure to respond to an argument is deemed an acquiescence" and "waive[r]," even if the government "adverted to [the arguments] in a perfunctory manner, unaccompanied by some effort at developed argumentation," which is at best what it did here. *Id.* (brackets and internal quotation marks omitted); *see, e.g.*, *Kone v. D.C.*, 808 F. Supp. 2d 80, 83 (D.D.C. 2011) (holding that "[t]he Court will treat defendant's two remaining arguments for dismissal as conceded," since the "Plaintiff's opposition, although timely filed, addresses neither of the arguments defendant raised").

**D.   The government applies the wrong standard in an attempt to support its defective wire fraud charges.**

Dr. Tao's opening brief contends that Counts 1 through 4 and Count 7 must be dismissed for the additional reason that none of the uses of the wires, as alleged, were in furtherance of the alleged scheme to deprive KU or the federal agencies of money or property. Br. at 25–31 (citing *Parr v. United States*, 363 U.S. 370, 390 (1960)). The government repeatedly argues that the charged uses of the wires are "directly related" to the alleged fraud scheme, Opp. at 29–33, betraying a fundamental misunderstanding of the required element, and confirming that Counts 1 through 4 and Count 7 are defective.

The government argues that Count 1—which alleges that Dr. Tao used the wires to facilitate travel to China—was "directly related" to efforts to research at FZU and benefit China. Opp. at 31; *see* Indictment ¶ 42. But conducting research at FZU and benefiting China are not valid objects of a fraud scheme, which must be to use deceit to deprive a person of *money or property*. *See* Br. at 10–18. Thus, to the extent the government maintains that researching for

13

FZU and benefiting China *were* the objects of the fraud scheme, the count must be dismissed for failing to allege a scheme to deprive a victim of money or property. *See id.*; *see also id.* at 28 n.21.[12] The government also fails to address, let alone distinguish, *United States v. Warme*, No. 09-CR-19A, 2010 WL 125846, at *2 (W.D.N.Y. Jan. 7, 2010), which held that use of the wires to support activity whose nondisclosure is the basis for fraud charges is not a use of the wires in furtherance of the fraud itself. This principle applies *a fortiori* here, where, as alleged, Dr. Tao did not even have the alleged FZU position when he sought to travel to China in December 2017.

The government argues that Count 2—which alleges submission of a grant application to DOE in December 2017—is sufficient because, although Dr. Tao had no position at FZU at that time, he "was in the final stages of applying for the Chang Jiang Scholar Program." Opp. at 32; *see* Indictment ¶ 42. But Dr. Tao's alleged nondisclosure of a pending *application* to a talent program is not an alleged conflict of interest, and the government does not deny that, as alleged, Dr. Tao had no conflict of interest to report at the time KU submitted the DOE grant application in December 2017. *See United States v. Weiss*, 630 F3d 1263, 1269 (10th Cir. 2010) (the use of the wires must be in furtherance of the scheme "as conceived by the perpetrator at the time"). The government's attempt to bootstrap Count 2 to Count 5, which alleged use of the wires in connection with the DOE grant application *after* Dr. Tao allegedly obtained a position at FZU, is also unpersuasive because Count 5 is a different count. Opp. at 32.

The government's defense of Counts 3 and 4 fares no better. Count 3 alleges that Dr. Tao used the wires to submit the January 9, 2018, Conflict of Interest form, even though that

---

[12] The government cannot argue that Dr. Tao's alleged fraud scheme had one object in an attempt to satisfy the money-or-property element (*i.e.*, depriving KU and the federal agencies of money or property) and, in the same breath, argue that it had a different object in an attempt to satisfy the use-of-the-wires element (*i.e.*, benefiting FZU and China).

