1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,

4         Plaintiff,

5    v.                              Docket No. 19-20052-01-JAR

6    FENG TAO,                       Kansas City, Kansas
                                     Date:   10/01/2020
7         Defendant.
     ....................
8

9                         TRANSCRIPT OF
              ZOOM MOTION TO DISMISS HEARING
10          BEFORE THE HONORABLE JULIE A. ROBINSON
                 UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Plaintiff:      Mr. Anthony W. Mattivi
                             United States Attorney's Office
14                           290 U.S. Courthouse
                             444 Southeast Quincy
15                           Topeka, Kansas 66683

16                           Mr. Benjamin J. Hawk
                             U.S. Department of Justice
17                           950 Pennsylvania Ave, NW
                             Suite 7700
18                           Washington, DC 20530

19   For the Defendant:      Mr. Peter R. Zeidenberg
                             Mr. Michael F. Dearington
20                           Arent Fox, LLC
                             1717 K Street NW
21                           Washington, DC 20006

22                           Mr. Thomas H. Johnson
                             Petefish, Immel, Hird, Johnson
23                                Leibold & Sloan, LLP
                             842 Louisiana Street
24                           Lawrence, Kansas 66044

25

1
2                           I N D E X

3    ARGUMENTS BY COUNSEL:                             PAGE:

4    Failure to State an Offense and Lack of Venue

5         By Mr. Dearington                              5
          By Mr. Hawk                                   42
6         By Mr. Dearington                             55
          By Mr. Hawk                                   59
7

8    Government's False, Misleading, and Prejudicial
     Statements to the Grand Jury
9
          By Mr. Zeidenberg                            61
10        By Mr. Mattivi                               68
          By Mr. Zeidenberg                            76
11        By Mr. Mattivi                               77

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (9:04 a.m., proceedings commenced).

2          THE COURT:  All right.  We'll put this case on the

3    record.  United States versus Feng Tao, 19-20052.  Who appears

4    for the government?

5          MR. MATTIVI:  Good morning, Your Honor.  Tony Mattivi

6    and Ben Hawk for the government.

7          THE COURT:  And who appears for Mr. Tao?

8          MR. ZEIDENBERG:  Good morning, Your Honor.  Peter

9    Zeidenberg and Michael Dearington in Washington and Mr. Johnson

10   in Kansas City.

11         MR. JOHNSON:  With Doctor Tao right here as well,

12   Judge.

13         THE COURT:  Oh, okay.  Yes, I see you.

14         I have a consent form from Doctor Tao that consents to

15   having today's motions hearing by video conference.  It's been

16   signed by Mr. Tao.

17         Mr. Tao, are you still willing to proceed in this

18   manner today and to waive your right to have this hearing

19   in-person and in the courtroom?

20         THE DEFENDANT:  Yes.  Yes, Judge.

21         THE COURT:  Okay.  All right.  We will proceed.

22         We are here on-- to hear motions filed by the

23   defendant.  There's a motion to dismiss the second superseding

24   indictment called the indictment for failure to state an

25   offense and for lack of venue.

1          And I'll ask everyone to mute their phones at this

2     time and to leave them muted unless you speak or mute their

3     video.

4          (Mr. Johnson and the defendant confer).

5          MR. JOHNSON:  She said telephone.

6          THE COURT:  No, also your video.

7          MR. JOHNSON:  Oh, okay.

8          THE COURT:  I'm getting feedback I'm pretty sure from

9     you, Mr. Johnson.

10         Mr. Zeidenberg, I don't know if you can mute.  I'm not

11    hearing anything so maybe you are muted.  Okay.  I hear no

12    feedback at this point.  So that's good; that's important for

13    the court reporter.

14         So we're here to hear a motion to dismiss for failure

15    to state an offense and lack of venue - the government has

16    responded, the defendant has replied - and defendant's motion

17    to dismiss due to government's false, misleading and

18    prejudicial statements to the grand jury.  Government has

19    responded, defendant has replied.

20         So let's start, Mr. Zeidenberg.

21         MR. ZEIDENBERG:  Good morning, Your Honor.

22         THE COURT:  Good morning.

23         MR. ZEIDENBERG:  Did the court have a preference as to

24    which motions to proceed on first?

25         THE COURT:  I don't.

1          MR. ZEIDENBERG:  In that case, Your Honor, I think

2    we'll proceed with Mr. Dearington, who will be arguing the

3    motion to dismiss for failure to state an offense.

4          THE COURT:  All right.  Thank you.

5          MR. DEARINGTON:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. DEARINGTON:  The government in this case has taken

8    two allegedly incomplete and false conflict of interest forms

9    submitted by Doctor Tao to the University of Kansas and sought

10   to transform those two forms into a false-- false statement and

11   wire fraud scheme spanning ten counts in the indictment.

12         The problem is that the factual allegations in the

13   indictment, putting aside the boilerplate at the end, taken as

14   true do not state either of those offenses and, therefore, the

15   indictment must be dismissed in its entirety.

16         Before we get into the specific flaws in the

17   indictment, we thought it would be helpful to summarize the

18   government's main theories of criminal liability articulated in

19   the indictment as that may be helpful in framing the issues.

20         First is the salary fraud theory.  The indictment

21   alleges in conclusory fashion in Paragraph 32 that Doctor Tao

22   schemed to deprive KU of salary by submitting incomplete or

23   false conflict of interest forms to KU.  The allegations in the

24   indictment, however, contradict that.

25         The allegations are that Doctor Tao submitted a

1    conflict of interest form, two conflict of interest forms, and

2    did not disclose an outside position in those forms to KU but

3    that KU uses those forms to manage its employees' conflicts of

4    interest and in some cases eliminate or reduce them.  There's

5    no allegation in the indictment that the conflict of interest

6    forms have anything to do with salary or even employment

7    decisions.

8         The agency fraud theory is the second fraud theory.

9    The government alleges again in Paragraph 32 in conclusory

10   fashion and boilerplate, tracking the language of the statute,

11   that Doctor Tao schemed to defraud the agencies of grants paid

12   by the agencies to KU.  The allegations in the indictment,

13   however, taken as true contradict that boilerplate.

14        The allegations are, again, that Doctor Tao submitted

15   two conflict of interest forms to his employer that omitted an

16   alleged outside position at another university, but there's no

17   allegation that KU takes those forms or the information therein

18   and passes it along to the agencies, let alone that Doctor Tao

19   knew that fact, which is not alleged.  Nor, even more

20   important, is there an allegation that the agencies used

21   information about conflicts when it decided whether to award

22   grants and in what amounts, much less that the agencies would

23   not have awarded the grants had it known that a researcher on

24   the KU research team had a conflict of interest.  So, again,

25   the allegations contradict the boilerplate that tracks the

1    statute.

2         Moving to the false statement allegations.  Counts 8

3    and 9 allege that those very same two conflict of interest

4    forms submitted in January and September 2018 constitute false

5    statements in a matter within the jurisdiction of federal

6    agencies, namely the Department of Energy, which I'll refer to

7    as the DOE, and the National Science Foundation, which I'll

8    refer to as NSF, but the factual allegations in the indictment

9    say just the opposite is true.

10        The factual allegations are that Doctor Tao submitted

11   these conflict of interest forms only to KU, his employer, so

12   that KU could manage its employees and their possible conflicts

13   of interest.  There's no allegation that the agencies had a

14   statutory basis to request the conflict of interest forms or

15   those information-- that information from Doctor Tao or that it

16   had the power or authority to act with respect to Doctor Tao's

17   submission to his employer, KU.  Again, the factual allegations

18   contradict the boilerplate that tracks the statute in the

19   indictment.

20        Now, this is clear and requires dismissal because the

21   purpose of an indictment is not just to inform a defendant

22   about the charges.  As the Tenth Circuit has noted in *United

23   States v. Mims*, the purpose is also to inform the indictment

24   [sic] about the factual allegations that are-- will be

25   presented that would satisfy the statutory elements.  So the

1   court stated there that just tracking the statute without

2   providing a clear statement of facts meant to satisfy the

3   statute is not enough.

4          In *United States v. Russell*, the Supreme Court further

5   articulated why this is so important, and this is particularly

6   germane here.  The court essentially said that notice is not

7   enough and that it's the court's duty to decide whether the

8   factual allegations, if proven, would, in fact, state the

9   offenses and, if not, the indictment must be dismissed.  Here,

10  the government's indictment fails that test.

11         So before the defense dives into the particular flaws

12  in the indictment that we highlight in our motion to dismiss, I

13  wanted to pause to give the court the opportunity to let us

14  know if there are any particular arguments that we should focus

15  on or start with or if you'd prefer that we start from the top

16  of our motion.

17         I'm sorry, Your Honor, I think you're on mute where we

18  can't hear you.

19         THE COURT:  That is correct.  I will have questions

20  for you and the government at the end of your-- each of your

21  arguments.  But, no, go ahead and proceed as you had planned at

22  this point.

23         MR. DEARINGTON:  Very well.  Thank you, Your Honor.

24  And, of course, if you ever want to cut in, feel free to

25  interrupt and ask any questions that you'd like and I'd be

 1   happy to answer them during the argument or at the close.

 2           The first argument in the defense's motion to dismiss

 3   for failure to state an offense and lack of venue.

 4   Section 1343, the wire fraud statute, does not criminalize

 5   deceit, does not criminalize mere deprivation of information,

 6   does not even criminalize corrupt acts and bad behavior, as the

 7   Supreme Court has over and over emphasized from *Carpenter*

 8   through *Cleveland* and most recently in the *Kelly* case, which is

 9   the Bridgegate case.  It specifically criminalizes schemes to

10   deprive a victim of money or property.

11           Here, the indictment does not allege a scheme to

12   deprive KU of salary or the agencies of grant money paid to KU.

13   As I noted earlier, there is boilerplate that tracks the

14   language of the statute, but the court must look to the factual

15   allegations and, taking them as true, decide whether those

16   factual allegations satisfied the elements of the wire fraud

17   statute.  They do not.

18           Now, I already articulated the fact-- the fact that

19   the indictment itself alleges the submission of false conflict

20   of interest forms that have nothing-- but there's no allegation

21   those forms have anything to do with salary or employment

22   decisions.  So starting with that salary issue, there are much

23   deeper problems than just the absent allegations that do not

24   tie the conflict of interest forms to money or property such as

25   salary.

1           The *McNally* and *Skilling* issue I'll address first.  So

2     a little bit of background about the Supreme Court's juris

3     prudence in the Section 1343 area helps inform why the Supreme

4     Court has already foreclosed under Section 1343 a scheme to

5     conceal a conflict of interest from an employer and held that

6     that's not a scheme to obtain money or property.

7           So starting as early as 1924 in the *Hammerschmidt*

8     opinion, the Supreme Court articulated that the wire fraud and

9     mail fraud statutes-- mail fraud statute requires a scheme to

10    deprive a person of money or property.  Over the next 60 years

11    the courts varied about the ways in which that concept might be

12    able to be stretched and over time the concept of an intangible

13    honest services fraud emerged in certain courts.

14          And that generally held in the most common situations

15    that an employee could deprive an employer of the right to

16    their honest services by concealing things like undisclosed

17    self-dealing, kickbacks, and bribery.  For instance, an

18    employee gives a company-- takes company money and pays a

19    vendor while concealing from the employer that that employee

20    owns the vendor and, therefore, is self-dealing.

21          Some of these courts started to articulate conflict of

22    interest theories of honest services fraud, but it by no means

23    had currency in the courts leading up to the *McNally* decision

24    in 1987.  In 1987 the Supreme Court handed down *McNally* and put

25    to a screeching halt all of those intangible honest services

1   fraud theories.

2        Congress didn't like that decision and so Congress

3   enacted Section 1346 to try to revive at least the core honest

4   services fraud theories like the example that I just

5   articulated, undisclosed self-dealing.  The Supreme Court in

6   *Skilling* again held that the honest services fraud theory at

7   large is too amorphous and, therefore, unconstitutional and

8   void for vagueness except as limited to two particular

9   situations, kickbacks and bribes.

