## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      Plaintiff,

      v.                                   Case No. 19-20052-JAR

FENG TAO,

      Defendant.

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Feng Tao's Motion to Dismiss the Second Superseding Indictment for Failure to State an Offense and Lack of Venue (Doc. 82) and Motion to Dismiss Second Superseding Indictment due to the Government's False, Misleading, and Prejudicial Statements to the Grand Jury (Doc. 83). Also before the Court is Asian Americans Advancing Justice and Asian Americans Advancing Justice-ALC's ("Amici") Motion for Leave of Court to Enter Their Appearance as Amicus Curiae and File Brief in Support of Defendant Dr. Franklin Tao's Motion to Dismiss the Second Superseding Indictment for Failure to State an Offense (Doc. 86). The Court heard oral argument on Defendant's motions on October 1, 2020. The Court grants Amici's motion for leave to appear and file the brief attached to their motion. Having fully considered the briefs and the parties' oral argument, the Court is prepared to rule on the motions to dismiss. As explained more fully below, the Court denies Defendant's motions to dismiss.

## I.    Motion to Dismiss for Failure to State an Offense and Lack of Venue

### A.    Factual Background

The following facts are alleged in the Second Superseding Indictment ("SSI") and assumed to be true for purposes of deciding this motion. Defendant Dr. Feng "Franklin" Tao is a

full-time professor and researcher who worked at the University of Kansas ("KU") Center for Environmentally Beneficial Catalysis on projects involving renewable energy.  KU is a public research university governed by the Kansas Board of Regents ("KBOR").  In his capacity as a researcher at KU, Defendant was responsible for submitting United States Government ("USG") grant proposals through KU and for managing USG-funded research projects at KU.  Between December 2017 and August 2019, Defendant obtained funds from the U.S. Department of Energy ("DOE") and the National Science Foundation ("NSF") to support his research at KU.

The KBOR has a policy requiring faculty and staff of KBOR institutions, including KU, to disclose any current or prospective situations that involve potential conflicts of interest or time as soon as they became known.  KBOR policies required Defendant to annually disclose conflicts of interest or time using KU's Institutional Responsibilities form ("Conflict form"), which included a certification that he was in compliance with KBOR policies, that he would "secure approval prior to engaging in any external personal, professional activities[, and that] he agreed to report any changes as soon as they become known to him and no later than 30 days after acquiring a new significant financial interest."[1]

The People's Republic of China ("PRC") uses "talent plans" to encourage the transfer of ideas and intellectual property from the United States to PRC institutions.  Applicants tend to have experience in "cutting-edge science or engineering research" and the PRC usually provides the participants with significant financial and social incentives to join the program.  Defendant applied to one of these talent programs, the Chang Jiang Scholar Program ("Scholar Program"), for the first time in 2016; he was not selected.  Starting in May 2017, he met with contacts in China regarding the Thousand Talents Program, a different talent program.  But he ultimately

---

[1] Doc. 75 ¶ 6.

applied to the Scholar Program again in July 2017.  On November 11, 2017, he sent an email from Kansas to the Consulate General of the PRC in Illinois about traveling to Fuzhou University ("FZU").  Defendant was accepted into the Scholar Program at the end of December 2017, with the understanding that he would be employed full time at FZU and would conduct research there involving renewable energy for the benefit of the PRC.  Beginning in May of 2018, Defendant signed a five-year contract requiring him to be a full-time employee at FZU.

Defendant falsely certified on two Conflict forms that he did not have any conflicts of interest or time under the KBOR policies, first on January 9, 2018, and again on September 25, 2018.  On January 29, 2018, in a grant proposal for DOE-funded research, Defendant certified to KU that he had made all relevant disclosures, financial and otherwise, as required by KU and the KBOR.  On May 17, 2018, Defendant submitted a proposal to KU for collaborative research with FZU and then later proposed using that budget to buy out his spring 2019 teaching requirement.  On July 16, 2018, Defendant represented to the DOE that he was only receiving and only expected to receive USG funding, despite expecting to receive funding from FZU and the PRC.  On June 15, 2019, Defendant submitted a progress report to the DOE stating he had no changes to current or expected support.

The Government alleges that these communications were misrepresentations that were part of a scheme to defraud KU of his salary and the USG of grant funds from May 2017 through August 21, 2019.  The ten-count Second Superseding Indictment charges Defendant in Counts 1–7 with wire fraud in violation of 18 U.S.C. § 1343, and in Counts 8–10 with making false statements in violation of 18 U.S.C. § 1001.[2]

---

[2] The SSI also charges these crimes through 18 U.S.C. § 2.

B.      Standards

Defendant argues that the SSI fails to state an offense under Fed. Crim. P. 12(b)(3) as to all counts and that venue does not lie in the District of Kansas as to Count 10.  That subsection governs motions to dismiss before trial, including where there is a defect in instituting the prosecution or a defect in the indictment.  Potential defects in initiating prosecution include improper venue.[3]  Potential defects in an indictment include failure to state an offense.[4]

"An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense."[5]  If these three standards are met, then the indictment "need not go further and allege in detail the factual proof that will be relied upon to support the charges."[6]  Importantly, Rule 12(b)(3) authorizes the district court to resolve before trial only those motions "that the court can determine *without a trial of the merits*."[7]  Accordingly, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial."[8]  To that end, "a court generally is bound by the factual allegations contained within the four corners of the indictment" when ruling on a pretrial motion claiming a defect in an indictment for failure to state an offense.[9]

---

[3] Fed. R. Crim. P. 12(b)(3)(A)(i).

[4] Fed. R. Crim. P. 12(b)(3)(B)(v).

[5] *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (quoting *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997)).

[6] *United States v. Doe*, 572 F.3d 1162, 1173–74 (10th Cir. 2009) (quoting *United States v. Redcorn*, 528 F.3d 727, 733 (10th Cir. 2008)) (internal quotation marks omitted).

[7] Fed. R. Civ. P. 12(b)(3) (emphasis added).

[8] *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (emphasis in original).

[9] *United States v. Welch*, 327 F.3d 1081, 1090 (10th Cir. 2003).

Although in "rare exception[s]" a court can potentially "resort to facts outside the indictment that bear on the merits of the case, this "extra-indictment evidence . . . must be undisputed in the sense that it is *agreed* to by the parties."[10]  In other words, if either party "expresse[s] any objection to its consideration or any objection to its completeness and accuracy," a court is constrained to the allegations in the indictment.[11]  As the Tenth Circuit has explained, "unlike their civil counterparts, criminal proceedings have no extensive discovery and summary judgment procedures requiring both sides to lay their evidentiary cards on the table before trial."[12]

"Challenging an indictment is not a means of testing the strength or weaknesses of the government's case, or the sufficiency of the government's evidence."[13]  Rather, "[a]n indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true."[14]  "On a motion to dismiss an indictment, the question is not whether the government has presented sufficient evidence to support the charge, but solely whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offense."[15]  Courts should therefore avoid considering evidence outside the indictment when testing the indictment's legal sufficiency.[16]  Similarly, the Court should consider a motion for

---

[10] *Pope*, 613 F.3d at 1260–61

[11] *Id.* at 1261.

[12] *Id.* at 1259–60.

[13] *Id.* (citing *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994)).

[14] *Id.*; *see also United States v. Sampson*, 371 U.S. 75, 78–79 (1962) (finding it irrelevant that charges had not been established by evidence, because on a motion to dismiss "the indictment must be tested by its sufficiency to charge an offense.").

[15] *Pope*, 613 F.3d at 1068 (citing *Sampson*, 371 U.S. at 78–79; *Hall*, 20 F.3d at 1087).

[16] *Id.* at 1067 (citing *Hall*, 20 F.3d at 1087).

improper venue under Fed. R. Crim. P. 12(b)(3)(A)(i) based on the four corners of the indictment.[17]

Defendant submits two exhibits in support of his motion to dismiss for failure to state an offense: Exhibit A is the January 9, 2018 Conflict form on which Counts 3 and 8 are based; Exhibit B is the September 25, 2018 Conflict form on which Counts 6 and 9 are based. The Government objects to the Court's consideration of these documents; thus, the Court disregards them in deciding the motion to dismiss for failure to state an offense and considers only the allegations set forth in the SSI.

### C.    Discussion

#### 1.    Wire Fraud Charges, Counts 1–7

Counts 1 through 7 allege violations of the wire fraud statute, 18 U.S.C. § 1343:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

The elements of wire fraud are: "(1) a scheme to defraud; (2) an interstate wire communication; and (3) a purpose to use the wire communication to execute the scheme."[18]  Defendant challenges the sufficiency of the allegations in support of the scheme to defraud and purpose elements of the wire fraud charges.

---

[17] *See, e.g.*, *United States v. Villalobos-Macias*, 280 F. Supp. 3d 1211, 1214–15 (D.N.M. 2017).

[18] *United States v. Zar*, 790 F.3d 1036, 1049 (10th Cir. 2015) (quoting *United States v. Wittig*, 575 F.3d 1085, 1093 (10th Cir. 2009)).

