## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       Plaintiff,

       v.

FENG TAO a/k/a "Franklin Tao,"

       Defendant.

Case. No. 19-20052-JAR-JPO

**BRIEF OF ASIAN AMERICANS ADVANCING JUSTICE | AAJC & ASIAN AMERICANS ADVANCING JUSTICE | ASIAN LAW CAUCUS AS AMICUS CURIAE IN SUPPORT OF DEFENDANT DR. FRANKLIN TAO'S MOTION TO DISMISS THE <u>SECOND SUPERSEDING INDICTMENT FOR FAILURE TO STATE AN OFFENSE</u>**

# TABLE OF CONTENTS

Identity and Interest of Amici Curiae ........................................................................................1

Introduction....................................................................................................................................10

I.   The Government Has Increased Efforts to Target Chinese American Scientists and
     Researchers Based on Ethnicity Rather than Suspected Criminal Activity......................10

     A.   The Government Has Heavily Scrutinized and Racially Targeted Chinese
          American Scientists and Researchers. ..................................................................10

          1.   Recent state of prosecutions under the Economic Espionage Act and
               the China Initiative reveals the influence of politicized Anti-Asian
               rhetoric and policies that disparately impact Asian Americans and
               immigrants. .............................................................................................11

          2.   U.S. Government prosecutions correspond with a rise in
               scapegoating and biased rhetoric by public officials driving racially
               targeted decision-making, structures, and training at federal
               agencies......................................................................................................12

          3.   The Government has increased pressure on academic institutions
               and federal agencies to target Chinese American scientists. .....................15

          4.   The Government's overzealous and broad prosecutions criminalize
               actions previously categorized as administrative matters or viewed
               as scientific and academic norms such as collaboration and open
               fundamental research. ...............................................................................17

     B.   The Government's Racially Biased Scrutiny of Chinese American
          Scientists and Researchers Has Led to Government Prosecutions for
          Lesser or Unrelated Alleged Infractions. ..................................................................20

II.  The Government's Racially and Politically Motivated Prosecution of Chinese Scientists
     Causes Immeasurable Harm to Chinese and Asian Americans and Immigrants..............23

     A.   Political Pressure Has Resulted in Racially Biased Prosecutions Causing
          Immense Harm to the Chinese and Asian American and Immigrant
          Communities. .........................................................................................................24

          1.   Individual Experiences Illustrate the Long-Lasting and Irreparable
               Negative Impact of Biased Prosecutions on Chinese Americans. .............24

          2.   Impact of Racially-Tinged Prosecutions and Escalated Government
               Efforts to Target Individuals of Chinese Descent on the Chinese
               Community. ...............................................................................................29

     B.   The Government's current policies against individuals of Chinese descent
          are rooted in a history of bias against Asian Americans........................................33

     C.   Like Many Chinese Americans and Immigrants, the Government Targeted
          Dr. Tao Based on His Ethnicity Rather Than Actual Criminal Activity. ..............36

Conclusion .....................................................................................................................................38

4819-7553-1216

# TABLE OF AUTHORITIES

**Cases**

*Chae Chan Ping v. United States*, 130 U.S. 581 (1889) ............................................. 34

*Chen v. Dep't of Commerce*, No. CH-0752-17-0028-I-1, 2018 WL 2128716 (Apr. 23, 2018) ............................................................................................................. 26

*Hirabayashi v. United States*, 320 U.S. 81 (1943) ....................................................... 35

*Korematsu v. United States*, 323 U.S. 214 (1944) ........................................................ 35

*Ozawa v. United States*, 260 U.S. 178 (1922) .............................................................. 34

*United States v. Wen Ho Lee*, 79 F. Supp. 2d 1280 (1999) ......................................... 24

*Yasui v. United States*, 320 U.S. 115 (1943) ................................................................. 35

**Statutes**

18 Stat. 477, 43 Cong. Ch. 141 ..................................................................................... 33

18 U.S.C. § 1831, Economic Espionage Act of 1996 ............................................. 11, 12

18 U.S.C. § 1832, Economic Espionage Act of 1996 ............................................. 11, 12

18 U.S.C. §§ 792–99, Economic Espionage Act of 1917 ............................................. 11

1875 Page Act ............................................................................................................... 33

22 Stat. 58, 47 Cong. Ch. 126 ....................................................................................... 33

Chinese Exclusion Act of 1882 ................................................................................ 33, 34

Geary Act of 1892 ......................................................................................................... 33

Immigration Act of 1924, Pub. L. 68-139, 43 Stat. 153 ............................................... 34

Magnuson Act in 1943, Pub. L. 78-199, 57 Stat. 600 ............................................. 34, 35

Naturalization Act of 1906, Pub. L. 59-338, 34 Stat. 596 ............................................ 34

Pub. L. No. 52-60, 27 Stat. 25 ...................................................................................... 33

**Publications**

Ana Swanson, *A New Red Scare Is Reshaping Washington*, N.Y. TIMES (July 20, 2019) ..................................................................................................................... 16, 17

ii

Andrew Chongseh Kim, *Prosecuting Chinese* .......................................... 11, 12, 17, 25

Annie Karni, *Trump Rants Behind Closed Doors with CEOs*, POLITICO (Aug. 8,
  2018) ....................................................................................................................... 13

ASIAN AMERICANS ADVANCING JUSTICE, INSIDE THE NUMBERS: HOW
  IMMIGRATION SHAPES ASIAN AMERICAN AND PACIFIC ISLANDER COMMUNITIES
  20 (2019) ............................................................................................................... 35

*Attorney General Jeff Sessions Announces New Initiative to Combat Chinese
  Economic Espionage*, U.S. DEP'T OF JUSTICE (Nov. 1, 2018), ........................ 20, 21

Betsy Woodruff Swan, *Inside DOJ's Nationwide Effort to Take on China*,
  POLITICO (Apr. 7, 2020) ...................................................................................... 21

Bill Rinehart, *FBI Is 'Harassing' Some Chinese Citizens Says Academic Group*,
  WVXU (Aug. 26, 2019) ........................................................................ 22, 23, 30, 31

Bloomberg Markets and Finance, *How the U.S. Is Purging Chinese Americans
  from Cancer Research*, BLOOMBERG (July 12, 2019) ...................................... 31, 32

Catherine Matacic, *U.S. Attorneys Warn of Upcoming 'Spike' in Prosecutions
  Related to China Ties*, SCI. MAG. (Feb. 7, 2020) .............................................. 22

Christopher Wray, Director, Fed. Bureau of Investigation, Responding Effectively
  to the Chinese Economic Espionage Threat, Remarks at the Department of
  Justice China Initiative Conference (Feb. 6, 2020) ............................................ 13

Colby Itkowitz, *Trump Again Uses Racially Insensitive Term to Describe
  Coronavirus*, WASH. POST (June 23, 2020) ...................................................... 13

David Armstrong, Annie Waldman & Daniel Golden, *The Trump Administration
  Drove Him Back to China, Where He Invented a Fast Coronavirus Test*,
  PROPUBLICA (Mar. 18, 2020) .............................................................................. 31

Elie Dolgin, *'Psychological Fear': MIT Scientists of Chinese Origin Protest
  Toxic US Climate*, NATURE (July 2, 2019) ..................................... 22, 29, 30, 32

EXEC. OFFICE OF THE PRESIDENT, NSDD-189, NATIONAL POLICY ON THE
  TRANSFER OF SCIENCE, TECHNICAL AND ENGINEERING INFORMATION 1 (1985).................. 19

Executive Order 9066 ................................................................................................ 35

*FBI Director Christopher Wray's Opening Remarks: China Initiative Conference*,
  CIS (Feb. 6, 2020) ................................................................................................ 16

4819-7553-1216

George Anthony Peffer, *Forbidden Families: Emigration Experiences of Chinese Women Under the Page Law, 1875-1882*, AM. ETHNIC HIST. J. 28, 28–46. (1986) ................................................................................................................ 33

Gina Kolata, *Vast Dragnet Targets Theft of Biomedical Secrets for China*, N.Y. TIMES (Nov. 4, 2019) ...................................................................................... 15, 32

Gisela Perez Kusakawa, *Concern for the Younger Generation: The Targeting and Profiling of Chinese and Asian Americans and Immigrants*, ADVANCING JUSTICE | AAJC (Aug. 11, 2020) ........................................................... 27, 28, 32

Gisela Perez Kusakawa, *The Korematsu Legacy: "Stand up for what is right!"*, AAJC (Jan. 30, 2020) ............................................................................................ 35

*Information About the Department of Justice's China Initiative and a Compilation of China-Related Prosecutions Since 2018*, U.S. DEP'T OF JUSTICE (Aug. 4, 2020). ....................................................................... 12, 13, 17, 21, 22, 37

Jeff Swiatek & Kristine Guerra, *Feds Dismiss Charges Against Former Eli Lilly Scientists Accused of Stealing Trade Secrets*, INDY STAR (Dec. 5, 2014) ............................ 25

Jeffrey Mervis, *Fifty-four Scientists Have Lost Their Jobs as a Result of NIH Probe into Foreign Ties*, SCI. MAG. (June 12, 2020) ....................................... 15, 16

Karen Korematsu, *How the Supreme Court Replaced One Injustice with Another*, N.Y. TIMES (June 27, 2018) ................................................................................. 35

Lowen Liu, *Just the Wrong Amount of American*, SLATE (Sept. 11, 2016) ................................ 24

Margaret Lewis, *The U.S. Department of Justice's China Initiative,* NAT'L COMM. ON U.S. CHINA RELATIONS (June 9, 2020) ............................................................ 21

Matt Apuzzo, *U.S. Drops Charges That Professor Shared Technology with China*, N.Y. TIMES (Sept. 11, 2015) .......................................................................... 26, 31

Maureen Fan, *An Immigrant's Story: Against a Wall of Exclusion*, S.F. CHRON. (Oct. 4, 2019) ...................................................................................................... 33, 34

MIKE GERMAN, DISRUPT, DISCREDIT, AND DIVIDE 77, 339 (The New Press 2019) ................... 14

Nicole Perlroth, *Accused of Spying for China, Until She Wasn't*, N.Y. TIMES (May 9, 2015) ....................................................................................................... 25, 26

Nicole Perlroth, *Cleared of Spying for China, She Still Doesn't Have Her Job Back*, N.Y. TIMES (May 17, 2018) .................................................................... 26

OFFICE OF THE HISTORIAN, *Chinese Immigration and the Chinese Exclusion Acts* .............. 33, 34

4819-7553-1216

*Open Hearing on Worldwide Threats: Before the S. Select Comm. on Intelligence*,
115th Cong. 50 (2018) (statement of Christopher A. Wray, Director, Fed.
Bureau of Investigation) ............................................................................. 13, 16

Peter Waldman, *Mistrust and the Hunt for Spies Among Chinese Americans*,
BLOOMBERG (Dec. 10, 2019) .............................................................. 14, 15, 26, 27

*Racial Profiling*, ACLU ........................................................................................ 26

Ros Krasny, *GOP Senator Says Don't Let Chinese Students Study STEM in U.S.*,
BLOOMBERG (Apr. 26, 2020) ............................................................................ 13

S. Res. 201, 112th Cong. (2011) (enacted) ........................................................ 18, 34

*Secretary Michael R. Pompeo with Laura Ingraham of Fox News*, U.S. DEP'T OF
STATE (May 28, 2020) ..................................................................................... 13

*Statement by Judge in Los Alamos Case, with Apology for Abuse of Power*, N.Y.
TIMES (Sept. 14, 2000) ................................................................................... 25

*Statement in Response to DOC Filing Appeal*, SHERRY CHEN DEFENSE FUND ........... 26

*Statement of the National Science Board on Security and Science*, NAT'L SCI.
FOUND. (Oct. 24, 2018) ................................................................................... 19

*The New Red Scare on American Campuses,* ECONOMIST (Jan. 2, 2020) ............................ 17, 18

U.S. SENATE, PERMANENT SUBCOMM. ON INVESTIGATIONS, THREATS TO THE U.S.
RESEARCH ENTERPRISE: CHINA'S TALENT RECRUITMENT PLANS, PERMANENT
SUBCOMMITTEE ON INVESTIGATIONS 9, 44–45, 70–72 (2019) .............................. 18, 19, 20, 36

4819-7553-1216

<u>**Identity and Interest of *Amici Curiae***</u>

*Amici curiae* are non-profit organizations and individuals concerned that the Government is targeting Asian American scientists and researchers based on their ancestry rather than suspected criminal activity. *Amici* believe that unwarranted and racially motivated investigations and prosecutions of Asian American scientists and researchers will result in irreparable harm to these professionals' reputations, careers, and livelihoods, and foment prejudice against Asian Americans more broadly.

Asian Americans Advancing Justice-AAJC ("Advancing Justice-AAJC") is a nonprofit, nonpartisan organization that seeks to promote a fair and equitable society for all by working for civil and human rights and empowering Asian American, Native Hawaiian, and Pacific Islander communities. Since 1991, Advancing Justice - AAJC has advanced its mission through advocacy, public policy, public education, and litigation. Advancing Justice - AAJC is one of the nation's leading experts on issues of importance to the Asian American community, including immigration and immigrants' rights. Advancing Justice - AAJC is part of a national affiliation, Asian Americans Advancing Justice, made up of five separate and independent organizations, including affiliates in Atlanta, Chicago, Los Angeles, and San Francisco.

Asian Americans Advancing Justice-Asian Law Caucus ("Advancing Justice-ALC") is the oldest legal and civil rights organization in the country serving Asian and Pacific-Islander communities. Its National Security and Civil Rights program defends those unjustly targeted by the government's national security policies.

Asian Services In Action, Inc. (ASIA) was founded in 1995 by four women who sought to improve the quality of life for Asians in Northeast Ohio. Today, the organization is the only Asian American and Pacific Islander-focused health and social services 501(c)(3) organization in the State of Ohio. ASIA has taken on the most challenging tasks to help the underserved, low-income,

1

and immigrant communities across the state. ASIA is a credible non-profit organization providing services for over 58,000 individuals annually coordinated out of offices located in Cleveland and Akron, Ohio. ASIA provides culturally and linguistically appropriate resources to ensure effective programming that addresses the needs of the AAPI and new American communities in Northeast Ohio.

Asian Americans Advancing Justice – Atlanta is the first non-profit legal advocacy organization dedicated to protecting the civil rights of Asian American, Native Hawaiian, Pacific Islander (AANHPI) and Arab, Middle Eastern, Muslim, and South Asian (AMEMSA) communities in Georgia and the Southeast. The organization works in four major program areas: Civic Engagement and Organizing, Direct Legal Services, Impact Litigation, and Policy Advocacy. It is one of five independent organizations that make up the national Asian Americans Advancing Justice. Together with its affiliates in Chicago, Washington, D.C., Los Angeles, and San Francisco, it brings more than 100 years of collective experience in addressing the civil rights issues faced by Asian Americans and other vulnerable and underserved communities.

Asian Americans Advancing Justice – Los Angeles (Advancing Justice-LA) has been the leading legal and civil rights organization for Asian Americans, Native Hawaiians, and Pacific Islanders (AANHPIs) in Southern California since 1983. The mission of Advancing Justice-LA is to advocate for civil rights, provide legal services and education, and build coalitions to positively influence and impact AANHPIs and to create a more equitable and harmonious society. The organization's main client population is low-income, limited-English-proficient AANHPIs and their communities. They have distinct interests, issues, and barriers to inclusion that make their voices vital for true representation in their local governments. The CVRA is an important tool in improving the opportunity for their voices to be heard, and much of Advancing Justice -

4819-7553-1216

LA's advocacy for protecting the voting rights of its client population depends upon the reasonable interpretation and application of the CVRA by the courts.

The Asian Pacific American Labor Alliance (APALA), AFL-CIO, founded in 1992, is the first and only national organization of Asian American and Pacific Islander (AAPI) working people dedicated to advancing worker, immigrant, and civil rights. Since its founding, APALA has played a unique role in addressing the workplace issues of the 660,000 AAPI union members and in serving as the bridge between the broader labor movement and the AAPI community.

The American-Arab Anti-Discrimination Committee (ADC) is a civil rights organization committed to defending the rights of people of Arab descent and promoting their rich cultural heritage. ADC is the largest Arab-American grassroots civil rights organization in the United States. ADC is at the forefront in addressing discrimination and bias against Arab Americans. Through its Legal Department, ADC offers direct legal services and support to victims of discrimination. ADC also offers immigration support and services to members in the United States and abroad. ADC has a vested interested in this case, as the government policies used to target Chinese scientists and researchers can also be used to target Arabs and Muslims. Currently there are numerous Arabs and Muslims in the sciences currently working in the United States—expansion of this program poses a real threat that these scientists and researchers will suffer immense harm from the governments overzealous prosecutions all done under the auspices of "economic espionage."

The 1990 Institute is a 501(c)(3) organization based in San Francisco with the mission of championing fair and equal treatment for Asian Americans and for a constructive relationship between the United States and China. The 1990 Institute believes in the principles on which the

United States is based and in the national security of our country.  However, it does not feel that the racial profiling of Chinese Americans or any other minority group is justified.

The American Society for Biochemistry and Molecular Biology is an international non-profit scientific and educational organization.  With over 11,000 members, made up of students, researchers, educators, and industry professionals, the ASBMB is one of the largest molecular life science societies in the world.  Founded in 1906, the ASBMB's mission is to advance the science of biochemistry and molecular biology and to promote the understanding of the molecular nature of life processes.

The Center for Constitutional Rights (CCR) is a national non-profit legal, educational, and advocacy organization dedicated to advancing and protecting the rights guaranteed by the United States Constitution and international law.  CCR has represented clients and communities challenging profiling, detention, surveillance, or other targeting of immigrant communities and noncitizens in a range of matters.

Chinese American Data Science and Engineering Association (CADSEA) is a non-profit organization dedicated to building a platform for education, research, technical innovation, and leadership development in data-related professions.  CADSEA is inspired to build the community for professionals and enthusiasts of data science and data engineering by integrating the three core dimensions of the entire data ecosystem—academia, industry, and talent—so that we can be better prepared and equipped to embrace the challenges of wisely leveraging data and serve the world around us.  CADSEA is a member-based organization.  Its membership is open to data scientists, data engineers, data analysts, other professionals, students, and anyone who is interested in data science and data engineering.

4819-7553-1216

Chinese American Citizens Alliance DC is a chapter of the Chinese American Citizens Alliance, a non-profit civil rights and educational organization that promotes the interests of Chinese Americans.

Chinese for Affirmative Action was founded in 1969 to protect the civil and political rights of Chinese Americans and to advance multiracial democracy in the United States. Today, CAA is a progressive voice in and on behalf of the broader Asian American and Pacific Islander community. It advocates for systemic change that protects immigrant rights, promotes language diversity, and remedies racial and social injustice.

Chinese American Progressive Action (CAPA) shares with Chinese Americans and the broader United States public how progressive, forward-looking policies benefit our communities. It believes in justice, fairness, and an inclusive economy that provides opportunity for all Americans. CAPA lifts up Chinese American voices on the important issues that affect our country's future and encourages Chinese Americans to take political action, lead our communities, and build coalitions to ensure a strong and diverse America.

The Japanese American Citizens League is a national organization whose ongoing mission is to secure and maintain the civil rights of Japanese Americans and all others who are victimized by injustice and bigotry. During World War II, Japanese Americans were targeted because of their ancestry under the false pretext of national security. The Japanese American Citizens League stands in opposition to efforts to similarly discriminate based upon ethnicity.

The Asian American Legal Defense and Education Fund (AALDEF), founded in 1974, is a New York-based national organization that protects and promotes the civil rights of Asian Americans. By combining litigation, advocacy, education, and organizing, AALDEF works with Asian American communities across the country to secure human rights for all. The discriminatory

governmental targeting of Asians has been a recurring element in the history of Asian immigration to the United States. The racial and ethnic profiling of Chinese American scientists is the latest example of xenophobic policies that run contrary to our American democracy.

The Sikh Coalition is the largest community-based Sikh civil rights organization in the United States. Since its inception following the tragic events of September 11, 2001, the Sikh Coalition has worked to defend civil rights and liberties for all people, empower the Sikh community, create an environment where Sikhs and other minority religious and ethnic groups can lead a dignified life unhindered by bias or discrimination, and educate the broader community about Sikhism. For almost two decades, the Sikh Coalition has also led efforts to combat and prevent discrimination and unlawful surveillance against Sikhs and other minorities by government agencies and officials. The Sikh Coalition is deeply concerned about issues of government intrusion and infringement on religious minorities, and joins this brief in the hope that this Court will prioritize the protection of those religious rights.

Project South is a social justice organization based in Atlanta that works with grassroots organizations and directly impacted communities, including Black, refugee, immigrant, Muslim, and Middle Eastern communities, in the U.S. South.

The Partnership for the Advancement of New Americans (PANA) is a 501(c)(3) non-profit based in San Diego, California, that is dedicated to advancing the full economic, social, and civic inclusion of refugees. PANA advocates for public policy solutions that will ensure local governments invest in the long-term economic self-sufficiency of newcomers and refugee families, including effective resettlement strategies and equitable allocation of federal resources. PANA provides support to communities directly affected by unjust immigration policies, including nationals from Iran, Libya, Somalia, Sudan, Syria and Yemen who have resettled and continue to

4819-7553-1216

seek refuge in the San Diego region. In addition to its public policy advocacy, PANA engages more than 40,000 former refugee, African immigrant, Muslim, and Southeast Asian voters in elections throughout the San Diego region to ensure the fair representation of these historically underrepresented communities.

Defending Rights & Dissent (DRAD) is a national not-for-profit public education and advocacy organization based in Washington, D.C. The mission of the organization is to make real the promise of the Bill of Rights for everyone. DRAD was founded by activists who were persecuted by the infamous House Un-Americans Activities Committee. As a result, Defending Rights & Dissent was formed in part because of how the Cold War was used to cast baseless suspicion on individuals and deprive people of civil liberties. To continue to be vigilant in defending the civil liberties of all people.

80-20 Educational Foundation and 80-20 Asian American Empowerment PAC aim to win justice and equal opportunity for Asian Americans.

The National Korean American Service & Education Consortium (NAKASEC), founded in 1994, organizes Korean and Asian Americans towards racial, economic, and social justice. Its founding values are: Live Right, Know Your Roots, Live Strong, and Live Together. NAKASEC has local affiliates in northern Virginia (NAKASEC VA), the greater Chicago area (HANA Center), Southern California (Korean Resource Center), and Montgomery County, Pennsylvania (Woori Center).

OCA–Greater Houston: OCA–Greater Houston (OCA-GH) is a chapter of OCA – Asian Pacific American Advocates, a national non-profit, social justice, membership-driven organization dedicated to advancing the social, political, and economic well-being of Asian Pacific Americans. Through OCA-GH's advocacy, community outreach, immigrant integration, leadership,

engagement, and education programs, OCA-GH strives to foster development and ensure Asian Pacific Americans have access to opportunities and equitable treatment that enable them to engage fully and thrive in American society. Efforts by the government to increasingly target Chinese American scientists and researchers based on ethnicity under the pretext of ferreting out economic espionage is neither fair nor equitable.

OCA–Asian Pacific American Advocates is a national, member-based non-profit organization dedicated to advancing the social, political, and economic well-being of Asian Americans and Pacific Islanders (AAPIs). OCA promotes fair treatment and the elimination of discrimination, stereotyping, and hate crimes.

East Coast Asian American Student Union is a 501(c)(3) non-profit whose mission is to inspire, educate, and empower those interested in Asian Pacific Islander/American (API/A) issues. ECAASU works to build inclusive community spaces and advocate for API/A communities on social, political, and cultural issues that affect us nationally and internationally. ECAASU opposes the xenophobic targeting of Chinese American scientists and researchers, especially in its impacts on Chinese students. Further, ECAASU opposes the anti-Chinese and anti-Asian immigration policy from which this targeting stems.

South Asian Americans Leading Together (SAALT) is a national, nonpartisan, non-profit organization that fights for racial justice and advocates for the civil rights of all South Asians in the United States. Its ultimate vision is dignity and full inclusion for all. Like many other communities, South Asians have long experienced xenophobic rhetoric, bias, and hate violence in the United States. SAALT has been systematically tracking hate violence and xenophobic rhetoric targeting Muslims and those racialized as Muslim since November 2015. Since the COVID-19

pandemic hit, Asian American allies have experienced a spike in hate violence and discrimination, and SAALT has expanded its tracking to include this.

United Chinese Americans' central mission is the constitutional protection of Chinese Americans.

Wei Su is a former United States Army scientist who worked for the government for 24 years without incident. However, in 2011, the FBI began interrogating him, placed him under surveillance, threatened him with arrest, and removed his security clearance. That investigation ultimately was dropped. In 2015, the Pentagon's Consolidated Adjudicated Facility ("CAF") also suspended Mr. Su's security clearance. After fighting for years to clear his name, the CAF rescinded letters suspending Mr. Su's clearance in 2019.

Karen Korematsu's father, Fred Korematsu (*Korematsu v. United States*), is recognized as civil rights icon. After his case, he spent the rest of his life crisscrossing this country to educate about the dangers of targeting Americans and non-citizens based on their ethnicity and religion. Karen Korematsu supports this brief as she opposes the government's overreaching of power.

Russell Jeung launched STOP AAPI Hate.

<u>**Introduction**</u>

Dr. Feng Tao stands as one example, among many, of the United States Government's coordinated effort to target Chinese American scientists and researchers based on their ancestry rather than suspected criminal activity. Amici submit this brief to provide context on the Government's "China Initiative," under which it broadly investigates many Chinese American scientists without any indication of wrongdoing and to trace the history of the Government's scrutiny of Chinese and Asian Americans and immigrants from Asia. Amici hope this background illuminates the Government's past and current initiatives and leads the Court to conclude that dismissal of Dr. Tao's Second Superseding Indictment is warranted.

I.     **The Government Has Increased Efforts to Target Chinese American Scientists and Researchers Based on Ethnicity Rather than Suspected Criminal Activity.**

A.     **The Government Has Heavily Scrutinized and Racially Targeted Chinese American Scientists and Researchers.**

The Government has been heavily scrutinizing and racially targeting Chinese American scientists and researchers particularly through the so-called "China Initiative." Although the U.S. Department of Justice ("DOJ") presents it as a national security measure meant to combat economic espionage by the Chinese government, the China Initiative's reach has become overbroad. While determining real security threats is necessary, the FBI and other government agencies should rely on real evidence rather than racial profiling and gross generalizations to create suspicion about an entire race or ethnicity. However, in its quest to protect national security, the Government casts a wider-than-necessary net and uses overly simplistic measures that are susceptible to abuse by law enforcement to the detriment of people of Chinese origin—citizens and immigrants alike. Through rhetoric, rapidly changing policies, and targeted prosecutions, Chinese American scientists and researchers are again caught in a pattern of suspicion and racial

10

discrimination that has harmed Chinese and other Asian communities in the United States for more than 150 years.

> 1. **Recent state of prosecutions under the Economic Espionage Act and the China Initiative reveals the influence of politicized Anti-Asian rhetoric and policies that target Asian Americans and immigrants.**

For more than a decade, the Government has prosecuted people of Chinese and Asian descent at a disproportionate rate under the Economic Espionage Act of 1996 ("EEA"),[1] suggesting, at the very least, the appearance of racial targeting. Broadly, the EEA provides federal criminal penalties for the theft or misappropriation of trade secrets,[2] expanding punishable offenses beyond national defense information to include commercial information.[3] Congress intended for the EEA to "protect proprietary economic information" from agents and instrumentalities on behalf of foreign governments or any individuals both domestic and abroad, including U.S. citizens.[4]

Although the EEA was intended to address economic espionage from all foreign governments following the Cold War, it has increasingly been used to prosecute those of Chinese or Asian descent.[5] Between 1996 and 2009, 17% of the defendants charged under the EEA's provisions were of Chinese descent.[6] Since 2009, that percentage has more than tripled, jumping to 52%.[7] Moreover, Asian Americans and immigrants are overall more likely than any other racial

---

[1] *See* Andrew Chongseh Kim, *Prosecuting Chinese "Spies": An Empirical Analysis of the Economic Espionage Act*, 40 Cardozo L. Rev. 749, 763 (2018).

[2] *See id.* A person commits economic espionage when the person takes or receives a trade secret "intending or knowing that the offense will benefit any foreign government." Economic Espionage Act of 1996, 18 U.S.C. § 1831. A person, in turn, commits theft of trade secrets when the person takes or receives any trade secret "related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner." *Id.* § 1832.

[3] *Cf.* Economic Espionage Act of 1917, 18 U.S.C. §§ 792–99.

[4] Economic Espionage Act of 1996, 18 U.S.C. §§ 1831–32.

[5] Kim, *supra* note 1, at 753.

[6] *Id.*

[7] *Id.*

group to be charged under the EEA, making up 62% of EEA defendants charged since 2009.[8]  For individuals of Asian descent who were prosecuted, the rate at which they were "acquitted at trial, pled guilty only to 'false statements' and released on probation, or, most often, had all charges dropped against them" was twice as high as individuals of any other race.[9]

Despite the paucity of serious charges, significant sentencing disparities also exist.  Of those convicted, people with Asian names received sentences twice as long than those with Western names.[10]  This has left Asian Americans and immigrants vulnerable to "pretextual prosecutions" where prosecutors have filed cases based on weak evidence under the belief that Asians are spies.[11]  Without sufficient evidence for more serious charges, prosecutors have then attempted to prosecute and convict Asian defendants for lesser charges, such as making a false statement.[12]  As discussed in Section II.A, these "pretextual prosecutions," unfortunately, are not hypothetical.[13]

### 2. U.S. Government prosecutions correspond with a rise in scapegoating and biased rhetoric by public officials driving racially targeted decision-making, structures, and training at federal agencies.

The Government has shifted from a policy of engagement with China to an emphasis on the "threat" of China.[14]  Part of this shift includes the change in treatment of any individuals connected to China as the FBI adopts "a whole of society" approach toward all individuals of Chinese descent.  The FBI "view[s] the China threat as not just a whole of government threat, but

---

[8] *Id.*
[9] *Id.*
[10] *Id.* at 753–54.
[11]  Kim, *supra* note 1, at 755.
[12] *Id.* at 756.
[13] *Id.*
[14]  *See Information About the Department of Justice's China Initiative and a Compilation of China-Related Prosecutions Since 2018*, U.S. DEP'T OF JUSTICE (Aug. 4, 2020), https://www.justice.gov/opa/information-about-department-justice-s-china-initiative-and-compilation-china-related. [hereinafter "China Initiative"].

[also] a whole of society threat"[15] encompassing Chinese individuals, including civilians such as professors and academics. As recently as February 2020, FBI Director Christopher Wray called for a "whole-of-society" response to Chinese economic espionage and the threat of "non-traditional collectors," singling out graduate students and researchers.[16]

The FBI is not alone. Senior U.S. Government officials employ racially biased rhetoric to target Chinese Americans and immigrants. One needs look no further than President Trump's choice to refer to the coronavirus as "'kung flu,' eliciting laughter and wild cheers" at recent rallies in Oklahoma and Arizona in late June 2020.[17] In yet another example, President Trump, at a private event in 2018, "noted of an unnamed country that the attendee said was clearly China, 'almost every student that comes over to this country is a spy.'"[18] Senator Tom Cotton recently made similar remarks, stating broadly that Chinese students come to the U.S. "to steal [] property."[19] Finally, in an interview last month with Fox News, Secretary of State Michael Pompeo also made the following sweeping, dangerous statement: "[S]tudents that come here who have connections deeply to the Chinese state, they shouldn't be here in our schools spying."[20] This rhetoric has alarmed academic institutions and raised concerns within the Asian American community.[21]

---

[15] *Open Hearing on Worldwide Threats: Before the S. Select Comm. on Intelligence*, 115th Cong. 50 (2018) (statement of Christopher A. Wray, Director, Fed. Bureau of Investigation) [hereinafter *Open Hearing on Worldwide Threats*].

[16] Christopher Wray, Director, Fed. Bureau of Investigation, Responding Effectively to the Chinese Economic Espionage Threat, Remarks at the Department of Justice China Initiative Conference (Feb. 6, 2020), https://www.fbi.gov/news/speeches/responding-effectively-to-the-chinese-economic-espionage-threat.

[17] Colby Itkowitz, *Trump Again Uses Racially Insensitive Term to Describe Coronavirus*, WASH. POST (June 23, 2020), https://www.washingtonpost.com/politics/trump-again-uses-kung-flu-to-describe-coronavirus/2020/06/23/0ab5a8d8-b5a9-11ea-aca5-ebb63d27e1ff_story.html.

[18] Annie Karni, *Trump Rants Behind Closed Doors with CEOs*, POLITICO (Aug. 8, 2018), https://www.politico.com/story/2018/08/08/trump-executive-dinner-bedminster-china-766609.

[19] Ros Krasny, *GOP Senator Says Don't Let Chinese Students Study STEM in U.S.*, BLOOMBERG (Apr. 26, 2020), https://www.bloomberg.com/news/articles/2020-04-26/gop-senator-says-don-t-let-chinese-students-study-stem-in-u-s.

[20] *Secretary Michael R. Pompeo with Laura Ingraham of Fox News*, U.S. DEP'T OF STATE (May 28, 2020), https://www.state.gov/secretary-michael-r-pompeo-with-laura-ingraham-of-fox-news-2/.

[21] *See* China Initiative, *supra* note 14.

4819-7553-1216

This racially biased rhetoric from government officials in turn influences the decision-making, culture, and training at federal agencies. According to a recent study of over a dozen former federal investigators, "[the] distrust of people of Chinese heritage [too often] drives decision-making at the FBI and other U.S. security agencies."[22] Chinese scientists who work as federal employees or contractors, for example, appear to receive disproportionate scrutiny. One study analyzed more than 26,000 security clearance decisions for federal contractors since 1996. The China-related denial rate for security clearance applicants jumped from 44% in the period between 2000 and 2009 to 61% between 2010 to October 31, 2019.[23] The Government denied security clearance to applicants with Chinese connections at the same rate as other countries before 2009.[24] Now, denial rates for those with Chinese connections are higher than any other country.[25] While it is possible that some of this increase is legitimate, evidence suggests that the system tilts toward false positives when Chinese connections are involved.

According to former FBI agent Mike German, after September 11, "[X]enophobia . . . spread like a cancer"[26] within the FBI and impacted FBI training materials for both Muslim Americans and Chinese Americans. One presentation on "the Chinese" warned, "Never attempt to shake hands with an Asian."[27] A counterintelligence presentation, in turn, "warn[ed] agents against giving too many compliments to a Chinese woman as it might suggest a romantic relationship is desired, [and] another [told agents] to never stare at or attempt to shake hands with

---

[22] Peter Waldman, *Mistrust and the Hunt for Spies Among Chinese Americans*, BLOOMBERG (Dec. 10, 2019) (according to a recent study of more than a dozen former federal investigators), https://www.bloomberg.com/news/features/2019-12-10/the-u-s-government-s-mistrust-of-chinese-americans.

[23] *Id.* (Bloomberg News acquired and analyzed more than 26,000 security clearance decisions made by the Defense Office of Hearings and Appeals (DOHA) from 1996 through October 2019.)

[24] *Id.*

[25] *Id.*

[26] MIKE GERMAN, DISRUPT, DISCREDIT, AND DIVIDE 77, 339 (The New Press 2019).

[27] *Id.* at 83, 339.

an Asian."[28]  This training fostered the idea of Chinese and Asian Americans as "the threatening 'other'" rather than as "fellow American[s]," and furthered the narrative of Asian Americans as the "perpetual foreigner" where "Asian Americans . . . [are] . . . more closely associate[ed] . . . with their ethnicity and national origin than their nationality, no matter how long they've been Americans."[29]  The training is "more likely to implant bias than to educate agents about the complex behavior of spies."[30]

3.    **The Government has increased pressure on academic institutions and federal agencies to target Chinese American scientists.**

Racial bias from Government leadership has translated to real consequences within universities and federal agencies.  The Government has increased pressure on universities and academic institutions to criminalize what were once administrative issues and to end the culture of open collaboration for fundamental research that has been crucial to the American research enterprise.  Academic institutions face the dual threats of losing grant money from the National Institutes of Health ("NIH") and the National Science Foundation ("NSF") and intimidation by the intelligence community.  NIH, for example, sent letters to medical centers across the country to investigate individual scientists, almost all of whom are of Chinese descent.[31]  A recent study also found that the FBI collaborated with the NIH to investigate scientists' failures to disclose ties to China[32] and "targeted 189 scientists at 87 institutions."[33]  These investigations on their face

---

[28] *Id.* at 192 (citing Sean McElwee et al., *4 Pieces of Evidence Showing FBI Director James Comey Cost Clinton the Election*, Vox (Jan. 11, 2017), https://www.vox.com/the-big-idea/2017/1/11/14215930/comey-email-election-clinton-campaign).

[29] *Id.* at 190–92.

[30] Waldman, *supra* note 22.

[31] Gina Kolata, *Vast Dragnet Targets Theft of Biomedical Secrets for China*, N.Y. Times (Nov. 4, 2019), https://www.nytimes.com/2019/11/04/health/china-nih-scientists.html.

[32] Waldman, *supra* note 22.

[33] Jeffrey Mervis, *Fifty-four Scientists Have Lost Their Jobs as a Result of NIH Probe into Foreign Ties*, Sci. Mag. (June 12, 2020), https://www.sciencemag.org/news/2020/06/fifty-four-scientists-have-lost-their-jobs-result-nih-probe-foreign-ties; *see also* Waldman, *supra* note 22 (FBI collaborated with NIH to probe into some 180 researchers at more than 70 hospitals and universities seeking undisclosed ties to China).

4819-7553-1216

targeted Asian scientists.  In a presentation to a senior advisory panel, Michael Lauer, NIH's head of extramural research, stated that 82% of those under investigation are Asian.[34]  He stated that this "'is not surprising' because 'that's who the Chinese target' in their foreign talent recruitment programs."[35]  Mr. Lauer's statement suggests that these strategic decisions and investigations are often based on broad generalizations and an inherent distrust of those of Chinese and Asian descent and not related to economic espionage investigations.[36]

FBI and federal agencies have increasingly focused on universities to target Chinese American scientists and researchers by conducting threat awareness sessions and circulating information on the threat of China and these so-called non-traditional collectors.[37]  As a result, they have injected racial bias into academic institutions, discouraged collaboration, criminalized connections to China, and encouraged universities to view researchers and scientists of Chinese descent differently than their colleagues because of race.[38]  Taken together, "it may be that DOJ

---

[34] Mervis, *supra* note 33.
[35] *Id.*
[36] *Id.*
[37] *FBI Director Christopher Wray's Opening Remarks: China Initiative Conference*, CIS (Feb. 6, 2020), https://www.csis.org/analysis/fbi-director-christopher-wrays-opening-remarks-china-initiative-conference (According to FBI Director, the FBI now has "private-sector coordinators in each of the FBI's 56 field offices who lead [their] engagement with local businesses and universities." "[They] meet with these partners frequently, providing threat awareness briefings…"); *see also* Ana Swanson, *A New Red Scare Is Reshaping Washington*, N.Y. TIMES (July 20, 2019), https://www.nytimes.com/2019/07/20/us/politics/china-red-scare-washington.html ("Officials from the F.B.I and the National Security Council have been dispatched to Ivy League universities to warn administrators to be vigilant against Chinese students who may be gathering technological secrets from their laboratories to pass to Beijing.").
[38] As Director Wray stated to the Select Committee on Intelligence:

> I think in this setting I would just say that the use of nontraditional collectors, especially in the academic setting, whether it's professors, scientist, students, we see in almost every field office that the FBI has around the country.  It's not just in major cities.  It's in the small ones as well.  It's across basically every discipline. I think the level of naivete on the part of the academic sector about this creates its own issues.  They're exploiting the very open research and development environment that we have, which we all revere, but they're taking advantage of it.

*Open Hearing on Worldwide Threats*, *supra* note 15.

4819-7553-1216

suspicions that Chinese and other Asian-Americans are more likely to commit industrial espionage . . . effectively creates a new crime, 'researching while Asian.'"[39]

In turn, academic institutions, facing the potential loss of grant funding, leave professors and researchers without appropriate support for minor errors, such as a failure to fill out a university form correctly. As a result, Chinese academic professionals find themselves under FBI investigation for mere technicalities—now treated as crimes—that are unrelated to economic espionage, but that nonetheless result in immeasurable harm to these professionals' reputations, careers, and livelihoods. The FBI has prosecuted current and former university professors of Chinese descent for filing false tax returns,[40] fraud,[41] and making false statements,[42] among other charges.

4. **The Government's overzealous and broad prosecutions criminalize actions previously categorized as administrative matters or viewed as scientific and academic norms such as collaboration and open fundamental research.**

Chinese scientists and researchers, like Dr. Tao, face a rapidly changing research environment that has shifted away from the scientific and academic norms of collaboration and open fundamental research.[43] Suddenly, conduct only recently addressed by department policies is now criminal. The Government's overbroad theories for Dr. Tao's prosecution based on alleged wire fraud and false statements, for example, criminalizes conduct that was handled previously by universities as an administrative matter or seen as part of the open nature of fundamental research.

---

[39] Kim, *supra* note 1, at 797.
[40] China Initiative, *supra* note 14.
[41] *Id.*
[42] *Id.*
[43] Swanson, *supra* note 37 ("The administration paints the crackdown [on Chinese espionage particularly at universities and research institutions] as necessary to protect the United States. But there is growing concern that it is stoking a new red scare, fueling discrimination against students, scientists and companies with ties to China . . ."); *see also The New Red Scare on American Campuses,* ECONOMIST (Jan. 2, 2020), https://www.economist.com/briefing/2020/01/02/the-new-red-scare-on-american-campuses.

4819-7553-1216

All of the charges in the indictment against Dr. Tao rely on an undisclosed conflict of interest allegedly created because Dr. Tao was working for the University of Kansas ("KU") and receiving grant money from the Department of Energy and the NSF while under a contract he allegedly entered into in 2018 with a Chinese university as part of China's talent recruitment plan.[44] However, the Government does not point to any KU policy that makes participation in a foreign recruitment plan a conflict of interest. Neither the Department of Energy nor the NSF had any rules against participation in foreign talent recruitment plans while receiving grant money until late 2019.[45] Indeed, the NSF's new policy, released in July 2019, prohibits only *employees* from participating in foreign talent recruitment plans and does not apply to *researchers* like Dr. Tao.[46] Likewise, the Department of Energy did not have a policy prohibiting researcher participation in foreign talent recruitment plans until June 10, 2019, a little more than two months before the date of the original indictment in this case.[47]

The criminal allegations against Dr. Tao stand in stark contrast to the longstanding national policy on research by foreign individuals to keep fundamental research unrestricted and exempt unclassified information from control or access limitations.[48] Fundamental or basic research is defined as a "systematic study directed toward greater knowledge or understanding of the fundamental aspects of phenomena and observable facts without specific applications towards processes or products in mind."[49] The current policy within the U.S. academic and scientific

---

[44] *See* Second Superseding Indictment, United States v. Tao, No. 19-20052-JAR/JPO (D. Kan. June 24, 2020).

[45] *See* U.S. Senate, Permanent Subcomm. on Investigations, Threats to the U.S. Research Enterprise: China's Talent Recruitment Plans, Permanent Subcommittee on Investigations 9, 44–45, 70–72 (2019), https://www.hsgac.senate.gov/imo/media/doc/2019-11-18%20PSI%20Staff%20Report%20-%20China%27s%20Talent%20Recruitment%20Plans.pdf [hereinafter "Senate Staff Report"].

[46] *Id.* at 44–45.

[47] *Id.* at 9, 70–72; *see also* Sealed Indictment, United States v. Tao, No. 19-20052-JAR/JPO (D. Kan. Aug. 21, 2019).

[48] *See* Senate Staff Report *supra* note 45, at 40–41.

[49] *Id.* at 37 (quoting Nat'l Res. Council, Assessment of Dep't of Defense Basic Research 49 (2005), https://www.nap.edu/read/11177/chapter/8#49).

4819-7553-1216

community for fundamental research favors open collaboration with minimum restrictions to further common scientific aspirations.[50] This policy reflects "the United States' commitment to freedom of inquiry, innovation, and the marketplace of ideas [that] has helped the U.S. grow, attract, and retain our world-class science and engineering workforce."[51] "Where the national security requires control, the mechanism for control of information generated during federally funded fundamental research in science, technology and engineering at colleges, universities and laboratories is *classification*."[52]

Dr. Tao's indictment upends this longstanding national policy by restricting, controlling, and limiting access through criminal indictments, regardless of whether or not classified information was shared. The indictment seems to flow from recommendations in the Senate Staff Report, released in 2020, which called for seven federal agencies, including the FBI, and universities to increase efforts against the alleged threat to the U.S. research enterprise posed by Chinese researchers and Chinese talent recruitment plans.[53] The Senate Staff Report increased pressure on federal agencies, including the DOJ, the State Department, and intelligence agencies, to target Chinese American scientists and researchers like Dr. Tao. The Senate Staff Report seeks to discourage collaboration and free flow of information, while also suggesting that various organizations target Chinese American researchers with criminal prosecution to stifle their research.[54]

While the Senate Staff Report recognizes the current norm of open collaboration within the U.S. academic and scientific community for the purpose of furthering common scientific

---

[50] EXEC. OFFICE OF THE PRESIDENT, NSDD-189, NATIONAL POLICY ON THE TRANSFER OF SCIENCE, TECHNICAL AND ENGINEERING INFORMATION 1 (1985).
[51] *Statement of the National Science Board on Security and Science*, NAT'L SCI. FOUND. (Oct. 24, 2018), https://www.nsf.gov/news/news_summ.jsp?cntn_id=297039.
[52] EXEC. OFFICE OF THE PRESIDENT, *supra* note 50, at 2 (emphasis added).
[53] *See generally* Senate Staff Report, *supra* note 45.
[54] *Id.* at 7–13.

aspirations, the Report also encourages academic institutions to move away from this open nature of fundamental research and implement more restrictions.[55]  It asks agencies to reassess whether sharing fundamental research is in the nation's interest.[56]  It suggests reevaluating the national policy of open, unrestricted fundamental research, which was established in 1985 through NSDD-189.[57]  It seeks State Department action to deny visas more frequently for individuals like Chinese scientists and researchers.[58]  It asserts that federal law enforcement, including all 56 FBI field offices, should step up investigations of scientists and researchers with connections to China.[59]  Simply put, the entire Senate Staff Report recommends targeting Chinese researchers like Dr. Tao with criminal investigations because their race and nationality allegedly make them and their research practices suspect.

B.      **The Government's Racially Biased Scrutiny of Chinese American Scientists and Researchers Has Led to Prosecutions for Lesser or Unrelated Alleged Infractions.**

When the DOJ launched the China Initiative in November 2018, former Attorney General Jeff Sessions said that the United States stands as "the world's top innovator" and that "geopolitical rival states . . . often try to steal [American] inventions and defraud [America]."[60]  However, as the name implies, the initiative does not address all geopolitical rival states of the United States.[61]  According to Seton Hall University Professor Margaret K. Lewis, it was "[h]ighly unusual if not unprecedented to have the name . . . of a country be the name of an initiative by the Department

---

[55] *Id.* at 11–13.
[56] *Id.* at 12.
[57] *Id.*
[58] *Id.*
[59] *Id.* at 11–13.
[60] *Attorney General Jeff Sessions Announces New Initiative to Combat Chinese Economic Espionage*, U.S. DEP'T OF JUSTICE (Nov. 1, 2018), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-announces-new-initiative-combat-chinese-economic-espionage.
[61] *Id.*

of Justice."[62]  Former Attorney General Sessions singled out the threat of Chinese economic espionage against the United States.[63]  He claimed that the initiative would "identify priority Chinese trade theft cases, ensure that we have enough resources dedicated to them, and make sure that we bring them to an appropriate conclusion quickly and effectively."[64]  Two years later, the Government continues to claim that the focus of the China Initiative is to "identify[] and prosecut[e] those engaged in trade secret theft, hacking, and economic espionage" to combat Chinese "national security threats."[65]

To combat these alleged threats from China, the DOJ is now pushing "prosecutors across the country to focus on investigations of Chinese state-backed efforts to steal intellectual property."[66]  John Demers, the Justice Department's Assistant Attorney General for National Security, said the DOJ wants each of the country's 94 U.S. Attorney's districts to bring cases of Chinese espionage or economic theft.[67]  Demers acknowledged that the U.S. Attorney's offices will not bring in "125 cases in a year" but still made a nationwide call for the offices to push to bring in these cases.[68]  And federal prosecutors have confirmed that prosecutions will spike this year as a part of the U.S. Government's nationwide effort to stop economic espionage; this is because prosecutors will be "creative" and not because there is any credible evidence of economic

---

[62] Margaret Lewis, *The U.S. Department of Justice's China Initiative,* NAT'L COMM. ON U.S. CHINA RELATIONS (June 9, 2020), https://www.ncuscr.org/media/podcast/China-Initiative-conversation.
[63] *Attorney General Jeff Sessions Announces New Initiative to Combat Chinese Economic Espionage*, U.S. DEP'T OF JUSTICE (Nov. 1, 2018), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-announces-new-initiative-combat-chinese-economic-espionage.
[64] *Id.*
[65] *See* China Initiative*, supra* note 14.
[66] Betsy Woodruff Swan, *Inside DOJ's Nationwide Effort to Take on China,* POLITICO (Apr. 7, 2020), https://www.politico.com/news/2020/04/07/justice-department-china-espionage-169653.
[67] *Id.*
[68] *Id.*  "[W]e wanted to signal to the U.S. attorneys that we understood that [these cases are complex and time-consuming]," said Demers.  "[N]onetheless we wanted them to focus their resources on this and that we were going to approve these charges and we wanted them to move forward."  *Id.*

espionage.[69]  This "creativity" has translated to vast resources being funneled into investigating Chinese scientists and charging them for minor or unrelated infractions rather than for economic espionage.  In essence, these offices are "padding" their numbers with minor or unrelated infractions as shown in the DOJ's own report about the China Initiative.[70]  This prosecution of scientists and researchers of Chinese descent for minor or unrelated infractions has caused immeasurable harm and created an environment of uncertainty and fear[71] for the Chinese community, American and immigrant alike.

The DOJ's own report on the China Initiative shows that many of the actual charges are not about intellectual property theft or economic espionage.[72]  Instead, many of the charges are for minor or unrelated offenses, including wire fraud, filing false tax returns, selling counterfeit computer parts, making false statements, and lying on a university conflicts of interest form, as is the case with Dr. Tao.[73]  Universities previously handled matters such as non-disclosures in a conflict of interest form; now, they are criminalized.   Previously, at Baylor College of Medicine, for example, when at least four researchers erred in their disclosures, the college allowed them to correct their forms.[74]  Now, the Government has pursued an aggressive strategy to charge and prosecute scientists for these minor or unrelated infractions,[75] deflecting from its inability to bring any credible charges of state-sponsored intellectual property theft or economic espionage.

---

[69] Catherine Matacic, *U.S. Attorneys Warn of Upcoming 'Spike' in Prosecutions Related to China Ties*, Sci. Mag. (Feb. 7, 2020), https://www.sciencemag.org/news/2020/02/us-attorneys-warn-upcoming-spike-prosecutions-related-china-ties.

[70] *See* China Initiative*, supra* note 14.

[71] Elie Dolgin, *'Psychological Fear': MIT Scientists of Chinese Origin Protest Toxic US Climate*, Nature (July 2, 2019), https://www.nature.com/articles/d41586-019-02063-z.

[72] China Initiative*, supra* note 16; *see also* Bill Rinehart, *FBI Is 'Harassing' Some Chinese Citizens Says Academic Group*, WVXU (Aug. 26, 2019), https://www.wvxu.org/post/fbi-harassing-some-chinese-citizens-says-academic-group#stream/0.

[73] China Initiative*, supra* note 14.

[74] Rinehart, *supra* note 72.

[75] *Id.*

4819-7553-1216

As of June 22, 2020, the DOJ has about 46 China-related cases under the China Initiative that the DOJ claims is intended to address economic espionage.[76]  Only about 15% of the cases under the initiative, however, are for economic espionage.[77]  The majority of the cases are for minor or unrelated offences; no cases in May and June 2020 deal with stolen trade secrets or economic espionage—the purported purpose of the China Initiative.[78]  Not only is DOJ's approach, if credited, ineffective against combatting real security threats, it also harms Chinese and Asian Americans and immigrants in our communities.

## II. The Government's Racially and Politically Motivated Prosecution of Chinese Scientists Causes Immeasurable Harm to Chinese and Asian Americans and Immigrants.

Dr. Tao's indictment, once viewed in the proper context, illustrates that he is a victim of racial targeting.  And Dr. Tao is not alone.  As discussed above, the FBI is ramping up its China Initiative efforts.  Unfortunately, for those like Dr. Tao, the Government's China Initiative casts an overly broad net, destroying the lives of many Chinese and Asian Americans and immigrants and spreading fear throughout the Asian American community.  The prosecutions under the China Initiative are predominantly for lesser or unrelated alleged infractions rather than their purported purpose of prosecuting acts of economic espionage.  This racially targeted strategy translates to real human ramifications for individuals whose reputations and livelihood were ruined as a result of the Government's targeting and racial profiling of Asian Americans.

---

[76] *Id.*
[77] *Id.*
[78] *Id.*

4819-7553-1216

## A.    Political Pressure Has Resulted in Racially Biased Prosecutions Causing Immense Harm to the Chinese and Asian American and Immigrant Communities.

### 1.    Individual Experiences Illustrate the Long-Lasting and Irreparable Negative Impact of Biased Prosecutions on Chinese Americans.

As the Government increases efforts to find incidents of Chinese espionage, more individuals of Chinese descent will be arrested, and then prosecuted; or, even if they are not prosecuted, suffer immeasurable harm.  American citizens such as Sherry Chen, Xiaoxing Xi, Wen Ho Lee, Guoqing Cao, Shuyu Li, and Wei Su have already suffered from these unwarranted investigations and prosecutions.  Their cases show ongoing bias, discrimination, and race and ethnicity-based profiling of individuals of Chinese descent by the U.S. Government.

In December 1999, the Government prosecuted Wen Ho Lee, a Taiwanese American scientist, accusing him of passing secrets to the Chinese government about a U.S. nuclear program despite lacking evidence of espionage.  *See United States v. Wen Ho Lee*, 79 F. Supp. 2d 1280 (1999).[79]  Although Mr. Lee finally received restitution, the damage had already been done.  In addition to suffering from a damaged reputation, he spent nine months in solitary confinement during which time the Government denied him basic legal protections under the law.[80]  At Mr. Lee's dismissal hearing, federal District Court Judge James A. Parker apologized to him and reproached the Government's conduct:

> What was the government's motive in insisting on your being jailed pretrial under extraordinarily onerous conditions of confinement until today, when the executive branch agrees that you may be set free essentially unrestricted?…Why were you charged with the many Atomic Energy Act counts for which the penalty is life imprisonment, all of which the executive branch has now moved to dismiss and which I just dismissed?... I believe you were terribly wronged by being held in custody pretrial in the Santa Fe County

[79] Lowen Liu, *Just the Wrong Amount of American*, Slate (Sept. 11, 2016), https://slate.com/news-and-politics/2016/09/the-case-of-scientist-wen-ho-lee-and-chinese-americans-under-suspicion-for-espionage.html.
[80] *Id.*

Detention Center under demeaning, unnecessarily punitive conditions. I am truly sorry that I was led by our executive branch of government to order your detention last December. Dr. Lee, I tell you with great sadness that I feel I was led astray last December by the executive branch of our government through its Department of Justice, by its Federal Bureau of Investigation and by its United States attorney for the district of New Mexico, who held the office at that time. I am sad for you and your family because of the way in which you were kept in custody while you were presumed under the law to be innocent of the charges the executive branch brought against you.[81]

Despite the injustice in Mr. Lee's case, the Government continues to bring indictments based on faulty and unclear grounds against Chinese scientists. In 2013, a federal grand jury indicted two former Eli Lilly and Co. senior biologists, Guoqing Cao and Shuyu "Dan" Li, on charges of stealing nine drug discovery trade secrets and passing them to a Chinese drug company.[82] The U.S. Attorney's office later requested the dismissal of all charges but neglected to specify the reasons.

In 2014, federal agents accused Sherry Chen, a Chinese American hydrologist, then employed at the National Weather Service, of using a stolen password to download information from a federal dam database and of lying about meeting with a high-ranking Chinese official.[83] Ms. Chen had sent publicly available information to a former classmate in China and then connected him to a colleague for further information about his inquiry.[84] The colleague reported her.[85] During the course of the investigation, investigators asked Ms. Chen when she last saw a

---

[81] *Statement by Judge in Los Alamos Case, with Apology for Abuse of Power*, N.Y. TIMES (Sept. 14, 2000), https://www.nytimes.com/2000/09/14/us/statement-by-judge-in-los-alamos-case-with-apology-for-abuse-of-power.html.

[82] Jeff Swiatek & Kristine Guerra, *Feds Dismiss Charges Against Former Eli Lilly Scientists Accused of Stealing Trade Secrets*, INDY STAR (Dec. 5, 2014), https://www.indystar.com/story/news/crime/2014/12/05/fedsdismiss-charges-former-eli-lilly-scientists-accused-stealing-trade-secrets/19959235/.

[83] Nicole Perlroth, *Accused of Spying for China, Until She Wasn't*, N.Y. TIMES (May 9, 2015), https://www.nytimes.com/2015/05/10/business/accused-of-spying-for-china-until-she-wasnt.html.

[84] Kim, *supra* note 1, at 774.

[85] *Id.*

4819-7553-1216

former classmate. She told them, "I think 2011" when they had actually met in 2012.[86] Prosecutors then sought to convict her of making a false statement before later dropping all charges.[87] While the DOJ dropped the case after finding no evidence of espionage, the United States Department of Commerce announced in 2015 its plan to fire Ms. Chen. Although the federal Merit Systems Protection Board in April 2018 ruled in favor of her reinstatement and suggested that Commerce Department officials had buried exculpatory evidence, the Department still plans to appeal the ruling and proceed with her dismissal.[88]

In 2015, the DOJ accused Xiaoxing Xi, a Chinese American physics professor at Temple University, of sharing sensitive American-made technology with Chinese scientists.[89] Without consulting with experts to understand the technology, FBI agents and prosecutors branded Mr. Xi as a Chinese spy. He was eventually vindicated after independent experts discovered that the information that he shared for academic purposes was not classified and perfectly lawful.[90] However, once again, the damage to Mr. Xi's reputation was done and to date, there has been no apology or compensation by the Government. These cases form a disturbing picture—one that shows that race and ethnicity-based profiling is indeed driving these prosecutions.[91]

Additionally, Wei Su, a former scientist for the U.S. Army, is an example of a government employee impacted by bias against Chinese Americans. Despite 24 years of working for the

---

[86] *Id.*

[87] *Id.*

[88] Perlroth, *supra* note 83; Nicole Perlroth, *Cleared of Spying for China, She Still Doesn't Have Her Job Back*, N.Y. TIMES (May 17, 2018), https://www.nytimes.com/2018/05/17/technology/sherry-chen-national-weather-service.html; *Chen v. Dep't of Commerce*, No. CH-0752-17-0028-I-1, 2018 WL 2128716 (Apr. 23, 2018); *Statement in Response to DOC Filing Appeal*, SHERRY CHEN DEFENSE FUND, https://www.sherrychendefensefund.org/uploads/9/9/2/8/99280080/statement_in_repsonse_to_doc_filing_appeal_20180618.pdf.

[89] Matt Apuzzo, *U.S. Drops Charges That Professor Shared Technology with China*, N.Y. TIMES (Sept. 11, 2015), https://www.nytimes.com/2015/09/12/us/politics/us-drops-charges-that-professor-shared-technology-with-china.html.

[90] *Id.*

[91] *Racial Profiling*, ACLU, https://www.aclu.org/issues/racial-justice/race-and-criminal-justice/racial-profiling (last visited Aug. 11, 2020).

Government without incident, Mr. Su found himself in the midst of an FBI investigation in 2011 when he was placed under surveillance, threatened with arrest, and stripped of his security clearance.[92] Although the FBI began to interrogate him in 2011, Mr. Su believes that the investigations started much earlier.[93] The investigation was eventually dropped.[94] Then, in 2015, the Pentagon's Consolidated Adjudicated Facility ("CAF") suspended his security clearance based on false evidence.[95] For years, Mr. Su fought to clear his name. Finally, in May 2019, the CAF sent Mr. Su a letter rescinding the Pentagon's previous letters that suspended and revoked his security clearance.[96] According to this letter, the Pentagon's previous letters suspending and revoking his security clearance were "not accurate."[97]

However, the impact of the FBI investigations and CAF's revocation of his security clearance remains with Mr. Su to this day.[98] He believes that these were instances of racial profiling.[99] Mr. Su studied engineering in China, and came to the United States for his Ph.D. in electrical engineering at the City University in New York in 1992.[100] Mr. Su's deep love for this country led him to join the army after graduation.[101] Mr. Su rose up in the army and was well revered and respected for his contributions.[102] After the Wen Ho Lee case, Mr. Su's friends warned him to leave the Government.[103] However, Mr. Su did not quit, believing that Asian Americans

---

[92] Waldman, *supra* note 22.
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *Id.*
[97] *Id.*
[98] Gisela Perez Kusakawa, *Concern for the Younger Generation: The Targeting and Profiling of Chinese and Asian Americans and Immigrants*, ADVANCING JUSTICE | AAJC (Aug. 14, 2020), https://advancingjustice-aajc.org/dr-su-profiling-chinese-american-immigrants.
[99] Waldman, *supra* note 22.
[100] Kusakawa, *supra* note 98.
[101] *Id.*
[102] *Id.*
[103] *Id.*

were already underrepresented in the Government.[104]  Moreover, he had a deep sense of justice and believed that if he did not do anything wrong or make any mistakes, he would be fine.[105]  Even as he continued working for the Government, Mr. Su felt the pressure to not travel to China.[106]  Despite not doing anything wrong, Mr. Su found himself under investigation by the FBI.  Even after CAF rescinded the Pentagon's previous letters that suspended and revoked his security clearance, Mr. Su is still extremely cautious about his actions.[107]  To this day, Mr. Su does not know why the FBI investigated him.[108]

Although his life was deeply impacted, Mr. Su considers himself a survivor.  However, he worries for the younger generation of Chinese Americans.  According to Mr. Su, "Chinese Americans have to act differently than others, even though they shouldn't have to."[109]  He believes that the FBI's treatment of him was biased, and he considers the increased targeting of Chinese Americans to be problematic.[110]  Mr. Su criticized the racial profiling of Chinese Americans:

> You should treat everyone fairly and not because [of] their race . . . Of course there are bad apples, but most people come here because they love this country and do a lot for this country. And you have to treat them fairly or they won't come here, and [we] will lose their contributions.  America is doing good because we are doing things fairly.[111]

Mr. Su stressed the importance of facts, stating:

> [I]f you have a charge or allegation, you have to have facts, and not just your imagination.  Investigators cannot lie.  You have to have facts; that is the important thing.  [W]hen you know they are not engaging in espionage and you try to label him a spy…[t]hat is

---

[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Id.*

4819-7553-1216

hurting Chinese Americans and is not a part of our Constitutional principles.[112]

## 2. Impact of Racially-Tinged Prosecutions and Escalated Government Efforts to Target Individuals of Chinese Descent on the Chinese Community.

The prosecutions of Chinese American scientists and ongoing investigations have harmed not just individuals but have rippled out into the Chinese community in the United States as a whole. As discussed below, the Government's broad suspicion of Chinese American and immigrant scientists has created an environment of uncertainty and fear for the community across the country. Even individuals who have not been prosecuted have been driven from the country they consider home and have suffered immeasurable harm to their livelihood, relationships and personal health. Moreover, there is a pervasive "psychological fear" among scientists of Chinese origin in an environment that has increasingly become hostile to them.[113]

The increased scrutiny by the Government of Chinese American and immigrant scientists and researchers can be felt in every facet of life for impacted persons. Jianzhu Chen is a U.S. citizen of Chinese descent and an immunologist who has worked at the Massachusetts Institute of Technology ("MIT") for a quarter of a century.[114] When returning to the United States, Mr. Chen was questioned by a U.S. customs agent on whether he worked for a foreign government.[115] "It was quite intrusive . . . [a]nyone of Chinese descent becomes a suspect."[116] He is not alone. Across the country, the Government's broad suspicion and aggressive tactics have intimidated academics and scientists of Chinese descent. At MIT, scientists have changed their behavior in response. Gang Chen, an MIT mechanical engineer ended his planned sabbatical at the Southern University

---

[112] *Id.*
[113] Dolgin, *supra* note 71.
[114] *Id.*
[115] *Id.*
[116] *Id.*

of Science and Technology in Shenzhen to avoid suspicion as "[t]he current atmosphere creates a lot of psychological fear."[117]  A former MIT engineering postdoc who is now in Beijing described FBI investigations as "scary" and wished to remain anonymous.[118]  He was questioned about his involvement in China's Thousand Talent Plan ("TTP"), and said that "[he] fe[lt] like [he] was unfairly targeted just because [he's] Chinese."[119]

In Cincinnati, Ohio, there are reports of FBI intimidation and harassment of Chinese employees and professors at the University of Cincinnati.[120]  Eric Palmer, the Executive Director of the local chapter of the American Association of University Professors, stated that the FBI contacted at least three faculty members at the university in 2018 in connection to China's Thousand Talents programs.[121]  According to Mr. Palmer, FBI agents harassed these individuals by showing up both at their workplace and at their homes.[122]  FBI agents then asked some faculty members "to turn over information about other Chinese national faculty members with at least an implicit threat that if they don't, they will be investigated further."[123]  Mr. Palmer considers the Government's approach to be "scare and authoritarian tactics" where the Government "assum[es] Chinese scholars are trying to steal intellectual property" rather than determining whether "there's credible information pointing to individuals and investigate on that basis."

The Government's investigation is not limited to a particular geographical region or even field of study.  Cancer researchers across the country have felt the brunt of the Government's scrutiny.  Scientists and researchers in cancer research from the University of Florida, the University of Texas MD Anderson Cancer Center, and the University of Louisville fled the United

---

[117] *Id.*
[118] *Id.*
[119] *Id.*
[120] Rinehart, *supra* note 72.
[121] *Id.*
[122] *Id.*
[123] *Id.*

4819-7553-1216

States after FBI investigations into non-disclosures.[124]  Xifeng Wu, an epidemiological researcher, worked at the University of Texas' MD Anderson Cancer Center for almost 30 years.[125]  She had twice rejected invitations to join the TTP, but was nonetheless investigated for non-disclosures.[126]  In early 2019, she was pushed out of MD Anderson along with at least three other researchers.[127]  According to her husband, "MD Anderson buckled under pressure from NIH, which provided the institution with more than $145 million in federal grants in 2019."[128]  Scientists and researchers are caught in the middle of politics between universities and the Government.  The sudden changing norms, such as mistakes on nondisclosure agreements that were previously considered minor administrative issues and handled internally at universities, are now under intense scrutiny by the national security apparatus of the U.S. Government.

Moreover, investigations have acted as a disincentive from funding opportunities for scientists of Chinese descent or any projects involving scientists of Chinese descent.  Mr. Xi, the Chinese American professor wrongfully accused of being a spy due the FBI's failure to understand the technology,[129] lost federal grants as a result of his investigations.[130]  Before his wrongful arrest and prosecution, Mr. Xi had nine federal grants; at the time of his interview in 2019, he only had two.[131]  Although he still applies for funding, he tries to apply for joint projects rather than applying

---

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] *Id.*

[128] *Id.*  Not all universities have buckled under pressure from the Government.  "When NIH alerted the Baylor College of Medicine that at least four researchers there – all ethnically Chinese – erred in their disclosures, Baylor corrected the documents and allowed them to continue working."  David Armstrong, Annie Waldman & Daniel Golden, *The Trump Administration Drove Him Back to China, Where He Invented a Fast Coronavirus Test,* ProPublica (Mar. 18, 2020), https://www.propublica.org/article/the-trump-administration-drove-him-back-to-china-where-he-invented-a-fast-coronavirus-test.

[129] Apuzzo, *supra* note 107.

[130] Bloomberg Markets and Finance, *How the U.S. Is Purging Chinese Americans from Cancer Research*, Bloomberg (July 12, 2019), https://www.youtube.com/watch?v=SBTroGMs-2w.

[131] *Id.*

as just an individual.[132]  This is the reality for Chinese scientists under the current climate where they must tread carefully because of the Government's broad scrutiny and assumption of guilt for scientists and researchers of Chinese descent.  The impact is not just on the scientist, but also on the entity for which the scientist works.  Mr. Su's loss of security clearance was a loss in funding not just for him as an individual, but also for the army.[133]  Even collaboration, which was previously encouraged, is now something Chinese scientists fear.  Mr. Xi shared that Chinese scientists are now fearful of collaborating with Chinese colleagues.[134]

Concerns about the impact of these investigations on human lives and for the academic arena are prevalent across universities.  MIT, Yale University, Stanford University and at least eight other institutions have issued statements detailing their concerns with the targeting of the Chinese scientists and academics.[135]  However, many universities provide inadequate support to their faculty who find themselves targets of the U.S. Government.  Caught in the middle of the investigations and prosecutions, many scientists, professionals, and academics of Chinese descent fear they will be criminalized under the Government's broad net of suspicion.  "The investigations have left Chinese and Chinese-American academics feeling 'that they will be targeted and that they are at risk,'" said Frank Wu, former president of C-100, a prominent Chinese American organization.[136]  "People are living in fear."[137]  The damage from the Government's overzealous prosecutions has already harmed Americans and has now permeated various facets of our society, creating an environment of fear and impacting the actions and abilities of Chinese scientists and researchers today to work and live in the United States.

---

[132] *Id.*
[133] Kusakawa, *supra* note 114.
[134] Bloomberg Markets and Finance, *supra* note 130.
[135] Dolgin, *supra* note 71.
[136] Kolata, *supra* note 31.
[137] *Id.*

4819-7553-1216

**B.** **The Government's current policies against individuals of Chinese descent are rooted in a history of bias against Asian Americans.**

The anti-Asian immigrant policies growing today trace their roots back to the mid-19th century, after Chinese workers first migrated to the U.S. to work in the gold mines, the agricultural and garment industries, and as laborers building railroads on America's west coast.[138] The end of the 19th century marked the rise in anti-Chinese sentiment as Chinese immigrants were scapegoated for lack of economic opportunity.[139] This scapegoating resulted in the 1875 Page Act, which barred immigrants deemed as "undesirable" and primarily targeted Asian immigrants, particularly those from China.[140] Rooted in anti-Chinese sentiment, the bill intended "to stop the flow of the 'yellow peril' to American shores," and disproportionately impacted Chinese women.[141] Although the bill failed to stop the immigration of Chinese laborers, it succeeded in reducing the number of female Chinese immigration by 68% from 1876 to 1882 from the previous seven-year period.[142]

The Senate then passed the Chinese Exclusion Act and its progeny to deter immigration not only from "undesirables," but from *all* new Chinese immigrants. The Chinese Exclusion Act—the first U.S. immigration law to bar an entire ethnic group—effectively prohibited Chinese immigrants to the U.S. for nearly 60 years.[143] The Act also barred all persons of Chinese descent from gaining citizenship.[144] The Geary Act of 1892 extended the Chinese Exclusion Act of 1882

---

[138] *See* OFFICE OF THE HISTORIAN, *Chinese Immigration and the Chinese Exclusion Acts*, https://history.state.gov/milestones/1866-1898/chinese-immigration (last visited Aug. 10, 2020).

[139] *See* George Anthony Peffer, *Forbidden Families: Emigration Experiences of Chinese Women Under the Page Law, 1875-1882*, AM. ETHNIC HIST. J. 28, 28–46. (1986), https://www.jstor.org/stable/27500484?read-now=1&seq=1#page_scan_tab_contents.

[140] 18 Stat. 477, 43 Cong. Ch. 141.

[141] *See* Peffer, *supra* note 139, at 29, 28–46.

[142] *See id.*

[143] 22 Stat. 58, 47 Cong. Ch. 126.

[144] *Id.*

4819-7553-1216

for another ten years.[145]  This bill singled out Chinese individuals, requiring them to obtain "certificates of residence," and denied them the right to be released on bail upon application for a writ of habeas corpus.  Chinese immigrants also could not bear witness in court.[146]  Instead, only a "credible white witness" could testify for them.[147]  Although economic security was touted as a reason for the Chinese Exclusion Act, the Act fit within a larger anti-Chinese movement intended to advance a racist agenda for white purity threatened by Chinese immigration.[148]  In 2011, the Senate introduced and passed a resolution recognizing the discriminatory nature of the Chinese Exclusion Act and other laws against those of Chinese decent in America.[149]

Chinese exclusionary laws paved the way for future immigration laws rooted in anti-Asian sentiment, and the Supreme Court issued harmful precedents by repeatedly upholding challenges to discriminatory laws against Chinese immigrants, *see, e.g.*, *Chae Chan Ping v. United States*, 130 U.S. 581 (1889), and its progeny, establishing Congress' plenary power on immigration matters.  Later legislation such as the Naturalization Act of 1906,[150] which allowed only "free white persons" and "persons of African nativity or persons of African descent" to naturalize, also survived constitutional challenges from immigrants seeking to overturn discriminatory policies against Asian immigrants.[151]  The Immigration Act of 1924[152] expanded the reach of the Chinese Exclusion Act to prevent citizens from all Asian nations from immigrating to the United States, and these exclusionary laws remained in effect until they were repealed by the Magnuson Act in

---

[145] Pub. L. No. 52-60, 27 Stat. 25.
[146] Maureen Fan, *An Immigrant's Story: Against a Wall of Exclusion*, S.F. CHRON. (Oct. 4, 2019), https://www.sfchronicle.com/opinion/article/An-immigrant-s-story-Against-awall-of-14494875.php.
[147] *Id.*
[148] OFFICE OF THE HISTORIAN, *supra* note 138.
[149] S. Res. 201, 112th Cong. (2011) (enacted), https://www.congress.gov/bill/112th-congress/senate-resolution/201/text.
[150] Pub. L. 59-338, 34 Stat. 596.
[151] *See, e.g. Ozawa v. United States*, 260 U.S. 178, 198 (1922) (Ozawa, a Japanese immigrant who had lived in the U.S. for over 20 years was "clearly ineligible for citizenship" because he "is clearly of a race which is not Caucasian").
[152] Pub. L. 68-139, 43 Stat. 153.

4819-7553-1216

1943.[153]  Exclusionary laws changed the changed the face of America.  As a result, by 1960, only 877,934 Asian Americans lived in the United States.[154]  That figure represented a mere half of one percent of the American population.[155]

Just over a year before the Magnuson Act was signed into law, President Franklin D. Roosevelt issued Executive Order 9066, which authorized the removal of people of Japanese ancestry from their homes and communities in the interest of "national security."  U.S. military leaders, without cause and with fabricated intelligence, feared that American citizens of Japanese descent would execute acts of sabotage against the government.  Despite never having been accused of any crime and without trial or representation, approximately 120,000 U.S. residents of Japanese ancestry, half of whom were children, were incarcerated in federal detention.  As a result, about 2,000 people died in incarceration from a series of causes, including infectious diseases, bad sanitation, or even shooting by guards.[156]  And more than 5,000 American babies were born in detention.[157]  The Supreme Court upheld the laws and curfews implementing Executive Order 9066 against U.S. citizens of Japanese descent in a shameful series of opinions.  *See, e.g.*, *Korematsu v. United States*, 323 U.S. 214 (1944); *Hirabayashi v. United States*, 320 U.S. 81 (1943); *Yasui v. United States*, 320 U.S. 115 (1943).  Although the Supreme Court ultimately overruled *Korematsu*, the Court simultaneously upheld the Muslim ban, despite the efforts of the Fred Korematsu, Gordon Hirabayashi, Minoru Yasui, and their descendants against injustice.[158]

---

[153] Pub. L. 78-199, 57 Stat. 600.
[154] ASIAN AMERICANS ADVANCING JUSTICE, INSIDE THE NUMBERS: HOW IMMIGRATION SHAPES ASIAN AMERICAN AND PACIFIC ISLANDER COMMUNITIES 20 (2019), https://www.advancingjustice-aajc.org/sites/default/files/2019-06/1153_AAJC_Immigration_Final_Pages_LR-compressed.pdf.
[155] *Id.*
[156] Gisela Perez Kusakawa, *The Korematsu Legacy: "Stand up for what is right!"*, AAJC (Jan. 30, 2020), https://medium.com/advancing-justice-aajc/the-korematsu-legacy-stand-up-for-what-is-right-4a19c5af491d.
[157] *Id.*
[158] Karen Korematsu, *How the Supreme Court Replaced One Injustice with Another*, N.Y. TIMES (June 27, 2018), https://www.nytimes.com/2018/06/27/opinion/supreme-court-travel-ban-korematsu-japanese-internment.html?action=click&module=RelatedCoverage&pgtype=Article&region=Footer.

4819-7553-1216

The legacy of exclusionary laws against Asian Americans and Japanese incarceration still impacts today's policies, such as the Muslim ban; modern detention imprisoning families, including children; and the targeting and profiling of Chinese and Asian Americans and immigrants.

### C. Like Many Chinese Americans and Immigrants, the Government Targeted Dr. Tao Based on His Ethnicity Rather Than Actual Criminal Activity.

Dr. Tao is caught in the middle of the Government's increasingly politicized rhetoric against China and the corresponding racial targeting of Chinese scientists and researchers that harkens back to the discriminatory policies of our country's past. Although the China Initiative's purported goal is to combat economic espionage, Dr. Tao's indictment alleges no economic espionage or theft of stolen trade secrets. Instead, the Government has charged Dr. Tao with seven counts of wire fraud and three counts of false statements for failing to disclose an affiliation with a Chinese university and a Talent Program. But being affiliated with a Chinese University or a Talent Program are not criminal activities or illegal. The Government's Senate Staff Report concedes as much. Indeed, the academic norm until recently was to encourage collaboration with Chinese universities.[159] Yet Dr. Tao now faces the prospect of criminal penalties under the auspices of the China Initiative.

The Government's racial targeting of Dr. Tao highlights the overbroad approach that stems from the China Initiative. As tensions between the United States and China escalate, the Government has placed undue pressure on prosecutors and investigators to prosecute Chinese Americans and immigrants like Dr. Tao under the China Initiative. The DOJ's sweeping efforts across the country to bring charges against Chinese Americans and immigrants has led to instances like Dr. Tao's case which do not involve economic espionage and prosecute nothing more than

---

[159] *See generally* Senate Staff Report, *supra* note 45.

what is historically an administrative issue within a university.[160]  To combat real security threats of economic espionage, the Government must not rely on broad generalizations or stereotypes that cast a wide net on all scientists and researchers of Chinese ethnicity.

Otherwise, more and more Asian American scientists and researchers will find themselves before criminal courts throughout the nation.  This type prosecutorial strategy will disproportionately impact Asian and Chinese Americans and immigrants, devastating individual lives and communities.  And it fosters fear today for Asian and Chinese Americans who see that they are held to a different standard than other Americans under misguided scrutiny based on their ethnicity from their own government.  Prosecution of Asian Americans simply for ties to China without evidence of economic espionage sets a dangerous precedent that threatens to repeat our history of scapegoating Asian Americans under the name of national security.

---

[160] China Initiative, *supra* note 14.

4819-7553-1216

## Conclusion

Unfortunately, Dr. Tao's case is not unique. Dr. Tao stands as yet another example of the Government's unrelenting, misguided, and disproportionate focus on Chinese scientists and researchers. For the reasons explained above, *Amici* urge the Court to consider Dr. Tao's Motion to Dismiss in the context of the government's targeting of Chinese scientists and history of anti-Chinese bias.

## Disclosure Statement

Counsel for *amici curiae* hereby states that the interested parties identified above are the only parties appearing as *amici* on this brief, have no parent corporations, and have issued no stock.

Counsel for *amici curiae* hereby states that (1) no party's counsel authored this brief in whole or in part; (2) no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief; and (3) no person—other than the *amici curiae*, their members, or their counsel—contributed money that was intended to fund the preparation or submission of the brief.

Shook, Hardy & Bacon L.L.P. is the only firm appearing for *amici* in this case.

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

/s/ Melissa M. Plunkett
Gregory Wu, KS Fed. Bar # 78404
gwu@shb.com
Melissa M. Plunkett, KS Fed. Bar # 78427
mplunkett@shb.com
2555 Grand Blvd.
Kansas City, Missouri 64108-2613

Telephone:  (816) 474-6550
Facsimile:   (816) 421-5547

John C. Yang
Niyati Shah
Asian Americans Advancing Justice-AAJC[161]
1620 L Street, NW, Suite 1050
Washington, D.C. 20036
Telephone: (202) 815-1098

Glenn Katon
Javeria Jamil
Asian Americans Advancing Justice-ALC
55 Columbus Avenue
San Francisco, CA 94111
Telephone: (415) 896-1701

**ATTORNEYS FOR AMICI**

---

[161] Gisela Perez Kusakawa, as a legal fellow not yet admitted to the bar, also contributed in the drafting of this Brief for *Amici*.

4819-7553-1216

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 3rd day of November, 2020, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such

filing to the following:

*ATTORNEYS FOR DEFENDANT:*

Thomas H. Johnson #13688
Petefish, Immel, Hird, Johnson,
Leibold & Sloan, LLP
842 Louisiana
Lawrence, KS 66044
Tel: (785) 843-0450
Fax: (785) 843-0407
tjohnson@petefishlaw.com

Peter Zeidenberg
Michael F. Dearington
Laura Zell
ARENT FOX LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
Peter.Zeidenberg@arentfox.com
Michael.Dearington@arentfox.com
Laura.Zell@arentfox.com

*ATTORNEYS FOR PLAINTIFF:*

D. Christopher Oakley
Office of United States Attorney – Topeka
290 US Courthouse
444 SE Quincy
Topeka, KS 66683-3592
Tel: (785) 295-7698
chris.oakley@usdoj.gov

Benjamin J. Hawk, DOJ-Nsd
950 Pennsylvania Ave. NW, Suite 7700
Washington, DC 20530
Tel: (202) 307-5176
Benjamin.Hawk@usdoj.gov

/s/ Melissa M. Plunkett
*Attorney for Amici*

4819-7553-1216