# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 19-20052-JAR-JPO |
| | ) | |
| FENG TAO | ) | |
| a/k/a "Franklin Tao," | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION FOR *FRANKS* HEARING AND TO SUPPRESS EVIDENCE RESULTING FROM TWO UNLAWFUL SEARCH WARRANTS OBTAINED USING FALSE AND MISLEADING AFFIDAVITS

The investigation of Dr. Franklin Tao began two years ago when a former international visiting scholar ("Government Informant") at the University of Kansas ("KU") tried to extort Dr. Tao for hundreds of thousands of dollars. When he refused to pay, she created fake email addresses, impersonated KU researchers who worked in Dr. Tao's lab, and fed lies to the FBI and KU, claiming that Dr. Tao was a Chinese spy who stole intellectual property and secretly worked at a second university in China.

Thus began an unlikely partnership between the FBI and Government Informant. The FBI looked past Government Informant's impersonations, false statements, and fabrications, so that it could use her to obtain unlawful search warrants. Although Government Informant admitted on July 9, 2019, that she had been lying to the FBI for months in order to punish Dr. Tao over an authorship dispute, two days later the FBI presented her to the Court as a credible informant with reliable evidence and information in order to obtain a search warrant. Absent the FBI's sworn misrepresentations and omissions, the Court would not have issued search warrants on July 11, and August 19, 2019, because probable cause was plainly lacking.

The evidence, laid bare below and in the exhibits attached to this memorandum, warrants a hearing under *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978), to determine whether sufficient evidence actually existed to establish probable cause for the search warrants. Dr. Tao respectfully requests that, based on the evidence here, and developed at a *Franks* hearing, the Court should suppress all evidence resulting from the two unlawful warrants, including the fruits of those warrants, which the FBI obtained without probable cause and in violation of his Fourth Amendment rights.[1]

## I.    BACKGROUND

### A.    Government Informant threatens to falsely report Dr. Tao as a "tech spy" if he does not pay her hundreds of thousands of dollars.

Dr. Tao is a Princeton-educated and internationally renowned chemical engineering and chemistry professor. Until being indicted for allegedly concealing a second job at a university in China, Dr. Tao was a tenured professor with a lab and research group at KU.

Government Informant[2] obtained a Ph.D. in Chemical Engineering from a University in Beijing, China. She worked at universities in Japan and Australia, Ex. 1, and then spent three

---

[1] Dr. Tao submits that good cause exists for the Court to consider this motion after the May 14, 2021, pre-trial motions deadline because the defense was only able to ferret out the full extent of government misconduct detailed in this Motion once the government provided all of its discovery (hundreds of thousands of documents) in a database-searchable format, which was not until May 13, 2021, and which the defense received and loaded for searching *after* the May 14 deadline had passed. The defense also learned new information from the government this month about key events detailed in this motion, including the lack of support for a material statement in the July 11, 2019, affidavit. In addition, the development of facts for this motion, without access to witnesses at the FBI and KU, involved a painstaking review and analysis of the evidence. Finally, the interests of justice, the importance of Dr. Tao's Fourth Amendment rights, and the public's faith in the integrity of the warrant process compel the Court's consideration of this motion. The defense hopes that this motion can be fully adjudicated in advance of the October 25, 2021 trial date, but understands that a continuance of trial may be necessitated by this motion.

[2] The government has repeatedly referred to Government Informant as an "informant" during the pendency of this case, hence the use of that term here. *See, e.g.*, ECF No. 35 at 1–7; ECF No. 54

weeks as a J-1 research scholar at KU beginning in mid-October 2018. Ex. 1. She later transferred her J-1 to the University of California, Berkeley, where she worked after her stint at KU. Ex. 1.

In early 2019, Government Informant complained to Dr. Tao about the amount of authorship credit she would receive in certain publications, and demanded more credit. Ex. 2. She threatened to retaliate if Dr. Tao did not meet her aggressive demands. *Id.*[3] Dr. Tao agreed to certain demands, Ex. 3, but Government Informant made new demands, and told Dr. Tao he "should feel lucky" because Government Informant was being "merciful." Ex. 4.

In April 2019, the relationship became more toxic. Government Informant blamed Dr. Tao after she lost her post-doctoral position at her home university in Australia, and she speculated that Dr. Tao had recommended one of his KU researchers (X.Z.)[4] for a position in the lab she worked in. Ex. 5. Government Informant emailed Dr. Tao: "[W]hen anything that belongs to me is taken away, my counterattack will be very strong and very extreme. I think that you wanted to have this experience, so I am satisfying your wish." Ex. 6.

Government Informant's behavior grew increasingly aggressive and erratic. On April 21, 2019, she demanded money for her scientific contributions and for "spiritual hurts." Ex. 5. The

---

at 21–23. Government Informant's name and email addresses have been redacted from the attached exhibits.

[3] A native Chinese-language speaker at Arent Fox LLP has translated the Chinese characters on the third page of Exhibit 2 as stating in part: "I don't covet things that don't belong to me, but when something that belongs to me is snatched away, my counterattack may be very strong and extreme." The defense can submit a certified translation of this language, and certain other untranslated exhibits, in advance of the *Franks* hearing if the government materially disagrees with this translation or if the Court would prefer it.

[4] Three individuals impersonated by Government Informant are referred to herein by their initials: X.Z., C.E.L., and L.N. The exhibits include redactions to the same effect, as well as highlights to focus the Court on particular language in the exhibits.

next day, her demand escalated: **"If you are no[t] sure how much you should compensate me, I could suggest you a level. It should be in the level of millions of RMB. For example, 2 million RMB,"** which is roughly $310,000. Ex. 7 (emphasis added). She repeated her demands a few days later. Ex. 8.

On May 2, 2019, Government Informant told Dr. Tao that she would send an email formally accusing him of engaging in "severe academic misconducting [sic]" and "forged authorship," and alleged that "most of the current listed authors did not contribute[] to" a particular article he authored. Ex. 9. The next day, Dr. Tao received an email purportedly from Government Informant's mother, apologizing for Government Informant's immaturity and for causing Dr. Tao "so much trouble" the day before. Ex. 10.[5] On May 6, 2019, Government Informant admitted to Dr. Tao that she had no evidence to support her accusations. Ex. 11.[6]

Nevertheless, on June 4, 2019, Government Informant continued to harass Dr. Tao. She reported her authorship concerns to KU (copying Dr. Tao), complaining that a corresponding author of a publication did not "merit the authorship" status. Ex. 12. She separately emailed the Internal Audit group at KU (again copying Dr. Tao) and alleged that "a few more papers" have "authorship issues" that she wanted to report. Ex. 13. Her accusations found no purchase with KU administrators. The Director of Research Integrity at KU informed Government Informant that the allegations did not constitute research misconduct. Ex. 14.

---

[5] It would appear almost certain that this email was sent by Government Informant, impersonating her own mother, given her habit of using fake email addresses.

[6] A native Chinese-language speaker at Arent Fox LLP has translated the Chinese characters in the email at the bottom of the first page of Exhibit 11 as stating: "What I mean by email is that I only considered it from the perspective of the author's change (no actual evidence). I can't determine the amount of each author's contribution." Government Informant then stated in English: "I will be terribly sorry if all the other authors had made contributions and their contributions could match their authorship." Ex. 11.

One June 6, 2019, Government Informant made clear her attempt to extort Dr. Tao: "I know that the issue with the tenure in the United States cannot be solved even if I hadn't reported you about your byline being incorrect." Ex. 15. She then escalated her threats: **"[I]t seems that the term 'tech spy' is very popular nowadays."** *Id.* (emphasis added).

As Government Informant knew, then–Attorney General Jeff Sessions had recently announced an initiative to "combat Chinese economic espionage."[7] While her authorship allegations failed to have the desired effect, she knew that she would get the attention of KU and the FBI if she accused Dr. Tao of espionage and intellectual property theft. In fact, one month earlier, Government Informant had already embarked upon a scheme to enlist the FBI and KU in her efforts to frame Dr. Tao and exact revenge upon him. *See* Ex. 16.

### B.    Government Informant creates fake email addresses, impersonates witnesses from Dr. Tao's lab, and files false reports about Dr. Tao with the FBI and KU, alleging espionage, IP theft, and other misconduct.

On April 30, 2019, Government Informant submitted an anonymous report to KU that alleged "Espionage," based on "Internet exploration," and claimed that Dr. Tao was a spy based on links to two websites included in the report. Ex. 17. Carl Taylor, KU's Director of Global Operations and Security, forwarded the report to the FBI, as he would continue to do with most or all other reports that KU received regarding Dr. Tao. *Id.* KU traced the IP address of the submission to San Francisco International Airport, 18 miles from the University of California, Berkeley, where Government Informant lived, and forwarded that information to the FBI. Ex. 18.

On May 10, 2019, Government Informant used a fake email address to impersonate X.Z., the former KU student and researcher who Government Informant believed Dr. Tao had

---

[7] *See* Press Release, Attorney General Jeff Sessions Announces New Initiative to Combat Chinese Economic Espionage, DOJ, Nov. 1, 2018, https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-announces-new-initiative-combat-chinese-economic-espionage.

recommended to replace her at her university in Australia. Ex. 19. Using the fake email address, Government Informant emailed the KU Chancellor and Dr. Tao's department chair, alleging that Dr. Tao "is taking another full time and full salary Professor position in China." Ex. 19. Government Informant alleged that the position began in May 2018, and listed websites to support her account. *Id.* She added: "[D]ue to the current relationship between USA and China**, I know the USA government is taking actions to the scholars who take both positions in USA and China**." *Id.* (emphasis added). Government Informant also stated that she "wrote anonymous emails" to KU about Dr. Tao days earlier. *Id.* This would not be the last time Government Informant would use a fake email address to impersonate a witness.

On May 12, 2019, Government Informant again impersonated X.Z., and sent an email to the FBI from the fake X.Z. email address with the subject: "Franklin (Feng) Tao in the University of Kansas is taking a Changjiang Professorship in China. **He may be a scientific espionage** [sic]." Ex. 16 (emphasis added). Government Informant again included links to websites that she said supported her accusations, and stated: "I believe you have good ways to handle it." *Id.* Special Agent Stephen Lampe of the FBI thanked Government Informant, stating that her "assistance in this matter is greatly appreciated!" *Id.*[8]

On May 13, 2019, Government Informant again impersonated X.Z. and made similar reports to KU Human Resources. Ex. 20. She added: "[D]ue to the current relationship between USA and China, I know the USA government is taking actions to the scholars who take both positions in USA and China. … I believe you have good ways to handle it." *Id.*

---

[8] Government Informant stated in her email that she "also submitted a tip in the website." Ex. 16. The defense is unaware of any such tip to the FBI, dated prior to May 12, 2019, being produced in discovery, despite our requests and contention that it constitutes *Brady* material.

In a follow-up email on May 14, 2019, Government Informant accidentally revealed her true identity by sending an email to KU Human Resources from the fake X.Z. email address, but signing her *real* name. Ex. 21. Government Informant attached a purported unsigned employment contract between Dr. Tao and Fuzhou University, and alleged that it is "exactly the same as the signed contract, except there [are] no signatures." *Id.* The document properties/metadata (easily viewed by clicking the "File" dropdown menu) showed that the document had been created on the same day (May 14, 2019), strongly suggesting that the unsigned contract was inauthentic and that Government Informant had created the document herself the same day that she provided it to KU Human Resources. *Id.* KU provided the email and contract to the FBI. Ex. 21.

On May 15, 2019, Government Informant again used the fake X.Z. email address to contact KU Security Director Carl Taylor, and sent links to additional social media websites that she claimed supported her accusations about Dr. Tao. Ex. 22. Taylor forwarded the email to the FBI. *Id.* The next day, Taylor responded by thanking Government Informant for her information, and asking for a call or meeting to clarify a few items, including why she was "providing [KU] with the information on Professor Tao." Ex. 23. Government Informant responded, but deleted the email with Taylor's question from the chain, and stated that she did "not have evidence at this moment" to support her allegation that Dr. Tao was forming a company in China, but stated that she "believe[d] it will come true in 2-3 years." Ex. 23. She added that all of her information "is authentic and true." *Id.* Taylor forwarded this email to the FBI. *Id.*

On May 19, 2019, KU Security Director Taylor received another anonymous accusation, this time from an "@guerrillamail.com" account,[9] repeating substantially the same allegations that Government Informant had made over the past month while impersonating X.Z. Ex. 24. Like the other accusations, the email provided a link to a website to support the allegations against Dr. Tao. *Id.* The sender stated: "I am afraid this behaviours violet [sic] the rules/laws of KU or USA." *Id.* Taylor forwarded to the FBI the email and the complete IP information in the header of the email, and Special Agent Carlson responded: "This is great. I'll give it to [Special Agent Steve] Lampe." *Id.* KU's Chief Information Security Officer observed that the email header even included the "X-Originating-IP in it," which "never happens anymore," allowing them to trace the email to the original location from which it was sent: a guest wireless network at the University of California, Berkeley, the university to which Government Informant had transferred months earlier. *Id.* Taylor said he found that information to be "interesting." *Id.* Government Informant had failed to mask her location.

Around this time, if not earlier, the FBI and KU appear to have both independently determined that Government Informant was impersonating X.Z. and also submitting anonymous accusations about Dr. Tao. Not only had Government Informant signed an email from the fake X.Z. email address with her *real* name on May 14, 2019, Ex. 21, but the anonymous accusations came from an IP address traced to Berkeley, Ex. 24, where Government Informant was known to live, and to an airport 18 miles from there, Ex. 18. This is clear from an exchange between KU and the FBI on May 19 and 20, 2019, detailed below.

---

[9] Guerrilla Mail markets itself as an anonymous email service that provides a disposable temporary email address: "Don't want to give them your real email? Use a temporary email. No registration, lasts 60 mins." www.guerillamail.com.

After receiving the May 19, 2019 anonymous report, KU Security Director Taylor sent a text message to Special Agent Jeffery Carlson of the FBI, stating: "A possible different source emailed me. I sent a copy to you." Ex. 25. Minutes later, however, Taylor reported that he thought the anonymous sender was Government Informant: "Actually rereading the message. I think it is the same source, \n\n." *Id.*[10] Special Agent Carlson agreed: "Ok. I just read it. Sounds similar for sure. If it is another source, this is interesting to say the least" *Id.*

On May 20, 2019, KU Security Director Taylor texted FBI Special Agent Carlson: "Got the scrapes on our latest chucklehead. Think we have a solid lead on the Source." *Id.*[11] Special Agent Carlson responded: "I think we think we know who it is too." *Id.* Taylor and Carlson agreed to meet the next day. *Id.* While the defense has no direct evidence of what was discussed during that meeting, it seems clear that the topic was Government Informant, as that same day Taylor asked International Support Services at KU for "all the information you have on [Government Informant]." Ex. 26. He received a response indicating that earlier that year, Government Informant had arranged to transfer to the University of California, Berkeley, where the anonymous reports had originated. *Id.* This confirmed that Government Informant had not only impersonated X.Z., but also submitted the two anonymous reports that KU and the FBI knew came from Berkeley, California, and the airport 18 miles away. Exs. 18, 24.

---

[10] The "\n\n" notation in the text message appears to be a redaction by the FBI. That begs the question *whom* KU Security Director Taylor had indicated the source was at that time—whether he named Government Informant in the text message or one of the individuals Government Informant had been impersonating.

[11] KU Security Director Taylor's reference to "scrapes" likely refers to an internal collection and review of KU emails, including Dr. Tao's email. It is unknown to the defense if Taylor had by then discovered Government Informant's many demands to Dr. Tao over the authorship dispute, which would have further confirmed her motive to frame him.

On May 26, 2019, Government Informant emailed KU Security Director Taylor using a second fake email address, this time impersonating "C.E.L.,"[12] with the subject: "Concerning Feng Tao." Ex. 27. She said that she is "happy to assist if [she] could," and signed the email with X.Z.'s first name, likely on accident. *Id.* The signature indicated that Government Informant, who had previously impersonated X.Z., was now also impersonating C.E.L. The new fake C.E.L. email address could now be tied to all of the prior reports and accusations against Dr. Tao. Taylor forwarded the email to the FBI. *Id.* Taylor also sent a text message to Special Agent Carlson, stating: "Just got contacted again. Different email address using name beginning with [X.Z.]. Something really odd occurred." Ex. 25.

On May 30, 2019, Taylor asked Government Informant (who was posing as C.E.L.) whether she was aware of situations when Dr. Tao had shared KU or sponsored research with anyone at Fuzhou University (where he had allegedly taken a second job), and Government Informant said no, despite having previously accused Dr. Tao of intellectual property theft. Ex. 28. The "evidence" she did provide, however, was substantially similar to past emails sent when she impersonated X.Z. Ex. 29. Taylor forwarded the email to the FBI, remarking "Nothing new." *Id.* On May 31, 2019, Government Informant (posing as C.E.L.) followed up her email by asking "what will Prof. Tao be facing" as a result of her reports. Ex. 30. Taylor responded that he does "not make decisions on these matters," and thanked her for her assistance. *Id.* Taylor forwarded the email to the FBI. *Id.*

On June 3, 2019, Government Informant again used the fake C.E.L. email address to email KU Security Director Taylor, and stated that she "checked the funded researches of Prof.

---

[12] Between May 26 and 28, 2019, Extortionist Source used the same false email address for "C.E.L." in emails to Dr. Tao, claiming that she was a recent graduate of the California Institute of Technology, and asking Dr. Tao scientific questions regarding a past publication. Ex. 31.

Tao by NSF and DOE," and alleged that "[t]here are similarity and overlap between the proposals he submitted to the Chinese government and the ones in US." Ex. 32.[13] Taylor forwarded the email to the FBI. *Id.*

On June 9, 2019, just three days after threatening to falsely report Dr. Tao for espionage if he did not pay her hundreds of thousands of dollars, Government Informant impersonated a third person: L.N., a researcher who currently worked in Dr. Tao's lab at KU. This time, Government Informant submitted an online tip to the FBI National Tip Operations Center. Ex. 33. The tip included L.N.'s date of birth and other identifying details, and claimed "Alleged Espionage by University of Kansas Professor, Giving Intellectual Property to China." *Id.* The tip also alleged that Dr. Tao "is conducting scientific espionage activities." *Id.* Although L.N. currently worked at KU and lived in Kansas, the IP address of the submitter could (once again) be traced back to Berkeley, California, where the FBI and KU had by now determined that Government Informant resided. *Id.* And the tip included links to websites previously sent to KU and the FBI by Government Informant. *Id.* This confirmed that Government Informant had stolen at least three identities to accuse Dr. Tao of espionage and other misconduct, in addition to the anonymous reports she had filed.

On or about June 12, 2019, in response to a grand jury subpoena, KU produced a copy of Government Informant's June 6, 2019 email to Dr. Tao, in which she threatened to falsely accuse him of espionage. Ex. 15. It is unknown to the defense when the government became aware of this extortion email, but the government had actual or constructive knowledge of the email shortly after June 12, 2019.

---

[13] Government Informant also stated that she "contacted NSF and DOE for further information." Ex. 32. The defense is not aware of any such communications being produced by the government in discovery, despite, to the extent they exist, this constituting *Brady* material.

On June 23, 2019, Government Informant, now using her real name, emailed Dr. Tao's department chair and stated that Dr. Tao "not only works for KU, but also works for the Chinese government." Ex. 34. She provided no evidence to support her accusation. *Id.* KU Security Director Taylor forwarded the email to the FBI. *Id.*

In total, KU and the FBI had received accusations against Dr. Tao purporting to be from four different individuals, including herself, and at least two anonymous reports—all of which, the FBI knew, were actually from Government Informant.

### C.   Government Informant admits to feeding the FBI lies, impersonating three witnesses to file false reports about Dr. Tao, and hacking his email to obtain the unsigned employment contract.

On July 9, 2019, Government Informant met in person with FBI Special Agent Jeffery Carlson and Special Agent Angie Ng at the University of California, Berkeley. Ex. 35.[14]

What transpired during the interview remains unknown to the defense, and can only partly be gleaned from an incomplete FBI FD-302 interview summary "entered" into the FBI system months after the interview occurred (and after Dr. Tao was indicted and pled not guilty). *Id.* According to the FBI's FD-302 from the interview, Government Informant said that she and Dr. Tao had a disagreement over the authorship of an academic paper, because she refused to state that she was affiliated with KU in her by-line. *Id.* She said that Dr. Tao was a Changjiang Scholar, and claimed that she obtained the purported unsigned employment contract with Fuzhou University in China (sent to KU from the fake X.Z. email address) from Dr. Tao's secretary, who gave it to her during a trip to Fuzhou University in February or March of 2019. *Id.* Government

---

[14] It is unknown to the defense what communications, if any, the FBI had with Government Informant in the weeks before the interview, including to arrange the interview. If they do exist, the defense is not aware of any such communications being produced.

Informant also said that she had personally created an email address in order to recruit researchers to Fuzhou University for Dr. Tao. *Id.*

Remarkably, the interview summary contains no information about whether the FBI confronted Government Informant about her past impersonations, fake email addresses, and other lies, or how she responded (including whether she falsely denied it). This is surprising, because by the time of the July 9, 2019 interview, the FBI *knew* that Government Informant had impersonated X.Z., C.E.L., and L.N., and had submitted other anonymous accusations against Dr. Tao, which were traced back to Berkeley, California, where the July 9 interview occurred.[15] Thus, either the FBI *chose not to confront* Government Informant about her multiple impersonations, fake email addresses, and false statements to the FBI – or it asked her but *deliberately omitted* this discussion from its FD-302. It is also unknown to the defense, and unclear from the FD-302, whether the FBI asked Government Informant about her attempts to extort Dr. Tao. The government has produced no contemporaneous notes or other records from the interview, and represented to the defense on August 19, 2021, that none exist, even though the government has produced notes from most other FBI interviews and *recorded* a subsequent interview with Government Informant. While a *Franks* hearing will aid in determining exactly what happened at the interview, it seems highly likely that the FBI confronted Government Informant about her impersonations and fake email addresses during the interview, and omitted it from the FD-302 finalized two months later to avoid creating a record of the confrontation and

---

[15] Indeed, a person who identified as X.Z.—not Government Informant—had provided the unsigned contract to KU and the FBI. Thus, it seems inconceivable that the FBI failed to ask Government Informant about X.Z. and the unsigned contract given that it had already determined that she impersonated X.Z.

Government Informant's continued deception—especially given the revealing email the FBI received after the interview.

Hours after the interview, on July 9, 2019, Government Informant emailed the FBI: "**For the talk today, I have to admit that I lied on some of the items**." Ex. 36 (emphasis added). She confessed that she "reported [her accusations against Dr. Tao] using the name of others, such as [X.Z.], [L.N.] or [C.E.L.], via email or reported to FBI directly." *Id.* This strongly suggests that the FBI confronted her about these impersonations and fake email addresses during the interview, and that she falsely denied impersonating the three witnesses, but the FBI deliberately omitted this *Brady* material from the FD-302.[16] She also admitted that she had hacked Dr. Tao's email account to obtain the unsigned contract, stating: "For the contract of Franklin, I downloaded it from his email address. Last year, he asked me to write proposals to apply to Chinese government. The account and password proposal submission are the same as his email in Fuzhou University. Sometimes I log his email address and check some information." *Id.* She stated that she would "accept any penalty for [her] wrongdoings," and that she was "sorry," and also asked the government to stop investigating Dr. Tao. *Id.* Special Agent Carlson thanked Government Informant for her help. *Id.*

The next day, on July 10, 2019, Government Informant sent another email to the FBI and reiterated that she would "accept the penalty for [her] wrongdoings," and again asked that the FBI "stop the checking to Franklin." *Id.* She also told the FBI she planned to leave the country at

---

[16] This would also explain why Government Informant's July 9 email notes that she "communicated with [X.Z.] sometimes last year." Ex. 36. Unless this remark is apropos of nothing, the topic of X.Z. must have come up at the July 9 interview, likely after the FBI confronted Government Informant about impersonating X.Z.

the end of the month. *Id.* Despite her admitted lies to the FBI, the FBI did not arrest her or

prevent her from leaving the country.

> **D.     Special Agent Lampe uses Government Informant to obtain the July 11, 2019 Google search warrant, but fails to inform the Court about her lies and fabrications, and misrepresents how she claimed she obtained the unsigned employment contract.**

On July 11, 2019, FBI Special Agent Lampe submitted a sworn affidavit to Chief U.S.

Magistrate Judge James P. O'Hara, in support of an application for a warrant to search Dr. Tao's

personal Gmail account. Ex. 37.

The affidavit claimed that there was probable cause to believe that Dr. Tao's Gmail

account had evidence that he committed program fraud and wire fraud, based on "evidence" that

Dr. Tao had secretly taken a second job at Fuzhou University in China without telling KU or two

federal agencies. This "evidence" consisted almost entirely of Government Informant's claims

and the unsigned employment contract she provided to the FBI while impersonating others. *Id.*

Special Agent Lampe's July 11, 2019 affidavit asserted:

> [B]oth KU and the FBI have **received a series of complaints regarding Tao, both anonymously and from an individual claiming to be a former post-doctoral student sponsored by Tao** to study in the United States ([Government Informant]). The sum and substance of the complaints were that Dr. Tao had taken a Changjiang Professor position in China, which [Government Informant] explained was a talent program sponsored by the Chinese government. According to [Government Informant], Tao took that position in May of 2018. … [Government Informant] also provided what appears to be an unsigned … contract between Tao and Fuzhou (FU) in China. **The contract is titled "Changjiang Scholar Distinguished Professor Employment Contract."** The appointment of the contract was from May 1, 2018, to April 30, 2023. Notably, the start date listed in this contract is *before* Tao's September 2018 statement to KU that he did not have any outside employment. Pursuant to the contract, Tao is to be a full-time employee of FU ….

*Id.* ¶ 11 (bold emphases added).

As to the provenance of the unsigned contract, Special Agent Lampe stated in a footnote: "[Government Informant] later told agents that she obtained the unsigned contract by accessing Tao's email account, **with Tao's permission and at Tao's direction**, but that she provided it to KU and to the FBI because she was angry with Tao over not crediting her on a published research article." *Id.* ¶ 11 n.2 (emphasis added). The affidavit then described the content of the contract, and explained that "[o]pen source reporting, **some of which was provided by [Government Informant] as well as anonymously**, corroborates many of the above-described complaints." *Id.* ¶ 12 (emphasis added). Special Agent Lampe admitted, however, that he had "no information or knowledge concerning the accuracy of these websites or articles beyond the fact that" they were found on the Internet. *Id.* The affidavit contained none of the details regarding Government Informant's repeated lies to the FBI and KU designed to exact revenge upon Dr. Tao.

The affidavit contained at least eight knowing, intentional, or reckless misrepresentations and omissions, all of which were material.

*First,* Special Agent Lampe failed to inform the Court that Government Informant—the sole source of the evidence and information used to show probable cause—had already admitted to repeatedly impersonating multiple individuals from Dr. Tao's research group at KU by creating fake email addresses to submit accusations to the FBI and KU. Government Informant had obviously appropriated other names to enhance the credibility of her accusations. This showed a willingness by Government Informant to use deceptive means to concoct evidence and lie to the FBI and KU, and to bait the government into investigating and charging Dr. Tao. This information undermined the reliability of all of the evidence and information that Government Informant provided to the FBI, and which the FBI now presented, whitewashed, to the Court.

**Second,** Special Agent Lampe concealed from the Court that Government Informant had admitted—in writing—to lying to the FBI about Dr. Tao just two days earlier. Not only had she admitted to impersonating three individuals, but she admitted that she lied to the FBI about where she obtained the unsigned contract. At first she told the FBI that she obtained the unsigned contract from Dr. Tao's secretary, and later that day she recanted and told the FBI that she had actually obtained it by hacking into Dr. Tao's email account. Government Informant's admitted lie about where the contract came from meant that neither of her explanations was reliable. Her inability to explain how she obtained a private contract to which she was not a party, moreover, suggested that she may have fabricated it to support her scheme. And even if her second explanation were true, her willingness to hack into an email account to steal a contract further undermined her credibility. Government Informant's admission, if presented to the Court, would have demonstrated Government Informant's unreliability and willingness to lie to inculpate Dr. Tao, undermining her credibility and the authenticity and reliability of the unsigned contract.

**Third,** Special Agent Lampe falsely told the Court that Government Informant said she obtained the unsigned contract by accessing Dr. Tao's email account with his "permission" and at his "direction." Ex. 37. As noted above, this concealed from the Court that Government Informant had in fact admitted (in writing) to hacking Dr. Tao's email to obtain the unsigned contract.[17] But this misrepresentation also made it seem as though Dr. Tao had given Government Informant the username and password to his email account, creating the false

---

[17] Special Agent Lampe's second affidavit confirmed that the statement in the first affidavit was false. In the August 19 affidavit, Special Agent Lampe stated in a footnote that Government Informant admitted "she hadn't been truthful earlier and that she had downloaded the contract from Tao's email account after Tao gave her the password for another account," and that he "suspect[ed] she obtained it by hacking into Tao's email account." Ex. 38 ¶ 11 n.2. This second affidavit did *not* disclose, however, that the first affidavit had misrepresented this fact.

impression that they had a close relationship and that he trusted her as a confidante, making her information seem more credible than it was. When the defense asked the government whether there was a basis for Special Agent Lampe's statement, the government provided none in its August 19, 2021 response, apparently confirming that the statement was knowingly false. Had Special Agent Lampe been truthful about how Government Informant claimed she obtained the unsigned contract, it would have further undermined the authenticity and reliability of the unsigned contract, as well as the credibility of Government Informant and her claims.

*Fourth,* Special Agent Lampe concealed from the Court that the unsigned contract provided by Government Informant had easy-to-see document properties (metadata) showing that the document was created the same day that Government Informant emailed it. This strongly suggested that Government Informant had fabricated the contract, especially given her admitted deception and willingness to create fake email addresses and evidence to inculpate Dr. Tao— which the FBI also failed to disclose to the Court.

*Fifth,* Special Agent Lampe's affidavit misleadingly stated that the FBI had received reports about Dr. Tao from Government Informant *and* anonymous reports. This lent credence to Government Informant's reports, which found support from an anonymous whistleblower. In reality, the FBI knew that the anonymous reports came from Government Informant, as part of a scheme to bolster her other false reports. Rather than being candid with the Court, Special Agent Lampe (like Government Informant) used the bogus reports to bolster Government Informant's claims. If the Court had known that Government Informant submitted the anonymous reports, it would have undermined her claims and showed her willingness to use deception to inculpate Dr. Tao.

**Sixth,** Special Agent Lampe concealed from the Court that Government Informant had *also* accused Dr. Tao of *espionage* and *intellectual property theft*—accusations for which Government Informant had no basis or evidence, as the FBI knew. Had the Court been aware that Government Informant made obviously false accusations about Dr. Tao, it would have undermined her credibility as to her other accusations about Dr. Tao taking a second job at Fuzhou University, as well as the reliability of the unsigned contract she provided.

**Seventh,** in an effort to further bolster Government Informant's claims, Special Agent Lampe pointed to three websites that he claimed "corroborate[d]" Government Informant's claims, and stated that "some" were provided by Government Informant or anonymously. Ex. 37 ¶ 12 (emphasis added). In fact, all three websites that Special Agent Lampe pointed to came from Government Informant.[18] Had the Court been aware of this—and given Special Agent Lampe's admission that he had "no information or knowledge concerning the accuracy" of the websites— the Court would not have had a basis to conclude that the websites were authentic or that their hearsay was reliable. Indeed, the FBI already knew that Government Informant was willing to create fake email addresses and other evidence to inculpate Dr. Tao, so there was no reason to think the websites were authentic and reliable. She easily could have created them, too. But Special Agent Lampe's affidavit deliberately gave the false impression that the FBI had discovered some of the identified websites on its own. Of course, evidence provided by Government Informant could not "corroborate" her own claims.

---

[18] Government Informant sent a link to the gaokeyan.com and sohu.com websites to KU on May 15, 2019, which KU sent to the FBI. Ex. 24. Government Informant sent a link to the fuzhou.quexiaodaquan.com website to KU on April 30, 2019, which KU sent to the FBI. Ex. 17. Government Informant also sent the link directly to the FBI on May 12, 2019. Ex. 16.

*Eighth,* to the extent the FBI was aware that Government Informant had tried to extort Dr. Tao for hundreds of thousands of dollars, and had threatened to falsely report him as a "tech spy" if he did not comply, the FBI concealed from the Court that crucial information. The FBI appears to have obtained the June 6, 2019 extortion email from KU more than a month earlier, around June 12, 2019—a month before submitting the first affidavit on July 11, 2019. Had the FBI informed the Court that Government Informant was using the FBI to actively extort Dr. Tao (an ongoing crime) while also admittedly lying to the FBI about Dr. Tao (also a crime), it would have undermined her credibility and the reliability of her evidence, including the unsigned contract.[19]

Rather than inform the Court that the FBI's sole source was a serial liar bent on destroying Dr. Tao, the FBI chose complicity, and partnered with her. The FBI deliberately whitewashed and misrepresented her evidence in the July 11, 2019, affidavit. Had the Court been aware of the truth, it would not have found probable cause to issue the July 11, 2019, search warrant. But the FBI concealed this information to obtain the warrant.[20]

On July 11, 2019, based on Special Agent Lampe's false and misleading affidavit, the Court issued a warrant to search Dr. Tao's personal Gmail account. Ex. 40. On July 26, 2019, Google produced a vast trove of Dr. Tao's emails in compliance with the unlawful warrant. Ex. 39; Ex. 40 at 2.

---

[19] If the government possessed, but did not know about, the extortion email as of July 11, this was due to its own failing. The government should have reviewed the evidence in its possession about Government Informant before presenting her evidence to the Court.

[20] If the FBI had been truthful about any of the above eight misrepresentations or omissions, it would have invited questions from the Court, potentially leading to disclosure of the full extent of her lies, fabrications, and crimes. The FBI therefore chose the absolutist approach and disclosed nothing.

**E.**     **Special Agent Lampe repeats his false and misleading statements in an affidavit to the Court in order to obtain the August 19, 2019 search warrant.**

On August 19, 2019, Special Agent Lampe submitted a second affidavit in support of an application for a search warrant to search three premises, computers at the premises, and additional Google account information. Ex. 38.

Special Agent Lampe repeated the same misrepresentations, with one exception. He now admitted that Government Informant had lied about the provenance of the unsigned contract, explaining in a footnote:

> She told agents in person that Tao's secretary had given it to her. In an email to agents later that same day, she said she hadn't been truthful earlier and that she had downloaded the contract from Tao's email account after Tao gave her the password for another account and asked her to assist him in writing grant submissions – she used the same password to access Tao's email. At this time I am unsure how she obtained the contract, but I suspect she obtained it by hacking into Tao's email account (prior to any contact with agents). She also stated that she provided the contract to KU and to the FBI because she was angry with Tao over not crediting her on a published research article, which I have no reason to doubt.

*Id.* ¶ 11 n.2. But Special Agent Lampe did *not* admit that he had misrepresented these facts in order to obtain the July 11, 2019, affidavit.[21] Nor did he state the date when Government Informant admitted to hacking into Dr. Tao's email. This gave the false impression that the hack was new information and not information that the FBI already had when it falsely stated in its July 11 affidavit that Government Informant said she obtained the unsigned contract with Dr. Tao's permission (which she never stated). *Id.*

---

[21] This was deliberate, as evidenced by the fact that Special Agent Lampe did correct a minor mistake in his first affidavit and identified it for the Court in the August 19 affidavit. *See* Ex. 38 ¶ 16 n.7.

Special Agent Lampe used the documents that he received as a result of the July 11, 2019, Google search warrant—all of which were tainted—to obtain the August 19, 2019 warrant.[22] *See* Ex. 41. The government indicted Dr. Tao on August 21, 2019, also using the tainted evidence from the unlawful July 11, 2019 warrant. All evidence from these two search warrants must therefore be suppressed.

## II.    ARGUMENT

### A.    The Court should order a *Franks* hearing, and should suppress the fruits of the July 11 and August 19, 2019 search warrants.

The FBI's knowingly false and misleading July 11, and August 19, 2019 affidavits led the Court to issue search warrants without probable cause. The FBI made material misrepresentations and omissions in the affidavits by concealing that Government Informant had admitted to impersonating witnesses and using fake email addresses, fabricating evidence, hacking Dr. Tao's email, and lying to the FBI, and the FBI also affirmatively misrepresented evidence it presented to the Court. Had the FBI truthfully represented this information, the Court would not have issued the warrants, because probable cause was plainly lacking. The Court should therefore order a *Franks* hearings, and should suppress all fruits of the unlawful warrants, which were obtained in violation of Dr. Tao's Fourth Amendment rights.

---

[22] Although Google produced a copy of Government Informant's extortion email to the government on July 26, 2019, Special Agent Lampe again omitted information about Government Informant's extortion attempt from the affidavit. Together with KU's earlier production of the email from Dr. Tao's KU account in mid-July, the government had two separate copies of the extortion email as of August 19, 2019.

1.   **A defendant who makes a substantial showing that a search warrant affidavit contained an intentional or reckless misstatement or omission that is material is entitled to a *Franks* hearing.**

Under *Franks v. Delaware*, 438 U.S. 154 (1978), the government violates a defendant's Fourth Amendment rights where "(1) an officer's affidavit supporting a search warrant application contains a reckless misstatement or omission that (2) is material because, but for it, the warrant could not have lawfully issued." *United States v. Herrera*, 782 F.3d 571, 573 (10th Cir. 2015) (citing *Franks*, 438 U.S. at 155–56).

"If a defendant makes a 'substantial preliminary showing' that both of these elements exist, he is entitled to an evidentiary hearing to prove a *Franks* violation." *United States v. Moses*, 965 F.3d 1106, 1110 (10th Cir. 2020); *accord Herrera*, 782 F.3d at 573 (citing *Franks*, 438 U.S. at 171).[23] "If the defendant establishes at the evidentiary hearing by a preponderance of the evidence that the false statement was included in the affidavit by the affiant 'knowingly and intentionally, or with reckless disregard for the truth,' and the false statement was 'necessary to the finding of probable cause,' then the Supreme Court has ruled that 'the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.'" *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997).

In applying the two-prong test from *Franks*, the court "court must strike any intentional, knowing, or reckless misstatements in the warrant application affidavit and assess the affidavit

---

[23] Even absent such a showing, the Tenth Circuit authorizes courts to grant a *Franks* hearing "in order to ensure not only that justice is done but that justice is seen to be done." *Herrera*, 782 F.3d at 573–74. As then-Judge Gorsuch explained: "Whether because of intuition born of experience that a meritorious issue may lurk in an imperfectly drawn application, or simply out of a jealous wish to guard individual rights against governmental intrusions, judges sometimes allow a claimant a fuller hearing than the law demands. In a democratic legal order built on the promise of due process and the vindication of individual rights that's often thought laudable or at least generally permissible …." *Id.* Here, a *Franks* hearing is mandatory, since Dr. Tao easily satisfies the two elements entitling him to such a hearing.

without them." *Herrera*, 782 F.3d at 575. In the case of "intentional, knowing, or reckless omissions, a court must add in the omitted facts and assess the affidavit in that light." *Id.*; *accord United States v. Moses*, 965 F.3d at 1113 ("In examining whether the excluded information would have been material, we consider whether the affidavit, had it included the omitted information, still would have supported probable cause and thereby justified a warrant."). The court must then "ask whether a warrant would have issued in a but-for world where the attesting officer faithfully represented the facts. … If not, a Fourth Amendment violation has occurred and the question turns to remedy." *Herrera*, 782 F.3d at 575.

An informant's credibility is critical to determining whether probable cause exists based on the informant's evidence or information. This is why the Supreme Court in *Franks* held that "[i]f an informant's tip is the source of information, the affidavit must recite some of the underlying circumstances from which the informant concluded that relevant evidence might be discovered, and some of the underlying circumstances from which the officer concluded that the informant … was credible or his information reliable." 438 U.S. at 165; *see also United States v. Jacobs*, 986 F.2d 1231, 1234–35 (8th Cir. 1993) (stating that "officers had a duty to provide the magistrate judge with any information which would undercut the warrant's validity"). "[R]eliability is 'key' to a magistrate's probable cause analysis when the search warrant application contains information provided by an informant." *United States v. Lull*, 824 F.3d 109, 116 (4th Cir. 2016). "When the information forming the basis for probable cause comes from an informant, the informant's 'veracity' and 'reliability' are critical." *Id.* at 118; *cf. United States v. Jones*, 533 F. App'x 562, 568 (6th Cir. 2013) (observing that "the omission of known information regarding credibility can in some cases be misleading enough to be deemed a falsehood under *Franks*").

For example, in *United States v. Lull*, the Fourth Circuit reversed a defendant's conviction because the search warrant affidavit failed to disclose that the informant had been dishonest with the officers in connection with a controlled narcotics buy. 824 F.3d at 112–13. Police officers gave the informant money to execute the buy with a suspected drug dealer, but then determined that the informant had stolen $20 of the excess funds. The district court ordered a *Franks* hearing due to the omission of this information from the affidavit, but denied the motion to suppress. *Id.* The Fourth Circuit reversed, explaining that the officer was at least reckless because he omitted from the affidavit that "[t]he informant demonstrated that he was unreliable during the course of th[e] very transaction" used to establish probable cause. *Id.* at 116. "The trustworthiness of the confidential informant lies at the heart of the reliability determination," the court explained, "and so the relevance of this information should have been obvious." *Id.* The court also found that the omission was material to the probable cause determination because "[m]uch of the information included in [the] affidavit came solely from the informant," and the omissions "prevented a neutral magistrate from being able to accurately assess the reliability and the veracity, and thus the significance, of the informant's statements." *Id.* at 118, 120. The court thus vacated the defendant's convictions. *Id.* at 120.

Applying these principles here, Dr. Tao is entitled to a *Franks* hearing.

## 2. Special Agent Lampe's July 11, and August 19, 2019 search warrants contained intentional or reckless misrepresentations and omissions that were material, warranting a *Franks* hearing.

Dr. Tao easily satisfies both prerequisites for a *Franks* hearing, because (1) the misrepresentations and omissions in Special Agent Lampe's July 11, and August 19, 2019, search warrant affidavits were intentional, or at least reckless; and (2) they were material, because the Court would not have found probable cause if it had known the truth about

Government Informant and the evidence and information she provided. Dr. Tao has therefore

made a substantial showing entitling him to a *Franks* hearing.

First, as demonstrated above, Special Agent Lampe made at least *eight* knowing,

intentional, or reckless misstatements or omissions in the July 11, and August 19, 2019,

affidavits about Government Informant and the evidence and information she provided.

Specifically, Special Agent Lampe's affidavits: (1) concealed that Government Informant

had admitted to impersonating witnesses to bolster her accusations, including by creating fake

email addresses; (2) concealed that Government Informant had admitted to lying to the FBI

about Dr. Tao just two days earlier, including about how and where she obtained the unsigned

employment contract; (3) falsely stated that Government Informant indicated that she obtained

the unsigned contract by accessing Dr. Tao's email account with his "permission" and at his

"direction," when she had actually claimed that she hacked it after misrepresenting that she

obtained it from his secretary;[24] (4) concealed from the Court that the unsigned employment

contract showed document properties (metadata) indicating that it was created the same day that

Government Informant provided it, strongly suggesting that she had fabricated it; (5) falsely

indicated that the FBI had received reports from Government Informant *and* anonymous sources

about Dr. Tao, when Special Agent Lampe knew that the anonymous reports had also come from

Government Informant, further diminishing her credibility; (6) concealed that Government

Informant had accused Dr. Tao of espionage and intellectual property theft, without any evidence

or basis; (7) falsely claimed that only *some* of the websites that purportedly corroborated

Government Informant's claims came from Government Informant, when in fact all three of

---

[24] Only the July 11, 2019, affidavit contained this false statement. The August 19, 2019, affidavit acknowledged that Government Informant likely hacked Dr. Tao's email to obtain he unsigned contract, but did not acknowledge that this was falsely represented in the July 11 affidavit.

them came from Government Informant, and they therefore had no corroborative effect; and (8) concealed from the Court that Government Informant had been actively extorting Dr. Tao for hundreds of thousands of dollars with the threat of falsely accusing him of being a Chinese spy if he did not pay, of which the FBI had actual or constructive knowledge.[25]

The misrepresentations and omissions in Special Agent Lampe's affidavit were not just reckless—they were deliberate. Special Agent Lampe knew the truth about Government Informant, her past identity theft and fake email addresses, false statements to the FBI and KU, hacking, and other fabrications at the time he presented his affidavit to the Court, but he deliberately chose to misrepresent and conceal these facts because he knew no reasonable magistrate judge would find probable based on Government Informant's evidence and information. *See Lull*, 824 F.3d at 117 ("One way of establishing reckless disregard is by proffering evidence that a police officer failed to inform the judicial officer of facts [he] knew would negate probable cause." (internal quotation marks omitted)); *Jacobs*, 986 F.2d at 1234–35 ("[T]he omission occurred at least with reckless disregard of its effect upon the affidavit. … Any reasonable person would have known that this was the kind of thing the judge would wish to know."). In this respect, Government Informant was far less credible than the informant in *Lull*, who had simply stolen $20 but had not admitted to repeatedly lying about the defendant and fabricating evidence in order to exact revenge upon him. 824 F.3d at 112–13. In fact, the defense has found no case involving a probable cause determination based on an informant *less* credible than Government Informant.

---

[25] Whether the FBI had actual, or only constructive, knowledge can be determined during the *Franks* hearing.

Second, these misrepresentations and omissions, especially taken together, were plainly material. The July 11, 2019, search warrant was based almost entirely on Government Informant's evidence and information, including her accusations against Dr. Tao, as well as the unsigned employment contract she provided to the FBI. If the Court had been aware that Government Informant was an admitted liar who had fabricated evidence and information, impersonated witnesses, created fake email accounts, hacked emails, falsely accused Dr. Tao of being a spy to extort him, and repeatedly lied to the FBI in order to inculpate Dr. Tao as part of a revenge scheme, the Court *never* would have found probable cause to issue the warrant. So, too, with the August 19, 2019 warrant. That warrant mirrored the July 11 warrant except that it was bolstered by the tainted evidence obtained from the unlawful July 11, 2019 warrant.

Simply put, evidence from an admitted fabricator bent on destroying a foe do not create probable cause. The FBI knew this, so it hid the truth from the Court, ultimately violating Dr. Tao's Fourth Amendment rights.

Based on the foregoing, Dr. Tao easily satisfies the two-part test required to obtain a *Franks* hearing, and the Court should therefore order such a hearing and permit Dr. Tao to further prove that the government violated in his Fourth Amendment rights in obtaining the July 11, and August 19, 2019 search warrants.

## III.    CONCLUSION

While questions about the government's misconduct remain unanswered, requiring a *Franks* hearing, this much is clear: Government Informant admitted that she had repeatedly lied to the FBI and KU, fabricated evidence, impersonated witnesses, used fake email addresses, falsely accused Dr. Tao of espionage and intellectual property theft, and hacked his email—a litany of federal crimes aimed at punishing Dr. Tao over an authorship dispute. Not only did the government fail to prosecute Government Informant for her admitted offenses, it then went

further and actively concealed her crimes. It falsely presented her to the Court as a credible informant with reliable evidence, and even affirmatively misrepresented her evidence, in order to obtain evidence against Dr. Tao in violation of Dr. Tao's Fourth Amendment rights.

Because Dr. Tao has made a substantial showing that the government intentionally or recklessly made material misrepresentations and omissions in the July 11, and August 19, 2019, search warrant affidavits, the Court should order a *Franks* hearing so that Dr. Tao can further prove that the fruits of those warrants must be suppressed.


Dated:  August 23, 2021                                     Respectfully submitted,

                                                            /s/ Thomas H. Johnson
                                                            Thomas H. Johnson #13688
                                                            Petefish, Immel, Hird, Johnson,
                                                            Leibold & Sloan, LLP
                                                            842 Louisiana
                                                            Lawrence, KS 66044
                                                            Tel: (785) 843-0450
                                                            Fax: (785) 843-0407
                                                            tjohnson@petefishlaw.com

                                                            Peter Zeidenberg
                                                            Michael F. Dearington
                                                            Laura Zell
                                                            ARENT FOX LLP
                                                            1717 K Street, NW
                                                            Washington, DC 20006
                                                            Tel: (202) 857-6000
                                                            Fax: (202) 857-6395
                                                            Peter.Zeidenberg@arentfox.com
                                                            Michael.Dearington@arentfox.com
                                                            Laura.Zell@arentfox.com

                                                            *Attorneys for Defendant Franklin Tao*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 23rd day of August, 2021, I electronically filed the foregoing

motion and memorandum with the Clerk of the Court using the CM/ECF system.

<u>/s/ Thomas H. Johnson</u>
Thomas H. Johnson