**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 19-20052-JAR-JPO |
| | ) | |
| FENG TAO | ) | |
| a/k/a "Franklin Tao," | ) | |
| | ) | |
| Defendant. | ) | |

---

**<u>AFFIDAVIT OF PETER R. ZEIDENBERG, ESQ.</u>**

I, Peter R. Zeidenberg, hereby declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1.      I am an attorney and partner at the law firm Arent Fox LLP, and I am based in the Washington, D.C. office. Before working in private practice, I was a federal prosecutor for 17 years at the Department of Justice, where I served in both the Public Integrity Section of the Criminal Division and at the U.S. Attorney's Office in the District of Columbia, including as a Deputy Special Counsel. I also previously worked for five years as an Assistant District Attorney in Middlesex County, Massachusetts.

2.      I have represented Dr. Franklin Tao, the defendant in the above-captioned case, since August 2019. The core of the defense team at Arent Fox consists of me and an associate, Michael Dearington, with occasional assistance from other associates, paralegals, practice technology personnel, and other support staff on an as-needed basis and where the limited budget in this case permits.

3.      In early-to-mid August 2021, while preparing for Dr. Tao's trial, Mr. Dearington and I came to the realization that Special Agent Lampe's July 11, 2019 and August 19, 2019

1

affidavits in support of two search warrants included numerous material misrepresentations. We then researched and drafted a Motion for *Franks* Hearing and to Suppress Evidence Resulting from Two Unlawful Search Warrants Obtained Using False and Misleading Affidavits ("*Franks* Motion"), which we filed on August 23, 2021. ECF No. 127. Below I describe how we came to discover these misrepresentations and ferret out what we believe was a scheme to deceive the Court in order to obtain two unlawful search warrant affidavits, and why we did not realize this sooner.

I.   **Discovery of Misrepresentations & Concealments in Footnote 2 of the July 11, 2019 and August 19, 2019 Search Warrant Affidavits**

4.      In early-to-mid August 2021, Mr. Dearington and I intensified our trial preparations which included reviewing discovery recently produced in April 2021, nine months after the pre-trial motions deadline, consisting of a few hundred documents that the government said it extracted from a computer in Dr. Tao's office at the University of Kansas (KU). We were uncertain that we had seen certain of these documents before, and we also had questions about when and how the government obtained them. At the beginning of August 2021, the government had also produced for the first time a vast trove of documents extracted from certain forensic images (which had previously been produced only as device images). We traced the newly produced documents back to a search warrant obtained by the government on August 19, 2019, which came on the heels of a search warrant obtained on July 11, 2019.

5.      We had carefully reviewed these affidavits when they were first produced to us in late August 2019. But, at the time we first reviewed these affidavits, we did not have in our possession the critical pieces of evidence that, in our opinion, demonstrate the falsity of the affidavits—in particular, in late August 2019 the government had not yet produced the "confession email" that Government Informant sent to the FBI on July 9, 2019. And we also were not in

possession of direct evidence that Lampe had received a copy of confession email prior to drafting the July 11, 2019 Affidavit.

6.      When, at the beginning of August 2021, we re-reviewed the search warrant affidavits to ensure that they were proper, footnote 2 of the July 11, 2019 affidavit jumped off the page at us—first to Mr. Dearington, and then to me, after he brought it to my attention. In footnote 2, Lampe stated that Government Informant "told agents that she obtained the unsigned contract [between Dr. Tao and Fuzhou University] by accessing Tao's email account, ***with Tao's permission and at Tao's direction***." *Franks* Motion Ex. 37 (emphasis added). Neither of us recalled ever seeing support in the discovery for this statement. Our understanding was that Government Informant told the FBI that she had hacked into Dr. Tao's email to obtain the unsigned contract.

7.      Although I had previously seen the July 9, 2019 confession email from Government Informant to Special Agent Carlson in which Government Informant admitted to hacking Dr. Tao's email to obtain the unsigned contract, after it was produced in October 2019, I did not believe or suspect at that time that footnote 2 of Lampe's July 11, 2019 affidavit was a fabrication, despite my misgivings about Lampe's candor.

8.      Although it is difficult to recreate my thought process from roughly two years ago, I have reviewed emails in preparing this affidavit to refresh my recollection in order to ascertain why I did not realize earlier that the July 11, 2019 affidavit was factually inconsistent with the July 9, 2019 confession email in multiple respects. One reason may well have been because the government produced the materials months apart, such that I did not review them together.

9.      Specifically, on August 23, 2019, the government produced the July 11, 2019 and August 19, 2019 search warrant affidavits, which the defense received shortly thereafter from the

public defender. I recall noticing the discrepancy between footnote 2 of the July 11, 2019 affidavit and footnote 2 of the August 19, 2019 affidavit, but I am quite sure that I thought that the new footnote was based on new information. The new footnote did not acknowledge that the prior footnote was false, let alone that the FBI knew it was false when the FBI submitted it, which, I believe, led me to believe that the FBI must have learned new information after submitting the July 11, 2019 affidavit and before submitting the August 19, 2019 affidavit. *See* Ex. 1 (affidavit excerpts showing footnote 2 of each of the two affidavits at issue).[1]

10.     On October 22, 2019, roughly two months *after* producing the affidavits (and after the deadline under the Case Management Order), the government produced the FD-302 from the July 9, 2019 interview and a copy of the July 9, 2019 confession email from Government Informant. *See* Ex. 2. When I reviewed the July 9, 2019 confession email, which I believe was on November 11, 2019, it seemed consistent with footnote 2 of the August 19, 2019 affidavit, but inconsistent with the July 11, 2019 affidavit. At the time, however, I do not believe I realized that the date of the confession email (July 9, 2019) was *before* the date of the July 11, 2019 affidavit, and I therefore likely assumed that the FBI received the confession email between the dates of the two affidavits, which would have explained the discrepancy.

11.     Even if I had reviewed the affidavits and the July 9, 2019 confession email together, at that time I doubt I would have considered it plausible that Lampe simply fabricated a material statement in footnote 2 of the July 11, 2019 affidavit about how Government Informant said she obtained the unsigned contract. For instance, Government Informant could have changed her story to the FBI between July 9, 2019 and July 11, 2019 such that it was consistent with Lampe's assertion in footnote 2 of the July 11, 2019 affidavit. I also had not seen evidence that Lampe was

---

[1] True and correct copies of the exhibits referenced herein are attached, with redactions.

aware of the July 9, 2019 confession email. The government had only produced the email from Government Informant to Carlson. Ex. 3. In May 2020, long after the Case Management Order deadline, the government produced a second version of the July 9, 2019 confession email showing that Carlson forwarded the email to Lampe in December 2019. Ex. 4. That email suggested that Lampe had not seen the July 9, 2019 confession email until months after he submitted his affidavits.[2] If I thought footnote 2 of the July 11, 2019 affidavit was a fabrication when I first reviewed the affidavit or confession email, I would have immediately prepared a *Franks* Motion, but I did not realize it at the time.

12.     When we reviewed footnote 2 of the July 11, 2019 affidavit in August 2021, however, it occurred to us that we had not seen any discovery that could support Lampe's statement in footnote 2 of the July 11, 2019 affidavit. We also reviewed the July 9, 2019 confession email in tandem with the affidavit, which confirmed to us for the first time that the FBI had at least constructive knowledge of the falsity of footnote 2 when Lampe submitted his July 11, 2019 affidavit that was contradicted by the July 9, 2019 confession email. Around that time, we also noticed that footnote 2 of Lampe's August 19, 2019 affidavit failed to acknowledge that the prior footnote 2 (in the July 11, 2019 affidavit) was false. The new footnote 2 (in the August 19, 2019 affidavit) therefore gave the Court the false impression—the same false impression we had earlier in the case—that it was stating *new* information, not information already known to the FBI when Lampe submitted the prior footnote 2 in the July 11, 2019 affidavit.

---

[2] As noted below, on September 9, 2019, the government produced a version of the confession email that showed, unbeknownst to the defense, that Lampe had received a forward of the July 9 confession email on July 9, and he therefore submitted his affidavit on July 11 with full knowledge of the confession email, which directly contradicted statements in his affidavit. Ex. 7.

13.     We also noticed that there were no notes that accompanied the July 9, 2019 interview of Government Informant, despite there being agent notes for almost all of the other interviews. When we realized this, we decided we should ask the government whether there was support for footnote 2 of Lampe's July 11, 2019 affidavit. We did not want to take the time and expense of drafting a *Franks* Motion or to accuse Lampe of possible misconduct if we were simply missing, or had overlooked, discovery or other information that supported his statement in footnote 2 of the July 11, 2019 affidavit.

14.     On the morning of August 16, 2021, we emailed the government and asked if there was a basis for Lampe's statement in footnote 2 of the July 11, 2019 affidavit. *See* Ex. 5. The government had not responded to our inquiry by the time the Court held a status conference on August 17, 2021 and therefore at the time of the hearing, although preparations were underway, we had not made a final decision as to whether we would file the Motion. The day after the status conference, on the morning of August 18, 2021, we emailed the government again, asking for a response to our question. *See* Ex. 6. On the evening on August 19, 2021, the government finally responded: "[Y]ou should not be missing any discovery regarding [Government Informant]. Having read the materials, we appreciate your question. It appears that the same footnote was revised for the subsequent search warrant and is based on the July 9, 2019, interview and subsequent email from [Government Informant] that is attached to the report." Ex. 6.

15.     Based on the government's August 19, 2021 response, the defense came to the conclusion that Lampe's statement in footnote 2 of the July 11, 2019 affidavit was a fabrication, and we subsequently decided to file the *Franks* motion.

II.    **Investigation of Other Statements in the July 11, 2019 & August 19, 2019 Search Warrant Affidavits**

16.    Around the time that the defense suspected, and ultimately concluded, that Lampe's July 11, 2019 affidavit included a material fabrication in footnote 2, the defense also began investigating other statements that Lampe made in the affidavits. I had previous concerns about Lampe's candor in the affidavits, but the apparent fabrication in footnote 2 caused me to question whether Lampe had made other material misrepresentations in order to obtain the warrants.

17.    In May 2021, the government had re-produced more than 200,000 documents in a format that could be loaded to a review database, searched, and sorted, whereas previously the same documents were produced on a rolling basis in an unsearchable format, notwithstanding the requirements of the Case Management Order. The searchable format allowed our practice technology team to coordinate with an e-discovery vendor to load the re-productions to the database, which enabled Mr. Dearington to run numerous searches, sort documents by date, and construct a timeline of the government's investigation leading up to the July 11, 2019 and August 19, 2019 affidavits. We wanted to know what Lampe knew about Government Informant and the reliability or unreliability of her evidence at the time Lampe submitted his affidavits based on her claims and evidence, and we wanted to compare those findings to statements in Lampe's affidavits about Government Informant and her evidence. We soon concluded that Lampe had duped the Court to obtain unlawful search warrants—search warrants upon which the government has built virtually its entire case.

18.    Before May 2021, it was very arduous and time-consuming to conduct the type of investigation we undertook in August 2021 to construct the timeline detailed in our *Franks* Motion about what Lampe knew about Government Informant and when he likely knew it. Only one attorney, Mr. Dearington, generally reviews discovery in this case because of severe budgetary

limitations. Dr. Tao has gone into great debt and has had to borrow money from friends and family to pay for his defense, and has received no indemnification from KU, which has not paid him any salary for the past 18 months. He is, unfortunately, unable to afford to have the defense turn over every stone, and review every one of the hundreds of thousands of documents produced in a highly complex case like this one.

19.     As the *Franks* Motion details, we realized in mid-August 2021 that the government had *already* concluded between May and June 2019—*before* receiving Government Informant's July 9, 2019 confession email—that she had impersonated three witnesses in order to file false reports against Dr. Tao to KU and the FBI, a federal offense, and that she had also submitted a slew of anonymous reports. *Franks* Motion at 5–12. This meant that, during the subsequent July 9, 2019 interview, the government almost certainly confronted Government Informant about her impersonations and false reports. This was the only logical conclusion because immediately after the July 9, 2019 interview Government Informant confessed, in writing, to having used multiple identities to implicate Dr. Tao. She would have had no reason to admit this if she had not first falsely denied that allegation during the interview.[3] Yet the FD-302 from the July 9, 2019 interview altogether omitted any discussion of stolen identities. When we realized this in August 2021, we suspected that the FBI had contrived to limit any documentation that undermined Government Informant's credibility.

20.     We also realized based on searches and analysis of documents in the database and our new timeline that the FBI knew long before the July 9, 2019 interview or the July 11, 2019 affidavit, in part from tracing IP addresses, that Government Informant had submitted all of the

---

[3]An alternative explanation is that the FBI deliberately avoided questioning Government Informant about her false statements to the FBI to avoid creating a record of her unreliability before concealing that information and using her to obtain search warrants.

anonymous reports to KU and the FBI that Lampe discussed in the search warrant affidavits. We therefore realized for the first time in August 2021 that Lampe had falsely represented or concealed in the affidavits that the anonymous reports were from Government Informant, and he instead represented them as independent reports that corroborated Government Informant's claims about Dr. Tao. *See Franks* Motion 6, 8, 9, 16, 18.

21.     As part of our investigation in August 2021 into what exactly Lampe knew about Government Informant and the reliability or unreliability of her evidence when he submitted his affidavits, we also discovered for the first time that the unsigned contract that Government Informant provided, the critical piece of evidence in the case against Dr. Tao, had document properties that showed that the document was created the same day that Government Informant provided it. *Franks* Motion at 7, 18. This strongly suggested that Government Informant had fabricated the unsigned contract and then provided it to inculpate Dr. Tao, whom she had a personal vendetta against. Lampe, as an experienced FBI agent, likely examined the document properties of the unsigned contract and learned this information upon receiving the unsigned contract, but concealed this material information from the Court.

22.     The defense also learned in August 2021, based on searches in the review database, that, before Lampe submitted his affidavits, the government appeared to have received copies of the emails in which Government Informant sought to extort Dr. Tao for money, and threatened to falsely report him as a "tech spy" if he did not pay. *Franks* Motion at 11, 19. The defense had a database with a limited universe of documents prior to August 2021 that included certain emails produced by KU to the government before July 11, 2019 in response to a grand jury subpoena. In August 2021, during our investigation of the affidavits, we searched the emails to see if KU had produced the "tech spy" extortion email from Dr. Tao's KU email account to the government

before the government submitted the July 11, 2019 affidavit. We confirmed that KU had produced the email before July 11, 2019, confirming that the government had actual or constructive knowledge of the "tech spy" extortion email before submitting the July 11, 2019 affidavit. As part of our investigation in August 2021, we also loaded to our database the Gmail account produced under the July 11, 2019 warrant, and we discovered that Google had also produced Government Informant's "tech spy" extortion email to the government before the FBI submitted the August 19, 2019 affidavit. This suggested that Lampe may have been aware of the extortion emails, but concealed them from the Court in his affidavits.

23.    Based on our analysis of Government Informant's reports to KU and the FBI— under multiple false identities—while we investigated the affidavits and reviewed documents in the database and constructed a timeline, we also realized that the FBI was aware that Government Informant had falsely accused Dr. Tao of espionage and intellectual property theft, and the FBI knew that she had no basis or evidence to support these accusations. *Franks* Motion at 10. While we had known in the past that Government Informant falsely accused Dr. Tao of espionage, we previously did not realize that Lampe knew this when he submitted his July 11, 2019 and August 19, 2019 affidavits, but concealed it from the Court.

24.    In August 2021, when investigating the affidavits, we also investigated whether Lampe had correctly stated that there were websites, listed in the affidavit, that Lampe asserted "corroborate[d]" Government Informant's claims, "some" of which were provided by Government Informant "as well as anonymously." *Franks* Motion Ex. 37 ¶ 12 & Ex. 38 ¶ 12. We were suspicious about this claim because we had recently realized that Lampe knew that the "anonymous" reports came from Government Informant, so we investigated whether, contrary to Lampe's statement, *all* of the websites listed in the affidavit came from Government Informant.

Sure enough, our analysis of documents in the database revealed that *all* of the websites Lampe listed in the affidavits came from Government Informant, and none had come from independent sources such that the websites could have had a corroborative effect. *Franks* Motion at 19.

25.     By the conclusion of our investigation in August 2021, we realized that Lampe's affidavits included at least eight highly material misrepresentations or concealments, most if not all of which seemed deliberate. We were also left with many unanswered questions that further warranted a hearing, such as whether the FBI confronted Government Informant about her impersonations during the July 9, 2019 interview and, if so, how she responded and why this was omitted from the FD-302 from the interview and not disclosed to the defense. Given the misrepresentations, and the lack of probable cause if the truth were known, we felt compelled to convert our timeline into a *Franks* Motion, and we promptly filed the motion on August 23, 2021.

26.     My presumption in this case—like other cases—is that when making representations under oath to obtain a warrant, FBI agents frequently portray facts in a light most favorable to the government's case, but they do not fabricate evidence, blatantly misstate facts, or deliberately omit information that would refute probable cause. My initial skepticism that this could have occurred here made me think that there most likely was a reasonable explanation for the contradictions that we did see. Based on our investigation and findings in August 2021, however, I am now convinced that the two search warrant affidavits intentionally or recklessly misrepresented material facts that, if known to the Court, would not have led to a probable cause finding as to either of the warrants.

### III.     The Government's Late Production of Documents Seized from the Forensic Images Obtained Under the Warrants

27.     Even if we had realized before the pre-trial motions deadline that Lampe had made numerous material misrepresentations and concealments in his affidavits, we lacked sufficient

information to make an informed decision about whether it would be worth expending limited budget and resources on a *Franks* motion.

28.     The government produced forensic images and massive email accounts obtained under the two warrants at issue, but had not produced the documents determined by the government to be within the scope of the warrants until long after the pre-trial motions deadline passed. Without knowing what evidence the government determined it could use at trial, Dr. Tao would not have known whether it was worth filing the motion.

29.     In August 2021, having ferreted out the misrepresentations in the two affidavits, we knew from productions in April 2021 and August 2021 (and later in September 2021)—many months after the pre-trial motions deadline—that the government had extracted vast quantities of evidence from the forensic images of devices that it believed met the descriptions of documents that could be seized under the warrants (*e.g.*, evidence of alleged crimes). We then realized that there were documents that we had not seen before, which the government clearly planned to rely upon at trial, and that were worth suppressing.

30.     Operating with a limited budget in this case, even if I had discovered the misrepresentations in the two affidavits before the pre-trial motions deadline, I may not have thought we should file a *Franks* Motion since I did not know what, if any, documents the government had extracted from the devices and accounts seized under the warrants until mid-to-late 2021. If I had known about the many misrepresentations in the search warrant affidavits, and that the government would ultimately extract hundreds of thousands of documents from the devices and accounts seized under the warrants for possible use at trial, we would have immediately filed the *Franks* Motion.

IV.   **The Government's Late Production of a Highly Exculpatory Email on September 9, 2021, and Again on September 16, 2021**

31.     Once our *Franks* Motion was on file, on September 1, 2021 we emailed the government to ask whether all copies of Government Informant's July 9, 2019 email to the FBI, including internal forwards, had been produced. *See* Ex. 7. We noted that we only had a copy of Carlson's forward of the confession email to Lampe dated December 30, 2019—long after Lampe submitted his July 11, 2019 and August 19, 2019 affidavits to the Court—and we asked whether there was an earlier forward from Carlson to Lampe that had been withheld from the defense. Ex. 7. As of September 1, 2021 when we sent this email to the government, we had no direct evidence that Lampe had received the July 9, 2019 confession email before he submitted his July 11, 2019 affidavit, which misrepresented and concealed facts from the confession email, notwithstanding our strong suspicions.

32.     The defense received no response for an entire week. On September 8, 2021, hours before the afternoon status conference with the Court, the government finally responded: "[I]t's our understanding that FBI SA Carlson forwarded the email from [Government Informant] to SA Lampe on July 9, 2019." Ex. 7. But the government did not definitively state that the email existed (or had been maintained), let alone commit to producing it. We responded the same day, asking that the government produce the email, but the government was non-committal: "We'll have to get back to you on your … request." Ex. 8. When the defense raised this issue with the Court later that day, during the September 8, 2021 status conference, the government acknowledged the email for the first time and stated that it would produce it.

33.     On September 9, 2021—more than two years after indicting Dr. Tao—the government finally produced the email showing that Lampe had full knowledge of Government Informant's July 9, 2019 confession email on July 9, 2019, two days *before* submitting his July

11, 2019 affidavit containing misrepresentations and concealing material facts from the July 9, 2019 confession email. Ex. 7. In producing the email, the government stated: "[W]e disagree with your assessment that the forwarded email constitutes *Brady* material or is otherwise discoverable under Rule 16." Ex. 7. We understood the government's position to mean that it does not believe it has an obligation to produce evidence demonstrating that a case agent knowingly made material misrepresentations to the Court. This email left the defense with the uncomfortable feeling that the government may be withholding additional *Brady* material.

34.     On September 16, 2021, two business days before our Opposition to the government's Motion to Strike was due, the government produced an email sent from Lampe to Carlson and Special Agent Ng on July 8, 2019, one day before the interview of Government Informant conducted by Carlson and Ng, and three days before Lampe submitted his July 11, 2019 affidavit. Ex. 9. In the email, Lampe stated: "Tony [Mattivi, the AUSA] and I had a brief discussion about how to handle her in the case (indict/flip, unindicted coconspirator, etc.)." Ex. 9. This suggested that Lampe, and the AUSA, believed Government Informant had committed an indictable federal offense or offenses—likely including her past false statements to the FBI or even extortion—before Lampe submitted his July 11, 2019 affidavit, but concealed this information from the affidavit three days later. Ex. 9.

* * * * *

35.     Our filing of the *Franks* Motion after the deadline was not "tactical," as the government stated in its Motion to Strike. We were not aware of the majority of the grounds for the motion until August 2021, and we never would have intentionally delayed filing such a motion until after the deadline, especially given the obvious strength of the motion. We never discussed or considered deliberately delaying the filing of a pre-trial motion until after the pre-trial motions deadline, let alone to cause prejudice to the prosecution team nine weeks before trial. Indeed just

14

the opposite discussion took place: We considered not filing a Motion to Suppress that we considered meritorious simply because we were past the filing deadline. Ultimately, we decided that we had to press forward, for the reasons outlined above and in the accompanying Opposition.

36.     Moreover, the defense continues to be amenable to continuing the trial date if the Court concludes that its consideration of the *Franks* Motion will prejudice the Government's ability to be ready for trial as currently scheduled on October 25.

37.     None of the foregoing should be read to suggest that defense counsel's investigatory work was flawless, or that other counsel could not have come to these same realizations sooner than we did.  But I can say, without hesitation, that the defense team has been working diligently on this case for the past two years, and no delay in filing the *Franks* Motion was done for tactical advantage.

38.     When one looks at the allegations painstakingly laid out in the *Franks* Motion, it may seem that the misrepresentations and apparent fabrications should have been apparent from the start by simply looking at the July 11, 2019 and August 19, 2019 affidavits, the FD-302 from the July 9, 2019 interview with Government Informant, the July 9, 2019 confession email from Government Informant, and all of the complaints that came to KU and the FBI. But we received the pieces of the puzzle that led to the filing of our *Franks* Motion at different times, along with hundreds of thousands of other puzzle pieces, some of which trickled in just these past few weeks. The contradictions, when laid out methodically, may now seem obvious. But that is looking in retrospect at a completed puzzle. In real time, we were unaware that there was even a puzzle that needed to be solved, much less what it would look like when completed.

*[signature on next page]*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 20, 2021

_____

Peter R. Zeidenberg