EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


UNITED STATES OF AMERICA          )
                                  )
                                  )
v.                                )          No.  2:19-CR-14
                                  )
XIAORONG YOU                      )

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is the government's objection to the Magistrate Judge's Order with respect to the

Defendant's motion to exclude expert testimony by retired Brigadier General Robert S. Spalding, III.  [Doc.

204].  Having carefully considered United States Magistrate Judge Cynthia R. Wyrick's July 10, 2020

order, [Doc. 193], the recording of the June 25, 2020 motion hearing, the government's objections, the

Defendant's response, supplemental documents filed in the record, and the applicable law, and for the

reasons set forth herein, the Court OVERRULES the government's objections to the Magistrate Judge's

order.

I.      **BACKGROUND**

        **A.**

On February 12, 2019, a federal grand jury returned an indictment in this case charging Defendant,

alongside a co-Defendant, with one count of conspiracy to commit theft of trade secrets in violation of 18

U.S.C. § 1832(a)(5), one count of wire fraud in violation of 18 U.S.C. § 1343, and seven counts of theft of

trade secrets in violation of 18 U.S.C. § 1832(a)(3).  [Doc. 3].  Presently, Defendant is the only defendant

going to trial, which is scheduled to begin on April 6, 2021.

The charges in the indictment stem from allegations that Defendant, a chemical engineer by

education and training, orchestrated the theft of trade secret information from her former employers to use

in her applications to two prestigious Chinese grant-like award programs, the Thousand Talents program

1

and the provincial Yishi-Yiyi program.  [Doc. 3].  The indictment generally alleges that Defendant's 2017 applications for these award programs were completely based on the stolen information.  [*Id.*].

The Thousand Talents and the Yishi-Yiyi programs are sponsored by the Chinese government and the Chinese Communist Party ("CCP")[1].  The award participants are selected to move to China to use his or her expertise to promote China's economic and technological development.  [*Id.*].  Specifically, the awards are designed to entice western educated, experienced, and trained individuals to return to China to help the country meet specific technological and economic goals.  [*Id.*].  These prestigious awards require a competitive and stringent application process and offer lucrative financial rewards and fame.  [*Id.*].

The indictment further alleges that in 2017 unbeknownst to her American employer, Defendant applied for the Chinese awards with support from an alleged co-conspirator and a Chinese business.  [*Id.*].  Defendant was successful in her award applications and won both awards.  [*Id.*].  From the award compensation, Defendant allegedly planned to form a new Chinese company that would own and utilize the stolen trade secret information as part of its business model.  [*Id.*].

### B.

Defendant filed a motion *in limine* to exclude testimony of the government's proposed expert witness, retired Brigadier General Robert S. Spalding, III.  [Doc. 142].  According to the government's Federal Rule of Criminal Procedure 16 disclosure, Gen. Spalding has held various positions within the United States government and military, where the entirety of his professional experience has centered around issues of national security and United States-China relations and policies.  [Doc. 151-1 at 1].  According to his *curriculum vitae*, Gen. Spalding has authored a book, *Stealth War: How China Took Over While America's Elite Slept*, that is "an executive summary of his almost decade-long work countering Chinese Communist Party influence."  [*Id.* at 2].  The government intends to have Gen. Spalding testify "about the Chinese Communist Party's strategy for acquiring technology from foreign sources, including U.S. sources, and the role that Chinese business and other entities play in that strategy."  [*Id.* at 1].

---

[1] People's Republic of China is a one-party state, and the CCP is the sole governing political party.

Specifically, the government anticipates Gen. Spalding "to testify about the role that the 'Thousand Talents Program' and related provincial-level talent programs play in that strategy. . . to obtain technology, even though they are aware that it induces the theft of foreign technology and causes economic damage to the victims of such theft, including to the U.S. and other foreign corporations." [*Id.*].

Pursuant to 28 U.S.C. § 636(b)(1)(A), the Court referred the nondispositive motion to the Magistrate Judge for a hearing, if necessary, and a determination. After the government responded, the Magistrate Judge held a June 25, 2020 *Daubert* hearing on the matter. Gen. Spalding did not participate or testify at the hearing. The Magistrate Judge requested the parties provide her supplemental documents including Gen. Spalding's *curriculum vitae* and the Rule 16 disclosure.

The Magistrate Judge determined in her July 10, 2020 order, [Doc. 193], that, based on the evidence provided, Gen. Spalding was qualified as an expert, but could not provide reliable expert testimony on the Thousand Talents program and related Chinese talent programs as tools of the CCP and Chinese government in their efforts to acquire foreign technology. She further held that, even if the testimony was reliable, it would be irrelevant and present significant risk of confusion for the jury. Finally, the Magistrate Judge found that any probative value of the proffered testimony was substantially outweighed by the risk of prejudice to the Defendant. [*Id.*].

The Magistrate Judge held that "Gen. Spalding's extensive experience working in high-level positions related to China endows him with the specialized knowledge and experience necessary to qualify as an expert on issues related to China and economic strategy pursuant to [Federal Rule of Evidence] 702." [*Id.* at 7]. Next, she evaluated Gen. Spalding's proposed testimony under the four *Daubert* factors. [*Id.* at 7-8]. In doing so, she determined that there was no evidence of Gen. Spalding's published or peer reviewed work on the subject of CCP strategy of foreign technology acquisition or the use of government sponsored talent programs. [*Id.* at 8]. The Magistrate Judge held that the record was bereft of evidence to show that Gen. Spalding's theory on Chinese talent programs is generally accepted in the relevant community. [*Id.*].

Further, the Magistrate Judge discussed the relevance of Gen. Spalding's proposed testimony in connection to the charged offenses in the indictment under Federal Rules of Evidence 702 and 401.

3

Notably, she determined that the "indictment contains no allegation that the Defendant acted in concert with or at the behest of the CCP or Chinese government or that such entities or officials thereof were involved in this act." [*Id.* at 11]. She found that it would be difficult to see how expert testimony on CCP strategy for foreign technology acquisition through talent programs would make it more or less probable that Defendant conspired with an individual wholly unrelated to the CCP or Chinese government to steal or to herself commit wire fraud by uploading trade secrets to her personal Google drive account. [*Id.* at 12]. However, she determined that Gen. Spalding's proffered testimony "would be highly relevant to proving a charge of economic espionage." [*Id.*].

The Magistrate Judge also analyzed Gen. Spalding's testimony under Federal Rule of Evidence 403 and concluded the risk of prejudice outweighed the proposed evidence's probative value. Specifically, she noted that "there are no allegations contained in the charging documents that Defendant acted in concert with or at the behest of the CCP or Chinese government. To allow Gen. Spalding to testify as to how the CCP and Chinese government have used these programs to steal trade secrets from other countries including the U.S. would necessarily signal to a jury that they also were the driving force behind Defendant's purported actions." [*Id.* at 14]. The Magistrate Judge also highlighted that a suggestion to a link to the Chinese government would also be likely to invoke a particularly strong emotional response from the jurors in light of the fact that the trial is scheduled to take place in the middle of a pandemic with virus origins in China. [*Id.* at 14-15].

Ultimately, the Magistrate Judge precluded Gen. Spalding's expert testimony. The government now seeks review of the Magistrate Judge's order, [Doc. 204].

**C.**

On August 4, 2020, the government returned a superseding indictment. [Doc. 217]. The superseding indictment named Hongmei Fan, Defendant's aunt, as another co-conspirator and charged Defendant with two additional counts: Count Ten, conspiracy to commit economic espionage in violation of 18 U.S.C. § 1831(a)(5), and Count Eleven, economic espionage in violation of 18 U.S.C. § 1831(a)(3). [*Id.* at 13-20].

4

Count Ten alleges that Defendant and her co-conspirators stole or without authorization appropriated, took, carried away, and concealed, and by fraud, artifice, and deception obtained trade secrets belonging to various companies and without authorization duplicate the trade secret information such that "the offense would benefit any foreign government, foreign instrumentality, or foreign agent, namely the Chinese Communist Party and governments of the People's Republic of China and of the Province of Shandong and the City of Weihai as well as China Company # 1." [*Id.* at 14]. Specifically, the superseding indictment alleges that Defendant and others formulated a plan for Defendant to apply to the Chinese government sponsored Thousand Talents program and the Yishi-Yiyi program with the expectation that once Defendant won the awards, the monetary prize monies would be used to establish a business in China founded on the stolen trade secret information. [*Id.* at 15]. The superseding indictment alleges the newly founded business "would become a foreign instrumentality of the Chinese government because it was substantially sponsored" by the two awards. [*Id.*]. Finally, Count Eleven alleges Defendant committed economic espionage from the acts previously detailed in Count Ten. [*Id.* at 18].

## II.     ANALYSIS

Pursuant to Federal Rule of Criminal Procedure 59(a) and 28 U.S.C. § 636(b)(1)(A), a district court, on its own motion, may refer a pending nondispositive matter to a United States Magistrate Judge for determination. Fed. R. Crim. P. 59(a); 28 U.S.C. § 636(b)(1)(A). The non-prevailing party may contest the magistrate judge's determination by filing written objections within fourteen days of being served with a copy of the order. Fed. R. Crim. P. 59(a). The standard of review for a decision of a magistrate judge in a nondispositive matter is governed by Rule 59(a), which provides that the district judge "must consider timely objections and modify or set aside any part of the order that is contrary to law or clearly erroneous." *Id.*; *see also* 28 U.S.C. § 636(b)(1)(A) ("A judge of the court may reconsider any [nondispositive] pretrial matter . . . where it has been shown that the magistrate's order is clearly erroneous or contrary to law.").

The government argues in its objections that the Magistrate Judge erred in excluding Gen. Spalding's testimony: (1) pursuant to Federal Rule of Evidence 702 the Magistrate Judge's determination was decided upon an incomplete record and relied on inaccurate factual assumptions; and (2) pursuant to

5

Federal Rules of Evidence 401, 402, and 403 the Magistrate Judge's order did not consider 18 U.S.C. § 1832(a)'s applicable offense element and relied on inaccurate factual assumptions.  [Doc. 204].

At the outset, it is important to note that a "district court is not obligated to hold a *Daubert* hearing," *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000); however, a district court should not make a *Daubert* determination when the record is not adequate to the task.  Here, the record consists of the entirety of the record before the Magistrate Judge, a recording of the *Daubert* hearing held before the Magistrate Judge, depositions of two witnesses, Defendant's 2017 application to the Thousand Talents program, Gen. Spalding's *curriculum vitae*, an excerpt of his book, *Stealth War: How China Took Over While America's Elite Slept*, and briefing from the parties.  This is sufficient; the Court will therefore make a *Daubert* finding without a hearing.  *See Food Lion, LLC v. Dean Foods* (*In re Se. Milk Antitrust Litig.*), No. 2:08-MD-1000, 2012 WL 947106, at *2 (E.D. Tenn. Mar. 20, 2012).

## A.  Federal Rule of Evidence 702

The Supreme Court in *Daubert* held that Federal Rule of Evidence 702 requires that trial courts perform a "gate-keeping role" when determining the admissibility of expert testimony.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  "A district court should not make a *Daubert* ruling prematurely, but should only do so when the record is complete enough to measure the proffered testimony against the proper standards of liability and relevance."  *Jahn v. Equine Servs., PSC*, 233 F.3d 393 (6th Cir. 2000).  "Usually, the record upon which the trial court will make an admissibility decision without a hearing will consist of the expert reports, affidavits, depositions, briefs of the parties, and the like."  *In re Se. Milk Antitrust Litig.*, 2012 WL 947106, at *2.

The government argues "that it was contrary to law for the magistrate judge to exclude Dr. Spalding's testimony as unreliable on the limited record before the Court."  [Doc. 204 at 16].  The government notes that the Magistrate Judge acknowledged "the sparse record" at the hearing but still "chose to rule on the defendant's undeveloped argument pretrial, rather than defer to trial when the Court would have more evidence before it."  [*Id.* at 16].  The government contends that "[b]ecause the defendant did not argue

against the qualifications for, or the reliability of, Dr. Spalding's testimony, the government did not have Dr. Spalding present for the hearing on the defendant's motion." [*Id.* at 15-16].

The Magistrate Judge opted to hold a *Daubert* hearing even though the Sixth Circuit has imposed no obligation to do so. *See Clay*, 215 F.3d at 667 (holding that a "district court is not obligated to hold a *Daubert* hearing."). The record before the magistrate court consisted of Gen. Spalding's *curriculum vitae*, the government's Rule 16 disclosure, [Doc. 151-1], supplemental exhibits provided by the government, [Docs. 174-178], and briefing by the parties, [Docs. 142, 145, 166]. The government neither provided the Magistrate Judge with a deposition transcript, expert report, nor did it call Gen. Spalding as a witness during the *Daubert* hearing. The government correctly notes that the Magistrate Judge found the record to be "sparse" at the hearing, and as a result, she requested additional information from the government as to the nature of Gen. Spalding's proposed testimony. Even after the hearing, the government did not provide further specifics on Gen. Spalding's proposed testimony. Instead, the government opted to provide the Magistrate Judge with exhibits about Defendant's application to the Thousand Talents and the Yishi-Yiyi programs and presentations on those programs. [Docs. 174-178]. The Magistrate Judge requested further information, which the government supplied, which was unrelated to Gen. Spalding's expert testimony. This Court finds the Magistrate Judge's record was not incomplete, but rather was sufficient to make a *Daubert* finding.

A witness is qualified to testify as an expert in the form of an opinion if, as Rule 702 provides:

> a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case

Fed. R. Evid. 702. Rule 702 applies equally to scientific testimony and other types of expert testimony based on technical or specialized knowledge. *Kumho Tire Co., LTD. V. Carmichael*, 526 U.S. 137, 147-49 (1999). The Magistrate Judge found Gen. Spalding's knowledge, education, and experience qualified him

7

as an expert under Rule 702. [Doc. 193 at 7]. Defendant does not contest that Gen. Spalding is a qualified expert, and this Court does not hold otherwise.

The proponent of the expert testimony has the burden of establishing that such testimony is reliable. *Rose v. Matrixx Initiatives, Inc.*, No. 07-2404-JPM/TMP, 2009 WL 902311, at *5 (W.D. Tenn. Mar. 31, 2009). To determine reliability, courts focus on "whether the reasoning or methodology underlying the testimony is scientifically valid." *Decker v. GE Healthcare Inc.*, 770 F.3d 378, 391 (6th Cir. 2014). The Supreme Court in *Daubert* set out the following non-exclusive list of factors to assist courts in their determination of whether an expert's testimony is reliable: "(1) whether the theory or technique can be or has been tested; (2) whether it 'has been subjected to peer review and publication'; (3) whether there is a 'known or potential rate of error'; and (4) whether the theory or technique enjoys general acceptance in the relevant scientific community." *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 677 (6th Cir. 2011) (quoting *Daubert*, 509 U.S. at 593-94). The *Daubert* factors "are not dispositive in every case" and should be applied "only where there are reasonable measures of reliability of expert testimony." *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001).

Gen. Spalding is a national security policy strategist with a career focused on "Chinese economic competition and influence" in the military, State Department and Department of Defense. [Doc. 151-1 at 2]. According to the government's pretrial disclosure, Gen. Spalding is expected to testify about the CCP's strategy for acquiring technology from foreign sources, the role that the Thousand Talents program and related provincial-level talent programs play in that strategy, the financial and reputational benefits conferred on program participants by the CCP and Chinese government officials, how the CCP incentivizes Thousand Talents program participants to benefit personally while also benefiting China and the CCP, and that the CCP and the Chinese government employ the programs to obtain technology, even though they are aware that it induces the theft of foreign technology and causes economic damage to the victims of such theft, including to the United States and other foreign corporations. [*Id.* at 1]. Moreover, Gen. Spalding is expected to testify that certain exhibits are consistent with the Defendant's participation in the Chinese talent programs. [*Id.*]. The entirety of Gen. Spalding's expected testimony falls within the boundaries of

8

the international relations and national security disciplines, both of which are more broadly considered within the social science field[2].

Although *Daubert*'s "reliability standard" for determining the admissibility of scientific evidence has been used to analyze nonscientific expert testimony, "the *Daubert* factors . . . were devised specifically for scientific testimony [and, therefore,] the *Daubert* analysis should be modified in the case of social science or other non-scientific expertise." *State of Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.*, 925 F. Supp. 1247, 1252 (S.D. Ohio 1996). Indeed, in examining Gen. Spalding's proposed conclusions and the record, the traditional *Daubert* reliability factors are of "limited utility" in the context of this case. *Vinel v. Union Twp.*, No. 1:16-CV-930, 2018 WL 7080037, at *6 (S.D. Ohio Apr. 13, 2018). The theory or technique of Gen. Spalding's proposed testimony can neither be tested, have a known or potential rate of error, nor enjoy general acceptance in the relevant scientific community. *See Daubert*, 509 U.S. at 593-94. The government does not provide this Court with any indication that Gen. Spalding's provided writing was subject to peer review. *See Vinel*, 2018 WL 7080037, at *6-7 ("The fact that [an expert's] opinions may not have been subjected to the crucible of peer review, or that their validity has not been confirmed through empirical analysis, does not render them unreliable and inadmissible."). However, it appears the excerpt from the book is published[3]. The Court recognizes that *Daubert* is an inappropriate reliability metric in the context of this case.

In endorsing a broad interpretation of Rule 702, the Sixth Circuit has made clear:

> [T]he fact that [an expert's] opinions may not have been subjected to the crucible of peer review, or that their validity has not been confirmed through empirical analysis, does not render them unreliable and inadmissible. In *United States v. Jones*, this court recognized that the four specific factors utilized in *Daubert* may be of limited utility in the context

---

[2] International relations is defined as "a branch of political science concerned with relations between nations and primarily with foreign policies." *International Relations*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/international%20relations (last visited Feb. 10, 2021). Social science is "a branch of science that deals with the institutions and functioning of human society and with the interpersonal relationships of individuals as members of society." *Social Science*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/social%20science (last visited Feb. 10, 2021).

[3] The excerpt provided to the Court consists of a copy of the book's cover, a two-page table of contents, and an excerpted chapter. Although the Court was not provided with a copyright or publication page, which would include the edition, publisher, colophon, and the year the book was printed, the Court assumes the book was published by a publishing house for public consumption. [*See* Doc. 214].

9

> of non-scientific expert testimony. We noted that 'if [the *Daubert*] framework were to be extended to outside the scientific realm, many types of relevant and reliable expert testimony--that derived substantially from practical experience--would be excluded.   Such a result truly would turn *Daubert*, a case intended to relax the admissibility requirements for expert scientific evidence, on its head.' Indeed, even the *Berry* court itself recognized that 'the distinction between scientific and nonscientific expert testimony is a critical one[,]' and that *Daubert* is 'only of limited help' in assessing technical or experiential expertise.   Consequently, in *Jones* we declined the appellant's invitation to apply the factors outlined in *Daubert* to testimony involving a non-scientific field.

*Vinel*, 2018 WL 7080037, at *6-7 (quoting *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001) (internal citations omitted)).

This is not to say that nonscientific expert testimony need not pass muster.  The expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702, advisory committee note, 2000 amend.  The Court must also analyze whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co., Ltd.*, 526 U.S. at 152.  Against this backdrop, the Supreme Court notes that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The government argues that "it was contrary to law for the magistrate judge to reason that Dr. Spalding's testimony was inadmissible because his expert opinion would likely be based in part on otherwise inadmissible hearsay[.]"  [Doc. 204 at 16].  The magistrate judge noted that "no evidence was provided to show that Gen. Spalding's theory on Chinese talent programs [were] generally accepted in the relevant community. . . .  it appears that the most relevant knowledge and experience on this topic Gen. Spalding has results from his work providing briefs to the Joint Staff and National Security Council sometimes between 2014 and 2018 which were prepared based on reports, articles, and Chinese government statements, the entirety of which is hearsay."  [Doc. 193 at 8].

First, this Court observes that an "expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703; *see also* Advisory committee

10

notes to Fed. R. Evid. 703 (observing that experts may "attend the trial and hear the testimony establishing the facts" upon which he or she bases an opinion).  Moreover, in forming his opinion, Gen. Spalding may rely on hearsay or otherwise inadmissible evidence if other experts in that field would reasonably rely on that kind of evidence.  *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").  If the witness does rely on such inadmissible evidence, however, the inadmissible evidence may be disclosed "to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."  *Id.*

However, the government does not agree that Gen. Spalding's expected testimony is based on hearsay; instead, according to the government, Gen. Spalding's potential trial testimony will be based on his "professional experience studying the Chinese Communist Party and its approaches to technology acquisition."  [Doc. 151-1 at 1].  From reviewing Gen. Spalding's *curriculum vitae*, it is apparent he has had a long career in the area of national security both in the military and in defense policy.  [*Id.* at 2].  It is important to note that this Court neither has an expert report prepared by Gen. Spalding nor deposition testimony.  As such, the Court will interpret Gen. Spalding's expected testimony in the government's disclosure as Gen. Spalding's conclusions.  The listed conclusions in the disclosure are unaccompanied by an explanation of how that proposed testimony is derived from experience.  An expert basing his opinion on experience "must do more than aver conclusory that his experience led to his opinion."  *Scott v. Deerbrook Ins. Co.*, 714 F. Supp. 2d 670, 674 (E.D. Ky. 2010) (quoting *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003)).  If a witness is relying on experience, he or she "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *United States v. Brown*, 415 F.3d 1257, 1261 (11th Cir. 2005); Fed. R. Evid. 702, advisory committee's note (citing *See Daubert v. Merrell Dow Pharms., Inc.* 43 F.3d 1311, 1319 (9th Cir. 1995)).  Without a report or deposition testimony offered on the record it is difficult for this Court to conclude Gen. Spalding's experience in national security supports his key conclusion that the Chinese talent programs which Defendant allegedly participated in were vehicles in the

11

CCP strategy to unethically acquire foreign intellectual property.  The Court, however, acknowledges the government has offered an excerpted chapter from Gen. Spalding's book, and the Court treats the excerpt as Gen. Spalding's reasoning and support for his conclusions outlined in the disclosure.

Gen. Spalding authored the 2019 political science book, *Stealth War: How China Took Over While America's Elite Slept*.  The book "is an executive summary of [Gen. Spalding's] almost decade-long work countering Chinese Communist Party influence."  [Doc. 151-1].  The contents of the book are arranged in chapters that presumably name areas where the CCP is globally competing with America – the economy, the military, politics and diplomacy, infrastructure, and lastly, intellectual property.  The undersigned has read the excerpted chapter titled "Stealing Intellectual Property," which was provided on the record by the government.  [Doc. 214].

In the selected chapter, Gen. Spalding describes the People's Republic of China as "utterly fixated on acquiring scientific knowledge," and calls it a decades-long "national obsession."  [*Id.* at 4].  The chapter provides an overview of the various official and unofficial methods the CCP pushes to develop cutting-edge technology.  Gen. Spalding lists the ten areas China seeks to advance, which includes "[n]ew materials, such as polymers," the same area of  science of the alleged trade secrets at issue in this case.  [*Id.* at 5-6].  The chapter details the CCP's efforts to acquire foreign technology not only within the one-party socialist republic's borders under its jurisdiction, but also in the international arena.  In the chapter's subsection titled "Diversifying Technology Acquisition," Gen. Spalding writes that "[o]ne official channel [of new technology acquisition] is the Thousand Talents Program, which offers foreign experts under the age of sixty-five significant sums of money."  [*Id.* at 18].  Gen. Spalding explains that "[f]or experts in the West with expertise that China truly covets, money is really no object" for the CCP to acquire the technology. [*Id.*].

The government argues the Magistrate Judge's order was clearly erroneous when she grounded the reliability finding on the factual conclusion that the Gen. Spalding had not written about the intersection of Chinese talent programs and the nation's acquisition of foreign intellectual property.  [Doc. 204 at 16].  The Court notes here that the Magistrate Judge was not provided any written material from *Stealth War: How*

12

*China Took Over While America's Elite Slept.*   Instead, the book was mentioned during the *Daubert* hearing, but an excerpted copy was not provided for the Magistrate Judge's review or placed on the record. The Court finds the book is a writing in which Gen. Spalding explains and details CCP's efforts of foreign intellectual property acquisition via state sponsored talent programs.   *See* [Doc. 193 at 8 ("[T]he [Magistrate] Court has no evidence that Gen. Spalding has published any work on the subject of the CCP's strategy for acquiring foreign technology or the use of talent programs to do so.")].

In the chapter, Gen. Spalding does not discuss the Chinese talent programs at length.   The discussion on talent program spans two paragraphs within the approximately fifteen-page chapter.   [*See* Doc. 214 at 18-19].   In explaining the Thousand Talents program, Gen. Spalding directly quotes the offerings from the program's own website.   [*Id.* at 18].   The topic is limited to a description of the programs and an accompanying statement that: "[o]ne official channel [of talent acquisition] is the Thousand Talents Program[.]"   [*Id.*].

The Court fails to find the necessary connection between Gen. Spalding's decades of experience and the conclusions drawn in the proposed testimony related to the talent programs in the excerpt provided of *Stealth War*.   *See* Fed. R. Evid. 702, advisory committee's note ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts.").   There is no mention of how Gen. Spalding's experience with Chinese talent programs led to his conclusion that the programs are ploys in a greater CCP strategy for technology acquisition from foreign sources.   [*See* Doc. 151-1].   Moreover, Gen. Spalding does provide reasoning behind his conclusion about the financial and reputational benefits conferred on program participants from the Chinese government.   Apart from quoting the prize from the program website, he states that the "Thousand Talents program [] offers foreign experts  . . . significant sums of money."   [Doc. 214 at 18].   There is no elaboration as to how his professional expertise leads to the conclusion that talent participants experience monetary benefits and preferential treatment apart from the program's description found on its direct website.   Although the Thousand Talents program and similar talent programs are recorded in Gen. Spalding's book as an alternative and official channel for foreign

13

technology acquisition, the excerpt provided fails to denote a link between the programs and the government backed inducement of theft of foreign technology, or the knowledge that the program induces the theft of foreign technology and causes economic damage to the victims of such theft including the United States and other foreign corporations. The reasoning behind this conclusion is not touched upon in the portion of the excerpt detailing the talent programs. The chapter does not even mention inducement, theft or stealing corporate secrets or technology in relation to program participants. The excerpt simply details the programs offerings as listed on the program's website and the participant's expected commitment "to work[] nine months of the year in China for three consecutive years" and the lump sum research subsidies granted. [*Id.*]. Finally, Gen. Spalding does not provide any link between his experience and the conclusion that certain exhibits to be introduced at trial are consistent with the Defendant's participation in the Chinese talent programs. Gen. Spalding does not indicate that he has any experience with prior talent program participants or in reviewing successful and unsuccessful talent program applications in the past as part of his professional experience. Further, the government has provided Defendant's application to these programs, and the Defendant does not contest she applied to the programs.

The witness has not explained how his experience leads to the conclusions reached, why that experience is a sufficient basis for the opinions presented, and how that experience is reliably applied to the facts. *See Daubert,* 43 F.3d at 1319 ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough."). The excerpted chapter provides no rationale for Gen. Spalding's conclusions as to CCP strategy and Chinese Talent Programs and the conclusions call upon this Court to rely solely on his subjective judgments. However, the more subjective an expert's inquiry, the more likely the testimony should be excluded as unreliable. *See, e.g.*, *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1909 (7th Cir. 1994) (expert testimony based on a completely subjective methodology held properly excluded). *See also Samarah v. Danek Med., Inc.*, 70 F. Supp. 2d 1196, 1206 (D. Kan. 1999) ("Indeed, there is nothing in Dr. Armani's notes to indicate … how he arrived at the conclusion that defendants' bone screws caused the injuries for which plaintiff presently seeks damages."). As part of its gatekeeping function, this Court cannot simply "tak[e] the expert's word for it"

14

without a sufficient basis for opinion.  Fed. R. Evid. 702, advisory committee's note.  The lack of analysis or substantive explanation of the Chinese talent programs in Gen. Spalding's book renders his conclusions and expected testimony on that subject unreliable.

Next, the Court turns to Gen. Spalding's conclusion and expected testimony from the government's disclosure as to the CCP's strategy for acquiring technology from foreign sources, including the United States' sources, and the role that Chinese business and other entities play in that strategy.  [*See* Doc. 151-1].  The Court finds there is enough substantive explanation in the excerpted chapter for how Gen. Spalding's experience in national security and foreign policy supports his key conclusion.  In the chapter, Gen. Spalding outlines the brief history of the Chinese government's scientific and technological policy throughout the country's Communist regime to its present-day focus of developing technology in certain sectors.  [Doc. 214].  Gen. Spalding dedicates a subsection of the chapter to a case-study of a natural gas processing subsidiary of the American company, the Nolan Group, in the Xinjiang Province in China.  The American subsidiary entered into a business venture with a CCP-sponsored company which resulted in the formation of new Chinese company.  The newly formed Chinese company using American technology entered into the American market with plans to dominate the market even though the initial American subsidiary had targeted the market.  [*Id.*].  He also elaborates how Chinese companies have avoided prosecution in United States' courts through Foreign Sovereign Immunities Act protection as state-owned businesses.  [*Id.*].  Gen. Spalding explains how these techniques are driven by global politics and are not purely business decisions based on capital.  [*Id.*].  Gen. Spalding also provides other examples of China's technology acquisition including an American engineer who was offered money from a CCP owned business to leave retirement, and examples of how Chinese companies approach foreign companies to contract deals for technology.  [*Id.*].  With the case studies and examples, Gen. Spalding provides quotes from his interviews with the subjects involved first-hand, namely with capital entrepreneur Patrick Jenevein, the CEO of the Nolan Group at the time of the dealings with the CCP state run company.  [*Id.*].  Gen. Spalding has provided the Court with sufficient basis as to how his experience and his rationale lead to his conclusion about the greater CCP strategy of foreign technology acquisition.  *See* Fed. R. Evid. 702,

advisory committee's note.  When evaluating *Daubert* challenges, courts focus 'on the experts' principles and methodology, not on the conclusions that the experts generate.  *Daubert*, 509 U.S. at 595.

"The *Daubert* standard is liberal, and does not require expert opinions to be bulletproof."  *United States v. Lang*, 717 F. App'x. 523, 534 (6th Cir. 2017).  "A determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion."  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 521 (6th Cir. 2008).  "As one Court of Appeals has stated, trial judges are gatekeepers, not armed guards."  29 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6268.2 (2d ed. 1987) (citing *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 86 (1st Cir. 1998)); *see also, Guild v. GMC*, 53 F. Supp. 2d 363 (W.D.N.Y. 1999) ("[T]rial judges acting as gatekeepers under Daubert must not assume 'the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul' and thereby usurp 'the ageless role of the jury' in evaluating witness credibility and weight of the evidence.") (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 (2d Cir. 1995)).  The government has provided by a preponderance of the evidence that Gen. Spalding can provide reliable expert testimony based on his professional experience studying the CCP strategy for acquiring technology from foreign sources and the role that Chinese businesses play in that strategy.

### B.  Relevance

As with all evidence, the threshold issue for admissibility of expert testimony is relevance.  *See* Fed. R. Evid. 401 and 402.  Rule 401 of the Federal Rules of Evidence defines relevant evidence as that "having any tendency to make a fact more or less probable than it would be without the evidence" and "of consequence in determining the action."  Generally, relevant evidence is admissible, unless it is not.  *See* Fed. R. Evid. 402.  Expert testimony is relevant under Rule 702 and *Daubert* if it will assist the trier of fact to better understand the evidence or to decide a material fact in issue.  *See In re Scrap Metal,* 527 F.3d at 529 (citing Fed. R. Evid. 702).  *See also Daubert*, 509 U.S. at 597 (holding that the testimony of an expert witness must be "relevant to the task at hand").

16

The government argues "the magistrate judge's order is contrary to law, because it does not consider the charged-offense element to which Dr. Spalding's testimony is relevant – namely, whether the defendant acted with 'intent to convert [the trade secrets] to the economic benefit of anyone other than the owner thereof.'"  [Doc. 204 at 17].  The government contends that it briefed this argument, but the Magistrate Judge's order failed to address the pertinence of Gen. Spalding's testimony to that element.  This Court notes that Rule 704(b) squarely excludes such testimony:

> In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone.

Fed. R. Evid. 704.  Thus, Rule 704(b) would still bar the at-issue Gen. Spalding opinion as to Defendant's intent to convert trade secrets for the economic benefit of someone other than the owner of the trade secrets.  *See United States v. Harris*, 393 F. App'x 314, 319 (6th Cir. 2010) ("Rule 704(b) may be violated when . . . the expert . . . directly refer[s] to the defendant's intent, mental state, or mens rea." (citations and quotation marks omitted)).  The Magistrate Judge did not err by not addressing the pertinence of Gen. Spalding's testimony to the *mens rea* element of the crime charged.

In a footnote, the government notes that in the event that it "supersedes the indictment and includes a violation of 18 U.S.C. § 1831, Dr. Spalding's testimony would be deemed relevant by the magistrate judge's order."  [Doc. 204 at 18].  The Magistrate Judge's order stated that "Gen. Spalding's proffered testimony focuses almost solely on the CCP and Chinese government and has little, if any, direct relation to Defendant.  Such testimony would be highly relevant to proving a charge of economic espionage[.]"  [Doc. 193 at 12].  In the order, however, she acknowledged that the elements of economic espionage are similar to those of theft of trade secrets, with the main difference being that economic espionage requires the intent or knowledge that the offense "will benefit any foreign government, foreign instrumentality, or foreign agent."  18 U.S.C. § 1831.  This Court agrees with the Magistrate Judge that Gen. Spalding's testimony as it relates to CCP strategy for acquiring technology from foreign sources and the role that Chinese businesses play in that strategy would be relevant to the economic espionage charge.

17

### C.  Federal Rule of Evidence 403

A court may still exclude relevant expert testimony under Federal Rule of Evidence 403 if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  The phrase "unfair prejudice," when used in the context of Rule 403, " does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." *United States v. Ford*, 761 F.3d 641, 648 (6th Cir. 2014) (quoting *United States v. Gibbs*, 182 F.3d 408, 430 (6th Cir. 1999)). *See also Old Chief v. United States*, 519 U.S. 172, 180 (1997) ("Unfair prejudice within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." (quoting Fed. R. Evid. 403 advisory committee's note)).  Moreover,

> [a]pplying Rule 403 necessarily contemplates a balance that is weighted in favor of admissibility, with the countervailing forces being the strength of the evidence's legitimate value and the tendency of the evidence's improper purpose(s) to overwhelm it.  Evaluation of legitimate probative value requires consideration of the strength of the evidence itself, whether the evidence may be the only available proof of a material point, and whether the focus of the proof is genuinely in issue, among other things.

*United States v. Duval*, 865 F. Supp. 2d 803, 809 (E.D. Mich. 2012).  The test is strongly weighted toward admission. *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018).  A district court has broad discretion in determining whether the danger of admitting evidence substantially outweighs that evidence's probative value. *Id.*

In this case, Defendant has been charged with a trade secret theft conspiracy in violation of 18 U.S.C. § 1832(a)(5), wire fraud in violation of 18 U.S.C. § 1343, and theft of trade secrets in violation of 18 U.S.C. § 1832(a)(3).  [Doc. 3].  In the superseding indictment, Defendant was also charged with an economic espionage conspiracy in violation of 18 U.S.C. § 1831(a)(5), and economic espionage in violation of 18 U.S.C. § 1831(a)(3).  [Doc. 217].  To convict under 18 U.S.C. § 1831, the government must prove that the alleged offense "benefit[ed] any foreign government, foreign instrumentality, or foreign agent[.]"  Gen. Spalding's testimony goes directly to this element of the charge; namely, CCP strategy for acquiring

18

technology from foreign sources and the role that Chinese businesses play in that strategy.  Gen. Spalding's testimony is highly probative.

Under Rule 403, this Court must balance the evidence's probative value against it's potential for unfair prejudice.  The government objects to the Magistrate Judge's Rule 403 balancing analysis as contrary to law.  First, the government argues the Magistrate Judge erred by not evaluating the relevance of Gen. Spalding's testimony to the *mens rea* element and did not articulate the probative value of the proposed testimony.  [Doc. 204 at 18].  The Court has already concluded that Rule 704(b) squarely excludes such testimony, and as such, the Magistrate Judge did not err by not including that information in her Rule 403 evaluation.

Second, the government takes issue with the Magistrate Judge's findings that Gen. Spalding's testimony would be prejudicial if he were to testify in military uniform.  Under Air Force Instruction 51-301 § 3.11.1, "military members on active duty and who are testifying in a non-official or private capacity should not wear their uniform while so testifying."  The provisions are extended to retired Air Force members under Air Force Instruction 51-301 § 3.15.  Gen. Spalding is a retired military officer and would be testifying in his private capacity, and as such, the Court assumes he would wear civilian dress and adhere to the Air Force Instructions cited.  The Court finds no prejudice to the government would ensue if Gen. Spalding testified in civilian clothing.

Third, the government alleges the Magistrate Judge erred by referencing the COVID-19 pandemic as a basis for finding Rule 403 prejudice.  The government argues the Magistrate Judge's conclusion is not supported by the record.  The Magistrate Court and this Court are sensitive of world events, including the origination of the COVID-19 virus in China and the recent spike of anti-Asian hate crimes in America since the COVID-19 pandemic[4].  Since the outbreak of the pandemic, Asian American and Pacific Islander

---

[4] In a February 2021 press release, Stop AAPI Hate, a nonprofit organization has documented over 2,800 reports of anti-Asian hate since March 2020 in 47 states across America.  *Stop AAPI Hate: New Data on Anti-Asian Hate Incidents Against Elderly and Total National Incidents in 2020*, Stop AAPI Hate (Feb. 9, 2021), https://secureservercdn.net/104.238.69.231/a1w.90d.myftpupload.com/wp-content/uploads/2021/02/Press-Statement-re_-Bay-Area-Elderly-Incidents-2.9.2021-1.pdf.

("AAPI") communities have been targets of xenophobic backlash, racial harassment, and violence, as China and the Chinese have been blamed for the spread of the COVID-19 virus.  *See* Joseph R. Biden, Jr., Memorandum Condemning and Combating Racism, Xenophobia, and Intolerance Against Asian Americans and Pacific Islanders in the United States, (Jan. 26, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/26/memorandum-condemning-and-combating-racism-xenophobia-and-intolerance-against-asian-americans-and-pacific-islanders-in-the-united-states/, (last visited Feb. 16, 2021).  This Court cannot find that the Magistrate Judge erred by including the COVID-19 global pandemic as part of her Rule 403 analysis.  *See United States v. Doe*, 903 F.2d 16, 21 (D.C. Cir. 1990) (it is "much too late in the day to treat lightly the risk that racial bias may influence a jury's verdict in a criminal case.").

Defendant contends that "Gen. Spalding's testimony would also create a risk of unfair prejudice to defendant on the basis that she is a Chinese-American citizen."  [Doc. 226 at 5].  More particularly, Defendant argues that according to Gen. Spalding's book, *Stealth War: How China Took Over While America's Elite Slept*, it is his "position that China has 'designated its entire population as spies.'"  [*Id.*].  Additionally, Defendant avers that "jurors may place great emphasis on Gen. Spalding's testimony due to his lengthy military career and position as national security policy strategist, in spite of his lack of personal knowledge regarding the facts of the present case.  [*Id.*].

Gen. Spalding's testimony is prejudicial to Defendant.  However, virtually all evidence is prejudicial or it is not material; the prejudice must be "unfair."  *United States v. Gibbs*, 182 F.3d 408, 430 (6th Cir. 1999).  Gen. Spalding's book is titled *Stealth War, How China Took Over While America's Elite Slept*, the title in itself implies the presence of hostility between China and America, and in that duality structure one nation can usurp power from the other.  This is further supported by the titles of final chapters of the book: "Sino Solutions: How to Combat and Stop China's Stealth War," and "Beating China at its Own Game."  [Doc. 214].  Further, his entire excerpted chapter provided reads from the perspective that China and the United States are engaged in a noncombative "stealth war" and how the United States' national security has been attacked.  In fact, Gen. Spalding's ultimate thesis of the chapter is that when

20

China acquires foreign intellectual property, specifically from the United States, "[o]ur national security suffers." [*Id.* at 19].

The tone of the writing is not objective but rather intended incite a response in the reader to support Gen. Spalding's conclusion. The tone is highlighted by the use of certain words and phrases such as the repeated use of "spies" to refer to Chinese workers, "bald-faced corporate hijacking" to describe CCP acts and labeling the CCP strategy as "diabolical," "straight out of a science fiction novel, " and "a form of warfare." [*Id.* at 6, 14]. In discussing Chinese workers he again uses the word "spy" and that "it isn't a complete stretch to say everyone can be regarded as a potential spy." [*Id.* at 8]. Gen. Spalding concludes that "China has put technology transfer at the forefront of its goals. So much so, it has now designated its entire population as spies." [*Id.* at 6]. The repetitive nature of his use of the word "spy" when discussing the entire Chinese population is in itself inherently and extremely prejudicial when the Defendant is facing an economic espionage charge. Although the Court recognizes that Gen. Spalding's book and excerpted chapter are not his verbatim proffered testimony, the rhetoric and perspective Gen. Spalding used when writing about the topics that he would be testifying to at trial is without a doubt prejudicial. Further, the government has not provided anything else for the Court to base its decision on.

Nonetheless, the Court has applied Rule 403 cautiously and sparingly, and has contemplated the unique complexities of this case and each objection. The entirety language of the excerpted chapter is anti-Chinese and pro-American national security, and the Court notes that testimony based on Gen. Spalding's writings has the potential to be substantially unfairly prejudicial. The language used would have "an undue tendency to suggest decision on an improper [emotional] basis." Fed. R. Evid. 403 (advisory committee notes). Based on the tone of the writing and perspective Gen. Spalding takes in his book, it would be likely to invoke a particularly strong emotional response from jurors. In fact, the tone of Gen. Spalding's writing suggests him to be more of an advocate than an expert. The Court finds the probative value is outweighed by the danger of unfair prejudice in the instant case.

The Court held a March 3, 2021 virtual status conference during which the Court heard brief argument on these objections from both parties. The hearing shed light on the government's use of Gen.

21

Spalding as an expert witness and his intended potential testimony. Specifically, the government represented to the Court that Gen. Spalding's expected and intended testimony would be far more limited in scope than anything in the current record. The contents from that hearing might alter the Court's analysis on Gen. Spalding's or, the government's alternate expert, Professor Chung's potential testimony. This ruling is not intended to be a final ruling, but the Court states its concerns about reliability, relevance and unfair prejudice on the record.

As the government intends to offer a more limited testimony than in the record currently before the Court, the Court will hear the expert's testimony, either Gen. Spalding or Professor Chung, and allow the parties to make their arguments, before rendering a final ruling. At some time before the expert witness's testimony, the Court will entertain a non-jury hearing, during which the government will proffer the expert's limited testimony. The Court strongly suggests the government provide a much more detailed disclosure on the limited scope of the proposed witness's testimony, the expert's conclusions, and the reasoning behind the conclusions on the record prior to the hearing. The Court makes clear to the parties that the Court's overriding concern here is that the trial not become a trial on the policies of the CCP or the Chinese government or their intent in establishing these talent programs.

III.     CONCLUSION

For the reasons stated above in the memorandum opinion and after a review of the record, this Court concludes that the Magistrate Judge's decision should be upheld. The Court **ACCEPTS AND ADOPTS** the report and recommendation, [Doc. 193], of the Magistrate Judge. Accordingly, the government's objections to the Magistrate Judge Order are **OVERRULED**. [Doc. 204]. The Defendant's motion to exclude Gen. Spalding's expert testimony is **GRANTED**. [Doc. 142]. The Court notes this is not a final ruling and it would entertain a more limited and non-prejudicial expert witness proffer that would take place outside the presence of the jury at some point during trial.

So ordered.

ENTER:

22

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE

23