# UNITED STATES DISTRICT COURT
## District of Kansas

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        v.                          Case No.  **19-20052-01-JAR**

**FENG TAO,**

        **Defendant.**

## GOVERNMENT'S REPLY TO DEFENDANT'S OPPOSITION TO MOTION TO STRIKE UNTIMELY *FRANKS* MOTION

Defendant's "good cause" arguments appear to boil down to a simple premise: his counsel did not discover the alleged misrepresentations and omissions—none of which was material to probable cause, let alone false or intentional—until August 2021. Had his late *Franks* motion, in fact, been based on a last-minute realization, he should have simply engaged the Court and the government before, during, or after the August 17, 2021 status conference. Instead, in what appears to have been a calculated move, he filed his surprise motion on August 23, 2021. Defendant contends that the timing of the filing was not tactical, but the facts speak for themselves.

In a lengthy response accompanied by two affidavits (in all, a total of 36 pages excluding exhibits), he now argues, mostly for the first time, that his failure to file a timely *Franks* motion is the result of three things: a document that he received *after* he filed his *Franks* motion; the

government's good-faith offer to reproduce certain discovery with Bates numbering; and his inability to make an informed decision as to whether to move to suppress evidence from his own email account and electronic devices. (Doc. 149; hereinafter "Def. Resp."). Those claims are meritless. For the reasons set forth in the government's motion (Doc. 141) and herein, the Court should strike Defendant's *Franks* motion as untimely.

I. **ARGUMENT**

A. **The Government Did Not Withhold *Brady* Evidence Related to Defendant's *Franks* Claims**

Defendant alleged in his August 23, 2021 *Franks* motion (Doc. 127; hereinafter "*Franks* Mot.") that the FBI case agent intentionally misrepresented Student #1's July 9, 2019 statements in the July 11, 2019 search warrant affidavit. The July 9th statements consist of two pieces of evidence: an FBI interview report and an email from Student #1 to the FBI. *See* Def. Resp. at 3-7. Defendant acknowledges, as he must, that he has had the relevant search warrant affidavits, the interview report, and Student #1's email since October 2019. *Id.* Notwithstanding those facts, Defendant now claims, among other things, that good cause exists for the Court to consider his late motion because, according to him, "the government withheld *Brady* evidence until September 9, 2021." Def. Resp. at 5. That accusation is unsupported by the facts.

As an initial matter, Defendant's *Brady* claim presupposes that he has a viable *Franks* claim with respect to Student #1's July 9th statements and the July 11th affidavit. For the reasons set forth in the government response to his *Franks* motion (Doc. 152), this is incorrect.

Moreover, the allegedly "withheld *Brady* evidence" was a forwarded copy of Student #1's July 9th email—she sent it to the interviewing agent who forwarded it to the case agent (the affiant of the July 11th warrant) on the same day it was received. Consistent with the government's discovery practice in this case, the government produced the forwarded email to

the defense after counsel requested it on September 1, 2021, which was notably *after* Defendant filed his late *Franks* motion.[1] That email, therefore, cannot be the basis of, or justification for, Defendant's motion or its lateness.

As to the basis of his *Franks* motion, Defendant went to great lengths to compare Student #1's July 9th statements with the July 11th and August 19th affidavits. Among other things, he alleged that the affiant "falsely told the Court [in footnote two] that [Student #1] said she obtained the unsigned contract by accessing Dr. Tao's email account with his 'permission' and at his 'direction.'" *Franks* Mot. at 17-18, 26 & n.24. He further alleged that the affiant "knew the truth . . . and deliberately chose to misrepresent and conceal these facts [and others]." *Id.* at 27. Defendant's accusations were unequivocal. He clearly understood that the affiant was aware of Student #1's July 9th statements when he swore out the July 11th affidavit. And the government has never disputed that fact. Thus, the forwarded email adds little to Defendant's meritless *Franks* motion and otherwise does not explain why Defendant filed it so late.

### B.      Defendant Did Not Need a Searchable Database to "Ferret Out" His *Franks* Claims

Defendant further repeats and expands significantly upon the good cause claim that he raised in a brief footnote in his *Franks* motion. *See* Def. Resp. at 3-5; *Franks* Mot. at 2 n.1. According to Defendant, the defense did not realize until August 2021—almost two years after the relevant statements had been produced—that the affiant had allegedly fabricated footnote two

---

[1] The government produced other emails at, or related to, the defense's requests out of caution and to provide context to demonstrate that the defense's claims are unfounded. Defendant seizes upon one of them to claim that the affiant had "concluded Government Informant lied to the FBI, or committed other federal offenses." Def. Resp. at 7 n.9. A simple read of the email in question, however, shows that Defendant has gone at least one step too far. The line Defendant references does not mention lying to the FBI and reads: "[The AUSA] and I had a brief discussion about how to handle her in the case (indict/flip, unindicted coconspirator, etc). We agreed this type of behavior we want to encourage, provided she's helpful." Def. Ex. 9.

3

in the July 11th affidavit. Def. Resp. at 3. He claims, among other things, that he was unable to "ferret out" the necessary details to come to that conclusion until the government reproduced discovery with Bates numbering as a load file in May 2021. *Id.* at 4. But that rationale makes little sense. Defendant's *Franks* claim with respect to footnote two is not complicated, and the information he presented to the Court in support of it is relatively straightforward. To reach his conclusion, he simply compared footnote two in the July 11th and August 19th affidavits with Student #1's July 9th statements, all of which the defense has possessed since October 2019.[2]

Defendant also claims that he was unable to "unearth" the other seven alleged misrepresentations without the aid of "218,145 documents" being "produced by the government in a searchable format in May 2021." *Id.* at 4. Here, Defendant highlights that the Bates-numbered reproduction contained more than two hundred thousand documents for dramatic effect. While that number appears quite large, in reality, Defendant possessed those materials well before the May 2021 reproduction, and the majority have nothing to do with his *Franks* claim. *See* Gov. Ex. A (Discovery Letter & Log Dated May 13, 2021). In fact, the materials largely consist of his own communications and employment personnel files. Specifically, 129,789 of the items were KU emails and personnel records for Defendant and several of his research associates, and 82,909 were Defendant's Notre Dame emails and personnel records.[3] In any event, this argument is a red herring. Defendant's *Franks* claims are directed at Student #1 and focus on the initial complaints to KU and the FBI and Student #1's statements, none of

---

[2] The second forwarded email referenced in Defendant's response, Def. Resp. at 3 n.2, seems to be an after-the-fact attempt to excuse the delayed *Franks* motion. It, too, was not so significant as to prevent Defendant from filing his *Franks* motion and accusing the affiant of lying.

[3] As reflected in Government Exhibit A, the KU and Notre Dame materials were provided to the defense in their original format when they were received by the government in October 2019 and May 2020.

which is new and most of which he has raised before, at least to a degree, in his premature November 2019 motion to dismiss.

With respect to the discovery productions, Assistant U.S. Attorney Mattivi, an experienced prosecutor who has since retired from the Topeka Branch after years of public service, produced most of the discovery in this case to the defense and did so in its original form as native files. Additionally, despite being represented by experienced and capable counsel (Doc. 151, ¶ 1), and notwithstanding the parties' frequent engagement about discovery over the last two years, *see* Def. Ex. 7 ("[T]he government has regularly and promptly addressed your monthly, if not weekly, discovery-related and factual questions . . . ."),[4] Defendant never asked for the discovery in any other format, with one exception discussed below, nor does he claim now to have done so.[5] Instead, the government suggested Bates numbering the bulk of the discovery and providing a discovery log to the defense for the benefit of the parties when it became apparent to the government that trial was likely. *See* Gov. Ex. B (Email Dated March 17, 2021). The government's good-faith offer to help the parties in the ongoing litigation resulted in what Defendant calls the "searchable database."[6] But it does not change the fact that Defendant

---

[4] The parties have exchanged numerous emails in this case. Based on a cursory review, the defense has sent the government at least 200 emails. The parties have also communicated by phone when necessary to resolve issues, and the government responded to two substantial discovery letters in late 2020. Should the Court require it, the government is prepared to share these communications, in addition to the ones attached to the defense's response and hereto.

[5] Defendant's suggestion that the native version of the emails was not searchable, *see* Def. Resp. at 9, is belied by the fact that his premature November 2019 motion to dismiss was based, in part, on emails that he identified from the original native productions. *See* Mot. to Dismiss (Doc. 30) (attaching numerous exhibits from Defendant's Gmail account in native format).

[6] The defense initially did not seem interested in having the reproduction in load files as part of a "searchable database." The defense contacted the government on May 18, 2021, to "get a better sense for which materials are most relevant" before it "decide[s] what to load." *See* Gov. Ex. C (Email Dated May 18, 2021). In response, the government noted that, "despite being

had those materials long before the government reproduced them with Bates numbering and that the majority have little to do with Defendant's late *Franks* motion.

### C. Defendant Could Have Made an Informed Decision to File a Suppression Motion Before August 20, 2020

For the first time, Defendant claims in his response that he was unable to make an informed decision about whether to file the *Franks* motion because the government only recently produced the forensic reports for the electronic devices and identified certain emails from his Google account. Def. Resp. at 7. This argument makes no logical sense. Defendant was well-positioned to know that there was incriminatory evidence—*i.e.*, evidence worth seeking to suppress—in his own Google account and on his own electronic devices. No one knows the content of that account and those devices better than Defendant. Regardless, his counsel certainly knew the importance of that evidence. The following are but a few examples:

- The August 19, 2019, search warrant, which the defense received in late August 2019, described incriminating emails from the Google account.

- In April 2020, while the parties were discussing electronic evidence discovery and navigating the terms of the protective order, the defense made clear that Defendant's KU workstation was of paramount importance. The basis for that position is clear given the evidence that the workstation contains. For example, it contains Defendant's Chang Jiang Scholar application in connection with his employment at Fuzhou University and his National Natural Science Foundation of China grant applications, which he submitted through Fuzhou University while employed by KU.

- In May 2020, the government provided the defense with audio files from Defendant's KU workstation, as well as draft summary translations. The files consist of numerous calls that Defendant recorded, including calls with individuals from Fuzhou University. The calls set forth Defendant's scheme.

- In May 2020, while the parties continued to discuss the electronic evidence discovery and navigate the terms of the protective order, the defense informed the government that it had engaged with an ESI vendor with the goal of at least extracting user-generated files from Defendant's KU workstation. *See* Def. Ex. 6. The defense intended to send those

---

voluminous, [the] materials were previously disclosed (unless otherwise noted)" and agreed to discuss the reproduction and answer questions about any specific materials. *Id.*

6

files to Defendant for his review. The government worked with the defense to ensure that it could do so without violating the protective order.

Related to this good cause claim, Defendant seems to accuse the government of discovery violations. This implicit argument ignores the history of the government's cooperation with the defense with respect to the electronic evidence and otherwise. Moreover, the parties engaged the Court on this topic at the April 30, 2020 status conference, and despite the parties raising the prospect of litigation over the production of the imaged devices, none ensued. Gov. Ex. D (Transcript).

The parties first engaged about the electronic evidence at the early stages of this prosecution. *See* Gov. Ex. E (Email Dated April 21, 2021). The defense sought native or TIFF files, metadata, and a load file for the contents of all the imaged devices. *Id.* The government explained that the defense's request was virtually impossible to satisfy, because the devices contained terabytes of data, and identified FTK Imager (free software) as a possible solution. Gov. Ex. F (Email Dated April 29, 2021). As an alternative, the government offered to provide "hot docs," and the defense agreed. *Id.*[7] The government memorialized its understanding of how the parties had resolved the earlier electronic evidence discussions in an email to the defense. Gov. Ex. G (Email Dated April 19, 2019). The defense did not disagree with the government's characterization and has not otherwise made any specific requests or filed any discovery motions. Specifically, on April 19, 2021, the government wrote:

> You may remember that [Assistant U.S. Attorney Mattivi] offered to provide what you characterized as "hot docs" (and which we understand to mean items we may use at trial) from the imaged devices you received in discovery. We are awaiting the final forensic reports for the devices, and we intend to produce those when we have them. Those final reports will include certain items (or "hot docs") from the devices and will be bates stamped.

---

[7] The government also offered to load the images onto a computer in the FBI forensic lab's "defense review room" and make the materials available to the defense to be reviewed at its own leisure. *See* Gov. Ex. E at 1.

Gov. Ex. G at 5.

In the same April 2019 exchange, the parties discussed how the government could best provide to the defense certain items from seized electronic devices in advance of final forensic reports. Gov. Ex. G at 4-5. The government then produced 247 files from Defendant's KU workstation and a thumb drive. Gov. Ex. H (Discovery Letter Dated April 26, 2021). In response to that production, the defense asked whether "those [have] all previously been produced." Gov. Ex. G. at 1. The government responded: "Yes, those files are from the imaged devices and removable media that were produced in discovery on April 6, 2020, and September 2, 2020," to which the defense replied, "Got it. Thanks." *Id*. These exchanges and the government's discovery letter undermine Mr. Zeidenberg's statement that he and Mr. Dearington "were uncertain that [they] had seen certain of these documents before" and that they "had questions about when and how the government obtained them." (Doc. 151, ¶ 4).

Once the final forensic reports for the electronic devices were complete, the government produced those to the defense. *See* Gov. Ex. I (Discovery Letter Dated August 6, 2021); Gov. Ex. J (Discovery Letter Dated August 30, 2021); Gov. Ex. K (Discovery Letter Dated September 13, 2021). With respect to the timing, as the government explained to the defense in the August 19, 2019, email attached to Defendant's response:

> [T]he government's diligent review of this device and the multiple other devices, which contain terabytes of data and numerous Chinese-language items, has taken some time to complete and items have been identified as potentially relevant on a rolling basis. It's our understanding that HARCFL [the FBI's forensic lab] will not produce a forensic report until a review is complete and that report was produced to the government and then provided to you on August 6th.

Def. Ex. 6 at 1. Notably, while the defense replied to the government's August 19th email, it did not further discuss the electronic evidence. Four days later, Defendant filed his surprise untimely

8

*Franks* motion, which also did not discuss the electronic evidence as a basis for good cause. *Franks* Mot. at 2 n.1. Now, for the first time in his September 20, 2021 brief, he raises the electronic evidence in a failed attempt to explain away the tactical timing of his *Franks* motion.

**D.     Defendant Has Failed to Show Prejudice**

The government did not "concede" prejudice as Defendant wrongly asserts. Def. Resp. at 10. Rather, Defendant never filed a motion for leave, nor did he otherwise argue prejudice at any time. Until now, the defense has made no prejudice-based argument to which the government could respond.

Defendant's argument that he will suffer prejudice if the Court grants the government's motion fares no better than his other meritless assertions. Defendant's logic is circular:  he claims that if the Court considers his *Franks* motion and finds that it has merit, then of course he would suffer prejudice if the Court rejected it as untimely. Def. Resp. at 10. He offers nothing more other than to reassert his discovery violation claims, which are addressed above. *Id.* at 10-11.

Defendant cannot claim prejudice, however, when he clearly timed the filing of his last-minute motion to create a strategic advantage before trial. Defendant submits that his willingness to accept a continuance is proof that his much-delayed motion was not tactical. Def. Resp. at 13. But forcing a continuance is, in fact, tactical.[8] Had the motion been based on a last-minute realization, as he appears to claim, he should have simply engaged the Court and the government. He had multiple opportunities to do both. Instead, he surprised all involved with his

---

[8] Defendant twice mentions a continuance in his response, and once in his *Franks* motion. Def. Resp. at 1 ("[T]he defense would agree to a continuance if the government finds it necessary."), 13 ("The defense's willingness to accept a trial continuance, if required."); *Franks* Mot. at 2 n.1 ("[T]he defense . . . understands that a continuance of trial may be necessitated by this motion."). Mr. Zeidenberg further states that "the defense continues to be amenable to continuing the trial date." (151, ¶ 36). The government is ready for trial. If Defendant requires more time to adequately prepare, he should be explicit, so that the record is clear.

late filing less than a week after the August 17, 2021 status conference. A defense email to the courtroom deputy lays bare the calculated timing of the motion: on August 26, 2021, without engaging the government, the defense informed the deputy that it was "expecting that under [the local rules] and absent an order from the Court to the contrary, the government would file its response within 14 days . . . mean[ing] the [government's] response is due 9/7," the day before the September 8, 2021, status conference.

## II.     CONCLUSION

In sum, Defendant filed his *Franks* motion on August 23, 2021, without leave from the Court, more than a year after the pretrial motions deadline and approximately two months before trial. Defendant filed his motion to create a strategic advantage before trial. And as a result, extensive litigation has ensued during the critical trial preparation period. The Court should reject this attempt at gamesmanship and strike Defendant's late, meritless motion.

Respectfully submitted,

/s/ Benjamin Hawk
Benjamin J. Hawk
Adam P. Barry
Trial Attorneys
National Security Division
U.S. Department of Justice

/s/ Christopher Oakley
D. Christopher Oakley
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas

**CERTIFICATE OF SERVICE**

      I hereby certify that on the 26th of September, 2021, I caused the foregoing reply to be filed with the Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

                                               */s/ Christopher Oakley*
                                               D. Christopher Oakley
                                             Assistant United States Attorney
                                             United States Attorney's Office for the
                                             District of Kansas