# UNITED STATES DISTRICT COURT
## District of Kansas

UNITED STATES OF AMERICA,

        Plaintiff,

        v.                          Case No.   **19-20052-01-JAR**

FENG TAO,

        Defendant.

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* #2: TO EXCLUDE EVIDENCE REGARDING CHINA AND TO EXCLUDE OR REQUEST A *DAUBERT* HEARING REGARDING DR. GLENN TIFFERT'S TESTIMONY (Doc. 157)**

The Court should deny Defendant's motion *in limine* to exclude evidence and argument under Fed. R. Evid. 401 and 403 regarding (1) the People's Republic of China ("PRC") government; (2) talent plans; (3) intellectual property theft; and (4) how Defendant's scheme benefitted the PRC or its Chinese Communist Party ("CCP"). First, the evidence that the government plans to present related to these topics is relevant to the pending charges. Defendant's hidden work for Fuzhou University ("FZU") in the PRC and participation in the PRC Ministry of Education's Changjiang Distinguished Professor talent recruitment program are at the center of his fraudulent scheme. His lies to the University of Kansas ("KU") and the U.S. government relate to his activities in the PRC. Evidence explaining what the Changjiang Scholars Program is and what Defendant's participation in the program entailed will assist the

jury in understanding Defendant's fraudulent scheme and why his statements to KU and the U.S. government were false.[1]

Second, contrary to Defendant's argument, mere mention of the PRC will not "enflame the jury against Dr. Tao" and cause them to "scapegoat Dr. Tao for China's conduct." Def. Mot. in Lim. #2 at 5. Rule 403 "is an extraordinary remedy [that] should be used sparingly." *United States v. Watson*, 766 F.3d 1219, 1241 (10th Cir. 2014).[2] Here, the government will present evidence showing that, as part of his work for FZU as a Changjiang Distinguished Professor, Defendant physically spent a significant amount of time at FZU, built a competing laboratory and scientific equipment at FZU, recruited post-doctoral students and professors to FZU, and applied for research grant funds in the PRC on behalf of FZU. This evidence goes to heart of, and there is relevant proof of, Defendant's fraudulent scheme and false statements. Of course, Defendant finds it prejudicial because it is incriminating, but it is not *unfairly* prejudicial, nor will it confuse the jury. *Cf. United States v. Rodriguez*, 192 F.3d 946, 950-51 (10th Cir. 1999) ("If that [expert testimony] is interpreted by the jury to connect Rodriguez to a drug ring or to bad people who smuggle drugs, that cannot be considered 'unfair' prejudice since that is at the core of the criminal charges against him.").

Finally, Dr. Glenn Tiffert's expected expert testimony should not be excluded under *Daubert* or Fed. R. Evid. 401, 402, 403, or 702. Dr. Tiffert is a research fellow at the Hoover Institution at Stanford University and a historian of modern China. He has written and spoken

---

[1] The government has not charged Defendant with intellectual property theft and does not intend to accuse him of that at trial. Testimony regarding the PRC government's objectives in promoting foreign recruitment programs are relevant to understanding the context in which such programs exist, but will be only a minor portion of the government's case in explaining Defendant's fraud.

[2] Unless otherwise noted, all internal quotation marks and citations are omitted in this brief.

extensively about how specific activities of the PRC government, such as foreign talent recruitment programs, impact the U.S. research enterprise. His expected testimony, which is based on his years of studying the PRC government's efforts to acquire foreign technology and talent to further the PRC's economic development, will be relevant, helpful to the jury, and not unduly prejudicial. His testimony will provide useful context, and the jury should hear it.

I.     **The Court Should Not Exclude Evidence and Argument regarding the PRC**

   a.  **PRC Government Talent Programs[3]**

Evidence regarding the PRC government's involvement in talent recruitment plans like the Changjiang Scholars Program is relevant to understanding Defendant's fraud. A key task of the jury in this case will be determining whether Defendant should have disclosed his work at FZU to KU, the U.S. Department of Energy, and the National Science Foundation. Whether Defendant complied with his disclosure obligations will be dictated, in part, by the nature of his activities at FZU. Therefore, understanding what inferences can reasonably be drawn from the evidence about the nature of Defendant's work at FZU will be critical.

For example, if Defendant argues, as he has in prior motions, that he "never accepted a professorship or worked at Fuzhou University," Def. Rule 15 Mot. at 3, it will be important for the jury to understand how the PRC government, through the Ministry of Education, was involved in Defendant's work at FZU; that Defendant's activities as a Changjiang Distinguished Professor involved both FZU and the Ministry of Education; and Defendant would not have been permitted to do certain things in the PRC, such as apply for grants while listing his employer as

---

[3] Because the PRC has a one-party political system and the CCP is the sole governing political party, the terms PRC government and the CCP can be used interchangeably. Here, the government will use the term PRC government.

FZU, without approval of the PRC government. Similarly, evidence regarding the purpose of the Changjiang Distinguished Professor program – including regulations promulgated by the Ministry of Education – will help contextualize how Defendant's recruitment efforts were in furtherance of his attempt to build a team at FZU that would advance the PRC government's publicly disclosed industrial objectives. Moreover, evidence regarding the rigorous selection process of Changjiang Distinguished Professors will help the jury understand Defendant's statements and actions leading up to and during his work at FZU as a Changjiang Distinguished Professor (*e.g.*, why FZU needed to sponsor his application, why Defendant flew to the PRC to defend his application in person, and how the Ministry of Education would provide some funding to support an awardee's position at a PRC university).

Another example of the relevance of such evidence is Defendant's Changjiang Distinguished Professor application itself. Because the PRC government ultimately decided whether Defendant would receive the prestigious award, Defendant explained in his application (which was submitted with FZU's express support) how his proposed work at FZU would benefit the PRC government's national development goals:

> Based on Franklin Tao's 20 years of experience in surface science research and his 12 cumulative years of technological development and apparatus design for near-ambient pressure photoelectron spectroscopy, Franklin Tao plans to complete the design and installation of an atmospheric pressure photoelectron spectrometer [AP-XPS] within two years. This achievement will give China a position of technological superiority in this field and cause China to occupy domestic and international markets.[4]

As will be shown through emails, testimony, and Defendant's recorded phone calls of himself, after he became a Changjiang Distinguished Professor and started working at FZU, he began building the as-promised AP-XPS machine.

---

[4] This, and much of the evidence previewed in this brief, are FBI translations of the original Chinese.

Moreover, evidence describing the PRC's political system, including the fact that it is a communist party-led state, will contextualize some of the evidence that will be presented to explain Defendant's fraudulent scheme.  Universities in the PRC, like FZU, are governed by a dual structure whereby CCP members are involved in making decisions that, in a typical U.S. university, would be made solely by the university's academic affairs personnel.  This explains why Defendant worked with FZU leadership to seek additional research funds from the provincial-level government in the PRC (also run by CCP members) and why, after his acceptance was announced, he publicly met with prominent CCP members at FZU to tout his forthcoming work at FZU.  Understanding the importance of the CCP in the PRC will also contextualize evidence like a May 11, 2018 letter from FZU's College of Chemistry CCP Party Committee that evaluates "Comrade Tao Feng" on his political performance and teaching ethics.  Because the PRC is a unitary political system, it will be helpful for the jury to hear testimony about the CCP's role in universities in the PRC and that CCP membership in the PRC means something different than political party membership in the United States.

Another example of how helpful evidence regarding the PRC government's use of talent recruitment plans will be to a jury concerns statements made by Defendant and others at FZU in which they discuss the need to conceal Defendant's selection as a Changjiang Distinguished Professor and work at FZU.  Defendant told one post-doctoral student whom he tried to recruit from a U.S. university to FZU not to tell anyone else about Defendant's Changjiang Scholar award.  He told the student that if others asked about it, he should pretend that he did not know anything.  In another conversation that Defendant recorded, he and the FZU president discussed details of the arrangement and the FZU president said, "don't, um, leave any trace in, in, um, in writing . . . .  But you can't leave it in writing or anything.  Because that would be evidence!"

Defendant was acutely aware that was he was doing at FZU was wrong and he went to great lengths to conceal it from KU and the U.S. government.  Expert testimony describing how, as an empirical matter, the PRC government has become less transparent with talent recruitment programs will help a jury contextualize these conversations.

Evidence describing the Changjiang Scholars Program will also assist the jury in weighing the evidence and evaluating the reasonableness of inferences from the evidence.  For example, it will be useful for the jury to understand that there are dozens, if not hundreds, of different talent recruitment programs in the PRC, but that the Changjiang Distinguished Professor program is one of the most prestigious.  This explains why it took a great deal of work for Defendant to apply to the program (including an in-person Ph.D.-like defense in the PRC) and why the award was a mark of achievement for Defendant.  Testimony describing that the Changjiang Scholars Program targets elite-level faculty in specific fields of study, such as Defendant's discipline of physical chemistry, to train the next generation of faculty and researchers in the PRC and bring technology to the PRC will show that Defendant's statements and actions were consistent with being a Changjiang Distinguished Professor.

Explaining Defendant's fraudulent scheme necessarily includes evidence of the PRC talent recruitment plan and Defendant's work at FZU that he hid.  Defendant's generic arguments about unfair prejudice ignore the fact that Defendant's scheme was intrinsically connected to a PRC government-led program that was intended to further the PRC government's industrial and economic objectives.  Evidence and argument related to the PRC government and talent recruitment programs are relevant in explaining Defendant's scheme, but the focus of the trial will not be the PRC government.  It will be Defendant.  Any risk of unfair prejudice is outweighed by the probative value that such evidence will provide.  *See United States v.*

*Rodriguez*, 192 F.3d 946, 951 (10th Cir. 1999) (explaining that evidence is only unfairly prejudicial if it increases the risk of conviction by adversely affecting the jury's attitude toward the defendant in a manner unrelated to his guilt or innocence).

### b. Lack of Transparency and Misconduct in PRC Talent Programs

The government does not intend to put the PRC government's technology acquisition strategies on trial. It does not intend to accuse Defendant of criminal conduct for which he has not been charged, including intellectual property theft. *See* Gov. Mot. in Lim. at 5 ("[Defendant] is charged with a money and property fraud scheme. Any uncharged crimes are irrelevant."). But in understanding how the PRC government encourages individuals like Defendant to participate in talent recruitment program (*e.g.*, financial and reputational benefits like those promised to Defendant), it is useful to understand how a program like the Changjiang Scholars Program fits into the PRC government's broader policy objectives. This will be a minor portion of the government's case and will be presented via expert testimony to explain how PRC talent recruitment plans, like the one Defendant concealed his participation in from KU and the U.S. government, are different than other countries' talent recruitment plans because they are often less transparent. This context also will assist the jury in drawing certain inferences from statements made by Defendant and others regarding the need for secrecy. And it will provide an explanation for why many of the open source reports that described Defendant as a Changjiang Distinguished Professor at FZU were removed from the Chinese language internet after Defendant was indicted.

### c. Whom Defendant's Scheme Benefitted

Defendant's scheme primarily benefitted himself. He fraudulently obtained money from KU and the U.S. government. That will be the focus of the government's case. Evidence or

7

argument of any tangential benefit that the PRC government or FZU obtained will be introduced only to explain, contextualize, and prove Defendant's fraudulent scheme and false statements.

Evidence and argument concerning the PRC government's use of talent recruitment programs generally, and the details of the Changjiang Scholars Program in particular, are important to understand how Defendant's specific acts were in furtherance of his fraudulent scheme and why his statements to KU and the U.S. government were false.  Such evidence and argument are essential to helping jurors understand Defendant's fraud, which involved a PRC government talent recruitment plan they likely will be learning about for the first time.  At most, Defendant's objections to the categories of argument and evidence described above are best left for trial where the specific context will assist the Court in making an evidentiary ruling. Therefore, Defendant's motion *in limine* to exclude evidence regarding (1) the PRC government; (2) talent plans; (3) intellectual property theft; and (4) how Defendant's scheme benefitted the PRC or the CCP should be denied.

## II. Dr. Tiffert is Well Qualified and His Proposed Expert Testimony is Highly Probative of Defendant's Fraudulent Scheme and False Statements

Federal Rule of Evidence 702 allows expert testimony at trial in the form of an opinion or otherwise if:

(a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) The testimony is based on sufficient facts or data;
(c) The testimony is the product of reliable principles and methods; and
(d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Before admitting expert testimony under Rule 702, the Court must first make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is

scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). The trial court acts as a gatekeeper to preclude unreliable and irrelevant expert testimony. *Kuhmo Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999). An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004). Rule 702 should be applied consistently with the "liberal thrust" of the Federal Rules and its general approach of relaxing traditional barriers to "opinion" testimony. *Daubert,* 509 U.S. at 579. The party offering the expert bears the burden of establishing by a preponderance of the evidence that Rule 702 is satisfied. *Id.* at 593, n.10. The court's "gatekeeping" function ultimately favors admissibility of expert testimony when it is relevant and reliable. *Burton v. R.J. Reynolds Tobacco Company*, 183 F.Supp.2d 1308, 1311 (D. Kan. 2002). Ultimately, any issue regarding the weight and credibility of the expert's testimony rests with the trier of fact.

      **a. Dr. Tiffert's Qualifications**

As described in the government's July 23, 2021 Rule 16 disclosure, Dr. Tiffert "is a specialist on the political and legal history of the [PRC], and he has worked extensively with government and civil partners to document and build resilience against authoritarian interference with democratic institutions." Def. Mot. in Lim. #2, Ex. 1. He has a Ph.D. in Modern PRC History from Cal. Berkeley and a Masters in East Asian Studies from Harvard University. He is a fluent Mandarin speaker and has extensively studied and written about the PRC government's efforts to acquire foreign technology and talent. He manages the Hoover Institution's China

Global Sharp Power Project, which researches the PRC government's sharp power[5] activities around the world, and serves on the executive committee of the Academic Security and Counter-Exploitation Program, which is an association of U.S. universities established to address the threat foreign adversaries pose to U.S. academic institutions.

Dr. Tiffert also has spoken and written extensively about the risk that certain PRC government activities, including talent recruitment programs, pose to U.S. academic institutions. He regularly briefs academic institutions, civil society partners, and government officials on these issues and has testified before Congress.[6]  He participates in academic and policy panels regarding these topics,[7] advises academic institutions and government officials on how best to mitigate such risks, and frequently engages with other scholars in this area to peer review or serve as an outside reader of publications on these topics, including foreign talent recruitment programs.  Dr. Tiffert's publications also support his qualifications.  A few examples: he edited

---

[5] "Sharp power is an approach to international affairs that typically involves efforts at censorship or the use of manipulation to sap the integrity of independent institutions.  This approach takes advantage of the asymmetry between free and unfree systems, allowing authoritarian regimes both to limit free expression and to distort political environments in democracies while simultaneously shielding their own domestic public spaces from democratic appeals coming from abroad."  C. Walker, *What is Sharp Power*? Abstract, 29 Journal of Democracy 9 (July 2018), https://www.journalofdemocracy.org/articles/what-is-sharp-power/.

[6] *See The Long Arm of China: Exporting Authoritarianism with Chinese Characteristics*, Hearing before the Congressional-Executive Commission on China (Dec. 13, 2017), transcript *available at* https://www.govinfo.gov/content/pkg/CHRG-115hhrg28385/html/CHRG-115hhrg28385.htm.

[7] Defendant cherry picks 20 seconds from a 70-minute video to argue that Dr. Tiffert "has advocated for decreasing collaborations between U.S. and Chinese scientists."  Def. Mot. in Lim. #2 at 10.  This is misleading.  When watched in full, it is clear that Dr. Tiffert is arguing that U.S. researchers should not collaborate with seven specific institutions in the PRC (the so-called "Seven Sons of National Defense") because those institutions support the PRC military's modernization.  All seven schools are now on the U.S. Commerce Department's Entity List.

and co-authored the July 2020 report *Global Engagement: Rethinking Risk in the Research Enterprise* (attached as Exhibit A), which is an extensive study of public research collaboration between U.S.-based researchers and counterparts from the Seven Sons of National Defense in the PRC; he wrote the May 2020 report *Compromising the Knowledge Economy: Authoritarian Challenges to Independent Intellectual Inquiry* (attached as Exhibit B), which describes how authoritarian regimes are exploiting vulnerabilities in open knowledge economies like the United States; and he contributed to the November 2018 report *China's Influence & American Interests: Promoting Constructive Vigilance* (attached as Exhibit C), which attempts to document the extent of the PRC government's expanding influence operations in the United States.  He has also been quoted in national news publications on the risks of research collaboration with universities in the PRC.[8]

An expert may be qualified by "knowledge, skill, experience, training, or education." *Daubert*, 509 U.S. at 589 (quoting Fed. R. Evid. 702).  As described above, Dr. Tiffert has the knowledge, skill, experience, training, and education to offer expert testimony on the topics outlined in the government's Rule 16 notice.  Therefore, he is qualified under Fed. R. Evid. 702. *See Rushing v. Kansas City S. Ry. Co.*, 15 F.3d 496, 507 (5th Cir. 1999) ("As long as some

---

[8] *See, e.g.*, N. Subbaraman, *US investigations of Chinese scientists expand focus to military ties*, Nature (Sept. 3, 2020), https://www.nature.com/articles/d41586-020-02515-x; J. Rogin, *The coronavirus crisis shows the risks of scientific collaboration with China*, Wash. Post (Apr. 23, 2020), https://www.washingtonpost.com/opinions/global-opinions/the-coronavirus-crisis-shows-the-risks-of-scientific-collaboration-with-china/2020/04/23/4ccd5850-85a8-11ea-878a-86477a724bdb_story.html.  Defendant cites to a comment thread regarding the controversy over the U.S. company Zoom blocking accounts affiliated with two prominent Tiananmen Square activists to argue that Dr. Tiffert will use "inflammatory and militant language" that could inflame the jury.  Def. Mot. in Lim. #2 at 10 n.8.  Notably, Defendant omitted the first sentence of Dr. Tiffert's comment ("Oops, they did it again."), which shows that he intentionally adopted a colloquial and punchy tone to persuade readers engaged in an online conversation about current events.  Here, when acting as an expert witness, his tone will be different.

reasonable indication of qualifications is adduced, the court may admit the evidence without abdicating its gate-keeping function. After that, qualifications become an issue for the trier of fact rather than the court in its gate-keeping capacity."); *accord Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("The question of whether the expert witness is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based.").

### b. Dr. Tiffert's Proposed Testimony is Relevant, Reliable, and Not Unfairly Prejudicial

Defendant's next challenge to Dr. Tiffert can be summed up in three words: relevance, reliability, and prejudice. The relevance of Dr. Tiffert's proposed expert testimony has already been discussed, *see supra* 3-8, but it is worth providing two more specific examples. First, Dr. Tiffert plans to testify that "[i]n the PRC, formal documents (such as applications to PRC government authorities for research funds or support) are typically finalized using an official seal or stamp." Def. Mot. in Lim. #2, Ex. 1 at 3. This will help the jury assess the significance of PRC Ministry of Education or FZU stamps on numerous exhibits that will be introduced at trial, including Defendant's Changjiang Scholar Program application and his research proposals to the National Natural Science Foundation of China. It also will explain how the parties to a Changjiang Distinguished Professor contract would typically finalize their agreement. *See Summers v. Missouri Pacific R.R. System*, 132 F.3d 599, 603 (10th Cir. 1997) ("[H]elpfulness to the trier of fact evaluates relevancy.").

Second, Dr. Tiffert's proposed testimony concerning the Changjiang Distinguished Professor program will assist the jury in understanding how Defendant's actions at FZU furthered his fraudulent scheme. The evidence will show that consistent with Dr. Tiffert's

proposed testimony regarding what the PRC's Ministry of Education expects Changjiang Distinguished Professor to do, Defendant attempted to build an "ecosystem" underneath him at FZU to help "fill the PRC's technological gaps, train the next generation of faculty and researchers in the PRC, bring technology to the PRC, and establish the PRC as a world leader on the targeted field of study." *Id.* at 2. The government expects Defendant to argue that whatever work he performed at FZU was unpaid, informal, part-time, and/or as a consultant. Specifically, based on Defendant's prior filings, the government expects him to argue that he was simply helping his former post-doctoral students, namely Yu Tang, who took a job at FZU purportedly after leaving KU, with their work because that is what international collaboration looks like.[9] Dr. Tiffert's proposed testimony will, as well as other evidence the government plans to present at trial, show that such an argument is nonsensical in light of how the PRC's Ministry of Education and provincial-level academic institutions like FZU actually administer the Changjiang Scholars Program.

Defendant also argues that the government's Rule 16 disclosure for Dr. Tiffert failed to include "the bases and reasons for his opinions." Def. Mot. in Lim. #2 at 12. This is inaccurate. The Rule 16 notice described Dr. Tiffert's background in this area, detailed the eleven topics on which Dr. Tiffert might offer expert testimony, and attached Dr. Tiffert's CV. *Id.*, Ex. 1. The government also disclosed to Defendant FBI summary reports of interviews with Dr. Tiffert which provided even greater details of his opinions and the bases for them. Defendant argues in a conclusory fashion that this additional information "fail[s] to adequately show the bases and reasons for" Dr. Tiffert's opinions, *id.* at 12 n.13, but it is not clear what additional information

---

[9] The evidence suggests that Yu Tang actually started working at FZU before his employment with KU ended. Yu Tang also is one of the witnesses Defendant sought to depose under Rule 15.

13

about Dr. Tiffert's opinions Defendant seeks. Moreover, it is well established that an expert's reliable methodology may consist primarily of applying his or her personal knowledge and experience to the facts of a case. *See Kumho*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). This is what Dr. Tiffert intends to do here.

Defendant relies heavily on an unpublished March 4, 2021 district court order from *United States v. Xiarong You* to argue that Dr. Tiffert's proposed testimony is unreliable and unfairly prejudicial. But Defendant leaves out a few things. In that order, which was specific to General Spalding (one of the noticed PRC experts in that case), the district court concluded that while it was excluding General Spalding's proposed expert testimony, it was not making "a final ruling" and "would entertain a more limited and non-prejudicial expert witness proffer." Def. Mot. in Lim. #2, Ex. 3 at 22. It also did not exclude the proffered testimony of Professor Chung whom the government in that case had noticed as an alternate PRC talent recruitment program expert. *Id.*

In a subsequent published ruling the next month, the *You* Court admitted the expert testimony of General Spalding's alternate, Professor Naughton.[10] *See United States v. You*, 2021 WL 1432595, --- F.Supp.3d ---- (E.D. Tenn. Apr. 15, 2021). The government called Professor Naughton, a professor of economics with a specialty in the PRC's economy, to provide expert testimony regarding "the Chinese government's efforts to obtain foreign technology, the Thousand Talents Program and related local talent programs, and the Chinese government's structure and the extent to which the national-level government exerts direction and control over

---

[10] The government originally identified Professor Tai Ming Chung as the alternate, but then switched to Professor Barry Naughton because Professor Chung became unavailable for personal reasons.

local governments." *Id.* at *1.  The defendant there, like Defendant here, challenged Dr. Naughton's proposed testimony under Fed. R. Evid. 702, 401, 402, and 403.

In denying You's motion *in limine*, the district court concluded that:

> While the actual talent program applications will be useful in determining the factual circumstances of this case, they are otherwise of little utility to a lay jury without any context.  Without any expert testimony, the jury will lack a complete understanding of the talent programs' significance within China, and the talent programs' role and purpose in the PRC's greater goal of cutting-edge technology acquisition.  Furthermore, an American jury, while very familiar with our structure of government, might not be as familiar with the inner workings of a modern day one-party Socialist republic, like the PRC, and will find Dr. Naughton's proposed testimony helpful to understand the dynamic between the national governing body and local provincial authorities in the PRC's governmental system.

*Id.* at *2.

The district court also found Dr. Naughton's testimony reliable.  Although Dr. Naughton had "not published any works regarding the use of Chinese talent programs," the court opined that such traditional *Daubert* reliability factors were of "limited utility in the context of this case where the proposed conclusions and reasoning are rooted in a social and not a hard science." *Id.* at *4.  The court then rejected this argument concluding that, "[t]he fact that there is not one article that specifically and explicitly refers to the use of Chinese talent programs in its title is not dispositive considering the list of recent relevant publications . . . ." *Id.*  Notably, Defendant fails to mention this subsequent order in its discussion of *You*.  Accordingly, Dr. Tiffert's proposed testimony is reliable and should be permitted.

Lastly, Defendant argues that Dr. Tiffert's proposed testimony would be unfairly prejudicial and confuse or mislead the jury.  As already described, Dr. Tiffert's testimony will help the jury understand how Defendant's fraudulent scheme operated and why his statements to KU and the U.S. government were false.  Without an expert like Dr. Tiffert, presenting Defendant's fraud to a jury without context would provide an inaccurate and incomplete picture

15

of Defendant's scheme and would make their job as fact finders unnecessarily difficult. Moreover, unlike what the *You* Court found so problematic with General Spalding's proposed testimony, Dr. Tiffert's scholarship and work has primarily focused on empirical analysis and policy recommendations, and avoided the charged political rhetoric contained in Dr. Spalding's book. *Contra* Def. Mot. in Lim. #2, Ex. 3 at 21 (quoting some of General Spalding's statements from his book *Stealth War: How China Took Over While America's Elite Slept* that the court found objectionable). Indeed, Dr. Tiffert has done quite the opposite. In a May 2020 panel hosted by the International Forum for Democratic Studies, Dr. Tiffert began his discussion of how democracies should respond to authoritarian governments' attempts to target academia by stating:

> So what should we do? Let me start by emphasizing what we shouldn't do. We shouldn't conflate race with the practices I've described. These troubling practices are common to a range of authoritarian regimes across the globe and the local actors in democratic societies who are complicit to them or fall prey to them also profess a spectrum of identities. It is practices and empirically justified risk profiles that we should target, not individual people. And the measures we adopt should be judged on the merits. Now racism is real and repugnant and we must constantly be alert to it, but we also need to learn how to keep more than one idea in our heads at the same time. The national security strategy of the United States has identified the PRC and Russia as strategic competitors and they actually do behave like ones. Universities must recognize that and adapt to this even if it is in tension with their universalizing mission to seek and spread knowledge. The reality is that this tension hardly burdens Russia or the PRC where we are reminded time and again that the knowledge sector is ultimately an instrumentality of the regime. The most powerful figure on campus in China is not the university president, but the party secretary.[11]

---

[11] *Compromising the Knowledge Economy: Authoritarian Challenges to Independent Intellectual Inquiry*, National Endowment for Democracy (May 15, 2020), *available at* https://www.youtube.com/watch?app=desktop&v=KtjsbwRVxDw&feature=youtu.be (13:12 to 14:28). Dr. Tiffert's last statement about the role of the party secretary in a PRC university is another example of why his proposed testimony will help a jury understand the significance of exhibits at trial, such as the news article, "Secretary Chen Youngzheng Pays a Visit to the School of Chemistry's Changjiang Scholar of the Ministry of Education and Distinguished Professor Tao Feng" which includes a photograph of Secretary Chen and Defendant having tea together.

16

Dr. Tiffert will help a jury understand Defendant's fraudulent scheme and false statements. It likely will damage Defendant's case. But "Rule 403 does not protect a party from all prejudice, only unfair prejudice." *Deters v. Equifax Credit Info. Servs.*, 202 F.3d 1262, 1274 (10th Cir. 2000). Therefore, Dr. Tiffert's testimony should not be excluded under Rule 403.

### c. A *Daubert* Hearing is Unnecessary Given Defendant's Ability to Cross Examine Dr. Tiffert

This Court, in fulfilling its "gatekeeping" role, does not have to hold a pretrial *Daubert* hearing whenever a defendant requests one. *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) ("It is within the discretion of the trial court to determine *how* to performs its gatekeeping function under *Daubert*. The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated." (emphasis in original)). The court also may "satisfy its gatekeeper role when asked to rule on a motion in limine, or an objection during trial . . . ." *Id.*; *see also United States v. Nacchio*, 555 F.3d 1234, 1245 (10th Cir. 2009) ("[Defendant] had no entitlement to a particular method of gatekeeping by the district court."). The court just needs "sufficient evidence to perform the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.*

### III. Conclusion

In sum, Defendant fails to explain why the court should exclude the identified categories of evidence at this time. He also fails to effectively challenge Dr. Tiffert's proposed expert testimony or justify the need for a *Daubert* hearing. For these reasons and those discussed above, the Court should deny his motion.

Respectfully submitted,

*/s/ Adam P. Barry*
Adam P. Barry

17

        Benjamin J. Hawk
        Trial Attorneys
        National Security Division
        U.S. Department of Justice

        */s/ Christopher Oakley*
        D. Christopher Oakley
        Assistant United States Attorney
        United States Attorney's Office for the
        District of Kansas

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of October, 2021, I caused the foregoing response to be filed with the Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

> */s/ Christopher Oakley*
> D. Christopher Oakley
> Assistant United States Attorney
> United States Attorney's Office for the
> District of Kansas