**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 19-20052-JAR-JPO |
| | ) | |
| FENG TAO | ) | |
| a/k/a "Franklin Tao," | ) | |
| | ) | |
| Defendant. | ) | |

**DR. TAO'S OPPOSITION TO GOVERNMENT'S**
**OMNIBUS MOTION IN LIMINE AND**
**<u>NOTICE OF INTENT TO INTRODUCE EVIDENCE</u>**

In its Omnibus Motion in Limine ("Gov't MIL"), the government maintains that the case against Dr. Tao is a "straightforward" fraud case that alleges "crimes that fall within the heartland of traditional money and property fraud." ECF No. 156 at 1. Therefore, the argument goes, there is no reason for the defense to discuss extraneous matters such as the China Initiative, as doing so would "confuse" the jury. The Indictment and the evidence the government seeks to introduce to prove its case, however, make clear that this case is anything but a "straightforward" or "heartland" fraud case.

The Indictment alleges a fraud scheme whose purpose was "for TAO to benefit the PRC by participating in a 'talent plan'" – an allegation that belies a garden variety fraud scheme – and references China over 60 times.[1] In addition, the government also seeks to call an expert witness to testify, *inter alia*, how: (i) China has "prioritized scientific and technological development and has implemented a pragmatic strategy to accelerate that development"; (ii) China "directly and

---

[1] *See also* ECF No. 88 (government opposition to motion to dismiss, which states nine times that Dr. Tao's alleged scheme was aimed at benefitting China).

1

indirectly encourages the use of a variety of lawful and unlawful means to achieve that objective";
and (iii) Chinese talent programs – such as the Changjiang Scholar program that Dr. Tao was
allegedly a participant in – "play an important role in the PRC government's national development
strategy by incentivizing persons with access to advanced scientific and technological information
to transfer that information and skills to the PRC in exchange for reputational and financial
benefits." ECF No. 157-1 at 3. The government has also revealed its intent to try to prove that Dr.
Tao had a "covert and hidden engagement with a foreign government," ECF No. 88 at 45, and had
"entered into an agreement with the Chinese government to further the PRC's major strategic
needs," *id.* at 2, because "he sought to make the PRC a world leader in the field of renewable
energy," sought "integration into Chinese Community Party circles," *id.* at 12, and his alleged
employment in China would "imbue him with feelings of patriotism, ambition for a strong PRC,
and dedication to the service of the PRC." *Id.*

To call this a "straightforward" fraud case that "fall[s] within the heartland of traditional
money and property fraud" is disingenuous at best. The government's intention is clear: It plans
to try to prove that Dr. Tao became a Changjiang Scholar in order to benefit China by providing it
"advanced scientific and technological information." ECF No. 157-1 at 3. In other words, in
everything but name, the government will try to prove that Dr. Tao was working as a foreign agent
to covertly benefit a foreign government that is hostile to the United States.

For the reasons stated in Dr. Tao's Motion in Limine #2, ECF No. 157, the government's
proffered evidence regarding China's alleged malevolent use of talent programs to induce
scientists in the United States to steal intellectual property to benefit China is irrelevant; China is
not on trial and its alleged motivation for establishing talent programs sheds no light on whether

Dr. Tao committed fraud against the University of Kansas (KU), the National Science Foundation, and the Department of Energy by failing to disclose outside employment.

Nevertheless, the government's failed efforts to find evidence of espionage by Dr. Tao should not be off limits to the defense, as these efforts show the motives and biases of the FBI agents involved in the case. It is undeniable that the investigation of Dr. Tao was pursued as a counter-espionage case. The lead case agent – Stephen Lampe – is from the Counterintelligence Squad of the FBI. Two of the three prosecutors on this case are from the National Security Division of the Justice Department – not the Kansas U.S. Attorney's Office. And the decision to pursue this case as a counterintelligence investigation – rather than a "heartland" fraud case – caused the FBI agents to make fundamental errors that likely would not have occurred had this truly been "just" a typical fraud case. The defense must be permitted to explore those errors and how and why they were made.

To be sure, much of the government's Omnibus Motion in Limine aims to prohibit Dr. Tao from seeking jury nullification by arguing that he should be acquitted because: (i) he is a "victim" of the China Initiative, (ii) he was wrongly suspected of being a spy, (iii) he is a victim of selective prosecution, or (iv) he will face a harsh punishment if convicted. Dr. Tao does not intend to argue for acquittal on these bases, and the Court can therefore deny these aspects of the motion as moot. But the remainder of the government's motion improperly seeks the Court's permission to present a sanitized version of its investigation at trial – which would give the false impression that the investigation was unbiased and reliable – and seeks to prevent the defense from putting before the jury the quality and reliability of the government's investigation.

The government's Omnibus Motion in Limine seeks to improperly curb any meaningful examination of the FBI agent witnesses' biases, motivations, and credibility, or any critique of

their biased investigation, in which they viewed innocent evidence through the prism of assumed guilt, and ignored exculpatory evidence at every turn. If granted, the government's motion would deprive Dr. Tao of the opportunity to confront and effectively cross-examine the witnesses against him, in violation of his Sixth Amendment rights guaranteed by the Confrontation Clause. Accordingly, for the reasons stated in Sections I through V below, the Court should deny the government's Omnibus Motion in Limine. In addition, for the reasons stated in Section VI below, the Court should deny the government's Notice of Intent to Introduce Evidence, ECF No. 155.

## ARGUMENT

I.    **MIL #1: THE DEFENSE DOES NOT INTEND TO ARGUE THAT DR. TAO IS THE VICTIM OF AN UNJUST GOVERNMENT DRAGNET.**

Dr. Tao does not intend to argue that he should be acquitted because he is a "victim" of the China Initiative, so to the extent the government seeks to preclude such argument its motion should be denied as moot. But the government's motion goes much further. It argues that Dr. Tao should be barred from even mentioning the China Initiative. ECF No. 156 at 5. Such a restriction would unconstitutionally infringe Dr. Tao's right under the Sixth Amendment's Confrontation Clause to impeach government investigators about their biases, motives, credibility, and the quality of their investigation, including the extent to which the China Initiative bears on those issues.

"The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him,'" including by guaranteeing "an opportunity for effective cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79 (1986) (holding that by "cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause"); *see* U.S. Const. amend. VI. Courts "have recognized that

effective cross-examination is critical to a fair trial because cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *United States v. Kohring*, 637 F.3d 895, 904–05 (9th Cir. 2011) (brackets and internal quotation marks omitted) ("[W]e, like the Supreme Court, have emphasized the policy favoring expansive witness cross-examination in criminal trials."). Thus, while courts have discretion to determine the scope and extent of cross examination, "that discretion must be exercised with due regard for the defendant's constitutional rights … of confrontation and cross-examination." *United States v. London*, 424 F. Supp. 556, 566 (D. Md. 1976) (internal quotation marks omitted), *aff'd sub nom. United States v. Clerkley*, 556 F.2d 709 (4th Cir. 1977).

The constitutional right to cross-examine witnesses includes the right to "show bias, motive, or prejudice on the part of a witness," which "is an integral part of cross-examination" that "speaks to the reliability of the witness." *United States v. Abboud*, 438 F.3d 554, 580 (6th Cir. 2006) (internal quotation marks omitted). As the Supreme Court has explained, "[t]he partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony. We have recognized that the exposure of a witness'[s] motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974) (citation omitted). "When one exposes bias, motive, or prejudice of a witness, one is calling into question the credibility of that witness'[s] testimony." *Abboud*, 438 F.3d at 580; *see United States v. Salem*, 578 F.3d 682, 686–87 (7th Cir. 2009) ("Proof of bias or motive to lie is admissible impeachment evidence. Indeed, exposing a witness's motive to lie is a 'core value' of the Sixth Amendment's Confrontation Clause." (citations omitted)); *United States v. Yagman*, No. CR 06-227(A)-SVW,

2007 WL 9724391, at *5 (C.D. Cal. May 16, 2007) ("Defendant is entitled to question the government's witnesses concerning their credibility, bias, and reliability.").[2]

The FBI agent witnesses' awareness of the Department of Justice's China Initiative and the ways in which it influenced their investigation is probative of their bias, motives, and credibility. The China Initiative was meant to identify and prosecute "Chinese trade theft cases."[3] FBI Director Christopher Wray gave speeches about the importance of the China Initiative and focused on the threat posed by academics with ties to China.[4] As the pressure to find Chinese spies mounted, AAG John Demers sent a message to every U.S. Attorney's Office: "You're not going to do 125 cases in a year as a U.S. Attorney's Office. You're going to do maybe one, which would be great. If you do two, that's very impressive. If you do none, that's understandable and you'll get there next year."[5] This message was heard clearly by the FBI agents in this case: Counterintelligence agents are expected to bring China Initiative cases, and while there are no strict quotas, it is "great" and "impressive" if an agent can bring one in.

For a junior FBI special agent like Stephen Lampe, assigned to the Counterintelligence Squad in Kansas City, and for even more senior agents, the prospect of bringing one of the first

---

[2] *See also* 27 Fed. Prac. & Proc. Evid. § 6095 (2d ed.) (noting that bias "causes a witness to be predisposed for or against a party," "can undermine the accuracy of witness perception," "calls into question the reliability of witness recollection," "raises questions concerning the sincerity of a witness," and "calls into question the accuracy of witness narration"). Evidence of witness bias is never cumulative. *Kohring*, 637 F.3d at 904.

[3] Attorney General Jeff Sessions Announces New Initiative to Combat Chinese Economic Espionage, Dep't of Justice, Nov. 1, 2018, https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-announces-new-initiative-combat-chinese-economic-espionage.

[4] Speech of Dir. Christopher Wray, The Threat Posed by the Chinese Government and the Communist Party to the Economic and National Security of the United States, July 7, 2020, https://www.fbi.gov/news/speeches/the-threat-posed-by-the-chinese-government-and-the-chinese-communist-party-to-the-economic-and-national-security-of-the-united-states.

[5] *Inside DOJ's Nationwide Effort to Take on China*, Politico, Apr. 7, 2020, https://www.politico.com/news/2020/04/07/justice-department-china-espionage-169653.

espionage cases in the country under the China Initiative – a priority of the NSD and FBI leadership – represented a once-in-a-lifetime career-making opportunity. It also explains why Lampe – the lead case agent – conducted a biased investigation that failed to ask witnesses the critical questions and ignored any exculpatory evidence or alternative explanations for conduct that contradicted the government's preconceived notions of guilt.

The defense is entitled to demonstrate that FBI agent witnesses are highly motivated to tilt their testimony in favor of trying to convict Dr. Tao. The government has trumpeted this case as a China Initiative exemplar in multiple press releases and its main China Initiative webpage.[6] A conviction would be a personal success for Lampe and the other agents who investigated the case, while an acquittal would be a career failure that also risks undermining the already-embattled China Initiative.[7] The pressure on agents to testify in a way that results in a conviction is unusually

---

[6] *See Information about the Department of Justice's China Initiative and a Compilation of China-Related Prosecutions Since 2018*, Dep't of Justice, June 14, 2021, https://www.justice.gov/nsd/information-about-department-justice-s-china-initiative-and-compilation-china-related; *University of Kansas Researcher Indicted for Fraud for Failing to Disclose Conflict of Interest with Chinese University*, Dep't of Justice, Aug. 21, 2019, https://www.justice.gov/opa/pr/university-kansas-researcher-indicted-fraud-failing-disclose-conflict-interest-chinese; *New Indictment: KU Researcher Concealed Being Recruited for Chinese 'Talent' Program*, Dep't of Justice, Jan. 15, 2020, https://www.justice.gov/usao-ks/pr/new-indictment-ku-researcher-concealed-being-recruited-chinese-talent-program.

[7] Ninety members of Congress have called on the Attorney General to investigate the China Initiative, and the news media has examined the failures and abuses of the China Initiative. *Rep. Lieu and 90 Members of Congress Urge DOJ Probe Into Alleged Racial Profiling of Asians*, July 30, 2021, https://lieu.house.gov/media-center/press-releases/rep-lieu-and-90-members-congress-urge-doj-probe-alleged-racial-profiling; Ellen Nakashima & David Nakamura, *China Initiative Aims to Stop Economic Espionage. Is Targeting Academics Over Grant Fraud "Overkill"?*, Washington Post, Sept. 15, 2021, https://lieu.house.gov/media-center/press-releases/rep-lieu-and-90-members-congress-urge-doj-probe-alleged-racial-profiling; Jack Queen, *"Overheated": How a Chinese-Spy Hunt at DOJ Went Too Far*, Law360, Sept. 28, 2021, https://www.law360.com/whitecollar/articles/1425776/-overheated-how-a-chinese-spy-hunt-at-doj-went-too-far?nl_pk=fe6bc9ea-cfd1-4418-8f47-13391371270a&utm_source=newsletter&utm_medium=email&utm_campaign=whitecollar.

great. This same pressure directly influenced how Lampe conducted the investigation that led to these charges.

The defense is also entitled to present evidence that the investigation of Dr. Tao was adversely affected by the pressure the agents felt to bring a China Initiative case. This pressure resulted in a rushed investigation in which the key witnesses were only interviewed *after* Dr. Tao was arrested and indicted and in which the agents ignored any evidence that was inconsistent with the government's theory of the case. *See United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998) ("[T]he quality or bias of a criminal investigation" can "affect the reliability of particular evidence in a trial, and hence, the facts surrounding the government's investigation may become relevant"); *United States v. Anderson*, 36 F. Supp. 2d 1264, 1268–69 (D. Kan. 1998) (finding evidence that "the testifying FBI agent conduced a biased investigation by ignoring exculpatory evidence" is "highly material" and could "affect the outcome of the case"); *see also Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 304 (3d Cir. 2016) (trial court "unreasonably disregarded the impeachment value of the evidence in discrediting the … adequacy of the investigation"); *United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000) ("Details of the investigatory process potentially affected Inspector Morris's credibility and, perhaps more importantly, the weight to be given to evidence produced by his investigation."); *Yagman*, 2007 WL 9724391, at *6 ("Defendant is entitled to inquire about the quality of the investigation so far as it bears on the credibility, validity, or probative weight of specific evidence produced by the witness's investigation"); *Gillispie v. Timmerman-Cooper*, 835 F. Supp. 2d 482, 509 (S.D. Ohio 2011) (evidence that "would have allowed [the defendant] to impeach Det. Moore with respect to his investigation of the crimes for which [the defendant] was tried and convicted … could

reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict").

In addition, the motivations and pressures from the high-profile China Initiative colored every investigative decision Lampe and his team made, and it caused them to disregard substantial exculpatory evidence. Indeed, after the FBI received reports from Government Informant that Dr. Tao was a Chinese spy, it initiated a full-fledged espionage investigation without any valid predicate or evidence to corroborate Government Informant's espionage accusations. That the FBI agents focused their investigation on espionage, rather than fraud, rendered their investigation biased and unreliable.[8] The FBI agents' strong yet baseless suspicions that Dr. Tao was a spy created a bias that caused them to view neutral evidence—such as ambiguous Conflict of Interest forms, or an attempted collaboration between KU and Fuzhou University—as evidence of guilt. It also led them to the otherwise inexplicable decision not to even attempt to inquire of any witnesses from Fuzhou University to determine if, in fact, Dr. Tao was ever accepted a position there and/or had received a salary.[9]

The government's focus on espionage caused it to disregard multiple types of exculpatory evidence that tended to show the absence of fraud and false statements. For instance, it failed to pursue lines of questions with KU and the agencies that would have shown that that there was widespread confusion over what information needed to be disclosed in Conflict of Interest forms and grant applications; the absence of any training related to the forms; or the unfamiliarity of KU

---

[8] The government's hypothetical that the government's falsely accusing Dr. Tao of being a spy during trial is the same as the defense's truthfully noting that he was investigated for being a spy but no evidence was found is unavailing. Gov't MIL at 6 n.3. The former is a false and prejudicial accusation; the latter is a correct and relevant statement.

[9] It was only in mid-2021 – nearly two years after indicting Dr. Tao and after the defense sought Rule 15 depositions of key personnel at Fuzhou University – that the government decided it was time to pursue this line of inquiry.

researchers with lengthy university or agency policies. It failed to inquire whether Dr. Tao had used the grant funds he's now charged with stealing to satisfactorily perform all research as required by the grants. Instead of conducting a fair-minded investigation, the FBI was determined to bring a case against Dr. Tao and then later sought to find evidence to justify the charges, rather than vice versa. Like "Maslow's hammer," the cognitive bias that holds that "to a hammer, everything looks like a nail," the FBI agents viewed all evidence with suspicion, and pursued no lines of inquiry that could exonerate Dr. Tao. Without cross-examining the agents about how the China Initiative impacted their investigation in this way, the jury will be unable to properly weigh their credibility and the reliability of their evidence.

In this way, the government's argument that the China Initiative "has no bearing whatsoever on Defendant's guilt or innocence" is a red herring. Gov't MIL at 4–5. The defense has no intention to examine the China Initiative in isolation, only the extent to which the China Initiative impacted the FBI agents' biases, motivations, and credibility, as well as the quality of their investigation. The jury needs to hear this evidence in order to properly assess the credibility of the FBI agent witnesses and give appropriate weight to their testimony.

## II.    THE GOVERNMENT'S FAILED ATTEMPT TO PROVE DR. TAO WAS A SPY IS INEXTRICABLY INTERTWINED WITH THE MERITS IN THIS CASE.

The government contends that the Court should bar Dr. Tao from arguing that the FBI investigated him for economic espionage and trade secret theft but found no evidence of espionage so it was forced to "settle[] on fraud charges" and that evidence of these uncharged crimes is irrelevant. Gov't MIL at 5–6. At the same time, the government seeks to introduce evidence that Dr. Tao schemed "to benefit the PRC by participating in a 'talent plan'" designed by China to lure scientists like to Dr. Tao back to China where "by lawful and unlawful means" it could obtain his "scientific and technological information." ECF No. 157-1 at 2 (expert notice).

In other words, the government wants it both ways: It should be permitted to introduce evidence that Dr. Tao was a willing and knowing participant in a program designed by China to benefit China and harm the United States – in essence, he was a foreign agent working to benefit a hostile foreign government. But, according to the government, the defense's hands should be tied so that it cannot show that despite the government's expansive espionage investigation, the government found no evidence of espionage or intellectual property theft, and Dr. Tao is only alleged to have misrepresented outside employment in two Conflict of Interest forms he submitted to KU and in grant application paperwork. This result would put a weighty thumb on the scale in favor of the government.

The government's plan to try to prove that Dr. Tao was covertly seeking to benefit China, and that China aims to steal intellectual property from the West through talent plans, means that it is not just relevant, but highly exculpatory, that the government searched for evidence that Dr. Tao transferred intellectual property to China, or that he was an agent of the Chinese government, and found nothing. The lack of this evidence is only compelling and exculpatory if the jury is aware that the government conducted a massive investigation to find it. Just as it is relevant in a murder case that there was no evidence admitted of a defendant's fingerprints at the scene of a crime, this is only compelling evidence if the jury is made aware that the police, in fact, thoroughly searched for this evidence and found none. The same logic applies here: It is not enough for the defense to be able to say that there was no evidence presented that Dr. Tao transferred intellectual property to China; it is critical for the jury to know that the government searched every aspect of Dr. Tao's life for this evidence to support its theories and found none.

Even if the Court were to properly exclude the government's evidence regarding China, moreover, evidence of the government's fruitless espionage investigation would still be important

to issues of motive, bias, and credibility. The agents' commitment of extraordinary resources toward investigating Dr. Tao for espionage or FARA violations gives them a personal stake in the outcome of the case. *See, e.g.*, *United States v. Infelise*, No. 90 CR 87, 1991 WL 251651, at *1 (N.D. Ill. Nov. 19, 1991) (stating that a "proper cross" included "questioning the case agents regarding whether they have invested much time and effort in the case, and if so, whether they have a stake in the outcome of the case as a result of their investment of time and effort"). The FBI agents used drones to watch Dr. Tao's home, had teams of agents surveil not just Dr. Tao, but also members of his family and students who worked in his lab. Agents obtained years of bank records of members of Dr. Tao's church in attempt to find evidence that he was a spy for China. This enormous investment in time, energy and resources increases the likelihood that the agents "have a stake in the outcome of the case as a result of their investment of time and effort." *Id.* An acquittal, in contrast, would call into question the FBI agents' decisions to use such tools as drones and in-person surveillance of Dr. Tao's family members – a result the agents have a personal interest in avoiding.

The FBI's decision to open a full-fledged espionage investigation based on hearsay from Government Informant – an extortionist who had confessed to lying to the FBI about Dr. Tao, stealing identities, and hacking email – is also probative of the FBI agents' credibility, bias, competence, and lack of good judgment exercised in this case.[10] The jury should know that the FBI agents' biases caused them to uncritically follow a false, unsubstantiated lead, and that the FBI's previous missteps in this case created a motive to try to save face by securing a conviction.

---

[10] Dr. Tao hereby incorporates by reference the Background and exhibits to his Franks Motion, and assumes the Court's familiarity with that motion and the facts therein. *See Franks* Motion, ECF No. 127.

In sum, the Court should not leave the jury with the false impression that the FBI agents conducted an exemplary investigation into whether Dr. Tao committed fraud and false statements, when, in reality, the FBI conducted a fruitless espionage investigation and then used evidence from that dry hole to bring fraud and false statement charges, despite not fairly searching for innocent explanations and exculpatory information that undermine the charges. Not only is the narrative that the government conducted a standard fraud investigation untrue, but it shields the jury from seeing the FBI agents' biases, motivations, and credibility issues, and it precludes them from giving proper weight to the evidence generated during the government's faulty, spy-focused investigation.

## III. MIL #3: DR. TAO HAS NO INTENTION OF MAKING A SELECTIVE PROSECUTION ARGUMENT TO THE JURY.

The government argues that the Court should bar Dr. Tao from raising a selective prosecution claim or from "backdoor[ing] such a claim" by arguing that the government had a discriminatory purpose or effect in charging him with fraud and false statements. Gov't Opp. at 6–7. Dr. Tao does not intend to raise a selective prosecution claim or defense at trial and, therefore, this motion can be denied as moot.

Of course, Dr. Tao is entitled to cross-examine the extent to which the FBI agents' views on China bear on their biases, motives and credibility, and the quality of their investigation. The government has made clear that it believes China's alleged intellectual property theft and other activities increase the likelihood that Dr. Tao committed fraud and made false statements. That is why the government seeks to introduce irrelevant expert testimony on these topics. And this is why the government mentions China more than 60 times in the Indictment, and alleges that Dr. Tao committed the alleged fraud for the purpose of benefitting China. To be sure, China's alleged conduct is *irrelevant* to the allegations against Dr. Tao, and the government should not be

permitted to introduce testimony regarding the Chinese government, talent plans, or intellectual property theft. ECF No. 157. But the FBI agents' biases and prejudices toward China *are relevant*. If an FBI case agent believes that a person is more likely to conceal information from an employer with a fraudulent purpose because it relates to activities in China, that is a bias that the jury should consider when weighing the agents' testimony and the evidence the agent generated during the investigation.

The Tenth Circuit's decision in *United States v. Bryant*, 5 F.3d 474, 476 (10th Cir. 1993), which the government cites, supports this conclusion. There, the court found no Sixth Amendment violation where the defendant sought to cross-examine an officer regarding whether the government charged him based on his race, because a selective prosecution claim must be raised before trial. *Id.* Critically, however, the court stated that it "agree[s] with Defendant's assertion that the ability to impeach a witness based on bias is guaranteed by the Sixth Amendment right to confrontation," and this included questioning the officer "concerning whether the officer possessed any racial biases." *Id.* at 476.

That is precisely what the Court should allow here. Dr. Tao does not intend to examine whether the government *charged* him based on his race, or whether the FBI agents have any racial animus against Chinese persons in general. Rather, the defense does seek to examine whether the FBI agent witnesses have biases that may impact their credibility or the credibility of the evidence they generated during their investigation

In the first major China Initiative trial involving alleged grant fraud, the district court reached the same conclusion as the one supported by Dr. Tao here. In *United States v. Hu*, the government filed a motion in limine to exclude selective prosecution arguments, and the Court granted the motion "to [the] extent defendant seeks to introduce evidence that would support a

claim of selective prosecution," but the Court held that it "will not limit inquiries into the bias or motivation of specific witnesses." *United States v. Anming Hu*, No. 3:20-cr-00021-TAV-DCP, Minute Order (E.D. Tenn. June 2, 2021), ECF No. 99. The same result should attach here.

## IV.    MIL #4: DR. TAO DOES NOT INTEND TO BLAME GOVERNMENT INFORMANT FOR HIS ALLEGED FRAUD AND FALSE STATEMENT CHARGES.

The government argues that Dr. Tao should not be able to "blame" Government Informant for Dr. Tao's alleged fraud and false statements as a defense. Gov't MIL at 7–8.[11] This argument is meritless for multiple reasons.

First, while Dr. Tao does not intend to "blame" Government Informant as a "defense" for the alleged fraud and false statements, if he ultimately discovers evidence that she is responsible for the alleged offenses, he is entitled to introduce that evidence. *See, e.g.*, *United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996) (observing that "[f]undamental standards of relevancy … require the admission of testimony which tends to prove that a person other than the defendant committed the crime that is charged"); *United States v. Barreiro*, No. 13-CR-00636-LHK, 2015 WL 7734139, at *1 (N.D. Cal. Dec. 1, 2015) (denying government motion in limine seeking to preclude defendants from arguing that "other individuals, not Defendants, made the alleged misrepresentations" because they were "entitled to present that defense").

---

[11] The government refers to Government Informant in its Motion in Limine as "Student #1," a significant departure from when it repeatedly referred to her as an "informant" before Dr. Tao filed his *Franks* Motion. *See, e.g.*, ECF No. 35 at 1–7; ECF No. 54 at 21–23. This revisionist history does not change the fact that the government used her as an informant despite her ongoing extortion attempt, lies to the FBI, and other crimes. In any event, if the government no longer claims she was a confidential informant and does not know her whereabouts, in the interest of clarity the Court may want the parties to use her real name, and the real names of those she impersonated to provide false tips, at the October 14 and 15 hearings, just as they would at trial, in order to avoid confusion. The fiction that she was a legitimate confidential informant perpetuated by the government earlier in the case can be put to rest.

Second, Dr. Tao is also entitled to present evidence that Government Informant attempted to frame him and falsified evidence against him. *See, e.g.*, *Yagman*, 2007 WL 9724391, at *4 ("Defendant is permitted to present any evidence demonstrating how he may have been framed. ... Thus, evidence … is admissible to support Defendant's defense that he was framed."). The government does not deny that Government Informant sought to extort Dr. Tao for hundreds of thousands of dollars and threatened to falsely accuse him of being a "tech spy." *Franks* Motion Exs. 7, 15. The government also does not deny that, when Dr. Tao refused to pay, Government Informant *did* falsely accuse him of being a Chinese spy by creating fake email addresses for researchers in Dr. Tao's lab and reporting Dr. Tao to the FBI and KU using the stolen identities. *Franks* Motion Exs. 16, 17, 33, 36.[12] As detailed in Dr. Tao's Motion in Limine #1, ECF No. 153, Government Informant also confessed to the FBI that she hacked into a Fuzhou University email account believed by the government to be Dr. Tao's, and she subsequently hacked into it again at the FBI's direction. *Id.* at 2–5; *Franks* Motion Ex. 36.[13] This evidence suggests that Government Informant had a history of seeking to frame Dr. Tao, had taken affirmative steps to falsify evidence against him, and had the ability to falsify evidence against him with respect to the alleged Fuzhou University email account, which she either created or hacked into and then showed to the government to try to inculpate Dr. Tao. Dr. Tao is entitled to examine whether Government Informant did, or could have, fabricated evidence against him.

Third, Dr. Tao is also entitled to introduce evidence that the FBI agent witnesses relied upon Government Informant during its investigation to the extent it undermines the agents'

---

[12] Remarkably, the government argues that "the majority of the information [Government Informant] provided was ultimately verified. Gov't MIL at 7 n.5. The government does not specify which information was "verified," but it clearly does not include her primary allegations that Dr. Tao was a spy or that he had secretly started a company in China.

[13] Government Informant's statements are admissible under Federal Rule of Evidence 804(b)(3).

credibility. *See, e.g.*, *United States v. Sandoval*, 6 F. 4th 63, 88–89 (1st Cir. 2021) (noting that the district court properly permitted the defense to cross-examine the case agent about his use of an informant who had committed crimes "throughout the investigation" and "made false representations about these crimes to the FBI," even though the informant did not testify, because the case agent's "credibility might be undermined by the fact that he allegedly 'missed the fact' that [the informant] had been committing serious crimes and then lied to [the case agent] about doing so"); *cf. Orena v. United States*, 956 F. Supp. 1071, 1107 (E.D.N.Y. 1997) (Weinstein, *J.*) (noting that the FBI agent "would have been subjected to an equally withering cross-examination" at trial if the defense had known that the agent had relied on a "less than reliably objective" informant). Lampe used information obtained from Government Informant throughout the investigation, including in search warrant affidavits, despite her many crimes and his belief that the government should consider indicting her. *See* ECF No. 149 Ex. 9. Lampe's uncritical reliance on this information demonstrates, at best, a lack of competence, or, at worst, a lack of honesty. Either way, both would be relevant to his credibility and the quality of the investigation and the evidence he generated.

## V.    MIL #5: DR. TAO HAS NO PLAN TO INTRODUCE EVIDENCE OR ARGUMENT AT TRIAL ABOUT HIS POTENTIAL PUNISHMENT OR SENTENCE.

The defense does not intend to discuss Dr. Tao's potential sentence or punishment at trial, mooting the government's motion in this respect. Gov't MIL at 9.

## VI.    THE COURT SHOULD DENY THE GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE.

The Court should deny or defer ruling on the government's Notice of Intent to Offer Evidence Pursuant to Federal Rule of Evidence 902(4), 902(11), and 902(14), ECF No. 155 (the "Notice") because it is incomplete and does not provide adequate notice for the defense to be able to evaluate whether to object. *See* Fed. R. Evid. 902(11) ("Before the trial or hearing, the proponent

must give an adverse party reasonable written notice of the intent to offer the record--and must make the record and certification available for inspection--so that the party has a fair opportunity to challenge them."). The Court should also deny the Notice and motion to the extent it erroneously argues that Gmail communications should be self-authenticated as business or electronic records.

The Notice is incomplete in several respects. The Notice indicates that the government does not have a certification for the Federal Reserve Bank of New York records, which prevents the defense from assessing the adequacy of such certification. *Id.* at 2. The two U.S. Customs and Border Protection certifications (DOJ-00019398 and DOJ-01424295) do not state that the travel records were "made at or near the time" of the travel events discussed in them, as required by Rule 803(6). To the contrary, the travel record report attached to DOJ-00019398 appears to have been generated pursuant to the government's request and in support of its investigation, as it is dated August 22, 2019, the day after Dr. Tao was indicted and arrested (the travel records for DOJ-01424295 are not even identified in the Notice, and the next bates number after the certification is an unrelated electronic evidence collection report).

The Notice also fails to identify many of the documents to which the certifications purportedly apply, preventing the defense from assessing whether they meet Rules 803(6) and 902(11). For example, the Notice cites the "Chex Systems, Inc." certification, but does not identify any records to which that certification applies. *Id.* The Old National Bank entry in the government's table cites to DOJ-01413760, which appears to be a one-page Bank of America document, not an Old National Bank document. *Id.* The Bank of America entry states that documents were "produced without bates numbers," but does not identify any of the documents such that the defense can review them to see if they are business records. *Id.* The first JP Morgan

Chase entry cites to DOJ-00010240, which appears to be page 4 of a Department of Energy progress report, which has nothing to do with JP Morgan Chase. *Id.* at 3.

The Notice also refers to voluminous sets of documents without specifying which documents, if any, the government plans to actually introduce. For instance, the Notice refers to years of emails and other data from two Gmail accounts, which would take months or more for the defense to review in order to determine if it should object. *Id.* at 2. It also cites nearly 1,000 pages of bank records from JP Morgan Chase ("DOJ-00009499 et seq") and Old National Bank (DOJ-01413466) alone. The government cannot dump entire email accounts and reams of bank records on the defense without any disclosure of which documents, if any, it actually plans to introduce at trial, and then expect the defense to conduct a document-by-document review to determine if the records satisfy Rules 803(6) and 902(11).

The Court also should not permit self-authentication of entire Gmail accounts under Rules 803(6) and 902(11) based on mere certifications that the documents came from Google. *See, e.g.*, *United States v. Edwards*, No. 16-20070-01-CM, 2019 WL 5196614, at *11 (D. Kan. Oct. 15, 2019). In *Edwards*, the district court denied the same motion made by the same AUSA who makes it here (the case is conspicuously omitted from the government's brief). There, the government moved pre-trial for a ruling on the admissibility of Gmail communications under Rules 902(11) and 902(14). *Id.* at *11. In denying the motion, the court pointed to a string of cases that all hold that "substantive content contained in online chat or email communications cannot be self-authenticated by way of certification from the host provider's record custodian alone," and therefore "[a] Google … record custodian's certificate will not suffice for the government to authenticate any online communication's substantive content." *Id.* Rather, the certification "will self-authenticate only the limited facts that communications generally took place between

particular accounts, at particular times, on particular dates." *Id.* The same result should apply here. *See also United States v. Safavian*, 435 F. Supp. 2d 36, 39 (D.D.C. 2006) (denying motion to authenticate emails under Rule 902(11) where the emails were not "being offered under the business records exception to the hearsay rule").

For these reasons, the Court should deny or at least defer ruling on the government's motion until the government makes a fulsome disclosure as required by Rule 902(11), and the Court should deny the motion to the extent it seeks an order that the Gmail communications are self-authenticating. To be clear, the defense has no interest in prolonging trial with unnecessary custodian witnesses, but it must have the requisite information to determine if it should object to the relief sought by the government's motion.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motions in limine.

Dated:  October 1, 2021                         Respectfully submitted,

                                                /s/ Thomas H. Johnson
                                                Thomas H. Johnson #13688
                                                Petefish, Immel, Hird, Johnson,
                                                Leibold & Sloan, LLP
                                                842 Louisiana
                                                Lawrence, KS 66044
                                                Tel: (785) 843-0450
                                                Fax: (785) 843-0407
                                                tjohnson@petefishlaw.com

                                                Peter Zeidenberg
                                                Michael F. Dearington
                                                Laura Zell
                                                ARENT FOX LLP
                                                1717 K Street, NW
                                                Washington, DC 20006
                                                Tel: (202) 857-6000
                                                Fax: (202) 857-6395

Peter.Zeidenberg@arentfox.com
Michael.Dearington@arentfox.com
Laura.Zell@arentfox.com

*Attorneys for Defendant Franklin Tao*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of October, 2021, I electronically filed the foregoing

opposition brief with the Clerk of the Court using the CM/ECF system.

/s/ Thomas H. Johnson
Thomas H. Johnson