```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,

 4        Plaintiff,

 5        v.                              Case No. 19-20052-JAR

 6   FENG TAO, a/k/a "Franklin
     Tao,"                                Kansas City, Kansas
 7                                        Date:  14 October, 2021
          Defendant.
 8   .........................

 9                 TRANSCRIPT OF MOTIONS HEARING
              BEFORE THE HONORABLE JULIE A. ROBINSON
10            UNITED STATES CHIEF DISTRICT COURT JUDGE

11
                      A P P E A R A N C E S
12
     For the Plaintiff:
13
     Mr. Adam Berry                  Mr. Christopher Oakley
14   U.S. DEPARTMENT OF JUSTICE      U.S. ATTORNEY'S OFFICE
     950 Pennsylvania Avenue, NW     500 State Avenue
15   Washington, D.C. 20530          Suite 360
                                     Kansas City, Kansas 66101
16
     For the Defendant:
17
     Mr. Michael F. Dearington
18   Mr. Peter R. Zeidenberg
     ARENT FOX, LLP
19   1717 K Street NW
     Washington, D.C. 20006
20

21

22

23

24   _____
               Proceedings recorded by machine shorthand,
25      transcript produced by computer-aided transcription.
```

19-20052-JAR    USA v. Feng Tao    10.14.21                2

I N D E X


Government's Witnesses:                                      Page

STEPHEN LAMPE
    Direct Examination by Mr. Barry                          131
    Cross-Examination by Mr. Zeidenberg                      167


E X H I B I T S

Government's
Exhibits                    Offered              Received

        1                      41                  42
        2                      41                  42
        3                      41                  42
        4                      41                  42
        5                      41                  42
        6                      41                  42
        7                      41                  42
        8                      41                  42
        9                      41                  42
       10                      41                  42
       11                      41                  42
       12                      41                  42
       13                      41                  42
       14                      41                  42
       15                                          37
       16                      29                  32

```
 1                    P R O C E E D I N G S
 2           THE COURT:  We are here in United States versus Feng
 3   Tao.  The case number is 19-20052.  Your appearances, please.
 4           MR. OAKLEY:  Good morning, Your Honor.  May it please
 5   the Court, the United States appears by Chris Oakley and Adam
 6   Barry.
 7           MR. ZEIDENBERG:  Good morning, Your Honor.  Peter
 8   Zeidenberg and Michael Dearington on behalf of Dr. Tao, who is
 9   present.
10           THE COURT:  All right.  Thank you.
11           All right.  So we have a number of matters to take up.
12   We actually have scheduled two days.  I don't know if we'll
13   need two days, but we've scheduled today and tomorrow.  So I
14   wanted to start by giving you all a road map of how I -- like,
15   what order I'd like to take all of these matters in.
16           I think we should start with the matters pertaining to
17   the *Franks* hearing.  And then after that -- and that's going to
18   be evidentiary, the *Franks* hearing, or argument?
19           MR. ZEIDENBERG:  Well, we anticipate evidentiary, Your
20   Honor.
21           THE COURT:  Okay.
22           MR. BARRY:  Just to add, Your Honor, the government --
23   our expectation was we would argue today, and if an evidentiary
24   was needed, we would be -- agents would be available tomorrow.
25   Of course, if the Court decides that an evidentiary is needed,
```

19-20052-JAR    USA v. Feng Tao    10.14.21                    4

1    we can get them here today.

2            THE COURT:  Okay.  All right.  And then next I wanted

3    to take up the *limine* motion No. 3, which is Document 158,

4    which concerns hearsay primarily, arguments about hearsay.

5            And then after that I'd like to take up *limine* motion

6    No. 1, which is Document 157, which has to do with e-mails from

7    the Fuzhou University account, from that account.

8            And then next *limine* motion, No. 1, which is

9    Document 157, which has to do with the -- well, the request for

10    an adverse inference instruction and admissibility of all

11    e-mails from the Fuzhou University account.

12            And then after that, *limine* motion No. 2,

13    Document 157.  I'm not sure I have these document numbers

14    right.  That's not right.  But *limine* motion No. 2, which I'm

15    calling the motion about evidence pertaining to China.

16            And then after that the government's omnibus motion,

17    which is Document 156, which has to do with wanting to exclude

18    defenses relating to certain matters pertaining to China

19    primarily.

20            And then after that I'd like to get to the experts,

21    Document 154 and the motion for exclusion, alternatively for

22    *Daubert* hearing.

23            And after that I was going to ask you about the motion

24    to take depositions and a status update on that, followed by

25    what I call a *limine* conference, which is, you know, the final

1    hearing we have before trial and kind of walk through trial

2    procedures and anything else we need to do to get the case

3    trial ready, and then also the government's motion to continue

4    the trial date and to hear from you all on that.

5            So that's kind of the order I thought would make the

6    best sense.  So we could start with argument concerning the

7    motion for *Franks* hearing, the motion to strike, et cetera.

8            And your witnesses are not available today to the

9    extent we're going to have an evidentiary hearing on that,

10   correct?

11           MR. BARRY:  They're prepared for tomorrow.  The

12   agents, if we have time and you conclude that a *Franks* hearing

13   is warranted, can be here.  We would just need some time to

14   call them and get them over here.  Dr. Tiffert, who is the

15   expert for which there is a *Daubert* motion will not be here

16   until tonight.  He's flying in today.  So he would be only able

17   to testify tomorrow.

18           THE COURT:  All right.  Well, let's start with

19   defendant's motion for *Franks* hearing and to suppress evidence

20   from two search warrants.  This is Document 127.  The

21   government has responded -- the government has filed a motion

22   to strike, which is Document 141.  Defendants filed a response.

23   Government has filed a reply.

24           The government moves to strike from the record

25   defendant's motion to suppress as untimely, arguing that the

1   defendant has waived his right to file a motion to suppress

2   under Rule 12 by filing his motion after the August 14, 2020,

3   pretrial motions deadline and without good cause for delay.

4          The government argues that the defense filed the

5   motion to suppress shortly before trial and more than one year

6   after the pretrial motion deadline for tactical reasons and

7   contends the Court should at this point decline to extend the

8   pretrial motions deadline under Rule 45 because there's no

9   excusable neglect for delay.

10          I think I've already told you that the deadline that

11  was set for motions in 2021 only pertained to the motion for

12  depositions and that, in my view, this motion for *Franks*

13  hearing and motion to suppress is untimely, but I'm going to

14  deny the motion to strike but consider the timeliness arguments

15  raised in the motion to strike, as well as in the responsive

16  pleadings in resolving the motion to suppress.  So I do think

17  some of the arguments raised are germane to my decision with

18  respect to the motion to suppress, so I will be considering

19  them in that context, but I do want to proceed and hear the

20  motion to suppress and a *Franks* hearing.

21          I have the discretion to hold an evidentiary hearing

22  on this motion.  I know the government argues that the

23  defendant has failed to make the requisite showing that

24  entitles him to a *Franks* hearing.  Under *Franks versus Delaware*

25  defendant is entitled to an evidentiary hearing only if he

1    makes a substantial preliminary showing accompanied by an offer

2    of proof that a materially false statement has been made

3    knowingly and intentionally or with reckless disregard for the

4    truth and was included by the affiant in the warrant affidavit.

5           That said, the Tenth Circuit has explained that

6    nothing in *Franks* or the logic on which it rests suggests that

7    a district court must foreswear an evidentiary hearing unless

8    the defendant's motion makes one constitutionally compulsory.

9    I'm not going to rule on whether the defendant has made the

10   requisite showing for a *Franks* hearing.  I think the better way

11   to proceed is to just have a *Franks* hearing and ruling on this

12   issue.  So that's my intention.

13          Given that the agents aren't here, let's see how we

14   proceed today.  If there's a way to get them here this

15   afternoon, maybe we can do that, at least, and then wait for

16   Dr. Tiffert for tomorrow.  But I do think we should proceed and

17   have the evidentiary hearing for the record.

18          So do you want to have argument on it at this point or

19   wait until the agents are available?

20          MR. BARRY:  Our preference would be to hold argument

21   on the motion itself and then -- well, I guess if the Court has

22   concluded there's no -- you're at the point where you're ready

23   for the evidentiary hearing, then I think we would just need

24   time to call them and get them over here.  So we can recess

25   right now and do that if you'd like so that they can be over

```
1    here when we're done arguing the motions in limine, or if you'd
2    like to wait initially, we can obviously call them and have
3    them over here as well.
4         THE COURT:  I think we should just proceed with the
5    other motions at this point, and if you can see -- I think
6    we'll be ready for them this afternoon.  If you can get them
7    here this afternoon, that would be fine.
8         MR. BARRY:  Okay.  We can certainly send them a
9    message and get them here this afternoon.
10        THE COURT:  Okay.  Let's see how quickly we proceed
11   through these motions in limine and you can let me know what
12   time they can get here today.
13        Okay.  All right.  So the next thing I'd like to take
14   up is limine motion No. 3.  And this is the defendant's motion
15   seeking exclusion -- let me see if I can find it -- seeking
16   exclusion of incoming e-mails from third parties to the Fuzhou
17   University account, seeking exclusion of websites, seeking
18   exclusion of two unsigned contracts and an addendum that is
19   signed at least by the defendant purportedly.  So let's take up
20   argument on that first.
21        There we go.  Mr. Dearington.
22        MR. DEARINGTON:  Your Honor, do you mind -- you want
23   me to keep the mask on?
24        THE COURT:  No.  You can take it off.  It will help
25   the court reporter and everyone.
```

19-20052-JAR    USA v. Feng Tao    10.14.21                                9

1          MR. DEARINGTON:  I figured.

2          THE COURT:  So during COVID my practice has been if

3    you prefer to come to the lectern and argue, you can do that,

4    or you can stay seated at counsel table and use the microphone

5    there.

6          MR. DEARINGTON:  Thank you, Your Honor.

7          So, Your Honor, just to -- so that I'm starting where

8    you want me to, there were, as you noted, three categories of

9    hearsay that the defense moved to exclude under motion *in

10   limine* No. 3, and I think you might have listed them in reverse

11   order from how they appeared in our brief, so would you like me

12   to follow that sequence or start as laid out in our brief?

13         THE COURT:  Sorry.  Whatever sequence you want to

14   follow is fine.

15         MR. DEARINGTON:  Thank you, Your Honor.

16         As Your Honor noted, there were three categories of

17   hearsay that Dr. Tao has moved to exclude as inadmissible

18   hearsay that do not meet exceptions and/or under Rule 403

19   because the risk of prejudice -- of unfair prejudice

20   substantially outweighs the probative value, if any, of these

21   pieces of evidence.

22         Starting with the unsigned contract templates and

23   supplements, by my count there are roughly five unsigned

24   contract templates that I've seen and five of the so-called

25   addendum, which, to clarify, we are using the word "addendum"

1    because the government has proffered a translation that uses

2    that word but we're not conceding that translation is correct.

3    In fact, I think from our review the word "supplement" may be

4    more precise, but that likely does not have a bearing on the

5    outcome of this motion, so I may refer to it as an addendum or

6    supplement variously throughout our argument.

7            So what are these documents, what do they purport to

8    be?  They are unsigned contract templates, so something like a

9    4- or 5-page employment contract that lays out various terms to

10   work at FZU between Dr. Tao and FZU.  Not a single version of

11   these five or so unsigned templates, which is actually what

12   they're called on the document, is signed and the government

13   has not identified a single version of this unsigned contract

14   that is signed by either Dr. Tao or Fuzhou University.  So we

15   wouldn't even call these contract offers.

16           Typically in contract law an offer has to be something

17   that can bind another person, so you would expect to see at

18   least one signature and then the tender of the document.  There

19   are no signatures on any of these unsigned templates.

20           And then the second category of document is the

21   supplement or so-called addendum, which is a single-paragraph

22   document that says that FZU, the university, would, if the

23   parties had entered into it, provide certain funding to

24   research at FZU for Dr. Tao if he were to come to work at FZU.

25           These are separate documents.  The one version of the

1    addendum that includes a signature -- that appears to include a

2    signature that the government contends is Dr. Tao's signature

3    does not reference the unsigned contract template, and there

4    are multiple versions of the so-called addendum, including ones

5    that post date the version that purportedly includes Dr. Tao's

6    signature.

7             So to recap, we're talking about a set of unsigned

8    templates that have different terms in each and a set of

9    so-called addenda or supplements that also, I believe, have

10   different terms such as amounts of funding in each, only one of

11   which earlier on from other ones purports to include Dr. Tao's

12   signature.

13            Now, both sets of these categories are quintessential

14   hearsay.  The government admits in its papers it plans to

15   introduce these documents in order to prove the truth of the

16   matters asserted in them; namely, that performance, as laid out

17   in these unsigned templates or in the addendum or supplement,

18   actually occurred.  And the case law on this is fairly clear.

19   We cited roughly six or seven cases that state that contracts

20   or documents similar to contracts cannot be used to prove

21   performance of the contract because that would be a hearsay

22   purpose.

23            And, as a reminder, here we're not even talking about

24   contracts.  We're talking about unsigned templates.  So the

25   government cannot use the provisions in these unsigned

1    templates in order to prove that Dr. Tao actually performed

2    under these unsigned templates or that FZU performed under

3    these unsigned templates; for example, to show that Dr. Tao

4    worked full-time at Fuzhou University as stated in the template

5    and had no other work as stated in the template, something I

6    think the government would concede is untrue since they allege

7    that Dr. Tao continued to work at KU and had a class in the

8    fall of 2018.

9            The government, therefore, plans to use these

10   exclusively for a hearsay purpose and for no other purpose and

11   they've identified none in their opposition.

12           They have, however, revealingly sought to satisfy

13   certain exclusions or exceptions.  The first one is under Rule

14   801(d)(2)(B).  The adoptive admission or adoptive statement

15   argument is as follows according to the government:

16           An adoptive statement or admission is, one, if the

17   statement is offered against an opposing party and, B, is one

18   the party manifested that it adopted or believed to be true.

19           Some of the cases that the government has cited for

20   this proposition in other places include cases where someone

21   might suggest that someone has committed a crime and the person

22   does not deny it.  So that's just an example that the

23   government has elsewhere pointed to.

24           The government argues that Dr. Tao adopted the

25   statements in the supplement by allegedly signing the

1    supplement.  But that's just not the case.  Even if this were

2    a -- to be construed, and now we're just talking about the

3    supplement, because there is no signature on any of the

4    unsigned contract templates.  But the supplement -- if I sign a

5    one-paragraph statement saying that if both parties enter into

6    a particular agreement, I will paint party B's house, that does

7    not -- that cannot be used to prove that I have adopted the

8    statement that I have painted party B's house.

9        When someone signs even a contract offer, they are not

10   adopting as true the statements in the offer.  In fact, as we

11   all know from contract law, in a typical contract like that,

12   what one would be doing is guaranteeing future performance of

13   an act if the other party signs and enters into the agreement.

14       And, of course, here Fuzhou University never signed

15   and there's no evidence that Fuzhou University signed this

16   one-paragraph supplement.  And to the contrary, there are

17   multiple versions of the supplement that can include different

18   terms than the one that Dr. Tao is alleged to have signed

19   demonstrating, at best, an ongoing negotiation.

20       So the supplement cannot be taken as an example of

21   something where Dr. Tao by -- even if it is true that he

22   signed, attested to the truth of a future performed event.

23   That is -- does not fit within the adoptive statement or

24   admission exception.

25       So turning to the unsigned contract template, it's

1    unclear what grounds even the government is arguing as to how

2    Dr. Tao would have adopted as true provisions in an unsigned

3    template that he didn't even sign, let alone that FZU would

4    have signed such that it could be a contract.

5           Now, the government appears to think that if Dr. Tao

6    signed a supplement, then he must have signed and FZU must have

7    signed these contracts and, therefore, he must have adopted the

8    provisions in the contracts -- the unsigned template contracts

9    as true.

10          But there's no -- there's a factual gap there from

11   premise A to premise B that the government simply cannot fill.

12   In this one-paragraph supplement, even the one version that

13   appears to have been superseded with no signatures, even in

14   that version, all it says is that if the parties were to enter

15   into that document, Fuzhou would provide certain funding of

16   Dr. Tao's research.  There is no acknowledgment in that

17   document that a contract exists, let alone the date of the

18   contract or that the parties entered into it.

19          At best, this is simply an offer relating to funding

20   that has -- that makes no representations that could be adopted

21   by Dr. Tao as to the unsigned contract template.  So the

22   government's argument as to unsigned contract template is

23   clearly meritless.

24          Now, Rule 807 is another argument that the government

25   tries to put forth in order to get this obvious hearsay into

1    evidence.  Rule 807 is the residual exception, and as an aside,

2    we think this really betrays the understanding weakness of its

3    hearsay argument, the fact that it's trying to get in a

4    centerpiece of its case these unsigned templates as a residual

5    exception.  But in any event, the government cannot satisfy

6    this exception with respect to either the unsigned contract

7    template versions or the so-called addendum or supplement.

8           That exception provides that a hearsay statement is

9    not excluded by the rule against hearsay even if it's not

10    admissible under a hearsay exception 804, if the statement is

11    supported by sufficient guarantees of trustworthiness after

12    considering the totality of the circumstances under which it

13    was made and evidence, if any, corroborating the statement and

14    is more probative on the point for which it is offered than any

15    other evidence that the proponent can obtain through reasonable

16    efforts.

17           Now, the government admits that the residual exception

18    should be used only in exceptional circumstances.  And I will

19    echo what the Tenth Circuit said about those circumstances

20    recently in *United States versus Hammers* in which the Tenth

21    Circuit said it should be applied only in, quote,

22    "extraordinary circumstances where the Court is satisfied that

23    the evidence offers guarantees of trustworthiness and is

24    material, probative, and necessary in the interest of justice."

25           An unsigned, unagreed-upon contract template does not

1    have any of these elements.  As to the first requirement in

2    807(a)(1), it has no guarantees of trustworthiness.  As we

3    know -- and this is part of the reason why there is no

4    exception for contracts.  As we know, when someone sees an

5    unsigned contract that doesn't even represent an offer because

6    no party has signed it, they're not -- there's no guarantee

7    that the provisions of this proposed template are true or have

8    happened sometime down the road.  There's no guarantee of

9    trustworthiness as to these documents and the government points

10   to one.

11            As to the second requirement in 807(a)(2), the

12   government's effort to corroborate performance of the contract

13   actually shows why it cannot meet this second condition.  The

14   government argues that it has ample evidence that Dr. Tao

15   worked at FZU full-time and that this corroborates that Dr. Tao

16   and FZU performed as described in the unsigned contract

17   templates and supplement.

18            But this is actually an admission by the government.

19   This means that the provisions are not, quote, "within the rule

20   more probative on the point for which it's offered than any

21   other evidence that the proponent can obtain through reasonable

22   efforts."

23            The government is saying it already has evidence that

24   it is now seeking to use the residual exception to bolster.  So

25   it's not the case that it should get to enter into evidence

1   hearsay based on an exception just to prove a point it already

2   says it can prove.  That would contradict the requirement in

3   the rule that the evidence has to be more probative on the

4   point for which it is offered than any other evidence that the

5   proponent can obtain through reasonable efforts.

6          The government also fails to explain why evidence of

7   the contract is, quote, "material, probative, and necessary" in

8   the interest of justice as required by the Tenth Circuit,

9   despite acknowledging that the Tenth Circuit requires as much,

10  and it, therefore, has not developed its argument.  It simply

11  overlooks those requirements.

12         In sum, Your Honor, admission of the unsigned contract

13  templates and supplement to prove performance of those unsigned

14  contract templates and supplement would swallow the hearsay

15  rule here and that is not the purpose of the residual

16  exception.

17         Finally, but very importantly, Your Honor, the

18  government does not respond to Dr. Tao's argument under Rule

19  403 and, therefore, in effect, concedes inadmissibility under

20  Rule 403.  The government is not free to pick and choose which

21  arguments it responds to here and we think that amounts to a

22  concession.

23         But I will argue and echo the arguments in our moving

24  papers that there's a substantial danger or risk of a danger of

25  unfair prejudice here because the government is, in effect,

1    trying to use unsigned documents as the centerpiece of its case

2    to prove that a contract existed when there is no signature or

3    fully executed version of the contract, not even a singly

4    executed version of the alleged contract.

5            Accordingly, respectfully, the Court should exclude

6    the unsigned contract templates and supplement as inadmissible

7    hearsay.

8            And before we turn to our next category of hearsay, of

9    course, if the Court has questions, I'd be happy to answer

10   them.

11           THE COURT:  No.  Go ahead.

12           MR. DEARINGTON:  Thank you, Your Honor.

13           So the second category of hearsay that the defense has

14   moved to exclude are websites found on the Internet.  Now, just

15   for a little bit of background about these websites, the person

16   we've been calling government informants in our papers on this

17   and other matters presented many of these websites to the

18   government, and the government seeks to use these as evidence

19   for an obvious admitted hearsay purpose.

20           According to the government, these websites found on

21   the Internet state Dr. Tao obtained a Changjiang scholarship

22   and worked at Fuzhou University.  The government would like to

23   point to those websites to say, in fact, Dr. Tao obtained a

24   Changjiang scholarship --

25           THE REPORTER:  I'm sorry.  Will you please slow down.

1           MR. DEARINGTON:  I'm sorry.

2           THE REPORTER:  Repeat that last sentence.

3           MR. DEARINGTON:  Sure.  The government would like to

4    use these websites for a hearsay purpose.  The websites,

5    according to the government, state that Dr. Tao obtained a

6    Changjiang scholarship and worked full-time or worked at Fuzhou

7    University, and the government would like to introduce those

8    websites to prove just that, that Dr. Tao, as stated in these

9    websites found on the Internet, worked at Fuzhou University and

10   obtained a Changjiang scholarship.  We point to a myriad of

11   cases that have held that websites found on the Internet of

12   this kind are inadmissible hearsay and the government appears

13   to concede that.

14           Rather, the government argues that these websites

15   should come in under Rule 803(8), arguing that these -- let me

16   clarify that, Your Honor, if I can take a step back.

17           The government appears to concede that the websites

18   are inadmissible and does not cite an exception for the

19   majority of these websites, but the government pushes back on a

20   small number of these websites that it claims came from Fuzhou

21   University's website or came from some other Chinese government

22   or local government website.  So it appears to have conceded

23   the argument as to all websites except the Fuzhou University

24   websites or purported ones and the -- any other websites that

25   came from the Chinese government.  And it claims that these

1    should come in under Rule 803(8), which is an exception for

2    certain public records, quote/unquote, "of a public," quote,

3    "office's activities."

4         The government's argument, Your Honor, is meritless.

5    Rule 803(8) provides an exception to the rule against hearsay

6    for a record or statement of a public office if it sets out,

7    Romanette i, the office's activities; B, and the opponent does

8    not show that the source of information or other circumstances

9    indicate a lack of trustworthiness.

10        Now, as notes to the Rule 803(8) exception provide,

11   quote, "Justification for the exception is the assumption that

12   a public official will perform his duty properly and the

13   unlikelihood he will remember details independently of the

14   record."

15        The examples in the case law that the government cites

16   to are clearly in apposite.  The government cites to U.S.

17   Treasury receipts and disbursement records or land office

18   records, all of which have been found to be official public

19   records that satisfy the exception.  And the government gives

20   another example to show that websites can in very limited

21   circumstances satisfy this rule by pointing to a Tenth Circuit

22   case involving an FDIC certification of insurance that was made

23   available by the FDIC on the Internet.

24        The FZU website is not analogous to any of these

25   examples.  If it is in fact an FZU website, it is a university

1    website and nothing more.  This lacks the indicia of

2    reliability of something like an FDIC certificate of insurance

3    or a contemporaneous treasury receipt or disbursement.  So it

4    lacks the trustworthiness which is required to meet Rule

5    803(8).

6            It's important to note here, Your Honor, the

7    government's own proposed expert, Mr. Glenn Tiffert, has taken

8    the position that Chinese universities and the Chinese

9    government regularly disseminates misinformation and that its

10   information is, therefore, untrustworthy.  We cannot accept the

11   government's representation that information emanating from

12   China including from government websites is untrustworthy when

13   it would like to introduce testimony or evidence but

14   trustworthy when the government would like to introduce

15   evidence, or when we would like to exclude evidence, rather.

16           Now, take, for example, the government informant's

17   past accusation that Dr. Tao took, quote, "a guest professor

18   position in Taiwan University of Technology China," which is in

19   Exhibit 28 to our *Franks* motion.  That was apparently based on

20   an incorrect announcement by a Chinese university found on the

21   Internet, and the government has never contended that Dr. Tao

22   was actually a visiting professor at this university and would

23   likely concede this was a mistake made by the university on the

24   Internet.

25           And I'd like to explain a little context why we

1    shouldn't create a direct analogy between someplace like Mizzou

2    announcing that a professor has come to work and someplace like

3    Fuzhou or, in this past example, Taiwan.  We've seen many

4    instances in which universities seek to promote and trumpet

5    their talent in China by claiming that certain professors who

6    may have given a guest lecture or may have visited or has a

7    collaboration have an exaggerated role at the university

8    because it gives them the imprimatur of prestige.  That's not

9    something I think we're accustomed to seeing here in the United

10   States.  But from what we've seen, this is actually a somewhat

11   common occurrence.

12          So this is another reason why, consistent with what

13   actually Mr. Tiffert might say, we can't take as true something

14   found on an Internet website just because the government claims

15   it came from the university.  There's simply no guarantee of

16   trustworthiness.  So, at bottom, Dr. Tao would be denied his

17   confrontation right if the Court were to admit these handful of

18   websites that allegedly came from Fuzhou University or some

19   other government website in China.

20          But even if the Court were to disagree with us and

21   think that these are Chinese public records, which we think is

22   erroneous, they still cannot come in because the government

23   would need to authenticate them as Chinese public records,

24   which it cannot do.

25          Under Rule 902(3), foreign public records can only be

1    authenticated if, quote, "signed or attested by a person who is

2    authorized by a foreign country's laws to do so," and, quote,

3    "It must be accompanied by a final certification that certifies

4    the genuineness of the signature and official position of the

5    signer or attester."

6           The government has not produced any certification by a

7    Chinese official stating that one of the websites that it

8    claims is authentic and that claims that Dr. Tao worked at

9    Fuzhou University is an authentic public record.

10          So this provides yet another reason why even if the

11   government could establish these are Chinese public records

12   rather than random press -- I don't know what they are --

13   websites found on a website that appears to be associated with

14   Fuzhou, they still cannot authenticated as such in order to

15   come in as admissible evidence.

16          There's one potential exception that the government

17   points to.  The government states that there's a picture on a

18   web page that, according to the government, shows Dr. Tao with

19   a Fuzhou employee or official that it claims is not hearsay.

20          Well, the government may be correct that a picture

21   standing alone is not hearsay, the rest of the article,

22   including the date of the meeting, the purpose of the meeting,

23   and the identities of the individuals, are clearly hearsay.

24   There's no guarantee that this information from any website,

25   whether it's Fuzhou or one of the websites the government has

19-20052-JAR    USA v. Feng Tao    10.14.21                              24

1    conceded do not meet an exception, is trustworthy.

2           The government does contend that, quote, "There is no

3    reason for the publisher to lie about the date of the meeting,

4    June 1, 2018; the purpose of the meeting; or the identity of

5    the Fuzhou official." But that's not the standard.  Hearsay

6    doesn't come in just because the parties can't think of a

7    motivation for the person to lie.

8           Rather, the problem is that Dr. Tao can't call whoever

9    made that website to the stand to cross-examine the person and

10   exercise his Sixth Amendment confrontation rights by asking

11   where did you find out that information, was it a rumor, are

12   you sure this was the actual date, where did the information

13   come from, and potentially impeach that person.

14          It is no excuse that the government believes a

15   person has --

16          THE REPORTER:  I'm sorry.  I'm sorry.  You need to

17   slow down.  Please repeat that last sentence, "It is no

18   excuse."

19          MR. DEARINGTON:  Sure.  Sorry about that.

20          There is no -- it's no excuse that the government

21   contends a person whom it doesn't know and hasn't identified

22   would have no motivation to lie.  That is not the test under

23   the confrontation clause or under the hearsay exception at

24   issue.

25          Finally, the government does not respond to Dr. Tao's

1    argument under Rule 403 and we contend the government,

2    therefore, concedes that as well.  For these reasons the Court

3    should exclude all of the website evidence stating or

4    suggesting that Dr. Tao was a Changjiang scholar or worked at

5    Fuzhou University.

6          Now, Your Honor, the third category of hearsay

7    consists of e-mails from third parties including apparent

8    post-docs asserting or suggesting that Dr. Tao works or will

9    work at Fuzhou University.

10          The Court should exclude these as hearsay and under

11    Rule 403 because Dr. Tao cannot -- these are hearsay that do

12    not meet an exception and Dr. Tao cannot call these people who

13    reside overseas apparently to the stand to cross-examine them

14    about their beliefs and/or statements in these e-mails.

15          The government contends that this is hearsay -- or,

16    sorry, that this hearsay is admissible as statements of a

17    party-opponent under Rule 801(d)(2)(A) which applies where the

18    party made the statement.  But here, we're talking about other

19    individuals who made statements, not Dr. Tao, so this exception

20    plainly does not apply.

21          The government alternatively argues that the hearsay

22    should be admissible under Rule 801(d)(2)(B) as adoptive

23    statements or admissions based on the principle that when,

24    quote, "a person hears, understands, and has the opportunity to

25    deny an accusatory statement made in his presence, the

1    statement and his failure to deny are admissible against him as

2    an adoptive admission."  And there I was quoting *United States*

3    *v. Wolf*, the Tenth Circuit decision cited by the government.

4              That exception also does not apply.  Now, *Wolf*

5    involved a person who was confronted in person, so in the

6    person's -- the defendant's presence with allegations of a

7    coverup of child abuse and the defendant said nothing to defend

8    herself.

9              *Williams*, another case cited by the government,

10    involves an example by the Tenth Circuit where a person is

11    discussed among a group as having robbed a bank and the person

12    does not speak up and say, I did not rob that bank.  Each of

13    these examples involves an accusation, in these cases, crimes,

14    and the person is present and there's evidence that the person

15    said nothing even though they had the opportunity and would be

16    expected to correct the record in that circumstance.

17              Our facts are inapposite because, first of all,

18    Dr. Tao in none of these e-mails is accused of any crime or

19    misconduct.  If anything, these post-docs are suggesting he

20    works at Fuzhou University or has a collaboration with Fuzhou

21    in which he might be able to recommend them for work there.

22    That's not something where the typical person would be expected

23    in all cases to spend the time to correct the record.

24              Second, Dr. Tao is not present, as in the examples

25    cited by the Tenth Circuit, to correct the record.  And there's

1   no confidence that Dr. Tao did not correct the record.  Unlike

2   the example in *Wolf* where two people are chatting at a softball

3   game and the defendant does not speak up, unlike the example in

4   *Williams* where a person is asked whether he committed a murder

5   and the person says nothing, Dr. Tao received an e-mail and in

6   some instances responded to an e-mail.  But there's no --

7   there's no confidence that he actually didn't speak up.

8          What the government would need to do in order to prove

9   that is actually call the individual who sent the e-mail to the

10  stand and ask them, did Dr. Tao correct you when you made this

11  statement?  Did he pick up the phone and call you?  Did he text

12  message you and say, hey, by the way, just to clarify, I don't

13  work at Fuzhou University?  And the government has not

14  indicated that it has that evidence or that it plans to do so.

15         So you have no accusation of a crime or other

16  misconduct and you have no evidence that Dr. Tao did not

17  actually speak up to correct it, so these e-mails cannot

18  possibly meet that exception.

19         An example of unreliability, Your Honor, of these

20  e-mails is the e-mail that -- the one e-mail that the

21  government describes in its motion *in limine*.  And this is an

22  e-mail from Ruben Olart [ph], who appears to be a post-doc in

23  Columbia seeking a position at Fuzhou University, and Dr. Tao,

24  according to the government, forwards the e-mail to an FZU

25  professor and says, "Please process it as soon as possible."

1          If the government suggestion is that this shows that

2    Dr. Tao has adopted as true something in Mr. Olart's e-mail

3    indicating he works at Fuzhou, the unreliability can be

4    demonstrated and the problem with admitting this sort of

5    evidence by other e-mails that the government has produced.

6    One of these is an e-mail attaching a letter to Dr. Tao

7    expressing interest in the group at Fuzhou but actually

8    addresses the e-mail to Franklin Tao at Kansas University.  So

9    that demonstrates he actually didn't think that Dr. Tao worked

10   at Fuzhou.

11          In another example, this particular applicant submits

12   application and lists a different professor as the employer.

13   He actually lists a Fuzhou professor as the prospective

14   employer, Lizzie Woo [ph].  So in every instance we're not

15   necessarily going to have that evidence that makes clear that

16   Ruben Olart, or whichever post-doc, he didn't actually know or

17   have a basis to think Dr. Tao worked at Fuzhou University.

18   We're just going to see an e-mail with a person with a

19   potentially mistaken belief.

20          But that example, the one seized on by the government,

21   explains why it's a problem to take a random person who's not

22   going to testify at trial and a belief that they have for

23   unstated reasons, possibly a rumor on the Internet, and take

24   them on their word as if that is a truthful statement.

25          Accordingly, Your Honor, we respectfully request that

1   the government exclude evidence from post-docs and others

2   claiming that Dr. Tao or suggesting that Dr. Tao worked at

3   Fuzhou University.

4        Unless Your Honor has questions, we will rest on our

5   papers in that argument with respect to motion *in limine* No. 3.

6        THE COURT:  I don't have any questions.  Thank you.

7        MR. DEARINGTON:  Thank you, Your Honor.

8        THE COURT:  Proceed.

9        MR. OAKLEY:  Thank you, Your Honor.

10       Your Honor, I think as it relates to the contracts,

11  both the signed addendum or supplement, and as it relates to

12  the unsigned versions, I think it's important to recognize that

13  this is not a contracts litigation case.

14       The signed addendum that the defendant signs, sends

15  back, and also forwards to his own e-mail is a statement of the

16  defendant.  It is admissible as an admission of a

17  party-opponent.

18       Your Honor, I'm sorry, I did not include this in the

19  binder that I gave the Court, but I have copies for Court and

20  counsel, if I may approach.

21       Your Honor, I've marked this as government's *limine*

22  Exhibit 16 and I would offer it for purposes of today's

23  hearing.

24       THE COURT:  You've handed me two Exhibit 16s.  Are

25  they the same?

19-20052-JAR    USA v. Feng Tao    10.14.21    30

1          MR. OAKLEY:  They are the same, Your Honor.  I'm

2    sorry.  One was for the clerk.

3          THE COURT:  Thank you.  I appreciate that.

4          And appears this is in Mandarin and it's been

5    translated?

6          MR. OAKLEY:  Yes, Your Honor.  There's actually two --

7    the first page of this is an e-mail.  There's no content, but

8    there's an attachment.  The page that comes after the orange

9    separation is the document that was attached.  It is the

10   addendum that we've been referring to.

11         The next page is the FBI's linguist translation of

12   that document, and in that first one that we have that is

13   translated, it's an unsigned version, so after the translation

14   you have the defendant, from his Gmail account, responding to

15   the same e-mail account that sent the unsigned version and

16   CCing his -- or blind -- BCCing his Franklin Tao 2011 Gmail

17   account, and then the attachment there is the same document

18   except that it's signed.

19         So the translated version is for the unsigned, but

20   there is no difference other than the document that the

21   defendant forwards back is the signed addendum.

22         THE COURT:  So page 22 of this exhibit is what the

23   government offers as the translation of the addendum that is

24   attached?  Or the attachment, I guess?  You say it's an

25   addendum, but it's the attachment to this e-mail?

1      MR. OAKLEY:  Yes, Your Honor.  It's what's been

2  refer- -- we refer to as the addendum and I think the defense

3  refer to as a supplement to the contract.

4      And the last page, page 22, is the translated version,

5  and it's -- the English translation is "Changjiang scholar,

6  distinguished professor addendum to employment contract."  And

7  so the document itself in Chinese identifies it as an addendum

8  to an employment contract.  Party A is Fuzhou University.

9  Party B is Feng Tao.  And then it discusses the addendum which

10  relates to the amount of money that FZU will provide.

11      THE COURT:  All right.  So Exhibit 16 is e-mail and

12  transmission of what the government is calling an addendum and

13  it includes a page that is a signed addendum.  And this isn't

14  all of the other contract templates; this is the addendum, both

15  attached, unsigned and at some point attached, signed?

16      MR. OAKLEY:  Yes, Your Honor.

17      THE COURT:  Any objection?

18      MR. DEARINGTON:  Your Honor, just -- no objection.  I

19  think we want to clarify.  You're saying this is a translation

20  of the signed version?

21      MR. OAKLEY:  It's a translation of the unsigned

22  version, but there's no difference between the signed version

23  and the unsigned other than the defendant's signature was

24  affixed.

25      MR. DEARINGTON:  And they were sent on different

1    dates, is what you're saying?

2          MR. OAKLEY:  The e-mail sending both as attached as

3    part of the exhibit.

4          MR. DEARINGTON:  No objection, Your Honor.

5          THE COURT:  All right.  Exhibit 16 is admitted.

6          MR. OAKLEY:  So, Your Honor, certainly that signed

7    version that we believe the evidence will show, and based upon

8    the defendant forwarding -- sending it back and sending it to

9    himself, is that that is a statement of the defendant.

10          It's an addendum and we do not have the original

11    signed version of the contract.  But what's important to note

12    is the importance of this and the reason that it's admissible

13    in this case is not whether or not the defendant specifically

14    performed certain requirements of the contract.  It doesn't

15    matter the amount of the salary, which, as the defense points

16    out, is different in some of the unsigned original contract

17    versions which one might expect in contract negotiations.

18          What is important is that the defendant acknowledges

19    this relationship with the university through this written

20    addendum, and by signing the written addendum, he acknowledges

21    the existence of an underlying contract.

22          As I said, the government doesn't intend to introduce

23    this to show that the defendant actually satisfied each and

24    every term of either the contract or the addendum, and

25    certainly the defense can argue that point to the jury, but

1   what is important is the defendant's intention and

2   demonstration of his willingness to enter into an employment

3   contract and an employment contract addendum with Fuzhou

4   University.

5         THE COURT:  So if the government offers this, it seems

6   to me that what you're, I guess, acknowledging is that there

7   would have to be a limiting instruction telling the jury that

8   this particular -- they're not to consider this particular

9   document as evidence that, in fact, the parties entered into a

10  contract with these terms.  I mean, the addendum itself is not

11  offered by both parties.  The government is not offering this

12  to show that this addendum was the agreement that the parties

13  entered into.  Nor is the government -- you know, nor is the

14  jury to consider that these particular terms were something

15  that the parties agreed to, but that the jury can consider this

16  as evidence that the parties were engaged in negotiations.

17        MR. OAKLEY:  Yes, Your Honor.  And that the defendant,

18  by signing and sending it back, certainly demonstrated that --

19  both his involvement and his intention to enter into this

20  agreement.  But, correct, the actual terms -- what is important

21  is the negotiation and the fact that an addendum was -- that

22  the defendant intended to enter into the contract and to the

23  addendum.  The particular terms of the agreement, and referring

24  specifically to this addendum, it relates to FZU agreeing to

25  pay 50 million -- provide 50 million Yuan in research funds,

1    that's immaterial.

2         So, yes, I think if the Court is inclined to give a

3    limiting instruction directing the jury to only consider what

4    this is properly admitted for, that would certainly be

5    appropriate.

6         THE COURT:  All right.

7         MR. OAKLEY:  As it relates to the residual exception

8    under Rule 807, Your Honor, we do believe, as we argued, that

9    that that's appropriate.  However, I don't know that the Court

10   could make that determination in an *in limine* context.  I think

11   if the Court were inclined to make that determination that this

12   is an exceptional circumstance, that would allow the admission

13   of these documents under Rule 807, that the Court is going to

14   have to hear evidence at trial and, specifically, evidence as

15   it relates to whether or not the defendant did actually engage

16   in some of the performance or did actually engage in

17   negotiations with Fuzhou and some of the other external

18   evidence that supports the authenticity of this contract.

19        Your Honor, turning to the websites, we do believe

20   that any website that is able to be identified as a web page of

21   either the PRC or a public institution and -- would be

22   admissible under the hearsay exception as a public record.

23        Directing the Court's attention to what we have

24   provided collectively as Government's Exhibit 15, these are

25   printouts both in English version, followed, when available --

1    excuse me -- both in Chinese, followed, when available, with

2    the translated version of certain websites.

3            The first website, Your Honor, is the photograph that

4    we reference in our motion as nonhearsay.  But providing --

5    excuse me.  Turning to the other web pages, the second web page

6    is a FZU faculty information page, as I understand it, that

7    identifies the defendant and in English identifies some of his

8    publications.

9            Since it is a website of a public institution in

10   China, we believe that it is admissible hearsay, or that it

11   meets an exception to the hearsay rule.

12           Similarly, Your Honor, the next page, and I apologize

13   because both of these copies, the first of which is in Chinese,

14   the second of which is in English, are very poor.  However, if

15   I may approach, I have a better example of this particular web

16   page.

17           Your Honor, to be clear, the cleaner copy that I gave

18   the Court is not -- this actually was located today.  This

19   still exists on Fuzhou University's web page.  You can see the

20   URL at the top.

21           The other two more unclear pages were accessed

22   previously, but it certainly appears to be the exact same

23   information, and I provide this one because it's easier to see.

24           And what this is, it appears to be Fuzhou University

25   providing information related to a talk dated Tuesday, May 21,

19-20052-JAR    USA v. Feng Tao    10.14.21                    36

1    2019.  The site is included as the creative space on the second

2    floor of the library and the presenter is identified as

3    Professor Tao Feng, School of Chemistry.  So this is an example

4    of Fuzhou University advertising a lecture that was going to be

5    provided by the defendant.  The defendant is identified as a

6    professor in the School of Chemistry.

7           Now, it doesn't specifically state he is identified as

8    a professor of the School of Chemistry at Fuzhou.  But again,

9    this is a Fuzhou University website that is advertising this

10   lecture and, certainly, the circumstantial evidence that

11   they're advertising it as he is a professor at the School of

12   Chemistry at Fuzhou.

13          As one might expect, for instance, if the University

14   of Kansas had a visiting foreign professor, they would not

15   advertise that as, you know, that professor just by name and

16   stating School of Chemistry; they would affiliate that visiting

17   professor with a foreign institution.

18          THE COURT:  This additional page, have you provided it

19   to the defendant?

20          MR. OAKLEY:  I just did this morning, Your Honor.

21          THE COURT:  Okay.  You want this included as part of

22   Exhibit 15?

23          MR. OAKLEY:  I would ask, Your Honor, it be included,

24   yes.

25          THE COURT:  All right.  Any objection to Exhibit 15?

 1            MR. DEARINGTON:  No objection, Your Honor.

 2            THE COURT:  All right.  Exhibit 15 admitted.

 3            MR. OAKLEY:  So, Your Honor --

 4            THE COURT:  So the websites at issue or websites the

 5    government intends to offer are websites of Fuzhou University,

 6    the government alleges are legitimate -- or is -- or pages I

 7    guess I should say -- maybe -- are there multiple Fuzhou

 8    University websites or just a Fuzhou University website with

 9    different pages that you're offering?

10            MR. OAKLEY:  There are multiple copies of different

11    pages.  For instance, this is an example that comes from

12    Fuzhou, but it references just that lecture.

13            THE COURT:  But you get to it from the main Fuzhou

14    University website?  Or are there different Fuzhou

15    University --

16            MR. OAKLEY:  I don't know how you click through it,

17    Your Honor.  I apologize.  I haven't accessed this.

18            THE COURT:  Okay.  All right.  I had a follow-up

19    question and now I've lost it.  But -- all right.  So the

20    exhibits, the website exhibits the government intends to offer

21    are exhibits that the government alleges are websites of Fuzhou

22    University, websites that are websites of arms of the People's

23    Republic of China, the government itself, and what else?  Any

24    other types of websites?

25            MR. OAKLEY:  Those are the ones we intend to introduce

1   that we believe are admissible as public records.

2            THE COURT:  All right.

3            MR. OAKLEY:  And as it relates to the -- so there's

4   the hearsay and then there's also the authenticity.  We believe

5   that those are self-authenticating as public records.

6            However, if the Court finds that they're not

7   self-authenticating, then the government, of course, would have

8   to prove authenticity in another way.  If they meet the hearsay

9   exception, that, of course, is a separate issue, but from

10  authenticity.  So if the Court does not find these are

11  self-authenticating, for instance, one way, as I'm standing

12  here thinking about it, would be that we could introduce

13  testimony from a witness who visited the particular website and

14  can testify that what they observed is the same or

15  substantially similar to what the government intends to

16  introduce.

17           But I simply point that out because -- to acknowledge

18  there's a difference between hearsay and hearsay exceptions

19  versus authenticity.  And we believe, as we state in our

20  pleading, that these are self-authenticating.

21           THE COURT:  And why do you believe they're self- --

22  and how -- in what respect are they self-authenticating?

23           MR. OAKLEY:  We believe they're self-authenticating as

24  under 902(5), as data on government websites.

25           THE COURT:  All right.  So I take it that the

1  defendant is arguing that there's no assurance that these are

2  even Fuzhou University websites or government websites.  It may

3  be these are fabricated by someone.

4          MR. OAKLEY:  Your Honor, that is always a question

5  when it comes to authenticity, and it's the same whether we're

6  talking about websites or whether we're talking about documents

7  that occurred before the creation of the Internet.

8          THE COURT:  So there has to be some indicia of

9  reliability when you're seeking to admit documents as public

10 records that they are, in fact, documents from the public

11 entity.

12         MR. OAKLEY:  Yes, Your Honor.

13         THE COURT:  How is the government going to demonstrate

14 that?

15         MR. OAKLEY:  We would demonstrate -- we believe

16 they're self-authenticating from the face of them because they

17 list the website, they list certain other indicators such as

18 identifying the university and that sort of thing.  Primarily

19 the URL that's included is an indication of where they come

20 from.

21         THE COURT:  Is this a consistent URL for -- like, for

22 example, what you've pulled off today and the other things that

23 are -- the other pages of Exhibit 15 are all the same URL with

24 extensions, obviously, for different pages or pointed places on

25 the website?

1          MR. OAKLEY:  Your Honor, I don't know if, for example,

2    FZU has multiple root level URLs, but I think to introduce

3    anything that came from a particular URL, the government would

4    have to introduce evidence that that URL belongs to a

5    university or to a public institution.

6          THE COURT:  All right.

7          MR. OAKLEY:  And, Your Honor, if I may, staying on the

8    authenticity portion, and I think this also bleeds into the

9    e-mails -- if I may approach again, Your Honor.

10          THE COURT:  Yes.

11          MR. OAKLEY:  In preparing for this hearing, I again

12    reviewed Judge Grimm's *Best Practices for Authenticating*

13    *Digital Evidence*, which I provided to the Court and counsel,

14    and I think as it relates to authenticity, what's important is

15    on page 11, which I believe is highlighted in what I provided.

16    And what he says here -- and I think this harkens back to my

17    statement before, about the fact that these are digital doesn't

18    create new issues, these issues related to authenticity has

19    always been around.

20          But what he says is "Finally, while it is true that an

21    e-mail may be sent by anyone who with a password gains access

22    to another's e-mail account, similar questions of possible

23    hacking could be raised with traditional documents; therefore,

24    there is no need for separate rules of authenticity for

25    e-mails.  And importantly, the mere fact that hacking, et

1    cetera, is possible is not enough to exclude an e-mail or any

2    other form of digital evidence.  If the mere possibility of a

3    electronic alteration were enough to exclude the evidence, then

4    no digital evidence could ever be authenticated."

5         And then he has a footnote citing a Pennsylvania state

6    court that says, "Just as an e-mail can be faked, a signature

7    can be forged, a letter can be typed on another's typewriter, a

8    distinct letterhead stationary can be copied or stolen."

9         So, certainly, these things -- authenticity is a

10   relatively low bar, and the decision is whether -- that the

11   Court has to make is whether the government's met that

12   relatively low bar, and then it's up to the jury to conclude

13   whether or not, yes, these actually are what the government

14   says that they are.  And the defense is free to attack that

15   through whatever means they want to, by either attacking the

16   website itself or through other things.

17        Turning now, Your Honor, to the e-mails, and I don't

18   think I've offered Government's Exhibit 15.  At this time I

19   would offer government's *limine* hearing Exhibit No. 15 and I

20   would also offer government's *limine* Exhibits 1 through 14,

21   which are the e-mails that I'm about to discuss.

22        THE COURT:  I think I did admit Exhibit 15.  You're

23   now offering *limine* Exhibits 1 through 14 as well, which are

24   the e-mails.

25        MR. OAKLEY:  Yes, Your Honor.

19-20052-JAR    USA v. Feng Tao    10.14.21                    42

1          THE COURT:  Any objection?

2          MR. DEARINGTON:  No, Your Honor.

3          THE COURT:  *Limine* Exhibits 1 through 14 are admitted,

4    and, of course, this is only for purposes of today's hearing

5    that I'm admitting these documents.

6          Okay.  Go ahead.

7          MR. OAKLEY:  Your Honor, these are a sample of the

8    e-mails, and since the defendant's motion *in limine* directly

9    contests the e-mails related to the recruitment of post-docs

10   and those sort of communications, I focused in on those.  I

11   want to be clear that these are not all of the e-mails that the

12   government has identified in its exhibit list and not

13   necessarily all of the e-mails that are directly related to

14   this topic, but I do believe that this gives the Court an

15   understanding of what we're talking about and would enable the

16   Court to either make a ruling now or be prepared to make a

17   ruling at the time the government offers each individual

18   e-mail.

19          The first instance, Your Honor, *limine* motion --

20   excuse me -- *limine* hearing Exhibit No. 1 is clearly not

21   hearsay.  This is an e-mail that the defendant sends from his

22   franklintao2017@gmail account to another person and says, "Hi,

23   Yoon Li [ph].  This is Franklin from Fuzhou University and

24   University of Kansas."  I won't read that.  But this is a

25   statement of the defendant.  It's not hearsay and it is

1    admissible.

2         So that's one bucket, would be e-mails that clearly

3    the defendant sends, that this particular one involves no other

4    communications from someone else, so this is absolutely

5    admissible as a defendant's statement.

6         *Limine* Exhibit 2, for instance, is an e-mail exchange.

7    This begins with someone -- turning to the second-to-last page.

8    It begins with an e-mail, "Dear Professor F. Tao," that was

9    sent on June 30, 2018.  He then -- the person who reaches out

10   to Dr. Tao then sends a reminder on July 12th of 2018 and he

11   sends it only to Dr. Tao.

12        So turning to the previous page, the defendant

13   responds to that person and says, "My collaborator" -- in this

14   version is redacted but it's Student No. 1 in China -- "has

15   opening.  I copy this e-mail to her.  She will contact."

16        And then there's an exchange involving Student No. 1.

17   This is an example of someone reaching out to the defendant and

18   the defendant then forwarding that on and indicating that

19   there's a position available in Fuzhou.

20        The government is not seeking to admit the truth of

21   the matter of any person other than the defendant as it relates

22   to content.  So, for instance, when this particular person says

23   that he or she is a PhD student and kind of, you know, gives

24   their background, the truthfulness of that is immaterial to the

25   government.  What is important is what the defendant does.

1    What the defendant does is not respond and say, hey, we have a

2    position open here at KU.  He doesn't respond to say, I don't

3    know why you're contacting me.  He says that I'm forwarding

4    this on to somebody else at Fuzhou that has an opening.  I'm

5    going to forward it to her and she will contact you.

6           Turning to Government's Exhibit 3, this is another

7    example, and the top e-mail, which, of course, would be the

8    last date to this particular exchange, comes from the defendant

9    to another person, and it says, "Please send the following ad

10   to all STM groups, as many as possible in Japan.  Thank you

11   very much."  And it's an opening of a faculty position in STM

12   in China.  And it says, "A group in China being led by one

13   Changjiang professor has an opening of a few faculty

14   positions."  So he's asking someone else who presumably is in

15   Japan to post an opening for positions not at KU but positions

16   that are open in China.

17          So that clearly is admissible as a statement of a

18   party-opponent.

19          The corresponding e-mails below back and forth, the

20   government's not offering to prove the truth of the matter of

21   anything that in this case Mr. Timoko says; those are

22   admissible to show context of the defendant's statement.

23          Exhibit No. 4 is another example of someone reaching

24   out to the defendant and the defendant then saying, "I've got a

25   contact at Fuzhou University and she will help you get the

1    paperwork done if you would confirm you can start in March."

2    So, again, the defendant's response is not hearsay.  What is

3    sent to defendant is not being offered for the truth of the

4    matter.

5         MR. DEARINGTON:  Your Honor, sorry to interrupt.  But

6    this might be helpful.  The defense motion *in limine* was not

7    seeking to exclude Dr. Tao's statements.  It was seeking to

8    exclude those of post-docs, so the types of e-mails that

9    Mr. Oakley is discussing I think we can discuss a limiting

10   instruction or redaction to the lower e-mails in the chain, but

11   we're not contending, at least as to our motion *in limine*, that

12   the government -- that the Court should exclude right now

13   something that comes from Dr. Tao of this nature.

14        THE COURT:  Understand.  But these are e-mail strings

15   and the government intends to offer them in that way, I think,

16   and those strings include these e-mails from other parties.  My

17   understanding is you're objecting to those e-mails from other

18   parties being admitted at all.  Did I misunderstand that?

19        MR. DEARINGTON:  That's correct, Your Honor, for the

20   truth of the matter asserted in them.

21        THE COURT:  The government says they're not offering

22   them for the truth of the matter asserted.  They're offering

23   Dr. Tao's statements for the truth of what he says, at least in

24   terms of how he responded, what he said to them, but they're

25   not offering what these third parties said for truth of the

1    matter asserted, which tells me that the proper way to handle

2    this is through a limiting instruction, for me to tell the jury

3    this is another e-mail and there are going to be e-mails from

4    people other than Dr. Tao and you're not to consider what they

5    say in those e-mails as the truth; you're to focus on what

6    Dr. Tao responds to, but, you know, what if they say, but how

7    he responds and what his statements are, something along those

8    lines.

9             MR. DEARINGTON:  That may be something the defense is

10   amenable to.  I apologize, I didn't mean to interrupt

11   Mr. Oakley's time.  I'm happy to address that.  I just didn't

12   want -- I wanted to save everyone's time if that was something

13   we thought was an issue.  Thank you, Your Honor.

14            THE COURT:  I think we can cut to the chase on these

15   e-mails, frankly.  I'm not going to rule anything in particular

16   is admissible because everything is subject to authentication

17   and relevance objections, and relevance, in particular, is not

18   something that really can be resolved typically *in limine* and

19   that's not the nature of these motions any way.

20            But if the government is not offering something for

21   truth of the matter asserted, unless I think, you know, there's

22   something, you know, inherently wrong with them offering it or

23   the only reason they could be offering it would be for truth of

24   the matter asserted, then the proper way to handle is a

25   limiting instruction.  It looks like there are going to be a

1    number of these and we can about whether -- I don't know --

2    what your order of proof is, whether you're going to put all of

3    these in at once.  I mean, I'm not going to tell you how to do

4    it or whether I need to give a limiting instruction every time,

5    which is fine, but I think that's the way to handle these

6    particular e-mails.

7            MR. OAKLEY:  Thank you, Your Honor.  And, Your Honor,

8    in fairness to the defense, obviously, they filed their motion

9    before they had our exhibit list, so they may have assumed that

10   we were trying to admit e-mails that we have no intention of

11   admitting.

12           Your Honor, the only last thing I would say, as it

13   relates to the motion *in limine* regarding hearsay, is that the

14   defense claims that we've not responded to their 403 argument.

15   We did respond, and perhaps I should have done a better job of

16   clarifying that we intended for it to apply to all of their

17   hearsay arguments.  We state -- on page 10 we address their 403

18   argument.  I don't think we've waived anything, the fact that

19   we don't think that it's an argument that in this particular

20   case requires much more than what we've set out.  These clearly

21   are relevant and probative and not improperly prejudicial.

22           THE COURT:  All right.  Thank you.

23           All right.  So on motion *in limine* No. 3, which all --

24   it's all based on hearsay, although there's also arguments of

25   403 arguments and there's also authentication arguments, I'm

1    not going to rule one way or the other as to whether the

2    government can authenticate these.  The government is -- and in

3    particular I'm talking about the websites, but really all of

4    them, I think everything in this particular motion is something

5    I should rule on at trial.

6           There is a signed addendum, one version of it, the

7    government says it's not offering for truth of the matter

8    asserted; in other words, that the parties reached or had an

9    agreement with respect to what that addendum says, but it's

10   offering to show that the defendant stated that he was willing

11   to do whatever that addendum says.  They're offering to show

12   that there were negotiations at least.

13          You know, I think that's proper, but I'm going to have

14   to see the context of how this evidence is offered and what the

15   witnesses are saying.

16          With respect to the five unsigned contract templates

17   again, I need context in terms of how they're offered, what the

18   other evidence is, et cetera.  But again, the government is

19   saying they're going to offer it in a way that is not for truth

20   of the matter asserted.

21          The websites, there's this authentication issue, but

22   the government needs to have the opportunity to authenticate

23   and they may be able to do based on certain indicators within

24   the web pages themselves, based on the URL, based on other

25   evidence, I don't know, but I'm not going to rule on that at

1    this time.  Again, I think that needs to be something I take up

2    contemporaneous based on all the evidence that's presented to

3    me.

4         And then these e-mails, some of which -- or it looks

5    like all of which include some e-mails that are purportedly

6    from Dr. Tao and would be statements of a party-opponent and

7    admissible.  But also include in the string statements of third

8    parties that would not be subject to a hearsay exception if

9    indeed they're offered for a hearsay reason, which the

10   government says they're not.

11        So I think the best way to handle motion *in limine*

12   No. 3 at this point is to deny it without prejudice subject to

13   the party -- the defendant raising any objections that are

14   appropriate at trial, be it authentication, relevance, or

15   hearsay.

16        With respect to the 403 objections, again, I'd rather

17   hear those then, but just generally speaking, you know, one of

18   the key issues in this case is did Dr. Tao misrepresent,

19   directly by omission or otherwise, make false statements by

20   omission directly or otherwise about whether or not he was

21   either employed by Fuzhou University, seeking employment by

22   Fuzhou University.  I mean, the nature of his relationship with

23   Fuzhou University at any given time is relevant and evidence

24   that go to that is probative.

25        And at least with respect to these three categories,

1   the unsigned contract templates, the websites, and the e-mails,

2   I haven't seen anything that convinces me at this point that

3   they're more prejudicial than probative, but again, I'm not

4   ruling on that at this point.  It's all contextual, as you

5   know.  I tried to warn you at the outset not to file motions *in*

6   *limine* based on hearsay.

7        At the same time, I appreciate that this -- these

8   motions are educating me.  You know, as the trial judge that

9   has to make these rulings, other than, you know, things that

10  have been litigated in the case, there's a motion to dismiss,

11  there's now a motion for a *Franks* hearing, and then the

12  indictment itself, the trial judge typically doesn't know very

13  much about the evidence, so at least this process has helped

14  educate me on what I can expect in terms of evidence that will

15  be offered and rulings I may need to make.

16       But with respect to this particular motion *in limine*,

17  I'm going to deny it without prejudice.  We'll be taking up any

18  objections contemporaneously at trial.

19       MR. DEARINGTON:  Your Honor, do you mind if I just

20  have one clarification for the record?  I'm not going to

21  respond as I intended to each argument but just one point.

22       THE COURT:  Sure.

23       MR. DEARINGTON:  I guess it's two subparts, but I do

24  just want to correct the record as to these two websites that

25  Mr. Oakley has presented the Court with because the first one

1   containing a picture appears to us to be a social media

2   website, not a Fuzhou University website.  That's the one with

3   the color on it, which demonstrates the issue here, right, the

4   government wasn't sure if these all came from the same place or

5   exactly what they are and they're making assumptions.

6        And the second part is Your Honor mentioned there may

7   be some creative ways for the government to authenticate, but

8   we would like to reserve and make clear to the Court that we

9   intend to enforce the authenticity rules around public records.

10   The government, if they're going to rely on an exception that

11   this is a public record and something that comes from an

12   office's activities and describes it, it cannot simply, as

13   Mr. Oakley suggested, have someone authenticate they found this

14   on the Internet.  That doesn't go far enough to show this is a

15   public record and that it is an official office activity being

16   described.  So it's not just that it's a website of Fuzhou

17   University, but that this is not somewhere where people can

18   express their opinions on the Fuzhou website.  This has to be

19   an official public record.

20        So, Your Honor, I won't go any further than that, but

21   just wanted --

22        90- -- I can grab that rule, Your Honor, if you just

23   wait one moment.  I know I cited it earlier.

24        THE COURT:  I understand you're going to raise

25   authenticity objections.  You're going to probably want to *voir*

1   *dire* a witness, whatever.  We'll take that up at trial.

2         And, you know, I think the government is right in

3   terms of when you're talking about the authenticity of public

4   records or documents or anything like that, it's the same --

5   it's the same sort of analysis that needs to happen, whether

6   it's digital or in paper form.  But there are markers, there

7   are indicators that point to the legitimacy of a website.  And

8   that it is what it says it is.  And I think there are ways to

9   prove authenticity of websites, and so I leave it to the

10  government to figure out how to do that.

11        MR. DEARINGTON:  And respectfully, Your Honor, we

12  understand that ruling.  It was Rule 902(3).  So to the extent

13  the government is going to need to show this is a public record

14  to get out of the hearsay territory, that's the authentication

15  that the rules will require to meet, not just that

16  it's something that authentically has been found on the

17  Internet.

18        THE COURT:  All right.  And that's the rule that has

19  language concerning the activities of the public entity, et

20  cetera, which again, I mean, you may be raising an objection to

21  that, but I don't think -- I mean, if it's an activity that the

22  entity typically engages in, such as discussing curriculum or

23  research or offering curriculum or research or, I mean, really

24  there's so much that goes on in an academic institution.  I

25  mean, if it relates to anything that goes on in an academic

1    institution, to me, that's the activities of that public

2    entity.

3         There's also -- and I know this from other things in

4    these motions that you've filed, you know, there's a different

5    relationship with the academy in China than there is here in

6    terms of its relationship with the government.

7         And so, again, I'm going to give the government the

8    opportunity at trial to authenticate websites from either

9    People's Republic of China or Fuzhou University or whatever.

10   But I understand what the rules are and we'll go from there.

11   It's something I can't decide at this point, obviously.

12        MR. OAKLEY:  Your Honor, not on that topic, but may I

13   address the color web page?  I didn't mean to imply that that

14   came from Fuzhou University.  We talked about that photograph

15   in our motion and say that that's not being offered for the

16   truth of the matter and that it's not hearsay, but I don't

17   believe that that came from the Fuzhou University website.  I

18   just wanted to clarify that.

19        THE COURT:  Okay.  Understand.  And I understand with

20   respect to that particular exhibit, in addition to the

21   authenticity issues, the hearsay concern is about the article

22   itself, not the photo.  I think everybody agrees a photo is not

23   hearsay, it's not a statement.

24        Okay.  All right.  It's 10:30.  Why don't we take

25   about a ten-minute break.

1          And then the next thing we're going to take up is

2    *limine* motion No. 1.  And there's two things going on there.

3    It's the outgoing e-mails from the Fuzhou account and then the

4    adverse inference instruction.  So that's what we'll talk about

5    next.

6          And I think, you know, the same rules pertain to

7    whether they're incoming or outgoing.  We're talking, I think,

8    about e-mail strings, some of which may include e-mails that

9    purportedly are from Dr. Tao and others that include e-mails

10   from other people, so it would be the same sort of analysis

11   that we just talked about.  I understand, though, I think that

12   the defendant has a separate argument, and that is as to the

13   authenticity of any of these e-mails based on Student 1's

14   access to that account, I think, but you all can clarify what

15   your concerns are about that.

16         So let's take about a ten-minute recess.

17         (Recess.)

18         THE COURT:  We're next going to take up defendant's

19   motion *in limine* No. 1, which is actually Document 153, and

20   there's two subjects:  To exclude evidence of -- or to exclude

21   from evidence e-mails sent from the Fuzhou University e-mail

22   account on the basis of authentication and Rule 403 arguing

23   that Student 1 had access to that e-mail account and used it,

24   and then also seeking an adverse inference instruction due to

25   destruction of evidence.  All right.

1          MR. DEARINGTON:  Thank you, Your Honor.

2          As the Court noted, we seek two types of relief in

3   motion *in limine* No. 1 on behalf of Dr. Tao, exclusion of

4   e-mails originating from the alleged Fuzhou University e-mail

5   account due to authentication and Rule 403 issues and an

6   adverse inference jury instruction regarding the destruction of

7   evidence by the government.

8          To lay the groundwork for both of these requests for

9   relief, I'd like to just canvas the facts that are germane and

10  appear to be beyond the dispute based on our filings and the

11  government's response, and I will try to be brief, although

12  there's a fairly extensive record of what actually happened.

13         So, in summary, on July 23, 2019, Special Agents

14  Lampe, Ng, and Carlson of the FBI met with a person whom I'll

15  call a government informant, as she's called in our papers, for

16  an interview in Berkeley, California.  In the lead-up to that

17  interview two weeks prior, roughly, government informant sends

18  an e-mail on July 9, 2019, in which she admitted to the FBI

19  that she had impersonated various individuals -- three

20  individuals, including two who had worked in Dr. Tao's lab at

21  Kansas University and had admitted that she had figured out

22  Dr. Tao's alleged Fuzhou University e-mail account password.

23         She explained that the way she did this is that she

24  had obtained a username and password from Dr. Tao for other

25  accounts and that had tried that out on the Fuzhou account and,

1    lo and behold, that worked, allowing her to get access to that

2    account.

3              Now, fast-forwarding back to the July 23, 2019, FBI

4    interview at Berkeley of government informant, during the

5    interview the government does not dispute that government

6    informant logged in to the account alleged to be Dr. Tao's at

7    Fuzhou University, even though Dr. Tao had never provided her

8    with the password and she had never stated that Dr. Tao had

9    authorized her to access or use the account.

10             After government informant logged in to the account on

11   her own laptop, the FBI agents directed government informant to

12   log in to the account once again on an FBI laptop.  The FBI had

13   planned to download, according to the government, a different

14   e-mail account of government informant prior to the meeting,

15   and so they had obtained a clean laptop that could be used for

16   that purpose without having other sensitive information on it

17   such that malware could cause a breach.

18             So the government came with a laptop to the July 23rd

19   interview and directed government informant to log in to the

20   FZU account on their laptop and also obtained the alleged

21   username and password to the account during that interview.

22             The government explained that it needed government

23   informant to log in to the account on an FBI laptop so that it

24   could log in to the account after the interview.

25             Following the interview Special Agent Lampe e-mailed

1    someone at the FBI involved with technical support and stated

2    that he had something he needed to download, and sometime

3    thereafter, the government has been unwilling to tell us when,

4    the government wiped the FBI laptop used to access the FZU

5    account believed to belong to Dr. Tao that had been accessed by

6    government informant and at the FBI's direction without a

7    warrant.

8            When government informant accessed the account,

9    apparently the FBI agents were able to see that there were

10   e-mails in the account, but they were in Chinese.  The

11   government stated in its opposition, and has informed the

12   defense of a correction last night, which I'll get to, but

13   stated in its opposition that the government -- that the FBI

14   agents were unable to see what was in the account because it

15   was in Chinese.

16           We know that that does not seem to be accurate because

17   the government previously produced an e-mail in which Special

18   Agent Lampe informed someone within the government that there

19   would be a Chinese-speaking FBI agent at the meeting.  And last

20   night the government corrected this footnote on their own

21   without our having presented it to them and stated that,

22   indeed, Special -- I believe it's Special Agent Ng -- is a

23   Chinese speaker and can read some Chinese.

24           So the reason that's important is because the defense

25   contends there was either exculpatory or potentially

1    exculpatory evidence in the e-mail account that the government

2    obtained and then destroyed.

3          And one way that we can determine that there was

4    either exculpatory or potentially exculpatory evidence is that

5    four agents viewed what was in the account -- excuse me --

6    three agents viewed what was in the account, one of whom spoke

7    and read some Chinese, spoke fluent Chinese and read some

8    Chinese at least, along with government informant who spoke

9    both English and Chinese and had a known vendetta against

10   Dr. Tao.

11         Surely, the only legitimate inference in that

12   circumstance is that if government informant had seen something

13   in this account, which she had already apparently accessed,

14   that was incriminating, she would have presented that to the

15   government.  Indeed, she was prepared and had in the past

16   fabricated evidence incriminating Dr. Tao as she later

17   admitted, including impersonating three witnesses and falsely

18   accusing Dr. Tao of being a spy.

19         THE COURT:  Let me stop here to make sure I get some

20   clarity here.

21         So the FBI had, you're calling it, a clean laptop,

22   meaning they probably didn't have any other applications on it.

23   They had this at the interview.  They had the student first

24   access this Fuzhou University account on her own laptop because

25   she had Dr. Tao's password, not because he had given it to her

1   specifically for that account, but she did have it by virtue of

2   him giving her access to another account.  I think his Gmail

3   account.  Same password, Gmail and Fuzhou University.

4           MR. DEARINGTON:  Your Honor, I think most of that is

5   consistent with our understanding, with two corrections.

6           First is we're not conceding this was actually

7   Dr. Tao's account at Fuzhou University.

8           And then second, I don't think that government

9   informant in her July 9th e-mail to the FBI stated that she had

10  obtained the Gmail account or password.  In fact, I believe the

11  government's interpretation or one interpretation is that she

12  had obtained a username and password for some online grant

13  application account and then tried that out on the alleged

14  Fuzhou account, but not Gmail.

15          THE COURT:  Okay.  I understand some of the details

16  are in dispute.  But the bottom line is during this interview

17  the FBI had her access this Fuzhou University account that was

18  at least named -- had its name Dr. Tao or Tao something.

19          MR. DEARINGTON:  Correct.

20          THE COURT:  Had her access that e-mail as an e-mail

21  account.  E-mail is brought up.  They're in Chinese.  The

22  government now concedes that one of those agents could speak

23  Mandarin and read at least, in part, Mandarin.  So may have

24  been able to -- I don't know -- during the interview read along

25  with the student.

1        But in any event the student brings this up e-mail

2    account from Fuzhou University.  The FBI then has her do the

3    same, log on to that same e-mail account on the FBI's laptop so

4    the FBI presumably can take that laptop back to the office and

5    get on the e-mail itself.

6        Through whatever reason, thought better of it, you may

7    think they went ahead and did it any way, or not, but no

8    dispute that they, so-called, wiped the FBI laptop.  But that

9    e-mail account didn't go anywhere.  All right.  So when you say

10   they wiped the FBI laptop, it means that they did something to

11   the laptop that they say means they couldn't log in anymore.

12   They didn't have the password, presumably; in other words, they

13   had logged on to that -- had her log on to the account and

14   leave it so that they could go back and get back in that same

15   e-mail account.  But they did something to their own laptop

16   which basically blocked their ability to do that.

17       But my question is, that e-mail account wasn't

18   destroyed.  That e-mail account still existed through Fuzhou

19   University.  It was still accessible, in fact.  It has been

20   accessed.  It's part of the evidence in this case.

21       MR. DEARINGTON:  Your Honor, we're not aware of any

22   instance when the Fuzhou e-mail has been accessed subsequent to

23   that meeting, so our view is that the government conducted a

24   warrantless search and I'll get to why that matters.

25       THE COURT:  My question is this:  You know, this

1    motion *in limine* pertains to e-mails that went out from that

2    account at Fuzhou University.  So for you to say that they

3    wiped the laptop and, therefore, destroyed evidence, what's

4    your evidence that they destroyed evidence?  That account was

5    still there.  In fact, the e-mails on that account are being

6    used by the government in this case as part of its evidence.

7            MR. DEARINGTON:  So, Your Honor, the e-mails that the

8    government seeks to use predated the hack.  I can't tell you

9    standing here today whether this e-mail account exists.  I'm

10   not -- we're not contending that the government deleted the

11   e-mail account from the universe.  All we're saying is there

12   was a seizure here.  There was a search and there was a

13   seizure, because on the government laptop existed these

14   e-mails, even if they may also exist on a server somewhere else

15   and could be accessed by someone with access.  So they obtained

16   something that day.  They searched and they obtained.  They

17   seized and --

18           THE COURT:  But they didn't destroy anything.

19           MR. DEARINGTON:  When they wiped the laptop, they

20   destroyed everything that was on the laptop, which --

21           THE COURT:  But not the account.

22           MR. DEARINGTON:  Which would have included whatever

23   e-mails and other information was downloaded to the laptop.

24           THE COURT:  But they did not destroy the account.  You

25   can't destroy an e-mail account by blocking yourself from

1    having access to that account.

2        MR. DEARINGTON:  So I guess the way I would explain

3    our view of what happened here is when you access an e-mail on

4    a particular laptop, you're downloading, and I'm not an expert

5    in this area by any stretch of the imagination, but information

6    from the server is being downloaded or at least appearing on

7    the particular FBI laptop.

8        So if you then -- if the FBI didn't wipe the laptop

9    right after the meeting, for example, hands it to the defense,

10   we would get to see exactly what the government saw, and which,

11   apparently, was not at all incriminating.  Now we're deprived

12   of that opportunity to see whatever it is that was in the

13   parlance of Fourth Amendment, which is not -- we're not seeking

14   suppression, but in Fourth Amendment parlance we're not able to

15   see what was seized.

16       This is an asymmetry created by the government.  It

17   looked at evidence and it put evidence on its laptop and then

18   it wiped it.  There would be no reason to wipe the laptop if

19   nothing was on it.

20       THE COURT:  But you do know that the government,

21   whatever they saw, if they saw anything, it would have been

22   e-mails that were existent -- existed in that account as of the

23   day of July 23, 2019.  And those e-mails still exist because

24   that account has not been wiped.

25       MR. DEARINGTON:  Your Honor, I can't tell you whether

1  those e-mails exist because we're not conceding that that was

2  even Dr. Tao's account.  We've never accessed the account.  We

3  don't feel comfortable using the username and password that the

4  government obtained from government informant to access that

5  account.  We can't make a representation one way or another

6  whether this account still exists.

7        THE COURT:  So you haven't discovered the e-mails in

8  that account?

9        MR. DEARINGTON:  Your Honor, we haven't even attempted

10  to log in to that account.

11        THE COURT:  Have you discovered from the

12  government anything?  Because the government ended up getting

13  access to that account.

14        MR. DEARINGTON:  No, Your Honor.  The government

15  obtained e-mails, for example, if someone from the Fuzhou

16  e-mail account sent an e-mail to a KU account, they would have

17  obtained the received e-mail.  They did not ultimately get the

18  Fuzhou account.  Nobody knows what's on that Fuzhou account.

19  The only people who knew what was on that Fuzhou account are

20  government informant and three FBI agents, and they destroyed

21  the evidence that they took away from the meeting of what was

22  on that account.

23        And the reason this is exculpatory, Your Honor, is

24  because if someone --

25        THE COURT:  Again, I come back to, you say they

1    destroyed it.  All they were doing with that laptop is

2    accessing the account, and they closed the door so they

3    couldn't access that account.  There's no evidence that they

4    downloaded e-mails, took e-mails.  I mean, they had access to

5    that account because she gave them the information they needed

6    to do that and they closed that door, for whatever reason,

7    decided they didn't want to go further because they were

8    worried it was improper search and seizure.

9          MR. DEARINGTON:  Your Honor, you raise good questions

10   that I think are probably ones that should be posed to the

11   government because we haven't been told what is it that was

12   on -- specifically on the laptop.  And we've made what we think

13   are solid inferences that the government wiped the laptop

14   because -- it claims because it didn't want to deal with a

15   suppression motion.  So if there's nothing to suppress, that

16   explanation wouldn't really make sense.  We think that they

17   actually did obtain something.

18         And if the government is willing to -- we haven't seen

19   any evidence in response.  There's no affidavit.  The

20   representations are fairly opaque.  If the government

21   represents that the laptop left the meeting with nothing at all

22   on it, then I think that we -- that weakens our argument that

23   was exculpatory evidence that was destroyed and leaves us with

24   testimony about the fact that these witnesses saw no

25   exculpatory evidence on there.

1           But if the government left the meeting with a laptop

2     that had some evidence on it, that's something we'd like to

3     know and informs some of the adverse inference instruction

4     argument, not so much the authentication argument, which is

5     separate.

6           And, Your Honor, I mentioned earlier the Fourth

7     Amendment, and I want to be perfectly clear, we're not moving

8     to suppress anything here.  The reason that the Fourth -- the

9     facts about the warrantless search are relevant here is because

10    it goes to bad faith and/or negligence.  The government has

11    argued there was apparent authority and made an issue whether

12    there was apparent authority for the FBI agents to direct a

13    third party who had been extorting Dr. Tao to log in to an

14    e-mail account that didn't belong to her, didn't belong to the

15    FBI, and for which there was no warrant.  They say there was

16    apparent authority to do so.

17          So what is apparent authority?  As Your Honor knows,

18    that's an erroneous or reasonable belief by the agents that

19    there was actual authority by government informant to give

20    consent to this account, but as we all know, and the government

21    doesn't dispute, government informant hacked into the account.

22    She had no actual authority and didn't represent that she had

23    actual authority.  And this is important not because we're

24    trying to suppress but because the government has claimed an

25    adverse inference instruction is inappropriate because there

1    was no bad faith.

2          But the fact that there was misconduct here, a

3    warrantless search of an e-mail account, suggests that the wipe

4    might have been to get rid of that evidence.  And one of the

5    reasons the government actually gives as affirmative evidence

6    of good faith is they notified the defense of the wipe, but

7    that didn't happen until ten months later, roughly nine months

8    after indictment, after many defendants would have already pled

9    out.

10         And so this is information that wasn't brought to the

11   defense's attention, we wiped this laptop, until we started

12   pressing.  We started pulling on the strands of government

13   informant with the government, and that's when they disclosed

14   this, because it was ultimately going to come out when we had

15   the trial.  And so that's not evidence of good faith.

16         And on top of that, when it comes to spoliation,

17   whether it be criminal or civil cases, an adverse inference

18   instruction, it has never been an excuse that you notified the

19   opposing party you destroyed evidence that's unfavorable to

20   you.

21         THE COURT:  Well, for me to give an adverse inference

22   instruction I have to be convinced there was spoliation of

23   evidence.  So far I've heard nothing that convinces me there

24   was other than speculation.

25         MR. DEARINGTON:  Well, we know that something -- the

1   government said there was a wipe of a laptop; that's the

2   evidence.  We don't know --

3         THE COURT:  No, that's not the evidence.  The laptop

4   is not the evidence.  The evidence is the content of the e-mail

5   accounts.  And I've heard nothing that suggests that the

6   content of the e-mail accounts was destroyed, because just by

7   accessing an e-mail account and then blocking your ability to

8   access the e-mail account does not make the e-mail account

9   disappear.

10        MR. DEARINGTON:  So, Your Honor --

11        THE COURT:  And even if you deleted e-mails off that

12  e-mail account, it doesn't make the e-mail account disappear.

13  And what you're telling me is the government is not even

14  offering the e-mail account into evidence.  It's offering into

15  evidence e-mails that came from that e-mail account that were

16  received.  So I'm not hearing anything at all suggests, other

17  than speculation, that the government somehow monkeyed around

18  with that e-mail account, deleted e-mails that were exculpatory

19  just by virtue of being able to access them through the laptop.

20        MR. DEARINGTON:  So, Your Honor, we would push back on

21  that and here's why:  What we do know is that -- or what we

22  believe based on reasonable and strong inferences is there was

23  exculpatory information in the e-mail account.  We can't access

24  that because we are unwilling to log in to an e-mail account

25  that we're not even conceding to the Court is Dr. Tao's, let

1   alone -- is affiliated with Dr. Tao, let alone is his or was

2   created by him.

3          So what we're left with is the government has been

4   able to view exculpatory evidence, had the ability having

5   already searched it, already seized it by having it on its

6   laptop, had the ability to take that away, and then give it to

7   the defense or at least talk about how it can be used, and,

8   with the exculpatory information on there, decided to wipe the

9   laptop.

10         So what was on the laptop, it seems, is what the Court

11  is probing at and that's an answer that we can't give because

12  all we know is there was exculpatory evidence.  Something was

13  on the laptop --

14         THE COURT:  You don't know there was exculpatory

15  evidence.  You're speculating that there was exculpatory

16  evidence.  And you're also speculating that it was downloaded

17  on the laptop.  I'm going to need to hear from the agents.

18         But again, I could log in to this on my iPad.  That

19  doesn't mean that that e-mail account is now on my iPad and if

20  I decide to, you know, delete my ability to access that

21  account, now I have done something to the account.  The account

22  is still there.

23         And the only way to determine whether there's

24  exculpatory information on that account is to log in to that

25  account and see what's on there, which like any other e-mail

1   account, if something had tried to delete something, there
2   would be a way to get it back.
3       MR. DEARINGTON:  We have no ability to do what Your
4   Honor just described, which is to access this account.  We
5   don't feel that we have -- that it would be proper for us to do
6   so.
7       I think going to your point about speculation, I would
8   like to argue that we're making an inference here, and that's
9   important.  So with spoliation, you don't know what the
10  evidence is because the opposing party destroyed it.
11      THE COURT:  Right.  But all I'm saying is I have to --
12  adverse inference instructions exist for a reason.  You don't
13  know what's been destroyed if it's been destroyed.  I have to
14  be convinced something was destroyed.  I've heard nothing that
15  convinces me that e-mails in that account were destroyed.
16      All I've heard is that the FBI, thinking better of
17  their efforts to access that e-mail account, decided to wipe
18  their account, meaning to close the door to their ability to
19  access the account.  That's all that means.
20      MR. DEARINGTON:  Well, Your Honor, if the government
21  came out of that meeting and had a laptop and all that was open
22  was the e-mail account and nothing was showing in the e-mail
23  account, that itself is evidence to us that there was no active
24  use of an account allegedly belonging to Dr. Tao.  So that is
25  evidence.  And if --

1          THE COURT:  I'm sorry.  I don't follow.

2          MR. DEARINGTON:  So the reason we think this is pretty

3    strongly exculpatory is twofold; really, one argument.  But the

4    government informant who had a vendetta against Dr. Tao and had

5    been trying to find evidence to use against him and fabricating

6    evidence saw this account and, obviously -- or the only

7    inference that it's reasonable is that there was no evidence in

8    the account that was incriminating.

9          And one thing that you might see, if we had the

10   opportunity, like the FBI, to view this account, would be if

11   Dr. Tao worked there, there might be regular e-mails throughout

12   the day showing research and classes and other things, but,

13   obviously, the FBI agents who looked at the account, including

14   one who speaks Chinese and reads Chinese, didn't see that and

15   neither did government informant.  And so that's exculpatory,

16   that very fact.  Unless it can be rebutted.

17         And we've lost the ability to show the jury what that

18   e-mail account looks like, because the government had it, they

19   had it on the laptop.  And I understand that we're disagreeing

20   about what it means to have e-mails that are open on the

21   account.  But they had it at one time and then they didn't have

22   it.  And so there may be a technical explanation of what

23   exactly happened that it disappeared from the laptop, but we

24   were the ones who were denied the benefit of being able to use

25   that evidence.

1    THE COURT:  All right.  Let me ask you this.  If

2    you're taking the position that this was not his account and he

3    didn't have access to it, how could there possibly be e-mails

4    on there that would be exculpatory with respect to him if he

5    never touched it, never accessed it?  How is it exculpatory?

6    MR. DEARINGTON:  So, Your Honor, we're not taking a

7    position one way or another that -- we're not saying that this

8    wasn't his account, as a factual matter.  We're not in a

9    position where we're going to start presenting facts,

10   submissions of anything kind right now for purposes of this

11   motion.  What we're saying is we're not conceding that this was

12   his account.

13   And so I'm a little unclear on what the question,

14   then, is:  How you wouldn't have exculpatory evidence?

15   If this was an account that was created for Dr. Tao,

16   let's just -- pure hypothetical, because the university wanted

17   him to come or they wanted to use his name for some purpose and

18   so they created an account for him.  Just a hypothetical here.

19   If the account was basically just a burner account that had

20   nothing in it, that's pretty strong evidence that no one used

21   that account, like Dr. Tao, to conduct business in the way that

22   someone at KU or at a law firm would.  You would see a lot of

23   e-mail activity showing research, classes, administrative

24   activity.  These are things you would expect to see, and

25   apparently they didn't see these things.

1          THE COURT:  The government intends to offer incoming

2    and outgoing e-mails from that account, correct?

3          MR. DEARINGTON:  But the government has intended to

4    introduce -- so related to the other aspect or request for

5    relief in our motion, there are a few e-mails that allegedly

6    originated from the account, and I believe there would be

7    others that the government seeks to introduce that -- not that

8    were obtained from the account but that would show the account

9    name on an e-mail in like a CC, for example.

10         THE COURT:  Right.  And there's also -- there's also,

11   I think, e-mails that originated in either the Gmail account or

12   the KU account that either CC or somehow interact with that

13   Fuzhou University account as well.

14         MR. DEARINGTON:  That is the government's contention,

15   correct.

16         THE COURT:  But the exhibits at least facially show

17   that.

18         MR. DEARINGTON:  I believe that's right.

19         But, again, Your Honor, that's consistent.  If what

20   you've just said is true and there are a couple of e-mails,

21   certainly not many, I don't think, but a handful of e-mails

22   that show that someone sent an e-mail from the Gmail or KU

23   account, Dr. Tao's accounts, to the FZU e-mail accounts, that's

24   a very different qualitative piece of evidence that -- from

25   what we think was in the account, which is that nobody was

1    really using it.  If you find those e-mails, five e-mails,

2    we'll say, for example, in FZU account over the course of two

3    years, that's pretty strong evidence that nobody was actually

4    working at Fuzhou University and using this account,

5    notwithstanding a handful of e-mails that may have been sent to

6    the account or from the account.  And that's what we're missing

7    here.

8              THE COURT:  But you want me to give an instruction

9    that says by virtue of the government blocking its access to

10   the account, wiping the laptop, whatever you want to call it,

11   we can -- the jury can infer that there were e-mails on that

12   account -- no.  What you're really asking -- what your

13   really -- your argument is really based on this:  You want an

14   instruction to the jury that says that they can infer that the

15   government's act in wiping that laptop means that there was an

16   absence of e-mails in that e-mail account that would show that

17   Dr. Tao was using that e-mail account.

18             MR. DEARINGTON:  And that is what is exculpatory.

19   Your Honor is correct.  I think framing the instruction may not

20   be exactly like that, what we would propose.  But that goes to

21   the same point, that the absence of incriminating evidence

22   where you would expect to see incriminating evidence consistent

23   with the government's theory is itself exculpatory.

24             THE COURT:  But the problem is there are e-mails that

25   are going to be offered into evidence that show activity in and

1   out of that account.

2           MR. DEARINGTON:  And so certainly we would think that

3   in fairness we should get to rebut those e-mails by showing

4   here's four or five e-mails the government has found after

5   searching Dr. Tao's entire life that have the FZU e-mail

6   account.  That's not proof that he was using the e-mail

7   account, let alone on a regular basis consistent with full-time

8   employment at Fuzhou.

9           THE COURT:  Okay.  I think I've got my answer to this,

10  but I will talk to the government.  I don't think an adverse

11  inference instruction is appropriate, but that does not all

12  foreclose you from asking these very questions, from impeaching

13  the witness by saying, hey, you blocked your access, you wiped

14  your laptop, whatever, meaning nobody has the full e-mail

15  account, so we'll never know.  I mean, I don't see any reason

16  why you can't go down that line of questioning.

17          I just think it's so speculative that it would be

18  inappropriate for me to give an adverse inference instruction.

19  But let think about it and let me hear from the government

20  further.

21          I didn't want to cut off your argument.  Is there

22  something --

23          MR. DEARINGTON:  No, Your Honor.  I'm almost done.

24  There was just one more point on that, and then I just wanted

25  to say a few sentences about the authenticity issue.

1          So on that point, I will note that we -- if the
2    government had obviously exculpatory evidence and had seized
3    it, as Your Honor as said has not happened here, and then
4    destroyed it, that's a dismissal basis.  That's not an adverse
5    inference, Judge.
6          We think -- I think it's *Youngblood* is the case,
7    deliberately destroying exculpatory evidence is the grounds for
8    dismissal.  We're not even seeking the most severe sanction in
9    terms of adverse inference instructions.  *Suarez* is a case we
10   cited from District of New Jersey, a criminal case involving
11   destruction of evidence and adverse inference instructions.
12          There's really three types of instruction.  One of
13   them the Court would instruct the jury to that the government
14   admitted X, whatever it is that defense claims is in this
15   e-mail.  The second, the slightly less severe, which is what
16   we're arguing for, is that the Court -- the government -- the
17   jury should infer X and the government can try to rebut that.
18   And then the least significant sanction is a permissive
19   instruction.
20          So we're not seeking dismissal, we're not seeking
21   mandatory admission; we're seeking a fairly modest instruction
22   here.
23          As to the authenticity issue, I just wanted to clarify
24   one thing.  So the e-mails that we're seeking to exclude
25   originating from the FZU account received by some other account

1    that the government obtained through search warrants or

2    subpoenas or otherwise, we think that those cannot be

3    authenticated because there is a person, government informant

4    who is known to have been able to access the account.  We don't

5    know when she got access to the account.  The government never

6    asked.

7            We knew she had access to the account and we know that

8    she had a motive to incriminate and falsely accuse Dr. Tao

9    because she had done so in the past and that her modus operandi

10   was using e-mails.  She had created fictitious e-mail accounts

11   and that's how she falsely accused Dr. Tao and gave the air of

12   legitimacy, because she used e-mail accounts that used names of

13   other people.

14           So for that reason we also seek the exclusion of the

15   handful of e-mails from that account that can't be shown to

16   have come from Dr. Tao versus her.

17           Thank you, Your Honor.

18           THE COURT:  Thank you.

19           MR. OAKLEY:  Your Honor, the first thing that I would

20   like to do relates to Mr. Dearington's mention of the

21   government reaching out last night.  In footnote 7 of the

22   government's response, it's on page 6, the government says,

23   "But he omits the fact that the content was in Chinese which

24   the agents could not read."

25           In reviewing -- so there was an audio recording made

1    of this July 23rd meeting with Student No. 1, and in reviewing

2    that recording, there's a conversation between Agent Angie Ng,

3    N-g, who was a San Francisco agent who was there, and one of

4    the Kansas City agents who flew out, and during this

5    conversation was actually about -- started because of a

6    discussion about a Chinese restaurant in Lawrence.

7         But during there there's a conversation between Agent

8    Carlson and Agent Ng, and I think Agent Carlson knew Agent Ng.

9    I think maybe he had been in San Francisco prior.  He made a

10   statement of I've been trying to get Angie to teach me

11   Mandarin.  Later, Special Agent Ng says, I don't know it very

12   well which is why I haven't been.

13        But that discussion -- based on that discussion, we

14   had a phone call with Special Agent Ng and she clarified that

15   she -- my understanding is she was born in Hong Kong, but she's

16   a native Cantonese speaker, which I understand to be a

17   different language than Mandarin Chinese.  However, she's had

18   some training in Mandarin, so she has some fluency.  She can

19   read a little bit.  I understand that some of the written

20   language is similar.

21        She didn't translate.  It's very clear from the audio

22   that she wasn't involved in translating.  In fact, I think one

23   of the direct quotes that comes from the defendant's motion,

24   she says to Special Agent Lampe, "You need a translator," and

25   he says, "I do."  But because that footnote said none of the

1    agents could read and she has some limited ability, I just

2    wanted to make sure that the record is clear on that.

3          To clarify some things that the defense said, first of

4    all, I think it's important to note that, to my knowledge,

5    Student 1 has never admitted to fabricating evidence.  She

6    admitted that she lied to the FBI, but I think at multiple

7    times defense has claimed she admitted to fabrication, which I

8    don't believe is the case, and if I'm mistaken, I'm sure

9    they'll correct me.

10         The other thing is I want to make sure the Court is

11   aware of what happened.  So there were two e-mail accounts that

12   Student No. 1 had access to that were related to Dr. Tao.  One

13   was the Tao FZU account, the e-mail account that looks -- that

14   is the standard university e-mail account that employees and

15   students and others get.

16         And then there was another one that we believe that

17   the government's evidence would show that was a 163 account,

18   which my understanding is a Chinese e-mail provider.  And we

19   believe the evidence will show that she, along with Dr. Tao,

20   created an e-mail account she had the password to.  She may

21   have even created the password.  But that was a Chinese account

22   that she created for the purpose of using it to recruit

23   post-doctoral students.

24         THE COURT:  So I misunderstood.  I thought the

25   Gmail -- Dr. Tao's Gmail account was what she was using.

1        MR. OAKLEY:  No.  It's the 163 account.

2        MR. BARRY:  Yeah, just to clarify, so there's three

3   relevant accounts here.  No. 1 is the Fuzhou e-mail account

4   we've all been talking about.  No. 2 is the 163.com, which is a

5   Chinese domain name which is similar to Gmail or Yahoo.  And

6   No. 3 is the account that Student No. 1 notes in her July 9th

7   e-mail which she says she used to submit research proposals for

8   Dr. Tao.  So there's three accounts.

9        THE COURT:  What account is that third one?

10        MR. BARRY:  We call it the Natural National Science

11   Foundation account, which is sort of analogous Chinese

12   government institution that provides research grants, but we

13   don't -- sitting here now, I don't know exactly what account

14   that was other than what's stated in the July 9th e-mail that

15   is, you know, attached to some of the briefing, which is simply

16   that she did have access to that NSFC account or that grant

17   account and that's the account that she said, these are the

18   credentials I know for that account and those are the same

19   credentials that allowed me to access the Fuzhou educational

20   institution account.

21        THE COURT:  So there is no evidence that Student 1 had

22   access to Dr. Tao's Gmail or KU accounts?

23        MR. BARRY:  I'm not aware of any evidence that Student

24   1 had access to either the Gmail or KU account of the

25   defendant.

1    THE COURT:  All right.  Go ahead.

2    MR. OAKLEY:  So what happens at that meeting in San

3  Francisco is Student 1 has her own laptop and she logs in to an

4  account, and then the FBI had brought a -- what's been called a

5  clean laptop, but I think, as the Court suggested, it's one

6  that's not connected to any other FBI network, and they asked

7  her to log in using the FBI laptop.

8    So she provided the username and the password.

9  Nothing was -- the e-mail account was not dumped, nothing was

10  downloaded to the FBI laptop.  It was simply that they logged

11  in on the FBI laptop.

12    Now, I believe that the Court may be familiar with the

13  save password/save ID function such as the web browsers have

14  where you can save it.  I believe they may have saved the

15  username and password, but, Your Honor, it was also written,

16  the username, the password.  It was provided to the defense,

17  presumably.

18    We believe the evidence will show that this was

19  Dr. Tao's password that he had access to, so he would have the

20  username and the account.  But it was also provided in

21  discovery to the defense.

22    But nothing was downloaded to that laptop.  The only

23  thing that would be on that laptop would be the username and

24  password that was documented in paper form and then whatever

25  other digital crumbs or -- that would be there when somebody

1    logs in, but the e-mail messages were not downloaded to that

2    account.  So e-mail messages were not destroyed.

3           At one point the FBI had contemplated, since she had

4    access to those accounts, whether or not she would have the

5    authority to access them, and so at one point the thought was

6    that they could then later, since they had the username and

7    password, access them.  It was decided, to avoid Fourth

8    Amendment issues, not to do that.

9           So --

10    THE COURT:  What was the date?  Sounds like the

11    defense has not -- despite having the username and password,

12    they've not accessed the account to date.  Has the government

13    accessed the account?

14    MR. OAKLEY:  The FBI has not accessed the account.

15    The prosecutors have not accessed the account.

16           So it's equivalent to they're a locked -- you know, a

17    locked room where there might be evidence inside, where the

18    defendant has a key, and the FBI has a key that's made, decides

19    not to use that key and throws the key away.  Nothing inside

20    the room is destroyed.  The defendant's ability to access the

21    account is not destroyed.

22           The other thing that, as it relates to the

23    authentication piece of this, Your Honor, is even if she had

24    access to this account because she had the username and she had

25    the password, I won't bore the Court with rereading the Judge

1    Grimm quote, but it's applicable here.  That doesn't mean that

2    the government can't meet the relatively low burden of

3    authentication.

4          And in this circumstance, Your Honor, because the FBI

5    did not access this account, we are unable to introduce e-mails

6    that came directly from that account.  What we have instead is

7    an example that we attached as Exhibit 1 to our response to the

8    defense motion *in limine*, and this is an e-mail where Dr. Tao's

9    Gmail account ends up sending a message, and I believe that

10   this is an unsigned contract, not the one that we introduced,

11   but sends it to the FZU account to taofeng@fzu.edu.cn.  And by

12   the way, Your Honor, this occurred August 3, 2019, which is

13   after the FBI met with Student No. 1.

14         So the authentication portion of this is the

15   government's going to be able to show that these -- that any

16   e-mail that involves the Fuzhou University account either sent

17   or received an e-mail by another known account of Dr. Tao,

18   either KU or the Gmail account.

19         And, Your Honor, it didn't strike me until the Court

20   said it, but I think it is absolutely right; if it's not his

21   account, how is there anything in there that's exculpatory?  I

22   can't fathom a situation where that would be possible.  Maybe

23   there is, but I think the Court hit it on the head.  They can't

24   have their cake and eat it too.  They can't say it's not his

25   account, that we're not saying it's his account, but there was

1    exculpatory things in the account.

2         But regardless --

3         THE COURT:  Because even if the account were -- to use

4    Mr. Dearington's hypothetical, even if Fuzhou University

5    created this account for Dr. Tao because they wanted him to

6    come, but he didn't, again, there would be no activity in that

7    account that could be tied to him other than the ones that I

8    guess you've got that show a connection between either KU or

9    Gmail accounts that are known accounts of him.  There would be

10   no activity in there that would be inculpatory or exculpatory,

11   it sounds like.  I mean, there would be no activity related to

12   him.  It would be an empty account, although apparently it

13   wasn't because there were some incoming.

14        So you've got e-mails that are outgoing from that

15   Fuzhou account somewhere and then you have -- do you have

16   e-mails from either KU account, Gmail account to the Fuzhou

17   account or CCing the Fuzhou account?

18        MR. OAKLEY:  The one I have in front of me, Your

19   Honor, which, again, is Exhibit 1, is from the Gmail account --

20   from the Franklin Tao Gmail account to the Tao Feng FZU

21   account.  I apologize, as I stand here, I'm not sure what all

22   we have as far as sent and received, but I know there are

23   instances where the defendant forwarded or -- blind copied --

24        THE COURT:  This is Exhibit 1 to your response.

25        MR. OAKLEY:  To our response, Your Honor.

  
1    THE COURT:  Okay.  Let's see.

2    MR. OAKLEY:  And, Your Honor, I apologize, if I would

3 have turned the page, Exhibit 2 was an example of KU account of

4 Franklin Tao sending an e-mail message to the Tao Feng at

5 Fuzhou e-mail account.

6    THE COURT:  Okay.  So Exhibit 1 to Document 162, which

7 is your response to motion *in limine* 1, is an e-mail from

8 Franklin Tao's Gmail account to taofeng@fzu.edu.cn August 3,

9 2019.

10    And then there was another one from Tao KU account

11 dated March 11, 2019, to taofeng@fzu.edu.cn.

12    MR. OAKLEY:  And then, Your Honor, the third one is

13 actually one from the Tao Feng FZU account to the KU account.

14 So I apologize, I had it in front of me, but we have it going

15 both ways involving the Gmail account, the KU account, and the

16 FZU account.

17    THE COURT:  And there was one from the KU account to a

18 student in Sydney, University of Sydney, but it's blind copied

19 to Tao KU account, which is where it came from, and also blind

20 copied to Tao Gmail account and also blind copied to Tao FZU

21 account.

22    MR. OAKLEY:  Yes, Your Honor, that one obviously

23 involves all three accounts.

24    Your Honor, unless you have any questions, I don't

25 have anything else on this motion.

19-20052-JAR    USA v. Feng Tao    10.14.21                    85

1          THE COURT:  All right.  Thank you.

2          All right.  So for *limine* No. 1, the outgoing e-mails

3     from the Fuzhou account, there's an authenticity objection.

4     I'm going to deny without prejudice.  The government is going

5     to have to lay authenticity at trial, but that's something I

6     would need to decide then.  I'll also decide if there's a Rule

7     403 issue with respect to the specific e-mails.

8          With respect to the adverse inference instruction, I

9     don't think there's been a showing that this would be proper.

10    There's not been a showing of spoliation.  There's -- the

11    laptop that the e-mail account was accessed on, the FBI laptop,

12    none of the e-mails were downloaded; therefore, there was

13    nothing destroyed through the use of that laptop.

14         Agent Ng may speak Cantonese but that Mandarin is a

15    separate language, completely separate language.  There may be

16    some characters that are the same in the written language, but

17    she apparently didn't understand that and that's why there's --

18    part of the recording interview includes her saying that they

19    need a translator because apparently she couldn't do it.

20         So to the extent that the FBI had access to the

21    e-mails by looking at them on the laptop, that wasn't -- it

22    wasn't something that they could use at that particular time

23    and, in any event, it wasn't downloaded or dumped onto the

24    laptop.  There's not been spoliation of evidence.  There would

25    have to be spoliation of evidence for me to give this adverse

1    inference instruction, which is, essentially, telling the jury

2    to infer that the government destroyed evidence that would have

3    been helpful to the defendant, but there's no showing that the

4    government destroyed any evidence.

5            So I deny the *limine* motion that asks for an adverse

6    inference instruction.

7            MR. OAKLEY:  Your Honor?

8            THE COURT:  As I told Mr. Dearington -- go ahead.

9            MR. OAKLEY:  Just to be hyper- -- I want to make sure

10   that the Court's very clear.  Special Agent Ng, Cantonese is

11   her native language.  She has had some FBI training in

12   Mandarin.  It was explained to me there's a test where they

13   give you a score.  She scored a 2 out of 5.  I don't pretend to

14   understand the significance, but she says she has some ability

15   both based on her native Cantonese and also some additional

16   training, but because of the complexity of the language, she's

17   not comfortable.  She says that in the audio recording.

18           And I think the audio recording is clear that she

19   doesn't translate the e-mails between the agents.  I just want

20   to make absolutely clear that I'm giving the Court all the

21   information I have.

22           THE COURT:  All right.  I think that's fair.

23           Again, I've heard nothing that at all suggests that

24   there was spoliation, destruction of evidence, or failure to

25   access that e-mail account because they knew there would be

1    exculpatory evidence on there.  They didn't access the e-mail

2    account because they were concerned about whether there might

3    be Fourth Amendment issues with accessing it through passwords

4    provided by Student 1, given the way that she obtained access

5    to that account.

6              So anyway, for all the reasons I've stated, I'm

7    denying the adverse inference instruction.

8              I'm not necessarily saying that the defense can't

9    impeach witnesses to the extent it's relevant to their

10   testimony that this -- that the FBI used this laptop to access

11   the account and then, you know, then wiped the laptop or did

12   whatever they did.  I do think, though, if you're going to go

13   down that path, we need to talk about it at the bench to make

14   sure we all understand the proper way to impeach with what the

15   record reveals actually happened.

16             All right.  Let's move on to *limine* motion No. 2,

17   Document -- I think it's 157.  And this is the defendant

18   seeking to exclude -- the defendant seeking to exclude certain

19   evidence that it anticipates the government may offer, whether

20   that's through the testimony of Dr. Tiffert or otherwise.

21             It's also related -- I think the government's omnibus

22   motion *in limine* is also related because the government seeks

23   to exclude the defendant's ability to offer defenses based on,

24   frankly, some of the same types of evidence.

25             So the defendant challenges evidence the government

1    might introduce related to China and other associated topics as

2    excessively prejudicial observing, quote, "during a worldwide

3    COVID-19 pandemic traced to China and a years' long trade war,

4    reports of growing anti-Asian discrimination and xenophobia in

5    this country have sharply increased in the last two years," end

6    quote.

7          The defendant goes on to express concern that evidence

8    about China's economic and security interests, its use of

9    talent programs to facilitate international intellectual

10   property theft, and China's growth in recent years would

11   confuse the jury and lead to a verdict based on prejudice and

12   not evidence of guilt and that such evidence is irrelevant to

13   the indicted counts.

14         The defendant notes that evidence related to

15   intellectual property theft is wholly unrelated to an

16   indictment that does not allege he stole anything.

17         The defendant asserts that evidence related to the

18   Communist Party of China or any claims which were not in the

19   indictment that the purpose of his scheme was to benefit the

20   Communist Party of China or China.

21         The government's omnibus motion seeks to exclude or to

22   preclude the defense from contending or mentioning he is the

23   victim of an unjust government dragnet, that the government is

24   out to catch a spy and settled on fraud charges, that he is the

25   victim of selective prosecution, that Student 1 is to blame for

1    his indictment, and that he faces imprisonment and has suffered

2    other consequences.

3          I should say that the defendant concedes that the last

4    thing -- no one should be going into or mentioning anything

5    about potential imprisonment or sentencing or consequences as

6    a -- that flow from a criminal conviction.  That is improper in

7    any case.

8          But, as you can see, these motions are related in the

9    sense that the government wants to exclude or preclude the

10   defendant from offering some of these arguments about him being

11   caught up in a dragnet and them suspecting he was a spy but not

12   being able to prove it or settling on fraud charges, but at the

13   same time, defendant doesn't want the government to get into

14   issues about the government's concern about intellectual

15   property theft by China or espionage, et cetera.  I really

16   think we need to talk about this globally, if you will.

17         And what I've tried to do is focus on the indictment,

18   and it is a speaking indictment, and my practice is, generally

19   speaking, not to read a speaking indictment to the defendant.

20   But the indictment itself educates me in terms of what the

21   government -- what the government contends are the false

22   statements and, you know, artifices or what's the -- what

23   constitutes the scheme to defraud.

24         And it seems to me that the important things --

25   there's contextually some things the jury needs to understand

1    in order to understand the charge -- these fraud charges.

2         So Counts 1 through 7 of the indictment charge wire

3    fraud based on e-mails, submission of institutional

4    responsibility forms, submissions to Department of Energy, and

5    Dr. Tao's application for National Natural Science Foundation

6    of China funding that relates to that.

7         And then Counts 8 and 9 are false statements that are

8    based on the 2018 and 2019 institutional responsibility forms,

9    which, you know, include statements about whether or not there

10   are conflicts of interest or conflicts of time.

11        And then Count 10 is a false statement count charging

12   false statements in connection with a KU grant application and

13   false representation to the Department of Energy about whether

14   or not he was receiving or expected to receive funding from

15   Fuzhou University and/or People's Republic of China.

16        So the jury is going to need, obviously, to hear

17   evidence about Dr. Tao and his work at KU and about the -- you

18   know, which included -- I think as the indictment alleges,

19   included doing research and applying for government -- U.S.

20   government grants and funding for that research; what

21   Department of Energy and NSF required; what KU required; what

22   was in the institutional responsibility forms; what the

23   relationship was between the NSF and KU and DOE and KU and the

24   research; what the research was about; why NSF and why

25   Department of Energy and KU, for that matter, had this

1   requirement in terms of no conflicts of interest or time; the

2   importance of that; and then the allegation is that, you know,

3   the fraud pertained to Dr. Tao actually either being employed

4   or seeking employment, spending time at Fuzhou University,

5   allegedly recruiting post-doc students to work with him to do

6   research at Fuzhou University as being, you know, what the

7   government says or the material misrepresentations and

8   omissions in these various statements that are charged.

9          As a matter of context and background, I think the

10  jury needs to know what the Changjiang Scholar Program was

11  because that's what some of the evidence is going to pertain

12  to, and there apparently are exhibits that are going to mention

13  this scholarship program and that are going to speak to whether

14  or not Dr. Tao had been awarded that scholarship or was seeking

15  that scholarship.  I mean, the evidence is going to pertain to

16  this.

17         So the jury needs to know, as a matter of background,

18  what the Changjiang Scholar Program was; who administered it;

19  what the requirements were I think is appropriate for that

20  program; and in particular, that was the, I think, talent

21  program that is at issue in this case; and what the

22  expectations were for someone that was going to participate in

23  that program as a scholar, et cetera.

24         I mean, all of that, to me, is material and germane to

25  these charges.

1          There are things in this superseding indictment,

2   second superseding indictment that I think go too far in the

3   sense that they could introduce some prejudice without being

4   particularly probative.  For example, I don't -- and I'm

5   telling all of you this at the outset and then I'll entertain

6   argument, but I'm just sort of trying to cut to the chase on

7   some of this.

8          You know, the fact that China is a populous country

9   and has invested heavily in its growing economy and is wanting

10  to get ahead of other countries in terms of technological

11  development, I mean, that's probably a given with respect to

12  China, it's a given with respect to the United States.  It's a

13  given with respect to any world power.  But I don't know it's

14  particularly germane.

15         I think what's germane is context in terms of what the

16  talent program was, who administered it, that it was apparently

17  sort of a joint -- I don't know if venture is the right word,

18  but there's some administration or some participation by both

19  the university and the Chinese government in these programs,

20  you know.  And in this particular program that's at issue in

21  this case, you know, what they wanted from the people that

22  participated in the program in terms of what kind of

23  performance or what kind of work, what were the expectations,

24  and, you know, what were the benefits, why would people even do

25  that.  They obviously wouldn't do that for free.

19-20052-JAR    USA v. Feng Tao    10.14.21

1        So, I mean, that's the kind of background, but I don't

2    think it would be appropriate to get into this business of

3    China as a world power and they want to get ahead of the United

4    States.  I don't think it would be necessarily appropriate to

5    talk about the theft of intellectual property because that's

6    not an issue in this case.

7        Obviously, that's a concern the United States

8    Government has.  It's probably a concern the Chinese government

9    has with respect to its intellectual property, but that's not a

10   charge in this case.  It would be prejudicial, I think, to

11   introduce evidence suggesting that Dr. Tao was stealing

12   intellectual property.  Conversely, I don't know why it would

13   be relevant then for then Dr. Tao to present a defense that

14   they were really trying to get me because they thought I was

15   trying to steal intellectual property.  But I don't to want

16   foreclose that, because, again, all of this is so contextual.

17       So it could be that that would be an appropriate

18   defense for Dr. Tao to get into, but I'm just saying at the

19   outset, with respect to the government's case, there's

20   certain -- there's certain lines I think that need to be drawn,

21   and that is I don't think the government should be presenting

22   evidence about intellectual property theft either through

23   Dr. Keiser or Dr. Tiffert.  I don't think the jury needs to

24   hear about this sort of competition between the Chinese

25   government and the United States Government as far as

1    developing technology.

2         But it is contextual and it is material I think to the

3    issues in this case for the jury to hear what this Changjiang

4    scholarship program was and what the purposes were and what the

5    expectations were and how it worked.

6         Let's see.  And that would include such as the

7    expectations to recruit other scholars, the expectation to, you

8    know, obtain grants or funding within China, just as there was

9    expectations to obtain funding from the United States in

10   working for KU and doing the research projects that Dr. Tao was

11   involved in.

12        So, anyway, I think just -- so those are my general

13   observations about where I think lines ought to be drawn and

14   where I think it would be going too far in terms of getting

15   into the way China operates and other talent programs and

16   competition and intellectual property theft and all of that.

17        So I hope that helps.  So now if you want to drill

18   down further, we can certainly do that, so why don't we take up

19   first with the defendant the motion -- *limine* motion No. 2, to

20   exclude the government from offering evidence about China as

21   described in that motion.

22        MR. ZEIDENBERG:  Thank you, Your Honor.

23        THE COURT:  I will say -- let me say one more thing.

24   I do want to hear all of your arguments about all of this, but

25   my intention is to -- because we're, I think -- we're talking

1    about line drawing and I want to be really clear on where I

2    think the outcome should be so I intend to write on this so

3    everybody understands this because obviously both sides are

4    very interested in dealing with some of these things in your

5    case.

6              Go ahead, Mr. Zeidenberg.

7              MR. ZEIDENBERG:  Thank you, Your Honor.

8              And we agree, in terms of organization, the way that

9    the Court sort of is combining these several issues.  It's a

10    little confusing keeping straight whose motion and whose

11    opposition and they're very closely related, and so I think it

12    makes sense to explore the issue and then we can make the

13    argument where we think the line should be drawn.

14              The government in its papers says this is a garden

15    variety fraud case.  And then a dozen times in its paper it

16    says it needs to put in evidence about the Chinese Communist

17    Party, the PRC government, and the purpose of the Chinese

18    talent programs, and the particular significance of the

19    Changjiang Scholars Program so the jury can contextualize the

20    defendant's misrepresentations.

21              Your Honor -- and I hear the Court's -- what I think

22    is the Court's distinction that it's making about the

23    requirements of a particular talent program, the Changjiang

24    Scholar Program which is at issue, and talking about the

25    purpose of Chinese talent programs writ large to the Chinese

1    industrial plan.

2            The lies, the misrepresentations in this case that the

3    government keeps saying needs context and needs to be

4    contextualized amount to a form, a conflict of interest form

5    with two boxes on it that require you to disclose outside

6    employment or whether you've received $5,000 in salary the

7    previous year.  That's the lie.

8            And then on the grant submission there's a box where

9    you have to list current impending support which they say that

10   should have been checked.

11           So evidence that shows that Dr. Tao had employment in

12   China is obviously fair game.  If they have e-mails that are

13   otherwise admissible that tend to show that he's doing work

14   there that would seem to be consistent with a full-time job or

15   that he had gotten paid or that he had research that he was

16   doing there and those are reporting requirements, I mean that

17   is fair game.  Okay?

18           So we don't disagree with that.  What my argument

19   here, Judge, is those statements don't really need context.  It

20   wasn't a long conversation in which there was an interview and

21   then different statements need to be looked at in terms of

22   other conduct.  We have a box.  The box was checked -- or

23   wasn't checked, outside employment.  That's the only context

24   that's needed.  So the role of the Chinese Communist Party in

25   Chinese society and how it does or does not run universities

1    there is not relevant.

2         The government, in its papers, said that evidence

3    about how Dr. Tao physically spent a significant amount of time

4    at FZU, built a competing lab and scientific equipment at FZU,

5    recruited post-doc students and professors, applied for

6    research grants on behalf of FZU, fair game.  No dispute.  If

7    they have that evidence, it's -- clearly would be relevant and

8    we would not be suggesting otherwise.

9         But evidence -- what they say on page 3 of their

10   opposition, evidence that the PRC government's involvement in

11   talent recruitment plans like the Changjiang Scholars Program

12   is not relevant to understanding his fraud.  It's not necessary

13   to understand how Changjiang scholar or other talent programs

14   fit into the Chinese business model, if you will, and how it

15   adds to their economic or military prowess.  That is not

16   relevant.

17        If these jobs that Dr. Tao took were at Harvard

18   University or at Kansas State, all you'd want to know is did he

19   work there, did he get paid, did he get research.  That's all

20   you need to know.  You don't need to know why Harvard wanted to

21   hire him.  You don't need to know why Kansas State wanted to

22   hire him.  If it was an unnamed community college that wanted

23   to hire him, it doesn't matter.

24        Or if there was a foreign talent program and it was in

25   Canada.  Canada has talent programs.  The reasons why Canada

1    wants to bring him to Canada to work there doesn't matter.  The

2    question is:  Did he lie on these forms?  The fraud was against

3    KU -- allegedly KU, NSF, and DOE.  They're the ones that were

4    supposedly lied to.  And they were lied to about whether he

5    took an outside job.

6          Why this outside employer sought to hire him is not

7    relevant.

8          Your Honor, I'm looking at page 4 of their papers.

9    The government says that "Evidence regarding the purpose of the

10   Changjiang Distinguished Professor Program, including

11   regulations promulgated by the Ministry of Education, are

12   needed to help contextualize how defendant's recruitment

13   efforts would advance the PRC government's publicly disclosed

14   industrial objectives."

15         It doesn't matter what they're publicly disclosed

16   industrial objectives were and the prejudice is enormous.

17         THE COURT:  I think what you're arguing is the

18   government can focus on the benefit to Dr. Tao, but the benefit

19   to the PRC or Fuzhou University is not material.

20         MR. ZEIDENBERG:  Perfect.  That's exactly --

21         THE COURT:  I guess I should say the benefit to Fuzhou

22   University in terms of what work he may have been doing for

23   them, but in terms of the government itself, no materiality

24   there.

25         MR. ZEIDENBERG:  Exactly.  That's it in a nutshell,

1    that this is a fraud that he was supposed to obtain money and

2    property in the form of salary and grant money, and that he

3    obtained it by failing to disclose outside employment, which if

4    he had disclosed, would have caused him to choose one job or

5    the other job or possibly being fired or something like that.

6    So he was able to maintain his employment.

7            But what this outside employer -- why they wanted him,

8    why they were trying to hire him, doesn't matter.  He could be

9    working at a charity.  He could be working for, you know,

10    Mother Teresa.  It doesn't matter -- it wouldn't make him less

11    guilty.  It wouldn't make him more guilty if it was -- the

12    government thought it was some nefarious purpose he was doing

13    over there, because he's not charged with anything illegal.

14    It's not illegal to join a talent program or to work at a

15    foreign university.  The only problem is if you -- according to

16    the government, it needed to be disclosed.

17            So the motives and intent of the Chinese Community

18    Party, the Chinese government, Fuzhou University is not

19    relevant.

20            Your Honor, on page 7, another statement from the

21    government just leapt out at me.  It says that "In

22    understanding how the PRC government encourages individuals

23    like defendant to participate in talent programs is useful to

24    understand how a program like the Changjiang Scholars Program

25    fits into the PRC government's broader policy objectives."

19-20052-JAR    USA v. Feng Tao    10.14.21                    100

1          This case cannot be about the PRC government's broader

2    policy objectives.  It's not important or relevant for the jury

3    to know, as the government states on page 6 of their papers,

4    that it would be useful for the jury to understand that there

5    are dozens, if not hundreds, of different talent recruitment

6    programs in the PRC, but the Changjiang Distinguished Professor

7    Program is one of the most prestigious.

8          That's why I was using the example of how Harvard

9    versus some unnamed -- or relatively unknown community college.

10   It doesn't matter if he was going to a prestigious university

11   or unknown university that has no national reputation; if he

12   was getting paid or if he had full-time employment, he had to

13   disclose it.

14         And trying to look at the -- what the role of the

15   Chinese Communist Party is, which they mention almost a dozen

16   times in their papers, seems like a transparent attempt to stir

17   the emotions of the jury in an improper way.

18         So, on page 8, "Evidence or argument of any tangential

19   benefit that the PRC government or FZU obtained will be

20   introduced to explain, contextualize, and prove defendant's

21   fraudulent scheme."

22         The tangential benefit to the PRC or FZU does not

23   explain or contextualize anything about this scheme.  The

24   scheme was to have outside employment and it's not necessary to

25   know, as I keep saying, how this benefits the other party.

1    He's essentially -- in this case, Your Honor, what it really

2    comes down to is he's moonlighting, is the allegation, is he

3    took outside employment and he didn't disclose it.

4         And it doesn't matter really, under these -- under

5    these categories, what that outside employment was.  He had to

6    disclose outside employment, if we're reading it according to

7    the government's allegations.

8         THE COURT:  So let me stop you here and I'll ask the

9    government this too.

10        So when we talk about, you know, moonlighting, outside

11   employment and the government's proof of that, and, of course,

12   there's these unsigned contracts, there's no signed contract.

13   I mean, one way you might prove employment is there's a signed

14   contract, but there's other ways to prove employment.

15        And one other approach, absent an unsigned contract

16   and I think what is what's going on in this case, is the

17   government seeks to prove, okay, here's what the expectations

18   would be or were for somebody to fill this particular position,

19   Changjiang scholar at Fuzhou University, here's what the

20   expectations are.  Here's the evidence he was doing this, he

21   was doing that; in other words, demonstrating he was fulfilling

22   the expectations as circumstantial evidence that he was, in

23   fact, working there may be evidence about the time spent there,

24   and that sort of thing.

25        So, to me, that's material evidence.  I mean, to

19-20052-JAR    USA v. Feng Tao    10.14.21                    102

1    understand here's what the expectations were and here's what he

2    was or wasn't doing with respect to those expectations would be

3    proper.  What you're arguing is for the government to go beyond

4    that and talk in general terms about the talent programs, the

5    importance of them, why they have them, what they do with them,

6    how that helps them compete with the United States and the

7    world; that's all immaterial to what the issues are in the

8    case.

9            MR. ZEIDENBERG:  Correct.  So I won't belabor that

10    further, Your Honor.  I think the government -- I mean, I think

11    Your Honor understands our arguments, and also I think the

12    Court seems to appreciate our concern about the potential

13    prejudice here because, you know, there is so much news every

14    day that we're all hear about the competition with China and

15    what a threat China is to the United States' national security,

16    Cold War, trade war, and who could be tougher on China.

17            So I think part of this is imbedded in the case.  You

18    know, that, you know, my client is Chinese.  He was born in --

19    his connection with Fuzhou University in China, so we know that

20    that's there.  There's no need to exacerbate that and inflame

21    that by putting in evidence that doesn't directly go to the

22    issues at hand, which is was he working there, was he paid --

23            THE COURT:  I agree.

24            MR. ZEIDENBERG:  -- and did he do research.

25            THE COURT:  I agree.  And I'm going to talk to the

1    government more about -- one of the things the government seeks

2    to exclude in terms of your defense is something that I think

3    could potentially inflame the jury for you to, for example,

4    suggest that what they really were trying to do is go after him

5    for espionage or theft of intellectual property and they

6    settled on fraud.  That at least introduces that concept.  I'm

7    a little bit concerned about that.  I'm not telling you that

8    can't be your defense, but that could introduce some

9    problematic prejudicial concepts as well.

10          MR. ZEIDENBERG:  That's true, Your Honor, and that

11   would be a tactical decision that we would have to make based

12   in part on what the ruling is, you know, on this part of the

13   motion.

14          But I would say, and it's important to draw a

15   distinction, we think, between the evidence that the government

16   was trying to introduce that we've just discussed and an

17   ability to cross-examine agents about bias and motive.  And we

18   think that there is -- that's a permissible area of

19   cross-examination and it's supported by the case law, and that

20   the credibility of the agents and the integrity of this

21   investigation we believe was impacted adversely by their -- a

22   rush to judgment based on their belief that this was an

23   espionage case, that they treated like an espionage case, they

24   investigated like an espionage case, and the amount of

25   resources, the amount of money, the amount of time, the amount

1  of manpower that they applied to this case goes into their

2  motive, and cases have held this, that it shows that they are

3  biased in favor of finding something, anything, in this case.

4        And that's what we assert that they did do, which is

5  they were looking for a spy.  They thought -- they were told he

6  was a spy.  They were looking at economic espionage.  They were

7  looking at theft of trade secrets.  They put a tail on him.

8  They put a drone over his house.  They searched the bank

9  accounts of him, his wife, his friends, his church members who

10  lent him money for legal fees, and at the end of the day they

11  had a conflict of interest form where the box wasn't checked.

12        And, you know, if this had been -- this is a

13  prosecution we believe that was born out of an incentive

14  program, essentially, from the Department of Justice to get

15  Chinese spies pursuant to the China Initiative, and that a

16  young agent, like Agent Lampe, was highly motivated, and as a

17  result of that motivation to try and, you know, accomplish what

18  he had been told was the goal was every office needs to bring

19  one of these cases, ignored exculpatory evidence at every turn,

20  looked at ambiguous evidence only in the light most sinister,

21  never looking at it as being open to another interpretation,

22  and simply ignored vast amounts of exculpatory information.

23        And we think there's a common thread that explains

24  this, that this wasn't a random mistake or random errors, but

25  they're tied together by a motivation which essentially had

1    them put blinders on and ignore this.  So I think that the jury

2    should be entitled and the defense should be entitled to

3    explore that and to thread it together for the jury that

4    they -- the information they got -- they're getting in this

5    case is one sided and biased and this is why.

6                THE COURT:  All right.  So given what you've just

7    said -- and I mean, that could be a very compelling defense and

8    I'm not at all foreclosing you from going down that path --

9    just some observations.

10               First of all, I would expect in this case, given that

11   if you're going to offer that defense and given that there are

12   some exhibits that reference the People's Republic of China, if

13   that one photograph comes into evidence, I think the photograph

14   purports to be of Dr. Tao and some member of the communist

15   party, but I could be wrong, it could be somebody at Fuzhou

16   University or maybe somebody that's both.  I don't know.

17               I would expect during *voir dire* that you and/or the

18   government are going to touch on this anti-Asian bias or the

19   fact they're not supposed to decide this case on the basis of

20   how they feel about the People's Republic of China, so I would

21   expect to hear that anyway.  And there's some evidence that

22   sort of references the People's Republic of China.

23               But also impeaching witnesses or getting into these

24   subjects with witnesses to show ill motivation for this or

25   whatever could potential open the door to some of the things

19-20052-JAR    USA v. Feng Tao    10.14.21                    106

1    that I am drawing lines against.  So, for example, I think one

2    of the things you said, that every agent was sort of tasked

3    with bringing in one of these cases, I mean, it could open the

4    door to the government seeking to get into what these talent

5    programs were all about.

6            I mean, if the defense is that there really was an

7    attempt to do a dragnet and sweep up people all over the

8    country that through talent programs were allegedly sharing

9    intellectual property and that's not what they could prove in

10   this case, so they went after him for something else that you

11   say they can't prove, that could open the door to the

12   government asking that same agent about, you know, what were

13   your directives.

14           I'm just suggesting this is fraught with some problems

15   depending -- and it's all contextual, but I'm going to be

16   listening carefully and what I'm going to try to do in my order

17   for all of you is to line draw, but I think you all understand

18   the lines could move a little bit depending on the evidence.

19   I'm just telling you that.  And I do think at the outset,

20   during *voir dire*, we do need to vet this jury for bias on some

21   of these issues.

22           So -- and you'll have the opportunity to submit, and

23   maybe you've already done that, proposed *voir dire* questions

24   too that we can talk about.  Okay.

25           Go ahead, Mr. Zeidenberg.

1          MR. ZEIDENBERG:  Thank you, Your Honor.

2          THE COURT:  Go ahead.

3          MR. BARRY:  I want to start by emphasizing what the

4    Court emphasized, which is that context is really, really

5    important here.  And there are a couple of examples that I want

6    to just kind of talk through from Mr. Zeidenberg's argument

7    that provide -- and in some of the Court's comments -- that

8    provide, I think, pretty good examples of why context is

9    important.

10          And the reason why it's important is because the

11   fraudulent scheme here and the false statements, unlike what

12   Mr. Zeidenberg said, do not just -- are not just premised on

13   whether or not a particular box on a form was checked.  They're

14   not just premised on whether or not the defendant made

15   particular disclosures at a particular point in time to NSF or

16   DOE or KU.  That's part of the scheme.  But it's a scheme.

17          And, at root, what the scheme is about is that the

18   government alleges that the defendant had a relationship and

19   worked at Fuzhou University in the PRC.  That relationship was

20   premised on his selection as a Changjiang distinguished

21   professor which was administered by the Chinese Ministry of

22   Education, which is a national-level entity.

23          Now, the thing that's important about this is that

24   this is a very different political system than the American

25   political system.  The government is not going to make

1    normative arguments about which one is better or the pros and

2    cons, but it's a different system, and so it's important to

3    understand how those differences in that system lead to

4    different reasonable inferences.

5              So, for example, Mr. Zeidenberg made the argument to

6    say this is just like if the defendant or anybody else who is a

7    professor had some other relationship at Harvard University or

8    KU.  That's not accurate.  Those independent institutions,

9    which may -- you know, KU is, obviously, a state institution,

10   but the relationship between those institutions and the

11   government, whether it's the Kansas state government or federal

12   government, is a very different relationship than the

13   relationship between Fuzhou University and the PRC government.

14             Similarly, the role of the Chinese Communist Party in

15   the PRC, limited to the context of how that party apparatus

16   operates at the university level, is also something different

17   than what -- how it operates here.

18             So another example is there is evidence, including

19   that photograph that you mentioned which purports to show the

20   defendant sitting with the Fuzhou party committee secretary.

21   So what that means is that in the Chinese political system

22   there is a dual structure from the bottom of the system all the

23   way to the top of the system.  There's the party structure,

24   because it's a unitary system, and there is the sort of more

25   typical what you think of government administrative structure.

19-20052-JAR    USA v. Feng Tao    10.14.21

109

1           THE COURT:  Let me stop you.  Why does the jury need

2    to have a lesson in Chinese politics?  Why -- I mean, all

3    right.  So there's the photograph.  Assuming that photograph

4    comes into evidence, I could see that the jury might be

5    confused.  They say he worked at Fuzhou University; what is

6    this picture about?  And it might be prejudicial for them to

7    see that picture without understanding any context for it.  I

8    don't know.

9           But why couldn't the government's evidence be just

10   limited to what, to me, is obvious, and that is the Changjiang

11   scholarship program had certain expectations and, you know,

12   they were required to do certain things for the university and

13   that this program was administered jointly by Fuzhou University

14   and the communist party because that's just the way it worked,

15   and leave it at that.

16          MR. BARRY:  So that will be the bulk of the evidence

17   on these topics that the government proposes to introduce and

18   the testimony we propose to elicit.  The way I think about it

19   is it's kind of like a funnel, and the top of the funnel, which

20   is the most generic, is the part that we're not going to spend

21   that much time on, but we're going to focus on the part we

22   think is important for context.

23          So, for example, Dr. Tiffert, who we're going to

24   propose to be an expert on some of these topics, will talk

25   about how talent recruitment plans writ large are different

1    than what we typically think of as scholarships, that there's

2    different responsibilities that come with those programs.

3            Now, the only reason why it's important to have that

4    general context is so that you understand how does the

5    Changjiang Scholar Program fit into that context.  Well, it

6    fits in because it's an incredibly prestigious program.  It

7    fits in because it's administered at the national level as

8    opposed to a local level.  And there's a couple reasons why

9    that's important.

10           So number one is -- and these are just examples from

11   evidence that the government will provide.  Some of these --

12   most are these are provided in the briefing.  So one of the

13   defendant's arguments that we anticipate, based on briefing

14   they've done up to this point, is sort of teasing the

15   distinction between the nature of defendant's relationship with

16   Fuzhou and whether it was what they're quoting at full

17   employment or something else and whatever the nature of is

18   required some sort of disclosure to KU, DOE, or NSF.

19           So the Court figuring out whether there was a

20   disclosure requirement is to figure out what's the nature of

21   that relationship.  And to understand that nature, you have to

22   understand the purposes of the program.  Not to say this is

23   about geopolitical competition or technological advancement,

24   but what's the specific program's purpose of the Changjiang

25   Distinguished Professor Program.

1          THE COURT:  What is it?

2          MR. BARRY:  So there's the Changjiang Scholars

3    Program, which I call the umbrella term, and then there's at

4    least two levels under that.  There's what's called the chair

5    professor program, which is not at issue in this case.  My

6    understanding is that that is for very experienced, seasoned

7    academics and scientists who are kind of senior in their

8    career.

9          Then there's the next level, which is what we accused

10   the defendant of being a participant in, which is not the chair

11   program, it's the Changjiang Distinguished Professor Program.

12   And what that program is for is folks like the defendant who

13   are mid career, up and coming, very promising from a research

14   perspective.  And the purpose of that program is different than

15   the purpose of the chair program.  The purpose is to hire

16   people to build an ecosystem at a Chinese university.

17         What do I mean by ecosystem?  To build a laboratory,

18   to recruit other talent, whether those are post-doctoral

19   students, other sort of lower-level professors.

20         THE COURT:  So I had characterized it as the

21   expectations, and I think that's appropriate, because, I mean,

22   if the way you're going to try to establish there was an

23   employment relationship is that Dr. Tao did these things that

24   match with the expectations for this -- being in this program,

25   in other words, being employed by Fuzhou University as a

19-20052-JAR    USA v. Feng Tao    10.14.21                    112

1    distinguished scholar or whatever, then that would be relevant.

2         I just -- I don't know why you need to go beyond that.

3    I mean, I -- you know, put on evidence that, you know, here's

4    what the Changjiang Scholar Program, here's what it is, here's

5    what the expectations are, here's what Dr. Tao did.

6         MR. OAKLEY:  So, I mean, that's our intention, is to

7    provide context.  That's why we're not talking about putting

8    the PRC government on trial or its geopolitical objectives or

9    policy decisions.  What we're talking about is:  How do you

10   understand what a talent recruitment program from the PRC is?

11   How is that different?  When we use the English term

12   "scholarship," we have certain assumptions about what that

13   means, just based on our own experience of what scholarships

14   look like.

15        THE COURT:  Again, I don't know why you need to get

16   into that.  I think what you really need to focus on is, you

17   know, evidence that he applied for this, he was admitted, this

18   is what the expectations were in terms of what the relationship

19   was, it was an employment relationship, and this is what he

20   did.

21        I mean, I think if you go further and you start

22   talking about, you know, this was coveted, this was at this

23   level, this was the highest level, this went to the national

24   level, you're starting to introduce this concept that he's

25   somebody the Chinese government wanted.

1          MR. BARRY:  I understand that.  I think our focus is

2    we expect the defense, again, based on briefing, to -- one of

3    the arguments that they've made is he never -- he was offered a

4    position at Fuzhou and he never accepted it.  Okay?  And so we

5    disagree with that, obviously.

6          And part of the way that we would plan to show that we

7    don't think that's very probable is based on some of the

8    e-mails you've seen and other pieces of evidence.  But it's

9    also based on understanding what it takes to apply to the

10   Changjiang Distinguished Professor Program in the first place.

11         THE COURT:  Yeah, you have to travel there, you have

12   to defend like your -- I mean, I guess the government's

13   position is you have to defend it like you're defending a PhD

14   or something.  Again, that's part of the expectations for

15   obtaining the scholarship or whatever position, and then there

16   are expectations associated with what do you do once we admit

17   you to this or grant you to this or whatever, correct?

18         MR. BARRY:  Correct.

19         THE COURT:  So I'm not saying you're foreclosed from

20   showing, you know, here's what the expectations are to get the

21   scholarship and here's what he did that matches up with that.

22   I mean, to me, that's one and the same.

23         MR. BARRY:  Okay.

24         THE COURT:  As part of the circumstantial evidence

25   that he did, in fact, apply, he was admitted, and he was

19-20052-JAR    USA v. Feng Tao    10.14.21

1    employed.

2            MR. BARRY:  Okay.

3            THE COURT:  That's your theory, correct?

4            MR. BARRY:  Correct.

5            THE COURT:  Okay.

6            MR. BARRY:  So, I mean, as you said, the line drawing

7    here is a little gray.  And the government's position is

8    context is going to matter a lot.  It's going to depend on the

9    way the questions are asked, the evidence that is at issue.  I

10   would agree with everything you're saying in terms of

11   expectations.

12           The government does also think that at a very

13   high-level understanding the political system in the PRC is

14   important to understand some of the evidence.

15           THE COURT:  What evidence?

16           MR. BARRY:  So let's use the photograph, for example.

17   So the photograph is -- it purports to be a photograph of the

18   defendant sitting with the party secretary of Fuzhou

19   University.  So, to me, at least, we didn't really have a great

20   understanding of this, I did not understand where does that

21   person rank within the system of Fuzhou University.  I would

22   have thought -- at the college I went to, the college president

23   was sort of the top person.

24           What expert testimony will show in this case is that

25   because there's this dual structure where the party -- the way

1    it's been described is basically it's a double helix and the

2    party is imbedded with the government sort of throughout the

3    system.  That's just the way the system is structured.

4         So in that paragraph it's significant that that person

5    is not the university president but is the party secretary of

6    Fuzhou.  And the reason it's significant is because the

7    government's view is that that meeting would not have occurred

8    if there were not some sort of agreement.  Someone that high in

9    the government at Fuzhou would not be taking photographs with

10    someone who was thinking about an application but hadn't made

11    up their mind.  That's just not plausible in the government's

12    view based on our understanding of how these programs work.

13         THE COURT:  And you intend to get there through

14    testimony of either Keiser or Tiffert?

15         MR. BARRY:  Tiffert.  Dr. Tiffert, correct.  That --

16    Dr. Tiffert -- a lot of these topics, frankly, are going to be

17    focused on Dr. Tiffert.

18         THE COURT:  Right.  And we're not there yet.  And,

19    obviously, I'm -- I'm going to take this under advisement, but,

20    obviously, I need to hear the *limine* motion on Dr. Tiffert as

21    well and Dr. Keiser.

22         MR. BARRY:  Yes.  Dr. Keiser is an employee of the

23    National Science Foundation.

24         THE COURT:  Okay.

25         MR. BARRY:  Thank you.

1           THE COURT:  But in terms of the government's omnibus

2     motion to exclude what you, I guess, speculate or anticipate

3     may be defenses, let's talk about that.  I think I've already

4     said, you know, no evidence about -- it's always improper to

5     get into sentencing.  I mean, that is too prejudicial and

6     nobody should be mentioning that.

7           But there were -- let's see.  Where are the other

8     ones?  You know --

9           MR. BARRY:  And, Your Honor --

10          THE COURT:  The dragnet, being caught up in the

11    dragnet.  What else?

12          MR. BARRY:  If I may, so I -- I'll make one last point

13    about this, because I do think it's important.  One of your

14    first comments was how do we, kind of, draw the lines between

15    the government's omnibus motion and the motion *in limine* of the

16    defense.  So I'm going to offer a view of how you can draw

17    that, and Mr. Oakley will kind of deal with what I'll classify

18    as the jury nullification argument.

19          So I think the way to focus on distinction, rather

20    than just saying this is all PRC-related topics, is that the

21    government's motion *in limine* is focused on excluding argument

22    or precluding argument that is intended to make this case about

23    the propriety of the investigation, to challenge the policy

24    pronouncement, the China Initiative, and whether that's a good

25    or bad thing and how, if at all, that affected the

19-20052-JAR    USA v. Feng Tao    10.14.21

1    investigation.

2         That is distinct from the evidence that the government

3    is planning to offer to contextualize what the Changjiang

4    Distinguished Professor Program is about, to understand how

5    that program fits within the larger PRC political system, which

6    are -- which is evidence focused on how to prove the fraudulent

7    scheme, how to prove that what he told KU, NSF, and DOE is --

8    was, in fact, false.

9         So I think conceptually that's one way to think about

10   it.  But I'm going turn it over to Mr. Oakley, unless you have

11   questions to actually deal with the jury nullification point.

12        THE COURT:  Well, I think it's 12:30, so it would

13   probably be a good time to take a lunch break before we move on

14   to Mr. Oakley's part of the arguments.

15        So why don't we do that.  It's 12:30.  You want to

16   reconvene at 1:30?

17        MR. BARRY:  That works for the government, Your Honor.

18        THE COURT:  Okay.

19        And then in terms of where we're at -- where is my

20   little road map here?  The next thing we're going to take up

21   after this subject are the experts, and Doctor -- I mean,

22   Dr. Tiffert is not going to be here until tomorrow morning,

23   correct?

24        MR. BARRY:  Yes, Your Honor.

25        THE COURT:  But we could do the *Franks* hearing this

1    afternoon?

2         MR. BARRY:  We could do the *Franks* hearing this

3    afternoon, but we don't need to do it now.  We do have -- the

4    government has some clarifying questions we'd like to just talk

5    about in advance of that, based on your --

6         THE COURT:  On *Franks*?

7         MR. BARRY:  On *Franks* and the motion to strike ruling

8    from this morning.  I mean, I'm happy to address them now, if

9    you want, but we certainly -- we've talked to the agents and we

10   can do that -- do the *Franks* hearing itself this afternoon.

11        THE COURT:  Okay.  Let's plan on doing the *Franks*

12   hearing and arguments about that this afternoon after we've

13   finished this, and then we'll take up expert witness issues

14   tomorrow.

15        If there's time this afternoon, we'll talk about the

16   depositions, we'll talk about the trial date, the government's

17   motion to continue the trial date, but we'll hopefully get

18   through everything except the experts.

19        MR. BARRY:  Okay.  So is it fair to say we should tell

20   the agents to be ready at 1:30 to start the *Franks* hearing?

21        THE COURT:  Yeah.  I'm going to hear additional

22   argument and maybe response, but I'm going to take it under

23   advisement and then, yeah, we'll be ready for *Franks* after

24   that.

25        (Recess.)

1          THE COURT:  Mr. Oakley?

2          MR. OAKLEY:  Your Honor, just briefly in response to

3    the government's motion related to -- to its omnibus motion *in*

4    *limine* and specifically as to what Mr. Zeidenberg said, the --

5    as he was saying it, certainly, I think he acknowledged that

6    the defense has a decision to make.

7          The argument, however, that the government set out to

8    catch a spy and caught a fraudster, or something along those

9    lines, seems to run awful close to the line of jury

10   nullification and seems awful close to arguing to the jury or

11   suggesting to the jury that, hey, he may be convicted of these,

12   you know, fraud charges, but you should acquit him because he's

13   not a spy, or something like that.  That's obviously the

14   government's concern.

15         The flip side of that is if the defense wants to argue

16   and wants to get into the China Initiative and directives that

17   may or may not come from management at FBI, it seems to me that

18   opens the door to the government being able to introduce

19   evidence to rebut that and to put those argument in context,

20   which I think could potentially include the rationale for such

21   an initiative, the national security concerns that would

22   initiate such an initiative.

23         And, again, I think we're all on the same page that

24   there's a fine line, and I would just -- I would just suggest

25   that those types of arguments get us awful close to the line,

1   and the government doesn't intend to get into that type of

2   information, as we said, in our case in chief, but if that's

3   where the defense is headed, that likely would open the door to

4   the government at least suggesting to the Court that we need to

5   get in some of that to rebut that type of argument.

6          Other than that, I don't have anything else unless the

7   Court has any questions.

8          THE COURT:  Okay.  Thank you.

9          Well, as I said, I'm going to take this under

10  advisement.  We've all used the term "line drawing," which is

11  difficult.  It's difficult except for obvious things without

12  drawing the lines in the context of the evidence, not only the

13  content of the evidence but who's testifying to it, how it's

14  introduced, for what purpose, et cetera.

15         But I think we -- I can draw some sort of general

16  observations, and I think I've already kind of told you those,

17  and that is that anything that has to do with the talent

18  program, specifically Changjiang, had to do with things that

19  are specifically germane and material to the charge in this

20  case.

21         And so I'm going to write on this, but what you're

22  going to see is me saying evidence that pertains to that

23  particular talent program, what the requirements were to obtain

24  the scholarship, what the requirements and expectations were

25  once awarded -- and scholarship is probably the wrong word, but

1    once awarded that -- are highly probative and not prejudicial

2    in my view, or at least the probativeness outweighs any

3    prejudice.

4            Understanding that there are some documents, e-mails,

5    and at least one photograph that reference or involve Chinese

6    government officials, I think it's appropriate for the jury to

7    have the context that this Changjiang Scholar Program was

8    administered by Fuzhou University and the Communist Party of

9    China, that they both played a role in this program, but no

10   need to go into detail about why or what that looks like.

11           General testimony about talent programs I don't think

12   is relevant.  What's relevant is this particular one and how it

13   worked, and we can talk about that more, I guess, tomorrow when

14   we talk about the experts.

15           Jury nullification, obviously, is crossing the line,

16   again, but that's contextual.  It's fair.  It's always fair for

17   a defendant's defense to include questioning the agent's

18   credibility or their bias or prejudice.  It's not appropriate,

19   though, to attack a particular policy of the government or

20   particular category of prosecution such as, you know, attacking

21   direct prosecutions in a general term.

22           So, again, I mean, there's a line to be drawn there.

23   We'll have to see where the evidence goes, at least with

24   respect to the defense.  So I'll write on this in very general

25   terms, but hopefully will give everybody the parameters of what

1    I think is appropriate.

2            And, you know, I had some discussion with Mr. Barry

3    about the Communist Party of the People's Republic of China and

4    how much detail the jury needs to know about their involvement

5    in this program.  And so Mr. Barry gave me an example that, you

6    know, the relevance of that particular photograph, assuming it

7    is admitted, is the position of that particular person and what

8    that might mean in terms of that particular person meeting with

9    Dr. Tao.

10            So again, I mean, you know, I don't know who would

11   testify to that, I don't know if that's something that would be

12   subject to expert testimony or opinion, I don't know, so it's

13   hard for me to rule on the parameter there.  But that's a good

14   example of something that causes me concern, but it may be

15   appropriate depending on the context in which it's offered,

16   assuming it's admissible at all.

17            So that's where we're at on that.  I'll take that

18   under advisement and give you something in writing that will

19   hopefully give us all a little bit of a road map on that.

20            So what we've got left are the experts -- we're going

21   to take that up tomorrow -- the motion to take depositions, the

22   *limine* conference, itself, the motion to continue trial date,

23   and the *Franks* hearing.

24            Give me an update on the motion to take depositions.

25   Is there any new developments, any response from PRC?

1       MR. BARRY:  There is a slight update, Your Honor.  So

2   we have received a preliminary response from the PRC

3   government.  We have a rough translation of it, and what we're

4   still trying to figure out is whether it's a response to one of

5   the government's requests pursuant to the MLAT or if it is a

6   response to the request we submitted having to do with

7   defendant's Rule 15 depositions.  It's unclear based on the

8   response.

9       But, essentially, what the response does is it asks

10  about the relationship of this investigation to the U.S.

11  Government's China Initiative and whether the investigation is

12  politically or racially motivated.  We have sought

13  clarification from the PRC government to determine whether that

14  is a response to one of the earlier MLAT requests or to the

15  most recent request we submitted to them sometime last month

16  having to do with the defense's depositions, that response we

17  received.

18      And, again, this is a rough translation, but we sought

19  clarification and we, on October 11th, have received -- "We are

20  seeking your further information on this case in our last

21  letter, especially on whether this case is initiated and

22  proceeded under the framework of China Initiative.  Such

23  information is important when we consider whether assistance

24  could be provided."

25      So we have talked to OIA, our colleagues, to continue

19-20052-JAR    USA v. Feng Tao    10.14.21

1    to engage with them and get some clarification, but the bottom

2    line is there's engagement.  Again, we don't know where it's

3    going to go, as we said at last week's motion to continue the

4    trial and as we've said on the briefing and arguing on the Rule

5    15 motion.  This is a very unusual atypical situation in terms

6    of the posture in which we're requesting these depositions.

7        So bottom line is there is engagement.  We're working

8    with them to see if we can get a more concrete response.

9        THE COURT:  So the government had previously used this

10   legat process to obtain evidence for the government?

11       MR. BARRY:  So we had submitted -- as we said in our

12   briefs, an earlier MLAT requesting various information, and we

13   had been waiting on a response from them.  And so we were

14   engaging with them in that initial request, and when the Rule

15   15 depositions came up, that's when, because of the posture in

16   the Court's view on unavailability and materiality, we offered

17   to supplement our initial request, which is why we called it a

18   supplement, because it was essentially supplementing what we

19   had already requested from the PRC government.

20       THE COURT:  But -- so did you make clear to the PRC

21   that it's the defendant that's requesting these depositions,

22   not the government, it's the defendant's witnesses that are

23   seeking to be deposed?

24       MR. BARRY:  Yes.

25       THE COURT:  Because when they respond about concerns

1    about political or racial motivation, it sounds like they're

2    concerned that this is something the government wants, not the

3    defendant.

4         MR. BARRY:  That's why we're trying to clarify whether

5    what we got back is in response to our initial request or this

6    most recent one having to do with the defendant's depositions.

7         THE COURT:  Okay.  And in seeking clarification you're

8    trying to make sure they understand these really are two

9    different requests, one for the government, one for the

10   defendant?

11        MR. BARRY:  Yes.

12        THE COURT:  Okay.  All right.  Okay.  Are your

13   witnesses here for the *Franks* hearing?

14        MR. BARRY:  Our witnesses are here, Your Honor.

15        THE COURT:  You wanted to start with --

16        MR. BARRY:  If I may, we have some clarifying

17   questions.

18        So in terms of clarifying questions, we wanted to

19   clarify some things from the Court's comments from this morning

20   that will impact sort of the scope of the *Franks* hearing.

21        So the first is on the motion to strike.  It was

22   unclear to us whether the Court was denying that motion on the

23   basis of Rule 12, meaning the Court had concluded that the

24   defense had demonstrated good cause and prejudice, or whether

25   the Court was concluding under Rule 45 that in the Court's

1    discretion the Court was extending the pretrial motions

2    deadline because the Court concluded that the defense had

3    demonstrated excludable neglect.

4            So we just wanted to know if you could add any more

5    color on that.

6            THE COURT:  I wasn't ruling on the basis of Rule 45,

7    and with respect to Rule 12, cause and prejudice, I wasn't --

8    well, the reason I want to go ahead and have the hearing is

9    because I want to consider the issue of prejudice with respect

10   to the merits.  I mean, I think I will be able to understand

11   that part of the analysis better than hearing the evidence.

12   And I haven't, frankly, ruled on the timeliness issue, whether

13   there's good cause for timeliness issue, but based on what I've

14   heard so far, I don't think there is.

15           But in any event I think it would be prudent for me to

16   exercise my discretion to go ahead and hear the merits of the

17   motion and then rule on both prongs.

18           MR. BARRY:  Okay.  So just to -- because I know

19   there's a bunch of things moving here, but in terms of

20   timeliness, if you do consider timeliness, that would be in the

21   context of the motion to strike and the posture of the motion

22   to strike, not on whether or not the defense has satisfied

23   *Franks*?  I just want to -- we want to make sure --

24           THE COURT:  I think -- well, I do think the bases --

25   the arguments the defense makes about why this is timely are

1    germane to the -- to both issues, frankly, but I'm not ruling

2    they have necessarily established that they have grounds for

3    *Franks* hearing.  But I want to have the *Franks* hearing in my

4    discretion because I think it will, I guess, enlighten me on

5    cause and prejudice and timeliness and those issues.

6            MR. BARRY:  Okay.  So on the *Franks* hearing itself, we

7    thought it would be helpful to try to get clarity on ground

8    rules before we do that.  So --

9            THE COURT:  I'll say that we're going to confine this

10   to the issues in the *Franks* hearing.  This is not going to be a

11   discovery deposition.  It's not going to go beyond the issues

12   that I need to hear with respect to this motion to suppress.

13           MR. BARRY:  Okay.  So there are eight alleged

14   misstatements or omissions in the *Franks* hearing.  Obviously,

15   *Franks* is not for the purpose of a fishing expedition or a sort

16   of early shot at a witness who will likely testify at trial, so

17   I want to make sure the Court's view of the scope of the *Franks*

18   hearing will be on those eight alleged omissions or statements;

19   is that correct?

20           THE COURT:  You are correct.

21           MR. BARRY:  Are there any particular of those

22   misstatements or alleged omissions that the Court thinks a

23   *Franks* hearing is appropriate for, meaning there's certain ones

24   you don't feel the need to cover?

25           THE COURT:  I think I've got those listed somewhere.

1    Let me look at them.  I think I have the list.  I don't know

2    what page it's on.

3            MR. BARRY:  I can -- I can sort of flag them real

4    quick.  They're in the briefing, they're numbered.

5            THE COURT:  I've got them.

6            MR. BARRY:  Okay.

7            THE COURT:  So you're asking me if there's any in

8    particular that you want the witness -- that the witness should

9    focus on?

10           MR. BARRY:  Basically are there any that you

11   specifically think that a *Franks* hearing or an evidentiary

12   hearing is warranted for as opposed to ones where you think,

13   based on the allegations, I don't need to hear evidence on

14   that?

15           THE COURT:  Okay.  Well, I'm going through these very

16   quickly, but No. 6 I don't think particularly needs any

17   testimony about.

18           MR. BARRY:  That's the omission regarding espionage or

19   intellectual property theft?

20           THE COURT:  Right.

21           Well, I would say that's the only one that I would

22   think any testimony would be largely irrelevant.

23           MR. BARRY:  Okay.  All right.

24           And the last thing I'll just say is, obviously, the

25   government respectfully disagrees.  We don't believe the

1  defendant has a made a substantial preliminary showing under

2  *Franks* and, therefore, we don't believe that they're entitled

3  to an evidentiary hearing on any of the alleged misstatements

4  or omissions, but nonetheless, we're prepared to go forward

5  with the *Franks* hearing.  But the Court's --

6        THE COURT:  To be clear, I'm not ruling the defendant

7  has made a substantial showing.  I'm just doing this as a

8  matter of discretion.

9        MR. BARRY:  Okay.  Absolutely.

10        The government calls FBI Special Agent Stephen Lampe

11  to the stand.

12                    STEPHEN LAMPE,

13  called as a witness on behalf of the government, having first

14  been duly sworn, testified as follows:

15        THE COURT:  You can remove your mask while you're

16  testifying.

17        THE WITNESS:  Thank you, Your Honor.

18        MR. BARRY:  And just as a matter of process, so my

19  plan is to -- defense counsel brought these binders that attach

20  the unredacted versions of the exhibits in support of their

21  *Franks* motion, so I'm only going to reference the exhibits in

22  here, and I'll just -- I'm not planning to introduce them as

23  exhibits in the evidentiary hearing since they're attached to

24  their motion.  So unless anybody disagrees, I'll just plan to

25  refer to the tabs, and I'm going to provide the witness with a

1    copy of this binder so we're all on the same page.

2            THE COURT:  That's fine.

3            MR. ZEIDENBERG:  That's fine.  And, Your Honor, I

4    meant to ask the government beforehand, but I want to do it

5    now, whether there's any objection to using the informant's

6    name given that she's now being referred to as Student 1, she's

7    not going to be a witness at trial, and the government

8    indicates that it doesn't even know her present location.  I

9    don't think there's any danger from anyone.  You know, this

10   isn't a case of violence or anything like that.

11           Is there any reason why we can't reference her by

12   name?  If not, we'll just call her government informant, but

13   just seems like an unnecessary measure given her status in the

14   case.

15           THE COURT:  I've been referring to her not as

16   government informant but as Student 1 because I know that

17   informant is a term of art and the government has all kinds of

18   terminology, and I think some of it is based on whether --

19   well, whether somebody is being paid.  There's all these

20   factors.  And informant is a term of art.  Sometimes they say

21   cooperating subject, sometimes they say cooperating source.

22   Government has referred to her as Student 1.

23           In the government's view is there any reason she can't

24   be referred to in this proceeding by name?

25           MR. BARRY:  Do you mind if I take a moment to confer

1    with counsel?

2              THE COURT:  Go ahead.

3              MR. BARRY:  For the purposes of today's hearing the

4    government would respectfully request that we continue to use

5    Student 1 or whatever non-identifying terminology we can all

6    agree on, and the reason being, we haven't fully thought

7    through the consequences of further publicly identifying her,

8    if any.

9              And obviously, as everybody is aware, when the

10   government's name was -- when the Source No. 1's name was

11   publicly disclosed in the November 2019 motion to dismiss, that

12   name was on the front page of the *Wall Street Journal*, and it

13   was a little bit of you can't unring the bell.

14             So for the purposes of trial or another proceeding,

15   obviously, if we had a little bit more time to think about it,

16   we might be able to get comfortable with something, but just

17   for the purposes of this hearing, we would respectfully request

18   that we stick with some term that we can agree on that doesn't

19   use the real name.

20             THE COURT:  All right.  I think Student 1 will do it.

21             MR. BARRY:  Okay.

22             May I approach the witness to hand him this binder?

23             THE COURT:  Yes.

24                        DIRECT EXAMINATION

25   BY MR. BARRY:

1    Q.   Would you please state and spell your name for the record?

2    A.   My name is Stephen Lampe, L-a-m-p-e.  "Lamp" with an E.

3    Q.   And where are you currently employed, Agent Lampe?

4    A.   I'm employed by the FBI in Kansas City.

5              THE COURT:  Can you speak -- you can move that

6    microphone closer.  I'm having trouble.  I have bad hearing,

7    but I'm sitting right next to you and I'm having trouble.

8              THE WITNESS:  I apologize.

9    BY MR. BARRY:

10   Q.   So what do you do at the FBI?

11   A.   I'm a special agent.

12   Q.   And do you work on any particular type of squad or case

13   team?

14   A.   I do.  I work on the counter-intelligence squad.

15             THE COURT:  So at trial you're not going to ask them

16   that question?

17             MR. BARRY:  No.

18   BY MR. BARRY:

19   Q.   How long have you worked on the counter-intelligence squad

20   at the FBI?

21   A.   Approximately five years.

22   Q.   What did you do at the FBI before working on the

23   counter-intelligence squad?

24   A.   I worked criminal violations, such as bank robberies and

25   drug cases.

1    Q.   And for how many years did you work criminal violations at

2    the FBI?

3    A.   Approximately two.

4    Q.   What did you do before that for work?

5    A.   I was active duty military.

6            MR. ZEIDENBERG:  I'm sorry.  I'm having a hard time

7    hearing.

8            THE WITNESS:  I'll speak up.  I apologize.

9            THE COURT:  Put the microphone up closer to you.

10           THE WITNESS:  Is that better?

11           MR. ZEIDENBERG:  Thank you.

12   BY MR. BARRY:

13   Q.   Agent Lampe, you were saying before you joined the FBI

14   about seven years ago you were active duty military?

15   A.   That is correct.

16   Q.   What did you do in the military?

17   A.   I'm a pilot.

18   Q.   How many years were you in the military?

19   A.   I've been in the military for approximately 24 years.

20   Q.   So when did you first learn of tips that were submitted to

21   Kansas -- University of Kansas or the FBI regarding defendant

22   Dr. Tao?

23   A.   It was early to mid May of 2019.

24   Q.   And how did you learn about those tips?

25   A.   Initially we received a tip through our PAO officer.

1    Q.   What is a PAO officer?

2    A.   It's a public affairs officer.  She receives -- because

3    she's the face of the Kansas City FBI, she receives e-mails,

4    and she saw this one and felt the need to address it with us.

5    Q.   And what was the substance of the tip that the FBI public

6    affairs officer received and passed to you?

7    A.   It was an e-mail suggesting that Dr. Tao had been engaged

8    in some activity at KU and overseas.

9    Q.   Did it say anything more specific than just some activity

10   overseas?

11   A.   I'd have to look at it to know exactly what it said.

12   Q.   Okay.  And other than the tip that was passed to you from

13   the FBI public affairs officer in the April to May 2019 time

14   period, did you become aware of any other tips related to

15   defendant Dr. Tao?

16   A.   We did.  We received multiple tips from the University of

17   Kansas, KU.  They were receiving tips and they then forwarded

18   those tips to us.

19   Q.   Okay.  And at the time that you received these tips from

20   your FBI colleague or from KU, did you have an opinion of who

21   was submitting the tips?

22   A.   At the moment we were receiving them?

23   Q.   Correct.

24   A.   At the moment we were receiving them, we did not know.

25   Q.   Did you, at some point after that moment, let's say in the

1  next month or two, so we're talking April 2019 through

2  July 2019, at any point within that time period did you develop

3  a view of who or what collection of people were submitting

4  those tips to KU or the FBI related to Dr. Tao?

5  A.   We did.

6  Q.   What was that opinion?

7  A.   We surmised that the tip, at least from the first e-mail,

8  was being provided by Student 1.

9  Q.   Okay.  And how did you surmise that?

10  A.   Well, I would be certain of that from the July 9th

11  interview and an e-mail that Student 1 provided to us after

12  that interview.

13  Q.   Okay.  So let's put aside, then, the initial -- FBI public

14  affairs officer tip.

15  A.   Yes.

16  Q.   Were there tips submitted in the names of people -- of

17  other people other than Student 1?

18  A.   Yes.

19  Q.   And were there any tips actually submitted in the name of

20  Student 1?

21  A.   I don't believe so.

22  Q.   Okay.  Were there any tips that were submitted anonymously?

23  A.   Yes.

24  Q.   And was there more than one tip submitted anonymously?

25  A.   Yes.

1    Q.   And was -- what was the substance of these tips at large?

2    Did they all touch on the same thing or did they talk about

3    different things?

4    A.   The substance at large was that the defendant was engaged

5    or was employed at a foreign university in China while also

6    being employed here and provided websites, public-facing

7    websites that would show the same.

8    Q.   And when you say show the same, do you mean would show that

9    defendant was allegedly employed at a university in China?

10   A.   That -- correct.  That the -- that the defendant was

11   employed at the university in China.

12   Q.   Okay.  So you mentioned this earlier, that there was a

13   July 9, 2019, interview, right?

14   A.   Correct.

15   Q.   Can you walk us through a little bit about how that

16   interview was set up?

17   A.   So I had planned on going to the interview myself, another

18   agent, an agent from the San Francisco area, as well as a U.S.

19   attorney here.  On the night before the interview the AUSA and

20   myself were on a flight that got cancelled and so we did not

21   get to attend that interview the next morning.

22   Q.   And this is an interview of Student 1?

23   A.   This is an interview of Student 1.

24   Q.   Okay.  And I should have asked this earlier, but are you

25   the case agent for the investigation of Dr. Tao?

19-20052-JAR    USA v. Feng Tao    10.14.21

1    A.    I am.

2    Q.    So you're primarily responsible for the investigation?

3    A.    I am.

4    Q.    So the July 9th interview is planned, and you and Assistant

5    USA Attorney Tony Mattivi are planning to go?

6    A.    That's correct.

7    Q.    It sounds like at the last minute you weren't able to

8    attend?

9    A.    Correct.

10   Q.    Did you contact -- did you or anybody at the FBI contact

11   Source 1 in advance of that interview to let her know that you

12   were coming to interview her?

13   A.    No.

14   Q.    Why not?

15   A.    Sometimes it's better to approach witnesses without letting

16   them know you're coming so they don't get to prepare their

17   answers in a way.  To feel that you're coming or that -- or

18   that Student 1 would, you know, evade us somehow.

19   Q.    And that assessment, is that based on your experience as an

20   FBI agent?

21   A.    Yes.

22   Q.    So I want you to unpack a little bit what you just said,

23   which is they have time to prepare their answer.  What do you

24   mean by that?

25   A.    It's probably not every day that somebody is approached by

1    an FBI agent and so that causes some level of undue stress, and

2    building up to the moment of actually -- if I were to engage

3    Student 1 early and then set a date to interview, sometimes

4    that would build undue stress on the subject of the interview

5    and they would consider their -- it's hard to explain.

6    Q.    Okay.  So before you knew that your and AUSA Mattivi's

7    flights were going to be cancelled, who was planning to take

8    the lead on asking Student 1 questions?

9    A.    I was.

10   Q.    Because you're the case agent?

11   A.    Correct.

12   Q.    Okay.  So once you learned that you were not going to be

13   able to make the interview and Agent Carlson was going to be

14   the only person from Kansas City there, what did you do to try

15   to help prepare Agent Carlson?

16   A.    I returned to -- actually, I'm not sure if I returned to

17   the office that night, but I wrote Agent Carlson a list of

18   several questions to ask during the interview the next morning.

19   Q.    And did you send those questions to Agent Carlson?

20   A.    I did the night before.

21   Q.    When you were drafting those questions, what was your

22   objective for the interview?

23   A.    My objective was to explore the -- explore Dr. Tao's

24   involvement overseas and to further that investigation to see

25   if there was more information there.

19-20052-JAR    USA v. Feng Tao    10.14.21

1  Q.   Leading up to the interview did you have any sense of how

2  Student 1 may respond?

3  A.   I did not.  I did not know whether she would be cooperative

4  or not.  It was very early on, so I didn't know how she would

5  react.

6  Q.   All right.  And when you sent Agent Carlson that list of

7  questions to ask her on July 9th, did you have any sense of

8  whether you planned or wanted to conduct any follow-up

9  interviews of her?

10  A.   I believe we would have conducted more interviews with her.

11  But to be clear, are you saying without me there or with me

12  there?

13  Q.   I'm simply asking, when you drafted those questions for

14  Agent Carlson --

15  A.   Oh.

16  Q.   -- to basically ask him to ask the questions you were

17  planning to ask but you weren't going to be able to be there,

18  did you have a sense as the case agent of whether you would

19  want to interview her again in person or over the phone or in

20  any context?

21  A.   Certainly.  She was an important witness to the

22  investigation.  I would certainly want to interview her again,

23  so, you know, those are the -- the questions that I gave Agent

24  Carlson I think were starter questions with the hope of, you

25  know, a further discussion and interview by me.

1    Q.   Okay.  So going back to all of these tips that came in in

2    the summer, late spring, early summer of 2019 regarding

3    Dr. Tao, when you were preparing Agent Carlson to interview

4    Source 1 or Student 1, did you have an opinion as to whether or

5    not Student 1 was behind all or some of the various tips that

6    had come in to the FBI and KU?

7    A.   We did.

8    Q.   What was your opinion?

9    A.   Our opinion was that she was at least behind the first

10   e-mail address that was used and potentially behind the other

11   e-mail addresses that were used.

12   Q.   Did you know for certain either way at that point in time

13   whether she was behind all of the tips?

14   A.   Prior to July 9th?

15   Q.   Correct.

16   A.   No.

17   Q.   And why didn't you know that?

18   A.   I mean, how can one be sure who is behind an e-mail

19   address?

20   Q.   Did you know if she was behind anonymous tips?

21   A.   No, did not know she was behind them.

22   Q.   So Agent Carlson interviewed Student No. 1 on July 9th,

23   right?

24   A.   Correct.

25   Q.   Who attended that interview with Agent Carlson?

1    A.   It was an agent from San Francisco.  Her name was Angie Ng.

2    Q.   She's the agent we spoke about earlier today, right?

3    A.   When?

4    Q.   Oh.  You weren't here.

5    A.   I wasn't here.

6    Q.   So after Agent Carlson and Agent Ng conducted the July 9th

7    interview, did either of them call you or communicate with you

8    in any way to tell you what happened at that interview?

9    A.   Yes.

10   Q.   And who contacted you?

11   A.   I believe Agent Carlson contacted me by phone, though I

12   don't specifically remember that event and what was discussed.

13   But he did also forward an e-mail after that.

14   Q.   What e-mail did he forward?

15   A.   After the interview Student 1 e-mailed Agent Carlson and

16   Agent Carlson forwarded that e-mail to me.

17   Q.   So I'd like to draw the Court and the witness's and

18   counsels' attention to what is Exhibit 36 in the -- I think the

19   black binder.  These are the exhibits attached to defendant's

20   motion for *Franks* hearing.  And this is tab 36 in everybody's

21   black binder.

22        Is this -- so this is an e-mail chain.  I want you to start

23   at the bottom e-mail, which is the oldest e-mail.  Is that the

24   e-mail that you're referring to in terms of what Agent Carlson

25   forwarded to you?

1    A.    This is the e-mail.  Yes.

2    Q.    And this is an e-mail that Student 1 sent to Agent Carlson

3    on July 9th after her interview with Agent Carlson and Agent Ng

4    concluded, right?

5    A.    That's my understanding.

6    Q.    And, obviously, we all have this e-mail in front of us, but

7    kind of without just reading what's in there, what did Student

8    No. 1 tell Agent Carlson on July 9th in this e-mail after her

9    interview concluded?

10   A.    Student 1 was correcting some of the statements she made

11   during her interview with Agent Carlson.

12   Q.    Which statements was she correcting?

13   A.    I mean, I can summarize.  She begins by saying that she

14   reported using -- she reported the issues regarding the

15   defendant using multiple names.  She reported downloading a

16   contract from his e-mail address.  She reported downloading

17   proposal information from a proposal submission account and

18   that she hadn't communicated with -- I don't know if I should

19   mention her name, but she hadn't --

20   Q.    You can just call her by the initials X.Z.

21   A.    X.Z.  She had not communicated with X.Z. in this year, did

22   not communicate in that recent year.

23   Q.    Did you receive this e-mail on July 9th from Agent Carlson?

24   A.    I did, yes.

25   Q.    All right.  So I'd like to shift to the search warrants,

1    which is obviously why we're here.  So I'd like to turn

2    everybody's attention to tabs 37, which is Exhibit 37, again

3    attached to defendant's motion for *Franks* hearing.

4        And this is the -- well, what is this document?  Should be

5    tab 37.

6    A.   It's tabbed as the July 11, 2019, search warrant

7    application and affidavit.

8    Q.   If you go to the back of the affidavit, you should -- do

9    you see your signature anywhere?

10   A.   I do see my signature.

11   Q.   Okay.  So this is a search warrant that you submitted to

12   the magistrate judge to be sworn in on July 11, 2019?

13   A.   That is correct.

14   Q.   So I want to walk through the drafting process for this

15   warrant.

16   A.   Okay.

17   Q.   So your name is obviously on it, but what was your

18   involvement in putting this together or drafting it?

19   A.   Primarily I wrote the probable cause section of the -- of

20   the warrant with the help of several agents on my squad, but I

21   did most of the writing of the information.

22   Q.   Okay.  So other than other agents in your squad did anybody

23   else assist with the drafting of the warrant?

24   A.   The AUSA.

25   Q.   That's Mr. Mattivi?

19-20052-JAR    USA v. Feng Tao    10.14.21

1    A.    Mr. Mattivi, as well as a DOJ attorney.

2    Q.    Was it -- it sounds like you said you drafted the probable

3    cause section?

4    A.    Yes.

5    Q.    What was the review process like with all those other folks

6    in terms of the AUSA and DOJ attorney and other agents?  Were

7    you circulating drafts?  Were you talking about and redlining

8    things?

9    A.    I would summarize it as the agents were helping me find

10   information through the grand jury material that we had

11   received.

12   Q.    Okay.

13   A.    And I would -- I would lay out the information that we had

14   all searched and found and then chronologically put them

15   together, and I typed those up and I provided drafts to

16   Mr. Mattivi and the DOJ attorney.

17   Q.    Did Mr. Mattivi or the DOJ attorney provide any feedback or

18   suggested edits?

19   A.    They did.

20   Q.    What did you do with that feedback?

21   A.    I performed the suggested edits.

22   Q.    Okay.  So I'd like to focus first on page 2 of the

23   affidavit, which is the legal background section, and there's

24   two criminal violations listed here, right?

25   A.    On page 2 and page 3, yes.

1    Q.   What are those violations?

2    A.   Violations are Section 666 of Title 18, as well as Section

3    1343 of Title 18.

4    Q.   Why weren't other potential criminal violations included in

5    the legal background section?

6    A.   In conference with the AUSA Mr. Mattivi, Mr. Mattivi

7    suggested that we use Section 666 as our basis of our searches,

8    as one of the basis for our searches.  And then we eventually

9    settled on 666 and 1343 based on the evidence that we had

10   obtained through the grand jury.

11   Q.   And in signing this -- sorry about that.

12        In signing the affidavit you attested you believed there

13   was probable cause to conclude that evidence or contraband or

14   fruits of criminal violations of Section 666 or 1343 would be

15   found in Dr. Tao's Google account, right?

16   A.   I did.

17   Q.   So I'd like to next go to footnote 2, which is on page 5 of

18   the affidavit.  Actually, let me take a step back.

19        Can you summarize what the -- since you were the primary

20   drafter of the probable cause section for this affidavit, what

21   were the different buckets or bases to believe that there was

22   probable cause that evidence of grant fraud or wire fraud would

23   be found or fruits or contraband of those violations would be

24   found in Dr. Tao's Gmail account?  And you can feel free to

25   reference the affidavit if you need to.

1    A.  Well, I believe we broke it up into sections starting with,

2    you know, what -- his current job at the University of Kansas,

3    the tips, and a contract provided by Student 1, translations of

4    that contract, the websites that were provided in the tips, and

5    then a review of KU e-mails.  I would say those are the three

6    main buckets.

7    Q.  So what I have is in terms of determining what the probable

8    cause was composed of in the July 11th warrant, you listed

9    information about Dr. Tao's job at KU, information about the

10   tips that were submitted relating to him, the draft contract

11   with Fuzhou University, websites discussing his alleged

12   affiliation with Fuzhou or the Changjiang Scholar Program, as

13   well as information obtained from his KU e-mail account.  Is

14   there anything else?

15   A.  I don't believe so on the spot right now.

16   Q.  Okay.  And did you include in this affidavit everything you

17   knew about the investigation of Dr. Tao?

18   A.  No.

19   Q.  Why not?

20   A.  I tend to be wordy on my probable cause, and I think in

21   Mr. Mattivi's -- with Mr. Mattivi's guidance sought to pare

22   that down a little bit, so it's certainly not everything I knew

23   at the moment, but, in general, this is what I knew.

24   Q.  Okay.  So let's go back to footnote 2, which is, again, is

25   on page 5.

1    A.    Okay.

2    Q.    So footnote 2 talks about where the unsigned contract came

3    from.    And it says, quote, "Student 1 later told agents she

4    obtained the unsigned contract by accessing Tao's e-mail

5    account with Tao's permission and at Tao' direction but that

6    she provided it to KU and to the FBI because she was angry with

7    Tao over not crediting her on a published research article."

8         Did you draft that footnote?

9    A.    I did not.

10   Q.    Do you remember who did?

11   A.    Based on review of my e-mails I believe Mr. Mattivi added

12   that footnote.

13   Q.    But you reviewed it before you signed the affidavit?

14   A.    I did.

15   Q.    And you attested that it was true?

16   A.    I did.

17   Q.    Did Student 1 initially tell the FBI that she obtained the

18   contract from Dr. Tao's e-mail account?

19   A.    No.

20   Q.    What did she tell the FBI?

21   A.    This is based on Agent Carlson's interview, I believe, but

22   that she had received the contract from Dr. Tao's secretary at

23   Fuzhou.

24   Q.    When did she tell the FBI that -- it says "later told

25   agents."    When did she tell the FBI that she had obtained it by

1    accessing Dr. Tao's e-mail account?

2    A.    That would be in her July 9th e-mail.

3    Q.    Okay.  So I'm summarizing this right that -- or accurately,

4    that on July 9th she was interviewed by the FBI, by Agent

5    Carlson and Agent Ng, and in that interview Student 1 said that

6    she obtained the draft contract from a secretary at Fuzhou; is

7    that accurate?

8    A.    That's my understanding.

9    Q.    Okay.  And then later that day she sent the July 9th e-mail

10   to Agent Carlson, which we discussed earlier, and in that

11   e-mail she said, I actually obtained it from Dr. Tao's e-mail

12   account?

13   A.    Correct.

14   Q.    So at the time that you drafted this warrant, you obviously

15   knew that she had said, I obtained the contract from his e-mail

16   account, because you wrote that in footnote 2?

17   A.    Yes.

18   Q.    All right.  So I want to focus on this clause "with Tao's

19   permission and at Tao's direction."

20        What's the basis for that statement?

21   A.    The basis for this statement is the -- I think refers back

22   to this e-mail.

23   Q.    Which e-mail?

24   A.    The July 9th e-mail that Student 1 provided to Agent

25   Carlson which was then provided to me.

1    Q.   So how does that July 9th e-mail that Agent Carlson

2    provided to you support the "with Tao's permission and at Tao's

3    direction" statement in the warrant?

4    A.   So in that e-mail she states that Dr. Tao had asked Student

5    1 to write proposals to apply to the Chinese government and

6    that the account and password for the proposal submission are

7    the same for his e-mail at Fuzhou University.  The last

8    sentence, "Sometimes I log in his e-mail address and check some

9    information," Student 1 was writing reports -- was writing

10   proposals for Dr. Tao for Fuzhou University, was our

11   understanding of this e-mail, and therefore, she had what I

12   would call implied approval or implied access to his e-mail as

13   well.

14        One wouldn't go without the other, I don't think.

15   Q.   So for footnote 2, when you reviewed it, was it your belief

16   that clause "with Tao's permission and at Tao's direction" was

17   accurate based on her statements to Agent Carlson in the

18   July 9th e-mail?

19   A.   I do.  Referencing accessing the e-mail account with

20   permission and at Tao's direction.

21   Q.   Okay.  And sitting here today, do you still believe that

22   that statement, "with Tao's permission and at Tao's direction,"

23   is accurate?

24   A.   And referencing, again, accessing the e-mail account with

25   Tao's permission and at his direction, I would still today say

1    the same.

2    Q.   So you still think it's accurate?

3    A.   I do.

4    Q.   Do you think it could have been drafted better?

5    A.   I do.

6    Q.   So I want to just look at this last clause where footnote 2

7    says -- it's explaining Student 1's statements about why she

8    provided KU and the FBI with the draft contract, and it says,

9    quote, "because she was angry with Tao over not crediting her

10   on a published research article," end quote.

11        Why did you include that clause in the affidavit?

12   A.   I believe that was a recommendation from the DOJ attorney

13   to include that clause.

14   Q.   Do you know why the DOJ attorney -- it wasn't me or

15   Mr. Hawk or any of the current attorneys, right?

16   A.   Right.

17   Q.   Do you know why that DOJ made that recommendation?  Did he

18   or she tell you why?

19   A.   She -- he did not tell me why, although I can surmise as to

20   why, to show the intent of Student 1 or the potential bias that

21   Student 1 may have.

22   Q.   So when you drafted this warrant, did you have a sense of

23   why Student 1 had reported Dr. Tao to the FBI and to KU?

24   A.   I did.  I felt -- I agreed with the statement that there

25   was some kind of dispute or discussion over -- what do you call

1    that?  I can't think of the word -- affil- -- not affiliations,

2    but being part of an article, being cited -- not cited in the

3    article.  I'm blanking on the word.  I'm sorry.

4    Q.    Is it like authorship attribution?

5    A.    Authorship, yes.  I'm sorry.

6         There had -- there was an indication that there was some

7    discussion between her and Dr. Tao regarding authorship of a

8    publication.

9    Q.    And were there any particular pieces of evidence or source

10   of evidence that led you to conclude that she may have had a

11   motive to report him based on that authorship dispute?

12   A.    At the moment right now, I would not be able to cite one.

13   Q.    Okay.  Last question about this affidavit, are you familiar

14   with what document metadata is?

15   A.    I am.

16   Q.    And, generally speaking, what is it?

17   A.    It's a -- it's the electronic properties of a file, often

18   includes an author, a create date, and a modified date.  I'm

19   sure there's several other factors that are included in those

20   details, but those are the three that come to mind right now.

21   Q.    When you reviewed the draft contract as you were drafting

22   this affidavit, did you look at the metadata properties of that

23   contract?

24   A.    I did not.

25   Q.    Why not?

1    A.    Simply didn't.

2    Q.    Do you typically review metadata of documents that you

3    receive related to ongoing investigations?

4    A.    No.

5    Q.    Why not?

6    A.    That would be -- for the number of files that we're talking

7    about and the time constraints that we're under, it would be

8    prohibitive to go to look at the metadata of each file to

9    determine the source of something.  But even then, I don't know

10   that the metadata is wholly reliable.

11   Q.    Okay.  When you submitted and swore to the July 11, 2019,

12   affidavit, did you believe that the draft contract had been

13   fabricated by Student 1?

14   A.    I did not.

15   Q.    All right.  I want to just turn everyone's attention to the

16   next affidavit, which is tab 38, Exhibit 38 attached to the

17   defendant's *Franks* motion.

18       And when you have a chance, Agent Lampe, please tell me if

19   you recognize this document.

20   A.    I recognize this document.

21   Q.    What is it?

22   A.    I believe it's the search warrant executed on the --

23   Dr. Tao's laboratory, his residence, as well as on his Google

24   account on August 19th.

25   Q.    2019?

1    A.   Correct.

2    Q.   And what was your role in drafting this affidavit?

3    A.   My role is similar to the first affidavit where I'm

4    primarily responsible for the probable cause section as well as

5    filling in the technical background and making sure the

6    attachments were correct.

7    Q.   So is it fair to say that the drafting process of this

8    affidavit was similar to the drafting process of the July 11th

9    affidavit?

10   A.   Very much so, yes.

11   Q.   So you were the primary drafter?

12   A.   Yes, sir.

13   Q.   But you received feedback and input from other agents on

14   your squad as well as prosecutors?

15   A.   Correct.

16   Q.   And for both affidavits, do you have a review process that

17   you follow when you're kind of reviewing it for the final time

18   before you sign it over and send it to the prosecutor to be

19   submitted to the magistrate judge?

20   A.   I do.

21   Q.   What is that process?

22   A.   My goal is to make sure that I present all the facts and be

23   able to back up those facts with documents, and so in my review

24   process I will ensure that each statement of fact will have a

25   document that backs it up, whether it be an e-mail or a

1    contract, for instance, or whatever it is.

2    Q.   So how do -- how do you -- sort of nuts-and-bolts-wise, how

3    do you review the paragraphs in the affidavit and line those up

4    with supporting evidence or information?  What's your process?

5    A.   Literally go through line by line or read a statement in my

6    probable cause and find the document that backs up that

7    statement, and then once I find that, move on to the next

8    sentence and determine the document that backs up that

9    statement, and continue on until I complete the document.

10   Q.   Did you do that for the July 11th affidavit?

11   A.   I did.

12   Q.   Did you do that for the August 19th affidavit?

13   A.   I did.

14   Q.   So let's just -- similar to what we did with the July

15   affidavit, and if you need a minute, take your time, but would

16   you please summarize the probable cause as described in the

17   August 19, 2019, affidavit.

18   A.   So, again, we start with Dr. Tao's employment at the

19   University of Kansas.  Some discussion about the Board of

20   Regents and the requirements.  And there's some information

21   regarding tips provided by Student 1.  We reference the

22   contract and a translation of that contract.  We go on with

23   some open source reporting.  Next bucket would be the KU

24   e-mails.  And then the final section would be results from the

25   initial Gmail search warrant.

1    Q.   Is the results from the initial Gmail search warrant

2    something that's different between the July affidavit and the

3    August affidavit?

4    A.   Yes.

5    Q.   Okay.  And again, in summary, what evidence did you find in

6    the Gmail account that further strengthened probable cause or

7    in your view was relevant to the probable cause determination?

8    A.   May I have a moment to read through it?

9    Q.   Sure.

10   A.   So we cite several instances of e-mails where Dr. Tao is

11   traveling to China to defend his -- like a doctoral defense for

12   the Changjiang scholarship by obtaining a passport through the

13   consulate.  Later there are e-mails congratulating Dr. Tao on

14   being awarded a Changjiang scholarship.  Additionally, there

15   are e-mails containing hiring contracts from Fuzhou University

16   and addendums as well.

17        There are e-mails where Dr. Tao identifies himself as being

18   affiliated with both Fuzhou University as well as KU.  There's

19   a paragraph regarding the purchase of equipment for a lab at

20   Fuzhou involving Dr. Tao.  There's a section on Dr. Tao

21   applying to the National -- the National Natural Science

22   Foundation of China, NSFC.

23   Q.   What is NSFC?

24   A.   It's -- to simplify, it's the NSF of China.

25   Q.   And I just want to have you do the same thing that you just

1    did, which is to just summarize what the -- in your view helped

2    establish probable cause from the KU account.

3        So you can go to paragraph 13.

4            MR. ZEIDENBERG:  Your Honor --

5            THE COURT:  This would pertain to both the first and

6    second search warrant?

7            MR. BARRY:  Correct.

8            MR. ZEIDENBERG:  I would say the affidavit speaks for

9    itself whether it establishes probable cause or not.

10           THE COURT:  Well, I mean, I'll overrule.

11           MR. ZEIDENBERG:  Rather than having to describe the

12   affidavit, the affidavit is an exhibit.

13           THE COURT:  Understood.  But we're here -- you're here

14   challenging the affidavit, so I think it's fair for him to

15   describe how he drafted it and what he views the probable cause

16   as consisting of.  So overruled.

17           Proceed.

18           Obviously, I'm -- the judicial officer is the one that

19   decides whether there's probable cause or not.

20           Go ahead.

21   BY MR. BARRY:

22   Q.  The question, Agent Lampe, is -- and I'm going to move on

23   in a minute, Your Honor.

24       But would you please summarize what you found in the -- in

25   defendant's KU account that you believed helped establish

1    probable cause of the criminal violations we've talked about?

2    A.   So I'm on page 5 of this same document.  Starting on

3    page 5.  I apologize.  That's not --

4    Q.   I think it starts on page 8.

5    A.   Yeah.

6    Q.   And this section is the same between the July affidavit and

7    the August affidavit.

8    A.   Right.

9    Q.   Okay.  So it starts with --

10   A.   Starts with --

11   Q.   Paragraph 13?

12   A.   E-mails that Dr. Tao is interested in a Changjiang

13   scholarship with Xiamen University.

14           THE REPORTER:  What university?

15           THE WITNESS:  X-i-a-m-e-n.

16           THE REPORTER:  Thank you.

17   A.   And that it -- e-mails consistent with him continuing his

18   interest in a Changjiang scholarship.  And then e-mails

19   consistent with Tao acting on his contract -- or acting on a

20   contract that required recruiting of post-doctoral students as

21   well as master students.

22       Again, Dr. Tao, in his KU e-mails, states that he's

23   received a joint appointment at Fuzhou University other than

24   the current one, and a contact card, and X.Z.'s e-mail account

25   listing Dr. Tao's e-mail account as taofeng@fzu.edu.cn, which

1   is a Fuzhou e-mail address.

2   BY MR. BARRY:

3   Q.   Who is X.Z. without saying the person's name?  What's his

4   or her relation to Dr. Tao?

5   A.   X.Z. is a former student, post-doctoral student of Dr. Tao

6   who came to KU.

7   Q.   So in X.Z.'s KU e-mail account, the FBI located a contact

8   card that listed Dr. Tao's e-mail account as the Fuzhou e-mail

9   account?

10  A.   That's correct.

11  Q.   I just have a few more questions about this affidavit.  So

12  I want to direct your attention to paragraph 11, which is on

13  page 5, and again, this is -- the language I'm going to point

14  to is identical to the language in the July warrant.  So the

15  paragraph starts with "While working as a professor at KU."

16       Do you see where I'm at?

17  A.   I do.

18  Q.   Okay.  So you state, quote, "Between approximately

19  April 2019 and the time of this filing both KU and the FBI have

20  received a series of complaints regarding Tao, both anonymously

21  and by an individual claiming to be a former post-doctoral

22  student sponsored by Tao to study in the United States,

23  (Student 1)," end quote.

24       As we discussed earlier, you said multiple complaints

25  regarding defendant came in to KU and FBI.

1    A.    That's correct.

2    Q.    And some of those complaints were submitted in the names of

3    people other than Student 1?

4    A.    Correct.

5    Q.    And you said some of them were submitted anonymously?

6    A.    Correct.

7    Q.    And you said that you, sitting here today at least, you did

8    not recall any of them being submitted in the name of Student

9    1?

10   A.    Not that I recall, no.

11   Q.    Okay.  But you're not sure?

12   A.    I'm not.

13   Q.    Okay.  So why did you write that the complaints had been

14   submitted anonymously and from Student 1 instead of, for

15   example, anonymously from Student 1 and from the other names in

16   which they were submitted?

17   A.    I base that on the fact that Student 1 had in her July 9th

18   e-mail admitted to submitting complaints using different e-mail

19   accounts such as X.Z., L.N., and C.E.L.

20        There are two complaints that I cannot pinpoint as Student

21   1, and 1 is -- there's a -- a submission was made to KU

22   regarding -- through a KU portal, a complaint submitted through

23   a KU portal.  I would not be able to verify that that was

24   Student 1.  Additionally, there was an e-mail complaint

25   provided through a Guerrilla mail account, which I would not be

1  able to verify was Student 1.

2  Q.   What is Guerrilla mail?

3  A.   Guerrilla mail is a temporary e-mail account that

4  disappears after a short period of time.

5  Q.   At the time that you signed the July 11, 2019, affidavit,

6  did you know the IP address from which either the Guerrilla

7  e-mail account -- or Guerrilla account e-mail or the anonymous

8  e-mail to KU had originated from?

9  A.   I believe I did know the IP addresses.

10  Q.   Where did those IP addresses render to?

11  A.   The San Francisco area.

12  Q.   And did you know at that time that Student 1 was living in

13  the San Francisco area?

14  A.   At the time of the warrant?

15  Q.   Correct.

16  A.   Yes.

17  Q.   And, in fact, two days before the warrant, you, Agent

18  Carlson, AUSA Mattivi had planned to go to the Bay Area to

19  interview her?

20  A.   That is correct.

21  Q.   So at the time you submitted the July 11th warrant, did you

22  know that Student 1 had submitted those two anonymous e-mails?

23  A.   No.

24  Q.   But you knew that the IP address rendered to that area?

25  A.   Yes.

1    Q.   So why didn't you know that she was behind those two

2    e-mails?

3    A.   Well, she didn't indicate that she was behind those two

4    e-mails.

5    Q.   Did she ever tell Agent Carlson or Agent Ng in the July 9th

6    interview that she was behind the anonymous e-mails?

7    A.   Not to my knowledge.

8    Q.   Did she tell Agent Carlson in her July 9th follow-up e-mail

9    that she was behind the anonymous e-mails?

10   A.   No.

11   Q.   And if you look to the paragraph dealing with the open

12   source reporting, this is paragraph 12 on page 7 of the August

13   warrant.

14   A.   Page 7, paragraph 12, yes.

15   Q.   So the sentence says, quote, "Open source reporting, some

16   of which was provided by Student 1, as well as anonymously,

17   corroborates many of the above-described complaints," end

18   quote.

19        Did you know at the time you submitted the July 11th

20   warrant who had submitted all of that open source reporting,

21   those news articles and other websites discussing Dr. Tao and

22   his work in China?

23   A.   Not all of them.

24   Q.   Did you know who was behind submitting some of them?

25   A.   Yes.

1    Q.    And who was behind submitting some of them?

2    A.    Student 1.

3    Q.    Was there a bucket of open source material that had been

4    submitted for which you did not know who was responsible for

5    submitting those?

6    A.    The anonymous tips.

7    Q.    Okay.  And those are the two tips we just discussed?

8    A.    Yes.

9    Q.    Okay.  So the last thing I want to do is I want to go back

10   to the -- well, actually, while we're there, so I want to draw

11   your attention to footnote 2 on page 6 of the August warrant.

12   A.    Yes.

13   Q.    So we looked at footnote 2 from the July warrant.  And was

14   it different than this footnote?

15   A.    It is different.

16   Q.    How is it different?

17   A.    It explains in more detail our sense of how Student 1

18   obtained the contract.

19   Q.    And describe for me how your understanding of how Student 1

20   obtained the contract -- well, let me ask you a different

21   question.

22        Between the July 11th warrant and the August 19th warrant

23   did your understanding of how Student 1 obtained the contract

24   change in any way?

25   A.    Yes.

1  Q.  How?

2  A.  Well, in the first footnote in the July 11th search warrant

3  footnote 2 states she obtained the contract by -- at Tao's --

4  well, by accessing his e-mail account.

5      We later felt over the course of the investigation that

6  that may not have been the case, and so to be clear and candid

7  with the judge, we felt that this was the more appropriate

8  statement.

9  Q.  And why did you feel the need to clarify for the judge or,

10  in your words, be more candid about relating to where -- from

11  where Student 1 obtained the contract?

12  A.  While I think she had access to Dr. Tao's e-mail account at

13  Fuzhou, I don't think Dr. Tao would have directed her to

14  download his employment contract from that e-mail account for

15  then to be provided to the FBI.  And that's why we include this

16  statement I suspect she obtained it by hacking into Tao's

17  e-mail account.

18  Q.  What did you mean when you used the word "hacking" here?

19  A.  So, again, I did not write this footnote.  I understand

20  that I attested to it.  Hacking is kind of a -- it's a more

21  aggressive term than I think I might have used.  But while I

22  feel she had access to Dr. Tao's Fuzhou account, again, I don't

23  know that Dr. Tao would have given her permission to download a

24  contract from that Fuzhou e-mail account.

25  Q.  Okay.  When you attested to footnote 2 in the August

19-20052-JAR    USA v. Feng Tao    10.14.21

164

1  warrant, did you believe that the footnote 2 in the July

2  warrant was incorrect?

3  A.  No.  I'm saying the same thing here, is that I believe

4  Dr. Tao allowed her to have access to the Fuzhou e-mail account

5  in the July 11th warrant.  What this paragraph -- what this

6  footnote states is that she used that access to download a

7  contract without his permission.

8  Q.  Okay.  The last few questions I have about this are there's

9  a -- this is the third sentence.  This is footnote 2 in the

10  August warrant, it says, quote, "In an e-mail to agents later

11  that day she said she hadn't been truthful earlier," and it

12  goes on but I'm going to just cut it right there.

13      So this is referring to the July 9th e-mail that Student 1

14  sent to Agent Carlson the same day as the interview?

15  A.  Correct.

16  Q.  When it says she hadn't been truthful earlier, what did you

17  mean by writing that here?

18  A.  Well, in her July 9th e-mail, if I can refer back to

19  that -- is that Exhibit 37?  No.  Exhibit 36?

20  Q.  This is Exhibit 36 attached to defendant 's motion for

21  *Franks* hearing.

22  A.  Yeah.

23      So I read and understand this e-mail as a clarifying

24  e-mail.  "We had a discussion today and here are some of the

25  things that I was not wholly truthful on," and she lists them

1    out in order, four items specifically.  But then at the end of

2    this e-mail she states, "Others are correct information to the

3    best of my knowledge," so I feel like she's citing specific

4    things that she wasn't fully honest on.

5    Q.    So when you drafted the -- either the July 11th warrant or

6    signed the July 11th warrant or August 19th warrant, in either

7    time period, did you believe that Student 1 was lying about all

8    of the allegations she made regarding Dr. Tao?

9    A.    No.

10   Q.    In either time period did you believe that Student 1 had

11   fabricated any of the evidence she had provided to the FBI or

12   KU in furtherance of her allegations?

13   A.    No.

14   Q.    The last thing I want to focus on is -- let's go back to --

15   I know we're going a little bit back and forth, but Exhibit 38,

16   which is the August warrant, and I want to draw your attention

17   to footnote 7, which is on page 10 of the warrant -- or of the

18   affidavit.

19         Are you there?

20   A.    I am.

21   Q.    So footnote 7 says, quote, "Tao did not, in fact, reply to

22   the person accepting the position at FU" -- which is Fuzhou.

23   "Rather, Tao forwarded the e-mail to a contract at FU.  I

24   incorrectly stated in a prior affidavit that Tao had responded

25   to the e-mail."

1        Did you add this footnote?

2    A.   I did.

3    Q.   Why did you add it?

4    A.   For the reasons I state in the footnote.  The first

5    affidavit mistakenly states that Tao had replied to this --

6    characterized the person as a recruit with his own name when,

7    in fact -- when I later was doing my checks on this affidavit,

8    I had realized that he wasn't replying to the recruit, he was

9    forwarding the recruit's -- I believe it's an acceptance

10   letter, I'm not entirely sure.  I'd have to see the document in

11   front of me.  But he forwards it to a contact at Fuzhou

12   University, and Dr. Tao's signature line at the bottom is

13   included in the forwarding, so there's no body.  It's just a

14   forwarded e-mail, but it says Franklin Feng Tao at the bottom.

15       And so in the prior affidavit I had thought that was Tao

16   responding to the recruit saying, I will be your supervisor.

17   And then I corrected myself in the second affidavit where he

18   was not responding, he was simply forwarding the e-mail to a

19   contact at Fuzhou.

20   Q.   How did you realize that you had made a mistake about the

21   sequence of the e-mail transmissions in the July warrant?

22   A.   Like I said, I spent a lot of time going line by line

23   through these affidavits.  It's very important to me to get

24   them right.  So when I got to this footnote, I knew I had made

25   a mistake and so I needed to correct it and I notified

19-20052-JAR    USA v. Feng Tao    10.14.21

1   Mr. Mattivi about those things.

2   Q.   Okay.  All right.

3            MR. BARRY:   The government has no further questions at

4   this time.

5            THE COURT:  All right.  Thank you.  Why don't we take

6   about a 15-minute recess.

7       (Recess.)

8                     CROSS-EXAMINATION

9   BY MR. ZEIDENBERG:

10  Q.   Good afternoon, Agent Lampe.

11  A.   Good afternoon.

12  Q.   How many search warrants have you been an affiant on?

13  A.   I wouldn't be able to say with precision without looking

14  through my case files.

15  Q.   Can you give us an estimate?

16  A.   Five to 10.

17  Q.   Five to 10.  And at the time that you did this one, which

18  was two years ago, how many had you done?

19  A.   Again, I'm guessing, probably more than five but less than

20  10.

21  Q.   And did you, at the FBI, receive training on how to apply

22  for search warrants?

23  A.   We did.

24  Q.   And did you understand that an affiant needs to swear under

25  oath that everything is true and accurate?

1    A.    We did.

2    Q.    And what were you taught about what your duty of candor is

3    with the Court?

4    A.    My duty to be truthful.

5    Q.    And is your understanding that your duty -- a duty of

6    candor goes beyond just not telling a lie but that it includes

7    more than that?

8    A.    I'm not sure what you mean by that.

9    Q.    Well, did you understand that you had responsibility to let

10    the magistrate know about facts that directly undercut probable

11    cause?

12    A.    My understanding of the warrant was to present information

13    to the best of my knowledge at that time.

14    Q.    Right.  But if you -- you could have truthful information

15    that establishes probable cause and then other information

16    which would undermine probable cause, and if you don't include

17    the information that undermines the probable cause, your

18    affidavit may still be truthful in that it doesn't have

19    anything that's a lie in it, but do you understand how that

20    wouldn't be a candid affidavit?

21    A.    Yes.  The way you're presenting it, yes.

22    Q.    And do you understand or do you believe when you were

23    writing these that you had a duty to include information that

24    would directly or could undercut the probable cause in your

25    affidavit?

1    A.    I understand what you're saying, and I believe I did.

2    Q.    So do you believe you did that?

3    A.    I believe I did.

4    Q.    So let's go to -- in your August affidavit, August 19th,

5    and your footnote 7 that government was asking you about, you

6    added a footnote on page 10 that said, "Tao did not, in fact,

7    reply to the person accepting the position at FU.  Rather, Tao

8    forwarded the e-mail to a contact at FU.  I incorrectly stated

9    in a prior affidavit that Tao had responded to that e-mail."

10        Why did you feel it was necessary to include that and tell

11    the magistrate that your earlier affidavit was inaccurate?

12    A.    So the magistrate could be aware of the mistake I made.

13    Q.    And did you feel that that was your responsibility to

14    advise the magistrate of mistakes in your earlier affidavit?

15    A.    I did.

16    Q.    Did you think it was significant that Tao did not reply to

17    an e-mail but rather just forwarded it on?

18    A.    Enough for me to make the note to the magistrate.

19    Q.    Did you think this affected probable cause in any way for

20    the warrant?

21    A.    I wouldn't characterize it as affecting the probable cause.

22    I would characterize it as highlighting a mistake that I made

23    in the prior affidavit so that judge could be aware of that

24    mistake.

25    Q.    And you felt that was important for the magistrate to know

1    about even a minor error; is that right?

2    A.    It's a misstatement, so yes, it was important for me to say

3    so.

4    Q.    Do you agree that an agent can't intentionally withhold

5    information from the Court in order to increase the odds that

6    the Court will sign the warrant?

7    A.    I would say that the agent should provide the Court with

8    the best information the agent has.

9    Q.    And does that include information that would undercut

10   probable cause?

11   A.    Yes, based on -- based on my footnote 7.

12   Q.    And do you believe in your affidavits that we've been

13   looking at today from July and August you included information

14   that would have directly undercut probable cause or did you

15   exclude it?

16   A.    I don't believe that I excluded specific information that

17   would undercut probable cause.

18   Q.    Do you believe you were completely candid with the Court in

19   connection with the search warrant affidavits in this case?

20   A.    I believe so, yes.

21   Q.    Prior to this case, which was initiated in August of 2019,

22   can you tell us how many cases you were the lead case agent on?

23   A.    Again, that's a question similar to how many search

24   warrants did you write.  I'd have to look at my case file to

25   know exactly how many cases.  I could give you an estimate.

1    Q.   Well, this was considered a counter-espionage case when it

2    came into the office, correct?

3    A.   I work on a counter-intelligence squad.

4    Q.   And it came to you?

5    A.   And it came to me.

6    Q.   Does that suggest that this was a counter-intelligence

7    investigation when it came to you?

8    A.   Yes.

9    Q.   You don't, like, do bank robberies and drug cases now,

10   right?

11   A.   I do not anymore, no.

12   Q.   And at the time this case was initiated, came to you, how

13   many counter-espionage cases were you the lead case agent on?

14   A.   Again, I would have to look at my case file, but I could

15   give you an estimation.

16   Q.   What's your estimate?

17          MR. BARRY:  Objection.  I don't see how this is

18   relevant to the *Franks* motion.

19          THE COURT:  Sustained.

20   BY MR. ZEIDENBERG:

21   Q.   When the -- when you were asked on direct examination about

22   the first complaint that came in, you said that you don't

23   recall what it was about.  Is that right?

24   A.   It was a complaint -- the complaint coming to the FBI or

25   the complaint coming to --

19-20052-JAR    USA v. Feng Tao    10.14.21

1    Q.   The first time you became aware of this case, what was your

2    understanding of what the complaint was about Dr. Tao?

3    A.   That Dr. Tao had been engaged with a foreign university

4    while also being employed at the University of Kansas.

5    Q.   And that was the -- doesn't sound like a counter-espionage

6    case.  I mean, working at another university at the same

7    time you're working -- you're at one university working at

8    another university, why is that an espionage case?

9              MR. BARRY:  Objection.  I think this is beyond the

10   *Franks* motion.

11             THE COURT:  I'll sustain.  I don't think it's

12   relevant.

13   BY MR. ZEIDENBERG:

14   Q.   Do you have a copy of Exhibit 17?

15   A.   This is an e-mail from Agent Carlson to myself on May 13,

16   2019.

17   Q.   Yeah.  Look at page 3, if you would, please.  That's dated

18   April 30th, correct?

19   A.   That's correct.

20   Q.   And the allegation at the top is espionage, correct?

21   A.   That's correct.

22   Q.   So they mention Franklin Tao and espionage in the first

23   complaint, right?

24   A.   This is a complaint to the University of Kansas, yes.

25   Q.   And that came to you?

1    A.  Correct.

2    Q.  It was forwarded on to you because you're in the

3    counter-espionage section, correct?

4    A.  Correct.

5    Q.  It doesn't say anything there about working at a second

6    university, right?

7    A.  It does.

8    Q.  Where is that?

9    A.  It's the fifth, I guess, line down from the top.  "Describe

10   the activity.  Please provide as much information as possible."

11      "He took another full-time pay position in his home

12   country, China."

13   Q.  And your takeaway from this allegation alleging espionage

14   and that he took a full-term position in his home country of

15   China, was the significant part that he took another job or

16   that he was involved in espionage?

17          MR. BARRY:  Objection.  Again, I don't see the

18   relevance.  This is a *Franks* motion.

19          THE COURT:  Sustained.  I mean, again, I go back to

20   this is not an opportunity to depose this witness and lock down

21   his testimony on how he might testify to defenses at trial.

22   We're just here to discuss the affidavits and the issues

23   pertaining to that.

24   BY MR. ZEIDENBERG:

25   Q.  Well, you got -- have you had a chance to read the defense

1   motion for *Franks* hearing?

2   A.   I believe I read through it.

3   Q.   You're not sure?

4   A.   I mean, there have been a lot of motions and I've read most

5   of them.

6   Q.   Well, this motion pertains to you?

7   A.   I understand.

8   Q.   Are you sure whether or not you've read it?  Because I've

9   got a lot of questions about some of the allegations that are

10  made in some of the exhibits.  Have you read -- I'll go through

11  it with you, but I want to know how familiar you are with these

12  allegations and with these exhibits.

13         MR. BARRY:  Objection; relevance.  I mean, this is

14  about what was stated in the two affidavits.  They've

15  identified eight material omissions and misstatements.  That's

16  the scope of the examination.  Again, I don't see why this is

17  relevant to today's hearing.  This shouldn't be a fishing

18  expedition for Mr. Zeidenberg.

19         THE COURT:  I don't think it's relevant.  I'm going to

20  let you rephrase your question to asking --

21         MR. ZEIDENBERG:  I'm trying to move things along, Your

22  Honor.  If he hasn't looked at this stuff before, I will take

23  him through it.

24  BY MR. ZEIDENBERG:

25  Q.   You testified on direct examination -- let me go back to

1    Exhibit 17.

2        Do you have that there?

3    A.   I do.

4    Q.   Now, the IP address -- this was an anonymous complaint?

5    A.   Yes.

6    Q.   And the IP address came back, it was discovered, to San

7    Francisco airport, correct?

8    A.   That is correct.

9    Q.   And that's about 18 miles from the Berkeley campus,

10   correct?

11   A.   I'm not sure of the mileage between the university and the

12   airport.

13   Q.   That's where Student 1 lived, correct, Berkeley?

14   A.   Student 1 lived in the Berkeley area, I believe.

15   Q.   That's in the area of the San Francisco airport?

16   A.   Yes.

17   Q.   Exhibit 19 this was a complaint made by someone with the

18   initials X.Z., correct?

19   A.   Yes, to the University of Kansas.

20   Q.   And this was forwarded on to the FBI and forwarded on to

21   you, correct?

22   A.   Well, this specific exhibit doesn't show it being forwarded

23   on to me.

24   Q.   Do you have any doubt that you would have received a copy

25   of this complaint?

1    A.    It looks familiar.

2    Q.    And this person purporting to be X.Z. says, "Several days

3    ago I wrote anonymous e-mails to you."

4          Do you see that?

5    A.    Yes.

6    Q.    And we just looked at an anonymous e-mail which was done

7    several days earlier, which was Exhibit 17, right?

8    A.    That's not my understanding.

9    Q.    Well, Exhibit 17 is anonymous, correct?

10   A.    It is.

11   Q.    And then Exhibit 19 is from someone purporting to be X.Z.

12   saying, I submitted an anonymous complaint several days

13   earlier, correct?

14   A.    That's not how I read this.  It says, "Several days ago I

15   wrote anonymous e-mails to you."

16   Q.    Let's go back to Exhibit 16 for a minute.  Do you see where

17   X.Z., the one purporting to be X.Z., makes a complaint about

18   "Franklin Tao taking position at Changjiang professor in China.

19   He may be a scientific espionage"?

20   A.    That's the May 12, 2019, e-mail?

21   Q.    Correct.

22   A.    From X.Z. to PAO.

23   Q.    I'm sorry?

24   A.    To the PAO, B.P.

25   Q.    I'm just asking if you see the e-mail.

177

1    A.    I'm just making sure that we see the same e-mail.

2    Q.    Yes.  It's the one dated May 12, 4:36 a.m.?

3    A.    Yes, sir.

4    Q.    And X.Z. says, "I also submitted a tip in the website."

5          Do you see that?

6    A.    I do.

7    Q.    And this is May 12th?

8    A.    Correct.

9    Q.    And then if you turn to Exhibit 18 -- strike that,

10   Exhibit 17, we have an anonymous -- this was anonymous,

11   correct?

12   A.    Correct.

13   Q.    And then we turn to Exhibit 19, and 19 says, "Several days

14   ago I wrote anonymous e-mails to you."

15         And it's purportedly from X.Z., Correct?

16   A.    Yes.  The e-mail on May 10, 2019, from X.Z. to KU says, "I

17   wrote anonymous e-mails to you."

18   Q.    And if you turn in your binder to the next one, you'll see

19   Exhibit 20 and, again, there's another complaint from someone

20   who purports to be X.Z., correct?  Page 3 of 4.

21   A.    I'm looking at a May 14, 2019, e-mail at 10:52 a.m.

22   Q.    Right.

23   A.    Right.

24   Q.    If you go on to the next page --

25   A.    Yes.

1    Q.    -- you see at the top on May 13th redacted X.Z. wrote, this

2    is X.Z., and then made a complaint about Dr. Tao and listed a

3    bunch of websites?

4    A.    I see that.

5    Q.    Okay.  If you go to Exhibit 21, on May 14th there's another

6    complaint purporting to be from X.Z. to HR officer, but this

7    time they sign the informant, Student 1's real name.

8         Do you see that?

9    A.    I do see that, yes.

10   Q.    And you got a copy of this, right?

11   A.    Yes.

12   Q.    Okay.  So what did that tell you about the identity of X.Z.

13   when you received this and saw that it was signed by the name

14   of Student 1?

15   A.    That X.Z. is potentially Student 1.

16   Q.    Seemed like a pretty strong link, right?

17   A.    Potentially, yes.

18   Q.    And X.Z. had been sending a stream of complaints and also

19   referenced an anonymous complaint that he or she made, correct?

20   A.    Correct.

21   Q.    So what does that tell you about the identity of Anonymous

22   (verbatim)?

23   A.    I think things are being conflated between the documents

24   that you cited.

25   Q.    Well, we have X.Z. saying -- making complaints, right?

1   A.   Correct.

2   Q.   X.Z. said we have Anonymous making complaints, right?

3   A.   Right.

4   Q.   We have X.Z. saying he submitted an anonymous complaint,

5   right?

6   A.   Let's walk through exhibit by exhibit to make sure we're on

7   the same page.

8   Q.   Okay.  Go ahead.

9   A.   You were walking me through this.

10  Q.   Okay.  Well, if there's redirect, the government will take

11  you through it.

12       Exhibit 21.

13  A.   Exhibit 21.

14  Q.   If you look on the second page, something redacted X.Z., so

15  X.Z. making another complaint, and attaching what purports to

16  be a contract between Franklin Tao and Fuzhou University,

17  right?

18  A.   Yes, on May 14th at 4:30 p.m., X.Z.

19  Q.   And it was signed with the actual name of Student 1, right?

20  A.   Yes.  The name of Student 1.

21  Q.   At this point, Agent Lampe, did you have any doubt about

22  whether X.Z. and Student 1 were one in the same?

23  A.   I would say there was some doubt as to who was behind all

24  of the e-mails because they came in from several e-mail

25  addresses.

1  Q.  Well, you're an investigator; you're an FBI agent?

2  A.  Right.

3  Q.  So you're putting on your investigator hat, and you've got

4  someone sending in e-mails using one name and signing it using

5  another.  Did that make you suspicious that maybe X.Z. is not

6  the real person who's submitting these?

7  A.  Of course.

8  Q.  Okay.  And did you do some investigation as to who Student

9  1 was?

10  A.  We did.

11  Q.  Okay.  And you found out pretty soon that she had been a

12  visiting scholar at KU, correct?

13  A.  Correct.

14  Q.  And that she now lived in Berkeley, California, correct?

15  A.  Correct.

16  Q.  And you knew the e-mail address, the IP address, for

17  X.Z. -- or for Anonymous came back to Berkeley, correct -- or

18  San Francisco area?

19  A.  For the anonymous report?

20  Q.  Yes.

21  A.  The anonymous report that went to KU?

22  Q.  Correct.

23  A.  Came back to the San Francisco area.

24  Q.  The same place where Student 1 was living?

25  A.  That's correct.

19-20052-JAR    USA v. Feng Tao    10.14.21

1    Q.    And Student 1 had signed the complaint, some of the

2    complaints that were purported to be from X.Z., right?

3    A.    In this e-mail Student 1 signs her name.

4    Q.    So did you start getting pretty suspicious that Student 1

5    was behind this?

6    A.    Behind the X.Z. e-mail?

7    Q.    Yes.

8    A.    Yes.

9    Q.    What about Anonymous?

10    A.    That's unknown.

11    Q.    Still didn't know?

12    A.    That's unknown.

13    Q.    All right.  Let's look at Exhibit 24.  It's hard to read in

14    the binder, but you read this on a computer before, right?

15    This is the Guerrilla mail?

16    A.    Yes.

17    Q.    Okay.  Now, the KU -- this was a complaint that was similar

18    in nature to the other ones you had received from -- regarding

19    Dr. Tao, right?

20    A.    This is a similar complaint.

21    Q.    And it was May 19, 2019?

22    A.    I'm sorry.  There is no way I'm going to be able to read

23    this.

24    Q.    Fair to say it was in the same time frame as these other

25    complaints?

1   A.   Yes.

2   Q.   And the IP address for this Guerrilla mail came back to the

3   same San Francisco area, correct?

4   A.   That's my understanding, yes.

5   Q.   So, as an investigator, did that make you suspicious as to

6   the identity of the author of the Guerrilla mail e-mail?

7   A.   What the IP address tells me is that it came back to the

8   San Francisco area.

9   Q.   My question was whether, as an investigator, it made you

10  suspicious as to the identity of the Guerrilla mail e-mail?

11  A.   I don't understand what you mean by suspicious of it.

12  Q.   Well, did you suspect that Student 1 was the person who was

13  behind the Guerrilla mail e-mail?

14  A.   Student 1 lives in the Bay Area of the San Francisco area.

15  The IP resolved to the San Francisco area, but that does not

16  necessarily mean that Student 1 is behind the IP.

17  Q.   Listen to my question.

18  A.   Okay.  I'm sorry.

19  Q.   My question is whether you were suspicious whether Student

20  1 was responsible for the Guerrilla mail e-mail.  Were you

21  suspicious?

22  A.   I wouldn't use the word "suspicious."  I would say that

23  it's possible.

24  Q.   Well, let's look at -- jump ahead for a second and look at

25  Exhibit 38.  That's the affidavit.

1    A.    Yes.

2    Q.    Look at footnote 2.  Look at the second sentence there.

3    You said, "At the time I am unsure how she obtained the

4    contract, but I suspect she obtained it by hacking into Tao's

5    e-mail account."

6         So when I use the word "suspicious" and you used the word

7    "suspect," I'm using it as an analogy or as a synonym.

8         Did you suspect that Student 1 was the person responsible

9    for the Guerrilla mail e-mail?

10   A.    I'm unsure why you're aiming towards "suspect."  It's

11   possible that Student 1 is responsible for the Guerrilla mail

12   e-mail.

13   Q.    Well, when you say the word "possible," Agent Lampe,

14   anyone -- virtually anyone in the world could potentially

15   possibly be responsible, right?

16   A.    Right.

17   Q.    My question isn't whether it's possible she did it.  I'm

18   asking, as a trained investigator, you know that Student 1 has

19   signed X.Z.'s -- has falsified, right, and used a fake e-mail

20   address to implicate Professor Tao, right?  You knew that?

21   A.    She stated that.

22   Q.    You knew that back in June 2019, because she signed her own

23   name to an e-mail that was coming from a different e-mail

24   address?

25   A.    And she wrote that in her e-mail on July 9th.

1    Q.   We'll get to July 9th.  Okay?

2    A.   Okay.  Sorry.

3    Q.   I'm talking about what you knew at the time as an

4    investigator, a counter-espionage trained agent.  Okay?

5    A.   Uh-huh.

6    Q.   She signed it.  Did that make you think she was X.Z. and

7    X.Z. was her?  Not whether it was possible.

8    A.   Okay.

9    Q.   Did you believe that was a likely -- a likely event?  Did

10   you discuss this with the other agents?

11   A.   Yes.

12   Q.   Was there discussion amongst you all about, hey, I think

13   that we know who the source is here?

14   A.   The source of the tips, yes.

15   Q.   And was there a consensus that it's likely to be Student 1?

16   A.   In the X.Z. e-mail, yes.

17   Q.   Okay.  And so you know that she is faking e-mail addresses

18   and you know that she's in the San Francisco area.  And then

19   you get a Guerrilla mail e-mail, anonymous, from the San

20   Francisco area.

21        Now, did that make you suspicious that it was all part of

22   activity by Student 1?  Did it occur to you, Agent Lampe, that

23   she was behind this?

24   A.   What I knew at the time was based on the e-mail that she

25   sent on July 9th.  This e-mail that you're showing me right

1   now -- I'm unsure which exhibit; we've been bouncing from

2   exhibit to exhibit -- but the e-mail where Student 1 signs her

3   name under an X.Z. e-mail, yes, that would point to the fact

4   that that may be Student 1.

5   Q.   May be?

6   A.   However, multiple e-mail accounts were coming in under

7   different names.

8   Q.   All coming from the same area?

9   A.   I don't know about the e-mails coming from the areas.  We

10  didn't track the IPs of the e-mails coming from --

11  Q.   You tracked the IP for the Guerrilla mail?

12  A.   We did.

13  Q.   You're saying that the -- you and your fellow agents didn't

14  discuss, once you learned that the Guerrilla mail IP came back

15  from San Francisco, that that was likely to be Student 1?

16        MR. BARRY:  Objection; asked and answered multiple

17  times.

18        THE COURT:  You can answer this last time.

19  A.   It's possible.

20  BY MR. ZEIDENBERG:

21  Q.   I didn't ask whether it was possible.  I asked whether you

22  and your fellow agents didn't discuss whether or not the fact

23  that this IP for the Guerrilla mail came back to San Francisco

24  made it very likely that Student 1 was responsible?

25        MR. BARRY:  Same objection.

1          THE COURT:  Overruled.  You can answer this last

2    question.

3    A.   You're going to have to restate it because you keep on

4    harping on the same word and I'm not -- I'm not sure what you

5    mean by it.  I just -- I want to be clear with you and I want

6    to be honest with you --

7    BY MR. ZEIDENBERG:

8    Q.   You believe something is highly likely, that's what I mean

9    when I say suspicious.  You don't know it as an

10   uncontrovertible fact but you view it as something that's

11   highly likely.

12   A.   That's kind of the definition of possible, so if --

13   Q.   No.

14   A.   -- if she is in the -- if the Student 1 is in --

15   Q.   Possible means anybody could have done it.

16   A.   Well, isn't that true?

17   Q.   Do you not understand the difference between possible and

18   highly likely?  Are those the same things to you?

19   A.   They're not.

20   Q.   Okay.  When you file for an affidavit, you're putting in

21   probable cause?

22   A.   Right.

23   Q.   Not possible cause, right?  So let's look at it in terms of

24   those kinds of definitions.  Did you think it was probable that

25   Student 1 was responsible for these -- the Guerrilla mail

1    e-mail?

2    A.   I did think it was possible.  That's what you just said.

3    Q.   I didn't ask you possible.  I asked you probable.

4    A.   I can't say that it's probable and I'm glad to explain why.

5    Q.   Okay.

6    A.   Because that IP -- that Guerrilla mail could be sent from

7    anywhere in the Bay Area.  So for me to commit to saying it's

8    highly likely her would be inaccurate.

9    Q.   Do you -- did you think that it was a coincidence that

10   you're getting, in a period of several weeks, almost identical

11   complaints about Dr. Tao all from the same IP address, that

12   these -- did you think that it was just random different

13   complaints that were unrelated to one another or were all

14   related to one another?

15   A.   The complaints are similar.

16   Q.   That wasn't my question.  My question is:  Do you think it

17   was random, these complaints coming in, or that they were all

18   related?  And keep in mind you already knew that Student 1 was

19   using a fake e-mail address to implicate Dr. Tao.

20   A.   At the time of the affidavit.

21   Q.   You knew that when she signed her name to an e-mail from

22   X.Z., right?

23   A.   According -- yes.  According to that e-mail, Student 1

24   signs her name to that e-mail.  Does that guarantee that that's

25   Student 1?  We're receiving multiple e-mails from multiple

1  accounts, one purporting to be X.Z. or multiple purporting to

2  be X.Z.

3  Q.  Did you have a conversation with AUSA Mattivi about these

4  e-mails and these anonymous sources?

5  A.  I mean, I'm sure I've had multiple conversations with

6  Mr. Mattivi about those.

7  Q.  Did you and he express a belief that Student 1 was

8  responsible for all of these complaints?

9  A.  We had a discussion that the X.Z. e-mail was Student 1.

10  That they were all from her, I don't remember that.  I don't

11  recall that.

12  Q.  You thought those could be other random people in San

13  Francisco making those complaints?

14  A.  I think you're mischaracterizing it by saying random people

15  in San Francisco.

16  Q.  So I'd like to direct your attention to Exhibit 25.  And if

17  you look on the second page -- or actually on the middle of

18  that page, you see that Taylor -- and that's -- help me out

19  with -- Taylor is from KU, correct?  Carl Taylor?

20  A.  That's correct.

21  Q.  And he's head of security; is that right?

22  A.  That's correct.

23  Q.  And he said, "A possible different source e-mailed me.  I

24  sent a copy to you."  This is going to Carlson and Carlson

25  shared this with you, correct?

1    A.    I would guess that it was shared with me.  That wouldn't be

2    abnormal.

3    Q.    And then Carlson [*sic*] says immediately after, "Actually,

4    rereading the message, I think it's the same source," and

5    Carlson says, "If it's another source, this is interesting to

6    say the least."  And Carlson says, "Got the scrapes on our

7    latest chucklehead.  Think we have a solid lead on the source."

8         And then Carlson says, "Well, I've been gone all day, but I

9    think we know who it is, so I've been told."  And then finally,

10   if you go down a few lines, Carlson says, "Just got contacted

11   again.  Different e-mail address using the beginning with X and

12   last name blanked out.  Something really odd occurred."

13        So Carlson is saying -- strike that.

14        Carlson is saying that they think it's the same source,

15   correct?

16   A.    Carl Taylor is stating I think it is the same source; isn't

17   that right?

18   Q.    Right.  Excuse me.

19        And what was your understanding?  You picked up the phone,

20   you've talked to Carl Taylor while this was going on, correct?

21   A.    I had discussions with Carl Taylor, yes.

22   Q.    And who did he think the source was?

23   A.    His understanding of the source -- the source of what

24   specifically, I don't know which this text message refers to,

25   but if it is in reference to X.Z., then I believe he believed,

1    which is really -- I think I'm going out on a limb there, that

2    he believed that it was Student 1.

3    Q.    And the very next day Carl Taylor -- have you looked at

4    Exhibit 26?  Carl Taylor asks for all the information that KU

5    has on Student 1, correct?

6    A.    Correct.

7    Q.    So that suggests that Carl Taylor knows who the source is,

8    correct?

9    A.    It doesn't -- I mean, this e-mail does not suggest that he

10   knows who the source is unless -- and let me read through it

11   and I'll be sure of my statement.

12        So this is an e-mail from a colleague of Carl Taylor's,

13   correct?

14   Q.    Right.

15   A.    To Carl.  And Carl Taylor is requesting from this colleague

16   all the information that they have on Student 1.  That Student

17   1 was supposed to be there in a certain time period and

18   questioning whether Student 1 had ever actually stayed in

19   Lawrence.  That doesn't necessarily say anything about him

20   knowing the source.

21   Q.    Go back to Exhibit 25 for a second.  Do you see that?  This

22   is the one with Carl Taylor where he's saying, I think it's the

23   same source.  The date of that is May 19th, correct?

24   A.    Correct.

25   Q.    May 19th is the date of the Guerrilla mail e-mail, correct?

19-20052-JAR    USA v. Feng Tao    10.14.21

1    A.   I don't know.  I'd have to look at it.  And, again, that

2    exhibit is entirely too small to read.

3    Q.   All right.  Well, I can represent that the Guerrilla mail

4    e-mail is dated that same date, May 19th, and we can submit a

5    more legible copy if the Court needs that.

6         Are you saying you don't remember looking at the Guerrilla

7    mail e-mail at some point on your computer so that it was

8    legible?

9    A.   No.  I do remember it, certainly.  I just -- I can't be

10   certain about the date without having the document in front of

11   me.

12   Q.   And the day after Carlson [*sic*] asks for all the records

13   regarding Student 1, the government served a grand jury

14   subpoena on KU searching for records for Student 1, correct?

15   A.   We did.  You'd have to tell me what day that was, but...

16   Q.   May 22, 2019.

17   A.   Okay.

18   Q.   Does that sound about right?

19   A.   It sounds -- it sounds right.  Again --

20   Q.   This is because you had determined or concluded she was

21   likely the source of some of these complaints against Dr. Tao,

22   correct?

23   A.   Of some of these complaints, that's correct.

24   Q.   So let's look at Exhibit 27.  Now, you've got an e-mail

25   from someone purporting to be C.E.L.

1    A.    Correct, on May 26, 2019.

2    Q.    And this was another anonymous complaint, correct?

3    A.    According to the affidavit, it was not an anonymous

4    complaint.

5    Q.    Well, it was from -- I'm sorry.  It was from someone

6    purporting to be C.E.L., correct?

7    A.    It's actually purporting to be X.Z.

8    Q.    I'm sorry.  So we have an e-mail -- the signed e-mail with

9    X.Z.'s first name, correct?

10   A.    Correct.

11   Q.    But it's from C.E.L., correct?

12   A.    Correct.

13   Q.    And so what does that tell you about the identity of

14   C.E.L.?

15          MR. BARRY:  Objection.  This whole line of questioning

16   is about Carl Taylor and his e-mails that he's on.  Agent Lampe

17   is not on any of these e-mails.  So, again, I don't see how

18   this is relevant and it doesn't have to do with Agent Lampe's

19   state of mind when he signed the July and August affidavits.

20          MR. ZEIDENBERG:  Your Honor, he's trying to -- he

21   testified that he did not know the identity of these people who

22   are making these complaints, and the evidence will show that

23   they knew before the July 9th interview exactly who was making

24   the complaints.  They knew who the identity was of all the

25   anonymous sources and the fake names, and that's why they

1    confronted -- they had the interview that they did and she

2    confessed.  And then he wrote an affidavit denying that.

3              THE COURT:  You're jumping a lot of steps here, right?

4    You spent some time talking about with this witness what

5    evidence there was that pointed to all or -- all of the

6    anonymous sources being from Student 1.  This particular

7    e-mail, this witness is not involved in, it's KU, but there

8    certainly is an e-mail from Mr. Taylor at KU with FBI.  There

9    definitely was suspicion that Student 1 might have been the

10   sole tipster.  Point well received, I think.  Move on.

11             MR. ZEIDENBERG:  If I may, Your Honor, this e-mail

12   went from Taylor to Carlson, his partner on the case.

13             THE COURT:  Okay.  Point well received.  I've got it.

14   I don't think we need to spend a lot of time on this.  I think

15   I've heard enough to understand the point that there was reason

16   to believe by the time the July -- even before the July 9th

17   interview there was reason to believe that she was the one that

18   was making these tips in a number of other names and a number

19   of e-mails, and she admitted to at least most of these in that

20   July 9th -- not on the July 9th e-mail but after the July 9th

21   interview in that e-mail.

22             So I don't think you need to spend much time on this

23   point.

24   BY MR. ZEIDENBERG:

25   Q.  Let's jump ahead to Exhibit 33.  This was another complaint

19-20052-JAR    USA v. Feng Tao    10.14.21

1    that came in from someone identifying himself as L.N. about

2    Dr. Tao, correct?

3    A.    That's correct.

4    Q.    And they allege espionage by a University of Kansas

5    professor conducting scientific espionage activities, right?

6    A.    That's in the submitted text, yes.

7    Q.    And you were able to determine that L.N. lived and worked

8    in Kansas, correct?

9    A.    Yes.

10    Q.    But the IP address came back to Berkeley, correct?

11    A.    The IP 192.31.105.152.

12          THE REPORTER:  Repeat that again.

13    A.    192.31.105.152.  From memory I believe that came back to

14    the Bay Area, but I can't be sure.

15    BY MR. ZEIDENBERG:

16    Q.    So, again, did it make you suspicious that someone using

17    the initials L.N. who you knew L.N. lived in Kansas -- he was a

18    student of Dr. Tao's, correct?

19    A.    He was a post-doctoral student of Dr. Tao's.

20    Q.    He worked with Dr. Tao.

21    A.    Right.

22    Q.    But the IP address came back again to the Berkeley area or

23    San Francisco area, correct?

24    A.    Correct.

25    Q.    And that's where Student 1 lived?

1    A.    Correct.

2    Q.    Did that make you suspicious that Student 1 was actually

3    purporting -- reporting this as L.N.?

4    A.    Student 1 admitted in her July 9th e-mail that she was L.N.

5    Q.    I'm aware of that, Agent Lampe.

6    A.    Okay.

7    Q.    I'm asking you, at the time when this came in and you

8    learned that it was coming from the same IP address with the

9    same type of complaints, did it make you suspicious that this

10    was also from Student 1?

11    A.    So looking at the date of this, this is -- if I'm correct,

12    it was submitted on June 9th, right, of 2019.  And yes, it

13    would suggest that somebody from the Bay Area was submitting

14    this as --

15    Q.    I didn't ask you that question.

16    A.    All right.

17    Q.    We know it came from the Bay Area.

18    A.    Okay.

19    Q.    Question was:  Did it make you suspicious that this was

20    actually being contrived and written and sent by Student 1?

21    A.    It makes me suspicious that it came from somewhere within

22    the Bay Area.

23    Q.    Agent Lampe --

24    A.    You're asking me to confirm the fact that Student 1 is

25    behind this e-mail --

19-20052-JAR    USA v. Feng Tao    10.14.21

1    Q.   I didn't ask you that --

2    A.   -- or this submission.

3    Q.   I didn't ask you that.  I asked you if it made you

4    suspicious.  So let's just go over it.  You know that she's

5    purporting to be X.Z., right?

6    A.   Based on -- well, based on a July 9th e-mail from her.

7    Q.   Agent Lampe, she signed her name to an e-mail coming from

8    someone purporting to be X.Z.

9    A.   I understand what you're saying, but --

10   Q.   She worked with him, correct?

11   A.   Yes.

12   Q.   She lived in the Bay Area?

13   A.   Yes.

14   Q.   You're saying you're not sure if she was really doing this?

15   A.   Am I sure that she is submitting this?

16   Q.   Yeah.  I'm asking you whether you were suspicious that it

17   was all coming from her, not whether you knew it was possible

18   and not whether you knew beyond any reasonable doubt.  I'm

19   asking you if you were suspicious.

20        MR. BARRY:  Objection; asked and answered.  This is

21   the same issue.

22        MR. ZEIDENBERG:  He hasn't answered the question.

23        THE COURT:  I'd like this question -- we could spend

24   hours on this.  July 9th -- I'm sorry.  July 9th she sends this

25   e-mail that identifies certain names that she says she uses.

19-20052-JAR    USA v. Feng Tao    10.14.21

```
 1    Those aren't all the names of the complaints that came into you
 2    or KU, but she admitted to some of them.  You've got all of
 3    these e-mails that are complaints, and some of them you knew
 4    that they were IP addresses that came back to San Francisco,
 5    some of them you apparently didn't check.  One of them she
 6    signed with her name, even though it was supposed to be from
 7    X.Z.
 8              The question is:  Even before she admitted to that on
 9    July 9th, did you suspect that she might have been the one
10    sending all of these?  And the ones in the names, the ones that
11    were anonymous, did you have some suspicious that maybe she was
12    the only tipster?
13    A.   I don't understand the suspicion part of it, but I can
14    agree that it could be suspicious that everything was coming
15    from the Bay Area.  But did I know that --
16              THE COURT:  I didn't ask you if you knew.  The
17    question is did -- did you just suspect that it was possible
18    that you really only had one tipster and not multiple tipsters?
19              THE WITNESS:  Yes.
20              THE COURT:  Because you certainly had indication it
21    was coming from the Bay Area; that doesn't mean it was her.
22    You've got one e-mail that she signed coming from X.Z. and
23    there were other ones from X.Z.  So, I mean, there's some
24    circumstantial evidence.  Just weave it together.  Couldn't you
25    have concluded that, hey, it's possible all of this is coming
```

1    from her and she may be the only tipster?  Possible you had

2    that as your suspicion even before she admitted to it on

3    July 9th; is that fair to say?

4          THE WITNESS:  That's why I keep on using the word

5    "possible," yes.

6          THE COURT:  All right.  Let's move on.

7    BY MR. ZEIDENBERG:

8    Q.  You received the grand jury materials from KU on or about

9    June 12th, if I can represent that date.  I can give you the

10   paperwork, but if I can represent that you received that grand

11   jury subpoena and you subpoenaed the records for Student 1.

12   And do you remember reviewing those documents when you received

13   it?

14   A.  Yes.  There is a process of -- well, the data has to be

15   processed because it's so voluminous, and when that data was

16   available to me I think was later in the month.

17   Q.  Later in the month of June?

18   A.  Yes, I believe so.

19   Q.  And did you see in the e-mails between Student 1 and

20   Dr. Tao that she was trying to extort him?

21   A.  I wouldn't use the term "extortion."  I believe -- I

22   believe there was a disagreement at the time, and you're also

23   asking me to look back at a time when I know so much more

24   investigation since that time, but what I remember is there was

25   at least some disagreement over authorship and Student 1 had

1    suggested money as a remedy.

2    Q.    Well, do you remember seeing an e-mail -- and for the

3    record, it's Exhibit 6 -- where she said to Dr. Tao on

4    April 2019, "When anything that belongs to me is taken away, my

5    counter-attack will be very strong and very extreme"?

6              MR. BARRY:    I just want to note for the record that

7    this is the exhibit that has an incomplete translation.  It's

8    noted in our brief in one of the footnotes.  So some of the

9    Chinese language is not translated into the English

10   translation.

11             THE COURT:    All right.  So noted.

12   A.    So this is the same -- so one is the English translation of

13   the others; is that correct?

14   BY MR. ZEIDENBERG:

15   Q.    Yes.

16   A.    Okay.  So your question, so I can be clear, is did I know

17   about this e-mail?

18   Q.    Yes.

19   A.    So in triaging the review of the material, like you said,

20   the grand jury material, we don't have machine translation to

21   do these e-mails that are in Chinese, so for the most part, I

22   think I moved most of the Chinese stuff to the side and focused

23   on stuff that I could read in English, and for what items that

24   we felt were most pertinent such as the contract, we handed it

25   off to a linguist.

1  Q.  Okay.  If you look at Exhibit 7, this one is in English.

2  A.  Okay.

3  Q.  This is from Student 1 and she says, "If you're not sure

4  how much you should compensate me, I can suggest you a level

5  that should be in the level of millions of RMB, for example, 2

6  million RMB."

7      Do you see that?

8  A.  I do see that.

9  Q.  And 2 million RMB is roughly $300,000?

10 A.  It's like 1 to 6.7 ratio, right?

11 Q.  So between 280 or $300,000.  A lot of money.

12 A.  Okay.  Yeah.

13 Q.  Were you aware of this?  When did you become aware of this

14 e-mail?

15 A.  I can't state that I saw it specifically this particular

16 e-mail.

17 Q.  It was before you drafted your affidavit, though, correct?

18 A.  It may have been.  Like I said before, there's -- I

19 understand there was an authorship dispute.  Whether I saw this

20 in the time frame before the first affidavit, I can't verify.

21 Q.  Well, do you think describing an interaction where someone

22 demands 300,000 RMB as an authorship dispute and requesting

23 that -- demanding that amount of money is a fair description?

24 Do you think authorship dispute is a fair characterization of

25 what this is, from what you can see?

1    A.   I'm not in the scientific community and I don't know how

2    authorship affects one's career.  I suspect authorship is very

3    important to one's career, but I would not be able to put a

4    dollar amount on whether, you know, $300,000 is worth

5    authorship.

6    Q.   Directing you to Exhibit 15, this is an e-mail dated

7    June 4th where she mentions -- this is between Student 1 and

8    Dr. Tao.  And she says, "I know that the issue with the tenure

9    in the United States cannot be solved even if I haven't

10   reported you about your by line being incorrect.  However, it

11   seems that the term tech spy is very popular now.  You should

12   be careful.  I have given you many chances and you didn't care.

13   After a thing happens, any compensation will be out of date."

14        Do you remember seeing this?

15        MR. BARRY:  I just want to note for the record this is

16   another incomplete translation noted in footnote 18 of the

17   brief, some of the Chinese is not contained within the English

18   translation.

19        THE COURT:  So noted.

20   A.   So is the question, do I remember seeing this e-mail?

21   BY MR. ZEIDENBERG:

22   Q.   Yes.  Do you remember seeing this?

23   A.   I remember seeing this e-mail, the tech spy.

24   Q.   And you saw this before you filed your affidavit, correct?

25   A.   Again, I can't be sure what I saw before the affidavit.  It

1    sounds familiar, and may have been before the first affidavit

2    or it may have been after.

3    Q.   All right.  Why don't we talk about the meeting with X.Z.

4    on July 19th.

5         THE COURT:  Strike from the record.  Strike name.

6         MR. ZEIDENBERG:  I'm sorry?

7         THE COURT:  Strike the name for the record.

8         MR. ZEIDENBERG:  Striking --

9         THE COURT:  Strike the name from the record.

10        MR. ZEIDENBERG:  Oh.  I'm sorry, Your Honor.

11   BY MR. ZEIDENBERG:

12   Q.   So this was something of a surprise interview by Agent

13   Carlson and Agent Ng on July 9th, correct?

14   A.   Correct.

15   Q.   You had hoped to be there originally?

16   A.   Correct.

17   Q.   And -- but Carlson -- Agent Carlson was very familiar with

18   the facts of the case, correct?

19   A.   He was familiar with the facts of the case, yes.

20   Q.   He had -- most of these complaints that came in to KU were

21   funneled to him first and then went to you?

22   A.   Correct.

23   Q.   So he had seen all these complaints that we've just walked

24   through this afternoon, correct?

25   A.   Any complaint that was forwarded to him from KU, yes.

1  Q.  And there was a discussion between you and Agent Carlson

2  about confronting Student 1 about whether she had, in fact,

3  fabricated all of these different e-mail addresses to implicate

4  Dr. Tao?

5  A.  I don't know that there was a discussion.  I did send an

6  e-mail the night that my plane was cancelled, kind of

7  explaining what I would like to hear from the interview, and if

8  it's in that, then yes.

9  Q.  But if it's not in there?

10  A.  Well, then I don't -- I don't know.

11  Q.  Weren't you interested as the lead case agent in finding

12  out whether or not she was, in fact, the source for all of

13  these complaints that you've been getting?

14  A.  Well, we had -- like you said, it was likely probable and

15  suspected that she was behind the X.Z. e-mail.  And so I

16  believe it was the X.Z. e-mail that provided the contract.  Is

17  that correct?

18  Q.  Right.

19  A.  So that was -- that was my primary goal, was to further the

20  investigation kind of regardless of any of the complaints at

21  that point.

22  Q.  So you weren't interested or it wasn't important to you to

23  know whether, in fact, she was also C.E.L.?

24  A.  I wouldn't say it's not important.  I would say the primary

25  objective is to obtain more information with the goal of having

1    a follow-on conversation with Student 1.

2    Q.   But if she was fabricating names to implicate Dr. Tao,

3    wouldn't that suggest that she might not be a credible person?

4    A.   What it suggests is that whoever is fabricating e-mails and

5    names is that they don't want to be identified.

6    Q.   Well, it could be -- did it occur to you that she was --

7    had an axe to grind with Dr. Tao and was trying to get him in

8    trouble and was fabricating e-mail addresses and complaints to

9    KU and the FBI because she wanted him arrested for being a tech

10   spy?  Did that occur to you?

11   A.   That did occur to me.

12   Q.   Well, didn't it seem important to try and find out whether

13   she was really behind all of these complaints or not?

14   A.   Again, the goal is to further the investigation.  And I

15   understand and appreciate what you're saying, but I think my

16   primary goal, if you're asking me about my state of mind at the

17   time, my primary goal was to -- and you can see this, I think,

18   from my e-mail to Agent Carlson -- that I wanted to know more

19   about --

20   Q.   Well, in your e-mail to Agent Carlson, you indicate that

21   there was some thought about charging her criminally, correct?

22   A.   May I see the e-mail?

23            MR. ZEIDENBERG:  May I approach, Your Honor?

24            THE COURT:  Yes.

25   A.   Yes.

1    BY MR. ZEIDENBERG:

2    Q.   What were you thinking of charging her with?

3    A.   Mr. Mattivi and I, we had not -- we had not settled on a

4    charge specifically, but that she might have been either

5    indicted and -- and -- or an unindicted co-conspirator, either

6    an indicted or unindicted co-conspirator.

7    Q.   Did you consider indicting her for identity theft?

8    A.   That did not occur to me.

9    Q.   So an unindicted co-conspirator or an indicted

10   co-conspirator would be for what?  What would be the

11   conspiracy?  Against whom?

12          MR. BARRY:  Objection.  This is beyond the scope of

13   the *Franks* hearing again.

14          THE COURT:  I agree.  Sustained.

15   BY MR. ZEIDENBERG:

16   Q.   You thought she had criminal liability?

17          THE COURT:  You know what, I don't think this has

18   anything to do with whether or not the affiant either

19   intentionally or recklessly omitted certain information from

20   the affidavit and more importantly, even if he did, whether

21   that defeats probable cause.

22          MR. ZEIDENBERG:  The question would be, Your Honor,

23   respectfully, is if the government was thinking she had

24   violated the law and was considering indicting her and they

25   don't include that in the affidavit, that is something that a

1    magistrate would want to know because it goes to her possible

2    credibility.

3            THE COURT:  Let me just stop you.  You've been asking

4    a lot of questions that have to do with her credibility, and

5    I'll let you ask this particular one, but we don't need to go

6    down this path very far and here's why:  This is not an

7    affidavit that's based on the credibility of this tipster and

8    it's not an affidavit, as I read it, that's based on the fact

9    that there are a gagillion tipsters.  This affidavit does not

10   read as if here's a tipster and she said this.

11           It doesn't vouch for her credibility at all like you

12   would see in an affidavit that is based on an informant's

13   information.  It says nothing about credibility.  Was she

14   credible?  In some respects probably not because of all the

15   things you're drawing out in this examination, but it's not an

16   affidavit that is based on -- or solely based on her

17   credibility.  It's not an affidavit based on the number of

18   tipsters.  It's an affidavit that's based on information that

19   she provided and then a lot of other information that did not

20   come from her that was corroborative of some of the things that

21   she was saying.  That's the way I see it.

22           So I think we're spinning our wheels, so to speak, to

23   spend hours on her credibility when the affidavit does not rise

24   and fall on her credibility.  That's not the type of affidavit

25   that this is.

1        And I mean, I am allowing this hearing, but frankly,

2    just looking at the four corners of the affidavit, which I

3    could have done without an evidentiary hearing, it's apparent

4    to me that the pitch was not that we've got a lot of tipsters

5    and they're all saying the same thing.  The pitch was not we've

6    got a tipster and she's so credible you can find probable cause

7    on the basis of what she says.  No.  The affidavit says we've

8    got this information, and then here's all the information that

9    supports that.  That's the kind of affidavit this is.

10        So I don't think it makes sense to spend a lot of time

11    in this hearing continuing to, you know, sort of beat a dead

12    horse about her credibility.  She obviously was not credible on

13    some issues.  But the affidavit includes information that seems

14    to corroborate some of the things she said.  So I'll leave it

15    at that.

16        MR. ZEIDENBERG:  Very well, Your Honor.

17    BY MR. ZEIDENBERG:

18    Q.  Agent Lampe, was there a discussion between you and Agent

19    Carlson that he should not take notes during the interview?

20    A.  No, not that I know of.

21    Q.  Was there a discussion between -- between you and

22    Carlson -- Agent Carlson that no one should take notes during

23    the interview?

24        MR. BARRY:  Objection.  Again, this is beyond the

25    scope.

```
1           THE COURT:  Overruled.
2    BY MR. ZEIDENBERG:
3    Q.  Would you agree that when you're talking to a witness for
4    an interview, it's the FBI practice to take notes?
5    A.  I believe I left that up to Agent Carlson's discretion when
6    my flight was cancelled.
7    Q.  My question is, in terms of the investigate -- your
8    training and experience as an FBI agent, when you interview a
9    witness, don't you take notes?
10   A.  I take notes.
11   Q.  Aren't FBI agents trained to take notes during interviews?
12           MR. BARRY:  Again, objection.  This is beyond the
13   scope.  This has to do with Mr. Zeidenberg's affidavit
14   involving a number of sort of implied discovery disputes and
15   adverse inferences that he wants to draw from the absence of
16   discovery that he believes should exist.
17           THE COURT:  Sustained.
18   BY MR. ZEIDENBERG:
19   Q.  Was it part of a discussion that you didn't want to have a
20   record of what -- of anything that would damage Student 1's
21   credibility, so you ask -- so there was a plan not to record
22   anything in notes?
23           MR. BARRY:  Objection; asked and answered.
24           THE COURT:  You can answer.  Go ahead.
25   A.  I would refer you to my e-mail to Agent Carlson the night
```

1    that I -- my flight was cancelled, and, in fact, I leave it up

2    to Agent Carlson to record the interview with an audio

3    recorder.

4    BY MR. ZEIDENBERG:

5    Q.    And he didn't do that?

6    A.    That's his discretion as an agent.

7    Q.    So there was no audio recording and no notes?

8    A.    That's my understanding, yes.

9    Q.    And after the interview did you get on the phone and speak

10    with Agent Carlson about what Student 1 said?

11    A.    I think I answered this before.  I don't have a specific

12    memory of Agent Carlson.  There is an e-mail where he says, I'm

13    going to call you on the way home or on the way to the airport.

14    I don't have a specific memory of talking to Agent Carlson.  I

15    think it's likely we probably discussed it, but I think the

16    highlight of the day was the e-mail that was then forwarded on

17    to me later in the day.

18    Q.    And the questions were about the contract, right?

19    A.    You'd have to refer to the e-mail.  The questions that I

20    asked Agent Carlson to ask are in the e-mail.  The questions

21    that Agent Carlson asked, I don't know.

22    Q.    You don't know what happened during that interview?

23    A.    It would be in his 302.

24    Q.    You've read the 302, haven't you?

25    A.    I have, but I don't have it in front of me to specifically

1    state what happened.

2    Q.   Well, you are the lead case agent and she is the most

3    important witness -- or was the most important witness at that

4    time, right?  Can you recall generally what was discussed?

5    A.   I can't honestly.  There are many serials that are in this

6    case.  And if the serial is in front of me, I'd be glad to

7    discuss what is in the serial and what was asked that day.

8    Q.   I believe that's Exhibit 35.  It's a page-and-a-half

9    interview.  A 302.

10        When did you get a copy -- when did you see this 302 the

11   first time, to the best of your recollection?

12   A.   I don't have a specific date of when I see it -- or when I

13   saw it.  It is -- let's see.  So the date of it is for the 9th

14   of January [verbatim], but I don't know when it was serialized

15   to my case.

16   Q.   Well, it was entered on September 23, 2019, more than two

17   months later.  Right?

18   A.   Well, September 23rd is two months later, that's correct,

19   roughly.

20   Q.   And you saw it before then, right?

21   A.   I believe I saw it beforehand because it was serialized to

22   a different sub file by mistake.  That was the month before.

23   And I can't give you a specific date on what day it was

24   serialized, but then it was then reserialized to the sub file

25   that it was supposed to be in which is the case I work from,

1    which is why you have that date.

2    Q.   Do you know if Agent Carlson asked her anything about her

3    attempt to get $300,000 from Tao or she was going to accuse him

4    of being a tech spy?

5    A.   If it's in the 302, then -- whatever he asked and she

6    answered is in the 302.  I wasn't there to --

7    Q.   Well, the 302 is a page-and-a-half long.  Is this all -- as

8    far as you understand, this is all that he talked to her about?

9         MR. BARRY:  Objection; speculation.  The agent never

10   said that the 302 reflects everything that was discussed.

11        THE COURT:  Sustained.

12   BY MR. ZEIDENBERG:

13   Q.   So when did you get a copy of the e-mail from Student 1?

14   A.   The July 9th e-mail?

15   Q.   Yeah.

16   A.   I believe I received it on July 9th.

17   Q.   And when you got a copy of that, did you get on the phone

18   with Agent Carlson and discuss it?

19        MR. BARRY:  Objection; asked and answered.

20        THE COURT:  Overruled.  Answer if you can.

21   A.   I'm unsure of when I talked to Agent Carlson to -- that

22   day, again, I don't have a recollection of talking to him.  I

23   think it's likely that we did talk because of, you know, it was

24   an interview I wanted to be at.

25   BY MR. ZEIDENBERG:

1   Q.   And you had already drafted your search warrant affidavit

2   at this point, correct?

3   A.   I had -- by July 9th I likely would have at least one

4   draft.

5   Q.   And in that e-mail Student 1 admitted that she had lied

6   repeatedly in the interview, correct?

7   A.   In that e-mail Student 1 states that she lied about some

8   things in the interview.

9   Q.   More than one thing?

10  A.   She lists four things.

11  Q.   Okay.  And did you ever find out from Agent Carlson why she

12  was admitting -- saying that she lied during the interview and

13  that she actually had impersonated L.N. and X.Z. and C.E.L.?

14  Did you ask him why she admitted she lied if there's no

15  reference to being asked about those things in the 302?

16          MR. BARRY:  Objection; calls for speculation.

17          THE COURT:  You can answer if you know.

18  A.   Again, I don't know what he asked and I only know what is

19  in Agent Carlson's 302 and what was produced in Student 1's

20  e-mail.  And like I said, I likely had a conversation with

21  Agent Carlson that day.  I don't have a recollection of it.

22  But I can't -- I can't tell you with certainty what he asked

23  during his interview.

24  BY MR. ZEIDENBERG:

25  Q.   Did it strike you as odd when you saw her e-mail that she

1   was -- that when you read her e-mail, did you infer from that

2   that she had previously denied using fake e-mail addresses?

3   A.   I don't think I went into that state of mind.  I think the

4   e-mail confirmed for me that she was X.Z. and then further

5   clarified for me that she was also the other two e-mails --

6   well, the other two identities L.N. and C.E.L.

7   Q.   And that wasn't a surprise to you?

8   A.   Not the X.Z., and likely not the L.N. or the C.E.L.

9   Q.   Okay.  It was kind of confirming, like what Judge Robinson

10  was asking, your suspicion?

11  A.   Yes.

12  Q.   And for how she obtained the contract, she said that she

13  downloaded it from his e-mail address.  "Last year he asked me

14  to write proposals to apply to Chinese government.  This

15  account and password for proposal submission are the same as

16  his e-mail in Fuzhou University.  Sometimes I log in his e-mail

17  address and check some information."

18       Do you see that, that's Exhibit 36?

19  A.   Yes, that's footlegs [verbatim] 2 from that e-mail.

20  Q.   And she's essentially admitting that she hacked his e-mail,

21  right?

22  A.   I don't think I would use the word "hacked."

23  Q.   Well, you did use the word "hacked."

24  A.   When?

25  Q.   In your affidavit in August.

1    A.    Correct.

2    Q.    So when you say you wouldn't use the word "hacked," are you

3    saying the e-mail -- that your affidavit in August wasn't

4    truthful?

5    A.    No.  In -- at this moment this e-mail suggested to me that

6    she was writing proposals for Dr. Tao at his direction, and he

7    asked her -- in fact, I think she says that.  Yeah.  "He asks

8    me to write the proposal for him.  He gave me the account and

9    password."  That's in No. 3.

10        So if she's writing for -- for me, if she's writing

11   proposals for Dr. Tao for his NSFC proposal account and she

12   goes on to his Fuzhou e-mail to check some things, that

13   suggests that she had permission to do so, to me.

14   Q.    Having access to one account means she has permission to

15   use that same information to another account?

16   A.    That's not what I'm saying.

17   Q.    You just said that.

18   A.    What I'm saying is if she has the permission to write the

19   proposals, the proposals are going to go back to Dr. Tao's

20   Fuzhou account, and so for her to check some things, to me,

21   that suggests that she is writing the proposal, submitting the

22   proposal, and then checking that the proposal either goes

23   through or does not go through.

24   Q.    You didn't just say that she did it with his permission,

25   you said she did it at his direction.

1    A.    In the footnote.

2    Q.    That's right.  We're talking about the footnote.

3    A.    Accessed his e-mail.

4    Q.    At his direction.  That's what you said.

5    A.    That's what it says in the footnote, yes.

6    Q.    Where does it say in her e-mail that she did anything at

7    his direction?

8    A.    "Last year he asked me to write a proposal for him.  He

9    gave me the account and password."

10   Q.    Right.  And we're talking about how she accessed his

11   contract.  Where does she -- where did she say that she

12   accessed it with his permission and at his direction?

13   A.    This is not about the contract.  This is about her writing

14   proposals for him and him giving her, I'd say, implied access

15   to his account because the Fuzhou e-mail account is responsible

16   for the proposal submissions.

17   Q.    You're saying that her statement that "For the

18   contract that" -- "for the contract, I downloaded it from his

19   e-mail address.  Last year he asked me to write proposals for

20   the Chinese government.  The log-in and account and password

21   are the same.  Sometimes I log in his e-mail address and check

22   some information," that is the same as I accessed his contract

23   at his direction and with his permission?

24   A.    Not his contract.

25              MR. BARRY:  Objection; misstates his prior testimony.

19-20052-JAR    USA v. Feng Tao    10.14.21

1           THE COURT:  All right.  Sustained.

2    BY MR. ZEIDENBERG:

3    Q.   You corrected that in your later affidavit, right?

4    A.   I corrected footnote 2 in the late -- well, I highlighted

5    it in the next affidavit, yes.

6    Q.   You said it was incorrect?

7           MR. BARRY:  Objection; misstates his prior testimony.

8           THE COURT:  Sustained.

9    BY MR. ZEIDENBERG:

10   Q.   You said that previously she told agents that Tao's

11   secretary had given it to her, in an e-mail later that day she

12   said she hasn't been truthful, and then you give an accurate

13   accounting of what she said in her e-mail, right?

14          MR. BARRY:  Objection; misstates his prior testimony.

15          THE COURT:  I'm not sure there's been prior testimony

16   specifically about the differences between -- by this witness,

17   at least on cross-examination, about the differences between

18   these two footnotes.

19   BY MR. ZEIDENBERG:

20   Q.   What new -- if I may, what new information did you get from

21   Student 1 about how she accessed that contract between July 9th

22   and August 23rd when you submitted this -- I'm sorry,

23   August 19th, when you submitted your second affidavit?

24   A.   So I wouldn't say there was new information from her.

25   Q.   So you just decided -- let me ask it.  So if there was no

1    new information, whose decision was it that the first e-mail,

2    the first footnote, wasn't accurate and needed to be changed?

3            MR. BARRY:  Objection; misstates his prior testimony.

4    I'm focused on the word "accuracy," which Mr. Zeidenberg has

5    been focusing on.

6            THE COURT:  I'll sustain to the form of the question.

7            MR. ZEIDENBERG:  I'm sorry, Your Honor.  I didn't

8    hear.

9            THE COURT:  I sustained as to the form of the

10   question.  You can re-ask the question.

11   BY MR. ZEIDENBERG:

12   Q.  Whose decision was it was to change the footnote in the

13   second affidavit?

14   A.  I believe that was a decision between myself and

15   Mr. Mattivi.

16   Q.  And you and Mr. Mattivi, based on no new information from

17   Student 1, decided that the first affidavit was wrong or didn't

18   accurately describe what she said, correct?

19           MR. BARRY:  Objection.  It's the same misstatement of

20   prior testimony concerning the word "accurate."  That's not

21   what Agent Lampe has said at any point.

22           THE COURT:  I don't think this relates to prior

23   testimony.  So I'll overrule.

24           Answer the question if you can.

25   A.  Please state it again, Mr. Zeidenberg.

1    BY MR. ZEIDENBERG:

2    Q.    You and Mr. Mattivi decided that footnote 2 in the first

3    affidavit wasn't accurate and needed to be changed, correct?

4    A.    I highlighted -- in one of the final drafts of the August

5    affidavit, I highlighted it for Mr. Mattivi and suggested that

6    there may be a change and that he would be best talking to --

7    talk to Agent Carlson.

8    Q.    And you never told the magistrate and you never put in that

9    second affidavit that this information was old, that you knew

10    this all along, correct?  Let me ask it a different way.

11        When you wrote the footnote in the August affidavit, you

12    wrote it in a way to make it look like this was based on a

13    receipt of new information, correct?

14    A.    No.  Well, to clarify, one, I did not write footnote 2 in

15    the August affidavit.  I believe that was a collaboration

16    between Mr. Mattivi and Agent Carlson.  I did -- and, again, I

17    attested to it, I read it, I agreed with it, so, therefore, I'm

18    responsible for it.  I understand that.

19    Q.    And it was written in such a way to make it appear that

20    this was the result of new information, correct?

21            MR. BARRY:  Objection.  Agent Lampe just said that he

22    was not involved in drafting footnote 2.  He obviously --

23            THE COURT:  Sustain to the form of the question.

24            MR. ZEIDENBERG:  I'm sorry, Your Honor?

25            THE COURT:  I sustained.

```
 1   BY MR. ZEIDENBERG:
 2   Q.   You didn't indicate in this affidavit, in this footnote 2
 3   in the second affidavit, that this was information that you had
 4   had all along?
 5             MR. BARRY:  Same objection.
 6             THE COURT:  Answer if you can.  I think then it
 7   exhausts this line of questioning, frankly.  Answer it.
 8   A.   That I had this information all along as in prior to the
 9   July --
10   BY MR. ZEIDENBERG:
11   Q.   11th affidavit.
12   A.   -- affidavit?  I did not have this information prior to the
13   July 11th affidavit.
14   Q.   Wait a minute.  This is based on the July 9th e-mail from
15   Student 1, right?
16   A.   This second paragraph?
17   Q.   Yes.
18   A.   Or -- I'm sorry.  The second footnote.
19        I can't -- I can't point to a specific piece of
20   information, but my -- I think over the course of the
21   investigation between the affidavit moving forward that it
22   became more apparent that she accessed and pulled the contract
23   from his e-mail without his permission.
24   Q.   Wait a minute.  Agent Lampe, you're the lead case agent on
25   this case.
```

1    A.   Right.

2    Q.   You've read and were aware and have been known since late

3    August that we're filing a motion to suppress based on what we

4    said were inaccuracies and misrepresentations in your

5    affidavit.

6    A.   Right.

7    Q.   And you're saying you don't know what information went into

8    your changing footnote 2, you just can't recall?

9            MR. BARRY:  Objection; asked and answered.

10           THE COURT:  Overruled.

11   A.   So between the two affidavits a lot of investigation

12   happened.  I believe with the first affidavit that Dr. Tao gave

13   Student 1 implicit access to his Fuzhou account to monitor the

14   proposals that she was submitting on his behalf to NSFC.  Over

15   the course of the investigation, after that, I believe it

16   became apparent that she still had access, but not to download

17   a contract and then give it away to the FBI or to KU.  Dr. Tao

18   would not give that permission.

19   BY MR. ZEIDENBERG:

20   Q.   So this isn't based on new information.  This is based on

21   your thinking about the information you already had that this

22   would have been highly unlikely that someone would have told

23   someone to access this contract; is that right?

24   A.   Objection misstates his prior testimony.

25           THE COURT:  Overruled.  Answer if you can.

1    A.   Please repeat.

2    BY MR. ZEIDENBERG:

3    Q.   The change that you're talking about isn't based on new

4    evidence or new information.  It's based on your thinking about

5    the information and evidence you already had and realizing it

6    was highly unlikely that Dr. Tao would have directed and given

7    permission for Student 1 to access this contract.

8    A.   Well, like I said, if over the course of the investigation

9    it became more apparent that --

10           THE COURT:  I really do think this has been asked and

11   answered, so I've compared these two footnotes, and the

12   addition in the second search warrant was -- still says she

13   told agents -- well, first of all, it clarifies that she first

14   told agents she got it from his secretary.  Then it repeats

15   what it said before, that she had downloaded the contract from

16   his account after he gave her the password for another account,

17   which was a little bit different.  But then it goes on to say,

18   "I suspect she obtained it by hacking into his e-mail account."

19           So it's providing more context for the agents not

20   giving her credit for everything that she said based on

21   something she said the first time and then the second time, and

22   the way I read this is based on further investigation and

23   reflection.  So I think, you know, I'm going to compare these

24   two, I've heard what he's had to say about it, let's move on to

25   a new subject.

1    BY MR. ZEIDENBERG:

2    Q.   Well, just on that, when you say you suspect she hacked,

3    she said she hacked.  You weren't suspecting it, right?

4    A.   She did not say she hacked it.

5    Q.   She said she accessed it using his name and password for a

6    different account?

7    A.   Yes.

8    Q.   Okay.  And you wrote -- or you attested to a footnote

9    written by Mr. Mattivi as being truthful that said hacked,

10   right?

11   A.   I attested to this, yes.

12   Q.   And that was based on no new evidence that you didn't have

13   in your possession as of July 9th?

14   A.   That's not accurate.  There was a lot of evidence between

15   July 9th and --

16   Q.   What was the new -- what was the new evidence that you

17   received between July 9th and August 19th that led you to say

18   and attest that she hacked the e-mail, other than her July 9th

19   e-mail?

20           MR. BARRY:  Objection; asked and answered multiple

21   times.

22           THE COURT:  Overruled.  I'm not sure this has been

23   answered.

24           Go ahead.

25   A.   What was the new information?  Is that accurate?

1    BY MR. ZEIDENBERG:

2    Q.  Yes.

3    A.  I would say I can't point to a single thing and be honest

4    with you right now.  I can't point to a single thing but a

5    sense that she misused her position and trust with Dr. Tao.  He

6    had previously given her trust to access that account, and over

7    the course of the investigation since the first search warrant

8    I feel that that trust had been misplaced.

9    Q.  Did you prepare for this hearing today, knowing that this

10   footnote 2 and these two affidavits were going to be of central

11   importance?

12   A.  I did.

13   Q.  And did you review the filings and the pleadings and try

14   and refresh your recollection about the investigation?

15   A.  I did, yes.

16   Q.  And you can't point to anything, any piece of evidence that

17   changed between July 9th and August 19th to cause you to change

18   that footnote, correct?

19   A.  I cannot.

20        MR. ZEIDENBERG:  One moment, Your Honor.

21   BY MR. ZEIDENBERG:

22   Q.  Did you think you had any obligation to inform the Court

23   that X.Z. had first denied --

24        MR. BARRY:  Objection, Your Honor.

25        THE COURT:  Strike the name from the record, please.

1          MR. ZEIDENBERG:  I'm sorry.  I'm sorry.  I'm sorry,

2     Your Honor.  I apologize.

3     BY MR. ZEIDENBERG:

4     Q.   Did you think you had any obligation to inform the Court

5     that Student 1 had first denied and then admitted to the FBI

6     that she had impersonated multiple individuals in order to

7     implicate Dr. Tao?

8     A.   You're suggesting that I have knowledge of Agent Carlson's

9     interview on July 9th that that question was asked and I was

10    not there.

11    Q.   She said in her e-mail that she had -- I lied and I did --

12    I did use those identities, right?  Isn't that what she said?

13    Do you want to go back?

14    A.   Let's go back.  Please.

15    Q.   Exhibit 35.  I'm sorry?

16          THE COURT:  I think it's 36.

17    BY MR. ZEIDENBERG:

18    Q.   36.

19    A.   36.  So reading the e-mail from her to Agent Carlson on

20    July 9th, her first sentence says, "I have to admit" --

21    actually the second sentence, but -- "I have to admit that I

22    lied on some items.  I do not know whether there are other

23    persons reporting this issue or not.  I reported it using the

24    name of X.Z., L.N., and C.L."

25          So I read that as the question was do you know of anybody

1    else reporting this, and she says, no, but I reported it as

2    these three people.

3    Q.    She says I lied in some of the items, and then numbers 1,

4    2, 3, 4.    Number one -- doesn't that suggest that, number one,

5    she's reporting on a lie that she had made to the FBI?

6    A.    Yes.    But the lie to what question?

7    Q.    Did you think you had an obligation to tell the magistrate

8    that she had lied about anything?

9    A.    She is correcting lies because the end of this is "Others

10   are correct information to the best of my knowledge," so for me

11   to read that would suggest that during the course of the

12   interview she was truthful except for these four things which

13   she is correcting on the same day via e-mail.

14   Q.    So she seemed truthful to you?

15         MR. BARRY:    Objection, Your Honor.    I just want to

16   note for the record, I mean, we've been here almost three hours

17   and, as you said earlier, you don't believe that the probable

18   cause in the affidavit is based on the credibility of Student

19   1.    Despite your admonishment, we -- Mr. Zeidenberg continues

20   to focus on that.

21         And I would also just like to state that, you know, as

22   you said when we started, you had not concluded that they had

23   met their substantial preliminary showing, but in your

24   discretion you wanted to, nonetheless, hold this hearing.

25         So I don't exactly know what the form of the objection

1    is, but it seems like Mr. Zeidenberg continues to focus on the

2    veracity of Student 1, despite the fact he's been told that

3    that's not material to the probable cause in either affidavit

4    and yet -- I don't know.  That was 45 minutes, 60 minutes ago.

5              THE COURT:  Well, first of all, I have not ruled as to

6    whether the defendant has made their threshold showing.  I

7    wanted to conduct this evidentiary hearing to help me decide

8    that.

9              Two, I have -- you know, based on the four corners of

10   the indictment and the other exhibits I've heard thus far, I

11   think I have made it pretty clear that this is not going to

12   rise and fall on -- the affidavit did not rise and fall on the

13   credibility of -- I'm calling her a tipster.  You can call her

14   whatever you want to -- because there's -- as this witness

15   testified to on direct, there's all these other buckets of

16   information in this affidavit, both of the affidavits, that

17   they allege constitute probable cause and that I need to

18   evaluate for probable cause.

19             So it does seem like a real waste of time to continue

20   to be beat a dead horse about the credibility of this person

21   who has admittedly in this exhibit told the FBI that she was

22   not accurate or credible on some things that she wanted to

23   correct or to tell them the truth on.

24             So the question is, first of all, you know, comparing

25   this to what's in the affidavits, were there intentional

1    misstatements by the affiant or reckless misstatements, and if

2    there were, did that defeat probable cause.  Probable cause was

3    not based solely on this information from the tipster --

4    BY MR. ZEIDENBERG:

5    Q.  Did you think --

6          THE COURT:  -- or tipsters, however many people there

7    were.

8          MR. ZEIDENBERG:  Excuse me, Your Honor.

9          THE COURT:  Go ahead.

10   BY MR. ZEIDENBERG:

11   Q.  Did you think by including information in the affidavit

12   about Student 1's lies that it would take away from the

13   probable cause?

14   A.  I didn't consider that.

15   Q.  Did you consider putting in the affidavit information that

16   you had seen in the e-mails that Student 1 was threatening

17   Dr. Tao?

18          MR. BARRY:  Objection; misstates his prior testimony

19   about his knowledge of those e-mails prior to the July 11th

20   affidavit.

21          THE COURT:  I think he testified he wasn't sure when

22   he saw them, so I'll overrule the objection.

23   A.  I'm still not sure, and I wouldn't use the term

24   "threatened."  What I stated before, and I think I can be clear

25   about, is that I know that there was a disagreement over

1    authorship.  Whether money was involved or not, I'm not sure.

2    BY MR. ZEIDENBERG:

3    Q.   You don't consider telling Dr. Tao that she's going to

4    report him as a tech spy is a threat?

5    A.   Was that one of the Chinese e-mails?

6    Q.   Do you not recall seeing an e-mail from Student 1

7    threatening Dr. Tao about reporting him to the FBI as a tech

8    spy?

9    A.   I do remember that.  I don't remember when I saw it, and

10   the tech spy does stand out, obviously, to me.

11   Q.   That's a threat, would you agree?

12   A.   Of course.  I'm going to report you to somebody.  But that

13   would imply that Dr. Tao is doing something wrong, right?

14   Q.   Do you consider that a threat, Agent Lampe, when someone

15   says, "Give me $300,000," and "I understand that tech spy is a

16   very popular term"?  Would you interpret that as a threat?

17   A.   Are those two things in the same e-mail?

18   Q.   Agent Lampe, you act as if you have not looked at this case

19   file.

20   A.   Mr. Zeidenberg --

21         MR. BARRY:  Objection.

22         THE COURT:  You cannot -- you cannot talk over each

23   other.  This lady does magic but she cannot take down two

24   voices at a time.  So let the witness answer.  Let the counsel

25   finish their question.

1          All right.  Re-ask the question.  I'm not sure it was

2    a question.  It was argumentative, actually, but ask your next

3    question.

4    BY MR. ZEIDENBERG:

5    Q.   Are you not familiar with e-mails sent by Student 1 to

6    Dr. Tao in which she talks about getting money or reporting him

7    as a spy to the FBI?

8    A.   If you are saying that those two things are in the same

9    e-mail, then I'll agree to that.  I don't know that they're in

10   the same e-mail.  I know there's an e-mail, because we looked

11   at it before, that says I will report you as a tech spy.

12   Whether she is asking for money in that same e-mail, I'm not

13   sure, and I'm glad to look at it.

14   Q.   Is that the type of information you think -- if you knew it

15   at the time -- would be something that the magistrate should

16   know?

17   A.   So her -- like we said at the beginning of this cross, is

18   that it's -- you're saying it's my duty to report it to the

19   magistrate.  That would undercut the probable cause.  So I

20   would agree with you.

21   Q.   So that's information the magistrate should know if you

22   knew it?

23   A.   I would concur with that, yes.

24   Q.   So after you had gotten the July 9th e-mail from Agent

25   Carlson from Student 1, did you still have doubt in your mind

1    about whether she was the source for the anonymous e-mails?

2         MR. BARRY:  Objection; asked and answered at the

3    beginning of cross.

4         MR. ZEIDENBERG:  This is after July 9th I'm asking

5    about, Your Honor.

6         THE COURT:  All right.  Go ahead.

7    A.   I do still to this day have questioned whether -- I

8    couldn't identify that person right now.  She did not identify

9    it for us that she was the -- I guess the submitter or the

10   complainant in the two anonymous documents you're referring to.

11   She did accept responsibility for the other ones.

12   BY MR. ZEIDENBERG:

13   Q.   So even though X.Z. wrote that he or she submitted an

14   anonymous complaint and you know X.Z. is Student 1, you're

15   still not sure whether Student 1 is probably Anonymous too?

16   A.   The statement that she wrote that says, "I wrote an

17   anonymous complaint," I believe was to the FBI right?

18   Q.   Right.

19   A.   That anonymous complaint is one of the exhibits that you

20   looked at today, which is identified as L.N., which she has

21   accepted responsibility for.

22   Q.   Okay.  So would you say Anonymous is L.N. and L.N. is

23   Student 1?

24   A.   In that instance.

25   Q.   Okay.  So we've got Student 1 being three different

1  individuals, L.N., C.E.L., X.Z., and Anonymous, right?

2  A.    No.  You're suggesting that the tip submitted to the FBI is

3  Anonymous.  It's not, because it's identified as L.N.

4  Q.    Okay.  X.Z. said that he or she submitted a tip

5  anonymously, correct?

6  A.    Correct.

7  Q.    Do you know who X.Z. is?

8  A.    Correct.

9  Q.    Student 1?

10  A.    Correct.

11  Q.    And when you wrote your affidavit, you said these

12  complaints had been coming in anonymously and from other

13  sources?

14  A.    I believe the complaint -- let's refer to the complaint,

15  but I think it says Student 1 and anonymously.

16  Q.    You never suggested anywhere in here that all of these

17  complaints -- that the FBI had reason to believe that all these

18  complaints were coming from the same individual?

19  A.    I wouldn't attest to that.

20  Q.    You didn't say that.  But you had reason to suspect that,

21  right?

22  A.    That's what we covered with the judge, yes.  That's

23  correct.

24  Q.    And you didn't say anything about her motive other than

25  there was an authorship dispute, right?

1   A.   That is footnote 2, yes.

2          MR. ZEIDENBERG:  Could I have one minute, Your Honor?

3          THE COURT:  Sure.

4   BY MR. ZEIDENBERG:

5   Q.   So at the time you had rewrote both of these affidavits,

6   you knew Student 1 had fabricated identities and you didn't

7   disclose that.  Is there a reason why?

8   A.   No.  I felt that she was becoming truthful with her

9   July 9th e-mail, so she had been truthful -- I'm restating my

10  testimony, but she had been truthful in the interview but then

11  corrected some lies from the interview.  And so I read that as

12  she had been truthful -- actually, she says at the end of the

13  e-mail, "All the other things are true and correct to my

14  knowledge."

15  Q.   And yet you felt the need to correct everything she had

16  said previously in footnote 2 of the second affidavit, right?

17         MR. BARRY:  Objection; misstates his testimony about

18  why footnote 2 is changed.

19         THE COURT:  Overruled.

20         Answer it if you can.

21  A.   That's not -- that's not why that was changed.

22  BY MR. ZEIDENBERG:

23  Q.   Why was it changed?

24  A.   As stated before, the course of the investigation led me to

25  believe that this was -- she misused her trust and downloaded

1  the contract.

2  Q.  And you can't point to anything in the course of the

3  investigation that led you to change that opinion?

4  A.  I cannot.

5  Q.  Do you conclude today that Student 1 was a reliable

6  informant?

7         MR. BARRY:  Objection.  This reliance at this point is

8  not relevant to the *Franks* determination on materiality and the

9  agent's intent.

10         THE COURT:  I'll overrule.  I think I made my position

11  clear on this.

12  A.  Do I find her reliable?

13  BY MR. ZEIDENBERG:

14  Q.  Do you believe she's reliable?

15  A.  I believe she's reliable based on the information that she

16  provided was corroborated with information from other sources.

17  Q.  And the lies?

18  A.  The lies don't make her unreliable when she corrects them

19  in an e-mail.

20         MR. ZEIDENBERG:  Could I have a moment, Your Honor?

21         THE COURT:  Go ahead.

22         MR. ZEIDENBERG:  I have nothing further, Your Honor.

23  Thank you.

24         THE COURT:  All right.  Thank you.

25         MR. BARRY:  No further questions from the government.

19-20052-JAR    USA v. Feng Tao    10.14.21

234

1          THE COURT:  I'm sorry?

2          MR. BARRY:  No further questions from us.

3          THE COURT:  All right.  I have a pretty extensive

4   record here.  I've got lots of exhibits, some of which have

5   been attached to pleadings.  I've got extensive briefing on

6   this issue and, of course, the affidavits themselves, the

7   e-mail, the so-called confession e-mail from July 9th, et

8   cetera, and the testimony of this witness.

9          You can step down.

10          So for this motion for *Franks* hearing, I need to rule

11   on the threshold issue first, because the government is arguing

12   that the defendant's motion is untimely and I should not even

13   consider it.  And as I said, I wanted to use my discretion to

14   go ahead and hear this -- hear this evidence, then make my

15   rulings on the threshold issues as well as the merits.

16          So defendant filed its motion to suppress on

17   August 23, 2021, which was over a year after the Court's

18   pretrial motions deadline, which was August 14, 2020.

19          Under criminal Rule 12(b)(3) a motion to suppress must

20   be raised in a pretrial motion if the basis for the motion is

21   then reasonably available, and if the party doesn't -- not meet

22   the deadline and is untimely, the Court may only consider it if

23   the party shows good cause.

24          Good cause requires both cause for the failure to

25   raise the claim on time and prejudice resulting from the error.

1    And it's that prejudice prong that I thought was something I

2    wanted to hear on the basis of -- or hear with the benefit of

3    hearing -- having an evidentiary hearing on the merits of the

4    motion to suppress.

5         So defendant has raised several arguments as to cause

6    for failure to raise the claim by August 14, 2020, deadline.

7    Says that they were only able to ferret out the full extent of

8    the government's conduct after being provided with discovery in

9    a searchable format.  Also, that the government failed to

10   timely produce what the defense asserts is *Brady* evidence.

11   Also, that the government did not produce the fruits of the two

12   search warrants for some time until -- in fact, after the

13   pretrial motions deadline had passed.

14        So, first of all, the argument about obtaining new

15   information after the pretrial motion deadline had passed, I

16   find that that does not -- that does not establish good cause,

17   because what the defense points to is new information is only

18   really the government's e-mail responding to questions the

19   defense had about is there additional discovery pertaining to

20   this issue, and the government responded no.  That e-mail did

21   not offer any new information.  The government simply confirmed

22   that the defense possessed all discovery regarding Student 1.

23        So I don't find that there was any new information

24   that came to the defendant so late that it would justify filing

25   this motion after the pretrial motions deadline.

1          Defendant also contends good cause exists because the

2    government failed to timely produce what he asserts is *Brady*

3    material, and specifically, that for the first time on

4    September 9, 2021, the government produced an e-mail that

5    showed that Special Agent Carlson forwarded Student 1's July 9,

6    '29 [*sic*], e-mail to Special Agent Lampe on that same day, on

7    September 9th, which, of course, was two days before the first

8    search warrant affidavit.

9          I don't find good cause with respect to this too

10   because, frankly, the government produced the forwarded e-mail.

11   I don't find good cause because, frankly, the government

12   produced this, I guess, part of that e-mail string that showed

13   that it was forwarded to Special Agent Lampe on September 9,

14   2021, which was after the defendant had even filed his motion

15   to suppress.  So it might have bolstered that, but it certainly

16   wasn't something that he needed in order to file the motion to

17   suppress.

18         The motion to suppress accuses Special Agent Lampe of

19   being aware of July 9, 2019, statements in Student 1's e-mail

20   when he submitted the July 11, 2019, affidavit.  But again, the

21   missing link that the defendant speaks to was produced to them

22   after they even filed this particular motion, so I don't find

23   that that was something that precluded them from filing a

24   motion to suppress.

25         And whether or not this is *Brady* material, I don't

1    think is something I need to address.

2         Also, the defendant says it was not able to ferret out

3    the full extent of the government's misconduct because of the

4    volume of the discovery produced.  The defense says they waited

5    until August 2021 to look into whether the two search warrants

6    were proper by re-reviewing documents that it admittedly had in

7    its possession since June 29, 2020, or, in some cases even

8    earlier.  The defense actually received the warrant affidavits

9    in August 2019.  That July 9th -- Student 1's July 9th

10   so-called confessional e-mail, the defense discovered in 2019.

11        And it was apparent, really, from those two affidavits

12   and that e-mail the very arguments that have been raised with

13   respect to this motion to suppress were apparent then.  In

14   fact, the defense essentially concedes that it was upon

15   re-review of the documents that they had already had for quite

16   a long time that they became concerned that there was

17   inconsistencies, et cetera.

18        Mr. Zeidenberg's affidavit states that he does not

19   actually recall noticing the discrepancy between footnote 2 of

20   the July 11th affidavit and footnote 2 of the August 19th

21   affidavit but he was quite sure he thought the footnote in the

22   later affidavit was based on new information.

23        He also says that when he later reviewed the

24   confession e-mail on November 11, 2019, he thought that e-mail

25   seemed inconsistent with the July 11, 2019, affidavit.  He did

1    not realize that the e-mail July 9, 2019, was before the

2    July 11, 2019, affidavit.

3         But, you know, that e-mail had the date on it, so I

4    mean, it might have inadvertence, but I don't think that's

5    cause for this untimely filing.

6         The defense also talks about the volume of the

7    documents produced in this case; 218,145 documents produced by

8    the government.  And that part of their problem was that these

9    were not produced in a searchable format back in, you know,

10    2019 or before the motions deadline in August of 2020.

11         But the volume of documents in this case, really, is

12    not at all representative or indicative of what the defense

13    needed to review for purposes of this motion.  It's a very

14    small universe; the two affidavits, the one e-mail, and then

15    other things that are referenced in the affidavits themselves,

16    the KU e-mails which were referenced in the first affidavit,

17    maybe the Google e-mails that were referenced in the second

18    affidavit.

19         But it's really misleading to talk about the number of

20    documents in this case because, sure, 218,000-plus documents,

21    but 128,000 of these are from the defendant's own personnel

22    file or, you know, KU e-mails or personnel records from KU for

23    the defendant and several of his research associates, which did

24    not at all have anything to do with this particular issue.

25    82,000, almost 83,000 of these documents were from the

1    defendant's Notre Dame e-mails and personnel records, which had

2    nothing to do with this issue.

3        So I don't think that's a convincing basis for good

4    cause either.

5        And as far as the format that the discovery was

6    provided in, yes, initially it was provided in native format,

7    with one exception.  I think there was forensic image of

8    defendant's electronic devices provided, but what happened

9    later and what came later was documents that were Bates

10    numbered which clearly would make it easier for everybody to

11    find things.

12        But again, we're talking about a very small universe

13    of documents to be looked at to determine whether or not there

14    was a problem with these affidavits.  And this small universe

15    of the documents was produced to the defendant long before the

16    motions deadline.  So I find no good cause.

17        To the extent there was delay, it was by oversights

18    from the defense, none of which are attributable to the delayed

19    production by -- to any delayed production by the government.

20    So I do not find good cause.

21        I should also say that the defendant really raised

22    much of this in his very early filed motion to dismiss in this

23    case, which is indicative that he had access to these

24    documents, the search warrant affidavits, the July 9th e-mail.

25    He had access to those and had reviewed them because he relied

19-20052-JAR    USA v. Feng Tao    10.14.21

1    on them, at least in part, or referenced them, at least, in his

2    motion to dismiss.

3         Similarly, the contract metadata, which was

4    essentially clicking, I think, on the document, I assume it was

5    a Word document, maybe PDF, but right-clicking on it to bring

6    up the creation date, the modification date, that sort of

7    thing, that was something that was available at the time that

8    that document was produced by the government, so that did not

9    constitute new information either.

10        So, in sum, the basis for the defendant's motion was

11   reasonably available to him well before the pretrial motion

12   deadline had passed.  So there's no good cause shown.

13        And with respect to the argument that the government

14   failed to produce the fruits of the two search warrants until

15   long after the pretrial motions deadline, that does not

16   constitute good cause.

17        Defendant argues that without the fruits of the

18   warrant he did not know whether the evidence was worth

19   suppressing.  That's not an argument that's well taken.  It's

20   not the outcome of the search warrant that matters.  I mean,

21   these kinds of motions go to the process, the process and the

22   information in the affidavit and whether there was probable

23   cause.  It doesn't rise and fall on whether the defendant

24   thinks that the evidence is particularly inculpatory.  That's

25   not a basis for cause for delay in filing such a motion, or

19-20052-JAR    USA v. Feng Tao    10.14.21

1    even the fact that the defendant did not perhaps know how

2    inculpatory it was is not a basis for a delay in filing the

3    motion.

4            To the extent the defendant thought that was

5    important, they could have asked for an extension of the

6    discovery deadline -- or the motions deadline.  They could have

7    asked for leave to file a motion out of time.  None of which

8    was before the Court in this case.

9            So defendant fails to meet the first prong to show

10   good cause for delay.  On that basis alone I could deny this

11   motion, but I've heard the evidence and I want to address the

12   prejudice prong.

13           So in that regard, there are eight -- I believe eight

14   statements or omissions that the defendant asks me to consider

15   in these affidavits in determining whether or not there was

16   intentional or reckless misstatements or omissions in the

17   affidavits that would justify suppressing the evidence.

18           So affidavits supporting search warrants are generally

19   entitled to a presumption of validity, but under *Franks*, a

20   Fourth Amendment violation occurs if an officer's affidavit

21   that's in support of the search warrant application contains a

22   reckless misstatement or omission that is material because but

23   for it the warrant could have not have lawfully issued.  In

24   other words, there would not have been probable cause but for

25   the inclusion of whatever that reckless or intentional

1    misstatement or omission is.

2         To establish recklessness there must exist evidence

3    that the officer, in fact, entertained serious doubts as to the

4    truth of his allegations.  Negligent or innocent mistakes are

5    insufficient.

6         And in addressing the materiality of the omitted

7    information, the Court has to ask whether a warrant would have

8    issued in a but for world where the attesting officer

9    faithfully represents the facts.  And the Court makes this

10   assessment by first removing any false information from the

11   affidavit; secondly, including any omitted material

12   information; and then, third, inquiring whether the modified

13   affidavit establishes or negates probable cause for the

14   warrant.  If what is left is sufficient to sustain probable

15   cause, then any inaccuracies are irrelevant.

16        So the first omission is concerning Student 1's

17   impersonating others, other so-called tipsters.

18        So in the first search warrant affidavit, it speaks to

19   the FBI receiving a series of complaints regarding Dr. Tao,

20   both anonymously and from an individual claiming to be a former

21   post-doctoral student identified as Student 1.  And then it

22   describes the sum and substance of the complaints, being that

23   Tao worked in China, Changjiang professor position while also

24   working at KU, a little bit more information about the terms of

25   that, and that there was an employment contract.

1         In this affidavit there's no indication that there's

2    any suspicion that there's really only one tipster.  It's

3    Student 1, that she had taken on the identity of other people,

4    or that even the ones that she hadn't admitted to taking on,

5    the anonymous ones, there's some suspicion that she was the one

6    that did that too.  So that's what the defendant is arguing

7    makes this affidavit, in part, deficient.

8         The government responds that Student 1's information

9    and whether or not there were other tipsters or whether or not

10   she was, in fact, the sole source and was pretending to be

11   other tipsters is not something that the affidavit relies so

12   heavily on that it defeats probable cause or that if the

13   magistrate judge knew there really was only one tipster and

14   Student 1 had lied about or had essentially lied by pretending

15   to other people, that it would have made a difference.

16        There is other evidence that this affidavit relies on,

17   of course, and the information received from Student 1 and

18   whoever these other folks, were which were probably Student 1.

19   The affidavit relied on defendant's own e-mail from his KU

20   account.  It relied on open source reporting, some of which

21   were links to websites that the so-called tipsters, which were

22   probably Student 1, provided, but which the government was able

23   to go out on the Internet and look at themselves.

24        Some of the open source reporting, of course, includes

25   photographs of the defendant.  There was also a contact card

1   found in records provided by KU itself.  X.Z., who actually was

2   a person who had matriculated at KU had a KU account.  That was

3   something that was produced to the government.  And X.Z., the

4   real X.Z. had listed in this information Dr. Tao's Fuzhou

5   University e-mail address on a contact card, as well as other

6   contact information for Dr. Tao.

7           So there was evidence that corroborated what Student 1

8   said, which was that Dr. Tao was working as a Changjiang

9   scholar at Fuzhou University.

10          In that sense, Student 1's reliability was not that

11  material to probable cause because it did -- this affidavit

12  does not rely very heavily on her veracity.  In fact, there's

13  no discussion of her veracity.  Now, I think the better course

14  in this first affidavit would have been to say there's some

15  suspicion that Student 1 was the only tipster because she's now

16  admitted that she -- that she made some of these tips in the

17  names of other students at KU; didn't come from them, it came

18  from her.

19          But had that information been in there, I don't think

20  it would have defeated probable clause.  To read that

21  information, to include that information, which is Student 1

22  has shown herself not to be totally credible because she admits

23  to doing this, does not negate the fact that her statements

24  about Dr. Tao working at Fuzhou University were corroborated

25  through other sources that did not come from her.

1           So her reliability was not critical to this affidavit.

2           So to the extent that information should have been

3    included in this first affidavit, I don't think the failure to

4    do that is fatal to finding of probable cause.

5           The omission about Student 1's admission that she lied

6    to the FBI, that's the July 9th e-mail, again, I've already

7    addressed that.  And at this point, of course, we're only

8    talking about the first affidavit.

9           Statements regarding where Student 1 said she got the

10   defendant's contract.  So by the time this first search warrant

11   affidavit was written, the government knew -- because of the

12   Student 1's July 9th e-mail, they knew that she was already

13   contradicting herself because she had first said that she got

14   the contract from Dr. Tao's secretary at Fuzhou University.

15   Then in the July 9th e-mail she said no -- and I'll read

16   exactly what she said, that's important -- she said, "For the

17   contract of Franklin, I downloaded it from his e-mail address.

18   Last year he asked me to write proposals to apply to Chinese

19   government.  The account and password for proposal submission

20   are the same as his e-mail in Fuzhou University.  Sometimes I

21   log in his e-mail address and check some information."

22          So with that admission and footnote No. 2 of the first

23   affidavit, it says, "Student 1 later told agents that she

24   obtained the unsigned contract by accessing Tao's e-mail

25   account with Tao's permission and at Tao's direction but that

1    she provided it to KU and the FBI because she was angry with

2    Tao over not crediting her on a published research article."

3            So what this footnote 2 says in the first affidavit is

4    she obtained the unsigned contract by accessing his e-mail

5    account with his permission and at his direction, which I think

6    is a fair reading of what she says in this July 9th e-mail.  It

7    could be interpreted, frankly, a couple of ways, but she says,

8    "For the contract of Franklin," so she's making it clear she's

9    talking about that contract that she provided, "I downloaded it

10   from his e-mail address."

11           And then she goes on to describe how she had access to

12   the e-mail address.  "Last year he asked me to write proposals.

13   The account and password for proposal submission are the same

14   as his e-mail at Fuzhou University," which one way to interpret

15   that is he had given her the account and password information

16   so that she could make these proposal submissions.

17           Now, she does have this language, "same as his e-mail

18   in Fuzhou University," which one interpretation could be, oh,

19   she's actually now talking about accessing a second account for

20   which she didn't have -- didn't have his permission, but it was

21   the same way to access it.  That's one way to interpret it.

22   But a fair reading of it also is she's just saying that, you

23   know, there's two accounts and she has the information for both

24   of them.  It's not very clear.  It's somewhat ambiguous.

25           Then she goes on to say in the July 9th e-mail,

1    "Sometimes I log in his e-mail address and check some

2    information," which again, could be interpreted as she's doing

3    this at his behest and with his permission because she's doing

4    work for him.

5          So I don't find that footnote No. 2 is intentionally

6    wrong.  I don't find that it's even recklessly wrong.  It's

7    based on this July 9th e-mail from her and which is somewhat

8    ambiguous but that does, I think, demonstrate that she's saying

9    that she had access to his e-mail account because he gave her

10   access because she was submitting proposals.  Again, there's

11   some ambiguity.

12         Now, when you go over to the next search warrant,

13   which is Exhibit 38, footnote 2 has been modified or added to

14   and Agent Lampe says it's not based on any new information.

15   It's still based on that July 9th e-mail, but this time it

16   reveals that she had actually first given a conflicting

17   statement and saying that she got it from his secretary.

18         But then it goes on to say that she acknowledged that

19   she hasn't been truthful earlier and that she had downloaded

20   the contract from his e-mail account after he gave her the

21   password for another account and asked her to assist him in

22   writing grant submissions.  She used the same password to

23   access his e-mail.  So it's a completely different

24   interpretation to the July 9th e-mail.

25         Again, when I read the July 9th e-mail, either one of

1    these interpretations seems reasonable to me, but this one in

2    the second affidavit is more accurate, to be sure.

3          The affiant goes on to say, "At this time I'm unsure

4    how she obtained the contract."  In other words, acknowledging

5    this woman is not particularly credible.  She's given three

6    different versions now.  "At this time I am unsure how she

7    obtained the contract, but I suspect she obtained it by hacking

8    into Tao's e-mail account prior to any contact with the

9    agents."

10          So could that language have been in the first

11    affidavit?  Since it wasn't based on any new information,

12    according to the affiant, it could have been.  It's probably

13    the product of further reflection and further confirmation of

14    suspicion that she's, you know, she's somebody that you can't

15    fully trust.  But the bottom line is, again, these affidavits

16    are not based on merely her allegation that Dr. Tao is working

17    for Fuzhou University; page after page of corroboration from

18    independent sources.

19          So it turns out that some of the information she was

20    saying -- that she gave to the government they could

21    corroborate in other ways, at least there was evidence to

22    suggest that, which means that even omitting her -- even adding

23    into these affidavits that, you know, she was impersonating

24    others and that the tips all came from her and that she told

25    several versions of how she got access to the contract, even

1    considering all of that, her statements that he was working at

2    Fuzhou University while he was at KU are corroborated by all

3    kinds of other independent evidence that I think means that

4    there was probable cause for these two affidavits.

5        Similarly, the omission regarding contract metadata, I

6    don't find that that was intentional.  The affiant testified

7    that that metadata could mean several things.  That's why he

8    doesn't necessary check it.  That's why he doesn't necessarily

9    rely on it.  That's why he doesn't check the metadata on every

10    one of the, whatever it was, 218,000 documents.

11        In this case the metadata showed that this contract

12    that Student 1 provided to the government was downloaded on the

13    same day as her -- I think the same day that she provided it to

14    the government.  It shows that it was -- it was saved, not

15    downloaded -- that it shows that it was saved to her computer

16    that same day that she sent it to KU.  And -- no.  I'm sorry.

17    I misstated.

18        The metadata shows that the document was created on

19    the same day that Student 1 e-mailed the contract to KU.

20    Created.

21        So again, that calls into question, of course, the

22    legitimacy of the contract, but again, there's other

23    information in these affidavits that is independent of this,

24    had this been in there, that corroborated that Dr. Tao did, in

25    fact, work at Fuzhou University as a Changjiang scholar.

1       And, of course, that metadata, the creation date may

2   also be the date that she downloaded it to her laptop and it

3   may be the date that she saved it and may be the date that she

4   converted it into a PDF.  So it's not necessarily conclusive

5   that she actually wrote and fabricated this contract.

6       There was the signed addendum which, you know, the

7   government, of course, relied upon, as well as its proof that

8   he had entered into some sort of agreement with Fuzhou

9   University, which gives some credence to even the unsigned

10  contract.  Again, had that information been in the affidavit,

11  it would not have defeated probable cause.

12      Heard a lot of evidence today that suggests that all

13  of these tips, even the anonymous ones that Student 1 didn't

14  own up to, were probably from her, but again, for the reasons

15  I've stated before, it does not defeat probable cause.  It's

16  not material to what the magistrate judge needed to consider to

17  determine whether there was probable cause.

18      *Franks* does not require that all statements in the

19  affidavit be true.  It requires only that the statements be

20  believed or appropriately accepted by the affiant as true.  And

21  with respect to the material statements in this affidavit that

22  came from the tipster, Student 1, the Court finds that there's

23  every reason for the affiant to believe or accept these to be

24  true because they were corroborated with independent evidence.

25      The omission regarding Student 1's accusations of

1   espionage and property theft and her asking or effectively

2   demanding, extorting, whatever you want to call it,

3   threatening, that she wanted money $300,000, that's not in

4   these affidavits.  Had that been in these affidavits, again,

5   that goes to her credibility, that goes to her motivation.

6   Would it have defeated probable cause that's based on

7   statements she made about Dr. Tao's relationship with Fuzhou

8   University that were corroborated?  It would not have defeated

9   that.

10          There was some -- obviously, some reference to the

11  fact that she was angry with Dr. Tao.  That's in both footnote

12  No. 2s in both of these affidavits.  It says, "She provided the

13  unsigned contract to KU and to the FBI because she was angry

14  with Tao over not crediting her on a published research

15  article."

16          Now, it doesn't go any further, it doesn't describe

17  she's demanding money from him.  It doesn't describe she's

18  throwing the -- you know, the verbiage of tech spy at him.

19  That's true.  But had that been included, again, it goes to her

20  veracity and credibility, which again, would not defeat

21  probable cause because corroboration for those statements that

22  she made are important and germane and material to this

23  affidavit.

24          Similarly, statements regarding the articles provided

25  by Student 1 and provided by so-called anonymous tipsters, in

1    total there was six different websites and three published

2    research articles that were provided to KU and the FBI.  And

3    the information in those corroborated Student 1's accusations

4    that the defendant was working at Fuzhou University.  The

5    affidavit only describes three specific web pages as examples.

6    It doesn't give an exhaustive list of the other open source

7    reporting and the other websites and articles that served as

8    corroboration.

9            Also, these affidavits expressly disavowed any

10   information or knowledge concerning the accuracy of the web

11   pages, so that's something that was expressly said to the

12   magistrate judge in these affidavits.  Quote, "What the

13   affidavit said was it was disavowed," or, quote, "any

14   information or knowledge concerning the accuracy," unquote, of

15   the web pages, quote, "beyond the fact that they were

16   discovered under open source searches of the Internet," end

17   quote.

18           So I don't think there was any misrepresentation

19   concerning that.

20           It would not have been reasonable for Judge O'Hara to

21   disregard all of the open source reporting or to conclude, as

22   the defendant argues, that the web pages were fabricated,

23   especially when some of the web pages included photos of

24   certain PRC officials meeting with someone who appeared to be

25   Dr. Tao.

1          And I've spoke to the omission regarding the alleged

2    extortion.

3          I find that there's no showing that Agent Lampe acted

4    with the requisite mental state of intentionally

5    misrepresenting or concealing facts or recklessly doing so,

6    because to the extent he -- there were things that he omitted,

7    they were immaterial, really, to the probable cause

8    determination for these affidavits.

9          There is no requirement that he set forth all of his

10   knowledge about every single thing that's mentioned in the

11   affidavit.  And when there's a reasonable misunderstanding of

12   what events had transpired that causes the affiant to

13   inadvertently include information that is not entirely

14   accurate, that's not a basis to suppress the search warrants.

15         So I deny the defendant's motion to suppress under

16   *Franks*.  I find that there was no prejudice.  So, essentially,

17   I find that I don't even have to consider this.  It was not

18   timely.  There was not good cause.  There's no prejudice.  But

19   further -- I went further and analyzed the merits of it,

20   nonetheless, and find that the motion to suppress should be

21   denied and is denied.

22         Defendant has failed to show Agent Lampe made

23   intentional or reckless misrepresentations and omissions that

24   were material to a finding of probable cause, even excising the

25   allegedly false information from the affidavit and including

1    the omitted allegedly material information, what is left in the

2    modified affidavit is sufficient to sustain probable cause.

3         So I orally ruled on this and so we'll just do a text

4    entry or minute entry referencing the oral ruling on this

5    particular issue.

6         Mr. Zeidenberg?

7         MR. ZEIDENBERG:  I understand the Court's rule.  I

8    just feel like I have to make a couple points because you

9    didn't give us an opportunity to address, you know, a very

10   important point, is what was left in the affidavit to give

11   probable cause.  And I think that it's very important, and

12   again, I understand the Court has made its ruling, but I just

13   want to make this clear for the record that there is no crime

14   to be affiliated, to be an adjunct professor, to do work at a

15   foreign university, or to be a member of a foreign talent

16   program.

17        The allegation in the affidavit was that he was -- the

18   only thing that would make it illegal under what the affidavit

19   was suggesting is that he had full-time employment there, and

20   that is based on the contract, an unsigned contract provided by

21   this Student 1.  That's the evidence, her statement and the

22   unsigned contract.

23        The other evidence that the Court is referencing,

24   which Agent Lampe said he can't verify, which are these other

25   websites, he said I can't vouch for those, and in any event

1    they simply say he's a Changjiang professor.

2            So being a Changjiang professor is not illegal.

3    There's no reference in the affidavit that that's not been

4    disclosed to KU.  There's no indication that his other

5    paperwork -- he hasn't told his colleagues or his dean or

6    anyone else, so all that is left is, well, he had a contract

7    and it was a full-time contract that he was going to get paid.

8    There is no other evidence in there that he got paid.  And

9    that's what you have to find for this to be a violation of his

10   conflict of interest statement, which is all that's alleged.

11           They don't talk in that affidavit about the NSF grants

12   or the DOE grants and what those grants require to be disclosed

13   and that if you, you know, don't disclose being a talent

14   program, you know, you're violating the law and you're

15   committing grant fraud.

16           So what you're left with is this affidavit, as to the

17   gravamen of the offense, comes down to what Student 1 said.

18           And, you know, the government's first filing in this

19   case, back in November 2019, they moved to strike, as you

20   remember, our motion to dismiss because they said we revealed

21   an informant.  Okay.  Well, informants are important.

22           The informant in a *Franks* hearing -- in a *Franks* case,

23   that it says affidavit must recite about the informant whether

24   they're credible or what -- or their information is reliable,

25   and officers have a duty -- this is from *Jacobs* -- to provide

1    the magistrate with any information which would undercut the

2    warrant's validity, and reliability is the key to magistrate's

3    PC analysis when you're talking about an informant.

4            And so in this case, Your Honor, the corroboration

5    that you're talking about, if it were all true, doesn't give

6    probable cause because it doesn't show that he had full-time

7    employment.  The full-time employment is based just on the

8    say-so of Student 1 and this unsigned contract.

9            And had the magistrate known that this was -- she was

10   involved in this extortion attempt against him, and that she

11   had created multiple false e-mail addresses sending anonymous

12   and known fake e-mails complaining about him, and that she had

13   done this all and she accused him of being a spy when there was

14   no evidence of being a spy, and that she lied about how she got

15   the contract, and she claimed that she got it from his

16   secretary and then she claimed that he -- that she admitted

17   that she hacked it, which wasn't included in the affidavit.  I

18   mean, now you're telling a magistrate trust this person.  Why

19   would you trust this person?

20           So let's look at the websites.  The websites don't say

21   that he was a full-time professor.

22           THE COURT:  To establish probable cause websites don't

23   have to -- nothing in particular has to say it was a full-time

24   professor.  There's a lot of corroboration here and we're not

25   talking about beyond a reasonable doubt.  The standard is

1    probable cause.  And the open source reporting, multiple

2    websites, not all of which were put in the affidavit, as I

3    said, talked about how he was the most recent recipient of this

4    Changjiang scholar award.

5         It talked about how Secretary Chen Yongzheng paid a

6    visit to the School of Chemistry's Changjiang scholar, Dr. Tao,

7    Distinguished Professor Dr. Tao.  There was a picture of them

8    together.  It talked about this was the first one of these

9    scholars Fuzhou University has brought in directly from

10   overseas.  There's a web page "Salute to our teachers.  You are

11   the brightest stars in the night sky."  The page 3 of this

12   article reports that it hired two Changjiang scholars and

13   identified defendant as being one of them.

14        There are KU e-mails that are described in this

15   affidavit, and these are e-mails from Dr. Tao's e-mail account,

16   primarily e-mails sent and received by him that first show he

17   was interested in and applied for the professorship, that show

18   he actually applied or was interested and wanted a different

19   university, but then e-mails concerning the application

20   process, these continued throughout 2016, 2017, 2018.

21        An e-mail congratulating Dr. Tao for being appointed

22   as the Changjiang scholar, that was in January of 2018.

23        And then there were corroboration in the form of

24   e-mails or documents that show that he engaged in activities

25   consistent with the duties described in the unsigned contract.

1  E-mails, you know, sending a message to the Japanese professor,

2  and I think they're forwarding an e-mail from a student about

3  that, a student that was interested in that.

4          But then there were e-mails concerning essentially

5  recruitment or attempts to recruit people to work with him at

6  Fuzhou, on and on.

7          So I think the affidavit speaks for itself.  I really

8  don't want to entertain any other argument on it.

9          MR. ZEIDENBERG:  All I would say is there are probably

10  thousands -- certainly hundreds of professors in the United

11  States that are members of foreign talent plans such as

12  Changjiang scholar or Thousand Talents scholar.  It's not

13  illegal.

14          THE COURT:  Yes.  But he's not charged with --

15          MR. ZEIDENBERG:  That's right.

16          THE COURT:  -- breaking the law for being that.  He's

17  charged with -- and this search warrant is talking about --

18  failing to disclose.  Failing to disclose conflicts of

19  interest.  Same thing that he ultimately was charged with.

20          MR. ZEIDENBERG:  But there is no obligation to

21  disclose being a member of a talent program.  It doesn't say

22  that in the affidavit, that that -- failure to disclose

23  involvement in a talent program is illegal.  The only thing

24  that would be illegal is failing to disclose full-time

25  employment.  And the only evidence of that is from the

19-20052-JAR    USA v. Feng Tao    10.14.21

1    contract, the unsigned contract.

2          THE COURT:  All right.  I think you're wanting to

3    impose beyond a reasonable doubt standard on search warrants

4    and, of course, we all know that's not the standard.

5          Anything more from the government?

6          MR. BARRY:  No, Your Honor.

7          THE COURT:  All right.  So we have other matters to

8    take up tomorrow.  Just to remind you, I think we're going

9    to -- Dr. Tiffert is going to be here and we're going to talk

10   about him.  And what about the other witness?  Well, I know

11   there's other experts the government wants to offer and you're

12   going to have argument, I assume, on those, the forensic

13   accountants and the translators.  But what about the woman from

14   NSF?  Is she going to be here?  Or are you just offering

15   argument?

16         MR. BARRY:  We were just planning to offer argument

17   related to Dr. Keiser as stated in our response.  I mean, first

18   of all, we didn't think that they would move for a *Daubert*

19   hearing, and as stated in our response, we consider any

20   testimony that she would provide to be lay opinion testimony

21   and noticed her pursuant to Rule 16 as sort of exercising

22   caution.

23         THE COURT:  Okay.  So we'll take that up in the

24   morning.  I do think that's related to the other things I've

25   already taken under advisement, because, again, we're talking

1    about line drawing.

2         Well, the first question will be are they being

3    offered as experts and, if so, with respect to what lines of

4    testimony versus what -- are they being offered as fact

5    witnesses or are they being offered for lay testimony.  That's

6    something to sort out.

7         But then, I will tell you, especially when I look

8    at -- well, actually, both of them, but especially with respect

9    to Dr. Tiffert, when I look at the descriptions of much of what

10   you've disclosed as being the topics of his conversation, I

11   think they're outside the lines I'm going to draw, frankly,

12   because a lot of it goes to the things we've already talked

13   about, which is talent plans in general, you know, Chinese

14   competition with the United States, stealing of intellectual

15   property, the danger and risks associated with that.  And

16   that's something that I think Dr. Keiser also may touch on.

17        So just kind of a word of warning, when I went through

18   the list of proposed topics, a lot of them sort of caused me

19   some concern as being outside the lines.  I think I'm going to

20   draw on a lot of these things, but we'll go through all of that

21   in the morning.  And then we're going to also need to do the

22   *limine* conference and also speak to the government's motion to

23   continue the trial date.

24        So I'll want an update on the status of your

25   witnesses, et cetera.

1          Okay.  With that, let's reconvene at 9:00 tomorrow

2    morning.

3          MR. BARRY:  May I just ask one clarifying question?

4    Well, one thing to note, I know that Dr. Tiffert's flight

5    earlier was delayed.  I haven't seen -- I think he's fine.  Are

6    we okay?

7          THE COURT:  I hope he's not flying Southwest.

8          MR. BARRY:  Yeah.  I think we should be fine.

9    Obviously, we'll let everybody know as soon as possible if --

10         THE COURT:  You don't know if he's landed tonight yet?

11         MR. BARRY:  I don't have a computer.  I don't see an

12   e-mail.

13         MR. OAKLEY:  We have an e-mail from him subsequent to

14   an earlier e-mail saying that his flight was delayed, so we're

15   hopeful that he's here, but we haven't confirmed it for sure.

16         THE COURT:  Okay.  All right.  Well, we'll plan on

17   9:00 unless we hear otherwise.

18         All right.  Have a pleasant evening.  We'll be in

19   recess until 9:00 or subject to whatever we find out.

20      (Evening recess.)

21

22

23

24

25

1                    C E R T I F I C A T E

2        I, Danielle R. Murray, a Certified Court Reporter and the

3    regularly appointed, qualified, and acting official reporter of

4    the United States District Court for the District of Kansas, do

5    hereby certify that the foregoing is a true and correct

6    transcript from the stenographically reported proceedings in

7    the above-entitled matter.

8        SIGNED 22nd of October, 2021

9

10                          /s/Danielle R. Murray
                            DANIELLE R. MURRAY, RMR, CRR
11                          United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25