# UNITED STATES DISTRICT COURT

## ———— District of Kansas ————

**UNITED STATES OF AMERICA,**

                **Plaintiff,**

       **v.**                   **Case No.  19-20052-01-JAR**

**FENG TAO,**

                **Defendant.**

## GOVERNMENT'S MOTION FOR RULE 15 DEPOSITIONS

Trial in this case was scheduled to begin on October 25, 2021. The Court continued trial based, in part, on the unavailability of three government witnesses. *See* Dkt. 169 (Government's Motion to Continue Trial). The Court recently informed the parties that trial has been set for December 6, 2021. The three witnesses—U.S. Department of Energy (DOE) employees Dr. Viviane Schwartz and Dr. Raul Miranda and University of Kansas (KU) employee Dr. Laurence Weatherley—remain unable to testify in person at trial due to the coronavirus pandemic and their particularized health issues.[1] Additionally, and as mentioned at the October 6, 2021 hearing, the government has been pursuing interviews with witnesses in Germany and Taiwan through the appropriate mutual assistance processes since January 2021 and May 2021, respectively. German authorities interviewed Dr. Robert Schlögl of the Fritz Haber Institute of the Max Planks Society

---

[1] As noted in the government's motion to continue, the defense also included Dr. Schwartz, Dr. Miranda, and Dr. Weatherley as potential witnesses on its witness list. *See* Dkt. 167.

(FHI) on September 29, 2021. Taiwanese authorities permitted the government to interview Dr. Yu-Wen Chen of National Central University on October 27, 2021. The government now respectfully moves the Court to authorize depositions pursuant to Fed. R. Crim. P. 15 for the five identified witnesses or, alternatively, given the proximity to trial, to permit live testimony by two-way video at trial of the three witnesses located in the United States (i.e., the DOE and KU witnesses).[2]

## I.    BACKGROUND

### A.    Charges Against Defendant

Defendant is charged in a Second Superseding Indictment with seven wire fraud counts, in violation of 18 U.S.C. § 1343, and three counts of making false statements, in violation of 18 U.S.C. § 1001. Dkt. 75 (hereinafter "SSI"). The charges stem from Defendant's scheme to defraud KU and the U.S. government, namely the DOE and the National Science Foundation (NSF), to obtain federal grant funds and a salary by concealing his affiliation with a foreign university, his foreign research support, and various financial benefits.

As alleged in the Second Superseding Indictment, Defendant was employed by KU for five years as a full-time professor and researcher. *See* SSI ¶ 3. During that time, Defendant applied for and received federal grants through KU to fund his research projects at KU. *See id.* ¶¶ 4, 9-15. Related to his employment and federally funded research, Defendant had a duty to disclose financial conflicts, conflicts of time, and other research support, and he was required to

---

[2] The government conferred with Defendant's counsel on November 2, 2021. Defendant objects to the instant motion. Counsel also indicated that Defendant would object to the timeliness of the government's motion. However, the timing of the government's motion is not due to the government's lack of effort to secure the witnesses' testimony. The Court should not penalize the government because of the particularized health issues of certain witnesses and because foreign governments have taken substantial time to comply with mutual assistance requests.

obtain approval prior to engaging in external professional activities. *See id.* ¶¶ 5-8, 10, 13, 15.

Between approximately July and December 2017, while employed by KU, Defendant applied for the Chang Jiang Scholar Program through Fuzhou University (FZU), a research institution in China.[3] *See id.* ¶¶ 24-26. The Chang Jiang Scholar Program is a Chinese-government talent recruitment plan designed to attract talented researchers to Chinese universities to bolster China's scientific and technological knowledge and expertise. *See id.* ¶ 21. Participants in the Chang Jiang Scholar Program and similar talent plans draw a salary from their employing Chinese universities and receive other financial and social benefits. *See id.* ¶¶ 19, 21.

In approximately December 2017, China's Ministry of Education selected Defendant to serve as a Chang Jiang Distinguished Professor at FZU. *See id.* ¶ 26. Following that award, in early 2018, Defendant negotiated an employment contract with FZU. *See id.* ¶ 28-29. Defendant officially commenced his five-year term of employment at FZU in approximately May 2018. *See id.* ¶¶ 29-30. Between approximately March 2018 and August 2019, Defendant engaged in activities related to his work at FZU, while remaining employed by KU and obtaining and using federal grant funds. *See id.* ¶ 31. In December 2018, unbeknownst to KU, Defendant effectively moved to China to work at FZU. *See id.*

As part of his scheme to defraud the U.S. government and KU, Defendant made various material misrepresentations and omissions. *See id.* ¶ 39. Moreover, at all relevant times, Defendant concealed from the U.S. government and KU his affiliation with FZU, his participation in the Chang Jiang Scholar Program, his Chinese research support, his foreign income, and other benefits and conflicts of interest and time. *See id.* ¶ 36.

---

[3] Because of the nature of China's political system, Chinese universities are functionally extensions of the Chinese government and the Chinese Communist Party. *See id.* ¶¶ 19, 27.

**B.      Conduct Relevant to the DOE Witnesses**

As alleged in the Second Superseding Indictment, part of Defendant's fraudulent scheme involved a DOE Office of Science (hereinafter "DOE" or "DOE Office of Science") grant award. *See* SSI ¶¶ 9-11. Evidence at trial will show that Defendant first applied for the DOE funding to support a research project at KU in May 2015. DOE awarded the grant in September 2015, and Dr. Raul Miranda served as the DOE program manager through May 2017, when Dr. Viviane Schwartz became the program manager and Dr. Miranda became her supervisor.

In December 2014, in connection with Defendant's proposal and in response to his questions about including a Chinese researcher as a co-principal investigator and using DOE funds to pay a Chinese post-doctoral student's salary, Dr. Miranda explained to Defendant that there was no clear mechanism within DOE's Office of Science to fund a researcher outside the United States and that it was illegal to subcontract a foreign university or pay for research to be carried out at a foreign university. Subsequently, in April and May 2015, Dr. Miranda and Defendant exchanged emails about Defendant's current and pending support, reflecting Defendant's understanding of the requirement and its purpose.

On December 11, 2017, Defendant applied for renewed funding from DOE to support the same project at KU. *See id.* ¶¶ 11, 42 (Count Two). As part of the grant application process, Dr. Schwartz, in her role as program manager, asked Defendant to provide his updated current and pending research support. On July 16, 2018, Defendant responded and falsely represented that he was only receiving and expected to receive U.S. government funding. *See id.* ¶¶ 39(D), 42 (Count Five), 46 (Count Ten). After DOE awarded the renewed funding to Defendant in September 2018, *see id.* ¶ 12, Defendant submitted a research performance progress report (RPPR) on June 15, 2019, in which he falsely represented that he had no changes to his current

support, *id.* ¶ 39(F).

C.     **Conduct Relevant to the KU and German Witnesses**

The evidence at trial will also show that Defendant made multiple material omission and misrepresentations related to his work for Fuzhou University and activities during the Spring 2019 semester. Initially, on May 17, 2018, Defendant sought approval from his department chair, Dr. Laurence Weatherley, for no-pay leave status for the Spring 2019 semester (i.e., January to May 2019). Defendant claimed that he had an invitation from Dr. Robert Schlögl of FHI to collaborate with Dr. Schlögl's team in Germany during the Spring and Summer of 2019.

On May 24, 2018, Defendant sought a "buyout" from KU instead of no-pay leave status for the Spring 2019 semester. Effectively, the buyout meant that KU would continue paying Defendant's salary except as it related to teaching a single course (i.e., 13.5% of Defendant's salary). Under Defendant's proposal, Fuzhou University and KU would enter into a subaward contract, which would have obligated Fuzhou University to pay Defendant's salary for that course, and in exchange, Defendant would have performed certain research for Fuzhou University using KU's facilities and equipment.[4] *See id.* ¶ 39(C). Dr. Weatherley approved Defendant's buyout on June 25, 2018, but with certain conditions. Specifically, as required by KU policy, Defendant was required to remain on campus and continue advising students and performing committee work and other service to the department, school, and university. Ultimately, Defendant failed to approve the subaward contract in KU's grant system, and his buyout, while approved, went unfunded. When the issue of the unfunded buyout was brought to his attention in May 2019, Defendant directed KU to pay the buyout using his NSF career grant

---

[4] As the evidence at trial will show, at no time did Defendant inform KU that he had any relationship with Fuzhou University, let alone that he was serving as a Chang Jiang Distinguished Professor at the university.

funds.

After obtain approval for the buyout, in October 2018, Defendant contacted Dr. Weatherley for assistance in obtaining a multi-entry visa for Germany from January to August 2019. Defendant provided Dr. Weatherley with a second invitation from Dr. Schlögl that indicated that it may be necessary for Defendant to travel to FHI in Germany several times in 2019 to give a lecture and discuss possible cooperation with FHI.

During the Spring 2019 semester, Defendant failed to attend various faculty meetings at KU and his advisees were unable to reach him. On multiple occasions, Defendant informed Dr. Weatherley that he was unavailable because he was traveling to Germany. For example, on February 19, 2019, Dr. Weatherley sought to meet with Defendant to discuss his annual faculty evaluation. Defendant claimed that he was visiting FHI in Germany.

As noted above, at the government's January 2021 request, German authorities interviewed Dr. Schlögl on September 29, 2021. *See* Gov. Ex. A. Among other things, Dr. Schlögl stated that, in October 2018, Defendant contacted FHI requesting an invitation to continue working on a planned joint journal. Dr. Schlögl provided the invitation, but a date was never finalized. Dr. Schlögl was not particularly interested in Defendant visiting FHI, so he did not pursue the matter further. Contrary to Defendant's claims to Dr. Weatherley, Defendant never visited FHI.[5]

### D.    Conduct Relevant to Taiwanese Witness

The evidence at trial will show that Defendant applied for funding from the National

---

[5] Despite having received a multi-entry German visa and claiming to have visited Germany, Defendant's passport does not show any entry or exit stamps for Germany. Such stamps are required under European Union laws. The evidence will also show that Defendant informed other individuals that he was in China during the same period.

Science Foundation of China (NSF-China) to support his research projects at Fuzhou University at various times between March 2018 and February 2019. On February 25, 2019, Defendant applied for funding from NSF-China for a joint project involving his research group at Fuzhou University and Dr. Yu-Wen Chen's group at Taiwan's National Central University. In connection with the application, Defendant and Dr. Chen exchanged various emails about their collaboration, including an email exchange on March 17, 2019. *See* SSI ¶ 42 (Count Seven).

As noted above, at the government's May 2021 request, Taiwanese authorities permitted the government to interview Dr. Chen on October 27, 2021. *See* Gov. Ex. B. Among other things, Dr. Chen stated that, while he never met Defendant, Defendant contacted him about applying to the NSF-China for an international collaboration project at Fuzhou University. Defendant stated that he had moved from KU to Fuzhou University and was working at Fuzhou University as a Chang Jiang Distinguished Professor. Dr. Chen did not know Defendant but knew others at Fuzhou University, and so he believed Defendant's proposal was legitimate. Dr. Chen signed a document affirming his intent to collaborate with Defendant at Fuzhou University.

## II.    APPLICABLE LAW

Rule 15 permits pretrial depositions in exceptional circumstances when witnesses are unavailable to testify in person at trial.[6] Fed. R. Crim. P. 15(a); *see also United States v. Troutman*, 814 F.2d 1428, 1453-54 (10th Cir. 1987). "The burden is on the moving party to establish circumstances justifying the taking of depositions." *United States v. Drogoul*, 1 F.3d

---

[6] The parties previously and extensively briefed Rule 15 as it applies to witnesses who are located abroad. Dkt. 111-12, 113, 116, 117. The circumstances set forth in the instant motion are vastly different from those involving Defendant's prospective witnesses in China. For example, the government witnesses' anticipated testimony is detailed in interview reports and is corroborated by other independent evidence. And, with respect to the foreign witnesses, the government has followed, and will continue to follow, the appropriate processes for interviewing and deposing witnesses in Germany and Taiwan.

1546, 1552 (11th Cir. 1993). Specifically, the movant must show that (1) "the witness's testimony could provide substantial proof of a material fact in a felony prosecution," (2) "there is a substantial likelihood that the witness's attendance at trial cannot be obtained," and (3) "taking the deposition [is] necessary to prevent a failure of justice." *United States v. Fuentes-Galindo*, 929 F.2d 1507, 1509 (10th Cir 1991).

Relevant to the DOE and KU witnesses, courts have held that a witness may be unavailable due to health problems that prevent the witness from testifying live at trial.[7] *See, e.g.*, *United States v. Bond,* 362 Fed. App'x 18, 22 (11th Cir. 2010) (witness unavailable where infirmity made travel a grave physical hardship); *United States v. Keithan*, 751 F.2d 9, 12-13 (1st Cir. 1984) (elderly witnesses with back problems and heart conditions unavailable); *United States v. Konrad*, No. Crim. A. 4:95-CR-37HLM, 1996 WL 735566, *1 (N.D. Ga. Nov. 27, 1996) (cardiac conditions sufficient to justify "exceptional" circumstances). Factors that courts consider include the witness's age, medical concerns, and need to travel long distances. *See United States v. Karoly*, Crim. No. 08-592, 2009 WL 1872083, at *2 (E.D. Pa. Jun. 29, 2009). More recently, courts have considered the impact of the coronavirus pandemic on witnesses who are at heightened risk of serious consequences should they contract the coronavirus. *See, e.g.*, *United States v. Akhavan*, 523 F. Supp. 2d 443, 455 (S.D.N.Y. 2021) (witness's age and preexisting conditions placed him at increased risk of death or serious illness from the coronavirus); *United States v. Davis*, Crim. No. 19-101-LPS, 2020 WL 6196741, at *3-4 (D. Del. Oct. 23, 2020) (seven witnesses were unavailable to travel to Delaware to testify at trial due to

---

[7] For purposes of unavailability at trial, Rule 804(a)(4) of the Federal Rules of Evidence applies. Rule 804(a)(4) reads, in relevant part that "[a] declarant is considered to be unavailable as a witness if the declarant cannot be present or testify at trial . . . because of . . . a then existing infirmity [or] physical illness."

the impact of the coronavirus pandemic and each witness's distance from Delaware and particularized risk factors).

Alternatively, both before and during the coronavirus pandemic, courts have permitted witnesses to testify remotely by two-way video during trial when exceptional circumstances were present. *See, e.g.*, *United States v. Benson*, 79 Fed. Appx. 813, 820-21 (6th Cir. 2003) (85-year-old witness who was "too ill to travel" from California to Cleveland due to "extensive health problems" and recent "major stomach surgery" which left her "underweight and fatigued"); *United States v. Griffin*, Crim. No. 11-CR-936 (RJS), 2021 WL 3188264, at 2 (S.D.N.Y. July 28, 2021) (witness could not travel after giving birth and because she was unvaccinated against COVID-19). The Supreme Court has recognized that "the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial . . . that must occasionally give way to considerations of public policy and the necessities of the case." *United States v. Kaufman*, 546 F.3d 1242, 1254 (10th Cir. 2008) (quoting in *Maryland v. Craig*, 497 U.S. 836, 849 (1990) (emphasis in original)). "[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where a denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* (quoting *Craig*, 497 U.S. at 850). "The requisite finding of necessity must . . . be a case-specific one." *Id.* (quoting *Craig*, 497 U.S. at 855).

Relevant to this motion, "there is no question that limiting the spread of COVID-19 and protecting at-risk individuals from exposure to the virus are critically important public policies." *United States v. Donziger*, Crim. No. 11-CV-691 (LAK), 2020 WL 5152162, at *2 (S.D.N.Y. Aug. 31, 2020), *reconsideration denied*, Crim. No. 11-CV-691 (LAK), 2020 WL 8465435 (S.D.N.Y. Oct. 23, 2020); *see also United States v. Pangelinan*, Crim. No. 19-10077-JWB, 2020

WL 5118550, at *3 (D. Kan. Aug. 31, 2020) (recognizing that limiting the spread of coronavirus is an important public policy but finding that the government had not shown that it was necessary to present the specific witnesses' testimony by video to further that public policy and that other alternatives, such as a continuance, were available). Moreover, use of two-way video systems and the presence of court personnel are acceptable means of assuring reliable testimony. *See Donziger*, 2020 WL 5152162, at *3 (permitting remote testimony of 72-year-old witness who was at heightened risk of coronavirus complications).

## III.    DISCUSSION

The Court should authorize Rule 15 depositions for the five witnesses. Each will offer testimony that provides substantial proof of a material fact and all are unavailable within the meaning of Rule 15 and Rule 804(a)(4). Alternatively, given the proximity to the December 6th trial date, the Court should permit the U.S.-based witnesses to testify at trial by two-way video, obviating the need for pretrial depositions.

### A.    The Court Should Authorize Rule 15 Depositions for Dr. Schwartz and Dr. Miranda Or, Alternatively, Permit Two-Way Video Testimony at Trial

With respect to Rule 15's materiality requirement, Dr. Schwartz and Dr. Miranda are expected to testify about, among other things, DOE's grant award practices, expectations, and disclosure requirements, the competitive nature of grant applications, and the agency's reliance on principal investigators and universities to be honest and to follow their internal policies. *See* Gov. Ex. C. At a minimum, their testimony will prove that Defendant made material misrepresentations to further his scheme to defraud DOE, two of which are specifically alleged in the Second Superseding Indictment. *See* SSI ¶¶ 39(D), 39(E), 42 (Counts Two and Five), 46 (Count Ten). Their testimony will also rebut or disprove expected defenses in this case. For example, based on discussions with Defendant's counsel, the government expects Defendant to

argue that DOE's current and pending support requirement was ambiguous and that he did not understand that it applied to foreign research grants. Defendant's December 2014 exchange with Dr. Miranda about DOE's inability to fund Chinese researchers further shows that Defendant understood that DOE would not fund his research if the agency knew he that he was working at Fuzhou University.

Regarding their unavailability, due to the coronavirus pandemic and individualized health issues, Dr. Schwartz and Dr. Miranda are unable to travel from the Washington, D.C. area to Kansas for trial. *See* Dkt. 174 (Sealed Exhibits).[8] The government recently spoke with the witnesses and their circumstances remain unchanged. Thus, because they are unavailable and are expected to provide material testimony at trial, the Court should authorize the taking of pre-trial depositions.

Alternatively, the Court should permit the witnesses to testify by two-way video at trial, obviating the need for depositions, litigation over the admissibility of the depositions at trial, and playing of video depositions for the jury. Allowing Dr. Schwartz and Dr. Miranda to testify by two-way video would not violate Defendant's Sixth Amendment rights. There should be no question that the protection of at-risk individuals from exposure to the coronavirus is a critically important public policy. And specific to this case and these witnesses, remote testimony is necessary to further that policy. Dr. Schwartz and Dr. Miranda, who is 70, have individualized health issues that inhibit their ability to travel during the coronavirus pandemic. Requiring them to travel significant distances, whether by plane or by car,[9] as Defendant's counsel suggested at

---

[8] The government respectfully asks that the Court seal any hearings that address the specifics of the witnesses' health issues.

[9] Washington, D.C. is more than 1,000 miles from Kansas, and according to Google Maps, it would take more than 17 hours to drive.

the last hearing, and to stay in hotels to testify for no more than a day would put them at unreasonable risk. Moreover, both witnesses have expressed health concerns with traveling by plane or car to Kansas.[10]

The court's order in *United States v. Davis*, 2020 WL 6196741, is instructive. In that case, the court found that seven witnesses were not available to travel to testify at trial. *Id*. at *3. The court explained that the coronavirus is a respiratory disease that spreads from person to person who are in close contact and that social distancing is difficult during air travel, potentially increasing the chance of exposure to the virus. *Id.* Three of the seven witnesses were at least 66 years old and at heightened risk of serious consequences were they to contract the coronavirus. *Id.* The court concluded that the witnesses were unavailable to testify at trial, and thus video testimony was appropriate, based on each witness's distance from Delaware and his or her particularized risk factors. *Id.* at *4.

Similarly, in *United States v. Akhavan*, 523 F. Supp. 3d 443, the district court concluded that a witness was unavailable to testify in person at trial and that exceptional circumstances supported his request to testify by two-way video. Specifically, the court found that the witness was unable to travel without subjecting himself to substantial risk of contracting the coronavirus and that, due to his age and comorbidities, contracting the coronavirus could well result in serious illness or death. *Id.* at 455 (also noting the risks to the witness's family). In reaching its conclusion, the court rejected the defendant's Confrontation Clause arguments. *Id.* at 452-55. The court explained that the Supreme Court "ha[s] never held . . . that the Confrontation Clause guarantees criminal defendants the absolute right to a face-to-face meeting with [all] witnesses

---

[10] For example, Dr. Schwartz stated that she has medical appointments in December that are necessary to evaluate whether her serious health issue has improved or worsened, and whether she will need additional medical procedures.

against them at trial." *Id.* at 453 (quoting *Craig*, 497 U.S. at 844). The court further looked to Second Circuit precedent, *United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999), which held that two-way closed-circuit television preserves face-to-face confrontation, and, therefore, courts should apply the Rule 15 standard when deciding whether to permit live video testimony. *Id.* at 454. Applying both *Craig* and *Gigante*, the district court permitted the witness to testimony remotely at trial.

As in *Davis* and *Akhavan*, the witnesses here are at increased risk of contracting the coronavirus that could result in serious illness or death, given their particularized health concerns. It is therefore necessary for them to testify by two-way video. Moreover, they are both unavailable under the Rule 15 standard and there is little to no difference between deposing them weeks before trial and allowing them to testify by two-way video during trial.

## B.   The Court Should Authorize a Rule 15 Deposition for Dr. Weatherley

Dr. Weatherley is expected to provide testimony that is material to proving Defendant's scheme to defraud KU. He was the Chair of KU's Chemical and Petroleum Engineering Department, supervised Defendant, and signed Defendant's annual performance evaluations. Among other things, Dr. Weatherley is expected to testify about several topics related to Defendant's employment responsibilities at KU, Defendant's performance during the relevant period, Defendant's buyout request for the Spring 2019 semester, Defendant's claims regarding FHI, and Defendant's absence from KU during the Spring 2019 semester. *See* Gov. Ex. D. At a minimum, his testimony will prove that Defendant made material misrepresentations to further his scheme to defraud KU, one of which is specifically alleged in the Second Superseding Indictment. *See* SSI ¶¶ 39(C).

As of the date of this filing, it does not appear that Dr. Weatherley is able to testify in

person at trial due to specific health issues. It is also unclear whether he will be able to testify at a deposition prior to December 6th. The government is moving to depose him to preserve its arguments should he become available for a deposition or trial does not commence as expected on December 6th.[11]

### C.     The Court Should Authorize a Rule 15 Deposition for Dr. Schlögl

As described above, Dr. Schlögl's testimony is material to prove Defendant made material misrepresentations to Dr. Weatherley and others at KU in furtherance of his fraudulent scheme. Specifically, he is expected to testify that Defendant was not in Germany visiting FHI during the Spring 2019 semester, contrary to Defendant's representations to Dr. Weatherley.

In terms of Dr. Schlögl's availability to testify in person at trial, the government is engaging him through the German authorities. It is unclear whether he will agree to travel to the United States, though he has indicated that his schedule will likely not permit him to do so. He appears willing to participate in a remote deposition, though the government is in the process of confirming as much. Because he is located outside of the United States, the Court cannot compel him to appear. Thus, if he decides not to travel and is willing to be deposed, he is unavailable within the meaning of Rule 15. *See, e.g.*, *United States v. Farfan-Carreon*, 935 F.2d 678, 679-80 (5th Cir. 1991); *United States v. Sindona*, 636 F.2d 792, 803 (2d Cir. 1980). Accordingly, the Court should authorize the taking of his deposition to preserve his testimony for use at trial.

### D.     The Court Should Authorize a Rule 15 Deposition for Dr. Chen

As described above, Dr. Chen's testimony is material to prove that Defendant applied for NSF-China funding and worked at Fuzhou University, both of which are significant points of

---

[11] It may also be appropriate to allow Dr. Weatherley to testify by two-way video, depending on his particular circumstances.

factual dispute. Moreover, his testimony is material to proving Count Seven, which is based on his email exchange with Defendant.

Like Dr. Schlögl, the Court cannot compel Dr. Chen to appear at trial, because he is located outside of the United States. Dr. Chen expressed that he was unsure about traveling to the United States to testify, and the government is in the process of engaging him through Taiwanese authorities regarding a Rule 15 deposition. Thus, because he is unavailable and has material information, if he willing to be deposed, the Court should authorize such a deposition.

**IV.    CONCLUSION**

For the reasons stated, the Court should grant the government's motion.

Respectfully submitted,

*/s/ Benjamin J. Hawk*
Benjamin J. Hawk
Adam P. Barry
Trial Attorneys
National Security Division
U.S. Department of Justice

*/s/ Christopher Oakley*
D. Christopher Oakley
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of November, 2021, I caused the foregoing motion to be filed with the Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

*/s/ Christopher Oakley*
D. Christopher Oakley