## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 19-20052-JAR** |
| **FENG TAO,** | |
| **Defendant.** | |

## MEMORANDUM & ORDER

This matter comes before the Court on Defendant Feng Tao's Motion in Limine #2: to Exclude Evidence Regarding China, the CCP, Talent Plans, and Intellectual Property Theft and to Exclude or Hold a *Daubert* Hearing as to Proposed Expert Testimony of Glenn Tiffert (Doc. 157); Defendant's Motion in Limine #4: to Exclude Inadmissible Expert Testimony (Doc. 154); and the Government's Omnibus Motion in Limine (Doc. 156). The Court held a *Daubert*[1] hearing and heard oral arguments on October 14 and 15, 2021. For the reasons detailed below, Defendant's Motion in Limine #2 is granted in part and denied in part; his Motion in Limine #4 is denied; and the Government's Omnibus Motion in Limine is granted in part, denied in part, and deferred in part.

## I.    Factual Background

Defendant is charged in a ten-count Second Superseding Indictment ("SSI") with seven counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, and three counts of making false statements, in violation of 18 U.S.C. §§ 1001 and 2. The charges stem from allegations that Defendant, a full-time professor and researcher at the University of Kansas ("KU"), engaged in a

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

scheme to defraud KU, the National Science Foundation ("NSF"), and the U.S. Department of Energy by concealing his employment as a Changjiang Distinguished Professor at Fuzhou University in the People's Republic of China ("PRC") and his PRC research funding.

## II.   Defendant's Motion in Limine #2

Defendant moves in limine to exclude: (1) the testimony of Dr. Glenn Tiffert, "the government's proposed China expert, or at a minimum hold a *Daubert* hearing"; (2) "evidence and argument regarding the Chinese government or its goals, the Communist Party of China (CPC), talent plans, and intellectual property theft"; and (3) "evidence or argument that [Defendant] sought to benefit China or the PRC."[2]   The Court addresses each request below.

### A.   Expert Testimony of Dr. Glenn Tiffert

Defendant asks the Court to exclude the proposed expert testimony of Dr. Glenn Tiffert—the Government's primary vehicle for introducing evidence about the PRC.  In its Fed. R. Crim. P. 16(a)(1)(G) expert disclosure of Dr. Tiffert, the Government identifies three main topics on which he is expected to testify: (1) "[t]he PRC government's national development goals and industrial policies"; (2) "[t]he Changjiang Scholars Program . . . and related talent recruitment programs"; and (3) "[a]cademic institutions, academic bureaucracy, and censorship in the PRC."[3]  The Government also states that Dr. Tiffert will offer testimony showing that "[c]ertain exhibits introduced at trial through other witnesses are consistent with the Defendant's participation in the [Changjiang Scholars Program] and work with Fuzhou University."[4] Defendant seeks to exclude Dr. Tiffert's proposed testimony under Fed. R. Evid. 702, 401, and 403.

---

[2] Doc. 157 at 2.

[3] Doc. 157-1 at 3–4.

[4] *Id.* at 4.

Whether expert testimony should be admitted is a matter committed to the court's broad discretion.[5]  Rule 702, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[6] the Supreme Court held that Rule 702 imposes a gatekeeping responsibility on trial courts to ensure that proposed expert testimony "is not only relevant, but reliable."[7]  In performing this gatekeeping function, the court "generally must first determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion."[8]  If the expert is sufficiently qualified, the court must next determine whether the expert's testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline."[9]

The Supreme Court in *Daubert* set forth a non-exhaustive list of four factors that courts may consider in determining the reliability of the proffered expert testimony: (1) whether the theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate; and (4) its degree of general acceptance in

---

[5] *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996).

[6] 509 U.S. 579 (1993).

[7] *Id.* at 589.

[8] *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quoting Fed. R. Evid. 702).

[9] *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. at 592).

the relevant scientific community.[10]  The Supreme Court has emphasized, however, that these four factors are not a "definitive checklist or test" and that a court's gatekeeping inquiry into reliability must be "tied to the facts of a particular case."[11]  In some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than the *Daubert* factors.[12]  That said, "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express. . . .  Quite simply, under Rule 702, the reliability criterion remains a discrete, independent, and important requirement for admissibility."[13]  Ultimately, the court's role "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[14]

After determining that a witness is qualified to testify as an expert and that the testimony is reliable, the court must determine whether the expert testimony is sufficiently "relevant to the task at hand."[15]  Under Fed. R. Evid. 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action."[16]  "Relevant expert testimony must 'logically advance[] a material aspect of the case' and be 'sufficiently tied to the facts of the case that it will aid the

---

[10] *Daubert*, 509 U.S. at 593–94.

[11] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).

[12] *Id.*

[13] *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (emphasis omitted).

[14] *Kumho Tire Co.*, 526 U.S. at 152.

[15] *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. at 597).

[16] Fed. R. Evid. 401; *see* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

jury in resolving a factual dispute.'"[17]  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."[18]  In assessing whether expert testimony will assist the jury, the court should consider whether the testimony "is within the juror's common knowledge and experience."[19]

Even if the court determines that expert testimony is reliable and relevant, it may nevertheless exclude the testimony under Fed. R. Evid. 403 "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." In the criminal context, "[t]he term 'unfair prejudice' . . . speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."[20]  So, the Advisory Committee Notes to Rule 403 explain, "'[u]nfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[21]

It is within the court's discretion to determine how to perform its gatekeeping function under *Daubert*.[22]  The most common method for fulfilling this function is a *Daubert* hearing,

---

[17] *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (alteration in original) (first quoting *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 n.2 (10th Cir. 2005); and then quoting *Daubert*, 509 U.S. at 591).

[18] *Daubert*, 509 U.S. at 591 (quoting 3 Weinstein & Berger ¶ 702[02] (1988)).

[19] *Garcia*, 635 F.3d at 476–77 (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006)).

[20] *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

[21] Fed. R. Evid. 403 advisory committee's note.

[22] *Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

although it is not specifically mandated.[23]  Here, Defendant requested a *Daubert* hearing.  This Court granted that request and held a *Daubert* hearing on October 15, 2021.

### 1.      Qualifications

Defendant argues that Dr. Tiffert is not qualified to offer testimony on any of the topics listed in the Government's expert disclosure.  Specifically, Defendant takes issue with the absence of any peer-reviewed publications focusing on Chinese talent programs and academia from Dr. Tiffert's curriculum vitae, noting that "his interests and publications on China are broad and varied."[24]  Defendant contends that if Dr. Tiffert is an expert in anything, it is Chinese constitutional law, not talent programs or academia.  In addressing Defendant's argument that Dr. Tiffert's qualifications are insufficiently narrow at the *Daubert* hearing, the Government stated: "We're not proposing Dr. Tiffert as a Changjiang Distinguished Professor expert. Frankly I don't know that anyone in academia or in the think tank industry c[ould] make much of a living if their expertise were so narrow.  We're simply proposing him as someone who's qualified under [Rule] 702 and *Daubert* to provide the expert testimony that we've previewed for the Court."[25]  Defendant responded that this "very telling admission" is "all the Court needs to know to exclude him as an expert."[26]  The Court disagrees.

Defendant takes an overly narrow view of the expertise necessary to provide expert testimony.  "[A] broad range of knowledge, skills, and training qualify an expert as such."[27]  As

---

[23] *Id.*

[24] Doc. 157 at 11.

[25] Doc. 182 at 17:7–14.

[26] *Id.* at 22:17–21.

[27] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994); *see also Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994) ("Federal Rule of Evidence 702 . . . contemplates a broad conception of expert qualifications. . . .  Moreover, the advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert.").

long as the expert stays "within the reasonable confines of his subject area," the lack of specialization affects the weight of the opinion, not its admissibility.[28]  Thus, that Dr. Tiffert does not specialize in the Changjiang Scholars Program—even assuming anyone's expertise is so narrow—does not render him unqualified.

The record shows that Dr. Tiffert received his Bachelor of Arts degree in Political Science with highest honors from the University of California, Berkeley, then received his Masters degree in East Asian Studies from Harvard University, and then received his Ph.D. in History from the University of California, Berkeley, with a specialization in twentieth-century China.  Dr. Tiffert later completed a post-doctoral fellowship at the Center for Chinese Studies at the University of Michigan, where he has also served as a faculty lecturer in the History and the Asian Languages and Cultures departments.  Dr. Tiffert is now a research fellow at the Hoover Institution, a public policy think tank and research center at Stanford University, where he co-leads its China Global Sharp Power Project, researching and publishing on the Chinese government's use of sharp power.  He also serves on the executive committee of the Academic Security and Counter-Exploitation Program ("ASCE") as a "China subject matter expert."[29] ASCE is an association of universities established to address the threat foreign adversaries pose to U.S. academic institutions, and Dr. Tiffert explains that it focuses on "problems and best

---

[28] *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (quoting *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1519–20 (10th Cir. 1996)); *see also Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996) ("[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."); *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997))).

[29] Doc. 182 at 31:4–5; *see also* Doc. 157-2 at 8.

practices in the research securities sphere."[30]  Dr. Tiffert reads simplified and traditional Mandarin.

Dr. Tiffert's curriculum vitae indicates that he has published several journal articles and peer-reviewed academic publications on the Chinese legal system, and he has written a forthcoming academic book on the history of the Chinese judicial system.[31]  He has also authored, contributed to, and edited reports on the risks certain PRC activities pose to U.S. academic institutions, and he advises academic institutions and government officials on how to assess and mitigate those risks.  Based on all this information, the Court concludes that Dr. Tiffert is qualified "as an expert by knowledge, skill, experience, training, or education"[32] to offer expert testimony on the topics the Government identifies in its expert disclosure, including Chinese academia and talent programs.

## 2.    Reliability

Defendant argues that Dr. Tiffert's proposed testimony is unreliable because it is not "based on sufficient facts or data" or "the product of reliable principles and methods."[33] However, while Defendant challenges the reliability of Dr. Tiffert's testimony under Rule 702, his argument pertains largely to the alleged inadequacy of the Government's expert disclosure of Dr. Tiffert under Fed. R. Crim. P. 16(a)(1)(G).  Defendant contends that the Government's expert disclosure fails to identify the bases for Dr. Tiffert's opinions, as required by Rule 16(a)(1)(G), and therefore fails to establish any connection between his experience and his

---

[30] Doc. 182 at 30:23–25.

[31] *See* Doc. 157-2.

[32] Fed. R. Evid. 702.

[33] Fed. R. Evid. 702(b), (c).

proposed testimony, as required to establish reliability under Rule 702 when an expert witness relies solely or primarily on experience.

Rule 16(a)(1)(G) requires the government to provide, at the defendant's request, a "written summary" of the expert testimony it intends to introduce, including "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." But a Rule 16 disclosure "is not intended to serve as the basis for a judicial determination regarding admissibility."[34] Instead, a Rule 16 disclosure is "designed to give opposing counsel notice that expert testimony will be presented, permitting 'more complete pretrial preparation' by the opposing side, such as lining up an opposing expert, preparing for cross-examination, or challenging admissibility on *Daubert* or other grounds."[35] Thus, "[d]etailed, extensive discussion is not required in the Rule 16 summary: 'Although the summary required by Rule 16 provides the defense with some notice, the requirement of setting forth "the bases and reasons for" the witnesses' opinions does not track the methodological factors set forth by the *Daubert* Court.'"[36]

Defendant's assertion that the Government's expert disclosure identifies "*no* basis for [Dr. Tiffert's] opinions," in violation of Rule 16(a)(1)(G),[37] is incorrect. The Government's expert disclosure, to which Dr. Tiffert's curriculum vitae is attached, states that his "testimony will be based on his years of research studying the PRC government's efforts to acquire foreign technology and talent to further the PRC's economic development," and summarizes his

---

[34] *United States v. Nacchio*, 519 F.3d 1140, 1151 (10th Cir. 2008), *vacated in part on reh'g en banc*, 555 F.3d 1234 (10th Cir. 2009).

[35] *Id.* (quoting Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment).

[36] *United States v. McCluskey*, 954 F. Supp. 2d 1224, 1231 (D.N.M. 2013) (quoting Margaret A. Berger, *Procedural Paradigms for Applying the* Daubert *Test*, 78 Minn. L. Rev. 1345, 1360 (1994)).

[37] Doc. 157 at 12.

background in the area.[38]  This description is sufficient under Rule 16.  Indeed, Defendant's motion indicates he was sufficiently able to raise reliability concerns based on the disclosure in hand.

During the *Daubert* hearing, the Court paid close attention to the reliability of Dr. Tiffert's expert testimony within the analytical framework of Rule 702.  The depth of and stated bases for the testimony offered at the *Daubert* hearing allow this Court to conclude that Dr. Tiffert's expert testimony is sufficiently reliable—drawn from his experience, education, knowledge, research, and review of the evidence in this case—to be admissible under Rule 702.[39]  In forming his opinions, Dr. Tiffert followed a reliable methodology: he reviewed the relevant evidence and applied his specialized knowledge to facts of the case.[40]  This is not a situation where the expert's opinions are "connected to existing data only by the *ipse dixit* of the expert," such that "there is simply too great an analytical gap between the data and the opinion[s] proffered."[41]

To the extent Defendant argues that Dr. Tiffert's testimony on Chinese academia and talent programs is unreliable because he has not published any peer-reviewed articles focusing specifically on those topics, the Court rejects it.  "[A]lthough publishing in a peer-reviewed publication is often a hallmark of expert witness reliability, that hallmark is a guidepost, not a

---

[38] Doc. 157-1 at 2.

[39] The Court notes that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  "If experts in the particular field would rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."  *Id.  See, e.g.*, *United States v. You*, 534 F. Supp. 3d 880, 885–86 (E.D. Tenn. 2021) (finding that an economics professor's lack of first-hand knowledge about or experience with the PRC's use of talent programs, and his reliance on hearsay, did not render his expert testimony on the topic inadmissible (citing Fed. R. Evid. 703)).

[40] *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

[41] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

mandatory prerequisite to qualification as an expert."[42]  The Court finds that Dr. Tiffert's testimony meets the reliability requirement.  Defendant can adequately explore any perceived deficiencies on cross-examination.[43]

### 3.    Relevance and Rule 403

Although Dr. Tiffert is a qualified expert and his testimony is reliable, the Government fails to show the relevance of most of his expected expert testimony, and Defendant demonstrates that most of it should be excluded under Rule 403.  Based on the arguments of the parties and the testimony elicited at the *Daubert* hearing, the Court finds it appropriate to set boundaries on the admissibility of Dr. Tiffert's testimony at this stage.  Below, the Court separately scrutinizes the three main topics of testimony set forth in the Government's expert disclosure of Dr. Tiffert, although there is a considerable amount of overlap between them.  But the Court notes at the outset that, as with all in limine rulings, its pre-trial ruling on the admissibility of Dr. Tiffert's expert testimony is "subject to change when the case unfolds."[44]

### a.    The PRC Government's National Development Goals and Industrial Policies

The first main topic the Government expects Dr. Tiffert's testimony to cover is "[t]he PRC government's national development goals and industrial policies," and it anticipates that he will offer testimony on "the following specific points":

> For the past several decades, the PRC government has prioritized scientific and technological development and has implemented a pragmatic strategy to accelerate that development.

---

[42] *United States v. Young*, 916 F.3d 368, 380 (4th Cir. 2019); *see also You*, 543 F. Supp. 3d at 886 (rejecting the defendant's argument that an expert's testimony on the PRC's use of talent programs to steal foreign technology was unreliable because the expert "ha[d] not published any works" on that topic).

[43] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

[44] *Luce v. United States*, 469 U.S. 38, 41 (1984).

> The PRC government is interested in obtaining a broad range of
> advanced scientific and technological information, and the PRC
> government directly and indirectly encourages the use of a variety
> of lawful and unlawful means to achieve that objective.[45]

The Court agrees with Defendant that all testimony on this topic is inadmissible.

The PRC's national industrial policy objectives, and its efforts to obtain foreign technology by "lawful and unlawful means" to achieve those objectives, are of questionable relevance to the wire fraud and false statements charges at issue in this case.  The Government argues that this testimony is relevant because Defendant's alleged scheme was "intrinsically connected to a PRC government-led program that was intended to further the PRC government's industrial and economic objectives," and testimony about the PRC's use of talent recruitment programs to advance those objectives will help the jury understand the context in which these programs operate.[46]  Despite the Government's desire to paint a broad picture of the role the Changjiang Scholars Program plays in the PRC's efforts to acquire foreign technology and achieve its industrial policy objectives, this backdrop will not help the jury understand the evidence or determine a fact in issue based on the charges in this case, which are limited to wire fraud and false statements.[47]

Even if testimony on this topic were relevant and helpful, its minimal probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.  In particular, testimony about the PRC's efforts to acquire foreign technology to achieve its industrial policy objectives risks misleading the jury into thinking this case is actually an economic espionage or theft of trade secrets case.  As Defendant points out, this is precisely

---

[45] Doc. 157-1 at 3.

[46] Doc. 164 at 6.

[47] *See* Fed. R. Evid. 702(a).

the impression left by some of the allegations in the SSI.[48]  But this is not an espionage

prosecution, and the Government may not color the trial with national security overtones.  This

testimony also poses a significant risk of stoking Sinophobia—especially given that Defendant,

who is Chinese, faces trial amid increasing reports of anti-Asian discrimination and violence

since the outbreak of the COVID-19 pandemic[49]—and evoking exactly the kind of negative

emotional response that might "lure the [jury] into declaring guilt on a ground different from

proof specific to the offense charged."[50]  Because whatever probative value testimony on this

topic might have is substantially outweighed by a danger of unfair prejudice, confusing the

issues, and misleading the jury, the Court excludes it.[51]

---

[48] *See, e.g.*, Doc. 75 ¶¶ 17, 33 (alleging that the PRC uses talent plans to enhance its "economic prosperity and national security," that Chinese talent planes "were designed to encourage the transfer of original ideas and intellectual property from U.S. universities to PRC Government institutions," and that Defendant sought to "benefit the PRC by participating in a 'talent plan'").

[49] *See* Fed. Bureau of Investigation, Crime Data Explorer, https://crime-data-explorer.fr.cloud.gov/pages /explorer/crime/hate-crime (last visited Jan. 25, 2022) (reporting that anti-Asian hate crimes rose 73 percent in 2020); Stop AAPI Hate, Stop AAPI Hate National Report 1–2 (2021), https://stopaapihate.org/wp-content /uploads/2021/08/Stop-AAPI-Hate-Report-National-v2-210830.pdf ("Between March 19, 2020 and June 30, 2021, Stop AAPI Hate received 9,081 reported incidents of racism and discrimination targeting Asian Americans and Pacific Islanders across the U.S. . . . .  Of all hate incidents, 48.1% included at least one hateful statement regarding anti-China and/or antiimmigrant rhetoric."); Weiyi Cai, Audra D. S. Burch & Jugal K. Patel, *Swelling Anti-Asian Violence: Who Is Being Attacked Where*, N.Y. Times (Apr. 3, 2021), https://www.nytimes.com/interactive/2021/04 /03/us/anti-asian-attacks.html (finding more than 110 incidents of anti-Asian violence since March 2020 in which "the assailants expressed explicit racial hostility with their language, and in which nearly half included a reference to the coronavirus: 'You are the virus.'  'You are infected.'  'Go back to China.'  'You're the one who brought the virus here.'").

[50] *Old Chief v. United States*, 519 U.S. 172, 180 (1997); *see also United States v. Doe*, 903 F.2d 16, 21 (D.C. Cir. 1990) ("It is much too late in the day to treat lightly the risk that racial bias may influence a jury's verdict in a criminal case.").

[51] In arguing that Dr. Tiffert's expert testimony is unfairly prejudicial, Defendant contends that the Government's expert disclosure suggests Dr. Tiffert "is an anti-China advocate and hawk" who thinks the PRC poses a threat to our national security, so his testimony "would likely incense the jury over China's misconduct." Doc. 157 at 9.  Defendant further argues that "his fears and disdain for China could easily . . . cause [the jury] to convict based on emotions, including fears of a rising China."  *Id.* at 10.  Because the Court precludes Dr. Tiffert from testifying about the PRC's industrial policy objectives and misconduct, it need not address this argument.

> ### b.   The Changjiang Scholars Program and Related Talent Recruitment Programs

The second main topic is the Changjiang Scholars Program and related Chinese talent recruitment programs.  Dr. Tiffert is expected to offer testimony on the following "specific points":

> PRC talent programs play an important role in the PRC government's national development strategy by incentivizing persons with access to advanced scientific and technological information to transfer that information and skills to the PRC in exchange for reputational and financial benefits.
>
> Other publicly disclosed PRC government programs (such as Five-Year Plans, "Made in China 2025," and the "One Belt One Road Initiative") also relate to the PRC talent programs and the PRC government's scientific and technological development strategy, as do PRC State Key Laboratories.
>
> Foreign talent recruitment programs are not unique to the PRC government, but the PRC talent programs' scale, organizational and decision making structures, and lack of transparency and level of misconduct associated with the programs set them apart from other countries' foreign talent recruitment programs.
>
> The [Changjiang Scholars Program] is one of the most prestigious PRC talent programs offered and targets elite-level faculty in their respective fields of study to fill the PRC's technological gaps, train the next generation of faculty and researchers in the PRC, bring technology to the PRC, and establish the PRC as a world leader in the targeted field of study.  [Changjiang Scholars Program] Distinguished Professor recipients are expected to build "ecosystems" underneath them to satisfy these goals.
>
> The PRC's Ministry of Education established the [Changjiang Scholars Program], but the Ministry of Education coordinates with provincial-level entities and academic institutions, such as Fuzhou University, in evaluating and funding [Changjiang Scholars Program] recipients.  The PRC's Ministry of Education also works with provincial-level entities to implement the [Changjiang Scholars Program] and publishes regulations governing the program.[52]

---

[52] Doc. 157-1 at 3.

The ten counts charged in the SSI are all predicated on the allegation that Defendant was employed as a Changjiang Distinguished Professor at Fuzhou University through the Changjiang Scholars Program.  Defendant disputes this allegation, and the Government intends to prove it through circumstantial evidence.  As the Court explained at the *Daubert* hearing, to place the evidence in context and resolve this issue, the jury will need to understand what the Changjiang Scholar Program is, who administers it, how it is administered, what the application and selection process is, and what the requirements, obligations, expectations, and benefits are for participants in the program.  These matters are outside the scope of typical lay knowledge.

Within the second main topic of testimony identified in the Government's expert disclosure, some, but not all, of the listed "specific points" or subtopics fall within the scope of permissible testimony.  Testimony regarding the Changjiang Scholars Program's administration and operations (the fifth "specific point") is relevant and helpful.  The Government has pointed to evidence it intends to introduce at trial that Dr. Tiffert's testimony will help the jury understand and contextualize, such as evidence that Defendant publicly met with the party secretary of Fuzhou University, a letter from Fuzhou University's "College of Chemistry CPC Party Committee" evaluating his performance, and other evidence of the Chinese government's involvement in his work at Fuzhou University.[53]  That said, the jury does not need a lesson on the Chinese political system, and the Government may not, as it did at the *Daubert* hearing, elicit testimony from Dr. Tiffert about, broadly speaking, how "the PRC's political system is structured," how "the national government communicate[s] decisions" on matters of industrial

---

[53] Doc. 164 at 5.

policy "to the provincial or lower-level institutions,"[54] or how "folks at th[e] lower provincial levels [are] incentivized or encouraged to follow the mandates that are promulgated by the national level."[55]  Dr. Tiffert's testimony on these issues, especially his testimony that there is "a darker side, in that [Chinese leaders use] a disciplinary apparatus" to enforce government policy,[56] is unhelpful to the jury and unduly prejudicial to Defendant.

Testimony regarding the benefits of participating in the Changjiang Scholars Program and the expectations for its participants is also relevant and helpful.  The Government intends to present evidence showing that Defendant fulfilled those expectations, so the jury will need to understand what they were.  However, the rest of the proposed testimony within this second main topic—that is, testimony about the role Chinese talent recruitment programs play in the PRC's national development strategy, what sets Chinese talent programs apart, other PRC plans and initiatives such as "Made in China 2025," and the prestige and goals of the Changjiang Scholars Program—is inadmissible.  For the same reasons described above in addressing the first topic, this testimony has little to no relevance to the issues in this case and has the potential to unfairly prejudice Defendant, confuse the issues, and mislead the jury.

### c.   Academic Institutions, Academic Bureaucracy, and Censorship in the PRC

The third main topic on which the Government expects Dr. Tiffert to testify is "[a]cademic institutions, academic bureaucracy, and censorship in the PRC," and he will offer testimony on the following "specific points":

---

[54] The Government may, however, elicit testimony regarding "how the Ministry of Education communicates how local or provincial provincial-level institutions should be administering [the Changjiang Scholars] [P]rogram." Doc. 182 at 41:18–21.

[55] *Id.* at 33–36.

[56] *Id.* at 35:1–5.

> Academic institutions in the PRC are governed by a dual academic affairs structure and a Chinese Communist Party structure.  Both structures play a role in the PRC talent programs, such as the [Changjiang Scholars Program].
>
> In the PRC, formal documents (such as applications to PRC government authorities for research funds or support) are typically finalized using an official seal or stamp.
>
> Over the past few years, the PRC government has become less transparent about PRC talent programs than it had previously been, in part due to increased scrutiny of those programs by foreign governments (including the U.S. government).  In some instances, once-publicly-available information about PRC talent programs, including information identifying their participants, has been removed from the internet.  This form of internet censorship is consistent with other efforts by the PRC government to control information.[57]

Dr. Tiffert may testify about the dual governance structure under which Fuzhou University operates and the role the two structures play in administering the Changjiang Scholars Program, but he may not expand that testimony into a broader discussion of the PRC's political system or its industrial policy objectives.  Dr. Tiffert may also offer testimony on the use of seals or stamps in the PRC to finalize formal documents.  The Government states that several exhibits it intends to introduce at trial bear a seal or stamp of either the PRC's Ministry of Education or Fuzhou University, including Defendant's Changjiang Scholars Program application and a certificate allegedly formalizing Defendant's position as a Changjiang Distinguished Professor at Fuzhou University.  The use of these seals and stamps in the PRC is not within the average American juror's common knowledge and experience, and Dr. Tiffert's testimony will help the jury understand their significance, which in turn will assist the jury in determining whether Defendant was employed as a Changjiang Distinguished Professor at Fuzhou University.

---

[57] Doc. 157-1 at 4.

The Government did not elicit any testimony from Dr. Tiffert about transparency or censorship in the PRC at the *Daubert* hearing, and it may not do so at trial.  The probative value of testimony regarding Chinese government censorship is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury.

With the foregoing limitations, the Court concludes that Dr. Tiffert's testimony is not only reliable but also relevant and helpful, in that it will assist the jury to understand the evidence and resolve a factual dispute.  Defendant has not shown that the probative value of that testimony is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, or undue delay.  The Court therefore grants in part and denies in part Defendant's request to exclude the expert testimony of Dr. Tiffert.

### B.     Evidence and Argument About the PRC

Defendant also requests that the Court exclude all evidence and argument, not just Dr. Tiffert's testimony, about "the Chinese government or its goals, the [CPC], talent plans, and intellectual property theft" under Rules 401 and 403.[58]  Although Defendant has not identified any other specific evidence that he seeks to exclude, based on the arguments presented, the Court concludes that its analysis of the admissibility of Dr. Tiffert's proposed expert testimony on these topics under Rules 401, 402, and 403 applies to other evidence or argument the Government might present at trial on the same topics, and the Court incorporates it here by reference.  However, the Court reiterates that it may revisit its pre-trial rulings during the trial. The Rule 403 balance may shift when the evidence develops, and as explained below, Defendant may open the door to some of this evidence at trial.

---

[58] Doc. 157 at 2.

### C.   Evidence and Argument That a Purpose of Defendant's Scheme Was to Benefit the PRC

Defendant asks the Court to exclude evidence and argument that a purpose of his alleged scheme was to benefit the PRC.  Defendant makes this request because in paragraph 33 of the SSI the Government alleges: "The purposes of the scheme were for TAO *to benefit the PRC by participating in a 'talent plan*,*'* to obtain [U.S. government] grant funds and his KU salary under false pretenses, and to conceal the scheme."[59]  Defendant contends that whether he sought to benefit the PRC is irrelevant under Rule 401 because seeking to benefit a foreign government is not an element the Government needs to prove to establish a violation of 18 U.S.C. § 1343, the wire fraud statute under which is charged.  He also argues that any such evidence or argument is highly prejudicial and could confuse the jury into erroneously believing that it is, and thus should be excluded under Rule 403.

The Court agrees.  As Defendant observes, seeking to benefit the PRC is not an actionable objective under the wire fraud statute.  Acting with the intent to benefit the PRC is an element the Government would need to prove to obtain a conviction for economic espionage under 18 U.S.C. § 1831(a), but again, Defendant is not charged with economic espionage.  Thus, whether a purpose of his scheme was to benefit the PRC is irrelevant.  This evidence or argument also presents a danger of unfair prejudice, confusing the issues, and misleading the jury that substantially outweighs any probative value it may have.  Accordingly, the Court grants this portion of Defendant's second motion in limine.

---

[59] Doc. 75 ¶ 33 (emphasis added).  The Court also notes that at the motion to dismiss stage, the Government again asserted that a purpose of Defendant's scheme was "to advance the interests of the PRC."  Doc. 88 at 2; *see also id.* at 4 ("Through his scheme, the defendant sought to enrich himself while advancing the strategic interests of the Chinese government.").

### III.     Defendant's Motion in Limine #4

Defendant moves in limine to exclude the expert testimony of five Government witnesses: Federal Bureau of Investigation ("FBI") forensic accountants Brian Koechner and Morgan Becker; FBI computer forensic examiners Joshua Clevenger and Steven Schmidt; and Dr. Rebecca Keiser, Chief of Research Security Strategy and Policy and head of the Office of International Science and Engineering at the NSF.  For all five witnesses, Defendant contends that the Government's expert disclosures are insufficient under Fed. R. Crim. P. 16(a)(1)(G) because the Government did not summarize their opinions or the bases for those opinions.  He asserts these witnesses should be excluded as a sanction for the Government's "deliberate disregard" of Rule 16(a)(1)(G)'s disclosure requirements.[60]  Separately, Defendant contends that Dr. Keiser's expert testimony should be excluded under Fed. R. Evid. 702 and 403.

The Government responds that it disclosed these five witnesses as expert witnesses pursuant to Rule 16(a)(1)(G) "out of an abundance of caution," but it intends to elicit from them "non-expert fact testimony or lay opinion testimony," not expert testimony.[61]  Even if the Court concludes that any or all of these witnesses will provide expert testimony, the Government contends, its expert disclosures comply with Rule 16(a)(1)(G).  Should the Court disagree, the Government requests the opportunity to correct any deficiencies before trial, arguing that exclusion of the witnesses' testimony would be an extraordinary, unwarranted sanction under the circumstances.

---

[60] Doc. 154 at 3.

[61] Doc. 163 at 2.

## A.      Standards

Fed. R. Evid. 701 allows a lay witness to offer opinions that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702," which governs expert testimony.  Unlike expert testimony, lay opinion testimony is not based on specialized knowledge and is "the product of reasoning processes familiar to the average person in everyday life."[62]  The Federal Rules of Evidence distinguish between lay and expert testimony to ensure that testimony "based on scientific, technical, or other specialized knowledge" is "scrutinized under the rules regulating expert opinion" and that "a party will not evade the expert witness disclosure requirements set forth in . . . Fed. R. Crim. P. 16."[63]

Fed. R. Crim. P. 16(a)(1)(G) provides that, "[a]t the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial."  The summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."[64]  As the rule's Advisory Committee Notes explain, Rule 16(a)(1)(G) is "intended to minimize surprise that often results from unexpected expert

---

[62] *United States v. Wilson*, 605 F.3d 985, 1025 (D.C. Cir. 2010) (quoting *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005)); *see United States v. Bishop*, 926 F.3d 621, 627 (10th Cir. 2019) ("[T]he distinction between lay and expert testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendment)), *cert. denied*, 141 S. Ct. 115 (2020).

[63] Fed. R. Evid. 701 advisory committee's note to 2000 amendment.

[64] Fed. R. Crim. P. 16(a)(1)(G).

testimony . . . and to provide the opponent with a fair opportunity to test the merit of the expert's

testimony through focused cross-examination."[65]

**B.      Discussion**

Below, the Court addresses whether the Government has fully complied with its

disclosure obligations under Rule 16(a)(1)(G) and, if not, whether exclusion of the experts'

testimony is the appropriate remedy.

**1.      Rule 16 Violations**

**a.      FBI Computer Forensics Examiners**

The Government intends to call Clevenger and Schmidt, both computer forensic

examiners with the FBI, as witnesses at trial to testify about their examination of electronic

devices seized from Defendant's residence and laboratory at KU.  In a September 1, 2021

Notice, the Government notified Defendant of its intent to introduce their testimony and

explained:

> In [their] capacit[ies] as . . . examiner[s] with the FBI, [Clevenger
> and Schmidt] examined numerous electronic devices and/or
> forensic images of electronic devices associated with Defendant,
> including, inter alia, the external media and hard drives that were
> located at KU.  The government believes that [their] testimony
> may involve [their] technical and specialized knowledge regarding
> the examination of computers and electronic evidence under
> Federal Rule of Evidence 702, including but not limited to,
> computer file metadata, hard drive partitioning, data retrieval,
> extraction and preservation and the use of computer forensic tools
> and procedures.  This testimony will be premised upon [their]
> knowledge, skill, education, training, and experience as a digital
> forensic examiner[s] and upon [their] firsthand review of the
> evidence in this case.[66]

---

[65] Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment.

[66] Doc. 154-1 at 3–4.

The Government also attached copies of the witnesses' curricula vitae and represents that it "produced images of the electronic devices at issue, the Forensic Toolkit (or 'FTK') reports related to the specific documents and other items found on the devices, and copies of the particular documents and items."[67]

As the Government recognizes, several courts have held that testimony about the process of forensic data extraction constitutes expert testimony because it is based on specialized knowledge or skill.[68]  This Court agrees with those courts and concludes that the testimony of Clevenger and Schmidt, which the Government's September 1, 2021 Notice suggests will concern technical aspects of forensic examination, requires specialized knowledge within the ambit of Rule 702.  Thus, their testimony constitutes expert testimony, and the Government was required to provide, at Defendant's request, written summaries of their testimony pursuant to Rule 16(a)(1)(G).

The Government's September 1, 2021 Notice is inadequate under Rule 16(a)(1)(G). While the Notice sufficiently describes the bases for Clevenger's and Schmidt's testimony, it merely lists the topics they intend to cover at trial.[69]  Rule 16 "requires a summary of the

---

[67] Doc. 163 at 7.

[68] *See, e.g.*, *United States v. Wehrle*, 985 F.3d 549, 554 (7th Cir. 2021) ("The forensic-examination process here implicated Rule 702 because [the witness] testified to technical concepts beyond ordinary knowledge."); *United States v. Yu*, 411 F. App'x 559, 566–67 (4th Cir. 2010) (holding that the process of forensic data extraction requires specialized knowledge or skill beyond that possessed by jurors, so "even if [the forensic computer expert] had confined her testimony to her extraction and translation of the data at issue, she would not have offered lay opinion"); *United States v. Ganier*, 468 F.3d 920, 926 (6th Cir. 2006) (holding that testimony that "require[s] [the witness] to apply knowledge and familiarity with computers and the particular forensic software well beyond that of the average layperson" constitutes expert testimony); *United States v. Channon*, No. 13-CR-966 JCH, 2015 WL 13666980, at *7 (D.N.M. Jan. 8, 2015) (concluding that testimony about creating duplicate images and data recovery was expert testimony).  *But see United States v. Berry*, 318 F. App'x 569, 570 (9th Cir. 2009) (holding no abuse of discretion in treating a witness's testimony as lay testimony where the witness "simply testified to what he found on the hard drive of [a] computer, without expressing an opinion that required specialized knowledge or offering insight beyond common understanding").

[69] *See United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001) (holding a Rule 16 notice was insufficient because it "provided a list of the general subject matters to be covered, but did not identify what opinion the expert would offer on those subjects"); *United States v. Galloway*, No. 1:17-CR-01235-WJ, 2018 WL 2303106, at *3 (D.N.M. May 21, 2018) ("While the [Rule 16] Notice informs what subject areas will be covered by [the witness's]

---

expected testimony, not a list of topics."[70]  Because the Government's Notice fails to describe Clevenger's and Schmidt's opinions on the listed topics, the Government has not fully complied with its expert disclosure obligations with respect to these two expert witnesses.

### b.    FBI Forensic Accountants

The Government asserts that neither Koechner's nor Becker's anticipated testimony implicates Rule 702, and thus Rule 16(a)(1)(G) does not apply.  The Government contends that while Koechner and Becker, both forensic accountants with the FBI, have the necessary expertise in forensic accounting to qualify as experts, it will not elicit expert testimony from either witness at trial.  Instead, the Government explains, these witnesses will "provide summary testimony concerning numerous bank accounts and will provide summary charts related to their testimony," as permitted by Fed. R. Evid. 1006, which allows the use of "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."[71]

As long as Koechner and Becker limit their testimony to summarizing bank records and other financial records, their testimony will not implicate Rule 702.[72]  But if they express

---

testimony, there is no way to infer from the Notice exactly what [the witness's] opinion will be, and [the] [d]efendants are entitled to such information.").

[70] *Duvall*, 272 F.3d at 828.

[71] Doc. 163 at 2–3.

[72] *See United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2002) (holding that the testimony of an FBI financial analyst who merely "summarized business records and client lists and presented them in condensed form," expressing "neither a lay nor an expert opinion," was properly admitted as lay testimony); *United States v. Chalker*, 966 F.3d 1177, 1192 (11th Cir. 2020) (finding no error in permitting an FBI forensic accountant to testify as a lay witness because "[s]he limited her testimony to providing the jury with a summary of [the defendant's] bank and wage records" and did not "opine about these records"); *United States v. Hamaker*, 455 F.3d 1316, 1331–32 (11th Cir. 2006) (holding that the testimony of an FBI financial analyst who "simply reviewed and summarized over seven thousand financial documents" was permissible lay testimony under Rule 701, as he "simply added and subtracted numbers from a long catalogue of . . . records, and then compared those numbers in a straightforward fashion"); *United States v. Milkiewicz*, 470 F.3d 390, 401 (1st Cir. 2006) (noting that creating charts that summarized voluminous financial records "took patience but not expertise").

opinions or make connections for the jury based on specialized knowledge, their testimony will

cross into Rule 702 territory.  To the extent these witnesses testify as experts, the Government

has not fully complied with its disclosure obligations under Rule 16(a)(1)(G).

In relevant part, the Government's September 1, 2021 Notice states:

> The government expects to elicit the testimony of [Koechner and
> Becker], . . . forensic accountant[s] with the FBI.  In [their]
> capacit[ies] as . . . accountant[s] with the FBI, [Koechner and
> Becker] analyzed financial records associated with Defendant and
> his wife.  The government believes that [their] testimony may
> involve [their] technical and specialized knowledge regarding the
> examination and analysis of financial records under Federal Rule
> of Evidence 702, including, but not limited to, asset tracing,
> structured transactions, cash flow analysis, financial techniques
> used to obscure the origin of funds, and patterns of use.  This
> testimony will be premised upon [the witnesses'] knowledge, skill,
> education, training, and experience as . . . forensic accountant[s]
> and upon [their] firsthand review of the evidence in this case.
> [Their] curricul[a] vitae [are] attached . . . .[73]

This Notice describes the bases for Koechner's and Becker's testimony and identifies a list of

general topics on which they are expected to testify at trial, but it fails to describe their opinions

on those topics.  Perhaps this is because, as stressed in the response brief, the Government

anticipates that Koechner and Becker will serve exclusively as summary witnesses.  But the

topics identified in the Government's Notice suggest that at least some of their testimony may

cross the line from lay testimony to expert testimony.  To the extent these witnesses will express

opinions based on specialized knowledge, the Government has failed to fully comply with Rule

16(a)(1)(G) because it has not provided Defendant with a summary that describes those opinions.

---

[73] Doc. 154-1 at 3.

c.      Dr. Rebecca Keiser

In a Notice dated September 17, 2021, the Government notified Defendant of its intent to

introduce the testimony of Dr. Keiser, NSF's Chief of Research Security Strategy and Policy and

head of its Office of International Science and Engineering, and stated that it anticipates she will

offer testimony on the following topics:

> the NSF grant submission, review, and approval processes; the
> purpose, nature, and history of NSF's conflicts of interest policy;
> the purpose, nature, and history of NSF's disclosure requirements;
> in particular, NSF's biosketch, current and pending, and
> collaborators and other affiliations sections; the purpose and nature
> of principled international scientific research collaboration; and the
> threat of foreign government interference to NSF research security
> and the U.S. science and engineering enterprise; in particular,
> certain provisions contained within some foreign talent recruitment
> program agreements.[74]

Defendant asserts that the Court should exclude Dr. Keiser's expert testimony because

the Government's September 17, 2021 Notice fails to describe her opinions and the bases for

those opinions, in violation of Rule 16(a)(1)(G).  Defendant also presents two additional reasons

why he thinks the Court should exclude Dr. Keiser's expert testimony.  First, Defendant

contends that she is not qualified to opine on the threat of foreign government interference and

talent recruitment programs, so the Court should exclude her expert testimony on those topics or,

at a minimum, hold a *Daubert* hearing.  Second, Defendant argues that her expert testimony on

any topic would unfairly prejudice him because she "has an extraordinary bias in this case," as

the NSF is an alleged victim and her position involves "stamping out research security violations

like the kind [he] is accused of."[75]  Defendant also suggests that the jury may become confused

about which testimony she offers as lay versus expert testimony, and it may give her lay

---

[74] Doc. 154-2 at 2–3.

[75] *Id.* at 5.

testimony undue weight as a result.  In short, Defendant contends, the Court should not allow "a fact witness, employed by a victim agency, and whose career stands to benefit from a conviction, to be presented to the jury as an expert on matters embraced by the case."[76]

In response, the Government agrees with Defendant that Dr. Keiser is a fact witness and states that it will not present her to the jury as an expert.  The Government explains that it submitted its September 17, 2021 Notice out of an abundance of caution, but her testimony does not fall within the ambit of Rule 702.  According to the Government, Dr. Keiser will not express opinions based on any specialized knowledge at trial, and "to the extent any of [her] opinions will be offered, they are admissible under Rule 701, as they are rationally based upon her perception and will be helpful to the jury."[77]  The Government also notes that any alleged bias is an appropriate subject for cross-examination, but it is not a basis for excluding her testimony.

Because the Government plainly states in its response brief that Dr. Keiser will not offer any expert testimony, and the topics identified in its September 17, 2021 Notice appear to conform with that expectation, the Court need not address whether the Notice complies with Rule 16(a)(1)(G), whether she is sufficiently qualified under Rule 702, or whether her expert testimony should otherwise be excluded under Rule 403.  The Court denies Defendant's motion with respect to Dr. Keiser, but the testimony she offers at trial must be limited to lay testimony pursuant to Rule 701.

---

[76] *Id.* at 6.

[77] Doc. 163 at 4.

## 2.    Remedy

Having concluded that the Government's Rule 16(a)(1)(G) disclosures of the two FBI computer forensic examiners and the two FBI forensic accountants are inadequate, the Court must still determine whether excluding their expert testimony is the appropriate remedy.  Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" Rule 16.[78]  The court may "order that party to permit the discovery or inspection," "grant a continuance," "prohibit that party from introducing the undisclosed evidence," or "enter any other order that is just under the circumstances."[79]  "In selecting a proper sanction, a court should typically consider (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to [the] defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance."[80]  "Frequently it will be found that the party who requested disclosure has not been prejudiced and that no sanction is needed."[81]  But if the court imposes a sanction, "it should be the 'least severe sanction that will accomplish . . . prompt and full compliance with the court's discovery orders."[82]  Exclusion of expert testimony is an extreme sanction that "is almost never imposed 'in the absence of a constitutional violation or statutory authority for such exclusion.'"[83]

Here, the Court concludes that the appropriate remedy is to direct supplementation, not to exclude testimony.  There is no evidence that the inadequacies in the Government's expert

---

[78] *United States v. Wicker*, 848 F.2d 1059, 1060 (10th Cir. 1988).

[79] Fed. R. Crim. P. 16(d)(2).

[80] *United States v. Charley*, 189 F.3d 1251, 1261 (10th Cir. 1999) (quoting *United States v. Gonzales*, 164 F.3d 1285, 1292 (10th Cir. 1999)).

[81] *Id.* (quoting 2 Charles Alan Wright, Federal Practice and Procedure § 260, at 121–22 (1982)).

[82] *Wicker*, 848 F.2d at 1060–61 (quoting *United States v. Fernandez*, 780 F.2d 1573, 1576 (11th Cir. 1986)).

[83] *Charley*, 189 F.3d at 1262 (quoting *Gonzales*, 164 F.3d at 1292).

disclosures were the result of bad faith, and exclusion is unnecessary to remedy any prejudice. The Government's September 1, 2021 Notice outlines the topics each witness's testimony will cover at trial, and each witness's curriculum vitae is attached to the Notice, setting forth their qualifications.[84]  Moreover, as to the testimony of the FBI computer forensic examiners, the Government produced images of the devices at issue, the FTK reports, and copies of the relevant documents and items.  As to the FBI financial analysts' testimony, the Government provided Defendant with the relevant bank records and other financial records.  Although at the time the Government filed its response brief it had not yet provided Defendant with summary charts prepared by Becker, it had given him a financial summary prepared by a former FBI forensic accountant and explained that it would provide Becker's summary charts when they were complete.  Defendant thus knows "well in advance of trial who [is] going to testify and the nature and purpose of the expected testimony."[85]  The trial has also been continued to March 2022.  The appropriate remedy under these circumstances is to order supplementation. Accordingly, the Court directs the Government to supplement its Rule 16 disclosures to identify the specific opinions Clevenger, Schmidt, Koechner, and Becker will offer at trial within seven days of this Order.  This motion is denied.

## IV.    Government's Omnibus Motion in Limine

In its omnibus motion, the Government states that it anticipates Defendant may seek to "push a false narrative about his prosecution" and "put others on trial" in an attempt to confuse

---

[84] *United States v. McCluskey*, 954 F. Supp. 2d 1224, 1231 (D.N.M. 2013) ("Provision of the expert's curriculum vitae satisfies the requirement of Rule 16 to include a description of the witness's qualifications." (citing *United States v. Mehta*, 236 F. Supp. 2d 150, 155 (D. Mass. 2002))).

[85] *Charley*, 189 F.3d at 1262 ("We note that in some ways, defense counsel may in fact have been better off with the actual records than with Rule 16 summaries.").

the issues and invite jury nullification.[86]  Jury nullification occurs when a jury acquits a

defendant even though the government proved guilt beyond a reasonable doubt.[87]  While jurors

have the power to nullify, "there is no right to jury nullification."[88]  To address its concerns

ahead of trial, the Government brings five consolidated motions in limine, all related to what it

views as improper defenses that Defendant might present at trial.  The Court addresses these

motions below.

### A.       Motions in Limine Nos. 1 and 2

The Government's first two motions in limine ask the Court to prohibit Defendant from

presenting the following defenses or arguments during any phase of the trial: (1) that "Defendant

is the victim of an unjust government dragnet" under the China Initiative; and (2) that "the

government sought to catch a spy and settled on fraud charges."[89]  In seeking to prevent

Defendant from advancing these defenses or arguments, the Government also makes a broader

request: that the Court preclude him from making any reference at trial to the China Initiative

and any uncharged crimes, including economic espionage and theft of trade secrets.  The

Government argues that the China Initiative has no bearing on Defendant's guilt or innocence,

and any attempt to focus on it at trial would only serve to confuse the issues and waste time.  The

Government also contends that any suggestion that the jury should find him not guilty because

"[he] was swept up in the China Initiative dragnet even though he is not alleged to have engaged

in any of the activities the initiative was meant to punish and deter,"[90] as he claimed in his

---

[86] Doc. 156 at 1.

[87] *See United States v. Edwards*, 266 F. Supp. 3d 1290, 1306 (D.N.M. 2017).

[88] *Crease v. McKune*, 189 F.3d 1188, 1194 (10th Cir. 1999).

[89] Doc. 156 at 2.

[90] *Id.* at 5 (quoting Doc. 82 at 1).

motion to dismiss, "smacks of jury nullification."[91]  And so does any suggestion that the Government "settled on fraud charges because it could not prove" that he committed economic espionage or trade secret theft.[92]

Defendant responds that he does not intend to argue that he should be acquitted because he is a victim of the China Initiative and was wrongly suspected of being a spy.  But he contends that preventing him from inquiring into the Government's investigation of this case as a counter-espionage case pursuant to the China Initiative would impinge on his right under the Confrontation Clause of the Sixth Amendment to cross-examine the FBI agents who investigated him about their "biases, motivations, credibility, and the quality of their investigation."[93] Defendant asserts that without the ability to cross-examine the investigating FBI agents about "how the China Initiative impacted their investigation" and dispel "the false impression that the FBI agents conducted an exemplary investigation," the jury cannot properly weigh their credibility and the reliability of their evidence.[94]

Defendant is entitled to cross-examine witnesses on their possible biases and motives as a means of attacking their credibility.[95]  But as explained in *United States v. Yagman*,[96] a case Defendant relies on, he may not use his ability to cross-examine witnesses to "introduce

---

[91] *Id.*

[92] *Id.*

[93] Doc. 166 at 4.

[94] *Id.* at 10.  Defendant also argues that "[t]he government's plan to try to prove that [he] was covertly seeking to benefit China, and that China aims to steal intellectual property from the West through talent plans, means that it is not just relevant, but highly exculpatory, that the government searched for evidence that [he] transferred intellectual property to China, or that he was an agent of the Chinese government, and found nothing." *Id.* at 11.  Because the Court has precluded the Government from presenting evidence or argument on these subjects, the Court need not address this argument.

[95] *See* Fed. R. Evid. 607; *United States v. Abel*, 469 U.S. 45, 52 (1984); *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974).

[96] No. CR 06-227(A)-SVW, 2007 WL 9724391 (C.D. Cal. May 16, 2007).

impermissible evidence of prosecutorial motive" or "belabor the details of the investigation's

chronological development," which have no bearing on his innocence or guilt.[97]  Moreover, the

Tenth Circuit has held that "the facts surrounding the government's investigation may become

relevant" at trial, but only if the "bias or quality of the investigation" bears on "the reliability of

particular evidence."[98]  In other words, Defendant must show a connection between the quality

of the investigation and the reliability of specific evidence produced by the investigation.[99]

As an initial matter, the Court grants the Government's request to preclude Defendant

from arguing or suggesting that he should be acquitted because he is the victim of the China

Initiative or because he was wrongly suspected of being a spy.  The Tenth Circuit instructs that

"neither the court nor counsel should encourage jurors to violate their oath" by exercising the

power of nullification,[100] and Defendant represents that he does not intend to make these

arguments at trial.

The Court also grants the Government's request to preclude any reference to the China

Initiative.  According to the U.S. Department of Justice, the China Initiative "reflects [its]

strategic priority of countering Chinese national security threats" by "identifying and prosecuting

---

[97] *Id.* at *5 (first quoting *United States v. Stewart*, No. 03 CR.717(MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004); and then quoting *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004)); *see also United States v. Abboud*, 438 F.3d 554, 580 (6th Cir. 2006).

[98] *United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998); *see also United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000) ("Details of the investigatory process potentially affect[] [the investigating agent]'s credibility and, perhaps more importantly, the weight to be given to evidence produced by his investigation."); *cf. United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994) (upholding the district court's refusal to allow a defendant to show that the government's investigation was "sloppy" because "the jury would not be called upon to determine whether the government's investigation had been good or bad").

[99] *See McVeigh*, 153 F.3d at 1192.

[100] *United States v. Gonzalez*, 596 F.3d 1228, 1237 (10th Cir. 2010) (quoting *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983)).

those engaged in trade secret theft, hacking, and economic espionage."[101]  The Court agrees with

the Government that "[t]he Department of Justice's strategic priorities and Defendant's views on

that topic are not proper issues for the jury to consider."[102]  This trial is about Defendant's guilt

or innocence, and it should not involve a policy discussion on the China Initiative.  Moreover,

Defendant fails to show how he could question the investigating FBI agents about the China

Initiative without attacking its propriety and suggesting to the jury that he was the target of

selective prosecution.  "[T]he defense of selective prosecution is a matter that is independent of a

defendant's guilt or innocence, so it is not a matter for the jury."[103]

Defendant's argument that the jury cannot properly weigh the investigating FBI agents'

credibility or the reliability of their evidence if he does not cross-examine them about how the

China Initiative impacted the investigation is unavailing.  First, the Department of Justice's

China Initiative is of questionable relevance to any individual FBI agent's bias or motive to lie in

this case; any connection between the two is speculative and tenuous at best.  Second, precluding

Defendant from referencing the China Initiative does not prevent him from probing the quality of

the investigation in order to attack the reliability of evidence obtained from the investigation.

While the China Initiative may be relevant to the Government's motives for investigating and

prosecuting Defendant, those motives have no bearing on the issues properly before the jury.[104]

---

[101] *Information About the Department of Justice's China Initiative and a Compilation of China-Related Prosecutions Since 2018*, U.S. Dep't of Justice, https://www.justice.gov/nsd/information-about-department-justice-s-china-initiative-and-compilation-china-related (last updated Nov. 19, 2021).

[102] Doc. 156 at 5.

[103] *United States v. Abboud*, 438 F.3d 554, 579 (6th Cir. 2006).

[104] *See United States v. Orrock*, No. 16-00111, 2019 WL 1643643, at *2 (D. Nev. Apr. 16, 2019) ("[I]t is well established that inquiries into why the government chose to investigate and ultimately charge a defendant are irrelevant and thus inadmissible at trial. (footnotes omitted)); *United States v. Johnson*, No. 08-466, 2011 WL 809194, at *3 (N.D. Ill. Mar. 2, 2011) ("Argument or evidence relating to the Government's motivation [for investigating and prosecuting a case] are not relevant to the to the jury's determination of a defendant's guilt or innocence."); *United States v. Stewart*, No. 03-717, 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) ("[A]rguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the

33

Allowing Defendant to question FBI agents about the China Initiative would also open the door to evidence the Court has excluded, at Defendant's request, about the PRC's efforts to steal U.S. technology and intellectual property, including through talent programs like the one in which he allegedly participated. On balance, the Court finds that any probative value of cross-examination about the China Initiative is substantially outweighed by the risk of unfair prejudice, confusing the issues, misleading the jury, and wasting time. Accordingly, this portion of the Government's omnibus motion is granted. Defendant may not reference the Department of Justice's China Initiative at trial.

However, the Court defers ruling on whether Defendant may reference any uncharged crimes until trial, when it can assess the relevance and propriety of cross-examination on this subject in light of the relevant witness's testimony and other evidence presented. Defendant points out that the FBI initially investigated him for economic espionage and theft of trade secrets. He may be permitted cross-examine the FBI agents about the espionage investigation if he establishes the requisite connection between the quality of that investigation and the reliability of specific evidence introduced at trial. But the Court cautions that Defendant may not cross-examine any FBI agent on the Government's decision to investigate this case as a counter-espionage case to suggest to the jury that he was the subject of selective prosecution or outrageous government conduct. These are legal issues for the Court to resolve, not the jury, and

---

defendant] . . . are essentially claims of selective prosecution."); *United States v. Yagman*, No. 06-227(A)-SVW, 2007 WL 9724391, at *6 (C.D. Cal. May 16, 2007) ("[P]ermitting Defendant to attack all aspects and motivation behind the investigation would violate the clear prohibition against arguing or introducing evidence of vindictive prosecution at trial."); *see also United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (stating that the defendants' questioning of the government's motives for investigating and prosecuting them "turn[ed] the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial").

presenting them to the jury would cause confusion, prejudice, and undue delay.[105]  The Court

also cautions that if Defendant questions FBI agents about investigating him for economic

espionage, he may open the door to at least some of the evidence the Court has excluded about

the PRC's efforts to steal U.S. technology and intellectual property through talent recruitment

programs.  Ruling on this portion of the Government's motion is deferred.

### B.      Motion in Limine No. 3

The Government moves in limine to preclude Defendant from raising a selective

prosecution claim and from "backdoor[ing] such a claim" by arguing that the Government's

decision to bring charges against him was motivated by a discriminatory purpose or had a

discriminatory effect.[106]  As explained above, "a 'defense' of selective prosecution is a matter for

the court, not the jury," as it is a "matter that is independent of a defendant's guilt or

innocence."[107]  Defendant states that he does not intend to pursue a selective prosecution claim

or defense at trial, but he asserts his constitutional right to impeach a witness's credibility by

exposing bias on cross-examination.  This motion is granted.  Defendant may cross-examine

witnesses to show bias, but he may not make an explicit or implicit selective prosecution

argument at trial.

### C.      Motion in Limine No. 4

The Government moves in limine to bar Defendant from blaming "Student #1," whose

reports about him led the FBI to launch its investigation, for the wire fraud and false statements

charges brought against him, as such a defense "would be improper and a blatant attempt to

---

[105]  *See United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983); *United States v. Nunez-Rios*, 622 F.2d 1093, 1098 (2d Cir. 1980).

[106]  Doc. 156 at 7.

[107]  *Abboud*, 438 F.3d at 579; *see also United States v. Bryant*, 5 F.3d 474, 476 (10th Cir. 1993).

garner sympathy and invite jury nullification."[108]  The Government also asserts that the Court should reject any attempt by Defendant to put her on trial for uncharged conduct or to claim, without evidence, that she framed him.

Defendant responds that he does not intend to blame "Student #1," whom he refers to as "Government Informant," for the alleged wire fraud and false statements, and so the Government's motion is granted to the extent it seeks to preclude Defendant from blaming her for the charges brought against him.  However, Defendant reserves the right to introduce evidence that Student #1 committed the charged offenses should he "ultimately discover" such evidence, that she attempted to frame him and falsified evidence against him, and that FBI agents relied on her during the investigation to the extent it undermines their credibility.  While the Court notes that this evidence cannot be introduced to invoke sympathy or invite jury nullification, the Court finds it premature to rule whether any of it is admissible.  Accordingly, to the extent the Government seeks to preclude such evidence, this portion of its motion is denied without prejudice to raising contemporaneous objections at trial.

### D.      Motion in Limine No. 5

The Government moves in limine to preclude Defendant from presenting evidence or argument referencing the potential sentence or other consequences he faces if convicted.  "[I]t is firmly established that when the jury has no sentencing function, as [i]s the case here, it 'should reach its verdict without regard to what sentence might be imposed.'"[109]  Relatedly, the Government also asks the Court to preclude Defendant from arguing or suggesting that the jury

---

[108] Doc. 156 at 8.

[109] *United States v. Courtney*, 816 F.3d 681, 686 (10th Cir. 2016) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)).

should find him not guilty because he has already suffered other consequences as a result of this case.  Defendant does not oppose the motion.  The Court therefore grants this motion in limine.

## V.        Conclusion

To summarize, the Court rules as follows on the parties' motions in limine:

1.        Defendant's Motion in Limine #2 (Doc. 157) is **granted in part and denied in part**.

- As to Dr. Tiffert's expert testimony, the motion is granted to the extent Defendant seeks to preclude him from offering testimony on the PRC government's national development goals and industrial policies, the role Chinese talent recruitment programs play in advancing those goals, PRC plans and initiatives not at issue in this case, what sets the PRC's talent recruitment programs apart from those of other countries, the prestige and goals of the Changjiang Scholars Program, and transparency and censorship in the PRC. The motion is denied to the extent Defendant seeks to preclude Dr. Tiffert from offering testimony on the Changjiang Scholars Program's administration and operations, the dual governance structure under which Fuzhou University operates, the requirements for and benefits of participating in the Changjiang Scholars Program, the expectations for Changjiang Distinguished Professors, and the use of seals or stamps in the PRC to finalize formal documents.

- As to other evidence and argument about "the Chinese government or its goals, the CPC, talent plans, and intellectual property thefts," the Court's analysis of the admissibility of Dr. Tiffert's testimony under Rules 401, 402, and 403 applies.

- The Government may not present evidence or argument that a purpose of Defendant's alleged fraud scheme was to benefit the PRC.

2.      Defendant's Motion in Limine #4 (Doc. 154) is **denied**.  The Government shall supplement its Fed. R. Crim. P. 16(a)(1)(G) expert witness disclosures to identify the specific opinions Clevenger, Schmidt, Koechner, and Becker will offer at trial **within seven days of this Order**.

3.      The Government's Omnibus Motion in Limine (Doc. 156) is **granted in part, denied in part, and deferred in part**.

- The Government's Motion in Limine No. 1 is granted.  Defendant may not argue or suggest that he should be acquitted because he was "the victim of an unjust government dragnet," and he may not reference the China Initiative at trial.

- The Government's Motion in Limine No. 2 is granted in part and deferred in part.  The motion is granted insofar as it seeks to preclude Defendant from arguing or suggesting that he should be acquitted because he was wrongly suspected of being a spy.  But the Court defers ruling on whether Defendant may reference any uncharged crimes.  Defendant indicates that he was initially investigated for economic espionage and theft of trade secrets. Although he is not charged with either crime, he may be permitted to cross-examine FBI agents about the espionage investigation to attack the reliability of specific evidence introduced at trial.  Defendant may not, however, cross-examine any FBI agent about the espionage investigation to suggest that he was the victim of selective prosecution or outrageous government conduct.

- The Government's Motion in Limine No. 3 is granted.  While Defendant may cross-examine witnesses to show bias, he may not make an explicit or implicit selective prosecution argument at trial.

- The Government's Motion in Limine No. 4 is granted to the extent it seeks to preclude Defendant from blaming "Student #1" for the charges brought against him as a defense.  To the extent the motion also seeks to preclude Defendant from introducing other evidence about Student #1, the motion is denied without prejudice to raising contemporaneous objections at trial.

**IT IS THEREFORE ORDERED BY THE COURT** Defendant Feng Tao's Motion in Limine #2 (Doc. 157) is **granted in part and denied in part**; Defendant's Motion in Limine #4 (Doc. 154) is **denied**; and the Government's Omnibus Motion in Limine (Doc. 156) is **granted in part, denied in part, and deferred in part**.

**IT IS FURTHER ORDERED BY THE COURT** that the Government shall supplement its Fed. R. Crim. P. 16(a)(1)(G) disclosures to identify the specific opinions Clevenger, Schmidt, Koechner, and Becker will offer at trial **within seven days of this Order**.

**IT IS SO ORDERED.**

Dated: January 27, 2022

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE