**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 19-20052-JAR-JPO |
| | ) | |
| FENG TAO | ) | |
| a/k/a "Franklin Tao," | ) | |
| | ) | |
| Defendant. | ) | |

**DR. FRANKLIN TAO'S MOTION TO COMPEL**
**THE GOVERNMENT'S PRODUCTION OF *BRADY* MATERIAL**

**INTRODUCTION**

Dr. Franklin Tao respectfully seeks an order directing the government to conduct a search at the Department of Energy (DOE) and the National Science Foundation (NSF) for specific *Brady* materials regarding agency grant proposal disclosure requirements and the lack of materiality of the types of information Dr. Tao is charged with concealing.

The government charged Dr. Tao with wire fraud and false statements for allegedly failing to disclose to DOE and NSF in grant proposals and progress reports that he participated in a talent plan in China (the Changjiang Scholar program) and had a second job collaborating with Fuzhou University in China. To convict Dr. Tao, the government must prove beyond a reasonable doubt, *inter alia*, that Dr. Tao was required to disclose this information to DOE and NSF, *and* that the information was material to DOE and NSF. Shockingly, the government did not interview a single DOE or NSF program officer or director—the individuals who review grant proposals and supervise the grant work—about whether their respective agencies required disclosure of foreign talent program participation or work before it indicted Dr. Tao in August 2019.

In the past six weeks, two high-level DOE officials (Acting Director Andrew Schwartz of the Office of Basic Energy Sciences, Materials Sciences and Engineering Division, and former Director of the Office of Science Chris Fall) in the offices that administered Dr. Tao's grants have acknowledged—in connection with a different China Initiative case—that DOE required disclosure only of other *federal* grants and that it did not expect to see disclosures regarding foreign affiliations, work, or talent plan participation. This new information led prosecutors to immediately dismiss all charges against Massachusetts Institute of Technology (MIT) professor Gang Chen, who was charged with defrauding DOE by concealing participation in a Chinese talent program and various paid and unpaid positions in China. DOE changed its disclosure requirements in October 2020 to, for the first time, require disclosure of information about foreign talent plan participation, but these requirements were not in place when Dr. Chen (and Dr. Tao) submitted proposals to DOE in 2017. NSF also broadened its disclosure requirements, in June 2020 and October 2021 to, for the first time, require disclosure of foreign positions and research resources. These requirements also were not in place when Dr. Tao made submissions to NSF. At the time of the revisions, the NSF official responsible for the policies (Jean Feldman) acknowledged that universities and researchers had not previously understood NSF's disclosure requirements and that there was a "disconnect" between the requirements and what was understood by grant applicants.

Based on this information, the defense requested that the government conduct a search for *Brady* material at DOE and NSF evincing that, before changing their disclosure requirements, DOE or NSF program officers did not believe that principal investigators were required to disclose talent program participation, foreign grant applications, or foreign affiliations or positions with a university; or that the disclosure requirements on this subject were not clear; or that the disclosure requirements could benefit from revisions or clarifications on this subject. If further evidence

exists that DOE and NSF did not require disclosure of this information, due process entitles Dr. Tao to obtain that evidence for his defense. The government is obligated to identify this evidence, because DOE and NSF have been closely aligned with, and served as members of, the prosecution team. Yet the government has refused to conduct a *Brady* search, instead choosing to bury its head in the sand rather than uncover exculpatory evidence that could jeopardize its case.

The Court should vindicate Dr. Tao's constitutional right to due process by directing the government to conduct a reasonable search for the requested *Brady* materials and ordering the government to promptly produce them. A fair trial requires the jury to see all evidence—favorable and unfavorable to the government—not evidence cherry-picked by the prosecution from its sister agencies to which only the prosecution has access before trial.

## BACKGROUND

### A. The government charged Dr. Tao with wire fraud and false statements for allegedly failing to disclose to DOE and NSF his talent plan participation and work at a university in China.

The government filed a Second Superseding Indictment on June 24, 2020 (the "SSI"). ECF No. 75. The SSI, as it is currently constituted,[1] alleges six counts of wire fraud, in violation of 18 U.S.C. § 1343, and two counts of false statements, in violation of 18 U.S.C. § 1001. Dr. Tao's trial is scheduled to begin March 21, 2022. ECF No. 211.

The SSI alleges that, in July 2017, Dr. Tao applied for the Changjiang Scholar Program, a "talent plan sponsored by the PRC Government" to "attract talented academics" who want to work and collaborate on science in China. SSI ¶ 21. Dr. Tao was allegedly named a Changjiang Scholar in December 2017. SSI ¶¶ 22–26. In March 2018, Dr. Tao allegedly negotiated a contract to take

---

[1] On February 14, 2022, the Court granted the government motion to dismiss one count of wire fraud and one count of false statements. ECF 222.

a second job at Fuzhou University in China, as a Changjiang Scholar Distinguished Professor, to begin in May 2018. SSI ¶ 29. While also employed by KU, Dr. Tao allegedly traveled to China periodically to help Fuzhou University apply for research funds and to help Fuzhou University recruit post-doctoral research students to research for him there. SSI ¶ 31. The SSI alleges that Dr. Tao defrauded NSF and DOE by failing to disclose these activities to those agencies in connection with federal grant applications.

The government's fraud and false statements charges are based on the premise that DOE and NSF required principal investigators to disclose foreign talent plan participation and affiliations in grant proposals and progress reports, and that this information was material to DOE and NSF grant-making decision. *See, e.g.*, SSI ¶ 36 (alleging that it was "part of the scheme to defraud" that Dr. Tao had "a duty to disclose," but "concealed from KU and USG agencies his affiliation with FZU, his participation in the PRC's Chang Jiang Scholar Program, and the associated financial and other benefits"); SSI ¶¶ 44, 46 (false statement counts alleging that Dr. Tao knowingly made material misrepresentations about his foreign affiliations to DOE and NSF).

### B. Recent statements of high-level DOE officials undermine the government's allegations regarding the disclosure requirements.

In a case with direct parallels to Dr. Tao's case, in January 2021 the government indicted renowned MIT professor Dr. Gang Chen for wire fraud, alleging that, like Dr. Tao, he defrauded DOE by failing to disclose in a 2017 DOE grant proposal and a 2019 DOE progress report his participation in a Chinese talent plan and various paid and unpaid positions in China. *See* Indictment ¶¶ 4–8, 1:21-cr-10018-PBS (D. Mass. Jan. 19, 2021), ECF No. 1 (hereafter, "Chen Indictment"). Like Dr. Tao, Dr. Chen submitted the grant proposal to the DOE Office of Science in response to DOE Funding Opportunity Announcement DE-FOA-0001664. Chen Indictment ¶

6. And just like Dr. Tao, the government alleged that Dr. Chen failed to disclose his talent plan participation and research work in China in his DOE submissions. Chen Indictment ¶¶ 6, 8.

After Dr. Chen's defense counsel advised the government that he intended to subpoena DOE for, *inter alia*, emails concerning DOE's evolving views on disclosure obligations in grant applications, the Chen prosecutors interviewed Andrew Schwartz, the Acting Director in the DOE Office of Science, Office of Basic Energy Sciences—the same office that administered Dr. Tao's grants. *See* Ex. A, DOE-OIG Memorandum of Investigative Activity (Jan. 4, 2022).[2] During the interview, Acting Director Schwartz reviewed the disclosure requirements in DOE Funding Opportunity Announcement DE-FOA-0001664—which applied to both Dr. Chen's and Dr. Tao's 2017 DOE grant proposals—and was asked whether DOE required disclosure of the seven positions Dr. Chen allegedly held in China in the 2017 grant proposal or 2019 progress report. Ex. A. Acting Director Schwartz stated that DOE *did not require* principal investigators to disclose *any* of the seven positions, and none was material to DOE. Ex. A. His specific response regarding each alleged nondisclosure is reproduced in the table below.

**DOE Disclosure Requirements Chart Per Acting Director Schwartz**

| No. | Allegedly Concealed Position or Work | Acting Director Schwartz's Response |
|---|---|---|
| 1. | Dr. Chen was a 4th Overseas Expert Consultant to the PRC government | Director Schwartz "did not think" Dr. Chen needed to disclose this in 2017, and if Dr. Chen had disclosed it, Director Schwartz "wasn't sure that if by 2017 these types of affiliations would have caused further inquiry," and "it would be unlikely to alter the decision of his office." |
| 2. | Dr. Chen served on the advisory board of Southern University of Science and Technology [a government-funded | Director Schwartz "said he assumed this was a Chinese university" and "he did not think it was necessary to report" this, and "many applicants don't include their advisory board positions." |

---

[2] The two individuals from DOE that the government indicated it plans to call as witnesses at trial, Viviane Schwartz and Raul Miranda, both work in the Office of Science, Office of Basic Energy Sciences.

|   | research university in China, per the indictment] | |
|---|---|---|
| 3. | Dr. Chen was a "review expert" for the National Natural Science Foundation of China | Director Schwartz was "asked if Dr. Chen was required to report he was a 'review expert' for the National Natural Science Foundation of China. Dr. Schwartz said 'definitely not.'" |
| 4. | Dr. Chen was an "overseas strategic scientist" for the Zhongguancun Development Group [a PRC state-owned enterprise funded by the Beijing Municipal Government, devoted to the PRC's scientific and technological development, per the indictment] | Director Schwartz "stated that under Appendix 1 (Biosketch) professional roles were supposed to be reported, but that he believed the form was limited to two pages while many professors have *curriculum vitae* of 20 or 30 pages." |
| 5. | Dr. Chen was an advisor to the Chinese Scholarship Council [an institution run by the PRC government's Ministry of Education, per the indictment] | Director Schwartz was "asked if Dr. Chen was required to report he was an advisor to the Chinese Scholarship Council. Dr. Schwartz said no." |
| 6. | Dr. Chen was a participant in the PRC's "Top Talent Wuhan City partner" and "3551 Optics Valley" Talent Plans | Director Schwartz was asked whether Dr. Chen was required to report his talent plan participation in his 2019 periodic report, and responded "he did not think so" and "did not think the 2019 period report required a Current and Pending Support page." |
| 7. | Dr. Chen was a consultant and advisor to the "Outstanding Talent Plan" to the "Chongqing No. 2 Foreign Language School," for which he was paid approximately $28,000. | Director Schwartz was "asked if Dr. Chen was required to report in his 2019 period report that he was a consultant and advisor to the 'Outstanding Talent Plan' to the "Chongqing No. 2 Foreign Language School,' for which he was paid $28,000," and "Schwartz stated he did not think so." |

As a result of this interview, the government promptly moved to dismiss all charges against Dr. Chen, stating to the Court that it had "obtained additional information bearing on the materiality of [Dr. Chen's] alleged omissions," and "in light of [the new] information, the government can no longer meet its burden of proof at trial." Dismissal, 1:21-cr-10018-PBS (D. Mass. Jan. 20, 2022), ECF No. 93. The Court dismissed the indictment the same day.[3]

---

[3] *See* Ellen Barry, *"In the End, You're Treated Like a Spy,' Says M.I.T. Scientist*, New York Times (Jan. 24, 2022), https://www.nytimes.com/2022/01/24/science/gang-chen-mit-china.html (reporting that the government dismissed the case against Dr. Chen after prosecutors "announced that they had received new information indicating that Dr. Chen had not been obliged to disclose [his] affiliations, undercutting the basis of the case").

Following the dismissal, on January 25, 2022, the former Director of the Office of Science—the top DOE official in charge of the office that administered Dr. Tao's DOE grant—publicly stated that DOE was only interested in disclosures of *other federal grants*, not other foreign grants or positions. Specifically, former Office of Science Director Chris Fall told the publication *Science* that "collaborations [in China], and the potential security concerns, weren't yet on DOE's radar" in 2017, and "[i]nstead, DOE's disclosure rules were focused on preventing 'duplicative grants, where [DOE was] being asked to fund something that another federal agency was already supporting.'" Ex. B, Jeffrey Mervis, *U.S. Prosecutors Said an MIT Scientist Hid his China Ties. Here's Why Their Case Collapsed*, Science (Jan. 25, 2022), https://www.science.org/content/article/u-s-prosecutors-said-mit-scientist-hid-his-china-ties-here-s-why-their-case-collapsed. Former Director Fall explained that DOE revised its disclosure requirements in October 2020 to newly require disclosure of "participation in foreign government-sponsored talent recruitment programs," and noted that "DOE made the revision after *considerable internal discussions*." Ex. B (emphasis added).

Despite the "considerable internal discussions" about what DOE required to be disclosed—which apparently did not include foreign talent plan participation and work, which Dr. Tao allegedly failed to disclose in order to defraud DOE—the government has never produced any of this information to the defense.

### C. NSF has acknowledged that its disclosure requirements were unclear and required revisions to encompass foreign affiliations and work.

Similar to DOE, NSF has recently expanded its disclosure requirements *twice* so that they now encompass foreign positions and work—the types of information they previously did *not* require to be disclosed, and which Dr. Tao is nevertheless charged with failing to disclose.

First, in June 2020, NSF revised the "Current and Pending Support" section of its Proposal & Award Policies and Procedures Guide (PAPPG) so that, for the first time, it required disclosure of all research-related resources (not just grants), even when received directly by a principal investigator (not just when received by the proposing institution). *Compare* NSF Jan. 2018 PAPPG at II-23, https://www.nsf.gov/pubs/policydocs/pappg18_1/nsf18_1.pdf (stating that "Current and Pending Support" refers to "ongoing projects and proposals"), *with* NSF June 2020 PAPPG at II-23, https://www.nsf.gov/pubs/policydocs/pappg20_1/nsf20_1.pdf (stating that "Current and Pending Support" should include "all resources made available to an individual in support of and/or related to all of his/her research efforts," including "in-kind contributions," and "irrespective of whether such support is provided through the proposing organization").

In announcing this change in April 2020, NSF Head of Policy Jean Feldman stated that "based on the comments and feedback we received," while NSF views all of its changes as "clarifications," its expectation that current and pending support be disclosed "irrespective of whether such support is provided through the proposing organization or directly to the individual … was clearly one of the biggest areas where there was a *disconnect with universities and faculties regarding what NSF's expectations truly are*." NSF Presentation at 7:545–8:44, Apr. 2020, https://nsfpolicyoutreach.com/resources/april-2020-nsf-approved-formats-for-proposals/ (emphasis added) (hereafter "Feldman Presentation").

Second, NSF twice revised and broadened the "Biographical Sketch" section of the PAPPG. In June 2020, NSF revised this section so that, for the first time, it required disclosure of non-salaried positions, including "adjunct, visiting, or honorary" positions. *Compare* NSF 2018 PAPPG at II-14 (stating that "Biographical Sketches" should list "academic/professional appointments"), *with* NSF 2020 PAPPG at II-14 (stating that "Biographical Sketches" should list

"academic, professional, or institutional appointments" including "any titled academic, professional, or institutional position whether or not remuneration is received, and whether full-time, part-time, or voluntary (including adjunct, visiting, or honorary)"). Feldman, the NSF Head of Policy, referred to this as "an important change to the appointments section," and stated that while NSF viewed it as a "clarification," "many felt like if there was no actual fund[ing] provided along with that appointment, that you did not have to identify that on the biographical sketch, and so we clarified to specify that we want all appointments to be identified." Feldman Presentation at 5:29–32, 6:10–31. In addition, in October 2021, NSF again revised the "Biographical Sketch" section so that, for the first time, it also required disclosure of positions "outside of the individual's academic, professional, or institutional appointments at the proposing organization." NSF Oct. 2021 PAPPG, https://www.nsf.gov/pubs/policydocs/pappg22_1/nsf22_1.pdf (stating that "Biographical Sketches" should list appointments for "all current domestic and foreign professional appointments outside of the individual's academic, professional, or institutional appointments at the proposing organization").

It is unimaginable that NSF, an agency with $8.5 billion in annual funding and which issues 12,000 grants a year,[4] made these changes without first conducting a comprehensive review of its disclosure requirements and concluding that they were, at best, unclear to universities and researchers. The government has never produced this information.

---

[4]    *At    a    Glance*,    Nat'l    Science    Found., https://www.nsf.gov/about/glance.jsp#:~:text=With%20an%20annual%20budget%20of,major%20source%20of%20federal%20backing (last visited Feb. 14, 2022).

**D. The government has refused to conduct a reasonable search at DOE and NSF for *Brady* materials related to the agency disclosure requirements.**

After the *Wall Street Journal* broke the news about Acting Director Schwartz's January 4, 2022 interview,[5] the defense requested the interview memorandum and "and any other documents or communications at DOE analyzing the disclosure requirements with respect to foreign positions," pursuant to *Brady*. Ex. C, Email from Dearington to Hawk, *et al.* (Jan. 14, 2022). When the defense indicated it would otherwise file a discovery motion, the government ultimately produced the memorandum, but stated that it disagreed with the defense's assertion that it "was 'clearly *Brady* evidence,'" and said it produced the memorandum only "out of an abundance of caution." Ex. C, Email from Hawk to Zeidenberg, *et al.* (Jan. 20, 2022). The government produced no other DOE materials regarding the disclosure requirements, however, and did not agree to conduct a search for such materials.

After *Science* published excerpts from its interview with former DOE Office of Science Director Chris Fall on January 25, 2022—which noted that DOE required disclosure only of other federal grants, and that DOE had "considerable internal discussions" before broadening its disclosure requirements—the defense broadened its *Brady* request. The defense highlighted Director Fall's interview and requested: "emails and other documents that suggest that anyone at *DOE or NSF* thought that: (i) PI's were not required to disclose participation in a talent program, a foreign grant application, or a foreign affiliation or position with a university; (ii) the disclosure requirements were not clear as to whether these should be disclosed; or (iii) the disclosure requirements could benefit from revisions or clarifications in this regard." Ex. D, Email from

---

[5] *See* Aruna Viswanatha, *Prosecutors Recommend Dropping Case Over China Ties Against MIT Scientist*, The Wall Street Journal, Jan. 14, 2022, https://www.wsj.com/articles/prosecutors-recommend-dropping-case-over-china-ties-against-mit-scientist-11642177123.

Dearington to Hawk, *et al.* (Jan. 28, 2022). The search would likely have involved contacting the handful of individuals responsible for revising the policies at DOE and NSF and asking for the requested documents.

On February 3, 2022, the government indicated that it would not agree to search DOE or NSF for *Brady* material and asserted that: (1) DOE and NSF policy changes "have no bearing on the charges against Dr. Tao," adding that Acting Director Schwartz's interview memo "has no reasonable connection" to Dr. Tao's case, and internal agency documents are "immaterial" to the case; (2) Dr. Tao already has *public* information about the policy changes; (3) the *Brady* request is on the "eve of trial" and is too late to be honored; and (4) the prosecution does not have possession of the requested materials (*i.e.*, DOE and NSF do). *See* Ex. E, Letter from Hawk, et al., to Zeidenberg, *et al.* (Feb. 3, 2022) (without attachments). These arguments are meritless.

## ARGUMENT

**A. Due process requires that the government conduct a reasonable search for the requested *Brady* evidence at DOE and NSF, which will rebut the government's allegations regarding agency disclosure requirements.**

**1. DOE and NSF documents undermining the government's allegations regarding the disclosure requirements constitute *Brady* evidence.**

The materials requested by the defense plainly constitute *Brady* (and *Giglio*) evidence because they are favorable to Dr. Tao in that they would undermine the government's allegations regarding DOE and NSF's disclosure requirements.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, "[t]he Supreme Court has framed the prosecution's duty to disclose as 'broad.'" *Fontenot v. Crow*, 4 F.4th 982, 1066 (10th Cir. 2021). "Evidence favorable to the defense encompasses exculpatory evidence, which 'tend[s] to establish a criminal defendant's innocence.' It also encompasses impeachment evidence, used to undermine a witness's credibility, for 'if disclosed and used effectively,' such evidence 'may

make the difference between conviction and acquittal.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). Thus, "'[i]mpeachment evidence," known as *Giglio* material, "merits the same constitutional treatment as exculpatory evidence.'" *Id.* (quoting *Bowen v. Maryland*, 799 F.2d 593, 610 (10th Cir. 1986)).

Broad disclosure of evidence favorable to the defense "serve[s] to justify trust in the prosecutor as 'the representative of a sovereignty whose interest in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Kyles v. Whitley*, 514 U.S. 419, 439 (1995) (ellipsis and internal quotation marks omitted). Thus, the prosecutor should resolve any doubt as to whether *Brady* applies to evidence in favor of disclosure. *United States v. Agurs*, 427 U.S. 97, 108 (1976), *holding modified on other grounds by United States v. Bagley*, 473 U.S. 667 (1985).

Here, the requested evidence is plainly favorable to the defense because, to convict Dr. Tao of fraud and false statements, the government must prove, *inter alia*, that DOE and NSF required disclosure of foreign talent plan participation and work in grant proposals, that Dr. Tao failed to disclose this information despite being aware that it must be disclosed, *and* that DOE and NSF deemed this information material to their grant-making decisions. *See, e.g.*, SSI ¶¶ 36, 44, 46; *see also, e.g.*, *United States v. Zander*, 794 F.3d 1220, 1230 (10th Cir. 2015) (elements of 18 U.S.C. § 1343 violation are "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of interstate wire or radio communications to execute the scheme"); *Neder v. United States*, 527 U.S. 1, 4 (1999) (holding that "materiality is an element" of the wire fraud statute); *United States v. Williams*, 934 F.3d 1122, 1128 (10th Cir. 2019) (elements of a 18 U.S.C. § 1001(a)(2) violation are "(1) the defendant made a statement; (2) the statement was false, fictitious, or fraudulent as the

defendant knew; (3) the statement was made knowingly and willfully; (4) the statement was within the jurisdiction of the federal agency; and (5) the statement was material").

The government's entire case is premised on the government's unverified assumption that Dr. Tao was required to disclose foreign talent plan participation and activities in China in his DOE and NSF submissions, and that this information was material to their grant payment decisions. The government undoubtedly expects its two DOE witnesses, Raul Miranda and Viviane Schwartz, to testify that DOE required Dr. Tao to disclose in grant proposals and progress reports any foreign talent plan participation or other work in China, that Dr. Tao understood this, and that this information was important to DOE. Otherwise, the government could not prove its allegations regarding DOE. The government also undoubtedly expects that its single NSF witness, Rebecca Keiser, an NSF research security officer, will testify similarly regarding NSF's expectations. The requested evidence, however, would at least give rise to reasonable doubt whether Dr. Tao made knowingly false and material statements to DOE and NSF by allegedly failing to disclose foreign talent plan participation and work.

If the government complies with its *Brady* obligations by producing evidence indicating that multiple DOE personnel agree with Acting Director Andrew Schwartz's contention that foreign talent plan participation and work need not be disclosed to DOE, Ex. A, or Director Chris Fall's contention that only other federal grants needed to be disclosed, Ex. B, Dr. Tao can consider calling such personnel at trial to rebut Viviane Schwartz's and Raul Miranda's testimony. Or he can use the evidence to impeach their testimony. This evidence must exist, because Director Fall stated that there were "*considerable internal discussions*" about these disclosure requirements and DOE's expectations. Ex. B. Nor has the government denied that this evidence exists.

So too with NSF. The Head of the Policy Office at NSF, Jean Feldman, indicated that NSF received information demonstrating that there was a "disconnect with universities and faculties regarding what NSF's expectations truly are," Feldman Presentation at 7:545–8:44, and that "many felt" that outside honors did not need to be listed in bio-sketches, *id.* at 5:29–32, 6:10–31. In contrast, the government's sole NSF witness, Rebecca Keiser, will testify that NSF's disclosure obligations were "clear" and well understood by universities and principal investigators like Dr. Tao. *See infra* note 6. If the government complies with its *Brady* obligations by producing evidence that there was at least a "disconnect" between NSF and principal investigators about its disclosure requirements or expectations, Dr. Tao can use that evidence to rebut Keiser's testimony. It can also impeach Keiser on this critical point. The government has not denied that this evidence exists.

Accordingly, because the requested materials are highly favorable to the defense, the government must obtain and produce them consistent with Dr. Tao's constitutional due process rights. Dr. Tao should not be required to simply rely on the media to disclose the existence of highly exculpatory evidence at DOE and NSF. That is the government's duty. The government's arguments to the contrary hold no water.

## 2. The government's excuses for not obtaining and turning over the requested *Brady* materials are unavailing.

The government asserted four excuses why it should not have to obtain and produce the requested *Brady* material from DOE and NSF. Each is meritless.

First, the government denies that the requested evidence—or even the statements from Directors Schwartz and Fall, and Jean Feldman—are favorable to the defense. Exs. C (claiming that the Schwartz memorandum is not *Brady*), E (claiming that the requested materials have "no bearing on the charges against Dr. Tao" and are "immaterial" to the case). This argument is easily dispatched. As an initial matter, the government's opinion that Directors Schwartz's and Fall's

statements are not favorable to the defense begs the question whether the government understands its *Brady* obligations in other facets of the case. That two superiors of the government's DOE witnesses in the Office of Science stated that the types of information Dr. Tao is charged with concealing did *not* need to be disclosed, and was *not* material is the most favorable kind of evidence that could exist in a fraud and false statement case like this one. If the jury credits these statements it cannot convict Dr. Tao of any charges regarding DOE. Acting Director Schwartz's statement is particularly apt, since he analyzed the disclosure requirements involving a grant proposal and progress reports that responded to the *same* funding announcement Dr. Tao responded to, in the *same years* Dr. Tao made his submissions to DOE, involving some of the *same* types of alleged omissions. In addition, Feldman's acknowledgment that principal investigators were unaware of their disclosure obligations, because NSF did not make these clear, will help demonstrate that Dr. Tao also had no way of knowing which information NSF wanted disclosed in grant proposals and progress reports.

Second, the government contends that Dr. Tao already has public information regarding DOE and NSF's *disclosure requirement policy changes*, so it does not need the requested *Brady* materials demonstrating what the disclosure requirements and expectations were before the changes. Ex. E. This argument misses the point. The fact that DOE and NSF broadened their disclosure requirement policies in 2020 or 2021 to capture foreign talent plan participation and work does not itself demonstrate that the agencies did *not* require disclosure of this information under the old policies. If the policies in place from 2017 to 2019 were clear about what information DOE and NSF expected to be disclosed, the government would have no need to call its DOE and NSF witnesses to testify about this. But the policies are ambiguous, and the government therefore hopes to convince the jury through the testimony of its DOE and NSF witnesses that the agencies

required and expected foreign talent plan participation and work to be disclosed. To ensure a fair trial, Dr. Tao should be allowed to gather the documents from the agencies that rebut or impeach this testimony.

Third, the government contends that Dr. Tao's request for *Brady* materials is too late, given that trial is set to begin March 21, 2022. Ex. E. As an initial matter, the defense promptly sought the *Brady* evidence within days of learning about the Acting Director Schwartz and Director Fall statements. The defense could not have known this information earlier. As for the *Brady* material requested from NSF, it is of no moment if the defense could or should have made its request earlier, because "'[t]he *Brady* rule imposes an independent duty to act on the government," which does not turn on whether the defense had "subjective or objective knowledge of such evidence." *Fontenot*, 4 F.4th at 1066. The prosecutor also "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case," *Kyles*, 514 U.S. at 437, rather than wait to see if the defense believes *Brady* information is missing from discovery.

Moreover, the defense made a *Brady* request similar to the one it made here 17 months ago, in September 2020, which included a request for:

> Documents reflecting that DOE and NSF personnel have acknowledged or suggested that principal investigators or other individuals who work on or help apply for grants were unaware that they needed to disclose to their research institutions and/or the granting agencies all affiliations or work outside universities or entities (*e.g.*, as Current and Pending Support), including but not limited to documents suggesting that the agencies or research institutions considered modifying or enhancing their regulations, policies, training materials, and/or other resources to make these disclosure requirements, if any, clearer or more widely understood.

Ex. F, Letter from Zeidenberg, *et al.*, to Mattivi, *et al.* (Sept. 18, 2020). On October 16, 2020, the government stated that it disagreed that its *Brady* obligations extended to DOE and NSF, but would

nonetheless provide "any *Brady* materials that come to light."[6] The new information reported in the press confirms that the information requested by the defense in September and November 2020 existed at the time this request was originally made and should have been produce long ago.

Fourth, the government claims that it does not have possession of the requested materials. Ex. E. This disregards that the government's *Brady* obligations extend to "files maintained by branches of government closely aligned with the prosecution." *United States v. Combs*, 267 F.3d 1167, 1175 (10th Cir. 2001) (observing that the duty to search for *Brady* materials extends to "files maintained by branches of government closely aligned with the prosecution"); *see, e.g.*, *United States v. Brooks*, 966 F.2d 1500, 1500–04 (10th Cir. 1999) ("Information possessed by other branches of the federal government, including investigating officers, is typically imputed to the prosecutors of the case."); *United States v. Safavian*, 233 F.R.D. 12, 17 (D.D.C. 2005) ("Under *Brady*, the prosecutors have an affirmative duty to search possible sources of exculpatory information, including a duty to learn of favorable evidence known to others acting on the prosecution's behalf … and to cause files to be searched that are not only maintained by the prosecutor's or investigative agency's office, but also by other branches of government closely aligned with the prosecution." (citation and internal quotation marks omitted)). Thus, in a joint investigation with another federal agency, "the prosecutor's duty extends to reviewing the

---

[6] In December 2020, the government produced narrative responses to certain defense requests in a document labeled "NSF Response." It is now apparent that the government's sole NSF witness, the research security officer Rebecca Keiser, drafted this document in order to bolster the prosecution's positions in lieu of providing *Brady* evidence. For instance, the document states that "NSF has been clear" about its disclosure requirements, even though NSF Policy Office head, Jean Feldman, publicly acknowledged that there was a "disconnect" between NSF and principal investigators about what needed to be disclosed. Feldman Presentation at 7:545–8:44. The government provided no analogous "DOE Response."

materials in the possession of that other agency for *Brady* evidence." *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012)

The government cannot deny that DOE and NSF are "closely aligned" with the prosecution—they are members of the prosecution team. *Combs*, 267 F.3d 1175. DOE and NSF OIG agents have jointly conducted investigative interviews with the prosecutors and FBI agents in this case in preparation for trial. For example, since this case was indicted, the government has jointly conducted interviews with both DOE and NSF personnel and had meetings with agency personnel on multiple occasions.

DOE and NSF OIG agents, and other DOE and NSF personnel, have also provided numerous documents to the government to help with its case. For example, on September 20, 2019, the FBI case agent, Stephen Lampe, highlighted two DOE grant awards of interest to his contact at DOE-OIG. The same day, the DOE-OIG agent contacted multiple DOE personnel, gathered documents, and sent them to Special Agent Lampe to help the prosecution. On October 28, 2019, the same DOE-OIG agent searched DOE's financial award management system at the Office of Science, which administered Dr. Tao's grants, and collected documents to send to Special Agent Lampe. NSF also collected and provided information to the FBI. For instance, on October 6, 2020, an NSF-OIG agent asked an NSF program officer who administered one of Dr. Tao's grants to compare Dr. Tao's alleged grant proposals in China (which the FBI shared with the NSF-OIG agent and program officer[7]) to Dr. Tao's NSF research to see if there was overlap. After the NSF program officer completed his analysis, the NSF-OIG provided the analysis to the FBI.

---

[7] The prosecution team frequently shared information with DOE and NSF personnel. For example, on September 25, 2019, Special Agent Lampe provided a Form FD-302 interview summary from a KU witness to a DOE-OIG agent.

There is also no indication that anyone at the agencies has ever resisted a document request or interview with the prosecutors or the FBI, and the evidence shows that the opposite is true. DOE and NSF personnel volunteered information to help the prosecution. For instance, on March 10, 2020, the government's sole NSF witness, Rebecca Keiser, sent a two-page email to DOE-OIG personnel, which was then passed on to the prosecutors, providing "additional information" meant to help the government's case. The email related to "the question that arose today on whether Dr. Tao was unaware of the disclosure requirements." Keiser provided eight paragraphs of information that she believed could help prove Dr. Tao's *mens rea*. This was no balanced or neutral assessment, but rather a list of arguments the prosecution could consider using to try to prove its case. In another example, one of the government's DOE witnesses, program officer Viviane Schwartz, searched her emails following a joint investigative interview involving the prosecution and DOE-OIG on May 22, 2020, and sent the government an email she found between Dr. Tao and her to help the prosecution. The prosecution found the email to be so useful that, the next month, it charged the email itself as a wire fraud count in Count 5 and a false statement in Count 10 of the SSI. In another example, on March 31, 2020, DOE-OIG personnel sent information at the request of the FBI regarding Dr. Tao's submissions and awards, stating, "Hopefully you find it helpful," and "I'm happy to answer any and all questions so please let me know if you have any." The prosecution also included agency personnel on emails regarding charging decisions before it filed the operative SSI. On April 30, 2020, Special Agent Lampe emailed the prosecutors, two DOE-OIG agents, an NSF-OIG agent, and the then-Director of Investigations at NSF, in which he shared information that KU had provided to the FBI, and he asked whether certain charges could be brought based on the facts. These examples are far from exhaustive and are merely illustrative of DOJ's close relationship with these agencies throughout this case.

Given these facts, the government cannot seriously deny that DOE and NSF are, at least, "closely aligned" with the prosecution team in this case, if not bona fide members of the prosecution team. *Combs*, 267 F.3d  1175. Accordingly, the government's *Brady* obligations extend to these agencies, and it cannot search their files for documents that are helpful only to the government. It must also produce documents from their files that are favorable to the defense.

**B.  A search for the requested materials would not be unduly burdensome.**

The government's compliance with its *Brady* obligations would not be unduly burdensome, and can be accomplished quickly and efficiently. The government could ask the DOE-OIG and NSF-OIG to find these materials, just as it has done over the past two years to find evidence it plans to use against Dr. Tao at trial. Or the government could streamline its search by contacting the individuals at DOE and NSF that would most likely have the requested materials. The government could contact Acting Director Andrew Schwartz and Former Director Chris Fall (or Fall's successor) at DOE and request documents and information indicating that DOE may not have required disclosure of foreign positions and work in China, that principal investigators may not have realized that this information had to be disclosed, or that this information may not have been material to DOE. These would include documents reflecting what Director Fall referred to as the "considerable internal discussions" at DOE around the need to broaden the disclosure requirements to capture this information. Similarly, the government could ask Jean Feldman, the Policy Office head at NSF, for the same types of materials, including documents and information demonstrating what she called the "disconnect" between NSF and universities/faculty regarding the disclosure requirements. If these individuals do not have the requested information, they likely would know who does.

The government cannot be heard to say that collecting and producing the requested *Brady* materials would be unduly burdensome, or would interfere with trial preparations, as this is exactly

the type of document and information gathering the government has engaged in with DOE and NSF since the case was indicted in August 2019. The only difference is that the government would now ask for exculpatory evidence—not just the evidence it thinks will support its case.

## CONCLUSION

Due process does not permit the Department of Justice to enjoy open-door access to their sister agencies in this case—enabling them to handpick witnesses and pluck documents that the government finds useful—without also providing the defense with exculpatory agency materials. When the government is closely aligned with its sister agencies, and especially as here when the agencies are members of the prosecution team, the government must search for and produce *Brady* materials, and cannot bury its head in the sand to avoid jeopardizing its case.

Dated:  February 18, 2022

                                Respectfully submitted,

                                /s/ Thomas H. Johnson
                                Thomas H. Johnson #13688
Petefish, Immel, Hird, Johnson,
Leibold & Sloan, LLP
842 Louisiana
Lawrence, KS 66044
Tel: (785) 843-0450
Fax: (785) 843-0407
tjohnson@petefishlaw.com

Peter Zeidenberg
Michael F. Dearington
Laura Zell
ARENT FOX LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
Peter.Zeidenberg@arentfox.com
Michael.Dearington@arentfox.com
Laura.Zell@arentfox.com

*Attorneys for Defendant Franklin Tao*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of February, 2022, I electronically filed the foregoing brief to be filed with the Clerk of the Court using the CM/ECF system.

<u>/s/ Thomas H. Johnson</u>
Thomas H. Johnson