# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 19-20052-JAR-JPO |
| | ) | |
| FENG TAO | ) | |
| a/k/a "Franklin Tao," | ) | |
| | ) | |
| Defendant. | ) | |

---

## DR. FRANKLIN TAO'S MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

Thomas H. Johnson #13688
Petefish, Immel, Hird, Johnson,
Leibold & Sloan, LLP
842 Louisiana St.
Lawrence, KS 66044
Tel: (785) 843-0450
Fax: (785) 843-0407
tjohnson@petefishlaw.com

Peter Zeidenberg
Michael F. Dearington
Laura Zell
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
peter.zeidenberg@afslaw.com
michael.dearington@afslaw.com
laura.zell@afslaw.com

Dated:  May 9, 2022

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………………………………………………..  1

BACKGROUND………………………………………………………………………………………………………………  3

STANDARD OF REVIEW………………………………………………………………………………………......  4

ARGUMENT……………………………………………………………………………………………………………  5

I.  The Court should acquit Dr. Tao on the three remaining wire fraud counts  because
the evidence was insufficient to sustain a wire fraud conviction…………………………...  5

A.  Dr. Tao never made a material misrepresentation to DOE, NSF, or KU
in order to obtain money or property…………………………………………………………  6

1.  Dr. Tao never made or caused to be made a material
misrepresentation to DOE in order to obtain grant funds for KU…..  6

2.  Dr. Tao never made or caused to be made a material
misrepresentation to NSF in order to obtain grant funds for KU.......  12

3.  Dr. Tao never made or caused to be made a material
misrepresentation to KU in order to maintain salary……………….  15

B.  Dr. Tao lacked intent to defraud KU, DOE, or NSF, and each alleged
victim was satisfied with his work…………………………………………………………  16

C.  The government failed to prove a scheme to obtain money or property, and
its theory that Dr. Tao had an undisclosed potential conflict of interest is
invalid under *Skilling* and *McNally*…………………………………………………  22

1.  *Skilling* and *McNally* held that a scheme to conceal a conflict of
interest from an employer or third party, as the government
charged here, is invalid under the fraud statutes even where the
fiduciary receives salary……………………………………………………  23

2.  The government cannot circumvent *Skilling* and *McNally* by
charging Dr. Tao with fraudulently maintaining his salary or
working on projects funded by grants…………………………………  27

D.  None of the three charged uses of the wires were "in furtherance of" a
scheme to defraud KU, DOE, or NSF…………………………………………………  32

II.    The Court should acquit Dr. Tao on the remaining false statement count............. 36

       A.    There was no evidence that Dr. Tao's September 25, 2018, Conflict of
             Interest form caused KU to make a false statement to DOE or NSF.......... 37

       B.    The government failed to present evidence that a false statement in the
             Conflict of Interest form was material to DOE or NSF........................ 40

       C.    The government failed to prove that Dr. Tao knowingly and willfully
             made an objectively false statement in the Conflict of Interest form......... 41

III.   In the alternative, the Court should grant Dr. Tao a new trial on the four counts of
       conviction in the interest of justice..................................................... 46

CONCLUSION.................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cleveland v. United States,*
    531 U.S. 12 (2000)........................................................................................................29

*Direct Sales Co. v. United States,*
    319 U.S. 703 (1943)........................................................................................................5

*Jackson v. Virginia,*
    443 U.S. (1979)..............................................................................................................5

*Kelly v. United States,*
    140 S. Ct. 1565 (2020)..............................................................................22, 23, 29, 30

*McDonnell v. United States,*
    136 S. Ct. 2355 (2016)..................................................................................................28

*McNally v. United States,*
    483 U.S. 350 (1987).............................................................................................. *passim*

*Moskal v. United States,*
    498 U.S. 103 (1990)......................................................................................................46

*Neder v. United States,*
    527 U.S. 1 (1999)............................................................................................................6

*Parr v. United States,*
    363 U.S. 370 (1960)................................................................................................32, 33

*Pasquantino v. United States,*
    544 U.S. 349 (2005)......................................................................................................22

*Skilling v. United States,*
    561 U.S. 358 (2010).............................................................................................. *passim*

*Tibbs v. Florida,*
    475 U.S. 31 (1982)..........................................................................................................5

*United States v. Anming Hu,*
    3:20-CR-21-TAV-DCP-1, 2021 WL 4130515 (E.D. Tenn. Sept. 9, 2021)...........17, 18, 22

*United States v. Billmyer,*
    No. 94-29-01-JD, 1995 WL 54471 (D.N.H. Feb. 3, 1995).........................................28

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015)..................................................................16

*United States v. Blankenship*,
    382 F.3d 1110 (11th Cir. 2004) ............................................................39

*United States v. Brown*,
    995 F.2d 1493 (10th Cir. 1993) ..............................................................5

*United States v. Butler*,
    494 F.2d 1246 (10th Cir.1974) ...............................................................4

*United States v. Camick*,
    796 F.3d 1206 (10th Cir. 2015) ............................................................10

*United States v. Canela*,
    No. CR 08-1539 MV, 2010 WL 11523585 (D.N.M. Jan. 15, 2010) .......................5

*United States v. Cardall*,
    85 F.2d 656 (10th Cir 1989) .........................................................33, 36

*United States v. Castile*,
    795 F.2d 1273 (6th Cir. 1986) ..............................................................35

*United States v. Dashney*,
    117 F.3d 1197 (10th Cir. 1997) ............................................................41

*United States v. Deffenbaugh Indus., Inc.*,
    957 F.2d 749 (10th Cir. 1992) ..............................................................38

*United States v. Delgado-Uribe*,
    363 F.3d 1077 (10th Cir. 2004) ..............................................................4

*United States v. Facteau*,
    1:15-cr-10076-ADB, 2016 WL 4445741 (D. Mass. Aug. 22, 2016)......................28

*United States v. Finn*,
    375 F.3d 1033 (10th Cir. 2004) ............................................................41

*United States v. Flanders*,
    491 F.3d (10th Cir. 2007) ....................................................................17

*United States v. Gabaldon*,
    91 F.3d 91 (10th Cir. 1996) .................................................................46

*United States v. Gaudin*,
    515 U.S. 506 (1995).............................................................................41

*United States v. Giraldi*,
   86 F.3d 1368 (5th Cir. 1996) ................................................................17

*United States v. Goodrich*,
   871 F.2d 1011 (11th Cir. 1989) .............................................................28

*United States v. Guertin*,
   2022 WL 203467, --- F. Supp. 3d --- (D.D.C. Jan. 24, 2022) ..........................28, 29

*United States v. Harra*,
   985 F.3d 196 (3d Cir. 2021)..................................................................44

*United States v. Holmes*,
   No. 5:18-cr-00258-EJD, 2020 WL 666563 (N.D. Cal. Feb. 11, 2020) ..................25

*United States v. Holstrom*,
   242 F. App'x 397 (9th Cir. 2007) (unpublished decision)...............................40

*United States v. Jackson*,
   No. 3:16–CR–31, 2017 WL 1129941 (N.D. W. Va. Mar. 24, 2017) ....................25

*United States v. Johnson*,
   19 F.4th 248 (3d Cir. 2021) ..................................................................10

*United States v. Johnson*,
   937 F.2d 392 (8th Cir. 1991) ................................................................44

*United States v. Jones*,
   44 F.3d 860 (10th Cir. 1995) ..................................................................4

*United States v. Kenrick*,
   221 F.3d 19 (1st Cir. 2000)....................................................................6

*United States v. Lanier*,
   520 U.S. 259 (1977)...........................................................................46

*United States v. Mann*,
   884 F.2d 532 (10th Cir. 1989) ...........................................................33, 36

*United States v. Maze*,
   414 U.S. 395 ...................................................................................35

*United States v. Migliaccio*,
   34 F.3d 1517 (10th Cir. 1994) ...........................................................44, 45

*United States v. Mingqing Xiao*,
   No. 4:21-cr-40039 (S.D. Ill. May 3, 2022) .........................................18, 19, 22

*United States v. Nissen*,
    432 F. Supp. 3d 1298 (D.N.M. 2020) ................................................................4, 5

*United States v. Ochs*,
    842 F.2d 515 (1st Cir. 1988) ................................................................................29

*United States v. Pizano*,
    421 F.3d 707 (8th Cir. 2005) .................................................................................6

*United States v. Prentiss*,
    256 F.3d 971 (10th Cir. 2001) ...............................................................................5

*United States v. Redcorn*,
    528 F.3d 727 (10th Cir. 2008) ...............................................................32, 33, 35

*United States v. Rodgers*,
    466 U.S. 475 (1984).................................................................................37, 38, 39

*United States v. Sadler*,
    750 F.3d 585 (6th Cir. 2014) ..........................................................................16, 25

*United States v. Santos*,
    553 U.S. 507 (2008)..............................................................................................46

*United States v. Shellef*,
    507 F.3d 82 (2d Cir. 2007).....................................................................................17

*United States v. Slay*,
    858 F.2d 1310 (8th Cir. 1988) ..............................................................................25

*United States v. Stiner*,
    765 F. Supp. 663 (D. Kan. 1991) ...........................................................................5

*United States v. Takhalov*,
    827 F.3d 1307 (11th Cir. 2016) .......................................................................16, 18

*United States v. Troutman*,
    814 F.2d 1428 (10th Cir. 1987) ..............................................................................5

*United States v. Weimert*,
    819 F.3d 351 (7th Cir. 2016) .................................................................................18

*United States v. Weiss*,
    630 F.3d 1263 (10th Cir. 2010) ............................................................................32

*United States v. White*,
    673 F.2d 299 (10th Cir.1982) ............................................................................4, 5

*United States v. Whiteside*,
    285 F.3d 1345 (11th Cir. 2002) ...........................................................44

*United States v. Williams*,
    934 F.3d 1122 (10th Cir. 2019) ...........................................................37

*United States v. Yates*,
    16 F.4th 256 (9th Cir. 2021) ........................................................ *passim*

*United States v. Zander*,
    794 F.3d 1220 (10th Cir. 2015) .........................................................6, 16

*Zzyym v. Pompeo*,
    958 F.3d 1014 (10th Cir. 2020) ...........................................................46

**Statutes**

18 U.S.C. § 1001 .................................................................................37, 38, 44

18 U.S.C. § 1001(a)(2) .........................................................................2, 36, 41

18 U.S.C. § 1343 .......................................................................................1, 32

18 U.S.C. § 1346 .....................................................................................23, 24

**Other Authorities**

Fed. R. Crim. P. 29 ....................................................................................1, 4, 5

Fed. R. Crim. P. 29(d)(1) ..............................................................................46

Fed. R. Crim. P. 33 .......................................................................................4, 5

# INTRODUCTION

Dr. Franklin Tao was convicted by a jury of three counts of wire fraud (Counts 4, 6, and 7) and one count of making false statements (Count 9) for allegedly failing to inform his employer, the University of Kansas (KU), and two federal agencies, DOE and NSF, that he held a second position at Fuzhou University in China from May 2018 to August 2019.[1] The Court should acquit Dr. Tao under Rule 29 because the evidence was insufficient as a matter of law to sustain the convictions.

To be convicted of wire fraud, 18 U.S.C. § 1343, Dr. Tao had to scheme to deprive KU, DOE, or NSF of money or property with fraudulent intent. The government called 30 witnesses over two weeks, and not one of them testified that Dr. Tao deprived KU, DOE, or NSF of money or property by failing to disclose the alleged stint at Fuzhou University. To the contrary, no one even identified a material misrepresentation that Dr. Tao made or caused to be made to the agencies, and the lone DOE and NSF witnesses testified that Dr. Tao completed all of his grant work to their satisfaction. Both the KU Chancellor and Dr. Tao's supervisor at KU also praised Dr. Tao's work in 2018–2019, and he was one of four professors at KU to receive the Chancellor's Award in 2019. At best, the government sought to prove that Dr. Tao labored under an undisclosed conflict of interest while satisfactorily performing his duties, but the Supreme Court has already invalidated the undisclosed-conflict-of-interest theory of fraud, even when an employee receives salary. Because there was no scheme with intent to defraud, the wire fraud convictions must fall.

The false statement conviction fares no better. To be convicted of making a false

---

[1] Of the ten counts charged in the Second Superseding Indictment ("SSI"), the government dismissed two counts (Counts 3 and 8) before trial, and the jury acquitted on four counts following trial.

statement, 18 U.S.C. § 1001(a)(2), Dr. Tao had to knowingly and willfully make a material false statement in a matter within the jurisdiction of DOE or NSF. The SSI charged that Dr. Tao made a false statement to DOE and NSF by omitting his alleged position at Fuzhou University from his September 2018 Conflict of Interest form. After the DOE and NSF witnesses testified that they had never received, considered, or even had access to university Conflict of Interest forms— confirming that this private submission to KU was not within agency jurisdiction, and not material to an agency decision—the government abandoned this theory mid-trial. Instead, it argued at closing that Dr. Tao's Conflict of Interest form *caused KU* to make a false statement. This was an improper variance from the SSI. The government also could not prove its new theory. The government failed to identify for the jury an allegedly false statement KU made to DOE or NSF based on the September 2018 Conflict of Interest form. The form itself also was not false. The government failed to prove that Dr. Tao had a disclosable Significant Financial Interest in Fuzhou University, because it failed to prove that he received money, let alone $5,000 or more, from Fuzhou University as of September 2018. The government also failed to prove that Dr. Tao had a Time Commitment to Fuzhou University that interfered with his KU job duties. Indeed, the FBI case agent acknowledged that, since he found no contract between Dr. Tao and Fuzhou University, and Dr. Tao had not performed central requirements from the draft contracts that he did find, he could only speculate about the terms of Dr. Tao's alleged employment at Fuzhou University.

This is the rare case where the Court should acquit based on the testimony of the government's own witnesses, without needing to assess their credibility, and the content of the government's own exhibits, without needing to weigh it against competing evidence. The government itself proved that Dr. Tao was not guilty, but the length and complexity of the case

confused the jury into rendering a split verdict. Because the evidence was insufficient for a reasonable fact-finder to convict, the Court should acquit Dr. Tao of the four remaining charges.

## **BACKGROUND**

On June 24, 2020, the government charged Dr. Tao in a ten-count indictment with seven counts of wire fraud and three counts of making false statements, for allegedly failing to disclose a purported second position he took at Fuzhou University in May 2018 to KU, DOE, and NSF, while receiving salary from KU and grant funds from DOE and NSF. ECF No. 75. On February 14, 2022, the Court granted the government's motion to dismiss Counts 3 and 8, which charged Dr. Tao with fraud and making a false statement to DOE and NSF by submitting a January 9, 2018 Institutional Responsibilities (*i.e.*, Conflict of Interest) form. ECF Nos. 219, 222.

Trial began on March 21, 2022. During roughly two weeks of testimony, the government called 30 witnesses, and introduced 395 exhibits, before resting its case-in-chief on April 4, 2022. The defense called three witnesses, including the FBI case agent, and rested its case on April 5, 2022. The government presented no rebuttal case. Dr. Tao moved for a judgment of acquittal at the close of the government's case-in-chief, as well as at the close of the defense's case, which the Court took under advisement. The Court instructed the jury on April 5, 2022, and the parties made closing arguments the same day. On April 7, 2022, after one and a half days of deliberations, the jury returned a split verdict.

The jury acquitted Dr. Tao on three of the six wire fraud counts and one of the two false statement counts. Specifically, the jury acquitted Dr. Tao of wire fraud based on Count 1 (November 2017 email to China Consulate General regarding Dr. Tao's travel to Fuzhou University), Count 2 (December 2017 electronic submission of a DOE grant application), and Count 5 (July 16, 2018 email to DOE regarding Dr. Tao's Current and Pending Support,

designated as Count 3 at trial). The jury also acquitted Dr. Tao of making a false statement in Count 10 (July 16, 2018 email to DOE regarding Current and Pending Support, designated as Count 8 at trial). The jury convicted Dr. Tao of wire fraud on Counts 4 (June 26, 2018 email to KU regarding internal checklist related to proposed collaboration between KU and Fuzhou University, designated as Count 3 at trial), Count 6 (September 25, 2018 Conflict of Interest form submission, designated as Count 5 at trial), and Count 7 (March 17, 2019 email regarding alleged grant application for funding in China, designated as Count 6 at trial). The jury also convicted Dr. Tao of making a false statement in Count 9 (September 25, 2018 Conflict of Interest form, designated as Count 7 at trial).

On April 21, 2022, Dr. Tao renewed his motion for judgment of acquittal as to the four counts of conviction under Rule 29, and moved in the alternative for a new trial under Rule 33. ECF No. 286. Dr. Tao timely filed this brief in support.

## STANDARD OF REVIEW

Under Rule 29, the Court must grant a judgment of acquittal if, "view[ing] the evidence in the light most favorable to the government … no reasonable jury could find guilt beyond a reasonable doubt." *United States v. White*, 673 F.2d 299, 301 (10th Cir.1982). "The court's role is to determine whether the evidence, if believed, would establish each element of the crime." *United States v. Nissen*, 432 F. Supp. 3d 1298, 1312 (D.N.M. 2020) (citing *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004)).

"While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable, and 'caution must be taken that the conviction not be obtained "by piling inference on inference."'" *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995) (quoting *United States v. Butler*, 494 F.2d 1246, 1252

(10th Cir.1974) and *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943)); *see, e.g.*, *United States v. Canela*, No. CR 08-1539 MV, 2010 WL 11523585, at *2 (D.N.M. Jan. 15, 2010) (stating that the court granted a judgment of acquittal because the jury's conclusion that the defendant had the requisite *mens rea* amounted to "piling inference on inference"); *see also White*, 673 F.2d at 301 ("Acquittal is proper if the evidence is so meager that no reasonable jury could find guilt beyond a reasonable doubt." (internal quotation marks omitted)). Rather, "the evidence supporting the conviction "must be substantial and must not raise a mere suspicion of guilt." *United States v. Brown*, 995 F.2d 1493, 1502 (10th Cir. 1993)*, overruled on other grounds by United States v. Prentiss*, 256 F.3d 971 (10th Cir. 2001).[2]

In contrast, when deciding whether to grant a new trial under Rule 33, the Court has "broad discretion which will not be disturbed on appeal absent plain abuse of that discretion." *United States v. Stiner*, 765 F. Supp. 663, 664 (D. Kan. 1991) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987))*, aff'd*, 952 F.2d 1401 (10th Cir. 1992). "The standards for granting a new trial are not as strict as the standards for granting judgment of acquittal," as Rule 33 "provides that a court may grant a new trial 'if required in the interest of justice.'" *Id.* (quoting Fed. R. Crim. P. 33). In contrast to Rule 29, under Rule 33 "the Court has broad discretion and is free to weigh the evidence in support of the motion and assess a witness's credibility." *Canela*, 2010 WL 11523585, at *1 (citing *Tibbs v. Florida*, 475 U.S. 31, 37–38 (1982)).

## ARGUMENT

**I.   The Court should acquit Dr. Tao on the three remaining wire fraud counts because**

---

[2] "A judgment of acquittal thus enables a federal district court to protect a defendant's due process rights by removing from jury consideration a charge with respect to which no rational trier of fact could find guilt beyond a reasonable doubt." *Nissen*, 432 F. Supp. 3d at 1312 (citing *Jackson v. Virginia*, 443 U.S. at 307, 317–19 (1979)).

**the evidence was insufficient to sustain a wire fraud conviction.**

In order to convict Dr. Tao of wire fraud, the government must prove beyond a reasonable doubt: "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of interstate wire or radio communications to execute the scheme." *United States v. Zander*, 794 F.3d 1220, 1230 (10th Cir. 2015). The evidence was insufficient to prove any of these elements.

### A. Dr. Tao never made a material misrepresentation to DOE, NSF, or KU in order to obtain money or property.

The SSI alleged a single fraud scheme with three victims: NSF, DOE and KU. Thus, in order to convict, the government needed to establish, beyond a reasonable doubt, that Dr. Tao made material misrepresentations to these three entities and that, as a result, the respective entity parted with money. *See, e.g.*, *Neder v. United States*, 527 U.S. 1, 25 (1999) ("[W]e hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."); *United States v. Pizano*, 421 F.3d 707, 722 (8th Cir. 2005) ("[T]o be criminally fraudulent, a defendant's deceptive course of conduct must be material and it must be directed at obtaining money or other property." (citing *United States v. Kenrick*, 221 F.3d 19, 31–32 (1st Cir. 2000))). There was no evidence at trial that Dr. Tao made or caused to be made a material misrepresentation in order to obtain money from DOE, NSF or KU.

### 1. Dr. Tao never made or caused to be made a material misrepresentation to DOE in order to obtain grant funds for KU.

The government alleged that Dr. Tao made misrepresentations in two submissions to DOE in order to secure grants for KU. Specifically, the government alleged that a July 16, 2018 email from Dr. Tao to Dr. Viviane Schwartz, his program manager at DOE, misrepresented his updated Current and Pending Support, and his June 15, 2019, progress report submitted to DOE misrepresented that there were no updates to his Current and Pending Support. SSI ¶¶ 39(D), (F),

42 (Count 5). The government argued at closing that Dr. Tao "directly lied to DOE as it relates to federal grants in order to obtain those federal grant monies that went to KU that the defendant used for his research." D.A.109 (Day 12 Tr. at 4:15–17).[3] But the government failed to prove that either of these submissions, or any other submission to DOE, contained a material misrepresentation.

KU submitted the DOE grant renewal proposal at issue on December 11, 2017, *six months before* Dr. Tao allegedly took a second position at Fuzhou University. *See* D.A.122 (Gov't Ex. 33 at 1, DOE proposal for Funding Opportunity DE-FOA-0001664). Thus, Dr. Tao could not have reported a second job at Fuzhou University in the proposal's Current and Pending Support or biosketch sections.[4] Special Agent Lampe agreed that "there was nothing to report on these grant applications [to DOE and NSF] as it pertains to any of these activities in China because they pre-dated that activity." D.A.106 (Day 11 Tr. 218:16–18).

Nor was Dr. Tao's July 16, 2018 email to Dr. Schwartz, providing updated Current and Pending Support, materially false. D.A.246–52 (Gov't Exs. 193 & 194). The email from Dr. Schwartz asked Dr. Tao for "an updated Current and Pending Support list from you and your co-PI that includes a short statement for each grant describing briefly their goals and indicating any existing or potential overlap with this DOE grant. For every current federal grant, please include the name and phone number of the program manager responsible for it." D.A.253 (Def. Ex. 1224). Dr. Tao responded by including his current and pending federal support. This statement was not false. As detailed below, the government introduced no evidence that, at the time of the

---

[3] "D.A.__ refers to the Defense Appendix attached hereto.

[4] The purpose of the biosketch was for DOE and NSF to review the principal investigator's qualifications to perform the work. D.A.41 (Day 5 Tr. at 118:5–12 (Dr. Keiser of NSF testimony)); D.A.56 (Day 6 Tr. at 14:11–13 (Dr. Schwartz of DOE testimony)). There was no obligation to update a biosketch if a new position was obtained. D.A.57 (Day 6 Tr. at 15:12–14, 19–24).

July 16, 2018 email, Dr. Tao had any active Chinese grants or even pending grant proposal applications. D.A.246–52 (Gov't Exs. 193 & 194). Moreover, Dr. Schwartz—the only witness from the DOE at trial—testified on direct examination that Dr. Tao did not need to disclose a second job at a Chinese university or funding from a foreign university to set up a lab as Current and Pending Support, and further testified that DOE was only concerned about *active,* not pending, grants:

> **Adam Barry [Prosecutor]:** So when you were evaluating Doctor Tao's renewal proposal, would you have wanted to know if he had a second job at a Chinese university while having his full-time job at KU?
>
> **Viviane Schwartz [DOE]:** Since I'm not his employer, I really don't verify, you know, jobs, per se. That is not my role as a program manager. What I'm verifying is what kind of research commitment the PI has, if there is enough time to – to perform the application and if the content does overlap with others. …
>
> **Adam Barry [Prosecutor]:** And when you were reviewing his renewal, would you have wanted to know whether he had been promised or received funding from a foreign research university or institution to build a laboratory?
>
> **[Viviane Schwartz]:** To build a laboratory? I don't think that would be any of my concern.

D.A.54–55 (Day 6 Tr. at 10:2–10, 11:9–14). She reaffirmed this testimony on cross examination:

> **Peter Zeidenberg [Def.]:** You said you didn't care at DOE about second jobs. That's not, like, your purview; correct?
>
> **Viviane Schwartz [DOE]:** That's not my purview. …
>
> **Peter Zeidenberg [Def.]:** You didn't care about the fact that he was potentially working on helping build a second lab, that was not important to you as a program manager?
>
> **Viviane Schwartz [DOE]:** Not at the time.

D.A.66–67 (Day 6 Tr. at 53:22–24, 54:11–14). Thus, even if the government could prove beyond a reasonable doubt that Dr. Tao had a second job at Fuzhou University, and received funding to build a lab there (it did not), the email was not false, let alone materially false.

Dr. Schwartz further testified that the existence of a foreign grant proposal was not material to DOE if it was not ultimately funded. She testified that the purpose of collecting

Current and Pending Support information in a grant proposal was to see if existing grants had "significant overlap" with the one proposed to DOE, and to ensure that the principal investigator had time to work on the grant proposed to DOE. D.A.54 (Day 6 Tr. at 10:6–10).[5] It follows, she testified, that if a principal investigator omitted pending support (*i.e.*, a pending grant application) from a Current and Pending Support submission, it would not be material to DOE if it was not ultimately funded because there could be no overlap or time commitment issue posed by an unfunded grant proposal application:

> **Peter Zeidenberg [Def.]:** And just to dive into that a little further, you're looking at a grant application, you want to know about current and pending support because of the overlap and time commitment issue; correct?
>
> **Viviane Schwartz [DOE]:** Yes.
>
> **Peter Zeidenberg [Def.]:** And if ultimately something is left off but – but it is not funded, then in a way, it's a situation where the problem is averted because there can be no overlap and there can be no time commitment issue on an unfunded grant?
>
> **Viviane Schwartz [DOE]:** Yes. …
>
> **Peter Zeidenberg [Def.]:** Yes, yes. If there are – other pending support is not funded, then overlap and time commitment is not an issue?
>
> **Viviane Schwartz [DOE]:** Correct.

D.A.63, 67 (Day 6 Tr. at 26:14–23, 54:8–10). Thus, even if the government could prove that Dr. Tao omitted a foreign grant proposal submitted in China from his Current and Pending Support, it would not be material unless the foreign grant was ultimately funded. *Id.* Even then, Dr. Schwartz testified, the funded grant would only be material if it had "significant overlap" with the grant proposed to DOE, or if the principal investigator did not have "enough time to – to

---

[5] A 2015 email from Dr. Tao's former program officer at DOE, Raul Miranda, to Dr. Tao stated that the overlap inquiry was focused on overlap with existing *federal* grants: "I can't find your annotated Current and Pending List … It is needed for my documentation as I must certify that there are no overlaps with other federal funding." D.A.254–55 (Def. Ex. 1223).

perform the application." D.A.53–54 (Day 6 Tr. at 9:25, 10:9–10). The government could not prove overlap or time commitment issues because there was no evidence that any of the Chinese proposal applications referenced at trial were actually funded.

The government's own witnesses acknowledged that there was no evidence any grant application in China received funding. D.A.87 (Day 10 Tr. at 157:2–4, 16–19) (testimony of James Churchill, FBI linguist, that of "[a]ll of the grant proposals or purported grant proposals in China, none of them had the seal or signature you would expect prior to submission," and "none of the draft contracts or addenda all the way through May [2018] had any stamps or seals on them"); D.A.104–105 (Day 10 Tr. at 214–15) (testimony of Special Agent Lampe confirming that there was no evidence of a funded grant in China). Thus, "overlap and time commitment [was] not an issue," D.A.67 (Day 6 Tr. at 54:9), and any pending support Dr. Tao failed to disclose to DOE could not have been material to DOE.[6]

In fact, the government failed to introduce a grant application/proposal in China that was even successfully submitted for funding. The only alleged foreign grant applications the government introduced were unsigned, contained no seal, and plainly were not submitted to the National Natural Science Foundation of China. *See* D.A.256–486 (Gov't Exs.352, 491, 493, 504). Thus, they did not even constitute "pending support." The closest the government came to evincing that a grant application may have been submitted in China was, first, by introducing a

---

[6] *Cf. United States v. Camick*, 796 F.3d 1206, 1219 (10th Cir. 2015) (reversing wire fraud conviction based on false statements made in a provisional patent application, because statements would only be material to the U.S.P.T.O. if the application became nonprovisional, and applicant later abandoned provisional application rather than converting it into a nonprovisional one); *United States v. Johnson*, 19 F.4th 248, 258–59 (3d Cir. 2021) ("In short, the problem with the Government's proof is that not every misrepresentation presented to a governmental decisionmaker is inherently material.' A statement might be false, but still incapable of affecting anything, as seen in the Tenth Circuit's decision in *United States v. Camick*, 796 F.3d 1206 (10th Cir. 2015)).

May 3, 2018 *rejection* of an application, where a signed and sealed version of the application itself (if one existed) was not in evidence and thus its contents were unknown. D.A.487 (Gov't Ex. 492-A). The May 3, 2018, rejection stated that the relevant application was incomplete, and thus could not be considered for funding. D.A.487 (Gov't Ex. 492-A). The May 3, 2018, rejection also demonstrated that the corresponding application was not pending when Dr. Tao sent the July 16, 2018, Current and Pending Support update to DOE, since the rejection pre-dated the email to DOE by more than two months. Second, the government introduced the email charged as Count 7, where a person named Yu-Wen Chen forwarded Dr. Tao an email purportedly from the National Science Foundation of China that stated that Dr. Tao would add Yu-Wen Chen "as a project participant when filling in the following application form." D.A.490–92 (Gov't Ex. 494-A). The government failed to introduce a corresponding grant application, however let alone one that included a time commitment or funding for Dr. Tao's research. And the email's statement that an application form still needed to be "fill[ed] in" indicated that no application had been finalized or submitted. D.A.490–92 (Gov't Ex. 494-A). As noted, there was also no evidence that a grant related to the Yu-Wen Chen email received funding. *See, e.g.*, D.A.86 (Day 10 Tr. at 154) (testimony of Churchill that he is unaware of evidence of a grant application related to the Yu-Wen Chen email being funded); D.A.105 (Day 11 Tr. at 215:5–10) (testimony of Special Agent Lampe that the Yu-Wen Chen email did not indicate that a grant was funded). And even if it did receive funding—contrary to the evidence— the March 2019 Yu-Wen Chen email *post-dated* Dr. Tao's July 2018 Current and Pending Support email *by almost a year*, and thus could not have been disclosed to DOE in the July 2018 email. *Compare* D.A.246–52 (Gov't Exs. 193 & 194, email of updated Current and Pending Support dated July 16, 2018), *with* D.A.488–89 (Gov't Ex. 494, email from Yu-Wen Chen dated

March 17, 2019).

The government's allegation that Dr. Tao failed to update his Current and Pending Support in his June 15, 2019 progress report to DOE fares no better. Contrary to the allegation in the SSI, ¶ 39(F), the progress report did not include a section that requested or required an update to Current and Pending Support. D.A.493–531 (Gov't Ex. 34 progress report for Award No. DE-SC0014561). Dr. Schwartz testified that she did not "think the progress report ever required" that an "unfunded grant application be provided." D.A.64 (Day 6 Tr. at 31:6–8); *accord* D.A.65 (Day 6 Tr. at 47:5–8 (same)). Rather, the DOE progress report sought information about the principal investigator's Accomplishments, Products (*i.e.*, publications), Participants, and Changes/Problems with the research approach. D.A.493–531 (Gov't Ex. 34).[7] Even if the progress report had requested that information—which it did not—Dr. Tao had nothing to report because he had no funded grants in China.

Accordingly, the Court should acquit Dr. Tao of defrauding DOE because he did not make or cause to be made a misrepresentation to DOE that was material to DOE's funding decision.

2.  <u>Dr. Tao never made or caused to be made a material misrepresentation to NSF in order to obtain grant funds for KU.</u>

The government also failed to prove that Dr. Tao made or caused to be made a material misrepresentation to NSF in order to obtain grant funds for KU. Remarkably, the SSI does not even allege a specific misrepresentation to NSF—likely because there was none.

KU submitted the grant proposal to NSF on October 2, 2017, *eight months before* Dr. Tao allegedly took a second job at Fuzhou University. *See* D.A.532 (Gov't Ex. 55 at 1, NSF Proposal

---

[7] Special Agent Lampe conceded at trial that he was unsure whether this disclosure was necessary, stating "I'm not so familiar with progress reports that I can answer accurately." D.A.107 (Day 11 Tr. at 220:5–6).

No. 1800601). Thus, even assuming Dr. Tao accepted the position at Fuzhou University in May 2018 as alleged at trial, there would have been nothing to disclose in October, 2017. The lone NSF witness called at trial, Dr. Rebecca Keiser, also testified a principal investigator is not required to subsequently update the biosketch. D.A.48–50 (Day 5 Tr. at 156–57, 175). Special Agent Lampe confirmed that no alleged activities in China needed to be disclosed in the October 2017 proposal because the proposal predated those activities. D.A.106 (Day 11 Tr. 218:16–20).

Nor was any subsequent submission to NSF materially false. Dr. Philippe Sautet of UCLA submitted to NSF an update to his and Dr. Tao's Current and Pending Support on May 18, 2018, but it was not materially false. *See* D.A.584–90 (Gov't Exs. 143 & 144). As an initial matter, there is no evidence that Dr. Tao, rather than Dr. Sautet, or someone else at KU, personally prepared the portion of the Current and Pending Support section related to Dr. Tao.[8] Nor was there evidence that the submission was materially false. Dr. Keiser testified that NSF collected Current and Pending Support for the same reason as DOE—to assess time commitments and overlap with existing grants—and updated Current and Pending Support was meant to help NSF determine just before issuing an award if any "pending support" listed in the original proposal "might now have been funded … to make sure that that is analyzed as part of this process." D.A.33 (Day 5 Tr. at 57:15–19). As a result, just like Dr. Schwartz from DOE, Dr. Keiser testified that the omission of a grant proposal from a Current and Pending Support submission is not material to NSF if the omitted proposal is not ultimately funded:

> **Peter Zeidenberg [Def.]:** And if someone forgot to include pending support and it ended up not getting funded, then it couldn't impact on time commitment or

---

[8] Despite having complete access to Dr. Tao's KU and personal emails, the government did not introduce any emails or other documentary evidence in which Dr. Tao provided his Current and Pending Support to Dr. Sautet. The jury could only speculate that Dr. Tao did so, and any inference that he did so would be unreasonable given the lack of documentary evidence or testimony from Dr. Sautet to that effect.

overlap, correct?

**Rebecca Keiser [NSF]:** Correct.

**Peter Zeidenberg [Def.]:** And pending support is only important to know about because if it gets funded, then it could impact things in terms of commitment and overlap?

**Rebecca Keiser [NSF]:** Correct.

**Peter Zeidenberg [Def.]:** But if it doesn't get funded, then you dodged one?

**Rebecca Keiser [NSF]:** Correct.

D.A.50 (Day 5 Tr. at 175:13–22).[9] Dr. Sautet's email on May 18, 2018 to NSF regarding Dr. Tao's current and pending support could not have been false, because there was no evidence Dr. Tao had any other "pending" grant applications in China as of that date, let alone current funded grants in China. *See supra* Part I.A.1. Nor could it have been material, since there was no evidence a proposal in China was funded as of that date. *See supra* Part I.A.1.

Nor was the July 5, 2019, annual progress report submitted to NSF materially false. Like with the May 18, 2018 NSF submission, Dr. Sautet made the submission, and there was no evidence that Dr. Tao contributed any false information to it. *See* D.A.594–603 (Gov't Ex. 57, progress report for Award No. 1800601). Nor was the submission actually false. Like with DOE progress reports, annual reports to NSF did not request updates to Current and Pending Support. *See id.* Dr. Keiser confirmed this:

**Peter Zeidenberg [Def.]:** And there are no questions in that progress report about current and pending support, correct?

**Rebecca Keiser [NSF]:** No. There are not. …

**Peter Zeidenberg [Def.]:** And there's no need to list pending support on a current

---

[9] Similar to Dr. Schwartz's testimony, she also testified that access to another university's lab, without a time commitment, does not constitute Current and Pending Support, consistent with a 2020 NSF FAQ. D.A.35–36 (Day 5 Tr. at 101–02); *see* D.A.591–93 (Def. Ex. 1460, FAQs on Current and Pending Support PAPPG).

and pending – on a progress report, correct?

**Rebecca Keiser [NSF]:** Correct, on an annual report.

D.A.42, 50 (Day 5 Tr. at 122:13–15, 175:10–12).[10] Dr. Subramaniam also testified that NSF did

not require disclosure of "new current and pending support" in progress reports. D.A.70 (Day 6

Tr. at 115:3–6). Instead, like DOE progress reports, NSF progress reports required information

about Accomplishments, Products (*i.e.*, publications), Participants, Impacts, and

Changes/Problems with the research approach. *See* D.A.594–603 (Gov't Ex. 57); *see also*

D.A.34 (Day 5 Tr. at 62:5) (testimony of Dr. Keiser that annual progress reports "tell[] us about

the status of the project that NSF funded").

Accordingly, the Court should acquit Dr. Tao of defrauding NSF because he did not

make or cause to be made to NSF a misrepresentation that was material to NSF's funding

decision.

3. <u>Dr. Tao never made or caused to be made a material misrepresentation to KU
   in order to maintain salary.</u>

The government also failed to present evidence that Dr. Tao made a material

misrepresentation to KU in order to fraudulently obtain salary. The SSI alleged that Dr. Tao

made two misrepresentations to KU—first, by proposing to KU a collaborative research proposal

with Fuzhou University on May 17, 2018, to support a buyout of his spring 2019 teaching duties,

without disclosing his alleged second job at Fuzhou University, and second, by allegedly failing

to disclose a second job at Fuzhou University in his September 25, 2018, Conflict of Interest

form. SSI ¶ 39(C), (E). The government failed to prove that Dr. Tao made a misrepresentation in

either submission. *See infra* Part II.C (COI form)

---

[10] Dr. Keiser also testified that the question in the progress report about foreign travel concerned
only "foreign travel done in connection with th[e] grant," and not travel unrelated to the grant
work itself. D.A.42-43 (Day 5 Tr. at 122:18–123:8).

The government also failed to prove that either alleged misrepresentation was material to KU's payment of his salary. The government called eleven witnesses from KU, and not a single one testified that KU would not have paid Dr. Tao his salary if it had known about his alleged second position at Fuzhou University. Nor did any witness testify that this information *could have* affected KU's decision to pay his salary. The government presented no evidence to bridge the causal gap between Dr. Tao's alleged misrepresentation regarding a second position in China and his receipt of KU salary.

### B. Dr. Tao lacked intent to defraud KU, DOE, or NSF, and each alleged victim was satisfied with his work.

The Court should acquit Dr. Tao of the three remaining wire fraud counts for the additional reason that he lacked "intent to defraud." *Zander*, 794 F.3d at 1230. The evidence conclusively showed that during the period in question, Dr. Tao performed all work to the satisfaction of KU, DOE, and NSF, which received the full benefit of their respective bargains, even if Dr. Tao did not inform them of an alleged position in China during that time. Not one witness during the whole trial testified that the alleged victims lost money or property. The only two district courts that have considered whether a defendant professor commits fraud in these circumstances have acquitted for lack of fraudulent intent, just as this Court should.

A defendant lacks fraudulent intent where "the alleged victims received exactly what they paid for." *United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016); *see United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) ("[W]e have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain."); *United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014) ("Case law reinforces that the conventional meaning of 'deprive' applies in the fraud context. To be guilty of fraud, an offender's purpose must be to injure, a common-law root of the federal fraud statutes." (citation

16

and internal quotation marks omitted)); *accord United States v. Shellef*, 507 F.3d 82, 109 (2d Cir. 2007) (indictment was legally insufficient where it failed to allege a "discrepancy between the benefits reasonably anticipated and actual benefits received" (internal quotation marks omitted)); *cf. United States v. Flanders*, 491 F.3d at 1197, 1210 (10th Cir. 2007) (stating in bank fraud context that "intent to defraud means to act with an intent to deceive or cheat someone, ordinarily for the purpose of causing some finance [sic] loss to another or bringing about some financial gain to oneself." (quoting *United States v. Giraldi*, 86 F.3d 1368, 1377 (5th Cir. 1996))).

For this reason, both federal district courts that have considered motions for judgment of acquittal where a professor was charged with fraud for not disclosing an affiliation in China while obtaining and working on federal grants, but who performed all required work, have acquitted the defendant. In *United States v. Anming Hu*, 3:20-CR-21-TAV-DCP-1, 2021 WL 4130515, at *13–*20 (E.D. Tenn. Sept. 9, 2021), a district court acquitted a university professor charged with defrauding NASA of grant funds by concealing a second position at Beijing University of Technology from his university and NASA while working on NASA grants. *Id.* *1–*4. In acquitting Dr. Hu, the court reasoned that even if Dr. Hu "intentionally deceived NASA about his affiliation" in China, there was "no evidence that NASA did not receive exactly the type of research that it bargained for [and] … NASA was satisfied with defendant's work on their grants." *Id.* at *18. The court concluded that there "is simply no evidence that NASA did not receive … the benefit of its bargain." *Id.* The court rejected the government's argument that "what NASA actually bargained for was research conducted by an individual who would not cause NASA to violate the China Funding Restriction," explaining that Dr. Hu's position in China "did not impact the price or characteristics of the service provided, namely, the research

work conducted." *Id.* (citing *Takhalov*, 827 F.3d at 1313–14).[11] Because Dr. Hu did "not lie[] about the nature of the bargain and has not 'schemed to defraud,'" the court held that he "cannot be convicted of wire fraud." *Id.* (quoting *Takhalov*, 827 F.3d at 1313–14).

Similarly, in *United States v. Mingqing Xiao*, No. 4:21-cr-40039 (S.D. Ill. May 3, 2022), a district court acquitted a university professor of wire fraud for allegedly causing his university (SIUC) to obtain an NSF grant without disclosing an active Chinese grant and a second position at a Chinese university as Current and Pending Support. *See* D.A.873–80, Tr. of Ruling on Rule 29 Mot., *Mingqing Xiao* (May 3, 2022) (hereafter, "Xiao Tr."); *see also* Superseding Indictment, *Mingqing Xiao*, No. 4:21-cr-40039 (S.D. Ill. Oct. 5, 2021), ECF No. 57 at 2–4 (wire fraud allegations). The court reasoned that there was evidence of deceit, but "'one can deceive without defrauding.'" D.A.877 (Xiao Tr. at 6:17–18) (quoting *Takhalov*, 827 F.3d at 1312). To constitute fraud, "the deceit must be coupled with a contemplated harm to the victim that affects the very nature of the bargain itself," such as where "there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." D.A.878 (*Id.* at 7:2–8) (citing *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016)); *see also Weimert*, 819 F.3d at 366 (reversing fraud conviction where the alleged victim "was not misled as to the nature of the asset it was selling or the consideration it received"). Because the defendant did not deny NSF the benefit of its bargain, did not steal the grant funds, and did not otherwise harm NSF through his deceit, there was insufficient evidence that he had a scheme to defraud or intent to defraud. D.A.878-79 (Xiao Tr. at 7–8).

---

[11] The lack of fraudulent intent is even more compelling here because, unlike Dr. Hu, Dr. Tao was not charged with obtaining agency grants that would violate Chinese funding restrictions of the granting agencies.

Here, like in *Hu* and *Xiao*, Dr. Tao did not have intent to defraud KU, DOE, or NSF because each received the full benefit of its bargain. Dr. Schwartz of DOE testified that Dr. Tao's work on the DOE grant "appeared to have been done satisfactorily." D.A.58 (Day 6 Tr. at 19:4–5). She also praised his work internally more than a year after he allegedly took a second job in China, stating in June 2019:

> This is the first year after the renewal and the PI continues [to] report[] nicely their recent advances with an output of (at least) four new publications on which our grant was the major contributor. The publications are (as usually with this PI) in high impact journals (JACS, Nature Comm., Langmuir, among others). In addition, the PI also contributed to a very comprehensive review in the field published this year at Chem. Rev. … The output is very good and supportive of continuing funding.

D.A.604–05 (Gov't Ex. 36).[12] Dr. Schwartz further testified that "one of the measures of a successful grant is that a lot of papers are published in high-quality journals," and "the more the publications are cited, the better." D.A.58–59 (Day 6 Tr. at 19:24–20:3). She testified that based on these metrics, Dr. Tao's "research for DOE was a success." D.A.60 (Day 6 Tr. at 21:8–12). She also testified that there was no requirement that the principal investigator not have a "foreign academic appointment." D.A.61 (Day 6 Tr. at 22:18–22). As the sole DOE witness, Dr. Schwartz did not identify any issues with Dr. Tao's work on the DOE grant; or that DOE lost money; or that DOE should not have awarded KU the grant; or that DOE was denied a benefit of its bargain with KU related to the grant.[13]

Similarly, Dr. Keiser of NSF testified that she was unaware "of any allegations in this case that any of the work on the NSF grants at issue was not done in the manner prescribed."

---

[12] Special Agent Lampe testified that he told the grand jury that his understanding was that Dr. Tao completed the required research. D.A.92 (Day 11 Tr. at 83:14–23).

[13] Alicia Reed, an Assistant Vice Chancellor for Research, testified that she had no reason to think that any expenses charged to Dr. Tao's grants were illegitimate. D.A.20 (Day 3 Tr. at 75:13–25).

D.A.37 (Day 5 Tr. at 111:6–9). She also testified that she was unaware "of any allegations in this case that NSF funds were used to support foreign organizations." D.A.39 (Day 5 Tr. at 113:14–16). Dr. Keiser further testified that "the mere holding of a professional appointment at an organization other than one's own organization is not a per se conflict of interest," nor is membership in "a foreign talent recruitment program … if the membership does not interfere with the researcher's responsibilities to the university." D.A.44–45 (Day 5 Tr. at 144:11–145:1). As the sole NSF witness, Dr. Keiser did not identify any issues with Dr. Tao's work on the NSF grant; or that NSF lost money; or that NSF should not have awarded KU the grant; or that NSF was denied a benefit of its bargain with KU related to the grant.[14]

KU was also highly satisfied with Dr. Tao's work. In fact, it was so satisfied that it selected him as one of four faculty members in the whole university to receive the prestigious Chancellor's (Scholarly Achievement) Award in 2019. D.A.10–11 (Day 2 Tr. at 75–76, testimony of KU Chancellor Douglas Girod).[15] In giving the award to Dr. Tao, Chancellor Girod

---

[14] It was also undisputed that Dr. Tao was able to complete his grant work even while in China for portions of the spring or summer of 2019. His graduate student Luan Nguyen testified that during this time Dr. Tao supervised the lab and graduate students "through e-mail communications and phone calls. Almost perhaps every two days or sometimes daily," and Nguyen was "getting constant direction and feedback from him." D.A.79–80 (Day 9 Tr. at 123:21–124:4). Nguyen testified that he never felt like Dr. Tao "had abandoned" him or that he "didn't know what [he was] supposed to do" in the lab, Dr. Tao had "high standards for th[e] work," and expected "results, on time results." D.A.80 (Day 9 Tr. at 124:5–16). This is permissible under both grants. Dr. Schwartz testified that "if a PI were in a foreign country, it would not violate any DOE rules if he or she was overseeing a DOE grant being completed in the United States." D.A.58 (Day 6 Tr. at 19:10–14). Dr. Keiser acknowledged that principal investigators "travel extensively, collaborating with other university and research facilities," and they can supervise their work while traveling overseas. D.A.38–39 (Day 5 Tr. at 112:12–113:6). Reed testified that there was "no restriction on travel for a principal investigator as long as it's not reimbursed to an agency." D.A.25 (Day 4 Tr. at 73:15–18).

[15] This "marquee award" was "a way to recognize standout researchers who embody [KU's] mission to make discoveries that change the world," and required evaluation "by a panel of eight individuals … selected by the chancellor," based on the following criteria: (i) Advances the field of scholarship, (ii) Exhibits novelty and originality, (iii) Promotes scholarly and research activity

acknowledged that Dr. Tao's "contributions really have far exceeded expectations in his field in terms of his productivity and really his level of ingenuity." D.A.12 (Day 2 Tr. at 77:17–21). Chancellor Girod recognized Dr. Tao for having "175 publications with over 6,000 citations, which really speak to the novelty and the relevance of his work." D.A.12 (Day 2 Tr. at 77:22–25). He stated that Dr. Tao has "really enhanced KU's capabilities in surface science and identified key areas in the potential in the area of catalysis." D.A.13 (Day 2 Tr. at 78:1–8). He also commended Dr. Tao for his service activities, including as a fellow in the American Association of the Advancement of Science and in the Royal Society of the United Kingdom, as well as his service as a DOE and NSF reviewer, his international collaborations, and his development of "a very strong team of graduate students and post-doc researchers in addition to developing a world-class lab here at KU." D.A.13 (Day 2 Tr. at 78). Chancellor Girod testified that Dr. Tao's research output, consisting of 25 papers in 2018, was "a remarkable accomplishment" that "[v]ery few" professors at KU have achieved. D.A.9 (Day 2 Tr. at 74:4–8). Special Agent Lampe testified that he agreed that Dr. Tao's recognition suggested that he "was performing his job duties at Kansas." D.A.93 (Day 11 Tr. at 111:7–11).

Similarly, Dr. Tao's supervisor and department chair, Dr. Laurence Weatherley, testified that Dr. Tao was a "solid faculty member," and that he supported his nomination for the Chancellor's Award in 2019. D.A.21–22 (Day 3 Tr. at 175:21–176:6). Dr. Subramaniam testified that Dr. Tao had a "strong output" during the time period in question, and he was "pleased with the quality of Doctor Tao's work." D.A.71–72 (Day 6 Tr. at 131:5–132:14).[16] Nguyen, Dr. Tao's

---

or creative works at KU, and (iv) Enhances the university's national and international reputation. D.A.606–08 (Def. Ex. 1450); D.A.10–11 (Day 2 Tr. at 75–76).

[16] Dr. Subramaniam testified that Dr. Tao continued to work, without any salary or agency funding, after he was arrested in August 2019, to ensure that his prior research was published, including a paper published in *Nature Catalysis* in 2022, which Dr. Subramaniam testified was

graduate student, testified that Dr. Tao worked seven days a week for KU, typically 14–16 hours a day, and took no vacations. D.A.78–79 (Day 9 Tr. at 122:22–123:5). Not one of the eleven KU witnesses testified that he or she thought Dr. Tao had failed to fulfill his KU job duties, that KU lost money, that KU would not have paid his salary had it known a particular fact, or that KU was denied a benefit of its bargain with Dr. Tao.

Just like in *Hu* and *Xiao*, the evidence was insufficient to prove beyond a reasonable doubt that Dr. Tao intended to defraud anyone of salary or grant funds. 2021 WL 4130515, at *18. DOE and NSF received the benefits of their bargain with KU related to the grants, and KU received the benefit of its bargain with Dr. Tao as an employee who received salary. In these circumstances, the evidence was insufficient for a jury to conclude, beyond a reasonable doubt, that Dr. Tao had intent to defraud, even if he did not disclose an alleged relationship with Fuzhou University while performing his work.

### C. The government failed to prove a scheme to obtain money or property, and its theory that Dr. Tao had an undisclosed potential conflict of interest is invalid under *Skilling* and *McNally*.

"The wire fraud statute … prohibits only deceptive 'schemes to deprive the victim of money or property,'" not "all acts of dishonesty." *Kelly v. United States*, 140 S. Ct. 1565, 1571, 1573 (2020) (quoting *McNally v. United States*, 483 U.S. 350, 356 (1987)). The money-or-property loss to the victim must also be "an 'object of the fraud,'" not a mere "implementation cost[ ]" or "incidental by-product of the scheme." *Kelly*, 140 S. Ct. at 1573–74 (quoting *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)). Under *Skilling v. United States*, the defendant also cannot be convicted of a scheme to conceal a conflict of interest from an employer or third party. *Skilling v. United States*, 561 U.S. 358, 410 (2010). By seeking to prove

---

an "extremely highly-regarded publication." D.A.68 (Day 6 Tr. at 106:12–17).

that Dr. Tao committed fraud by concealing an actual or potential conflict of interest from KU and, by extension DOE and NSF, the government's fraud theory is invalid under these authorities.

1. _Skilling_ and _McNally_ held that a scheme to conceal a conflict of interest from an employer or third party, as the government charged here, is invalid under the fraud statutes even where the fiduciary receives salary.

The Supreme Court held in _Skilling_ and _McNally_ that a fiduciary's scheme to deprive an employer or third party of their right to the fiduciary's honest services, such as when the fiduciary labors under an undisclosed conflict of interest, is invalid under the fraud statutes. _Skilling_, 561 U.S. at 410 (rejecting government's argument that concealment of a conflict of interest is a valid federal fraud scheme); _McNally_, 483 U.S. at 360 (reversing fraud convictions of state officials who engaged in self-dealing and received kickbacks because scheme to defraud Kentucky government and its citizens of their right to honest services was not money-or-property fraud), _superseded by statute_, 18 U.S.C. § 1346, _as limited by Skilling_, 561 U.S. at 404 (limiting honest-services fraud statute to schemes involving kickbacks or bribes).

In 1987, the Supreme Court held in _McNally_ that "[t]he fraud statutes … were 'limited in scope to the protection of property rights.'" _Kelly_, 140 S. Ct. at 1571 (quoting _McNally_, 483 U.S. at 360). Before _McNally_, "federal courts had treated the breach of a duty owed to one's employer as a form of fraud, reasoning that it operated to defraud the employer of the intangible right to the employee's honest services." _United States v. Yates_, 16 F.4th 256, 266 (9th Cir. 2021). In these cases, "[u]nlike fraud in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other, the honest-services theory targeted corruption that lacked similar symmetry." _Skilling_, 561 U.S. at 400. "[B]y 1982, all Courts of Appeals had embraced the honest-services theory of fraud." _Id._ at 401.

In _McNally_, the Supreme Court "stopped the development of the intangible-rights

doctrine in its tracks" by construing the statute "as limited in scope to the protection of property rights." *Id.* at 401–02. The Court held that a state officer in Kentucky who, in selecting Kentucky's insurance agent, arranged to procure a share of the agent's commissions via kickbacks paid to companies the official partly controlled deprived the state and its citizens of their right to the official's honest services, but not to money or property as required to constitute fraud. *McNally*, 483 U.S. at 360. The year after *McNally*, Congress enacted the honest-services fraud statute, which criminalized any "scheme or artifice to deprive of another of the intangible right of honest services," 18 U.S.C. § 1346, but that statute also raised constitutional vagueness problems.

In 2010, the Supreme Court held that the new statute was constitutional only if applied to schemes where the fiduciary received bribes or kickbacks. The Court reasoned: "Congress' reversal of *McNally* and reinstatement of the honest-services doctrine, we conclude, can and should be salvaged by confining its scope to the <u>core</u> pre-*McNally* applications." *Skilling*, 561 U.S. at 408 (emphasis added). The "core" honest services fraud cases involved bribes and kickbacks:

> [T]here is no doubt that Congress intended § 1346 to reach *at least* bribes and kickbacks. Reading the statute to proscribe a wider range of offensive conduct, we acknowledge, would raise the due process concerns underlying the vagueness doctrine. To preserve the statute without transgressing constitutional limitations, we now hold that § 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law.

*Id.* at 408–09; *see Yates*, 16 F.4th at 267 (observing that the Supreme Court's narrowing of the statute was meant "to avoid declaring the statute unconstitutional"). Because Skilling was charged with defrauding Enron and its shareholders by inflating company stock prices through lies about its fiscal health, denying them his honest services, the Court reversed his conviction even though he received "salary and bonuses … and [profited] through the sale of approximately

$200 million in Enron stock." *Skilling*, 561 U.S. at 413, 415.

Importantly, *Skilling* made clear that fraud schemes based on undisclosed conflicts of interest remain invalid under *McNally*. In seeking to sustain Skilling's conviction, the government argued that the "core" honest services fraud cases include "undisclosed self-dealing by a public official or private employee—*i.e.*, the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Id.* at 409. But the Court rejected this argument:

> Nor are we persuaded that the pre-*McNally* conflict-of-interest cases constitute core applications of the honest-services doctrine. … In light of the infrequency of conflict-of-interest prosecutions in comparison to bribery and kickback charges, and the intercircuit inconsistencies they produced, we conclude that a reasonable limiting construction of § 1346 must exclude this amorphous category of cases.

*Id.* at 410. The Supreme Court has never revisited this ruling, and thus concealment of a conflict of interest by a fiduciary remains too "amorphous" to charge as fraud.[17]

The government's fraud theory contravenes *Skilling*'s holding. The government sought to prove that Dr. Tao concealed an actual or potential conflict of interest related to his alleged second position at Fuzhou University from KU and, by extension, DOE and NSF. *See* SSI ¶ 33 (alleging as part of the purpose of the scheme that Dr. Tao sought to "benefit the PRC"); *id.* ¶ 34

---

[17] Based on *Skilling* and *McNally*, courts have similarly held that the right to accurate information is not a "property right" whose deprivation can constitute fraud. *See, e.g.*, *Yates*, 16 F.4th at 265 ("The accurate-information theory is legally insufficient. There is no cognizable property interest in 'the ethereal right to accurate information.'" (quoting *Sadler*, 750 F.3d at 591)); *Sadler*, 750 F.3d at 591; *United States v. Slay*, 858 F.2d 1310, 1316 (8th Cir. 1988) ("Withholding valuable information from the City is not the same thing as depriving the City of its property, and only the latter conduct violates the mail fraud statutes."); *United States v. Holmes*, No. 5:18-cr-00258-EJD, 2020 WL 666563, *17 (N.D. Cal. Feb. 11, 2020) (holding that the "ethereal right to accurate information doesn't fit within limited property rights protected by [the] wire fraud statute" (brackets and internal quotation marks omitted)); *United States v. Jackson*, No. 3:16–CR–31, 2017 WL 1129941, at *4 (N.D. W. Va. Mar. 24, 2017) (stating that "alleged victims do not have a property right, as recognized by § 1341, to the truth," and "[c]learly, mail fraud does not punish mere deceit of another person or entity").

(alleging that "[a]s part of the scheme to defraud KU and the USG, **TAO** provided FZU with technical training, scientific expertise, and research as a Chang Jiang Professor at FZU, while purporting to remain loyal to KU, his employer." SSI ¶ 34 (emphasis added)). The government insisted over Dr. Tao's objection that the Court instruct the jury as to this invalid theory, resulting in the following instruction regarding the theory: "As part of the scheme to defraud KU and the USG, Dr. Tao provided Fuzhou University (FZU) with technical training, scientific expertise, and research as a Chang Jiang Distinguished Professor at FZU, while purporting to remain loyal to KU, his employer." Jury Instruction No. 2, ECF No. 278 (emphasis added).

The government similarly argued that Dr. Tao's object was to maintain positions at both universities simultaneously while he decided at which university he wanted to work fulltime. It argued at closing: "The defendant knew he couldn't do both [jobs], and that's why he lied and that's why he concealed and that's why he deceived." D.A.111 (Day 12 Tr. at 11:17–18) (emphasis added). The government reiterated: "The fact of the matter was there was no way for him to do both [jobs].... Now, Dr. Liu [from Georgia Tech] gave him sound advice, try and work it out with your employer, talk to them, be upfront, be honest, explain what's going on, maybe you can work something out … You're here because … what the defendant did was choose to lie, he chose to conceal, and he chose to mislead." D.A.121–22 (Day 12 Tr. at 55:19–56:5). The government's opening began the same way, contending that Dr. Tao "ha[d] a problem" in February 2018 because "he's a full-time professor at the University of Kansas … but he's just been offered a very terrific job at a research university in China. And he doesn't know what to do." D.A.2 (Day 2 Tr. at 6:7–11). According to the government, Dr. Tao's "solution" was to "conceal[] the second job" from KU. D.A.2 (Day 2 Tr. at 6:20–23).

Were there any doubt, the government charged Dr. Tao in Count 6 with wire fraud for

allegedly failing to disclose an actual or potential conflict of interest in his September 2018 Conflict of Interest form. D.A.609–16 (Gov't Ex. 25). It introduced KU conflict of interest policies and claimed he had an "ad hoc" obligation to tell KU about potential conflicts. *See* D.A.617–83 (Gov't Exs. 1, 3, 3-A, 4). In its opening statement, the government asserted that "there's forms and disclosures that KU requires professors like the defendant to make," and "one of those policies requires that scientists or professors like the defendant disclose all potential or actual conflicts of interest," but "the evidence will show that on numerous occasions over the years, he submitted certifications to KU stating that he didn't have anything to disclose," as part of "an elaborate scheme to lie to KU." D.A.4–5 (Day 2 Tr. at 11:25–12:21). At closing, the government repeatedly argued that "the defendant knew he had an obligation to report potential conflicts of interest to KU and he chose not to," both in his Conflict of Interest form and "on an ad hoc basis." D.A.111–12, 116–18 (Day 12 at Tr. 11:23–12:6, 18–19, 51). The government extended this theory to DOE and NSF, by claiming that they relied on KU to identify and manage conflicts of interest. *See, e.g.*, D.A.6 (Day 2 Tr. at 16:21–23) (stating in the government's opening that there is a "tripartite relationship" between agencies, universities, and their professors that is "premised on trust" and "integrity").

The government's fraud theory—that Dr. Tao concealed an actual or potential conflict of interest—is invalid under *Skilling* and *McNally*, and the Court should therefore acquit Dr. Tao on the three fraud counts.

2.   The government cannot circumvent *Skilling* and *McNally* by charging Dr. Tao with fraudulently maintaining his salary or working on projects funded by grants.

The government cannot circumvent *Skilling* and *McNally* merely by framing its invalid conflict-of-interest theory as a scheme to maintain salary, or a scheme to continue working on grants funded in part by DOE and NSF.

27

It is now well-settled that the government cannot skirt *Skilling* and *McNally* by alleging that a fiduciary continued to draw salary while depriving an employer or third party of honest services, absent the defendant's receipt of kickbacks or bribes. In the last seven months alone, both the Ninth Circuit and a district court in the District of Columbia reaffirmed this conclusion. *See Yates*, 16 F.4th at 266–68 (bank managers charged with making misrepresentations to Board of Directors and shareholders about financial condition of bank in order to receive continued salary and bonuses did not commit money-or-property fraud); *United States v. Guertin*, 2022 WL 203467, at *3, --- F. Supp. 3d --- (D.D.C. Jan. 24, 2022) (State Department official charged with lying during his federal background check to maintain his employment and salary did not commit money-or-property fraud); *accord United States v. Goodrich*, 871 F.2d 1011, 1013–14 (11th Cir. 1989) (defendant charged with defrauding county of salary, which was paid to county zoning board members who accepted defendant's bribes and thus did not provide honest services, did not state a money-or-property fraud scheme under *McNally* even though charged as salary fraud); *United States v. Facteau*, 1:15-cr-10076-ADB, 2016 WL 4445741, at *10 (D. Mass. Aug. 22, 2016) (rejecting maintenance of salary theory); *United States v. Billmyer*, No. 94-29-01-JD, 1995 WL 54471, at *9 (D.N.H. Feb. 3, 1995) (same). Indeed, "the only circuit courts to address the issue have rebuffed the Government's salary-maintenance theory." *Guertin*, 2022 WL 203467, at *3 (citing *Yates*, 16 F. 4th at 266, and *Goodrich*, 871 F.2d at 1013–14).[18]

---

[18] Just like in *McNally* and *Skilling*, the Ninth Circuit highlighted the due process void-for-vagueness concerns that a maintenance-of-salary fraud theory would present. The theory "would criminalize a wide range of commonplace conduct," the court explained, such as when "an employee who wastes time on the Internet but then, to avoid being fired, falsely claims to have been working productively." *Id.* at 267 (citing *McDonnell v. United States*, 136 S. Ct. 2355, 2373 (2016)). The court added: "Extending the fraud statutes in that way would raise serious concerns about whether the offense is defined 'with sufficient definiteness that ordinary people can understand what conduct is prohibited and … in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Id.* at 267–68 (quoting *Skilling*, 561 U.S. at 402–03). As Justice

As the Ninth Circuit explained, *Skilling* "reject[ed] … the salary-maintenance-theory" of fraud. *Yates*, 16 F.4th at 266. The court explained: "Of course, salaries and other financial employment benefits are both forms of money…. But there is a difference between a scheme whose object is to obtain a new or higher salary and a scheme whose object is to deceive an employer while continuing to draw an existing salary—essentially, avoiding being fired." *Id.* (internal quotation marks omitted). The district court in *Guertin* agreed with *Yates*, and also pointed out that the word "obtain" in the wire fraud statute does not embrace "continued salary" unless one engages in "tortured semantics." *Guertin*, 2022 WL 203467, at *2. The court explained that "it is a contradiction in terms to say a defendant's scheme enables him to 'obtain' a pre-existing contractual right like a 'continued salary,'" and "[t]he only way to make sense of that contradiction would be to ignore the active, affirmative connotations of the word 'obtain," which "[t]he Court will not do." *Id.*

Courts have therefore rejected attempts by the government to recharacterize invalid honest services fraud schemes as money-or-property fraud schemes—like the government seeks to do here—to skirt *Skilling* and *McNally*. In *Yates*, the Ninth Circuit explained: "To be sure, the government charged … property fraud, not honest-services fraud. But we do not believe the Court intended 'to let in through the back door the very prosecution theory that [it] tossed out the front.'" *Id.* (quoting *United States v. Ochs*, 842 F.2d 515, 527 (1st Cir. 1988)); *see Ochs*, 842 F.2d at 527 ("[W]e do not think courts are free simply to recharacterize every breach of fiduciary duty as a financial harm …."). The court added: "Permitting the government to recharacterize

---

Kagan put it in *Kelly*, if prosecutors "could prosecute as property fraud every lie … the result would be … 'a sweeping expansion of federal criminal jurisdiction,'" and "the Federal government could use its criminal law to enforce (its view of) integrity," an outcome "[t]he property fraud statutes do not countenance." 140 S. Ct. at 1574 (quoting *Cleveland v. United States*, 531 U.S. 12, 24 (2000)). These concerns are front and center in this case.

schemes to defraud an employer of one's honest services—thereby profiting 'through the receipt of salary and bonuses'—as schemes to deprive the employer of a property interest in the employee's continued receipt of salary would work an impermissible 'end-run' around the Court's holding in *Skilling*." *Yates*, 16 F.4th at 267 (quoting *Skilling*, 561 U.S. at 413, and *Kelly*, 140 S. Ct. at 1574).

For the same reason, the government's attempt to reframe this case as grant fraud fails. As an initial matter, the SSI and the government's opening statement were wrong in alleging that Dr. Tao personally obtained grant funds. *See* SSI ¶¶ 4, 14, 24, 31, 32, 33, 35 (alleging that Dr. Tao "obtained" funds from DOE and NSF); D.A.3 (Day 2 Tr. at 8:1–4) (stating in government opening statement that "the defendant received hundreds of thousands of dollars in federal grant money from the National Science Foundation and from the U.S. Department of Energy").[19] But the undisputed evidence was that KU applied for the grants, KU was the awardee, and KU owned, received, and disbursed all of the grant funds, even if Dr. Tao was a principal or co-principal investigator on the grant. *See, e.g.*, D.A.40 (Day 5 Tr. at 114, Rebecca Keiser testimony); D.A.19 (Day 3 Tr. at 73, Alicia Reed testimony); D.A.27 (Day 4 Tr. at 149, Kim Wittman testimony); D.A.69 (Day 6 Tr. at 109, Bala Subramaniam testimony).[20] Dr. Tao could not even buy equipment for his lab under the KU grants and instead someone had to prepare a requisition, which "a series of people" at KU would need to approve, and then KU would send a purchase order and pay the vendor directly, with no grant money ever touching Dr. Tao's hands.

---

[19] The government's erroneous pleading helped it defeat the defense's motion to dismiss. *See, e.g.*, ECF No. 99 at 24 (noting that the SSI alleged that there is no intermediary between Defendant and the federal agency in this case and Defendant directly applied for NSF grants, and DOE and NSF directly agreed to fund Defendant's research, citing paragraph 4 of the SSI's allegation that "TAO obtained funds from the [DOE] and [NSF]").

[20] Loving and Dr. Subramaniam confirmed that principal investigators at KU do not get bonuses or commissions if KU receives a grant award they helped propose. D.A.16-17 (Day 2 Tr. at 127:12–28:1, Loving testimony); D.A.69 (Day 6 Tr. at 109:10–18, Subramaniam testimony).

D.A.29–31 (Day 4 Tr. at 225–27, Jane Johns testimony). The government finally admitted this in its closing argument: "You heard testimony that [the grant] money belonged to the university, it doesn't go to the PI." D.A.110 (Day 12 Tr. at 9:20–21). The agency grants merely funded KU, Dr. Tao's employer, and KU's research that he guided and developed as a KU employee.

The government's theory that Dr. Tao deprived the agencies of grant money that they paid to KU because he had an undisclosed actual or potential conflict of interest fails under *Skilling* and *McNally*. Aside from the fact that the agencies did not have a right to Dr. Tao's honest services since he worked for KU and was not a fiduciary to the agencies, *Skilling* and *McNally* made clear that depriving non-employer third parties (here, DOE and NSF) of their right to the defendant's honest services is invalid. *Skilling*, 140 S. Ct. at 369, 409 (invalidating alleged scheme by Skilling as executive of Enron to deprive Enron as employer and its third-party shareholders of their rights to his honest services); *McNally*, 483 U.S. at 352 (invalidating scheme by state officials to deprive government as employer and third-party citizens of their rights to officials' honest services). Even if the government could establish that Dr. Tao actually had a conflict of interest—and it did not—this at most deprived KU and, indirectly, DOE and NSF, of a right to Dr. Tao's honest services.

No court since *Skilling* has upheld a fraud conviction predicated on alleged disloyalty to an employer or a third party—through concealment of an actual or potential conflict, or otherwise—just because the employee received salary or the employer received third-party funding. Such a holding would repudiate *Skilling* and *McNally* and render them dead letters, since virtually every employee or other fiduciary accused of dishonest services receives salary, and many serve as fiduciaries to third parties.

**D. None of the three charged uses of the wires were "in furtherance of" a scheme to defraud KU, DOE, or NSF.**

The evidence was also insufficient to prove beyond a reasonable doubt that any of the three remaining wire fraud counts involved a use of the wire "for the purpose of executing" the alleged fraud scheme. 18 U.S.C. § 1343.

To violate the wire fraud statute, the use of the wires must have been "a part of the execution of the fraud" or "incident to an essential part of the scheme." *Parr v. United States*, 363 U.S. 370, 390 (1960) (internal quotation marks omitted). This requirement must be met "as conceived by the perpetrator at the time" of the offense. *United States v. Weiss*, 630 F.3d 1263, 1269 (10th Cir. 2010). "It is therefore not correct … that use of the wires is illegal if at all 'in relation to' a scheme to defraud." *United States v. Redcorn*, 528 F.3d 727, 741 (10th Cir. 2008) (citation omitted). None of the three wire fraud counts satisfy this requirement.

Count 7 of the SSI (designated as Count 6 at trial) charged Dr. Tao with sending an email "regarding [his] application for National Natural Science Foundation of China funding" to Yu-Wen Chen on March 17, 2019. SSI ¶ 42; *see* D.A.488–89 (Gov't Ex. 494).[21] In the email, the National Natural Science Foundation of China told "Teacher Yu-Wen Chen" that Dr. Tao "will add you as a project participant when filling in the following application form." D.A.490-92 (Gov't Ex. 494-A). Yu-Wen Chen forwarded the email to Dr. Tao and stated, "I do not know how to do it," then stated in follow-on emails, "I have done it," and "I have confirmed it." D.A.490–92 (Gov't Ex. 494-A). Dr. Tao is charged with wire fraud for responding from his KU email account to the Gmail account of Yu-Wen Chen, "Thank you very much!" D.A.490–92 (Gov't Ex. 494-A).

The evidence was plainly insufficient to prove that Dr. Tao's thank-you email furthered a

---

[21] Government Exhibit 246 is the same email as Government Exhibit 494.

scheme to defraud KU of salary, or DOE and NSF of grant funds. At most, the jury could have speculated from this email that Dr. Tao was involved in a grant application in China in March 2019, which, in any event, post-dated any required disclosure to KU, DOE, or NSF. *See supra* Part I.A1, I.A.2. There was no evidence or argument that the thank-you email was "incident to an essential part of the scheme." *Parr*, 363 U.S. at 390. Nor did the government attempt to argue otherwise. During its closing argument, the government asserted that Dr. Tao's thank-you email is "related to the NSFC grant application," and therefore is "in furtherance of the scheme to defraud," without providing any explanation. D.A.115 (Day 12 Tr. at 17:7–8). The thank-you email was not "necessary to gain control over the funds or to conceal the nature of [the] [alleged] fraud." *Redcorn*, 528 F.3d at 741–42. And the "the success" of Dr. Tao's alleged scheme to defraud KU, DOE, or NSF "in no way depended upon the receipt of" the thank-you email by Yu-Wen Chen. *United States v. Cardall*, 85 F.2d 656, 682 (10th Cir 1989). It was not "incident to the accomplishment of an essential part of the scheme" to defraud anyone. *United States v. Mann*, 884 F.2d 532, 536 (10th Cir. 1989).

The government also failed to prove the September 2018 Conflict of Interest form submission charged in Count 6 of the SSI (designated as Count 5 at trial) was in furtherance of the scheme to defraud. Aside from the fact that this count plainly charges a fraud theory that violates *Skilling* and *McNally*, *see supra* Part I.C., the submission also was not in furtherance of a scheme to defraud KU, DOE, or NSF. As a threshold matter, the form itself was not false. *See infra* Parts II.C. Nor did Dr. Tao or KU submit the form to DOE or NSF. *See infra* Part II.A. Thus Dr. Tao could not have submitted it to KU in furtherance of a scheme to defraud DOE or NSF. It also could not have been in furtherance of a scheme to defraud KU. The form had no causal relationship with Dr. Tao's receipt of salary, and there was no evidence that KU had

actually reviewed Dr. Tao's prior Conflict of Interest form when he submitted it several months late in January 2018, or when he submitted one in September 2018, let alone for purposes of making a salary payment determination.

There was also insufficient evidence that the email charged in Count 4 of the SSI (designated as Count 3 at trial) was in furtherance of a scheme to defraud. Count 4 was a June 26, 2018, email from Dr. Tao to Kim Wittman at KU in which Dr. Tao stated that the answer is "NO" to certain internal questions in KU's "PI Checklist … regarding Intellectual Property Development." D.A.684–85 (Gov't Ex. 170); *see* D.A.114 (Day 12 Tr. at 16:2–4) (government closing argument identifying Count 4, designated as Count 3 at trial, as Government Exhibit 170). The government argued that "[i]t was part of the scheme to defraud because the defendant thought that would give him cover in dealing if anyone asked, why are you dealing with somebody from Fuzhou University so much." D.A.113 (Day 12 Tr. at 15:19–22). As a threshold matter, the proposed agreement had nothing to do with DOE or NSF, which never even knew about it, and thus it could not have been incident to an essential part of a scheme to defraud them.

Nor was the Count 4 email in furtherance of a scheme to defraud KU of salary. Wittman merely asked Dr. Tao to confirm that the proposal did not involve "(1) Improvements on previously disclosed inventions; (2) Development of a new method, apparatus, material, or device; (3) Creation of software or other copyrightable instruments that may have commercial value; (4) Reliance on intellectual property previously disclosed to the University; or (5) Reliance on intellectual property previously disclosed by another entity." D.A.684 (Gov't Ex. 170). Dr. Tao correctly answered no, because the proposed project involved only "characterization." D.A.684 (Gov't Ex. 170). This did not further a scheme to defraud KU of

salary in any way, and merely helped KU determine whether there were patent issues related to the proposed collaboration.

Even the proposed collaboration itself was not in furtherance of a scheme to defraud. The proposal, if finalized, would have required Fuzhou University to pay $90,000 to KU. Thus, the proposal revealed, rather than concealed, that Dr. Tao had a relationship and collaboration with Fuzhou University. *United States v. Maze*, 414 U.S. 395, 403 (1974 (holding that  a use of the mails that "increased the probability that respondent would be detected and apprehended" was not in furtherance of the fraud scheme); *Redcorn*, 528 F.3d at 742 (use of the wires was not in furtherance of the scheme because it made the fraud scheme "*more*, not less, obvious"); *accord United States v. Castile*, 795 F.2d 1273, 1278 (6th Cir. 1986). Wittman herself testified that the proposed collaboration caused her to assume that Dr. Tao "had a relationship with Fuzhou University around this time." D.A.28 (Day 4 Tr. at 151:10–14). The proposed agreement, if finalized, also would have resulted in KU *receiving* money from Fuzhou University to cover Dr. Tao's salary buyout for spring 2019, rather than defrauding KU of salary, the alleged object of the scheme as to KU. D.A.686–92 (Gov't Ex. 149).

The government's theory that the proposed collaboration provided "cover" also made no logical sense. Since the proposed agreement was not finalized, it served to reveal that Dr. Tao had a relationship with Fuzhou University, without giving Dr. Tao any cover to work with them. As the government acknowledged in its closing, "it was never entered into," and thus "[t]here was no reason most certainly after defendant sends that e-mail saying it didn't go through for him to have any contact with Fuzhou University." D.A.113–14 (Day 12 Tr. at 15:23–16:1). If the agreement had been finalized, it would have meant Fuzhou University paid KU money, which would be used to cover Dr. Tao's spring 2019 salary buyout, rather than defraud KU of salary.

No matter how the government characterizes it, the proposal could not have been in furtherance of a scheme to defraud KU.

Even if the government's "cover" explanation were plausible, however, as demonstrated above the June 26, 2018 email did not propose the collaboration, and merely confirmed a prior answer to an internal question regarding whether the proposal involved intellectual property issues. D.A.684 (Gov't Ex. 170). The email was far too attenuated from the alleged scheme to defraud KU of salary to be in furtherance of such a scheme. In short, the alleged fraud scheme "in no way depended upon" Dr. Tao's email to Wittman correctly stating that the proposal did not implicate IP issues, *Cardall*, 85 F.2d at 682, nor was the email to Wittman "incident to the accomplishment of an essential part of the scheme" to defraud KU, DOE, or NSF, *Mann*, 884 F.2d at 536.[22]

Accordingly, because none of the three remaining wire fraud counts were in furtherance of a valid scheme to defraud, the Court should acquit Dr. Tao as to these counts.

## II.     The Court should acquit Dr. Tao on the remaining false statement count.

Count 9 of the SSI charged Dr. Tao with making a false statement under 18 U.S.C. § 1001(a)(2) by omitting from his September 25, 2018, Conflict of Interest form submission to KU that he allegedly had a second job at Fuzhou University and received financial and other benefits. SSI ¶ 44. To be convicted under 18 U.S.C. § 1001(a)(2), the government must prove beyond a reasonable doubt that "(1) the defendant made a statement; (2) the statement was false, fictitious, or fraudulent as the defendant knew; (3) the statement was made knowingly and willfully; (4) the statement was within the jurisdiction of the federal agency; and (5) the statement was material."

---

[22] The government's failure to adequately connect the wire fraud counts to the alleged fraud scheme is illustrated by the fact that, when attempting to respond to this argument during its rebuttal closing, the government demurred: "I don't have time to go through each and every count, but they are all in furtherance of a scheme to defraud." D.A.119 (Day 12 Tr. at 52:17–18).

*United States v. Williams*, 934 F.3d 1122, 1128 (10th Cir. 2019). The evidence was insufficient to prove any of these elements beyond a reasonable doubt.

### A. There was no evidence that Dr. Tao's September 25, 2018, Conflict of Interest form caused KU to make a false statement to DOE or NSF.

At trial, the government argued that Dr. Tao's September 2018 Conflict of Interest form, D.A.609–16 (Gov't Ex. 25), *caused KU* to make a false statement to DOE and NSF. This theory constituted an improper variance from Count 9 of the SSI, which charged the form itself as the false statement. The government also failed to prove this new theory.

The government argued its causation theory during its closing:

> Count 7 [Count 9 of the SSI] relates to the institutional responsibilities form, and so this is the count that the defendant caused KU to make a false statement. … And so September 2018, the time when the defendant had already received the Changjiang Distinguished Professor Award …. And he reports none of it. And he causes KU to make a false statement.

D.A.116–17 (Day 12 Tr. at 18:17–19:12). To support this new theory, the government endorsed a jury instruction stating that the false statement must be made "to the government." Jury Instruction No. 13, ECF No. 278. When the defense argued in response to this new theory that the government presented no evidence that KU made a false statement to DOE or NSF related to the September 2018 Conflict of Interest form, the government had no answer on rebuttal, effectively conceding its lack of evidence. Nor did the government provide any such evidence. In fact, it introduced no evidence that KU even *reviewed* the September 25, 2018, Conflict of Interest form prior to the FBI's investigation.

The government likely shifted its theory away from the one charged in the SSI because of its awareness that jurisdiction under § 1001 "covers all matters confided to the authority of an agency or department," *United States v. Rodgers*, 466 U.S. 475, 479 (1984), and Congress did not confide in DOE or NSF the review of KU's internal Conflict of Interest form submissions.

37

Jurisdiction under *Rodgers* includes two circumstances: when the agency "has the power to exercise authority in a particular situation," or when there is a "statutory basis for an agency's request for [the] information." *Rodgers*, 466 U.S. at 479, 481 (internal quotation marks omitted); *see also United States v. Deffenbaugh Indus., Inc.*, 957 F.2d 749, 753 (10th Cir. 1992) (observing that "the Supreme Court has found jurisdiction under §1001 when there is either a statutory basis for an agency or department's request for information or when the agency or department has the power to exercise authority in a particular situation" (citation and internal quotation marks omitted)). The charge in the SSI—that the Conflict of Interest form itself was a false statement—satisfies neither requirement.

First, the government did not point to a "statutory basis" for DOE or NSF to request the Conflict of Interest forms from KU, just as it failed to do in its opposition to Dr. Tao's Motion to Dismiss. *Rodgers*, 466 U.S. at 479, 481. Nor did the agencies have any ability to even review the forms. Undisputed evidence demonstrated that KU's Conflict of Interest forms are internal KU documents that are never submitted to or shared with DOE or NSF. *See* D.A.47 (Day 5 Tr. at 147:23–25, testimony of Dr. Keiser that NSF never reviews Conflict of Interest forms); D.A.52, 56–57 (Day 6 Tr. at 6:2–5, 14:24–15:2, testimony of Dr. Schwartz that DOE does not review Conflict of Interest forms); D.A.26 (Day 4 Tr. at 88:15–19, testimony of Reed from KU Research Office that Conflict of Interest forms are not provided to the funding agencies); D.A.15 (Day 2 Tr. at 125:1–6, testimony of Loving from KU H.R. that she is unaware of any Conflict of Interest forms being sent to the funding agencies). The government presented no evidence that DOE or NSF were entitled to review a Conflict of Interest form if they wanted to, or that they had any interest in doing so. Dr. Schwartz testified that DOE did not even have a conflict-of-interest policy, D.A.62 (Day 6 Tr. at 23:3–5), and she did not "look at issues of conflict of

interest," which relate to an employee's "dedication to their job or not" and are thus the university's responsibility and not DOE's. *See* D.A.52 (Day 6 Tr. at 6:2–4).[23] Even NSF's guidance document, the PAPPG, directed universities to maintain only a *financial* conflict-of-interest policy, which only needed to embrace significant financial interests researchers had in entities that could be "affected" by the research itself, which did not apply to Dr. Tao's alleged second job at Fuzhou University. *See* D.A.693, 819–20 (Gov't Ex. 48 at 101–02).[24] The PAPPG is also not a statute with force of law, or even a regulation.

Second, Congress did not confide in DOE or NSF "the power to exercise authority" over employee submissions of Conflict of Interest forms to KU. *Rodgers*, 466 U.S. at 479, 481. In fact, the agencies did not even award the grants to Dr. Tao; instead, he worked for KU as a principal investigator on grants awarded to KU. In these circumstances, the government never proved—as it was required to—that DOE or NSF had the authority to act with respect to Dr. Tao's private statements to KU in his COI form. For example, in *United States v. Blankenship*, 382 F.3d 1110, 1137 (11th Cir. 2004), the court rejected the argument that a federal agency has jurisdiction over a federal contractor's employee because "a federal agency only has the authority to take action against the recipient of the federal funds—that is, the party with whom it has a contract." *Id.* The court added that "a federal agency's agreement with a recipient of federal funds does not necessarily empower that agency to exercise authority over third parties"—such as Dr. Tao—and "jurisdiction does not simply follow federal money wherever it may lead." *Id.* at

---

[23] The government misrepresented the record during its closing in arguing that Dr. Schwartz testified that "under the rules we expect KU to have a policy and to enforce the policy." D.A.119 (Day 12 Tr. at 52:3–4).

[24] Dr. Keiser agreed that "the mere holding of a professional appointment at an organization other than one's own organization is not a per se conflict of interest," and that "universities found that they agreed that being a member of a foreign talent recruitment program might not be considered a nonfinancial conflict of interest if the membership does not interfere with the researcher's responsibilities to the university." D.A.44–45 (Day 5 Tr. at 144:11–145:1).

1138. And in a case involving far more egregious facts than this one, in *United States v. Holstrom*, 242 F. App'x 397, 398–99 (9th Cir. 2007) (unpublished decision), the court held that a DOE contract lab employee's submission of false time cards were not within DOE jurisdiction because, while the DOE contract lab had "a direct contractual relationship with DOE," DOE itself had no "power to act" with respect to the contract lab employee or her false time cards, which were "peripheral to DOE's obligations and not directly related to any DOE authorized function." *Id.* The court further held that "DOE's general contractual monitoring and investigatory authority" is not "sufficient to confer agency jurisdiction over [the employee's] allegedly false statements, as [m]ere access to information is not enough to establish jurisdiction." *Id.* (internal quotation marks omitted). These cases both involve closer calls than this one, where neither DOE nor NSF ever reviewed, considered, or was even entitled to review KU's internal employee Conflict of Interest form submissions—far from being confided authority over those submissions by Congress.[25]

In sum, Dr. Tao's private statements to KU in his Conflict of Interest form are confided to the authority of KU, not DOE or NSF, which do not even have the right or ability to review the form. Because the government failed to prove its theory that KU made a false statement to DOE or NSF based on the Conflict of Interest form, which was also a variance, or that the form itself was a statement within DOE's or NSF's jurisdiction, the Court should acquit on Count 9.

### B. The government failed to present evidence that a false statement in the Conflict of Interest form was material to DOE or NSF.

For substantially the same reasons, the government failed to present sufficient evidence

---

[25] The Court denied Dr. Tao's motion to dismiss in part because the government "represented at oral argument that the agencies' conflict requirements are based on policy statements, federal regulations, and contracts." ECF No. 99 at 22. At trial, however, it failed to present any evidence of such materials for DOE.

that Dr. Tao's allegedly false statements in his Conflict of Interest form were *material* to DOE or NSF, which never saw or even had the right to see the forms. The Tenth Circuit has explained with respect to the materiality requirement:

> Deciding whether a statement is 'material' requires the determination of at least two subsidiary questions of purely historical fact: (a) 'what statement was made?' and (b) 'what decision was the agency trying to make?' The ultimate question: (c) 'whether the statement was material to the decision,' requires applying the legal standard of materiality … to these historical facts.

*United States v. Finn*, 375 F.3d 1033, 1038 (10th Cir. 2004) (quoting *United States v. Gaudin*, 515 U.S. 506, 512 (1995)). The government failed to prove that Dr. Tao's form was material to any decision that DOE or NSF could make, because neither agency had access to the forms, and neither agency could review the forms. *See supra* Part II.A.

### C. The government failed to prove that Dr. Tao knowingly and willfully made an objectively false statement in the Conflict of Interest form.

The government also failed to prove that Dr. Tao knowingly and willfully made an objectively false statement in his September 25, 2018 Conflict of Interest form. *See United States v. Dashney*, 117 F.3d 1197, 1201 (10th Cir. 1997) (willfulness defined as "specific intent to do something the law forbids; that is to say, with bad purpose to disobey or disregard the law" in structuring case).

First, the government failed to prove that Dr. Tao made an affirmative false statement in his September 25, 2018 Conflict of Interest form. The government charged Dr. Tao under 18 U.S.C. § 1001(a)(2), which requires an affirmative false statement, but its theory regarding the Conflict of Interest form is that Dr. Tao *omitted* information from the form by not disclosing a Significant Financial Interest or Time Commitment. *See* D.A.609–16 (Gov't Ex. 25). The government did not prove a certification or other affirmative false statement, dooming Count 9.

Second, the government failed to prove that Dr. Tao actually had a disclosable

Significant Financial Interest (SFI) or a Time Commitment. The form required disclosure of an SFI "in any entity that a) reasonably appears to be related to your University responsibilities, and b) meets one or more of the following three criteria … A financial interest worth $5,000 or more in any entity, where the value is the aggregate of: i. any remuneration received from the entity in the twelve months preceding the disclosure …." D.A.612 (Gov't Ex. 25 at 4). It required disclosure of a Time Commitment "in any entity with which you engage in personal professional activities *that take time away from your University responsibilities*." D.A.612 (Gov't Ex. 25 at 4) (emphasis added).

The government could not prove that Dr. Tao had an SFI or Time Commitment because it failed to prove that Dr. Tao received money from, or had a contract with, Fuzhou University. The FBI's forensic accountant, Morgan Becker, testified that she and her predecessor had subpoenaed multiple financial institutions and reviewed hundreds or thousands of pages of bank records, including foreign wires, encompassing Dr. Tao's accounts, his wife's accounts, and his children's accounts, and found no evidence of payments made directly or indirectly by Fuzhou University. D.A.81–83 (Day 9 Tr. at 159–61).[26] The FBI linguist Churchill testified that he listened to between 100 and 200 call recordings involving Dr. Tao, including with members of Fuzhou University, and never heard a discussion that reflected that Dr. Tao received a payment from Fuzhou University. D.A.76 (Day 8 Tr. at 84:11–16). Dr. Tao's Chinese bank book also did not reflect any payments from Fuzhou University. Def. Ex. 1462 (physical exhibit).

There was also no evidence that Dr. Tao had entered into the draft contract with Fuzhou University and thus made a binding Time Commitment. To the contrary, Special Agent Lampe

---

[26] Becker testified that she and Special Agent Lampe tried to find such evidence, because they were "try[ing] to fill the gap in this case since there's no evidence that Dr. Tao received payments from Fuzhou University." D.A.84 (Day 9 Tr. at 166:6–9).

agreed that Dr. Tao had not performed central requirements in the draft contract, such as working exclusively for Fuzhou University, teaching a class at Fuzhou University, transmitting his personnel file from KU to Fuzhou University, and publishing papers and identifying exclusively as a professor there. *See* D.A.94–101 (Day 11 Tr. at 125–32). Special Agent Lampe speculated that there could be *another contract* that Fuzhou University and Dr. Tao could have signed, which was not in evidence, but that he would have no idea what the terms of such a hypothetical contract were. D.A.102 (Day 11 Tr. at 138:1–11). He added: "I assume it's possible that they negotiated something" that is different from the unsigned draft contracts the government found. D.A.103 (Day 11 Tr. at 144:9). He further explained:

> **Peter Zeidenberg [Def.]:** Mr. Oakley asked you about whether there were in your view further – that he asked you whether or not there could have been other negotiations undisclosed so far in trial about what was going on at Fuzhou between Doctor Tao and the administration there that he may not have had to follow the contract and you said perhaps; right?
>
> **Special Agent Lampe [FBI]:** Yes, I said perhaps....
>
> **Peter Zeidenberg [Def.]:** And when you say perhaps there were further negotiations that allowed him, would you agree that perhaps there could have been further negotiations such that Doctor Tao agreed to work for no pay and no time commitment and to work there on a trial basis and see if he could build up a team and see how things went? Do you agree that that's perhaps what happened?
>
> **Special Agent Lampe [FBI]:** Yeah, I don't know the nature of the negotiations.
>
> **Peter Zeidenberg [Def.]:** But perhaps that happened?
>
> **Special Agent Lampe [FBI]:** Perhaps.

D.A.107 (Day 11 Tr. at 220:8–25). No witness testified that Dr. Tao had a position at Fuzhou University, let alone the terms of such employment. Nor was any agreement introduced. If the FBI agent himself admitted he could only speculate whether Dr. Tao may have  reached an agreement with Fuzhou University, and had no idea what the terms of such a hypothetical agreement were, the jury could only have engaged in improper speculation to find that there was an SFI or Time Commitment with Fuzhou University.

Third, the Court should acquit on Count 9 because the reporting requirements are ambiguous as applied here, and a reasonable reading of the reporting requirements would not have called for disclosure of an alleged second position at Fuzhou University. The Tenth Circuit has held that "[i]n cases arising under 18 U.S.C. § 1001, which criminalizes making false statements to a government agency, the government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct where reporting requirements are ambiguous." *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994).[27] Thus, faced with an ambiguous reporting requirement, the government must prove "(a) that its interpretation is the only objectively reasonable interpretation and that, under this interpretation, the defendant's statement was false, or (b) that the defendant's statement was false under each alternative, objectively reasonable interpretation." *Harra*, 985 F.3d at 215.

Here, KU provided no training on what the reporting requirements meant, leaving Dr. Tao to interpret the requirements on his own. *See* D.A.14 (Day 2 Tr. at 119:14–17, Loving testimony); D.A.23 (Day 3 at 211:10–13, Weatherley testimony); D.A.91 (Day 11 Tr. at 33:4–7, Special Agent Lampe testimony). Even if Dr. Tao had received $5,000 from Fuzhou University from May 2018 to September 2018, a reasonable reading of the SFI disclosure requirement would not have required a disclosure. Chancellor Girod testified that the SFI language, "reasonably appears to be related to your University responsibilities," D.A.609–16 (Gov't Ex. 25), meant that "if the entity is unrelated to one's university responsibility, there's nothing to

---

[27] Other appellate courts agree. *See, e.g.*, *United States v. Harra*, 985 F.3d 196, 214 (3d Cir. 2021) (holding that "fair warning demands that the Government prove a defendant's statement false under each objectively reasonable interpretation of the relevant requirements"); *United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) ("[T]here has been no crime if the statements were not false … under an objectively reasonable interpretation of the law imposing the duty."); *United States v. Johnson*, 937 F.2d 392, 399 (8th Cir. 1991) ("[T]he government must negative any reasonable interpretation that would make the defendant's statement factually correct.").

report," and he acknowledged that the form does not explain "what it means to be related or unrelated." D.A.7–8 (Day 2 Tr. at 71:10–72:4). A reasonable interpretation of this language, in the context of a Conflict of Interest form, is that an alleged second position at Fuzhou University is not "related" to Dr. Tao's position at KU for purposes of identifying a potential conflict of interest. Unlike a KU employee working on an NSF grant that examines tobacco use's ties to cancer—who would need to disclose significant stock holdings in a major tobacco company because the holding is "related" to the research for KU—a second position at another university poses no potential conflict issue and in this respect is "unrelated." So too with the Time Commitment. A reasonable reading is that Dr. Tao only needs to disclose the alleged second position if he believed that it had interfered with his position at KU over the past year. In September 2018, however, Dr. Tao was teaching fulltime at KU, and had completed all of his work during that period to the complete satisfaction of KU, DOE, and NSF. Thus, Dr. Tao could reasonably have concluded that the alleged second position at Fuzhou University, for which there was little evidence of actual work, was not a Time Commitment because it did not interfere with his KU responsibilities. These reasonable interpretations render Dr. Tao's nondisclosures correct, and thus require acquittal. *Migliaccio*, 34 F.3d at 1525.

For substantially the same reasons, and given the lack of training regarding KU's Conflict of Interest form disclosure requirements, the evidence was also insufficient to prove that Dr. Tao knowingly and willfully submitted a false statement in the form.

* * * * *

The Court should acquit Dr. Tao of all four remaining counts because the evidence was insufficient to sustain a conviction. The Court should also acquit Dr. Tao because the novel, strained prosecution theories violate the Due Process Clause's fair warning requirement. *See*

*United States v. Lanier*, 520 U.S. 259, 266 (1977) (describing the three doctrines embraced by the fair-warning requirement, including vagueness, the rule of lenity, and lack of fair notice); *United States v. Santos*, 553 U.S. 507, 514 (2008) ("[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them"); *Moskal v. United States*, 498 U.S. 103, 108 (1990) (rule of lenity applies in "those situations in which a reasonable doubt persists about a statute's intended scope").

### III.    In the alternative, the Court should grant Dr. Tao a new trial on the four counts of conviction in the interest of justice.

The Court should acquit Dr. Tao of the four remaining counts because the evidence as to each was insufficient for a reasonable jury to convict for the reasons stated above. The Court should also provide in its order that if its judgment of acquittal is overturned on appeal, the Court would grant a new trial. *See* Fed. R. Crim. P. 29(d)(1). Even if this Court were to deny Dr. Tao's motion for judgment of acquittal on one of the counts, however, the Court should at least order a new trial on that count.

If the Court declines to acquit as to *any* of the four counts, the Court should nevertheless grant a new trial because the verdict was against the weight of evidence for the reasons stated in Parts I and II above. *See United States v. Gabaldon*, 91 F.3d 91, 93–94 (10th Cir. 1996) ("[I]f after weighing the evidence and the credibility of the witnesses, the court determines that 'the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred, it may grant the defendant's motion.'").

In addition, if the Court agrees that the government's fraud theory was legally invalid as to any alleged victim, the Court should grant a new trial as to such counts. *See Zzyym v. Pompeo*, 958 F.3d 1014, 1033 (10th Cir. 2020) ("The Supreme Court has [reversed and remanded] when a valid and invalid theory were submitted to the jury and the jury returned a general verdict,

creating uncertainty on whether the jury relied on the invalid theory."); *e.g.*, *Skilling*, 561 U.S. at 414 (holding that because a charged object of the conspiracy was invalid, the "conviction is flawed"); *Yates*, 16 F.4th at 269 (vacating fraud conviction because "even assuming that [one fraud] theory was presented to the jury and was valid, we still must overturn the conspiracy conviction because the government's reliance on the accurate-information and salary-maintenance theories was not harmless").

## <u>CONCLUSION</u>

Despite three years of investigation, thirty witnesses, and 395 exhibits, the government failed to present evidence sufficient to prove that Dr. Tao defrauded KU, DOE, or NSF, or made a false statement to DOE or NSF. The Court should therefore acquit Dr. Tao of the three remaining wire fraud counts and one remaining false statement count.

Respectfully submitted,

/s/ Thomas H. Johnson
Thomas H. Johnson #13688
Petefish, Immel, Hird, Johnson,
Leibold & Sloan, LLP
842 Louisiana St.
Lawrence, KS 66044
Tel: (785) 843-0450
Fax: (785) 843-0407
tjohnson@petefishlaw.com

Peter Zeidenberg
Michael F. Dearington
Laura Zell
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
Peter.Zeidenberg@afslaw.com
Michael.Dearington@afslaw.com

Laura.Zell@afslaw.com

*Attorneys for Defendant Franklin Tao*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of May, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

/s/ Thomas H. Johnson
Thomas H. Johnson