# UNITED STATES DISTRICT COURT

## District of Kansas

UNITED STATES OF AMERICA,

                Plaintiff,

    v.                              Case No.  **19-20052-01-JAR**

FENG TAO,

                Defendant.

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

Defendant's "Renewed Motion for Judgment of Acquittal and Alternative Motion for a New Trial" (hereafter, "Def. Mot.") [Doc. 290] largely repeats arguments this Court already rejected.[1]  After an eleven-day trial, the Government proved that Defendant used a fraudulent scheme to obtain grant funds, salary, and access to the University of Kansas's ("KU") personnel, equipment, and facilities.  The object of Defendant's fraud was to obtain money and property, and the evidence at trial proved that he intended to deprive KU, the National Science Foundation ("NSF"), and U.S. Department of Energy ("DOE") of those things, and that he used interstate wires to execute his scheme.  Defendant's lies and misstatements mattered to KU and his federal funders.  The facts that Defendant hid and distorted were capable of influencing his victims'

---

[1] *See United States v. Tao*, 499 F. Supp. 3d 940 (D. Kan. 2020) (denying motion to dismiss).

decisions regarding whether to award Defendant grants, allow him use of those funds, and/or pay him as a full-time professor and principal investigator with access to KU's facilities, equipment, and personnel.  This conduct falls within the confines of federal wire fraud.  The out-of-circuit authority that Defendant cites to challenge the Government's fraud theories is either contrary to binding Tenth Circuit precedent, inapposite, or unpersuasive.  Like most of Defendant's arguments challenging his wire fraud convictions, his challenges to the false statement conviction also have already been rejected by this Court, so under the law of the case doctrine, the Court should again reject Defendant's challenges.

Defendant also glaringly ignores the trial evidence proving his crimes.  Absent from Defendant's Motion are his secretly recorded phone calls in which he discusses aspects of his scheme and his concealment of his work and research in China.  Gone are his emails evidencing his efforts to trick KU into granting him a course buyout so that he could work at Fuzhou University ("FZU") for nearly nine months while KU paid him academic year and summer salaries.  The lies Defendant told his chair about being in Germany are missing from his Motion. Tellingly, he blatantly ignores testimony that his deception jeopardized KU's ability to receive federal funds and caused NSF to view his research as suspect.  At bottom, Defendant wants to scrap Rule 29's legal presumptions, reargue the evidence, and ignore binding precedent.  The Court should reject his attempt to invalidate the jury's verdict, and it should deny his Motion.

## I.   PROCEDURAL HISTORY

Trial commenced on March 21, 2022, and the Government concluded its case-in-chief on April 4, 2022.  At the close of the Government's case, Defendant moved, pursuant to Rule 29, for a judgment of acquittal.  Trial Tr. Day 11 at 3:20-17:15.  The Court took Defendant's motion under advisement and, if the jury returned a verdict in the Government's favor, asked the parties

to brief the motion.  The Defendant presented his case and rested on April 5, 2022.  He then renewed his motion for judgment of acquittal, which the Court took under advisement.  Trial Tr. Day 12 at 124:14-20.  On April 7, 2022, the jury convicted Defendant of Counts Three, Five, Six, and Seven and acquitted him of Counts One, Two, Four, and Eight in the Second Superseding Indictment.  On April 21, 2022, Defendant renewed his motion for judgment of acquittal and moved, in the alternative, for an order vacating the convictions and granting a new trial under Rule 33.  ECF No. 290.  On May 9, 2022, Defendant filed his substantive Motion for Acquittal or, in the Alternative, a New Trial.  ECF No. 290.

## II.    THE TRIAL EVIDENCE

The jury convicted Defendant of wire fraud and making a false statement.  The burden Defendant now bears on a Rule 29 motion for acquittal is heavy.  At this stage, the Court may "enter a judgment of acquittal only if the evidence that defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982).[2]  Here, the evidence was more than sufficient to convict Defendant.  Granting all inferences in favor of the jury's verdict and examining the evidence in the light most favorable to the government, *see, e.g.*, *United States v. Brooks*, 438 F.3d 1231, 1236 (10th Cir. 2006), the evidence at trial established, among other things, that from approximately May 2017 to August 2019, Defendant was a full-time professor at KU who was paid to teach students, perform research, and serve the KU community.  As part of his job at KU, Defendant applied for and obtained grants from NSF and DOE.  After the grants were awarded, the agencies relied on KU to appropriately administer those taxpayer funds consistent with federal grantmaking regulations and NSF's conflict of interest policy.

---

[2] Unless otherwise noted, all internal quotation marks and citations are omitted in this brief.

Unbeknownst to KU and Defendant's federal funders, however, during that same period, Defendant applied for and began working a second full-time job at FZU in China as a Chang Jiang Distinguished Professor.  The position mirrored his KU position to a large degree.  As a Chang Jiang Distinguished Professor, Defendant received research funding and laboratory space from FZU, recruited researchers for his team at FZU, procured scientific equipment for his lab at FZU, applied for research grants for FZU from the National Natural Science Foundation of China ("NSFC") and the Fujian provincial government, and traveled extensively to FZU in 2018 and 2019.

Defendant actively concealed his scheme from KU, NSF, and DOE.  Between 2018 and 2019, he cheated and deceived KU and his federal funders so that he could obtain hundreds of thousands of federal research dollars, his salary for the academic year and the summer months, and access to KU's personnel, equipment, and facilities that Defendant needed to perform his federally-funded research, publish his findings, and enhance his personal reputation.  The evidence at trial proved that Defendant chose to lie, deceive, and conceal so that he could reap the benefits of being a full-time KU professor, principal investigator, and recipient of federal grants.  Defendant knew that lying to KU and his federal funders about his FZU position was illegal, but he chose to do it anyway.  A jury heard the evidence and found Defendant guilty of the wire fraud scheme and a false statement directly related to his use of federal funds at KU.

### A.     Defendant At KU

#### i.      Defendant Was a Full-Time KU Associate Professor

From 2014 until his arrest in August 2019, Defendant was a full-time tenured associate professor at KU in the chemical and petroleum engineering department.  Trial Tr. Day 3 at 93:12-22 (L. Weatherley).  His research focused on catalysis, and he used KU's research

facilities, equipment, and staff to perform scientific experiments primarily funded by the federal government. *Id.* at 3 at 76:1-6 (A. Reed) (grants necessary for Defendant to perform research); *id.* at 111:17-112:2 (L. Weatherley) (grants needed to pay post-doctoral students). At KU, Defendant had a nine-month academic year appointment, and he was expected to spend 40% of his time teaching, 40% of his time on research, and 20% of his time serving the KU community (the "40/40/20 split"). Trial Tr. Day 2 at 44:14-49:1, 74:12-21, 153:3-154:16 (D. Girod); Trial Tr. Day 3 at 90:1-15 (L. Weatherley). Research and teaching are equally important to KU. Trial Tr. Day 2 at 151:6-9 (D. Girod). KU paid Defendant approximately $108,000 per academic (nine-month) year. Ex. 11 (Appointment Letter).[3] If Defendant wanted to earn extra compensation in the summers, he needed to find an alternative funding source, such as a federal grant. Trial Tr. Day 2 at 153:15-155:7 (A. Reed). Although Defendant was not paid by KU using state funds during the summers, he remained a KU employee during that time period. *Id.* at 156:1-8. During the summers of 2018 and 2019, Defendant fraudulently used DOE and NSF grant funds to pay his summer salary. Ex. 20 (salary spreadsheet); *see also* Trial Tr. Day 3 at 77:1-79:2 (A. Reed).

Defendant's performance at KU was mixed. For the 40% research portion of his job, Defendant's grant portfolio and research output were "excellent." Exs. 26, 27, 28, 29 (annual performance evaluations for 2015 to 2018). For the remaining 60% of his obligations, however, Defendant needed to improve his teaching, student advising, and faculty committee service. *See, e.g.*, Ex. 29 (Feb. 25, 2019 evaluation for 2018 year) ("You are strongly encouraged to

---

[3] During this same period, KU also provided Defendant with partial contributions to his medical, dental, and life insurance premiums; health savings account contributions; and over $10,000 in employer-matching retirement savings contributions. *See* Ex. 1115. Moreover, for each two-week pay period in which Defendant recorded work hours, he earned paid time off. *Id.*; *see also* Trial Tr. Day 2 at 133:10-134:22 (A. Loving).

strengthen engagement with faculty colleagues . . . .  You are encouraged to pay attention to KU

service . . . especially focusing on undergraduate advising and C&PE committee work.  We

discussed your performance in the teaching of C&PE 512 in fall 2018 and the student

evaluations which are significantly below average . . .”); Ex. 28 (2017 eval).  Defendant's

February 25, 2019 annual evaluation (for 2018) also noted that Defendant and his department

chair (who delivered his evaluation) "discussed the need for [Defendant] to notify the department

if [he] plan[ned] to take extended periods of absence for travel etc."  Ex. 29.

**ii.        Defendant Was an Experienced Federal Researcher**

KU is a top-tier research university and considers research a core part of its mission.

Trial Tr. Day 2 at 41:5-42:2 (D. Girod).  Every year, KU receives hundreds of millions of federal

research dollars for its professors and students to perform research.  *Id.* at 149:5-150:11 (A.

Reed).  The federal government is by far the largest contributor, so KU has a "very vested

interest in making sure that [it] remain[s] eligible" for that funding.  Trial Tr. Day 2 at 50:25-

51:14 (D. Girod); *see also id.* at 62:3-14 ("[W]e certify that we are meeting all our obligations

under the requirements of any given agency . . . and if we are incorrect in that certification, there

are consequences, ranging from admonishment, to having to repay grant funding, to in an

extreme version potentially not being allowed to apply for funding from that agency.  So the

stakes are fairly high for us.").  KU does this by ensuring that it complies with each federal

agency's funding requirements and regulations.  *Id.*  If KU were to become ineligible to receive

federal funding, it would cease to be a research university.  *Id.* at 51:15-20.  KU's Office of

Research oversees grant administration for KU, including grant proposals, contract negotiations,

and post-award management.  Trial Tr. Day 2 at 142:25-143:6 (A. Reed).

Defendant frequently worked with KU's Office of Research on his grant proposals and

6

post-award management.  Trial Tr. Day 3 at 10:2-22, 17:1-6 (A. Reed); *see also, e.g.*, Exs. 125

(Dec. 8, 2017 email regarding DOE grant proposal), 157 (July 13, 2018 email regarding budget

proposal).  While at KU, Defendant was awarded (or re-awarded) three grants from DOE and

two grants from NSF for a total of approximately $1.8 million in funding.  Trial Tr. Day 3 at

77:1-79:2 (A. Reed); *see also id.* at 111:25-112:2 (L. Weatherley); Ex. 16 (spreadsheet showing

Defendant's Research Proposals and Awards).  After a grant was awarded to KU, the Office of

Research worked with Defendant to ensure that the federal funds were spent in accordance with

applicable funding guidelines and regulations.  Trial Tr. Day 2 at 215:21-216:9 (A. Reed).

Ensuring compliance was a joint endeavor.  While the Office of Research ensured that each grant

was administered according to applicable guidelines (*e.g.*, format, budget, reports, etc.),

Defendant was responsible for ensuring that the information about the research and about his

own activities was accurate.  Trial Tr. Day 2 at 205:7-206:2 (A. Reed).  KU professors cannot

submit grant proposals to any entity outside KU without the prior approval of KU's Office of

Research.  *Id.* at 145:1-12.  Similarly, KU does not submit grant proposals to the federal agencies

without first having a PI who agrees to perform the scientific work.  Trial Tr. Day 3 at 74:7-24

(A. Reed); *see also* Trial Tr. Day 5 at 10:15-22 (R. Keiser).

      **B.**      **Defendant's Work At FZU**

          **i.**      **FZU Offers Defendant a Professorship, Research Funding, and More**

      In July 2017, while employed by KU and applying for and receiving federal funds,

Defendant applied to the People's Republic of China's ("PRC") Ministry of Education to be a

Chang Jiang Distinguished Professor at FZU in southern China.  Ex. 485A[4] (application

---

[4] Exhibits containing an "A" after the exhibit number denote that that exhibit is either an
attachment to another exhibit or an English translation of a document that was originally in
Chinese.

materials).  The Chang Jiang Distinguished Professor program is one of the PRC's most

prestigious talent recruitment programs.  Trial Tr. Day 10 at 177:12-24 (G. Tiffert).  The PRC

government funds hundreds of talent recruitment programs, which generally seek to attract

promising researchers to work at Chinese universities by offering lucrative benefits.  *Id.* at 169:2-

9.  The Chang Jiang Distinguished Professor program is administered by the PRC's Ministry of

Education, but applicants must apply through a sponsoring PRC university like FZU.  *Id.* at

178:21-180:25.  The typical profile of a successful Chang Jiang Distinguished Professor

applicant is an accomplished mid-career scientist who is a proven researcher and who knows

how to run a lab, train post-doctoral and graduate students, and build a research ecosystem.  *Id.*

at 177:22-178:13.  Chang Jiang Distinguished Professors are expected to work full time at a PRC

university, but may be given a transition period to wind down their current employment.  *Id.* at

176:17-177:2; Trial Tr. Day 9 at 52:24- 53:16 (S. Zhang); Ex. 516A at 02:00 to 02:05

(Defendant stating that "the start date can actually be pushed back").

  By January 2018, Defendant had been awarded the Chang Jiang Distinguished Professor

position at FZU.  *See, e.g.*, Ex. 128A (congratulatory email).  FZU offered Defendant a five-year

professorship and expected him to, among other things, recruit and mentor graduate students,

"actively undertake major state-level scientific research projects," and "lead innovation teams

from [FZU's] Institute of Photocatalysis in applying for innovative research groups and seeking

approval by the NSFC."  Ex. 132A (Feb. 5, 2018 draft contract).  In exchange, FZU offered

Defendant lab space, funds for scientific research, a research staff, a "finely decorated 200-

square-meter villa on campus," and an approximately $85,000 annual salary.  *Id.*  Between

February and May of 2018, Defendant and FZU exchanged multiple draft employment contracts.

*See* Exs. 321A, 332A, 333A, 336A, 337A.[5]  In the final version of the contract that FZU sent to Defendant on May 4, 2018, FZU promised Defendant, among other things, approximately $1.5 million in research funds upfront, another approximately $1.5 million in research funds for year two of the contract (for a total of 20 million Chinese Yuan in research funds), and approximately $1.5 million in funds to purchase scientific equipment.  Ex. 336A at 5, 337A.  The next day, on May 5, 2018, Defendant traveled to the PRC to finalize his contract with FZU.  *See* Ex. 518A (phone call discussing travel to FZU); Ex. 355 at 2 (flying to PRC on May 5, 2018 and returning on May 8, 2018); Ex. 643 (flight itinerary for FZU).  Sometime in May 2018 (likely during the May 5, 2018 trip), Defendant was issued a leather-bound certificate from the PRC's Ministry of Education officially appointing him as a Chang Jiang Distinguished Professor at FZU for five years.  Ex. 619/619A.  Defendant's possession of a formal certificate from the Ministry of Education meant that he had a final contract with FZU.  Trial Tr. Day 10 at 184:18-20, 194:19-23, 197:21-198:5 (G. Tiffert).

Leading up to his agreement to the FZU contract, Defendant talked to his colleagues about FZU.  Between January and May of 2018, Defendant secretly recorded hundreds of phone calls and saved them on his KU computer.  In one of the recorded calls, from February 27, 2018, Defendant spoke with a more senior professor at the Georgia Institute of Technology, named Meilin Liu.  Ex. 512A.  In that call, Defendant described how FZU had already promised to give him 20 million yuan (approximately $3 million dollars) in research support, but that FZU required a full-time appointment, and that he did not think FZU would let him build a research team unless he committed to working at FZU full time.  *Id.* at 02:26 to 08:06.

---

[5] On August 3, 2019, Defendant emailed the last (and likely final) version of the contract to his wife's email account and his own FZU email account taofeng@fzu.edu.cn.  Exs. 313, 314A, 315, 316 (same version as 314).

Defendant then asked Liu whether he thought it would be possible for Defendant to scale back his appointment at KU from full time to part time so that he could join FZU full time. Liu said it depended on KU and how KU "assesses" Defendant, but that he knew other professors who worked a few months in the U.S. and the rest of the year in China. Defendant then asked if those professors were paid less by their U.S. universities and whether they got to "keep" their "research group" in the U.S. *Id.* 3:37 to 4:38. Liu then warned Defendant that if he wanted to work for KU *and* FZU, he should "clearly" tell KU what he was doing or else he would have a "problem." *Id.* at 21:36 to 21:58. Defendant expressed concern about telling KU and bemoaned that, "This is really a headache for me. . . . on the one hand . . . I don't think I should give up [the FZU] opportunity. But . . . but I think this is also a nuisance. If I don't give up the opportunity . . . I'll have to give things up on [the KU] end." *Id.*

A day earlier, on February 26, 2018, Defendant spoke with another KU professor about how to simultaneously work two jobs. *See* Ex. 514A. On that occasion, however, Defendant did not mention FZU. Instead, he lied and said that he was exploring an opportunity in Germany and wanted to know whether he could convert his full-time appointment at KU to a half-time appointment to work in Germany. *Id.* at 00:00 to 01:34. Defendant said that he had a research "team" at KU and repeated, as he later told Liu, that he did not "want to give it up." *Id.* The other KU professor suggested that Defendant might be able to work something out if he resigned one of his department appointments and was paid only half his KU salary (at the time, Defendant was jointly appointed in the departments of chemistry and chemical and petroleum engineering). *Id.* at 00:22 to 04:11. The KU professor advised Defendant that if Defendant wanted to pursue the idea, he should talk to his department chair. *Id.* at 05:46 to 05:55. He warned, however, that if Defendant was paid for nine months from KU and more than three months from another

university, it would be a "problem." *Id.* at 05:55 to 06:44.  Contrary to the advice he received, Defendant accepted the FZU job, but never told KU about it.

  **ii.**   **Defendant Begins His Work for FZU**

  Defendant began working for FZU in early 2018 and continued until August 2019 when he was arrested.  His work for FZU largely mirrored his KU work and lined up with most of the terms of the draft contracts that he negotiated with FZU in early 2018.

  *First*, Defendant recruited graduate students and post-doctoral researchers from around the world to join his FZU team.  *See, e.g.*, Exs. 155, 156A (June 8, 2018 recruitment advertisement); 161 (June 17, 2018 recruitment email); 158A, 159A (July 15, 2018 emails recruiting KU graduate student); 227, 234, 235 (emails recruiting R. Palacio from Colombia); 310 (Sept. 27, 2018 email recruiting J. Ding from PRC); 311 (Nov. 30, 2018 email recruiting Y. Huang from Singapore); 511A (Feb. 21, 2018 phone call recruiting his former student W. Huang); Trial Tr. Day 8 at 125:22-131:23  (W. Huang) (describing Defendant's calls to recruit him in Feb. 2018 and early 2019); Trial Tr. Day 9 at 52:16-56:11 (S. Zhang) (describing Defendant's efforts to recruit him).  He also sought help from other professors to identify prospective candidates.  *See* Exs. 174A (July 3, 2018 recruiting inquiry); 196A (July 16, 2018 email regarding same).  In many instances, when a prospective post-doctoral researcher emailed Defendant to inquire about a potential job at KU, Defendant redirected that candidate to his research group at FZU.  *See, e.g.*, Exs. 162 (June 20, 2018 email redirecting R. Kumar to FZU); 179 (June 11, 2018 email redirecting J. Sahato to FZU); 207 (July 13, 2018 email redirecting M. Dhiman to FZU); 226 (Jan. 20, 2019 email redirecting K. Khan to FZU); 312 (Feb. 10, 2019 email redirecting S. Cheng to FZU).  Defendant also offered his then-current post-doctoral researcher at KU, Luan Nguyen, a job at FZU.  Trial Tr. Day 9 at 78:16-19 (L. Nguyen).

Nguyen's expertise was using the expensive scientific equipment in Defendant's KU lab.  *Id.* at 76:16-19.

*Second*, while Nguyen considered the offer, beginning around August 2018, Defendant told him to help FZU build a lab that contained equipment like the equipment Defendant had in his KU lab.  *Id.* at 83:10-85:7; *see also, e.g.*, Exs. 262, 263, 268, 270, 279, 282, 283, 284 (emails obtaining quotes for and ordering equipment for FZU).  Defendant specifically instructed Nguyen to work with Yu Tang, who had recently completed his Ph.D. at KU under Defendant and joined FZU's faculty.  Trial Tr. Day 9 at 90:3-91:6 (L. Nguyen).  On December 29, 2018, Defendant set a work schedule for Nguyen and Tang and checked in on them regularly.  Exs. 273-75.  He also gave Nguyen the credit card of another FZU employee and instructed him to make purchases for FZU with that card.  Trial Tr. Day 9 at 86:8-89:20 (L. Nguyen).  In May 2019, Nguyen and Defendant traveled to FZU.  *Id.* at 124:25-125:6.  Defendant told Nguyen not to mention the FZU trip to others.  *Id.* at 134:21-135:1.

*Third*, starting as early as March 2018, Defendant submitted grant proposals to the NSFC and another PRC government agency to obtain external funding to support his research at FZU. *See* Exs. 491A (Mar. 4, 2018 NSFC proposal); 493A (Aug. 23, 2018 NSFC proposal); 504A (Sept. 20, 2018 Fujian Province Engineering Research Center proposal); 352A (Feb. 25, 2019 NSFC proposal).  In some of those proposals, Defendant described the scientific equipment that he had already obtained for FZU.  *See, e.g.*, Exs. 352A at 34 ("TAO FENG began forming the Institute for Molecular Catalysis and In-Situ Characterization" at FZU and "already has a complete system for catalyst preparation and catalyst performance evaluation . . . ."); 351A at 38-42 (photographs of FZU lab equipment); 493A at 37.  He also touted the federal research funds he had obtained while in the United States.  *Id.* at 29 ("Professor TAO Feng . . . . obtained

more than 7 million USD in grants from outside the school."). And, as of August 2018, Defendant described his "source" of funding for his FZU team as "the first-class discipline construction funding at" FZU. *Id.* at 36.

*Fourth*, Defendant hired researchers for his FZU team and began performing research that was directly funded by FZU. *See* Exs. 352A at 36 (Defendant's "team has four dedicated professors with deputy and senior titles as well as close to ten Master's and PhD students"); 510A at 05:24-07:07 (Defendant describing how he plans to perform reactions at FZU and characterization overseas since his equipment in the U.S. "will continue to be there"); 493A at 10 ("We recently conducted preliminary studies at Fuzhou University."). In one document signed by Defendant, bearing FZU's official stamp and listing a project start date of May 2018, Defendant requested disbursement of his personnel funding from FZU to pay for graduate and post-doctoral students to assist him with a specific research project. Ex. 489A; *see also* Trial Tr. Day 9 at 45:19-46:2 (M. Liu) (professors need funding to recruit post-doctoral students).

*Fifth*, starting in March 2018, Defendant agreed to serve as an advisor to multiple graduate students at FZU and signed formal mentor cards. Exs. 322A, 323A, 495A, 496A.

*Sixth*, Defendant traveled extensively to the PRC in 2018 and 2019, including multiple trips to FZU. Exs. 355, 358 (Defendant's passport), 643 (travel itinerary), 665 (same). In particular, from December 11, 2018 to August 20, 2019, unbeknownst to KU, Defendant effectively moved to the PRC to work at FZU and took only a few two-week-long trips back to the U.S. Ex. 355; *see also* Exs. 220, 228 (Defendant stating in Jan. 2019 that he was in China).

## C. Defendant's Lies, Deception, And Concealment

For nearly two years, Defendant misled and deceived his KU colleagues, defrauded KU and his federal funders, and lived a double life.

13

### i.        Defendant Lied about his Outside Activities and Conflicts

When Defendant joined KU in 2014, he agreed to follow all university policies, including the Kansas Board of Regents' Commitment of Time/Conflict of Interest Policy (the "Conflict & Commitment Policy") and the Individual Financial Conflict of Interest Policy (the "Financial Conflict Policy"). Ex. 1.  He also certified that he had "reviewed and comprehended the policies." *Id.*  The Conflict & Commitment Policy defines a conflict of interest as "a divergence between an individual's private, personal relationships or interests and any professional obligations to the university such that an independent observer might reasonably question whether the individual's professional actions or decision are determined by considerations of personal benefit, gain or advantage." *Id.* at 2.  Conflicts of commitment usually involve issues of time allocation. *Id.*  KU faculty also are required to "maintain a presence" on campus and any exceptions must "enhance the institutional mission" of KU. *Id.*

The Conflict & Commitment Policy specifically required Defendant to, *inter alia*, (1) disclose, on an *ad hoc* basis, all external personal, professional activities and secure prior approval before engaging in such activities; (2) report, on an annual basis, all "consulting arrangements, significant financial or managerial interests, or employment in an outside entity whose financial or other interests would reasonably appear to be directly and significantly affected by their research or other university activities;" and (3) report, on an *ad hoc* basis, "current or prospective situations that may raise questions of conflict of commitment or interest, as soon as such situations become known to faculty." *Id.* at 3-4.  Moreover, "[w]ithout prior approval, faculty members on full-time appointments must not have significant outside managerial responsibilities nor act as principal investigators on sponsored projects that could be conducted at their institution but instead are submitted and managed through another

14

organization." *Id.* at 3.  After an apparent or real conflict of interest or time is reported, it must be either eliminated or managed in an acceptable manner.  *Id.* at 2.[6]

If a PI reports a potential conflict of interest or commitment of time issue, KU's Office of Research will review the submission to determine whether the conflict can be managed.  Trial Tr. Day 2 at 162:21-163:6, 199:17-200:1 (A. Reed).  Before submitting any proposal to a federal funder, the Office of Research reviews the PI's Institutional Responsibilities forms to determine if there are any potential or actual conflicts of interest that need to be managed or disclosed to the federal agency.  *Id.* at 176:7-23 (A. Reed).

KU has these disclosure policies and controls in place, in part because federal funding regulations, specifically 2. C.F.R. Part 200, require them.  *Id.* at 159:2-23; *see also* 2 C.F.R. § 200.112 ("The Federal awarding agency must establish conflict of interest policies for Federal awards.  The non-Federal entity must disclose in writing any potential conflict of interest to the Federal awarding agency . . . in accordance with applicable Federal awarding agency policy."); Ex. 48 (NSF PAAPG) at 127 ("NSF requires each grantee organization [*i.e.*, university] . . . to maintain an appropriate written and enforced policy on conflict of interest and that all conflicts of interest for each award be managed, reduced or eliminated prior to the expenditure of the award funds."); Trial Tr. Day 6 at 5:24-6:16 (V. Schwartz) ("As a program manager, I don't look at issues of conflict of interest . . . . That is something that the university is responsible for.") Federal guidelines require KU "to have some sort of conflict-of-interest policy, and the way that [KU has] implemented it is to use the annual certification process with the *ad hoc* requirement to update it so that [KU] can be compliant."  Trial Tr. Day 4 at 88:23-89:11 (A. Reed).

---

[6] KU's Policy Handbook also described KU's conflict of interest, commitment of time, and outside activities policies.  Ex. 4.

The Office of Research strives to ensure that federal funders are confident that KU has conflict policies and controls in place to protect research integrity so that KU (and its faculty and students) can continue to enjoy federal funds.  Trial Tr. Day 2 at 213:2-19 (A. Reed).  Every time KU submits a research proposal to a federal agency, it certifies that it will comply with all applicable federal funding regulations and guidelines, including the conflict of interest and commitment of time disclosure requirements.  *Id.* at 214:6-22.  In making that certification to the federal funders, KU relies on the accuracy of the information that PIs submit in their Institutional Responsibilities forms and on an *ad hoc* basis.  Trial Tr. Day 3 at 79:5-80:8 (A. Reed).

 Defendant never disclosed to KU any of his FZU activities.  Instead, he falsely certified his Institutional Responsibilities forms and used a course buyout and fictitious FZU sub-award, discussed *infra*, to mislead KU about his true relationship with FZU.  In violation of KU policies, Defendant never reported these activities to KU on an *ad hoc* basis as they arose, nor in his annual Institutional Responsibilities forms submitted in January and September of 2018.  *See* Exs. 24 (Jan. 2018), 25 (Sept. 2018); *see also* Trial Tr. Day 2 84:13-85:4 (D. Girod) (recruiting students for another university without notifying KU violates policy).[7]  If KU had known about Defendant's work at FZU, it would not have submitted his grant proposals to NSF and DOE or approved his ongoing expenditure of grant funds after the proposals were approved and the grants were awarded to KU.  Trial Tr. Day 3 at 54:1-10. (A. Reed).  At a minimum, KU would have wanted to determine if it could manage Defendant's conflicts and, if so, put a conflict management plan in place before submitting Defendant's research proposals or allowing him to spend grant funds.  *Id.* at 54:11-55:21.  If KU had concluded that the conflict could not be

---

[7] Defendant also failed to disclose this information in PI checklists he completed every time he submitted a research proposal to the Office of Research.  Trial Tr. Day 3 at 42:17-44:25 (A. Reed); Trial Tr. Day 4 at 8:14-25 (A. Reed).

managed and Defendant refused to cease the outside activity, then KU could have terminated him. *Id.* Day 2 at 123:23-124:16 (A. Loving).

### ii.     Defendant Deceived and Misled KU about his Relationship with FZU

The only time Defendant mentioned FZU to KU was in May 2018 when, as part of his fraudulent scheme, he misled KU into believing that he was collaborating with another professor at FZU.  On May 17, 2018, Defendant sent KU a proposed sub-award contract with FZU, which would have required Defendant to perform specific research tests at KU for the benefit of FZU. Exs. 148, 149.  This was only about a week after Defendant had returned from FZU and been formally appointed as a Chang Jiang Distinguished Professor, which Defendant concealed from KU.  *See* Exs. 355 (travel records); 619A (certificate).  Defendant also proposed that the sub-award would be used to buy out his spring 2019 teaching responsibilities at KU.  Ex. 153. Notably, the sub-award came at a time when Defendant was starting up his lab at FZU, but required to perform research for FZU under his contract with FZU.

Defendant worked with the Office of Research to prepare a budget and review the proposed contract with FZU.  Exs. 152, 153 (email regarding FZU sub-award).  In doing so, Defendant described the scope of the proposed research activity as KU "analyz[ing] [FZU's] catalysts," and falsely described his relationship with FZU as a "collaboration."  Ex. 152. Defendant rushed KU's Office of Research and told them that FZU hoped to start the research "ASAP."  Ex. 153.  However, after KU sent a proposed markup of the draft sub-award agreement to FZU in June 2018, FZU stopped responding.  Ex. 211.  After the Office of Research sent multiple follow-up emails to no avail, Defendant finally told them in November 2018 that there "were a few competitors for that fund" and that he "was not successful in the competition."  *Id.*  This was the first time he told KU that the sub-award was competitive.  At no

point, however, did Defendant tell KU that he was a Chang Jiang Distinguished Professor at FZU, that he had helped found the Institute for Molecular Catalysis and In-Situ Characterization at FZU, or that he was already applying for and performing research at FZU.  Instead, he misled KU into believing that his only relationship with FZU was that of a failed collaboration.

### iii.        Defendant Lied to NSF about his Current and Pending Support

Despite having received research funding directly from FZU and having applied for external research funding from the NSFC and the Fujian Province Engineering Research Center, Defendant never reported that research support to KU or NSF.  When, on May 17, 2018, the NSF program officer asked Defendant to update his current and pending information, Defendant was required to list all current and pending research support, whether paid or unpaid, from any source (foreign or domestic) including grant funding, lab space, and research equipment.  Trial Tr. Day 5 at 34:21-36:19 (R. Keiser); *see also* Exs. 48 at 56 (NSF's PAAPG); 142 (program manager email).  He also was required to list "all other projects or activities requiring a portion of time of the PI . . . even if they receive no salary support from the project(s)." *Id.*  On May 18, 2018, Defendant falsely told NSF that his only current and pending research support was from NSF and DOE.  Exs. 143 & 144.  This was false because by May 18, 2018, Defendant had already accepted the Chang Jiang Distinguished Professor job at FZU, which included direct research support from FZU, lab space, and funds to purchase lab equipment.  Defendant should have disclosed all of this to NSF.  Trial Tr. Day 5 at 34:17-37:5 (R. Keiser).

Had Defendant disclosed this information to NSF, it would have affected NSF's analysis of Defendant's capacity to perform the proposed research and whether there was any overlap in research between the proposed research and Defendant's other projects.  Trial Tr. Day 5 at 90:14-93:1 (R. Keiser).  It is also very important to NSF that PIs are transparent about who they

are working for or collaborating with so that the research itself can be trusted.  *Id.* at 95:17-24.

According to NSF's research security chief, if the PI cannot be trusted, neither can his research

that NSF funded.  *Id.* at 8:4-9:3 (undisclosed affiliations, appointments, or sources of funding can

bias the research and lead to research results that cannot be trusted).  This casts a shadow of

doubt on the integrity of any research that a compromised PI publishes using NSF funds.  *Id.* at

17:15-17:4 (NSF research is prestigious and trusted because it is supposed to be unbiased).

Defendant also violated KU policies by submitting research proposals to the NSFC and Fujian

Province Engineering Research Center without involving KU's Office of Research.  Trial Tr.

Day 2 at 145:1-12; 148:15-18; 174:10-16 (A. Reed).  By failing to disclose his activities for

FZU, Defendant prevented the Office of Research from acting as a check to ensure that all

current and pending support was disclosed to NSF, and that any potential conflicts were properly

managed or disclosed.  *Id.* at 208:13-209:3 (A. Reed).

       **iv.**       **Defendant Lied to KU about his Spring 2019 Teaching Buyout**

To excuse his KU teaching obligation for the spring of 2019 so that he could work at

FZU, Defendant also lied to his department chair, Professor Laurence Weatherley.  On the very

same day that Defendant separately told the Office of Research that he had a sub-award from

FZU, May 17, 2018, Defendant requested from Weatherley a four-month no-payment leave for

the spring 2019 semester so that he could develop "overseas collaborations."  Exs. 145, 146.  In

support, Defendant sent Weatherley a letter from Professor Robert Schlögl of the Fritz Haber

Institute ("FHI") in Germany, inviting Defendant to collaborate in the spring and summer of

2019.  Ex. 147.  Defendant did not mention FZU, and this misled Weatherley into believing that

the "overseas collaboration" was with FHI.  Weatherley, however, denied Defendant's no-

payment leave request shortly thereafter, in part because a no-payment leave would not have

furthered Defendant's desire to be promoted to full professor.  Trial Tr. Day 3 at 118:16-17,

123:21-24 (L. Weatherley).  Defendant then requested, on June 22, 2018, a course buyout to

relieve him of his teaching responsibilities for the spring 2019 semester.  In his request,

Defendant falsely told Weatherley that FZU would pay for the buyout (it did not) and that the

buyout was "necessary to perform the research projects including [the FZU sub-award] project,

NSF-Career and DOE projects."  Ex. 165; *see also* Ex. 164.  Defendant never received the FZU

sub-award, however, so there was no need for him to be relieved of his teaching duties to work

on that award, and at no time did he tell anyone from NSF, as required, that he planned to use

any equipment or facilities outside of KU to work on his federal grants, despite the fact that he

spent the majority of 2019 in the PRC working at FZU and had told KU that he needed the

buyout, in part, to work on his NSF grant.  Ex. 354.

On June 25, 2018, Weatherley approved Defendant's buyout request, but imposed three

conditions: first, that the funds to cover the buyout (*i.e.*, pay Defendant's salary that semester) be

transferred to KU; second, that Defendant's other duties, such as advising, committee work, and

service to KU continue; and, third, that Defendant "be in attendance on campus during the

semester in accordance with KU policy."  Ex. 167.  Four months later, Defendant continued to

mislead Weatherley regarding the spring 2019 buyout and asked him for help with a visa to visit

Germany for his purported collaboration.  Ex. 291.  In support, he attached another invitation

letter from Schlögl of FHI.  Ex. 291A.

Contrary to Weatherley's directives, Defendant did not stay on campus, did not transfer

the funds to KU to cover his buyout, and did not satisfy his other advising and service duties in

the spring of 2019.  Unbeknownst to KU, Defendant spent the vast majority of the spring 2019

semester in the PRC.  Ex. 355.  The FZU funds that he said would cover his course buyout never

materialized.  And, during that semester, Weatherley had to continually reprimand Defendant for failing to fulfill his advising and service commitments to KU.  *See, e.g.*, Exs. 225 (Defendant missing faculty retreat in Jan. 2019); 231 (Defendant late in responding to Jan. 2019 ABET outcome survey which was necessary for department's certification); 247 (Defendant failing to meet with 22 student advisees in March 2019); *see also* Trial Tr. Day 3 at 141:5-153:23 (L. Weatherley) (describing importance of ABET certification).  In May 2019, after Defendant had already been paid his spring 2019 salary despite not teaching any classes, a KU administrator realized that Defendant's buyout was unfunded (because the FZU sub-award had never materialized) and asked him which funds should be used to pay for the buyout (which cost approximately $18,000).  Ex. 254.  Defendant used his NSF funds, despite the fact that he had spent the majority of the spring 2019 semester in the PRC working at FZU.  Around this time, Defendant also told Weatherley that he planned to use DOE funds to buy out his spring 2020 teaching, meaning that if he had not been caught, he would have continued his fraud.  Ex. 249.

Defendant also blatantly lied to Weatherley about being in Germany during the spring of 2019.  When Defendant failed to meet certain obligations at KU, he blamed it on his fictitious collaboration in Germany.  *See* Exs. 225 (on Jan. 17, 2019, stating, "I apologize for missing the upcoming faculty retreat due to the trips of conferences in Germany"); 231 (on Jan. 31, 2019, stating, "I am travelling in Germany"); 233 (on Feb. 20, 2019, stating "I am visiting FHI at Germany and will get back to town after 15th March.").  Defendant never visited Germany in 2019.  Leading up to his spring 2019 buyout, Defendant requested invitations from Schlögl at FHI which he then showed to Weatherley to mislead Weatherley, but Defendant, in fact, "didn't show up" at FHI.  Trial Tr. Day 6 at 73:6-74:3 (R. Schlögl); Exs. 355, 358 (Defendant's passport).  Instead, by late 2018, Defendant had stopped communicating with Schlögl and by

December 2018 he had moved to China full time to work at FZU.  *Id.* at 73:6-74:3.

During his nearly nine-month stay in the PRC from December 2018 to August 2019, Defendant also deceptively applied for and received a $10,000 KU research prize.  On December 22, 2018, while unbeknownst to KU he was beginning his first nine-month term with FZU in the PRC, Defendant nominated himself for KU's Scholarly Achievement Award, which recognizes mid-level KU professors for their research contributions.  Exs. 221, 355 at 2 (travel records); Trial Tr. Day 2 at 56:1-24 (D. Girod).  The award focuses exclusively on an applicant's research achievements; it does not evaluate teaching.  In his self-nominating letter, Defendant touted his research accomplishments, noting that he had been "granted external funds from federal funding agencies" and that "[t]he amount of funds directly granted to [his] research group is $3.4 M." Ex. 221A.  Curiously, despite the Chang Jiang Distinguished Professor position's prestige, Defendant did not mention it in his nominating letter.  In April 2019, KU awarded Defendant the prize, but because Defendant was working at FZU at the time, his wife accepted the $10,000 prize on his behalf.  Trial Tr. Day 2 at 57:17-24 (D. Girod).

### v.      Defendant Took Additional Steps to Conceal His FZU Job

Defendant also told others to hide his FZU job.  In one phone call, he told a former KU student of his whom he was trying to recruit to FZU that, "If someone else mentions it to you, pretend you didn't know, right?  You don't, you don't need to go . . . mention this to others . . . saying I, that is, I got some Chang Jiang Scholar award or anything like that."  Exs. 511A at 15:43-16:14 (Feb. 21, 2018 phone call with W. Huang).  In an email, he told another of his former KU students not to use Defendant's FZU email address in emails with other U.S. colleagues.  Ex. 253 (May 21, 2019 email to Yu Tang, "You should use your Fuzhou address instead of Kansas. . . . I will only use my Kansas.  No need to mention my address.").  Defendant's actions were consistent with what FZU told him to do.  In a phone call with FZU's

president, Defendant agreed when the president told him not to leave any trace of his job at FZU "in writing or anything.  Because that would be evidence!"  Ex. 521A.  Defendant also partitioned his KU hard drive to hide his FZU work.  Trial Tr. Day 7 at 77:25-78:13 (J. Clevenger).

## III.    ARGUMENT

### A.    Applicable Law

#### i.    Rule 29

The heavy burden Defendant faces on a Rule 29 motion "reflects a deep respect for the fact-finding function of the jury."  *White*, 673 F.2d at 302.  In considering a Rule 29 motion, the court must "examine the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Brooks*, 438 F.3d at 1236; *accord United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015).  It is not the court's duty to weigh conflicting evidence nor to consider the witnesses' credibility as those matters are for the jury's consideration.  *Id*.  Moreover, "while the evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt."  *United States v. Vallejos*, 421 F.3d 1119, 1122 (10th Cir. 2005).  The court must not "overturn a jury's finding unless no reasonable juror could have reached the disputed verdict."  *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997).[8]

---

[8] Defendant's reliance on *United States v. Jones*, 44 F.3d 860 (10th Cir. 1995), and its concern over "piling inference on inference," Def. Mot. at 4-5, is not an issue here because Defendant was not charged with conspiracy, which is what animates that concern.  *See Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) (conspiracy charges cannot be "made out by piling inference upon inference" because that would create "a dragnet to draw in all substantive crimes"); *see also Jones*, 44.F.3d at 864-65 (analyzing conspiracy charge); *United States v.*

ii.      **Rule 33**

Rule 33 gives a court discretion to vacate a judgment and grant a new trial, "if the interest of justice so requires."  Although a motion for a new trial is not held to as strict of a standard as a motion for judgment of acquittal, *United States v. Fritzel*, 5:18-CR-40058-HLT, 2019 WL 4670204, at *1 (D. Kan. Sept. 25, 2019), such a motion nonetheless "is not regarded with favor and is only issued with great caution."  *United States v. Herrera,* 481 F.3d 1266, 1269-70 (10th Cir. 2007); *accord United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997).  Indeed, the court should not grant a new trial even if it believes that a different result would be more reasonable.  *Fritzel*, 2019 WL 4670204, at *1.

B.      **Wire Fraud Counts**

To convict Defendant of wire fraud, the jury must have been convinced that the Government proved: (1) Defendant devised or intended to devise a scheme to defraud; (2) he acted with specific intent to defraud; (3) he used, or caused another person to use, interstate wire communications for the purpose of carrying out the scheme; and (4) the scheme employed false or fraudulent pretenses, misrepresentations, or promises that were material or involved omissions or concealment of material facts with a duty to disclose.  *United States v. Zar*, 790 F.3d 1036, 1049 (10th Cir. 2015).  "The offense of a scheme to defraud focuses on the intended end result, not on whether a false representation was necessary to effect the result.  Schemes to defraud, therefore, may come within the scope of the wire and mail fraud statutes even absent an affirmative misrepresentation."  *United States v. Capra*, 652 F. App'x 632, 639 (10th Cir. 2016) (quoting *United States v. Cronic*, 900 F.2d 1511, 1513-14 (10th Cir. 1990), *overruled on other*

---

*Butler*, 494 F.2d 1246, 1251-52 (10th Cir. 1974) (same); *United States v. Canela*, No. CR 08-1539 MV, 2010 WL 11523585, at *1 (D. N.M. Jan. 15, 2010) (same); *United States v. Migliaccio*, 34 F.3d 1517, 1521 (10th Cir. 1994) (same).

grounds by United States v. Iverson, 818 F.3d 1015 (10th Cir. 2016)); see also Neder v. United States, 527 U.S. 1, 22 (1999) (noting that, at common law, fraud required misrepresentation, concealment, or omission of material fact).

An "intent to defraud" means an intent to deceive or cheat someone. United States v. Welch, 327 F.3d 1081, 1105 (10th Cir. 2003). Because direct evidence of fraudulent intent is rare, juries can rely on a variety of circumstantial evidence such as attempts to conceal, knowledge of falsity, personal gain, or proof of harm. Id. at 1105-06. "Like proof of harm, proof of potential, actual, or contemplated gain simply is one means of establishing the necessary intent to defraud. . . . Yet, the intent to defraud does not depend on the intent to gain, but rather, on the intent to deprive." Id. at 1106. A representation is "false" if it is known to be untrue, is made with reckless indifference as to its truth or falsity, constitutes a half-truth, or effectively conceals a material fact. United States v. Sharp, 749 F.3d 1267, 1288-89 (10th Cir. 2014).

### i. The Government Proved that Defendant Orchestrated a Scheme to Obtain Money or Property

Defendant was convicted of scheming to defraud KU and the U.S. government to obtain grant funds, his salary, and access to KU's property, including its research facilities and equipment. See ECF No. 278, Jury Instruction No. 2. Despite this, Defendant continues to mischaracterize the Government's fraud theory as honest services fraud, so that he can argue that the Government's theory is invalid under Skilling v. United States, 561 U.S. 358 (2010). Def. Mot. at 25-27. As it did at the motion-to-dismiss stage, the Court should reject this argument. "[T]his case goes beyond honest services fraud because the betrayed parties – KU and the USG – suffered a deprivation of money" and property. Tao, 499 F. Supp.3d at 952. Specifically, Defendant used his scheme to, among other things, fraudulently obtain grant funds; use those funds to pay for his course buyout and summer salary while he was working at FZU in China;

and deprive KU of his academic year salary as a KU professor.

Defendant withdrew over $100,000 from his NSF grant account at KU from December 2017 to August 2019. Ex. 60 (draw spreadsheet). During the same period, he withdrew approximately $248,000 from his DOE grant account. *Id.* Defendant used this money to benefit himself, his reputation, and his research. He purchased supplies and scientific equipment and he paid for fringe benefits, travel, facilities, and salaries for himself and his research team. *See, e.g.*, Exs. 20 at tabs "16152," "8747," and "8056" (summarizing, by category, funds spent from those grants), 59 at tab "FITC Data" (detailing line-item expenses for grants). For example, in February 2019, Defendant used NSF funds from a grant he had received in September 2018 to purchase gases for his research. Ex. 59 at tab "FITC Data," rows 651-659. In April and May of 2019, he used DOE funds from a grant that had been renewed in September 2018 to purchase scientific hardware such as steel tubing, drills, pressure sensors, mechanical gaskets, and aluminum framing. *Id.* at tab "FITC Data," rows 1517-1556. And in June 2019, he used DOE funds to pay for his post-doctoral researcher, Nguyen, to travel to New York and Japan. *See* Ex. 20 at tab "Award Transactions," rows 133-149 (detailing grant fund expenditures).

Defendant also defrauded KU and his federal funders of grant funds that he then used to pay his summer salary. Trial Tr. Day 11 at 37:22-38:23 (S. Lampe). Because Defendant was on a nine-month contract, he was not entitled to any summer pay from KU. *See, e.g.*, Trial Tr. Day 6 at 109:19-110:1 (B. Subramaniam) (summer salaries "go into the pockets of" PIs and need to be approved by NSF); *id.* Day 2 at 105:8-106:1 (A. Loving) (base salary is for nine-month academic year). Instead, he fraudulently caused KU to use grant funds from NSF and DOE to pay his salary during those summer months. Specifically, for the summer of 2019, Defendant used grant funds to obtain more than $10,000 in extra compensation. *See* Ex. 15 (deposits into

Defendant's accounts spreadsheet); Ex. 1115 (Defendant's paystubs) at FT-DEF-000068-74; *see also* Ex. 21 (notifications of summer 2019 pay) at 1-4.  This was despite the fact that in that same period (May 19 to August 24, 2019), Defendant spent 61 of the 87 days in the PRC working at FZU.  Ex. 355.  For the summer of 2018, after he had accepted the FZU job, Defendant used grant funds to obtain more than $5,000 in extra compensation.  Ex. 20 at tab "Pivot by Pay Period"; *see also* Ex. 1115 at FT-DEF-000042-47.  This compensation was in addition to his $108,000 annual salary that KU paid him and was wholly dependent on his grant funding.  Ex. 13 (annual salary "does not include summer pay").

Moreover, Defendant's scheme involving his spring 2019 course buyout fraudulently used NSF funds to effectively pay Defendant *not* to teach a course that semester.  By deceiving KU and NSF about his FZU activities during that period, Defendant fraudulently obtained NSF funds and used them to reimburse KU for the salary it had already paid him.  This is analogous to *United States v. Ransom*, in which the Tenth Circuit affirmed a wire fraud conviction for a salaried federal employee who "wrongly [took] money from the government" by falsely claiming to work during hours when he was actually playing tennis or gambling.  642 F.3d 1285, 1289-90 (10th Cir. 2011).  As in *Ransom*, where the court concluded that the "money" defendant fraudulently obtained was the *paid* leave he accrued based on his false time records, Defendant here essentially obtained paid leave (from his teaching obligations) in the form of a course buyout.  *Compare id.* at 1290 (explaining that "a federal employee is financially responsible for leave taken in excess of what the employee has accrued"), *with* Ex. 254 (KU email to Defendant regarding buyout stating, "You will need to identify key salary funds from one or more of your sponsored projects to cover this debt").

The object of Defendant's scheme was money and property – plain and simple.  *United*

*States v. Richter*, 796 F.3d 1173, 1194 (10th Cir. 2015) (affirming wire fraud conviction where customers' money went to defendant who "would not have received it if all the facts had been known"); *United States v. Zander*, 794 F.3d 1220 (10th Cir. 2015) (obtaining federal grants was scheme to defraud to obtain money); *United States v. Williams*, 527 F.3d 1235, 1244-45 (11th Cir. 2008) (same); *see also Pasquantino v. United States*, 544 U.S. 349, 356-57 (2005) (government's right to tax revenue was an "economic interest" cognizable under wire fraud statute); *United States v. Weingand*, 482 F. Supp. 3d 224, 235-36 (S.D.N.Y. 2020) (rejecting argument that *Kelly v. United States*, 140 S. Ct. 1565 (2020), precluded prosecution and holding that banks had "concrete property interests" in depositor funds and defendants "sought to injure those interests by causing the banks to relinquish those funds through deception").[9]

Defendant argues that because KU maintained possession of the grant funds after they were awarded, Defendant could not have schemed to obtain the funds from NSF and DOE. Def. Mot. at 30-31. This is nonsensical. It is blackletter law that "a defendant need not literally obtain money or property – in the sense of putting money into his pocket – to violate the wire fraud statute." *United States v. Gatto*, 986 F.3d 104, 113-14 (2d Cir. 2021); *see also Welch*, 327 F.3d at 1108 ("Defendants deprived the [victim] of property if their fraudulent conduct caused the [victim] to permit the use of its funds in a manner which the [victim], if cognizant of the truth, would not have sanctioned. . . . Fraudulent deprivation of another's property is no less fraudulent because it might or does result in a benefit to the defrauded."); *Carpenter v. United*

---

[9] KU also had a property interest in the lab space, equipment, and personnel that Defendant used at KU. *See Kelly*, 140 S. Ct. at 1573 ("A government's right to its employees' time and labor . . . can undergird a property fraud prosecution."). By violating KU policy and directing his post-doctoral researcher, Nguyen, to assist him in building a lab at FZU, Defendant deprived KU of its right to Nguyen's time and labor. This is an additional form of property that Defendant fraudulently obtained from KU.

*States*, 484 U.S. 19, 27-28 (1987) (holding that victim's deprivation of exclusive use of property constituted a scheme to obtain property).  Moreover, even under Defendant's logic, he still defrauded KU and the federal funders of the grant funds once they passed from the federal funders to KU, and then Defendant misled and deceived KU in order to spend those funds.  Either way, he used deceit and lies to obtain the grant funds.

Defendant also defrauded KU of the portion of his compensation that came from state funds.  From January 2018 (when Defendant was offered the FZU position) to August 2019, KU paid Defendant approximately $160,000 in salary (excluding his summer salaries) and a $10,000 bonus for the Scholarly Achievement Award.  Ex. 15.  As described above, *supra* at 13-23, during this entire period, Defendant deceived, misled, and lied to KU about his activities at FZU, his position as a Chang Jiang Distinguished Professor, his research proposals and support in the PRC, and his extensive travel to FZU in 2018 and 2019.  As a result, he deprived KU of the money it used to pay his salary and bonus, which is a cognizable money-or-property interest under federal fraud statutes.  *United States v. Ransom*, No. 09-20057-JWL, 2009 WL 3756977, at *3-4 (D. Kan. Nov. 9, 2009) (defendant's falsified time records deprived employer of salary and constituted a scheme to defraud even if the time records had "no bearing upon the amount of salary" defendant received); *see also, e.g.*, *United States v. Morales*, 664 F. App'x 228, 230 (3d Cir. 2016) (affirming conviction for scheme to defraud employer of salary); *United States v. Ratcliff*, 488 F.3d 639, 645 (5th Cir. 2007) (dismissing indictment, but stating, "We do not dispute the Government's contention that a salary and other financial employment benefits can constitute 'money or property' under the statute; as the Eighth Circuit put it when discussing a scheme to defraud an employer of wages, 'money is money, and 'money' is specifically mentioned in the statutory words.'") (quoting *United States v. Granberry*, 908 F.2d 278, 280 (8th

Cir. 1990)); *United States v. Burns*, 104 F.3d 529, 533-35 (2d Cir. 1997) (affirming conviction

for scheme to defraud employer of salary and travel reimbursements).   As this Court wrote in its

denial of Defendant's motion to dismiss, "'Jobs are a lot like contracts.   Neither is a bag full of

money but both are immensely valuable: a contract is a promise to pay for services rendered,

while a job is the exchange of labor for a paycheck.' . . . KU was deprived of something of value

because it continued to employ Defendant despite his failure to notify it that he was in violation

of [KU's] conflict policies – policies he was required to comply with as part of his job." *Tao*,

499 F. Supp.3d at 952-53 (quoting *United States v. Sorich*, 523 F.3d 702, 713 (7th Cir. 2008)).[10]

Defendant argues that two intervening out-of-circuit decisions, *United States v. Yates*, 16

F.4th 256 (9th Cir. 2021), and *United States v. Guertin*, --- F. Supp. 3d ----, 2022 WL 203467

(D.D.C. Jan. 24, 2022), should cause the Court to revisit its earlier ruling not to draw a

distinction between salary maintenance and salary enhancement "in the absence of controlling

Tenth Circuit law." *Tao*, 499 F. Supp.3d at 953.[11]   But neither *Yates* nor *Guertin* is a change in

controlling law, and Defendant has not identified any relevant difference between the facts as

alleged in the operative indictment and as presented at trial that would affect the Court's legal

analysis.   Therefore, the law of the case doctrine applies.   *Dobbs v. Anthem Blue Cross and Blue*

*Shield*, 600 F.3d 1275, 1279-80 (10th Cir. 2010) ("The law of the case doctrine provides that

---

[10] In addition, Defendant received leave and sick time that accrued as a result of his KU
employment.  Ex. 1115.  Fraudulent accrual of sick leave is sufficient "money or property" to
support a wire fraud conviction.  *See Ransom*, 642 F.3d at 1290.

[11] Defendant also cites *United States v. Goodrich*, 871 F.2d 1011 (11th Cir. 1989), but that case
did not concern a theory in which a defendant fraudulently maintained his own salary; instead,
the theory (which the court rejected) was that the defendant fraudulently obtained the salaries of
government commissioners by causing them to attend "sham" zoning hearings that were of no
consequence because the defendant had already bribed them to make certain decisions.  *Id.* at
1013-14.

when a court decides upon a rule of law, that decision should continue to govern the same issues

in subsequent stages in the same case."); *see also McIlravy v. Kerr-McGee Coal Corp.*, 204 F.3d

1031, 1035 (10th Cir. 2000) (three "exceptionally narrow" exceptions are when (1) trial evidence

is "substantially different"; (2) change in controlling authority; or (3) prior decision is clearly

erroneous and would cause a "manifest injustice").[12]

 Even if the Court considers *Yates* and *Guertin*, their persuasive value is questionable.

Contrary to Defendant's view, neither decision represents "well-settled" law.  Def. Mot. at 28.

*Yates* was a split panel decision by the Ninth Circuit with a lengthy dissenting opinion that

characterized the majority opinion as "contradict[ing] governing precedents and improperly

vacat[ing] convictions that were premised on a valid legal theory, backed by overwhelming proof

of wrongdoing."  *Yates*, 16 F.4th at 275-76 (Bress, J., dissenting).[13]  And *Guertin* has been

appealed to the D.C. Circuit.  *See United States v. Guertin*, No. 1:21-cr-00262-TNM-1, ECF No.

44 (Mar. 1, 2022 notice of appeal).  This is another reason why the Court should not revisit its

earlier rejection of Defendant's argument, which was supported by case law from this District

and the Second, Third, Fifth, Seventh, and Eighth Circuits.  *See Sorich*, 523 F.3d 702 (7th Cir.

2008); *Ratcliff*, 488 F.3d 639 (5th Cir. 2007); *Burns*, 104 F.3d 529 (2d Cir. 1997); *Morales*, 664

F. App'x 228 (3d Cir. 2016); *Ransom*, 2009 WL 3756977 (D. Kan. Nov. 9, 2009).

---

[12] Even if the Court decides to adopt the defense's maintenance of salary theory at this stage, Defendant's use of grant funds to pay for his summer salary would still be a valid theory of fraud to obtain Defendant's salary, because, as a nine-month employee, Defendant did not have a preexisting contractual right to his summer salary.  *Cf. Guertin*, 2022 WL 203467, at *2.

[13] *Guertin* opines that the dissent in *Yates* seemed to agree with the majority that maintenance of an existing salary, as opposed to performance-based compensation, is not cognizable under the fraud statutes, *Guertin*, 2022 WL 203467 at *3 n.4, but the majority in *Yates* refused to draw such a distinction.  *Yates*, 16 F.4th at 267-68.  Here, even if such a distinction mattered, Defendant received a $10,000 bonus prize from KU for his research performance in the spring of 2019, even though at the time, he was in the midst of executing his scheme to defraud KU.

Moreover, even if the Court adopts *Yates* and *Guertin*, the facts here are distinguishable because Defendant fraudulently obtained much more from KU and the federal funders than just his nine-month salary. As discussed above, *supra* at 25-29, he also fraudulently obtained grant funds to pay for his summer salary, buyout payment, and research, as well as access to KU's equipment, facilities, and personnel. Plus, unlike in *Yates* and *Guertin,* KU paid Defendant his nine-month salary even though, unbeknownst to KU at the time, Defendant was not delivering the services he had promised to render to KU, namely teaching and serving the KU community. Thus, even under *Yates* and *Guertin*, the Defendant's wire fraud conviction is legally valid because Defendant failed to render the services he had agreed to provide to KU in exchange for his salary. *Tao*, 499 F. Supp.3d at 952-53.

Finally, as this Court previously held in its motion-to-dismiss order, this is not an honest services fraud case. The Government alleged and proved money and property fraud. As described above, the object of Defendant's scheme was to obtain grant funds, salary, and access to KU's equipment, facilities, and personnel. KU's and the federal funders' "loss of money or property supplied the defendant's gain, with one the mirror image of the other." *Skilling*, 561 U.S. at 400. Defendant tries to confuse the issue by arguing that the Government's theory was that Defendant deprived KU of his "loyalty" by concealing his job at FZU. Def. Mot. at 31. But that is not what the Government alleged or proved at trial. *See, e.g.*, ECF No. 75 ¶¶ 32 ("TAO engaged in a scheme to defraud KU and the USG to obtain money and property from KU, DOE, and NSF, to include USG grant funds and his KU salary."); 36 ("TAO fraudulently maintained his employment with KU to obtain access to KU's research facilities and equipment and USG grant funds"); 38 ("TAO caused KU to . . . request funds from DOE and NSF for expenditures associated with his USG-funded research at KU."). In its closing argument, the Government

said:

> It wasn't just the money.  The defendant needed to remain a full-time employee at the University of Kansas because he needed access to his lab while he got the FZU lab up and running, but he also needed access to the federal grant money.  You heard testimony that money belonged to the university, it doesn't go to the PI.  The only way that the defendant had access to that grant money is if he remained at a university in the United States.

Trial Tr. Day 12 at 139:25-140:7.

Unlike in an honest services fraud case, KU and the federal funders suffered a "deprivation of money or property." *Skilling*, 561 U.S. at 400.  Specifically, Defendant deprived KU of his salary and KU's property interests in the grant funds and its facilities, equipment, and personnel.[14]  Defendant also deprived NSF and DOE of grant funds, which he used to advance his own interests and career at the expense of KU.  Some of the funds he paid to himself as a summery salary, others he used to further his research, which, as the evidence showed, Defendant then touted to further his personal career in the PRC and obtain personal benefits.

### ii.      The Government Proved Defendant's Intent to Defraud KU and NSF

An "intent to defraud" means an intent to deceive or cheat someone.  *Welch*, 327 F.3d at 1105.  "The Tenth Circuit has repeatedly noted that, because fraudulent intent is difficult to prove with direct evidence, it may be inferred from circumstantial evidence considered in its totality." *United States v. Kalu*, 791 F.3d 1194, 1205 (10th Cir. 2015) (collecting cases).  Some examples of evidence that can prove intent to defraud are a defendant's attempt to conceal activity, a defendant's misrepresentations, a defendant's knowledge of a false statement, or whether a "defendant profited or converted money to his own use." *Id.*  Similarly, proof of

---

[14] This is precisely the type of property fraud the Supreme Court has stated rises to the level of federal fraud. *Kelly*, 140 S. Ct. at 1573 ("[T]he cost of those employee's services would qualify as an economic loss to the city, sufficient to meet the federal fraud statutes' property requirement.").

actual, potential, or contemplated harm or gain are but another "means of establishing the necessary intent to defraud." *Welch*, 327 F.3d at 1104-05.

Here, the jury had ample evidence to conclude that Defendant had the requisite intent to defraud KU and NSF. Defendant knew that he was required to disclose his FZU position and activities to KU. Trial Tr. Day 3 at 10:14-15:25 (spreadsheet summarizing Defendant's grant awards and proposals); *see also* Exs. 22-25 (annual Institutional Responsibilities forms). Defendant also knew that if he had questions about what he was supposed to disclose, he could ask KU's Office of Research, his department chair, or his mentor. That is precisely what he did in other circumstances. *See, e.g.*, Exs. 117-118 (Defendant emailing chairs and mentor to ask if serving as an editor of a scientific journal would pose "any potential issue conflicting with KU policy."); *see also* Ex. 292 (asking Office of Research, on March 3, 2017, what he should "do for clearance of conflict interest" if his wife started a company). Defendant knew how to report potential conflicts to KU, but he chose not to for his FZU activities.

Defendant also tried to conceal his scheme. On multiple occasions, Defendant instructed his current and former students and researchers to hide his affiliation with FZU. *See supra* at 22-23. These attempts at concealment, especially when combined with the other evidence of Defendant's misrepresentations and knowledge of falsity, were more than sufficient to establish Defendant's fraudulent intent. *See Ransom*, 642 F.3d at 1291 (knowledge of proper timekeeping procedures and consequences if they were violated sufficient to establish intent); *United States v. Chavis*, 461 F.3d 1201, 1208 (10th Cir. 2006) (concealment sufficient to establish intent); *United States v. Trammell*, 133 F.3d 1343, 1352 (10th Cir. 1998) ("Evidence of the schemer's

indifference to the truth of statements can amount to evidence of fraudulent intent.").[15]  Indeed,

"one of the overriding reasons [Defendant's] motion for acquittal rings hollow is that some of the

most damning evidence against him came from his own mouth."  *United States v. Porat*, No. CR

21-170, 2022 WL 685686, at *5 (E.D. Pa. Mar. 8, 2022).

Defendant did this, in part, because he wanted to use federal grant money at KU and he

did not want to give up his research team and position there.  In the February 26, 2018 phone call

with another KU professor, Defendant said that he had a "team" at KU and did not "want to give

it up."  Ex. 514A at 00:00 to 01:34.  Defendant repeated this the next day in his call with Liu

from Georgia Tech—he wanted to "keep" his "research group" at KU, and did not want to "give

things up" at KU.  Ex. 512A at 3:37 to 4:38, 21:36 to 21:58.  Defendant deceived KU and his

federal funders because he wanted to benefit from the federal grant dollars and his position at

KU (including all of its benefits).  This was sufficient evidence of contemplated or actual gain

for the jury to conclude that he had the requisite intent to defraud.  *See Welch*, 327 F.3d at 1106.

Defendant also knew what might happen if his fraud was uncovered.  When Defendant

asked Liu for advice, he was told repeatedly that he should "clearly" tell KU about the FZU

position, or else he'd have problems.  Ex. 512A at 21:55-57.  Instead of agreeing to tell KU,

Defendant responded that "some people don't say anything, that's for certain.  But if I don't say

anything, then . . . it would definitely be problematic if this thing were ever looked into."  *Id.* at

04:42 to 04:55; *see also* Ex. 514A.  Defendant then went on to tell Liu about the FBI

investigations Defendant had been following in which other scientists were criminally charged

---

[15] Defendant also discussed his attempts at concealment with FZU employees.  In a March 16, 2018 phone call, Defendant told a FZU employee whom he had been negotiating his hiring package with that FZU should not post anything on its homepage regarding Defendant because that "would be bad" and Defendant "wouldn't be able to get started" at FZU "when the time comes," because someone might think he is "up to something."  Ex. 519A 12:41 to 13:10.

for undisclosed activities in the PRC.  Ex. 512A at 13:58-20:34.

On another occasion, when a KU professor emailed Defendant's department some news articles about criminal NSF grant fraud cases involving undisclosed foreign activities in August 2018, Defendant forwarded the email to his wife.  Ex. 203.  The evidence also showed that screenshots had been saved to Defendant's electronic device regarding an investigation by the National Institutes of Health of PIs at Emory University who had "failed to fully disclose foreign sources of research funding and the extent of their work for research institutions and universities in China."  Ex. 675; *see also* Ex. 676.

Defendant ignores all this evidence and, relying principally on the Eleventh Circuit's opinion in *United States v. Takhalov*, 827 F.3d 1307, *as revised* (Oct. 3, 2016), *opinion modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016), argues that his wire fraud convictions cannot stand because the Government failed to prove Defendant's deceit "coupled with a contemplated harm to the victim that affects the very nature of the bargain itself."  Def. Mot. at 16-22 (quoting *United States v. Mingqing Xiao*, No. 4:21-cr-40039 (S.D. Ill. May 3, 2022)).  But this is not, and should not be, the law in the Tenth Circuit.  Furthermore, even if the Court applied Defendant's contorted legal rule here, the trial evidence would still support Defendant's convictions.

*First*, this Court and the Tenth Circuit have already rejected Defendant's "benefit-of-the-bargain" defense to fraud.  *See* ECF No. 82 at 16-18 (Defendant arguing benefit-of-the-bargain defense in motion to dismiss).  In *United States v. Welch*, the Tenth Circuit reversed a district court's dismissal of an indictment charging executives of the Salt Lake City Bid Committee for the 2002 Winter Olympics with various crimes, including mail and wire fraud, related to bribes given to members of the International Olympic Committee to bring the Olympic Games to Utah. 327 F.3d 1081, 1085-86 (10th Cir. 2003).  Defendants in *Welch* argued that the mail and wire

fraud counts should be dismissed because the Government "fail[ed] to allege [the defendants] intended to inflict economic harm on or injure the [victim's] property rights." *Id.* at 1104. The Tenth Circuit expressly rejected this argument, holding that "[a]n intent to inflict economic harm on or injure the property rights of another is not an element of federal mail or wire fraud." *Id.* "The notion of harm in a mail or wire fraud prosecution is important only in the sense that proof of contemplated or actual harm to the victim or others" is one, but not the only, "means of establishing the necessary intent to defraud." *Id.* 1104-05. Thus, to the extent Defendant argues that the Government needed to prove that Defendant intended to harm KU, NSF, or DOE, *Welch* forecloses that argument. *See also United States v. Hollis*, F.2d 1441, 1452-53 (10th Cir. 1992) (refusing to equate intent to defraud with intent to cause "financial harm").[16]

An out-of-circuit district court's oral ruling granting a defendant's Rule 29 motion for acquittal on the wire fraud counts in *United States v. Xiao*, No. 21-cr-40039-SMY (S.D. Ill.), does not counsel otherwise. There, the defendant was charged with, *inter alia*, a scheme to defraud NSF of grant money by failing to disclose to NSF at the proposal stage all his current and pending support and organizational affiliations, which included foreign funding and a relationship with a PRC university. *Id*., ECF No. 57 (Superseding Indictment) ¶¶ 2-12. Late in the evening after the Government rested its case, Xiao filed a 32-page motion for judgment of acquittal. *Id.*, ECF No. 155. The court heard argument the next morning and then granted, in part, defendant's Rule 29 motion. The Government never had an opportunity to respond in writing. *Id.*, ECF No. 157 (Mot. for Reconsideration). The crux of the district court's ruling

---

[16] *United States v. Flanders*, 491 F.3d 1197 (10th Cir. 2007), is inapposite because the discussion of "intent to defraud" there related to 18 U.S.C. § 656 (misapplication by bank officer), which has a different intent element than 1343. *Id.* at 1208 (Section 656 requires "that the defendant acted with intent to injure or defraud the bank").

appears to have been that although the Government proved that the defendant had deceived NSF, it had failed to prove that he had intended to injure NSF.  D.A. 877-79.

This is not the law in the Tenth Circuit, *see Welch*, 327 F.3d at 1085-86, and as the Government argued in its Motion for Reconsideration in *Xiao*, No. 21-cr-40039-SMY, ECF No. 155, it is not the law in the Seventh Circuit either.  *See United States v. Leahy*, 464 F.3d 773, 786-87 (7th Cir. 2006) (wire fraud does "not require the government to prove either contemplated harm to the victim or any loss"); *Sorich*, 523 F.3d at 713 (rejecting argument that defendant did not obtain money or property if victim was not harmed); *see also United States v. Vorley*, No. 18 CR 00035, 2021 WL 1057903, at *17-19 (Mar. 18, 2021) (rejecting argument that *Takhalov* and *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007), the two cases cited by the *Xiao* Court, D.A. 876-78, should apply in the Seventh Circuit).

*Second*, to the extent Defendant argues that under *Takhalov*, Defendant did not obtain money or property from KU, NSF, and DOE because they received "exactly what they paid for," the Tenth Circuit has rejected that argument too.

In *United States v. Ricther*, the Tenth Circuit "held that payments made in exchange for services provided under a contract induced by false representations, even where the services are performed, constitute a deprivation of money or property sufficient to invoke the federal fraud statutes."  796 F.3d 1173, 1192 (10th Cir. 2015).  Specifically, the court concluded that even though the defendant (an e-recycling company executive) had disposed of the e-waste that customers had paid him to recycle, his lies about how he would recycle the waste – lawfully, domestically, and completely – "were material to the customers' decisions" and a reasonable juror could conclude that the customers "were induced to pay for services under false pretenses." *Id.*  Similarly, Defendant's lies were material to KU's and the federal funders' decisions, and the

jurors reasonably concluded that they were fraudulently induced to give him grant funds, his

salary, and access to KU's equipment, personnel, and facilities.  *Cf. Shaw v. United States*, 137

S. Ct. 462, 466-70 (2016) (bank fraud does not require proof that defendant intended to harm

victim bank, but that defendant intended to "deceive the bank *and* deprive it of something of

value") (emphasis in original); *accord Tao*, 499 F. Supp. 3d at 953 n.31 (collecting cases of

fraudulent inducement involving money or property); *United States v. Bunn*, 26 F. App'x 139,

142-43 (4th Cir. 2001) (rejecting argument that defendant contractors did not defraud victim

because he performed the work, because the "evidence established that [defendants] obtained

money to which they were not otherwise entitled by falsely representing that subcontract work

would be performed by [disadvantaged business enterprises].  Nothing more is required.").

Even if Defendant's interpretation of *Takhalov* applied here and the Government had to

prove that the victims did not receive what they bargained for, the evidence still supports the

jury's verdict.  KU bargained for a full-time professor who would spend 40% of his time

teaching, 40% of his time on research, and 20% of his time serving the KU community.  It also

bargained for a professor who would follow the universities' policies regarding outside activities,

potential conflicts of interest or commitments of time, and external research funding.  *Tao*, 499

F. Supp. 3d at 954 (KU and the federal funders "bargained for an employee who lacked conflicts

of interest of time and money").  And it expected PIs to comply with all applicable funding

guidelines and KU Office of Research policies pre- and post-award.  What KU did *not* bargain

for is a full-time professor who had a second full-time job at a competing university and who lied

to KU about it.  It did not bargain for a full-time professor who used KU personnel to build a lab

at a different university, who siphoned prospective post-docs from KU to another university, and

who served as an advisor for students at a different university.  And it certainly did not bargain

for a PI who would jeopardize KU's eligibility to receive federal funding. *See* Trial Tr. Day 2 at

214:6-215:20 (A. Reed). In short, KU did not bargain for what Defendant delivered.

Defendant argues that KU was fully satisfied with his performance. Def. Mot. at 20-21.

But that is not what the evidence showed, especially when drawing all inferences in favor of the

Government. *See, e.g.*, Exs. 26, 27, 28, 29 (annual evaluations), 247 (Defendant failing to advise

students), 231 (Defendant failing to timely perform paperwork for department accreditation); 225

(Defendant missing faculty retreat). Defendant presented this argument at trial, *see e.g.*, Trial Tr.

Day 2 at 23:8-10 (P. Zeidenberg), and the jury rejected it. This was reasonable. *See Richter*, 796

F.3d at 1192; *Tao*, 499. F. Supp. 3d at 953 n.31 (collecting cases); *accord Morales*, 664 F. at

229-30 (affirming wire fraud conviction for National Guardswoman who concealed second full-

time job from National Guard, even though "by all accounts she was a good employee" who

"often pulled long hours on evenings and weekends").

This is one of the main reasons why the unpublished district court order in *United States*

*v. Hu*, 3:20-CR-21-TAV-DCP-1, 2021 WL 4130515 (E.D. Tenn. Sept. 9, 2021), is of no

persuasive value here. Unlike in *Hu*, the evidence here showed that neither KU nor NSF

received what it bargained for from Defendant. In *Hu*, the Government charged the defendant

with a scheme to defraud NASA by "falsely representing and concealing his affiliation" with a

PRC university from his home university in the U.S., which caused his home university to falsely

certify to NASA that it was in compliance with NASA's China Funding Restriction. *Id.* at *1.

The Government's only alleged scheme was to defraud NASA for grant money; it did not allege

any other victims. *Id.* at *13. At trial, an agent from NASA's Office of Inspector General

testified that "NASA was satisfied with defendant's work on the grants," and that "NASA got

what they thought they had bargained for" from Hu. *Id.* at *12. Based on this, the court granted

Hu's Rule 29 motion and concluded that, based on the evidence presented at trial, Hu's

affiliation with a PRC university "did not impact the price or characteristics of the service

provided, namely, the research work conducted."  *Id.* at *18.  In essence, the court in *Hu*

interpreted *Takhalov* to mean that if a fraud victim receives the benefit of its bargain with a

defendant, then the defendant did not deprive the victim of something of value that was essential

to the bargain.  *Id.* at 15.  Under that interpretation, the corollary must also be true:  if a victim

did *not* receive the benefit of its bargain, then the defendant necessarily deprived the victim of

something of value that was essential to the bargain.  *See, e.g.*, *United States v. Schwartz*, 924

F.2d 410, 420 (2d Cir. 1991) ("While the government must prove the defendant contemplated

harm in order to establish a scheme to defraud, it is not necessary that this harm be monetary in

nature.  It is sufficient if the contemplated harm goes to some essential element of the bargain.").

   Unlike NASA's witness in *Hu*, Dr. Keiser did not testify that NSF was satisfied with

Defendant's work and that it believed it received what it bargained for from Defendant.  To the

contrary, she testified that when a PI, like Defendant, conceals affiliations, appointments, or

sources of funding from NSF, he unfairly distorts NSF's decision-making process and causes

NSF to distrust the results of any research from that PI that NSF funded, because NSF does not

know if the PI was biased in a way that could affect his research.  Trial Tr. Day 5 at 8:4-9:3 (R.

Keiser); *see also id.* at 95:16-24 ("One of the big things --- I started by talking about research

integrity and the need to be very clear, honest and transparent about all parts of the research so

that we can trust the research.  And so it's very important to be transparent about who you're

working with, who you're collaborating with, so that we can trust the research results and make

sure we're also responsibly giving out research funding.").

   Defendant quotes a portion of Dr. Keiser's testimony on cross-examination where she

said she was unaware whether there were any allegations that the work on the NSF grants was
not performed, but Defendant omits the rest of Dr. Keiser's answer, which explains why, even if
Defendant performed the research that he said he would, his undisclosed research support and
affiliations potentially tainted his research and delivered to NSF less than it bargained for:

> Defense counsel: And are you aware of any allegations in this case that any of the
> work on the NSF grants at issue was not done in the manner prescribed?
>
> Dr. Keiser: I'm not aware. *I think what's challenging, just to explain a little bit
> more, is if someone has not disclosed that they have an affiliation or are doing
> research somewhere else, then they might be doing that NSF funded research in
> another place using other equipment that they haven't told us either. And so it
> makes it very difficult then to trust that the research was done as the researcher
> had told us they were going to do it.*

*Id.* at 111:6-16 (emphasis added to highlight omitted text).

In totality and when drawing all inferences in favor of the Government, Dr. Keiser's
testimony proved that, in light of Defendant's misstatements and omissions, NSF did not believe
that it received what Defendant promised. At most, it received research of questionable
legitimacy that was possibly biased. If NSF had used the funds that went to Defendant for
another PI, it would have gotten a better quality product (*i.e.*, research that did not have an
asterisk next to it for potential bias). Defendant's deceit deprived NSF of something of value,
and, therefore, even if the Court adopts Defendant's broad interpretation of *Takhalov* (which it
should not), Defendant had the requisite intent to defraud NSF. *See Richter*, 796 F.3d at 1192-
93; *Leahy*, 464 F.3d at 787 (2006); *Granberry*, 908 F.2d at 280; *accord United States v.
Kelerchian*, 937 F.3d 895, 909-914 (7th Cir. 2019) (holding that defendant defrauded gun seller,
even though he paid for the machineguns, because he lied to the seller causing it to illegally sell
him machineguns and "open[ing] itself up to risks it did not bargain for: risks of liability, of
increased government scrutiny, and negative publicity, all of which in turn could jeopardize
future sales. These are serious repercussions central to [the seller's] calculus of the 'benefits and

burdens' of this transaction.").

*Lastly*, the Court should not adopt Defendant's broad interpretation of *Takhalov*, especially in light of subsequent opinions by the Eleventh Circuit questioning *Takhalov*'s ongoing validity.  *Takhalov* only supports a "benefit of the bargain" defense in narrow, fact-specific cases where a defendant's misrepresentations are truly incidental to the bargain between the defendant and the victim such that the defendant "gave the victims exactly what they asked for and charged them exactly what they agreed to pay."  827 F.3d at 1310.  The Eleventh Circuit itself has stated that it views *Takhalov* as consistent with other circuits' interpretation of a "scheme to defraud," and that *Takhalov* did not change the baseline proposition that, "[w]hen the misrepresentation goes to the value of the bargain, or the nature of the bargain itself, there is a scheme to defraud."  *United States v. White*, 848 F. App'x 830, 844 (11th Cir. 2021); *see also United States v. Sams*, 769 F. App'x 769, 772-73 (11th Cir. 2019) (affirming fraud conviction where defendant promised a high-quality team of software engineers and delivered a hot-air balloon pilot and low-cost programmers, because the defendant's deception "deprived [the victim] of the opportunity to weigh the true costs and benefits of the transaction and thereby accomplished a scheme to defraud").  As described above, *supra* at 49-52, Defendant's lies deprived KU and NSF of the opportunity to weigh the true costs and benefits of employing him, allowing him to serve as a PI, and allowing him to work on NSF grants.

After *Takhalov* was remanded to the district court, the Government retried one of the defendants and a jury convicted him of conspiracy to commit wire fraud and conspiracy to commit money laundering.  *See United States v. Feldman*, 931 F.3d 1245, 1250 (11th Cir. 2019). At the second trial, the Government's fraud theory focused on how Feldman, who was one of the main investors and managers of the night clubs at issue in *Takhalov*, participated in a scheme in

which the women posing as tourists (called "B-girls") not only enticed men to visit and buy drinks at the clubs, but also engaged in a "panoply of deceptive or underhanded tactics that the B-girls and bartenders used to increase the customers' bills and to keep them unaware of the charges they were incurring: for example, hiding menus, ordering drinks without the customers' knowledge, ignoring customers' inquiries about prices, lying about prices . . . forging customers' signatures . . . [etc.]" *Id.* at 1250-51.  The Eleventh Circuit affirmed Feldman's convictions and sentence, but in a concurrence, Chief Judge William Pryor (who also authored the panel opinion) expressed his "concerns about our puzzling opinion in" *Takhalov*.  *Id.* at 1266 (Pryor, J., concurring).  Specifically, he criticized *Takhalov* for sending "mixed signals" and endorsing a "narrow construction of the phrase 'scheme or artifice to defraud'" that is "difficult to understand" and, "depending on how [it] is interpreted, its analysis may well be at odds with both the common law and binding precedent."  *Id.*

Judge Pryor also noted that "[f]raud in the inducement fits squarely within the 'well-settled' meaning of 'actionable fraud'" and that if "*Takhalov* means that the federal fraud statutes punish only fraud-in-the-factum schemes, not schemes to commit fraud in the inducement, it is at odds with the common law."  *Id.* at 1271.  "As Judge Learned Hand explained nearly a century ago, a man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value.  He has suffered a wrong; he has lost his chance to bargain with the facts before him."  *Id.*  In light of the problems with *Takhalov*, Judge Pryor "encourage[d] the bench and bar to evaluate carefully the precedential value of *Takhalov* . . . and, in doing so, to keep in" mind, *inter alia*, "the binding force of precedent is limited to its holding" and "the holding of any panel decision must be construed, if at all possible, in a manner that maintains the harmony of our precedents."  *Id.* at 1273.  This Court should heed Judge

Pryor's advice, decline to follow *Takhalov*, and follow Tenth Circuit precedent to conclude that, when drawing all inferences in favor of the Government, the evidence was sufficient for a reasonable juror to conclude that Defendant had the requisite intent to defraud.[17]

### iii.        The Wires Were for the Purpose of Executing Defendant's Scheme

The "purpose" element of wire fraud requires the Government to prove that the charged wire transmission was "part of the execution of the scheme as conceived by the perpetrator at the time." *United States v. Redcorn*, 528 F.3d 727, 738 (10th Cir. 2008).  While a transmission that is "incident to an essential part of the scheme" or "a step in the plot" is sufficient, *Schmuck v. United States*, 489 U.S. 705, 712 (1989), a transmission that is merely "in relation" to a scheme is not.  *Redcorn*, 528 F.3d at 741.  Defendant need not use the wires himself, however: "It is sufficient if the perpetrator does an act with knowledge that the use of the [wires] will follow in the ordinary course of business, or where such use can be reasonably foreseen, even though not actually intended."  *Zander*, 794 F.3d at 1226.  The transmission need "not be at the heart of a scheme, nor necessary or even helpful for its success; it need not itself be false or deceptive." *Redcorn*, 528 F.3d at 738.

The three wire fraud counts that the jury convicted Defendant of (Counts Three, Five, and Six) were all in execution of Defendant's scheme to defraud KU, DOE, and NSF.  Count Three is a June 26, 2018 email between Defendant and Kim Wittman, who worked in KU's Office of Research, concerning Defendant's scheme to mislead KU about his true relationship with FZU and create a "cover" by proposing a sub-award between KU and FZU.  Ex. 170.  As described

---

[17] To the Government's knowledge, because of the procedural posture of the *Hu* and *Xiao* cases, neither of those district court judges was made aware in briefing or argument of the Eleventh Circuit's skepticism of *Takhalov*, including Judge Pryor's *Feldman* concurrence.  Because the district courts' rulings in *Hu* and *Xiao* occurred after jeopardy attached, the Government was unable to appeal those decisions.

above, *supra* at 17-22, the proposed FZU sub-award was part of Defendant's scheme to fraudulently induce his department chair into approving his spring 2019 buy-out request.  In his formal request for the buyout, Defendant misleadingly identified the FZU sub-award as one of the reasons why he needed to be excused from his teaching responsibilities and focus on his research.  Exs. 150, 164, 165.  Defendant's concealment of his true relationship with FZU and his use of the proposed FZU sub-award and course buyout to create a "cover" and provide him with the ability to spend most of 2019 at FZU working were integral to his scheme to defraud. *See Redcorn*, 528 F.3d at 741 (use of wires to conceal fraud sufficient).

Count Five is Defendant's September 25, 2018 Institutional Responsibilities form that he submitted to KU's Office of Research.  Ex. 25.  As discussed below, *infra* at 58-59, Defendant made numerous false statements in the form.  Defendant's submission of the September 2018 form was a step in his plot to lie, cheat, and deceive KU, and by effect NSF and DOE, so that he could obtain grant funds, use them, and continue to be paid his salary.  Defendant used the form to further conceal his scheme and it was reasonably foreseeable that when he submitted the form through the internet, wires would be used in the ordinary course of how information is sent through the internet. *Zander*, 794 F.3d at 1226; *see also United States v. Kelley*, 929 F.2d 582, 585 (10th Cir. 1991) (mailings which facilitate concealment meet "furtherance" requirement).  Moreover, even if the form did not contain false information (which it did), the wire used to transmit the form was still part of the execution of Defendant's scheme and sufficient to constitute a charge under the wire fraud statute.  *See Schmuck*, 489 U.S. at 715.

Count Six is a March 17, 2019 email that Defendant sent from his KU email account to a professor in Taiwan, Professor Yu-wen Chen, regarding a joint grant application to the NSFC. Ex. 246A.  In the email exchange, Chen indicated that he did not know how to electronically

accept the NSFC's funding regulations, so he emailed Defendant for help and Defendant completed the task for Chen.  A few weeks earlier, on February 25, 2019, Defendant had submitted the grant proposal to NSFC.  Ex. 352A.  In it, he identified himself as a Chang Jiang Distinguished Professor at FZU, stated that he had returned to the PRC full time and established the Institute for Molecular Catalysis and In-Site Characterization at FZU, and identified his KU post-doctoral researcher, Nguyen, as someone who would work on the NSFC grant with him if he received it.  Ex. 352 at 4, 34.

Months later, in August 2019, Defendant had a memory stick in his pocket that contained a PowerPoint presentation for the same NSFC proposal.  Trial Tr. Day 7 at 201:16-23; *id.* Day 8 at 23:21-24:24; Ex. 351A.  This showed that Defendant had progressed in the application evaluation process and that he was preparing, or had already given in the past, a presentation to the NSFC regarding his joint proposal with Chen.  Some of the slides on the presentation deck included photographs of his proposed team members (including Nguyen) and the equipment at FZU that Defendant would use to perform the research.  Ex. 351/351A at 36, 38-42.  During this entire time, Defendant and Nguyen remained full-time employees of KU.  Despite this, Defendant never told KU about the NSFC grant, thereby necessarily failing to submit the grant through KU's Office of Research, as was required.  Trial Tr. Day 2 at 145:1-12; 148:15-18; 174:10-16 (A. Reed).  He also never received approval from KU to conduct research at FZU or to use KU personnel, namely Nguyen, to work on a research grant at a different university.

Defendant's March 2019 email exchange with Chen regarding the NSFC grant furthered three important aspects of his scheme.  First, it showed Defendant violating KU policies by secretly proposing to use a subordinate KU employee, Nguyen, to work on a research project at another university.  Second, it was an example of Defendant failing to submit an external

research proposal through KU's Office of Research.  Third, and most importantly, Defendant

submitted the NSFC proposal because that was one of the requirements of his job at FZU.  Ex.

336A.  As a Chang Jiang Distinguished Professor at FZU, Defendant was required to submit a

specific number of external research proposals to the NSFC for research funding that would

support Defendant's research at FZU.  *Id.*  He also was required to be physically present at FZU

as a full-time professor there and, as previously discussed, Defendant essentially moved to the

PRC in December 2018 and worked at FZU for most of 2019 until he was arrested in August

2019.  The jury had sufficient evidence to conclude that the March 2019 email "was a step in the

plot that furthered the scheme to defraud KU and the federal agencies of money while

maintaining [Defendant's] position at FZU."  *Tao*, 499 F. Supp. 3d at 958.

     **iv.**     **The Evidence Proved that Defendant's Scheme Used False or Fraudulent Pretenses, Representations, or Promises that Were Material**

Despite Defendant's continued protestations, the evidence proved beyond a reasonable

doubt that from 2018 to 2019 Defendant concealed from KU and the U.S. government that he

had accepted a Chang Jiang Distinguished Professorship and was working full time at FZU.  At

this stage in the proceedings, the nature, duration, and reality of Defendant's job at FZU is

beyond dispute.  *Brooks*, 438 F.3d at 1236; *Dewberry*, 790 F.3d at 1028.

Defendant claims that the Government needed to prove that he made material

misrepresentations to KU, NSF, *and* DOE.  Def. Mot. at 6.  However, the jury only needed to

find that Defendant made a material misrepresentation in furtherance of his scheme to defraud.

*See Welch*, 327 F.3d at 1106-07.  The jury convicted Defendant of wire fraud as charged in

Counts Three, Five, and Six, and acquitted Defendant of wire fraud as charged in Counts One,

Two, and Four.  The evidence supported the jury's conclusion that Defendant made material

misrepresentations and omissions in furtherance of his scheme to defraud.

1.      **The Government proved Defendant made material
        misrepresentations and omissions in order to obtain money
        and property**

Between 2018 and 2019, Defendant made a plethora of misleading, false, or fraudulent

statements and half-truths, directly and indirectly, to KU, NSF, and DOE.  Defendant's

statements and omissions were intended to deceive KU and the federal funders, and deprive them

of money and property, namely grant funds, Defendant's salary, and use of KU's equipment, lab

space, and personnel.  The jury had ample evidence of Defendant's deceit to convict him, but

below are some examples from trial:

- Defendant failed to disclose to KU the potential conflict of interest and
  commitment of time that his FZU position presented, and never received approval
  from KU to work as a Chang Jiang Distinguished Professor at FZU or to use KU
  equipment, facilities, and personnel to work on projects for FZU.

- Defendant falsely certified on his January 9 and September 25, 2018 Institutional
  Responsibilities forms to KU that, *inter alia*, he had complied with all KU
  policies and made all appropriate disclosures, including all significant financial
  interests and potential conflicts of time commitment.

- Between March 2018 and August 2019, Defendant concealed from KU's Office
  of Research the research support from FZU, NSFC, and the Fujian provincial
  government that Defendant had applied for and/or received.

- Between May and November of 2018, Defendant misled KU into believing that
  his only relationship with FZU was a proposed collaboration with another FZU
  professor (to test some samples at KU) that never came to fruition.

- Between May 2018 and the spring of 2019, Defendant misled his chair into
  provisionally granting him a spring 2019 course buyout and then lied to him about
  his whereabouts in spring 2019, falsely stating multiple times that he was in
  Germany collaborating when, in fact, he was in the PRC working at FZU.

- On May 18, 2018, Defendant falsely told NSF that the "only" current and pending
  support he was receiving or expected to receive was from DOE and NSF when, in
  fact, Defendant had received research support directly from FZU and had applied
  for a grant from NSFC.

These misstatements and omissions were material.[18]  A statement is material for purposes of federal fraud charges if the statement "has a natural tendency to influence, or is capable of influencing a decision or action by another."  *United States v. Camick*, 796 F.3d 1206, 1214 (10th Cir. 2015)[19]; *see also United States v. Lawrence*, 405 F.3d 888, 899 (10th Cir. 2005) (wire fraud context).  "[A] statement can be objectively material even if the decision maker did not consider it."  *United States v. Williams*, 865 F.3d 1302, 1316 (10th Cir. 2017).  Materiality must be decided by the jury as a factual question.  *United States v. Gaudin*, 515 U.S. 506, 522-523 (1995); *see also Camick*, 796 F.3d at 1214-15.

For KU, Defendant's false statements and omissions regarding potential conflicts of interest and commitments of time; outside personal, professional activities; and external research were material for at least three reasons.  *First*, not only were they capable of affecting whether KU would allow Defendant to apply for and, after an award was granted, spend federal grant dollars, they actually affected KU's decision in this regard.  Trial Tr. Day 3 at 54:5-55:11, 59:8-60:4 (A. Reed).  By deceiving KU, Defendant prevented KU from assessing whether Defendant's outside activities posed a potential or actual conflict of interest or commitment of

---

[18] Defendant argues that some of KU's disclosure requirements were ambiguous.  Def. Mot. at 44-45.  This is not an accurate description of the evidence or law, but even if it were, and Defendant had no affirmative duty to disclose certain information to KU, a misleading omission is still "actionable as fraud if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled."  *United States v. Gallant*, 537 F.3d 1202, 1228 (10th Cir. 2008) (quoting *United States v. Cochran*, 109 F.3d 660, 664 (10th Cir. 1997)).  As described above, *supra* at 33-45, because the intent evidence satisfies this standard, even if some of KU's reporting requirements were ambiguous, Defendant's failure to disclose material information can still form the basis for a wire fraud conviction.

[19] Although *Camick* considered mail fraud as opposed to wire fraud, "The requisite elements for mail fraud and wire fraud are 'virtually identical' so interpretations of one statute 'are authoritative in interpreting parallel language' in the other."  *Zander*, 794 F.3d at 1229 n.4 (quoting *United States v. Weiss*, 630 F.3d 1263, 1263 (10th Cir. 2010)).

time issue that needed to be managed or disclosed to the federal government.  Defendant's failure to submit his proposals to NSFC and the Fujian government through KU's Office of Research also prevented KU from being able to ensure that any research proposals he submitted complied with all applicable funding guidelines.  If KU had known the true nature of Defendant's FZU activities, it would not have submitted his grants to the federal funders or allowed him to work on federal funds without a management plan in place.  Trial Tr. Day 54:5-55:11, 59:22-60:4 (A. Reed).  Indeed, for NSF specifically, before any NSF funds were expended on a particular award, KU was required (on a rolling basis) to manage, reduce, eliminate, or disclose to NSF any conflicts of interest related to that award in accordance with KU policy.  Trial Tr. Day 5 at 29:13-30:23 (R. Keiser); Ex. 48 (PAPPG) at 127.  Defendant "knowingly provide[d] or withh[eld] materially false information" from KU and NSF, which "impose[d] a substantial risk of loss" on both organizations.  *Welch,* 327 F.3d at 1108.

*Second*, Defendant's lies to KU not only were capable of influencing KU's decisions regarding Defendant's spring 2019 course buyout and summer 2019 salary, the lies did influence those decisions.  Defendant lied to his chair about why he was requesting a spring 2019 course buyout and then misled him into believing that he was in Germany collaborating with FHI when, in fact, he was in the PRC working at FZU.  Contrary to Defendant's misleading statements to his chair, his proposed buyout did not "further the academic goals of the department."  Ex. 6 (C&PE buyout policy).  Furthermore, in his request letter, Defendant stated that he would use the buyout to focus on the FZU sub-award and his NSF and DOE grants.  Ex. 165.  However, as discussed, Defendant never received a sub-award from FZU, and he did not report on his DOE and NSF annual reports that he was working on those grants while at FZU.  Exs. 34, 54.  Defendant also failed to tell KU that he was spending nearly all summer in the PRC working at

FZU when he requested that his NSF and DOE funds be used to pay his summer 2019 salary. Thus, Defendant's misleading statements influenced KU's decision to allow Defendant to use NSF and DOE funds to pay for his spring 2019 buyout and summer 2019 salary.

*Third*, Defendant's lies to KU were capable of influencing KU's decision to pay Defendant a full-time salary and permit him access to KU's facilities, equipment, and personnel. If KU had known that Defendant, while purporting to be a full-time professor at KU, was actually spending a significant amount of time recruiting researchers for FZU, applying for external research funding to benefit FZU, redirecting post-doctoral applicants interested in joining KU to FZU, using KU personnel to build a lab at FZU, and traveling to FZU to work, it would have needed to decide whether to restrict his access to federal funds, convert him to a part-time employee, or terminate his employment. Regardless of what action KU would have taken had it learned the truth, the information was capable of influencing KU's decisions regarding Defendant's continued role as a PI and KU employee. In fact, when KU learned of Defendant's position at FZU, it immediately placed him on administrative leave to investigate and terminated his access to KU's facilities, equipment, and personnel. Trial Tr. Day 3 at 61:18-21 (A. Reed).

Defendant argues that the Government failed to present evidence showing that his misrepresentations "could have affected KU's decision to pay his salary." Def. Mot. at 16. That is incorrect. Angie Loving, a KU human resources employee, testified that if KU's director of research integrity had concluded that a KU professor's conflict of interest could not be managed with the terms of the professor's terms of employment, then KU could have terminated Defendant. Trial Tr. Day 2 at 124:4-16.

Defendant also directly lied to NSF on May 18, 2018 when he told NSF that his "only"

sources of current and pending research support at that time were from DOE and NSF.  Exs. 143 & 144.  This was untrue because by that date, Defendant had been formally appointed as a Chang Jiang Distinguished Professor at FZU, which entailed, *inter alia*, Defendant's receipt of a salary, research support directly from FZU, lab space,[20] and a budget to purchase scientific equipment.  Defendant had also committed to working full time at FZU, begun recruiting a research team, and applied for at least one grant from NSFC.  Defendant should have disclosed all of these things to NSF.  Trial Tr. Day 5 at 34:17-37:5 (R. Keiser).  These facts were capable of influencing NSF's funding decisions (whether to grant an initial proposal or continue current funding).  Specifically, if NSF had been told about Defendant's FZU position and all the activities it included, NSF would have assessed (1) whether Defendant had the capacity to perform the research he was proposing in light of his other commitments; (2) any other affiliations that might bias his research; and (3) whether he had any overlapping research funding.  *Id.* at 12:8-14:4; 35:22-36:7; 90:4-91:23.  With this information, NSF may have concluded that Defendant could not work on the grant, the scope or amount of the grant needed to be adjusted, or the grant itself should not receive funding.  *Id.* at 92:18-93:1.  Indeed, once NSF learned of Defendant's conflicts, it suspended all of the NSF grants he was working on at KU.  Ex. 58 (suspension letter); Trial Tr. Day 6 at 103:7-104:6 (B. Subramaniam).

Defendant argues that his May 18, 2018 false statement to NSF regarding his current and pending research support was not material because NSF was only interested if another proposal was ultimately funded.  Def. Mot. at 13.  But such an interpretation would make meaningless the

---

[20] Defendant implies in a footnote that Defendant merely had access to FZU's lab, Def. Mot. at 14 n.9, but that is contrary to the evidence that showed that Defendant was promised a lab, ordered equipment for that lab that was similar to the equipment in his KU lab (including a unique device, the AP-XPS, that he specialized in using), described in his NSFC applications the equipment he had procured, and recruited researchers to work in his lab.

word "pending" in the phrase "current *and pending* support," and the argument is contrary to the

trial evidence.  NSF's PAPPG required PIs like Defendant to disclose, *inter alia*, "*all* other

projects or activities requiring a portion of time of the PI . . . even if they receive no salary

support from the project" and "*all* current and pending support for ongoing projects and

proposals."  Ex. 48 at 56 (emphasis added).  And Dr. Keiser confirmed that NSF was interested

in *all* pending research support, even research support that was in the process of being negotiated

at the time of the disclosure.  Trial Tr. Day 5 89:4-19 ("Q. Did all include all research support

that had been committed or that a PI had applied for that was just for that PI as opposed to the

PI's institution?  A. Yes."); 99:25-100:2 ("Q. And you mentioned current and pending support

and your view that everything needs to be disclosed.  A. Correct, if it's research support, yes.");

116:2-5; 118:23-119-3, 152:11-13.

DOE also expected KU to be "responsible for" managing any conflicts of interest that PIs

working on DOE grants had.  Trial Tr. Day 6 at 5:24-6:16 (V. Schwartz).  Thus, for Defendant's

DOE funds, the misstatements and omissions were the same that Defendant made directly to KU,

and the materiality of those statements was based on KU's assessment of whether Defendant

could be an eligible PI who could apply for and use DOE funds after they were granted.

Defendant also argues that his May 18, 2018 disclosure to NSF was not false because

there was "no evidence" Defendant had any other "'pending' grant application in China as of

that date, let alone current funded grants in China."  Def. Mot. 14.[21]  Again, Defendant

---

[21] Defendant's argument that there is "no evidence" that Defendant prepared the portion of the current and pending support section submitted to NSF on May 18, 2018 is frivolous.  Def. Mot. at 13.  On May 17, 2018, an NSF program officer emailed Defendant and his UCLA co-PI Philippe Sautet and asked for updated current and pending support information.  Ex. 142. Defendant replied, copying Professor Sautet, that "Philippe and I will be preparing the requested documents.  They will be sent to you quickly from Philippe's email account."  *Id.*  A day later, as

misconstrues the record.  Current and pending support did not just require disclosure of

Defendant's current and pending externally-funded grants.  It required disclosure of all current

and pending *research support*, which included more than just current and pending external

grants.  Ex. 48 at 56.  The evidence at trial showed that, at a minimum, as of May 18, 2018,

Defendant had committed to work full time at FZU and FZU had promised him approximately

$3 million in direct research funds, $1.5 million to purchase laboratory equipment, an

approximately $85,000 annual salary, and lab space.  Exs. 336A, 337A (May 4, 2018 draft

contract); 518A (Apr. 29, 2018 phone call discussing upcoming FZU travel); 643 (Defendant's

May 5, 2018 travel itinerary to FZU); 355 (showing Defendant flying to the PRC on May 5,

2018 and returning on May 8, 2018); 619A (certificate); Trial Tr. Day 10 at 184:18-20; 194:19-

23; 197:21-198:5 (G. Tiffert) (Ministry of Education certificate meant that Defendant and FZU

had finalized contract by May 2018).

### C.    False Statement Count

The jury also convicted Defendant of Count Seven, which alleged that he made a false

statement in violation of 18 U.S.C. § 1001 by submitting, on September 25, 2018, his

Institutional Responsibilities form to KU, in which he "falsely represented to the University of

Kansas, an institution that requested and received funds from the U.S. Department of Energy and

the National Science Foundation, that he had no conflicts of time or interest; when in truth, as

---

Defendant said he would, Sautet emailed NSF, copying Defendant, the updated current and
pending support information for himself and Defendant. Ex. 143.  In his cover email, Sautet
wrote, "For the current and pending information, *we* did not use the NSF table . . . Please tell *us*
if you need the NSF table format instead." *Id.* (emphasis added).  This was sufficient evidence
for the jury to reasonably conclude that Defendant provided the false information that was
contained in the May 18, 2018 current and pending support submission to NSF.  Defendant also
argues that the March 4, 2018 NSFC proposal was "plainly . . . not submitted," but a forensic
report from Defendant's KU computer suggests otherwise.  *Compare* Exs. 491A (NSFC
application dated March 4, 2018), *with* Ex. 509A (computer forensic report showing that
Defendant logged into NSFC's website from his KU computer on March 4, 2018)

Dr. Tao then knew, he was affiliated with FZU as a Chang Jiang Distinguished Professor and was receiving financial and other benefits, which he had a duty to disclose."  Jury Instruction No. 2; *see also* Second Superseding Indictment, ECF No. 75, ¶ 44.  The Government also alleged a violation of 18 U.S.C. § 2, *id.*, and the jury was instructed on the principles of aiding-and-abetting liability under 18 U.S.C. § 2(b).  Jury Instruction No. 14.  Like the jury's other findings, the jury's verdict on Count Seven was supported by the evidence.

*First*, as described below, *infra* at 58-59, Defendant made multiple affirmative false statements in the September 25, 2018 Institutional Responsibilities form and they were material to, at least, NSF, *infra* at 49-55.[22]

*Second*, the evidence proved that by submitting a false Institutional Responsibilities form to KU, Defendant made a false statement in a matter within the jurisdiction of NSF and DOE.  If KU wants to receive federal grants, federal regulations require that it have and enforce policies and procedures to identify, manage, and disclose potential conflicts of interest that PIs may have. 2 C.F.R. § 200.112; *see also* Trial Tr. Day 2 at 159:2-23 (A. Reed); *id.* Day 4 at 88:23-89:11 (A. Reed); Ex. 48 (NSF PAAPG) at 127.  KU's Office of Research relies on the information in Institutional Responsibilities forms to identify any potential or actual conflicts of interest that need to be managed or disclosed to the federal agencies.  Trial Tr. Day 2 at 176:7-23 (A. Reed).

---

[22] Defendant's variance argument is equally meritless.  Because the Government charged 18 U.S.C. § 2 in its indictment, its argument in trial that Defendant caused KU to submit a false statement to the federal agencies was not a variance.  The indictment clearly alleges that Defendant was charged with submitting the Institutional Responsibilities form "to the University of Kansas" and that, because KU requested and received federal funds, the statement was a matter within the jurisdiction of the executive branch.  ECF No. 75, ¶ 44.  And even there was a simple variance like Defendant has alleged, it was harmless.  *See United States v. Koerber*, 10 F.4th 1083, 1115-17 (10th Cir. 2021).  Moreover, to convict Defendant on this count, the jury needed to find that the false statement was material to DOE *or* NSF.  Jury Instruction No. 13.

If a PI provides false information in an Institutional Responsibilities form, then KU relies on that false information in deciding on a rolling basis whether, in accordance with federal regulations and its prior certifications to the federal agencies, the PI has any conflicts of interest that need to be managed or disclosed, or whether the PI is eligible to spend federal funds that have already been granted. When a PI provides false information to KU, it prevents KU from conducting this compliance check. That is what happened here. Specifically, because Defendant lied to KU in his Institutional Responsibilities form, he prevented KU from fulfilling its management and disclosure obligations under the terms of the NSF grants, thereby causing its earlier statements of compliance to NSF to be false and its ongoing commitments (*i.e.*, to ensure compliance before disbursing any awarded funds to PIs) to also be false. *See* Trial Tr. Day 5 at 114:24-115:19 (NSF relies on university certifications regarding conflict policies).[23]

Defendant next resurrects an argument that the Court already rejected at the motion-to-dismiss stage: Defendant's "private statements to KU in his [Institutional Responsibilities] form are confined to the authority of KU" and not within the scope of 1001. Def. Mot. at 38-40. But as this Court has already ruled, "[t]he ability to safeguard federal funds is not peripheral to an authorized function of NSF" and "the federal agencies have direct authority to control whether an applicant receives those funds." *Tao*, 499 F. Supp. 3d at 962;[24] *see also United States v.*

_____

[23] Defendant also argues that the federal agencies were not "entitled" to view the Institutional Responsibilities form, Def. Mot. at 38, but the evidence showed that the *information* contained within the form was reviewed by KU and then, as needed, passed to the federal agencies.

[24] This also distinguishes *United States v. Blankenship*, 382 F.33d 1110 (11th Cir. 2004), because unlike here, defendants' false statements in *Blankenship* concerned their compliance with the terms of their contract with a private contractor, "over which the [U.S. government] neither had nor exercised any supervisory power." *Id.* at 1137. As the evidence showed, KU had a conflict policy and required annual Institutional Responsibilities forms to be submitted *because* NSF required such measures if KU wanted to remain eligible to receive federal funding. Per that

*Baker*, 626 F.2d 512, 514 (5th Cir. 1980) ("[I]t is well-settled that the false statement need not be made directly to a federal agency to sustain a s 1001 conviction as long as federal funds are involved."). Even KU's conflict of interest policies, which provided additional guidance regarding the Institutional Responsibilities form, notified Defendant that "compliance with the requirements to disclose specified information about interest by Investigators is a condition of participation in projects, including those sponsored by federal agencies," and that KU's conflict policies were "intended to comply with . . . federal conflict of interest laws and regulations." Ex. 3A at 1-2; *see also* Ex. 3 (Board of Regents Conflict and Commitment of Time Policy) at 5 (institutional responsibilities forms "will also be available to institutional research officers to permit certification and/or verification of compliance with federal regulations"), 6 (policies developed "to conform to Federal regulations governing research"). Thus, "even if the false statements were made to KU as an initial matter, it is not necessary that they be made directly to DOE or NSF." *Tao*, 499 F. Supp. 3d at 962. Defendant has not identified any reason why the Court should revisit this ruling. *See Dobbs*, 600 F.3d at 1279-80; *McIlravy*, 204 F.3d at 1035.

*Third*, the evidence proved that Defendant knowingly and willfully made the false statements contained in the September 25, 2018 Institutional Responsibilities form. Defendant knew what he was supposed to disclose and that, generally speaking, his concealment could constitute a crime. *See* Exs. 512A at 13:58-20:34 (Defendant discussing other FBI investigations), 203 (NSF grant fraud email), 675-76 (NIH investigation screenshots). Instead, Defendant chose to lie and falsely certified that (1) the form was "true, correct, and complete," (2) he had "read and complied with the Kansas Board of Regents and University of Kansas

---

requirement, KU had to manage and disclose conflicts to NSF on an ongoing basis and, if it did not, it risked NSF terminating KU's ability to receive federal funds. This also proves materiality. *See Baker*, 626 F.2d at 515.

policies on commitment of time, conflict of interest, consulting and other employment," (3) he would "secure approval" for any "consulting or outside employment" prior to engaging in the activities, and (4) he would "report any changes" to the form "as soon as they become known to me and no later than 30 days after acquiring a new significant financial interest." Ex. 25.

Defendant tries to reargue the evidence about whether he had a contract with or received any money from FZU. Def. Mot. 41-43. But the Government was not required to prove either of those facts to prove that Defendant's statements in the Institutional Responsibilities form were false. And the jury had plenty of evidence, *see supra* at 13-17,[25] to reasonably conclude that Defendant's position as a Chang Jiang Distinguished Professor and activities at FZU should have been disclosed to KU, and that by failing to do so, his certifications to the contrary and statements in the Institutional Responsibilities form were materially false.

*Lastly*, Defendant's argument that he lacked the requisite intent because the Institutional Responsibilities form was ambiguous is a red herring. Defendant focuses exclusively on the disclosure criteria contained in the form regarding significant financial interests and time commitments in external professional activities, but as Defendant concedes, the Government's false statement theory for Count Seven was based on affirmative false statements made in violation of § 1001(a)(2), not omissions. Def. Mot. at 41. Defendant's false statements are contained in the certification statement at the bottom of the form where he certified, among other

---

[25] The jury also had sufficient circumstantial evidence to infer that Defendant had received some financial benefit from FZU, even though that was not necessary to convict him. *See* Exs. 336/336A at 6 (FZU contract detailing financial benefits for Defendant); Ex. 711 (summary of Defendant's foreign financial transactions from U.S. bank accounts); Trial Tr. Day 9 at 155:7-15 (M. Becker) (total foreign financial transactions from December 2018 to August 2019 approximately $300); 526 (photo of China Construction Bank debit card); Trial Tr. Day 12 at 120:3-122:9 (H. Peng) (testifying that she did not know of China Construction Bank account or that Defendant had deposited honorariums into that account).

things, that the form is "true, correct, and complete" and that he has "complied" with KU's policies on commitment of time, conflict of interest, consulting and other employment.  Ex. 25 at 8.  Those statements were false and there was nothing ambiguous about whether Defendant had complied with the policies, sought prior approval for any outside consulting or employment, or reported any changes as soon as they became known to him.

Additionally, the evidence at trial does not support the alternative interpretation of some of the disclosure requirements that Defendant now advances.  The only record citation Defendant musters is an exchange with Chancellor Girod on cross-examination in which he agreed that if a financial interest was in an entity that did not "reasonably appear" to be related to a PI's "university responsibility," then it did not need to be reported *as a significant financial interest* (this does not mean that such a relationship did not need to be reported pursuant to a different disclosure policy).  Trial Tr. Day 2 at 71:9-20.  Defendant posits that his position as a professor at FZU, in which he performed research, supervised a research team, and managed a lab was "unrelated" to his position as a professor at KU, in which he *performed research, supervised a research team, and managed a lab*.  Def. Mot. at 45.  That is not a reasonable interpretation of the word "related," and the Chancellor agreed.  Trial Tr. Day 2 at 71:21-25 ("Q: So if a professor, for example, is collaborating at a different university, that might not be considered as being related to his KU responsibilities, correct? Girod: Well, if you're collaborating as a professional in your field, that is related to the university.").  Unlike in *United States v. Migliaccio*, evidence at trial did not support any alternative interpretation of the Institutional Responsibilities form, so the jury was in its right to conclude that Defendant had deliberately, voluntarily, and intentionally made false statements in the September 25, 2018 Institutional Responsibilities form.  34 F.3d at 1523-1525 ("Because the evidence at trial supported their

theory of defense, the jury should have" received the ambiguity instruction).

### D.    Defendant's Due Process Argument Is Meritless

The Court's earlier rejection of Defendant's "fair warning" due process argument should stand.  *Tao*, 499 F. Supp. 3d at 963-65; *see also Dobbs*, 600 F.3d at 1279-80; *McIlravy*, 204 F.3d at 1035.  Defendant had fair notice that his conduct could result in federal charges filed against him.  *See, e.g.*, Exs. 203 (forwarding NSF fraud email to wife), 675 (NIH investigation screenshot), 676 (same).  That is why he sought to conceal his actions.  Moreover, the rule of lenity does not apply here.  *United States v. Wilson,* 10 F.3d 734, 736 (10th Cir. 1993) (The rule of lenity "is not to be invoked lightly.  It is not applicable unless there is a grievous ambiguity or uncertainty in the language and structure of the Act.").

### E.    Defendant's Motion For A New Trial Also Fails

 The jury's verdict is consistent with the law and the evidence presented.  Other than his legal arguments for acquittal under Rule 29, Defendant has not identified any independent reason why the "interests of justice" require a new trial.  Thus, if the Court denies Defendant's Rule 29 motion, then it also should deny his motion for a new trial.  *Cf. United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999) ("[A] motion for a new trial is regarded with disfavor and should only be granted with great caution."); *see also United States v. Drage*, 681 F. App'x 656, 664 (10th Cir. 2017) (reversing conditional grant of new trial, as abuse of discretion, because the evidence was sufficient to support the jury's guilty verdict).

Even if the Court concludes that the Government's fraud theory was invalid as to one of the victims, it should not order a new trial.  The Government alleged a single scheme to defraud, so even if the Court concludes that the evidence is insufficient to support a conviction related to one victim (which it should not), that does not throw the entire fraud theory into question. Moreover, it is blackletter law that a crime may be charged in the conjunctive, but proven in the

disjunctive. *See United States v. Gunter*, 546 F.2d 861, 868-69 (10th Cir. 1976); *United States v. Powell*, 226 F.3d 1181, 1193 (10th Cir. 2000). Accordingly, unless the Court acquits Defendant of all three wire fraud counts, Defendant's request for a new trial should be denied.

## IV.    CONCLUSION

For the reasons stated above, the jury's verdict should stand, and Defendant's Motion should be denied.

Respectfully submitted,

*/s/ Adam P. Barry*
Adam P. Barry
Trial Attorney
National Security Division
U.S. Department of Justice

*/s/ Christopher Oakley*
D. Christopher Oakley
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas

## CERTIFICATE OF SERVICE

I hereby certify that on the June 15, 2022, I caused the foregoing pleading to be filed with the

Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

*/s/ Christopher Oakley*
D. Christopher Oakley
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas