## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>FENG TAO )<br>a/k/a "Franklin Tao," )<br>)<br>Defendant. ) | Case No. 19-20052-JAR-JPO |

---

## DR. FRANKLIN TAO'S REPLY IN SUPPORT OF HIS MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

Thomas H. Johnson #13688
Petefish, Immel, Hird, Johnson,
Leibold & Sloan, LLP
842 Louisiana
Lawrence, KS 66044
Tel: (785) 843-0450
Fax: (785) 843-0407
tjohnson@petefishlaw.com

Peter Zeidenberg
Michael F. Dearington
Laura Zell
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
peter.zeidenberg@afslaw.com
michael.dearington@afslaw.com
laura.zell@afslaw.com

Dated:  July 6, 2022

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

ARGUMENT.......................................................................................................................1

I.    The government does not contest that it failed to prove the essential
      elements of its fraud and false statement theory as to DOE ...............................1

II.   The Opposition confirms that the Court should acquit Dr. Tao
      on the three remaining wire fraud counts to the extent they
      allege that he defrauded KU and NSF ................................................................3

      A.    The government fails to identify a material misrepresentation that
            Dr. Tao made to NSF or KU in order to obtain salary or grant funds ..................3

      B.    Unrebutted evidence demonstrates that, consistent with well-settled
            law, Dr. Tao lacked intent to defraud KU and NSF............................................16

      C.    The government's fraud theory plainly violates *Skilling*,
            and every court since *Skilling* has rejected it......................................................24

      D.    None of the three charged uses of the wires were
            "in furtherance of" a scheme to defraud KU or NSF .........................................31

III.  The Court should acquit Dr. Tao on the remaining
      false statement count as to NSF ........................................................................34

      A.    The government points to no evidence that Dr. Tao
            caused KU to make a false statement to NSF....................................................34

      B.    The government's alternative false-certification theory also fails......................35

IV.   The government's limitless prosecution theory violates Dr. Tao's Due Process
      rights and threatens the Due Process rights of employees everywhere ...........46

V.    A new trial is warranted if the Court decides that the evidence is
      sufficient as to any of the four counts...............................................................48

CONCLUSION..................................................................................................................49

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Brizinova*,
    588 B.R. 311 (Bankr. E.D.N.Y. 2018) ...................................................................25

*Columbia Gas Transmission, LLC v. Ott*,
    984 F. Supp. 2d 508 (E.D. Va. 2013) ....................................................................25

*Dobbs v. Anthem Blue Cross & Blue Shield*,
    600 F.3d 1275 (10th Cir. 2010) ............................................................................26

*Kelly v. United States*,
    140 S. Ct. 1565 (2020) .........................................................................................10

*McIlravy v. Kerr-McGee Coal Corp.*,
    204 F.3d 1031 (10th Cir. 2000) ............................................................................26

*Perez-Ruiz v. Crespo-Guillen*,
    25 F.3d 40 (1st Cir. 1994) ....................................................................................25

*Phillips v. Calhoun*,
    956 F.2d 949 (10th Cir. 1992) ................................................................. 2, 3, 37, 40

*United States v. Adamson*,
    291 F.3d 606 (9th Cir. 2002) ........................................................................*passim*

*United States v. Anming Hu*,
    3:20-CR-21-TAV-DCP-1, 2021 WL 4130515 (E.D. Tenn. Sept. 9, 2021) ............... 17, 19, 21

*United States v. Baker*,
    626 F.2d 512 (5th Cir. 1980) ................................................................................42

*United States v. Berheide*,
    421 F.3d 538 (7th Cir. 2005) ................................................................................20

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015) ................................................................... 16, 17, 21, 24

*United States v. Blankenship*,
    382 F.3d 1110 (11th Cir. 2004) ................................................................. 42, 43, 47

*United States v. Buckley*,
    No. 3:10–cr–00328–MO, 2013 WL 5206287 (D. Or. Sept. 12, 2013) ...................5

*United States v. Bunn,*
 26 F. App'x 139 (4th Cir. 2001) ......................................................22

*United States v. Burns,*
 104 F.3d 529 (2d Cir. 1997) ....................................................27, 28

*United States v. Canela,*
 No. CR 08-1539 MV, 2010 WL 11523585 (D.N.M. Jan. 15, 2010) ....................................48

*United States v. Chandler,*
 388 F.3d 796 (11th Cir. 2004) ......................................................20

*United States v. Deffenbaugh Indus., Inc.,*
 957 F.2d 749 (10th Cir. 1992) ......................................................45

*United States v. Facteau,*
 1:15-cr-10076-ADB, 2016 WL 4445741 (D. Mass. Aug. 22, 2016) ....................................24

*United States v. Feldman,*
 931 F.3d 1245 (11th Cir. 2019).......................................................22

*United States v. Goodrich,*
 871 F.2d 1011 (11th Cir. 1989).................................................26, 30

*United States v. Guertin,*
 2022 WL 203467, --- F. Supp. 3d --- (D.D.C. Jan. 24, 2022) ........................................*passim*

*United States v. Hollis,*
 971 F.2d 1441 (10th Cir. 1992).......................................................23

*United States v. Holstrom,*
 242 F. App'x 397 (9th Cir. 2007) ......................................................43

*United States v. Koerber,*
 10 F.4th 1083 (10th Cir. 2021) ......................................................25

*United States v. Mingqing Xiao,*
 No. 4:21-cr-40039 (S.D. Ill. May 3, 2022) ........................................ 17, 19, 21, 24

*United States v. Morales,*
 664 F. App'x 228 (3d Cir. 2016) ................................................27, 28

*United States v. Ransom,*
 642 F.3d 1285 (10th Cir. 2011).............................................27, 28, 31

*United States v. Ratcliff,*
 488 F.3d 639 (5th Cir. 2007) ....................................................28, 29

*United States v. Redcorn*,
   528 F.3d 727 (10th Cir. 2008) ...................................................................... 32, 33

*United States v. Richter*,
   796 F.3d 1173 (10th Cir. 2015) ............................................................. 21, 22, 24

*United States v. Rodgers*,
   466 U.S. 475 (1984) ........................................................................................45

*United States v. Sanchez-Porras*,
   No. CR 19-1374 KG, 2019 WL 4727820 (D.N.M. Sept. 27, 2019) ...................... 2, 3, 37, 40

*United States v. Sorich*,
   523 F.3d 702 (7th Cir. 2008) ..........................................................................28

*United States v. Takhalov*,
   827 F.3d 1307 (11th Cir. 2016)..............................................................*passim*

*United States v. U. S. Smelting Ref. & Min. Co.*,
   339 U.S. 186, 70 S. Ct. 537, 94 L. Ed. 750 (1950) .............................................25

*United States v. Warme*,
   No. 09-CR-19A, 2010 WL 125846 (W.D.N.Y. Jan. 7, 2010) ...............................31

*United States v. Welch*,
   327 F.3d 1081 (10th Cir. 2003)........................................................ 21, 22, 23, 24

*United States v. Williams*,
   934 F.3d 1122 ...............................................................................................35

*United States v. Wright*,
   988 F.2d 1036 (10th Cir. 1993)........................................................................45

*United States v. Yates*,
   16 F.4th 256 (9th Cir. 2021) ..............................................................*passim*

*Zzyym v. Pompeo*,
   958 F.3d 1014 (10th Cir. 2020)........................................................................48

## Statutes

18 U.S.C. § 2.................................................................................................34

18 U.S.C. § 1001 ...........................................................................................35

18 U.S.C. § 1001(a)(2) ........................................................................ 35, 36, 37

**Other Authorities**

2 C.F.R. § 200.112 ........................................................................................................ 43, 44, 45

## INTRODUCTION

Dr. Tao's opening brief demonstrates that the government's evidence at trial failed to prove any of the required elements of wire fraud or statements, and that its fraud theory is also unconstitutional under *Skilling* and its progeny. Dr. Tao never made a material misrepresentation to KU, DOE, or NSF in order to obtain salary or grant funds, and not one witness from any of these entities testified that he or she would not have paid Dr. Tao salary or awarded KU grants if Dr. Tao had a second position at FZU and/or research funding in China—an allegation the government also failed to prove. The evidence also conclusively showed that Dr. Tao performed all work required of him by KU, DOE, and NSF. Given the myriad flaws in the government's case, the Opposition (ECF No. 302) relies on prosecution theories that were not alleged in its Second Superseding Indictment (SSI) or argued at trial, misrepresentations of the evidence (often without citations to the record), and mischaracterizations of the case law. And, tellingly, the government fails to address testimony from its own witnesses, including the case agent, about the complete *absence* of any evidence that Dr. Tao had an employment contract with FZU, received salary from FZU, or received research funding from FZU or the Chinese government—despite being the central allegations in the SSI. For the reasons stated in Dr. Tao's opening brief and below, the Court should acquit Dr. Tao on the three remaining wire fraud counts (Counts 4, 6, and 7 of the SSI) and the one remaining false statement count (Count 9 of the SSI).

## ARGUMENT

I. **The government does not contest that it failed to prove the essential elements of its fraud and false statement theory as to DOE.**

The government does not contest the argument that Dr. Tao had no intent to defraud DOE, and it thus concedes, as it must, that he lacked such intent. *See* Opp. at 33 (stating in the heading: "The Government Proved Defendant's Intent to Defraud *KU and NSF*."); *id.* at 34 ("Here, the jury

1

had ample evidence to conclude that Defendant had the requisite intent to defraud *KU and NSF*." (emphasis added)). This constitutes a forfeiture or waiver. *See Phillips v. Calhoun*, 956 F.2d 949, 953–54 (10th Cir. 1992) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point." (internal quotation marks omitted)); *United States v. Sanchez-Porras*, No. CR 19-1374 KG, 2019 WL 4727820, at *7 n.13 (D.N.M. Sept. 27, 2019) ("[T]he failure to respond to an argument is deemed an acquiescence" and "waive[r]," even if the party "adverted to [the arguments] in a perfunctory manner, unaccompanied by some effort at developed argumentation" (cleaned up)), *report and recommendation adopted*, No. CR 19-1374 KG, 2019 WL 5288237 (D.N.M. Oct. 18, 2019).

This result is also consistent with the evidence at trial. Dr. Tao never made a material misrepresentation to DOE in order to obtain grant funds for KU, and the sole DOE witness, Dr. Schwartz, contradicted the government's theory of the case during her direct testimony. *See* Tao Br. at 6–12 (ECF No. 290). Dr. Schwartz testified that it was not her "purview" whether Dr. Tao had a second job at another university, and it was not "any of [her] concern" if he was promised funding to build a laboratory in China. *Id.* at 8. She also testified that if Dr. Tao did not list a foreign grant proposal in his DOE proposal, but the foreign proposal was not ultimately funded, the omission was not material to DOE. *Id.* at 9. And Dr. Schwartz testified that Dr. Tao's work on the DOE grant at issue "appeared to have been done satisfactorily." *Id.* at 19.[1] Indeed, in June 2019, more than a year after Dr. Tao allegedly took a job at FZU, she praised his work internally

---

[1] The jury also acquitted Dr. Tao on Counts 2 and 5 of the SSI, which charged Dr. Tao with defrauding DOE with respect to a DOE grant proposal and an email to DOE regarding his Current and Pending Support, *see* SSI ¶ 42, indicating that the jury likely acquitted Dr. Tao as to the DOE fraud theory.

at DOE as "very good and supportive of continued funding." Gov't Ex. 36.

The government also concedes that, in Count 9 of the SSI (Count 7 at trial), Dr. Tao did not make a materially false statement within the jurisdiction of DOE. Dr. Tao argued, *inter alia*, that the alleged false statement in the September 2018 Conflict of Interest form was not material to DOE, given Dr. Schwartz's testimony summarized above and the fact that DOE had no ability to access or review the form. *See* Tao. Br. at 40–41. The government responds in conclusory fashion that Dr. Tao's statements "were material to, at least, NSF," but does not even make this assertion as to DOE. Opp. at 56. This also constitutes a forfeiture or waiver. *Phillips*, 956 F.2d at 953–54; *Sanchez-Porras*, 2019 WL 4727820, at *7 n.13.

Accordingly, for these reasons, and the reasons stated in Dr. Tao's opening brief, to the extent that the three wire fraud counts (Counts 4, 6, and 7) and the one false statement count (Count 9) are based on the allegation that Dr. Tao defrauded and made a false statement to DOE, the Court should acquit Dr. Tao on these counts.

## II.   The Opposition confirms that the Court should acquit Dr. Tao on the three remaining wire fraud counts to the extent they allege that he defrauded KU and NSF.

### A.   The government fails to identify a material misrepresentation that Dr. Tao made to NSF or KU in order to obtain salary or grant funds.

The government failed to prove that Dr. Tao made a material misrepresentation to KU or NSF in order to obtain money or property. *See* Tao Br. at 6–16. Not one alleged victim testified that it parted with money or property due to a misrepresentation by Dr. Tao. The government's six "examples" of alleged misrepresentations—one to NSF, and five to KU—fail to show otherwise. *See* Opp. at 49. The Court should therefore acquit on Counts 4, 6, and 7 of the SSI.

1. <u>The uncharged email from Dr. Sautet of UCLA to NSF, which was neither false nor material, does not support the wire fraud convictions as to NSF.</u>

The only alleged misrepresentation to NSF charged in the SSI is the grant proposal that

KU submitted to NSF on October 2, 2017. SSI ¶ 15. The government does not dispute, and therefore concedes, that this proposal did not contain a material misrepresentation. *See* Tao Br. at 12–13. This concession requires acquittal on the wire fraud counts as to NSF. The government's attempt to pivot to a new, uncharged theory—that Dr. Tao *caused* Dr. Sautet of UCLA to misrepresent their Current and Pending Support in a May 18, 2018, email from Dr. Sautet to NSF—fails for four reasons, each of which requires acquittal. *See* Opp. at 49, 52–55.[2]

First, there is no basis to conclude that the jury convicted Dr. Tao of defrauding NSF based on the May 18, 2018, email from Dr. Sautet to NSF. The SSI charged Dr. Tao with causing *KU* to misrepresent his Current and Pending Support in its October 2, 2017, grant proposal to NSF, and that he caused *KU* to falsely certify that the proposal was accurate. *See* SSI ¶ 15. The May 18, 2018 email from Dr. Sautet to NSF was never referenced in the SSI, in the government's opening, in the government's closing, or in the Jury Instructions. *See* Jury Instructions at 4 ¶ 8 (ECF No. 278) (listing charged misrepresentations). No reasonable juror could have convicted Dr. Tao on a theory that emerged for the first time after trial.

The jury's reliance on this theory would also constitute a fatal variance from the SSI. Having failed to prove that the October 2017 proposal was false, the government cannot pivot post-trial to a new theory that is neither alleged in the lengthy, 16-page SSI nor described in the Jury Instructions. For example, in *United States v. Adamson*, 291 F.3d 606, 616 (9th Cir. 2002), the court reversed a wire fraud conviction because "the indictment charged the defendant with misrepresenting the fact that the servers *had been upgraded*," but the government proved "that the

---

[2] The government mischaracterizes this email by asserting that Dr. Tao "*directly* lied to NSF on May 18, 2018 when *he told* NSF that his 'only' sources of current and pending research support at that time were from DOE and NSF." Opp. at 52–52 (emphasis added). As the government later admits, Dr. Sautet sent this email to NSF—not Dr. Tao. *See* Opp. at 54 n.21.

defendant had misrepresented *how* the servers had been upgraded." *Id.* (emphasis added). This "variance was fatal," the court explained, "because it affected the substantial rights of the defendant," in that the indictment "affirmatively misled the defendant" about the misrepresentation to be proven at trial. *Id.*; *see also United States v. Buckley*, No. 3:10–cr–00328–MO, 2013 WL 5206287, at *9 (D. Or. Sept. 12, 2013) (finding a fatal variance in a fraud case where the government's theory of misrepresentation at trial did not "match[] the language of the indictment"). This reasoning applies equally here. Had Dr. Tao been aware that the government would pivot to a new alleged misrepresentation involving Dr. Sautet after trial, he could have prepared a defense to that allegation rather than (successfully) defending against the October 2, 2017, one charged in the SSI.

Second, there was no evidence that Dr. Tao was involved with Dr. Sautet's preparation of the Current and Pending Support document attached to Dr. Sautet's May 18, 2018, email to NSF. *See* Tao Br. at 13 & n.8. The government never called Dr. Sautet to testify that Dr. Tao provided his Current and Pending Support information to him. And despite having unfettered access to all of Dr. Tao's KU and personal email, and all of his KU and personal devices, the government never introduced an email, text message, or other communication in which Dr. Tao provided his Current and Pending Support information to Dr. Sautet or anyone else at UCLA, or any metadata indicating that Dr. Tao authored or edited the Current and Pending Support document that Dr. Sautet emailed to NSF. Absent any such proof, no reasonable juror could have found beyond a reasonable doubt that Dr. Tao made a misrepresentation to Dr. Sautet.[3]

---

[3] Dr. Sautet's hearsay use of the words "we" and "us" in his May 18, 2018, email to NSF do not, as the government now argues, prove that Dr. Tao authored the Current and Pending Support document attached to the email. Opp. at 54 n. 21 (citing Gov't Ex. 143). Nor does Dr. Tao's email to NSF on May 17, 2018, stating that he and Dr. Sautet would comply with NSF's request. *Id.* (citing Gov't Ex. 142). Neither Dr. Sautet nor Dr. Tao indicated in these emails that Dr. Tao would

Third, the government failed to prove that the Current and Pending Support document was materially false. There was no evidence that Dr. Tao had any pending or active foreign grants on May 18, 2018, that needed to be disclosed. *See* Tao Br. at 10–15. The government asserts that Dr. Tao submitted a March 4, 2018, proposal for funding in China (though it does not contend it was funded). *See* Opp. at 55 n.21 (citing Gov't Ex. 491A). The government does not dispute, however, that the proposal contained no signatures, stamps, or seals, which, according to the FBI linguist and the government's expert, signifies that the proposal was not a final submission for funding. Day 10 Tr. 156–57 (Churchill testimony); Day 10 Tr. 226 (Tiffert testimony). That Dr. Tao allegedly accessed NSFC's website on March 4 does not prove otherwise. *See* Opp. at 55 n.21. More important, even if Dr. Tao submitted a proposal on March 4, 2018, there is no evidence—let alone evidence sufficient to sustain a finding beyond a reasonable doubt—that it was still *pending* before NSFC on May 18, 2018, when Dr. Sautet emailed the Current and Pending Support document to NSF. The government's argument based on Gov't Ex. 491A therefore fails to prove that Dr. Sautet's Current and Pending Support document was false.[4] It is also indisputable, as Special Agent Lampe testified, that there was no evidence that Dr. Tao received grant funding in China. Day 11 Tr. at 212:4–213:10.

The government's alternative argument—that Dr. Sautet's Current and Pending Support document omitted a promise by FZU to provide "$3 million in direct research funds, $1.5 million

---

prepare the Current and Pending Support document (or the other attachment to the email), let alone that he actually did prepare the that document. And even if Dr. Tao was just as likely as Dr. Sautet to have prepared the Current and Pending Support document, that represents a 50/50 probability, which is insufficient to prove beyond a reasonable doubt that Dr. Tao prepared it.

[4] The government acknowledges that the other alleged NSFC proposals post-dated Dr. Sautet's May 2018 email. *See* Opp. at 12 (listing alleged August 2018 and September 2018 proposals). The government's assertion that these were "submitted" for funding in China is unsupported by the evidence. Opp. at 12. None contained a stamp, seal, or signature, and the government introduced no evidence any were submitted. *See* Tao Opp. at 10–11.

to purchase laboratory equipment, an approximately $85,000 annual salary, and lab space" is unsupported by the evidence. Opp. at 55. The government relies on an unsigned draft employment contract between Dr. Tao and FZU, even though it later acknowledges, as it must, that it never introduced an actual contract between Dr. Tao and FZU, or evidence that Dr. Tao ever received salary or funding in China. *See* Day 11 Tr. at 99:9–11 (Special Agent Lampe testimony acknowledging that there was no signed contract between Dr. Tao and FZU in evidence); Opp. at 59 (arguing that "the Government was not required to prove" that Dr. Tao "had a contract with or received any money from FZU"); Tao Br. at 42–43 (evidence regarding lack of a contract with FZU or salary/funding in China). The government cannot prove a misrepresentation based on self-serving speculation that  a hypothetical contract, which was not in evidence, was acted upon.[5] This is particularly true where the evidence showed that Dr. Tao did not perform the central requirements of the draft contract, strongly indicating that the hypothetical contract was never agreed to by the parties,[6] and Dr. Tao's alleged lab in China, as of November 2018, consisted of

---

[5] The government would also need to assume, without a proper basis, that the hypothetical contract was dated before Dr. Sautet's May 18, 2018, email such that it could be disclosed, even though its theory that such a contract existed is based on a "May 2018" certificate that may have issued between May 19 and May 31, 2018.

[6] For example, contrary to the May 4, 2018, unsigned draft contract that the government relies upon, Dr. Tao never taught a class at FZU, Gov't Ex. 336A at 2, never led a research project in China, *id.* at 3, never published any of the 60 required papers in which FZU is listed as the exclusive employer, *id.*, never invited renowned experts or scholars to FZU, *id.* at 4, never had a lab at FZU, *id.* at 5, never received salary, research funds, or a house at FZU, *id.* at 5–6, and, most obviously, did not work fulltime and exclusively at FZU, *id.* at 6.

The government's reliance on Dr. Tiffert's testimony is misplaced, because that testimony strongly suggested that Dr. Tao did *not* take the job at FZU. Dr. Tiffert testified that although one piece of evidence, a Chang Jiang Certificate, suggested that Dr. Tao took a job at FZU—even though it could be translated to say that FZU is "approved" to appoint Dr. Tao, *see* Day 10 Tr. at 100:13–101:17 (Churchill), and he had never seen or had any knowledge of these certificates before this case, *see* Day 10 Tr. at 205:24–206:1 (Tiffert)—other ample evidence suggested he did not take a job there. For example, Dr. Tiffert testified that if Dr. Tao had a contract and position with FZU, he would have had to quit his job at KU within six months, by November 2018, and it was "inconceivable" he could maintain his KU position. *See* Day 10 Tr. at 218:3–2019:5, 221:20–

empty rooms. *See* Gov't Ex. 213A.[7] The government also never proved that Dr. Tao knew an alleged position at FZU would constitute Current and Pending Support. KU never provided training on these requirements, Day 6 Tr. at 117:10–14 (Subramaniam), a fact that even Special Agent Lampe acknowledged was significant, Day 11 Tr. at 14–20, and there was no evidence Dr. Tao had ever even seen the NSF PAPPG before. Even if Dr. Tao had reviewed the PAPPG, its instruction that current and pending "projects and proposals" should be disclosed appears to encompass grant projects and proposals—not affiliations or positions at other organizations. Gov't Ex. 48 at 56.[8] Thus, the government's alternative Current and Pending Support disclosure theory

---

222:10. Dr. Tiffert conceded that he offered his opinion without having been informed by the government that Dr. Tao was working and teaching fulltime at KU after November 2018, or that Dr. Tao was publishing papers in which he openly touted his position at KU after that time. Day 10 Tr. at 222:8–10, 223:2–4; *see* Day 11 Tr. at 126:10–16 (Dr. Tao was teaching at KU in November 2018). Thus, once informed of the evidence, Dr. Tiffert's testimony strongly suggests that Dr. Tao did not have a job at FZU. Even Special Agent Lampe testified that, if there was a contract and it was similar to the draft one, Dr. Tao was not fulfilling central parts of it since he taught at KU in fall 2018 and returned in fall 2019 to teach again, he did not transfer his personnel file to FZU, and he had not published exclusively on behalf of FZU. Day 11 Tr. at 126:7–132:16. Special Agent Lampe also agreed that Dr. Tao may not have received pay or had a time commitment at FZU. *See* Day 11 Tr. at 220:8–25.

[7] The government mischaracterizes the record by asserting that Dr. Tao "ordered equipment" for a lab in China through Luan Nguyen, a graduate student in Dr. Tao's group at KU. Opp. at 53 n.20; *see* Opp. at 12. To the contrary, Nguyen testified that he never purchased any equipment for FZU, or shipped a single part to FZU, and he merely obtained a few price quotes for equipment. Day 9 Tr. at 119:18–120:6, 121:15–25, 131:12–13. He once used an FZU employee's credit card to "make purchases," Opp. at 12, but only of copyrights to three journal articles, not lab equipment. *See* Day 9 Tr. at 120:13–23. None of the exhibits cited by the government (262, 263, 268, 270, 279, 282, 283, or 284) shows the purchase of any equipment, either, and all are price quotes or inquiries, principally consisting of emails with Yu Tang, a former colleague of Nguyen's at KU who was then a professor at FZU. *E.g.*, Gov't Ex. 262; Day 9 Tr. at 134:5–12 (Nguyen). Notably, Nguyen testified that it looked like Dr. Tao was merely "collaborating" and "working with" FZU personnel, Dr. Tao never told him he took a job at FZU, and he was unsure whether Dr. Tao would ever work there. Day 9 Tr. at 125:12–126:2, 133:2–7, 135:2–5. Nguyen also testified that Dr. Tao never offered him a job at FZU, as the government claims, Opp. at 11, but rather "was passing [the offer] along" from FZU. Day 9 Tr. at 126:8–13.

[8] A natural reading of this section is that only other current and pending grants had to be disclosed, not second jobs. For instance, Dr. Schwartz of DOE understood her agency's Current and Pending Support disclosure requirement to refer only to grants, not second jobs or access to other labs. *See*

also fails.

Fourth, the government failed to prove that the alleged omissions were material to NSF's decision to fund KU grants. *See* Tao Br. at 13–14. Despite that funding decisions are made by NSF program officers, review panels, the Division Director, and the Division of Grants and Agreements, *see* Day 5 Tr. at 21–23 (Dr. Keiser testimony), the government failed to call a witness from any of these groups to testify that inclusion of a grant proposal pending in China, a job offer, or even a second position at another university in a Current and Pending Support list would be material to NSF's funding decision. The government also does not dispute that its sole NSF witness, Dr. Keiser, testified that *pending* proposals *were not material* to funding decisions. *See* Tao Br. at 13–14. The government argues that pending proposals had to be disclosed just like funded (current) ones, Opp. at 53–54, but this argument conflates falsity with materiality.[9] Even if a fact must be disclosed, it does not inevitably follow that the fact is material to the agency's funding decision. Dr. Keiser's testimony is therefore fatal to the government's fraud theory as to NSF.

The government's Opposition confirms that Dr. Tao never made a material misrepresentation to NSF—as charged in the SSI or otherwise—in order to obtain grant funds for KU. Accordingly, the Court should acquit Dr. Tao of the wire fraud counts (4, 6, and 7) as to NSF.

---

Tao Br. at 8 (reciting Dr. Schwartz's testimony on direct examination that it was not "any of [her] concern" or within her "purview" whether Dr. Tao "had been promised or received funding from a foreign research university or institution to build a laboratory" or "had a second job" at university in China).

[9] Far from a "meaningless" requirement, Opp. at 53 n.20, NSF likely requires that pending support be disclosed so that it has information about the proposal if the applicant later indicates that it was funded. But, like the provisional patent application in *United States v. Camick*, that does not make pending support material to NSF's funding decisions. 796 F.3d 1206, 1219 (10th Cir. 2015). The government fails to distinguish *Camick*.

2. The government failed to prove a material misrepresentation to KU in order to obtain salary or access to facilities.

The government asserts five "examples" of material misrepresentations that Dr. Tao allegedly made to KU to obtain salary or access to KU facilities. Opp. at 49. But the government failed to charge the majority of these alleged misrepresentations, and, fatal to the government's case, no one from KU testified that any of these alleged misrepresentations were material to its decision to pay Dr. Tao his salary.

First, of the government's five "examples" of alleged misrepresentations to KU, only the September 25, 2018, Conflict of Interest form was charged in the SSI. *See* Tao Br. at 15; SSI ¶ 39. This is why none of these other "examples" are listed as misrepresentations in the Jury Instructions. *See* ECF No. 278 at 4–5 ¶¶ 8–9.[10] The government's reliance on these other "examples" in its Opposition therefore constitutes a fatal variance. *See Adamson*, 291 F.3d at 616.

Second, the government fails to point to evidence that any of its examples were material to a decision by KU to pay Dr. Tao salary or provide Dr. Tao with access to KU facilities. *See* Tao Br. at 16. The government argues that KU used the September 2018 Conflict of Interest form to assess potential conflicts of interest and compliance with agency funding requirements. Opp. at 50–51. But it does not, and cannot, argue that KU used the forms to make salary decisions or to decide who gets access to KU research facilities. The disconnect between statements in the September 2018 Conflict of Interest form and a KU decision to pay salary or provide Dr. Tao with access to facilities is critical because the fraud statute does not criminalize mere "deception," *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020), only deception aimed at cheating a victim out of

---

[10] As one such example, the government attempts to resurrect the January 9, 2018 Conflict of Interest form that was previously charged, Opp. at 49, but which the Court dismissed before trial at the government's request. ECF No. 222.

money or property. *See* Tao Br. at 25 (collecting cases).

The government also fails to rebut Dr. Tao's argument that none of the eleven KU witnesses—including KU Chancellor Dr. Girod and Department Chair Dr. Weatherley—testified that Conflict of Interest form submissions were material to salary decisions or access to research facilities. *See* Tao Br. at 16. The government highlights the testimony of Angie Loving from KU Human Resources. Opp. at 52. But Loving confirmed that if Dr. Tao had disclosed a second position in China and it did constitute a conflict of interest, he would not "get fired," and it would instead "go to the director of research integrity," and, if it was a conflict of interest, "they would review the conflict of interest stated and they would work through steps to determine if that conflict could be managed or not with the terms of their employment." Day 2 Tr. at 124:2–9. Only if the department chair concluded that the conflict could not be managed, and he or she therefore forced the employee to decide between KU and the second position, and the employee refused to "abandon" the second position, could the employee "potentially" be referred to Human Resources and "potentially" be terminated, but only "[i]f it meant that their employment could not continue because of that conflict." Day 2 Tr. at 124:10–16. No one testified that Dr. Tao would have been fired if KU knew about the alleged second position at FZU,[11] and the alleged deprivation of information about a position that *could* lead to conflict management is not tantamount to cheating KU out of money or property.

Third, the government's argument that Dr. Tao made material misrepresentations to KU in order to obtain a "course buyout and summer 2019 salary," and that his "misleading statements

---

[11] The government cites no support for its contention that, if KU had learned that Dr. Tao had a second job at FZU, "it would have needed to decide whether to restrict his access to federal funds, convert him to a part-time employee, or terminate his employment." Opp. at 52. The testimony of Alicia Reed, who had no authority over Dr. Tao's salary or employment, did not state otherwise.

influenced KU's decision to allow [him] to use NSF … funds to pay for his spring 2019 buyout and summer 2019 salary," is contradicted by the evidence. Opp. at 51. Putting aside that the SSI does not allege that Dr. Tao defrauded KU of a course buyout or summer salary, and neither a course buyout nor summer salary are referenced in the 16-page SSI, the course buyout also could not support a wire fraud conviction because the buyout meant that KU would spend *less* money on Dr. Tao's salary than it otherwise would have. In addition, the government's theory is flawed because KU had no discretion whether to authorize the use of NSF funds for the course buyout or summer salary in 2019. As KU administrator Jane Johns testified, "[i]t was [Dr. Tao's] call which funding he was going to use for" the buyout, and it was his decision whether to use NSF funds to cover the buyout "because he did have available funds on that project." Day 4 Tr. at 231:5–16. She also testified that there was "no problem with Dr. Tao choosing an NSF grant to cover the buyout in May 2019." Day 4 Tr. at 231:15–17. Dr. Weatherley agreed, and also testified that if funding for the buyout fell through (as it did), he would expect Dr. Tao to cover it with existing grants (as he did). Day 3 Tr. at 211:19–23, 212:6–8. No one testified to the contrary.[12]

So too with summer salary, which NSF required KU to pay Dr. Tao based on a predetermined budget—even though Dr. Tao offered to forgo it. Dr. Tao notified Jane Johns on May 23, 2019, that he was "totally fine for any amount [of] summer salary, even down to no summer payment." Gov't Ex. 254. But Johns testified that KU and Dr. Tao had no choice:

> **Jane Johns [KU]:** Doctor Tao would not have had the authority to in any one summer say don't apply my summer salary. On federal awards, key salary must be taken and again it's taken generally in the summer because they're paid by their

---

[12] The government also failed to prove that Dr. Tao defrauded NSF by covering the buyout with NSF funds. Dr. Tao never made a misrepresentation to NSF regarding this use of funds, which Johns and Weatherley agreed were proper. And he could not have had fraudulent intent, because KU forced him to use agency funds to cover the buyout after the proposed FZU funding for it fell through. *See* Gov't Ex. 254 (email from Johns to Dr. Tao instructing him to select "one or more" of the NSF or DOE grants to cover the buyout, and stating that it "has to be done immediately").

departments in the fall and spring semesters. To re-route those funds to another line on the budget or do anything else with key salary funds other than paying key salary would require approval from the sponsoring agency, in this case NSF.

**Michael Dearington [Def.]:** So Doctor Tao suggested he could also just forego summer salary, but he was required to take summer salary from NSF that was used?

**Jane Johns [KU]:** Yeah. [It] was required that the key salary awarded on that project[] be taken. … Authorization for the summer salary is built into the project budget and it's awarded and spent accordingly. …

**Michael Dearington [Def.]:** Doctor Tao had no choice but to take that salary from KU as charged to NSF under the conditions of the award?

**Jane Johns [KU]:** That is my understanding of how that has to be taken, yes.

Day 4 Tr. at 232:6–19; *id.* at 233:10–11, 15–16. Far from trying to fraudulently obtain summer salary *from KU*, the funds *belonged to NSF*, and neither KU nor Dr. Tao had discretion whether it would disburse them to him. *See also* Opp. at 5 ("Defendant was not paid by KU using state funds during the summers"). Thus, these novel uncharged misrepresentation theories also fail.[13]

Fourth, the government argues that Dr. Tao lied to Dr. Weatherley by indicating that he was in Germany instead of in China when he missed a KU faculty retreat. Opp. at 49.[14] But there

---

[13] Even though Dr. Tao was budgeted to work on his NSF grants only 36 hours during the entire summer of 2019 in exchange for summer salary, Gov't Ex. 21 at 3, the evidence showed that Dr. Tao worked 14 to 16 hour days, seven days a week, on his DOE and NSF research, even during his free time. *See* Tao Br. at 22–23; Day 9 Tr. at 122:22–123:5 (Nguyen).

[14] The government continues to confuse or distort the facts regarding Dr. Tao's unsuccessful no-pay-leave request, which was meant to support a visit to Fritz Haber in Germany but was denied, Gov't Exs. 146, 147; Day 3 Tr. at 188:14–17, and his successful buyout request, Gov't Ex. 165, which was meant to give him more time to work on his NSF and DOE grants and which Dr. Weatherley granted, Gov't Ex. 165. The request letters belie the government's erroneous assertion during its opening, Day 2 Tr. 13:15–18, and in its Opposition, Opp. at 19–20, that Dr. Tao told Dr. Weatherley that the buyout was meant to support a semester in Germany. The government also confuses the no-pay-leave request with a separate invitation for Dr. Tao to give a four-day lecture at Fritz Haber. *See* Opp. at 20 (citing Gov't Ex. 291). Dr. Tao also did not "falsely" tell Dr. Weatherley that FZU promised to cover the buyout, Opp. at 20, and instead emailed Dr. Weatherley that the KU Research Office had not even submitted a proposed budget to FZU yet. *See* Gov't Ex. 166. Dr. Weatherley also did not condition his approval on a funds being "transferred to KU," Opp. at 20, but rather from his "accounts" at KU, Gov't Ex. 167, which he ultimately did. Dr. Weatherley also did not "direct[]" Dr. Tao to "stay on campus" during the semester buyout in spring 2019, Opp. at 20, but rather told him to be in attendance on campus "in accordance with campus policies," and Dr. Weatherley testified that the buyout policies *did not*

13

is no evidence that Dr. Tao's location was material to KU's decision to pay his salary or continue giving him access to its facilities. To the contrary, Dr. Weatherley testified that Dr. Tao's location "was not significant. The point was that [Dr. Tao] was extending [Dr. Weatherly] a courtesy to let [Dr. Weatherly] know he was not going to be at the retreat," which not all faculty members attend. Day 3 Tr. at 198:7–10, 197:17–19. In fact, Dr. Weatherley never even testified that he would have suspended Dr. Tao's salary if he learned that he had a second job, let alone if Dr. Tao lied about where he was while missing a retreat. A white lie to an employer is not fraudulent merely because employees receive salary, and the government's argument has no limiting principle. All manner of misrepresentations to employers would be fraudulent under the government's limitless theory, from excuses for late-finished assignments to sick days taken to cover child care. But without being material to KU's salary decisions, Dr. Tao's alleged misrepresentations are not fraudulent as a matter of law.

Fifth, apart from the lack of an actual misrepresentation to obtain salary, the government also failed to prove that Dr. Tao entered into a contract with FZU and worked there fulltime in 2018 or 2019. The government baldly asserts, without any citation to record evidence, that Dr. Tao "lived a double life" and worked fulltime at FZU. *See* Opp. at 13; *see also id.* at 2 (asserting, without citation, that Dr. Tao worked at FZU "for nearly nine months");[15] *id.* at 2, 11 (asserting,

---

require Dr. Tao to stay on campus if, as here, he had no classes to teach during the spring 2019 semester. Day 3 Tr. at 195:20–22, 196:15–19, 180:19–181:4, 181:20–22. He also testified that KU does not "micromanage" accomplished professors like Dr. Tao who frequently travel internationally including for conferences, and the course buyout is "designed to provide flexibility for highly active researchers such as him." Day 3 Tr. at 196:20–197:2, 181:20–182:1. And he testified that it was possible Dr. Tao told him he was in China, but he does not keep track of where professors are. Day 3 Tr. at 179:12–20.

[15] The government conflates travel to China with work for FZU during the period of December 2018 to August 2019, and it ignores that Dr. Tao had winter break, summer break, and a course buyout during this time that freed him to travel to China—his home country and where his mother resided—so long as he continued to supervise and work on his research from abroad, which he

without citation, that Dr. Tao's alleged job at FZU "mirrored" his fulltime work at KU); *id.* at 2 (asserting, without citation, that Dr. Tao received "research funding and laboratory space from FZU"); *id.* at 17 (asserting, without citation, that Dr. Tao "was starting up his lab at FZU" and "required to perform research under his contract with FZU"); *id.* at 18 (asserting, without citation, that Dr. Tao was a professor at FZU and "helped found" an institute there); *id.* (asserting, without citation, that Dr. Tao received "direct research support from FZU, lab space, and funds to purchase lab equipment").

Critically, however, there was no evidence of a contract with FZU, no evidence Dr. Tao taught at FZU, no evidence he received salary or other payments from FZU, no evidence he received research funding from FZU, and no evidence he worked in a lab or had a research group at FZU. Instead, the evidence showed that FZU declined to provide sufficient research funding to meet Dr. Tao's needs, and they were "far apart" in May 2018, the same month that Dr. Tao allegedly took the position at FZU. *See* Day 10 Tr. at 129:8–131:6 (Churchill), 217:5–15 (Tiffert); Day 11 Tr. at 214:12–13 (Lampe). The government also admits that if Dr. Tao had taken the job at FZU, he would have been "expected to work full time" there, Opp. at 8; *see also supra* note 6, which did not happen here, as Dr. Tao returned to Kansas after his course buyout ended to teach classes at KU in the fall of 2019, just as scheduled. Day 11 Tr. at 130:7–9, 130:25–131:2 (Lampe). Contrary to the government's argument, clearly erroneous (hearsay) statements from three unsigned, unstamped purported draft Chinese grant proposals of unknown origin or authorship, Opp. at 13, also do not prove that Dr. Tao worked fulltime at FZU.[16] Nor do unsuccessful attempts

---

indisputably did. It also fails to deduct the time Dr. Tao was in the United States, Gov't Ex. 355, when he was on campus or at home in Lawrence, Kansas. In any event, there is evidence that Dr. Tao worked at FZU when he was in China.

[16] For instance, one alleged NSFC grant proposal, dated August 2018, indicated that Dr. Tao began working at FZU in March 2018, even though the government's own theory is that he did not take

at recruiting a team, which the government erroneously describes as successful, Opp. at 11, and which the evidence showed was yet another reason why, in addition to the insufficiency of the proposed research funding, Dr. Tao decided to reject the FZU job offer and employment contract. *See* Day 10 Tr. at 144:22–145:3 (testimony of Churchill that Dr. Tao's failure to recruit students made a potential job at FZU unsustainable if he were to decide to take it). Thus, the government failed to even prove the underlying activity that it contends Dr. Tao concealed in the Conflict of Interest form in order to fraudulently obtain salary from KU.

Absent a material misrepresentation to either KU or NSF to obtain salary or grant funds, the Court should acquit Dr. Tao of the three wire fraud counts.

### B. Unrebutted evidence demonstrates that, consistent with well-settled law, Dr. Tao lacked intent to defraud KU and NSF.

The government failed to prove that Dr. Tao intended to defraud KU or NSF out of money or property because he "did not lie about the nature of the bargain," and KU and NSF "received exactly what they paid for," *United States v. Takhalov*, 827 F.3d 1307, 1313–14 (11th Cir. 2016), such that they "received the full economic benefit of [their] bargain," *United States v. Binday*, 804

---

a job there until May 2018. *See* Gov't Ex. 493A at 40. Another, dated February 2019, in contrast, indicated that Dr. Tao began working at FZU "full-time in 2017," Gov't Ex. 352A at 34, 39, despite that Dr. Tao was indisputably working and teaching classes at KU in 2017 and 2018, and it listed then-KU doctoral student Luan Nguyen as an Associate Professor at FZU since March 2019, which postdated the February 2019 date of the proposal itself, *id.* at 4, 50, even though Nguyen testified that he never took a job or worked at FZU, Day 9 Tr. at 135:6–17. Special Agent Lampe acknowledged that the proposal contained inaccuracies. *See* Day 10 Tr. at 209:16–20. A third alleged proposal,, dated March 2018, which is before the government alleges Dr. Tao even took a position at FZU, indicates that Xiaoyan Zhang was an FZU professor, even though he rejected an offer to work at FZU. *See* Gov't Ex. 491A at 1, 4; Day 10 Tr. at 147:21–148:16. The government's linguist testified that the one document that appeared to have a seal and signature, a budget of "labor costs," Gov't Ex. 489A, may not even be a proposal, and he was unsure if it was actually Dr. Tao's signature, which no one from the government sought to determine. Day 10 Tr. at 155:18–156:12. The government also claims that Dr. Tao advised graduate students at FZU based on documents dated March 2018, but this was months before it contends he even took a job at FZU. *See* Opp. at 13.

F.3d 558, 570 (2d Cir. 2015); *accord United States v. Anming Hu*, 3:20-CR-21-TAV-DCP-1, 2021 WL 4130515, at *13–*20 (E.D. Tenn. Sept. 9, 2021). Dr. Tao completed all of the work that KU and NSF required of him in exchange for salary and grant funding, and both alleged victims were left satisfied. *See* Tao Br. at 16–22. The SSI does not even allege otherwise. Well-settled case law in the Tenth Circuit and around the country requires acquittal in these circumstances.

The government does not dispute that the two district courts that have decided this issue in the past year have acquitted the defendant of wire fraud. *See Hu*, 2021 WL 4130515, at *13–*20; *United States v. Mingqing Xiao*, No. 4:21-cr-40039 (S.D. Ill. May 3, 2022). These cases accord with *Takhalov* and *Binday*'s reasoning that a defendant lacks fraudulent intent where "the alleged victims received exactly what they paid for." *Takhalov*, 827 F.3d at 1314; *accord Binday*, 804 F.3d at 570. As *Hu* held, even if Dr. Tao "intentionally deceived [NSF or KU] about his [alleged] affiliation with [FZU], such did not go to the nature of the bargain." *Hu*, 2021 WL 4130515, at *18. This conclusion applies *a fortiori* here, as this is not a case where the defendant tricks the victim into a bargain it otherwise would not have entered into, but nevertheless intends to fulfill his end of the bargain. Dr. Tao did not fraudulently induce KU or NSF to pay his salary or fund his research, no one testified that he did, and he completed all work that was required of him by KU and NSF.

The government's effort to distinguish *Hu* is meritless. The government attempts to show that NASA was more satisfied than KU and NSF were with the work at issue. *See* Opp. at 40. This is erroneous. The NASA OIG agent testified that he understood that "NASA 'got their research' and '[t]he technical reviewer was satisfied with it,'" and "he had no evidence that defendant 'took any money to China or had anybody in China working on' the NASA grants." 2021 WL 4130515, at *12. Dr. Keiser likewise testified that there was no allegation "that any of the work on the NSF

grants at issue was not done in the manner prescribed," or "that NSF funds were used to support foreign organizations." Tao Br. at 19–20. And an NSF program manager, George Janini, wished him "continued success" on his NSF grant work after reviewing and approving his progress report. Gov't Ex. 154. The principal investigator on one NSF grant, Dr. Subramaniam, testified that Dr. Tao exhibited "strong output" on the grant and he was "pleased with the quality of Doctor Tao's work." Day 6 Tr. at 131:5–132:14. The government's assertion, without citing the record, that "at no time did [Dr. Tao] tell anyone from NSF, as required, that he planned to use any equipment or facilities outside of KU to work on his federal grants," Opp. at 20, is false or misleading at best. There was no evidence that Dr. Tao ever used unapproved equipment outside of KU to work on his NSF grant, and the government has never argued or alleged, let alone proved, the contrary. Dr. Keiser's testimony that it is "difficult to trust" NSF-funded research if the research is being completed "in another place using other equipment" than the equipment specified in the grant proposal, Opp. at 42, is therefore irrelevant. Dr. Keiser herself testified that she was unaware "of any allegations in this case that NSF funds were used to support foreign organizations." Tao Br. at 20.[17] Dr. Keiser's testimony that it is important for NSF to know who the principal investigator is "collaborating with" on NSF research, Opp. at 41, is also irrelevant. The government did not allege or argue, let alone prove, that Dr. Tao collaborated with professors in China on NSF research.[18]

KU was also satisfied with Dr. Tao's work.[19] The government does not address the unrebutted evidence that he was one of four professors at KU who received the Chancellor's

---

[17] Dr. Keiser also testified that "there's no prohibition on a researcher who receives grant funding from NSF being a member of a foreign talent program" or "being funded by a foreign entity," which was not proven here anyway. Day 5 Tr. at 145:6–15.

[18] While Dr. Tao supervised KU research from China at times, it is undisputed that this was permissible. *See* Tao Br. at 20 n.14.

[19] As the government points out, Dr. Hu was not even charged with defrauding his university, Opp. at 40, presumably because the government knew such charges were legally and factually flawed.

(University Scholarly Achievement) Award in 2019, or the praise Dr. Girod heaped on him in connection with the award, in the same year that the government now claims that KU was dissatisfied with his work. *See* Tao Br. at 20–21.[20] The government ignores that Dr. Tao's department chair, Dr. Weatherley, testified that he was a "solid faculty member," and that the CEBC Director, Dr. Subramaniam, testified that he was "pleased with the quality of Dr. Tao's work," Opp. at 21. And it ignores that Luan Nguyen, the KU graduate student and postdoctoral student, testified that Dr. Tao worked seven days a week for KU and took no vacations, *see* Tao Br. at 21–22, just as the other former graduate student witnesses testified, *see* Day 9 Tr. at 64:18–65:9 (testimony of Shiran Zhang that Dr. Tao worked "90 to 100 hours a week" and had a "pure interest in science"); Day 8 Tr. at 134:18–135:9 (testimony of Weixing Huang that Dr. Tao worked seven days a week, sixteen hours a day, which was harder than any other professor when he was at Notre Dame). Thus, *Hu* is directly on point and requires acquittal here.[21]

The government's attempt to "redefine the bargain in this case," just like the government did in *Hu*, also falls short. *See Hu*, 2021 WL 4130515, at *18. The government cherry-picks

---

[20] The government now contends, for the first time, that Dr. Tao "deceptively applied" for this award, Opp. at 22, but it never alleged this theory, never argued it to the jury, and does not support it in its Opposition. The government also states that Dr. Tao nominated himself, but Dr. Weatherley testified that he supported the nomination, and an eight-member committee appointed by Dr. Girod decided that Dr. Tao was most deserving based on his record. Day 3 Tr. at 176:6–14. The government also ignores the fact that, after paying taxes on the award, Dr. Tao donated $3,500 of his award back to KU (and $1,000 to his local church). Def. Ex. 1116. Donating a monetary prize back to KU is inconsistent with fraudulent intent.

[21] The government does not even try to distinguish *Xiao*, which is also on point, and involved the same funding agency as here (NSF). Relying in part on the Eleventh Circuit's decision in *Takhalov*, the court in *Xiao* acquitted the defendant professor because he did not deprive NSF of a benefit of its bargain when it provided a grant to his university, even if he failed to disclose a Chinese grant (which the government does not contend existed here) and a second position at a Chinese university (which was not proven here). *See* Tao Br. at 18. The same holds true here. A failure to disclose a fact is not fraudulent if it does not cheat the alleged victim out of money and has no impact on the bargain.

(hearsay) statements regarding areas "for further development" from Dr. Tao's performance evaluations, most of which pre-dated the alleged fraud scheme, *see* Day 3 Tr. at 175:3–25, or isolated instances where he could have been more attentive. *See* Opp. at 39–40. It asserts that his "performance at KU was mixed." Opp. at 5. But it also admits that his research output was "excellent," Opp. at 5, which is particularly significant since he had only research and no teaching duties in spring 2019. More important, KU did not bargain for a perfect professor, and imperfection is not fraud.[22] The government also argues that KU bargained for a professor with no second position at another university, without citing evidence, but Dr. Tao's employment letter plainly permits Dr. Tao three months of free time each year to do as he pleases, and nowhere does it prohibit outside affiliations. Govt' Ex. 9; *accord* Day 2 Tr. at 131:7–10 (testimony of Loving that employees can choose how they spend their three free months in the summer outside the nine-month appointment). Even if KU's offer of employment prohibited Dr. Tao from accepting a second position, moreover, his alleged acceptance of such a position four years later would at most be a breach of contract, not fraud. *See, e.g.*, *United States v. Chandler*, 388 F.3d 796, 803 (11th Cir. 2004) ("The government agreed that breach of contract does not support a mail fraud conviction. The court agreed to give the instruction."); *United States v. Berheide*, 421 F.3d 538, 540 (7th Cir. 2005) ("[B]reach of contract is not a crime.").

---

[22] The government's other attacks on Dr. Tao's performance are also meritless, as Dr. Weatherley explained away each during his testimony. Specifically, it now argues that Dr. Tao missed a faculty retreat, Opp. at 40 (citing Gov't Ex. 225), but ignores that Dr. Weatherley testified this faculty members regularly miss retreats and this was not "unusual." Day 3 Tr. at 197:17–19. It argues that Dr. Tao "fail[ed] to advise students" based on an email in which Dr. Weatherley asked Dr. Tao to promptly meet with his advisees, Opp. at 40 (citing Gov't Ex. 247), but ignores that Dr. Weatherley testified that he understood that Dr. Tao met with his advisees later that week and "the problem had been solved." Day 3 Tr. at 200:13–21. And it argues that Dr. Tao "fail[ed] to timely perform paperwork for department accreditation," Opp. at 40 (citing Gov't Ex. 231), but it ignores that Dr. Weatherley testified that Dr. Tao completed the paperwork as requested before the deadline, contradicting the government's assertion. Day 3 Tr. at 200:3–9.

The government's argument that *Takhalov*, *Binday*, *Hu*, and *Xiao*—decisions from four different circuits—are contrary to Tenth Circuit law, Opp. at 36–39, is meritless.[23] Neither *United States v. Welch*, 327 F.3d 1081 (10th Cir. 2003), nor *United States v. Richter*, 796 F.3d 1173, 11942 (10th Cir. 2015), the cases cited by the government, held that a defendant commits fraud if he makes a misrepresentation that has no impact on the bargain and performs all services in the manner prescribed to the satisfaction of the alleged victim.

To the contrary, *Richter*'s reasoning mirrors that of *Takhalov*, *Binday*, *Hu*, and *Xiao*, reinforcing that Tenth Circuit law accords with the latter decisions and requires acquittal here. In *Richter*, the court sustained wire fraud convictions where the defendants lied to customers by indicating that they would "domestically" dispose of their toxic e-waste "in a lawful and environmentally sound manner" in order to induce them to pay for the service, and then illegally smuggled and exported the hazardous e-waste to China. 796 F.3d at 1178–81, 1192. Critically, the court reasoned: "The heart of the government's fraud case is that Executive's customers, relying on such representations, paid the defendants to dispose of their e-waste in a particular way— lawfully, domestically, and completely—*but did not get the benefit of that bargain* because Executive unlawfully exported e-waste." *Id.* at 1191–92 (emphasis added). This reasoning accords with *Takhalov*, *Binday*, *Hu*, and *Xiao*. *See Takhalov*, 827 F.3d at 1314 (no fraud where the defendant "did not lie about the nature of the bargain"); *Binday*, 804 F.3d at 570 (no fraud where "the purported victim received the full economic benefit of its bargain"); *Hu*, 2021 WL 4130515, at *18 (no fraud where the defendant "has not lied about the nature of the bargain" and where the alleged victim received "the benefit of its bargain"); *Xiao* Tr. at 7 (D.A.878) (no fraud where the

---

[23] This Court did not "already reject[]" Dr. Tao's argument when it denied Dr. Tao's motion to dismiss the SSI. Opp. at 36. The Court did not address *Takhalov*, *Hu*, or *Xiao* or whether Dr. Tao had fraudulent intent. ECF No. 99.

"benefits reasonably anticipated" by the purported victim matched "the actual benefits which the defendant delivered, or intended to deliver"). *Richter* requires acquittal because, in contrast to the defendants there, Dr. Tao never lied to KU or NSF about the way in which he would perform his work for them or any other "benefit of th[e] bargain." 796 F.3d at 1191–92.

Unlike the defendant in *Richter*, Dr. Tao also never fraudulently induced KU or NSF to enter into a bargain with him. For this reason, the government's reliance on *United States v. Bunn*, 26 F. App'x 139, 142–43 (4th Cir. 2001), and a concurrence from *United States v. Feldman*, 931 F.3d 1245, 1250 (11th Cir. 2019), are also misplaced. The defendants in *Bunn* lied about their eligibility for a Disadvantaged Business Enterprise (DBE) loan in order to fraudulently induce the award of a government contract, even though they planned to perform the required services. But the government bargained for a DBE to do the work, not the defendants, and the defendants fraudulently deprived the government of money by misrepresenting that aspect of the bargain. *Id.* The concurrence in *Feldman*, which is not even an authority in the Eleventh Circuit, is also inapposite. The concurrence questions the hypothetical in *Takhalov* where the defendant induces another to "enter into transactions that they would otherwise avoid" but provides all required services, *Takhalov*, 827 F.3d at 1314, but Dr. Tao did not fraudulently induce KU to hire him, as he had already worked there since 2014, and he did not fraudulently induce NSF into awarding the grant at issue to KU. No one from NSF testified that NSF would not have awarded the grant if it knew that Dr. Tao was affiliated with FZU. Dr. Tao neither fraudulently induced KU or NSF into parting with money or property, nor lied about an aspect of the bargain.

*Welch* also supports acquittal here. 327 F.3d at 1104. "[T]he intent to defraud," the court explained, "is akin to intent to deceive in order to deprive one of property," and "[a] fact-finder may infer an intent to defraud where a defendant intends to deprive another of its money … through

deceit or misrepresentation." *Id.* at 1105–06; *see id.* at 1106 ("intent to defraud … depend[s] upon … the intent to deprive"). The government adequately alleged intent to defraud in *Welch* because it alleged that the defendants took $1 million of Salt Lake City Bid Committee (SLBC) funds "under fraudulent pretenses" to pay bribes, despite promising not to commit bribery and knowing that SLBC would not have dispensed the money to pay bribes. *Id.* at 1085, 1108. While the court noted that evidence of concealment *can* be relevant to fraudulent intent, *id.* at 1105, it did not hold that concealment of information unrelated to the bargain or use of the money can prove fraudulent intent.[24] The concealment in *Welch* involved the creation of sham programs and contracts to mask the bribes from the SLBC and thus facilitated the deprivation of money under false pretenses. *Id.* at 1086. It was not concealment of an immaterial fact that, like here, had no bearing on the use of the money at issue.[25]

---

[24] The government's citation to *United States v. Hollis*, 971 F.2d 1441, 1452–53 (10th Cir. 1992), Opp. at 37, is also misplaced. There, the court noted that a defendant could still commit bank fraud if he obtained a loan under false pretenses, even if he intended to repay the loan without causing "financial harm to the bank." *Hollis*, 971 F.2d at 1452–53. This is inapposite. Dr. Tao did not obtain anything under false pretenses, did not fraudulently induce anyone to part with money, and he did everything required of him by KU and NSF in exchange for salary and grant funding.

[25] The government's mischaracterization of phone calls to demonstrate fraudulent intent also fails. The government attempts to transform an exculpatory statement during a phone call in which Dr. Tao states: "If I take [the FZU job], I'll have to give things up on this end [at KU]," into evidence of fraudulent intent. *See* Opp. at 35 (citing Gov't Ex. 512A). To the contrary, Dr. Tao made clear that he would have to pick one position, and he could not work at both universities. The government also points to a phone call from February 2018—three months before the government even alleges he took a job at FZU—in which he asks for discretion about his consideration of a position at FZU. Opp. at 22 (citing Gov't Ex. 511A). Nearly everyone who applies for a job conceals his job search from his or her current employer unless and until he makes a final decision to accept a new position. This type of "concealment" is hardly evidence of fraudulent intent. The government also highlights references during calls regarding three Chinese researchers who were charged with crimes, two whom Dr. Tao criticized for their alleged conduct, Gov't Ex. 512A at 15:53–18:07; *id.* at 14:35–15:52, and one who "accused unjustly" and exonerated, *id.* at 18:21, 19:50, 20:07. None demonstrates intent to defraud KU or NSF. And the government highlights a call between Dr. Tao and an FZU administrator who sought to persuade Dr. Tao to take the job, in which the administrator offered to "broaden assessments and time" but did not want the broader assessments and time "in writing" or "evidence" of it. Opp. at 23 (citing Gov't

*Hu*, *Xiao*, *Takhalov*, *Binday*, *Richter*, and *Welch* underscore the difference between a misrepresentation that has no bearing on the benefits of the bargain or purpose of the payment, which cannot prove fraudulent intent, versus a misrepresentation meant to defraud a victim of money or property. Dr. Tao's alleged failure to disclose a second job in China, *see* Opp. at 34–35, may arguably evince a lack of candor during the time period when he needed to decide whether to stay at KU or take the offer at FZU—albeit one exhibited by most people who are thinking about switching jobs but have not fully decided yet—but there was no evidence that Dr. Tao concealed this information from KU or NSF *in order to fraudulently obtain salary or grant funds*. And the evidence conclusively showed that Dr. Tao intended to, and did, provide all required work in exchange for his salary and funding provided to KU for his research. This is fatal to the government's wire fraud counts. The Court should therefore acquit on Counts 4, 6, and 7.

### C. The government's fraud theory plainly violates *Skilling*, and every court since *Skilling* has rejected it.

Dr. Tao's opening brief demonstrates that the government's fraud theory based on his alleged undisclosed potential conflict of interest is invalid under *Skilling*, *McNally*, and their progeny, including *United States v. Yates*, 16 F.4th 256, 266 (9th Cir. 2021), *United States v. Guertin*, 2022 WL 203467, at *3, --- F. Supp. 3d --- (D.D.C. Jan. 24, 2022), and *United States v. Facteau*, 1:15-cr-10076-ADB, 2016 WL 4445741, at *10 (D. Mass. Aug. 22, 2016); *see* Tao Br. at 22–31. The government does not dispute that *Skilling* held that a fraud theory based on an undisclosed conflict of interest is unconstitutional, but it argues that this holding does not apply here because it charged Dr. Tao with concealing a potential conflict of interest in order to obtain

---

Ex. 520A at 10:52–11:18, but incorrectly describing it as 521A). The FZU administrator's preference that a broader assessment and time not be in writing, if Dr. Tao took the job, is not evidence that Dr. Tao intended to defraud KU or NSF.

salary. Every court that has considered this argument has rejected it, however, and this Court should not be the first to endorse it.

As an initial matter, the government's argument that the Court should overlook this flaw based on the "law of the case" misapplies the doctrine. *See* Opp. at 30–31. For starters, the Court had no occasion to rule on the constitutional sufficiency of the government's evidence in its denial of Dr. Tao's motion to dismiss the SSI. Instead, it concluded: "At this stage of the proceedings, the Court reviews only the sufficiency of the allegations in the SSI," and "[t]he SSI explicitly alleges that the object of the wire fraud scheme was to deprive KU and the USG of research grants and Defendant's salary." ECF No. 99 at 8. The Court, as it was required to do, merely accepted the government's money-or-property allegation as true for purposes of the motion, and it did not decide whether the evidence at trial would survive *Skilling*, as it had not seen the evidence.

Nor does the "law of the case" doctrine apply to a decision on a motion to dismiss, which is not a final judgment passed upon by the Court of Appeals. As the Tenth Circuit recently explained, the doctrine holds that "a legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, generally becomes the law of the case." *United States v. Koerber*, 10 F.4th 1083, 1103 (10th Cir. 2021). Courts have therefore refused to apply the doctrine to rulings on motions to dismiss. *See United States v. U. S. Smelting Ref. & Min. Co.*, 339 U.S. 186, 199, 70 S. Ct. 537, 544, 94 L. Ed. 750 (1950) ("We think that it requires a final judgment to sustain the application of the rule of the law of the case just as it does for the kindred rule of res judicata."); *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994) ("Interlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case."); *accord In re Brizinova*, 588 B.R. 311, 324 (Bankr. E.D.N.Y. 2018) (same); *Columbia Gas Transmission, LLC v. Ott*, 984 F. Supp. 2d

508, 523 (E.D. Va. 2013) (same).[26]

The government's argument that *Skilling* does not apply because Dr. Tao maintained his salary, access to facilities, and federal research support by concealing a potential conflict of interest is meritless. Every court that has considered the salary-maintenance theory has rejected it, including two circuit courts and three district courts, and no court has endorsed it. *See* Tao Br. at 28–29.[27] Indeed, *Skilling* "reject[ed] … the salary-maintenance theory of fraud." 16 F4th at 266; *accord Guertin*, 2022 WL 203467, at *3 (agreeing with *Yates* and noting that "[t]he Government offers no appellate precedent contravening [*Yates*'s] straightforward reasoning").[28] The government invites this Court to split from the five decisions that have rejected its theory and violate *Skilling* without citing a single case that supports its position. Tellingly, it argues that the issue is not "well-settled law" by citing the dissent in *Yates* and the government's loss, but decision

---

[26] The two law-of-the-case decisions cited by the government do not hold otherwise. *See Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275, 1279–80 (10th Cir. 2010) ("[T]he decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal."); *McIlravy v. Kerr-McGee Coal Corp.*, 204 F.3d 1031, 1034 (10th Cir. 2000) ("[W]hen a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal." (internal quotation marks omitted)).

[27] The government argues that *United States v. Goodrich*, 871 F.2d 1011 (11th Cir. 1989), did not reject a salary-maintenance theory. Opp. at 30. To the contrary, *Goodrich* explained: "[W]e agree with the district court that the property interest alleged to have been denied the victim here—what the government contends Hillsborough County paid salaries for but did not get—is the 'honest and faithful services' of the County Commissioners, an interest *McNally* held to be unprotected by the mail fraud statute. Thus, this 'property interest' is indistinguishable from the intangible right to good government described in *McNally* and cannot sustain the mail fraud count." 871 F.2d at 1014. This is why *Guertin* counted *Goodrich* as one of the "circuit courts [that] rebuffed the Government's salary-maintenance theory." 2022 WL 203467, at *3.

[28] The principle applies equally to the government's theory, which was never alleged in the SSI or argued at trial, that Dr. Tao "obtained" use of KU facilities and equipment, which is just another way of saying he worked at KU. Every employee uses their employer's property when they do their work, but it cannot be said that they "obtained" those facilities while they do their job; the facilities remain the property of the employer.

to appeal, *Guertin*. This betrays the weakness of its argument.

The government's reliance on cases where the defendant failed to do his or her job and then lied about it in fraudulent time sheets in order to receive salary—which involved no undisclosed conflicts of interest—fares no better. In *United States v. Ransom*, 642 F.3d 1285 (10th Cir. 2011), the defendant government employee failed to show up for work 53% of the time while playing tennis and gambling at a casino, and then submitted fraudulent time sheets in order to get paid for 600 hours of work he did not do and to accrue 230 hours of leave he did not earn, which could be cashed in for money upon retirement. *Id.* at 1287, 1290. The court ruled that the defendant's falsification of time sheets to receive unearned salary and leave that was worth money constituted fraud. The defendant was convicted of fraud because he did not do his work and lied about it in time sheets. There was no allegation or evidence that the defendant defrauded his employer by failing to disclose a conflict of interest.

Similarly, in *United States v. Burns*, 104 F.3d 529 (2d Cir. 1997), the court affirmed a fraud conviction where the defendant employee moved from Vermont, where he worked at a federal funded nonprofit, to Cambridge, Massachusetts, in order to attend Harvard University fulltime, but he asked his sister to submit false time sheets for him so that he could continue to receive his federally funded salary despite not working. 664 F. App'x at 533–35. He also misused federal funds to rent his apartment in Cambridge. *Id.* Like *Ransom*, however, *Burns* is inapposite because the defendant did not do his work and then lied about it in time sheets. And there was no allegation that the defendant committed fraud by concealing a potential conflict of interest.

*United States v. Morales*, 664 F. App'x 228, 230 (3d Cir. 2016), also follows this fact pattern. There, the government affirmed a fraud conviction where the defendant national guardsperson secretly worked fulltime for a private contractor during the same hours of the day

that she was supposed to be working for the national guard, drawing two paychecks, while submitting false timesheets indicating that she worked fulltime for the national guard. 664 F. App'x at 229–30. The defendant was convicted because she did not do her work for the national guard and then lied about it in time sheets by stating that she was working fulltime. There was no allegation that the defendant concealed a potential conflict of interest, however, and the defendant did not even challenge the sufficiency of the evidence on appeal, asserting only a variance and jury-instruction challenge.

The common thread in *Ransom*, *Burns*, and *Morales* is that a defendant can commit fraud if he or she fails to do more than half of his or her work, and then submits false time sheets in order to obtain unearned salary and/or accrue unearned leave time that could be cashed in for money. In stark contrast, Dr. Tao performed all of the work required of him by KU and NSF to their satisfaction, far exceeding the research and publication output of his colleagues, and he never submitted false time sheets in order to receive unearned salary or accrue unearned leave that he could cash in for money. In addition, none of these cases involved a *Skilling* issue because the government did not argue or allege—unlike here—that any of the defendants concealed a potential conflict of interest as the gravamen of the fraud scheme.

The government's reliance on *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008), and *United States v. Ratcliff*, 488 F.3d 639, 645 (5th Cir. 2007), is also misplaced. *See* Opp. at 29, 31. In *Sorich*, a pre- *Skilling* case, the Seventh Circuit affirmed the fraud convictions of corrupt government officials who "doled out thousands of city civil service jobs based on political patronage and nepotism," to unqualified workers, in violation of a federal consent decree and "multiple laws and personnel regulations," and then tried to destroy the evidence. 523 F.3d at 705– 06. The court reasoned that a "fraudulently obtained" job can constitute money or property. *Id.* at

713. In contrast, Dr. Tao did not falsify his credentials in order to obtain a job or research funding; he was already an accomplished KU professor who regularly received research support when he allegedly took a second job at FZU. And in *Ratcliff*, the court upheld the *dismissal* of an indictment that alleged salary fraud based on concealment of campaign-finance violations by a candidate who subsequently won office and received salary, because the misrepresentation was not made to obtain salary. 488 F.3d at 645. *Ratcliff* did not involve an undisclosed conflict of interest, and it supports acquittal here, because, like the defendant in *Ratcliff*, Dr. Tao never made a misrepresentation to obtain salary or grant funds.

Unlike the foregoing cases, the government here alleged and argued that Dr. Tao concealed an undisclosed potential conflict of interest because he falsely "purport[ed] to remain loyal to KU, his employer," while aiming to "benefit the PRC." SSI ¶¶ 33–34; *accord* Jury Instruction No. 2 (ECF No. 278). Count 6 is itself a Conflict of Interest form. The government's attempt to deny that this was its trial theory is belied by the Opposition itself, which repeatedly argues that Dr. Tao concealed a potential conflict.[29]

Nevertheless, contrary to *Yates* and *Guertin*, the government asks the Court "to let in through the back door the very prosecution theory that [the Supreme Court] tossed out the front," *Yates*, 16 F.4th at 267 (quoting *United States v. Ochs*, 842 F.2d 515, 527 (1st Cir. 1988)). The

---

[29] *See, e.g.*, Opp. at 14–16 (arguing in the heading of Part II.C.i that Dr. Tao "Lied about his … Conflicts," emphasizing the importance of KU's Conflict of Interest reporting policies, and contending that Dr. Tao failed to follow them); *id.* at 39 (arguing that KU "bargained for a professor who would follow the universities' policies regarding … potential conflicts of interest" but was denied this"); *id.* (arguing that KU did not bargain for a professor "who siphoned prospective post-docs from KU to another university"); *id.* at 49 (arguing that Dr. Tao "failed to disclose to KU the potential conflict of interest" based on his alleged position at FZU); *id.* at 50 (arguing that Dr. Tao failed to disclose "potential conflicts of interest" to KU and deprived KU of information to assess whether he had "a potential or actual conflict of interest"); *id.* at 53 (arguing that Dr. Tao had "conflicts").

government argues that this was not an undisclosed conflict of interest fraud case merely because Dr. Tao received salary, and KU used NSF grant funds to buy equipment, cover Dr. Tao's course buyout, and pay summer salary. Opp. at 26–27, 32–33. But expenditures consistent with a grant budget are not evidence of fraud.[30] They were consistent with Dr. Tao's diligent work on the grants—which budgeted for equipment purchases, summer salary, and other expenditures—and his receipt of summer salary for NSF research he completed "in the manner prescribed" during his summers of free time is not evidence of fraud. Tao Br. at 19–20. Thus, as *Yates* explained, "[p]ermitting the government to recharacterize schemes to defraud an employer of one's honest services—thereby profiting 'through the receipt of salary and bonuses'—as schemes to deprive the employer of a property interest in the employee's continued receipt of salary would work an 'end-run' around the Court's holding in *Skilling*." *Yates*, 16 F.4th at 267 (quoting *Skilling*, 561 U.S. at 413). This Court should join *Yates*, *Goodrich*, *Guertin* and the other cases that have rejected the government's argument here, and should decline to endorse the government's unconstitutional fraud theory.[31]

---

[30] Alicia Reed from KU testified that she was unaware of any improper expenditures. Day 3 Tr. at 75:19–76:13. And, contrary to the government's assertion that Dr. Tao "withdrew" funds for the purchases, Opp. at 26, Dr. Tao never had access to the funds, Day 4 Tr. at 224:23–226:7. His group could only request that KU purchase equipment using budgeted funds, which would happen only after obtaining various levels of approval. *Id.* Reed also testified that these types of expenditures were necessary and appropriate to successfully complete research. *See* Day 3 Tr. at 76:1–13.

[31] The Court should also reject the government's three new uncharged money-or-property theories. First, Dr. Tao did not deprive KU of its "personnel," *i.e.*, because Luan Nguyen obtained price quotes for equipment for FZU. *See* Opp. at 28 n.9; *id.* at 32; *id.* at 33 & n.14. Nguyen never testified that he "buil[t] a lab at FZU," Opp. at 28 n.9, and instead testified that he never worked for FZU. Day 9 Tr. at 135:6–17. Dr. Tao also could not have defrauded KU of his time. The government never introduced evidence that Nguyen was a paid KU employee who shirked his work obligations to request the quotes, or even that he requested the quotes during work hours. The government's assertion that Nguyen worked on a grant at FZU, Opp. at 47, is unsupported by any evidence. Second, Dr. Tao did not fraudulently obtain his Chancellor's Award, which also was not a "bonus." Opp. at 31 n.13. There was no allegation, argument, or evidence that Dr. Tao lied in order to obtain the award. Third, Dr. Tao did not fraudulently obtain unearned leave. Opp. at 30 n.10. Loving

### D.   None of the three charged uses of the wires were "in furtherance of" a scheme to defraud KU or NSF.

The three wire fraud counts were not in furtherance of the alleged scheme to defraud KU or NSF. *See* Tao Br. at 32–36. The government's failure to explain how any of the three uses of the wire were plausibly in furtherance of the alleged scheme, Opp. at 45–48, is fatal to all three wire fraud counts.

As to Count 7 of the SSI (Count 6 at trial), Dr. Tao's four-word email stating "Thank you very much!" to Yu-Wen Chen in connection with an alleged grant proposal in China played no part in the alleged scheme to defraud KU of salary and NSF of grant funds. Tao Br. at 32–33. The use of wires as part of an activity that the defendant later conceals in order to obtain money or property is not a use of the wire in furtherance of the fraud itself. *See, e.g.*, *United States v. Warme*, No. 09-CR-19A, 2010 WL 125846, at *2 (W.D.N.Y. Jan. 7, 2010) (dismissing honest services wire fraud charge against a corrupt drug-using police officer accused of concealing violations of sworn duty from government and citizenry when he purchased and used drugs (prior to *Skilling*), because the defendant's use of the wires by withdrawing money for drugs from an ATM was part of the underlying activity he concealed but not in furtherance of the fraudulent scheme). The government fails to cite a single case that upheld a wire fraud conviction where the use of the wire was part of the concealed activity and not the scheme to obtain money or property by concealing that activity. The Court must therefore acquit on Count 7 because the thank-you email was not

---

testified that "[f]aculty don't earn vacation leave" and KU does not have "[p]aid time off." Day 2 Tr. at 133:3, 13–15. The government misstates this testimony by asserting that Loving testified that Dr. Tao "earned paid time off." Opp. at 5 n.3. Unlike in *Ransom*, there was no evidence that Dr. Tao obtained unearned leave that could be cashed out for money, let alone that Dr. Tao schemed to obtain it. To the contrary, the evidence showed that Dr. Tao worked seven days a week, usually 14 to 16 hours per day, and never took leave or vacation. Day 9 Tr. at 122:22–123:5. The government's newly concocted theories, which find no support in the evidence and were not charged in the SSI, are unavailing.

"necessary to gain control over the [KU or NSF] funds or to conceal the nature of [the alleged] fraud." *United States v. Redcorn*, 528 F.3d 727, 741–42 (10th Cir. 2008). The government does not argue otherwise.

Count 6 of the SSI (Count 5 at trial), the September 2018 Conflict of Interest form, also fails. *See* Tao Br. at 33–34. As a threshold matter, any argument that this count survives a *Skilling* challenge, when the count itself argues that Dr. Tao had an undisclosed conflict of interest, cannot withstand scrutiny. *See supra* Part II.D. But the use of the wires also was not in furtherance of the alleged fraud scheme. The government does not dispute that the Conflict of Interest form was internal to KU, belying any claim that Dr. Tao submitted the form as part of a scheme to defraud NSF. *See* Tao Br. at 33. Nor was there any evidence that Dr. Tao had any reason to believe that the Conflict of Interest form would play any role in grant funding decisions. The government's argument that KU used the forms to evaluate potential conflicts of interest when submitting grant proposals to NSF, Opp. at 15, also fails to save this count. Indeed, KU submitted the NSF grant proposal at issue nearly a year before Dr. Tao completed the September 2018 Conflict of Interest form, and NSF had already funded the grant three months before Dr. Tao submitted the form on September 25, 2018. Gov't Ex. 56. Thus, the form could not have been in furtherance of a scheme to obtain a grant that had already been awarded months earlier. The government also does not dispute that there was no evidence that KU actually reviewed Dr. Tao's September 2018 Conflict of Interest form, or even his January 2018 form, let alone that it considered the forms when making salary decisions or in connection with grant proposals. *See* Tao. Br. at 33–34.[32] The government

---

[32] To the contrary, KU submitted the NSF grant proposal in October 2017 (Gov't Ex. 55) and the DOE grant proposal (Gov't Ex. 33) in December 2017, without realizing that Dr. Tao had not yet submitted his Conflict of Interest form—which was due in September 2017 but which he ultimately submitted in January 2018. Gov't Ex. 24. This means KU submitted the proposals

argues that the form still could have helped Dr. Tao conceal a conflict, even if it had no bearing on salary decisions, Opp. at 46, but this argument holds no water given the lack of evidence that KU ever reviewed the forms—let alone that Dr. Tao *believed* KU would review the forms. Nor was the form even false. *See* Tao Br. 41–46; *infra* Part III.B.3. The government fails to explain its assertion that a truthful form, which KU required Dr. Tao to submit, could be in furtherance of a salary fraud scheme. Opp. at 46.

Count 4 of the SSI (Count 3 at trial) also charges a use of the wire that was not in furtherance of the fraud scheme. *See* Tao Br. at 34–35. In it, Dr. Tao truthfully replied that the proposed collaboration with FZU would not involve an intellectual property element, stating: "Thank you. I guess it is ok to choose 'NO' since it is a project to do characterization. I don't expect that [a] new method[, apparatus, material or device] could be generated from this project." Gov't Ex. 170. The email did nothing to advance a scheme to defraud KU or NSF. *See id.*; Tao Br. at 34–35. The government's argument that the email was "*concerning* Defendant's scheme to mislead KU about his true relationship with FZU" confirms that it was not in *furtherance* of such a scheme. Opp. at 45; *Redcorn*, 528 F.3d at 741 (use of wire "in relation to" scheme is insufficient). Nor is allegedly depriving KU of information about "his true relationship with FZU" a money-or-property fraud under the wire fraud statute. *See* Tao Br. at 25 n.17. And the email itself did nothing to conceal Dr. Tao's alleged relationship with FZU or provide "cover." Most important, like the other two wire fraud counts, Dr. Tao's response was not "necessary to gain control over the [KU or NSF] funds or to conceal the nature of [the alleged] fraud." *Redcorn*, 528 F.3d at 741–42. And like the other two wire counts, the government does not argue otherwise.

---

without reviewing Dr. Tao's Conflict of Interest form, or even checking whether he had submitted one.

**III.    The Court should acquit Dr. Tao on the remaining false statement count as to NSF.**

      **A.  The government points to no evidence that Dr. Tao caused KU to make a false statement to NSF.**

Count 9 of the SSI (Count 7 at trial) alleged that Dr. Tao falsely "represented to the University of Kansas … that he had no conflicts of time or interest" when he allegedly had a second position at FZU and received financial and other benefits. SSI ¶ 44. At trial, however, the government switched its theory entirely by arguing for the first time during closing that Dr. Tao "caused KU to make a false statement." Tao Br. at 37. The government undoubtedly switched its theory because Dr. Tao's private statement to KU would not be within NSF's jurisdiction. *See id.* at 37–40. The problem with the government's changed theory, however, is that that not only does it constitute a fatal variance from the scheme alleged in the SSI, but there was also no evidence that Dr. Tao actually caused KU to make a false statement to NSF. The government never introduced or identified such a statement. The absence of such evidence requires acquittal.

The government's Opposition does not dispute these facts. It does not dispute that its theory at trial, as it argued to the jury in closing, was that Dr. Tao's September 2018 Conflict of Interest form *caused KU* to make a false statement to NSF. And it does not dispute that it presented no evidence that Dr. Tao's September 2018 Conflict of Interest form in fact caused KU to make a false statement to NSF. *See* Tao Br. at 37; Opp. at 56. These two concessions confirm that acquittal on Count 9 is warranted.[33]

---

[33] The government's argument that its new theory was not a fatal variance is also flawed. *See* Opp. at 56 n.22. The government claims that, because it charged both a principal and an aiding-and-abetting theory in the SSI, its argument at trial that Dr. Tao caused KU to make a false statement to NSF is consistent with the SSI. *Id.* Not so. While the government could have alleged an aiding-and-abetting theory given its citation to 18 U.S.C. § 2, it still had to prove the false statement actually alleged in Count 9, which was the Conflict of Interest form. It cannot switch to a different, previously undisclosed statement—one never introduced at trial—that was not alleged in Count 9 merely because it cited 18 U.S.C. § 2 in Count 9. *See Adamson*, 291 F.3d at 616.

The government's jaw-dropping new argument that Dr. Tao's September 2018 Conflict of Interest form caused a *prior* statement by KU to *become* false also fails. Opp. at 57 (arguing that the Conflict of Interest form caused KU's "earlier statements of compliance to NSF to be false"). This is yet another fatal variance. The government also does not identify the statement that allegedly became false, nor does the Dr. Keiser testimony it cites identify such a statement. *See* Opp. at 57 (citing Day 5 Tr. at 114:24–115:1). In addition, a statement that is true when made does not become a false statement under § 1001(a)(2) merely because it would be false if re-asserted at a later date. *See, e.g.*, *United States v. Williams*, 934 F.3d 1122, 1128 (statement must be "false, fictitious, or fraudulent" when made to violate 18 U.S.C. § 1001). The government's new theory therefore fails.

### B.  The government's alternative false-certification theory also fails.

The government's original false statement theory—later abandoned at trial—that Dr. Tao omitted a Significant Financial Interest or Time Commitment from his September 2018 Conflict of Interest form—was flawed because, *inter alia*, it alleged an omission and not an affirmative false statement as charged under 18 U.S.C. § 1001(a)(2). *See* Tao Br. at 41. To fix this flaw, the government now, for the first time, argues that the false statement was actually the certification of correctness at the end of the Conflict of Interest form. *See* Opp. at 59–60. This argument is meritless for multiple reasons.

1.  The government did not charge or argue the false-certification theory to the jury.

The government did not charge Dr. Tao with falsely certifying the correctness of his Conflict of Interest form. *See* SSI ¶ 44 (alleging in Count 9 that Dr. Tao "falsely represented … that he had no conflicts of interest or time"). There is no reference in Count 9 to the false certification as to the truth of the Conflict of Interest form. *See id.* The government's new theory

therefore constitutes a fatal variance. *See Adamson*, 291 F.3d at 616.

The government also never argued the false-certification theory to the jury. The government does not dispute that it instead argued that Dr. Tao caused KU to make a false statement to NSF. *See* D.A.116–17 (Day 12 Tr. at 18:17–19:12) (arguing to the jury that Count 9 is based on Dr. Tao allegedly causing KU to make a false statement to NSF). In addition, the government's argument regarding the Conflict of Interest form during its closing focused exclusively on the alleged omissions (which are not affirmative false statements under § 1001(a)(2)) and how they allegedly caused KU to make an unidentified false statement—not the certification on page 8 of the form. Specifically, the government argued: "Count 7 [Count 9 of the SSI] relates to the institutional responsibilities form … And so September 2018, … when you look at – it's the second page … And he reports none of it. And he causes KU to make a false statement." Day 12 Tr. at 18:16–19:12. There is no reason to conclude that the jury based its conviction on the government's new certification theory rather than the one the government argued in its closing (that he caused KU to make a false statement) or at best one involving an alleged omission from the form (which does not violate § 1001(a)(2) because it is not an affirmative statement).

2. The government does not address Dr. Tao's argument that his private statement to KU was not material to NSF.

The government does not address Dr. Tao's argument that his private statements to KU in the September 2018 Conflict of Interest form were not material to NSF, which had no access to the forms, and which had no right or ability to review the forms when making any agency decisions. *See* Tao Br. at 40–41; Opp. at 56 (stating in a single sentence that the form was "material to, at least, NSF," without providing any explanation). The government's *ipse dixit* denial is

insufficient to survive acquittal based on this argument.[34]

Nor can the government overcome this argument. NSF's inability to access or review the forms makes clear that they were not "material," because a statement is only material if it "has a natural tendency to influence or is capable of influencing a decision of a federal agency." Jury Instruction No. 13 at 21 (ECF No. 278 ). NSF cannot be influenced by a statement that it has no ability to review.[35] The form's lack of materiality to NSF is fatal to Count 9.

### 3.   The government did not prove that the certification was false.

Now that the government has shifted its false-statement theory from the Significant Financial Interest and Time Commitment sections of the Conflict of Interest form to the certification on page 8 of the form, the government must demonstrate that the certification was actually false. But a close reading of Dr. Tao's certification confirms that it was not false.

The correctness of the certification turned on whether Dr. Tao had a reportable Significant Financial Interest or Time Commitment, and the government fails to rebut Dr. Tao's contention that there was no evidence that he had a disclosable Significant Financial Interest (SFI) or a Time Commitment. *See* Tao Br. at 41–43. Instead, it appears to acknowledge, as it must, that there was no evidence of an actual contract between Dr. Tao and FZU, Day 10 Tr. at 156:18–23 (Churchill); Day 11 Tr. 99:9–11 (Lampe), or of any funds or grants that Dr. Tao received from FZU or any other entity in China, Day 9 Tr. at 160:8–19, 164:6–10, 165:16–166:9 (Becker); Day 11 Tr. at

---

[34] *See, e.g.*, *Phillips*, 956 F.2d at 953–54; *Sanchez-Porras*, 2019 WL 4727820, at *7 n.13.

[35] To the extent the Conflict of Interest form could be material *to KU*, that argument fails because the jury was instructed that the alleged false statement in Count 9 had to be "material to the … National Science Foundation." Jury Instruction No. 13 at 20 (ECF No. 278). And to the extent the government argues that nondisclosure in the form could be material to NSF because it causes KU to make no disclosure to NSF when it otherwise would have, Opp. at 57 n.23, this argument also fails because (i) it relies on the materiality of a subsequent omission, not the charged statement in the form, and (ii) the omission theory does not violate the charged statute, 18 U.S.C. § 1001(a)(2), which requires a materially false affirmative statement.

212:4-213:10 (Lampe); Day 10 Tr. at 145:4-21 (Churchill). *See also* Opp. at 59 (contending that "the Government was not required to prove" that "he had a contract with or received any money from FZU"). It argues that it need not introduce this evidence to prove Count 9, but this ignores that the alleged contract and Dr. Tao's alleged receipt of research support from FZU formed the central basis for the entire SSI, *see, e.g.*, SSI ¶¶ 29, 31, 35, 36, 39, including Count 9 itself, *see* ¶ 44 (alleging that Dr. Tao concealed that "he was receiving, and expected to receive, funding from … China and [FZU]"). The government's failure to prove this allegation is fatal to Count 9, as well as the three remaining wire fraud counts, because Dr. Tao did not have a proven Significant Financial Interest or Time Commitment.

The government argues that the jury could have inferred that Dr. Tao received "some financial benefit from FZU" because, as it argued at trial, he did not transfer much money there from the U.S. *See* Opp. at 59 n.25. This argument is flawed for at least four reasons. First, it ignores that Dr. Tao's Chinese bankbook did not show any alleged income from FZU or anyone else in his account in China during the relevant time period, Def. Ex. 1462,[36] and the FBI's forensic accountant scoured his bank records and saw no direct or indirect payments from FZU, Day 9 Tr. at 160:8–19; *see also* Day 9 Tr. at 166:6–9 (acknowledging that "there's no evidence that Dr. Tao received payments from Fuzhou University"). Second, it ignores that Dr. Tao could have received honoraria from visiting seminars at universities in China other than FZU, and he could have limited his boarding expenses by staying with his family and relatives nearby while he was there. Day 9 Tr. at 161:23–162:4, 162:7–168:4. Third, it ignores that Dr. Tao could have spent money using the

---

[36] The government points to a picture of a China Construction Bank card found on Dr. Tao's computer, Gov't Ex. 526, but this also does not evince any payments by FZU or anyone in China to Dr. Tao. Indeed, the card does not even have Dr. Tao's name on it, let alone show that its owner received funds from FZU or any other entity during the relevant time period.

WeChat phone application, which the FBI forensic accountant acknowledged that she did not check, despite having access to the information. Day 9 Tr. at 162:25–163:14. Fourth, even if the jury could infer that Dr. Tao "received some financial benefit" as the government argues, that would be insufficient to trigger a Significant Financial Interest disclosure, which is triggered only if the person receives $5,000 or more in the year preceding September 2018—not just "some financial benefit" at some unidentified time. *See* Gov't Ex. 25 at 4. The government's argument therefore relies on baseless speculation, not a reasonable inference.

4.   <u>The Conflict of Interest form disclosure requirements were ambiguous.</u>

The Significant Financial Interest and Time Commitment disclosure requirements in the Conflict of Interest form were also ambiguous, and thus the alleged nondisclosure was not objectively false, warranting acquittal. *See* Tao Br. at 43–45. This is reinforced by the fact that the government does not dispute that Dr. Tao received no training or instruction as to the meaning of the ambiguous terms in the definitions of Significant Financial Interest or Time Commitment.

Significant Financial Interests were only disclosable if they were "*related* to your University responsibilities" Gov't Ex. 25. The plain meaning of "related" is "associated; connected" or "allied by nature, origin, kinship, marriage, etc."[37] An alternative definition is "connected by reason of an established or discoverable relation" or "connected by common ancestry or sometimes by marriage."[38] Thus, the ordinary meaning of "related to your University responsibilities" is that there is an actual connection or association between KU and the entity in which the professor has a financial interest. Thus, if a professor owned $5,000 or more in stock in

---

[37]   Related, dictionary.com, https://www.dictionary.com/browse/related (last visited June 27, 2022).

[38]   Related, Merriam-Webster, https://www.merriam-webster.com/dictionary/related (last visited June 27, 2022).

a lab testing company that he sent KU samples to for analysis, that would constitutes a Significant Financial Interest because the testing company is "related" to his research responsibilities in that there is an actual connection or association between the professor's KU work and the testing company. But if a professor allegedly moonlights at another university, which has no connection to his own, that second position is not "related" to his KU responsibilities under the plain meaning of "related."[39] Dr. Girod's testimony that "collaborating as a professional in your field" with another entity could mean that the entity is related to one's KU responsibilities is not contrary to this notion. If the KU professor collaborates in his capacity as a KU professor with an entity in which it has a financial interest, that could be reportable. But Dr. Tao's alleged position with FZU was mutually exclusive from his position at KU. In any event, even if the government's interpretation of "related" is reasonable, the Court must acquit unless it is the *only* reasonable construction of "related" and renders Dr. Tao's statement objectively and materially false. *See* Tao Br. at 44 & n.27 (collecting cases). The fact that the government's interpretation is at odds with the dictionary definition of "related" conclusively demonstrates that it is not.

The government does not even address, let alone explain, how the definition of Time Commitment is clear such that Dr. Tao knowingly made an objectively false statement by not reporting the alleged position at FZU as a Time Commitment. This amounts to a forfeiture. *Phillips*, 956 F.2d at 953–54; *Sanchez-Porras*, 2019 WL 4727820, at *7 n.13. As defined, an activity constitutes a Time Commitment only if it "take[s] time away from your University responsibilities." Gov't Ex. 25. A reasonable reading of this definition is that, if a person engages

---

[39] The government repeats its unsupported argument that Dr. Tao "performed research, supervised a research team, and managed a lab" at FZU. Opp. at 60. It proved none of this at trial, however, and in any event this kind of alleged work is not objectively "related" to work at KU if there is no connection between Dr. Tao's KU job and his alleged position at FZU.

in activities during their three months of free summer time, on weekends, or after hours, but is able to complete all of his or her required work for KU, that activity does not "take time away from" the person's KU responsibilities. The government fails to dispute that this is a reasonable construction, or that Dr. Tao's response under this construction was true, because he expected to, and in fact did, complete all of his KU responsibilities when he submitted the Conflict of Interest form in September 2018.

The government's failure to negate these reasonable interpretations of the reporting requirements provide yet another basis why the Court should acquit Dr. Tao on Count 9.

    5.  <u>The government's false-certification theory fails because the certification was not within the jurisdiction of NSF.</u>

The government's argument that the certification in the Conflict of Interest form was a statement made in a matter within NSF's jurisdiction also fails. *See* Tao Br. at 37–40. The form related to Dr. Tao's "Institutional Responsibilities," not his compliance with NSF grants, and stated: "This profile of your University responsibilities helps in determining whether your disclosed financial interests or time commitments (if applicable) could potentially conflict with your university responsibilities." Gov't Ex. 25 at 1. The private Conflict of Interest form employees submit to their employer is outside NSF's purview and cannot form the basis for a false statement conviction. The government's arguments to the contrary are meritless.

The government erroneously contends that the Court already decided that NSF had jurisdiction over the Conflict of Interest form, Opp. at 57, even though the Court merely ruled that the allegations were sufficient to survive dismissal—not that the government's evidence would be

sufficient to sustain a conviction.[40] The evidence at trial also differed from the allegations in the SSI that the Court found supported jurisdiction. Indeed, Dr. Tao argued in his motion to dismiss that *United States v. Blankenship*, 382 F.3d 1110, 1137 (11th Cir. 2004), supported dismissal because "a federal agency only has the authority to take action against the recipient of the federal funds—that is, the party with whom it has a contract." *Id.*; *see* ECF No. 82 at 33–35. The Court rejected this argument because, unlike in *Blankenship*, the SSI alleged that Dr. Tao "personally applied" for NSF grants, ECF No. 99 at 23, and the Court therefore reasoned that the government "distinguishes *Blankenship* on the basis that there is no intermediary between Defendant and the federal agency in this case." *Id.* at 24. Dr. Tao disproved this allegation as trial, however, as the witnesses unanimously testified—and the government conceded—that KU was the grant applicant and recipient—not Dr. Tao, who only worked on the grant in his capacity as an employee. *See* Tao Br. at 30.[41]

Given the evidence at trial, *Blankenship* requires acquittal because Dr. Tao's statement to KU was not within NSF's jurisdiction. As noted, "a federal agency only has the authority to take action against the recipient of the federal funds—that is, the party with whom it has contracted," which in this case is KU. 382 F.3d at 1137. Similar to in *Blankenship*, the fact that Dr. Tao worked for KU as a principal investigator on the KU grant did not give NSF "power over" the relationship

---

[40] The government's "law of the case" argument, Opp. at 58, also fails because the Court's denial of Dr. Tao's motion to dismiss was not a final order upheld on appeal or not appealed. *See supra* Part II.C.

[41] For this reason, *United States v. Baker*, 626 F.2d 512, 514 (5th Cir. 1980), *see* Opp. at 58, is also inapposite. There, the defendant state employees submitted false time sheets to their employers for hours they did not work, which caused them to receive federal funds to which they were not entitled. *Id.* at 513–14. The court held that "the false statement need not be made directly to a federal agency so long as federal funds are involved." *Id.* at 514. Here, in contrast, Dr. Tao's private statements to KU did not involve or relate to federal funding or the expenditure of grant funds, but rather his personal financial interests and activities.

between KU and Dr. Tao. *Id.* And KU, not NSF, "was responsible for overseeing" Dr. Tao's work at KU. *Id.* Thus, like in *Blankenship*, if NSF "was displeased" with Dr. Tao's work, "it lacked the power to compel" KU to fire him, and "[t]he only thing it could do would be to pressure [KU], under the terms of [KU's] contract with [NSF], into pressuring [Dr. Tao] into take some sort of action." *Id.* The government argues that NSF had "supervisory power" over Dr. Tao, Opp. at 57 n.24, but it ignores that this power was indirect—just like in *Blankenship*—as NSF could not remove Dr. Tao from his position at KU or take other direct action against him. It could only take action against KU, for instance by terminating the grant. The government mistakes NSF's *interest* in Dr. Tao's work with *authority* over Dr. Tao as an employee.

For this reason, *United States v. Holstrom*, 242 F. App'x 397, 398–99 (9th Cir. 2007), is also directly on point. *See id.* (DOE had no jurisdiction over federal contract lab employee's submission of false time cards because lab contracted with DOE, DOE itself had no "power to act" with respect to the lab employee, time cards were "peripheral to DOE's obligations and not directly related to any DOE authorized function," and "DOE's general contractual monitoring and investigatory authority" is not "sufficient to confer agency jurisdiction"); Tao Br. at 40. The government does not even address *Holstrom*, let alone try to distinguish it.

The government's argument that KU relies on employees so that it can report unmanageable conflicts to NSF in compliance with 2 C.F.R. § 200.112 and the NSF PAPPG fares no better. *See* Opp. at 56. The regulation, 2 C.F.R. § 200.112, requires granting agencies to establish conflict of interest policies and requires grantees to disclose potential conflicts of interest to the agency, Opp. at 56, but the government itself objected (successfully) including on relevance grounds when Dr. Tao sought to introduce this and the other regulations governing conflicts of interest, and it never asked for a jury instruction regarding this regulation. *See* Day 4 Tr. at 18:2–

11. The jury therefore could not have based its verdict on this regulation. The regulation also applies to NSF and its grantees, but not to employees of the grantee. *See* 2 C.F.R. § 200.112. Dr. Tao's statements to KU are therefore outside the ambit of this regulation.

The government's reliance on NSF PAPPG is also unhelpful to its argument. Although the PAPPG requires that grantees disclose certain "conflicts of interest" to NSF, Dr. Tao did not have a "conflict of interest" as defined by the PAPPG, and thus KU had no reporting obligation. Opp. at 56 (citing Gov't Ex. 48 at 127). The PAPPG defines "conflict of interest" to mean a situation where "a significant financial interest could directly and significantly affect the design, conduct, or reporting of NSF-funded research or educational activities." Gov't Ex. 48 at 127.[42] The allegation that Dr. Tao certified that he had "no conflicts of time," SSI ¶ 44, is not within NSF's jurisdiction because the NSF policy applies only to financial conflicts of interest, not conflicts of time. Dr. Tao's alleged omission of a Significant Financial Interest is also not within NSF's jurisdiction because he never had a financial "conflict of interest" as defined in the NSF policy. The government appears to concede that it never proved that Dr. Tao received funds from FZU. *See* Day 9 Tr. at 160:8–19 (Becker testimony); Opp. at 59 (arguing that "the Government was not required to prove" that Dr. Tao "had a contract with or received any money from FZU"). Even if Dr. Tao could have received funds from FZU (which is not in evidence), moreover, there is no reason why compensation for an alleged second position at another research university would affect the design, conduct, or reporting of the NSF grant work. If Dr. Tao were working on lung cancer research for NSF and failed to disclose a second job at a large tobacco company, that would

---

[42] This is significantly narrower than KU's definition of conflict of interest, which is "a divergence between an individual's private, personal relationships or interests and any professional obligations to the university such that an independent observer might reasonably question whether the individual's professional actions or decision are determined by considerations of personal benefit, gain or advantage." Opp. at 14 (quoting Gov't Ex. 3 at 2).

be a reportable conflict of interest that could reasonably be said to affect his research decisions, but the government failed to demonstrate that the alleged second job at FZU posed a conflict of interest with respect to the NSF grant at issue.[43] No one from KU or NSF even analyzed the second job and testified that it was likely a conflict of interest. As a result, the alleged false statement was not within NSF's jurisdiction notwithstanding 2 C.F.R. § 200.112 and the PAPPG.

Accordingly, Dr. Tao's statement in the September 2018 Conflict of Interest form fails to satisfy *United States v. Rodgers*, 466 U.S. 475, 479 (1984), which recognized two circumstances when the agency has jurisdiction: when the agency "has the power to exercise authority in a particular situation," or when there is a "statutory basis for an agency's request for [the] information." *Rogers*, 466 U.S. at 479, 481 (internal quotation marks omitted); *accord United States v. Deffenbaugh Indus., Inc.*, 957 F.2d 749, 753 (10th Cir. 1992). The government does not deny that there is no "statutory basis for an agency's request for [the] information" in the Conflict of Interest form. 466 U.S. at 479, 481.[44] And the government's argument that NSF had the power to exercise authority over Dr. Tao's statements to KU fails because, contrary to the allegations in the SSI, Dr. Tao has no contractual relationship with NSF, and NSF provided its funding directly to KU.[45]

---

[43] The government does not dispute Dr. Keiser's testimony that having a second position at another organization, without more, is not a conflict of interest. *See* Tao Br. at 39 & n.24.

[44] This case is therefore distinguishable from *United States v. Wright*, 988 F.2d 1036, 1037, 1039 (10th Cir. 1993), where the court held that falsified statements to a state regulator regarding water quality data that was required by Safe Drinking Water Act and regulations thereunder, and over which EPA had statutory enforcement authority, were within EPA's jurisdiction.

[45] If the Court accepts the government's argument, it will mean that every Conflict of Interest form at all of the 261 research universities in the United States that receive federal grants would suddenly constitute statements in matters within the jurisdiction of the Executive Branch, subjecting tens of thousands of employees, including KU employees who testified about their own disclosure lapses during the trial, to the threat of federal prosecution for any allegedly false statements, and substantially increasing the scope of the federal government's already massive jurisdiction. This is contrary to *Rogers* and basic principles of federalism.

IV.     **The government's limitless prosecution theory violates Dr. Tao's Due Process rights and threatens the Due Process rights of employees everywhere.**

The government's novel fraud and false statement theory also fails because it violates the fair warning requirement of the Due Process Clause. *See* Tao Br. at 45–46.[46] The government's argument that Dr. Tao had notice that applying for and considering a second job at FZU, and spending time remotely supervising grant work from overseas during a semester in which he had a course buyout, constituted a federal crime, even though he performed all of his KU and grant work, is baseless. The government cites to two exhibits, one of which is a press release about two Chinese-American professors "ousted" by their university, but which makes no reference to federal charges or crimes. *See* Gov't Ex. 676. The other is an email from one KU CPE professor to the rest of the department, including Dr. Weatherley and Dr. Subramaniam, regarding a defendant's conviction for grant fraud, which Dr. Tao forwarded to his wife. *See* Gov't Ex. 203. But the email does not identify the basis for the fraud conviction, which could have been a plain-vanilla fraud theory—not the novel one asserted here. This evidence fails to bolster the government's unprecedented prosecution theory. Dr. Tao should therefore be acquitted based on the fair warning requirement and the rule of lenity.

Were the Court to sustain the government's novel and unconstitutional fraud and false statement theory based on the evidence in this case, any paid employee who fails to tell an employer about a new job he or she is considering taking, or who tells a white lie in the office, could be charged with fraud and face up to 20 years in prison. Anyone accused of misrepresenting outside activities to an employer in internal conflict of interest forms could be charged with making

---

[46] The government's "law of the case" argument, Opp. at 61, fails because the Court rejected Dr. Tao's prior version of this argument based only on the unproven allegations—not the evidence—and the doctrine does not apply to decisions on a motion to dismiss. *See supra* Part II.C.

false statements to the federal government, so long as the employer receives grants or other funding, subjecting the employee to five years in prison.

The Eleventh Circuit in *Blankenship* described other examples of simple dishonesty that the government's limitless prosecution theory would transform into federal crimes without any notice to the individuals: (1) anyone who "padded his resume to obtain a job" with an entity that received federal funds or did work for the federal government, (2) a "person who lied about his address to get a local library card in a town in which he does not reside that happened to receive some funds under Congress's library subsidization program," (3) "any teachers in inner-city public schools that receive federal subsidies who take sick days when they're really going to the beach," (4) a "UPS driver who deliberately puts off delivering a package that the Government mailed second-day air until the third day," and (5) "[p]erhaps … most shocking … anyone who lies on an admissions application to any of the thousands of educational institutions in this nation that receive federal funds or participate in a federal financial aid program." *Blankenship*, 382 F.3d at 1138.

The Ninth Circuit in *Yates* adds this example:

> [The government's salary-fraud theory] also would criminalize a wide range of commonplace conduct. Consider an employee who wastes time on the Internet but then, to avoid being fired, falsely claims to have been working productively. Presented with that scenario at oral argument, the government declined to say whether the employee would be guilty of federal fraud on a salary-maintenance theory. The government's hesitation is understandable. Extending the fraud statutes in that way would raise serious concerns about whether the offense is defined 'with sufficient definiteness that ordinary people can understand what conduct is prohibited and … in a manner that does not encourage arbitrary and discriminatory enforcement.

*Yates*, 16 F.4th at 267–68.

As these decisions recognize, the Department of Justice is not an Orwellian Ministry of Truth that can prosecute white lies told in the workplace, and courts do not recognize Kafkaesque prosecution theories that ensnare unwitting defendants who do not understand the alleged crime.

The Due Process Clause demands more, and it does not permit a conviction in this case.

## V.   A new trial is warranted if the Court decides that the evidence is sufficient as to any of the four counts.

The government's arguments against a new trial are easily dispatched. First, the government argues that Dr. Tao does not assert any new arguments other than the ones he asserted in support of his motion for judgment of acquittal. He is not required to. Different standards apply to a Rule 29 motion and a Rule 33 motion, and thus, even if the Court were to deny Dr. Tao's motion for judgment of acquittal as to one or more of the counts, it should grant him a new trial on such count(s) in the interest of justice because the verdict is against the weight of evidence. *See, e.g.*, *United States v. Canela*, No. CR 08-1539 MV, 2010 WL 11523585, at *1 (D.N.M. Jan. 15, 2010) ("[W]hen ruling on a motion for a new trial, the Court has broad discretion and is free to weigh the evidence in support of the motion and assess a witness's credibility.").

Second, the government invites constitutional error when it argues that the Court can decline to grant a new trial if it decides that the fraud theory as to one alleged victim is valid but as to another alleged victim is invalid. *See* Tao Br. at 46–47; Opp. at 61–62. The government cites no case for this proposition, and it ignores the Supreme Court, Tenth Circuit, and Ninth Circuit cases cited by Dr. Tao that hold otherwise. Indeed, "[t]he Supreme Court has [reversed and remanded] when a valid theory and invalid theory were submitted to the jury and the jury returned a general verdict, creating uncertainty on whether the jury relied on the invalid theory." *Zzyym v. Pompeo*, 958 F.3d 1014, 1033 (10th Cir. 2020). Thus, the Court must at a minimum grant a new trial as to the fraud counts if it determines that one of the theories is invalid, particularly due to a constitutional infirmity such as a violation of *Skilling*.[47]

---

[47] Now that the government has conceded that the evidence was insufficient to prove its fraud theory as to DOE, the Court should, at a minimum, grant a new trial on the wire fraud counts due

**CONCLUSION**

For the reasons stated in Dr. Tao's opening brief, and herein, the Court should acquit Dr.

Tao of the three remaining wire fraud counts and one remaining false statement count.

Respectfully submitted,

/s/ Thomas H. Johnson
Thomas H. Johnson #13688
Petefish, Immel, Hird, Johnson,
Leibold & Sloan, LLP
842 Louisiana
Lawrence, KS 66044
Tel: (785) 843-0450
Fax: (785) 843-0407
tjohnson@petefishlaw.com

Peter Zeidenberg
Michael F. Dearington
Laura Zell
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
Peter.Zeidenberg@afslaw.com
Michael.Dearington@afslaw.com
Laura.Zell@afslaw.com

*Attorneys for Defendant Franklin Tao*

---

to the risk that the jury rested its conviction on the DOE theory that the government concedes was
defective.

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of July, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

/s/ Thomas H. Johnson
Thomas H. Johnson