## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

FENG TAO,

      Defendant.

Case No. 19-20052-JAR

## MEMORANDUM AND ORDER

Defendant Feng Tao was a highly respected and acclaimed chemistry and engineering professor at the University of Kansas ("KU") when he received the coveted Changjiang Scholar award from the Peoples Republic of China at Fuzhou University, the sponsoring institution. Tao did not disclose this to KU. Tao obtained a "buy-out" of his teaching responsibilities at KU for the spring semester of 2019, and without KU's knowledge, spent most of the first eight months of 2019 at Fuzhou University ("FZU"), preparing to build a research lab there, applying for funding for that research, and recruiting graduate students to join his research team.

Tao was charged with multiple counts of wire fraud for concealing his affiliation with FZU from KU, and from two federal agencies, Department of Energy ("DOE") and National Science Foundation ("NSF") that had previously awarded KU grant funding for Tao's ongoing research at KU. Tao was also charged with making false statements in certified forms that Tao submitted to KU, within the jurisdiction of DOE and NSF, in that these federal agencies required KU to implement and manage conflict-of-interest policies concerning the federal grant funds.

After a two-week jury trial, Tao was convicted of three counts of wire fraud and one count of making a false statement. Now before the Court is Tao's Motion for Judgment of

Acquittal, or, in the Alternative, for a New Trial (Docs. 286, 290).  The motion is fully briefed, and the Court is prepared to rule.

Viewing the evidence in the light most favorable to the Government, the Court finds that the evidence was legally and factually insufficient to support Tao's wire fraud convictions. Though Tao was deceptive in not disclosing his activities at FZU, there was no evidence that Tao *obtained money or property* through the alleged scheme to defraud, as required under the wire fraud statute.  During the time period of the alleged scheme to defraud, Tao continued to rightfully receive his salary from KU for his services and continued to successfully perform the research required by DOE and NSF under their research grants.  But there was sufficient evidence supporting the jury's guilty verdict on the false statement count. Tao made a false statement in certifying to the truth and completeness of the September 2018 Institutional Responsibilities form he submitted to KU.  Further, there is no basis for a new trial on the false statement count.  So, after a careful and thorough review of the trial record and arguments presented, the Court grants in part and denies in part Tao's motion.

## I.     Background

A federal grand jury returned a ten-count Second Superseding Indictment ("Indictment") charging Tao in Counts 1 through 7 with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, and in Counts 8 through 10 with making false statements, in violation of 18 U.S.C. §§ 1001(a) and 2.[1]  To support these charges, the Indictment alleged that Tao engaged in a scheme to "obtain" his salary from KU and federal grant funds from DOE and NSF by concealing his affiliation with FZU, associated benefits, and foreign research support.  Before trial, Tao filed two motions to

---

[1] Doc. 75.

dismiss the Indictment,[2] which the Court denied.[3]  The Court later granted the Government's motion to dismiss Counts 3 and 8.[4]

Trial began on March 21, 2022.  The Government's case-in-chief spanned nearly two weeks, during which the jury heard testimony from 30 witnesses and viewed close to 400 exhibits.  At the close of the Government's case, Tao orally moved for a judgment of acquittal on all eight counts under Fed. R. Crim. P. 29, arguing the evidence was insufficient to convict him of the charges.  As permitted by the rule, the Court reserved its judgment on the motion.  Tao orally renewed his motion after the close of the defense's case the next day.  The Court again reserved judgment and permitted the case to proceed to the jury.  After deliberating for one and a half days, and submitting a jury question, the jury returned a split verdict.  The jury found Tao guilty of three counts of wire fraud (Counts 4, 6, and 7, renumbered as Counts 3, 5, and 6 at trial) and one count of making a false statement (Count 9, renumbered as Count 7 at trial).  The jury acquitted him on the remaining four counts.  Tao timely renewed in writing his motion for judgment of acquittal and moved in the alternative for a new trial under Fed. R. Crim. P. 33.[5]  That motion is now before the Court.

---

[2] Docs. 82, 83.

[3] Doc. 99.

[4] Docs. 219, 222.

[5] Docs. 286, 290.

## II.     Evidence Presented at Trial[6]

The Court begins by recounting the evidence presented at trial, viewed in the light most favorable to the Government.[7]

### A.     Employment at KU

KU hired Tao in 2014.  Previously a professor at Notre Dame, Tao joined the KU faculty as a full-time, tenured associate professor in the Chemistry and Petroleum Engineering Departments.  With him came several hundred thousand dollars in federal grant funds from NSF. This NSF grant was originally awarded to Notre Dame to fund Tao's research under NSF's CAREER program, which supports promising early-career faculty to "help them bring their research to the next level."[8]  The CAREER grant was transferred to KU in December 2014.

Tao successfully secured additional federal research grants while at KU.  As relevant here, KU submitted a grant proposal to NSF to support his research on October 2, 2017; NSF awarded the grant to KU on June 28, 2018.  On December 11, 2017, two months after submitting the NSF grant proposal, KU submitted a grant proposal to DOE seeking renewed funding to support Tao's ongoing research.  DOE awarded the grant on September 18, 2018.  In addition to these grants, Tao was a co-principal investigator on an NSF grant that KU applied for in March 2015.  During Tao's tenure, he submitted numerous grant proposals to funding agencies and he submitted numerous annual Institutional Responsibilities forms.[9]

---

[6] All citations to trial testimony are to the unofficial transcripts because neither party has purchased finalized certified transcripts.  At Tao's unopposed request, the Court allowed him to rely on the unofficial transcripts in part because everyone agrees the transcripts in this case, though unofficial, are of high quality.  *See* Docs. 291, 292.

[7] *See United States v. Tennison*, 13 F.4th 1049, 1059 (10th Cir. 2021).

[8] Trial Tr. Day 3 at 57:5–9.

[9] Exs. 22–25.

During his tenure at KU, Tao had a "stellar research record."[10]  In April 2019, he was one of four KU professors to receive the University Scholarly Achievement Award.  This marquee award "recognize[s] standout researchers who embody [KU's] mission to make discoveries that change the world," and comes with a $10,000 prize.[11]  The chair of Tao's department, Dr. Laurence Weatherley, supported Tao's nomination.

At the awards ceremony in April 2019, KU's Chancellor, Dr. Douglas Girod, proclaimed that Tao's research contributions had "far exceeded expectations in his field in terms of his productivity and really his level of ingenuity."[12]  Dr. Girod noted that Tao "had 175 publications with over 6,000 citations, which really speaks to the novelty and the relevance of his work," and that he had "really enhanced KU's capabilities in surface science in the area of catalysis."[13]  Dr. Girod also commended Tao for (1) being named a fellow in the American Association of the Advancement of Science and in the Royal Society of the United Kingdom; (2) serving as a reviewer on panels for both DOE and NSF; (3) "flourishing research collaborations with a number of colleges and other institutions"; and (4) developing "a very strong team of graduate students and post-doc researchers in addition to developing a world class lab here at KU."[14]  Tao's wife accepted the award on his behalf because Tao was in China at the time.

Like many faculty members, Tao's research was stronger than his teaching.  In his annual evaluations from 2015 to 2018, undergraduate teaching and advising were identified as "[a]reas

---

[10] Exs. 28, 29.

[11] Ex. 1450.

[12] Trial Tr. Day 2 at 77:16–20.

[13] *Id.* at 77:21–78:2.

[14] *Id.* at 78:3–25.

noted for improvement" or "further development."[15]  Faculty committee service was also listed

as an area for development.  Dr. Weatherley, who prepared and delivered the annual evaluations,

testified that Tao's "external service [was] no problem."[16]  But he emphasized the importance of

internal, departmental service as a "piece of advice . . . that [he] would give to any colleague"

interested in being promoted to full professor, because "the process for promotion . . . is basically

peer review."[17]  Dr. Weatherley testified that it is not unusual for faculty members to have areas

for development identified in annual evaluations.  Indeed, providing feedback on a faculty

member's strengths and weaknesses in an annual evaluation is "[v]ery common" and a purpose

of the evaluation.[18]  In Dr. Weatherley's view, Tao was a solid faculty member.

## B.     The 40-40-20 Split

Faculty members at KU divide their effort into three parts: research, teaching, and

service, typically in a classic 40-40-20 split of their time.  Research responsibilities include

conducting scientific research, publishing scholarship, and seeking grant funding to support

scholarly activity.  Traditionally, teaching two classes per semester "would make up that

[second] 40 percent," covering the time that goes into preparation, instruction, evaluation,

assessment, testing, and advising.[19]  But teaching also includes "hands-on" instruction like

directing graduate-student research.[20]  Eighty percent of a faculty member's time is split evenly

---

[15] *See, e.g.*, Ex. 26 (2015 annual evaluation); Ex. 27 (2016 annual evaluation); Ex. 28 (2017 annual evaluation); Ex. 29 (2018 annual evaluation).

[16] Trial Tr. Day 3 at 111:3.

[17] *Id.* at 109:22–110:13.

[18] *Id.* at 174:25–175:11.

[19] Trial Tr. Day 2 at 43:22–23, 47:11–15.

[20] *Id.* at 43:25–44:3 ("[O]ur graduate students learn by doing research, working closely along a faculty member who helps them conduct research, and plan out the research and analysis, and so [the teaching component includes] both hands-on as well as classroom [instruction]."); *see also id.* at 47:15–18.

between research and teaching, reflecting their equal importance.  The remaining twenty percent is spent on service to the university, community, and profession.

Although faculty normally spend forty percent of their time teaching, a faculty member may request to "buy out" a course with external grant or endowment funds to release them from teaching responsibilities for a semester.  If approved, another faculty member or adjunct instructor will cover the bought-out course.  Faculty members receive no extra salary for teaching a bought-out course, but if an adjunct is assigned to teach it, KU will use the buyout funds to pay the adjunct.

Faculty members at KU are on a nine-month academic year appointment.  The university thus does not pay them a salary in the summer months—"the off-contract period."[21]  But faculty members may earn supplemental compensation in the summer funded by research grants for effort expended on their research projects.

### C.    Federal Research Funding

KU is a top-tier research university.  Each year, the university receives hundreds of millions of dollars in federal grant funds to support its research.  Dr. Girod testified that the university has a "vested interest in making sure that [it] remains eligible" for that funding.[22]  If KU lost the ability to obtain grant funds, Dr. Girod testified, then it would "fail to serve as a research university," and would become "a teaching university."[23]  KU's Office of Research oversees research administration at the university, including pre- and post-award management, to ensure compliance with federal funding requirements.

---

[21] *Id.* at 153:6–12.

[22] *Id.* at 51:13–14.

[23] *Id.* at 51:18–20.

KU's Office of Research worked with Tao not only in the pre-award phase of his grant proposals but also in the post-award phase to ensure that the federal funds were spent in accordance with applicable guidelines, policies, and procedures.  Ensuring compliance was a joint responsibility.  The Office of Research ensured that each grant was administered in accordance with applicable guidelines (e.g., format, budget, reports, etc.) while Tao was responsible for ensuring that the information about the research and his own activities was accurate.

After the NSF and DOE awarded grants funds to support Tao's research, KU managed and maintained possession of the federal grant money.  Alicia Reed, the Assistant Vice Chancellor for Research at KU, testified that "each agency will have terms of allowability" and that allowable costs on a standard research award usually include salary, fringe benefits to support personnel, travel costs, and equipment and supplies necessary for research.[24]  While at KU, Tao used his NSF and DOE grant funds to support his research projects.  In 2019, for instance, KU purchased scientific equipment and supplies at Tao's request.  Tao also used grant funds to pay for travel and salaries for him and his research team.  And, Tao earned summer salaries funded by his grants in 2018 and 2019.  KU has not identified any improper expenditures of grant funds incurred by Tao or his research team.

### D.    Changjiang Scholars Program

In July 2017, Tao applied to the Changjiang Scholars Program, a Chinese talent recruitment program.  Broadly speaking, foreign government talent recruitment programs seek to recruit promising scholars and researchers by offering them resources to perform research.  Dr. Glenn Tiffert, the Government's expert witness, testified that the Changjiang Scholar Program is

---

[24] Trial Tr. Day 3 at 23:24–24:5.

administered by China's Ministry of Education, but candidates apply through a sponsoring Chinese university. Tao's sponsor was FZU. Dr. Tiffert testified that the typical profile of a successful candidate is an accomplished mid-career scientist with a strong research background, including experience running a lab, training graduate students and post-doctoral researchers, and building a research program. The candidate must also be able to teach core courses at the sponsoring Chinese university.

If a candidate is selected to serve as a Changjiang Scholar by the Chinese Ministry of Education, the sponsoring university and the candidate then negotiate the terms of an employment contract. That employment contract must be approved by the Ministry of Education. Once approved, the Ministry of Education issues a certificate formalizing the candidate's participation in the program as a Changjiang Distinguished Professor. Ministry of Education regulations require Changjiang Distinguished Professors to work full-time at a Chinese university and prohibit them from maintaining employment elsewhere. The regulations give them a six-month transition period to wind down their current employment after signing the contract and receiving the certificate.

By January 2018, Tao had been selected as a Changjiang Scholar. After his selection, employment contract negotiations with FZU began. Between February and May 2018, FZU and Tao exchanged several unsigned draft employment contracts. Tao received the latest version of the draft contract on May 4, 2018. In that version, FZU offered Tao an annual salary of about $85,000, $3 million dollars in research funds, $1.5 million to purchase laboratory equipment, and laboratory space. The draft contract also contained a provision that Tao would "work full-time for [FZU] and not hold or draw salary from any concurrent post nor change his employer."[25]

---

[25] Exs. 336, 337.

The next day, on May 5, 2018, Tao took a three-day trip to China to visit FZU.  And sometime that same month, Tao was issued a leather-bound certificate from China's Ministry of Education certifying "that Fuzhou University appoints [him] as a 2017 Ministry of Education 'Changjiang Scholar Award Program' Distinguished Professor, with an employment period of five years."[26]  There is no evidence of an executed employment agreement between Tao and FZU.  Nor is there evidence that Tao received any payments from FZU.

Before traveling to China, Tao sought advice from his colleagues about the FZU opportunity.  For instance, in February 2018, Tao called Meilin Liu, a professor at the Georgia Institute of Technology, to discuss the offer.  Tao recorded the call. Tao told Liu that FZU had offered him about $3 million dollars in research support, but that FZU required a full-time academic appointment.  Tao asked whether Liu thought he could scale back his appointment at KU from full time to part time.  Liu responded that it "depend[ed] on [KU]" and "how it assesse[d] [Tao]," but that he knew other professors who worked three or four months in the United States, and the rest of the year in China.[27]  At the end of the conversation, Tao stated: "This is really a headache for me. . . .  On the one hand . . . I don't think I should give up [the FZU] opportunity.  But . . . I think this is also a nuisance.  If I don't give up the opportunity. . . . You say I should take it, but if I take it, I'll have to give things up on [the KU] end."[28]  Liu responded that if Tao "clearly" told KU that he was "working on both sides, it shouldn't be an issue."[29]

---

[26] Ex. 619A.

[27] Ex. 512A at 00:03:52–00:04:04.

[28] *Id.* at 00:21:40–00:21:51.

[29] *Id.* at 00:21:56–00:21:57.

A day earlier, Tao called a KU professor, which call Tao also recorded, to ask him whether KU allows professors to convert their full-time appointments to half-time appointments.[30]  Tao did not mention FZU to the KU professor.  Instead, Tao said that he was exploring an opportunity in Germany and wanted to know if he could pursue it without giving up his job at KU.  Tao explained that he had a research team at KU and did not "want to give it up."[31]  The KU professor floated a suggestion: that Tao accept a three-month, rather than six-month, appointment at the German university and that he buy out one of his courses at KU.  This, the professor explained, would free Tao to travel and work at the German university during the semester of the buyout and into the summer.  The professor noted that Tao could "even tell [his] department chair explicitly . . . that [he] want[ed] to go there to collaborate."[32]  But the professor advised Tao that if he wanted "to do half-and-half," then he should "mention it to [his] department chair to see if it's a possibility."[33]  The professor cautioned that if Tao earned his nine-month salary from KU and was paid for more than three months from another university, it "may be a problem."[34]

And two days before he traveled to China, Tao recorded a phone discussion with another professor about his offer from FZU.  During this call, Tao stated that if wanted the job, he would need to sign a contract in a few days, or the offer would expire.  Tao expressed concern about the requirement that he work at FZU full time because his family would not agree to move back to China. But Tao explained that he could buy out of his teaching responsibilities at KU for a

---

[30] Ex. 514A at 00:00:54–00:01:01.

[31] *Id.* at 00:00:43–00:00:54.

[32] *Id.* at 00:04:41–00:04:48.

[33] *Id.* at 00:05:48–00:05:54.

[34] *Id.* at 00:06:42–00:06:44.

semester and then take three months of no-pay leave.  Tao said that this would permit him to simultaneously fulfill his scaled-back responsibilities at KU, receive little pay from KU, and satisfy the Chinese Ministry of Education's requirement that he spend most of his time in China.

Recorded conversations and evidence seized from Tao's home and lab indicated that Tao was aware that other professors involved in China talent programs were under investigation or prosecution.  Tao forwarded articles concerning these prosecutions to his wife.[35]  And when Tao's professor friend at Georgia Tech advised Tao that he needed to tell KU about the FZU position, Tao responded, "some people don't say anything, that's for certain.  But if I don't say anything, then . . . it would definitely be problematic if this thing were ever looked into."[36]  Tao also mentioned the FBI investigations of other scientists.[37]

### E.      Fuzhou University

While FZU and Tao were engaging in contract negotiations, Tao began taking steps to work at FZU.  In March 2018, Tao agreed to serve as an advisor to graduate students there and he signed mentor cards.  Tao also began applying for research funding in China and began recruiting graduate and post-doctoral students to potentially join his research team at FZU— efforts that continued throughout 2018 and into 2019.  Tao sought assistance from other professors to identify potential recruits, and when researchers emailed him to inquire about working at KU, Tao often redirected them to FZU.  Tao also encouraged Luan Nguyen, then a post-doctoral researcher on Tao's team at KU, to apply to work at FZU.  Nguyen applied and he received an offer from FZU.  Nguyen testified that Tao "passed along the offer" to him.[38]

---

[35] Ex. 203.

[36] Ex. 512A at 21:55–57, 04:42–04:55; *see also* Ex. 514A.

[37] Ex. 512A at 13:58–20:34.

[38] Trial Tr. Day 9 at 119:11.

While Nguyen was considering the offer, beginning around August 2018, he tried to help Tao obtain equipment to set up a laboratory at FZU.  Tao instructed Nguyen to work on this with Yu Tang, who had recently earned a Ph.D. from KU and joined FZU's faculty.  In December 2018, Tao set a schedule for Nguyen and Tang, giving them until March 31, 2019, to receive the equipment and "start to assemble and test."[39]  Nguyen obtained quotes for equipment from different vendors but never purchased any of it.  Nguyen also used a credit card provided by Tao, but that belonged to another FZU employee, to purchase copyrights to some journal articles.  In May 2019, Nguyen traveled to China with Tao to visit FZU.  Tao told him not to tell others about the trip.  Nguyen testified that, based on his observations, "it look[ed] like [Tao] was working with people at Fuzhou University," but he did not know if Tao ever worked, or ever would work, for FZU.[40]  In the end, Nguyen declined FZU's offer.

In 2018 and 2019, Tao traveled extensively to China.  From December 11, 2018, to August 20, 2019, Tao spent most of his time in China, save for a few short trips back to the United States.

### F.    KU Disclosure Requirements

When Tao joined KU in 2014, he signed an acknowledgment stating that he "agree[d] to follow all university policies," including the Kansas Board of Regents' Commitment of Time and Conflict of Interest Policy ("Commitment & Conflict Policy") and the Individual Financial Conflict of Interest Policy.[41]  He also certified that he had "reviewed and comprehended the policies."[42]  The Commitment & Conflict Policy provides that "a conflict of interest occurs when

---

[39] Ex. 274.

[40] Trial Tr. Day 9 at 126:2–11.

[41] Ex. 1

[42] *Id.*

there is a divergence between an individual's private, personal relationships or interests and any professional obligations to the university such that an independent observer might reasonably question whether the individual's professional actions or decisions are determined by considerations of personal benefit, gain or advantage."[43]  "Conflicts of commitment usually involve issues of time allocation."[44]

The Commitment & Conflict Policy requires KU faculty members to: (1) report on an annual basis any "consulting arrangements, significant financial or managerial interests, or employment in an outside entity whose financial or other interests would reasonably appear to be directly and significantly affected by their research or other university activities"; (2) disclose "on an ad hoc basis current or prospective situations that may raise questions of conflict of commitment or interest"; and (3) report on an ad hoc basis outside consulting activities, i.e., "all external personal, professional activities," and "secure approval prior to engaging in the activities."[45]  Moreover, "[w]ithout prior approval," full-time faculty members "must not have significant outside managerial responsibilities nor act as principal investigators on sponsored projects that could be conducted at their institution but instead are submitted and managed through another or organization."[46]  After a real or apparent conflict of interest or commitment is reported, it must be either eliminated or managed "in an acceptable manner."[47]

KU faculty members must annually disclose conflicts of interest and commitments using the university's "Institutional Responsibilities" form.  The form first requires faculty members to

---

[43] Ex. 3 at 2–3.

[44] *Id.* at 2.

[45] *Id.* at 4–5.

[46] *Id.*

[47] *Id.* at 2.

disclose "all activities [the faculty member] perform[s] in the scope of [their] work for the

University."[48]  The form explains that "[t]his profile of your University responsibilities helps in

determining whether your disclosed financial interests or time commitments (if applicable) could

potentially conflict with your university responsibilities."[49]  The form then goes on to require

faculty members to disclose significant financial interests and time commitments that meet the

following criteria:

> **1.  Disclosure Criteria for Significant Financial Interests (SFI)**
>
> Disclose financial interests . . . in an entity that a) reasonably
> appears to be related to your University responsibilities, and b)
> meets one or more of the following criteria:
>
> A.  A financial interest worth $5,000 or more in any entity, where
> the value is the aggregate of:
>
> i.  any remuneration received from the entity in the twelve months
> preceding the disclosure plus
>
> ii.  any equity or other legal interest in the entity as of the date of
> disclosure or, if not owned on the date of disclosure, as of the date
> of liquidation.
>
> . . . .
>
> C.  Intellectual property rights and interests (patents, copyrights)
> upon receipt of income related to such rights and interests.
>
> D.  Any reported or reimbursed travel in the past 12 months from
> any external entity that is reasonably related to your University
> responsibilities . . . .
>
> . . . .
>
> 2.  Disclosure Criteria for Time Commitments in External
> Professional Activities

---

[48] Ex. 25 at 1.

[49] *Id.*

> Disclose any entity with which you engage in personal
> professional activities that take time away from your University
> responsibilities, whether or not you receive compensation . . . .[50]

By electronically submitting the form, faculty members certify that the form "is a true, correct, and complete statement" and that they "have read and complied with the Kansas Board of Regents and University of Kansas policies on commitment of time, conflict of interest, consulting and other employment."[51]

When a faculty member reports a potential conflict of commitment or interest, the Office of Research reviews the submission to determine whether a conflict exists and, if it does, KU will put a conflict management plan in place to address it.  Similarly, before submitting a grant proposal to a federal agency, the Office of Research reviews the principal investigator's Institutional Responsibilities forms to determine if there are any conflicts of interest that need to be managed or disclosed to the agency.

Having a conflict does not, however, mean that a faculty member cannot do research or work at KU.  Reed testified that "[t]here is no policy that states that you couldn't be an employee or that you couldn't do research [if a conflict exists]; you just have to have it managed so that there's not the appearance of that conflict."[52]  Similarly, Angie Loving, Assistant Vice Provost for Human Resources at KU, testified that employees do not lose their jobs for having conflicts.  Rather, Loving explained, the Director of Research Integrity will "work through steps to determine if that conflict c[an] be managed or not with the terms of their employment."[53]  If the conflict cannot be managed, and if the employee refuses to abandon the external activity that

---

[50] *Id.* at 4.

[51] *Id.* at 8.

[52] Trial Tr. Day 2 at 161:21–162:10, 162:17–20.

[53] *Id.* at 124:4–8.

presents the conflict, then the matter could "potentially end up with HR"—but only "[i]f it meant that their employment could not continue because of that conflict."[54]

One reason KU maintains these conflict policies and controls is to comply with the Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Uniform Guidance"), located in 2 C.F.R. Part 200.  Reed testified that the Uniform Guidance requires universities to "have some sort of conflict of interest policy, and the way that [KU] ha[s] implemented it is to use the annual certification process with the ad hoc requirement to update it."[55]  Moreover, pursuant to the Uniform Guidance, NSF specifically "requires each grantee organization . . . to maintain an appropriate written and enforced policy on conflict of interest and that all conflicts of interest for each award be managed, reduced or eliminated prior to the expenditure of award funds."[56]  DOE also makes universities responsible for handling conflict of interests issues.[57]

The Office of Research seeks to ensure that KU maintains and enforces conflict of interest policies so that the university can remain eligible to receive federal research grants. Every time the Office of Research submits a grant proposal to a federal agency, it agrees to follow the Uniform Guidance and certifies that it will comply with the specific requirements of the agency, including the agency's conflict of interest requirements.

Tao never disclosed to KU any actual affiliation with or activities at FZU.  In both his 2018 and 2019 Institutional Responsibilities forms, submitted on January 29, 2018 and

---

[54] *Id.* at 124:10–16.

**[55]** Trial Tr. Day 4 at 89:4–7; *see* 2 C.F.R. § 200.112 ("The Federal awarding agency must establish conflict of interest policies for Federal awards.  The non-Federal entity must disclose in writing any potential conflict of interest to the Federal awarding agency . . . in accordance with applicable Federal awarding agency policy.").

[56] Ex. 48 at 127.

[57] *See* Trial Tr. Day 6 at 6:2–16 (explaining that DOE does not "look at issues of conflict of interest"; "[t]his is something that the university is responsible for").

September 25, 2018, respectively, he disclosed no conflicts of interest or time.  At trial, the Government asked Reed if she would have submitted Tao's grant proposals "as is" to DOE and NSF if she had known that Tao: (1) "had received a Changjiang Scholar Award"; (2) "was collaborating with [or working at] Fuzhou University"; (3) "was helping build a lab at Fuzhou University"; (4) "was recruiting students for Fuzhou University"; (5) "had submitted research proposals to the Chinese National Science Foundation"; and (6) "had been promised any funding from Fuzhou University."[58]  She responded no; before submitting, she would have updated the grant proposals and put a conflict management plan in place.  The last proposal KU had submitted to a federal agency to support Tao's research was in 2017—before Tao had been selected as a Changjiang Scholar.  But Tao made no ad hoc disclosures thereafter either.

### G.     NSF

In May 2018, about one month before NSF awarded the grant for which KU applied in 2017, an NSF program manager asked Tao to update his "current and pending support" information.[59]  NSF's Proposal and Award Policies and Procedures Guide states that "current and pending support" includes all current and pending research support, whether paid or unpaid, from any source, and "all other projects or activities requiring a portion of time of the [principal investigator] . . . even if they receive no salary support from the project(s)."[60]  NSF uses current and pending support information to assess whether the individual has the capacity to carry out the research as proposed, and to determine whether there is any overlap or duplication with the proposed project.  On May 18, 2018, Tao told NSF that his only current and pending research

---

[58] Trial Tr. Day 3 at 54:6–9, 59:22–24.

[59] Ex. 142.

[60] Ex. 48 at 56.

support came from DOE and NSF.  He did not disclose any information about an affiliation with or activities at FZU.

NSF's Chief of Research Security Strategy and Policy, Rebecca Keiser, testified that if Tao had disclosed this information, NSF would have assessed that information for "capacity, duplication, and overlap."[61]  She elaborated: "if that information had been disclosed, it might influence the considerations about whether [he] had the capacity to perform the grant, if he had many other research obligations.  We would have to look through it to see . . . if there was any concerning overlap or duplication between what was being funded by the other organizations and what NSF was funding."[62]

Dr. Keiser testified that she was unaware of any allegations in this case that Tao did not perform his research for NSF precisely in the matter prescribed or that he used NSF funds to support any foreign organizations.  She expressed concern that a researcher who fails to disclose that they have an affiliation or are doing research elsewhere "might be doing th[e] NSF funded research in another place using other equipment that they haven't told" NSF about, making it difficult "to trust that the research was done as the researcher had told us they were going to do it."[63]  But she was unaware of any allegations that this happened here.  Dr. Keiser was the only witness from NSF called to testify at trial.

**H.     DOE**

In July 2018, Tao sent Dr. Viviane Schwartz, a program manager for DOE, updated current and pending support information she requested in connection with his December 2017 DOE grant proposal.  Like NSF, DOE requests current and pending support information to assess

---

[61] Trial Tr. Day 5 at 91:4–5.

[62] *Id.* at 91:5–11.

[63] *Id.* at 111:6–16.

capacity, duplication, and overlap.  Tao did not disclose any information about an affiliation with or activities at FZU.

Dr. Schwartz testified that she would have wanted to know if Tao had received any foreign research support to verify that he had the capacity to perform the DOE research and to assess whether there were any overlap concerns.  But she was not interested in whether he had a second job at a foreign university or whether he was given funding to build a laboratory there:

> Q.      . . . .  [W]ould you have wanted to know if he had a second job at a Chinese university while having his full-time job at KU?
>
> A.      Since I'm not his employer, I really don't verify, you know, jobs, per se.  That is not my role as a program manager. . . .
>
> . . . .
>
> Q.      And when you were reviewing his renewal, would you have wanted to know whether he had been promised or received funding from a foreign research university or institution to build a laboratory?
>
> A.      To build a laboratory?  I don't think that would be of my concern.
>
> Q.      And is that because it's – the building of the laboratory is sort of a distinct concept from your perspective versus the actual research that he might be doing in that he might be doing in that laboratory?
>
> A.      Correct.[64]

As for Tao's research for DOE, Dr. Schwartz agreed "the research got done" and that "it appeared to have been done satisfactorily."[65]  She also praised Tao's work internally to DOE in June 2019:

> This is the first year after the renewal [of the grant] and the [principal investigator] continues [to] report[] nicely their recent advances with an output of (at least) four new publications on

---

[64] Trial Tr. Day 6 at 10:2–7, 11:9–18.

[65] *Id.* at 19:1–5.

> which our grant was the major contributor.  The publications are
> (as usually with this [principal investigator]) in high impact
> journals (JACTS, Nature Comm., Langmuir, among others). . . .
> [T]he [principal investigator] also contributed to a very
> comprehensive review in the field published this year at Chem
> Rev. . . .  The output is very good and supportive of continued
> funding.[66]

The metrics DOE uses to measure grant success include, among other things, the number of articles published under the grant, the number of citations to those articles, and journal impact factor.  Based on DOE's metrics, Dr. Schwartz viewed Tao's research for DOE as a success.[67] Dr. Schwartz was the only witness from DOE called to testify at trial.

## I.    Spring 2019 Course Buyout

Tao never mentioned FZU to anyone at NSF or DOE.  And he did not disclose to KU that he had been named a Changjiang Scholar or Changjiang Distinguished Professor at FZU.  Tao told a former KU student whom he was trying to recruit to FZU: "If someone else mentions it to you, pretend you didn't know right?  You don't, you don't need to go . . . mention this to others . . . saying I, that is, I got some Changjiang Scholar award or anything like that."[68]  Tao told another of his former KU students to not use Tao's FZU email address in emails with other US-based colleagues.[69]  This was consistent with FZU's president's advice to Tao.  In a recorded phone call, the president told Tao not to leave any trace of his job at FZU "in writing or anything.  Because that would be evidence."[70]

---

[66] Ex. 36.

[67] Trial Tr. Day 6 at 20:14–21:12.

[68] Ex. 511A at 15:43–16:14.

[69] Ex. 253.

[70] Ex. 521A.

In May 2018, shortly after returning from China, Tao did tell KU that he planned to collaborate with a professor at FZU.  He sent KU's Office of Research a proposed subaward contract with FZU for a collaborative research project and worked with the Office of Research to prepare a budget and review the proposed contract.  He also proposed using part of the budget to buy out of teaching one course in spring 2019.

Tao told the Office of Research that FZU "hope[d] to start [the research project] ASAP."[71]  But after the Office of Research sent a markup of the draft contract to FZU in June 2018, FZU stopped replying to their emails.  After several months went by, the Office of Research asked Tao if he knew the status of the contract.  Tao responded that "[t]here were a few competitors for that fund" and that he "was not successful in the competition."[72]

The same day he first sent the Office of Research the proposed subaward contract, Tao emailed Dr. Weatherley requesting a leave without pay for the spring semester of 2019.  In support, Tao attached a letter from Robert Schlögl, a German professor, inviting him to collaborate in Germany in the spring and summer of 2019.  Dr. Weatherley denied the request because he was concerned about the impact the leave would have on Tao's future promotion to full professor and on his department's funding.

About a month later, on June 22, 2018, Tao submitted to Dr. Weatherley a request to buy out of teaching the one course he was scheduled to teach in the spring semester of 2019.  Tao represented to Dr. Weatherley that FZU would fund the buyout and that the buyout was necessary for him to focus on his "research projects[,] including [the FZU subaward] project, [and his] NSF-Career and DOE projects."[73]  Tao also said the buyout would allow him "to travel

---

[71] Ex. 153 at 1.

[72] Ex. 211 at 1.

[73] Ex. 165 at 1.

. . . to access public facilities and instruments located at synchrotron centers in other states or countries for these projects."[74]

Dr. Weatherley approved the buyout request three days later.  Dr. Weatherley's approval was subject to three standard conditions: (1) that Tao "arrange the transfer of dollars from [his] accounts to the department account amounting to 13.5% of [his] nine month salary + fringes"; (2) that Tao's other duties, "including advising, committee work, [and] other service to [KU]," continue; and (3) that Tao "be in attendance on campus during the semester in accordance with KU policy."[75]  But Dr. Weatherley testified at trial that there is no policy requiring faculty members to stay on campus when they have no other classes to teach the semester of the buyout. A buyout, Dr. Weatherley told Tao, is "designed to provide flexibility for highly active researchers."[76]

Tao spent most of the spring 2019 semester in China.  During that semester, Tao lied to Dr. Weatherley about his whereabouts, claiming that he was doing research in Germany.  For instance, Tao notified Dr. Weatherley by email in January 2019 that he would miss an upcoming faculty retreat because he was attending "conferences in Germany."[77]  Dr. Weatherley testified that Tao's whereabouts did not matter to him; he just wanted to be informed that Tao would not attend the retreat.  Faculty members do not always attend these retreats, and Dr. Weatherley found "nothing unusual" about Tao's email.[78]

---

[74] *Id.*

[75] Ex. 167.

[76] Trial Tr. Day 3 at 182:8–11.

[77] Ex. 225.

[78] Trial Tr. Day 3 at 198:2–4.

Later that same month, Dr. Weatherley emailed Tao requesting that he promptly submit paperwork necessary for accreditation of the department's undergraduate and graduate programs. Dr. Weatherley said that "the [National Accrediting Body for Engineering and Technology ("ABET")] committee met . . . and noted that [Tao's] ABET Outcome Evaluations for [a] course [he taught] in academic year 2018-19 [wa]s missing."[79]  Tao submitted the required paperwork by the deadline Dr. Weatherley gave him.  And although Dr. Weatherley did not ask, Tao again falsely claimed that he was "traveling in Germany."[80]

Two months later, in March 2019, Dr. Weatherley emailed Tao requesting that he promptly meet with twenty-two of his undergraduate advisees.  These students needed to enroll in classes for the fall semester that week but had been unable to reach Tao for advising.  Dr. Weatherley testified that after he sent this email, he understood the matter was taken care of, because he "didn't hear about it anymore."[81]

After the spring 2019 semester ended, someone from Tao's department contacted Jane Johns, a KU administrator, to ask which research grant would cover Tao's buyout.  She reviewed Tao's available funding sources, identified three—two NSF grants and one DOE grant—and sent Tao an email asking him which one he wanted to use for the buyout.  Johns testified that she directed this question to Tao because "it was his call which funding he was going to use."[82]  Tao selected his NSF CAREER grant.

In his buyout request to Dr. Weatherley, Tao proposed to use funds from FZU, not NSF, to cover the buyout.  But using FZU funds was not a requirement.  Dr. Weatherley testified that

---

[79] Ex. 321.

[80] *Id.*

[81] Trial Tr. Day 3 at 201:5–6.

[82] Trial Tr. Day 4 at 231:5–6.

if the proposed subaward contract with FZU fell through, as it did, Tao could use other available grant funds to cover the buyout.  Dr. Weatherley explained that Tao "had a significant portfolio of funding" and could select any funds available to him.[83]  Dr. Weatherley was never "too concerned" about where the funds to cover the buyout would come from.[84]

## III.   Discussion

Tao moves for a judgment of acquittal on all four counts of conviction.  He argues that the evidence was insufficient to convict him on the three wire fraud counts, and that the Government presented an infirm theory of fraud.  He also argues that the evidence was insufficient to prove any of the essential elements on the false statement count.  If the Court declines to acquit him on any of the four counts, Tao requests that the Court order a new trial.

### A.   Legal Standards

Fed. R. Crim. P. 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  The rule permits the court to reserve decision on a Rule 29 motion and decide it "after [the jury] returns a verdict of guilty."[85]  When the court reserves decision, "it must decide the motion on the basis of the evidence at the time the ruling was reserved."[86]  Because Tao renewed his motion for judgment of acquittal at the close of the defense's case and after the jury returned a verdict, the Court considers all the evidence presented at trial.

---

[83] Trial Tr. Day 3 at 142:25

[84] *Id.* at 142:24–25.

[85] Fed. R. Crim. P. 29(b).

[86] *Id.*

A defendant who challenges the sufficiency of the evidence after a conviction "bears a heavy burden."[87]  In ruling on a motion for judgment of acquittal, the court asks "only whether, taking the evidence—both direct and circumstantial, together with reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt."[88]  In so doing, the court does not weigh "conflicting evidence or the credibility of witnesses."[89]  "But even under this deferential standard," the court will enter a judgment of acquittal "if the evidence does no more than raise a mere suspicion of guilt or requires piling inference upon inference to conclude the defendant is guilty."[90]  "While the jury may draw reasonable inferences from direct or circumstantial evidence," inferences cannot be based on mere "speculation and conjecture."[91]  And "[t]he evidence supporting the conviction must be substantial."[92]

Under Rule 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  When considering a Rule 33 motion, courts are generally "free to weigh the evidence and assess witness credibility."[93]  But the Tenth Circuit has held that "[s]ufficiency-of-the-evidence challenges made in a Rule 29 or Rule 33 motion are adjudicated and reviewed under the same standard."[94]  While courts have greater discretion under Rule 33 than Rule 29, "a

---

[87] *United States v. Almaraz*, 306 F.3d 1031, 1040 (10th Cir. 2002).

[88] *United States v. Baldridge*, 559 F.3d 1126, 1134 (10th Cir. 2009) (quoting *United States v. Beers*, 189 F.3d 1297, 1301 (10th Cir. 1999)).

[89] *United States v. Tennison*, 13 F.4th 1049, 1059 (10th Cir. 2021)

[90] *United States v. Cordova*, 25 F.4th 817, 824 (10th Cir. 2022) (alteration in original) (quoting *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015)).

[91] *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015) (*United States v. Arras*, 373 F.3d 1071, 1073 (10th Cir. 2004)).

[92] *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998) (citing *United States v. Taylor*, 113 F.3d 1136, 1144 (10th Cir. 1997)).

[93] *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999).

[94] *Dewberry*, 790 F.3d at 1028.

motion for new trial is regarded with disfavor"[95] and should be granted "only in exceptional circumstances in which the evidence preponderates heavily against the verdict."[96]

### B.     Wire Fraud Counts

Tao challenges his wire fraud convictions in Counts 4, 6, and 7.  To secure the wire fraud convictions, the Government had to prove the following elements: "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of interstate wire or radio communications to execute the scheme."[97]  Tao argues that the Government failed to prove any of these elements at trial.  Because it is dispositive here, the Court reaches only the question of whether the Government presented sufficient evidence to prove the first element—the existence of a scheme to defraud.

The Indictment alleges that Tao devised a scheme to defraud and obtain money and property.  As fully explained hereafter, when viewed in the light most favorable to the Government, the evidence did not prove that Tao obtained money or property.  Rather, the evidence merely proved that Tao continued to receive his full-time salary from KU, keep access to his research laboratory there, and receive disbursements of federal grant funds for research from DOE and NSF already awarded to KU.  Viewing the evidence in the light most favorable to the Government, no reasonable jury could find that Tao's conduct, however deceitful, amounted to a scheme to deprive KU, DOE, or NSF of money or property.

---

[95] *Quintanilla*, 193 F.3d at 1146.

[96] *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994) (citation omitted).

[97] *United States v. Zander*, 794 F.3d 1220, 1230–31 (10th Cir. 2015) (quoting *United States v. Ransom*, 642 F.3d 1285, 1289 (10th Cir. 2011)).

1.      **Scheme to Defraud: The Federal Wire Fraud Statute**

The wire fraud statute makes it a crime to effect with use of wires "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."[98]  Construing the statute's "disjunctive language as a unitary whole," the Supreme Court has held that "the money-or-property requirement of the latter phrase" limits the former.[99]  "The wire fraud statute thus prohibits only deceptive 'schemes to deprive [the victim of] money or property.'"[100]  And that deprivation "must play more than some bit part in a scheme: It must be an 'object of the fraud.'"[101]  So to prove a scheme to defraud, the Government must "show not only that [the defendant] engaged in deception, but that an 'object of the fraud was property.'"[102]

2.      **Scheme to Defraud: Inducement/Benefit of Bargain Theory**

Tao argues that the Government failed to prove that he deprived KU, NSF or DOE of money or property because he never induced them to enter into a bargain they would have otherwise avoided, and that they received the so-called benefit of their bargain.  Tao maintains that the evidence showed that he fully performed his research obligations to KU, NSF, and DOE even during the spring 2019 semester when he had a buyout of his teaching responsibilities.

The Government claims that Tao's scheme nonetheless deprived KU, DOE, and NSF of money or property because his deceitful conduct fraudulently induced them to give him his

---

[98] 18 U.S.C. § 1343.

[99] *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987)); *see also United States v. Zar*, 790 F.3d 1036, 1050 (10th Cir. 2015).

[100] *Kelly*, 140 S. Ct. at 1571 (alteration in original) (quoting *McNally*, 483 U.S. at 358).

[101] *Id.* at 1573 (quoting *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)).

[102] *Id.* at 1571 (alterations omitted) (quoting *Cleveland v. United States*, 531 U.S. 12, 26 (2000)).

salary, access to his laboratory at KU, and federal grant funds.[103]  Relying on the Tenth Circuit's

decision in *United States v. Richter*,[104] the Government contends that whether Tao performed the

services expected of him is not dispositive, so long as Tao deprived KU, NSF or DOE of money

or property by fraudulently inducing them to provide him his salary, access to his laboratory and

federal grant funds.

In contrast, Tao's benefit-of-the-bargain argument relies upon nonbinding decisions:

*United States v. Takholov*,[105] an Eleventh Circuit decision involving bar owners who were

charged with fraudulently luring businessmen into their establishments,[106] and two recent district

court decisions in which professors were acquitted of wire fraud charges stemming from their

hiding their Chinese affiliations while seeking and working on federal grants.[107]

In *Richter*, the Tenth Circuit joined the Fourth, Seventh, and Eighth Circuits in holding

that the property fraud statutes reach deceptive schemes to induce a party into entering a contract

it would not enter if it had been told the truth—even when the defendant performs the agreed

---

[103] The Government asserted for the first time in posttrial briefing that Tao also deprived KU of its right to Nguyen's time and labor by directing Nguyen to assist him in building a laboratory at FZU.  This was neither alleged in the Indictment nor proven at trial.  While Nguyen testified that he tried to help Tao build a laboratory at FZU, there is no evidence that Nguyen obtained quotes on equipment or performed any other activities related to this effort while on the clock at KU.

[104] 796 F.3d 1173 (10th Cir. 2015).

[105] 827 F.3d 1307, 1315 (11th Cir. 2016) (revisiting the definition of "scheme to defraud" and holding that none exists when the alleged "victims 'receive . . . exactly what they paid for.'" (quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007))), *opinion modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016)).

[106] To the extent *Takholov* holds that the property fraud statutes do not criminalize fraud-in-the-inducement schemes, it is at odds with *Richter*.

[107] *See United States v. Hu*, No. 3:20-CR-21-TAV-DCP-1, 2021 WL 4130515, at *13 (E.D. Tenn. Sept. 9, 2021) (finding acquittal of professor was warranted because even if he had deceived NASA about his affiliation with a Chinese university, the deception did not go to the nature of the bargain as NASA received exactly the type of research that it bargained for); *United States v. Xiao*, No. 21-40039 (S.D. Ill. May 3, 2020), Tr. of Ruling on Rule 29 Mot. filed at Doc. 290-2 (orally granting defendant's Rule 29 motion for acquittal because though there was evidence of deceit, the benefits reasonably anticipated by NSF matched what defendant delivered or intended to deliver in research).

services.[108]  In these cases, the defendant's deceptive conduct results in a property deprivation "in the very elementary sense" that the victim's money goes to someone who would not have received it had the victim known the truth.[109]  As the Tenth Circuit explained, "payments made in exchange for services provided under a contract induced by false pretenses, even where the services are performed, constitute a deprivation of money or property sufficient to invoke the federal fraud statute."[110]  The Government asserts that this is what happened here.  But, as more fully explained below, the principles announced in these cases lead to one conclusion—Tao's conduct did *not* constitute a scheme to defraud, because no reasonable jury could have concluded that he induced either DOE, NSF, or KU to give him money or property that it would not have had it known the truth, and DOE, NSF and KU received all that they bargained for.

In *Richter* two executives of a waste removal and recycling business promised customers that the company would recycle or destroy their electronic waste domestically, completely, and in a lawful and environmentally sound manner.[111]  Despite these promises, the company exported e-waste to Hong Kong and China.[112]  "The heart of the government's fraud case [wa]s that . . . customers, relying on such representations, paid the defendants to dispose of their e-waste in a particular way—lawfully, domestically, and completely—but did not get the benefit of that bargain because [the company] unlawfully exported e-waste."[113]

---

[108] *Richter*, 796 F.3d at 1194 (first citing *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006); then citing *United States v. Bunn*, 26 F. App'x 139 (4th Cir. 2001); and then citing *United States v. Granberry*, 908 F.2d 278 (8th Cir. 1990)).

[109] *Id.* (quoting *Granberry*, 908 F.2d at 280).

[110] *Id.* at 1192.

[111] *Id.* at 1178–79.

[112] *Id.* at 1179.

[113] *Id.* at 1191–92.

On appeal, the defendants argued that there was no deprivation of money because "the e-waste removal services that were paid for were actually performed," even if "the services were not performed in a particular way."[114]  Rejecting this argument, the Tenth Circuit held:

> [The] customers paid to have their e-waste disposed in accordance
> with the defendants' factual representations, which were material
> to the customers' decisions.  A reasonable trier of fact could
> conclude the customers were induced to pay for services under
> false pretenses: the pretenses that their e-waste would be
> completely destroyed, in the United States, in a lawful and
> environmentally sound manner.[115]

The Tenth Circuit concluded that the customers were "deprived of their money in the very elementary sense that [their] money ha[d] gone to [a company that] would not have received it if all the facts had been known."[116]  In so holding, the Tenth Circuit observed that, under similar circumstances, the Fourth, Seventh, and Eighth Circuits had "held that payments made in exchange for services provided under a contract induced by false representations, even where the services are performed, constitute a deprivation of money or property sufficient to invoke the federal fraud statutes."[117]

In *United States v. Granberry*, the defendant lied about his murder conviction to obtain a school bus operator's permit, and then lied about it again to obtain employment as a bus driver with a Missouri school district.[118]  A grand jury indicted him for mail fraud.[119]  The indictment alleged that "[i]f the conviction had been known, the State would not have issued him a license,

---

[114] *Id.* at 1192.

[115] *Id.*

[116] *Id.* at (alterations in original) (quoting *Granberry*, 908 F.2d 278, 280 (8th Cir. 1990)).

[117] *Id.* (first citing *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006); then citing *United States v. Bunn*, 26 F. App'x 139 (4th Cir. 2001); and then citing *Granberry*, 908 F.2d at 279–80).

[118] *Granberry*, 908 F.2d at 279.

[119] *Id.*

nor would the School District have hired him."[120]  Seeking to dismiss the indictment, the

defendant argued that he did not deprive the school district of money or property because the

district got what it paid for—"a competent school-bus driver."[121]  The defendant also noted that

the school district would have paid the same amount of money to another driver had it not hired

him.  The Eighth Circuit rejected the defendant's argument, holding:

> What the School District wanted was a competent school-bus
> driver who was truthful and had not been convicted of a felony,
> and this is not what it got.  The School District has been deprived
> of money in the very elementary sense that its money has gone to a
> person who would not have received it if all of the facts had been
> known.[122]

The court also concluded that the school district had been deprived of property because the

school district had the right to control how to spend its money, and the defendant's

misrepresentations induced it to part with that money under false pretenses.[123]

And *United States v. Bunn*[124] and *United States v. Leahy*[125] both involved defendants

convicted of fraud for making "false representations to attain government contract[s]" to which

they were not entitled.[126]  In *Bunn*, a contractor used disadvantaged business enterprises

("DBEs") as "fronts" on bids for highway construction projects in West Virginia to circumvent

federal and state DBE requirements.[127]  The defendants argued that because "the subcontract

---

[120] *Id.*

[121] *Id.* at 280.

[122] *Id.*

[123] *Id.*

[124] 26 F. App'x 139 (4th Cir. 2001).

[125] 464 F.3d 773 (7th Cir. 2006).

[126] *United States v. Richter*, 796 F.3d 1173, 1193 (10th Cir. 2015).

[127] *Bunn*, 26 F. App'x at 141.

work was performed satisfactorily," there was no deprivation of money.[128]  The Fourth Circuit rejected the argument, concluding: "The Government's evidence established that [the defendants] obtained money to which they were otherwise not entitled by falsely representing that subcontract work would be performed by DBEs.  Nothing more is required."[129]

Similarly, the defendants in *Leahy* were convicted of mail and wire fraud arising out of a scheme "to cheat the City of Chicago out of funds slotted for minority- and women-owned businesses."[130]  Seeking to take advantage of the Chicago ordinance, one of the defendants, a white man, gave the city the false impression that his mother and a black man ran his businesses.[131]  Through his fraud scheme, that defendant won lucrative contracts with the City.[132]  On appeal, the defendants argued that the indictment could not support the convictions because they "fulfilled their obligations under the relevant contracts or subcontracts."[133]  The Seventh Circuit disagreed, concluding that the city suffered a property deprivation "in that it paid for services provided by [a minority-owned business] or [women-owned business] that it did not receive," and the contracts at issue "would not have been awarded in the absence of the [minority-owned/women-owned business] certifications obtained through fraud."[134]

In sum, *Richter*, *Granberry*, *Bunn*, and *Leahy* all hold that a defendant schemes to deprive another of money or property when the defendant's deceitful conduct induces a party into entering a contract that it would not enter if it knew the truth—even if the defendant

---

[128] *Id.* at 142.

[129] *Id.* at 142–43.

[130] *Leahy*, 464 F.3d at 778.

[131] *Id.* at 779–81.

[132] *Id.* at 781.

[133] *Id.* at 787.

[134] *Id.* at 788–89.

performs satisfactorily under that contract.  The fact that the victim receives the services it paid for does not mean that it received all that it bargained for.

Unlike in *Richter*, *Granberry*, *Bunn*, and *Leahy*, the evidence, together with all reasonable inferences drawn in favor of the Government, does not permit any reasonable jury to conclude that Tao's deceit induced DOE, NSF, or KU to contract with him.

### a.      Inducement—DOE and NSF Grant Awards

There was insufficient evidence to allow a reasonable jury to find that DOE or NSF would not have awarded the grant funds at issue had Tao told the truth.  Dr. Schwartz of DOE and Dr. Keiser of NSF both testified that the federal agencies have no policy prohibiting principal investigators from having foreign academic appointments or participating in foreign talent programs.  To be sure, NSF would have wanted to know about Tao's affiliation with and activities at FZU,[135] and both NSF and DOE would have wanted to know if Tao had any foreign research support.  Dr. Keiser and Dr. Schwartz testified that the federal agencies would have used the information to assess Tao's capacity and potential overlap or duplication.  But neither Dr. Keiser nor Dr. Schwartz testified that the agencies would have determined, or even would have likely determined, that there were capacity, overlap, or duplication issues that meant the scope or amount of the grants required adjustment or that the grants should not have been awarded at all.

The Government argues that Tao's deceit prevented KU from assessing whether his foreign activities posed a conflict of interest that needed to be managed.  Both DOE and NSF expected KU to manage principal investigators' conflicts of interest, and NSF specifically

---

[135] This information was not relevant to DOE.  Dr. Schwartz testified that whether Tao had a second job at another university or was promised funding to build a laboratory in China was not "of [her] concern."  Trial Tr. Day 6 at 11:9–14.

required KU to manage, reduce, eliminate, or disclose conflicts in accordance with KU policy before the expenditure of award funds. The Government points to Alicia Reed's testimony that, if she had known about Tao's work at FZU, she would not have submitted the grant proposals to fund his research "as is" to the agencies.[136]

But the evidence was that KU submitted all the grant proposals at issue *before* Tao was even selected as a Changjiang Scholar in January 2018. Moreover, neither Reed nor any other witness from KU testified or suggested that Tao's foreign affiliation and activities presented, or likely presented, a conflict of interest that would have led KU to not submit his grant proposals to DOE or NSF or to prohibit him from working on the grants once awarded. KU would have simply put a management plan in place. Thus, there is no evidence that Tao fraudulently induced DOE or NSF to award grant funds.

### b.   Inducement—KU Employment of Tao

There is also no evidence that Tao induced KU to enter into an employment contract with him. The reason is simple: KU hired Tao in 2014—several years before the Government claimed the scheme began. As more fully discussed below,[137] the Court is not convinced that *Richter* can be read more broadly to support the proposition that the wire fraud statute also covers schemes to maintain a pre-existing contractual right like a salary. But even if it could, the evidence was insufficient to allow a reasonable jury to conclude that KU would have fired Tao or revoked his access to KU facilities and equipment had he told the truth.

The Government asserts that if Tao had told the truth, KU "would have needed to decide whether to restrict his access to federal funds, convert him to a part-time employee, or terminate

---

[136] Trial Tr. Day 3 at 54:5–10.

[137] *See infra* Part III.B.4.

his employment."[138]  The Government cites no evidence supporting that assertion, and the Court

cannot find any such evidence in the trial record.  While the Government points to the testimony

of Angie Loving from KU Human Resources, she testified that KU employees do not get fired

for having conflicts of interest.  Instead, Loving explained, if a conflict of interest is disclosed,

the matter "go[es] to the director of research integrity," who then "review[s] the conflict of

interest stated" and "work[s] through steps to determine if that conflict could be managed or not

with the terms of their employment."[139]  Only if the conflict cannot be managed—and the

employee refuses to abandon the unmanageable conflict—can the employee "potentially" be

referred to Human Resources, but only "[i]f it meant that their employment could not continue

because of that conflict."[140]  Reed similarly testified that having a conflict does not make a

faculty member ineligible to work at KU or to do research there; the conflict "just . . . ha[s] to

[be] managed so that there's not the appearance of that conflict."[141]  The Government called

multiple witnesses from KU at trial, and not one testified or suggested that if Tao had disclosed

his foreign affiliation and activities, KU would have terminated his employment, converted him

to a part-time employee, or revoked his access to KU's research facilities and equipment.[142]

### c.    Benefit of Bargain—Research for DOE and NSF

As a fallback argument, the Government contends that even if it needed to prove that

DOE, NSF, and KU did not receive what they bargained for, the evidence still supports his

---

[138] Doc. 302 at 52.

[139] Trial Tr. Day 2 at 124:4–9.

[140] *Id.* at 124:10–16.

[141] *Id.* at 162:17–20.

[142] The Government notes that when KU learned about the allegations in this case, it immediately placed Tao on administrative leave to investigate, and terminated his access to its facilities and equipment.  But the fact that KU placed Tao on administrative leave pending an internal investigation after he was indicted on federal criminal charges is not evidence that, had Tao told KU about FZU in the first place, KU would have terminated his employment.

convictions.  The Court disagrees.  The evidence presented at trial showed that all three received what they bargained for.

DOE awarded KU grant funds in exchange for the research Tao had proposed.  And there is no evidence that Tao did not carry out that research as proposed to DOE's satisfaction.  On the contrary, Dr. Schwartz agreed that "the research got done" and that "it appeared to have been done satisfactorily."[143]  She also praised Tao's work internally to DOE in June 2019, more than a year into Tao's alleged scheme, and stated that Tao's research "output [wa]s very good and supportive of continued funding."[144]  Based on DOE's grant success metrics, Dr. Schwartz viewed Tao's research for DOE as a success.  There is simply no evidence that DOE did not receive the benefit of its bargain.

Like DOE, NSF provided grant funds in exchange for the research Tao had proposed.  And there is no evidence that NSF did not receive what it bargained for.  Dr. Keiser testified that she was unaware of any allegations that Tao's research for NSF was not performed precisely in the manner prescribed.  While she expressed some concern at the possibility that a researcher who fails to disclose an affiliation and research support might perform NSF-funded research using unapproved equipment, the Government never alleged, argued, or introduced any evidence that Tao performed his research for NSF using unapproved equipment outside of KU.[145]  Dr. Keiser also testified that she was unaware of any allegations that NSF funds were used to support

---

[143] Trial Tr. Day 6 at 19:1–5.  Agent Lampe also testified that he had no reason to believe that DOE was not fully satisfied with his research.

[144] Ex. 36.

[145] Dr. Keiser also testified that NSF requests information about the "facilities, equipment, and other resources" necessary for the research but already available to the researcher, because "if it's already available" and "it's going to be used on the project, then we don't need to provide funding for that as part of the NSF grant." *Id.* at 228:10–19.  The Government contends that "at no time did [Tao] tell anyone from NSF, as required, that he planned to use any equipment or facilities outside of KU to work on his federal grants." Doc. 302 at 20.  But again, there is no evidence that Tao used unapproved equipment in China to work on an NSF grant.

foreign organizations,[146] and there is no evidence that any payments or expenditures made under the NSF grants were improper.  Moreover, in a June 2018 email to Tao, a program manager at NSF wished him "continued success" on his research after reviewing and approving his progress report.[147]  And the principal investigator on one NSF grant, Dr. Bala Subramaniam, testified that Tao's scholarly output on the grant was strong and that he was pleased with the quality of Tao's work.  No jury could reasonably conclude that NSF did not get what it paid for.

### d.        Benefit of Bargain—KU

KU also received what it bargained for.  Tellingly, in April 2019—almost a year into the alleged scheme—Tao was one of four professors at KU to receive the University Scholarly Achievement Award, in recognition of his significant research contribution.  At the awards ceremony, Dr. Girod lauded Tao's accomplishments, noting that Tao had "far exceeded expectations in his field in terms of his productivity and really his level of ingenuity."[148]  Dr. Girod also commended Tao for his external service and for developing a "world[-]class lab" and "a very strong team" of researchers at KU.[149]  FBI Special Agent Stephen Lampe conceded at trial that Tao's recognition suggested he "was performing his job duties at [KU]."[150]  Dr. Weatherley, Tao's supervisor and department chair, testified that Tao was a solid faculty member and that he had supported Tao's nomination for the University Scholarly Achievement Award.  Tao's wife, and Nguyen, one of Tao's graduate students, testified that Tao never missed

---

[146] Dr. Keiser testified that "it's very important" for researchers to be "transparent about all parts of the research," including who they "collaborat[e] with, so that we can trust the research results and make sure we're also responsibly giving out research funding."  Trial Tr. Day 5 at 94:21–23.  But the Government never alleged, argued, or presented any evidence that Tao lied about any part of the research he did for NSF or collaborated with anyone in China on his NSF research.

[147] Ex. 154 at 1.

[148] Trial Tr. Day 2 at 77:16–20.

[149] *Id.* at 78:16–25.

[150] Trial Tr. Day 11 at 111:4–11.

a day of work.  Tao worked seven days a week, and except for Sundays, he typically worked fourteen to sixteen-hour days.  To Nguyen's knowledge, Tao never took any vacations.

The Government argues that the evidence showed that KU was not "fully satisfied with his performance."[151]  The Government points to Tao's annual evaluations, in which Dr. Weatherley noted that Tao had areas for improvement or further development, including teaching, student advising, and faculty committee service.  The Government also cites communications between Dr. Weatherley and Tao showing that Tao missed a faculty retreat, failed to timely submit paperwork for department accreditation, and failed to timely advise undergraduate students.

But Dr. Weatherley's testimony discredits the Government's argument.  Tao, like most if not all employees, had areas of strength and areas of needed development.  And "like many faculty," Dr. Weatherley explained, Tao's teaching fell in the latter category.[152]  Dr. Weatherley testified that teaching, advising, and internal service were the areas Tao needed to develop "to get a good strong case for *promotion*," and that there was nothing unusual about Tao's annual evaluations.[153]  Indeed, providing feedback on a faculty member's strengths and weaknesses in an annual evaluation is "[v]ery common"; it is a purpose of the evaluation.[154]  It is also not uncommon for faculty members to miss faculty retreats, and Dr. Weatherley saw nothing unusual about Tao's email stating he would not attend.  To the extent Tao was dilatory in submitting required paperwork for accreditation and advising undergraduate students, Dr. Weatherley testified that after he contacted Tao about these matters, they were resolved.  This

---

[151] Doc. 302 at 40.

[152] Trial Tr. Day 2 at 103:1.

[153] Trial Tr. Day 3 at 110:23–111:7 (emphasis added).

[154] *Id.* at 174:25–175:11.

evidence is insufficient to allow a jury to find that Tao did not provide KU with what it paid him for.

In sum, a reasonable jury could not conclude that, had Tao told the truth, he would not have received his salary, access to KU facilities and equipment, or the federal grant funds. The evidence was also insufficient to allow a reasonable jury to conclude that DOE, NSF, and KU did not get what they bargained for.

### 3.      Scheme to Defraud: Risk of Loss to KU or NSF Theory

The Government also asserts that by preventing KU from assessing whether his foreign activities presented a conflict that needed to be managed or disclosed to NSF, Tao imposed a substantial risk of loss on KU and NSF. The Government relies on *United States v. Welch*,[155] but that reliance is misplaced. The defendants in *Welch* were officers of the Salt Lake City Bid Committee ("SLB") for the 2002 Winter Olympic Games, a not-for-profit corporation.[156] The indictment alleged that the Committee had agreed to "act in accord with the [International Olympic Committee's ("IOC")] instructions to candidate cities," which prohibited bribery.[157] Nonetheless, the defendants allegedly used SLBC funds to bribe members of the IOC into choosing Salt Lake City to host the Winter Olympic Games.[158] The bribes were allegedly worth about $1 million.[159] According to the indictment, neither the SLBC nor its contributors were aware of the bribes.[160]

---

[155] 327 F.3d 1081 (10th Cir. 2003).

[156] *Id.* at 1084.

[157] *Id.* at 1085.

[158] *Id.*

[159] *Id.*

[160] *Id.* at 1086.

In challenging their wire fraud and mail fraud charges, the *Welch* defendants argued that the indictment failed to allege a deprivation of money or property because SLBC's funds were used for their intended purpose—"to get the Games."[161]  Indeed, the SLBC stood to benefit from the defendant's scheme to bring the Games to Salt Lake City through bribery.  But this did not help the defendants.  The Tenth Circuit held:

> Defendants, regardless of the end result, deprived the SLBC of its funds at the time [they] allegedly obtained them for use under false pretenses.  In other words, Defendants deprived the SLBC of property if their fraudulent conduct caused the SLBC to permit the use of its funds in a manner which the SLBC, if cognizant of the truth, would not have sanctioned.

> Just as a borrower still commits bank fraud if he knowingly provides or withholds from a bank materially false information to induce a loan and then repays it, one still may commit mail or wire fraud if he knowingly provides or withholds materially false information which imposes a substantial risk of loss on another (in this case for example, the SLBC's possible loss of donors, tax-exempt status, or even the Games) even if the risk does not materialize.  Fraudulent deprivation of another's property is no less fraudulent because it might or does result in a benefit to the defrauded.  Defendants' alleged conduct in this case could have just as easily ended in catastrophe for the SLBC.[162]

As explained above, the evidence here is insufficient to allow a reasonable jury to find that Tao's deceitful conduct caused KU or NSF to allow him to use any funds that they would not have allowed had he told the truth.  Moreover, there is also no evidence that Tao's conduct imposed a risk of loss on KU or NSF.  To be sure, NSF expects KU to maintain and enforce conflict of interest policies.  But NSF's institutional interest is that the principal investigator has the capacity to do the research, does the research, does not cause the agency to fund duplicative or overlapping research, and is not entwined with some other entity or research that may raise

---

[161] *Id.* at 1108.

[162] *Id.*

questions about the integrity of the research.  And the evidence presented at trial showed that Tao had the capacity and in fact performed the research.  There is also no evidence of any overlap, duplication or conflict of interest that could have biased Tao's research for NSF.

To the extent the Government argues that Tao imposed a risk on KU because Tao's deceitful conduct put KU at risk of losing its eligibility for NSF funding, the evidence does not support that argument.  At trial, Alicia Reed forcefully denied the suggestion that Tao's conduct exposed KU to any risk:

> Q.  . . . [I]f agencies think that your office isn't doing a good job at [complying with federal funding requirements], KU could lose hundreds of millions of dollars; is that fair?
>
> A.  True.  But we are audited every year to ensure that we have controls in place, so I'm not concerned about them thinking we're not doing a good job.
>
> Q.  You weren't concerned at all when the FBI came knocking and your office was under a microscope as to whether there were compliance issues and you were responsible?
>
> . . . .
>
> A.  I think anybody would be concerned but we often work with auditors.
>
> Q. I'm talking about the FBI. . . .
>
> A.  Honestly to me the FBI and auditors have very similar questions because they want to know if our controls are adequate and in this case I believe they are.
>
> . . . .
>
> Q.  And fair to say that notwithstanding everything that's been alleged against Dr. Tao . . . KU's reputation is quite strong?
>
> . . . .
>
> A.  I would agree.

> Q.  In fact after the investigation, KU funding went up dramatically several million dollars, tens of millions of dollars, correct?
>
> A.  I do believe that we increased five places in the [NSF's] HERD survey, yes.[163]

In short, there is no evidence that Tao's conduct put KU or NSF at any risk of loss.

### 4.   Legal Insufficiency of Salary Maintenance Theory

Finally, the Court concludes that in addition to not being supported by sufficient evidence, the Government's salary maintenance theory was legally insufficient.  The Government argued to the jury that Tao concealed his involvement with FZU from KU so that "he could continue to receive his salary."[164]  Or, said another way, an object of Tao's fraudulent scheme, according to the Government, was to "keep his KU job."[165]  Tao argues that the Government's salary maintenance theory of fraud is invalid because it is really an honest services theory, contravening longstanding Supreme Court precedent.

As the Government points out, Tao challenged the Government's salary maintenance theory in his motion to dismiss the Indictment, and this Court rejected the challenge.[166]  But at the motion-to-dismiss stage, the Court ruled upon the sufficiency of the allegations in the Indictment, not on the sufficiency of the evidence.  For this reason, the Government's argument that this Court's ruling is law of the case, is unavailing.  The law of the case doctrine posits that, generally, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."[167]  The doctrine is a discretionary doctrine

---

[163] Trial Tr. Day 3 at 63:15–65:3.

[164] Trial Tr. Day 12 at 4:10–12.

[165] *Id.* at 52:22.

[166] *See* Doc. 99, pp. 7-11.

[167] *Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275, 1279–80 (10th Cir. 2010) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).

"designed to promote finality and prevent re-litigation of previously decided issues," not a jurisdictional bar.[168]  More importantly, "[o]nly final judgments may qualify as law of the case."[169]  This Court's ruling on the motion to dismiss the Indictment was not a final judgment. Moreover, to the extent the Court ruled on issues raised in Tao's motion to dismiss, the Court is free to revisit them here in assessing *the sufficiency of the evidence presented at trial*.

Notably, certain allegations in the Indictment were not borne out by the evidence.  The Indictment alleged that Tao's scheme to defraud deprived DOE and NSF of research grant money.  But the evidence showed that DOE and NSF awarded the subject grants *before* Tao obtained the Changjiang Scholar award and before he went to FZU.  Further, the Indictment alleged that Tao's scheme to defraud deprived KU of his salary.  But the evidence showed that Tao merely maintained his pre-existing KU salary; and there was no evidence suggesting that he did not earn that salary during the buy-out semester when he was at FZU.  In fact, the evidence showed that other than his teaching duties, which had been duly bought-out, Tao continued to satisfy KU, DOE, and NSF with his prolific and productive research during the spring and summer of 2019.

In the order denying Tao's motion to dismiss, this Court declined, absent controlling Tenth Circuit law, to draw the distinction made in some unpublished decisions from district courts in the First Circuit, that mere maintenance of a preexisting salary or employment was legally infirm but obtaining a new position, or an increase in salary or the payment of a bonus could be sufficient to satisfy the "money or property" element of the wire fraud statute.[170]  In any

---

[168] *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011) (citing *Wilson v. Meeks*, 98 F.3d 1247, 1250 (10th Cir. 1996)); *see also Pepper v. United States*, 562 U.S. 476, 506 (2011).

[169] *In re Unioil, Inc.*, 962 F.2d 988, 993 (10th Cir. 1992); *United States v. Bettenhausen*, 499 F.2d 1223, 1230 (10th Cir. 1974).

[170] Doc. 99 at 9 (first citing *United States v. Billmyer*, Nos. CRIM 94-29-01-JD, CRIM 94-29-03-JD, CRIM 94-29-04-JD, 1995 WL 54471, at *9 (D.N.H. Feb. 3, 1995), *aff'd sub nom United States v. Joselyn*, 99 F.3d 1182

event, it is now clear that the wire fraud counts in this case rest on Tao continuing to receive his pre-existing salary, and on grants that were awarded before the alleged scheme commenced. In light of the evidence, the Court agrees with Tao, that the government's theory of salary maintenance is indeed infirm.

Recent case law provides helpful guidance. In *United States v. Yates*,[171] the Government charged bank executives with conspiracy to commit bank fraud for concealing their bank's financial condition, and argued at trial that the defendants' fraudulent scheme aimed to deprive the bank of their salaries and bonuses.[172] The Ninth Circuit rejected the claim:

> Of course, salaries and "other financial employment benefits" are both forms of "money." If obtaining a new job or a higher salary is the object of a defendant's fraudulent scheme, then the deprivation of that salary can in some circumstances support a fraud conviction.
>
> But there is a difference between a scheme whose object is to obtain a new or higher salary and a scheme whose object is to deceive an employer while continuing to draw an existing salary— essentially, avoiding being fired. The history of the Supreme Court's treatment of fraud in the employment context demonstrates why that distinction matters.[173]

Before the Supreme Court's decision in *McNally v. United States*,[174] courts interpreted the federal fraud statutes to criminalize schemes to defraud another of the intangible right of honest services.[175] Honest services prosecutions typically involved bribery and kickback

---

[171] 16 F.4th 256 (9th Cir. 2021).

[172] *Id.* at 263. The Supreme Court has construed the wire, mail, and bank fraud statutes similarly. *See Neder v. United States*, 527 U.S. 1, 20–21 (1999).

[173] *Yates*, 16 F.4th at 266 (quoting *United States v. Ratcliff*, 488 F.3d 639, 644 (5th Cir. 2007)) (citations omitted)).

[174] 483 U.S. 350 (1987).

[175] *See Skilling v. United States*, 561 U.S. 358, 401 (2010) ("[B]y 1982, all Courts of Appeals had embraced the honest-services theory of fraud." (citation omitted)).

schemes, but an employee's breach of duty to their employer also could constitute honest services fraud: "The actual deception [there] . . . is in the continued representation of the employee to the employer that he is honest and loyal to the employer's interest."[176]

*McNally* "stopped the development of the intangible-rights doctrine in its tracks."[177] "Rather than constru[ing] the statute[s] in a manner that leaves [their] outer boundaries ambiguous and involves the Federal Government in setting standards of setting disclosure and good government for local and state officials," the Supreme Court read the fraud statutes "as limited in scope to the protection of property rights."[178]  Justice Stevens, dissenting in *McNally*, argued that deprivations of the intangible right of honest services could be recharacterized as deprivations of money or property, because "[w]hen a person is being paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer—who is not getting what he paid for."[179]

The Government's salary maintenance theory of fraud here echoes Justice Stevens's dissent in *McNally*.  The theory goes something like this: Tao deprived his employer of money because KU paid him a salary for his loyal services, and he breached that loyalty through fraud by concealing his affiliation with another university.  But as the United States District Court for the District of Columbia recently explained in *Guertin*:

> [T]hat's just private-sector honest-services fraud—a case in which the employee's criminal conduct arises out of his 'continued representation . . . to the employer that he is honest and loyal to the employer's interests.'  True, the alleged *breach of duty* is different here—[the defendant] violated a contractual duty of honesty, not a fiduciary duty of honesty—but the alleged *deprivation* arising out

---

[176] *United States v. Procter & Gamble Co.*, 47 F. Supp. 676, 678 (D. Mass. 1942).

[177] *Skilling*, 561 U.S. at 401.

[178] *Id.* at 402 (quoting *McNally*, 483 U.S. at 360).

[179] *McNally*, 483 U.S. at 377 n.10 (Stevens, J., dissenting).

of that breach is the same.  In either case, the victim's deprivation is the loss of the employee's bargained-for loyal services.[180]

To allow the Government to recast fraudulent schemes to deprive an employer of honest services as ones to deprive the employer of the employee's pre-existing salary would "let in through the back door the very prosecution theory that [the Supreme Court] tossed out the front."[181]  "In almost every honest-services prosecution the defendant receives a salary from the victim of the fraud (an employer/governmental agency)."[182]  If the Government could call it property fraud just by pointing to the employee's pre-existing salary, the Court would sanction an end-run around *McNally*.[183]  This Court would also give prosecutors a weapon to "criminalize a wide range of commonplace conduct."[184]

This conclusion finds support in the plain text of the statute, too.  Section 1343 proscribes schemes "for obtaining money or property."  "Obtain" and "maintain" are not synonyms.  To "obtain" is "[t]o bring into one's own possession; to procure, esp. through effort."[185]  By contrast, to "maintain" is "[t]o continue in possession of,"[186] connoting "action to preserve the

---

[180] *United States v. Guertin*, 581 F. Supp. 3d 90, 96 (D.D.C. 2022) (quoting *Procter & Gamble Co.*, 47 F. Supp. at 678) (citing *United States v. Yates*, 16 F.4th 256, 267 (9th Cir. 2021)).

[181] *Yates*, 16 F.4th at 267 (quoting *United States v. Ochs*, 842 F.2d 515, 527 (1st Cir. 1988)); *Guertin*, 581 F. Supp. 3d at 96.

[182] *Guertin*, 581 F. Supp. 3d at 96.

[183] *See id.*

[184] *Yates*, 16 F.4th at 267 (citing *McDonnell v. United States*, –U.S.–, 136 S. Ct. 2355, 2373 (2016)); *see Skilling v. United States*, 561 U.S. 358, 402–03 (2010) ("To satisfy due process, a penal statute must define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

[185] *Obtain*, Black's Law Dictionary (11th ed. 2019).

[186] *Id.*

status quo."[187]  Plainly, then, § 1343 requires that the "defendant's scheme sought to gain

possession of something not previously in his possession."[188]

Although the Government argued that Tao sought to "obtain" his salary, this usage does

not fit the ordinary meaning of the word: "It is a contradiction in terms to say a defendant's

scheme enables him to 'obtain' a pre-existing contractual right like a 'continued salary.'  The

only way to make sense of that contradiction would be to ignore the active, affirmative

connotations of the word 'obtain.'"[189]  The Court will not do that.[190]  For these reasons, the Court

finds that the Government's salary maintenance theory was legally insufficient.

The Government asserts that, even if the Court rejects the salary maintenance theory, it

still presented a valid salary theory of fraud because Tao obtained: (1) a summer salary, to which

he had no pre-existing contractual right; (2) the $10,000 "bonus" prize that came with his

University Scholarly Achievement Award in 2019; (3) leave and sick time; and (4) his spring

2019 buyout.  The Court rejects the Government's eleventh-hour theories of fraud.  These

theories were neither alleged in the Indictment nor argued at trial, and the Court cannot assume

that the jury convicted on theories that were never presented to them.  But even if the

Government had properly alleged and argued these theories, they find no support in the evidence.

First, there is no evidence that Tao made a material misrepresentation to obtain his

summer salary.  The summer salary was funded by DOE and NSF, and neither KU nor Tao had

discretion on whether the funds would be disbursed to him because they were budgeted as part of

---

[187] *Guertin*, 581 F. Supp. 3d at 92–93.

[188] *Id.* at 92.

[189] *Id.* ("The Government relies on tortured semantics . . . .").

[190] *See id.*; *cf. Agrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning.").  If any doubt remained about whether the word "obtaining" as used in § 1343 can be read to mean "maintaining," the Court would resolve that ambiguity in favor of lenity.  *See Yates v. United States*, 574 U.S. 528, 547–48 (2015).

his grants.  And, as explained above, there is no evidence that Tao, who performed all the research required of him, fraudulently induced anyone into giving him grant funds that he would not have received had he told the truth.

Second, Tao did not deprive KU of the $10,000 prize that came with the University Scholarly Achievement Award.  The Government points out that "[c]uriously, despite the Changjiang Distinguished Professor position's prestige, [Tao] did not mention it in his nominating letter."[191]  But there is no evidence that Tao would not have received the award had he mentioned it.  In fact, even when the Government directly questioned Dr. Girod on this issue at trial, Dr. Girod did not testify that the information would have had any effect on whether Tao received the award.  Dr. Girod merely said that the information would have been relevant to KU's "conflict process," under which KU would "determine . . . whether that was advantageous to the university, and if so how we would resolve conflicts of time and other things."[192]

Third, Tao did not fraudulently obtain leave and sick time.  As an initial matter, Angie Loving testified that faculty do not earn vacation leave and that KU does not give faculty members paid time off.  And the Government presented no evidence that Tao fraudulently obtained sick time to which he was not entitled.

Finally, there is no evidence Tao fraudulently obtained the buyout.  Tao represented in his buyout request that the proposed FZU subaward contract would fund the buyout.  He also represented that he would work on that collaborative project, as well as on his DOE and NSF research, the semester of the buyout.  But the FZU subaward contract was still in negotiations at the time, and Dr. Weatherley did not condition his approval of the buyout on the contract

---

[191] Doc. 302 at 22.

[192] Trial Tr. Day 2 at 60:20–61:6.

materializing.  What's more, Dr. Weatherley expressly rejected the Government's suggestion that if the contract with FZU fell through, there would be no funds to cover the buyout.  The Government asked Dr. Weatherley: "[I]f [the proposed contract with FZU] wasn't entered into, there would be no source of funding for a buyout, would there?"[193]  Dr. Weatherley responded that, actually, there would be, because Tao had a "significant portfolio, so he would have had access to overhead for those grants or he could have paid maybe some of his own salary in that way to buy out."[194]  Dr. Weatherley was therefore never "too concerned" about where the funds to cover the buyout would come from.[195]  Tao ultimately chose to fund the buyout with an NSF grant, and there is no evidence that this was improper.  Indeed, Jane Johns testified that it was Tao's "call which funding he was going to use" for the buyout, and she saw no issue with him selecting an NSF grant because he had those funds available to him.[196]

Tao clearly engaged in deceitful conduct. But the Government did not prove that Tao's efforts to conceal his affiliation with or activities at FZU University amounted to a scheme to deprive KU, DOE, or NSF of money or property.  The Court therefore grants Tao's motion for judgment of acquittal on the wire fraud counts.

## C.     False Statement Count

Tao next challenges the sufficiency of the evidence to support his conviction on Count 9, which charged a violation of 18 U.S.C. § 1001.  Count 9 alleged that, "through his submission of an Institutional Responsibilities form" on September 25, 2018:

> Dr. Tao falsely represented to the [KU], an institution that
> requested and received funds from [DOE] and [NSF], that he had

---

[193] Trial Tr. Day 3 at 206:1–2.

[194] *Id.* at 206:36.

[195] *Id.* at 142:24–25.

[196] *Id.* at 231:5–6.

> no conflicts of time or interest; when in truth, as Dr. Tao then knew, he was affiliated with [Fuzhou University] as a Chang Jiang Distinguished Professor and was receiving financial and other benefits, which he had a duty to disclose.[197]

Section 1001 is a "sweeping" statute that prohibits lying to the federal government.[198] The statute criminalizes making a false statement "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States."[199]  To support a conviction for making a false statement under § 1001(a)(2), the Government must prove five elements beyond a reasonable doubt: "(1) the defendant made a statement; (2) the statement was false, fictitious, or fraudulent as the defendant knew; (3) the statement was made knowingly and willfully; (4) the statement was within the jurisdiction of the federal agency; and (5) the statement was material."[200]  The Court finds that the jury had sufficient evidence to convict on Count 9.

### 1. Jurisdiction

Tao contends that the KU Institutional Responsibilities form was not a matter within the jurisdiction of NSF or DOE because neither agency has the authority to review the form, much less the power to exercise authority over employee submissions of this form to KU.  The Court rejected this argument at the motion to dismiss stage, and for largely the same reasons, the Court rejects it again.

---

[197] Doc. 278 at 6–7 (Jury Instructions); *see also* Doc. 75 ¶ 44 (Second Superseding Indictment).

[198] *United States v. Rodgers*, 466 U.S. 475, 479 (1984).

[199] 18 U.S.C. § 1001(a)(2).

[200] *United States v. Williams*, 934 F.3d 1122, 1128 (10th Cir. 2019) (quoting *United States v. Harrod*, 981 F.2d 1171, 1175 (10th Cir. 1992)).

The term "jurisdiction" in § 1001 "should not be given a narrow or technical meaning."[201]  The term refers to a federal agency's or department's "power to exercise authority in a particular situation,"[202] and that power need not include "the power to make final or binding determinations."[203]  "A false statement falls within that jurisdiction when it concerns the 'authorized functions of an agency or department,' rather than 'matters peripheral to the business of that body.'"[204]  The false statement need not be made directly to the agency or department to fall within its jurisdiction.[205]

The Court finds that Tao's Institutional Responsibility form fell within the jurisdiction of NSF.  NSF awarded federal funds to KU specifically to support Tao's research.  "NSF requires each grantee organization . . . to maintain an appropriate written and enforced policy on conflict of interest and that all conflicts of interest for each award be managed, reduced or eliminated prior to the expenditure of award funds."[206]  "Conflicts that cannot be satisfactorily managed, reduced or eliminated, and research that proceeds without the imposition of conditions or restrictions when a conflict of interest exists, must be disclosed to NSF via use of NSF's electronic systems."[207]

Thus, NSF relies on the grantee organization, KU, to identify conflicts of interest and ensure that those conflicts are managed or disclosed before the expenditure of NSF funds.  The evidence at trial showed that to ensure compliance with federal funding requirements such as

---

[201] *Rodgers*, 466 U.S. at 480 (quoting *Bryson v. United States*, 396 U.S. 64, 70 (1969)).

[202] *Id.* at 479.

[203] *Id.* at 482.

[204] *United States v. Wright*, 988 F.2d 1036, 1038 (10th Cir. 1993) (quoting *Rodgers*, 466 U.S. at 479).

[205] *Id.*

[206] Ex. 48 at 127.

[207] *Id.* at 12.

NSF's, KU uses the information in Institutional Responsibilities forms submitted by principal investigators like Tao to determine whether any conflicts exist that need to be managed, reduced, or eliminated.  NSF's ability to safeguard its funds is not merely peripheral, but rather an authorized function of the agency.[208]  And NSF had direct authority to control whether Tao received those funds.  The Court therefore finds that Tao's Institutional Responsibilities form fell within NSF's jurisdiction.

### 2.      False Statement

Viewed in the light most favorable to the Government, Tao's Institutional Responsibilities form was a false statement.  Tao argues that under § 1001(a)(2), the Government cannot rely on an omission of information in the form.  But by electronically submitting the form, Tao certified that (1) the form was "true, correct, and complete," (2) he had "read and complied with the Kansas Board of Regents and University of Kansas policies on commitment of time, conflict of interest, consulting and other employment," (3) he would "secure approval" for any "consulting or outside employment" before engaging in the activities, and (4) he would "report any changes" to the form "as soon as they become known to [him] and no later than 30 days after acquiring a new significant financial interest."[209]  This certification constitutes a statement under § 1001(a)(2), even though the underlying conduct could be characterized as an omission or concealment.[210]

As an initial matter, Tao's argument that the Government's false-certification theory constitutes a "fatal variance" from the Indictment is unavailing.  The Indictment alleged that the Institutional Responsibilities form was itself a false statement, which includes the certification.

---

[208] *See United States v. Jackson*, 608 F.3d 193, 197 (4th Cir. 2010) (collecting cases).

[209] Ex. 25 at 8.

[210] *See United States v. Celis*, 128 F. App'x 819, 819 (2d Cir. 2005).

And the jury was properly instructed on this false statement charge, including the allegations in the Indictment and the requisite elements of the offense.[211]  Tao also argues that the Government deviated from the Indictment when it argued that Tao caused KU to make a false statement, thus aiding and abetting KU.  While the Court agrees with Tao that there was no evidence identifying any false statement by KU, the Court instructed the jury that "[s]tatements, questions[,] and arguments of counsel are not evidence," and admonished the jury to base its verdict solely on the trial evidence.[212]  Under Tenth Circuit precedent, this Court must presume that the jury "follow[ed] its instructions, even when there has been misleading argument,"[213] and there is no evidence here to the contrary.

The Government first contends that Tao's certification was false because he did not disclose a significant financial interest.  But the Court agrees with Tao that the Government failed to prove that he had a significant financial interest, which is defined as a financial interest worth $5,000 or more in an entity that "reasonably appears to be related to your University responsibilities."[214]  The Government presented no evidence that Tao received any remuneration from FZU.  And, although a reasonable jury could conclude that Tao received some form of remuneration during his eight months at FZU, there was no evidence from which it could be inferred that Tao received $5000 or more.

---

[211] Doc. 278, Nos. 2, 13.

[212] Doc. 278, No. 33.

[213] *Bland v. Sirmons*, 459 F.3d 999, 1015 (10th Cir. 2006) (first citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); then citing *Boyde v. California*, 494 U.S. 370, 384 (1990); and then citing *Lingar v. Bowersox*, 176 F.3d 453, 460–61 (8th Cir. 1999)).

[214] Ex. 25 at 4.

Although the Court finds that the Government did not make a false statement by certifying that he had no significant financial interest, a reasonable jury could find beyond a reasonable doubt that the certification was false because Tao had conflicts of time or interest. Tao did not secure approval from KU for consulting or other employment activities he engaged in at FZU, including advising graduate students, applying for research funding in China, obtaining quotes to purchase equipment for the lab and recruiting students to join his research team at FZU. There was also evidence that Tao had a time commitment in an entity with which he "engage[d] in personal professional activities that take time away from your University responsibilities."[215] A reasonable jury could conclude that Tao's eight-month-long stint at FZU demonstrated a commitment of time in activities reasonably related to his KU responsibilities, which included (at both KU and FZU), procuring equipment and managing a lab (or planning to manage a lab), applying for research funding, advising graduate students, and recruiting students to join his research team.[216]

### 3. Materiality

When viewed in the light most favorable to the Government, the evidence established that the Institutional Responsibilities form was materially false. A false statement is material if "it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed."[217] Materiality is a mixed question of law and

---

[215] *Id.*

[216] Unlike the wire fraud counts, which required the Government to prove that Tao's deception was part of a scheme to deprive KU, DOE, or NSF of money or property, the false statement element of this offense only required the Government to prove that the statement was known to be untrue or made with reckless indifference as to its truth or falsity. *See* Doc. 278, No. 13.

[217] *United States v. Williams*, 934 F.3d 1122, 1128 (10th Cir. 2019) (quoting *United States v. Williams*, 865 F.3d 1302, 1310 (10th Cir. 2017)).

fact.[218]  In determining whether the Government presented enough evidence to support a jury's

materiality finding under § 1001, the court asks three questions: "(1) What statement was made?

(2) What decision was the decision maker considering? (3) Was the statement capable of

influencing the relevant decision?"[219]

The Government presented sufficient evidence of materiality.  It is true that NSF never

sees a principal investigator's KU Institutional Responsibilities forms, and there is no evidence

that had Tao disclosed his foreign activities to KU, KU would have disclosed this information to

NSF.  There is no evidence that NSF would have ever received Tao's statement.  Yet, NSF

required KU to ensure that any conflicts held by principal investigators are managed or disclosed

to NSF in accordance with KU policy before the expenditure of grant funds.  Tao's false

certification prevented KU from fulfilling its responsibility to determine whether his affiliation

with FZU presented a conflict of interest, and if so, what steps needed to be taken to manage,

reduce, or eliminate that conflict before the expenditure of NSF funds.  This evidence was

sufficient to allow the jury to find beyond a reasonable doubt that Tao's false statement had a

natural tendency to influence NSF.

### 4.     Knowingly and Willfully Made a False Statement

There was also sufficient evidence for a reasonable jury to find that Tao knowingly and

willfully made a false statement in certifying his Institutional Responsibilities form.  Tao argues

that he did not act knowingly and willfully because what constituted a financial interest in an

entity that "reasonably appears to be related to your University responsibilities" was ambiguous

language that Tao could reasonably interpret to mean that a second position at FZU was not

---

[218] *Id.* (citing *United States v. Gaudin*, 515 U.S. 506, 512–14 (1995)).

[219] *Id.* (quoting *United States v. Christy*, 916 F.3d 814, 853–54 (10th Cir. 2019)).

related to his position at KU and not subject to disclosure.  Tao points to Dr. Girod's testimony that this language means that "if the entity is unrelated to one's university responsibilities, there's nothing to report,"[220] and Dr. Girod's acknowledgement that the form does not explain "what it means to be related or unrelated."[221]  And, Tao argues, a reasonable reading of the time commitment disclosure requirement is that he only needed to disclose the position if he believed it interfered with his position at KU over the past year.

Of course, as the Government posits, the false statement count does not solely depend on whether Tao had a Significant Financial Interest or Time Commitment.  By submitting his Institutional Responsibilities form, Tao certified not only that it was "true, correct, and complete" but also that he had "complied" with all of KU's policies on commitment of time, conflict of interest, consulting, and other employment.

To be sure, the Tenth Circuit has held that "in cases arising under 18 U.S.C. § 1001, . . . the government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct where reporting requirements are ambiguous."[222]  But, when viewed in the light most favorable to the Government, the evidence proved beyond a reasonable doubt that Tao in fact understood the disclosure requirements and knowingly and willfully signed the certification that failed to disclose his affiliation with FZU.

The best evidence that Tao acted knowingly and willfully was Tao's own words and conduct.  By January 2018, Tao had been selected a Changjiang Scholar and had commenced

---

[220] Trial Tr. Day 2 at 71:9–20.

[221] *Id.* at 72:1–3.

[222] *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994).  At trial, Tao requested an ambiguity jury instruction on this issue, and the Court rejected that request because the evidence did not show that there were two reasonable interpretations of the language in the Institutional Responsibilities form.  Tao also failed to propose a jury instruction that instructed the jury on what the two reasonable interpretations would be.

employment contract negotiations with FZU.  The draft contract required that he work full-time for FZU and relinquish any salary from any concurrent post.  Over the next several months, as he continued to negotiate with FZU, Tao sought advice from several colleagues about navigating his desire to maintain his employment at KU on either a full-time or part-time basis because he did not want to give up his research team at KU.  One friend, a professor at the Georgia Institute of Technology, advised him that he needed to "clearly" disclose to KU what he was seeking to do at FZU and at KU.

Tao had a similar discussion with a colleague at KU, notably not telling that colleague about his opportunity and negotiations with FZU, but deceptively advising that he had an opportunity in Germany and asking the colleague whether KU allowed professors to convert their appointments from full-time to half-time.  That colleague also advised Tao to be transparent with Tao's department chair.  Tao had a conversation with still another friend, in which Tao described his dilemma in wanting to sign the contract for full-time employment with FZU, but Tao's family's reluctance to move back to China.  These conversations evidence that Tao was aware that he needed to disclose the truth to KU in attempting to accomplish an appointment at FZU.

The jury had other evidence pointing to Tao's knowledge and willfulness.  Recorded conversations and evidence seized from Tao's home and lab indicated that Tao was aware that other professors involved in China talent programs were under investigation or prosecution.  Tao forwarded articles concerning these prosecutions to his wife.[223]  And when Tao's professor friend at Georgia Tech advised Tao that he needed to tell KU about the FZU position, Tao responded, "some people don't say anything, that's for certain.  But if I don't say anything, then .

---

[223] Ex. 203.

. . . it would definitely be problematic if this thing were ever looked into."[224] Tao also mentioned the FBI investigations of other scientists.[225]

Further, Tao told his graduate student Nguyen not to tell anyone about Tao taking Nguyen with him to FZU, even while Tao passed on to Nguyen FZU's employment offer to Nguyen. And Tao told another of his former KU students to not use Tao's FZU email address in emails with other US-based colleagues.[226]  This was consistent with FZU's president's advice to Tao.  In a recorded phone call, `FZU's president told Tao not to leave any trace of his job at FZU 'in writing or anything.  Because that would be evidence."[227]

And despite the prestige of the Changjiang Scholar award, Tao concealed his receipt of the award.  He told a former KU student whom he was trying to recruit to FZU: "If someone else mentions it to you, pretend you didn't know right?  You don't, you don't need to go . . . mention this to others . . . saying I, that is, I got some Changjiang Scholar award or anything like that."[228]

Moreover, a reasonable jury could infer that Tao understood the disclosure requirements, given his long and prolific history of research funded by government agencies.  Tao had served as a research reviewer on panels for both DOE and NSF.  Tao had numerous grant proposals and awards,[229] and had submitted numerous annual Institutional Responsibilities Forms.[230]  And on

---

[224] Ex. 512A at 21:55-57, 04:42-04:55; *see also* Ex. 514A.

[225] Ex. 512A at 13:58–20:34.

[226] Ex. 253.

[227] Ex. 521A.

[228] Ex. 511A at 15:43–16:14.

[229] Trial Tr. Day 3 at 10:14–15:25 (spreadsheet summarizing Tao's grant proposals and awards).

[230] Exs. 22–25.

other occasions, when Tao had a question about disclosure requirements, he did not hesitate to ask his department chair or mentor.[231]

In short, there was sufficient evidence for the jury to conclude that Tao was affiliated with FZU as a Changjiang Scholar or Changjiang Distinguished Professor, that he knew he should have disclosed the affiliation to KU but chose not to, and that his certification that he had complied with all of KU's policies on commitment of time, conflict of interest, consulting, and other employment was therefore false.  For these reasons, the Court denies Tao's motion for a judgment of acquittal on the false statement count.[232]

## IV.  New Trial

Tao makes little attempt to show that the interest of justice requires a new trial, reiterating only that the evidence is insufficient to sustain the guilty verdicts.  While the Court agrees the Government presented insufficient evidence to sustain his convictions for wire fraud, and thus grants Tao's motion for judgment of acquittal on those counts, the Court finds that the evidence is sufficient to support his conviction on the false statement count and that there is no ground for a new trial on that count of conviction.  The Court therefore denies Tao's request for a new trial.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Feng Tao's Motion for Judgment of Acquittal, or, in the Alternative, for a New Trial (Docs. 286, 290) is **granted in part and denied in part**.  The motion for judgment of acquittal is **granted** on Counts 4, 6, and 7.  The motion for judgment of acquittal and for new trial is **denied** as to Count

---

[231] *See, e.g.*, Exs. 117–118 (Tao emailing chairs and mentor to ask if serving as an editor of a scientific journal would pose "any potential issue conflicting with KU policy"); Ex. 292 (Tao asking KU Office of Research on March 3, 2017 what he should "do for clearance of conflict of interest" if his wife started a company).

[232] The Court also rejects Tao's due process challenge.  He asserts that the Government's prosecution theory violates the Due Process Clause's fair warning requirement.  Tao raised this argument in his motion to dismiss, and the Court rejected it.  *See United States v. Tao*, 499 F. Supp. 3d 940, 963–66 (D. Kan. 2020).  For the same reasons stated in the Court's order denying his motion to dismiss, the Court rejects it again here.

9.  The Clerk of the Court shall enter a judgment of acquittal on Counts 4, 6 and 7 of the Second Superseding Indictment.

**IT IS SO ORDERED.**

Dated: September 19, 2022

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE
