1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,

4         Plaintiff,

5         v.                          Case No. 19-20052-01-JAR

6    FENG TAO, a/k/a "Franklin
     Tao,"                            Kansas City, Kansas
7                                     Date:  March 22, 2022
          Defendant.
8                                     Day 2 (Pages 1-221)

9    .........................

10                     TRANSCRIPT OF JURY TRIAL

11          BEFORE THE HONORABLE JULIE A. ROBINSON
         SENIOR UNITED STATES DISTRICT COURT JUDGE
12

13                  A P P E A R A N C E S

14
     For the                 Mr. D. Christopher Oakley
15   Plaintiff:              United States Attorney's Office
                             500 State Avenue
16                           Room 360
                             Kansas City, Kansas 66101
17
                             Mr. Adam Barry
18                           Department of Justice-Nsd
                             950 Pennsylvania Avenue, NW
19                           Washington, DC 20530

20   For the                 Mr. Peter R. Zeidenberg
     Defendant:              Mr. Michael F. Dearington
21                           Arent Fox, LLP
                             1717 K Street NW
22                           Washington DC, 20008

23

24   _____
                 Proceedings recorded by machine shorthand,
25        transcript produced by computer-aided transcription.

<pre>
1                            I N D E X

2
     Government's Witnesses:                              Page
3
     DOCTOR DOUGLAS A. GIROD
4      Direct Examination By Mr. Oakley                    38
       Cross Examination By Mr. Zeidenberg                 64
5      Redirect Examination By Mr. Oakley                  82

6    ANGIE LOVING
       Direct Examination By Mr. Oakley                    88
7      Cross Examination By Mr. Dearington                 110
       Redirect Examination By Mr. Oakley                 137
8      Recross Examination By Mr. Dearington              141

9    ALICIA REED
       Direct Examination By Mr. Oakley                   143
10

11                        E X H I B I T S

12   Government's
     Exhibits              Offered            Received
13
               1             89                  89
14             3             92                  92
              3A             93                  93
15             4             94                  94
               5            206                 206
16             9             97                  98
              11             99                  99
17            12            101                 101
              13            102                 102
18            14            103                 103
              15            105                 105
19            21            109                 109
              22            183                 183
20            23            199                 199
              24            202                 202
21            25             72                  73

22
     Defendant's
23   Exhibits              Offered            Received

24          1115            136                 136
            1448             69                  69
25          1449             70                  70
            1450             77                  77
</pre>

1          (Court called to order).

2          (The following proceedings were held outside the

3    presence of the jury).

4          THE COURT:  Did you have something to take up before

5    we bring the jury in?

6          MR. BARRY:  We did, Your Honor.  Good morning.

7          THE COURT:  Good morning.

8          MR. BARRY:  As you're aware, there's a lot of media

9    coverage on this case.  We learned yesterday that -- after we

10   got out that during jury selection one of the sequestered

11   witnesses held a press conference outside.

12         And so in light of that, we just wanted to make -- we

13   would ask that the judge just remind the jury obviously to not

14   listen to any media about the case and to also -- just in case,

15   to make sure there aren't any issues.  If they happen to

16   inadvertently be exposed to the media about the case, to just

17   let the court know so we can deal with any issues that may come

18   up.  Hopefully there won't be any, but we just wanted to let

19   the court know that.

20         THE COURT:  Okay.  We had gotten word that that was

21   going on, but our understanding was by the time we recessed

22   that there wasn't anybody there.  So I wasn't -- and I did not

23   get the impression that when we took breaks or anything,

24   anything was going on so that people would've been exposed.

25   But I give an overnight admonition every night during trial

1    reminding them about media coverage.  Are you asking that I do

2    that now before we get started today?

3            MR. BARRY:  I think if you do it every night, that

4    would be sufficient.  We just want to make sure -- I don't know

5    if there's going to be continuing coverage, but just that the

6    jurors know that if they happen to be inadvertently exposed to

7    something - you know, it's on the local news, it's on in the

8    background - that they just let the court know that

9    affirmatively so that we can just make sure that, you know,

10   even in light of that, hopefully they can still just decide the

11   case on the facts and the evidence introduced in the case

12   itself.

13           THE COURT:  Okay.  I don't usually tell them to let me

14   know, but I'll try to remember that.  If I don't, prompt me

15   when I'm giving that admonition.  Okay?

16           MR. BARRY:  Thank you, Your Honor.

17           THE COURT:  All right.  Okay.  So is there anything

18   else?

19           Are all the jurors here, Bonnie?

20           COURTROOM DEPUTY:  They weren't ten minutes ago, but I

21   will go check and make sure.

22           (The following proceedings were held in the presence

23   of the jury).

24           THE COURT:  All right.  You can be seated and welcome

25   back.

1          All right.  Ladies and gentlemen of the jury, we're

2    going to proceed with opening arguments -- opening statements,

3    not arguments.  We call what the lawyers present at the end of

4    the case closing arguments, but we call this opening

5    statements.  But I just want to give you some very brief

6    instructions before we get started.  You've heard much of this

7    yesterday, but I just want to remind you of some very important

8    rules of law that we proceed under.

9          The first is, of course, that Doctor Tao is presumed

10   to be innocent of the charges.  So you're about to hear from

11   the government what the charges are and what they expect the

12   evidence to be, but keep in mind what the lawyers say, either

13   the prosecutor or the defense counsel, is not evidence.  The

14   charges themselves, not evidence.  Doctor Tao is presumed to be

15   innocent.

16         And so let's talk about evidence.  The evidence that

17   you're going to rely upon is in two general forms.  Witness

18   testimony - the witnesses are going to testify from this area

19   right here - and then whatever exhibits I admit into evidence.

20   Those may be documents, they may be videotapes, I'm not sure,

21   but various types of evidence.  What the lawyers say is not

22   evidence, what I say is not evidence.  What I -- my role is to

23   rule on issues of law.

24         So from time to time during the presentation of the

25   evidence, you may hear one of the lawyers object to something

1    and I will rule on that.  And just keep in mind those are legal

2    rulings, not meant to sway you one way or the other because

3    those legal rulings aren't evidence either.

4            One other thing I'll say about evidence is there --

5    and I say this because I know people watch lawyer shows and

6    maybe even actual trials, so you've heard the word

7    "circumstantial evidence," you may have heard the word "direct

8    evidence."  I just want you to understand there really are two

9    general types of evidence presented in any case.  One is direct

10   evidence, one is circumstantial evidence.

11           Direct evidence is very limited in terms of what it

12   actually is.  It's evidence that is presented by someone that

13   has heard, seen, read, touched, in other words, someone that

14   through their senses has perceived something and they're

15   testifying about it.  So the classic kind of direct evidence is

16   eyewitness testimony.

17           All other types of evidence are classified as

18   circumstantial evidence.  And importantly for you to understand

19   is that circumstantial evidence has just as much legal weight

20   as direct evidence.  And whether it's direct evidence or

21   circumstantial evidence, you as the jurors will determine what

22   weight to give it, but just understand that generally

23   circumstantial evidence is considered just as legitimate and

24   valid as direct evidence.

25           So that's my very preliminary instructions.

1          (Opening statements were previously transcribed and

2     are included here for completeness of the record).

3          THE COURT:  With that, I will turn to the government.

4     Are you ready to proceed with your opening statement?

5          MR. BARRY:  Yes, Your Honor.

6          THE COURT:  Okay.

7          MR. BARRY:  Good morning.  It's February 27th, 2018

8     and the defendant, Franklin Tao, has a problem so he dials up

9     his friend, another scientist at Georgia Tech, to ask for

10    advice, but what that scientist doesn't know is that the

11    defendant is about to secretly record that phone call.

12          In that secretly recorded call, you'll hear the

13    defendant describe his problem.  You see, he's a full-time

14    professor at the University of Kansas in Chemical and Petroleum

15    Engineering, but he's just been offered a very attractive job

16    at a research university in China and he doesn't know what to

17    do.  Should he give up the KU job, should he take the China

18    job, or should he try to do both?  So the Georgia Tech

19    professor gives him some advice.  He says, if you're upfront

20    with KU, you tell them the truth, you shouldn't have any

21    problems.  Maybe they'll even let you work out a situation

22    where you can do both.

23          But the evidence in this case will show that that is

24    not what the defendant did.  He ignored his friend's advice,

25    but he still came up with a solution and that solution was to

1    lie.  What the evidence in this case will show is that for over

2    a year, from 2018 to 2019, the defendant lied, cheated, and

3    concealed his second job at a research university in China from

4    KU and from the federal government that had been giving him

5    hundreds of thousands of dollars to fund his research.

6              Now, this case isn't just about that second job in

7    China.  It's about the lies, it's about the fraud, it's about

8    the concealment, and it's about the deceit that the defendant

9    used for over a year to conceal that second job so that he

10   could get paid his full-time salary at KU and so that he could

11   continue to benefit from the hundreds of thousands of dollars

12   in federal taxpayer money to fund his research.

13             Now, this is my opportunity to give you an overview of

14   what the government will present to you to prove its case.  So

15   I just want to give you a sort of 30,000-foot preview of what

16   the evidence is going to show.

17             The first thing it's going to show is that since 2014

18   the defendant has been a full-time professor at KU in chemistry

19   and chemical and petroleum engineering.  The evidence will show

20   that his expertise is catalysis, which basically just means

21   using substances to speed up a chemical reaction or to change

22   the conditions under which a chemical reaction occurs.  An

23   example is that you drove here today, your car probably had a

24   catalytic converter.  That uses catalysis to reduce the amount

25   of harmful pollutants that go into the atmosphere.

1          The evidence will also show that as part of his

2    full-time position he earned over $100,000 a year from KU and

3    that KU expected him to have what's called a 40/40/20 split.

4    That means 40 percent of his time should be spent on research,

5    40 percent of his time should be spent teaching, and 20 percent

6    of his time should be spent on service to KU.

7          The evidence will also show that while at KU the

8    defendant received hundreds of thousands of dollars in federal

9    grant money from the National Science Foundation and from the

10   U.S. Department of Energy.  The evidence will show that that

11   evidence *[sic]* was used to build him an expensive laboratory,

12   to purchase expensive equipment, to hire a staff of researchers

13   to perform that research.

14         The evidence will also show that from 2015 *[sic]* to

15   2019 the defendant had a second job at a research university in

16   China.

17         The evidence will show that in the summer of 2017, the

18   defendant applied for a highly competitive position in China

19   called a Changjiang Distinguished Professor Program, also

20   sometimes called the Yangtze River Distinguished Professor

21   Program.  You'll hear testimony that that program is sponsored

22   by the Chinese government and that people who participate in

23   that program receive numerous reputational and financial

24   benefits.  You will hear that the purpose of that program is to

25   recruit scientists from around the world, just like the

1    defendant, who are successful mid-level career researchers who

2    have the know-how of how to build a laboratory, how to conduct

3    science, how to publish articles, how to build a research team.

4         You'll also hear evidence that Changjiang

5    Distinguished Professors receive a salary of at least $85,000 a

6    year; that the Chinese government gives them millions of

7    dollars in research support; that they give them lab space so

8    they can build a laboratory; that they give them a budget to

9    hire a research team.

10        And you'll hear evidence that in -- around May of

11   2018, the defendant accepted a job at a university in southern

12   China called Fuzhou University, because the other thing you'll

13   hear is that to be a Changjiang Distinguished Professor - even

14   though it's a Chinese government sponsored program - you need a

15   sponsoring Chinese university.  So the evidence in this case

16   will show that around May of 2018, the defendant accepted a

17   position at Fuzhou University in southern China as a Changjiang

18   Distinguished Professor.

19        Now, you'll see a lot of evidence of different

20   varieties in this case.  You'll see e-mails in English and

21   Chinese; you'll hear translations.  You'll read translations.

22   You'll listen to the dozens of recorded phone calls that the

23   defendant secretly recorded.  You'll see documents.  And what

24   that sort of plethora of evidence will show is the sequence in

25   which the defendant applied for the position at Fuzhou

1   University.  You'll see him travel to China to defend his

2   application in front of the Chinese government.  You'll see him

3   exchange draft contracts with people who work at Fuzhou

4   University and you'll see a certificate found in his house that

5   announces that he's been appointed as a Changjiang

6   Distinguished Professor at Fuzhou University.

7           You'll hear testimony from an opinion leader on what

8   are called Chinese talent programs who will testify to the

9   significance of this certificate, who will testify to the

10  significance of a Chinese government seal.

11          Now, you won't see a signed contract, but what you

12  will see are a variety of draft contracts exchanged back and

13  forth, and then you'll also see evidence showing the defendant

14  fulfilling the key terms of that contract.  You'll see him

15  sending recruiting e-mails to scientists from around the world

16  trying to get them to join his research team at Fuzhou.  You'll

17  see him funneling post-doctoral students who reach out to him

18  at KU asking if he has a position there and him telling them,

19  are you interested in a lab at Fuzhou University?

20          You'll hear him in the recorded phone calls that he

21  secretly made trying to recruit other students of his,

22  including his former students from KU, to try to get them to go

23  to Fuzhou.  You'll see mentor/mentee cards, some of which are

24  signed by the defendant, of him agreeing to mentor students at

25  Fuzhou University.  You'll see e-mails of him negotiating the

1    prices of equipment to put in his laboratory at Fuzhou.  You'll

2    see e-mails of him ordering that equipment and you'll see

3    research proposals that he submitted to the Chinese government

4    for the Chinese government to fund research that he was going

5    to do at Fuzhou.  You'll also see his extensive travel, which I

6    will talk about shortly, to China.

7            And you don't have to take my -- you'll --

8    furthermore, you will see the defendant's own words.  You'll

9    see him sending e-mails saying, I got a joint appointment at

10   Fuzhou University-China other than the current one.  Or

11   Franklin Tao from Fuzhou and Kansas.  This is Franklin from

12   Fuzhou and University of Kansas.  You'll see his own words.

13           So how was he able to do both?  How was he able to

14   work a full-time job at KU and a job at Fuzhou in China?  He

15   was able to do it through lies, through deceit, through

16   cheating, and through concealment.

17           The evidence will show that starting around May of

18   2018, the defendant made -- took multiple steps of fraud to

19   conceal his second job at Fuzhou.  The evidence will show that

20   he first intentionally failed to disclose that job or any of

21   his affiliation with Fuzhou or any of the activities that he

22   was doing there to KU.

23           The evidence will show that KU has an Office of

24   Research to manage the hundreds of millions of dollars in

25   federal research dollars that it gets every year, and the

1    evidence will show that the defendant was very familiar with

2    that office because he had done federal research a number of

3    times in the past.  The evidence will show that among the 80

4    members of that office, they had to frequently contact -- had

5    frequent contact with the defendant.

6            And as part of that process, there are certain forms

7    and disclosures that KU requires professors like the defendant

8    to make.  The evidence will show that one of those policies

9    requires that scientists or professors like the defendant

10   disclose all potential or actual conflicts of interest.

11           The evidence will show that they require scientists

12   like the defendant to -- whenever they submit a research

13   proposal, to do it through the Office of -- the Office of

14   Research at KU.  They're not allowed to just submit the

15   proposals on their own.

16           The evidence will also show that anytime a professor,

17   who was full-time at KU like the defendant, wanted to accept

18   outside employment or engage in outside activities that were

19   related to their primary job responsibilities, they were

20   supposed to seek pre-approval from this office and what the

21   evidence will show is that the defendant did none of these

22   things.  Instead, the evidence will show that on numerous

23   occasions over the years he submitted certifications to KU

24   stating that he didn't have anything to disclose.

25           But it's not just the failure to disclose certain

1   information to KU.  The evidence will also show that the

2   defendant engaged in an elaborate scheme to lie to KU, not only

3   about where he was but about what he was doing.  The evidence

4   will show that in the 2018 time period, the defendant was

5   mostly able to work remotely for Fuzhou University, meaning he

6   could be in the United States and other places while he was

7   doing that.

8          But in December of 2018, the defendant effectively

9   moved to China to work full-time at Fuzhou University.  And

10  what the evidence will show is that from December of 2018, for

11  nine months, until August of 2019, with the exception of a

12  handful of two-week trips back to the United States, the

13  defendant was effectively working at Fuzhou University in

14  China.

15         The evidence will show that to maintain this double

16  life, this duality, the defendant concocted an elaborate lie.

17  The first step to that lie is that he asked his chair at KU to

18  allow him to do what's called a course buyout.  And what this

19  is, is it's a policy that KU has that allows professors to

20  essentially buy out their teaching responsibilities for a

21  particular semester.  So it's that 40 percent of the 40/40/20

22  split.

23         And what the evidence will show is that the defendant

24  told his chair, I'd like to do a course buyout and I'd like to

25  do that buyout because I want to do some research in Germany.

1    In particular, there is a research institution in Germany that

2    I have a collaboration with and so I'd like to take the time

3    off so I can focus on that and so I can focus on my

4    federally-funded research.  That's the first part of the web of

5    lies.

6              The second part is, the evidence will show, that the

7    defendant had to figure out a way to try to pay for that buyout

8    because if the defendant is not teaching that class, somebody

9    else at KU has to teach that class.  And so what the defendant

10   did is he told KU, hey, I might have this contract from a

11   university in China called Fuzhou and they want me to do some

12   tests for them and they might give KU some money to do those

13   tests.  But what the evidence will show is that during that

14   entire period, the defendant never disclosed his relationship

15   with Fuzhou.  He never said, I have a job there; I'm building a

16   laboratory; I'm recruiting students to work there.

17             Instead, based on those lies, the evidence will show

18   that his chair allowed him to have a buyout for the spring 2019

19   course, but he imposed three conditions:  First, he said you

20   need to transfer the money that's going to pay for the buyout

21   to KU so that we can pay for somebody to teach the course;

22   second, you need to satisfy your -- continue to satisfy your

23   other duties to the university; and, third, you need to stay on

24   campus.

25             Now, what the evidence will show is that the defendant

1    didn't do any of those things.  Instead, what the evidence will

2    show is that there was no collaboration with Germany.  The

3    scientist who he was supposed to be collaborating with will

4    testify that although he had talked to the defendant about a

5    collaboration, the defendant never followed up, and that

6    scientist will testify that when he sees the defendant in this

7    courtroom, it will be the first time he's seen him in six

8    years.

9         The evidence will also show that the defendant's

10   travel records don't show any stamps to Germany or the European

11   Union during this time period.  The evidence will show they

12   show a lot of stamps to China.

13        And the evidence will also show that during this time

14   period when the defendant missed and failed to satisfy his

15   obligations at KU, like failing to go to a faculty retreat or

16   failing to be able to meet with his professor to do his faculty

17   review, that the defendant actively lied.  The defendant told

18   his chair, as you'll see in e-mails, I'm in Germany; I'm at the

19   Fritz-Haber Institute doing research, but the evidence will

20   show that those were lies.

21        The evidence will also show that that cover that he

22   used to say Fuzhou is going to pay for my buyout, that never

23   came to fruition.  The evidence will show that Fuzhou never

24   transferred any money to KU.  Instead, the defendant went to

25   China, worked at Fuzhou, and when he came back and KU asked,

1    hey, how are you going to pay us for that course buyout, he

2    says, oh, the thing with Fuzhou never worked out, and he

3    instead used his National Science Foundation dollars to pay for

4    that buyout.

5              This isn't just about fraud on KU though, this is

6    about fraud on the federal government.  And in particular in

7    this case, you'll hear testimony about the special relationship

8    between the federal government - primarily here the National

9    Science Foundation, the Department of Energy - and research

10   universities across America like KU.  You'll hear evidence that

11   there's a special relationship between the way that the federal

12   government funds the research, the way that universities and

13   colleges in the United States sponsor that research or provide

14   the environment in which the research can take place, and the

15   way that the individual scientists, also called principal

16   investigators or PIs, participate in that system.

17             You'll hear evidence that every year the U.S.

18   Government pumps billions of dollars of research money into

19   this system, and they do it because they're funding something

20   called fundamental or basic research.  This is different than

21   applied research.  You'll hear evidence that fundamental

22   research is the type of investment that takes 20 to 30 years

23   before you see any kind of return.  It's the type of investment

24   that in our country the federal government primarily, if not

25   exclusively, funds.  And you'll hear testimony that many of the

1    things that we take for granted in our daily lives, like an

2    Internet search, at some point -- at some point in the distant

3    past were funded by the federal government.  You'll also hear

4    testimony that this system is a tripartite relationship.  It's

5    premised on trust and it's premised on the integrity of the

6    system.

7            You'll also hear about the specific program the

8    defendant participated in.  For example, this is the Department

9    of Energy program that funded his research.  It's called Basic

10   Energy Sciences.  And you'll see its mission statement is:  The

11   mission of Basic Energy Sciences program is to support

12   fundamental research; to understand, predict, and ultimately

13   control matter and energy at the electronic, atomic, and

14   molecular levels in order to provide foundations for new energy

15   technologies and to support DOE missions in energy,

16   environment, and national security.  That's the mission of

17   these organizations that are funding the defendant's research.

18           You'll hear that as part of that mission and as part

19   of that purpose of ensuring the integrity of the system, these

20   agencies have a number of policies in place.  They require

21   scientists or principal investigators like the defendant to

22   disclose certain information.  You'll hear testimony that that

23   information is crucial for them to make funding decisions.

24           One of the types of information that they require is

25   called current and pending support and what that means is that

1    basically any scientist or principal investigator who's

2    applying to receive federal grant dollars has to disclose all

3    current research support that they're getting and all pending

4    support, meaning applications that they submitted but they

5    haven't heard back from yet.

6            You'll hear testimony that the reason why the National

7    Science Foundation and the Department of Energy require this

8    information, why it's crucial to their decision-making, why

9    it's incredibly important to the integrity of the system, is

10   because they don't want to fund duplicative research.  They

11   don't want to use federal taxpayer dollars to pay for something

12   that somebody else is already paying for.  They also want to

13   fund research that the scientist actually has the time to do.

14           You'll also hear that the National Science Foundation

15   and the Department of Energy in different ways require

16   principal investigators like the defendant to disclose all

17   outside affiliations, and they do this because -- and this is

18   an example from the Department of Energy -- because part of the

19   process when they review these proposals - and they get tons of

20   them, they're incredibly competitive to get - is that they have

21   an independent panel of third-party experts who basically

22   volunteer, who are other scientists in the space, and who

23   review the merits of the scientific proposal.

24           And one of the things that the Department of Energy

25   requires is that we need to know all of your outside

1  affiliations because we need to screen for any conflicts of

2  interest for that panel because, again, this is about funding

3  science for science's sake, and the merits of the science

4  should be what determines whether or not funding occurs.

5       And so one of the ways -- even if there isn't an

6  actual conflict of interest, one of the ways that they ensure

7  the integrity of that system is that they ensure that the panel

8  of independent experts who are reviewing that proposal -- that

9  they don't have any conflicts; that they don't work for the

10 same institution; that they're not brother-in-laws of the

11 person who is submitting the proposal.

12       You'll hear testimony from an executive at the

13 National Science Foundation who will say that this kind of

14 information is crucial; it is critical to their funding

15 decisions.  You'll hear testimony from the two Department of

16 Energy program managers who reviewed the defendant's

17 applications and grant proposals in this case who will say that

18 this information was incredibly important to their

19 decision-making, that they required it and that if they had

20 failed to receive it, it would have -- it could affect their

21 funding decision.

22       You'll also hear testimony that since the defendant

23 was charged in August of 2019, some of these funding

24 requirements have been clarified.  You'll hear testimony from

25 the National Science Foundation executive who was involved in

1    one of those clarifications who will say, yes, there were

2    clarifications.  There were even clarifications to this current

3    and pending section.

4          You will also hear her testify, however, that in terms

5    of disclosing all current and pending research support, "all"

6    has always meant all.  She will testify that since the 1970s

7    the National Science Foundation has required principal

8    investigators to disclose all current and pending research

9    support, irrespective of whether it comes from the federal

10   government, a state government, or a foreign government.

11         You will hear similar testimony from the Department of

12   Energy witnesses who will say that aside from looking at the

13   text of the instructions of current and pending, "all" meant

14   all.

15         You'll also hear -- you'll also see evidence that even

16   if other scientists who aren't on trial here today may have had

17   misgivings or questions about what they were supposed to tell

18   the Department of Energy and the National Science Foundation

19   during the relevant time period, the evidence in this case will

20   show that the defendant knew what he was supposed to disclose

21   and that he chose to conceal that information from the federal

22   government and from KU.

23         You'll hear testimony from KU as well as the federal

24   funders that the defendant is an experienced researcher; he's

25   been doing this for years.  You'll hear evidence that in lots

1    of other circumstances that did not involve his job at Fuzhou

2    in China, he asked questions, he asked for clarifications.  He

3    engaged with that staff of 80 people at KU to make sure he was

4    doing it right.  But when it came to his job at Fuzhou, when it

5    came to his Changjiang Distinguished Professor position, no

6    questions.

7              You'll also see the multiple steps of concealment that

8    he took.  You'll see e-mails where he tells people, don't use

9    my Fuzhou e-mail account.  You'll hear recorded phone calls

10   where he says, don't mention this Changjiang Distinguished

11   Professor thing.  You'll hear a witness testify and you'll hear

12   the recorded call where the defendant expressly tells that

13   witness, if anybody mentions this Changjiang Distinguished

14   Professor thing, I'd like you to pretend like you don't know

15   what they're talking about.

16             You'll hear testimony from a forensic examiner from

17   the FBI who will tell you that when the defendant's KU computer

18   was searched, they found that it was partitioned, meaning that

19   the hard drive had been broken into a bunch of

20   sub-compartments, and in two of those sub-compartments you'll

21   see lots of documents relating to Fuzhou and his work there.

22             You'll also hear another recorded phone call between

23   the defendant and someone at Fuzhou where they talk about the

24   need to not put anything in writing.  You'll hear the defendant

25   agree when that person says, don't put anything in writing,

1     that would be, quote, "evidence."

2          As a result of the defendant's multi-year fraud, his

3     lies, his deceit, he's been charged with six counts of wire

4     fraud and two counts of making materially false statements in a

5     federal matter.

6          Now, Judge Robinson will instruct you on the law at a

7     later time, but just to give you an overview of what -- wire

8     fraud makes it a crime to use telecommunication wires - so

9     using the Internet, sending an e-mail - across state lines to

10    further a scheme to defraud.  It's also a crime to make a

11    materially false statement to a federal agency.

12         You'll see a lot of evidence in this case.  There's

13    going to be a lot of exhibits.  It's going to be a couple

14    weeks, you've already heard that, there's going to be a lot of

15    witnesses.  But in the end, the story is simple.  KU trusted

16    the defendant; the National Science Foundation trusted the

17    defendant; the U.S. Department of Energy trusted the defendant,

18    and the defendant broke that trust.  He betrayed them and he

19    did it because he wanted to reap the benefits of that second

20    job at Fuzhou University while continuing to receive a

21    full-time salary from KU and hundreds of thousands of dollars

22    in federal taxpayer-funded research dollars.

23         At the end of trial we'll come back to you and after

24    you've heard all the evidence and gotten your instructions on

25    the law from Judge Robinson, we'll ask you to return the only

1   verdict that the evidence and the law will support, which is a

2   verdict finding the defendant guilty on all counts.  Thank you.

3           MR. ZEIDENBERG:  Thank you, Your Honor.

4           Good morning, ladies and gentlemen.  Moonlighting.

5   That's the government's case.  The government has alleged that

6   Doctor Tao was moonlighting, that he had a second job and he

7   didn't tell his employer about it.  For that, they have charged

8   him with eight felonies.

9           The government is prosecuting Doctor Tao, a father, a

10  husband and, until he was arrested, the most productive member

11  of the Chemistry Department at the University of Kansas, for

12  suspicion of moonlighting.  And if you think there's something

13  wrong with this picture, you're not alone.

14          If you listened to the government's opening and

15  wondered, why aren't I hearing about some money being lost?

16  Well, join the crowd.  Think about it.  He's being charged with

17  eight felonies alleging that he defrauded the government and KU

18  and yet no one lost a penny.  Doctor Tao did not defraud KU or

19  NSF or DOE of a dime.  He did all of the research that was

20  expected of him, all of it.  All of the research he was

21  expected to do, he did.  They got exactly what they paid for.

22          Now, before I tell you what happened here, ladies and

23  gentlemen, and what the evidence will show, I want to tell you

24  what the case is not about.  It isn't about theft.  There's no

25  allegation that Doctor Tao stole anything from anyone.  It

1    isn't about transferring technology.  There's no allegation

2    that Doctor Tao transferred technology or intellectual property

3    to anyone in China or anywhere else.  It's not about diverting

4    grant funds for personal use.  He didn't take grant money and

5    go take a vacation or buy fancy watches, he used it to pay for

6    research.

7         What it is about is an allegation that Doctor Tao had

8    a second job in China and didn't tell the University of Kansas

9    about it.  Now, if that second job had been in Belgium or

10   France or Canada or Ireland or Houston, Texas, none of us would

11   be here today.  It would be an H.R. matter with the University

12   of Kansas.  But because that other country involved China, the

13   government has turned it into a federal case.

14        But as absurd as that sounds, trying to make a

15   criminal out of someone who's alleged to have worked a second

16   job, in this case it isn't even true.  Doctor Tao did not

17   accept the position at Fuzhou University and he was never paid.

18   In addition to it not being true, ladies and gentlemen, the

19   amazing thing here that you will learn during this trial is

20   that none of this even mattered.  At the time of these events

21   neither the DOE nor the NSF had any requirements that

22   researchers like Doctor Tao report unpaid positions at foreign

23   universities.  There was no requirement that they report

24   participation in a foreign talent program.  You will hear from

25   the government witnesses that none of these things would've

1   made the slightest difference to whether or not Doctor Tao's

2   grants would've been funded.  It didn't matter.

3        Now, I want you to pay close attention not just on

4   direct examination when the government is asking their witness

5   the questions but listen on cross examination to the answers

6   that you hear.  And you're going to learn the following, ladies

7   and gentlemen:  That all the research money that was provided

8   to Kansas to fund Doctor Tao's research was properly spent on

9   research; that there is no allegation of theft of intellectual

10  property; that he never signed an employment agreement with

11  Fuzhou University; and he was never paid.

12        You will learn that it's not only not illegal to be a

13  member of a foreign talent program, it's not unethical, it's

14  not improper.  There are no rules against it from KU, from NSF,

15  from DOE.  None of them prohibit it.  And, in fact, in this

16  time period, 2017 and 2018, there was no requirement that it

17  even be disclosed.

18        And finally, you're going to learn that there was no

19  training provided whatsoever to researchers like Doctor Tao on

20  all these regulations and all these policies that you're going

21  to see the government talk about.  No training.  The

22  government -- KU and the NSF and DOE simply referred their

23  researchers to websites and said, look at these policies,

24  here's a booklet, some of them 180 pages long, figure it out.

25  And in all those websites and in all those booklets, not once

1   does it say, and by the way, if you get something wrong, you

2   can expect the FBI to be bursting through your door with arrest

3   warrants and search warrants and you'll be indicted for wire

4   fraud.  They never say that.

5           This entire prosecution was a rush to judgment.  The

6   government indicted this case without asking the most basic and

7   fundamental questions that they should have been asking first.

8   Was the information about the allegations of what Doctor Tao

9   was doing in China -- did that need to be disclosed?  They

10  never asked.  It's incredible, but it's true.

11          The government indicted this case before asking a

12  single relevant witness at the National Science Foundation or

13  the Department of Energy whether participation in a foreign

14  talent program needed to be disclosed.  If they had asked that

15  question before indicting the case, none of us would be here

16  today.  If they had simply asked if an affiliation with a

17  foreign university needed to be disclosed before they indicted

18  the case, none of us would be here today.  If they had picked

19  up the phone or sent an e-mail to Fuzhou University and said,

20  hey, do you guys have a Doctor Tao on your faculty, we wouldn't

21  be here.  None of you would be here.

22          The basic fundamental questions that you would have

23  expected investigators to ask before indicting, they failed to

24  ask.  They indicted first and investigated later.  Of course,

25  by that point they had already committed themselves and they

1     did not want to admit that they had made a colossal mistake.

2              The investigation of Doctor Tao should be everyone's

3     worst nightmare.  They went through every shred of paperwork in

4     this man's life.  Every e-mail, every text message, every

5     submission of paper, electronic or otherwise, to any employer

6     he's had here in the United States or to the federal government

7     was put under a microscope.

8              They surveilled him and his wife while they went to

9     Costco, and went to get pizza, and took their kids to school.

10    They had drones up over his house.  They didn't just search his

11    bank account, they searched his wife's bank account.  And they

12    didn't just search their bank accounts, they searched their

13    children's bank accounts, their middle school-aged children's.

14    And not just them but the church members who happened to lend

15    them money to pay for their legal fees, their bank accounts

16    were searched.  They looked for anything they could find to try

17    and turn that into a federal crime.

18             And after all that digging and all that investigating,

19    what did they find?  A conflict of interest form sent to the

20    H.R. department at KU in 2018 that they say didn't have the

21    right box checked, and they said, you should've updated your

22    paperwork to the NSF and the DOE.  And for those alleged

23    paperwork failures, they charged him with eight felonies.

24             Why did this happen?  What explains this rush to

25    judgment and this attempt to turn paperwork, paperwork

1   failures, into eight felonies when there's no one who lost any

2   money and the research was done?  The answer to the question of

3   "why?" is that the FBI and the DOJ were tricked and manipulated

4   by a former graduate student of Doctor Tao's, a woman by the

5   name of Huimin Liu, who was attempting to extort Doctor Tao for

6   $300,000.  She was angry with Doctor Tao because she didn't

7   feel she got sufficient credit on an article that she had

8   written.  Doctor Tao refused to change her credit, she said she

9   wanted $300,000 from him and if he didn't pay her she was going

10  to report him to the FBI as being a spy involved in economic

11  espionage, she said, because that topic is very popular these

12  days.

13          And that is exactly what she did.  She made up

14  aliases, she made up this allegation that Doctor Tao was a spy,

15  and she sent these allegations in to the FBI and to the

16  University of Kansas.

17          Well, you can imagine what happened next.  Cue the

18  drones, cue the surveillance teams.  Doctor Tao's life was put

19  under a microscope.  Her plan worked perfectly.  She said she

20  was going to reap revenge on him if he didn't pay her and she

21  did.  She manipulated the FBI into destroying Doctor Tao's life

22  and they fell for it hook, line, and sinker.

23          Who is Doctor Tao?  Doctor Tao is a 50-year-old

24  husband.  He's the father of twins who are now in high school.

25  They were in middle school at the time of these events.

1          After getting his undergraduate degree in China, he

2    came to the United States over 20 years ago to get his Ph.D. at

3    Princeton University.  After getting his Ph.D. at Princeton, he

4    went to the University of California in Berkeley in 2006.  He

5    stayed there until 2010 where he went to Notre Dame as a

6    professor.  And at Notre Dame, from 2014, his specialty, as the

7    government has said, was something called catalysis.  You don't

8    have to know anything about the science involved, it's not

9    going to be on the test.  You're relieved to know.

10          But I will tell you this, as the government said

11   correctly, this is fundamental research.  Fundamental, as

12   opposed to applied, does not seek to answer a specific question

13   or solve a specific problem.  It's considered knowledge for

14   knowledge sake.  All of the results of fundamental research are

15   published.  They're made available for anyone to read.  In

16   fact, the research that Doctor Tao was doing required the

17   results to be published and that's how his success was to be

18   measured.  If you didn't get it published, well, then it was

19   wasted money.  And none of this is classified, none of this is

20   secret, none of this is confidential.  It's just the opposite.

21   It's meant to be widely dispersed, and the more widely

22   dispersed the better.

23          After four years at Notre Dame, Doctor Tao came to KU.

24   And while at KU, from 2014 to 2019, he was by far the most

25   productive member of the chemistry department at KU.  He was

1    just one of 26 professors, but he alone accounted for

2    25 percent of the published -- publications from that

3    department.  His colleagues were publishing three or four

4    papers per year.  He was publishing a dozen, a multiple of four

5    more than his colleagues.

6            His output and productivity were so outstanding that

7    he was formally recognized by the Chancellor of the University

8    of Kansas at a ceremony in April of 2019.  That's right.  One

9    year after Doctor Tao allegedly began working full-time in

10   China, he was being recognized by the University of Kansas by

11   being one of the four most outstanding and productive members

12   of the faculty.

13           Now, that award came with a $10,000 prize.  After

14   taxes, Doctor Tao cleared $7,000.  He took that seven -- $7,000

15   and half of it he donated back to the Chemistry Department at

16   KU to further the research of his group.  The other thousand

17   dollars he donated to his church.  Now, that is the man, the

18   Doctor Tao the government is claiming is a fraudster.

19           Now, what is it exactly the government is claiming

20   that he did that was illegal?  The government's case comes down

21   to this:  They claim that he accepted a full-time job at Fuzhou

22   University and he failed to disclose that to KU or on his grant

23   applications.  The government is wrong.  You will hear that

24   Doctor Tao applied to be considered a Changjiang Scholar in

25   China.  Not only was this not improper, as I said earlier

1    there's no rules that prohibited it and back in 2017 or 2018,

2    it didn't even have to be disclosed.

3            In 2017, the end of the year, he was named a

4    Changjiang Scholar.  What that means was at that point he had

5    to negotiate an employment contract with Fuzhou University, but

6    Doctor Tao had serious misgivings and he never came to an

7    agreement with Fuzhou.  He was in an awkward situation because

8    Fuzhou had sponsored him for this award, they wanted him to

9    come and to teach full-time.  He gave that offer serious

10   consideration.  In fact, you will hear that he brought his

11   family with him - his wife, his children - to Fuzhou in early

12   2018 to take a look at Fuzhou, the city, the campus, and see

13   what life would be like for them.

14           Well, they didn't like it.  His children were born in

15   New Jersey.  They never lived in China.  They are not fluent in

16   Chinese, they don't write Chinese, and they were in middle

17   school.  You can imagine the idea for them moving at that point

18   in their lives.  His wife, Hong, was studying to be a doctor

19   here and put down deep roots in Kansas and here in the U.S.

20   She didn't want to move back to China.  And Doctor Tao had

21   serious misgivings whether Fuzhou would really do what they

22   said that they would do in terms of whether they would actually

23   provide him the resources they had promised.

24           But rather than turn them down cold, Doctor Tao made

25   exorbitant demands from them on how much research money he

 1    needed.  They were demands that Fuzhou was never able to meet.

 2    And you're going to see this back and forth negotiation; you're

 3    going to see Doctor Tao asking for "X" amount and Fuzhou

 4    offering half of "X".  They were light years apart in what they

 5    were going to offer.  He wasn't asking for the money for

 6    himself, he was asking for research, to build a research lab.

 7    And they couldn't come to an agreement and it was never signed,

 8    and you're going to see that.  There's no question about that.

 9         Now, one reason for Doctor Tao's hesitancy was that he

10    was skeptical that Fuzhou would do what it said.  He wanted to

11    see if they would really deliver on what they promised.  Would

12    they really put up the money to fund a world-class lab?  Would

13    they really be able to recruit for him or with him top students

14    to Fuzhou, which was not a top university in China?  Would they

15    get him the grant money he would need?  He wanted to find out.

16         So you're going to see that Doctor Tao agreed to help

17    Fuzhou set up a research lab and to recruit students.  You're

18    going to see e-mails and hear calls of Doctor Tao trying to

19    assist Fuzhou with that process of setting up a research lab

20    and trying to recruit students.  You will see those e-mails of

21    him trying to recruit students to Fuzhou to staff it.

22         The government points to these facts and the fact that

23    Doctor Tao had a Fuzhou e-mail address and says, that's proof,

24    he was employed there.  He signed the contract.  They're wrong.

25    In fact, Doctor Tao was trying to help Fuzhou set up a lab; he

 1    was trying to recruit students to that lab.  And if he had been

 2    successful in setting up that lab and if he had been successful

 3    in recruiting students to that lab and if he could not get a

 4    better job at one of the more than one dozen U.S. universities

 5    he was also applying to at that very same time and if he could

 6    persuade his family to change their minds, to uproot themselves

 7    and go with him back to China, and if all those things had come

 8    to pass, he might well have accepted that position.  But they

 9    didn't and he didn't.

10            And here's how you will know that the government's

11    case is full of holes.  The government has alleged in their

12    indictment that Doctor Tao accepted a full-time position at

13    Fuzhou University in May of 2018.  Okay?  That's the end of the

14    school year, 2018.  And there's a summer break where he's not

15    working.  It's a nine-month appointment.  September 2018, where

16    is Doctor Tao?  He's in Lawrence, Kansas teaching a full load

17    with office hours.

18            Now, you would think that the government would say,

19    well, he's -- we think he accepted a full-time position but

20    he's teaching full-time in Kansas, obviously these two things

21    can't both be correct so maybe we should think this through

22    again.  Unfortunately, you would be wrong if you thought that

23    that gave them any pause, but that's why we have jurors decide.

24    Jurors with common sense decide whether these theories make any

25    sense.

1          You're going to learn that during the exact same time

2    that the government claims Doctor Tao was working full-time at

3    Fuzhou University, he was applying to Princeton, Brown,

4    Stanford, Illinois, Florida, Michigan, Wisconsin, and a half a

5    dozen other schools here in the United States.  He was looking

6    for a job here at the very same time they say he accepted a

7    job.

8          Not only that, ladies and gentlemen, in September he

9    worked in China as I -- in Kansas, as I said, from

10   September 2018.  And fall of 2019, he was scheduled to teach

11   full-time here in Kansas.  The only reason he didn't is he got

12   arrested in August of 2019.

13         So what he did do in the interim, in the spring

14   semester of 2019 when he had a semester with no teaching

15   requirements, he traveled to China and collaborated with Fuzhou

16   University.  He helped set up a lab and tried to recruit

17   students to come there.  He collaborated on papers.  He wanted

18   to keep his options open.  But he never accepted the job, he

19   never got paid, he never taught classes there, and he never

20   quit his job at KU.  All things that this purported contract

21   that he had with Fuzhou University required him to do, he did

22   none of them.

23         But here's another problem with this case and it's a

24   big one.  You will hear that during the 2017 and 2018 time

25   frame when these events were occurring, neither the NSF nor the

1    DOE even required that the affiliations that you will be

2    hearing about needed to be disclosed.  Foreign grants and

3    unpaid appointments at foreign universities did not at that

4    time need to be disclosed.  It was only in 2020, long after

5    Doctor Tao was arrested, that those rules were changed.

6            Ladies and gentlemen, this is not a breach of contract

7    case.  Even if you were to find that Doctor Tao violated some

8    clause of some provision of some grant proposal, that does not

9    make him guilty of wire fraud.  In order to convict Doctor Tao

10   of wire fraud, you must find beyond a reasonable doubt that he

11   knowingly and intentionally lied in order to obtain money or

12   property from the NSF or DOE or KU.  That's very different from

13   simply failing to properly follow every provision in a

14   contract.

15           One other thing to keep in mind.  None of this grant

16   money went to Doctor Tao.  All of the grant money we've been

17   talking about went to KU; they disbursed the money.  And Doctor

18   Tao's salary was not tied to whether or not he got grants.  It

19   was a salary, not contingent.  So what the government wants you

20   to believe, ladies and gentlemen, is that Doctor Tao committed

21   wire fraud, that he defrauded NSF and DOE of money so that

22   money could go to KU.  Think about it.  The money wasn't going

23   to him.  Their theory is that he committed fraud on NSF and DOE

24   to benefit KU.  I mean, you've got to just scratch your head.

25   Like, does that make any sense?

 1              Finally, and I'm almost done, there's two things that

 2     you really have to keep at the forefront of your mind

 3     throughout this trial, and the first is that all of the conduct

 4     that Doctor Tao was alleged to have been involved in in China

 5     was lawful.  Okay?  It's legal to be a member of a foreign

 6     talent program.  It is legal to work at a Chinese university.

 7     It's legal to work on grants in China.  All legal.  The

 8     government's entire case is that Doctor Tao failed to report

 9     about legal, lawful activities in China.  That's it.  That's

10     how they come up with eight felonies even though no one lost a

11     dime.

12              And the second thing that you can't lose sight of is

13     that this is a criminal trial.  Doctor Tao is on trial for wire

14     fraud.  This is not an H.R. disciplinary hearing convened to

15     determine if Doctor Tao violated the H.R. policy of KU.  Doctor

16     Tao is not on trial because he might've violated some H.R. or

17     KU policy.  He's not on trial for violating a conflict of

18     interest policy.  He's on trial for criminal fraud.  That is a

19     distinction that the government seems to have forgotten, but

20     you must keep it in mind.

21              All the research Doctor Tao was supposed to do, he

22     did.  All of the money was spent properly.  No one was

23     defrauded of a dime.  And at the end of the case when you come

24     and consider all that evidence, we'll be asking you to return a

25     verdict consistent with that evidence, and that is not guilty.

38

```
 1              Thank you.

 2              (Excerpt of opening statements concluded).

 3              THE COURT:  Are you ready to at least get started with

 4     your first witness before we take a mid-morning break?

 5              MR. OAKLEY:  Yes, Your Honor.

 6              THE COURT:  Okay.

 7              MR. OAKLEY:  Your Honor, the United States calls

 8     Doctor Douglas Girod.

 9                    DOCTOR DOUGLAS A. GIROD,

10     called as a witness on behalf of the Government, having first

11     been duly sworn, testified as follows:

12                      DIRECT EXAMINATION

13     BY MR. OAKLEY:

14     Q.   Good morning.

15     A.   Good morning.

16     Q.   Sir, would you please state and spell your name for the

17     record?

18     A.   Douglas A. Girod.  That's Douglas, D-O-U-G-L-A-S.  Middle

19     initial A.  G-I-R-O-D.

20     Q.   And how are you employed?

21     A.   I work for the University of Kansas.

22     Q.   What do you do for the University of Kansas?

23     A.   I am the chancellor of the University of Kansas, so I'm

24     responsible for all the elements of the university.

25     Q.   I want to talk to you a little bit about what exactly a
```

1    chancellor does, but before we do that I want to talk about
2    your personal background.  Do you hold any degrees?
3    A.   I do.  I have a bachelor's degree from the University of
4    California at Davis, M.D. degree from the University of
5    California at San Francisco.
6    Q.   How long have you been chancellor at the University of
7    Kansas?
8    A.   Almost five years.
9    Q.   What did you do prior to becoming chancellor at KU?
10   A.   I was the executive vice chancellor at the University of
11   Kansas Medical Center here in Kansas City.
12   Q.   And so you mentioned that you have an M.D.?
13   A.   Correct.
14   Q.   And so you were vice chancellor at KU's Medical Center;
15   correct?
16   A.   Correct.
17   Q.   What did you do prior to that?
18   A.   I joined the university in 1994 to start a head and neck
19   cancer surgery program.  I'm a cancer and reconstructive
20   surgeon by training.  I was a chair of a department for about
21   13 years, was the dean for clinical affairs for seven years.
22   Q.   Let me talk to you about what exactly a chancellor at KU
23   does.  Can you describe for the jury your job responsibilities?
24   A.   The title is sometimes president at other universities and
25   essentially I'm the CEO of the university so I'm responsible

1   for all its elements, both education, research, service.  We

2   have seven different sites across the state of Kansas, I'm

3   responsible for all those as well, so both the KU-Edwards

4   complex as well as KU Medical Center.

5   Q.  And so you're the head person for the University of Kansas?

6   A.  That's correct.

7   Q.  The University of Kansas is commonly referred to as KU;

8   correct?

9   A.  Correct.  It's a long story.

10  Q.  And you said that there's seven schools at KU?

11  A.  We have seven sites.

12  Q.  Seven sites, excuse me.

13  A.  Yes.

14  Q.  Could I talk you into moving that microphone just a tad bit

15  closer?

16  A.  Where would you like it, over here?

17  Q.  Perfect.

18          THE COURT:  It does bend.  It bends up and down too.

19          THE WITNESS:  Okay.  Thank you, Your Honor.

20  BY MR. OAKLEY:

21  Q.  And so there's seven sites.  Is the main campus in

22  Lawrence, Kansas?

23  A.  Correct.

24  Q.  Are all the seven sites located in the state of Kansas?

25  A.  They are.

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    Q.    And could you just briefly describe those sites?

2    A.    Sure.  Our main campus is in Lawrence, Kansas, and then we

3    also have a suburban site in Overland Park, Kansas, in what we

4    call our Edwards campus.  The KU Medical Center has our main

5    campus in Kansas City, but we also have a School of Medicine in

6    Wichita as well as a School of Medicine in nursing in Salina.

7    We also have the Law Enforcement Training Center which is in

8    Yoder, Kansas, where we do the law enforcement training, and we

9    have a site outside of Fort Leavenworth in Leavenworth, Kansas,

10    where we do graduate training.

11    Q.    So approximately how big is the university, approximately

12    how many students?

13    A.    We have about -- just over 27,000 students.  We have about

14    10,000 employees, faculty and staff.

15    Q.    And the University of Kansas, is it a public institution or

16    a private institution?

17    A.    It's a public institution under the State of Kansas;

18    correct.

19    Q.    And so it's at least partially funded by the State of

20    Kansas?

21    A.    That is correct.

22    Q.    So you're the head of the university, but do you report to

23    anyone or to any group of people?

24    A.    So my report is to the Kansas Board of Regents, which there

25    are nine regents that are appointed by the governor to

1  four-year terms and they have a defined distribution across the

2  State of Kansas, so they represent various parts of the state

3  of Kansas.  And that's my board.  And then there's a president

4  of that as well; Blake Flanders is the president of that.  So

5  the president and the CEO of the board are my direct reports.

6  I directly report to them.

7  Q.  Does the Board of Regents oversee other public institutions

8  in the state?

9  A.  They have broad responsibility over six regents

10 institutions.  So in addition to KU, that's Kansas State

11 University, Wichita State University.  Those are the three

12 research universities.  And then the three regional

13 universities - Emporia State, Pittsburg State and Fort Hays

14 State - and then they have coordinating authority over all the

15 19 community colleges and seven technical colleges.

16 Q.  Okay.  Are you familiar with an Association of American

17 Universities?

18 A.  I am.

19 Q.  What is that?

20 A.  The AAU as it's known is an organization of -- membership

21 organization of the top research universities in North America.

22 So there are two Canadian members and the rest are U.S.

23 members, and they are the top research universities in our

24 country.

25 Q.  Is KU a member of that association?

1   A.  We have been a member since 1909, yes.

2   Q.  And you said that it's a membership of the top research

3   universities.  Do you know how many universities are a member

4   of that organization?

5   A.  Currently I believe we have 65 members, yes.

6   Q.  So is research important to the university?

7   A.  We are what's considered a top tier research university.

8   That's core to our mission of what we do.  Obviously we

9   educate, but we educate through research and so a big component

10  of our faculty responsibility is to both educate but also to

11  conduct scholarly activity.  That takes many different forms

12  depending on the field that you work in.  But also, our

13  students have the opportunity to participate in that scholarly

14  activity both as undergraduates and graduate students.

15  Q.  When I think of research I think of folks in white coats in

16  a laboratory with beakers and that sort of thing.  Is that part

17  of research at the university?

18  A.  That's certainly an element research, but so is writing

19  novels and writing plays and conducting orchestras and many

20  other things as well.

21  Q.  And so research is not just at the -- for the sciences.

22  Every department at KU has a research component; is that

23  accurate?

24  A.  Correct.  That is accurate, yes.

25  Q.  Where does the funding for the various types of research

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    that occur at KU come from?

2    A.    Many different sources, and it does certainly depend on the

3    field that you're in.  If you're in the humanities, it might be

4    through the National Endowment for the Arts or through multiple

5    foundations that support the arts, for example.  If you're in

6    the more hard sciences, it's often through our -- federal

7    agencies are far and away the biggest funder of research in

8    America, and that's everything from the National Science

9    Foundation to the National Institutes for Health to Department

10    of Energy, Department of Defense, and several others.

11    Q.    And so you said that federal funding through the agencies

12    that you named is the largest source of funding for KU?

13    A.    Correct.

14    Q.    Are there other sources of funding other than federal

15    grants?

16    A.    As I mentioned, foundations are certainly one.  And then we

17    have industry partnerships as well and often our industry

18    partners will fund research also in areas that they have

19    interest.

20    Q.    And that would be private companies?

21    A.    Correct.

22    Q.    Is there any State of Kansas funding that the university

23    receives for research?

24    A.    A very small amount, yeah.

25    Q.    Which of those that we've described is the largest?

19-20052    USA v. Feng (Franklin) Tao    03.22.22                45

A.   The federal funds.  When you put all the federal agencies
together, by far that's the largest.
Q.   It's not even close; it's -- federal money is the largest?
A.   Yes.
Q.   In addition to research you said that -- that research is a
component and then also the teaching side.  And typically when
I think of a university, I think of professors and sort of, you
know, standing in front of students lecturing.  Is that what
you refer to when you're talking about teaching?
A.   It takes on multiple forms.  Certainly that's the classic
form of which is in a classroom setting, which classrooms
actually look a little different today than they used to.  But
it's also teaching at -- for example, our graduate students
learn by doing research, working closely alongside a faculty
member who helps them conduct research and plan out the
research and analysis, and so it's both hands-on as well as
classroom.
Q.   And let me back up.  As a research institution, describe
whether or not research is important to the University of
Kansas.
A.   It's core to who we are, yes, as a research university.
Q.   How about the teaching component, is that important to the
university?
A.   Universities exist to teach, so yes.
Q.   Generally speaking, people who teach are professors at a

19-20052    USA v. Feng (Franklin) Tao    03.22.22                46

1    university; is that correct?

2    A.   Correct.

3    Q.   And when a professor is hired by the university, is their

4    effort divided such that -- I've heard of a 40/40/20 split, is

5    that something that you're familiar with?

6    A.   That's the common scenario, particularly on our Lawrence

7    campus, our main sort of traditional residential research

8    university campus for our full-time faculty.  We do have

9    adjunct and professors of practice and other types of faculty,

10   but for our full-time faculty generally that's the construct is

11   our expectation is that they spend 40 percent of their time in

12   educational obligations and then 40 percent of the time in

13   their scholarly work.  The other 20 percent is typically spent

14   in committee work for the university or even nationally and

15   internationally through other organizations.

16   Q.   I want to talk to you about this split.  You said for a

17   full-time professor a common split is 40 percent, 40 percent

18   20 percent.  Let's break that down.  Let's talk about the

19   40 percent.  Is that 40 percent research?

20   A.   40 percent of the time would be committed to research, yes.

21   Q.   Okay.  And that research is what we talked about, it

22   depends on your field, but it could be the scientific research

23   or, if in humanities, it could be writing and that sort of

24   thing?

25   A.   Correct.

1    Q.   And then the other 40 percent, that's devoted to teaching?

2    A.   Yes.

3    Q.   And so that -- and you said that that's a typical split for

4    a full-time professor at KU?

5    A.   Yes.

6    Q.   Now, as chancellor of the university, are your obligations

7    divided in a -- in a similar fashion although perhaps not

8    40/40/20?

9    A.   It would be much cleaner if it was set up that way, but no,

10   it's not.

11   Q.   And so your responsibilities are different than the average

12   full-time professor; correct?

13   A.   Correct.

14   Q.   And so there are exceptions; that professors may have

15   heavier on a research or heavier on a service versus the

16   teaching?

17   A.   Absolutely.

18   Q.   But typically the typical full-time professor would be

19   40 percent teaching, 40 percent service -- I'm sorry,

20   40 percent research, 40 percent teaching, and 20 percent

21   service; correct?

22   A.   Correct.

23   Q.   And so let's talk a little -- well, so typically the

24   research and the teaching component are both 40 percent?

25   A.   That's sort of where -- yeah, foundationally, yes.

19-20052    USA v. Feng (Franklin) Tao    03.22.22                48

1    Q.  And is that an indication that to the university the

2    research component and the teaching side of it are just as

3    important?

4    A.  Yes.  Yes.

5    Q.  Let me talk to you about the 20 percent, and I think you

6    mentioned that 20 percent is a service component?

7    A.  Correct.

8    Q.  What do you mean when you say service?  Is that service to

9    whom?

10   A.  It's variable depending on the faculty member and where

11   they are at their point in their career, but that's service to

12   the university, it could be service to the community, service

13   to the state.  It certainly could be service to the country

14   and, as I mentioned, to our national organizations as well, so

15   serving as an officer in one of our national organizations.  It

16   can take many forms.  In general, we view those activities when

17   they're outside the university as beneficial to the university

18   by advancing our reputation.

19   Q.  And so the 20 percent is devoted to the university, but it

20   can occur outside the university?

21   A.  Correct.

22   Q.  Let me talk to you a little bit about the 40 percent that's

23   devoted to teaching.  That teaching component, is that just the

24   time that a professor is inside a classroom giving instruction

25   or does that include other things?

1    A.  It's certainly -- in a classic sense, it would typically

2    be -- two classes for a semester would make up that 40 percent,

3    but there's a lot of prep work that goes into going into the

4    classroom and then there's a lot of work that goes on after

5    that of evaluation, assessment, and testing.  But it also could

6    be in the graduate setting of working with graduate students

7    doing graduate research symposia and, as I mentioned, some

8    hands-on teaching as well, so it can take multiple forms.

9    Q.  And so it would include the classroom instruction?

10   A.  Yes.

11   Q.  It would include the preparation for that --

12   A.  Yes.

13   Q.  -- instruction?  Would it include such things as becoming a

14   better public presenter or things of that nature?

15   A.  Certainly.  Professional development in advancing the

16   education, yes.

17   Q.  How about meeting with students outside of the classroom

18   setting, is that part of that 40 percent?

19   A.  Yes.

20   Q.  Is it important for a professor, a full-time professor at

21   KU, to be available to meet with students outside the

22   classroom?

23   A.  Yeah, it is.  To have office hours as we call them, to make

24   themselves available for students that may be challenged in one

25   area or another of the classroom.

1   Q.   Are full-time professors at the University of Kansas ever

2   expected to act in an advisory capacity for students that they

3   are teaching?

4   A.   They often mentor students and, again, in a graduate

5   setting very frequently.  Well, every graduate student has a

6   mentor specifically as well, so both undergraduate and

7   graduate.

8   Q.   You had mentioned sometimes KU hires adjunct professors.

9   Are those sort of part-time employees that -- well, you tell me

10  what an adjunct professor is.

11  A.   Yeah.  Most commonly they're part-time professors who teach

12  in a specific area that they have some expertise in.  That may

13  be because we need additional help to cover the teaching load

14  of a given department or class or maybe because they bring

15  particular expertise to the topic.  And so we'll also have

16  part-time faculty who may be working full-time in whatever

17  industry they're in but will come and teach courses because

18  they have expertise in that area.

19  Q.   So I don't want to focus on the adjunct, the part-time.  I

20  want to focus in on what would be considered a full-time

21  professor.  Are those sometimes referred to as one FTE or

22  full-time equivalent?

23  A.   Yes.

24  Q.   Does KU have a spring and a fall semester?

25  A.   We do.

1    Q.   And so typically a full-time equivalent at KU, is that

2    teaching the spring and fall semester?

3    A.   So, again, focusing on the Lawrence sort of traditional

4    campus, yes.  It's typically a nine-month job, really, of

5    focusing on those two semesters between fall semester and then

6    the spring semester.

7    Q.   Does KU expect its full-time employees, specifically

8    professors, to work full-time for the university?

9    A.   We do, yes.

10   Q.   And in order to earn a full-time salary, is a full-time

11   professor expected to work full-time?

12   A.   Yes.

13   Q.   For the university?

14   A.   Correct.

15   Q.   We talked a little bit -- let me get back to the research

16   side.  You said that federal research funding is the largest

17   source of funding to the university.

18   A.   Yes.

19   Q.   So are those -- describe for me, not in detail but

20   generally speaking, is that just federal funds that's set aside

21   for KU or are there other universities and entities that are

22   also trying to get the same funds?

23   A.   The vast majority of those funds come to us through

24   competitive grants that are submitted to the given agency.  And

25   the traditional way that that would work is one of our faculty

1    would be called -- it's called a private -- the principal

2    investigator would be the author of that grant, would propose a

3    body of work and submit that to the agency.

4         The agencies then have review committees that look through

5    all those applications and have a process that they go through

6    by which they prioritize those either based on the competitive

7    nature of that or the import of the work being done or the

8    field that the work is being done, and then they decide -- or

9    they really prioritize the grants that they get in and then

10   they fund them until they run out of money.  And so not

11   uncommonly, at best, 20 percent of those will often get funded.

12   Q.  And so if only 20 percent get funded, does that mean

13   80 percent don't receive funding?

14   A.  Correct.

15   Q.  And so are those -- excuse me, are those grants

16   competitive?

17   A.  Highly competitive.

18   Q.  And you described that there's a process as part of the

19   application for the competitive grant funding.  How important

20   is it that the university abides by all the rules of a

21   particular federal grant?

22   A.  Well, although the grants are submitted by an individual

23   faculty member, they actually are awarded to the university;

24   they're not awarded to the individual.  And so we as a

25   university have to verify that we have met all the

1    requirements, regulations, compliance issues around -- and it's

2    a little bit different for each agency, but they all have them,

3    that we are in compliance with everything to make us eligible

4    to receive those funds and then to expend those funds when they

5    come to us.  So we have a very vested interest in making sure

6    that we remain eligible for those funds.

7    Q.  What would happen to the university -- what would the

8    impact be if the university was not able to obtain federal

9    funding?

10   A.  Well, we certainly would fail to serve as a research

11   university at that point.  We would be a teaching university

12   and not a research university.

13           THE COURT:  When you're at a good stopping point,

14   we'll take a morning break.  It doesn't have to be this minute,

15   but let me know.

16           MR. OAKLEY:  Your Honor, I think this is a good

17   moment.

18           THE COURT:  Why don't we take about a 15-minute recess

19   and we'll reconvene with Doctor Girod's testimony.

20           (The following proceedings were held outside the

21   presence of the jury).

22           THE COURT:  So about 15, 20 after.

23           (Recess).

24           (The following proceedings were held out of the

25   presence of the jury).

1        THE COURT:  Mr. Oakley, I'm just wondering, is this a

2    witness you think you can finish direct, maybe even cross

3    examination, by lunchtime if we take a later lunch or --

4        MR. OAKLEY:  I think lunch -- or, excuse me, I think

5    direct for sure.

6        THE COURT:  Okay.  All right.  Well, we'll see how far

7    we get.  If we can get him on and off and take a later lunch,

8    let's try to shoot for that, but we'll see.

9        (The following proceedings were held in the presence

10   of the jury).

11       THE COURT:  All right.  You can be seated.

12       Mr. Oakley.

13       MR. OAKLEY:  Thank you, Your Honor.

14   BY MR. OAKLEY:

15   Q.  Doctor Girod, I'd like to next talk to you about any

16   policies that KU has as it relates to the disclosure of

17   potential conflicts of interest.  Does either the Board of

18   Regents or KU have policies that would require employees to

19   disclose activities that they undertake outside the university?

20   A.  Yes.

21   Q.  And what's the purpose -- well, let me back up.

22       What types of policies?  Is that solely a KU policy or is

23   it also a Board of Regents policy?

24   A.  It is both.  And there's also State of Kansas policy as

25   well, depending on your position within the university.

1    Q.   And so why does KU have such policies?

2    A.   Well, we're required to.  And those policies really are to

3    identify outside activities that may cause a conflict with the

4    duties being served to the university, and that could be

5    through time or through resources.

6    Q.   And a full-time employee has a duty to whom?

7    A.   Well, a full-time employee has a duty to the university to

8    fulfill their obligations as an employee.

9    Q.   Okay.  And could a -- and I want to talk to you

10   specifically about a full-time professor.  Could a full-time

11   professor's activities away from the university ever affect

12   things that KU is concerned about?

13   A.   They can.

14   Q.   And so because of that, does KU require its employees to

15   provide certain information to the university?

16   A.   Yes, through the conflict of interest process.  It's -- and

17   conflict by definition is not necessarily bad.  They just need

18   to be aware and we can resolve conflicts most of the time.  If

19   somebody has -- for example, doing some work that could be

20   conflicting with a contract, there are ways to mitigate those

21   sorts of things.  If there's a time commitment conflict, then

22   that has to be worked out with the supervisors if it can be

23   worked out.  If not, then we have to resolve it otherwise.

24   Q.   And so the fact that an employee discloses something

25   doesn't mean that KU will take action or can't employ that

1    person; is that a fair statement?

2    A.  Not at all.  It's very common.

3    Q.  You had mentioned that -- the time component of that.  Why

4    is KU concerned with what its full-time employees are doing

5    with regard to their time?

6    A.  Well, if one of our employees, faculty or otherwise, has an

7    outside obligation that would impinge upon the time needed to

8    meet their obligations at the university, then we have to solve

9    for that.

10   Q.  Is it just -- well, let me ask this question.  Who at KU

11   has these obligations as far as reporting potential conflicts

12   of information?

13   A.  Every employee has some level of conflict of interest

14   obligation to report.  And then the further up you go or the

15   different activities you're in, you may have more than one of

16   those you need to complete.

17   Q.  Do those conflict of interest policies require reporting on

18   an annual basis by -- let's focus on professors.  Are

19   professors required on an annual basis to make certain

20   disclosures?

21   A.  Required to do it annually or if there's any substantial

22   change mid-year, that's required to be reported as well.

23   Q.  So if something comes up, a professor is required to report

24   that as it comes up?

25   A.  If it's substantial, yes.

1  Q.  Is that sometimes referred to as ad hoc, on an ad hoc

2  basis?

3  A.  Yes.

4  Q.  Do you have any obligation as chancellor of the University

5  of Kansas to make these annual reports related to potential

6  conflicts?

7  A.  I believe I complete four different conflict of interest

8  forms, yes.

9  Q.  And do you also have an obligation on an ad hoc basis to

10  report anything --

11  A.  Yes.

12  Q.  -- that might arise that would potentially give you a

13  conflict?

14  A.  Correct.

15  Q.  I want to talk to you about the defendant, Doctor Feng

16  Franklin Tao.  Do you know him?

17  A.  I believe we've met before, yes.

18  Q.  And was he a professor at the University of Kansas?

19  A.  Yes.

20  Q.  I want to talk to you about something that's called the

21  University Scholarly Achievement Award at KU.

22  A.  Uh-huh.

23  Q.  Are you familiar with that award?

24  A.  Yes, I am.

25  Q.  Can you explain for the jury what that award is?

19-20052   USA v. Feng (Franklin) Tao   03.22.22

1    A.  It's a research award that's given out of my office, and

2    it's -- we give four of these awards every year typically in

3    different fields of study.  There is a nominating process;

4    faculty can self-nominate or they can be nominated by their

5    colleagues.  And then I have a committee of former award

6    winners that actually goes through all the nominations and

7    helps me select those four awardees every single year.

8    Q.  Okay.  And you said that award is focused on research?

9    A.  Mid-career research.  So it's typically people that are at

10   the associate professor level and with ten -- in ten years of

11   having hit that associate professor level.  So it's really

12   mid-career targeted.

13   Q.  Okay.  And I think earlier before the break we talked about

14   the importance of teaching and it's as equally important as

15   research.  Does this award solely focus on the research

16   component?

17   A.  It is a Scholarly Achievement Award, yes.  It's not about

18   the teaching/education side.

19   Q.  And you presented that award for -- to Doctor Tao in 2019?

20   A.  He was a recipient in 2019, yes.

21   Q.  Does that award -- it's presented in 2019, but is it based

22   on work that was done the previous year?

23   A.  It's really based on the body of work up to that point in

24   time, yes.

25   Q.  And typically how many professors receive the award each

1    year?

2    A.    Four.

3    Q.    And is the award presented at a public ceremony?

4    A.    Non-pandemic times, yes.  We would have an annual ceremony

5    where the four would be recognized and have an opportunity to

6    speak briefly about their research.

7    Q.    Okay.  You said that they would have an opportunity to

8    speak about their research.  "They" being the professor that

9    won the award?

10   A.    Correct.

11   Q.    When you presented the award in 2019, were there four

12   professors who received that award?

13   A.    Yes.

14   Q.    And Doctor Tao was one of them?

15   A.    Correct.

16   Q.    Did you physically present the award to Doctor Tao?

17   A.    I believe I actually presented it to his spouse.  I believe

18   Doctor Tao was traveling at the time.

19   Q.    And typically when you present this award at this ceremony,

20   you said that the professor that receives the award would stand

21   up and talk about his or her research?

22   A.    Correct.

23   Q.    Since Doctor Tao wasn't present at the time, was he able --

24   I assume he wasn't able to stand up and speak about his

25   research?

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    A.   Correct.

2    Q.   Did you give a few words about the reason the defendant

3    received that award?

4    A.   I did.

5    Q.   And you mentioned some collaborations that he had at the

6    time?

7    A.   I believe I did, yes.

8    Q.   During the presentation -- well, you said that you

9    mentioned collaborations.  How did you know about these

10   collaborations or how did you know about the work that Doctor

11   Tao was performing?

12   A.   Well, to be honest, those remarks were prepared for me by

13   my office, and they do that out of the packet, the nomination

14   packet, that was presented.  Yeah, and that's where they draw

15   the materials from, yes.

16   Q.   Okay.  And so it would be things that were reported to

17   someone at the university that would then be prepared for you

18   so that you could give comments based on those facts?

19   A.   Yes.

20   Q.   And you said that Doctor Tao was not there to receive the

21   award?

22   A.   That's correct.

23   Q.   Do you know where Doctor Tao was at?

24   A.   I don't recall, no.

25   Q.   Do you remember the comments that you made when you

1    presented that award to Doctor Tao?

2    A.  Not specifically, no.  I know that his research is far more

3    complex than I understood, so... yeah.

4    Q.  Okay.  Do you remember talking about that Doctor Tao was a

5    fellow with the Royal Society of Chemistry --

6    A.  Yes.

7    Q.  -- in the U.K.?

8    A.  Yes.

9    Q.  Do you remember mentioning that he had collaborated with

10   colleagues at King Abdullah University in Saudi Arabia?

11   A.  Yes.  Yeah.

12   Q.  You didn't mention any work that Doctor Tao was doing with

13   Fuzhou University in China?

14   A.  Not that I recall, no.

15   Q.  Do you remember discussing that he had developed a strong

16   team of grad students and post-doctorate students?

17   A.  Yeah.  Yes.

18   Q.  Now, when you mentioned this team, were you referring to a

19   team at the University of Kansas?

20   A.  Yes.

21   Q.  Were you aware at the time whether or not he was trying to

22   develop a team at another university?

23   A.  Not that I'm aware of, no.

24   Q.  You mentioned that he was developing a world-class lab here

25   at KU.  Did you mention whether or not Doctor Tao was

19-20052    USA v. Feng (Franklin) Tao    03.22.22

```
 1   attempting to develop a world-class lab at any other

 2   university?

 3           MR. ZEIDENBERG:  Objection.  Leading questions, Your

 4   Honor.

 5           THE COURT:  All right.  I think that's fair.  He can

 6   answer this question, but then I think you should ask

 7   open-ended questions.

 8           MR. OAKLEY:  I can rephrase, Your Honor.

 9   BY MR. OAKLEY:

10   Q.  What, if any, other university did you mention that Doctor

11   Tao was developing a world-class lab at?

12   A.  I don't believe I mentioned any other university that I was

13   aware of.

14   Q.  If you would have known that Doctor Tao was seeking to

15   develop a lab at another university, not KU, or that he was

16   seeking to recruit people to another university, not KU, or

17   that he was conducting research at another university, not KU,

18   would that have affected what you said about Doctor Tao and

19   whether or not you would've awarded him the award?

20   A.  I don't know that it would've impacted the work

21   specifically, but obviously those are issues that we would have

22   to resolve through, as I mentioned, our conflict process to

23   determine if the -- whether that was advantageous to the

24   university and, if so, then how we would resolve conflicts of

25   time and other things.
```

1   Q.  You had mentioned early on that KU is a member of -- one of

2   65 members, you said, of the Association of American

3   Universities, and you said that's throughout the United States

4   and then there's also some in Canada.

5       How does KU's reputation with other universities affect KU

6   in receiving acknowledgements such as that AAU designation?

7               MR. ZEIDENBERG:  Objection.  Relevance.

8               THE COURT:  I'm not sure I understand the relevance.

9   Why don't you lay some additional foundation.

10  BY MR. OAKLEY:

11  Q.  Well, let me ask it this way.  You said that in applying

12  for grants, these grants are competitive; is that correct?

13  A.  Yes.

14  Q.  Does KU's reputation play any role in applying for and

15  obtaining grants?

16  A.  It does.  The agencies have to have confidence that the

17  university can actually complete what's being proposed and is

18  capable of doing so.  The evaluation process is supposed to be

19  more independent than that and objective than that, but

20  certainly our relationship with the agencies does play a role

21  in our standing of being competitive for funding.

22  Q.  And does -- these agencies in the grant application

23  process -- their ability to trust that what KU says during the

24  process is truthful, is that important to you as chancellor of

25  KU?

1   A.  It is, yes.

2   Q.  Why?

3   A.  Well, we certify that we are meeting all our obligations

4   under the requirements of any given agency that we're working

5   with.  And if we are incorrect in that certification, there are

6   consequences to that ranging from admonishment, to having to

7   re-pay grant funding, to - in an extreme version - potentially

8   not being allowed to apply for funding from that agency.  So

9   the stakes are fairly high for us.

10          MR. OAKLEY:  Okay.  Your Honor, may I have one moment?

11          THE COURT:  Yes.

12          (Government counsel confer).

13          MR. OAKLEY:  Your Honor, I have no further questions

14   of this witness.

15                         CROSS EXAMINATION

16   BY MR. ZEIDENBERG:

17   Q.  Good afternoon -- or morning I guess.

18   A.  It's still morning I think.  Thank you.

19   Q.  Doctor Girod, is that --

20   A.  Yes.

21   Q.  Do you go by Doctor Girod?

22   A.  Sure.

23   Q.  Doctor Girord, you mentioned something about 40/40/20 and

24   that's 40 percent research, 40 percent teaching and 40 *[sic]*

25   percent service.  I take it that that's an aspirational goal;

1    is that correct?

2    A.   I'm not sure I --

3    Q.   Well, not all professors get funding every year, correct,

4    for research?

5    A.   Correct.  I think I understand what you're asking.  So not

6    everybody does exactly that.

7    Q.   Right.

8    A.   If that is the question.

9    Q.   That's exactly what I'm asking, is that not everybody is

10   going to literally be spending 40 percent of their time doing

11   X, 40 percent Y, 20 percent Z.  It's going to depend on the

12   year, right, to some extent?

13   A.   It largely depends on working with the chair of their

14   department to decide what their assignments are for that year.

15   Q.   Because some years they may have a much more demanding

16   teaching load or some year they may have a much more demanding

17   research load?

18   A.   And it's up to the -- their chair to work that out, yes.

19   Q.   And some years they may not have any research and some

20   years they may not have any teaching?

21   A.   That would be exceptionally rare.

22   Q.   And if someone falls short of that goal, the 40/40/20 goal,

23   could that -- you know, would a -- like the department chair

24   might confer with that person and say, you know, you're not

25   doing enough of this, you should be doing more of that?  Would

1    that typically be something that would happen?

2    A.   Yes.

3    Q.   And if that conversation didn't get a proper response,

4    might there be like a written e-mail or some kind of

5    admonishment that, you know, you haven't been spending enough

6    time in your office hours or you're not doing enough research

7    this quarter or a semester?  Would that be like an escalation,

8    a written e-mail or an admonishment?

9    A.   It could be that.  It could be a conversation with the

10   dean.  It could be a conversation with the dean of research if

11   it's research.  There are multiple parties that might

12   participate in that.

13   Q.   Okay.  And there could even be -- if there was still no

14   response, there could be some kind of a disciplinary hearing or

15   some kind of --

16   A.   Correct.

17   Q.   -- job action, like a letter to the file or something like

18   that?

19        Have you ever heard of a professor being charged with wire

20   fraud for missing a faculty meeting?

21            MR. OAKLEY:  Objection, relevance.

22            THE COURT:  Overruled.

23            THE WITNESS:  No.

24   BY MR. ZEIDENBERG:

25   Q.   And have you ever heard of search warrants being executed

 1   at a professor's house because they spent too much time on

 2   research or missed office hours?

 3   A.   No.

 4   Q.   Now, you mentioned how important the conflict of interest

 5   policy is for KU.  Going back to the period between 2014 when

 6   Doctor Tao was hired by KU and 2018, can you tell us how it was

 7   you conveyed to new hires the importance of the conflict of

 8   interest policy to the new faculty?

 9   A.   Well, I was not chancellor in 2014, but I will tell you at

10   the university we do -- or through our orientation processes,

11   we conveyed what is required of our people.  There's also a

12   process -- if you're applying for grant funding, that you have

13   to go through the conflict of interest process as well.

14   Q.   Well, again, going back a few -- you've been there since

15   2017?

16   A.   Correct.

17   Q.   Okay.  So starting in 2017 when you have familiarity, can

18   you tell us what specific training was provided to new hires

19   that explained to them the significance of the conflict of

20   interest policy and why it was so important to KU?

21   A.   I can't tell you specifically what the training was.

22   Q.   Again, during that time frame - we're talking when you

23   started there, 2017 to 2018 - are you aware of any formal

24   guidance that was provided to Doctor Tao that explained that

25   the conflict of interest form would be considered by federal

1    grant agencies in determining whether or not to issue grants?

2    A.   I'm not sure I follow the entirety of that question.

3    Sorry.

4    Q.   Okay.  Let me ask you again.  Are you aware - and, again, I

5    want to confine these questions to 2017-2018 - of any formal

6    guidance that was provided to researchers like Doctor Tao that

7    explained to them that this conflict -- this KU conflict of

8    interest form is used to determine whether or not your grants

9    will be funded?  It will be used by the funding agencies, the

10   DOEs and the NSFs of the world, in deciding whether to give you

11   grant funds?  Are you aware whether your new hires or your

12   researchers were told that?

13   A.   I know that that has been communicated, including by the

14   agencies.  I could not tell you the time frame.

15   Q.   I'm talking about KU.  Did KU provide training to

16   researchers like Doctor Tao that the conflict of interest form

17   is considered by the funding agencies before they grant -- they

18   fund grants?

19   A.   I'm certain that we notified people that they needed to

20   complete it in order to apply for the grants, but I'm not --

21   Q.   Okay.  Are you -- my question is:  Are you aware of any

22   training that was provided to new researchers that the conflict

23   of interest form is considered by granting agencies in deciding

24   whether or not to fund grants?  Are you aware of any such

25   training?

1  A.  I know they were notified.  I don't know that there was any

2  training.

3  Q.  Now, there are a lot of policies that -- that KU expects

4  people to be aware of; isn't that right?

5  A.  Correct.

6  Q.  And, in fact, if you go to the KU website and look up

7  academic policies --

8          MR. ZEIDENBERG:  If I can approach the witness.

9          THE COURT:  Yes.

10  BY MR. ZEIDENBERG:

11  Q.  I'm showing you Defense Exhibit 1448.  This is a list of

12  all the academic policies that are on the KU website.  Do you

13  see that that reaches ten pages in length?

14  A.  Yes.

15  Q.  Have you seen that before?

16  A.  Not in this format, but I'm aware of it, yes.

17  Q.  Those are your policies?

18  A.  Yes.

19          MR. ZEIDENBERG:  Your Honor, I'd like to publish 1448.

20          THE COURT:  Moving it into admission?  You're moving

21  it into admission?

22          MR. ZEIDENBERG:  Yes, Your Honor.

23          THE COURT:  Any objection?

24          MR. OAKLEY:  No objection, Your Honor.

25          THE COURT:  Exhibit 1448 admitted.

BY MR. ZEIDENBERG:

Q.   Okay.  This is just Page 1 of 1448.  Do you see all those?
And I'm not going to read these off for you, but -- because
we'll be here all day, but this is Page 2, this is Page 3, this
is Page 4, 5.

     And that's just the academic policies.  There are also
financial policies; correct?

A.   Correct.

Q.   And I'm showing you --

          MR. ZEIDENBERG:  May I approach, Your Honor?

          THE COURT:  Yes.

BY MR. ZEIDENBERG:

Q.   -- 14 -- 1449.

          THE COURT:  Are these already in the books?

          MR. ZEIDENBERG:  They are not, Your Honor.

          THE COURT:  Oh, okay.

BY MR. ZEIDENBERG:

Q.   And 1449, Doctor Girod, is that the listing of the KU
financial policies?

A.   Yeah, it looks like it is.

          MR. ZEIDENBERG:  Your Honor, I'd move to introduce
1449.

          MR. OAKLEY:  No objection, Your Honor.

          THE COURT:  1449 admitted.

BY MR. ZEIDENBERG:

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1  Q.  And here are the financial policies, and this goes on for

2  eight pages; is that right?  And I didn't even mention before,

3  the other one is double-sided.  They're all double-sided.  And

4  we don't have to go through all of them with you right now.

5      Fair to say between these two academic and financial, there

6  are scores of policies?

7  A.  Correct.

8  Q.  And you don't even know all the details of all these

9  different policies; correct?

10 A.  I do not.  Many of them don't pertain to me.

11 Q.  I'm sorry?

12 A.  Many of them don't pertain to me.

13 Q.  Right.

14 A.  Yes.

15 Q.  And nobody could know offhand all those policies; correct?

16 A.  Nor would you be expected to know all of them, no.

17 Q.  And are some of these policies more important than others?

18 A.  Well, they -- yes, I would say yes.  I mean, they

19 pertain -- these policies apply to different segments of our

20 campuses, depending on what their activities are, what their

21 responsibilities are.

22 Q.  How is it explained to new faculty members which policies

23 are most important to KU and must be most rigorously followed?

24 A.  Well, certainly in the education side, the academic

25 policies of how you have to conduct yourself as an educator are

1   conveyed.  And then on the research side, the policies you're

2   required to follow to conduct research, which is everything

3   from safety to compliance, is conveyed as well.

4   Q.  And, again, are you aware of any specific training that's

5   provided that says this conflict of interest form must -- is a

6   priority that must be rigorously followed?

7   A.  It isn't out as a mandatory annual requirement.

8   Q.  I'm asking about training.

9   A.  I don't --

10  Q.  Are you aware of any?

11  A.  I don't know about training.

12  Q.  Well, let's look at the conflict of interest form that the

13  government referenced.  This is Government Exhibit 25.

14         MR. ZEIDENBERG:  I don't know if the court needs it, I

15  have one.

16         THE COURT:  I don't think I need it.  I think it's in

17  the books.

18  BY MR. ZEIDENBERG:

19  Q.  You've seen that before?

20  A.  Yes, I have.

21         MR. ZEIDENBERG:  Your Honor, I'd move to introduce

22  Government Exhibit 25.

23         MR. OAKLEY:  Your Honor, I don't object to the

24  admission of this document.  I think if the defense wants to

25  admit it, it should be marked as a defendant's exhibit so that

1    the record is clear.

2         THE COURT:  Well, I don't want to get into duplicate

3    exhibits with duplicate numbering.  So it is definitely marked

4    as Government Exhibit No. 25 so I'll admit it that way.  Admit

5    it as Exhibit 25.

6    BY MR. ZEIDENBERG:

7    Q.  Now, this is the conflict of interest form that you were

8    referring to previously?

9    A.  Yes.

10   Q.  And if you look at Page 4, it says, "Disclose financial

11   interests held by you or family members, including your spouse,

12   dependent children and/or other members of your personal

13   household, in any entity that reasonably appears to be related

14   to your university responsibility and meets more of the

15   following criteria."

16       So before we get to the following criteria, if the entity

17   is unrelated to one's university's responsibility, there's

18   nothing to report; correct?

19   A.  Yes.

20   Q.  You agree?

21   A.  Yes.

22   Q.  So if a professor, for example, is collaborating at a

23   different university, that might not be considered as being

24   related to his KU responsibilities; correct?

25   A.  Well, if you're collaborating as a professional in your

1    field, that is related to the university.

2    Q.   Is it explained anywhere in this conflict of interest form

3    the details of what it means to be related or unrelated?

4    A.   I'm not sure -- I don't know that it is explained here, no.

5    Q.   Well, let's keep reading.  It says that, "A financial

6    interest worth 5,000 or more in any entity where the value is

7    the aggregate of any remuneration received from the entity in

8    the 12 months preceding the disclosure."

9         So if someone had not been paid $5,000 in the 12 months

10   prior to the submission of this form, in this case

11   September 2018, then nothing to report; correct?

12   A.   I believe that would be correct.

13   Q.   The form doesn't require reporting of future or anticipated

14   earnings, only realized earnings over $5,000 in the preceding

15   12 months; correct?

16   A.   That is correct.

17   Q.   Do you recall speaking at a conference in Washington, D.C.,

18   in February 2020 put on by the Department of Justice?

19   A.   I do.

20   Q.   And at that conference you said the following about

21   conflict of interest forms.  You said, "What it means to

22   violate a conflict of interest is really, I think, evolving at

23   our institutions now."

24        Do you remember saying that?

25   A.   Not specifically, no, but...

1    Q.   Does that sound familiar?

2    A.   It's consistent, yeah.

3    Q.   Is it fair to say that by "evolving," you meant that the

4    rules were changing and becoming broader and more explicit?

5    A.   Well, I believe what I would've been referring to is the

6    fact that even our federal agencies have changed their

7    expectations and requirements and continue to do so.

8    Q.   And fair to say that in 2018 that evolution hadn't really

9    begun at that point?

10   A.   I don't know that I could say that, but it certainly

11   continues to evolve.

12   Q.   Let's go back to 25, talking about time commitments.  It

13   says, "Disclose any entity with which you engage in personal

14   professional activities that take time away from your

15   university responsibilities, whether or not you receive

16   compensation."  Do you see that?

17   A.   Yes.

18   Q.   Are you aware, Doctor Girod, that in 2014 that Doctor Tao

19   published four papers?

20   A.   I'm not.

21   Q.   Well, let me ask you this:  Do you know in 2015 he

22   published six papers?

23   A.   No, I was not aware.

24   Q.   Why don't you, for purposes of this question, assume that

25   in 2014 he published four papers, and in 2015 he published six

1    papers, and in 2016 he published six papers, and in 2017 he

2    published 12 papers, and then in 2018 assume that he published

3    25 papers, okay?  And in 2018 is the year that the government

4    alleges he had entered into a contract with Fuzhou University.

5        By the way, do you know of any other professor at KU that

6    published 25 papers in a single year?

7    A.    Very few, I assure you.

8    Q.    That's a remarkable --

9    A.    It's a remarkable accomplishment.

10   Q.    Okay.  And it's fair to say, is it not, that if -- those

11   numbers that I related to you about the number of publications,

12   his scholarly output was increasing over time; correct?

13   A.    If how you laid it out is true, yes, absolutely.

14   Q.    So would you agree that if someone's productivity is

15   increasing over time, that he or she might reasonably think

16   that whatever outside activity they're involved in, it was not

17   adversely impacting their job performance?

18   A.    There's more to the job than just the scholarly output, but

19   I would certainly -- clearly being very productive on the

20   scholarly side.

21   Q.    I'm sorry?

22   A.    Being very productive on the scholarly side.  That's not

23   the entire job, but that is true, yes.

24   Q.    And just a few questions about this University Scholarly

25   Achievement Award that the government was asking you about.  In

1  November 2018 you put out the announcement for the Scholarly

2  Achievement Award; correct?

3  A.   I would have, yes.

4        MR. ZEIDENBERG:  May I approach?

5        THE COURT:  Yes.

6  BY MR. ZEIDENBERG:

7  Q.   I'm showing you Exhibit 1450.

8  A.   Thank you.

9        THE COURT:  You don't have to keep asking to approach.

10  You're fine.

11        MR. ZEIDENBERG:  Thank you.

12  BY MR. ZEIDENBERG:

13  Q.   Is this the e-mail announcement that you issued in --

14  November 12th, 2018 calling for nominations for the Scholarly

15  Achievement Award?

16  A.   It is.

17        MR. ZEIDENBERG:  Your Honor, I'd like to introduce

18  Defense Exhibit 1450.

19        MR. OAKLEY:  No objection, Your Honor.

20        THE COURT:  1450 admitted.

21  BY MR. ZEIDENBERG:

22  Q.   You said that, "The University Scholarly Achievement Award

23  is a marquee award for our university and a way to recognize

24  standout researchers who embody our mission to make discoveries

25  that change the world."

1       Do you see that?

2   A.   Yes.

3   Q.   And that it recognizes four faculty members as recipients

4   with a $10,000 award that recognizes significant scholarly or

5   research contribution; correct?

6   A.   Correct.

7   Q.   And on the next page you say that, "All nominations will be

8   evaluated by a panel of eight individuals."  That's your team

9   that reviews them; correct?

10  A.   Correct.

11  Q.   And they're appointed by you and they give the award based

12  on -- the criteria are:  Advances in the field of scholarship;

13  exhibits novelty and originality; promotes scholarly research

14  activity or creative work at KU; enhances the university's

15  national and international reputation.

16  A.   Correct.

17  Q.   And through that process, Doctor Tao was one of the four

18  awardees; correct?

19  A.   Correct.

20  Q.   And, by the way, Mr. Oakley was asking whether Doctor Tao

21  was present at the ceremony in which the award was given and

22  where you gave some remarks.  Is it fair to say that

23  researchers that you're familiar with who are prolific

24  researchers frequently travel all over the world giving

25  seminars and giving speeches and conferring with other

1    scientists around the world?

2    A.   Yes.

3    Q.   And that is something that's a normal part of the

4    collaborative process?

5    A.   It is.

6    Q.   And it's something that the university encourages and

7    welcomes, and that's -- understands that, of course, you have

8    to travel to do your -- to do your research and to meet other

9    people and to collaborate?

10   A.   Correct.

11   Q.   At that awards ceremony you said that they were being --

12   that you had four exceptional scholars, has made important

13   contributions to their particular field of research, their

14   contribution was acknowledged not by this country but also

15   around the world.  Their impressive accomplishment has

16   confirmed that the University of Kansas can foster scholarly

17   achievement at the highest levels.

18        Does that sound like something you would've said?

19   A.   It does.

20   Q.   You said that -- regarding Professor Tao, you said that his

21   contributions really have far exceeded expectations in his

22   field in terms of his productivity and really his level of

23   ingenuity?

24   A.   That sounds like something I would've said, yes.

25   Q.   You noted that he had 175 publications with over 6,000

```
 1   citations, which really speak to the novelty and the relevance

 2   of his work.  Does that sound right?

 3   A.   Yes.

 4   Q.   And you said that he's really enhanced KU's capabilities in

 5   surface science and identified key areas of a potential in the

 6   area of catalysis.  He's really received a number of

 7   prestigious awards.  In 2014 he received a National Science

 8   Foundation career award.  He's been named a fellow in both the

 9   American Association of the Advancement of Science as well as

10   the Royal Society in the United Kingdom; is that correct?

11   A.   Correct.

12   Q.   And is the -- if you are familiar, and it sounds like you

13   probably are, the American Association for the Advancement of

14   Science, being named a fellow, that's a big deal?

15   A.   It is.

16   Q.   And is that unusual for a scholar who's only been out in

17   the -- a professor for ten years?

18   A.   That would be on the early side, yes.

19   Q.   And you said that he serves as a reviewer on panels for

20   both the Department of Energy and the National Science

21   Foundation, and that he is flourishing research collaborations

22   with a number of colleges and other institutions, and you

23   mentioned Harvard and Georgia Institute of Technology, King

24   Abdullah University of Science and Technology in Saudi Arabia,

25   and he's developed a very strong team of graduate students and
```

1    post-doc researchers in addition to developing a world-class

2    lab here at KU?

3    A.    Correct.

4    Q.    Now, this award comes with a $10,000 prize?

5    A.    It does.

6    Q.    And that is money that's -- goes into the researcher's

7    pocket and he can go out and have a vacation or he can --

8    A.    Correct.

9    Q.    -- buy himself a treat for his wife or his family or do

10    whatever he wants with it; correct?

11    A.    Correct.

12    Q.    Are you aware that Doctor Tao donated $3,500 of that award

13    back to his department at KU?

14    A.    I was not.

15    Q.    Have you ever had or been aware of a scientist doing that?

16    A.    I've never inquired.

17    Q.    What's that?

18    A.    I've never inquired what they do with their money.

19    Q.    But have you been told, are you aware of that ever

20    happening?

21    A.    Our faculty often make donations to their departments and

22    to their programs.

23          MR. ZEIDENBERG:  I don't have any further questions,

24    Your Honor.

25          THE COURT:  Mr. Oakley, anything further from you?

1          MR. OAKLEY:  Yes, Your Honor.

2                  REDIRECT EXAMINATION

3   BY MR. OAKLEY:

4   Q.  On cross examination you were asked about that 40/40/20

5   split and explained that sometimes an instructor's work might

6   require more of one than the other.

7   A.  Correct.

8   Q.  Is it possible for an instructor to communicate with the

9   university to adjust that 40/40/20 split?

10  A.  That adjustment typically needs to require -- needs to

11  happen through at least the department chairman, and in some

12  schools that also happens through the dean to get approval for

13  that adjustment.

14  Q.  On cross examination you were asked about the research

15  grant and training as it relates to the conflict of interest

16  requirements.  Does KU have a department or an entity that is

17  designed to support both the university and professors in

18  obtaining grants?

19  A.  We do.  The Kansas University Center for Research is our

20  research organization that not only helps organize all that but

21  actually manages the interface with the other outside agencies

22  and foundations, et cetera, and is the organizing entity and

23  manages the oversight of all of that.

24  Q.  And is part of their job to be available for professors,

25  for researchers who have questions about what they're obligated

1    to do?

2    A.   They do that extensively, yes.

3    Q.   I want to show you what's been admitted as Defendant's

4    Exhibit 1448, and this is the long list of policies at KU;

5    correct?

6    A.   Correct.

7    Q.   And I think you pointed out that these policies apply

8    across the -- you know, hit multiple components of KU and apply

9    to multiple people at KU; is that fair?

10   A.   Yes.

11   Q.   And you mentioned earlier, I'm sorry, how many different

12   schools does KU have?

13   A.   We have 13 in Lawrence and another three in Kansas City.

14   Q.   And so multiple locations, multiple schools.  And so, for

15   instance, I would assume that maybe the Kansas Law Enforcement

16   Training Center that you mentioned is operated outside of Hutch

17   in Yoder might have different policy requirements than KU Med

18   School; is that fair?

19   A.   Most definitely.

20   Q.   It looks like this is printed from a website that's

21   maintained by KU --

22   A.   Yes.

23   Q.   -- is that correct?

24   A.   Yes.

25   Q.   And these all appear to be blue links that -- that are on

1    this list; is that true?

2    A.   Yes.  This is designed so if you want to know what any one

3    of these policies is, you can click on it and it will take you

4    to the policy.

5    Q.   And so this is a way for KU to provide all of its policies

6    to people who are interested, and they can link to determine

7    what the policy is?

8    A.   The goal of this was to try and get them all in one place,

9    because they haven't always been in one place, and so to make

10   sure that the full listing is here and that people can find

11   what it is that applies to whatever it is they're working on.

12   Q.   And the same thing on Defendant's Exhibit 1449, this is a

13   compilation of policies that are directly related to financial

14   policies; correct?

15   A.   Correct.

16   Q.   And, again, it's just a compilation so that someone who

17   wants to be refreshed or wants to learn about a particular

18   policy can go to the web and find that particular policy?

19   A.   Correct.

20   Q.   I want to talk to you about what's been admitted as

21   Government's Exhibit 25.  And is this a printout from an

22   electronic form that is submitted by individuals annually when

23   they certify whether or not they have a -- any information that

24   could be a potential conflict of information?

25   A.   That is an electronic form, yes, so this would be a

1    printout.

2    Q.   And so this shows what someone who's on the computer who's

3    complying with their annual requirements would see, check boxes

4    and that sort of thing?

5    A.   Correct.

6    Q.   And then what the defense showed you and read to you was

7    part of the disclosure criteria, and I think what he read to

8    you first was the Disclosure Criteria for Significant Financial

9    Interests?

10   A.   Correct.

11   Q.   Is that just a reminder to assist the person that's filling

12   out that form, the highlights of what they're required to

13   report?

14   A.   It's intended to tell people the types of things that they

15   need to disclose, yes.

16   Q.   And so KU, in providing the annual form, wants to make it

17   easy for the person filling out the form to know what they need

18   to report?

19   A.   That's certainly the intent.

20   Q.   Does KU have any reason to conceal to its employees what

21   they're required to report?

22   A.   No.  No.  It's in our best interest to make things as

23   evident as possible.

24   Q.   The portion on there marked No. 2, Disclosure Criteria for

25   Time Commitments and External Professional Activities, says --

1    could you read that highlighted part for the jury that begins

2    with "disclose" and ends with "below"?

3    A.    "Disclose any entity with which you engage in personal

4    professional activities that take time away from your

5    university responsibilities, whether or not you received

6    compensation, except for single occasion activities as

7    described below."

8    Q.    On cross examination you were asked about the scholarly

9    award that you presented to Doctor Tao in 2019.  And I think

10   Mr. Zeidenberg read to you the comments that you made where you

11   acknowledge affiliations that Doctor Tao reported.

12   A.    Yes.

13   Q.    And you had those because Doctor Tao reported them; is that

14   correct?

15   A.    Yes.

16   Q.    And he also asked you about comments related to

17   clarifications of federal policy.  Let me ask you this:  At any

18   point since you've been at the University of Kansas has it been

19   okay for a professor to have another employment where that

20   professor was required to research *[sic]* students at another

21   university and not disclose that to KU?

22   A.    Is that ever okay; was that the question?

23   Q.    Is that ever okay?

24   A.    No, it's not.

25   Q.    Has it ever been okay for a professor to divert people who

1    ask about employment at KU to another university?

2    A.  Certainly not preferred.

3    Q.  Has it been -- ever been okay for a professor who's a

4    full-time employee at the University of Kansas to put together

5    a group of researchers at another university and not report

6    that to KU?

7    A.  No.

8              MR. OAKLEY:  Your Honor, I have no further questions.

9              THE COURT:  Anything more?

10             MR. ZEIDENBERG:  No redirect, Your Honor -- or recross

11   I should say.

12             THE COURT:  All right.  May Chancellor Girod be

13   excused?

14             MR. OAKLEY:  Yes, Your Honor.

15             THE COURT:  May he be excused?

16             MR. ZEIDENBERG:  Yes, Your Honor.

17             THE COURT:  All right.  You're excused.  Thank you.

18             THE WITNESS:  Thank you.

19             THE COURT:  All right.  This would be a good time I

20   think to take a lunch break.  It's 12:15.  Why don't we

21   reconvene at 1:15.

22             (Recess).

23             (The following proceedings were held outside the

24   presence of the jury).

25             THE COURT:  Are we ready to resume?

1        MR. OAKLEY:  Yes, Your Honor.

2        THE COURT:  Joy, you can let her know.  Bonnie.

3        (The following proceedings were held in the presence

4   of the jury).

5        THE COURT:  All right.  You can be seated.

6        And you can call your next witness.

7        MR. OAKLEY:  Thank you, Your Honor.  The United States

8   calls Angie Loving.

9                         ANGIE LOVING,

10  called as a witness on behalf of the Government, having first

11  been duly sworn, testified as follows:

12                      DIRECT EXAMINATION

13  BY MR. OAKLEY:

14  Q.   Ma'am, could you please state and spell your name for the

15  record?

16  A.   Angie Loving.  A-N-G-I-E.  L-O-V-I-N-G.

17  Q.   And how are you employed?

18  A.   I'm employed as an assistant vice provost for human

19  resources at the University of Kansas.

20  Q.   And you work in KU's H.R. department?

21  A.   Yes.

22  Q.   Okay.  And does KU's H.R. department maintain files for its

23  employees?

24  A.   It does.

25  Q.   I'm going to hand you what's been marked as Government's

1    Exhibit 1.  Do you recognize that document?

2    A.  Yes.

3    Q.  And what is that document?

4    A.  It's a policy acknowledgement statement that employees sign

5    at the time that they're on-boarded.

6    Q.  And was this particular policy acknowledgement form signed

7    by a KU employee by the name of Franklin Tao?

8    A.  Yes.

9    Q.  And is this an example of a document that KU maintains in

10   its employee personnel file?

11   A.  Yes.

12        MR. OAKLEY:  Your Honor, I'd offer Government's

13   Exhibit 1.

14        MR. DEARINGTON:  No objection.

15        THE COURT:  Exhibit 1 admitted.

16        MR. OAKLEY:  Can we publish Exhibit 1?

17   BY MR. OAKLEY:

18   Q.  And so directing your attention to the top of this

19   document, it says University Policy and Mandated Notice

20   Acknowledgement.  Do you see that part?

21   A.  Yes.

22   Q.  Could you read that paragraph below?

23   A.  Sure.

24        "As an employee of the University of Kansas, I agree to

25   follow all university policies, including but not limited to

1   those identified below, and agree to the requirements,

2   expectations, and stipulations outlined therein.  I understand

3   that I may request a hard copy of any of the below -- below

4   identified notices and policies from the Department of Human

5   Resources, (HR).  I also understand that I may seek

6   clarification or an explanation regarding my obligations under

7   these policies from HR.  I also acknowledge the provision of

8   information related to the New Health Insurance Marketplace

9   Coverage Options and Your Health Coverage."

10  Q.  And then if we could zoom out from that first part.

11      It appears as though there's a series of policies.  For

12  instance, the first one is the Affordable Care Act notice?

13  A.  Correct.

14  Q.  And then below that it appears that there's a link to a

15  website.

16  A.  Yes.

17  Q.  Is that a website in which the person filling out this form

18  could obtain the particular policy?

19  A.  Yes.

20  Q.  Okay.  I want to direct your attention to the very bottom

21  where it begins "my signature below."

22  A.  Yes.

23  Q.  And could you please read that paragraph beginning with "my

24  signature below"?

25  A.  "My signature below affirms my agreement to abide by

1    university policy and receipt of the mandated notice.  I hereby

2    certify that I have reviewed and comprehend the policies

3    identified above, and I acknowledge and agree to abide by the

4    obligations and guidelines set forth therein."

5    Q.    And this particular form, does it appear it was signed by

6    Franklin Tao?

7    A.    Yes.

8    Q.    And it's dated August 18 of 2014?

9    A.    Correct.

10   Q.    And you said that this form is typically signed by the

11   employee around the time that they're hired on to the

12   institution, on to KU?

13   A.    It is part of their on-boarding materials, yes.

14   Q.    And if we could pull up the section that begins with

15   "Institutional Conflict of Interest policy," please.

16        And one of the policies that the defendant acknowledged,

17   too, that he had received and agreed to be bound by is

18   Institutional Conflict of Interest policy; is that correct?

19   A.    Yes.

20   Q.    And on there there are three hyperlinks.  Are those each

21   hyperlinks to the conflict of interest -- excuse me, the Kansas

22   Board of Regents Commitment of Time and Conflict of Interest

23   policy?

24   A.    Yes.

25   Q.    And then also the Individual Financial Conflict of Interest

1   policy?

2   A.  Yes.

3   Q.  I'm next going to hand you what's been marked as

4   Government's Exhibit 3.  Do you recognize Government's

5   Exhibit 3?

6   A.  Yes.

7   Q.  And what is Government's Exhibit 3?

8   A.  Commitment of Time, Conflict of Interest, Consulting, and

9   Other Employment Policy.

10  Q.  And actually I'm going to trade you, I think I handed you

11  my version.  Is this the same document?

12  A.  Yes.

13          MR. OAKLEY:  Your Honor, I offer Government's

14  Exhibit 3.

15          THE COURT:  Any objection?

16          MR. DEARINGTON:  No objection, Your Honor.

17          THE COURT:  Exhibit 3 admitted.

18  BY MR. OAKLEY:

19  Q.  And this is the Commitment of Time, Conflict of Interest,

20  Consulting and Other Employment Policy that was referenced in

21  the policy acknowledgement; is that correct?

22  A.  Correct.

23  Q.  And I would direct your attention to the bottom where it

24  says "Policy Statement:  Preamble."  And the preamble begins

25  with "The Board of Regents encourages the Regents institutions

1    to interact with businesses," et cetera.  This policy adopts

2    the Board of Regents policies; is that correct?

3    A.   Yes.

4    Q.   Next I want to hand you what's been marked as Government's

5    Exhibit 3A.  Do you recognize that document?

6    A.   Yes.

7    Q.   What is that?

8    A.   Individual Financial Conflict of Interest Policy.

9    Q.   And is that another policy -- is that the other policy that

10    was referenced in the Government's Exhibit 1, the university --

11    excuse me, university policy acknowledgement signed by the

12    defendant?

13    A.   It is.

14          MR. OAKLEY:  Your Honor, I'd offer Government's

15    Exhibit 3A.

16          THE COURT:  Any objection?

17          MR. DEARINGTON:  No objection, Your Honor.

18          THE COURT:  3A admitted.

19    BY MR. OAKLEY:

20    Q.   And again directing your attention to the top.  This is the

21    Individual Financial Conflict of Interest Policy?

22    A.   Correct.

23    Q.   And this is the second of the conflict of interest policies

24    the defendant acknowledged that he understood and agreed to be

25    bound by?

1  A.  Yes.

2  Q.  I next want to hand you what's been marked as Government's

3  Exhibit 4.  Do you recognize that document?

4  A.  I do.

5  Q.  And what is that document?

6  A.  It's the Handbook For Faculty and Other Unclassified Staff.

7  Q.  And is that a handbook that's -- that the university

8  publishes?

9  A.  Yes.

10        MR. OAKLEY:  And, Your Honor, I'd move to admit

11  Government's Exhibit 4.

12        THE COURT:  Any objection?

13        MR. DEARINGTON:  No, Your Honor.

14        THE COURT:  Exhibit 4 admitted.

15  BY MR. OAKLEY:

16  Q.  This policy is -- if you scroll to the middle, it says

17  University of Kansas, Lawrence, Kansas, March 2010?

18  A.  Uh-huh.

19  Q.  Is this the version of the policy that was in effect when

20  the defendant was brought on to the institution?

21  A.  Yes.

22  Q.  And this handbook -- what's contained in this Handbook For

23  Faculty and Other Unclassified Staff?

24  A.  It has an overview of rules and regulations from faculty

25  senate, staff senate, and the university, governing employment

19-20052    USA v. Feng (Franklin) Tao    03.22.22          95

1    at the University of Kansas.

2    Q.  And does this document give an overview of the university?

3    So, for instance, on Page 5 it discusses the Board of Regents

4    at the top?

5    A.  It does.

6    Q.  And then there are references to the Board of Regents and

7    the Board of Regents policy manual?

8    A.  It has that, yes.

9    Q.  Okay.  And so is this an example of a handbook that would

10   be provided to new staff when they're brought on to the

11   university?

12   A.  Uh-huh.

13          THE COURT:  You have to answer yes or no.

14          THE WITNESS:  Oh, yes.

15   BY MR. OAKLEY:

16   Q.  How are -- these documents that we've been talking about

17   that contain the policies, how are they -- how does KU

18   disseminate these types of documents to its new employees?

19   A.  New employees get their policy -- they get the information

20   that was provided in the on-boarding packet for policies that

21   are applicable to their employment, and then all university

22   employees have access to the university policy library that has

23   every policy that we publish from all sectors across campus

24   including human resources.

25   Q.  And so --

 1        Could we show Government's Exhibit 1 again, please?

 2        And when an employee is brought on to the university,

 3   they're provided these specific policies; correct?

 4   A.   Correct.

 5   Q.   And they're told to read and agree to be bound by those

 6   policies?

 7   A.   Yes.

 8   Q.   But is that the only time that -- that policies such as the

 9   conflict of interest policy is available to an employee?

10   A.   All policies are available year-round.

11   Q.   How?

12   A.   In our online policy library.

13   Q.   And someone that wanted -- are those publicly available on

14   the university's website?

15   A.   Yes.

16   Q.   And so could anyone that wanted to see the policies go to

17   the KU website and find them?

18   A.   They could.

19   Q.   But most specifically, the persons who those policies apply

20   to are not only provided links to them at the time of

21   on-boarding but have the ability to access those policies at

22   any time?

23   A.   That's correct.

24   Q.   Next I want to hand you what's been marked as Government's

25   Exhibit 9.  Ms. Loving, do you recognize that document?

1   A.   Yes.   This is a university offer of employment offer

2   letter.

3   Q.   And is that an offer letter that relates to the defendant,

4   Franklin Tao?

5   A.   Yes.

6   Q.   And could you explain for the jury just what that offer

7   letter is?

8   A.   The offer letter outlines the official job title, start

9   date, compensation package, the department in which that

10  employee will be working for, if they're benefits-eligible, if

11  they're in a tenured status, and any other types of offer

12  package materials is also combined in this letter, which would

13  include perhaps a moving package, startup allocation to bring

14  someone's lab or to get something up and running or purchase

15  equipment for.

16  Q.   Okay.   So does this basically summarize the employment

17  agreements that KU is making for particular faculty?

18  A.   Yes, at the time that they're hired.

19  Q.   Okay.   And in this particular case is this dated June 25th,

20  2014?

21  A.   Yes.   That's the date that this offer letter was issued.

22       MR. OAKLEY:   Your Honor, I'd offer Government's

23  Exhibit 9.

24       THE COURT:   Any objection?

25       MR. DEARINGTON:   No, Your Honor.

```
 1              THE COURT:  Exhibit 9 is admitted.

 2   BY MR. OAKLEY:

 3   Q.   And so at the top it's -- there's the name Franklin (Feng)

 4   Tao?

 5   A.   Yes.

 6   Q.   Does that correspond with the KU employee that this

 7   document would apply to?

 8   A.   Yes.

 9   Q.   And then there's a start date.  In this particular case

10   it's August 18th of 2014?

11   A.   Correct.

12   Q.   And then there's an official job title that says associate

13   professor?

14   A.   Yes.

15   Q.   And then FTE.  What does FTE mean?

16   A.   It stands for full-time equivalent.  So basically this

17   means that it's a full-time employee on our campus.

18   Q.   And so in this particular case Franklin (Feng) Tao was

19   hired as a full-time employee at the university?

20   A.   Yes.

21   Q.   As an associate professor?

22   A.   Correct.

23   Q.   And then there's also a section that's base salary.  What

24   does that mean?

25   A.   Base salary is the amount of salary he would've been paid
```

1    between 8-18 through 5-16 of that academic year.

2    Q.   Next I want to hand you what's been marked as Government's

3    Exhibit 11.   Do you recognize that document?

4    A.   Yes.

5    Q.   What is that?

6    A.   This is a secondary offer letter for Franklin Tao.

7    Q.   And is this document dated January 13th, 2015?

8    A.   That is the date that the letter was issued.

9         MR. OAKLEY:   Your Honor, I would offer Government's

10   Exhibit 11.

11        THE COURT:   Any objection?

12        MR. DEARINGTON:   No objections, Your Honor.

13        THE COURT:   Exhibit 11 admitted.

14   BY MR. OAKLEY:

15   Q.   And so, again, directing your attention to the top, this

16   document relates to the defendant, Franklin (Feng) Tao?

17   A.   Yes.

18   Q.   And the start date on this is dated January 1st, 2015.   And

19   then under Official Job Title it says Associate Professor,

20   Chemical and Petroleum Engineering .5 FTE, and then chemistry

21   .5 FTE.   Do you know what that signifies?

22   A.   Yes.   It signifies that on January 1st of 2015 instead of

23   being full-time in the Department of Chemical and Petroleum

24   Engineering, his appointment shifted where half the time he was

25   in chemical and petroleum engineering and the other half of his

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    position was in chemistry.

2    Q.  And so the FTE next to that says 1.0.

3    A.  Yes.

4    Q.  And so Defendant Tao was still a full-time employee of the

5    university --

6    A.  Correct.

7    Q.  -- is that correct?

8    A.  Correct.

9    Q.  But that full-time responsibility was split between the two

10   departments, chemical and petroleum engineering and chemistry?

11   A.  Yes.

12   Q.  And then the base salary was $105,000; is that correct?

13   A.  Correct.

14   Q.  Next I want to hand you what's been marked as Government's

15   Exhibit 12.  Do you recognize Government's Exhibit 12?

16   A.  Yes.

17   Q.  What is that document?

18   A.  This is an annual salary notice that was issued by the

19   University of Kansas Human Resources Office in February of

20   2018.

21   Q.  And does this relate to the defendant, Feng Tao?

22   A.  Yes.

23   Q.  And this is dated February 3rd, 2018?

24   A.  Correct.

25        MR. OAKLEY:  Your Honor, I'd offer Government's

```
 1   Exhibit 12.

 2            THE COURT:  Any objection?

 3            MR. DEARINGTON:  No objection, Your Honor.

 4            THE COURT:  Exhibit 12 admitted.

 5   BY MR. OAKLEY:

 6   Q.  And so can you explain to the jury just what this letter

 7   is?

 8   A.  Yes.  Every year the University of Kansas issues a letter

 9   to our employee -- our faculty and staff employees that are on

10   regular positions that outlines the terms of their employment.

11   Q.  Okay.

12   A.  It covers their job title, their FTE, academic year salary,

13   dates of the appointment.  And for faculty it also indicates if

14   they're tenured or tenure track.

15   Q.  Okay.  And so this particular letter relates to what dates?

16   A.  This is for the dates of the 2017-2018 academic year.  So

17   that would begin 8-18 of 2017 through May 16th of 2018.

18   Q.  Next I want to hand you what's been marked as Government's

19   Exhibit 13.  Do you recognize that document?

20   A.  Yes.

21   Q.  And what is that document?

22   A.  It's an annual salary notice for the academic year of

23   8-18-2018 through May 16th of 2019.

24   Q.  And is this the same -- similar to the letter that we just

25   talked about except for this is for the next academic year?
```

1    A.   Correct.

2    Q.   And this relates to the defendant, Feng Tao?

3    A.   Yes.

4              MR. OAKLEY:   Your Honor, I'd offer Government's

5    Exhibit 13.

6              THE COURT:   Any objection?

7              MR. DEARINGTON:   No objection, Your Honor.

8              THE COURT:   13 admitted.

9    BY MR. OAKLEY:

10   Q.   And so I notice -- let me direct your attention to the

11   bottom.  I noticed that both Government's Exhibit 12 and

12   Government's Exhibit 13 are signed by Douglas Girod, but -- and

13   there's an empty line at the bottom of each.  Can you explain

14   that to the jury?

15   A.   Yes.  We ask that employees sign and return this letter to

16   human resources for their employee folder; however, it isn't

17   required for them to do so.  So these are copies of what was

18   issued and since we don't have a signed copy, I would assume

19   that he did not return one signed back to our office.

20   Q.   Okay.  And so you said that you ask employees to sign them,

21   but you don't always receive them back?

22   A.   Correct.

23   Q.   But this is a copy of what's maintained in the defendant's

24   H.R. file?

25   A.   Yes.

1    Q.  Okay.  Next I want to hand you what's been marked as

2    Government's Exhibit 14.  And do you recognize that document?

3    A.  Yes.

4    Q.  And what is that document?

5    A.  This is a letter that -- one second.

6         This is a letter from the provost at the time, so our

7    provost Neeli Bendapudi in April 27th of 2018 and this letter

8    outlines that instead of being in a -- having a split

9    allocation between the Department of Chemistry and the

10   Department of Chemical and Petroleum Engineering as an

11   associate professor, he's returning back to full-time effort in

12   the Department of Chemical and Petroleum Engineering.

13        MR. OAKLEY:  Your Honor, I would offer Government's

14   Exhibit 14.

15        THE COURT:  Any objection?

16        MR. DEARINGTON:  No objection.

17        THE COURT:  Exhibit 14 admitted.

18   BY MR. OAKLEY:

19   Q.  So you said this letter is dated April 27th of 2018?

20   A.  Uh-huh.

21   Q.  So earlier we talked about how prior to this that the

22   defendant was a full-time employee, but he worked both for the

23   Department of Chemistry and CP&E; is that correct?

24   A.  Yes.

25   Q.  And this letter just signifies that at this point he was

1    still a full-time employee but only in the CP&E department; is

2    that fair?

3    A.    Yes.    This signifies that he would return to full-time in

4    CP&E beginning August 18th of 2018, which is a new academic

5    year.

6    Q.    This was signed in April and so it relates to the next fall

7    semester?

8    A.    Correct.

9    Q.    Okay.    Next I want to hand you a DVD that's been marked as

10   Government's Exhibit 15.    And are you familiar with that DVD?

11   A.    No.

12   Q.    In preparation for your testimony today did I show you a

13   DVD containing a spreadsheet that contains payment information

14   related to salary to Doctor Tao?

15   A.    Oh, yeah, uh-huh.

16   Q.    And is that spreadsheet contained on that DVD --

17   A.    Yes.

18   Q.    -- that's Government's Exhibit 15?

19   A.    Yes.

20   Q.    And that spreadsheet was -- contains Doctor Tao's salary,

21   the amount of money that he received in salary from KU?

22   A.    Correct.    It contained the payments that were made to

23   Doctor Tao each payroll cycle between 2014 and 2020.

24   Q.    And it's a fair and accurate representation -- the

25   spreadsheet is a fair and accurate representation of that

1    information?

2    A.   What I saw was, yes.

3          MR. OAKLEY:   Your Honor, I'd offer Government's

4    Exhibit 15.

5          THE COURT:   Any objection?

6          MR. DEARINGTON:   No objection, Your Honor.

7          THE COURT:   15 admitted.

8    BY MR. OAKLEY:

9    Q.   And so if we could just look at the top of this

10   spreadsheet, can you explain for us the -- the columns and what

11   information is contained in this document?

12   A.   Sure.  Column A is labeled ID, which that's the employee ID

13   number.  That's a uniquely assigned number to each employee on

14   campus.

15       Off cycle really means the payroll run that that paycheck

16   was generated off of.  So this was not on an off cycle, so "N"

17   means no, so that means it was paid on time on an on cycle

18   payroll calculation with the State of Kansas.

19       The next column, Column C, is the pay period end date for

20   each pay period.

21       Check date would be the date in which that person was paid

22   for those earnings.

23       Total gross salary for that time period.

24       The net pay after deductions and taxes.

25       Priority is really just associated with the off cycle check

19-20052    USA v. Feng (Franklin) Tao    03.22.22                    106

1    number and is facilitated with the State of Kansas.

2        Type is the type of bank account that the deposit went to.

3        The account number would've been the account number that

4    the employee requested for their paycheck to be deposited in.

5        Bank ID would be the routing number.

6        And the deposited amount.  University employees can select

7    up to three different accounts for their earnings to be

8    distributed in.  And so "priority" you'll see 999, that means

9    that the full deposit went into one account, and then it

10   appears that additional accounts were selected.  So 1 and 2

11   would show those different accounts and you can reference by

12   the pay period cycle how that was distributed.

13   Q.  So, for instance, the first row was a pay period that ended

14   August 30th of 2014?

15   A.  Correct.  And since he's on an academic year appointment,

16   the first pay -- his first day of pay status would've been

17   August 18th of 2024 *[sic]* as stated in his offer letter.

18   Q.  And so for that particular pay period, the paycheck just

19   went into one account?

20   A.  Yes.

21   Q.  Since there's only one account listed?

22   A.  Yes, yes.

23   Q.  Could we scroll to the bottom, please?

24       And so looking at row 412, does that correspond with

25   payments that were related to a pay period May 16th, 2020?

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    A.   Yes.  His paycheck was distributed into three different

2    accounts for the end of that pay period on 5-16 of 2020,

3    represented by Lines 410 through 412.

4    Q.   So if an employee wants to have their paycheck divided up

5    into multiple accounts, that's -- you said you could do up to

6    three?

7    A.   Yes.

8    Q.   And so this spreadsheet shows the amount of payments that

9    KU made to Doctor Tao as salary throughout his tenure at the

10   university; is that accurate?

11   A.   Correct.

12   Q.   Let me talk to you about professors and full-time

13   professors at KU.  Is the standard that they be hired on for

14   the academic year, fall semester and spring semester?

15   A.   The standard for a tenured/tenured track faculty are to be

16   appointed on an academic year, so yes.

17   Q.   And so how many months are we talking about?

18   A.   Approximately nine.

19   Q.   And so it's a nine-month school year?

20   A.   Yes.  It would represent when our fall semester begins and

21   through the end of the spring semester.

22   Q.   And are professors that are on the nine-month calendar, are

23   they able to obtain payment for the -- for the summer months,

24   the months outside the standard school year?

25   A.   They can if they have additional resources through grants

1    or the opportunity to teach in the summer or any kinds of other

2    awards or requests made of them to provide service.

3    Q.  So if -- you mentioned that one way to receive payment in

4    the summer was if a professor had a grant?

5    A.  Yes.

6    Q.  And in order to receive that summer salary, would the

7    professor have to be working on that particular grant?

8    A.  Yes.

9    Q.  And does human resources maintain information related to

10   summer salary for professors?

11   A.  We maintain what is necessary for payroll purposes as far

12   as the amount of effort that that person is working on a

13   specific project and how much they should be paid, but that's

14   pretty much it of it.

15   Q.  I want to hand you what's been marked as Government's

16   Exhibit 21.  Do you recognize that document?

17   A.  Yes.

18   Q.  And what is that?

19   A.  This is called a Summer Pay Notification document.  So it

20   outlines when a professor or an academic year employee is paid

21   summer salary regardless of whatever funding source it's on.

22   This is the document that is the audit reference as to the

23   allocation of effort and the amount to be paid on that source

24   of funds.

25   Q.  And so you indicated that one way that a professor could

1    receive summer pay would be if that particular professor were

2    working on a project that allowed for summer pay; is that fair?

3    A.   Yes.

4    Q.   You also mentioned that sometimes there's opportunities to

5    teach summer classes?

6    A.   Correct.

7    Q.   Okay.  And does this particular document, Government's

8    Exhibit 21, relate to 2019 summer pay notification for the

9    defendant?

10   A.   Yes.

11   Q.   And this document contains the summer pay notification and

12   then also related e-mails?

13   A.   Yes.

14   Q.   And was this maintained by KU's H.R. department as part of

15   its normal course of business?

16   A.   Yes, and part of the audit records.

17        MR. OAKLEY:  Your Honor, I would offer Government's

18   Exhibit 21.

19        THE COURT:  Any objection?

20        MR. DEARINGTON:  No objection, Your Honor.

21        THE COURT:  Exhibit 21 admitted.

22   BY MR. OAKLEY:

23   Q.   And so directing your attention to the -- to the top

24   portion, does this document just identify the sources that were

25   used for summer pay for 2019?

1    A.  Yes, and the dates.

2    Q.  And the dates.

3         MR. OAKLEY:  Your Honor, I have no further questions.

4                    CROSS EXAMINATION

5    BY MR. DEARINGTON:

6    Q.  Good afternoon, Ms. Loving.

7    A.  Hi.

8    Q.  Did the government - and by "the government" I mean the

9    FBI - ever meet with you prior to Doctor Tao's arrest in

10   August 2019?

11   A.  No.

12   Q.  They never met with you to ask about the policies that were

13   just presented to you and to ask what they meant and how they

14   might be understood?

15   A.  They did not meet with me.

16   Q.  So when was the first time that the FBI met with you to get

17   a better understanding of these policies?

18   A.  About a week ago.

19   Q.  A week ago.

20        The policy acknowledgement form that you mentioned, that's

21   Exhibit 1.

22        Ms. Kessler, do you mind pulling that up on the computer,

23   please?  So if you could just please scroll to the top.

24        I think, Ms. Loving, that you read from this preamble, that

25   it says, "As an employee of the University of Kansas, I agree

1   to follow all university policies, including but not limited to

2   those identified below."  And there are 15 policies identified

3   below; is that correct?

4   A.   I haven't counted them, but...

5   Q.   Roughly?

6   A.   Yes.

7   Q.   Okay.  And fair to say there are scores of university

8   policies?

9   A.   Yes.

10  Q.   So an employee when they sign this form is agreeing that

11  they're going to follow, what, upward of over 100 policies?

12  A.   Yes.

13  Q.   Okay.  And I think you mentioned also that these policies

14  are available on the Internet; is that true?

15  A.   True.

16  Q.   And that's important because it means that if a researcher

17  is filling out a conflict of interest form or otherwise trying

18  to maintain adherence to a policy, it might be 8:00 at night,

19  they could pull it up on the Internet rather than call someone

20  who might have a better understanding of it so they can look at

21  the policy and understand it.  Is that why they're on the

22  Internet, one of the reasons?

23  A.   That would be one of the reasons why, yes.

24  Q.   And that's also why they're publicly available; correct?

25  A.   Yes.

19-20052    USA v. Feng (Franklin) Tao    03.22.22                    112

1    Q.   To make them as easy and accessible as possible to the

2    10,000 or so employees of the University of Kansas?

3    A.   Yes.

4    Q.   And so when Doctor Tao signed this, I believe you said the

5    signature was August 18th, 2020 -- it was 2014, sorry, do I

6    have that correct?

7    A.   That's the date stamped on this document.

8    Q.   And earlier when you looked at the terms of Doctor Tao's

9    employment, that was his start date; correct?

10   A.   Yes.

11   Q.   And so you have an employee on the very first day of work

12   certify that they've understood and will agree with all

13   university policies, including but not limited to these 15

14   which are linked; correct?

15   A.   Yes.  But the offer letter was issued in July, if I recall

16   by another exhibit, and so the employee would have had from

17   that point to the start date of the employment to have that

18   document to review all of those policies.

19   Q.   Fair enough.

20       And so for Doctor Tao, when he was leaving Notre Dame and

21   moving his family and his 9-year-old twins --

22           MR. OAKLEY:  Objection, assumes facts not in evidence.

23           THE COURT:  Overruled.  You can complete the question.

24   BY MR. DEARINGTON:

25   Q.   And moving his family from South Bend, from where he was at

1    Notre Dame, to Lawrence, Kansas, where he was at Kansas, and

2    moving all of his lab and getting ready for coursework and

3    getting ready for the first day and handling all of that, he

4    was required to have reviewed all of these policies and all

5    university policies, over 100, and understood those on his

6    first day of work so that he could sign in compliance with

7    that; correct?

8    A.    Correct.

9    Q.    And do you expect that all 10,000 or so university

10   employees, or however many have to sign a form like this, have

11   read all of the policies before they sign?

12   A.    I expect that they have read the policies, especially those

13   of this document.

14   Q.    And do you think that all of those employees have, in fact,

15   read all of the policies?

16   A.    I do not know.

17   Q.    Okay.  And it doesn't say especially the 15 policies below

18   should be read; correct --

19   A.    That's correct.

20   Q.    -- it says including but not limited to those policies.

21        And if a employee doesn't sign, they don't get hired;

22   correct?

23   A.    That's correct.

24   Q.    So there is pressure to have read all university policies

25   and signed so that one can start their first day of work and

1    continue about their business on their first day; fair to say?

2    A.   Fair to say, yes.

3    Q.   Okay.  So going back to the Internet, I'd like to kind of

4    put myself, if we can, and put this courtroom into the position

5    and the shoes of a researcher who might be trying to look at --

6    at these types of policies.

7        So Exhibit 50 I believe, was it 50, there was a faculty

8    handbook -- sorry, not Exhibit 50.

9        Ms. Kessler, do you mind pulling up the faculty handbook

10   exhibit, please.

11       And that's marked as Exhibit 4.  You mentioned that this

12   would be one place where an employee would have access to

13   guidance and requirements of the university and it's also

14   linked in here; correct?

15   A.   Yes.

16   Q.   To certain policies?

17   A.   Yes.

18   Q.   Okay.  So if I wanted to know about the conflict of

19   interest policy, for example, I might go on the Internet --

20       And I'm going to ask, Ms. Kessler, if you could pull up the

21   website for the faculty handbook and just pause on the -- other

22   page, please.  I think it's a handbook -- yes, right there.

23       So is that the page that an employee might look at if they

24   wanted to look at this handbook online?

25   A.   Yes.

1    Q.  Okay.  And, Ms. Kessler, could you please click on the link

2    for Handbook For Faculty and Other Classified Staff.

3       Do you know where in this -- is it -- can we see the page

4    number, 50 pages, do you know where in the 50 pages the

5    conflict of interest policies might be addressed?

6    A.  I do not recall.

7    Q.  Okay.  Well, I think I can -- if I remember correctly --

8       If you could please, Ms. Kessler, scroll to page -- let's

9    try 30.  And I want to -- if you could just pause and hover

10   over the link that says Regents Policy Manual, II.F.2.  So

11   pause there for a moment.

12      It says, "The Regents policy manual on activities that

13   interfere with the conduct of the university."  And that would

14   be a link where the employee could access this; right?

15   A.  Yes.

16   Q.  So the employee would have to find the handbook -- or one

17   way that the employee could find this is by finding the

18   handbook, scrolling all the way to Page 37, and then clicking

19   on this link; correct?

20   A.  That is one way.

21   Q.  Ms. Kessler, could you please clink on the link?

22      What does that say?

23   A.  It looks like it's a broken link and that there's an error

24   found.

25   Q.  So fair to say this link is not accessible to employees as

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    we stand here today?

2    A.    As shown, yes.

3    Q.    And if I were an employee and I were certifying my conflict

4    of interest form today and I had a question and let's say it's

5    7:00 at night and I came to this website and it said Error 404,

6    I would probably -- fair to say that an employee could reach

7    out to H.R. if they encountered this broken link to ask the

8    question they might have?

9    A.    That's correct.   That's today.

10   Q.    Sure, today.

11   A.    I do not know in 2014 if that link was broken.

12   Q.    I'm just asking about today.   We'll get -- we'll get there.

13   A.    Yeah.

14   Q.    So today.

15   A.    Yes.

16   Q.    And you're not sure how long this link has been broken?

17   A.    No.

18   Q.    And so fair to say no one has reached out to you or anyone

19   that you're aware of to report that they don't have access to

20   this conflict of interest policy listed in this faculty

21   handbook?

22   A.    That's correct.

23   Q.    Okay.   Does that signal to you that it's possible people --

24   that -- let me rephrase that.

25        Fair to say that means that no one who has encountered this

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    website has thought it important enough to try to get it fixed,

2    to reach out to you?

3    A.    I suppose so.

4    Q.    Okay.  Ms. Kessler, if you could please go backwards to the

5    faculty handbook.

6        Because there is another link that an employee might be

7    able to use.

8        If you could go to Page 37, please.

9        Okay.  The very first link, Board of Regents Policy,

10   Commitment of Time, Conflict of Interest, Consulting, and Other

11   Employment.

12       Again, that's an opportunity that an employee could have to

13   look at that policy, study it, understand it, and if they had

14   questions, come to you with those questions; fair?

15   A.    Yes, along with the conflict of interest policy that's in

16   the website and policy library.

17   Q.    Okay.  Bear with me one moment, I just want to make sure I

18   have the right page number right here.

19       Okay.  Ms. Kessler, if you could return to the electronic

20   version of the handbook that's given out to employees, please.

21   And let's try that first link.

22       Does that signal to you the same that you mentioned

23   earlier, that you testified to earlier, that an employee would

24   be unable to reach this link as we stand here today?

25   A.    From this link, from this resource, yes.

1    Q.   Okay.  And you said at least today this is the case?

2    A.   Today.

3    Q.   So it's possible that a week ago this link went down and it

4    just happens to help our point as we stand in court today;

5    correct?

6    A.   That's correct.  I can only speak to today.

7    Q.   But can you speak to the last seven years about this link

8    being down?

9    A.   No.

10   Q.   So you're not sure as you stand here today that this link

11   was active for the -- any time for the last five years -- seven

12   years rather?  We'll say six to be safe.

13   A.   I do not check the links to this document every day, so no.

14   Q.   You don't check the links to this document every day.  Do

15   you check the links to this document ever?

16   A.   This document was created in 2010 from the Office of the

17   Provost.  It has not been checked for some time.

18   Q.   Okay.  And you're in HR; correct?

19   A.   Yes.

20   Q.   So fair to say you -- policies are one of your domains?

21   A.   Yes.

22   Q.   But there's also an expectation, even though you haven't

23   checked this link in six years, that employees like Doctor Tao

24   who were spending 16 hours in a lab all day will have checked

25   this policy and understood it?

1    A.   That's what our policy acknowledgement statement says, yes.

2    Q.   Okay.  Ms. Kessler, could you please travel or navigate to

3    the financial conflict -- to the online conflict of interest

4    policy, please.

5         Okay.  And here we have the Individual Financial Conflict

6    of Interest policy; correct?

7    A.   Correct.

8    Q.   And this was marked I believe as -- the hard copy version

9    was marked as 3A; is that correct?

10   A.   Let me look.

11   Q.   Yes.  You can see here, this is 3A.

12   A.   Yeah.

13   Q.   Great.

14   A.   Yes.

15   Q.   Ms. Kessler, could you please navigate back to the web

16   page?

17        So this is a conflict of interest form for the University

18   of Kansas and KU Medical Center; correct?

19   A.   Yes.

20   Q.   And would this apply to multiple campuses or -- multiple

21   campuses?

22   A.   Yes.

23   Q.   So if you could scroll down to the Lawrence link, Ms.

24   Kessler, please.  I think keep going.  A long policy, but I

25   think it's toward the bottom.  Even further down.

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    Related Procedures.  Reporting and Managing Conflict of

2    Interest, Lawrence Campus.  So fair to say that would be a

3    place if you wanted more information about the policies that

4    are specific to you, if you're at the Lawrence campus like

5    Doctor Tao was, you could click on that link?

6    A.   Yes.

7    Q.   Do you know whether that link works?

8    A.   I do not.  This isn't a policy that's owned by human

9    resources.

10   Q.   Do you know if the next link works?

11   A.   I do not.

12   Q.   Do you know if any links on this page work?

13   A.   Not without trying them.

14   Q.   Well, let's try Reporting and Managing Conflicts of

15   Interest, Lawrence Campus.

16       "Sorry about this, but that page cannot be found.  Oh,

17   Hawk."

18       So fair to say a researcher who was trying to access this

19   policy with questions wouldn't have access to this through this

20   web page, which is the financial conflict of interest online

21   web page?

22   A.   Not today.  This looks like it is the migration to our

23   accessible web page that's currently underway --

24   Q.   Okay.

25   A.   -- at the University of Kansas.

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    Q.  Understood.  So not today, but you're not sure when this

2    would've -- you can't say with certainty when this would've

3    been available.

4        Was there any training provided by KU on any of the

5    policies you've testified about today, provided to Doctor Tao?

6    A.  There is training provided on several of these policies.

7    The training for conflict of interest would be through the

8    Office of Research, so I would not be able to speak as to back

9    in 2014 through his term of employment when those trainings

10   would've taken place.

11   Q.  And when you say training by the Office of Research related

12   to conflicts of interest, are you talking about formal

13   training?

14       Let me rephrase my question, apologies.  You're not aware

15   of any formal training that Doctor Tao has undergone related to

16   conflicts of interest; correct?

17   A.  Specifically no, but there is a requirement that you have

18   to disclose every year --

19   Q.  I'm just asking --

20   A.  -- conflicts of interest, yes.

21   Q.  We'll get there.  I'm sorry to cut you off, Ms. Loving.

22   A.  Sorry.

23   Q.  So not aware of any training related to conflicts of

24   interest provided to Doctor Tao from when he was hired in 2014

25   to when he was indicted in 2019?

19-20052   USA v. Feng (Franklin) Tao   03.22.22                    122

1   A.   Not specifically from human resources.

2   Q.   Okay.  Got it.

3        And turning back to -- actually I would like to show you

4   what's been marked as Exhibit 25 from the government.

5        Ms. Kessler, do you mind navigating to that?  I'm sorry,

6   actually if we could start with 3A again, which I think you

7   were just at, that might be a better place to start here.

8        Because you've already testified about this, this is the

9   Individual Financial Conflict of Interest policy; correct?

10  A.   Uh-huh.  Yes.

11  Q.   And is there anywhere in this policy that states and

12  informs an employee that if they violate the policy, they could

13  be charged with a federal crime?

14  A.   Not that I'm aware of.

15  Q.   You can look if you would like.  I think -- if you'd like

16  us to scroll down to somewhere, we're happy to do so, but...

17  A.   Please.

18  Q.   Okay.  Let's scroll through it.

19       Just to short-circuit this, I can represent to you that it

20  does not -- nothing in here says that you may be charged with a

21  federal crime if you violate the policy.

22       What it does say, I can represent to you, is that, "The

23  implementation and enforcement of this policy and the conflict

24  of interest procedures and the handling of violations of the

25  policy and/or procedures will be managed in accordance with the

1    applicable university policies and procedures."  Does that

2    sound familiar?

3    A.   Yes, it's in the enforcement section.

4    Q.   Okay.  And there's also a list of statutes and regulations

5    in here; is that correct?

6    A.   That's correct.

7    Q.   And none of those to your awareness are criminal federal

8    statutes, are they?

9    A.   No.

10   Q.   Okay.  So one of the key concepts of human resources

11   management is ensuring that your employees are well-informed

12   about policies; is that correct?

13   A.   That's part of it, yes.

14   Q.   Do you think an employee would've had a better

15   understanding of the conflict of interest policy if they were

16   required to undergo conflict of interest training?

17   A.   Yes, possibly.

18   Q.   Are you aware that KU does, in fact, give conflict of

19   interest training to certain principal investigators who deal

20   in certain health fields?

21   A.   I can't speak to that.

22   Q.   You just know that -- you're not aware of Doctor Tao doing

23   such a training?

24   A.   That training would be done by the Office of Research.

25   Q.   Okay.  So fair to say that the Office of Research actually

1    manages certain policies that otherwise might be maintained by

2    human resources or that are kept by human resources?

3    A.   As documentation, yes.

4    Q.   Okay.  And is it fair to say that the conflict of interest

5    policy at KU was narrower in 2018 than it is today?

6    A.   I can't speak to that.

7    Q.   Are you aware of what the conflict of interest policy is

8    today?

9    A.   I could not recite it.  I do know what -- as an employee

10   what needs to be done and can speak to an overview of conflict

11   of interest.

12   Q.   So if there was a significant revision to the conflict of

13   interest policy since 2018, you can't say one way or another

14   whether that, in fact, happened?

15   A.   Not today, no.

16   Q.   But employees like Doctor Tao who are in the lab are

17   expected to know if that's changed; correct?

18   A.   The Office of Research would have likely had sent out

19   communication to all principal investigators and individuals on

20   grants regarding conflict of interest policy changes as well as

21   to the university if there was a change made.

22   Q.   Okay.  So when someone does disclose a possible conflict of

23   interest in their conflict of interest institutional

24   responsibilities form, that doesn't necessarily mean that it's

25   a conflict; correct?

1  A.  Conflict of interest is not disclosed to human resources;

2  it goes to the Office of Research conflict of interest team.

3  Q.  Well, I'm asking you about the policy --

4  A.  The policy --

5  Q.  -- so what must be disclosed and what must not be -- or

6  what may not be disclosed.  Are you not familiar with those

7  strictures?

8        MR. OAKLEY:  Your Honor, I think this witness was

9  already asked and has already said that the conflict of

10 interest policy is not an H.R. policy, so I would object.

11       MR. DEARINGTON:  I can rephrase my question just to

12 clarify whether there is, in fact, a foundation for that

13 question, Your Honor.

14       THE COURT:  All right.  Go ahead.

15 BY MR. DEARINGTON:

16 Q.  So although you've testified that the conflict of interest

17 policy is not an H.R. policy, are you familiar with its

18 contents back to -- back in 2018?

19 A.  I could not tell you --

20 Q.  Okay.

21 A.  -- the difference between the policy today and 2018 if

22 that's your question.

23 Q.  Can you confirm whether the policy would be in 2018 -- if

24 something was disclosed in the conflict of interest form, it

25 might get managed by the university as a result?

1    A.    Any changes to policies go through a particular process and

2    they're also available for public comment.

3    Q.    Sorry, I think maybe my question was unclear.  If I'm

4    filling out a conflict of interest form disclosure and I

5    disclose something --

6    A.    Yes.

7    Q.    -- whether because it's deemed a significant financial

8    interest or a time commitment that could interfere with my

9    university responsibilities --

10    A.    Okay.

11    Q.    -- so if I do that, I don't get fired; right?

12    A.    No.

13    Q.    Even if it's a deemed a conflict, it's not an offense that

14    would cause me to get fired; right?

15    A.    No.  It would go to the Director of Research Integrity and

16    they would review the conflict of interest stated and they

17    would work through steps to determine if that conflict could be

18    managed or not with the terms of their employment.

19    Q.    Okay.  And if there were an issue with the department head

20    such that the employee didn't want to, for example, abandon

21    some external activity, would that potentially end up with HR?

22    A.    Potentially the end result could end up with HR.

23    Q.    Okay.

24    A.    If it meant that their employment could not continue

25    because of that conflict.

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    Q.    Okay.  And do you know whether KU informs employees that

2    the conflict of interest forms -- whether the conflict of

3    interest forms will cross state lines after they've been

4    submitted?

5    A.    I cannot answer that question.

6    Q.    Okay.  KU doesn't tell its employees that the conflict of

7    interest forms will be submitted to agencies, does it?

8    A.    I also can't answer that question.

9    Q.    Are you aware whether KU submits completed conflict of

10   interest forms to federal agencies?

11   A.    I'm not aware of that.

12   Q.    As in you do not think that they are submitted to federal

13   agencies?

14   A.    I do not know.

15   Q.    Okay.  Fair enough.

16        Ms. Kessler, could you please pull up Exhibit 9?

17        So, Ms. Loving, I think you testified that this exhibit

18   shows, as we talked about, that Doctor Tao started on

19   August 18th, 2014, which was the day that he certified the

20   acknowledgement, and also that FTE means full-time employment

21   1.0 for the academic year; correct?

22   A.    Yes.

23   Q.    And that's a nine-month academic year?

24   A.    It's not exactly nine months.

25   Q.    Roughly nine months?

1    A.   Roughly.

2    Q.   Fair enough.  And that's -- appointment period there says

3    academic year, 272 days; right?

4    A.   That's correct.

5    Q.   So for the rest of the year, the other three months, the

6    researcher, that's the researcher's own -- or the employee's

7    own time; correct?

8    A.   Correct.

9    Q.   Unless they decide they have the benefit of federal grants

10   in which case they can choose, if they have such funds

11   available, to work on their grants during the summer and KU

12   will pay them a summer salary for however many weeks they've

13   worked on the grant; right?

14   A.   As noted in the summer pay notification, yes.

15   Q.   Okay.  Ms. Kessler, could you please turn to Exhibit 12?

16   And scroll down to the bottom.

17       So why is it that H.R. would have -- would want an employee

18   to sign their appointment letter -- rather, the acknowledgement

19   in their employment letter?

20   A.   We like to make for sure that employees have read and

21   understand the terms of their employment as stated above,

22   especially if there is an error.

23   Q.   But I think you also said that it's not required that an

24   employee sign this; right?

25   A.   It is not required.

1   Q.   So fair to say KU could have required an employee to sign

2   this?

3   A.   We could have.

4   Q.   And that would've ensured that the employee understands the

5   terms and conditions of their appointment outlined in this

6   letter; fair?

7   A.   So their signature would say.

8   Q.   And so it wasn't deemed important enough, it's fair to say,

9   to KU that they understood such terms that they -- KU did not

10  require this to be signed and submitted by an employee; is that

11  fair?

12  A.   I -- not say it's not important enough, but there was not

13  the requirement to do so.

14  Q.   Okay.  We looked at Exhibit 15 earlier, and I'm not going

15  to have you have to go through it again, but it was a

16  spreadsheet and it showed Doctor Tao's salary.

17  A.   Yes.

18  Q.   Do you remember that exhibit?

19  A.   Uh-huh.

20  Q.   Isn't it true that there's no link between the time a

21  researcher spends on their research and their pay during the

22  nine-month appointment?

23  A.   Can you re-ask that question?

24  Q.   Sure.  So a researcher, an employee, or a professor during

25  the nine-month appointment period --

1    A.   Right.

2    Q.   -- there's no impact on their salary if they receive -- if

3    KU receives a federal grant on which they're the principal

4    investigator; correct?

5    A.   Correct.   I mean --

6    Q.   And there's no bonus or commission that a principal

7    investigator will receive if KU receives a grant on which

8    they're the principal investigator?

9    A.   No.

10   Q.   Ms. Kessler, could you please pull up the summer pay

11   notification exhibit marked -- bear with me one moment.   I

12   think it's 21.   Yes, 21.

13        Okay.   And this is dated May 6th, 2019; correct?

14        Sorry, if you just scroll up a little bit, it's at the

15   bottom there.

16   A.   This shows --

17   Q.   Sorry, we'll get into it, but just the date.

18   A.   Oh, yes.   It was created on May 6th of 2019.

19   Q.   Okay.   And could you please scroll down?   I just want to

20   make sure that there's a second notification in this exhibit.

21   Okay.   Pause right there.

22        So do you see that this one was created on May 29th, 2019?

23   A.   Uh-huh.

24   Q.   So fair to say this notification superseded the one we just

25   reviewed?

1    A.   Not necessarily.  I'd have to look at the dates of the --

2    and the amounts of pay.  It could've just come in at a

3    different time frame for additional summer salary coming in

4    then.

5    Q.   Well, in fact, if you look at the first one and you look at

6    the second one, I think the summer salary goes down.  So does

7    that change your answer?

8    A.   One second.

9    Q.   No need to -- I can move on from that question.  No need to

10   consult with the papers you have there.

11   A.   Okay.

12   Q.   So this -- in the bottom left corner, that box there, that

13   lists two grants; right?

14   A.   Yes.

15   Q.   And it lists the time that Doctor Tao would be expected to

16   be working on those grants during the summer; correct?

17   A.   Yes.

18   Q.   And in the first grant it says 7-1 to 7-8, so that's one

19   week of time he would be working on that NSF grant, it says NSF

20   on it?

21   A.   Well, there's two NSF grants.

22   Q.   Sure.  Just the first one for now.

23   A.   First one.  The first one is 5-19 to 6-30.

24   Q.   The bottom one is 5-19 to 6-30.  Okay.  And then the top

25   one is 7-1 to 7-8?

1    A.  It appears, yes.

2    Q.  Okay.  And you can see there the gross summer pay, and

3    that's how much summer salary Doctor Tao, according to this

4    summer pay notification, would receive in the summer of 2019;

5    correct?

6    A.  For that pay period on that -- that source of funding for

7    that level of --

8    Q.  Well, do you see other pay period -- other sources of

9    funding and pay periods during the summer of 2019 here?

10   A.  Well, I'd have to scroll up to the first page to see if

11   there were any additional distributions because --

12   Q.  Okay.

13   A.  -- if you go up to the first page, he had additional summer

14   salary on a different grant from 7-9 to 8-17.

15   Q.  Well, let's scroll up to that first page one more time.

16       So you're not aware that this was actually revised to

17   create the second summer pay notification?

18   A.  No.

19   Q.  Well, let's --

20   A.  I would have to look at his compensation for the time

21   periods that are overlapped to each other.

22   Q.  If you could scroll back down, Ms. Kessler.

23       I just want to make sure I'm reading this correctly.  So

24   the gross summer pay for these two grants is roughly we'll say

25   $7,500.  And so if you assume for a moment that Doctor Tao's

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    salary was $12,000 a month based on the net salary that you

2    mentioned earlier, would that mean that $7,500 divided by the

3    12,000 for the month is the amount of time commitment Doctor

4    Tao would have for these grants?

5    A.   The amount of time commitment charged to these projects is

6    on the standard hours section on this worksheet.

7    Q.   Of this worksheet here?

8    A.   Yes.

9    Q.   So could you navigate --

10   A.   If you scroll up to -- and scroll over.

11       Those are the hours that were indicated that that level of

12   effort happened on those -- on those specific projects.

13   Q.   So there you see it's 36 hours?

14   A.   So total, yes.

15   Q.   Right.  So three months outside the nine-month appointment

16   window are free for an employee to go to the beach, to do

17   reading and so forth; correct?

18   A.   They could be if that's how they chose to --

19   Q.   Sure.

20   A.   -- to do their time.

21   Q.   And based on this summer notification, if we treat this as

22   the only one just for purposes of this explanation, this

23   testimony -- if Doctor Tao worked those 36 hours, he would be

24   covered for whatever the $7,500 is that he received for that

25   summer from the grants; right?

1   A.   (Nods head up and down).

2   Q.   Sorry, that KU pays him, which is funded by the agencies.

3        So if I represented to you that Doctor Tao worked the rest

4   of the summer, that would essentially mean he was working for

5   free on those grants; right?

6   A.   Well, the page above that shows that he did work the rest

7   of that summer and we paid him for that.

8   Q.   Well, if you scroll back up.

9        And remember --

10        You can scroll back up, please, Ms. Kessler.

11        -- that I've represented to you that this was an edit, but

12   let's proceed along that pathway and use your assumption here.

13   So that would be three times 40 hours, so now we're at 120

14   hours, plus the 35 or so hours from the other notification.

15   Now we're at almost a month; fair to say?

16   A.   (Nods head up and down).

17   Q.   So in your scenario that you're presenting here, if Doctor

18   Tao was paid for one month of research during his three months

19   that are his time, but I've represented to you that he was

20   working seven days a week during that summer in the other two

21   months and that month, he was effectively researching without

22   being paid for that time; correct?

23   A.   If there wasn't a summer pay request for compensation and

24   he was doing work, then yes, there would not have been any

25   compensation --

1    Q.  Okay.

2    A.  -- for that effort.  I also can't speak to how much money

3    was in the grants and if they were -- no longer had funding to

4    support any additional effort on those projects.

5    Q.  Fair enough.  And I just have a few more questions for you

6    if you'd just hold for one second, please.

7         So, Ms. Loving, if I were to represent to you that Doctor

8    Tao never took a single day of vacation and a single sick day

9    his entire time at KU going back to 2014, would you agree with

10   that?

11   A.  Faculty don't earn vacation leave.  Sick time is required

12   to be reported by the individual when they are sick.  Not all

13   faculty report their sick leave to their supervisor for

14   approval.

15   Q.  Are you aware whether Doctor Tao has ever taken a sick day

16   or a vacation day in his entire career at KU?

17   A.  I do not know that.

18   Q.  Are you aware that Doctor Tao had accrued 458 hours of paid

19   time off at the time he had been arrested?

20   A.  For sick time?

21   Q.  Paid time off.

22   A.  We don't have PTO at the University of Kansas; we have sick

23   leave and vacation leave.

24   Q.  So sick leave would also be paid time off; correct?

25   A.  It is governed under the State of Kansas statutes of how

```
 1   you use that leave and how it is paid.  So it's not PTO, it has

 2   to be used for sick leave.

 3            MR. DEARINGTON:  May I approach the witness, Your

 4   Honor?

 5            THE COURT:  Yes.

 6   BY MR. DEARINGTON:

 7   Q.  Having looked at the bottom left line there of --

 8   A.  Yes, it has year-to-date for sick leave accrual.

 9   Q.  So, sorry, I haven't quite introduced this exhibit yet.

10   A.  I'm sorry.

11   Q.  I'm going to present to you what's been marked as Exhibit

12   1115.  And that is the last page of 1115.

13   A.  Okay.

14   Q.  Do you recognize that document, Ms. Loving?

15   A.  Yes, this is a -- basically a pay advice for an employee.

16   Q.  And is this -- that employee Doctor Tao?

17   A.  Yes.

18            MR. DEARINGTON:  Okay.  Move to introduce

19   Exhibit 1115, Your Honor.

20            THE COURT:  Any objection?

21            MR. OAKLEY:  No objection, Your Honor.

22            THE COURT:  1115 admitted.

23   BY MR. DEARINGTON:

24   Q.  Ms. Loving, can you read the number at the very end which

25   will be on the screen in a moment?
```

1    Ms. Kessler, do you mind scrolling all the way to the

2  bottom, to the last page?

3    So the bottom left corner there, can you read the number

4  beneath paid time off?

5  A.   Sure.   458.10 hours.

6  Q.   Okay.   One moment, please.

7         MR. DEARINGTON:   No further questions, Ms. Loving.

8  Thank you.

9         THE WITNESS:   Thank you.

10                  REDIRECT EXAMINATION

11  BY MR. OAKLEY:

12  Q.   Ms. Loving, on cross Mr. Dearington asked you if the FBI

13  ever went to you and asked for you to provide them with KU

14  policies such as the conflict of interest.   Do you remember

15  that question?

16  A.   Yes.

17  Q.   Those policies are published online; is that correct?

18  A.   Correct.

19  Q.   And then are there other people -- so they're available to

20  anybody in the public; is that correct?

21  A.   That's correct.

22  Q.   Including the FBI?

23  A.   Yes.

24  Q.   And are you the only person at the University of Kansas

25  that has access to those policies?

1    A.    No.

2    Q.    And I think you said when Mr. Dearington asked if the FBI

3    ever went to you, you said something like, well, the first time

4    was a couple weeks ago.   Do I understand that correct?

5    A.    Yes.

6    Q.    Are you referring to a meeting that I attended as well?

7    A.    Yes.

8    Q.    And was that a meeting where you and I discussed the

9    questions I would be asking you and I showed you the documents

10   that I would be seeking to admit into evidence through you?

11   A.    Yes.

12   Q.    And that's the day related to the -- to the spreadsheet

13   where I showed you the DVD and had you look at it; correct?

14   A.    Yes.

15   Q.    The FBI didn't -- and you work in HR; correct?

16   A.    Yes.

17   Q.    And so you mentioned that the conflict of interest policies

18   are someone -- another department's policies, did I understand

19   that?

20   A.    That's correct.

21   Q.    What other department is that --

22   A.    It's Office of --

23   Q.    -- as you understand?

24   A.    Office of Research.

25   Q.    Are you familiar with the conflict of interest policies,

1    however?

2    A.   Familiar, yes.

3    Q.   Are you required to annually certify?

4    A.   I am as an employee of the University of Kansas.

5    Q.   And so your familiarity comes because you're obligated to

6    abide by the policies, did I understand that?

7    A.   Yes.

8    Q.   Mr. Dearington also showed you that some of the links that

9    are contained online are now broken, and specifically he was

10    showing you the online version of what's been admitted as

11    Government's Exhibit 4; correct?

12    A.   Correct.

13    Q.   And you indicated that Government's Exhibit 4 was

14    originally a policy from 2010?

15    A.   Yes.

16    Q.   It's still maintained online --

17    A.   Yes.

18    Q.   -- is that right?

19    A.   It is.

20    Q.   However, since that time has KU done anything in its online

21    system to move policies around?

22    A.   Yes.

23    Q.   You started to explain when Mr. Dearington asked you a

24    question why those links might have been broken, but he cut you

25    off.  What were you going to say?

A.    The links may have been broken because a lot of time has

passed from now to 2014.  So it's difficult for me to say.

Q.    And those links came from this 2010 policy and more

specifically the online policy; correct?

A.    (Nods head up and down).

Q.    And when Doctor Tao signed Government's Exhibit 1, the

University Policy and Mandated Notice Acknowledgement, he was

provided links to policies, including the conflict of interest

policy; is that correct?

A.    That's correct.  Those policy links are checked frequently

throughout the year to make for sure that they're updated and

not broken.

Q.    Mr. Dearington asked you if the conflict of interest policy

told Defendant Tao or any other employee of the University of

Kansas whether or not -- that they could be prosecuted for a

violation of the policy --

A.    Uh-huh.

Q.    -- under federal law.  What policy, if any, tells employees

at the University of Kansas that if they rob a bank they could

be prosecuted under federal law?

A.    None that I'm aware of.

Q.    Are there any policies that tells an employee of the

University of Kansas that if they struck another member of the

faculty or if they struck a student that they could be

prosecuted for assault or battery under state law?

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1        MR. DEARINGTON:  Objection, Your Honor.

2        THE COURT:  I'm sorry?

3        MR. DEARINGTON:  Objection, Your Honor.  It's

4    argumentative.

5        THE COURT:  Overruled.

6        THE WITNESS:  No.

7        MR. OAKLEY:  No further questions, Your Honor.

8                    RECROSS EXAMINATION

9    BY MR. DEARINGTON:

10   Q.  So, Ms. Loving, I just wanted to clarify with you, you're

11   not a tech person at KU; right?

12   A.  I do not work in IT.

13   Q.  And you don't know when these links that I showed you went

14   down?

15   A.  I cannot tell you that.

16   Q.  And you're not -- you can't say with confidence that the

17   link from the handbook I showed you, I think there were two of

18   them, have at any time in the last six years been live?

19   A.  I cannot tell you that.

20   Q.  And I think you testified that there's some people at KU

21   who check to make sure links aren't broken.  Did you testify to

22   that effect?  You can correct me if I'm wrong on that.

23   A.  I did say that the information that is presented on the

24   document that employees used for on-boarding and agreed to

25   those policies are checked frequently, yes.

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    Q.   But fair to say nobody checked those policies that I

2    presented to you?

3    A.   In the handbook?

4    Q.   Correct.

5    A.   The handbook links, not that I'm aware of.

6    Q.   Okay.  So Mr. Oakley asked you whether there's an

7    anti-robbery policy at KU.  Do you remember that question?

8    A.   Yes.

9    Q.   Hard to forget.  Is there -- would you deem it within the

10   employee's scope of responsibilities at KU to rob banks?

11   A.   I would say that it's not in anyone's responsibility to rob

12   a bank.

13   Q.   Would you deem it within the scope of a KU employee's

14   responsibility to strike pedestrians with their vehicles?

15   A.   No.

16   Q.   And that's why there's no policy on that; right?

17   A.   Correct.  I would say that there is not policy references

18   to any kind of illegal activity that would be recognized by a

19   court of law.

20   Q.   And yet here we are, Ms. Loving.  And so my question to you

21   is the conflict of interest form, that is within an employee's

22   scope of responsibility; correct?

23   A.   It is within the scope of an employee's responsibility to

24   complete annual conflict of interests.

25   Q.   And yet nothing in the conflict of interest form states

1   that an employee who miscertifies, mistakenly or otherwise,

2   could be charged with a federal crime?

3   A.   It does not say that.

4            MR. DEARINGTON:  No further questions, Your Honor.

5            THE COURT:  Anything further?

6            MR. OAKLEY:  Nothing further, Your Honor.

7            THE COURT:  May this witness be excused?

8            MR. OAKLEY:  Yes, Your Honor.

9            THE COURT:  All right.  You're excused.  Why don't we

10  at least get started on your next witness before we take a

11  break.

12           MR. OAKLEY:  Yes, Your Honor.  Thank you.  The United

13  States would call Alicia Reed.

14           THE COURT:  Go about 15 minutes or so and we'll take a

15  break.

16           MR. OAKLEY:  Okay.  Thank you, Your Honor.

17                       ALICIA REED,

18  called as a witness on behalf of the Government, having first

19  been duly sworn, testified as follows:

20                    DIRECT EXAMINATION

21  BY MR. OAKLEY:

22  Q.   Ma'am, would you please tell the jury your name.

23  A.   My name is Alicia Reed.

24  Q.   And could you spell it for the record, please?

25  A.   A-L-I-C-I-A.  Reed, R-E-E-D.

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    Q.    How are you employed?

2    A.    I work for the University of Kansas.

3    Q.    What do you do for the University of Kansas?

4    A.    I'm the assistant vice chancellor for research.

5    Q.    Could I talk you into moving that microphone just a little

6    bit closer.

7    A.    Sure.  Is that better?

8    Q.    Yes.  I'm sorry, could you state your position again?

9    A.    Sure.  I'm the assistant vice chancellor for research.

10    Q.    And how long have you been assistant vice chancellor for

11    research?

12    A.    I have been in this position since 2016.

13    Q.    How long have you been at KU?

14    A.    I've been at KU since 2005.

15    Q.    Okay.  And so before you were the assistant vice chancellor

16    for research at KU, what did you do?

17    A.    I started at KU in working in the pre-award services

18    preparing proposals for research awards, and then I moved into

19    being the Associate Director of Research Administration, so

20    that was the support person for my current position.

21    Q.    Let me talk to you -- before I ask you what an assistant

22    vice chancellor for research does at KU, I want to talk to you

23    a little bit about your background.  Do you have any degrees?

24    A.    I do.  I have an undergraduate and master's degree in

25    social sciences from the University of Kansas.

1  Q.  And so what does an assistant vice chancellor for research

2  at the University of Kansas do?

3  A.  Sure.  So my role at the Office of Research is to oversee

4  all the research administration tasks that go on and support

5  research.  So that includes supervising and overseeing the

6  proposal preparation, contract negotiation, award management,

7  and award data services for the university.

8  Q.  And you specifically mentioned the KU Center for Research.

9  A.  Yes.  So the KU Center for Research is a 501(c)(3)

10  non-profit organization, but it is affiliated with the

11  university and we do all the research administration for the

12  university.  It's a way to make sure that the research funds

13  are held in a funding separate from KU funds so that they can

14  be spent specifically for research.

15  Q.  And so is all funds that KU receives for research supposed

16  to run through the KU Center for Research?

17  A.  Yes.  The Office of Research usually operating as KU's

18  Center for Research is the way that individuals who are doing

19  research at KU can receive money to do that research.

20  Q.  Does the Center for Research have any departments or

21  groups?

22  A.  Right.  The way that we are organized is that we have a

23  research administration unit, which is the unit that I oversee,

24  and that, again, is our pre-award unit that does all the

25  proposals and is required to review everything prior to

1    submission.

2        The contract negotiations unit that does all the contract

3    negotiations, meaning that any award that comes in that needs a

4    signature on it, they would review and ensure that it was

5    appropriate for us to sign.

6        And then our post-award or award management and they do all

7    the management of the awards, billing and compliance work after

8    an award is set up.  So that's research administration.

9        And then we also have a fiscal affairs unit that assists

10   with processing/procurement.  We also have a research integrity

11   unit that does human subjects, animal care and compliance as

12   well as research misconduct and other sort of restricted

13   research activities.

14   Q.   And you indicated there was both a pre-award and post-award

15   component.  When you say award, what do you mean?

16   A.   So when the university requests funding for a research

17   activity, we submit what we call a proposal and that is a

18   summary of the activities that are going to take place, and

19   it's usually accompanied by a budget and credentials to explain

20   what the principal investigator or the lead scientist is -- who

21   will be leading that, their background and how they are experts

22   in their field.  So that's our proposal piece.

23       And then once we've submitted something for a proposal, if

24   it is deemed meritorious, if we get the award, then we would

25   receive a notice from the sponsor that let them -- that lets us

1    know that they're going to give us money to fund that project

2    and so we would -- our pre-award side helps do the preparation,

3    review and submission of that proposal piece.

4        And then our contract negotiation again reviews that

5    agreement that comes in to make sure it's protecting the

6    university.  And then the award side really helps manage that

7    proposed budget, making sure that we're good stewards of the

8    funds and that we're spending in accord with the sponsor's

9    terms and conditions.

10   Q.  And so the Center for Research is involved in both the

11   application and seeking to obtain grants and then, if a grant

12   is awarded, in utilizing that grant?

13   A.  That is correct.  We are -- the University of Kansas, our

14   Office of Research, Center for Research, we are required and

15   investigators at KU are required to submit their external

16   proposals through us for review and we are required to

17   administer them for them.

18   Q.  Is that true of any research that an employee at KU does?

19   A.  That's exactly right.  Any external funding to support

20   research needs to run through our office to ensure that we're

21   compliant.

22   Q.  You've referred to your office as both the Office of

23   Research and the Center for Research.  Are they -- those terms

24   used interchangeably?

25   A.  They are, those are synonymous terms.  The Office of

1    Research is a KU department; Center for Research is the name of

2    the non-profit organization.  But we are one and the same,

3    we're all KU employees and we are doing the work for KU.

4    Q.  And so if the jury heard people say either that they work

5    for the Office of Research or the Center for Research, that

6    person is talking about the same thing?

7    A.  That's exactly right.

8    Q.  And as the assistant vice chancellor for research, are you

9    in charge of the office or the Center for Research?

10    A.  I'm in charge of the research administration portion.

11    Q.  So who do you report to?

12    A.  I report to Simon Atkinson, who is the vice chancellor for

13    research.

14    Q.  Do you know someone by the name of Douglas Girod?

15    A.  I do.  He's the chancellor of the university.

16    Q.  And so are you under him in the pecking order at KU?

17    A.  I am.  My boss reports to him.

18    Q.  Let me talk to you a little bit about just the -- the

19    Center for Research.  How many employees work there?

20    A.  At the Center for Research we have around 100 employees and

21    80 of those do research administration.

22    Q.  When you say "research administration," what do you mean?

23    A.  So that's -- again, that's the proposal preparation, the

24    contract negotiations, and the award management pieces.

25    Q.  And so of the total of 100, 80 are involved in that part?

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    A.    That's exactly right.

2    Q.    Do you know approximately how many grant proposals your

3    office handles in any given year?

4    A.    Sure.  We submit anywhere from 1,300 to 1,500 proposals in

5    a year, depending on the amount of federal funding available

6    and other calls, but it's -- you could average it out to about

7    1,400 proposals.

8    Q.    And when you say 1,400 on average, is that just new

9    proposals or would that include grants that have been awarded

10    that are in the post-award stage?

11    A.    That would be new activity.  So that would include

12    brand-new proposals as well as requests for additional funding

13    or a request -- we call them renewals, where somebody has

14    received a certain amount of funding, they want to continue the

15    work and so they're going to renew it for an additional time so

16    they would submit a proposal again.

17        The policy is that anytime anybody is requesting any

18    additional funding, a new proposal needs to be put into the

19    system so that we can track and make sure that we're being good

20    stewards should we be given that award.

21    Q.    Of those 1,400 on average awards that run through your

22    office on any given year, are all of those approved?  Does KU

23    receive funding for all 1,400?

24    A.    No.  So of the 1,400 proposals, our funding rate, again

25    depending on the year, anywhere from 20 to 30 percent of those

1    actually get funded.

2    Q.   And so most of the awards -- if only 20 to 30 percent get

3    approved, that means most of them don't get approved?

4    A.   That's right, they are considered not funded.  But that's

5    an average -- that is average for a university.

6    Q.   So based on that, how competitive are these grants that KU

7    is seeking to obtain through your office?

8    A.   A lot of the federal awards are very competitive and you

9    can -- I don't have good cites on this, but you can look at any

10   of the federal agencies that give federal funding and you can

11   see their award lines it's called and so you can see sort of

12   how much they award.  So when I say that 20 to 30 percent is --

13   is a standard, we're competitive with other peer institutions

14   that -- you know, they're very, very competitive to get the

15   money.

16   Q.   And you specifically mentioned federal grants.  I want to

17   talk to you about the source of funding for grants that fund

18   research --

19   A.   Sure.

20   Q.   -- through the Center for Research.  Are they all

21   federally-funded grants or are there other types of grants that

22   are available through your office?

23   A.   So anything that's externally funded goes through our

24   office.  So in addition to federal funds, we also work with

25   state funds, local governments, non-profit organizations, other

1   business organizations and international entities.

2   Q.  Can you give the jury an idea as far as size the --

3   specifically as it relates to federal grants, how does it

4   relate to the other source of funding that you talked about,

5   the international, the state, the private companies, the

6   not-for-profit?

7   A.  So anywhere from, you know, 30 to 40 percent of our

8   expenditures are from federal funding.  We also have a lot of

9   funding from state funds as well as from different, like,

10  foundations and non-profit organizations, so places like Bill

11  and Melinda Gates give us quite a lot of money and other

12  non-profits like that.

13  Q.  So do you know ballpark the total amount of funding that KU

14  receives from federal grants on any given year?

15  A.  So the number that I have because it was just published

16  recently, in FY22 our expenditures of federal dollars was

17  $293 million.

18  Q.  Do you know -- and you said that was for fiscal year --

19  A.  '22.

20  Q.  -- '22?

21  A.  So, yeah, the fiscal year that just ended, so July 1st

22  through June 30th of the past year.

23  Q.  And 293 million.  Historically since you've been the

24  assistant vice chancellor for research, is that 293 million

25  higher than average, average, lower than average?  Give us an

1   idea throughout your tenure.

2   A.   We're slowly increasing as one of the pillars of the KU

3   plan is to continue to increase research, and so every year

4   we're investing more in research and so we have grown over the

5   last few years.

6   Q.   When you started -- do you know approximately how much it

7   would have been when you became vice chancellor in 2016?

8   A.   What I can tell you is that, again, the HERD Survey, which

9   is the National Science Foundation's report that we're required

10  to put in because we receive over $150,000 in research dollars,

11  was just published and the data that was submitted in 2014

12  compared to the data that was just recently submitted in

13  February of '22 shows a 22-and-a-half percent growth from 2014.

14  Q.   From 2014?

15  A.   Yes.

16  Q.   But if you're at 293 million now or even at 2014, we're

17  talking about 100 -- at least tens of millions of dollars, if

18  not more than $100 million?

19  A.   That's right.

20  Q.   Let me next talk to you about professors at KU.  So I

21  assume the Center for Research is concerned primarily with a

22  professor's research responsibilities?

23  A.   That's exactly right.  Our responsibilities are to support

24  professors and research staff for their research and

25  development activities.

1   Q.   Are there other obligations other than research that a

2   typical professor has to the university?

3   A.   Yes.  Most professors' appointments include both research

4   and instruction/teaching and public service of some type, so

5   service of some type for their profession.

6   Q.   Are you familiar with the concept of a 40/40/20 split as it

7   relates to that division of responsibility at KU?

8   A.   Yes.

9   Q.   Is that fair -- fairly typical for professor -- for

10  full-time professors at KU?

11  A.   It is a typical split to say that you have 40 percent time

12  for your teaching, 40 percent time for your research, and

13  20 percent time for your service.  That is correct.

14  Q.   Okay.  And is that an indication that the university for

15  the typical professor views the research and the teaching

16  responsibilities as just as important?

17  A.   That's exactly right.

18  Q.   And then let's talk about the 20 percent.  You said that

19  20 percent you identified as service?

20  A.   That's right.

21  Q.   What does that mean?

22  A.   So depending on the discipline, service could be a wide

23  variety of activities, including giving presentations, working

24  on editorial boards, review for competitive cycles at

25  federal -- being a peer reviewer for federal agencies for

1   competitive proposals, and a wide variety of other activities

2   that would be more discipline specific.

3   Q.  Let's talk about the two -- the division, the 40 percent

4   division of teaching and the 40 percent division of research,

5   and let's talk first about the 40 percent that's teaching.

6       Does that just include the hours that a professor spends in

7   a classroom teaching to students or could that include other

8   things?

9   A.  The expectation is not only is it the preparation and

10  presentation in classroom time but also being available for

11  office hours, answering student questions, helping to mentor

12  students as necessary for the coursework.

13  Q.  Let me talk to you about the 40 percent that's the research

14  component.  When I think of research, I think of someone in a

15  white lab coat with a beaker in a lab.  Is that part of

16  research?

17  A.  Sure.  That's definitely part of research, but that's not

18  the only research that takes place at KU.

19  Q.  Could you explain for the jury, just generally speaking,

20  give them an idea of the variety of research that takes place

21  at KU?

22  A.  Sure.  KU has a really wide variety of research, everything

23  from chemistry or physics, sort of what you're thinking of

24  maybe in the lab coat, to working on really amazing support for

25  students, working out in the community to do community

1    supports.  So education, social sciences, math, arts.  So

2    anything that's externally funded to either increase student

3    experience at KU, to help further knowledge in the discipline,

4    that all goes through the Office of Research and is treated as

5    research activity.

6    Q.  And would research look different depending on where the

7    professor teaches?  For instance, someone that's teaching one

8    of the hard sciences, their research might be different than

9    someone at the law school?

10   A.  That's exactly right.

11   Q.  Let me talk to you a little bit about the pay for

12   professors at KU.  Are you familiar with a 1.0 FTE?  Do you

13   know what that means?

14   A.  Yes.  So 1.0 FTE means a full-time appointment.  It's

15   100 percent.  And so under contract a standard academic

16   appointment would be nine months and then there would be

17   additional time, and so the nine months is what the 40/40/20

18   split refers to.

19        And then there would be the off-contract period, which in

20   research we call the summertime.  And the expectation for

21   high-performing research professors is that they would fund

22   their summer months from research dollars.

23   Q.  Let me have you break that down a little bit.  The

24   nine-month term, is that based on the -- the typical school

25   year from the fall through the spring?

1    A.   That's right.  Mid-August through mid-May is the usual

2    nine-month appointment unless somebody has, you know, other --

3    other things on top of it, but a typical appointment is nine

4    months.  And then you have your three-month summer which can be

5    dedicated fully to research if you are in a research-intensive

6    and, I guess I would say, successful research program where you

7    have three months of summer salary that's been awarded, but the

8    three months of summer is not paid for by the state.  The nine

9    months of academic time under contract is paid for by the State

10   of Kansas.

11   Q.   Okay.  Typically does the State of Kansas pay -- so the

12   nine-months is paid by the State of Kansas?

13   A.   That's accurate.

14   Q.   And so state taxpayers fund the complete nine-month salary

15   for --

16   A.   Taxpayers and tuition dollars.

17   Q.   That's a good point.  KU is not a free institution;

18   correct?

19   A.   That is correct.

20   Q.   And so students who go there are required to pay tuition?

21   A.   That's accurate.

22   Q.   Okay.  And so it's a combination of the tuition and the

23   taxpayers?

24   A.   That's right.

25   Q.   In school if there's a student who is a resident of Kansas,

1  do they get to pay a little bit lower tuition?

2  A.   Right.   There are in-state rates and then out-of-state

3  rates and then there's also fees based on the school, so you

4  pay -- have your tuition plus your fees is what people pay to

5  go to KU.

6  Q.   Okay.   And then you mentioned that during the summer that

7  professors can earn additional money?

8  A.   That's correct.

9  Q.   And you specifically mentioned research during the summer.

10  A.   That is accurate.   There are up to three additional months

11  of summertime that can be brought in to total out to the 12

12  months total that one person would have in a year.

13  Q.   And so a professor that wanted to do work in the summer has

14  that opportunity?

15  A.   That's exactly right.

16  Q.   Are there also opportunities to teach in the summer?   Does

17  KU offer any summer classes?

18  A.   They do.

19  Q.   Okay.   And so if an instructor wanted to teach a summer

20  class, would that be in addition to the nine-month salary?

21  A.   That's exactly right.   So the nine-month appointment would

22  be for those nine months and then anything on top of that would

23  be extra.

24          THE COURT:   This would probably be a good time to take

25  a break if you're ready.

1          MR. OAKLEY:  Yes, Your Honor.  Thank you.

2          THE COURT:  All right.  Let's take a 15-minute break.

3    We'll try to make it 15.  If we need to, it will be 20.

4          (Recess).

5          (The following proceedings were held in the presence

6    of the jury).

7          THE COURT:  All right.  You can be seated.

8          You can resume, Mr. Oakley.

9          MR. OAKLEY:  Thank you, Your Honor.

10   BY MR. OAKLEY:

11   Q.  I think before we broke we were discussing the

12   nine-month -- typical nine-month commitment for a professor.

13   A.  Yes.

14   Q.  Does that mean that during the summer months a professor is

15   not bound by KU's policies?

16   A.  That is not accurate.  While you are under contract, even

17   if you are not during your nine-month appointment, you are

18   still an employee of the university.

19   Q.  And you mentioned that the summer pay could come from

20   teaching.  Let me ask you -- summer pay as it relates to

21   researching, can you explain for the jury how that's funded and

22   how that's paid to the professor?

23   A.  Sure.  So anytime somebody has enough sponsored research

24   that they can be paid during the summer months, what happens is

25   during the proposal process we would budget those months into

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    the request to the agency.  And then when the agency gave us

2    the award, we would enter that into our payroll system so the

3    KU payroll system would show that that award was going to pay

4    for three months or whatever portion of those three months.

5         And so then when that pay period came, the pay that had

6    been attributed to that project would be paid to the

7    investigator.  And then what we would do is we would then alert

8    the sponsor that we had paid them that amount and they would

9    reimburse us.

10   Q.  And so in order for a professor to receive summer pay

11   through a research grant, the professor would have to

12   identify -- well, first of all, would have to have received a

13   grant that would cover salary; is that correct?

14   A.  That is correct.  So it would have to be an allowable

15   expense, meaning the agency or sponsor would have to say, yes,

16   you can pay for salary and fringe.  And then that would also

17   have to be processed through the KU payroll system to say for

18   this amount of time is -- the funds should come from that

19   specific source.

20        Just to give a little bit of background.  For every single

21   award we have to set up a specific account so that we keep all

22   funds separate.  And so when the PI, the principal

23   investigator, the investigator, was working with the

24   individuals who were either in the Office of Research or in the

25   Shared Service Center to assist in keying that payroll

1   information into the system, they would indicate how they

2   wanted that to be paid out based on their actual activities and

3   then that would be keyed in and they would be paid out in that

4   way.

5   Q.   In order to receive the summer salary from a particular

6   grant, it is -- is it expected that the professor will actually

7   be working on that grant during the particular summer?

8   A.   That's accurate.  It is required to be paid from a project

9   that you are actually dedicating effort to that project.  We

10  have a system that's in accord with the federal guidelines

11  called 2 C.F.R. 200, which is requirements that we have to

12  follow to be able to get federal money.  And one of the

13  requirements there is that we ensure that how we are paying

14  effort is truly in alignment with how the time is spent, and so

15  we have an effort certification system that aligns with our

16  payroll.

17  Q.   I want to -- here in a little bit I think we're going to

18  talk about principal investigators, but you mentioned that term

19  so I just want to clarify.  Principal investigator, is that

20  typically in research going to be the professor?

21  A.   That's exactly right.  So the word "principal investigator"

22  means the lead scientist or the investigator that's charged

23  with ensuring that all of the award terms and conditions are

24  followed, is usually the one who's the lead scientist on that

25  work.  And they're the one, under KU policy, responsible for

1    ensuring that the award is -- is managed appropriately.

2    Q.   I want to show you on the screen in front of you

3    Government's Exhibit 3 that's already been admitted into

4    evidence.

5    A.   Yes.

6    Q.   And then I also have the printed document if it's easier to

7    refer to that as well.

8    A.   Thank you.

9    Q.   Are you familiar with Government's Exhibit 3?

10   A.   I am.

11   Q.   And is this the -- commonly referred to as a conflict of

12   interest policy that KU has?

13   A.   That is accurate.

14   Q.   And how does this -- how does the conflict of office --

15   excuse me, the conflict of interest policy relate to the work

16   that the Office of Research does?

17   A.   Right.  So under federal regulations, again I mentioned 2

18   C.F.R. 200, it's called the uniform guidance, and it requires

19   us to have policies and controls in place to ensure that the

20   funding that we are receiving from the federal government is

21   treated appropriately, that we are -- that it's separate and

22   that there's not any apparent conflict of interest.  And so

23   this policy helps us make sure that we are -- that we can

24   propose and accept from -- funding from federal agencies.

25   Q.   And is that true of all federal agencies, that KU is

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    required to have this policy?

2    A.   There is an expectation that we have some type of controls

3    around conflict of interest, yes.

4    Q.   And is it sufficient to just have the policy or do the

5    federal agencies expect that KU will abide by the policy that

6    it has?

7    A.   We are expected to abide by and part of my office's

8    responsibility is to ensure that we are monitoring and ensuring

9    that we are managing awards in -- in conjunction with the

10   policy.

11   Q.   Directing your attention to Government's Exhibit 3, does

12   this appear to be the policy that's printed from KU's website?

13   A.   Yes.

14   Q.   I would like to just go -- if we can turn to Page 2 of the

15   policy.  And at the top it says "Preamble," and it says, "The

16   Board of Regents encourages the Regents institutions."  So is

17   this related to a Board of Regents policy as well?

18   A.   That is exactly right.  So the University of Kansas is one

19   of the Board of Regents universities in the state and so this

20   policy allows us to be compliant with the expectations of the

21   Board of Regents.

22   Q.   I want to direct your attention, and I think it will be on

23   the screen, to the last paragraph of that -- of that paragraph

24   that states "with particular reference to such interaction" and

25   then it begins "the Board of Regents."  Do you see that

1    section?

2    A.    I apologize.  Are we on Page 2?

3    Q.    I'm sorry, yes, on -- just above that, please.

4    A.    Where it says, "The Board of Regents considers it of utmost

5    importance that university employees conduct their affairs so

6    as to avoid or minimize conflicts of time commitments and

7    conflicts of interest."

8                THE COURT:  Slow down.  Slow down.  She has to take

9    down what you're reading.

10               THE WITNESS:  Sorry.

11               MR. OAKLEY:  That's exactly -- it's just above that.

12               THE WITNESS:  Yeah, it's --

13   BY MR. OAKLEY:

14   Q.    That's precisely the part that I wanted --

15   A.    Okay.

16   Q.    -- to direct your attention to.  And if you could read it,

17   but just a little bit slower please for the court reporter.

18   A.    Sure.  Sorry.  Sorry.  All right.  So "The Board of Regents

19   considers it of utmost importance that university employees

20   conduct their affairs so as to avoid or minimize conflicts of

21   time commitments and conflicts of interest, and that the

22   Regents institutions must be prepared to respond appropriately

23   when real or apparent conflicts arise."

24   Q.    And then sticking in that same section with the -- the

25   preamble, could you read the last sentence that begins with "if

1   a situation raising questions"...

2   A.   Sure.   "If a situation raising questions of real or

3   apparent conflict of commitment or conflict of interest arises,

4   affected faculty and/or unclassified staff must meet with their

5   department chair, school dean or supervisor, report the

6   conflict as described below, and eliminate the conflict or

7   manage it in an acceptable manner."

8   Q.   And so, again, we're in the preamble and this kind of gives

9   the overall introduction.  But as it relates to conflicts of

10  interest, does that mean if someone has a particular conflict

11  of interest that they can't work at KU or they can't get

12  research or what does it mean?

13  A.   No.  And so just to put a little bit of context to this, it

14  is the Office of Research and the Research Integrity Office's

15  responsibility to determine, along with the Conflict of

16  Interest Board, if there is truly a conflict of interest.

17      What really is required here is that faculty and

18  unclassified staff who potentially have a conflict, it's not

19  for the faculty to determine or it's not for the individual to

20  determine.  If they could potentially have a conflict that

21  meets any of the criteria laid out in this policy, they are to

22  report it so that we can avoid even the appearance of any bias

23  to the research that we are doing.

24  Q.   So if a professor, for instance, knows of a situation that

25  could potentially create a conflict, they're expected to report

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    it?

2    A.   That's exactly right.  And then the conflict of interest

3    office would review it and determine if there truly was a

4    conflict and then put a management plan in place.

5        There is no policy that states that you couldn't be an

6    employee or that you couldn't do research; you just have to

7    have it managed so that there's not the appearance of that

8    conflict.

9    Q.   Okay.  And so when you say "manage," if it's determined

10   there is a conflict, there might be a way to -- I don't want to

11   use the word "manage" again, but to deal with the conflict from

12   both the university perspective and the research grant

13   perspective?

14   A.   Right.  The policy lays out ways to mitigate that -- that

15   conflict by, you know, potentially having someone work with

16   individuals to have different roles or responsibilities.  So

17   there's a variety of ways that it could be mitigated, but

18   that's exactly the role -- part of the role of our Research

19   Integrity Office is to assist with that.

20   Q.   And then the next portion is marked General Principals and

21   then under A, it's a discussion of conflict of time commitment

22   and there's a Section 1 and a Section 2.

23       I won't have you read the whole thing, but I want to direct

24   your attention to the last sentence of Paragraph 1 where it

25   begins "whenever a faculty or staff member"...

1    A.    Okay.    "Whenever a faculty or staff member's external

2    activities exceed reasonable time limits, or whenever an

3    unclassified staff or faculty member's primary professional

4    responsibility is not to the institution, a conflict of time

5    commitment exists."

6    Q.    And so as a full-time professor at the University of

7    Kansas, who should receive the full-time professor's attention?

8    A.    The University of Kansas.

9    Q.    And then No. 2, could you read the first two sentences of

10   that portion?

11   A.    Sure.    "Conflicts of commitment usually involve issues of

12   time allocation.    Faculty members and unclassified staff of

13   Regents institutions owe their primary professional

14   responsibility to their employing institutions, and their

15   primary commitment of time and intellectual effort should be to

16   the education, service, research and scholarship missions of

17   said institutions."

18   Q.    And so that first part talks about -- and we've been

19   referring to this as a conflict of interest policy, but there's

20   a conflict of interest concern and then also a conflict of time

21   concern.

22   A.    That's right.

23   Q.    In other words, what an employee of the university -- how

24   they spend their time.

25   A.    That's right.

1   Q.   And this first part talks about that time commitment; is

2   that accurate?

3   A.   That is correct.

4   Q.   And so at the bottom, if we could scroll down to B, this

5   discusses conflict of interest.  Could you read No. 1?

6   A.   Sure.  "A conflict of interest occurs when there is a

7   divergence between an individual's private, personal

8   relationships or interests and any professional obligations to

9   the university such that an independent observer might

10  reasonably question whether the individual's professional

11  actions or decisions are determined by considerations of

12  personal benefit, gain or advantage."

13  Q.   Could you read 2 next?

14  A.   "A conflict of interest or the appearance of it depends on

15  the situation, and not necessarily on the character or actions

16  of the individual.  The appearance of a conflict of interest

17  can be as damaging or detrimental as an actual conflict.  Thus,

18  individuals are asked to report potential conflicts so that

19  appearances can be separated from reality."

20  Q.   Okay.  Does that relate to what you said earlier, that the

21  policy and the obligation is to provide information?

22  A.   That's exactly right, is that there's oftentimes additional

23  factors that can be determined by the Office of Research and

24  the Research Integrity Office.  So the role of the faculty or

25  unclassified staff member is to provide information as covered

1    in this policy, and then any determination of a conflict would

2    be made by the Office of Research.

3    Q.    Okay.  In the first sentence of No. 3 does it recognize

4    that at a university, especially one the size of KU, that it's

5    not unusual to have potential conflicts of interest that arise?

6    A.    It does say that, yes.

7    Q.    And then 4, does 4 relate to the use of university

8    property?

9    A.    It does, university resources, including the facilities,

10   which would be property, and materials.

11   Q.    And so can you read that first sentence under 4?

12   A.    Sure.  "Except in a purely incidental way, university

13   resources, including but not limited to, facilities, materials,

14   personnel, or equipment may not be used in external activities

15   unless written approval has been received in advance from the

16   institution's chief executive officer or designee."

17   Q.    And then Section II that's at the bottom of this document

18   starts off "Consulting and Other Employment."  And under A it

19   relates to Consulting for Other State of Kansas Agencies?

20   A.    Yes.

21   Q.    And then B is Consulting Outside the University.  And

22   that's where I want you to focus your attention.  Could you

23   read the -- can you just read Section B and I'll stop you when

24   you get far enough.

25   A.    Sure.  "For members of the faculty, the Regents institution

1   permits and, indeed encourages, a limited amount of personal,

2   professional activity outside the faculty member's reasonably

3   constructed *[sic]* total professional responsibilities of

4   employment by and for the institution, provided such activity:

5   (A) further develops the faculty member in a professional sense

6   or serves the community, state, or nation in a professional

7   capacity; (b) does not interfere with the faculty member's

8   teaching, research and service to the institution; and (c) is

9   consistent with the objectives of the institution."

10       "Regular instructional services to other educational

11   institutions is normally regarded as an inappropriate personal,

12   professional activity.  Without prior approval, faculty members

13   on full-time appointments must not have significant outside

14   managerial responsibilities nor act as a principal investigator

15   on sponsored projects that could be conducted at their own

16   institution but instead are submitted and managed through

17   another organization."

18   Q.   So in your experience -- and I think the policy even

19   recognizes that college professors may have opportunities to

20   engage with other institutions outside of the University of

21   Kansas?

22   A.   Yes.

23   Q.   And that's permitted?

24   A.   That is permitted.  You must ensure that when you are

25   working outside of your university that you are doing it in

19-20052   USA v. Feng (Franklin) Tao   03.22.22

1    alignment with the expectations of this policy.  So if you are

2    doing a lot of consulting, then you need to do the faculty

3    development's process of external activity.

4         So there's a process where you can tell the faculty

5    development office what your plans are to work outside of the

6    university and it goes through an approval process to ensure

7    that it aligns with points A, B and C here under Consulting

8    Outside the University.

9    Q.   And delving in further to the points A, B and C, that --

10   this policy says that that will be approved provided: (a) that

11   it further develops the faculty member in a professional sense

12   or serves the community, state or nation in a professional

13   capacity.

14        Earlier we had talked about the 40/40/20 split.  And this

15   sort of -- of collaboration that's approved outside the

16   facility, can that be part of that 20 percent service to the

17   university?

18   A.   That definitely could be.  Depending on what the consulting

19   is, it could fall into service, for sure.

20   Q.   And then (b), the second requirement is it does not

21   interfere with the faculty member's teaching, research and

22   service to the institution?

23   A.   Correct.

24   Q.   And is that just a recognition that a full-time University

25   of Kansas professor's primary responsibility is to the

1    institution?

2    A.    That is correct.

3    Q.    And then finally (c), that it's consistent with the

4    objectives of the institution?

5    A.    Correct.

6    Q.    You had mentioned the -- the consulting request form.

7    A.    Yes.

8    Q.    And that paragraph under the section that says "Note," does

9    that discuss that process of how someone wants to get approval,

10    that you can consult using the unclassified professional staff

11    consulting request form?

12    A.    That's exactly right.  And so there's a process.  And this

13    wording, I don't know if you want me to read it or not, but

14    that's exactly what this note says; it tells you with a

15    hyperlink how to get to the required form to complete for that

16    external activity.

17    Q.    So that's B.  And I want to talk to you about C next that's

18    titled Other Employment.

19    A.    Yes.

20    Q.    Could you read that entire section to the jury, please?

21    A.    Sure.  "The Regents expect faculty and unclassified staff

22    employed by the Regents institutions to give professional

23    effort to their assignments.  It is, therefore, considered

24    inappropriate to engage in gainful employment outside the

25    Regents institution that is incompatible with the institutional

1    commitments.  It is inappropriate to transact business for

2    personal gain unrelated to the institution from one's

3    institutional office or at times when it might interfere with

4    commitments to the institution."

5        "Participation in academic conferences, workshops and

6    seminars does not usually constitute consulting or outside

7    employment.  However, organizing and operating such meetings

8    for profit may be construed as consulting or outside employment

9    as defined in this policy."

10   Q.  And then the third section is Reporting Requirements and

11   then there's subsection A, Annual Reporting.  Are KU --

12   full-time KU professors obligated to report on an annual basis

13   any information related to potential conflicts of interest?

14   A.  That is correct.  That we -- when someone is hired at the

15   university, they are required to complete their first reporting

16   cycle and then annually after that they are notified of their

17   requirement to complete that reporting.

18   Q.  And how does that -- as a practical matter, how does that

19   happen at the University of Kansas?

20   A.  So an e-mail goes out to faculty and unclassified staff.

21   It contains information about the requirements, so information

22   about this policy, and links to the actual system in which we

23   do the reporting and so it contains instructions on how to

24   follow the link and do the reporting.

25   Q.  The next section in subsection B there that says Reporting

1    Significant Ad Hoc Current Or Prospective Conflicts As They

2    Occur, is it simply enough that a professor fill out the annual

3    reporting as required or are they expected and required under

4    the policy to make other notifications to the university?

5    A.    Under this policy they are required and the wording here

6    says "as soon as situations become known to faculty or

7    unclassified staff member," and so that's considered an ad hoc

8    report.  So say you've reported and then something changes, you

9    are required to go back into the system and update your annual

10   report to reflect the change in circumstances.

11   Q.    And that's as that change in circumstance arises?

12   A.    That's exactly right.  It says "as soon as such situations

13   become known to faculty or unclassified staff members," and

14   what we advise is within 30 days of that happening.

15   Q.    C is captioned Reporting of Consulting.  Can you read that

16   section up to the note?

17   A.    Sure.  "The faculty member must inform the chief academic

18   officer, through the department chair or the head dean, of all

19   external professional" -- excuse me, "personal, professional

20   activities.  For all such activities, except those single

21   occasion activities specified below, the faculty member must

22   report in writing the proposed arrangements and secure approval

23   prior to engaging in the activities."

24   Q.    And so for outside consulting, the obligation is to notify

25   but then also receive approval before you do whatever it is

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    that you've identified as consulting?

2    A.    That's exactly right.  So the approval for consulting is

3    not the same thing as reporting in a conflict of interest

4    reporting system.  So you must receive proactive approval for

5    that consulting activity.  And then once that is in place, then

6    you would report that as a conflict of interest if it met the

7    thresholds for reporting.

8    Q.    So if a professor had an opportunity to consult, approval

9    has to be obtained first?

10   A.    Yes.

11   Q.    And once the approval is given, then that would also have

12   to be reported on the ad hoc basis, which means within 30 days,

13   and then annually thereafter?

14   A.    That's exactly right.

15   Q.    Then finally I'd like to direct your attention to

16   Section 5, Campus Policy Development and Enforcement.

17   A.    Yes.

18   Q.    And it says, "Additional rules and procedures for personal

19   external activity, consistent with board policy, will be

20   established by Regents institution."  Can you read the rest of

21   that, please?

22   A.    So -- I'm sorry.  So I'm looking in -- I'm sorry.  I was

23   looking at Section 4 so that was why I was confused.

24        So "additional rules and procedures for personal external

25   activity, consistent with board policy, will be established by

1    each Regents institution.  In situations in which the

2    objectivity of a faculty or unclassified staff member" --

3         THE COURT:  Slow down.

4         THE WITNESS:  Sorry.  I got flustered after I couldn't

5    read Roman numerals.

6         "In situations in which the objectivity of a faculty

7    or unclassified staff member could reasonably be questioned, or

8    where apparent conflicts of interest exist, each Regents

9    institution will establish an effective review mechanism to

10   determine if a conflict of time or interest exists and to

11   facilitate resolution of the conflict where possible and to

12   decide upon the appropriate sanctions when an unclassified

13   staff or faculty member's activities have been determined to

14   constitute a conflict.  Such review mechanisms will include

15   opportunity for appeal."

16   BY MR. OAKLEY:

17   Q.  Thank you.  I don't know about you, but I had a flashback

18   to second grade reading.

19   A.  I got a little flustered.

20   Q.  I want to talk to you about whether it would be possible

21   for a professor or a principal investigator to be employed by a

22   foreign entity.  Would that be possible?

23   A.  I think that it could potentially be possible if they did

24   not have a full-time appointment and it had been disclosed and

25   had been approved by the university through the policy.

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    Q.  Is it ever possible for a professor to have multiple

2    appointments at other domestic universities, for instance?

3    A.  Yes, that would follow the same exact requirements in that

4    as -- as stated in the policy, the Regents expect that the

5    professor's full-time, you know, commitment be to KU.  And so

6    no matter if the institution is domestic or international, if

7    they have another job, they would need to go through the

8    process of ensuring that their appointment at KU was not being

9    hurt by that.

10   Q.  And so full-time at KU means full-time?

11   A.  It means full-time at KU.

12   Q.  Is it possible for a -- well, strike that.

13       If a KU professor wanted to seek funding for research from

14   another government outside the United States, is that possible?

15   A.  That is possible as long as they are following the policies

16   and we can agree to the terms and conditions that that money or

17   funding would be awarded under, we oftentimes work with

18   international organizations or entities.

19   Q.  You say "we."  When you say "we," who do you mean?

20   A.  The University of Kansas.

21   Q.  Okay.  And specifically does that run through the Center

22   for Research?

23   A.  It does.

24   Q.  And so if a professor wants to obtain foreign funding for

25   research, it's possible?

1    A.   That is correct.

2    Q.   But it has to go through your Center for Research?

3    A.   That is correct.  Right.  It would follow the same proposal

4    process with our pre-award review, contract negotiation, and

5    award management.

6    Q.   You mentioned as part of the policy that there's a conflict

7    of interest committee?

8    A.   Yes.

9    Q.   What is that?

10   A.   So what happens is if there is a conflict of interest

11   determined, then individuals who are experts would be asked to

12   assist to make sure that the mitigation steps are being

13   appropriately handled.

14   Q.   Let's talk about the annual reporting.  Is that reporting

15   done through what's called a -- the Institutional

16   Responsibilities form?

17   A.   I believe so.  Could I see a copy?  I believe we call it

18   e-compliance, which is the name of the system, so I'm sure the

19   form has a different name.

20   Q.   I'm handing you for the record what's been marked as

21   Government's Exhibit 22.

22   A.   Yes, this is the Institutional Responsibilities form.

23   Q.   Before we get there, I realized looking at my notes that I

24   wanted to ask you one more question about the conflict of --

25   potential conflict of interest reporting policies.

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    A.    Yes.

2    Q.    Recently has KU changed its policies as it relates to

3    unpaid affiliations that have no time commitment requirements?

4    A.    So what I can say is that while this policy remains intact,

5    due to federal focus for investigators who are applying to

6    federal institutions, we have updated how we gather information

7    so that as an institution we can be compliant when we are

8    submitting to National Science Foundation, National Institutes

9    of Health, and the Department of Energy.

10   Q.    Okay.  And so help me break that down.  What's -- what's

11   the change?

12   A.    So what has happened over the last few years is that the

13   National Science Foundation, National Institutes of Health, and

14   Department of Energy have asked us to, when we submit, certify

15   certain information is accurate and that the forms that we're

16   submitting are accurate.  Over time the information on the

17   forms has changed, and so to ensure that we are being compliant

18   with the policies of the sponsors, we have increased the amount

19   of information that we gather from investigators so that we can

20   answer those questions because we -- I'm sorry.

21   Q.    Go ahead.

22   A.    We depend on -- we -- our staff, while trained, we only can

23   report what we are told.

24   Q.    When you say that you can only report what you are told,

25   from whom?

A.   So the institutional responsibilities form that you

provided, our staff have access to see that information and so

part of our proposal preparation process is to look in the

electronic system to make sure that all named faculty and staff

on a proposal have completed their annual report and that we do

not need to work with the conflict of interest office to

have -- so what will happen in the proposal process is that if

somebody did have a conflict indicated, we would provide the

scope of work and budget to the conflict of interest office so

they could ensure that there was not a conflict or a perceived

conflict with anything that the investigator or any named

personnel had disclosed and what was in our proposal.

Q.   Okay.  And so I think I've taken us a little bit into what

I wanted to get to next, but let me focus on changes.

A.   Sure.

Q.   What was the change that you talked about that results --

that -- well, first of all, when did that change?  When was it

implemented?

A.   I believe it was implemented two years ago, but I would

have to check our records to confirm that that's the first

annual cycle, but it was in alignment with the National Science

Foundation and National Institutes of Health updates for their

current and pending and other support requirements.  And so

specifically when someone does federal research now, we ask

about federal research and then we ask a few questions

1  specifically around appointments and associations so that we

2  can ensure that those forms are accurate when we're submitting

3  them.

4  Q.  Okay.  And let me talk to you about those appointments and

5  commitments.  Do those relate to -- the change, does it relate

6  to the reporting of unpaid affiliations?

7  A.  Yes.

8  Q.  And does it also relate to -- specifically does it relate

9  to unpaid affiliations that have no time commitment?

10 A.  Yes.  Under new federal agency requirements, some forms are

11 required to list that information.  When we submit a proposal

12 as the university, we are required to say that everything in

13 the -- in the entire proposal is accurate and so we do our very

14 best to collect all the information from the faculty and staff

15 so that we are assured that when we're submitting, that we're

16 being diligent in following that agency requirement.

17 Q.  And that change you said relates to unpaid affiliations

18 with no time commitment.  Can you think of an example of

19 something that would be an unpaid affiliation with -- with no

20 time commitment?

21 A.  Sure.  Oftentimes individuals are given honorary

22 professorships at different universities to recognize their

23 exemplary science, maybe from an alumni or something like that.

24 And so the expectation is that that would still be listed so

25 that as we are submitting to National Science Foundation or

1    National Institutes of Health, we would then be able -- they

2    would be able to see, okay, you know, this person has a

3    non-paid appointment so that could be perceived as a conflict

4    if, say, we were giving them also a subaward for a large amount

5    of money.  So it's us making sure that we can disclose.  We are

6    required by the federal agencies to include certain elements in

7    the proposals and so that's what we're doing, we're gathering

8    that information.

9    Q.   Okay.  What about unpaid affiliations that would have time

10   commitments, are those required to be reported?

11   A.   Yes, because that time commitment then it goes against the

12   actual commitment of time policy.  And so in addition to being

13   listed as part of the biosketches for those -- sorry, biosketch

14   is like a truncated CV, it's like a three- to five-page

15   document that says sort of your experience and gives a little

16   blurb about your background.  And so that information, the

17   unpaid affiliations, needs to be on that form.

18       And then if anybody actually has a commitment of time,

19   whether they're -- you know, whether they're getting paid or

20   not, or vice-versa, if they're getting paid with no commitment

21   of time, either of those would need to be reported because we

22   would put that as research support which has to be on your

23   other support form.

24   Q.   Now, has that been affected?  In other words, in the past

25   were researchers not required to report time commitments or has

1    that been the same since you've been at the Center for

2    Research?

3    A.   So there's always been the other support or current and

4    pending forms that have to be completed.  But over the last few

5    years National Science Foundation and National Institutes of

6    Health, along with the Department of Energy, have increased

7    their scrutiny and updated their definitions of what needs to

8    be included.  And so as those changes happen, we continue to

9    update our policies as well.

10   Q.   Okay.  But specifically I want you to think -- well,

11   specifically an instance where there is a time commitment,

12   whether it's paid or not, has that always been required to be

13   reported?

14   A.   Yes.  A time commitment is a time commitment.  And the

15   reason that you submit in Other Support is to make sure that

16   whatever amount of time that you are asking the government to

17   pay you on the specific proposal is -- that you're going to

18   have that amount of time.

19   Q.   Now, let's get to the Institutional Responsibilities form.

20   And I think I handed you Government's Exhibit 22.

21   A.   Yes, you did.

22   Q.   Do you recognize this as the Institutional Responsibilities

23   form for the defendant, Feng Tao?

24   A.   Yes.

25   Q.   And is it -- can you tell when it was submitted or --

```
 1   A.  It is dated at the top Tuesday, September 29th, 2015, at

 2   9:05 with 52 seconds a.m.

 3              MR. OAKLEY:  Your Honor, I'd offer Government's

 4   Exhibit 22.

 5              THE COURT:  Any objection?

 6              MR. DEARINGTON:  No objection, Your Honor.

 7              THE COURT:  22 admitted.

 8   BY MR. OAKLEY:

 9   Q.  So as we're looking at this form, how is this submitted by

10   the -- by the employee, by the professor?  Is it a paper form

11   or is it submitted in some other manner?

12   A.  So it's in electronic form.  And so what happens when you

13   get your annual e-mail, like I referenced before, there's a

14   link and you sign in with your KU online ID, which is unique to

15   the individual, and then the questions that you can see sort of

16   neatly lined out here are on a screen.  And so you have -- you

17   know, you can toggle with your mouse to select the different

18   answers, and in some cases if you've answered yes or no, then

19   you are given a space that you can type in some additional

20   information.

21   Q.  And so, for instance, let's just focus in on the first

22   question related to education.

23   A.  Yes.

24   Q.  And it looks like there's a little bubble on this form

25   that's marked yes, and so you said that electronically when you
```

19-20052    USA v. Feng (Franklin) Tao    03.22.22

```
 1   move your mouse and you select it, somebody on this form
 2   selected yes?
 3   A.   You right click it, yes.
 4   Q.   And so the question for this is:  Do your university
 5   responsibilities includes teaching, instruction, or education
 6   of students?  And then it --
 7   A.   Right.
 8   Q.   -- does the form sort of self-populate?  In other words, as
 9   you answer questions, depending on your answers, you may be
10   asked additional questions?
11   A.   That's exactly right.  So some of these first questions
12   everyone would receive, but then once you start answering
13   questions about which FCOI policy applies, which is on the
14   second page, that's when -- it's called a branching form.  And
15   so when you answer a specific question, then it pops up the
16   appropriate questions based on what campus and -- and so that
17   you're getting the correct questions for your affiliation.
18   Q.   Okay.  And Government's Exhibit 22, is this a copy of a
19   printed form from that system?
20   A.   That is correct.
21   Q.   And it shows the answers?
22   A.   That is correct.
23   Q.   So, for instance, the second question on this form is:  Are
24   you responsible for the design, conduct, or reporting of
25   externally-sponsored research?
```

1    A.  Correct.

2    Q.  And here it's marked yes?

3    A.  Correct.

4    Q.  I want to direct your attention to the second page and the

5    section that says Annual for Feng Tao, and it says:  Which FCOI

6    policy applies, KU or KUMC?  What's KUMC?

7    A.  It's the medical center, so University of Kansas Medical

8    Center is KUMC.

9    Q.  And then based on answers to that, it then brings you

10   Annual for Feng Tao, What to Disclose (KU Lawrence)?

11   A.  That's exactly right.

12   Q.  And there's a portion on there that's marked Instructions?

13   A.  Yes.

14   Q.  And is that indicative of what the person filling out this

15   form would see?

16   A.  Yes.

17   Q.  And then the section below that, it's marked Disclosure

18   Criteria and then there's -- there's definitions.

19   A.  Yes.

20   Q.  And what -- what is that section, the Disclosure Criteria?

21   A.  So these are definitions and then the next section, it goes

22   into the actual criteria.  But for the University of Kansas

23   this indicates what would need to be reported on this annual

24   form.

25   Q.  Okay.  And then the next section on Page 3 --

1   A.   Yes.

2   Q.   -- has disclosure criteria for significant financial

3   interests?

4   A.   Yes.

5   Q.   And then there's a description with some definitions?

6   A.   Yes.

7   Q.   And then under 2, there's Disclosure Criteria For Time

8   Commitments in External Professional Activities?

9   A.   Yes.

10  Q.   And so all of this is someone is filling out the form, they

11  have the ability to read this?

12  A.   That is exactly right.   They actually -- this page

13  populates and you have to click a button at the bottom to move

14  on.   So this is a page that is -- is visible to whomever is

15  entering the information on the form; correct.

16  Q.   And then I notice at least on the printout that the Board

17  of Regents is a different color on this form.   Do you know why?

18  A.   Yes.   So the Board of Regents and university policy are in

19  a navy color because they are hyperlinks.   So that is actually

20  -- if you hover over it or if you click on it, it would take

21  you to the policy library for the University of Kansas where

22  you would see the Board of Regents and university policy, which

23  is when -- the university policy would link us back to what we

24  were just talking about, the commitment of time and conflict of

25  interest policy.

1    Q.  And so someone filling out this form from their computer if

2    they had questions or if they wanted to see the policy, they

3    could simply click it and be taken to the policy of their

4    choice, the Board of Regents or the university policy?

5    A.  That is accurate.

6    Q.  And then likewise in that section, "The consulting approval

7    process is separate from disclosure of time commitments," that

8    appears to be blue to my eyes.  Is that indicative of another

9    hyperlink that one could visit if one wanted more information

10   on the consulting approval process?

11   A.  Yes.

12   Q.  And then you mentioned that you -- there's a continue that

13   you -- is that -- can we see that there just above the Annual

14   For Feng Tao Disclosure Details, it says, "click continue to

15   advance to the disclosure page"?

16   A.  Yes, and it would be like a little button that would be

17   obvious that you click it to move on like an electronic form.

18   Q.  Is this exactly as someone sitting on a computer sees?  Or

19   because it's printed are there some modifications -- or not

20   modifications but changes in appearance as a result of the

21   printing process?

22   A.  I mean, it -- it might be narrower than you -- because

23   it's -- it has a wide margin.  But I mean, if you're looking at

24   your screen, you're going to see the same wording, the same

25   format with the hyperlinks and everything like that, that

1    doesn't change.  It's just -- I can't -- without seeing it, I

2    can't say, but I think that because this is so narrow, you

3    probably wouldn't have this much space over here.

4    Q.  Okay.  And then after clicking continue to advance to the

5    disclosure page, is that when you would get to the next

6    section, this Annual For Feng Tao: Disclosure Details?

7    A.  That's exactly right.

8    Q.  And then it begins with instructions?

9    A.  Yes.

10   Q.  And what do the instructions relate to?

11   A.  So the instructions are specifically how to use this

12   electronic form to make or update an existing disclosure.  So

13   you can either enter a new one in or if there's -- if you

14   already had one and something had changed on it, you can update

15   it in the -- in the box area that -- that would be center

16   screen.

17   Q.  Okay.  And then there's the Use the Back Button to Return

18   to the Disclosure Criteria For Reference.  And so if at some

19   point one filling out that form wanted to go back and refresh

20   their recollection or look at other policies or procedures,

21   they simply hit that back button?

22   A.  That's exactly right.  The form has a way that you can go

23   back so that you can refer to disclosure criteria if you had a

24   question about what the definition was or the threshold or

25   anything like that so that it -- so that the attempt here is to

1    make it as easy as possible to fill out this electronic form.

2    Q.    And then the next part is Click Continue to Advance to the

3    Assurance and Certification Page?

4    A.    That's right.

5    Q.    And then next is Disclosure Reminders and then there's

6    three bullet points that just remind on that particular section

7    what needs to be reported?

8    A.    That's correct.

9    Q.    And then you get to a section that's Disclosures Under

10   Review.    What does that section relate to?

11   A.    So disclosures under review would be something that had

12   recently been entered in but had not yet been fully processed

13   by the conflict of interest office.    So, for instance, if you

14   did your annual report yesterday and you, you know, had put

15   something in here and it had needed to be routed to your

16   supervisor and then to the conflict of interest office, you

17   might not be able to edit it because it might be en route.    So

18   you would be able to see -- on this form it says there are no

19   items to display, but you would see whatever you had initially

20   entered in.    Once it's actually been through the process of

21   approvals and/or mitigation as necessary, then it would show

22   under previously reviewed disclosures.

23   Q.    Okay.

24   A.    So, sorry, to simplify that.    Disclosures under review mean

25   that they're under processing right now.

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1   Q.   Okay.  And then below that is the previously reviewed --

2   well, let me back up.

3        Do you see on that form where it says, "There are no items

4   to display"?  What does that mean?

5   A.   That means that nothing was disclosed on this form.

6   Q.   So whoever filled out this form disclosed nothing?

7   A.   That is correct.

8   Q.   And the section that says, "Previously Reviewed

9   Disclosures.  Click Modify or Remove to Enable Editing"?

10  A.   Yes.

11  Q.   What does that mean?

12  A.   So this would be something that had been previously

13  disclosed and had gone through the review process so the

14  appropriate reviews and approvals had been put into place.  If

15  a management plan was necessary, that would've been put into

16  place.  And so it would list here so that we understood what

17  that disclosure meant.

18  Q.   Okay.  And so on there where it says, "There are no items

19  to display," above that it says, "Modify View Organization; Is

20  Public Company; Relationships."  Do you see that section?

21  A.   Yes, yes.

22  Q.   What does that -- why is that there?

23  A.   So what it is is -- so Modify and View.  So the modify

24  button would actually be a little icon that if there was

25  something to list there, you could click that and then update

1    it as necessary and then that would kick it back into the

2    review process again.  So if you needed to come in and say the

3    relationship has changed or the total value has changed or

4    something, that would be able -- you could modify that.

5        The view just means you would see the -- the detailed

6    information.  And then organization means the entity, the name

7    of the entity that was listed as a -- as the disclosed entity

8    that -- that has -- with whom the person filling out the form

9    is affiliated or related to.  "Is a public company" is a

10   checkbox.  If it's a publicly-owned company, it would be

11   checked.  Relationships, so that would be, you know, like self

12   or spouse.  So disclosure types, that would be the type of

13   disclosure, whether it's the different types of equity

14   interests, remunerations, excuse me, or intellectual property.

15   And then at Total Value, "significant" would be a checkbox

16   again if it exceeded the thresholds that are listed under the

17   Disclosure Criteria For Significant Financial Interests on the

18   previous page.

19   Q.  And so on these sections in the filled out form it says

20   there are no items to display.

21   A.  Right.

22   Q.  If someone filling out the form had decided to report

23   something, there would be -- once you hit the button, there's

24   questions that would fill in that section?

25   A.  That's correct.  And then you would see a line here that

1    actually had a summary of that information, the summary of the

2    organization, public, the last update.  So that would -- that

3    would line up there so then we would know -- we, meaning the

4    University of Kansas, when we were filling out forms to make

5    sure that the forms reflected that conflict.

6    Q.    And since it's -- indicates there are no items to display,

7    whoever filled out this form did not report any information

8    related to any disclosures?

9    A.    That is correct.

10   Q.    And then let's keep scrolling down, the Annual for Feng

11   Tao, Additional Information.  And then it says -- your primary

12   supervisor is listed here.

13   A.    Yes.

14   Q.    And in this case there is information listed as Laurence

15   Weatherley.  Do you know who Laurence Weatherley is?

16   A.    Doctor Weatherley is the Chair of the Chemical and

17   Petroleum Engineering Department.

18   Q.    And then No. 2, there's a space to list additional

19   supervisors?

20   A.    Correct.

21   Q.    No. 3, "Please provide any additional details regarding

22   your disclosure."

23   A.    Correct.

24   Q.    And then No. 4, "Please upload any related documents."  And

25   in this particular form all of those are blank?

1   A.  Correct.

2   Q.  Now, at the top -- you had mentioned -- if we could go back

3   to the -- to the first page at the very top.

4   A.  Yes.

5   Q.  There's -- you mentioned that the date this was submitted

6   was Tuesday, September 29th, 2015 and I think you even said at

7   9:05 --

8   A.  Correct.

9   Q.  -- and 52 seconds?

10  A.  Yes.

11  Q.  And then it looks like there's a date.  That's the date

12  that the form was submitted?

13  A.  Yes.

14  Q.  And then there's a date of June 27th, 2019.  Do you know

15  what that date relates to?

16  A.  That would be the date that this was printed.

17  Q.  Okay.  And so if someone looks at this, the date where it

18  says date and it gives the hour, the minute, and the seconds,

19  that's when it was filled out.  The 2019 date is when it was

20  printed?

21  A.  That's exactly right.  Right.  The date that's listed in

22  the actual sort of form under the KU header is part of the

23  actual system saying this is the system date.  At the top that

24  is just a date to show when this was printed so that we can be

25  sure if something had changed that we were looking at the right

1    thing.

2    Q.   Okay.  So if we can get back to the last page.  And on the

3    top half this document says, "Annual for Feng Tao, Assurance

4    and Certification," and then there's instructions.

5    A.   Yes.

6    Q.   What do those instructions relate to?

7    A.   So this is about actually submitting the form.  So it's the

8    certification, it's the review to make sure that the disclosure

9    was complete so that everything that you intended to disclose

10   was saved and that it's in the system correctly, and then it's

11   -- the next thing down is the certification statement.  And so

12   these are instructions on how to submit the actual form into

13   the system.

14   Q.   And it says in there to "save and submit later if your

15   disclosures are not ready to submit"?

16   A.   Correct.

17   Q.   "For instance, if you would like to add details or

18   attachments you do not have at hand, you can save this draft

19   certification and return at a later time to edit your

20   disclosures and submit."

21   A.   Correct.

22   Q.   So the person filling that out has the opportunity to save

23   it and get whatever documents or consult whoever they need and

24   then get back to the form to actually submit it?

25   A.   Correct.  The form will save information that's already

1    been input so you don't have to restart the session if you need

2    to take a break or grab other supporting information.

3    Q.   And then it says Disclosures Under -- under the -- "In this

4    case, click 'Save'" if you wanted to save it.  And then it has

5    a section Disclosures Under Review, and again it says, "There

6    are no items to display."

7    A.   Right.

8    Q.   Is that another indication to whoever is looking at it that

9    there were no disclosures made?

10   A.   That's exactly right.  The instructions say -- and again,

11   this is put here so you can ensure before you click the

12   certification statement that it's an accurate representation of

13   what you intended to submit.  But, yes, this is a repeat of

14   what we saw on the previous page to say here is what this form

15   is going to say when you submit it to the system.

16   Q.   And so if someone didn't -- made a mistake the first time

17   or didn't see the first time that there was nothing to report

18   or that they had reported a disclosure, it's another

19   opportunity to look at what they're providing?

20   A.   That is correct.  That is the opportunity to sort of check

21   your work before you submit it.

22   Q.   And then under that there's a section Previously Submitted

23   Disclosures?

24   A.   Correct.

25   Q.   And there are no items to display?

19-20052    USA v. Feng (Franklin) Tao    03.22.22                196

1   A.   Correct.

2   Q.   And then there's a certification statement.  What is that

3   certification statement?

4   A.   This certification statement is stating that the

5   information being submitted is accurate and that it reflects

6   the actual information that it is truthful.

7   Q.   And can you read that?

8   A.   Sure.   "I, Feng Tao, declare that this Report of

9   Significant Financial Interests and Time Commitments has been

10  examined by me and to the best of my knowledge and belief is a

11  true, correct, and complete statement."

12       And then the Bullet Point 1 says, "I have read and complied

13  with the Kansas Board of Regents and University of Kansas

14  policies on commitment of time, conflict of interest,

15  consulting, and other employment."

16       Bullet Point 2.   "I understand that any external personal

17  professional activities in which I engage that take time away

18  from my university responsibilities must:"

19       Sub-Bullet Point 1, "Contribute to my professional

20  development as a faculty member and/or enable me to serve the

21  community, state, or nation in a professional capacity;"

22       Sub-Point 2, "be consistent with the objectives of the

23  University of Kansas;"

24       Sub-point 3, "not interfere with meeting my faculty

25  responsibilities in teaching, research, and service;"

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1      And sub-point 4, "not use the name of the University of

2  Kansas, its facilities, equipment, staff, or students."

3      Next bullet point.  "Regarding consulting and outside

4  employment, I agree to secure approval, following the

5  procedures specified on my campus, prior to engaging in these

6  external activities."

7      Next bullet point.  "I understand that Regents policy

8  states that failure to file this statement as required or

9  intentionally filing a false statement may result in

10  disciplinary action."

11      Last bullet.  "I will report any changes to this statement

12  as soon as they become known to me and no later than 30 days

13  after acquiring a new significant financial interest, e.g.,

14  through marriage, inheritance, or purchase."

15  Q.  And then can we scroll to the bottom where it says "by

16  clicking submit"?

17  A.  Yes.

18  Q.  And it says, "By clicking submit, you confirm that you

19  understand and agree with the certification statement"?

20  A.  That is correct.

21  Q.  And then it looks like there's a checkmark in real -- in

22  small print.  Could we enlarge that?

23      Are you able to read that?

24  A.  No, but --

25  Q.  Does it look like there's a box with a checkmark?

1  A.  It is.  And so I don't know what the words say, but I know

2  that you have to check that box again as sort of a check of

3  your work so that you don't accidentally hit submit without

4  making sure that you really want to.  So you actually have to

5  click that little box or it doesn't submit.

6  Q.  So in addition to clicking submit after the part that says,

7  "By clicking submit, you confirm that you understand and agree

8  with the certification statement," you also have to check the

9  box?

10  A.  That's right.

11  Q.  Can we get back to the -- the certification statement where

12  it says, "I have read and complied."  I notice again that -- to

13  my eyes part of that text looks a different color.  And Kansas

14  Board of Regents, is that a different color on the printout?

15  A.  Yes.  Kansas Board of Regents and University of Kansas

16  policies are both navy, again indicating that those are

17  hyperlinks to those policies.

18  Q.  And so by -- someone that wanted to review the policies in

19  the statement has two opportunities to click and review both

20  the Board of Regents policies and the University of Kansas

21  policies?

22  A.  That is correct.

23  Q.  Next I want to hand you what's been marked as Government's

24  Exhibit 23.  Do you recognize that?

25  A.  I do.

1    Q.   What is that document?

2    A.   This is the annual institutional responsibilities for

3    Doctor Tao for 2016.  It's dated Wednesday, October 5th, 2016

4    at 6:01 and 23 seconds p.m.

5    Q.   And so the one that we looked at previously was submitted

6    September of 2015?

7    A.   Correct.

8    Q.   This is the one that was submitted October -- in 2016?

9    A.   That is correct.

10    Q.   I'm not going to have you -- well, is this the same type of

11    document that we looked at that is a printout of the computer

12    system that involves the certification?

13    A.   That is correct.

14          MR. OAKLEY:  Your Honor, I'd offer Government's

15    Exhibit 23.

16          THE COURT:  Any objection?

17          MR. DEARINGTON:  No objection, Your Honor.

18          THE COURT:  Exhibit 23 admitted.

19    BY MR. OAKLEY:

20    Q.   And directing your attention to the last page under the

21    Disclosures Under Review.

22    A.   Yes.

23    Q.   There are no items to display, so no disclosures were made

24    in -- in the 2016 form?

25    A.   That is correct.

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1   Q.   Either under review or previously submitted disclosures?

2   A.   That is correct.

3   Q.   And so if -- for instance in 2015 someone would've

4   submitted a disclosure, would you expect to see that under the

5   previously submitted disclosures?

6   A.   That is correct.  And then the expectation would be that in

7   the 2016 cycle, that would be updated to reflect the accurate

8   information if that had not already been done, which it

9   should've been done at the time that the change happened.  But

10  this is again an opportunity to check and make sure that the

11  reporting is correct.

12  Q.   And that's -- what you were talking about is the ad hoc

13  requirement --

14  A.   That's exactly right.

15  Q.   -- that within 30 days --

16  A.   That's right.

17  Q.   And this also contains the same certification?

18  A.   Correct.

19  Q.   Next I want to hand you what's been marked as Government's

20  Exhibit 24.  Do you recognize that?

21  A.   I do.

22  Q.   And what is Government's Exhibit 24?

23  A.   This is the Institutional Responsibilities form for Doctor

24  Tao for -- dated Tuesday, January 9th, 2018 at 9:45 and 26

25  seconds a.m.

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    Q.   And so this is the annual reporting form that was filled

2    out in 2018?

3    A.   Correct.  But I would assume that because of the timing of

4    this that this was actually the annual report that should've

5    been done in 2017.  We do not submit proposals until someone

6    has completed this.  So in a case where someone maybe did not

7    submit it in the fall as they were supposed to, then when --

8    next time they submit a proposal, we catch that at time of

9    proposal and require it be submitted prior to our proposal

10   submission.  And so the January 9th, 2018 date to me appears to

11   be for a 2017 cycle because the 2018 actual annual report would

12   not have happened until the fall of 2018.

13   Q.   Okay.  And so typically the annual requirement comes due in

14   the fall?

15   A.   That's exactly right, to coincide with the start of the

16   academic semester.

17   Q.   And so Government's Exhibit 23 that we looked at was

18   submitted October 5th of 2016 and Government's Exhibit 22 was

19   submitted September 29th of 2015?

20   A.   Yes.

21   Q.   This one, however, was submitted early January, January 9th

22   of 2018?

23   A.   Yes.

24   Q.   But based on the timing, you believe that is the 2017 form?

25   A.   I do.

1          MR. OAKLEY:  Your Honor, I'd offer Government's

2    Exhibit 24.

3          THE COURT:  Any objection?

4          MR. DEARINGTON:  No objection, Your Honor.

5          THE COURT:  24 admitted.

6    BY MR. OAKLEY:

7    Q.  And you said that if -- if a professor or a principal

8    investigator wants to submit for research through your lab --

9    or through the center, excuse me, that you all check to see if

10   this form has been filled out?

11   A.  That's correct.  For anybody who is named on the proposal,

12   we check our electronic system and make sure that each of those

13   individuals has a submitted form and then that again is how we

14   know based on the information that's -- that's in that record

15   on if prior to submission we need to have the conflict of

16   interest office review that proposal.

17   Q.  And so directing your attention to the form that was

18   submitted January 9th, 2018.  And again, this is for the

19   defendant, Feng Tao?

20   A.  Yes.

21   Q.  And, again, to the last page, the Annual for Feng Tao:

22   Assurance and Certification?

23   A.  Yes.  There's no items to display.

24   Q.  And so --

25   A.  It's on Page 8.

1   Q.  In the middle where it says, "Disclosures Under Review" --

2   A.  Correct.  It says, "There are no items to display."

3   Q.  And similarly no previously submitted disclosures?

4   A.  Correct.

5   Q.  And it contains the same certification or a similar

6   certification to the others?

7   A.  Correct.

8   Q.  Next I want to hand you what's been marked as Government's

9   Exhibit 25.  Do you recognize that?

10  A.  I do.

11  Q.  What is that document?

12  A.  This is the institutional responsibilities form for Doctor

13  Tao dated Tuesday, September the 25th, 2018, 10:07 and 20

14  seconds a.m.

15  Q.  And is this the defendant's Institutional Responsibilities

16  form submitted in September 2018?

17  A.  Yes.

18          MR. OAKLEY:  Your Honor, I would move to admit

19  Government's Exhibit 25.

20          THE COURT:  It's already admitted.

21          COURTROOM DEPUTY:  That's the one --

22  BY MR. OAKLEY:

23  Q.  I'm going to show you what's already been admitted as

24  Government's Exhibit 25.  You said that this is the same

25  Institutional Responsibilities form?

1   A.   Correct.

2   Q.   And this is dated September 25th, 2018 at 10:07 and 20

3   seconds?

4   A.   Yes.

5   Q.   And this is for Defendant Feng Tao?

6   A.   Yes.

7   Q.   And turning to Page 8 again.  "Disclosures Under Review.

8   There are no items to display"?

9   A.   Correct.

10  Q.   And under Previously Submitted Disclosures, "There are no

11  items to display"?

12  A.   Correct.

13  Q.   Does that indicate to you that there was no disclosures

14  made during that time period?

15  A.   Yes.

16  Q.   Earlier on you and I both used the term called "principal

17  investigator," and I think we summarized it as being similar to

18  a professor.  But what is a principal investigator?

19  A.   Right.  So at the University of Kansas the principal

20  investigator is the individual who is charged with leading the

21  sponsored research project.  So we require for every single

22  submitted research project for there to be one named principal

23  investigator, meaning one individual who would be responsible

24  to ensure that the science that is being submitted, that the

25  information that's in the application is accurate.  And then if

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1  an award were to be made, they would be the person charged with

2  ensuring that both the scientific activities that were -- that

3  were issued under that award or that were proposed under that

4  award as well as the terms and conditions are being followed.

5      Our office obviously assists with the pre-award portion to

6  make sure that all of the forms and everything are accurate and

7  then during the award phase we assist with helping with

8  budgetary reviews and things like that, but it's still the

9  responsibility of the principal investigator as the named

10 person on that award, both at the proposal stage and at the

11 award stage, to have responsibility for what occurs and is

12 submitted in the proposal and occurs during the award.

13 Q.  And so is "principal investigator" a term of art in the

14 industry?

15 A.  It is.  It's -- yes, it's a term that's used not only by

16 our office but by the sponsors as well.

17 Q.  Now, I have said that principal investigator means

18 professor, but is that always the case?

19 A.  So it could mean professor; it could also mean anybody who

20 has a -- given -- is given a PI status.  So at KU we have a

21 policy about expectations for PIs and some titles like

22 professor, assistant professors, things like that, are

23 automatically granted PI status upon hire.  Some unclassified

24 staff are not granted automatic status and would have to show

25 that their credentials are suitable for them to be a PI, but

1    that's all guided by a policy that KU has to ensure that we are

2    being good stewards of sponsored funding money.

3    Q.   And when you say PI, that's short for principal

4    investigator?

5    A.   That is right.

6    Q.   I want to next hand you what's been marked as Government's

7    Exhibit 5.  Do you recognize that?

8    A.   Thank you.  Yes, this is KU's principal investigator status

9    policy.

10    Q.   And is this a fair and accurate copy of KU's principal

11    investigator status policy?

12    A.   Yes.

13         MR. OAKLEY:  Your Honor, I'd offer Government's

14    Exhibit 5.

15         THE COURT:  Any objection?

16         MR. DEARINGTON:  No objection, Your Honor.

17         THE COURT:  Exhibit 5 admitted.

18    BY MR. OAKLEY:

19    Q.   And so directing your attention to the top, it says this is

20    an Office of Research Policy, Principal Investigator Status

21    Policy.  And again --

22    A.   Correct.

23    Q.   -- the Office of Research is your office?

24    A.   That is my office; correct.

25    Q.   And then the next section I want to talk to you about is

1   the policy statement.

2   A.   Yes.

3   Q.   And it says that, "The principal investigator," in fact,

4   the policy itself evens shortens that to PI, "is the person

5   ultimately responsible for the scope, fiscal affairs, and

6   administration of a sponsored project"?

7   A.   That is accurate.

8   Q.   And "the PI is responsible for ensuring that all sponsored

9   research take place in accordance with the terms under which

10  the grant was issued and that this research complies with all

11  applicable federal, state, and university regulations"?

12  A.   Correct.

13  Q.   "All proposals and sponsored projects must designate one

14  person as the PI and in order to be designated as the PI in a

15  proposal or sponsored project, an individual must first have PI

16  status"?

17  A.   That is accurate.

18  Q.   And so as it relates to a particular research project, the

19  PI is the person that's in charge?

20  A.   That is accurate.

21  Q.   And is that just in the application -- excuse me.  Is that

22  just in the funding process?  In other words, once the project

23  is funded they're in charge or as far as what's submitted

24  through your office?

25  A.   The principal investigator is our main point of contact for

1    most proposals, meaning that they work with an assigned grant

2    specialist or grant coordinator to put together the proposal.

3    So they are ultimately responsible -- well, it's our office's

4    responsibility to check for the compliance, to make sure that

5    we're meeting all of the proposal submission guidelines and

6    things like that.

7        It is the responsibility of the PI to ensure that all of

8    the information that's actually contained included, like the

9    technical piece, like the scope of work, that the budget is an

10   accurate representation of how they plan to expend the funds,

11   that any of the other forms that are contained in there are

12   accurate and follow along with the guidelines.

13       Our staff reviews that and helps out, but it really is the

14   PI's responsibility to make sure that in the end it's accurate

15   because they are the ones who know that information much better

16   than our staff.

17   Q.  And then the section that's on the screen now discusses a

18   co-principal investigator or co-PI?

19   A.  Correct.  And in some cases if -- if there's two

20   individuals who have complementary expertise or it's a really

21   large program/project, there might be more than one individual

22   who is really named as a key investigator and they want to

23   highlight in the application that this person's expertise and

24   abilities are going to be in full scope in the activity.  So

25   they would be named as co-principal investigator,

1    co-investigator, you might hear it as key personnel as well

2    depending on the agency.  But this really means that this

3    person would be working with the PI to ensure things are

4    accurate, but in the end it's the PI that has the final

5    responsibility.

6    Q.    Let me direct your attention to the second page where it

7    says, "Regular PI status."

8    A.    Yes.

9    Q.    And it says, "Faculty and academic staff on the Lawrence

10   campus who have one or more of the official job titles listed

11   below automatically attain PI status" --

12   A.    Correct.

13   Q.    -- "effective with their written acceptance of employment."

14   And the first section there or the first bullet point is

15   professor, associate professor or assistant professor.

16   A.    Correct.

17   Q.    And so professor, associate professor, assistant professor,

18   you automatically have PI status --

19   A.    Correct.

20   Q.    -- with the university under its policy?

21   A.    Correct.

22   Q.    And so a professor, associate professor, assistant

23   professor has the ability to submit through your office

24   research grant applications?

25   A.    That is correct.

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    Q.   Let me talk to you about another term of art in your

2    business.  Are you familiar with the term or the concept

3    "current and pending support"?

4    A.   Yes.

5    Q.   What is that?

6    A.   The current and pending support is a document that is

7    required by National Science Foundation and sometimes

8    Department of Energy.  And under the proposal preparation

9    guidelines, it is to list out the current support that an

10   investigator has for their work as well as the pending support,

11   meaning if you have proposals outstanding or if you're

12   anticipating getting some other type of support for your work,

13   you would list that there.

14        And the form has a set format where you list the title of

15   the activity, where the activity is going to take place, the

16   individual's time commitment and the dollar amount of support.

17   Q.   And does the PI put that information together for the

18   current and pending support?

19   A.   So the PI can put it together or sometimes our office might

20   start with a prior version and provide to it PI for updates.

21   And so the idea behind that is if we can save some of the

22   administrative burden of having to complete a new form, we

23   would do so, but the PI would always have the final say of the

24   content of that form because, again, they're the ones who fully

25   understand the scope of the support for their research.

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1  Q.  Would KU internally ever use the current and pending

2  support for anything?

3  A.  Not usually.  So the only thing that we might use a current

4  and pending support for is if we are actually doing our own

5  internal competition, if we're giving some sort of internal

6  monies or something like that.  But I guess maybe the other

7  thing is that we obviously compare it to anything that's listed

8  in these Institutional Responsibilities form.

9      So one of the steps that we do, like I said, is we always

10  look up in the system to see what institutional

11  responsibilities have been submitted.  If there's a disclosure,

12  we would then look to make sure that if there was a current

13  disclosure where they said they were getting funding from

14  somewhere, that that was included in the current and pending so

15  that we were, again, checking to make sure that the documents

16  were accurate because, again, that's our -- that's our role is

17  to ensure compliance as much as we can.

18  Q.  You had mentioned that your office may assist a PI that's

19  putting together a current and pending support.

20  A.  Correct.

21  Q.  I want to talk to you just generally how your office

22  supports PIs who are interested in submitting grant

23  applications seeking funds.  I think earlier you said that

24  there's 100 employees that work in your office?

25  A.  So we have a team of 12 employees currently that work in

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    our pre-award, and that doesn't include staff that's in

2    research centers that also help do some of this work.  But what

3    our staff does is, if given adequate time, we help by reading

4    the solicitation, which is the call from the sponsor.

5        So the sponsor will put out a call oftentimes saying here's

6    what we're looking for, here's what the format of the proposal

7    should be.  So our team would read that and then work with the

8    PI to gather all the pieces that they're putting together, make

9    sure that the budget is accurate.  We would go through, do all

10   the compliance reviews, so conflict of interest, if there was

11   going to be international activities, make sure that we have

12   the right reviews of that, make sure that things as simple as

13   formatting are accurate, and then we would help with the

14   electronic submission of that after we had done all the reviews

15   and made sure that it met all of the applicable guidelines,

16   whether that's state, federal, non-profit for the sponsor, as

17   well as KU's own guidelines.

18   Q.   And so a PI that needs help navigating the application

19   process as it relates to grants, are they able to come to your

20   office for help?

21   A.   That's exactly right.  That our -- our office, we have

22   trained professionals that work in pre-award specifically to

23   assist investigators and hopefully to reduce some of the

24   administrative burden from them so they can focus on the

25   science and making sure that the technical pieces are accurate.

1    We're worried about margins and fonts and other compliance

2    issues.

3    Q.    Do you know how many professors or associate professors or

4    assistant professors are on the Lawrence campus?

5    A.    I don't know that.

6    Q.    I assume there's quite a few.

7    A.    It is quite a few, yes.

8    Q.    And are there different levels of people, you know, as far

9    as experience with the submission of grants across that

10   spectrum of professors?

11   A.    There are -- that's exactly right.  We have faculty,

12   everything from brand-new faculty or even post-docs, who are

13   looking for support, clear through distinguished professors who

14   have been submitting to National Science Foundation or National

15   Institutes of Health for years.

16   Q.    And is your office able to provide help to everyone from

17   the newbie to the old pro?

18   A.    That is correct.  That's our mission for our pre-award is

19   to provide that service to ensure investigators can get the

20   proposals submitted.

21   Q.    The Center for Research, do you have a physical location?

22   A.    We do.  We have an office on the west campus of Lawrence.

23   Q.    Do the people that work in your office have access to

24   phones?

25   A.    They do.

1    Q.    How about e-mail accounts?

2    A.    They do.

3    Q.    And so typically how are people in your office able to

4    provide support to the PIs, to the professors to help them with

5    the process?

6    A.    Most of our exchanges are via e-mail just because that's --

7    a lot of investigators are faculty, are very busy.  And so our

8    staff makes sure that they're responsive to e-mails, but they

9    also do have phones and people, especially prior to COVID,

10   could stop by.

11       But anytime -- so the way that something would happen is

12   that a PI would determine that they wanted to work on a

13   specific submission, and so they would be assigned one single

14   person to assist them with that submission, and so then that

15   person would read the solicitation and be in e-mail contact

16   telling the PI, you know, here's the deadline, here's what we

17   need to get done so that we can submit.  They would be the

18   person that reviewed it and said, hey, you need to fix these

19   things before we can submit.  And then the specialist in our

20   office would also be the person who did the final review and

21   said, you know, I need your approval to submit this.

22   Q.    Let me talk to you a little bit about the grant application

23   process from KU's perspective.  Can you help walk the jury

24   through the bird's eye view by just summarizing the steps that

25   typically take place?

1   A.   Sure.   So I described in detail sort of the proposal

2   preparation process, but so what happens is an opportunity is

3   identified, the proposal is prepared, reviewed, submitted.   It

4   goes to the sponsor and, depending on the sponsor, they will

5   either do a peer review, meaning that other experts in the area

6   will review it and then rank it and give it a score to say,

7   yeah, this is fundable or they give comments back and say, you

8   know, this isn't fundable, but if you change these things,

9   maybe next time.

10      And so there's either that kind of peer review or in some

11   agencies it's a program officer, and so then the program

12   officer is responsible for -- you know, they have a pot of

13   money and they can say, I can fund, you know, four things out

14   of this solicitation and so they would review all of those.

15      So either way, there's an expert panel looking at the --

16   the scientific materials and everything like that, deciding

17   what's funded.   If something is funded, then KU would get a

18   notice of award and that would either be -- if it's a grant, we

19   don't usually have to sign anything.   Usually by starting

20   expending funding, we are accepting the terms and conditions.

21      If it's a contract or cooperative agreement, our contract

22   negotiations office would get that, review all the terms and

23   conditions and make sure that we can actually abide by what's

24   in those terms and conditions.   We would sign it.   Then either

25   if it was signed or not signed, it goes down to our award setup

1    team.  They enter it into your financial system.

2        And then at that point it's assigned to a grant specialist

3    for post-award review and monitoring, and then that's when the

4    PI and their team can start expending funds, start doing the

5    work.  And then there's usually either -- depending again on

6    the agency, there would be either quarterly or annual financial

7    and scientific reports that have to be submitted to show

8    progress.

9    Q.  You used the term "sponsor."

10   A.  Yes.

11   Q.  I want to talk to you specifically as to federal grants.

12   When you say "sponsor," what are you referring to?

13   A.  So when I say "sponsor," if it's a federal grant I'm

14   specifically talking about the federal agency that has given us

15   the money.  So if it's -- you know, if it's a federal agency,

16   that could be again, like the examples I've used, National

17   Institutes of Health, National Science Foundation, Department

18   of Energy.  We get a lot of money from Department of Education

19   and the Department of Defense.  So large federal agencies that

20   abide by federal regulations and then have their own agency

21   regulations as well.

22   Q.  You talked about how your office engages with the sponsors,

23   is that a bit of a partnership?

24   A.  That's exactly right.  And so one of the -- one of the

25   really important things that -- and I mentioned it really early

19-20052    USA v. Feng (Franklin) Tao    03.22.22

1    on, but 2 C.F.R. 200, which is sort of the regulatory

2    guidelines for grants and cooperative agreements, outlines

3    requirements that we have to follow so that we can be

4    considered good stewards of money.  And every single time we

5    submit a proposal or accept an award, we're saying that we're

6    going to follow those guidelines and that we're going to do

7    that work in that way.  And so it really has a lot to do with

8    reputation because we're saying, hey, we're going to do this,

9    you can trust us to give us the money, we're going to make sure

10   that your investment in this science is carried through.

11       And so, yes, it's a back-and-forth.  If we had a problem or

12   a question or a concern about a term or anything like that, we

13   would contact the agency and actually talk with them.

14   Q.   You mentioned KU's reputation as part of that.

15   A.   That's right.

16   Q.   And specifically as we were talking about the federal

17   funding entities, you mentioned NSF as an entity that your

18   office works with on more than one occasion?

19   A.   We work with National Science Foundation very often, yes.

20   Q.   How about Department of Energy?

21   A.   We also work with them very often.

22   Q.   And so why is KU's reputation important for the center when

23   you're working with these federal grant-making entities?

24   A.   So I think -- I mentioned earlier that there's very limited

25   funding, that our funding rate is about 20 or 30 percent, which

1    is the same as many other universities.  And so there's limited

2    money for a lot of really great science, and so it's really

3    important to us to make sure that we are being good stewards of

4    the money, that sponsors know that there's not any activity

5    that going to get us debarred *[sic]* or suspended or otherwise

6    cast doubt on the work that we're doing.

7         So Office of Research is charged with making sure that we

8    have policies and processes and controls in place to protect

9    the university and protect that relationship and protect the

10   investigators and students that are at KU so that we can

11   continue to get those research dollars.

12   Q.   Can a professor, a principal investigator --

13   A.   Yes.

14   Q.   -- go directly to a federal agency such as NSF or

15   Department of Energy and obtain a grant without the involvement

16   of the university?

17   A.   So they can talk with program officers about technical

18   ideas and we totally encourage that.  We want that relationship

19   to be built.  But if there is going to be a discussion about

20   budgets or actually getting funds, then that's when our office

21   needs to come in to make sure that everything that's being

22   proposed is actually an allowable activity, that it's in accord

23   with all of our policies and procedures.

24   Q.   And so the grant funding, specifically federal grant

25   funding, has to be run through the university?

1    A.   That is correct.  Our office must review and accept all

2    federal grant funding.

3    Q.   Are you familiar with the website grants.gov?

4    A.   Yes.

5    Q.   And what is that?

6    A.   Grants.gov is the centralized portal that the government

7    set up so to simplify proposal submission for federal agencies.

8    So the idea behind it is that there's a standard set of forms

9    that can be used and this portal -- you can go out and look up

10   any solicitation, pull down those forms, and then submit

11   through that portal using the credentials of the university.

12   Q.   Do you know, is that located outside the state of Kansas?

13   A.   Yes, it's a cloud-based application I believe.  I mean,

14   it's on the web.

15   Q.   And so grant applications are submitted through, in KU's

16   case, through the Center for Research in Lawrence?

17   A.   Correct.

18          MR. OAKLEY:  Your Honor, I don't know if this would be

19   a good time to break.

20          THE COURT:  It sounds like you have a little ways to

21   go with this witness.

22          MR. OAKLEY:  Yes, Your Honor.

23          THE COURT:  All right.  So let's recess for the

24   evening.  We're going to start a little later tomorrow, but

25   after tomorrow we'll try to start at 9:00 every morning.  So it

1    could be 9:30, but I think it's probably safer to say 9:45

2    tomorrow is when we'll re-commence.

3            So remind you not to do any independent reading or

4    research about any of these issues or folks.  And should you be

5    inadvertently exposed to media coverage, avoid, you know,

6    reading or listening to it.  Also let us know if you come

7    across something that you've pushed to the side because there

8    are -- there has been and probably will continue to be media

9    coverage.  So if you should inadvertently come across

10   something, let us know in the morning, let Bonnie know, let us

11   know what it was, but more importantly just don't allow

12   yourself to be exposed to it.

13           All right.  So have a pleasant evening.  We'll see you

14   tomorrow morning at 9:45.

15           (The following proceedings were held outside the

16   presence of the jury).

17           THE COURT:  And I should be available at 9:30 if you

18   need anything ahead of time.  All right.  Have a good evening.

19           MR. OAKLEY:  Thank you, Your Honor.

20           MR. ZEIDENBERG:  Thank you, Your Honor.

21           (Proceedings concluded).

22

23

24

25

1                              * * *

2

3                     C E R T I F I C A T E

4        I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   December 2, 2022.

8

9                          /s/ Kelli Stewart_____
10                         KELLI STEWART, CSR, RPR, CRR, RMR
                           United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25