submission *predated* Dr. Tao's alleged position at FZU whose concealment forms the basis of the fraud count. Br. at 29; *see* Indictment ¶ 42. Count 4 alleges that Dr. Tao used the wires to propose a collaboration between KU and FZU, even though the Indictment does not allege that this was in furtherance of a scheme to conceal his position at FZU, and could only have increased the risk that KU would find out about that alleged position. Br. at 29–30; Indictment ¶ 42. In a single sentence, the government contends that Counts 3 and 4 are sufficient because they are "directly related to an essential part of the scheme." Opp. at 32. But the test is not whether the use of the wires is "related" to part of the alleged scheme; it is whether the use of the wires was in furtherance of the scheme, meaning "incident to an essential part of the scheme." *See Parr*, 314 F.3d at 349; *accord United States v. Trammell*, 133 F.3d 1343, 1353 (10th Cir. 1998). Count 3 fails this test because, taking the allegations in the Indictment as true, Dr. Tao had no position at FZU or other conflict to disclose in January 2018, and the government does not rebut that argument. Count 4 fails this test because, taking the allegations as true, creating a collaboration between KU and FZU is not a scheme to deprive KU or the federal agencies of money or property.

The government's argument in support of Count 7 also falls flat. Count 7 alleged that Dr. Tao used email to submit a grant application to the National Natural Science Foundation. Indictment ¶ 42; *id.* ¶ 31. The government argues that this use of the wire "relates to" Dr. Tao efforts to benefit China by applying for a grant in China—again reciting the wrong standard—and provides no further argument. Opp. at 31. This constitutes a concession and waiver of the count. *See supra* Section I.C. In any event, allegedly using the wires to apply for a grant in China was not in furtherance of a scheme to conceal a conflict of interest to deprive KU, the NSF or DOE of money or property. Br. at 30–31. As noted above, moreover, to the extent the

government contends that benefiting China *was* the object of the fraud scheme for this count, the count must be dismissed because it does not allege a scheme whose object was to deprive a person of money or property.

> **E.** **The government disregards Supreme Court precedent in arguing that Dr. Tao's statements to KU in Conflict of Interest forms are within the federal government's jurisdiction.**

Dr. Tao's opening brief demonstrates that, as alleged, Dr. Tao's false statements made to KU in Conflict of Interest forms (Counts 8 and 9) are not statements in a "matter within the jurisdiction of the executive branch" within the meaning of § 1001, Br. at 31–36, because they do not meet either of the two prongs from *United States v. Rodgers*, 466 U.S. 475, 479, 481 (1984). *See* Br. at 31–36. Indeed, the Indictment does not allege that DOE or NSF have the "power to exercise authority" in the "particular situation" of employee disclosures to KU of possible conflicts and KU's management of conflicts of interest. *Rodgers*, 466 U.S. at 479; *see* Br. at 32–34. Nor does it allege a "statutory basis" for DOE or NSF to request the Conflict of Interest forms from KU. *Rodgers*, 466 U.S. at 481; *see* Br. at 34–36. This defect is fatal to Counts 8 and 9.

In response, the government does not contend that Counts 8 and 9 meet either of the two prongs from *Rodgers*. *See* Opp. at 35–42. As to the first prong from *Rodgers*, the government tacitly agrees that DOE and NSF have no "power to exercise authority" over KU's management of its employees or their possible conflicts of interest. *See* Opp. at 37–38 (conceding that "it may or may not be the business of federal agencies to manage KU's employees"). Nevertheless, the government seeks to distinguish *United States v. Blankenship*, 382 F.3d 1110, 1137 (11th Cir. 2004), where the court foreclosed the same government theory relied upon here by holding that "a federal agency only has the authority to take action against the *recipient* of the federal funds—

that is, the party with whom it *has a contract*," and not employees who work for such companies. *Blankenship*, 382 F.3d at 1137 (emphasis added). The government asserts that *Blankenship* is distinguishable because, although KU (and not Dr. Tao) received the grants, *Blankenship* involved more "degrees of separation" between the false statement and the federal agencies than is present here. Opp. at 38. But *Blankenship* limited jurisdiction to the direct recipient of the federal agency funds, consistent with *Rodgers*, not an amorphous concept of proximity to the funds as the government argues. Moreover, the government's argument is inconsistent with *United States v. Holstrom*, 242 F. App'x 397, 398–99 (9th Cir. 2007) (unpublished opinion), where the Ninth Circuit held that DOE had no jurisdiction over an employee's false statements in time cards submitted to her employer, a DOE contractor, because DOE had no "power to act" with respect to the employee's false statements. *Id.*; *see* Br. at 34. The government failed to address *Holstrom*, which is directly contrary to its argument.[13]

As to the second prong of *Rodgers*, the government appears to concede that there is no "statutory basis" for DOE or NSF to request the Conflict of Interest forms from KU. Certainly the Indictment fails to identify such a statute. While the government highlights the Indictment's allegation that NSF required KU to maintain a conflict of interest policy, Opp. at 36, it points to no *statute* that authorizes NSF, let alone DOE, to direct KU to *disclose* the Conflict of Interest forms. The government's reliance on *United States v. Wright*, 988 F.2d 1036, 1038 (10th Cir. 1993), is therefore misplaced. In *Wright*, the Tenth Circuit held that the defendant's reports to a state agency—which were required by the Safe Drinking Water Act—were within the

---

[13] The government, for the first time, now asserts that the grant "funds did not belong to KU or the defendant, and that the agencies could revoke the grants," Opp. at 39; but it did not allege this in the Indictment. Putting aside the illogic of the assertion that KU's grant funds "did not belong to KU," *id.*, this new allegation, which does not appear in the Indictment, must be disregarded. *See Todd*, 446 F.3d at 1068.

jurisdiction of the Environmental Protection Agency (EPA) because EPA had statutory authority over the reports, the EPA had "retain[ed] the authority … to enforce its regulations," the reports "clearly concern[ed] an authorized function of the EPA," and EPA had the right to audit the reports and condition funding on the outcome of its audits. *Id.* at 1039. No analogous allegations are present here.[14] Thus, the government also fails to meet the second prong of *Rodgers*.

Having failed to satisfy the Supreme Court's standard as to when false statements are made within the jurisdiction of a federal agency within the meaning of § 1001, the government attempts to conjure a new standard—one without any legal support. The government contends that Dr. Tao's alleged false statements in Conflict of Interest forms submitted to KU are within the jurisdiction of the federal agencies because the agencies have an "interest" in the statements, Opp. at 36, and because there is a "link" between the statements and the federal agencies that provide grants to KU. Opp. at 37 (arguing that there is a "clear link" between the Conflict of Interest forms and the agencies); *see also id.* at 38 (arguing that "there is a direct and explicit link between" Dr. Tao's work at KU and the federal agencies). But the government's gloss contradicts the Supreme Court's precedent in *Rodgers*, 466 U.S. at 479, 481, and must therefore be rejected.[15]

---

[14] The government's reliance on *United States v. Brittain*, 931 F.2d 1413 (10th Cir. 1991), is also misplaced. In *Brittain*, the court held that false statements in reports a defendant submitted *directly to EPA* were *material*, and the defendant never argued the jurisdiction issue. That case is therefore also inapposite.

[15] The government attempts to support its new standard with dicta from *United States v. Wolf*, 645 F.2d 23 (10th Cir. 1981), and *United States v. Baker*, 626 F.2d 512, 514 n.5 (5th Cir. 1980), but these cases predated *Rodgers*. In any event, the court in *Wolf* held that "a false statement made to a private oil company was within § 1001 because of a specific federal regulation for the information where it was reasonable to assume the false statement would be forwarded and used by the agency," *United States v. Dunne*, No. 98-CR-278 ST, 2000 WL 33710849, at *6 (D. Utah Oct. 5, 2000). No such allegation or federal regulation exists here. And the government concedes that jurisdiction cannot be based merely on KU's receipt of federal funds. Opp. at 38 (asserting that Dr. Tao "is not charged based on the theory that an agency has jurisdiction over the

Accordingly, the government's attempt to transform alleged false statements made by Dr. Tao to his employer in private Conflict of Interest forms, over which the agencies had no authority or statutory right of access, is contrary to Supreme Court precedent. Counts 8 and 9 must therefore be dismissed.

F.     **The government's argument for why its novel legal theory is consistent with the Due Process fair warning requirement falls short.**

The government concedes that its prosecution theory—which attempts to transform workplace misrepresentations into federal fraud and false statement offenses—is "unique" and unprecedented, Opp. at 23, 42, but nevertheless contends that Dr. Tao should have been on notice of its novel theory. This argument lacks merit and confirms that the charges violate the fair warning requirement of the Due Process Clause.

The government's principal argument is that only novel legal constructions violate the fair warning requirement (not novel facts), and a person of ordinary intelligence "would know that it was illegal to lie to and defraud one's employer and the federal government to obtain money and property." Opp. at 44. This argument is circular. It assumes that a person of ordinary intelligence would know that "fraud is fraud," without arguing that such a person would know that the facts alleged in the Indictment, if true, actually constitute fraud in the first place. The government therefore ignores Dr. Tao's argument that the prosecution theory *does* rely on a novel legal construction of the fraud and false statement statutes. Br. at 40–41. Indeed, not only is the legal theory novel, but it is one that is already foreclosed by binding Supreme Court precedents. *See, e.g.*, *supra* Sections I.B. & I.D.

The government also fails to reconcile its argument with the statement by the Chairman

_____

employees who work at companies that receive federal funds" (internal quotation marks omitted)).

of the Senate United States Permanent Subcommittee on Investigations who noted that failing to disclose a foreign position or funding to a university or federal granting agency is *not* a crime. The government argues that Chairman Portman "was commenting on an entirely separate case," Opp. at 44, but fails to distinguish the alleged facts in the two cases.[16] Chairman Portman concluded, in the context of a professor who allegedly concealed his work in China from his university and federal granting agencies, that "[f]ailing to disclose compensation from a foreign government is not currently a crime." Br. at 41–42. The government does not explain how this observation is inapposite to the facts alleged here. Thus, even if the government disagrees with Chairman Portman's conclusion, it cannot reasonably argue that Dr. Tao—a scientist and non-citizen immigrant from China—should have understood what constituted criminal fraud when Chairman Portman did not.[17]

The government also fails to explain how its legal theory would avoid the absurd result of criminalizing all manner of workplace dishonesty so long as the government can allege that the employee receives salary or the employer receives federal funding. Br. at 42–44. Dr. Tao provided examples of situations in which persons of ordinary intelligence would not view their misrepresentations to an employer as federal crimes, but which the government's prosecution theory here would criminalize, illustrating the overreach of the prosecution theory. *Id.* In

---

[16] Notably, in the Massachusetts case that Chairman Portman commented about, the government *did not* rely on the overreaching fraud and false statements theory advanced here. Indeed, in apparent agreement with Chairman Portman, the prosecution in that case did not charge fraud or false statements made in Conflict of Interest forms; instead, it charged only false statements made during the course of the criminal investigation. *See* Harvard University Professor Indicted on False Statement Charges, Dep't of Justice (June 9, 2020), https://www.justice.gov/opa/pr/harvard-university-professor-indicted-false-statement-charges.

[17] The government argues that Dr. Tao should have been on notice of its novel legal theory because the China Initiative was launched in November 2018. Opp. at 44 n.25. But as the DOJ press releases cited by Dr. Tao make clear, the China Initiative was purportedly focused on intellectual property theft, which the government notably does not allege here.

response, the government argues that the examples involve different "facts" than this case, Opp. at 45, but does not dispute that the hypotheticals involve the same *legal theory*. And the government identifies no legal principle that would prevent it from charging each of the hypothetical examples as crimes under its theory here. Thus, the government's assurances that its prosecution theory would not open the floodgates to a vast range of federal prosecutions involving employment disputes, selected at the whim of the prosecutor, rings hollow.[18]

Accordingly, even if the Court were to decide that the Indictment adequately charges an offense, it should still dismiss the Indictment since Dr. Tao lacked fair warning of that possibility consistent with the Due Process Clause.

## II.     The Opposition confirms that the District of Kansas is an improper venue for Count 10.

Dr. Tao's opening brief argues that the District of Kansas is an improper venue for Count 10 because it alleges that Dr. Tao, who the government concedes was outside the District of Kansas, made a false statement to DOE in Washington, D.C. *See* Br. at 44–46. Under *United States v. Smith*, 641 F.3d 1200, 1207 (10th Cir. 2011), the *locus delicti* of a false statement is where the false statement was made, and thus the District of Kansas is not a proper venue since the false statement was not allegedly made there. *See* Indictment ¶¶ 39(D), 45–47.

---

[18] As a result of prosecutions like this one, numerous professors with family or other links to China have reportedly begun leaving the United States out of fear that conduct they reasonably viewed as legal, such as that alleged here, is now being treated as illegal by the government without any fair warning. *See, e.g.*, Andrew Silver, *US Political Crackdown Spurs Fears of Chinese Brain-Drain*, Nature (Sept. 7, 2020), https://www.nature.com/articles/d41586-020-02359-5 (noting that "[s]everal scientists who spoke to *Nature* say they know of researchers with Chinese backgrounds who have left the US because they felt nervous or unsafe," providing examples, and lamenting the "loss for US innovation" observed by "scientists and research leaders" as a result of this "exodus").

The government invokes 18 U.S.C. §§ 3237 and 3238, not cited in the Indictment, to avoid this result, but these statutes do not apply here. First, the government argues that venue is proper in the District of Kansas under § 3238 ("Offenses Not Committed in Any District"), because Dr. Tao purportedly committed the offense while "outside the United States," when he was "either in China or Japan," and "was arrested in Kansas." Opp. at 40–41. But Count 10 does *not actually allege* that Dr. Tao was "outside the United States," let alone "either in China or Japan," when his alleged offense began. *See* Indictment ¶¶ 45–47. To be sure, paragraph 42 of the Indictment alleges that Dr. Tao sent or caused someone to send an email on July 16, 2018 from "outside the United States" to DOE, Indictment ¶ 42 (Count 5), but Count 10 does not allege that the July 16, 2018 false statement was the same as the July 16, 2018 email sent from outside the United States. *Id.* ¶¶ 45–47. And Count 10 does not even incorporate paragraph 42 by reference, meaning that paragraph 42 cannot be used to allege venue for Count 10. *See* ¶ 45 (incorporating by reference "[p]aragraphs 1 to 39," but not paragraph 42). Thus, while the government concedes that Dr. Tao was outside the District of Kansas when he made the false statement alleged in Count 10, Count 10 includes no allegation that Dr. Tao was outside the *country* such that § 3238 could apply. As a result, even accepting the allegations in Count 10 as true, § 3238 does not provide venue in the District of Kansas for that count.

Second, the government argues that the District of Kansas is a proper venue under § 3237 ("Offenses Begun in One District and Completed in Another") because the July 16, 2018 email allegedly passed through servers in the District of Kansas on its way to DOE in Washington, D.C. Opp. at 40–41. Again, however, this is not alleged in the Indictment, let alone in Count 10. *See* Indictment ¶¶ 45–47. Even if the Indictment had so alleged, moreover, the government's argument disregards *Smith*, which holds that the offense occurs for purposes of venue where the

statement is made, not where it passes through. *Smith*, 641 F.3d at 1207.[19] For the same reasons, *United States v. Wiles*, 102 F.3d 1043, 1064–65 (10th Cir. 1996), and *United States v. Camick*, No. 13-10042-01-JTM, 2014 WL 1356056 (D. Kan. Apr. 7, 2014), do not support venue under § 3237 because no part of the making of the false statement occurred in the District of Kansas. Section 3237 therefore also cannot provide venue in the District of Kansas for Count 10.

Thus, accepting the allegations in the Indictment as true, Washington, D.C. is the only proper venue for Count 10, and the Court should therefore dismiss that count under Rule 12(b)(3)(A)(i).

## CONCLUSION

For more than thirteen months, Dr. Tao has lived under the dark cloud of an indictment while the government has taken two allegedly false Conflict of Interest statements and sought to somehow contrive a cognizable criminal case. It has failed. The government's legal theories are foreclosed by binding Supreme Court precedents and legions of cases interpreting the wire fraud and false statements statutes, thereby warranting dismissal.

Dismissal should be *with prejudice*, moreover, because the government cannot cure the many legal defects that pervade its case. Absent dismissal with prejudice, the government could very well conjure other faulty legal theories, further protracting the case, all at Dr. Tao's continued, significant expense. Three tries is more than sufficient. Enough is enough.

---

[19] The government also argues that Dr. Tao "made his false statement both to DOE and to KU's Office of Research, which the defendant copied on the email due to its role in the grant application process." Opp. at 41. This allegation appears nowhere in the Indictment, however, and Count 10 alleges a false statement made to DOE, not to KU's Office of Research.

Dated:  September 23, 2020                    Respectfully submitted,

                                              /s/ Thomas H. Johnson
                                              Thomas H. Johnson #13688
                                              Petefish, Immel, Hird, Johnson,
                                              Leibold & Sloan, LLP
                                              842 Louisiana
                                              Lawrence, KS 66044
                                              Tel: (785) 843-0450
                                              Fax: (785) 843-0407
                                              tjohnson@petefishlaw.com

                                              Peter Zeidenberg
                                              Michael F. Dearington
                                              Laura Zell
                                              ARENT FOX LLP
                                              1717 K Street, NW
                                              Washington, DC 20006
                                              Tel: (202) 857-6000
                                              Fax: (202) 857-6395
                                              Peter.Zeidenberg@arentfox.com
                                              Michael.Dearington@arentfox.com
                                              Laura.Zell@arentfox.com

                                              *Attorneys for Defendant Franklin Tao*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of September, 2020, I electronically filed the

foregoing Reply in Further Support of the Motion to Dismiss the Second Superseding Indictment

with the Clerk of the Court using the CM/ECF system.

/s/ Thomas H. Johnson
Thomas H. Johnson

25

**Appendix A: Allegations in the Government's Opposition that Are Not Alleged in the Second Superseding Indictment**

1. Dr. Tao "signed a policy acknowledgment form, agreeing to abide by and follow all of KU's policies," *id.* at 5;

2. Dr. Tao was a "fulltime employee of KU" until his arrest in August 2019 (*i.e.*, including in the spring of 2019), *id.* at 5;

3. Dr. Tao "earned an annual base salary of approximately $105,000" from KU, *id.* at 5 n.2, 22;

4. Dr. Tao bought out his course "for the spring of 2019 but with explicit conditions … that his other duties at KU would continue as usual and that he was expected to be in attendance on campus during the semester in accordance with KU policy," but "ultimately failed to approve" the buyout in the "electronic system," and thus it "remained unapproved and unfunded," *id.* at 13 & n.15;

5. "[D]espite the clear direction from his department chair, [Dr. Tao] traveled to China for almost the entirety of the spring 2019 semester, and he did so to work at FZU unbeknownst to KU," *id.* at 13;

6. "KU paid [Dr. Tao] a teaching salary of approximately $18,000 for the spring 2019 semester, which he did not earn," and when KU alerted him to "the error," it asked him "to identify the research funds he intended to use to cover the debt," after which he "directed KU to use his NSF grant funds," *id.* at 13;

7. KU's Conflict of Interest policies required disclosure of situations that could appear as conflicts, not just actual or potential conflicts, and stated that the "appearance of a conflict of interest could be as damaging or detrimental as an actual conflict," *id.* at 5;

8. KU's "policies expressly prohibited the defendant from obtaining outside employment and performing research at another institution without prior approval" and stated that "it was inappropriate to engage in gainful outside employment that was incompatible with his institutional commitments," *id.* at 7 n.6;

9. Dr. Tao "was required to obtain approval prior to obtaining outside employment or engaging in outside research; and … those requirements directly related to his use of federal funds at KU," *id.* at 21 n.19;

10. Dr. Tao submitted his September 2018 Conflict of Interest form "late, likely due to the time he spent applying" to FZU, *id.* at 6;

11. Dr. Tao "caused KU to apply for, and receive, at a minimum, hundreds of thousands of dollars in grants from" DOE and NSF "to fund his research at KU involving renewable energy," *id.* at 8–9;

12. Dr. Tao "was the principal investigator ('PI'), or lead researcher, in charge of multiple research projects at KU," which meant he "was responsible for the scope of work of each project, its fiscal administration, meeting the terms and conditions of the award, and representing the project to the sponsoring agency," *id.* at 7, 22;

13. "PIs, such as [Dr. Tao], are responsible for identifying funding sources for their proposed research at KU," *id.* at 8;

14. "[W]hile KU received the grants to support [Dr. Tao's] research at KU, [Dr. Tao] was solely responsible for the projects, from conception to completion, and he was required to keep the sponsoring agencies informed of his progress," *id.* at 7–8;

15. DOE and NSF "post funding announcements that solicit research proposals from universities," and their "grants are highly competitive, limited in number, and are not intended to fund research merely for the sake of research," *id.* at 8;

16. "Once PIs identify funding sources, they are responsible for drafting and submitting proposals to KU, which then reviews the proposals before submitting them to the federal agencies," *id.* at 8;

17. "In addition to drafting the grant proposals, [Dr. Tao] developed the budget for the projects and then oversaw the use of the federal funds," *id.* at 36;

18. Dr. Tao was required by DOE and NSF "to submit, as part of KU's grant application, a biographical sketch, to include his current and past employers," *id.* at 9;

19. Dr. Tao's "current and pending support" that needed to be listed in KU's grant applications to DOE and NSF "was to include all of [Dr. Tao's] sponsored activities and awards requiring a measurable commitment of effort, whether paid or unpaid," *id.* at 9;

20. "PIs further review the grant applications prior to KU submitting them," and "KU relies on the truthfulness of the PIs" in ensuring their accuracy, *id.* at 8;

21. "Grants that are approved by a federal agency, such as DOE or NSF, are awarded to KU but are, of course, directly tied to the PI who proposed the research and who is responsible for managing it," *id.* at 8;

22. Dr. Tao "well knew" that DOE and NSF used information about "current and pending support" listed in grant applications "to help identify potential scientific, budgetary, and/or commitment overlap between the defendant's proposal and his current and planned research projects," *id.* at 9;

23. "It is illegal to receive funds from two sources for the same research," and it is the responsibility of DOE and NSF's program managers to confirm that there is no duplication of effort and support," *id.* at 9;

24. DOE (not just NSF) "relied on KU, as the institution applying for and receiving the grant funds, to identify and manage [Dr. Tao's] conflicts of interest and time commitments," *id.* at 9;

25. Dr. Tao's "conflicts of interest and time commitments directly affected his ability to manage federally funded projects at KUs," *id.* at 36;

26. "DOE and NSF [had] an interest in the accuracy of [Dr. Tao's] disclosures related to the money the agencies awarded KU for [Dr. Tao's] research," *id.* at 24;

27. Dr. Tao's July 16, 2018 email to DOE was sent "both to DOE and to KU's Office of Research, which [Dr. Tao] copied on the email due to its role in the grant application process," *id.* at 41;

28. "[A]ll federal grants are regulated by the Uniform Administrative Requirements, Cost Principals, and Audit Requirements for Federal Awards," *id.* at 10 n.10;

29. Grant "funds did not belong to KU or to [Dr. Tao], and the agencies could revoke the grants," *id.* at 39;

30. "During a court-authorized search of the defendant's KU computer, the FBI located the defendant's TTP application on a partition of the hard drive, which the defendant created," which was "dated July 6, 2017," and "includes a signed intent to work contract" that "details the defendant's KU employment and DOE and NSF grants and expresses the defendant's intent to conduct research of value to the PRC to help the PRC dominate the market in the field of renewable energy," *id.* at 10 n.11, 30 n.21;

31. The FBI "also located" a "Chang Jiang Scholar Program application" on Dr. Tao's hard drive, which "includes information about his DOE and NSF grants and his work at KU," and "includes a signed commitment" by Dr. Tao "to work fulltime at FZU, make all of his research the property of FZU, and resign from his current employer, KU," *id.* at 10 n.12;

32. The application located by the FBI on Dr. Tao's computer "includes a recommendation from FZU that provided for the following: the defendant would conduct research in his field; build a team of researchers who would apply for PRC-funded projects; establish his field as a world-class discipline at FZU; focus on research of value to the PRC to help the PRC achieve its strategic goals; design and develop groundbreaking technology to give the PRC technological superiority and help the PRC dominate the international markets," *id.* at 10 n.12;

33. Dr. Tao sought to make China a world leader in renewable energy, *id.* at 2;

34. When Dr. Tao sought to travel to China to defend his Chang Jiang Scholar Program application, "he sent an email to the Chinese Consulate General in Chicago, Illinois, with the subject line 'Urgently need Passport,'" *id.* at 11;

35. Dr. Tao had an agreement with the Chinese government (not just FZU), and "misrepresent[ed] … his association with … the Chinese government," *id.* at 2, 9;

36. Dr. Tao "signed [an] addendum" to the unsigned employment contract with FZU, *id.* at 11;

37. Dr. Tao was "employed fulltime" by FZU, *id.* at 4;

38. While Dr. Tao's start date at FZU was May 1, 2018, "the evidence at trial will show that he accepted employment at FZU when he applied for, and was accepted into, the Chang Jiang Scholar Program and that he worked to establish his research team at FZU prior to May 1, 2018," *id.* at 11, 30 n.21;

39. Dr. Tao was entitled "to an annual salary of 550,000 yuan (approximately $80,000), which included the PRC Ministry of Education's Distinguished Professor award of 222,000 yuan (approximately $32,000)," "a residence on campus," "and the equivalent of millions of U.S. dollars in research funds," *id.* at 12;

40. Dr. Tao was "integrat[ed] into Chinese Communist Party circles as a scientific expert, resulting in significant reputational gains," and FZU agreed to "strengthen his ideological and emotional identification, and imbue him with feelings of patriotism, ambition for a strong PRC, and dedication to the service of the PRC," *id.* at 2, 12;

41. Dr. Tao's research proposal to FZU "included a $90,000 budget, which FZU apparently would fund for two years from September 2018 to August 2020," *id.* at 12;

42. Dr. Tao "also never sought approval from KU to work at Nagoya University in Japan in June and July 2018" or "report that employment and the salary he received from it," *id.* at 7 n.7;

43. "Travel records show that [Dr. Tao] flew to China for the summer of 2018," but "emails … reveal that, during that time, [he] traveled between Fuzhou … and Japan, where he also worked for Nagoya University," *id.* at 13 n.17;

44. Dr. Tao "risk[ed] losing his six-figure KU salary and access to hundreds of thousands of dollars in federal research funds" if he told KU that he had an alleged position at FZU, *id.* at 2; and

45. An "anonymous source" provided information to the government regarding the allegations, and the FBI determined it could "prove the charged crimes" based on evidence it independently developed from "search warrants for the defendant's office, residence, electronic devices, and email accounts," *id.* at 4.

\* \* \* \* \*