10       So when you read *McNally* and *Skilling* together, what

11   is clear is that *McNally* held that a conflict of interest

12   scheme is not a scheme or artifice to defraud within the

13   meaning of Section 1343 and Section 1346, which is not even

14   charged here, and expanded the definition of scheme or artifice

15   to defraud to include certain honest services fraud.  That too

16   does not include conflicts of interest.

17       So what you're left with is a Section 1343 that the

18   Supreme Court has clearly held in two decisions does not

19   encompass schemes to deprive an employer of information about

20   conflicts of interest.  Now, the government has sought to

21   skillfully plead around that defect by merely alleging that

22   Doctor Tao-- the uncontroversial point that Doctor Tao as an

23   employee received salary and tries to say that that salary is

24   money.  But if the court were to adopt that, that would

25   essentially render *McNally*'s rejection of conflict of interest

1    schemes a dead letter because all of the cases involving

2    conflict of interest schemes involved employees who received

3    salary.

4            So the court was not saying all that the government

5    has to do to get around our seminal *McNally* decision is merely

6    point out the obvious proposition that employees also receive

7    salary.  The point is that this non-disclosure of a conflict of

8    interest to an employer who happens to pay salary is not a

9    scheme whose object is to deprive the employer of money or

10   property.  And the Supreme Court has reiterated time and time

11   again over the past three decades since *McNally* that the scheme

12   must be one whose object or aim is to deprive the victim of

13   money or property.

14           Most recently in the *Kelly* case, which is the

15   Bridgegate case before the Supreme Court, in that case the

16   Supreme Court termed this requirement in terms of the scheme

17   must be directed at obtaining money or property through deceit.

18   So in that case the government claimed that there was-- one of

19   their theories was that there was money involved here and there

20   was money that improperly changed hands as a result of the

21   defendant's scheme.

22           So the defendants were political appointees who tried

23   to seek retribution on the mayor of Fort Lee in New York for

24   not endorsing Governor Christie.  And part of that scheme was

25   going to require that certain lanes be shut down on the George

1  Washington Bridge, which meant only one toll collector would be
2  on the bridge for the Fort Lee lane, in order to cause backup
3  in the mayor's city.  And as a result of--
4        THE COURT:  If I could stop you for just a minute.  If
5  I could stop you for just a minute because I have two
6  questions, one about the *Kelly* case.  My understanding is that
7  it really talked about the deprivation of property as opposed
8  to deprivation of money because the theory of the government--
9  well, deprivation of property I think is what the government's
10 theory was.  And ultimately what the court decided was this was
11 about regulatory functions, it wasn't about a property
12 interest.  So I want you to address that.
13       But then I also want you to address, because you made
14 an argument about salary essentially being incidental, it's not
15 deprivation of money because it's just incidental.  Does it
16 matter whether the defendant actually performed services for
17 the salary or whether he-- in other words, whether the conflict
18 of interest was such that he was performing work for Fuzhou
19 University on time that he was being paid for KU.
20       MR. DEARINGTON:  Very good questions, Your Honor, and
21 I'll take them in the order in which you presented them.
22       So in the Supreme Court's *Kelly* decision, there were,
23 in fact, two theories presented of money or property.  And the
24 first major theory is the one that you touched on there, which
25 is this control theory, that the government alleged that the

1    bridge itself was Port Authority or government property and

2    that these two political appointees fraudulently took control

3    of the bridge by changing around the lanes.

4            And you're right in saying that the government--

5    excuse me, the court held under *United States v. Cleveland* that

6    that's really a regulatory interest.  That's a regulatory

7    action and it didn't deprive the government of the lanes that

8    were closed down.  Those lanes weren't taken home by someone

9    unlawfully.

10           But there was a second theory.  The government also

11   asserted that there was money that changed hands there.  And

12   the way that the government articulated this theory is-- is

13   fairly helpful I think to understanding this case and the

14   by-product or incident holding in that case.

15           And the theory was that when three lanes for Fort Lee

16   became one lane for Fort Lee in order to cause traffic backup

17   in the city and exact retribution, no longer were there three

18   toll collectors who all were dedicated to Fort Lee such that

19   when one had to use the restroom, they couldn't just shut it

20   down to two lanes.  There was only one toll collector.  So as a

21   result, the Port Authority had to hire another toll collector.

22           And the court held that just because that other toll

23   collector received salary which, of course, nobody disputes

24   salary is money, isn't enough to have a scheme whose object is

25   directed at obtaining salary.  And the reason was because even

1   if the political appointees, defendants in that case, knew that

2   there would be money that would be costed as a result of their

3   scheme - and there perhaps was evidence that that is true - it

4   didn't matter because their scheme wasn't aimed at getting that

5   money to change hands.  Their scheme was aimed at political

6   retribution by shutting down the lanes.

7        So that's why *Kelly* is so important, because the

8   Supreme Court time and time again has emphasized that the wire

9   fraud statute is not a good government statute or a good

10  behavior statute.  And the Supreme Court even said there could

11  be wicked behavior here and it did not endorse the behavior

12  there, perhaps said that it could be charged under state laws.

13       But what wasn't alleged and wasn't proven at the trial

14  in that case was that the scheme to exact political retribution

15  was meant to deprive the Port Authority of money or property.

16  Even if incident to that scheme, money improperly changed hands

17  as a by-product of the scheme.  So there was, in fact, a money

18  theory there that the Supreme Court rejected.

19       As to your question about the salary at KU, I'd like

20  to point out as an initial matter that while I will address

21  your premise, it's not one that is alleged in the indictment.

22  Conspicuously absent from the indictment is any allegation that

23  Doctor Tao shirked his duties or shirked his teaching

24  responsibilities at KU by taking an outside position.  There

25  was no allegation that he didn't show up for classes or that he

1  failed to perform all research to the complete satisfaction of

2  KU or the agencies.

3         But accepting your premise, if the government had

4  alleged that Doctor Tao didn't do the work he was paid for

5  because he didn't show up for class, for example, while I don't

6  want to speak to an indictment that doesn't exist and endorse

7  it as potentially stating an offense, certainly that would be--

8  give the government more grounds to argue than they have here,

9  given the way the indictment is written by the government and

10 returned by the grand jury.

11        THE COURT:  That leads me to another question, and

12 this may not be the opportune time to answer it, but I have

13 some confusion, I'm going to ask the government about this as

14 well, about this whole-- you know, there are counts based on

15 the proposal to collaborate between the two universities and

16 the buyout.  And I'm not clear on how those are related, I'm

17 not clear on-- it seems like there's a factual dispute about

18 whether there-- whether the buyout was granted or not.  So I'm

19 really unclear as to whether Doctor Tao was teaching that

20 particular semester at KU.

21        MR. DEARINGTON:  Your Honor, as a threshold matter,

22 the motion to dismiss for failure to state an offense doesn't

23 need to turn on those facts outside the indictment that are

24 addressed in our motion to dismiss for false and misleading

25 statements and prejudicial statements to the grand jury.

1          So from the defense's perspective, whether those

2     statements about if Doctor Tao had any teaching

3     responsibilities in the spring of 2019 that could be a conflict

4     in the first place is really more relevant to our argument that

5     there was a very crucial misstatement to the grand jury, and

6     Mr. Zeidenberg will be addressing that.

7          So for purposes of the motion to dismiss, what's most

8     important is just that there's no allegation that Doctor Tao

9     shirked any responsibilities or failed to perform to the full

10    satisfaction of KU or the agencies in exchange for his salary.

11          THE COURT:  Okay.

12          MR. DEARINGTON:  Your Honor, I think you might be on

13    mute again, but I'm not positive.

14          THE COURT:  Okay.  I just said "okay."  You're right.

15    I was on mute.  Thank you.

16          MR. DEARINGTON:  Thank you, Your Honor.

17          So going back to the money or property argument.  The

18    problems go deeper than *McNally* and *Skilling* and the problems

19    go even deeper than the fact that there's no allegation tying

20    the conflict of interest forms to the salary that is

21    purportedly, according to the boilerplate in the indictment,

22    the object of the scheme.

23          And that's because as you just highlighted, Your

24    Honor, there's no allegation that Doctor Tao didn't fully

25    perform in exchange for his salary.  And there's plenty of case

1    law out there that points out from the Eleventh Circuit's

2    decision in *Takhalov* to a host of Second Circuit cases

3    involving *Shellef and Regent's* and *Novak* and *Starr*, all the way

4    over to the Sixth Circuit in the *Sadler* decision, that when an

5    entity-- even when an entity receives a misrepresentation, if

6    the entity isn't deprived of part of the benefit of its bargain

7    for which it paid, that's not a scheme to drive the entity of

8    money or property.

9         And in those cases, the courts went even further and

10   said even if the purported victim would not have paid out

11   money, if it knew the truth, that too is not fraud if the

12   victim received the full benefit of the bargain.

13        Now, I want to be clear that these holdings aren't

14   necessary to dismiss all of the fraud counts in this case

15   because there is no allegation that the agencies or KU would

16   not have paid out their-- the salary in KU's case or the grants

17   in the agency's case if they had known about the conflict.

18        Indeed, there's no allegation that the agencies

19   should've even known about the conflict because there's no

20   allegation that KU passed that information on to the agencies,

21   let alone that they take it into consideration.  But those

22   cases, even if the government-- they're important to understand

23   that even if the government had made certain allegations or

24   could make certain allegations beyond what it has already made,

25   if it can't show that KU or the agencies or can't allege facts

1   showing that the agencies or KU didn't receive the benefit of

2   their bargain, it's still not fraud.

3          Turning again to the agency fraud theory, Your Honor.

4   As I noted in our introduction, there's simply no allegation

5   that KU took the conflict of interest forms or the information

6   therein and passed them on to the agencies or that Doctor Tao

7   knew that that would happen.  Of course, he didn't if there's--

8   if it didn't happen.  But on top of that, as I just mentioned,

9   there's also no allegation that had there been an allegation

10  the information was passed on to the agencies, they would've

11  taken that information and decided not to award the grants to

12  KU or to limit the-- or reduce the amount of money paid to KU.

13         So at bottom, Your Honor, what we're left with is an

14  indictment whose factual allegations, putting aside the

15  boilerplate, do not state an offense whose object, whose aid or

16  who was directed at obtaining salary from KU or grant money

17  from the agencies paid to KU.

18         So unless Your Honor has questions about that

19  particular argument, the defense will move on to the next

20  argument in its motion to dismiss which relates to the lack of

21  a misrepresentation.

22         THE COURT:  Just for clarity; the last thing you

23  argued was that there was no allegation that KU passed the

24  conflict forms on to the agency, no allegation that the

25  defendant knew that the conflict forms would be passed on to

1    the agency.  And then was your third point that-- essentially

2    no materiality, is that what you're arguing?

3         MR. DEARINGTON:  Well, Your Honor, in terms of the

4    fraud statutes, while materiality under *United States v. Nader*

5    (phonetic) is required, the issue is broader than materiality.

6    So, of course, our position would be if the information isn't

7    passed on to the agencies, it can't be material to the agency's

8    decision to award grants.

9         But it goes deeper than that because the critical

10   element, as the Supreme Court has stated over and over again,

11   is that there must be a scheme to deprive the agencies of money

12   or property.  So the lack of materiality is also dispositive

13   here.  But it really goes to the broader issue, which is that

14   the indictment doesn't allege a scheme by Doctor Tao whose

15   object was to deprive the agencies of money or property.

16        And I would say, Your Honor, that the government's

17   opposition tries to limit this fairly - what we thought -

18   noncontroversial principle that not depriving a victim of the

19   benefit of its bargain is not fraud, tries to limit that to the

20   Second and the Eleventh Circuit, but many district courts have

21   also articulated that theory.  And, in fact, the Sixth Circuit

22   in *United States v. Sadler*, Judge Sutton has also adopted a

23   very similar principle in that holding.

24        And that case involved a pill mill essentially.  So

25   there was a owner and operator of a pain management clinic and

1  the owner and operator sought opioids from a pharmaceutical

2  distributor and some of those opioids she diverted so she could

3  sell them outside the pain management clinic and earn extra

4  profit.

5       And in that case Judge Sutton held that even if the

6  pain management clinic would not have given her the pills which

7  were property, if it had known that she was going to use them

8  in an improper way, that's still not fraud on the pain

9  management clinic because the pain management clinic received

10  everything that it required in exchange for the bargain.  And

11  so that case I think is-- goes to the same point.

12       But again, I just want to reiterate that our motion

13  doesn't live and die on that holding because the government

14  doesn't even get there.  The government's indictment doesn't

15  even allege that this information was before the agencies in

16  the first place, let alone that they would not have given money

17  or grant money to KU if it had known about the conflicts.

18       Now, Your Honor, the next argument in our motion to

19  dismiss is that there's no actual misrepresentation alleged in

20  the indictment.  So in *Gatewood* and in *Good*, *United States v.*

21  *Gatewood* and *United States v. Good*, cases cited in the

22  defense's motion to dismiss, the appellate courts made clear

23  that in order to make a-- allege adequately a false statement

24  or a misrepresentation for purposes of the wire fraud statute,

25  the indictment must allege the representation or in some cases

1    the omission and put that side-by-side with the truth.  And

2    from looking at those two representations side-by-side, what

3    was actually asserted by the defendant and what the truth was,

4    one must be able to see that there's a direct conflict.  And

5    that's lacking in this case.

6         So, for example, we attached conflict of interest

7    forms, Exhibits A and B, to our motion to dismiss.  And while

8    the defense maintains that the court should not review any

9    facts outside the indictment, and that is the standard, there's

10   a limited exception here because the government already agreed

11   that the court could look at those conflict of interest forms.

12   So now it has argued that it has withdrawn that consent, but

13   that's after the defense filed its motions.  So our view is the

14   court can look at those forms.

15        But even if the court weren't to look at those forms,

16   there's still no misrepresentation adequately alleged.  The

17   court can simply look at the indictment, see that the

18   indictment alleges there was a conflict of interest, and see

19   that there's no allegation that shows what a conflict of

20   interest is such that when you put that representation next to

21   the allegation that the representation or omission was false,

22   no one can look at those two, compare them and see that they

23   were-- that they are, so to speak, in conflict.

24        So in *Gatewood,* just by way of example, *Gatewood*

25   involved a fraud, alleged fraud in which a government

1    contractor won a contract from the Navy in Tennessee, and the

2    government contractor submitted a certification before

3    receiving payment from the Navy that said he had paid his

4    subcontractors.  He certified that, submitted it directly to

5    the Navy.

6          And in *Gatewood*, the court - I believe following

7    conviction - reversed because the indictment itself was

8    deficient.  The indictment must show the representation and the

9    truth.  And from looking at that-- those two from the face of

10   the indictment, the judge must be able to determine that one is

11   directly contrary to the other.  And in that case even though

12   the statement was that the contractor had paid his

13   subcontractors and the truth was that he had not paid all of

14   his subcontractors, there was no literal falsity or

15   contradiction.  There was a false dichotomy there because, in

16   truth, the contractor had paid some contractors.

17         So the principle there is there has to be a direct

18   contradiction between the statement or omission and the truth.

19   And here that is lacking, even if the court doesn't look at the

20   conflict of interest forms themselves for purposes of our

21   motion.

22         Now, walking through the actual allegations and how

23   they rely on a defective misrepresentation, I'd like to start

24   with Counts 1 through 4 and Count 8, because we broke this into

25   three categories in our motion.  So Counts 1 through 4 and 8

1   allege four counts of wire fraud and Count 8 is a conflict of

2   interest form, which is also itself a wire fraud count.

3           But the factual allegations in the indictment are that

4   Doctor Tao took the job at FZU and entered into a contract in

5   March 2018.  So if the court looks at these wire fraud counts,

6   looks at the false statement count, you'll see that these

7   actually predate Doctor Tao having allegedly accepted a

8   position at FZU.  There was no contract; he had no job at FZU.

9   So there is no misrepresentation there.

10          Moving to Counts 6 and 7 and also Count 9, so two more

11  wire fraud counts, one of which is the September 2018 conflict

12  of interest form and one of the false statement counts.  Count

13  9 is also that 2018 conflict of interest form.  Again, while

14  these counts might post-date the alleged acceptance of a

15  position at FZU, there still is no conflict that was meant to

16  be disclosed.

17          So if the court looks at the conflict of interest

18  forms, it will see that there is a $5,000-in-the-past-year

19  threshold before Doctor Tao would've had to disclose this

20  conflict, this alleged conflict.  And then there's also a

21  requirement that there be a time commitment conflict, such that

22  he was unable to take care of his KU responsibilities.  So even

23  though these three counts post-date the March 2018 contract,

24  there's no allegation that Doctor Tao met either of those

25  disclosure thresholds at that point.  Again, no

1    misrepresentation.

2           Third, Counts 5 and 10 are a little bit different

3    because they're based on an alleged July 2018 e-mail.  And this

4    is where *Gatewood* becomes particularly persuasive, because what

5    is alleged is that Doctor Tao was asked in an e-mail to list

6    his current and pending support.  There is not a lot of

7    allegations about what that means, but the allegation is that

8    he listed some of his current and pending support but not his

9    alleged international support in China through this alleged

10   position.

11          But just like *Gatewood*, that is not a literally false

12   statement.  If someone asks you to list certain information and

13   you list some of it, which might have seemed natural at the

14   time to list domestic grants, but it doesn't matter.  If you

15   list some information, that's not literally false.  Just like

16   in *Gatewood,* stating that he-- the defendant had-- certifying

17   to the Navy that the defendant had paid contractors wasn't

18   literally false because he had paid some contractors.  Just

19   like Doctor Tao did disclose some support, just not - according

20   to the allegations - all of it.  So there's no literal falsity

21   there.  And just like in *Gatewood*, the indictment would have to

22   be dismissed on that basis.

23          Another thing that we find important to note is that

24   the government didn't meaningful respond to this argument in

25   its opposition.  It essentially said it will rest on its

1   papers, but there were no papers, according to the

2   understanding of that phrase.  There was just the indictment

3   itself.

4         So the defense views that as a concession and a

5   remarkable one to boot, because this argument applied to all

6   ten counts.  So in one failure to respond, the defense contends

7   that, among the other defects in the indictment, the lack of

8   response as to the argument that there's no misrepresentation

9   is dispositive of all ten counts in the indictment.

10        The next argument in our motion to dismiss is the use

11  of the wires for purpose of executing the scheme.  Courts have

12  explained that Section 1343, which is itself called the wire

13  fraud statute, doesn't just criminalize fraud.  It criminalizes

14  fraud schemes that involve the use of the wires - in the

15  language of the statute - for purposes of executing the scheme.

16  And, again, going back to our first argument, that's a scheme

17  to deprive KU of salary, according to the government, and to

18  deprive the agencies of grant money, according to the

19  government.

20        So the use of the wires must be in furtherance or

21  incident to an essential part of the scheme to take money from

22  KU and the agencies.  And that's in terms of the Supreme

23  Court's decision in *Parr* as well as *Maze* and several other

24  Supreme Court decisions over the last couple decades.

25        The government in choosing the way that it charged the

1    wire fraud counts and also in its opposition appears to have

2    used the wrong standard.  So the government's opposition makes

3    clear that the government charged use of the wires that it

4    thought were related to the scheme.

5           Now, I'd like to, as an initial matter, point out that

6    some of the uses of the wires we highlight in our motion to

7    dismiss aren't even related to the scheme in any way.  So the

8    uses of the wires charged fail even to meet that incorrect

9    standard that the government articulates, but what's more

10   important is that the standard itself is incorrect that the

11   government articulates.

12          While the government contends that the use of the

13   wires must merely be related to the scheme, the Tenth Circuit

14   has said just the opposite.  The Tenth Circuit in *Redcorn*

15   stated, and I'm quoting, "It is therefore not correct that use

16   of the wires is illegal, if at all, in relation to a scheme to

17   defraud."

18          Now, let's think about those principles and apply them

19   to the actual wire fraud charges.  And we highlight five wire

20   fraud charges in the indictment, Counts 1 through 4 and

21   Count 7.

22          So Count 1 alleges use of the wires to e-mail the

23   Chinese Consulate in November 2017, so before Doctor Tao

24   allegedly had a position at FZU that he failed to disclose, to

25   arrange travel to China to apply for a talent program.

1          So the non-disclosure as alleged hadn't even happened

2   yet.  There was no alleged FZU position that he had entered

3   into a contract for, and there's no allegation as to how-- that

4   could possibly be used to show that this travel arrangement

5   somehow supported a scheme to deprive KU of salary or was in

6   furtherance of a scheme to deprive KU of salary or the agencies

7   of grant money.

8          Now, the government I'm not sure has even argued this,

9   but to the extent the government thinks that non-disclosure

10  that leads to fraud can mean that uses of the wires related to

11  the non-disclosure are themselves for purposes of executing the

12  fraud, that is contrary to the terms of the statute.  The use

13  of the wire has to be for the purpose of executing the scheme,

14  which here is non-disclosure for the purposes of obtaining

15  money.  So, again, the government's argument there would be an

16  "in relation to" standard at best.

17         And we would cite to *United States v. Warme*, though we

18  think that proposition is supported by the plain language of

19  the statute.  And in *Warme*, the court held that a

20  non-disclosure scheme in the honest services fraud statute

21  couldn't be charged as a wire fraud merely because of the

22  activity that wasn't disclosed.  In this case a police officer

23  using an ATM which was connected to the Internet in order to

24  get money to use for corrupt purposes could be charged as the

25  wire fraud.

1           So there's no cognizable scheme that can be charged as

2    wire fraud that would involve the activities that aren't

3    disclosed, because it must be use of the wire in furtherance of

4    the scheme that's actually charged.  So it would have to be use

5    of the wires in furtherance of a non-disclosure to obtain money

6    from KU or the agencies.

7           Now, Count 2 alleges that KU submitted a DOE grant

8    application in December of 2017.  Again, that's several months

9    before Doctor Tao allegedly had a conflict to disclose, because

10   he hadn't entered into a contract until March 2018 and he

11   hadn't even started work until several months later.  And

12   that's according to the allegations in the indictment, which we

13   take as true for purposes of this argument.

14          Count 3, January 9th, 2018 conflict of interest form.

15   Same defect.  There was no alleged position at FZU as of that

16   time.  So the use of the wires could not have been in

17   furtherance of a purpose to not disclose that position.

18          Count 4, June 26th, 2018 e-mail to KU regarding a

19   collaboration with FZU.  Now, this one is even more problematic

20   than the other counts because the Supreme Court in *Maze* and

21   several other courts, including in the Tenth Circuit, have held

22   that a scheme-- a use of the wires that could get the defendant

23   caught and reveal the defendant's scheme certainly cannot be a

24   use of the wires that's in furtherance of the scheme.

25          So the government has alleged here that Doctor Tao

1    revealed that he was interested in a collaboration between KU

2    and FZU, so certainly that revelation using the wires cannot

3    have been in furtherance of a scheme to defraud KU or the

4    agencies by not disclosing a position.

5              And finally Count 7, which is a March 17th, 2019

6    e-mail regarding, quote/unquote, an application to China NSF.

7    Now, it's unclear from the count in the allegations what

8    "regarding" means.  But even allowing an inference that the

9    e-mail itself or the use of the wires itself was the grant

10   application, a grant application to a foreign government in

11   order to try to obtain money to support research overseas as--

12   taken as true is not a scheme to not disclose an outside

13   position in order to obtain money or property from KU or the

14   agencies.

15             So at bottom, the government has charged five uses of

16   the wires out of the seven wire fraud counts, none of which,

17   taking the allegations in the indictment as true, were in

18   furtherance of a scheme to defraud KU or the agencies.

19             Unless Your Honor has any questions about those

20   arguments thus far, we'll turn to the false statement counts.

21   Your Honor, I think you're on mute again.  Apologies.

22             THE COURT:  Okay.  I do have some questions.  So the

23   defendant initially took the position that the court should

24   just consider the four corners of the indictment and not the

25   two conflict forms, but you've now switched your position and

1    you are consenting to my reviewing the consent forms, is that--

2    or the conflict forms; is that correct?

3            MR. DEARINGTON:  Your Honor, apologies if I've

4    misunderstood your question, but are you asking whether we--

5    the defense consents to the court's review of the conflict of

6    interest forms?

7            THE COURT:  Yes.

8            MR. DEARINGTON:  Your Honor, yes, the defense actually

9    attached the conflict of interest forms to the motion to

10   dismiss.  So just to clarify; it was the government that during

11   the January hearing said the court could review the conflict of

12   interest forms and in its opposition withdrew that consent.

13           THE COURT:  Yeah, it seems like you all have switched

14   your positions on this, so I'm going to ask the government the

15   same thing.  I just want to be clear, you do consent.  And I'll

16   ask the government whether they do or do not consent.  Okay.

17           MR. DEARINGTON:  Yes, Your Honor.  Just to be clear--

18   apologies for interrupting, Your Honor.  Just to be clear,

19   we've always consented to the court's review of the conflict of

20   interest forms.  We've never thought that's inappropriate.  If

21   I misstated our position in the beginning, I just want to

22   apologize and clarify.

23           So ordinarily, of course, the government-- excuse me,

24   the court is confined to the four corners of the indictment,

25   but we believe there's an exception here where the government

1    has already consented to the court's review of the forms.  And

2    that's why we attached the forms to the conflict of interest--

3    to the motion to dismiss.

4           But I did-- we do believe that if for some reason the

5    court didn't want to review the forms or thought it didn't have

6    to, all of our arguments still stand as stated because there is

7    no allegation in the indictment that sets the alleged omission

8    next to the truth and clearly states that one is literally

9    false as *Gatewood* requires.

10          THE COURT:  Okay.  I have another question and then I

11   also will be having a question about the false-- the false

12   statement counts, but I'll defer that until later.

13          All right.  So you're arguing that the scheme is not

14   alleged to deprive KU or the United States agencies of money or

15   property, at best it's a by-product of the scheme to continue

16   to receive salary and/or grant money but not the object of the

17   fraud.

18          And you've mentioned this, Paragraph 33 of the

19   superseding indictment does allege that this is the purpose.

20   My question is:  Aren't you really arguing a jury issue,

21   whether the government can prove that this, in fact, is the

22   true object of the scheme?

23          MR. DEARINGTON:  Your Honor, just to clarify; our

24   position is not that the indictment adequately alleges that

25   salary and grant money were a by-product of the scheme.  We

1    actually allege that the conflict of interest forms were so far

2    from the issue of salary decisions or the issue of grant

3    decisions that there's no connection alleged.  But even if

4    there were a connection that were properly alleged, it would at

5    best be a by-product.

6         So I don't want to mislead the court into thinking the

7    defense's position is that this is a close call as to whether

8    it's a by-product or an object of the scheme.  It's neither.

9    There are no allegations in the indictment that even tie the

10   conflict of interest forms to the receipt of salary or the

11   payment of-- the decision to pay grants by the agencies.

12        As to your question whether this is an issue for the

13   jury, it's a good question, Your Honor, but the answer is no.

14   And here is why:  The Supreme Court in *Russell* stated that one

15   of the purposes of the indictment is not just to put the

16   defendant on notice and then proceed to trial, but rather so

17   that the court can look at the factual allegations, not just

18   the boilerplate that tries to match those allegations to the

19   statutes, such as in Paragraph 32.

20        The court needs to look at the factual allegations and

21   decide, if taken as true, does that state a scheme directed at

22   obtaining salary, directed at obtaining grants paid by the

23   agencies to KU due to the misrepresentations?

24        And *United States v. Mims* reinforces that point and

25   I-- *Mims* states specifically that-- and *Mims* is a Tenth Circuit

1    case.  "An indictment which is cast in the language of the

2    statute is legally sufficient if and only if it states with

3    requisite clarity the essential facts of the offense charged."

4          And then *Russell* stated, quote, an important purpose,

5    end quote, of informing, quote, the court of the facts alleged

6    so that it may decide whether they're sufficient in law to

7    support a conviction.

8          So it's not the case that the government can merely

9    track the statute or simply state that a salary is money and,

10   therefore, survive a motion to dismiss.  The factual

11   allegations in this 16-page indictment are determinative of

12   whether that boilerplate is, in fact, true.

13         So the court's task is to look at the factual

14   allegations and decide whether that boilerplate is correct.  Do

15   these factual allegations, if proven, state a scheme to deprive

16   KU of salary or to deprive the agencies of grant money?

17         THE COURT:  All right.  That's all the questions I

18   have for now.

19         MR. DEARINGTON:  Okay.  Thank you, Your Honor.

20         So moving on to the Counts 8 and 9, which are 1001

21   counts alleging false statements.  As we stated in our motion

22   to dismiss, there are two circumstances under the *United States*

23   *v. Rodgers*, the Supreme Court decision, and *Deffenbaugh*, the

24   Tenth Circuit decision, in which a statement is within the

25   jurisdiction of federal agencies or departments.  And those two

1    circumstances are when the agency has the power to exercise

2    authority in the particular situation or when there's a

3    statutory basis for an agency's request for the information.

4           As we've argued in our papers, neither is alleged in

5    the indictment, nor even alleged or argued inappropriately in

6    the opposition.  For example, the indictment cites no statutory

7    basis by which or under which DOE or NSF could've requested the

8    information in the conflict of interest forms, nor does it even

9    seem to argue that the agencies had authority to exercise--

10   excuse me, power to exercise authority in those circumstances.

11   And we believe the opposition is actually conceding that point.

12   So the government-- the indictment cannot meet either of these

13   mandatory prongs, even taking the allegations in the indictment

14   as true.

15          Now, the government has seemed to take the approach

16   rejected by the courts that jurisdiction of the United States

17   government follows its money wherever it goes.  And that is

18   simply untrue under *Rodgers*, *Deffenbaugh* and every case of

19   which the-- since *Rodgers* that the defense is aware of.

20          And two cases in particular have rejected this

21   argument squarely.  The first is the Ninth Circuit's decision

22   in *Holstrom* which involved more aggravating factors and alleged

23   facts than this case.  In that case an employee of a contractor

24   of the Department of Energy who worked at a DOE lab falsified

25   timecards to the contractor even though she was, of course,

1    paid with DOE money that went to the contractor.  And there,

2    the Ninth Circuit held that this false statement in timecards

3    to the contractor that worked for DOE and received DOE money

4    was not a false statement within the jurisdiction of DOE.

5         The court reasoned that there-- while the employer,

6    the contractor, had a direct contractual relationship with DOE,

7    DOE had "no power to act" with respect to the false timecards,

8    which were merely peripheral to DOE's obligations and not

9    directly related to a DOE-authorized function.

10        *United States v. Blankenship*, the Eleventh Circuit

11   reached a similar result.  There, the U.S. Department of

12   Transportation had a contract involving the Florida Department

13   of Transportation that involved contractors and subcontractors.

14   A false statement was made to one of the contractors in that

15   line and the government charged it under 1001.  The Eleventh

16   Circuit held that the DOT's jurisdiction was only over the

17   party with which it had a contract, which in that case was DOT.

18   In this case, if there is a contract, KU has it with DOE and

19   NSF.  NSF and DOE have no contract with Doctor Tao.

20        And in that case, it's important to note-- Your Honor,

21   you might be on mute, I'm not sure.

22        THE COURT:  No, I'm off mute because I was about to

23   ask you the question I had about your false statement

24   arguments, and that is:  What about the Tenth Circuit's

25   decision in *Wright* that, you know, announces a general rule

1   that-- (reporter interruption).

2         Why don't you put yourselves on mute while I ask-- I

3   think your paper shuffling is interfering with-- if you could

4   mute.

5         MR. DEARINGTON:  Excuse me, Your Honor.

6         THE COURT:  Okay.  So that leads me to the question I

7   was going to ask you because you talked about these other

8   circuits' decisions.  What about the Tenth Circuit's decision

9   in *Wright* that a state agency's use of federal funds standing

10  alone is generally sufficient to establish jurisdiction under

11  Section 1001?  And I'll go on mute now.  You can go-- you can

12  unmute.

13        MR. DEARINGTON:  Your Honor, the decision in *Wright* we

14  think is clearly distinguishable and the dicta that you just

15  pointed out we don't think is meant to abrogate the Supreme

16  Court's decision in *Rodgers* or the Tenth Circuit's decision in

17  *Deffenbaugh* and is not to be taken as a statement that

18  jurisdiction follows the money.  That's a position that no

19  court that we're aware of has ever actually accepted.

20        But *Wright* is a case that we'd like to discuss briefly

21  because we find that it is inapposite and actually emphasizes

22  the types of situations where perhaps an agency does have

23  jurisdiction because it's in such stark contrast, the facts in

24  *Wright*, to here.

25        So in *Wright*, the court held that the defendant's

1    report to a state agency which was required by a statute, so

2    that's the Safe Drinking Water Act - again no statute here that

3    has been cited - were within the jurisdiction of the EPA

4    because EPA had statutory authority over the reports and the

5    EPA had retained authority to enforce its regulations.  So the

6    report, according to the court, clearly concerned an authorized

7    function of the EPA and the EPA had the right even to audit the

8    reports and condition funding on the outcome of the audits.  So

9    you have both of the *Rodgers* factors that have been met in that

10   case.

11           Essentially distilling the facts in *Wright*, EPA had

12   delegated its authority to a state but maintained all of its

13   authority.  So it delegated its oversight authority but

14   maintained all of that authority should the EPA want to act.

15   It could've had a statutory basis to request the Safe Drinking

16   Water Act reports and it could act as to those reports.

17   Neither of those prongs is alleged in the indictment nor even

18   argued in the opposition.  And the court, again, emphasized

19   that the power to exercise authority in a particular situation

20   is what governs and not "matters peripheral to the business of

21   that body."

22           So we're confident that had the panel in *Wright*

23   addressed the circumstance such as here, it would not have

24   perhaps stated the dicta in the same way that you articulated

25   because surely the court in *Wright* would not have found

1    jurisdiction following the money, so to speak, of any agencies,

2    which would really lead to absurd results as *Blankenship*

3    pointed out.

4            So the court in the Eleventh Circuit and *Blankenship*

5    recited some fairly persuasive results of a theory of

6    jurisdiction, again rejected by every holding we're aware of,

7    which would follow the money.  One of those examples was a

8    student who applies to a university I believe that receives

9    funding.  If there's a misstated credential, presumably under a

10   follow-the-money theory, the government, federal prosecutors

11   and the FBI could charge a student with wire fraud-- excuse me,

12   false statements because something was misstated somewhere in

13   the application.  And maybe even if the-- even if the

14   university wouldn't have necessarily cared, so long as it was

15   material, that would be a false statement.  And the court in

16   *Blankenship* held that simply cannot be a reasonable

17   construction of 1001 under the Supreme Court and several other

18   precedents around the country.

19           So just quoting *Blankenship* here, because this seems

20   germane to Your Honor's question, "We also note that if 1001

21   were interpreted to prohibit any false statement to any," in

22   this case, "private entity whose funds, in whole or in part,

23   happened to originate with the federal government, the results

24   would be shocking.  To start with a simple example, any

25   employee of either" the defendant contractor in that case, "or

1    its subcontractors who may have padded his résumé to obtain a

2    job on the project would be guilty of a federal offense."

3         So that simply cannot be the case *Blankenship* held and

4    it can't be the case here either.  It's contrary to the Supreme

5    Court precedent in *Rodgers*.

6         So, Your Honor, as to our due process arguments, I'm

7    not going to address those at length here and we can rest on

8    our papers there.  But it's important to think about each of

9    the flaws in the indictment through the lens of due process as

10   well.  So, for example, *McNally* and *Skilling* are in part due

11   process cases.

12        So not only was the theory not encompassed by the wire

13   fraud statute in those cases or the honest services fraud

14   statute as it expanded the definition of the wire fraud statute

15   but also the rule of lenity and fair warning and these other

16   due process principles that are so critical also led to the

17   same result.

18        So even if the court in those cases had decided that

19   this is an appropriate theory, it still would've likely came

20   out the same way under the due process argument because the

21   defendant in those cases were not on-- the defendants in those

22   cases were not on notice that their conduct could've been a

23   crime.  And we think the same principle applies here.

24        And it is worth noting that the government failed to

25   develop a limiting principle as to each of the examples that

1   the defense cited as to the absurd results of a decision

2   holding that the indictment adequately alleges fraud, and we

3   think that speaking volumes.

4           The last argument in our motion to dismiss was as to

5   venue.  It's a fairly complicated argument and we'll rest on

6   our papers on that one unless the court has any questions for

7   us about that argument.

8           THE COURT:  Proceed.

9           MR. DEARINGTON:  Okay.  Your Honor, I would just like

10  to make one more point.  The defense's view is that dismissal

11  without prejudice would not go far enough and my colleague, Mr.

12  Zeidenberg, I think will likely touch on this issue as well.

13  But Doctor Tao has been under indictment for close to 14 months

14  now, and we're back where we were nine months ago with a motion

15  to dismiss that's fully ripe for disposition.  We're in a

16  hearing just like we were nine months ago in January.

17          And the government has used superseding indictments,

18  whether deliberately or otherwise, in order to avoid a decision

19  on the motion to dismiss.  And it doesn't matter whether they

20  had good faith or bad faith in those circumstances, and

21  certainly the defense is not questioning that and assumes that

22  this is a good-faith decision, but the facts haven't changed

23  from indictment to indictment.  So the result is that Doctor

24  Tao has been under the cloud of an indictment for 14 months

25  while the government tinkers with its legal theories based on

1   the same core facts.

2          So the defense respectfully requests that the court

3   not only dismiss all ten counts in the indictment but it does

4   so with prejudice so that Doctor Tao can move on with his life.

5   Thank you, Your Honor.

6          THE COURT:  All right.  Why don't I hear from the

7   government at this point and then we'll turn to Mr. Zeidenberg

8   to argue the second defense motion pertaining to the grand

9   jury.

10         MR. HAWK:  Yes, Your Honor, thank you.  I'll be

11  handling this argument for the government.

12         So I first want to just point out to the court that

13  all of Mr. Dearington's arguments, they basically underscore

14  the reason why we have jury trials.  I think and I hope it's

15  clear to all that there are disputed facts here.  All the

16  evidence is obviously not before the court at this time, it's

17  not the appropriate forum for that.  This isn't a motion for

18  summary judgment.

19         And, you know, to the extent that the defense consents

20  to the court reviewing two pieces of evidence, they also

21  seemingly object to the court's consideration of all the other

22  facts and evidence outside of the indictment.  So in many ways

23  it appears that the defense wants to have it both ways.  They

24  want to argue facts outside of the indictment, they also want

25  to take facts not in the light most favorable to the

1    government, as the law requires, but to argue them in favor of

2    their client which, again, is more appropriate for a jury

3    trial.  But regardless, I think Your Honor's question and point

4    is absolutely correct in that all of these arguments and issues

5    are for the jury.

6         We think we can basically rely on the plain reasonable

7    reading of our indictment, which clearly is not boilerplate.

8    It sets forth in detail numerous factual allegations to support

9    the charges.  But we also think we can rely on the plain

10   reading of our arguments and our response.  We don't concede or

11   waive any arguments whatsoever, and I hope it's clear to all

12   that we vigorously contest all of the defendant's arguments.

13        I would like to make a few brief points, however, and

14   also happy to answer any questions for the court.

15        First, despite Mr. Dearington's efforts to confuse the

16   facts and the law, this is a pretty straightforward case that's

17   well within the heartland of wire fraud.  It's a case about

18   money, property and lives.  The object of the scheme was to

19   obtain a second salary and money and access to federal funds

20   that the defendant wasn't entitled to.  As the court pointed

21   out, that is clearly alleged in Paragraph 33 of the indictment

22   and facts otherwise throughout the indictment also support that

23   that is the object of the conspiracy in a plain and reasonable

24   reading of the indictment.

25        This case isn't about honest services, it's not about

1   *Skilling.*  Mr. Dearington acknowledges that 1346 and honest

2   services is not alleged in the indictment because, again, it's

3   a case about money and property.  It's also not about

4   self-dealing and intangible rights.

5           It's not about *McNally*, which also recognized that the

6   mail fraud statute protects property rights.  So in many ways

7   *McNally* actually supports the government's theory.  It's not

8   about by-products or incidental exchanges of money.  It's not

9   about *Kelly*.  It's not about some obscure property rights that

10  are argued in the defendant's motion.  It's not about some

11  novel construction of the statute.

12          The defendant defrauded and lied to his employer, the

13  University of Kansas and the federal government, to obtain a

14  second salary that he wasn't entitled to and to obtain access

15  to federal funds that he also wasn't entitled to.  That's what

16  the indictment alleges and that's what the government's

17  evidence at trial will prove.

18          The second point I want to make, Your Honor, is that

19  the defense doesn't get to pick and choose what standard

20  applies here.  This is a criminal case and a motion to dismiss.

21  Again, the indictment clearly sets forth the charges, it

22  provides more than adequate detail to put the defendant on

23  notice of the charges against him and to adequately defend

24  against those charges.  That's all the law requires at this

25  juncture.

1        Mr. Dearington respectfully appears to be wanting to

2   have it both ways.  On the one hand he says, of course, the

3   court should only look to the facts alleged in the indictment,

4   but then also asks the court to look at numerous facts outside

5   of the actual four corners of that document.

6        On the one hand he appears to consent and the defense

7   appears to consent to the court reviewing the two conflict of

8   interest forms which are, frankly, just two pieces of evidence

9   in the government's case, but seemingly objects to all the

10  other facts and evidence in this case that the government would

11  gladly put forward before the court.  But again, this isn't the

12  appropriate forum; that's for trial.

13       Frankly, Your Honor, the defense is trying to take us

14  down this rabbit hole of arguing the facts and the sufficiency

15  of the evidence and, again, that's not appropriate.

16       The third point that we want to make, Your Honor, that

17  I mentioned previously as well is that the government does not

18  concede, doesn't waive and doesn't confirm any of the

19  defendant's arguments, both the relevant and the irrelevant

20  ones that are raised in the motion.

21       I want to point out here I think that there's a

22  pattern - and I want to say this respectfully, Your Honor, but

23  I think it's worth noting - that in the defendant's motion and

24  reply and now in Mr. Dearington's argument, they appear to

25  cherry-pick particular facts, portions of statements, legal

1    principles and cases that don't tell the entire picture of what

2    that case was about, and they take all that out of context and

3    attempt to support their baseless arguments.  And, again, I

4    think just to underscore, we are not conceding any arguments

5    here.

6          And, you know, Your Honor, again I think the

7    government relies on our papers here and relies on the plain

8    and reasonable reading of the indictment.  I don't have

9    anything further to say, but, of course, I'm happy to answer

10   any questions that the court may have.

11         THE COURT:  All right.  First I'd like to ask you

12   about the objects of the fraud.  In Paragraph 38 it lists "to

13   benefit the Peoples Republic of China, to obtain U.S. grant

14   funds and his KU salary and to conceal the scheme."  I'm

15   asking, can you concede that the stated object of benefiting

16   the Peoples Republic of China is insufficient to establish

17   money or property fraud?

18         MR. HAWK:  Your Honor, I think what I would say to

19   that question is that the object of the scheme is to obtain

20   money and property, but, as alleged, the defendant had other

21   purposes as well in addition to that.  He was attempting to

22   benefit the Peoples Republic of China and to conceal his

23   scheme, but the primary purpose of this scheme was to obtain

24   money and property, to enrich himself and to obtain access to

25   grant funds that he otherwise wasn't entitled to.  So I think

1   it's part of the entire picture and story of the defendant's

2   scheme and conduct.

3           THE COURT:  But the actionable object you're saying is

4   to obtain U.S. grant funds and KU salary?

5           MR. HAWK:  That's correct, Your Honor.

6           THE COURT:  Okay.  And not concealment of the scheme.

7   Because my follow-up question is:  Is there-- what's the

8   authority to-- for concealment of a scheme to be an actionable

9   object of the scheme?

10          MR. HAWK:  Your Honor, again, I think it's our

11  position that the object of the scheme is to obtain money and

12  property.  Part of the defendant's scheme and the purpose of it

13  was to conceal that scheme.  But in terms of actionable

14  objects, I don't think that that is what is-- what we were

15  attempting to allege here.

16          THE COURT:  Okay.  My next question is:  The

17  indictment alleges that the National Science Foundation

18  required KU to maintain conflict forms, and I'd like more

19  information about that.  And also, what about the DOE and what

20  are the sources of these requirements, if any?  Is this by

21  regulation, by contract?

22          MR. HAWK:  Yes, Your Honor.  As the evidence I believe

23  will show at trial, it's by both policy statements that are

24  publicly made, regulations, federal regulations, and then also

25  contracts surrounding the grants.

1          NSF and DOE handle grant funds a little bit

2    differently.  NSF has a publicly-available document that sets

3    forth all of its policies and requirements, and that's where

4    the quoted language in the indictment comes from.  But overall,

5    grant funds are regulated by-- it's the Uniform Administrative

6    Requirements, and it's 2 CFR Part 200.  And within that it

7    discusses certain requirements that the sponsoring institutions

8    like KU must abide by, including having policies related to

9    outside employment, for example.

10          Your Honor, I think the bottom line again is I think

11   the evidence will show at trial that the federal agencies,

12   generally speaking, don't micro-manage the research and the

13   projects.  They grant them money to the sponsoring institution

14   and rely on that institution then to manage the project, manage

15   the way the money is spent.  But I don't think that that means,

16   as I think Mr. Dearington was implying, that the federal

17   agencies have no business in how that money-- or have no

18   interest in how that money is being spent.

19          THE COURT:  Mr. Dearington framed it, relying on case

20   law, that the government necessarily must allege and prove that

21   the DOE and the NSF had some authority or some power to enforce

22   with respect to the conflict of interest issue.

23          MR. HAWK:  And I think they do and I think in some

24   ways it goes a little bit to materiality, Your Honor.  But I

25   think as the evidence at trial will show is that they do.

1          These are federal grant funds provided by these

2     agencies to KU as a sponsoring institution and ultimately they

3     have the authority and the right to withdraw those funds to

4     stop the grant research.  It's not just a gift of money that

5     the institution and Doctor Tao, as principle investigator, get

6     to do whatever they want with.  And so the idea that the

7     federal agencies would have no power and authority to cease or

8     provide grant funds and distribution of grant funds, I find

9     that logic personally difficult to follow.

10          THE COURT:  Another argument that Mr. Dearington

11    raised I think was with respect to knowledge, Doctor Tao's

12    knowledge.  I assume your answer to that question would be that

13    that's a matter of evidence as well?  Knowledge with respect to

14    the conflict requirements imposed by the agencies on KU or

15    perhaps also knowledge with respect to KU or the Board of

16    Regents' own conflict policies and requirements.

17          MR. HAWK:  Your Honor, I think the law is clear in

18    terms of knowledge of federal jurisdiction, that the government

19    doesn't have to prove a defendant's knowledge of that

20    particular fact.  And so our position would be it's irrelevant

21    whether Doctor Tao knew or didn't know in terms of the federal

22    jurisdiction.  But at the same time, you know, I think the

23    evidence at trial will show that there's a very fair and

24    reasonable inference, if not direct evidence, that he actually

25    did.

1          As we set forth in our response, the form clearly

2    explains-- the conflict form clearly explains that KU was

3    obtaining this information as it relates to a staff or faculty

4    members' responsibilities at a university to include externally

5    funded research.  You know, and Doctor Tao here is a principal

6    investigator, he is the lead researcher for a project.  And the

7    idea that he would think that his statements have no bearing on

8    how the funds are distributed or whether he can continue to use

9    particular federal funds does not-- it seems ridiculous, Your

10   Honor.

11         THE COURT:  With respect to the conflict forms, the

12   basis for your affirmative misrepresentation claims, is that

13   the certification portion of the form itself?

14         MR. HAWK:  In terms of the 1001, Your Honor, or for--

15         THE COURT:  For the wire fraud.

16         MR. HAWK:  The misrepresentation?

17         THE COURT:  Right.

18         MR. HAWK:  It's our position and we think the evidence

19   will show that Doctor Tao's filling out of the form and

20   materially omitting-- or omitting his conflicts, that forms the

21   basis of the misrepresentation.  The fact that he certified it

22   is just further proof of that omission or misrepresentation.

23         THE COURT:  All right.  So under the wire fraud

24   statutes itself, you're saying that that's the affirmative

25   misrepresentation, it's essentially false pretenses as well I

1   suppose.

2        MR. HAWK:  I think it's-- I think it's, you know,

3   half-truths, I think it's omissions, I think it's false

4   pretenses.  You know, even if you want to characterize it as an

5   affirmative misrepresentation, I mean, he's misrepresenting the

6   fact that-- claiming that he has no conflicts when, in fact, he

7   does.

8        THE COURT:  All right.  One of the arguments-- one of

9   the things that you respond is that Doctor Tao signed a letter

10  of intent to work at Fuzhou in July 2017, but I don't think

11  that's alleged in the indictment itself, is it?

12       MR. HAWK:  No, Your Honor.  And, again, I think

13  that's-- you know, to the extent that the government included

14  in footnotes additional factual information, it's just to

15  underscore the idea that that's why jury trials are appropriate

16  here and that we will put forth the full weight of the evidence

17  which is, frankly, far more than what we referenced in our

18  response.

19       But in terms of-- I think the letter of intent or the

20  specific details of Doctor Tao's application for the talent

21  plan, no, those specific details are not alleged.  And it's our

22  position that we don't have to allege every factual detail in

23  an indictment, only enough to set forth the elements and

24  provide the defendant with notice, which we think the

25  indictment does.

1            THE COURT:  Okay.  One other question.  A couple

2    others probably, but I asked the defense about this.  I'm

3    struggling to understand the-- because there's counts based on

4    the e-mails regarding the buyout and the proposal for

5    collaboration between the two universities.

6            Okay.  So the grant-- the proposal to obtain a grant

7    based on collaboration, how was that used to fund the buyout or

8    how would it have been used to fund the buyout?  And then the

9    question is:  Was there, in fact, a buyout and how does any of

10   this relate to furtherance of the scheme?  I'm confused about

11   all of that.

12           MR. HAWK:  Sure.  I'm happy to address Your Honor's

13   questions.  I would just note, again, though, that I think, you

14   know, this is what will come out, evidence at trial.  And I

15   think, you know, this level of factual detail doesn't need to

16   be alleged in the indictment and isn't necessary for a motion

17   to dismiss.  But again, I'm happy to clarify and address the

18   court's questions.

19           You know, I think, again, this is all factual

20   information and evidence outside of the four corners of the

21   indictment that will be introduced at trial, but, you know, the

22   defendant needed a reason essentially to be out of the country,

23   to be in China for a substantial period of time in order to

24   fulfill his contractual duties and obligations to Fuzhou

25   University and the government of the PRC while maintaining his

1   second employment, full-time employment at KU at the same time.

2   And so he contrived this collaborative proposal between KU and

3   Fuzhou University which he submitted in order to obtain a

4   buyout or an excuse or a reason not to be at KU teaching a

5   course.

6          And so, you know, it furthers the scheme, again,

7   because it's a contrived situation that provides a cover story

8   and an excuse to allow him to continue defrauding the

9   University of Kansas of salary and his access to grant funds

10  while benefiting the PRC and obtaining a second salary at

11  Fuzhou University.  The idea that he identified Fuzhou

12  University in the collaborative proposal, of course Mr.

13  Dearington and the defense have their version of that

14  particular fact and the government has its version and, you

15  know, again, I think we will present all of that at trial and

16  make our arguments.

17         Our version, for the record, is what better way to

18  conceal and hide an obvious fact than to tell a half-truth or

19  even a fraction, a kernel of a truth in case anybody is ever

20  questioned.  And that's exactly what Doctor Tao did here.  He

21  never disclosed, which he should've, the fact that he was

22  working and employed by Fuzhou University.  So, again, here he

23  omitted important and material details and information to

24  obtain this buyout.

25         THE COURT:  Respond to the defendant's argument that

1    at least some of these charged wires were not essential to the

2    scheme and maybe not even related to the scheme.

3              MR. HAWK:  Sure, Your Honor.  Again, I think all of

4    Mr. Dearington's arguments are factual questions and issues for

5    the jury ultimately to decide when the full weight of the

6    evidence is before the jury.

7              Mr. Dearington claims that the government is confused

8    and misstates the standard here in terms of, you know, the few

9    several instances where we say "directly related to."  I think,

10   frankly, that's splitting hairs quite a bit and I think just

11   another sort of example of cherry-picking information to

12   support a baseless argument.

13             If I could just direct Your Honor to the government's

14   brief, which as the court knows, we addressed the standard at

15   length.  On Page 39, we clearly wrote and quoted from a Tenth

16   Circuit opinion of *Redcorn*, and this is well-settled law, "That

17   the wire need not be at the heart of a scheme nor necessary or

18   even helpful for its success.  It need not itself be false or

19   deceptive.  Rather, the transmission must be incident to the

20   accomplishment of an essential part of a scheme."

21             And the indictment sets forth the manner and means to

22   which the defendant accomplished his scheme and it's our

23   position that those, in essence, are the essential parts of the

24   scheme and each of the wires are incident to or directly

25   related to the advancement and accomplishment of the scheme.

         THE COURT:  Okay.  One more question and then I think
we'll be ready to move on to hear from Mr. Zeidenberg on that
motion.

         Are the false statement charges all based on
violations of 1001(a)(2) or are you also claiming concealment
under 1000(a)(1) [sic]?

         MR. HAWK:  The former, Your Honor.

         THE COURT: (a)(2) only?

         MR. HAWK:  That's correct, Your Honor.

         THE COURT:  Okay.  All right.  I don't think I have
any other questions.  Thank you.

         MR. HAWK:  Thank you.

         THE COURT:  Mr. Zeidenberg, if you'd like to take up
the next motion.

         MR. ZEIDENBERG:  I'm sorry, can you hear me, Your
Honor?

         THE COURT:  I can, yes.

         MR. ZEIDENBERG:  Okay.  I'm sorry.  I was asking the
court permission for Mr. Dearington to address just a couple of
points by Mr. Hawk.

         THE COURT:  Okay.  Go ahead.

         MR. DEARINGTON:  Your Honor, of course I'd be happy to
answer any follow-up questions, but there were just a couple of
items I did want to respond to that Mr. Hawk mentioned.

         First, Your Honor is absolutely right to put the

1    government to the question what is the scheme here, because the

2    indictment is all over the map.  Paragraph 32 says salary is

3    the scheme and grant funds.  And as I explained earlier, there

4    are no factual allegations that support that boilerplate.

5          But then you have Paragraph 33 that seems to flip the

6    scheme into one where Doctor Tao is trying to benefit China or

7    conceal the scheme.  And these are clearly not actionable, to

8    use the court's language, money or property objects and yet the

9    government is seeking to shoehorn them into the money or

10   property box in order to justify these uses of the wires and

11   say that they were in furtherance of a scheme to benefit China.

12   But that's-- the scheme that they must be in furtherance of is

13   the money or property scheme, not benefiting China or

14   concealing the scheme itself.

15         The government contends that it's not conceding any

16   arguments as to the misrepresentation, but that *ipse dixit*

17   assertion is itself a concession.  In order to not concede an

18   argument, one must address the argument and explain why it's

19   wrong so that the defense can counter that counter-argument and

20   we can find what the actual heart of the matter is to help the

21   court decide the issue.

22         So Mr. Hawk merely saying it's not-- the government

23   doesn't concede an argument is belied by the active concession

24   of not responding to the argument.  Certainly the case law does

25   not support the proposition that an opposition can merely say,

1    "We do not concede these points" and be adequate.

2          One refrain the government makes repeatedly is that it

3    should get to go to trial and prove its case and all of the

4    arguments that are based on legal issues that the defense has

5    marshaled here and pointing out why the indictment is

6    inadequate under Rule 12 are merely issues for trial, but

7    that's just not so.  These are critical allegations that are

8    missing from the indictment or allegations that are in the

9    indictment and contradict the scheme.

10          Mr. Hawk referred to-- as a "detail" and said that the

11    indictment doesn't need to go into detail, but that's not the

12    defense's point.  The defense isn't making a sufficiency

13    argument based on whether the government has enough facts to

14    prove its case.  The defense is arguing that the facts the

15    government has alleged in the indictment, if true, cannot prove

16    its case, because, for example, there is no scheme alleged in

17    the indictment to obtain salary by deceit or grant funds from

18    the agencies by deceit.

19          So if Mr. Hawk is right that the government gets the

20    chance to try all of its facts on a bad indictment, then there

21    would be no reason that a defendant could move to dismiss for

22    failure to state an offense.  The purpose and the standard are

23    there for the court to take all of the factual allegations and

24    decide whether, if the government can prove those, they state

25    an offense.  And here, the government has failed to meet that

1    standard.

2         Finally, Your Honor, Mr. Hawk-- you asked questions

3    about the standard for what is required to use the wires in

4    furtherance of a scheme.  And Mr. Hawk said that the defense

5    is, quote/unquote, splitting hairs here in arguing that the "in

6    relation to" standard is incorrect.  But certainly the

7    government does not contend that the Tenth Circuit was

8    splitting hairs when it reached a holding exactly the opposite

9    of Mr. Hawk's argument in *Redcorn*.  Certainly Mr. Hawk is not

10   contending that the Supreme Court splits hairs when it writes

11   opinions about what is required to violate Section 1343.

12        So we would urge the court to look at the actual

13   standard that applies according to the courts, not the

14   government in this case, and apply that standard.  And the

15   outcome there is that these five counts that we've highlighted

16   are not as alleged, taking the factual allegations as true,

17   uses of the wires in furtherance of a scheme to deprive KU of

18   salary or the agencies of grant money.

19        One final point, Your Honor, if you'll indulge me, is

20   that the government repeatedly makes reference to facts outside

21   the indictment.  And just to be clear here, the defense

22   doesn't-- contends that the court should follow the appropriate

23   standard and only review the factual allegations in the

24   indictment.  The exception are the two conflict of interest

25   forms which meet an exception because the government already

1    conceded in January that the court could review those forms.

2         Our position is not that the court needs to look

3    outside the indictment to grant our motion to dismiss, though.

4    The court can just look at what's actually alleged in the

5    indictment about the purpose of these conflict of interest

6    forms, for example, and dismiss on that basis.

7         The court is not authorized under the standard or

8    should not look outside the indictment to the new allegations,

9    about 12 pages worth in the government's opposition, explaining

10   what it hopes to prove at trial despite the defective

11   indictment, such as that Doctor Tao was a PI and that there are

12   these regulations that the government thinks somehow apply to

13   this case, none of which is addressed in the indictment or the

14   opposition itself.

15        So unless the court has any further questions on that

16   point, we'll again rest on our papers and arguments.

17        THE COURT:  All right.  Thank you very much.  One

18   thing I did neglect to ask you, Mr. Hawk, is about the

19   government's position on the court considering the two conflict

20   forms.

21        MR. HAWK:  Your Honor, I think it's our position that

22   we would gladly have the court consider all of the evidence in

23   addition to those two conflict forms in reaching its ruling but

24   that trial is the most appropriate forum for all the evidence

25   to come in.  I appreciate the government previously said it was

1    going to have the court see those two forms, but again, I think

2    taking those two forms out of context without the full weight

3    of the evidence, I think it's our position that it's not

4    appropriate to do so at this particular time.

5            THE COURT:  All right.  Thank you.

6            MR. HAWK:  And, Your Honor, may I just very briefly

7    respond to a few of Mr. Dearington's points?

8            THE COURT:  Go ahead.

9            MR. HAWK:  Thank you, Your Honor.

10           I think I simply just want to point out that the idea

11   that we concede any arguments is simply not true.  And I think,

12   you know, a careful reading of the government's response would

13   see that we didn't concede factual arguments, which is

14   essentially what the defense is focusing in on here.

15           Frankly, it's our position that it's not appropriate

16   right now to get into the weeds and argue the facts and

17   evidence in the case, particularly when it comes to the

18   material omissions, false representations, in furtherance of

19   the wire.  All of that is properly alleged in the indictment

20   and the facts taken as true support those allegations.

21           So, again, I simply don't think it's true that-- that

22   we are conceding anything or not addressing any arguments.  I

23   think we've done a pretty good job of responding in kind to all

24   of the various arguments the defense has raised in their

25   50-some-page motion to dismiss.  Thank you, Your Honor.

1          THE COURT:  All right.  Thank you.

2          We'll turn to Mr. Zeidenberg now.

3          MR. ZEIDENBERG:  Your Honor, can you hear me or am I

4    on mute?

5          THE COURT:  I can hear you, yes.

6          MR. ZEIDENBERG:  Okay.  Thank you.

7          Your Honor, just on the question of looking at the

8    conflict of interest forms, you know, I would just say Mr. Hawk

9    wasn't at the hearing in January, I would say I'm sure he's

10   looked at the transcript.  But, you know, we take issue, I take

11   issue with the fact that the government concedes that-- that

12   motion on the record that the court can look at that, has no

13   objection to the court reviewing the conflict of interest

14   forms.  And then after we file the motion to dismiss, then

15   says, well, on second thought, why don't you just look at the

16   whole record.  And I think they should be held to their

17   representation.

18         Your Honor, on the grand jury motion, we feel that the

19   evidence shows and that our papers present the fact that the

20   grand jury was seriously misled about two critical facts which

21   combined should give the court grave doubt that the decision to

22   indict was free from substantial influence of a grand jury

23   violation, and the two work in perfect concert with one

24   another.

25         First, the government, as it had in the previous grand

1    juries, did not introduce the conflict of interest forms which

2    are the subject of this case.  The heart of the case are the

3    conflict of interest forms which they claim are false, and they

4    misled the grand jury into thinking that the conflict of

5    interest forms were far broader than they actually were.  And

6    they read these policies, these KU policies, which were never

7    introduced and which are not subsumed into the conflict of

8    interest form and then they referred the grand jury to the

9    conflict of interest form.

10            And they read-- in Paragraph 39 the agent reads the

11   paragraph and says, "Doctor Tao falsely stated on his 2018

12   institutional responsibility form that he did not have any

13   conflicts of interest or time when in truth he had been

14   selected for the Chang Jiang Scholar Program at FZU and he

15   intended to work at FZU and receive funding."

16            But, Your Honor, if you look at the conflict of

17   interest forms, even if that's true, that is not necessarily a

18   conflict of interest.  The conflict of interest form is

19   triggered if there's $5,000 paid to you in the previous year,

20   and there's no allegation that that happened, or that the work

21   impacts your KU responsibilities.

22            And so the grand jury obviously-- that triggered

23   something in their mind because a grand juror asked the

24   question, what was-- what did KU think Doctor Tao was doing in

25   the spring of 2019?  They obviously knew he wasn't on campus.

1    And at that point they were told something that was, frankly,

2    not true.

3           The agent starts to answer by saying, "Well, there was

4    a buyout," which, in fact, there was a buyout.  As a matter of

5    fact, Franklin Tao, Doctor Tao, had no teaching

6    responsibilities at that time so there was no conflict.  And

7    this is what was on the grand juror's mind.  And he makes that

8    comment, the agent starts to answer the question, Mr. Mattivi

9    interrupts him and then he retracts and says there wasn't a

10   buyout.  But that wasn't true.

11          In their papers in their opposition, the government

12   concedes, as it must, that there was a buyout.  They say it was

13   a conditional buyout, but that's not what they told the grand

14   jury.  They didn't say there was a conditional buyout; they

15   said there was no buyout.  It was never perfected, it didn't

16   happen.  So they were misled and they created a conflict in the

17   juror's mind between his obligations at FZU and the conflict of

18   interest form.

19          And as a result, how can the court have any confidence

20   that that was-- not affected their opinion?  This is what they

21   were concerned about.  And it boggles the mind, Your Honor,

22   that they have a case that is the heart-- the beating heart of

23   this case is the conflict of interest form.  They never

24   introduce it and they never quote from it.  And then they say

25   it was-- he violated it and by submitting it, that's a false

 1    statement, that's a wire fraud.

 2          They have four direct counts.  And we would argue,

 3    Your Honor, all the counts are affected by this because without

 4    the conflict of interest forms and without them being false,

 5    there is no case.  They have to be false.  That's what the

 6    whole case is about.  That's what the grand jury was concerned

 7    about and that's what they were misled about.

 8          They had an e-mail from Mr. Weatherley, the dean,

 9    saying that it had been approved and they had an interview with

10    him in January of 2020.  To his understanding it had been

11    approved.  And the question, Your Honor, is did Franklin Tao

12    have teaching responsibilities on KU during this operative time

13    in 2019, the spring.  And the answer was no, he did not.

14          THE COURT:  One question I do have, Mr. Zeidenberg.

15    Mr. Zeidenberg, what about research responsibilities?  Again, I

16    understand we're getting-- we're getting into evidence, but

17    what about research responsibilities during that semester?

18          MR. ZEIDENBERG:  Your Honor, research responsibilities

19    are very different because research responsibilities, as you

20    can imagine, can be done anywhere.  And so the conflict of

21    interest form talks about impacting your teaching

22    responsibilities or research responsibilities, but there's no

23    evidence that that's what happened.

24          And the concern by the grand juror who asked this

25    question was clearly, well, where did they think he was?  He

1    clearly wasn't on campus.  And so the answer to that question

2    was very clear.  Well, he had a buyout so he didn't have to be

3    on campus.  Now, maybe there would be another--

4         THE COURT:  Let me stop you for a minute because I

5    thought I read somewhere that-- and I'm-- as you know, I've

6    already asked about this.  I was confused about the buyout and

7    the collaboration and all of that, but I thought I read

8    somewhere that although he didn't have teaching

9    responsibilities, he was still expected to be on campus that

10   semester.

11        MR. ZEIDENBERG:  Your Honor, what it said was-- the

12   e-mail from Mr. Weatherley was that, "You're expected to be in

13   attendance on campus during this semester in accordance with KU

14   policy."  The question is, what is that policy?  And he had no

15   teaching responsibilities that semester, none.  He didn't have

16   any classes to teach.  So there was no-- now, the government

17   can make whatever argument at trial, if we ever got to trial,

18   but the fact is the question is-- and they could present

19   evidence-- or they could have presented evidence to say, well,

20   he had a buyout; however, he still had research

21   responsibilities and whatnot.  But that's not what they were

22   told.  They were misled about what his responsibilities were

23   and whether or not there was a buyout.

24        And you couple that, Your Honor, with the other

25   questions that the grand jury asked.  The grand jury asked, "Is

1  this a question of espionage or double-dipping?"  Well, Your

2  Honor has-- we've been going at this for now, you know, almost

3  two hours and the court has heard the arguments and has read

4  the papers.  This isn't a case of espionage.  That was a very

5  easy question, is it a case of espionage?  The answer is no.

6         But that's not what they were told.  They're told,

7  well, just-- just listen.  Just listen.  Because they didn't

8  want to give the answer.  Yes, it's a case of double-dipping.

9  Because that's a case that's not going to excite their

10 passions.  That's not interesting.  That's not sexy.  That's

11 mundane.

12        And so you put that together, Your Honor, you put the

13 fact that they have a case agent who works in the

14 counter-espionage section or the national security section, and

15 he says, "I investigate cases like this, I work on cases like

16 this."  What is the grand jury supposed to think?  They were

17 given a deliberate misimpression that this is really some kind

18 of an espionage case.

19        There is no crime.  It is not illegal, it is not

20 improper, it is not unethical to work in China at a Chinese

21 university.  It is not illegal, improper, unethical in any way

22 to join a talent program.  There's nothing illegal about that.

23 Nothing improper about it.  Thousands of scientists do it all

24 over the country.

25        So to suggest to the grand jury that there's something

1   nefarious that's just baked into this case and then to mislead

2   them about the actual contents of what that conflict of

3   interest form required-- as Mr. Dearington said, you know,

4   you've got to have a dichotomy between the misrepresentation--

5   or the alleged misrepresentation and the facts.  And they

6   were-- on both ends they were misled.  Because the way the

7   evidence was presented, they were given the distinct impression

8   that anyone would've taken when you hear the-- and you look at

9   the transcript, the agent goes through the policy, which is far

10  broader, and then goes to the allegations in Paragraph 39, the

11  conflict of interest statement.

12          And anyone would naturally read that and think, well,

13  the conflict of interest statement encompasses the policy.  But

14  if you look at them, the policy is far broader.  The conflict

15  of interest statement itself has parameters, and that was the

16  grand jury's concern, that was what-- their question.  And they

17  were misled about both sides, what the parameters were and what

18  the conduct was.

19          And as a result of all of that, Your Honor, we think

20  that Doctor Tao was prejudiced, that the grand jury was

21  substantially influenced and that the court can't have any

22  confidence that this was of-- about the reasons for why they

23  returned this indictment.  Thank you.

24          THE COURT:  Thank you.

25          Mr. Hawk or Mr. Mattivi.

1           MR. MATTIVI:  Yeah, this one is me, Judge.

2           I'm going to start if you don't mind, Your Honor,

3    where Mr. Zeidenberg started because it leads into what I

4    submit the defense is trying to do here in what - I'm just

5    going to say this - in their misrepresentations to the court.

6           Mr. Zeidenberg started out by saying that he had an

7    issue with the government.  He thinks we should be held to our

8    representation in January that the court could look at the

9    conflict of interest forms.  And when we made that

10   representation to the court, I thought it was a valid

11   representation.  I didn't think it was a bad idea.

12          Since then what has happened is the defense has

13   cherry-picked particular pieces of evidence, they've even

14   broken down sentences in our pleadings and parsed them and

15   tried to make them sound like they say something that they

16   don't say.  And we have reached the point where we can't rely

17   on them to accurately portray to you what the evidence is, we

18   can't rely on them to accurately portray even what our

19   arguments are.

20          And so that leads us to the position where we think

21   that you taking out of context the conflict of interest forms

22   is not what we agreed to because it doesn't take into account

23   all of the evidence.  And that-- that's what's happened in

24   these motions.  It's happened in each motion, it's happened in

25   each argument.  They cherry-pick particular details and try to

 1    make them into something that they're not.

 2          So the arguments that Mr. Zeidenberg is making about

 3    this grand jury being misled are offensive.  They're absolutely

 4    offensive.  And the reason for that is the agent did not lie

 5    and the prosecutor did not mislead with regard to anything that

 6    happened in front of that grand jury.  And let me give you a

 7    couple of specific examples.

 8          Mr. Zeidenberg argues repeatedly that there was a

 9    buyout.  That is going-- that may very well be a contested

10    issue at the trial.  Right.

11          THE COURT:  Hold on.  Mr. Zeidenberg, can you all

12    mute?  We're having a lot of interference from your room.

13    Great.

14          MR. MATTIVI:  All right.  Sounds better already.

15    Thanks, Judge.  Now the feedback is back.  I'm not sure where

16    that's coming from.

17          Judge, you're on mute.

18          THE COURT:  I think that your-- Mr. Zeidenberg, I

19    think we're still getting feedback.  Not when I talk.

20          All right.  Go forward, Mr. Mattivi, and see if we're

21    still getting feedback.

22          MR. MATTIVI:  Sure, Judge.  So when I talk, my screen

23    lights up on the Zeidenberg end which-- okay.  It's not doing

24    it anymore, maybe we've got the problem solved.  Okay.  All

25    right.

1          So, Judge, the reason that these arguments are

2   offensive are I think highlighted by the nature of the

3   pleadings.  And if you look at the pleadings, the defense

4   accuses the government of concealing the conflict of interest

5   forms.  There was no concealment.  They may take issue with the

6   fact that we didn't present the forms to the grand jury, but

7   concealment is defined as an act of suppressing something or

8   preventing someone from seeing it.  Us making a tactical

9   decision not to show the forms to the grand jury to speed in an

10  otherwise very long and complicated presentation of the case,

11  that's not concealment.

12         And it's just-- they go on and they actually accuse

13  the agent of lying.  The agent may not have testified here

14  consistently with the defense's theory, I would certainly agree

15  to that.  The agent's testimony is very different from what the

16  defense's theory is, but the defense's theory is not the

17  evidence.  And the agent testified reliably and accurately

18  based on the facts.

19         And I ask you to pay particular attention to Mr.

20  Zeidenberg's words.  He's trying to tell you what was on a

21  grand juror's mind.  We don't know that and he can't know that.

22  But more particularly, he says things like, "Mr. Mattivi

23  interrupts the agent," and that's how he tries to convince you

24  that somehow I got the agent to change his story away from an

25  exculpatory fact.  That's not what happened at all.  Your

1  Honor, please, I ask you to look at that transcript and read it

2  in detail.  Nowhere in there do I interrupt the agent or try to

3  influence or color his testimony.

4        And I can't imagine a situation where it's improper

5  for a prosecutor to tell a grand juror to please be patient and

6  listen to the presentation of the evidence.  That's exactly

7  what we're there for.  And yet somehow the defense tries to

8  twist that into an impropriety and they allege that we've done

9  something wrong by asking the grand jurors to do precisely what

10  they're in that room to do, which is to listen to all of the

11  evidence.

12        So if you'll allow me now just to go back to the

13  specific claim regarding the buyout.  Judge, I submit to you

14  that everything that you need to know about the buyout is in

15  the transcript from the grand jury which the defense presented

16  you of.

17        So, first of all, I'm going to go-- I believe it's

18  Exhibit E, which is our grand jury transcript from August.  If

19  you go near the end, so it's at page-- it's a little bit

20  confusing because the exhibit numbers are different from the

21  page numbers.  But on Exhibit E which is attached to the

22  defendant's motion, Document 83, and it's actually

23  Document 83-5, the grand jury transcript page is 22, but that's

24  Page 11 of the defendant's exhibit.  That's where the

25  discussion begins regarding the buyout.

1           And I ask you to just read through that, Your Honor.

2   And there's-- there's nothing in there where the prosecutor

3   interrupts.  The agent I think explains what happened.  And

4   what happened is, the defendant, as Mr. Hawk explained, we

5   believe that it's a-- it's a part of a concerted effort to

6   deceive KU that he applied for a buyout.  And Mr. Zeidenberg

7   argues very passionately, as I expect him to do before the

8   jury, that there was a buyout.  But that's not what the

9   evidence shows.

10          The evidence shows that Mr. Tao, Doctor Tao applied

11  for a buyout, his department chair granted it conditionally

12  upon Doctor Tao meeting the requirements of the university,

13  which he did not do.  But then Doctor Tao never followed

14  through, the buyout was never approved.  And so even though the

15  department chair approved the initial application for a buyout,

16  it never happened.  It never got approved at the university

17  level and it never got funded.

18          And so we can argue at trial over whether there was a

19  buyout, and I expect that we will.  But for the defense to say

20  that the agent lied in the way that he represented that to the

21  grand jury, that's just offensive, Your Honor.  It doesn't fit

22  neatly into their box as to what the theory of this case should

23  be, but that doesn't make it a lie.

24          Once that falls away, I respectfully submit to you

25  that the rest of this motion falls away too.  They can take

1   issue with the fact that we didn't present the conflict form.

2   The conflict of interest form is very detailed, and I would ask

3   you to look, Your Honor, at-- you know, they-- I guess I don't

4   want to go down that road because we've got this fight going on

5   over whether you look at the conflict forms at all.  But the

6   bottom line is the conflict form is very detailed, it's very--

7   I'm sorry, Judge.

8            THE COURT:  Well, Mr. Hawk I thought told me I could

9   look at the conflict forms.

10           MR. MATTIVI:  Well--

11           THE COURT:  I mean, he made the argument that it's--

12   you know, they're evidence, there's a lot of other evidence,

13   the defense is cherry-picking.  I can be mindful of that I

14   think and look at the conflict forms myself, but it seems like

15   there's a difference between what you and Mr. Hawk are saying

16   about whether I should or should not.

17           MR. MATTIVI:  No.  Yeah, that's not the way I

18   understood his statement.  But be that as it may, if the court

19   decides to look at the conflict forms, you'll see they are very

20   thick, they are very dense.  But there is a certification

21   statement at the end and that certification statement is much

22   broader than Mr. Zeidenberg portrays it to be.  He portrays it

23   to be a very narrow issue with regard to $5,000 having been

24   paid within the last year, but the certification statement at

25   the end of the conflict form is much broader and it is

1    completely consistent with the way that the agent testified.

2          So whether you're talking about the agent's

3    representation with regard to the conflict form-- which, again,

4    his representation of it is exactly correct and it is

5    100 percent in keeping with the facts of the case.  So whether

6    you're talking about that or you're talking about the way that

7    the buyout was represented to the grand jury, the agent

8    testified completely accurately.  And, again, once those fall

9    away, we respectfully submit the rest of this motion falls away

10   as well.  And I don't think there's a need for me to go back

11   through everything that was in our papers.

12         The one issue-- the one remaining issue that I do want

13   to address is in one of their footnotes the defense made a

14   reservation of right.  And it's in their reply.  It's one of

15   the later footnotes, I think it's 19.  Let me find it.  It's

16   Footnote 12 on Page 13.  "To be clear, if the court were to

17   decline to dismiss any counts in this case, Doctor Tao reserves

18   the right to move to strike these paragraphs."

19         I didn't understand the court's motion deadlines in

20   this case to be a round one or a preliminary round of motions.

21   My interpretation of the court's motion deadline and the way we

22   practice pretrial litigation in this district is if you have a

23   motion, you need to file it.

24         The defense did not file a motion to strike paragraphs

25   from the indictment and I don't think that it's a correct

1    interpretation of this court's pretrial litigation practices to

2    reserve the right to file another motion based on whether the

3    court rules against the defense in this round of motions.

4         So that having been said, I'm happy to answer any

5    questions the court has.  And otherwise we'll submit it on our

6    pleading.

7         Judge, if you said something, you're on mute again.

8         THE COURT:  I was asking my law clerk something.  No,

9    I don't have any questions.  So I think we can consider this

10   now-- both motions now under advisement.  I also have under

11   advisement the-- both the--

12        MR. ZEIDENBERG:  Your Honor.

13        THE COURT:  -- the response to-- just a minute.  I

14   also have under advisement the motion for leave to appear amici

15   curiae by the organization and I'll be deciding that on the

16   basis of the papers.  (Reporter interruption).

17        MR. ZEIDENBERG:  Yes, Your Honor.  Thank you.  I just

18   have a brief--

19        THE COURT:  You're having trouble, Kelli?  You

20   couldn't understand what I said?

21        MS. REPORTER:  That's correct.

22        THE COURT:  Okay.  Mr. Zeidenberg, could you mute and

23   just let me make a record of what I just said?

24        Okay.  So what I said was I consider these two motions

25   to be under advisement as well as the motion for leave to file

 1    an amicus brief.  I have the government's response to that,

 2    I'll decide that on the papers.  So I consider these motions to

 3    be under advisement.

 4         I think Mr. Zeidenberg then wanted to say something,

 5    perhaps offer some rebuttal to what Mr. Mattivi said, so we'll

 6    do that now.

 7         MR. ZEIDENBERG:  Thank you, Your Honor.

 8         Mr. Mattivi said that the agent was absolutely

 9    accurate when he testified.  Your Honor, you look at the grand

10    jury transcript that Mr. Mattivi referenced, the question was

11    from Mr. Mattivi, "So he requested a buyout, but you didn't say

12    that KU granted him a buyout.  Correct?"

13         Answer:  "I did not."

14         Answer:  "They did not grant him a buyout."

15         There's nothing equivocal about that.  In its papers,

16    in its opposition on Page 12, the government writes, "On

17    June 25th, 2018, after a series of e-mails and meetings between

18    the defendant and KU, the chair of KU's chemistry department

19    approved a buyout."

20         That was not-- they say with conditions, with

21    conditions, but that was not the answer he gave.  He didn't say

22    he got a buyout with conditions, he said they did not grant him

23    a buyout.  So you cannot possibly say that that was 100 percent

24    accurate.  That was misleading at best.

25         And finally, Your Honor, Mr. Mattivi-- the government

1    wants the court to now consider the certification.  But in the

2    indictment, what the grand jury was told, is in Paragraph 39 it

3    says that the institutional responsibility form was that he did

4    not have any conflicts of interest, any conflicts of interest

5    or time.

6          So they're not referring in the indictment to the

7    language in the certification, they're referring to the

8    language that we quote that comes-- that talks about your time,

9    effort and money.  So it's not the certification section that's

10   referenced as being false.  The court asked that question of

11   Mr. Hawk early on, and Mr. Hawk indicated it's the time and

12   conflict is the portion of the conflict of interest statement,

13   not the certification.

14         So with that, Your Honor, I would submit.  Does the

15   court have a question?

16         THE COURT:  No, I don't.

17         MR. MATTIVI:  And, Judge, that-- I think Mr.

18   Zeidenberg just did an excellent job of illustrating my point

19   for me that we cannot rely on the defense to accurately present

20   what the evidence is.  Because if you look at precisely the

21   page in our pleading that he was referring to, he seized on a

22   clause in that sentence that says, "the chair of KU's chemistry

23   department approved a buyout."

24         Okay.  But even the rest of the sentence makes it

25   clear that that buyout alone was just for one course in Doctor

1    Tao's entire academic load, just for one course, and that it

2    had explicit conditions.  And the next sentence goes on to

3    explain what happened with regard to that buyout.

4          So again, they're not even seizing on particular

5    sentences, they're seizing on words within sentences and then

6    making misrepresentations based on those words.  And that's

7    what makes their charge that the agent lied so offensive.

8          Judge, with regard to the amicus motion, there was one

9    thing in the reply that I would like to bring the court's

10   attention to if you would allow me to do that.

11         THE COURT:  Go ahead.

12         MR. MATTIVI:  So the reply relies almost entirely on

13   the *Alkaabi* case which obviously is not binding on this

14   district.  And the difficulty with *Alkaabi* is we don't know

15   precisely what issue-- or at least I can't tell from reading

16   the opinion precisely what issue the amici briefed that was

17   helpful to the court.  But if you look at Footnote 19 in

18   *Alkaabi*, you'll see that the court there rejected at least a

19   part of the amicus submission in that case.  And the reason it

20   rejected that part is it was a due process argument that wasn't

21   raised by the defendants.

22         And so even in the best case that the amici have and

23   that they rely on, the brief-- that's the best case, the one

24   they rely is *Alkaabi*.  But even in *Alkaabi*, even there at least

25   a part of that amicus brief was rejected because it wasn't on

1  point.

2       And we submit that's exactly what's happening here.

3  They want to distract the court with this China Initiative

4  business, but that is about selective prosecution.  And there

5  is no selective prosecution motion before the court, and we

6  submit that's why the amicus brief should be rejected.  So

7  that's all I have, Your Honor.  Thank you.

8       THE COURT:  All right.  All right.  I will consider

9  this matter under submission and we'll be issuing an order.

10  And then based on that order, we'll probably give further

11  direction as to what our next step is.  All right?

12       I thank you all for appearing today by Zoom.  We're

13  still kind of learning these things as we go, but we're getting

14  better and just thankful we're all able to gather in this way

15  and-- safely and without having to travel.

16       MR. MATTIVI:  Thank you for your patience with us,

17  Your Honor.

18       MR. ZEIDENBERG:  Thank you.  Thank you, Your Honor.

19  We appreciate the court conducting it in this fashion, it's a

20  great help.

21       THE COURT:  All right.  Good.  All right.  Everyone be

22  well.  We'll recess.

23       MR. ZEIDENBERG:  All right.  Thank you.

24       (11:01 a.m., proceedings concluded).

25

1

2                                * * *

3

4

5                    C E R T I F I C A T E

6        I certify that the foregoing is a correct transcript

7   from the record of proceedings in the above-entitled matter.

8

9

10   October 5, 2020.

11

12
                              /s/ Kelli Stewart _____
13                            KELLI STEWART, CSR, RPR, CRR, RMR
                              United States Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25