### a.     Scheme to Defraud Element: Money or Property Fraud

The first element of wire fraud is a scheme to defraud, which "includes a scheme to obtain [money or] property by means of false or fraudulent pretenses, representations, or promises."[19]  Here, the Government alleges a scheme to obtain money—grant funds and Defendant's salary—by means of false or fraudulent pretenses, representations, or promises. The Supreme Court recently explained in *Kelly v. United States* that where property fraud is alleged, "[i]t must be an 'object of the fraud.' . . . Or put differently, a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme."[20]  The government's right to employee time and labor can form the basis of a property fraud prosecution, but not if "the loss to the victim is only an incidental byproduct of the scheme."[21]

First, Defendant argues that the right to accurate information is not a property right; therefore, Defendant's withholding of information from KU does not implicate a property interest.  But, as one district court has observed, this argument "stretches *Kelly* to the breaking point," because *Kelly* dealt with a scheme involving "public corruption and the misuse of regulatory power, holding that an allegedly corrupt state regulatory decision, where no actual money changed hands, did not have as its object money or property."[22]  Here, the SSI alleges the purpose of the scheme as follows: "to benefit the PRC by participating in a 'talent plan,' to obtain USG grant funds and his KU salary under false pretenses, and to conceal the scheme."[23] The USG and KU have concrete interests in the funds used for Defendant's research and salary, and Defendant allegedly tried to obtain this money under false pretenses by avoiding disclosure

---

[19] *Id.* at 1049–50; *see also Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020).

[20] *Kelly*, 140 S. Ct. at 1573 (footnote omitted).

[21] *Id.*

[22] *United States v. Weigand*, –F. Supp. 3d–, 2020 WL 5105481, at *5 (S.D.N.Y. Aug. 31, 2020).

[23] Doc. 75 ¶ 33.

of conflicts of interest.  Under such circumstances, "whether the banks also had a 'right to accurate information,' 'ethereal' or otherwise, is beside the point."[24]

Defendant next argues that fraud based on nondisclosure of conflicts of interest is not money-or-property fraud, but instead honest services fraud under 18 U.S.C. § 1346.  Because *United States v. Skilling* held that prosecutions based on the failure to disclose a conflict of interest do not fall within the bounds of the honest services wire fraud statute, Defendant argues that the SSI fails to state wire fraud offenses.[25]  The Government responds that the allegations in the SSI go beyond nondisclosure of conflicts of interest and explicitly allege money-or-property fraud.  The Court agrees.  At this stage of the proceedings, the Court reviews only the sufficiency of the allegations in the SSI.  The SSI does not rely on § 1346, the honest services fraud statute, to establish wire fraud—the charges are brought under § 1343 only.

Under the honest services doctrine, "[w]hile the offender profited, the betrayed party suffered no deprivation of money or property; instead, a third party, who had not been deceived, provided the enrichment."[26]  The allegations in this case go beyond honest services fraud because the betrayed parties—KU and the USG—suffered a deprivation of money.  The SSI explicitly alleges that the object of the wire fraud scheme was to deprive KU and the USG of research grants and Defendant's salary.[27]  These allegations are sufficient to state money-or-property wire fraud offenses.

Relying on First Circuit law, Defendant argues that the Government cannot rely on the maintenance of Defendant's salary at KU to support its allegation that deprivation of money was

---

[24] *Weigand*, 2020 WL 5105481, at *5.

[25] 561 U.S. 358 (2010).

[26] *Id.* at 400.

[27] *See Pasquantino v. United States*, 544 U.S. 349, 357 (2005) ("the object of petitioners' scheme was to deprive Canada of money legally due, and their scheme thereby had as its object the deprivation of Canada's 'property.'").

an object of the scheme to defraud.[28]  To be sure, some unpublished decisions from district

courts in the First Circuit have determined

> that while the mere maintenance of a preexisting salary or
> employment did not satisfy the "money or property" requirement
> of the wire fraud statute, obtaining a new position, an increase in
> salary, or the payment of a bonus could be sufficient, as long as
> those benefits were obtained through the fraudulent scheme, and
> the defendant was not otherwise entitled to receive those benefits.[29]

The Court declines to draw this distinction in the absence of controlling Tenth Circuit law.  As

the Seventh Circuit has adeptly explained, "[j]obs are a lot like contracts.  Neither is a bag full of

money but both are immensely valuable: a contract is a promise to pay for services rendered,

while a job is the exchange of labor for a paycheck."[30]  According to the SSI, KU was deprived

of something of value because it continued to employ Defendant despite his failure to notify it

that he was in violation of the KBOR's conflict policies—policies he was required to comply

with as part of his job.

The Court also disagrees with Defendant's contention that the alleged victims of the

fraud were not deprived of money because Defendant performed the research and teaching duties

necessary to receive grant funding and his salary.  Several cases support the proposition that

payment of an employee's salary is sufficient to show deprivation of money or property, even if

---

[28] *United States v. Billmyer*, Nos. CRIM 94-29-01-JD, CRIM 94-29-03-JD, CRIM 94-29-04-JD, 1995 WL 54471, at *9 (D.N.H. Feb. 3, 1995), *aff'd sub nom United States v. Joselyn*, 99 F.3d 1182 (1st Cir. 1996).

[29] *United States v. Facteau*, No. 1:15-cr-10076-ADB, 2016 WL 4445741, at *10 (D. Mass. Aug. 22, 2016) (comparing *United States v. Doherty*, 867 F.2d 47, 56 (1st Cir. 1989) and *United States v. Allard*, 864 F.2d 248, 251 (1st Cir. 1989) with *Billmyer*, 1995 WL 54471, at *9); *Billmyer*, 1995 WL 54471, at *9.

[30] *United States v. Sorich*, 523 F.3d 702, 713 (7th Cir. 2008) ("here the city paid for, and was cheated out of, qualified civil servants."); *see also United States v. Johns*, 742 F. Supp. 196, 205 n.7 (E.D. Pa. 1990) (finding deprivation of salary and benefits was not an intangible loss under First Circuit precedent where the government alleged that the victim "actually lost the money it used to pay Johns' salary and benefits, and not merely its intangible right to control those payments.").

services are performed in exchange for the salary.[31]  For example, in *United States v. Ransom*,

the defendant, a salaried FLSA-exempt federal employee, was charged with wire fraud for

falsely reporting his hours worked on time and attendance reports. [32]  Judge Lungstrum held:

> [R]egardless of whether the submission of falsified T&A Reports
> impacted the amount Mr. Ransom received in any given paycheck,
> it did help permit Mr. Ransom to continue his employment despite
> his reduced work hours and to continue to receive a paycheck.
> Therefore, if the government can establish the requisite intent at
> trial, the submission of the Reports could be said to have resulted
> in a deprivation of something of value to the United States—
> namely, the amount paid Mr. Ransom in salary—by means of
> deceit.[33]

Here, the allegations in the SSI about KU's conflict-of-interest requirements support that

KU and the federal agencies did not just bargain for a professor who performed his research and

teaching responsibilities, they bargained for an employee who lacked conflicts of interest of time

and money.  KU sought to enforce this requirement by annually requiring the Conflict forms to

be submitted.  NSF sought to enforce this requirement by requiring KU to maintain conflict

policies.  And DOE sought to enforce this requirement by requiring Defendant to submit current

and pending support along with his grant applications.  According to the SSI, KU and the federal

agencies were deprived of money expended on Defendant's salary and research funding, money

that was conditioned in part on Defendant being conflict-free.

---

[31] *See, e.g.*, *United States v. Richter*, 796 F.3d 1173, 1192–93 (10th Cir. 2015) (holding "payments made in exchange for services provided under a contract induced by false representations, even where the services are performed, constitute a deprivation of money or property sufficient to invoke the federal fraud statutes."); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) (upholding conviction of school bus driver who obtained job after lying on application about his status as a convicted felon because school district bargained for a school bus driver who was truthful and not a convicted felon yet this is not what it received); *United States v. Person*, 373 F. Supp. 3d 452, 465–66 (S.D.N.Y. 2019) ("The alleged misrepresentation in this instance went directly to the essence of the bargain that the University had with Person—his contract with the University to run a NCAA-compliant basketball program."); *United States v. O'Brien*, 994 F. Supp. 2d 167, 182–83 (D. Mass. 2014) ("It is well-settled that a scheme to obtain jobs or promotions to persons who are not qualified, or not the most qualified, can constitute a scheme to obtain money or property under the mail fraud statute.") (collecting cases).

[32] No. 09-20057-JWL, 2009 WL 3756977, at *3 (D. Kan. Nov. 9, 2009).

[33] *Id.* (citing *United States v. Burns*, 104 F.3d 529 (2d Cir. 1997)).

Defendant argues that the SSI does not allege that he would not have been paid or received funding if his disclosures had included the information about his FZU employment. The Court disagrees.  According to the SSI, as part of his job at KU, Defendant was responsible for submitting grant proposals to USG agencies through KU for research projects.  KU used the information provided by Defendant on his Conflict forms "to determine whether TAO had financial interests or commitments of time that conflicted with his responsibilities to manage USG-funded research projects."[34]  Also, DOE asked Defendant to update his current and pending support disclosures in July 2018, while it was reviewing his grant application.  DOE awarded the grant in September 2018, relying on Defendant's representations.  Similarly, NSF required KU to maintain a written, enforceable conflict of interest policy.  The SSI alleges that on June 28, 2018, NSF awarded a grant to KU and Defendant, relying on his representations as to conflicts of interest.  Thus, the SSI sufficiently alleges that Defendant's fraudulent scheme sought to deprive KU and the United States government of money or property under 18 U.S.C. § 1343.

> **b.**  **Scheme to Defraud Element: False or Fraudulent Pretenses, Representations, or Promises**

Defendant argues that the SSI does not sufficiently allege false or fraudulent pretenses, representations, or promises—another component of the scheme to defraud element of wire fraud.  Specifically, Defendant maintains that the statements alleged in Counts 1–7 must be dismissed because the SSI fails to allege facts that, if true, render the representations on the Conflict forms false.  He argues that he had no reportable conflicts of interest at the time he filled out each of the Conflict forms charged in Counts 3 and 5.  As for the January 9, 2018 form charged in Count 3, Defendant points to the facts set forth in the SSI establishing that he did not accept the offer of employment from FZU until two months later, in March 2018.  And although

---

[34] Doc. 75 ¶ 7.

the SSI alleges that the Scholar's Program accepted Defendant at the end of December 2017,

there is no allegation that this generated a conflict of interest—the SSI does not allege that he

was paid or performed work for the program before he filled out the January 9, 2018 Conflict

form.  According to Defendant, Counts 1, 2, and 4 are tied to this Conflict form, so they too fail

to allege falsity.

Defendant's arguments on falsity rely on information outside the SSI, and thus fail on a

motion to dismiss.  What constitutes a reportable conflict of interest on the Conflict form is

clearly alleged in the SSI:

> Among other things, the form required TAO to certify that (1) his
> statements were true, correct, and complete to the best of his
> knowledge and belief; (2) he had read and complied with KBOR
> and KU policies; (3) he agreed to secure approval prior to
> engaging in any external personal, professional activities; and (4)
> he agreed to report any changes as soon as they become known to
> him and no later than 30 days after acquiring a new significant
> financial interest.[35]

Moreover, the SSI alleges that KU and KBOR policies "required TAO to disclose any current or

prospective situations that involved potential conflicts of interest or time as soon as they became

known."[36]  Based on these allegations, the Government maintains that Defendant's certification

that he lacked any conflicts of interest or time were false or fraudulent.

The Court confines itself to the allegations in the SSI about what the form requires

because the parties do not agree to the Court examining the forms in considering this motion.

Therefore, to the extent Defendant argues that his responses were true and correct based on

certain language or definitions on the forms, that argument is properly reserved for trial.  The SSI

alleges that Defendant falsely certified on the January 9, 2018 Conflict form that he did not have

---

[35] *Id.* ¶ 6.

[36] *Id.* ¶ 5.

any conflicts of interest or time, when in truth, he knew he had been selected for the Scholar

Program at FZU and he intended to work there and receive funding from FZU and the PRC.

Whether knowledge of a prospective potential conflict is sufficient to prove falsity is an

evidentiary question for trial.

      Similarly, Defendant argues that he did not make false representations in his September

25, 2018 Conflict form because there is no allegation that he received money from FZU or

anyone else sufficient to qualify as a financial interest on the form as of that date.  And

Defendant argues that although the SSI alleges he traveled to China for substantial periods of

time prior to September 25, 2018 to fulfill his contractual obligations to FZU, it does not allege

that he actually performed work there that would create a reportable conflict of interest in his

time.  He contends that the charges alleged in Counts 6 and 7 are tied to this Conflict form and

must fail for the same reasons.

      Again, the Court confines its analysis to the four corners of the SSI and does not consider

language on the form that is not included in the SSI.  The SSI alleges that Defendant falsely

stated on the September 25, 2018 Conflict form that "he did not have any conflicts of time or

interest; when in truth, as TAO then knew, he was working for FZU as a Chang Jiang

Distinguished Professor and was receiving, and expecting to receive, funding from FZU and the

PRC, in addition to other financial benefits."[37]  To the extent the forms do not support this

allegation, that is a matter appropriately left for trial.  The SSI sufficiently apprises Defendant of

the basis for its claim that the Conflict form certification constitutes false or fraudulent pretenses,

representations, or promises.[38]

---

[37] *Id.* ¶ 39(E).

[38] Thus, the Court need not separately address Counts 1, 2, 4, and 7 as Defendant failed to articulate any
specific argument about the sufficiency of those allegations other than their relation to the Conflict forms charged in

Finally, Defendant argues that the SSI is insufficient as to the July 16, 2018 email charged in Count 5. According to the SSI, Defendant sought renewed funding from DOE in December 2017 for his ongoing research. As part of his renewal application, DOE required Defendant to identify institutional affiliations and his current and pending support, including funding from foreign governments and institutions. In July 2018, while his grant application was under review, DOE asked Defendant to update his current and pending support to include any submissions planned in the future. In response, Defendant provided DOE with a document identifying only his funding sources in the United States. According to the SSI, Defendant made these statements, "when in truth, as [he] then knew, he was working for FZU as a Chang Jiang Distinguished Professor and was receiving, and expected to receive, funding from FZU and the PRC."[39] Defendant argues that the list in his July 16, 2018 email was not false, it was merely an incomplete list of current and pending support. He argues that if the statement is "literally true" but incomplete, it is a defense to making an affirmatively false statement.

The cases cited by Defendant do not stand for the proposition that a "literal truth" defense is available in wire fraud cases.[40] Those cases evaluate the defense in false statement and perjury prosecutions and explain that the defense applies if the allegedly false statement could be said to be indisputably true but misleading or nonresponsive.[41] Even if this defense applies to wire fraud cases, the SSI goes beyond alleging Defendant provided the DOE with

---

Counts 3 and 6. For the same reasons explained with respect to Counts 3 and 6, the motion is also denied as to those other counts.

[39] *Id.* ¶ 39(D).

[40] *United States v. Gatewood*, 173 F.3d 983, 986–87 (6th Cir. 1999) (quoting *United States v. Gahagan*, 881 F.2d 1380, 1383 (6th Cir. 1989)) (discussing availability of literal truth defense in cases alleging false statements and perjury); *United States v. Good*, 326 F.3d 589, 591 (4th Cir. 2003) (same); *United States v. Baer*, 92 F. App'x 942, 944 (4th Cir. 2004) (same).

[41] *See United States v. Strohm*, 671 F.3d 1173, 1185 (10th Cir. 2011); *United States v. Sarwari*, 669 F.3d 401, 406 (4th Cir. 2012).

incomplete information.  It alleges that Defendant represented to the DOE that he "only" was

receiving and expected to receive funding from the United States.  The response to the DOE's

request in the email, as described in the SSI,[42] cannot be said to be indisputably true because

Defendant was not "only" receiving funding from United States-funded sources; he was

receiving or expected to receive funding from Chinese sources.  These allegations are sufficient

to withstand dismissal as to Count 5.[43]

### c.      Purpose Element on Counts 1–4 and 7

To meet the "purpose" element of wire fraud, the "wire transmission must be 'part of the

execution of the scheme as conceived by the perpetrator at the time.'"[44]  The Tenth Circuit has

explained:

> The defendant need not have made the transmission personally,
> merely caused it to be made.  It need not be at the heart of a
> scheme, nor necessary or even helpful for its success; it need not
> itself be false or deceptive.  Rather, as we have said, a transmission
> is "considered to be for the purpose of furthering a scheme to
> defraud 'so long as the transmission is incident to the
> accomplishment of an essential part of a scheme.'"  Nonetheless, at
> some point the fraudulent scheme must be complete, and the
> perpetrators' subsequent enjoyment of its fruits—buying groceries,
> going to the movies, redecorating the bathroom—is not an
> "essential" part of the scheme.[45]

---

[42] To the extent Defendant claims his answer depends on the ambiguity of the question asked by the DOE, the literal truth defense does not entitle him to dismissal of the SSI.  The request itself is not before the Court and the allegations in the SSI do not suggest there is an ambiguity.  *See Sarwari*, 669 F.3d at 406.

[43] While perhaps not organized under the same headings as Defendant utilized in his motion, the Government did address Defendant's arguments disputing the falsity of the statements alleged in the SSI.  As the Court explains, the Government clearly responded to these arguments by asking the Court to relegate itself to the four corners of the SSI, and to reject application of the literal truth defense.  Thus, the Court rejects Defendant's contention that the Government conceded this issue.

[44] *United States v. Redcorn*, 528 F.3d 727, 738 (10th Cir. 2008) (quoting *Schmuck v. United States*, 489 U.S. 705, 715 (1989)).

[45] *Id.* at 738–39 (quoting *United States v. Mann*, 884 F.2d 532, 536 (10th Cir.1989)) (citations and footnote omitted).

Defendant discusses each wire charged in Counts 1 through 4 and 7 and explains how their purpose at the time was not incident to the accomplishment of an essential part of the scheme— lying to KU, DOE, and NSF about his position at FZU in order to maintain both jobs and continue to receive grant funding.

Count 1 is based on a November 11, 2017 "[e]mail from Kansas to the Consulate General of the People's Republic of China in Illinois regarding TAO's travel to Fuzhou University."[46] Defendant argues that the purpose of this email was to obtain a position at FZU, not to deceive KU, NSF, and DOE. Thus, taking steps to obtain travel documents was not in furtherance of the scheme. But, as the Government argues, the SSI alleges that the scheme to defraud began in May 2017 and lasted through Defendant's arrest on August 21, 2019. "A scheme is not necessarily limited to each individual fraudulent act. Rather, '[a] scheme refers to the overall design to defraud one or many by means of a common plan or technique.'"[47] Thus, to support the scheme, each charged wire must be part of the overall scheme to deprive KU, the DOE, and the NSF of money or property.[48] In order to support the scheme here, Defendant needed to secure a position in the Scholar's Program. The Government alleges that Defendant's scheme would have failed without his ability to travel to China at the end of 2017, a trip that directly furthered his efforts to obtain the position at FZU while remaining employed by KU and continuing to receive grant funding from the USG. According to the SSI, at the time Defendant sent this email, he would have been bound by the KBOR policy requiring him to immediately disclose any prospective potential conflict of interest. The Court agrees that these allegations are

---

[46] Doc. 75 ¶ 42.

[47] *United States v. Weiss*, 630 F.3d 1263, 1270 (10th Cir. 2010) (quoting *United States v. Massey*, 48 F.3d 1560, 1566 (10th Cir. 1995)) (citation omitted).

[48] *See id.*

sufficient to demonstrate that the November 11, 2017 email was a "step in the plot" of the alleged scheme to defraud.[49]

Count 2 is based on a December 11, 2017 "[e]lectronic submission of TAO's U.S. Department of Energy grant application from Kansas to a location outside Kansas."[50]  Defendant argues that, according to the SSI, he had nothing to report at this time because he had not yet been accepted into the Scholar's Program and was not yet affiliated with FZU.  As such, it could not have been incident to an essential part of the scheme of lying to KU, DOE, and NSF in order to maintain two jobs and grant funding.  Again, this wire was sent during the term of the alleged scheme to defraud.  As the Government correctly argues, at that time Defendant was in the final stages of applying to the Scholar's Program and was bound by KU's policy requiring him to immediately report prospective potential conflicts of interest.

Count 3 is based on the January 9, 2018 Conflict form.[51]  Again, Defendant argues that because he had not accepted the position at FZU at that time, he had nothing to report.  But again, this contention relies on language in the form itself, which the Court does not consider on this motion to dismiss.  According to the KU and KBOR conflict policies set forth in the SSI, and according to the contents of the form set forth in the SSI, Defendant was required to report the fact that he had applied and was accepted into the Scholar's Program.  The SSI sufficiently alleges that submitting this Conflict form without disclosing this information was a "step in the plot" in furtherance of the scheme to defraud.

Count 4 is based on a June 26, 2018 "[e]mail from outside the United States to the University of Kansas regarding TAO's proposal for a collaborative research project with Fuzhou

---

[49] *Id.* at 1269.

[50] *Id.*

[51] Doc. 75 ¶ 42.

University."[52]  Defendant argues that it defies logic that he would have proposed this collaborative research project if he was trying to hide his affiliation with FZU.  Defendant cites caselaw stating that where the wire makes the fraud scheme more obvious, the purpose could not have been to further the scheme to defraud.[53]  Again, the Court finds that this goes to the sufficiency of the evidence and not sufficiency of the allegations in the SSI.  The Government argues that the wire was a step in the plot because Defendant needed to justify to KU his reason for traveling so extensively to FZU.  This proposal offered him a reason for not being on the KU campus in the Spring of 2019.  Such a "cover" would have been incident to the accomplishment of an essential part of the scheme—lying to KU, DOE, and NSF about his position at FZU in order to maintain both jobs and continue to receive grant funding.  These allegations distinguish this case from the cases relied on by Defendant, cases that address this issue in the context of sufficiency of the evidence, not on a motion to dismiss the indictment.[54]

Count 7 is based on a March 17, 2019 "[e]mail from outside the United States, through Kansas, to a location outside Kansas regarding TAO's application for National Natural Science Foundation of China funding."[55]  Defendant complains that the SSI fails to assert or explain how this grant application was necessary to conceal his position at FZU and maintain two jobs and USG funding.  But the SSI explains that during the period between December 11, 2018 and August 20, 2019, Defendant traveled to the PRC to fulfill his contractual obligations to FZU, while still employed by KU and receiving grant funding.  One example of fulfilling his contractual obligations to FZU was the grant application alleged in Count 7.  These allegations

---

[52] *Id.*

[53] *See United States v. Maze*, 414 U.S. 395, 403 (1974); *United States v. Redcorn*, 528 F.3d 727, 742 (10th Cir. 2008); *United States v. Castile*, 795 F.2d 1273, 1278 (6th Cir. 1986).

[54] *See Maze*, 414 U.S. at 397–98; *Redcorn*, 528 F.3d 737–38; *Castile*, 795 F.2d at 1278.

[55] Doc. 75 ¶ 42.

are sufficient to support the Government's charge that the email in Count 7 was a step in the plot

that furthered the scheme to defraud KU and the federal agencies of money while maintaining

his position at FZU.

**2.      False Statement Charges**

Counts 8 through 10 allege that Defendant made false statements in violation of 18

U.S.C. § 1001.  Subsection (a) of that statute provides:

> (a) Except as otherwise provided in this section, whoever, in any
> matter within the jurisdiction of the executive, legislative, or
> judicial branch of the Government of the United States, knowingly
> and willfully—
>
> (1) falsifies, conceals, or covers up by any trick, scheme, or device
> a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement
> or representation; or
> (3) makes or uses any false writing or document knowing the same
> to contain any materially false, fictitious, or fraudulent statement
> or entry;
>
> shall be fined under this title, imprisoned not more than 5 years or,
> if the offense involves international or domestic terrorism (as
> defined in section 2331), imprisoned not more than 8 years, or
> both. If the matter relates to an offense under chapter 109A, 109B,
> 110, or 117, or section 1591, then the term of imprisonment
> imposed under this section shall be not more than 8 years.

The Government must establish the following elements to prove a false statement offense

under 18 U.S.C. § 1001(a)(2): (1) Defendant made a statement; (2) the statement was false,

fictitious, or fraudulent; (3) the statement was made knowingly and willfully; (4) the statement

was made within the jurisdiction of the executive, legislative, or judicial branch of the United

States; and (5) materiality.[56]  Defendant challenges the second element on all counts, the fourth

element on Counts 8 and 9, and venue on Count 10.

a.        **Falsity Element: All Counts**

As described on the wire fraud counts, Defendant challenges the Government's

allegations in support of the falsity of his statements, and asserts a "literal truth" defense.  He

contends that the alleged misrepresentations in Counts 8 and 9 (the Conflict forms) were literally

true because he certified the January 9, 2018 form before he began working at FZU, and because

he did not affirmatively misrepresent that he had *not* accepted a position at FZU on the

September 25, 2018 form.  For the same reasons explained on the wire fraud charges, the SSI

sufficiently alleges that the Conflict forms were false when made and the literal truth defense

does not apply.

On Count 10, Defendant argues that his July 2018 statement to the DOE was literally true

because it correctly listed current and pending support in the United States, but was simply

incomplete because it omitted the FZU position.  The Court rejects Defendant's literal truth

defense on Count 10 for the same reason it explained on Count 5—the statement was not

indisputably true because, according to the SSI, he "falsely represented to the U.S. Department

of Energy that he was receiving and expected to receive, funding from U.S. Government

agencies *only*."[57]  Assuming as true the facts alleged in the SSI, this was an affirmative

misrepresentation sufficient to support a false statement charge.

Relatedly, Defendant argues that Count 10 is based on omissions of material fact rather

than affirmative misrepresentations.  He urges that concealment of a material fact is not

---

[56] *United States v. Williams*, 934 F.3d 1122, 1128 (10th Cir. 2019).  Although the SSI does not specify a statutory subsection, the Government stated at oral argument that its false statement charges are brought under § 1001(a)(2) only.

[57] Doc. 75 ¶ 46 (emphasis added).

actionable under § 1001(a)(2), and must be charged instead under § 1001(a)(1), which requires the Government to prove that Defendant owed a duty to disclose his conflicts to KU, DOE and NSF.[58]  Defendant argues that because the SSI fails to allege that he owed a duty to disclose to the DOE—the recipient of the July 16, 2018—the charge fails to state an offense.

But the Government does not rely on § 1001(a)(1) for its false statement charge in Count 10; it relies on subsection (a)(2) and maintains that the July 16, 2018 email was an affirmatively false statement.  As described above, the Government alleges that Defendant stated in the July 16, 2018 email that he was receiving and expected to receive funding from USG agencies only, despite the fact that he was already working under contract with FZU at that time.  This is sufficient to support the false statement element of the charge.

### b.  Jurisdiction Element: Counts 8 and 9

The Government must allege that the false statements were made within the jurisdiction of the executive branch.  The term "jurisdiction" in § 1001 "should not be given a narrow or technical meaning."[59]  Jurisdiction is present when there is a statutory basis for an agency or department's request for information.[60]  Also, "an agency has jurisdiction under § 1001 'when it has the power to exercise authority in a particular situation.'  A false statement falls within that jurisdiction when it concerns the 'authorized functions of an agency or department,' rather than 'matters peripheral to the business of that body.'"[61]  The false statement need not be made

---

[58] *See United States v. White Eagle*, 721 F.3d 1108, 1116–17 (9th Cir. 2013) ("As other circuits have recognized, a conviction under § 1001(a)(1) is proper where a statute or government regulation requires the defendant to disclose specific information to a particular person or entity."); *see also United States v. Craig*, 401 F. Supp. 3d 49, 63–64 (D.D.C. 2019) ("there must be a legal duty to disclose in order for there to be a concealment offense in violation of section 1001(a)(1).").

[59] *United States v. Rodgers*, 466 U.S. 475, 480 (1984).

[60] *United States v. Deffenbaugh Indus., Inc.*, 957 F.2d 749, 753 (10th Cir. 1992).

[61] *United States v. Wright*, 988 F.2d 1036, 1038 (10th Cir. 1993) (quoting *Rodgers*, 466 U.S. at 479).

directly to the federal agency in order for it to fall within its jurisdiction.[62]  Moreover, there is no requirement that the Defendant be aware that his false statement would be submitted to or influence the decision of the federal agency.[63]

Defendant argues that KU's Conflict forms, charged as false statements under Counts 8 and 9, are not matters within the jurisdiction of NSF and DOE because there is no statutory basis present for NSF or DOE to request KU's Conflict forms, and because the forms are part of KU's human resources management and therefore only peripheral to the business of the federal agencies.  Defendant further argues that when KU receives federal funding, it does not relinquish jurisdiction over its employees.  The Government does not cite to a specific statutory or regulatory basis for jurisdiction, but represented at oral argument that the agencies' conflict requirements are based on policy statements, federal regulations, and contracts.  It argues that it need not cite to those specific sources of jurisdiction in the indictment in order to avoid dismissal.  The Government also points to allegations in the SSI that KU used the disclosures in its Conflict forms to determine whether Defendant had any conflicts that pertained to his USG-funded research projects, that DOE required Defendant to provide a list of current and pending institutional affiliations and support as part of his grant applications, and that NSF required KU to maintain conflict-of-interest policies as part of its funding agreement.  The Government relies on the Tenth Circuit's language in *Wright* that "a state agency's use of federal funds, standing alone, is generally sufficient to establish jurisdiction under section 1001."[64]

The Court finds that the SSI contains sufficient allegations to satisfy the jurisdiction element of the false statement charges in Counts 8 and 9.  As stated above, jurisdiction is to be

---

[62] *Id.*

[63] *Id.*

[64] *Id.*

construed broadly and includes "all matters confided to the authority of an agency or department."[65]  Despite the language in paragraph 44 of the SSI, KU's federal funding is not the sole basis for jurisdiction in this case.[66]  The federal funding referenced in the SSI is for Defendant's research; grants for which he personally applied as a KU employee.  The SSI alleges that one way KU used the information provided by Defendant on the Conflict forms was to determine whether he "had any financial interests or commitments of time that conflicted with his responsibilities to manage USG-funded research projects."[67]  Also, the SSI explicitly alleges that the NSF "required KU to manage, reduce, or eliminate all conflicts of interest for each grant before the expenditure of the grant funds," and that the KU and KBOR conflict-of-interest policies complied with NSF's requirements.[68]  The Court disagrees that NSF's conflict requirements are peripheral to the business of the agency, or that KU's reliance on the forms to determine whether Defendant could manage USG-funded research was peripheral to the business of DOE and NSF.  As the SSI alleges, those agencies fulfilled their missions in part by funding research grants.

While the forms themselves may have been generated by KU for purposes of its own human resources management, KU also used them to determine whether its employees could manage USG-funded research projects, and they brought KU into compliance with NSF conflict requirements.  The fact that the forms had multiple functions does not mean that they are

---

[65] *Rogers*, 466 U.S. at 479.

[66] Doc. 75 ¶ 44 ("FENG TAO, willfully and knowingly made materially false, fictitious, and fraudulent statements, representations, and omissions in a matter within the jurisdiction of the executive branch of the United States Government, to wit: through his submission of an Institutional Responsibilities form, TAO falsely represented to the University of Kansas, an institution that requested and received funds from the U.S. Department of Energy and the National Science Foundation, that he had no conflicts of time or interest . . . .").

[67] *Id.* ¶ 7.

[68] *Id.* ¶ 13.

peripheral to the business of the agencies—funding research and education through grants and cooperative agreements.

Defendant relies heavily on the Eleventh Circuit's decision in *United States v. Blankenship*,[69] where the court considered false statements made by the defendants to a private construction company that was under contract to build roads for the Florida Department of Transportation ("FDOT"), which in turn was under contract to follow certain requirements and specifications by the United States Department of Transportation ("USDOT").  The Eleventh Circuit found the jurisdiction element lacking because "[t]he false statements made by the defendants concerned their compliance with the terms of their contract with Granite, a contract over which the USDOT neither had nor exercised any supervisory power."[70]  The court focused on the fact that the federal agency had no power of control once it learned of the false statements; all it could do was "pressure the FDOT, under the terms of the FDOT's contract . . . into pressuring [the contractor] into taking some sort of action."[71]

The Government correctly distinguishes *Blankenship* on the basis that there is no intermediary between Defendant and the federal agency in this case.  Defendant, as a KU employee, applied for and received DOE and NSF grants.  As described above, the SSI sufficiently alleges that the NSF required KU to maintain conflict policies, and conditioned its grant awards on applicants' compliance with those policies.  Defendant directly applied for NSF grants in 2014 and 2017, and DOE and NSF directly agreed to fund Defendant's research.[72] Also in contrast with *Blankenship*, the SSI alleges that the DOE and NSF had direct authority to

---

[69] 382 F.3d 1110, 1137 (11th Cir. 2004).

[70] *Id.*

[71] *Id.*

[72] Doc. 75 ¶¶  4 ("TAO obtained funds from the [DOE] and the [NSF] to support his research at KU"); 11 ("On or about September 18, 2018, relying on TAO's representations, DOE's Office of Science awarded the grant to KU and agreed to continue funding TAO's research at KU through at least September 2019."); 14–15 (NSF grants).

withhold grant funds from KU employees.[73]  "This constitutes a substantial power to act, and other circuits have long reached essentially similar conclusions."[74]  The ability to safeguard federal funds is not peripheral to an authorized function of NSF,[75] and unlike in *Blankenship*, the SSI here alleges that the federal agencies have direct authority to control whether an applicant receives those funds.  And even if the false statements were made to KU as an initial matter, it is not necessary that they be made directly to DOE or NSF.  Thus, the SSI alleges sufficient facts to meet the jurisdiction element in Counts 8 and 9.

### c.      Venue: Count 10

Count 10 charges that Defendant made a false statement to the DOE on July 16, 2018, "in connection with" a KU "grant application."[76]  At the beginning of the false statement charge, the Government incorporated by reference paragraphs 1–39 of the SSI.  In paragraph 42 alleging the wire fraud charges, Count 5 states that Defendant transmitted an "[e]mail from outside the United States, through Kansas, to the U.S. Department of Energy regarding TAO's updated current and pending support."[77]  Defendant argues that Count 10 must be dismissed for lack of venue, and that, in determining venue, the Court may not consider the allegation in paragraph 42 of the SSI since it was not incorporated by reference into Count 10.

---

[73] *Id.* ¶ 13 (In order to receive its funds, NSF required KU to maintain a written, enforceable conflict of interest policy. . . .  NSF further required KU to manage, reduce, or eliminate all conflicts of interest for each grant before the expenditure of the grant funds."); ¶ 11 ("On or about September 18, 2018, relying on TAO's representations, DOE's Office of Science awarded the grant to KU and agreed to continue funding TAO's research at KU through at least September 2019.").

[74] *United States v. Jackson*, 608 F.3d 193, 197 (4th Cir. 2010) (collecting cases).

[75] *Id.* at 198.  Because the Court finds that the executive branch has direct authority to control the funds that Defendant, as a KU employee, received, the Court need not decide whether KU's receipt of federal funds standing alone is a sufficient jurisdictional nexus.

[76] Doc. 75 ¶ 46.

[77] *Id.* ¶ 42(5).

Under the Constitution and Fed. R. Crim. P. 18, a person must be tried "for an offense where that offense is committed."[78]  If a defendant is charged with more than one count, venue must be proper with respect to each count.[79]  The Tenth Circuit has explained that even though § 1001 does not have a venue clause, "the *locus delecti* is where the defendant makes the false statement."[80]  Because Defendant's July 16, 2018 false statement was not alleged to have been made in the District of Kansas, Defendant argues that venue does not lie here.  Pointing to paragraph 42 of the SSI, the Government responds that because the statement alleged in Count 10 was made outside the United States, venue lies in Kansas as the district where Defendant was arrested, citing 18 U.S.C. § 3238.  In the alternative, the Government argues that under 18 U.S.C. § 3237, venue lies in Kansas because the email traveled through servers in various districts including Kansas.

Defendant's overly technical arguments that venue is defeated because the Government failed to specifically incorporate paragraph 42 into the false statement charge in paragraph 46, or cite 18 U.S.C. §§ 3237 or 3238, are unavailing.  There is no real dispute between the parties that the same statement is charged in Count 5 as wire fraud and Count 10 as a false statement.  The motion to dismiss standard requires the Court to review the face of the indictment to determine if the allegations in support of venue are sufficient.  "Prior to trial, the Government 'need only allege that criminal conduct occurred within the venue, "even if phrased broadly and without a specific address or other information."'"[81]  The Court will not turn a blind eye to allegations specifically alleged in the SSI that support venue.  The Government alleges that the July 16,

---

[78] *United States v. Cabrales*, 524 U.S. 1, 5 (1998).

[79] *United States v. Abdalla*, 334 F. Supp. 3d 582, 587 (S.D.N.Y. 2018).

[80] *United States v. Smith*, 641 F.3d 1200, 1207 (10th Cir. 2011).

[81] *Abdalla*, 334 F. Supp. 3d at 587 (quoting *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010)).

2018 statement made in connection with a grant application to the DOE was sent in the form of an email from outside the United States.  The Court finds that the Government has satisfied its burden of alleging facts sufficient to support its assertion that Count 10 was committed outside the jurisdiction of the United States, triggering the venue provision in 28 U.S.C. § 3238, which provides that venue lies in the place of arrest—Kansas.

### 3.      Due Process Challenge

Defendant challenges the SSI as a whole by arguing that the Government's theory of prosecution violates the Due Process Clause because there was no fair warning that Defendant's alleged conduct was criminal under the wire fraud and false statement statutes.  He argues that the SSI would allow for wire fraud charges based on any misrepresentation made in the workplace if deemed material, merely because the employee receives a salary.  And the false statement charges justify criminalizing any false statement to an employer if the employer receives federal funds.  Both of these arguments go to substantive elements of the offenses charged here, and the Court has already rejected Defendant's assertions that he has been charged as he describes.  As the Court concluded, the SSI sufficiently alleges that the object of Defendant's scheme to defraud was to deprive KU, DOE, and NSF of money in the form of his salary and research grants.  And the SSI sufficiently alleges the jurisdiction element of the false statement claim, beyond the fact that KU is the recipient of federal funding.  Thus, the Court rejects the premise that the statutes as applied to Defendant allow for the expansive prosecutions described by Defendant in his briefs.

"[T]he Due Process Clause prohibits the Government from 'taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice

of the conduct it punishes, or so standardless that it invites arbitrary enforcement.'"[82]  The touchstone of the due process fair warning requirement is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."[83]  While Defendant is correct that his due process challenge implicates the vagueness doctrine, the rule of lenity, and the novel construction doctrine,[84] he fails to demonstrate that the conduct charged in the SSI violates due process under any of these doctrines.

Defendant first argues that the wire fraud statute is unconstitutionally vague for the same reason identified in *Skilling*—honest services fraud under 18 § 1346 does not include the mere failure to disclose a conflict of interest.[85]  The Court has already rejected this argument, finding that the SSI does not allege honest services fraud.  The SSI alleges pecuniary fraud under § 1343; thus, *Skilling* does not apply.

Next, Defendant argues that the Government's theory would encourage arbitrary and discriminatory enforcement because he is a person of Chinese descent, who "has been charged by national-security prosecutors for lying to his employer without any allegation of espionage, intellectual property theft, or a cognizable nexus to national security."[86]  This, in conjunction with the fact that charges were brought during a "politically charged trade war with China that rages on today," allows for these statutes to be used to target university professors with ties to

---

[82] *Beckles v. United States*, 137 S. Ct. 886, 892 (2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)).

[83] *United States v. Lanier*, 520 U.S. 259, 267 (1997).

[84] *See id.* at 266.

[85] *United States v. Skilling*, 561 U.S. 358, 409–10 (2010).

[86] Doc. 82 at 38.

China.[87]  But Defendant fails to explain how the charges in this case—wire fraud and false statements—violate due process by failing to include a national security nexus.  The well-established elements of these claims require no such nexus and the fact that "national-security prosecutors" may be involved, or that the United States is in the midst of a trade war with China, has no bearing on the due process inquiry.

Third, Defendant argues that the rule of lenity requires dismissal because "no court has ever upheld the theories advanced in the Indictment."[88]  But the test for the rule of lenity is not whether a particular theory has ever been advanced under the charged statutes.  The rule of lenity requires courts to "interpret an ambiguous law in favor of a criminal defendant."[89]  It is a rule of last resort once all evidence of congressional meaning identified by the parties is exhausted.[90]  But here, the Court has rejected Defendant's arguments that the wire fraud and false statement statutes are ambiguous as applied to Defendant.  Therefore, the rule of lenity does not apply.

Defendant concludes his due process argument by spending several pages generally explaining why Defendant lacked fair notice that his conduct could lead to wire fraud and false statement charges.  Defendant points to the Conflict forms and argues that they do not make clear that an incomplete answer could subject the signor to criminal liability.  But the Court does not consider these forms on a motion to dismiss; and, as already explained, the SSI's recitation of the form and the KBOR policies is sufficient to state offenses under the wire fraud and false statement statutes.

---

[87] *Id.*

[88] *Id.* at 40.

[89] *United States v. Richter*, 796 F.3d 1173, 1188 (10th Cir. 2015).

[90] *See, e.g.*, *United States v. Rentz*, 777 F.3d 1105, 1113 (10th Cir. 2015).

Defendant cites to a statement by Senator Rob Portman that Congress has not yet criminalized the conduct charged in this case.[91] But the Court has reviewed the report referenced in Senator Portman's speech and cited by Defendant and cannot find that it supports Defendant's claim that he lacked fair warning he could be prosecuted under existing laws. To the contrary, it demonstrates that Defendant is not the only professor who has been charged under existing laws for allegedly misappropriating NSF research by working for Chinese universities. The report issued by the United States Permanent Subcommittee on Investigations ("PSI"), for which Senator Portman is Chairman, discusses Defendant as one of three "Public Case Examples," involving the NSF.[92] These examples were used to demonstrate that the NSF lacks the resources to fully investigate and enforce conflict of interest requirements, and "relies on sponsoring institutions to vet and conduct due diligence on potential grantees."[93] The PSI report emphasizes the need for coordinated enforcement due to these lack of resources, despite a few successful enforcement efforts such as Defendant and two other individuals who have been charged and convicted for fraud and making false statements in conjunction with misappropriating NSF grant funding.[94]

And in the press release cited by Defendant, in which Senator Portman discusses upcoming legislation coming out of the PSI report, he acknowledged that

---

[91] Press Release, Senator Rob Portman, On Senate Floor, Portman Outlines Upcoming Bipartisan Legislation to Stop China's Theft of U.S. Taxpayer-Funded Intellectual Property (May 13, 2020), https://www.portman.senate.gov/newsroom/press-releases/senate-floor-portman-outlines-upcoming-bipartisan-legislation-stop-chinas.

[92] Staff of Sen. Permanent Subcom. on Investigations, Comm. on Homeland Security & Gov. Affairs, 116th Cong., Threats to the U.S. Research Enterprise: China's Talent Recruitment Plans 3 (2019), https://www.hsgac.senate.gov/imo/media/doc/2019-11-18%20PSI%20Staff%20Report%20-%20China's%20Talent%20Recruitment%20Plans%20Updated2.pdf.

[93] *Id.*

[94] *Id.* at 48–49.

> [f]ortunately the FBI and the Department of Justice have now taken a different approach. They began stepping up their efforts this year with several recent high-profile arrests and charges filed. But again more laws and practices need to change to stop U.S. taxpayer-funded research from being stolen in this way to benefit our number one global competitor.[95]

Senator Portman's isolated statement on the Senate floor that his prospective bill fills a gap in the law by giving "the Justice Department the ability to hold federal grant recipients accountable for hiding their financial ties to foreign governments by failing to disclose it on federal grant applications,"[96] is insufficient to demonstrate that this Defendant cannot be charged under existing laws for failing to disclose and seek approval for his ties to the Scholar Program and FZU as alleged in the SSI.

Moreover, the Court is mindful that "[i]n determining whether a judicial interpretation is sufficiently foreseeable to merit application to a criminal defendant where that interpretation has not been given effect by a prior court decision, the starting point of our analysis 'is the statutory language at issue, its legislative history, and judicial constructions of the statute.'"[97] Assuming that this Court's judicial interpretation of the wire fraud and false statement statutes has not been applied previously to the conduct charged in this case, Defendant makes no attempt to discuss the statutory language, legislative history, or *judicial* constructions of these statutes. An errant comment by a legislator trying to persuade his colleagues to support upcoming legislation falls short of the showing required to demonstrate lack of fair warning.

---

[95] Press Release, Senator Rob Portman, On Senate Floor, Portman Outlines Upcoming Bipartisan Legislation to Stop China's Theft of U.S. Taxpayer-Funded Intellectual Property (May 13, 2020), https://www.portman.senate.gov/newsroom/press-releases/senate-floor-portman-outlines-upcoming-bipartisan-legislation-stop-chinas.

[96] *Id.*

[97] *United States v. Richter*, 796 F.3d 1173, 1189 (10th Cir. 2015) (quoting *Webster v. Woodford*, 369 F.3d 1062, 1069–70 (9th Cir. 2004)).

Finally, Defendant urges that the prosecution's theory here would criminalize workplace communications, resulting in several hypothetical workplace scenarios being subject to criminal liability.  But the Court disagrees that the prosecution in this case opens the door to these hypothetical situations, primarily due to the intent and willfulness elements required under the charged offenses.  Moreover, the Court's task is not to determine whether myriad hypothetical situations may be charged under the statutes; it is to determine whether this Defendant had fair notice that his conduct could result in the federal charges filed against him.  For the reasons explained above, the Court finds that he did.

## II.     Motion to Dismiss due to the Government's False, Misleading, and Prejudicial Statements to the Grand Jury

### A.     Background

On August 21, 2019, a grand jury sitting in the District of Kansas returned the original Indictment, charging Defendant with one count of wire fraud, in violation of 18 U.S.C. § 1343, and three counts of program fraud, in violation of 18 U.S.C. § 666.[98]  On January 15, 2020, the grand jury returned a Superseding Indictment, which effectively added a wire fraud count and combined the three program fraud charges into a single count.[99]  Then, on June 24, 2020, the grand jury returned the SSI, charging Defendant with seven wire fraud counts, including the two counts from the Superseding Indictment, and three counts of making false statements in violation of 18 U.S.C. § 1001.[100]  The FBI case agent testified at all three grand jury proceedings about the evidence supporting the indictments.

---

[98] Doc. 1.

[99] Doc. 50.

[100] Doc. 75.

## B.      Standard

Defendant moves to dismiss the SSI under Rule 12(b)(3)(A)(v) based on prosecutorial misconduct during the most recent grand jury proceeding.  Dismissal on this basis is only appropriate if Defendant can show he was prejudiced due to the alleged error, which in turn requires a showing that the error "substantially influenced the grand jury's decision to indict, or . . . there is a grave doubt that the decision to indict was free from the substantial influence of such violations."[101]  "A grand jury's independent judgment is compromised when the prosecutor's misconduct invades the grand jury's independent deliberative process and substantially affects its decision to indict."[102]  Where a defendant claims that the Government elicited false testimony before the grand jury, the Tenth Circuit "require[s] a showing the government deliberately attempted to influence the grand jury with false testimony."[103]  Because Defendant relies on the Conflict forms and other evidence outside the SSI to establish prosecutorial misconduct during the grand jury proceeding, the Court considers the exhibits attached to the parties' briefs when deciding this motion.

## C.      Discussion

Defendant argues that the Government presented false and misleading testimony by the case agent, and that the prosecutor made immaterial and prejudicial statements that substantially influenced the grand jury's decision to return the SSI.  First, Defendant argues that the case agent gave false and misleading testimony about the contents of the Conflict forms.  Second, Defendant argues that the prosecutor elicited and the case agent gave false testimony about Defendant's buyout of his teaching responsibilities at KU for the 2019 spring semester.  Finally,

---

[101] *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986)).

[102] *United States v. Hillman*, 642 F.3d 929, 933 (10th Cir. 2011) (citations omitted).

[103] *United States v. Cooper*, 396 F. Supp. 3d 992, 995 (D. Kan. 2019).

Defendant claims that the prosecutor made several irrelevant and prejudicial statements in an attempt to unduly influence the grand jury's decision.  Defendant urges the Court to consider the cumulative effect of these three grand jury errors and dismiss the SSI.

### 1.    Conflict Forms

The electronic January and September 2018 Conflict forms required Defendant to "[m]ake new or update an existing disclosure . . . for each external entity with which you have a Time Commitment and/or a Significant Financial Interest as defined in the Disclosure Criteria."[104]  The forms include specific disclosure criteria that determined whether an employee needed to disclose an outside position, which turned on whether the position met the definition of a reportable "Significant Financial Interest" or a reportable "Time Commitment."[105]  The form states that to be a reportable "Significant Financial Interest" in an outside entity, the interest must be worth at least $5,000.[106]  If the financial interest consisted of "remuneration," such as "salary" or "other payments for services," the remuneration must have amounted to at least $5,000 received by the employee "in the twelve months preceding the disclosure."[107]  As for time commitments, the form explains that the for an employee to have a reportable "Time Commitment in External Professional Activities," the person must have a current time commitment (i.e., "with which you engage," in the present tense) that "take[s] time away from [the employee's] University responsibilities."[108]  The form goes on to explain that "KBOR and University policy indicate that external activities of faculty and staff such as consulting, outside employment, public service, pro bono work, or serving as an officer of an external entity, even

---

[104] Ex. A at 4; Ex. B. at 4.

[105] *Id.*

[106] *Id*.

[107] *Id.*

[108] *Id.*

without compensation, can result in real or apparent conflicts regarding commitment of time or effort," and that their primary responsibility is to their employing institution.  It also clarifies that the procedures for obtaining approval for outside employment go through a separate reporting system.  On his Conflict forms, Defendant stated that he had no conflicts of interest or time.

Following the disclosure section of the form is a certification statement where Defendant certified that the disclosure information was true, accurate, and complete; that he had read, understood, and complied with the KBOR's conflict policies; that he agreed to secure approval regarding outside employment prior to engaging in that activity; and that he agreed to report any changes as soon as they become known but no later than 30 days after acquiring a new significant financial interest.

The Government did not introduce the Conflict forms to the grand jury.  Instead, before all three grand juries, the case agent described the Conflict form requirements.  At the third grand jury proceeding on June 24, the case agent recited to the grand jury the portion of the SSI that states the Conflict forms' requirements.  He explained that KU's conflict policy was broad and recited from the SSI that the forms required Defendant to "disclose any current or prospective situations that involved potential conflicts of interest or time as soon as they became known."[109] After the case agent testified about the KBOR's broad conflict of interest disclosure requirements, he testified that Defendant falsely stated on his Conflict forms that he did not have any conflicts of time or financial interest.  The case agent did not tell the grand jury about the specific definitions of those terms in the Conflict form.

Defendant maintains that the Government's failure to provide either the Conflict forms or the definitional information on those forms to the grand jury led to the case agent's false and

---

[109] Ex. E at 6:16–18.

misleading testimony suggesting the forms contained a broad disclosure requirement rather than the precise information defined on the forms. Defendant argues it was false and misleading for the case agent to testify that Defendant was required to disclose *any* current *or prospective situations that involved potential conflicts of interest* as soon as he became aware of them. But this is a key evidentiary dispute between the parties, as discussed at length in the Court's ruling on Defendant's other motion to dismiss. Defendant reads the Conflict forms' disclosure requirements narrowly, only pointing to the disclosure criteria language. The Government relies not just on the specific disclosure questions, but also on the certification portion of the forms that incorporate KBOR policies with broader conflict requirements, including a requirement to secure approval before engaging in outside employment activities.[110]

Whether the Government's evidence is sufficient to support its theory that Defendant falsely certified on the Conflict forms that he had no conflicts of interest or time is an issue for trial and, as such, the Court declines to find that the Government advancing its theory of the case before the grand jury was misleading. There is no rule that requires the Government to present certain types of evidence to the grand jury in support of an indictment. That the Government chose to only submit the case agent's testimony does not, standing alone, constitute prosecutorial misconduct. Nor does the record support Defendant's allegation that the case agent testified falsely. Defendant will have a full and fair opportunity at trial to challenge the Government's theory and the evidence in support thereof.

### 2.      Buyout

---

[110] *See* KU Office of Provost and Executive Vice Chancellor Policy, Commitment of Time, Conflict of Interest, Consulting, and Other Employment (1995), https://policy.ku.edu/provost/commitment-of-time-conflict-of-interest; https://policy.ku.edu/chancellor/individual-conflict-of-interest; KU Office of the Chancellor Policy, Individual Financial Conflict of Interest (2012), https://policy.ku.edu/chancellor/individual-conflict-of-interest.

The case agent also testified in response to a grand juror's question about Defendant's responsibilities at KU during the spring of 2019.  The case agent indicated that Defendant had asked to "buy out" his teaching responsibilities in the spring of 2019, such that he would have no teaching obligations during that time.  Then, the following exchange transpired between the prosecutor and the case agent:

> BY MR. MATTIVI:
>
> Q. Hang on. Let me focus that just a little bit, if you don't mind. So he requested a buy-out, but you didn't say that KU granted him a buy-out, correct?
>
> A. I did not --
>
> THE REPORTER: I'm sorry, I can't hear you.
>
> A. They did not grant him a buy-out.
>
> BY MR. MATTIVI:
>
> Q. So although Dr. Tao applied for a buy-out of his teaching obligations that semester, KU never granted it, correct?
>
> A. That is -- I can't say -- they did not grant it from the department chair or the Provost, which is the normal process. I don't know how it ended up, but they didn't.
>
> Q. Would it be accurate to say, though, that from KU's perspective Dr. Tao was contractually obligated to be a full-time professor at KU during that time period?
>
> A. Yes.[111]

In fact, Laurence Weatherley, the KU Chair of the Chemical Engineering and Petroleum Engineering Department, approved Defendant's requested buyout in a June 25, 2018 email.[112] He told Defendant that three conditions applied to the buyout:

---

[111] Ex. E at 23:4–25.

[112] Ex. F.

1.      You will need to arrange the transfer of dollars from your accounts to the department account amounting to 13.5% of your nine month salary + fringes.  These dollars will be used for the funding of the instructional support required to cover your release.  The SSC accountants will advise on exact amounts and the account into which the dollars will be transferred into.

2.      Your other duties will continue in spring 2019 as usual, including advising, committee work, other service to the department, school and university.

3.      You are expected to be in attendance on campus during the semester in accordance with KU policy.[113]

When the FBI interviewed Prof. Weatherley as part of the investigation, he stated that he "believed the buyout was successful, though was unsure if Tao had met the financial requirements."[114]  He further stated that Defendant did not tell him where he was in the spring of 2019, that Defendant was not present for faculty or committee meetings during that semester, and that Defendant never requested permission from him to engage in outside employment.

Defendant argues that the case agent's testimony about the buyout was false and misleading because he knew that KU had approved Defendant's buyout yet testified to the contrary.  The Government responds that KU did not approve the buyout because he did not comply with the financial conditions set forth in Dr. Weatherley' s email.  According to the SSI, on or about May 17, 2018, shortly after Defendant traveled to China to start his work at FZU, he submitted a proposal to KU for a collaborative research project between KU and FZU.  The proposal included a $90,000 budget, which FZU apparently would fund for two years from September 2018 to August 2020.  The SSI alleges that Defendant sought to use those funds to buyout his teaching responsibilities at KU for the spring 2019 semester.  The Government also

---

[113] *Id.*

[114] Ex. G at 1.

points to the FBI interview notes for Dr. Weatherley, which show that he did not have personal knowledge about whether the KU administration approved the buyout and whether Defendant complied with the financial conditions set forth in his email.

Again, the Court finds that this is an evidentiary issue that should be resolved at trial; Defendant does not make the requisite showing that the prosecutor influenced the grand jury with false testimony. The Government does not dispute that the Chair of Defendant's department initially approved the buyout. Instead, the Government maintains that the buyout was either never approved by KU administrators, or that Defendant failed to adhere to the conditions upon which his buyout was approved. The record demonstrates that the Government had a good faith belief that the buyout did not excuse Defendant from his teaching duties at KU during the spring 2019 semester. Therefore, the Court cannot find that the prosecutor elicited false or misleading testimony before the grand jury on this issue.

### 3.      Prosecutor's Statements

Finally, Defendant argues that the prosecutor made a series of immaterial and prejudicial statements before the grand jury intended to influence its charging decision: (1) he elicited testimony from the case agent that Defendant had been "originally indicted" in August 2019; and (2) he elicited testimony from the case agent that the case was handled by an FBI "counterintelligence" squad, and failed to make clear when asked by a grand juror that the SSI did not allege espionage. Defendant urges that when considered in conjunction with the other false and misleading statements by the case agent, these remarks were intended to influence the grand jury's decision to indict.

The Court finds that there is nothing inherently prejudicial about presenting a superseding indictment to a grand jury, which by definition conveys that an indictment came before it.[115] Defendant presents no information that convinces the Court that this reference to the original indictment influenced the grand jury's decision to return the SSI.  Unlike the case relied on by Defendant, there is no indication here that the prosecutor "placed undue influence on the . . . grand jury to return the Second Superseding Indictment without fully considering the matter."[116]

As for the prosecutor's reference to the FBI's counterintelligence squad, the Court likewise finds that, to the extent it was prejudicial, it did not influence the grand jury's decision to indict.  Defendant relies on the fact that one of the grand jurors specifically asked the prosecutor whether the SSI charged Defendant with "double-dipping or espionage?"[117]  Rather than confirm that this case does not contain espionage-related charges, the prosecutor replied, "Well, if you'll give us a little time, we'll work our way through the rest of the Indictment.  Okay?  Any other questions?"[118]  Defendant argues that this response gave the false impression that, eventually, the grand jury would be provided with information about espionage.

The prosecutor's answer to this grand juror's question did not constitute misconduct, nor is there any indication that it influenced the grand jury's charging decision.  The prosecutor did not confirm for the grand juror that this case involved espionage; he asked the grand juror to

---

[115] *See, e.g.*, *United States v. Galindo*, No. 04-053 DAE, 2008 WL 918405, at *6 (D. Haw. Apr. 4, 2008) ("The Court first notes that GJ # 4 would have been aware that Defendant had been indicted previously based on the fact that they were considering a *Third* Superseding Indictment."); *United States v. Chambers*, No. 3:18-CR-00079 (KAD), 2019 WL 1014850, at *5 (D. Conn. Mar. 4, 2019) ("A grand jury being asked to return a superseding indictment is always going to know that a previous indictment was returned.").

[116] *United States v. Leeper*, No. 06-CR-58A, 2006 WL 1455485, at *4 (W.D.N.Y. May 22, 2006) (listing several reasons for the undue influence finding, including "[t]he haste of the proceeding, the jury's knowledge that another grand jury had already indicted the defendant, the prosecutors' assurances that the error was merely an 'oversight' or an 'omission in paperwork,' the implication that the original grand jury would have fixed the error itself had it not expired, the immediacy with which the May 16th grand jury was being asked to return the superseding indictment, and their knowledge that a petit jury had already been picked and the trial had started").

[117] Ex. E at 24:10–11.

[118] *Id.* at 24:12–14.

listen to the rest of the presentation on the indictment.  He immediately followed this statement

up by asking the case agent to recite from the SSI that the alleged scheme to defraud sought to

obtain money and property from KU and the USG, including grant funds and his KU salary.  If

the prosecutor intended to imply that the case alleged espionage, this description of the scheme

to defraud immediately after should have put that implication to rest.

In sum, the Court finds no prosecutorial misconduct involved in the statements identified

by Defendant.  The case agent's testimony was not false or misleading and there was no

prosecutorial misconduct.  Even when viewed cumulatively, these comments do not amount to

the showing required to dismiss based on false or prejudicial statements before the grand jury.

Instead, with respect to the case agent's testimony, Defendant presents issues that go to the

evidentiary weight of the Government's case against him and not the falsity of the case agent's

testimony.  These issues must be resolved by the finder of fact at trial.  And the prosecutor's

comment about the FBI's counterintelligence squad, reference to the original indictment, and

failure to specifically disabuse a grand juror of the notion that the charges involve espionage do

not amount to misconduct that leaves the Court with "a grave doubt that the decision to indict

was free from the substantial influence of such violations."[119]  Thus, Defendant's motion to

dismiss based on statements to the grand jury is denied.

## III.     Amici's Motion for Leave

Amici move for leave to file a brief in support of Defendant's motion to dismiss for

failure to state an offense.  The proposed brief discusses the Government's efforts to target

Chinese-American scientists and researchers based on ethnicity, and the harm that these

increased prosecutions cause Chinese and Asian-American and immigrant communities.  Amici

---

[119] *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986)).

suggest that increased prosecutions of what used to be administrative matters show that the Government is targeting Defendant based on his ethnicity rather than criminal activity.  The Government opposes the motion, arguing that the scope of the proposed brief goes beyond what the Court may consider when deciding the Defendant's motion to dismiss for failure to state an offense.

The Federal Rules of Criminal Procedure do not provide for amicus participation before the district court, and there is no governing standard in the Tenth Circuit for amicus participation before the district court in criminal cases.  Other courts to consider the question note that district courts have broad discretion in permitting or denying an amici curiae appearance.[120]  They consider whether the defendant's interests are adequately represented by counsel, whether the amicus has interests that will be affected by the criminal proceedings, and the relevance or usefulness of the brief.[121]  "An amicus brief should normally be allowed [in district court] . . . when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide."[122]

The Government argues that under both this standard and the rule applied to amicus participation before the appellate courts, the Court should deny leave.[123]  It argues that Defendant is adequately and ably represented by counsel, and that the issues argued in the brief are extraneous to the four-corners analysis required on the motion to dismiss.  The Court grants Amici's leave to file their brief in support of Defendant's motion.  The Court has considered the brief to the limited extent it is relevant to the due process challenge raised in the motion—a

---

[120] *See, e.g.*, *United States v. Ahmed*, 798 F. Supp. 196, 198 (S.D.N.Y.), *aff'd*, 980 F.2d 161 (2d Cir. 1992).

[121] *See, e.g.*, *id.*; *United States v. Keleher*, –F. Supp. 3d–, 2020 WL 4283226, at *4–5 (D.P.R. July 27, 2020).

[122] *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997) (Posner, J.).

[123] *See* Fed. R. App. P. 29.

challenge that includes and implicates many of the arguments raised in Amici's brief.  The Court disregards the brief to the extent it is immaterial to the legal standards that govern the Court's analysis on the motion to dismiss.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Dismiss the Second Superseding Indictment for Failure to State an Offense and Lack of Venue (Doc. 82) and Motion to Dismiss Second Superseding Indictment due to the Government's False, Misleading, and Prejudicial Statements to the Grand Jury (Doc. 83) are **denied**.

**IT IS FURTHER ORDERED** that Amici's Motion for Leave of Court to Enter Their Appearance as Amicus Curiae and File Brief in Support of Defendant Dr. Franklin Tao's Motion to Dismiss the Second Superseding Indictment for Failure to State an Offense (Doc. 86) is **granted**.  **Amici shall appear and file the proposed brief forthwith**.

**IT IS SO ORDERED.**

Dated: November 2, 2020

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE