```
 1                  UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,

 4       Plaintiff,
                                      Case No. 19-20052-JAR
 5       v.

 6   FENG TAO, a/k/a "Franklin        Kansas City, Kansas
     Tao,"                            Date:  25 March, 2022
 7
         Defendant.                   Day 5
 8                                    Pages 706 - 932
     .........................
 9
                       TRANSCRIPT OF JURY TRIAL
10             BEFORE THE HONORABLE JULIE A. ROBINSON
             SENIOR UNITED STATES DISTRICT COURT JUDGE
11

12                     A P P E A R A N C E S

13   For the Plaintiff:

14   Mr. Adam Barry               Mr. Christopher Oakley
     U.S. DEPARTMENT OF JUSTICE   U.S. ATTORNEY'S OFFICE
15   950 Pennsylvania Avenue, NW  500 State Avenue
     Washington, D.C. 20530       Suite 360
16                                Kansas City, Kansas 66101

17   For the Defendant:

18   Mr. Michael F. Dearington
     Mr. Peter R. Zeidenberg
19   ARENT FOX, LLP
     1717 K Street NW
20   Washington, D.C. 20006

21

22

23

24   _____
              Proceedings recorded by machine shorthand,
25      transcript produced by computer-aided transcription.
```

1                           I N D E X

2

   Government's Witnesses:                                    Page
3
   DR. REBECCA KEISER
4    Direct Examination  by Mr. Barry                         710
     Cross-Examination by Mr. Zeidenberg                      803
5    Redirect Examination by Mr. Barry                        883
     Recross Examination by Mr. Zeidenberg                    891
6  DR. VIVIANE SCHWARTZ
     Direct Examination by Mr. Barry                          892
7

8

9                         E X H I B I T S

10   Government's
     Exhibits              Offered           Received
11
         31                  923                923
12       32                  907                907
         34                  920                920
13       36                  926                926
         37                  924                924
14       38                  924                924
         39                  925                925
15       40                  925                925
         41                  925                925
16       48                  725                725
         49                  781                781
17       50                  784                784
         51                  785                785
18       52                  786                786
         53                  772                772
19       54                  778                778
         56                  761                761
20       57                  769                769
         63                  777                777
21      125                  915                915
        126                  919                919
22      142                  762                762
        143                  765                765
23      144                  767                767
        154                  791                791
24

25

19-20052-JAR   USA v. Feng Tao   03.25.22   Day 5

```
 1    Defendant's
      Exhibits              Offered           Received
 2
          1459                812               812
 3        1460                808               808

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2       (The following proceedings occurred outside the presence of

3   the jury.)

4       THE COURT:  I wanted to bring something to your

5   attention that was brought to my attention.  So apparently

6   yesterday evening as the jurors were leaving, there was someone

7   outside the Nebraska entrance -- street entrance, which is

8   where they come in and out, who was apparently taking pictures

9   of them.  And one of the jurors told us about this.  We haven't

10  heard this from all of them, but actually the court reporter

11  experienced this too.  One of the jurors expressed to us

12  concern about it.  And I don't know that it was a member of the

13  press.

14       I don't know who it was, but the juror did express

15  concern about it.  So, I mean, we'll talk to the court security

16  officers.  I assume it was on the curtilage and something that

17  we can't control.  But I don't know.  I wanted to give you all

18  a heads up about that.

19       And is there anything more you'd like me to do with

20  that information?

21       MR. BARRY:  No, Your Honor.

22       MR. ZEIDENBERG:  Nothing, Your Honor.

23       THE COURT:  All right.

24       If anyone happens to know who it is, I think you

25  should tell them not to do it because we don't want the jury to

1  feel uncomfortable and feel like somebody is surveilling them.

2         We're ready otherwise, correct?  Does anyone have

3  anything else before we bring the jury in?

4         MR. BARRY:  No, Your Honor.

5         THE COURT:  No?  Okay.

6         MR. BARRY:  Are we ready to bring the witness?

7         THE COURT:  Yes, she can come in.

8         Also, the jurors are complaining that they're having

9  difficulty hearing so, everyone, really try to speak into the

10  mic and adjust these in both locations, as well as the

11  witnesses.

12     (The jury entered the courtroom, after which the following

13  proceedings were had.)

14         THE COURT:  You can be seated.  Welcome back.  Doctor

15  Keiser, you're still under oath to tell the truth.

16         THE WITNESS:  Yes, Your Honor.

17                    DR. REBECCA KEISER,

18  called as a witness on behalf of the Government, having been

19  previously sworn, testified as follows:

20                    DIRECT EXAMINATION

21  BY MR. BARRY:

22  (Continued)

23  Q.  Good morning, Dr. Keiser.

24  A.  Good morning.

25  Q.  Since we took a break yesterday, I want to recap where we

19-20052-JAR    USA v. Feng Tao    03.25.22    Day 5

1    left off.  You said National Science Foundation is a federal

2    agency?

3    A.    Yes, it is a federal agent.

4    Q.    And it injects a couple billion dollars into the

5    fundamental research community in the United States every year?

6    A.    $8 billion a year approximately.

7    Q.    And that money is directed towards fundamental research?

8    A.    Correct, fundamental research.

9    Q.    What's fundamental research again?

10   A.    Fundamental research is the exploration of knowledge and

11   ideas.  So it's before something gets to the point of becoming

12   commercialized, becoming part of a business, being applied.

13   It's the more basic research part of the research environment.

14   Q.    Okay.  And you said your role is currently chief of

15   research security strategy and policy?

16   A.    Correct.

17   Q.    And you obtained that role in 2020?

18   A.    Correct.

19   Q.    And before that you headed the Office of International

20   Science and Engineering?

21   A.    Yes, I did.

22   Q.    You said before that you spent over a decade at NASA?

23   A.    Yes, approximately 16 years.

24   Q.    And you also had a stint at the White House Office of

25   Science and Technology Policy?

1    A.    Correct.

2    Q.    Okay.  So let's first go back to that job you had before

3    your current job at NSF when you were head of International

4    Science and Engineering.  Can you talk a little bit about it,

5    what that job entailed?

6    A.    Sure.  The main role of the Office of International Science

7    and Engineering that I headed was to form international science

8    collaborations, explore ways we could work with scientists from

9    other countries on fundamental research.  I also ran several

10   research programs, international research programs, that were

11   part of this office.  So we -- the NSF would fund the U.S.

12   researchers who were part of these collaborations, and our

13   partner countries would fund the international researchers that

14   were part of these collaborations.  So we ran programs that had

15   funding to basically fund the collaboration.

16   Q.    What is an international collaboration?  What does that

17   mean in the context of fundamental research?

18   A.    So one of the key points of international collaboration is

19   we have to identify what the benefit is to the U.S. researchers

20   and what the benefit is to the international researchers and

21   make sure that we're very clear about what the roles are of the

22   U.S. researchers and the international researchers in a

23   research project.

24         So an example is we formed a collaboration between a U.S.

25   university and the University of Tokyo in Japan to do robotics

1    research.  And in this collaboration the U.S. researchers were

2    really good at doing computer modelling of robots and coming up

3    with this 3D model on a computer that you could rotate and all

4    of this.  And the University of Tokyo researchers were really

5    good at building the robots and so they actually constructed

6    the robots based on the models that the U.S. researchers

7    developed.

8        That's a real collaboration where everyone used their

9    skills and their knowledge and then everybody benefitted from

10    the results.  So a key part of this collaboration is that the

11    results of the research should be openly published for everyone

12    to be able to benefit from the information found in the

13    collaboration.

14    Q.   For that Tokyo example, was the Office of International

15    Science and Engineering involved?

16    A.   Yes.  So what we did is the two parts of the collaboration,

17    the U.S. university and University of Tokyo came together and

18    they submitted a proposal to us, basically outlining what they

19    were proposing to do in their research.  We took that proposal

20    in and put it through our review process and selected that

21    research for funding.  So the funding for the research came out

22    of the international office.

23    Q.   So NSF was involved in that kind of negotiation or the

24    process of figuring out the details of that collaboration?

25    A.   The scientists themselves really developed the details of

1    the collaboration themselves.  What we do is we put out this

2    solicitation, it's called, so an announcement to the community

3    saying we welcome proposals in research in international

4    collaboration.  And what a key part of this proposal has to be

5    is that you collaborate together, and that's a requirement of

6    the funding from the international office.

7         So the researchers themselves then came together.  They had

8    a previous relationship in research, the U.S. university and

9    the University of Tokyo researchers, and they looked at our

10   announcement and they said, this is perfect for us, let's apply

11   to it.  That's how it worked and they applied together.  Once

12   we selected the research based on the review process, we then,

13   in our office, could then work with the researchers after

14   selection at helping them encourage the collaboration.

15   Q.  But that's not your current job, right?

16   A.  Correct.  That's not my current job.

17   Q.  So your current job as chief of research security strategy

18   and policy, what does that entail?

19   A.  So something that's very important in my current job is to

20   differentiate between beneficial principled international

21   collaboration and other sources that are not disclosed to us

22   that researchers might have.  Sometimes they're domestic

23   affiliations and sources of funding; sometimes they're foreign

24   affiliations and sources of funding that are not disclosed to

25   us.  And a big part of my role is to differentiate between

19-20052-JAR    USA v. Feng Tao    03.25.22    Day 5

1    that, right, those sources of funding and connections and

2    affiliations and make sure that that is considered very

3    differently from beneficial international collaboration.  And

4    that's why my position is separate from the international

5    office.

6    Q.   So your title is research security strategy and policy.

7    What does research security mean in this context?

8    A.   Research security means to protect the integrity of the

9    research.  So what that means is we need to make sure, of

10   course, as a government agency, number one, that we are good

11   stewards of taxpayer money.  We give this money out to the

12   researchers.  We need to make sure we give this money out

13   fairly and we give this money out based on the best science

14   that's reviewed so that we get the best results for the

15   American public.

16       Something that's concerning to us is if we receive

17   applications for this funding and there are conflicts there,

18   there are things like affiliations, appointments, sources of

19   funding that are not told to us.  Then we're basing our

20   decisions on inaccurate or incomplete information, and that

21   isn't fair and it also results in funding research where we

22   can't trust the results of the research.

23       So research security means to make sure that we have good

24   policies in place and we have good communication with the

25   community and that we address in any way possible these -- this

1    nondisclosure, this lack of telling us information that could

2    bias the research and could cause us to make bad funding

3    decisions.  So that's what I focus on in my job, is how can we

4    make sure that we alleviate these risks from these affiliations

5    and these sources of funding that are not told to us that can

6    bias the research.

7    Q.  Do you do that all by yourself or do you have a team that

8    works with you?

9    A.  I have a team, and so I have a data analyst who looks at

10   all sorts of data and helps me understand what the risks are.

11   I have a senior adviser who's my acting deputy.  I have someone

12   on detail to my office, meaning they're coming from another

13   office at NSF to help me with policy.  And I have an assistant.

14   Q.  Okay.  Do you have a boss?

15   A.  Yes, sir.  My boss is the head of NSF, the director of NSF.

16   Q.  Okay.  And how do you get that job?

17   A.  So he was -- he was appointed by the President of the

18   United States and confirmed by the U.S. Senate.

19   Q.  Okay.  So I want to now get a little bit into the weeds of

20   how the grant process works.  So can you just start us from

21   let's say T-0, time 0.  You have -- NSF has some money.  They'd

22   like to fund some projects.  So can you please walk the jury

23   through from that T-0 to when a researcher actually gets

24   funded?

25   A.  Sure.  So there are two ways that we start the process to

1    fund research.  One way is that we develop this solicitation,

2    this announcement out to the community saying in this

3    particular research area, we welcome proposals.  We would like

4    you to submit applications to us in this research area that we

5    will consider.  So that's the first step and that's the usual

6    way, is to issue this solicitation.

7        And the second way is that we can receive unsolicited

8    proposals.  So someone in the research community might have a

9    really good idea, it might not match with any of the

10   solicitations that are out there, but it's a really good idea,

11   and so they can submit this proposal to us without this overall

12   big announcement.  And we can consider that as well.  So the

13   first step is either solicitation or receiving a proposal

14   through an unsolicited way.

15       If we receive the -- if we issue a solicitation, then we

16   still get the proposals that match that solicitation in from

17   the research community.

18       What's important is that when I say research community, the

19   proposals, the applications actually come into us through a

20   U.S. research organization, usually a university.  So the

21   university is responsible for submitting the application to us.

22   And in that application the university names who is going to

23   lead that research project.  We call them the principal

24   investigator.  And who else is going to be on that research

25   team.

1     We then receive these proposals in and we go through, first

2   a compliance review, so does the proposal have all the elements

3   in there that it should have, does it have all the proper

4   disclosures of sources of research support, does it have the

5   proper biosketch which has all the information, the biographies

6   on the people on the research, does it have the technical

7   content, all of that.

8     After the compliance review, we then send it out to

9   community reviewers, so these are external reviewers who are

10   expert in that particular research field, and they review the

11   research, the project, and they assess the project based on its

12   intellectual merit and its impact on the community and they

13   give recommendations back to us, the agency, the best proposals

14   that came in.

15     We have people at NSF called program officers, and they're

16   the ones who actually run that particular funding program in

17   that particular research area.  After they receive all of these

18   reviews back, they took -- take a look at the -- what the

19   reviewers say.  They take a look at the application itself and

20   see based on what the -- you know, what's in here and what's

21   proposed to us, do I, as a program officer, feel confident that

22   the researchers that are on this, that they have the capacity

23   to do the research, they have the time to do the research, that

24   they don't have concerning conflicts of commitment, meaning a

25   part of lots of other projects that might take up too much of

19-20052-JAR    USA v. Feng Tao    03.25.22    Day 5

1    their time, do I feel confident that there isn't -- that

2    they're not being funded by someone else to do the exact same

3    thing that they're proposing to NSF to do.

4        They look at all those kinds of things, and then the

5    program officer makes a determination about what they think we

6    should fund based on all that information.  And then they

7    submit it into the system and their boss, their division

8    director, reviews all of that and says, yeah, I agree with the

9    program officer and presses the button and then the funding

10   goes out.  So I know it's a long -- it's a bit complicated.

11   Q.   Okay.  So I want to unpack two things you said in there

12   when you were talking about the review process.  You said that

13   one of the things that NSF reviews is the capacity of the

14   researcher to do the work that they're proposing?

15   A.   Correct.

16   Q.   Why is that important to NSF?

17   A.   So as good stewards of taxpayer money, when we give money

18   out, let's say someone proposes a project that is for a million

19   dollars of funding and they say that this project is going to

20   take, let's say, 40 hours a month to do or more, we have to be

21   sure that when we give that funding, they really do have that

22   time to dedicate to the project so that they're going to do the

23   research that we're paying them to do.

24       We also have to make sure that they're not doing so many

25   other projects that might either, number one, bias the research

1    itself because of other commitments that they have and other

2    obligations that they have or that they're being funded to do

3    something else and that they're proposing to us to fund the

4    same thing so that's too much overlap.  And of course, as the

5    government, we don't want to fund something to do -- to do

6    something that they're being funded by somebody else to do.  So

7    that's really important why we look at those things.

8    Q.   Why are you worried about whether a PI has the time to do

9    the work?  Why can't a PI just get to it when they want to get

10   to it?

11   A.   Because if -- they basically are being overseen and being

12   paid to do work by the government and they tell us the time

13   that they need to do that work and they tell us when they're

14   going to do the work and where they're going to do the work.

15   And so we have to have confidence that they are telling us the

16   truth, that they're going to do what they say they're going to

17   do, and that's the only way that we can actually trust that the

18   research is being done properly and that we can trust the

19   research results.

20       The worst thing we can do is fund someone where we've

21   basically wasted taxpayer money because they're not doing the

22   work they told us they were going to do when they were going to

23   do it.  How can we trust that?  So it's extremely important

24   that they do what they say they're going to do in the proposal.

25   Q.   So does everybody who applies for NSF money get it?

1   A.    No.  In fact, NSF receives about 45,000 proposals per year,

2   and we can only fund about one-fourth of that, of those

3   proposals.  And a lot of the proposals that we can't fund were

4   actually rated really highly by the reviewers, but we can't

5   fund them because even though it sounds like we've got a big

6   budget, it's not enough to fund all the really good research

7   that comes into us.

8   Q.    I want to take a step back real quick.  Are you a

9   scientist?

10  A.    No, I'm not.

11  Q.    Okay.  So is your Ph.D. in something else?

12  A.    Yes.  My Ph.D. is in international relations, international

13  studies.

14  Q.    So I want to just talk a little bit more about the

15  mechanics of the grant proposal process.  Are most proposals

16  submitted or almost all proposals submitted through the

17  Internet?

18  A.    Yes.  All proposals have to be submitted through the

19  Internet.

20  Q.    And how -- if I'm a scientist, which I'm not, and I want to

21  submit a proposal to NSF either in response to a funding

22  announcement or just on my own, how do I -- where do I go to do

23  that?

24  A.    So the scientists write up their proposal and they give it

25  to their university, and every university has an office that

1    handles these called the sponsored research office.  The

2    sponsored research office looks through everything and makes

3    sure it's complete, and then they go to a website called

4    grants.gov, and they upload the proposal into grants.gov.  And

5    when they do that, it then pops over to us, the funding agency,

6    NSF.

7    Q.   And that would be NSF?

8    A.   That's right, NSF.

9    Q.   And where is NSF headquartered?

10   A.   NSF is in Alexandria, Virginia.

11   Q.   So if somebody submits a grant through grants.gov to NSF

12   from wherever, does it ultimately end up in Virginia?

13   A.   Yes.  It goes into -- it gets popped from grants.gov into

14   our internal system and the servers for that internal system

15   are based in Alexandria, Virginia.

16   Q.   And you said that it sounded like NSF only has the budget

17   to fund about 25 percent of the proposals?

18   A.   Correct.

19   Q.   So would you say that receiving a grant from the NSF is

20   competitive?

21   A.   Extremely competitive, and 25 percent is the average.

22   There's some programs at NSF where we select even fewer than

23   25 percent because we have a huge amount of proposals and a

24   limited amount of funding.  So it's extremely competitive and

25   selective.

1    Q.    Since it's so competitive, does that mean that people who

2    actually get the money who are part of that small, sort of call

3    them grantee or kind of the winner group, does that mean having

4    that NSF award is valuable or prestigious?

5    A.    It's extremely prestigious because it's so selective,

6    number one, and because it means a great deal in the community

7    itself to have an NSF grant.

8    Q.    So can you talk a little bit more about that, why does it

9    mean such a great deal in the scientific community to have an

10   NSF grant?

11   A.    First of all, something that scientists of course need to

12   do is they need to do their research, and to do their research,

13   they need research funding.  That research funding very rarely

14   comes from their university itself.  The university pays their

15   salary to teach their courses, have an office, do all of their

16   other responsibilities, but they need the funding to do the

17   research.

18        The important thing about getting research funding is that

19   it is considered very important to get the research funding

20   from a well-reputed, a very established source, because if you

21   get funding from a very well-established, well-known,

22   prestigious source, then the research you produce from that is

23   considered very valuable and very prestigious as well.

24        So if someone, for instance, is receiving their funding,

25   let's say, from a tobacco company to do lung research, as you

1  can imagine, that research -- those research results would not

2  be trusted very much because it would be considered to be very

3  biased to be paid by a tobacco company to do lung research.

4  When you're paid by an entity like NSF that doesn't have any

5  bias, that's very prestigious, that's very selective, that has

6  this prestigious review process, the research itself is very

7  much trusted and considered prestigious itself.

8  Q.   All right.  I would like to show you what's been marked as

9  Government Exhibit 48.

10        MR. BARRY:  Your Honor, may I approach?

11        THE COURT:  Yes.

12 BY MR. BARRY:

13 Q.   Do you recognize this document?

14 A.   Yes, I do.

15 Q.   What is it?

16 A.   This is the Proposal and Award Policies and Procedures

17 Guide that NSF issues every year.

18 Q.   And what is the Proposal and Award Policies and Procedures

19 Guide?  What does that mean?

20 A.   We call it the PAPPG which is still challenging to say, I

21 know.  But what this is, is this is the overall guide for the

22 research community regarding how you develop and submit

23 proposals to the National Science Foundation.  Then what you

24 need to do if you do receive a grant, so we call it an award,

25 and what you need to do in the policies regarding that award

1    itself.

2    Q.   Okay.  And is the copy that's been marked as Exhibit 48 a

3    fair and accurate copy of the Proposal and Award Policies and

4    Procedures Guide from January 2017?

5    A.   Yes, it is.

6              MR. BARRY:  The government moves to admit Exhibit 48

7    into evidence.

8              THE COURT:  Any objection?  Any objection?

9              MR. ZEIDENBERG:  No objection.  I'm sorry.

10             THE COURT:  Exhibit 48 admitted.

11             MR. BARRY:  Ms. Boyd, can we please publish that for

12   the jury?

13   BY MR. BARRY:

14   Q.   Okay.  So this is a pretty large document, right?

15   A.   Yes, it is.

16   Q.   So there's a number of sections that I want to walk through

17   with you and I'm going to try to use the table of contents, and

18   Ms. Boyd's expertise is going to help us navigate, but the

19   first thing I want to note is, if you look at the bottom

20   right-hand corner of the exhibit, you'll see there are red page

21   numbers.

22   A.   Yes.

23   Q.   So when I refer to a page number, you know, I'm going to

24   say page 10, page 20, I'm going to be referring to the red

25   number, okay?

1  A.  Okay.

2  Q.  So let's first look at the cover page, and you'll see in

3  the bottom it says the effective date is January 30, 2017?

4  A.  Yes, correct.

5  Q.  Okay.  And how often does the National Science Foundation

6  publish new or updated PAPPGs?

7  A.  We issue it every year, once a year.

8  Q.  Okay.  And so this proposal would have been effective at

9  least during this time period?

10  A.  Correct.  It became effective on January 30, 2017.

11  Q.  Okay.  So first I want to turn your attention to start with

12  page 2, so if we can -- again, this is the red numbers at the

13  bottom.  And if you can just kind of look from page 2 to

14  page 8.

15      And, Ms. Boyd, if you wouldn't mind, please start scrolling

16  through this.

17      You'll see that this is titled Significant Changes and

18  Clarifications to the PAPPG.

19      So can you describe for the jury, what's the purpose of

20  this section at the beginning of the guide?

21  A.  So when we issue the guide, we want to be very clear

22  because these are -- this is, as I said, the instructions and

23  also the requirements for what one needs to do to submit a

24  proposal to NSF and during the actual award.  So we want to

25  make sure that when we issue this guidance, this guide, we're

1  very clear about what changes are significant changes,
2  significant changes in the requirements, and also be very clear
3  about what language is more clarification language.  And
4  language of course -- that we could be as clear as possible
5  about what those requirements are.  So in other words, the
6  requirement existed in the previous guide from last year, but
7  we are clarifying that requirement to be as clear as possible.
8  Q.    Okay.  So if we can just look -- and it's going to be a
9  little tough, but if you can first look at page 2 where it says
10 -- in the middle of the page where it says Significant Changes.
11 So is this listing all the bullet points under here, these are
12 the things NSF is saying these are the significant changes from
13 the prior guide?
14 A.    Yes, exactly.
15 Q.    If you go to page 4.  Ms. Boyd, if you wouldn't mind
16 scrolling to page 4.  You'll see the sub-heading here is
17 Clarifications and Other Changes.  So does this mean that these
18 bullet points are -- they're not significant changes, they're
19 clarifications?
20 A.    They're clarifications, correct.
21 Q.    And this is a little unfair, but I want to turn your
22 attention to page 96 because I want to see if this sort of
23 accurately represents the description that you did without a
24 chart describing the funding process.
25 A.    Sure.

1    Q.    So can you please walk the jury through -- I know this is a

2    little bit more detailed than what you talked about, but the

3    sort of steps in the funding process that we talked about a few

4    minutes ago?

5    A.    So at the top left it says "NSF announces opportunity."  So

6    this is the announcement, the solicitation that I mentioned

7    where we say we are welcoming proposals to NSF in a particular

8    research area.  So that announcement goes out.

9         And the arrow is because it goes out to the research and

10    education communities, so that's who the announcement goes out

11    to.

12         The community then submits proposals based on that

13    announcement to us, which is that third box on the top left,

14    submit.

15         And if you see FastLane and grants.gov, so that is the

16    electronic -- this web-based process I was talking about where

17    the proposer submits the proposal to us electronically.

18         It then goes into the NSF internal system and goes to the

19    NSF program officer, which is that box that says "NSF program

20    officer" kind of in the middle there.  The program officer

21    receives the proposals and then it submits the proposals for

22    this review in the community.  You see these different boxes:

23    Ad hoc, impaneled, combination, and internal.

24         And ad hoc reviews means that the reviewers, they don't get

25    together in one room virtually or a real room together.

1    Rather, the proposal is sent out to individual reviewers by

2    e-mail and they review it electronically and send the review

3    back to us.  That's one way we can review proposals.

4        And how we review proposals is made clear overall as part

5    of this process that I'm talking about.  So there's certain

6    types of reviewers -- programs where we can do ad hoc reviews.

7        Most of the proposals, though, are submitted and they're

8    reviewed by a review panel, so the reviewers get together,

9    they're submitted -- they get the proposals, they read them

10   ahead of time, they get together in a meeting, and they discuss

11   the proposals together to decide together which are the most

12   highly ranked proposals.  Sometimes there's a combination,

13   depending on the availability of reviewers and the process

14   itself.

15       And a very small number of proposals are not sent out for

16   external review, but they're reviewed by program officers and

17   other experts inside of NSF, but based on the same criteria

18   that the external reviews are done.

19       It then goes to the program officer analysis and

20   recommendation, so all of this review information after the

21   review and these recommendations goes back to the program

22   officer.  The program officer analyzes both the reviews, which

23   are these recommendations it says, because the reviewers give

24   recommendations.  They don't make the decision.  And they do

25   analysis.  So they analyze the other parts of the proposal, so

1    all of the disclosure information to make sure, again, capacity

2    to do the review, overlap, duplication, they look at the

3    biographical sketch to make sure the PIs are qualified to do

4    the project.  They look at all these different aspects and they

5    make a determination on which proposals they are recommending

6    for funding.

7    Q.    Thank you.

8    A.    That then goes to the division director as division

9    director concurrence who looks at all that information and

10   decides whether they agree with the program officer or not.

11        If that determination is then made to give an award for a

12   particular proposal, it goes -- if you see in the upper right

13   -- to the division of grants and agreements.  And so that's

14   part of NSF that looks at the recommendations and what the

15   division director decided to want to fund, and they're the ones

16   who do the final check for compliance, making sure that all the

17   elements of the proposal are there and they are the ones who

18   actually send the funding out.  This division of grants and

19   agreements, they send the funding out to the awardee who

20   actually got the award.

21        If the determination was to decline the proposal and not to

22   fund the proposal, then that information about the decline is

23   sent back to the submitting research organization, the research

24   university which is in the bottom right.

25   Q.    All right.  I want to dive into this document.  So let's

1  first go back to the table of contents.  Just so we can sort of

2  navigate where we are, this is page 9 with the little red dot.

3  And tell me when you're there, please.

4  A.   Yes, I'm here.

5  Q.   Okay.  So you'll see page 9 is the beginning of the table

6  of contents.  And so what I want to do is I'm going to walk

7  through the table of contents and we're going to go to the

8  table then we're going to go to a section, then we're going to

9  go back to the table sort of pretending we're actually looking

10  stuff up.

11      So first I want to go to section E, which is who may submit

12  proposals.  So that will be on page 9 -- or sorry, page 30 of

13  the red numbers.  Okay.  And you'll see there's a section.

14  Tell me when you're with me.

15  A.   I'm here.

16  Q.   Okay.  So you see that section that says Who May Submit

17  Proposals?

18  A.   Yes.

19  Q.   And can you please read the first paragraph?

20  A.   NSF welcomes proposals on behalf of all qualified

21  scientists, engineers, and educators.  The foundation strongly

22  encourages women, minorities, and persons with disabilities to

23  participate fully in its programs.  In accordance with federal

24  statutes, regulations, and NSF policies, no person on grounds

25  of race, color, age, sex, national origin, or disability shall

1  be excluded from participation in, be denied the benefits of,

2  or be subjected to discrimination under any program or activity

3  receiving financial assistance from NSF, although some programs

4  may have special requirements that limit eligibility.

5  Q.   Then would you please read the first sentence of the second

6  paragraph?

7  A.   Scientists, engineers, and educators usually initiate

8  proposals that are officially submitted by their employing

9  organization.

10  Q.   Okay.  And then you'll see on the bottom of this page 30

11  and the following page, it lists different types of proposers?

12  A.   Correct.

13  Q.   So the first one says universities and colleges.  Is that

14  the example that you gave earlier where you said most PIs would

15  submit their proposal through their employing university or

16  college?

17  A.   Correct.  Most are the employing university or college.

18  Q.   All right.  Let's scroll down a little bit through page 31

19  and there's a section that says Foreign Organizations and I'd

20  like you to read that for the jury.

21  A.   Foreign Organizations.  NSF rarely provides support to

22  foreign organizations.  NSF will consider proposals for

23  cooperative projects involving U.S. and foreign organizations,

24  provided support is requested only for the U.S. portion of the

25  collaborative effort.

1   Q.   Why does NSF rarely support foreign organizations?

2   A.   Because we are -- we are funded by the U.S. taxpayer and

3   we're part of the U.S. government, and so although we encourage

4   collaboration, we need to be very clear that our funding goes

5   to the U.S. side of that collaboration, to the U.S.

6   researchers, again, because this is U.S. federal funding.

7   Q.   So does that mean that NSF never supports foreign

8   organizations?

9   A.   It's very rare.  And so there's a special process where

10  there are a very few exceptions where there was a funding of a

11  foreign organization.

12  Q.   Okay.  So let's go back to the table of contents.  It's

13  going to be page 10.  And I want to focus when you're there

14  with me.

15  A.   I'm here.

16  Q.   I want to focus on this section that says Chapter II,

17  Proposal Preparation Instructions.  Okay?

18  A.   Okay.

19  Q.   So what are the proposal preparation instructions?  What

20  does that mean?

21  A.   So this is detailed instructions of how you develop a

22  research proposal and application to NSF for funding and the

23  different sections that need to be part of that research

24  proposal.

25  Q.   And NSF is making this available to anyone who wants to

1   apply for research?

2   A.   Correct.  This is publicly available and it's on the web.

3   Q.   So first I want to go to near the top, if you scroll up a

4   little bit you'll see there's a subsection that says Proposal

5   Content, sub 1, single copy document.  And then if you go a

6   little bit, sub E, it says collaborators' and other

7   affiliation's information?

8   A.   Yes.

9   Q.   I'd like to direct you there, and that's going to be

10  page 40.

11  A.   Okay.

12  Q.   I think we've got to scroll a little bit down.  Yeah, there

13  we go.  Okay.  Do you see it at the bottom there?

14  A.   Yes.

15  Q.   Okay.  And can you describe to the jury what this section

16  is asking for?

17  A.   This information is on, you know, the collaborator, so the

18  people that you're doing research with, you're collaborating on

19  the research with them, as well as other affiliations such as

20  -- let's say as a scientist you're on -- you're an officer as

21  part of your scientific society.  For instance, the American

22  Chemical Society and you're an officer there.  And so your

23  affiliation would be as an officer of the American Chemical

24  Society.  And so that's separate from your job, you know, your

25  professional appointment and where you're employed, but it's an

1    important affiliation that's part of your research enterprise.

2    Q.   Why does NSF want that information?

3    A.   So I described this review process, which is extremely

4    important to us, and when we select reviewers to review a

5    project, we want to make sure that there's no conflict of

6    interest between the reviewer and the proposer for the project.

7         So a conflict of interest is if there is some type of

8    connection between the reviewer and the proposer that might

9    bias the reviewer, that might cause the reviewer to look more

10   favorably upon that proposal because of that connection.  We

11   need to know that so that we do not select that particular

12   reviewer for the project.

13   Q.   So I want to go back to the beginning of this little single

14   copy document section.  This is on page 37.  And, Ms. Boyd, if

15   you would scroll up.  There we go.

16        All right.  Tell me when you're there.

17   A.   I'm here.

18   Q.   Page 37?

19   A.   Yes.

20   Q.   You'll see this is the single copy document section that

21   was in the table of contents we were talking about?

22   A.   Yes.

23   Q.   I'd like you to turn the page to page 38, and you see this

24   Proposal Certifications section?

25   A.   Yes.

1    Q.    Okay.  So what are these?  What are these proposal

2    certifications?

3    A.    So these are basically the entity that submits the proposal

4    is certifying, so they're saying that the information that's

5    provided here is complete and accurate and correct, and so they

6    are basically asserting to us through the certification that

7    all of this information is accurate, complete, and correct.

8    Q.    Does it say that under the first bullet point?

9    A.    Yes.  So it says the AOR, which is the authorized

10   organizational representative, so they're the one that's in the

11   research office of the research organization, the university,

12   completes the certifications.  So it says the AOR is required

13   to complete certifications regarding the accuracy and

14   completeness of statements contained in the proposal, as well

15   as to certify that the organization or individual agrees to

16   accept the obligation to comply with grant terms and

17   conditions.

18   Q.    And then what about that second certification regarding

19   conflict of interest, what's that about?

20   A.    So this -- through NSF policy we require every research

21   organization that's going to submit proposals to NSF to have a

22   conflict of interest policy, and we outline what has to be in

23   that conflict of interest policy.  And then we require the

24   organization before they submit the proposal to us to look and

25   make sure that the people that are part of that research

1    proposal do not have any conflicts of interest.  So the

2    organization has to make sure there are no conflicts of

3    interest in the proposers to the project and they certify that

4    they did that to us in this section.

5    Q.   So I want to draw your attention here to that paragraph, it

6    says -- the first question is, does NSF require the sponsoring

7    institution or the university to have a written policy?

8    A.   Yes, it must be a written policy.

9    Q.   And do they require -- does NSF require that that policy be

10   enforced when there are violations?

11   A.   Yes.

12   Q.   And what -- I want you to focus on, I think it's four lines

13   down where it says, and that conflicts of interest, if any,

14   were or prior to the organization's expenditure of any funds

15   under the grant will be satisfactorily managed, reduced, or

16   eliminated in accordance with the university conflict of

17   interest policy.  Can you please unpack that for the jury?

18   A.   So basically the research organization is responsible for

19   identifying any potential conflicts of interest, so if there

20   are things that the researcher is involved with, other sources

21   of employment for instance, other sources of getting research

22   funding that might present a conflict of interest, the research

23   organization has to make sure that they get rid of that

24   conflict of interest or mitigate it in some way.  And how they

25   do that has to of course be part of their written conflict of

1   interest policy.  So they have to make sure that they have

2   addressed any conflict of interest prior to NSF giving them any

3   funding.

4   Q.   And you'll see if you scroll down a little bit that there

5   are a lot of other kinds of certification such as lobbying or

6   drug-free workplace.  Why does NSF require universities to

7   certify that they're complying with these specific

8   requirements?

9   A.   Because we need to -- again, if we go back and we see any

10  violations later on, so let's say we, NSF, identify a conflict

11  of interest that wasn't resolved, we then go back and say, but

12  you certified that you resolved all conflicts of interest.  And

13  if that happens, then we need to refer the issue to our Office

14  of Inspector General who are our investigators.

15      We take this very seriously if there are violations so

16  that's why there have to be these certifications that you

17  really address these.  And if we have to refer something to our

18  Office of Inspector General for investigation, that's a very

19  serious thing and they might recommend for us to take certain

20  actions against either the principal investigator or the

21  research organization itself.

22  Q.   So I want to go back to the table of contents, so page 10.

23  And I want us to dive into another section.  So I want us to go

24  into the Chapter II.C.2 sections of the proposal.

25  A.   Okay.

1  Q.  And I want to draw your attention first to page 46.  It's

2  called Unfunded Collaborations.  You'll see it under Romanette

3  IV up there.

4  A.  Okay.

5  Q.  Okay.  And if we could scroll down a little bit.  Would you

6  please read that first sentence of Unfunded Collaborations?

7  A.  Any substantial collaboration with individuals not included

8  in the budget should be described in the facilities, equipment,

9  and other resources section of the proposal, see Chapter

10  II.C.2.i, and documented in a letter of collaboration from each

11  collaborator.

12  Q.  Why does NSF want this information?

13  A.  Because if there's -- let's -- basically what we want to

14  know is, is how our money is being used and what the effort is.

15  So let's say -- let's say there's a collaboration where an

16  international researcher is going to come into this

17  researcher's lab and work with them on the project and so that

18  wasn't mentioned in the budget because we, NSF, aren't going to

19  pay for that international person coming into the lab.

20  However, it's still part of the effort.  It's still part of

21  what's happening here.  And so we need to know about it as part

22  of the overall project.

23      We also want to make sure that we are -- if that

24  international collaborator is, let's say, they're the one who

25  is responsible for a big chunk of the project by coming into

1    the lab, then we want to make sure that we, frankly, are not

2    paying our U.S. researcher to do that same thing because

3    they're being paid by somebody else to do that chunk of the

4    project.

5        But that's why we have to be very clear about that.

6    Q.   Let's scroll down a little bit or you can turn the page,

7    and I want to next go to another section of required content,

8    which is called the Biographical Sketch.  I think you mentioned

9    that earlier, the biosketch?

10   A.   Yes.

11   Q.   Can you describe what that is?

12   A.   This is where a researcher needs to provide all their

13   information about their current and their past employment,

14   their professional appointments, their employment, as well as

15   their schooling, where they were trained, where they did their

16   undergraduate and graduate and post-doctoral work, and they

17   need to also list up to five products, which are usually

18   publications that they've issued, that show the kind of work

19   that they do, as well as different activities that they've done

20   to show the impact of the previous work they've done.  So, for

21   instance, reaching out to high school students to do projects

22   in their area of research is one example of a synergistic

23   activity that they might list here.

24   Q.   If we scroll down here under B, is that that appointment

25   provision that you mentioned, sub B?

1    A.    Correct.  So appointments mean whether you're paid or

2    unpaid, where you have gotten a professional appointment, both

3    present and past.

4    Q.    Why does NSF want that information?

5    A.    We need that to understand the qualifications of the

6    researcher, and so we want to make sure that if somebody

7    proposes to do a very complex project in computer and

8    information science, that they have had professional

9    appointments where they have gained experience in that area of

10   computer and information science.  So it's extremely important

11   for us to have that information.

12   Q.    Do you use that information for anything other than

13   determining whether the PI can do the research based on their

14   qualifications?

15   A.    That really is the main way that we use the information.

16   And so if there's something in there that points to a concern

17   that maybe they've had an appointment that would show they're

18   not qualified or if there's something in there that shows that

19   maybe there's some type of conflict of interest that wasn't

20   mitigated, you know, by the university or, you know, through

21   the conflict of interest policy, then it might point to that.

22   Q.    So let's keep going.  I want to next go to a different

23   section on page 56, Current and Pending section.  And this is

24   in the same section of the proposal part of the table of

25   contents.

1    So can you -- if you need a minute, take it, but can you

2    describe what this sub H, Current and Pending Support section

3    is asking for?

4    A.   So this is asking for all of the research support, whether

5    it's paid or unpaid.  So, for instance, if someone is provided

6    with a research lab, that is considered research support.  If

7    someone is given a grant, that's research support.  All of that

8    needs to be disclosed in this section, so whether it's research

9    support that you currently have or research support that you've

10   applied to get that would be pending.  That's -- all of that we

11   need to know in this section.

12   Q.   And I want you to, if you would please, read the second

13   sentence of that section?

14   A.   Sure.  That starts with all current project support?

15   Q.   Yes, ma'am.

16   A.   All current project support from whatever source, e.g.

17   federal, state, local, or foreign government agencies, public

18   or private foundations, industrial or other commercial

19   organizations, or internal funds allocated towards specific

20   projects must be listed.

21   Q.   And would you please continue reading the next sentence for

22   me?

23   A.   The proposed project and all other projects or activities

24   requiring a portion of time of the PI and any other senior

25   personnel must be included, even if they receive no salary

1    support from the projects.

2    Q.   So why does NSF want to know of all current and pending

3    research support that a potential PI is receiving or may

4    receive?

5    A.   So we use this information to look at this capacity issue.

6    So again, whether -- if they're getting all of this other

7    research support, they still have the time and intellectual

8    capacity to do the grant that they're proposing to NSF to do.

9    We also look at this information to look at overlap and

10   duplication, so again, if they're being funded by someone else

11   to do the same thing that they're proposing to NSF, then that

12   might be undue overlap or duplication.

13   Q.   So would NSF expect a PI who had been promised research

14   dollars from another university, so another home university, to

15   have reported those research dollars into that current and

16   pending support section?

17   A.   Yes, correct.  Both research dollars, as well as other

18   research support from another university.  So, again, provision

19   of research equipment or a lab or something like that also

20   needs to be reported if it's from another university or another

21   entity.

22   Q.   And would NSF -- would it matter to NSF whether that entity

23   is foreign or domestic?

24   A.   It does not matter.  Both need to be reported.

25   Q.   What if a PI was in the process of negotiating a contract

1    with another university potentially for research support?

2    Would NSF expect that that would be disclosed?

3    A.   If it's for research support, then yes, that is pending.

4    So if it's in negotiation, that's pending current -- support,

5    and it would need to be reported in this section.

6    Q.   How long has NSF required that current and pending support,

7    as listed in this subsection H, be provided to it when folks

8    want to receive NSF money?

9    A.   As least since the 1970s.  So it's been a longstanding

10   requirement.

11   Q.   All right.  Let's go back to the table of contents, so

12   page 11 of the table of contents.  And you'll see if we scroll

13   up a little bit where we were, so go up to the page above,

14   please.  A little bit more.

15       So we were just talking about this proposal contents

16   section.  Some sections in there, right?

17   A.   Yes.

18   Q.   If you scroll down to the next page, you'll see the next

19   capital letter heading is Special Processing Instructions.  Do

20   you see that?

21   A.   Yes.

22   Q.   Okay.  So I want to turn to the D.3, which is Collaborative

23   Proposals, and that's going to be on page 60 of the exhibit.

24   Tell me when you're there.

25   A.   I'm here.

1    Q.    Okay.  Is this describing the kind of collaborative process

2    that you were talking about when we first started talking this

3    morning?

4    A.    Yes, it is.  And -- but this is talking about

5    collaborations that could be both with an international entity

6    or a U.S. entity.

7    Q.    Okay.  And would you please read the first sentence of that

8    paragraph?

9    A.    A collaborative proposal is one in which investigators from

10    two or more organizations wish to collaborate on a unified

11    research project.

12    Q.    So are there situations where, let's say there's two

13    universities, K-State and KU, who want to jointly submit a

14    proposal to NSF, if they were to jointly submit a proposal,

15    let's say a professor from KU and a professor from K-State,

16    would that be a collaborative professorship?

17    A.    Yes, that would be a collaborative proposal.

18    Q.    Would you read the last sentence for the jury?

19    A.    All collaborative proposals must clearly describe the roles

20    to be played by the other organizations, specifically the

21    managerial arrangements, and explain the advantages of the

22    multi-organizational effort within the project description.

23    Q.    So why does NSF want that information?  Why do they want to

24    understand the details of the collaboration?

25    A.    Because we want to know exactly what we're funding and who

1  we're funding and what they're going to do with that funding.

2  And so here, if there's a collaborative proposal where both

3  organizations, so K-State and KU, are both proposing for the

4  NSF funding, then we need to know exactly what KU is going to

5  be doing with that funding and what K-State is going to be

6  doing with that funding, and it has to be outlined here.

7  Q.  Okay.  All right.  Let's go back to the table of contents.

8  Only a few more.  I want go to page 11 of the table of

9  contents.

10  A.  Okay.

11  Q.  And there's obviously a lot of pages here.  I want to

12  address your focus to Exhibit 2-1, which is the proposal

13  preparation checklist.  Do you know what that is?

14  A.  Yes.

15  Q.  And let's turn to that.  It's page 77.  What is this?

16  A.  So this is the list of things that need to be part of the

17  proposal and so we list them all here so that it can be checked

18  before you submit the proposal to NSF that you have all of

19  these elements as part of the proposal.

20  Q.  So is the point of having this checklist to make the PI's

21  job easier?

22  A.  Yes.

23  Q.  Because the information is already contained in the bigger

24  part of the document, right?

25  A.  Correct.

1  Q.   And this is just -- I think it's four pages.  And I want

2  you to look at the top on page 77, and if you wouldn't mind

3  please reading the first two sentences of the preamble to the

4  prep checklist?

5  A.   Sure.  It is imperative that all proposals conform to the

6  proposal preparation and submission instructions specified in

7  part one of the Proposal and Award Policies and Procedures

8  Guide.  Conformance with all preparation and submission

9  instruction is required and will be strictly enforced unless a

10 deviation has been approved in advance of proposal submission.

11 Q.   Okay.  So I want to scroll down and I want to sort of flag

12 some of the things we've talked about.  So, first, do you see

13 on the first page at the bottom, you see that Collaborators and

14 Other Affiliations little check box?

15 A.   Yes.

16 Q.   We talked about that earlier, right?

17 A.   Yes.

18 Q.   And then if you scroll to the next page, 78, near the

19 bottom you'll see the Biosketch section?

20 A.   Yes.

21 Q.   And you'll see a little check box there?

22 A.   Yes.

23 Q.   We talked about that section's requirements as well, right?

24 A.   That's right.

25 Q.   Let's keep scrolling.  Next page you see Current and

1    Pending Support section?

2    A.    Yes.

3    Q.    Okay.  And can you read again that first sentence, that

4    section?

5    A.    All current and pending support from whatever source, e.g.,

6    federal, state, local, or foreign government agencies, public

7    or private foundations, industrial or other commercial

8    organization, or internal funds allocated toward specific

9    projects must be listed.

10   Q.    Is that the same language that we read earlier when we

11   looked at the more detailed Current and Pending Support

12   section?

13   A.    Yes, it's the same language.

14   Q.    Let's go down to the top of the next page.  You see that

15   Letters of Collaboration little check box?

16   A.    Yes.

17   Q.    Is that related to what we discussed earlier, which is that

18   if a PI is proposing to have a collaboration, they need to

19   disclose information about that?

20   A.    Correct.

21   Q.    Okay.  All right.  So next I want to go -- let's go back to

22   the table of contents, so page 13 of the table of contents.

23   And I want to look at the Grantee Standards.

24   A.    Okay.

25   Q.    So if you go to 13, you'll see it's Chapter IX.  Do you see

1    where I'm at?

2    A.    Yes, sir.  I see where you're at.

3    Q.    All right.  So we're going to turn to -- and this is

4    confusing because the pagination is different, but it's 101 in

5    the table of contents.  In the exhibit it's 127, so the little

6    red number is going to be 127.

7    A.    Okay.

8    Q.    Okay.  And can you describe what this is?

9    A.    So this is the conflict of interest policies, as we were

10    talking about earlier, the requirements for what has to be part

11    of a research organization's conflict of interest policy.

12    Q.    So in this context is the grantee the university, like KU

13    or K-State?

14    A.    Correct.

15    Q.    And is this conflict of interest policy saying that NSF

16    requires each grantee organization, like KU or K-State, that

17    employs more than 50 people to maintain an appropriate written

18    and enforced policy on conflict of interest and that all

19    conflict of interest for each award be managed, reduced, or

20    eliminated prior to the expenditure of the awards funds?

21    A.    Yes.

22    Q.    And just as a reminder, why does NSF require universities

23    like K-State or KU to have a written and enforceable conflict

24    of interest policy?

25    A.    Because the researchers are employees of that university,

1    and so it is the university's responsibility to manage and

2    assess their employees' conflicts of interest.  It's also

3    because the recipient of the NSF grant is the research

4    organization technically, who then designates the principal

5    investigators.

6    Q.    And this policy says that having a conflict doesn't

7    necessarily mean you can't do the research, right?

8    A.    Correct.

9    Q.    What NSF is requiring is just there be a written and

10   enforceable policy, and that if conflicts are known, they're

11   either managed, reduced, or eliminated, right?

12   A.    Correct.

13   Q.    Last time we're going to go to table of contents.  So we're

14   going to page 12, little red number.  And I want to focus on --

15   we've kind of walked through the life of the grant.  I want to

16   focus on this Grant Administration section, Chapter VII.

17   A.    Yes.

18   Q.    What is grant administration?

19   A.    This is basically after we give the award out to the

20   awardee, how we manage the grant, how we monitor the

21   performance of the grant, and what needs to happen if there are

22   any changes that the awardee, the grantee, would like to make

23   in the grant, this instructs what to do about that.

24   Q.    This is after the grant has already been given, this is how

25   you manage the grant or administer it?

19-20052-JAR    USA v. Feng Tao    03.25.22    Day 5          751

1    A.   Correct.

2    Q.   During the life cycle of it?

3    A.   Correct.

4    Q.   So I want -- there's one section of this I want to talk

5    about, and so it's the changes in project direction or

6    management changes in objectives or scope.

7    A.   Uh-huh.

8    Q.   If you go to page 109 with the little red number?

9    A.   Okay.

10   Q.   All right.  And can you please read the first two sentences

11   of that?

12   A.   Grantee responsibilities?

13   Q.   The changes in objectives or scope.

14   A.   Okay.  Yes.

15   Q.   Page 109.

16   A.   At the bottom, okay.

17       The objectives or scope of the project may not be changed

18   without prior NSF approval.  Such change requests must be

19   signed and submitted by the AOR, which is the authorized

20   organizational representative, via use of NSF's electronic

21   systems.

22   Q.   So what does that mean?

23   A.   So let's say the principal investigator wants to -- let's

24   see, they want to take some time off from the NSF grant for

25   some reason.  Might be a personal reason, might be something

1    else.  Then that would be a change request where there would be

2    a break in the use of the NSF funding, and that would be a

3    change request that then would have to be submitted and

4    approved by NSF.

5        Another example is in some cases the university needs to

6    change who the principal investigator is on the grant due to

7    some reason.  Maybe the other -- the first one left the

8    university or doesn't have the time to do the grant anymore.

9    That would be a change request that would have to be submitted

10   to NSF.

11   Q.    Okay.  So does that mean that if a PI who's already

12   receiving the grant wants to change the scope of the grant or

13   re-scope it in some ways, that they need to check with NSF and

14   get approval before doing that?

15   A.    Correct.  Maybe they want to look at some other aspect of

16   the research, they want to change the scope in some other way,

17   the approach that they're going to use to the research,

18   anything like that that's a change in scope would have to be

19   submitted to NSF for approval.

20   Q.    Okay.  So you can put this away.

21   A.    Okay.

22   Q.    Big picture, I mean, this is a big document, so why is NSF

23   making this so complicated?  Why is this so big?

24   A.    It's so big because we want to be as detailed as possible

25   in what we require to be submitted as part of the proposal and

1    what needs to happen after we award the grant.  So we -- our

2    customer really is the research community, and so we want to be

3    clear with them.  We don't want to pull the wool over anyone's

4    eyes or trick anyone.  So that's why we're as detailed as

5    possible in the instructions that we give out to the community.

6    Q.  All right.  I would like to show you what's already been

7    admitted into evidence as Exhibit 55.

8           MR. BARRY:  May I approach?

9           THE COURT:  Yes.

10          MR. BARRY:  Would you please pull that up?  Okay.

11   BY MR. BARRY:

12   Q.  Do you recognize this?

13   A.  Yes.  This is the cover sheet for this proposal, this

14   application that's provided, that's submitted to NSF.

15   Q.  And so this is -- this is the proposal that a principal

16   investigator would submit to NSF either in response to an

17   announcement or just because they're reaching out unsolicited?

18   A.  Correct, exactly.  This is what they would submit to NSF.

19   Q.  And do you know -- looking at this, do you know when this

20   proposal was submitted?

21   A.  I know that it was received by NSF on October 2, 2017.

22   Q.  Okay.  And looking at this cover page -- and you might need

23   to flip to the first few pages.  Tell us who the co-PIs for

24   this proposal are.

25   A.  So we have the PI, who is Philippe Sautet, and we have a

1   co-PI who is --

2   Q.   Page 4?

3   A.   -- Franklin Tao.

4   Q.   Got it.  If you go back to the cover page, please, so this

5   is page 1?

6   A.   Yes.

7   Q.   You see in the middle of that page where it says,

8   international activities --

9   A.   Yes.

10  Q.   -- that little check box?

11  A.   Yes.

12  Q.   What does that signify to you?

13  A.   So that's checked, again, if there is international effort

14  or international collaborations that are part of a proposal,

15  that box should be checked.

16  Q.   Okay.  So is it fair to say that what this -- based on your

17  experience, what this shows to you is that Philippe Sautet,

18  who's one of the PIs on this research proposal, has indicated

19  he plans to perform international activities in France,

20  Germany, and the United Kingdom?

21  A.   Yes.

22  Q.   Let's go to page 4 which is the cover sheet for Dr. Tao.

23  And I want to see if those same boxes are checked.  Do you see

24  any international activity boxes checked?

25  A.   No, I do not.

1    Q.   All right.  So let's -- we're going to walk through this

2    document and we're probably going to -- I think scrolling is

3    going to be the easiest.  So first I want to go to the next

4    page, which is page 5.  And I want to kind of show -- you know,

5    we've talked about it in the abstract, but I want to sort of

6    show the grant in process.  So if you look at the second

7    paragraph there where it says Certification Regarding Conflict

8    of Interest.  If we could zoom in on that, please.

9    A.   Yes.

10   Q.   Is that the certification that we looked at earlier in the

11   policy guide?

12   A.   Yes, it is.

13   Q.   Okay.  And then if you go to the next page, page 6, you'll

14   see -- do you know -- if you scroll down a little bit.  Do you

15   know who Alicia Reed is?

16   A.   No, I do not.

17   Q.   But does this look like it's whoever the authorized

18   organizational representative for KU is signing this

19   electronically?

20   A.   Yes.

21   Q.   And in signing that, they're certifying to the truth and

22   accuracy of the certifications that we looked at, including the

23   conflict of interest certification?

24   A.   Yes, that's right.

25   Q.   All right.  So let's next -- let's go to the next page.

1    It's called Project Summary.  And is this sort of the

2    description of the science, what's being proposed here?

3    A.   Correct.  This is an overview, so this is a summary of

4    what's being proposed, the technical description.

5    Q.   And let's keep going.  Let's keep scrolling.  And you'll

6    see there these two little table of contents on the next two

7    pages, pages 8 and 9.  What are these?

8    A.   So this tells us what is in this proposal and how many

9    pages each part of -- each section has.

10   Q.   Okay.  And it looks like there's two.  Is that because

11   there's one for each PI?

12   A.   Correct.

13   Q.   All right.  And then if we keep scrolling, you can see

14   there's -- starting on page 10 it looks like there's a more

15   detailed explanation of the science that's being proposed?

16   A.   Correct.

17   Q.   Let's fast-forward to page 23.  So the prior section is

18   about the scientific merit of the proposal, and then this

19   section says at the top, Integration of Education in the

20   Proposed Research.  Why is NSF asking a potential PI to talk

21   about integration of education in the proposed research?

22   A.   A big part, of course, of what NSF wants to make sure is

23   not only do -- is the research project itself performed

24   according to good science, but that there is outreach in

25   education to the community that we're funding as part of the

1    project as well.  It's part of NSF's mission to make sure that

2    we have science and engineering education and that we provide

3    outreach as broadly as possible regarding the research we fund.

4    It's a responsibility to have that education and what you're

5    going to do to help others in the community regarding education

6    as part of the proposal.

7    Q.   So is it fair to say that when NSF is looking at a proposal

8    like this, they're not only looking at the scientific merit,

9    but they're looking at how it could benefit the public such as

10   by providing STEM education?

11   A.   Correct.

12   Q.   And you'll see here that the first two paragraphs -- each

13   of them seems to talk about how each of the co-PIs plans to,

14   you know, provide stammer catalysis or chemistry education to

15   folks in their community?

16   A.   Correct.

17   Q.   Is that typical for PIs to include that as part of their

18   proposal?

19   A.   Yes, it's very standard.

20   Q.   All right.  I want to go to page 32.  Is this the biosketch

21   or biographical sketch we talked about earlier?

22   A.   Yes.

23   Q.   If we could scroll through the first page, it appears this

24   one is for Dr. Tao?

25   A.   Yes.

1  Q.    And the second page has some more information about other

2  activities, synergistic activities and honorary and prestigious

3  awards he's received?

4  A.    Correct.

5  Q.    Let's go to page 46.  And is this the current and pending

6  section that we talked about?

7  A.    Yes, it is.

8  Q.    All right.  And if you could just list on here, it looks

9  like there's four current and pending listed.  Are those all

10  from agencies you recognize?

11  A.    Yes.

12  Q.    Looks like they're all either NSF or U.S. Department of

13  Energy?

14  A.    That's exactly right.

15  Q.    If we go to the next page on 47, so what is this Facilities

16  and Equipment and Other Resources?  What is this section

17  talking about?

18  A.    So this basically shows what resources and facilities and

19  equipment are already available to the researcher to use as

20  part of the project, and we use this to look at basically

21  things they already have that we don't need to fund.  So if

22  it's already available, it's going to be used on the project,

23  then we don't need to provide funding for that as part of the

24  NSF grant.

25  Q.    This one, it looks like one of the PIs, Philippe Sautet

1    from UCLA, is writing that UCLA has provided office space

2    sufficient to support the PI and several students and post-docs

3    for the proposed research?

4    A.   Correct.

5    Q.   If you go to the next page, is this describing what

6    Dr. Tao's research group at KU is proposing to provide if their

7    award was granted?

8    A.   Yes.

9    Q.   And it says that the labs of Franklin Feng Tao group at

10   University of Kansas are comprised of a space of 2400 square

11   feet and it talks about the details of that laboratory?

12   A.   Right.

13   Q.   And is this a pretty standard package in terms of NSF

14   proposals with current and pending and biosketch and how the

15   research is going to be conducted, the benefits to the

16   community, the scientific merit?

17   A.   Yes, very standard.

18   Q.   All right.  Okay.  You can put that away.  So I'd like to

19   show you what's been marked as Government Exhibit 56.

20          MR. BARRY:  May I approach?

21          THE COURT:  Yes.

22   BY MR. BARRY:

23   Q.   Do you recognize this document?

24   A.   Yes.

25   Q.   What is this?

19-20052-JAR    USA v. Feng Tao    03.25.22    Day 5        760

1  A.   This is a grant letter.  So if we decide to give the grant,

2  to award the grant, this is the notification that goes out

3  notifying them that we're giving them award.

4  Q.   And is this for the prior grant that we just looked at with

5  Philippe Sautet from UCLA?  If you want a shortcut, you can

6  compare the proposed project titles.

7  A.   No, this one is proposal number 1800601.  And this is 577.

8  Q.   Is that the award number, the 577?

9  A.   Yes.  Proposal number, sorry.

10  Q.   So let's -- if you look at 55, which is the document we

11  looked at previously, what's the proposed project title?  It's

12  on the first page.

13  A.   Sorry.

14  Q.   That's okay.

15  A.   Sorry.  Understanding the restructuring of model metal

16  catalysts and reactant gases.

17  Q.   And the co-PI is Philippe Sautet from UCLA who we talked

18  about?

19  A.   Correct.

20  Q.   And if you look at 56, do you see the project title there?

21  It's the second paragraph.

22  A.   Yes.  It's the same title, correct.

23  Q.   Do you see the PI listed as Philippe Sautet from UCLA?

24  A.   Yes.

25            MR. BARRY:  Government moves to enter into evidence

1    Government Exhibit 56.

2              MR. ZEIDENBERG:  No objection.

3              THE COURT:  Exhibit 56 admitted.

4    BY MR. BARRY:

5    Q.   So you said this is basically the formal document that the

6    sponsoring institution and the PI would receive indicating that

7    they have been awarded the money?

8    A.   Correct.

9    Q.   Okay.

10   A.   Yes, that 1800601 in the middle that I was pointed to

11   before.  So, correct, I can verify it's the same.

12   Q.   Yeah, I know there's a lot of different numbers.

13         So let's call this for now -- let's just refer to it as the

14   award number.  So one -- you can write it down if you want.

15   1800577.  We're going to call this the UCLA grant.  Okay?

16   A.   Yes.

17   Q.   And if you -- if we can scroll through, is this just

18   describing the details of the grant?

19   A.   So, yes, this is describing we're awarding the grants and

20   the statutes under which we're providing the grant.

21   Q.   All right.  I would like to show you what's been marked as

22   Government Exhibit 142.

23             MR. BARRY:  May I approach?

24             THE COURT:  Yes.

25   BY MR. BARRY:

1    Q.   Do you recognize this?

2    A.   Yes.  This is -- I recognize this as a request for

3    additional information from the program officer.

4    Q.   Okay.  And you see at the top it has the same number,

5    1800601?

6    A.   Correct.

7    Q.   And do you recognize the authors on this e-mail chain?

8    A.   Yes, I do.

9    Q.   And is one of them Kenneth Moloy from the National Science

10   Foundation?

11   A.   Yes, it is.

12        MR. BARRY:  Government moves to introduce into

13   evidence Exhibit 142.

14        THE COURT:  Any objection?

15        MR. ZEIDENBERG:  No objection.

16        THE COURT:  142 admitted.

17   BY MR. BARRY:

18   Q.   Let's start at the -- are you familiar when e-mails are

19   printed out, sometimes the oldest e-mail starts at the bottom

20   of the chain?

21   A.   Correct.

22   Q.   Let's start with that bottom e-mail.  You'll see this is --

23   let's scroll down a little bit so we can understand who

24   Mr. Moloy is.  So it says Mr. Moloy, program director, division

25   of chemistry.  Do you know Mr. Moloy personally?

1    A.    No, I do not.

2    Q.    Can you tell from his signature block what his job may

3    entail?

4    A.    Yes.  So he's the program director.  So program officer and

5    program director are used interchangeably at NSF, and so he's

6    the one who's responsible for this overall program and does all

7    of the looking at the review -- reviews and the analysis of

8    proposals, as we talked about in that flowchart.

9    Q.    If you scroll up, Mr. Moloy is e-mailing what look to be a

10   sautet@ucla.edu and an e-mail account for Dr. Tao; is that

11   right?

12   A.    Correct.

13   Q.    And Mr. Moloy says -- Dr. Moloy says, your NSF proposal --

14   and then it has the number we looked at previously in the title

15   -- is under active review by the chemical catalysis at NSF.  In

16   order for the review to proceed, I need some additional

17   information.  You'll see he next says, first I require updated

18   current and pending support information which you can e-mail

19   back to me directly.  Please comment on any overlap between

20   this proposal and other sources of current/pending funding.

21         So this is -- the prior exhibit we looked at, Exhibit 56,

22   just to kind of set some dates, that's the grant award?

23   A.    Yes.

24   Q.    And that's June 28, 2018, is the date of that?

25   A.    Yes.

1    Q.    And the Exhibit 55, which was the proposal, the date that

2    was received was in October 2017.  So you have proposal

3    submitted October 2017, grant awarded end of June 2018.  And

4    this e-mail is from May 2018, so it looks like it's about a

5    month before the grant is formally awarded?

6    A.    Correct.

7    Q.    So why is Dr. Moloy e-mailing these co-PIs in advance of

8    that award to ask for updated current and pending information?

9    A.    So by this point in the process the reviews have come in on

10   this proposal and have been reviewed and the program director

11   is in this final -- these final stages of that box of review

12   and analysis.  So looking at the reviews and then looking at

13   everything else that's part of the proposal to look at these

14   things like capacity and overlap and duplication.  So at this

15   point the program director wants to make sure they have the

16   most up-to-date, accurate information to review and analyze

17   before making a decision on the proposal.

18   Q.    And part of that is because the initial proposal we looked

19   at in this case was submitted, I think it's about seven months

20   before we're actually looking at this e-mail?

21   A.    Correct.  So sometimes when you list current and pending

22   support, that pending support might now have been funded and so

23   therefore we would need that update in the current and pending

24   support to make sure that that is analyzed as part of this

25   process.

1    Q.  So let's scroll up a little.  And it says -- so this is

2    Dr. Tao's response and he says, Dear Dr. Kenneth, thank you

3    very much for the information.  We highly appreciate you for

4    your time and effort in handling and reviewing our proposal.

5    Philippe and I will be preparing the request documents.  They

6    will be sent to you quickly from Philippe's e-mail account.

7    Did I read that correctly?

8    A.  Yes.

9    Q.  I'd like to show you what's been previously marked as

10   Government Exhibit 143.  I'm going to also show you what's been

11   marked as Government Exhibit 144.  So let's start with 143.  Do

12   you recognize this document?

13   A.  Yes.

14   Q.  What is it?

15   A.  So this is the response -- so this previous chain of

16   e-mails requesting updated current and pending support

17   information saying that we'll provide you with the requested

18   information.  So this is the response back to Dr. Moloy

19   providing the requested information.

20        MR. BARRY:  Government moves into evidence

21   Exhibit 143.

22        THE COURT:  Any objection?

23        MR. ZEIDENBERG:  No objection, Your Honor.

24        THE COURT:  Exhibit 143 admitted.

25   BY MR. BARRY:

1  Q.  So let's first go to the bottom e-mail.

2      This is the May 17th e-mail?

3  A.  Yes.

4  Q.  And this is the same one that we looked at in the prior

5  exhibit, right?

6  A.  Correct.

7  Q.  And then let's scroll up.  And if you remember, did the

8  prior exhibit say Dr. Moloy asked for the additional

9  information and then Dr. Tao said, we'll get back to you

10 shortly, Philippe will provide the updated information for you?

11 A.  Correct.

12 Q.  And then you'll see at the top, Dr. Sautet says, Dr. Moloy,

13 thank you very much for your e-mail.  Please find attached the

14 two files for the current and pending information.  We did not

15 use the NSF table in order to include more information.

16 Summary and note of absence of overlap.  Please tell us if you

17 need the NSF table format instead.  I hope these files respond

18 to your request.  Best regards.  Philippe Sautet on behalf of

19 both PIs.

20     What does he mean about, if you know, about we did not use

21 the NSF table?

22 A.  So at this point in time we had two options for submitting

23 current and pending support information.  There was -- there's

24 an NSF format, an NSF template where you can fill in this

25 information, and that was one option, or you could submit the

1   information in current and pending support as long as you did

2   everything in another format.  It could be in the NSF table

3   format or another format, either are acceptable.

4   Q.   And then you see how there's two attachments, there's

5   General Technical Summary Sautet-Tao and Sautet and Tao C & P

6   May 2018?

7   A.   Yes.

8   Q.   I'd like you to look at Exhibit 144, which has not been

9   admitted yet.  Do you recognize this document?

10  A.   Yes.

11  Q.   What is this?

12  A.   This is the updated current and pending support information

13  that was provided again in another format, not in the NSF table

14  format.

15  Q.   And who are the PIs listed on this updated current and

16  pending?

17  A.   Phillip Sautet and Franklin Tao.

18       MR. BARRY:  Government moves to introduce into

19  evidence Government Exhibit 144.

20       MR. ZEIDENBERG:  No objection.

21       THE COURT:  144 admitted.

22  BY MR. BARRY:

23  Q.   Let's just start at the top.  And you'll see Dr. Sautet

24  lists his current support and he lists one from some support

25  from Harvard, and then let's scroll down.  DOE, NSF grant, Army

1  Research Office, another NSF grant, another NSF grant, DOE

2  grant, NSF.  These are all pending, right, the longer list?

3  A.   Correct.

4  Q.   Okay.  And then let's go to page -- we may have passed it,

5  page 3.  Near the second -- two-thirds down the page, you'll

6  see Dr. Tao's current and pending support, right?

7  A.   Yes.

8  Q.   And what grants or current and pending research support has

9  he listed?

10 A.   Current support:  Department of Energy, DOE; NSF; and NSF,

11 and then pending support from NSF and NSF.

12 Q.   So for Dr. Tao on this current and pending for May 2018, do

13 you list -- do you see any other current or pending support

14 listed from any other organization or entity other than the

15 U.S. Department of Energy and the National Science Foundation?

16 A.   No.

17 Q.   All right.  I'd like to show you what's been previously

18 marked as Government Exhibit 57.  Do you recognize this?

19 A.   Yes.

20 Q.   What is it?

21 A.   This is an annual report.  So PIs and co-PIs are required

22 to submit annual reports on the status of the project that

23 they've been funded by NSF.

24 Q.   And do you see the grant number being the same 1800601 as

25 the prior documents we've looked at?

1    A.   Yes.

2         MR. BARRY:  Government moves to introduce into

3    evidence Government Exhibit 57.

4         MR. ZEIDENBERG:  No objection.

5         THE COURT:  57 admitted.

6    BY MR. BARRY:

7    Q.   What is an annual project report?

8    A.   As a requirement, the principal investigator and the

9    co-principal investigator on a grant, every year they need to

10   submit a report to us.  So annually they need to submit a

11   report.  It goes to the program officer, the program director,

12   telling us about the status of the project that NSF funded them

13   to do.

14   Q.   And is this annual project report for the 1800601 grant

15   between Dr. Tao and Dr. Sautet that we previously looked at?

16   A.   Yes.

17   Q.   When was this report submitted to NSF?

18   A.   So let's see.  It was submitted on July 5, 2019.

19   Q.   And what's the reporting period covered by the report?

20   A.   So it's September 15, 2018 to August 31, 2019.

21   Q.   Does that mean that this report should contain information

22   about the project for that time period?

23   A.   Correct.

24   Q.   So let's first go to page 7 of the report, and again we're

25   going to rely on the little red numbers.

1    A.    Okay.

2    Q.    And let's scroll to the bottom where it says participants'

3    organizations.   This lists who's involved in this grant, right?

4    A.    Yes.

5    Q.    Why is this information important for NSF to have?

6    A.    Because we need to know who is involved in the project

7    we're funding, and so who is basically working on the project

8    that NSF is involved with.   And so we want to make sure, of

9    course, that we have the PI and the co-PI, but we need to know

10   everyone else, of course who's involved, again, for good

11   accountability of our funding.

12   Q.    Let's scroll down to the next page where it lists all the

13   folks.   Let's stop right there.   You'll see for each individual

14   who worked on the project it has a couple fields that have been

15   filled out.   Do you see that?

16   A.    Yes.

17   Q.    Do you see how at the bottom it has two fields for

18   international collaboration and international travel?

19   A.    Yes.

20   Q.    I want to look through each one.   And you see how they all

21   seem to say no?

22   A.    Yes.

23   Q.    Can you find any on this annual report for the

24   international travel box or international collaboration box

25   that says yes?

1    A.   No, I do not.

2    Q.   Let's go to the next page.  What other organizations have

3    been involved as partners?  What's the answer?

4    A.   Nothing to report.

5    Q.   What other collaborators or contacts have been involved?

6    A.   Nothing to report.

7    Q.   And then there's some other fields where there's nothing to

8    report as well.

9    A.   Correct.

10   Q.   And should PIs -- do they have to report something on these

11   fields?

12   A.   Yes.  They -- it's required for them to support -- to

13   report.  Again, if they have any other partner organizations,

14   collaborators, this is a requirement to fill out this report.

15   Q.   And then let's go to the last page where it says

16   changes/problems.  Do you see where it says changes in approach

17   and reason for change?

18   A.   Yes.

19   Q.   What's the answer?

20   A.   Changes and report and reasons for change is none.

21   Q.   You can put that away.

22        I want to move to another grant.  This is what's been

23   previously marked as Government Exhibit 53.

24             MR. BARRY:  Do you want to take a break?

25             THE COURT:  Yeah.  Would this be a good time?

1          MR. BARRY:  Yes.

2          THE COURT:  Let's take a break for 15 minutes.

3      (Recess.)

4      (The following proceedings occurred outside the presence of

5  the jury.)

6          THE COURT:  Anything we need to talk about before we

7  bring the jury?

8          MR. BARRY:  No, Your Honor.

9      (The jury entered the courtroom, after which the following

10  proceedings were had.)

11          THE COURT:  You can be seated.

12  BY MR. BARRY:

13  Q.   Dr. Keiser, before we broke, I had handed you what has been

14  marked as Government Exhibit 53.  It's another grant proposal.

15  Do you see that in front of you?

16  A.   Yes, I do.

17  Q.   What is this document?

18  A.   This is another fully written proposal to NSF.

19          MR. BARRY:  Government moves into evidence Government

20  Exhibit 53.

21          THE COURT:  Any objection?

22          MR. ZEIDENBERG:  No objection.

23          THE COURT:  Admitted.  53.

24  BY MR. BARRY:

25  Q.   I want to first look at the top.  And if you can tell me

1    when this grant was submitted or received by NSF?

2    A.    It was on February 20, 2015.

3    Q.    And then --

4    A.    Yes, yes, received.  Sorry.

5    Q.    And that's just right there, that date received?

6    A.    That date received, exactly.

7    Q.    How much was this proposal for?  If you look about halfway

8    down in the requested amount?

9    A.    For $4 million.

10   Q.    Let's go to the bottom of the page.  And you see, are those

11   the PIs and co-PIs?

12   A.    Yes.

13   Q.    You see the lead PI is someone by the name of Bala

14   Subramaniam?

15   A.    Yes.

16   Q.    You see at the bottom, one of the co-PIs is Dr. Franklin

17   Tao?

18   A.    Yes.

19   Q.    This is a grant proposal similar to the ones we've looked

20   at before, right?

21   A.    Correct.

22   Q.    And if we go to the next page, we'll see that same

23   certification regarding conflict of interest?

24   A.    Correct.

25   Q.    Okay.  So I want to first draw your attention to page 34.

1    And does this look to be a CV or a biosketch of one of the PIs,

2    in particular Dr. Subramaniam?

3    A.   Yes, this is a biosketch.

4    Q.   And this includes some of the information we went over,

5    right, like appointments, educational background?

6    A.   Correct.

7    Q.   So let's keep scrolling down.  You see in the next page it

8    has a section called Collaborators and Other Affiliations?

9    A.   Yes.

10    Q.   All right.  And you see that list of collaborators that

11    Mr. Subramaniam has there?

12    A.   Yes.

13    Q.   Do you recognize any of those entities?

14    A.   Yes.  These would be coauthors.  These are other

15    researchers with whom this PI collaborates.

16    Q.   And you see how there's one for Archer Daniels Midland,

17    which is a company?

18    A.   Yes.

19    Q.   You see how this is one for University of Kansas?

20    A.   Yes.

21    Q.   University of Roland in Germany?

22    A.   Yes.

23    Q.   Technical University of Delft in the Netherlands.  Third

24    line down?

25    A.   Correct.

1  Q.   There's another one for KU for Brian Laird.  And then do

2  you see the last line, it says Max Planck Institute?

3  A.   Yes.

4  Q.   Magdeburg, Germany?

5  A.   Yes.

6  Q.   Let's go to the next PI's CV.  This is Juan Bravo Suarez.

7  It's the next page on 36.

8  A.   Yes.

9  Q.   Does it look similar in terms of educational background,

10  appointments?

11  A.   Correct.

12  Q.   And those productions are the publications we talked about?

13  A.   Yes.

14  Q.   And let's go to the next page.  You'll see how there's

15  another Collaborators and Other Affiliation section?

16  A.   Yes, I do.

17  Q.   Am I reading this correctly, it looks like there's

18  Dr. Kyoko, K-y-o-k-o; Bando, B-a-n-d-o, from the National

19  Institute of Advanced Industrial Science and Technology in

20  Japan?

21  A.   Yes.

22  Q.   And you'll see there's a few others listed.  For example,

23  there's a professor from the Department of Applied Chemistry,

24  Indian School of Mines and Dhanbad, India?

25  A.   Yes.

1  Q.  There's another professor from the Tokyo Metropolitan

2  University in Japan.  Do you see those?

3  A.  Correct, I see those.

4  Q.  And then let's go to -- I want to keep going through the CV

5  or the biosketches and let's go to page 42.

6  A.  Okay.

7  Q.  Is this the biosketch of Dr. Tao?

8  A.  Yes, it is.

9  Q.  And you'll see he lists his appointment at KU?

10  A.  Yes.

11  Q.  And his educational background.  And then some of his

12  publications, right?

13  A.  Correct.

14  Q.  And on the next page it lists synergistic activities?

15  A.  Yes.

16  Q.  I want to stop where it says Collaborators and Other

17  Affiliations.  You'll see how it lists a number of what are

18  identified as collaborators and conflict of interest.  Total of

19  17?

20  A.  Yes.

21  Q.  And can you read some of those universities that are listed

22  there?

23  A.  So the first one I believe should be Lund University from

24  Sweden, UC-Berkeley, University of Notre Dame.  Lund University

25  In Sweden.  Arizona State University.  Uppsala University.

1    Q.   Okay.  You can put that one away.

2    A.   Okay.

3    Q.   So I'd like to show you what's been previously marked as

4    Exhibit 63.  Do you recognize this document?

5    A.   Yes, this is cooperative agreement.

6    Q.   And is this for -- I should have done this before, but for

7    Exhibit 53, the one we just looked at, the proposal.  Do you

8    see at the top there it says the grant proposal number is

9    1539105?

10    A.   Yes.

11    Q.   And then for this cooperative agreement, does it have the

12    same grant number at the top, 1539105?

13    A.   Yes, it does.

14         MR. BARRY:  Government moves to introduce any

15    evidence, Government Exhibit 63.

16         THE COURT:  Any objection?

17         MR. ZEIDENBERG:  No objection.

18         THE COURT:  63 admitted.

19    BY MR. BARRY:

20    Q.   This is a cooperative agreement.  Is this the cooperative

21    agreement for that grant we looked at?

22    A.   Yes, it is.

23    Q.   What is a cooperative agreement?

24    A.   A cooperative agreement is another way that we give out

25    funding.  It's similar to a grant, but it's usually for larger

1    scale grants where the awardees are going to be running

2    something or operating something on behalf of NSF.  So it's for

3    something related to, you know, operating a facility, doing --

4    operating an institute or research institute, something like

5    that.  That would go into a cooperative agreement.

6    Q.   And does this cooperative agreement involve a number of

7    universities?

8    A.   Yes, it does.

9    Q.   And it looks -- on the bottom of page 1 it lists

10   Dr. Subramaniam and Dr. Tao from KU and then if you scroll to

11   the next page, it has a few other folks from KU and somebody

12   from the University of South Carolina?

13   A.   Yes.

14   Q.   You can put that one away.  I'd like to show you what's

15   been previously marked as Government Exhibit 54.  Do you

16   recognize this document?

17   A.   Yes.  This is an annual project report.

18   Q.   And is it for the same cooperative agreement or grant that

19   we've been looking at, 1539105?

20   A.   Yes.

21        MR. BARRY:  Government moves to introduce into

22   evidence Government Exhibit 54.

23        MR. ZEIDENBERG:  No objection.

24        THE COURT:  54 admitted.

25   BY MR. BARRY:

1    Q.    You see there where it lists the PIs?

2    A.    Yes.

3    Q.    Dr. Subramaniam, who we talked about earlier, Dr. Suarez,

4    and you see at the bottom it has Dr. Tao?

5    A.    Yes.

6    Q.    What's the reporting period for this annual project report?

7    A.    It's from August 1st, 2018 to July 31, 2019.

8    Q.    And when -- can you tell from this when this was submitted

9    to NSF?

10   A.    Yes.  July 19, 2019.

11   Q.    And if you scroll down a little bit more, there's the

12   submission date right there and Dr. Subramaniam's signature?

13   A.    Yes.

14   Q.    Is this annual project report similar to the one we looked

15   at previously in that it's kind of an update on the progress of

16   the research and what's been going on?

17   A.    Correct.

18   Q.    Okay.  And I'd like to draw your attention to page 17 of

19   the progress report for this grant.

20   A.    Okay.

21   Q.    And at the bottom there's a list of participants'

22   organizations and it says what individuals have worked on this

23   project.  And you'll see there's a pretty lengthy list, right?

24   I think it goes on three pages?

25   A.    Yes.

1  Q.  Do you see Dr. Tao's name somewhere on there?

2  A.  Yes.

3  Q.  Where is it?

4  A.  It's on the top of page 18.

5  Q.  Okay.  And then you see how at the beginning it lists all

6  the PIs, or the principal investigators, and then it goes to

7  faculty, then post-doctoral students, then staff scientists,

8  then graduate students, then undergraduate students, and it

9  even has an Other category, which I'm not sure what that is.

10  A.  Yes, probably lab assistants.

11  Q.  This lists all the people that -- for Dr. Subramaniam's

12  grant, he's saying these are all the folks who worked on it

13  during the reporting period, correct?

14  A.  Correct.

15  Q.  If you go to next section it says Full Detail.  Does it

16  list all those people with all those detailed fields we looked

17  at in the prior annual report?

18  A.  Yes.

19  Q.  You'll see how Dr. Subramaniam right there -- for

20  international collaboration, what did he write?

21  A.  He wrote no.

22  Q.  For international travel, what does he have in there?

23  A.  He has yes to Spain and India.

24  Q.  Okay.  And do you see any other travel or international

25  collaboration disclosures in this annual report from anybody

1  else?  You can take your time because there's a lot of them.

2  A.   Sure.  Julian Silverman on page 21.

3  Q.   Can we go there, please.  That's another -- looks like

4  Julian Silverman, post-doctoral student, is stating that

5  part of the -- there was some international travel in Spain

6  related to this award?

7  A.   Correct.  And then further down there's Anand Ramanathan,

8  who's a staff scientist, travel to Spain for seven days.

9  Q.   That's on the same page, on 21?

10  A.   Correct.

11  Q.   Any others that you see?

12  A.   On page 22, at the top, Amy Jystad.

13  Q.   That's another Spain trip?

14  A.   Correct.

15  Q.   Keep going.

16  A.   That's it.

17  Q.   Okay.  All right.  Last grant that we're going to talk

18  about.  So I'd like to show you what's been previously marked

19  as Government Exhibit 49.  Do you recognize this document?

20  A.   Yes.  This is another proposal to NSF.

21       MR. BARRY:  The government moves to introduce

22  Exhibit 49 into evidence.

23       THE COURT:  Any objection?

24       MR. ZEIDENBERG:  No, Your Honor.

25       THE COURT:  49 admitted.

1    BY MR. BARRY:

2    Q.   So let's start at the top.  And this is submitted in

3    July -- or was received by the National Science Foundation on

4    July 24, 2013, right?

5    A.   Correct.

6    Q.   And it looks like the university is University of Notre

7    Dame?

8    A.   Correct.

9    Q.   And it says title of proposed project, CAREER, catalysis of

10   singly dispersed bimetallic catalytic sites.  Does that capital

11   CAREER word mean anything?  Is that an acronym?  Why is it

12   there?

13   A.   CAREER is a special program at NSF that's aimed to early

14   career faculty to encourage them -- to give them support early

15   in their career to help them advance.

16   Q.   What do you mean by early career faculty?

17   A.   So early career faculty are those who have just begun as a

18   professor in the research system.  They're usually an associate

19   professor level.  And so they haven't yet made it to full

20   tenure, which means, you know, almost permanent status as a

21   professor.  So it's in the first few years of their research

22   career.

23   Q.   And it looks like the term of this one is 60 months?

24   A.   Correct.

25   Q.   Is that in part because the purpose of the CAREER NSF grant

1    is to support an up-and-coming researcher for an extended

2    period of time?

3    A.    Correct.

4    Q.    And who is the PI for this CAREER award or proposal rather?

5    A.    This is Franklin Tao.

6    Q.    All right.  I'd like to show you what's been marked as

7    Government Exhibit -- and let's keep track of the numbers

8    because this one is going to be a little confusing.  So if you

9    look at the Exhibit 49, the number is 1352516.

10    A.    Yes.

11    Q.    So I'd like to show you what's been previously marked as

12    Government Exhibit 50.  Do you recognize this document?

13    A.    Yes.  This is a grant transfer request document.

14    Q.    What does that mean?

15    A.    That means if the -- if there's a request for the grant to

16    move from one research organization to another research

17    organization.  So as you recall, it's the research organization

18    or the university that is the recipient of the grant, and so if

19    there's a request to move it to another research organization,

20    this document is submitted.

21    Q.    Okay.  And is this the grant transfer request for that same

22    proposal that we looked at, 1352516?

23    A.    Yes, it is.

24         MR. BARRY:  The government moves to introduce into

25    evidence Government Exhibit 50.

1          MR. ZEIDENBERG:  No objection.

2          THE COURT:  50 admitted.

3    BY MR. BARRY:

4    Q.   And if you zoom in on the middle, what is this showing,

5    this sort of original grantee and then the transfer

6    organization?

7    A.   So the original grantee was University of Notre Dame, so

8    they were the original recipient of the grant.  And the

9    transfer organization is University of Kansas Center for

10   Research, which is where the grant is requested to be

11   transferred to.

12   Q.   Okay.  And then let's go to the next page so we can see who

13   the PI for this is.  Who is the PI on this CAREER award?

14   A.   Franklin Tao.

15   Q.   And so is this document showing that that NSF CAREER award

16   was transferred from the University of Notre Dame to the

17   University of Kansas?

18   A.   Yes.

19   Q.   And that that transfer would follow Dr. Tao's move from

20   Notre Dame to KU?

21   A.   Yes.

22   Q.   I'd like to show you what's been previously marked as

23   Government Exhibit 51.  Do you recognize this document?

24   A.   Yes.  This is another award letter.

25   Q.   Okay.

1    A.   Which, you know, it's a transfer letter in this case.

2    Q.   And is this for the same grant we've talked about?

3    A.   Yes, it is.

4         MR. BARRY:   The government moves to introduce into

5    evidence Government Exhibit 51.

6         MR. ZEIDENBERG:   No objection.

7         THE COURT:   51, admitted.

8    BY MR. BARRY:

9    Q.   So let's focus on the top real quick.   This is dated

10   December 1st and there's the grant number, 1352516?

11   A.   Correct.

12   Q.   And is this showing that that CAREER grant -- that the

13   transfer actually went through and was transferred to KU?

14   A.   Yes, it does.

15   Q.   Okay.   All right.   I'd like to show you what's been

16   previously marked as Government Exhibit 52.   Do you recognize

17   this document?

18   A.   Yes, this is an annual project report.

19   Q.   And which grant is this for?

20   A.   This is for the CAREER grant.

21   Q.   For the same grant that we've been talking about?

22   A.   Correct.

23        MR. BARRY:   Government moves to introduce into

24   evidence Government Exhibit 52.

25        MR. ZEIDENBERG:   No objection.

1      THE COURT:  52, admitted.

2   BY MR. BARRY:

3   Q.   All right.  So let's just kind of get our bearings again.

4   So this is the CAREER grant that we were talking about, right?

5   A.   Correct.

6   Q.   And that grant, the purpose of it is to support early

7   career scientists for an extended period of time?

8   A.   Exactly.

9   Q.   And in 2014, early 2015, that grant was moved from Dr. Tao

10  at Notre Dame to Dr. Tao at KU?

11  A.   Yes.

12  Q.   And then what is this -- when was this annual report

13  submitted to NSF?

14  A.   It was submitted on June 3, 2018.

15  Q.   Okay.  And what was the reporting period for this?

16  A.   July 1, 2017 to July -- to June 30, 2018.

17  Q.   Okay.  And let's -- and who submitted this, if you can

18  tell?

19  A.   Franklin Tao submitted this.

20  Q.   Let's start by looking at page 4.  Again, we're going to

21  rely on the little red numbers.

22       And this -- it says major activities, specific objectives,

23  significant results.  What is this describing?

24  A.   This describes what was actually done during this year of

25  the grant, during the reporting period.

1    Q.   And this is describing not only the scientific work, like

2    the performed computational studies of the chemical processes

3    on a particular element, but it's also talking about the kind

4    of educational components of the grant, like who trained

5    graduate students?

6    A.   Correct.

7    Q.   Okay.  And those are both important to KU -- or to NSF,

8    right?

9    A.   Yes.  Both very important.

10   Q.   Okay.  And then you'll see -- let's go to the next page.

11   You'll see there's -- these are all the publications or

12   products?

13   A.   Yes.

14   Q.   And then let's go to the next page.  You'll see these are

15   the achievements, right?

16   A.   Yes.

17   Q.   And I'd like you to first start by reading the first

18   sentence of the first paragraph.

19   A.   Through the support of this CAREER award, two graduate

20   students, Shiran Zhang and Luan Nguyen, were trained.

21   Q.   Just the first sentence.

22   A.   Okay.

23   Q.   You can read the other one, but let's move to the next

24   paragraph.

25        So that's talking about students who the PI is saying were

1    trained as part of the grant, right?

2    A.   Correct.

3    Q.   And then let's look at the next paragraph, and I want you

4    to read the first sentence again?

5    A.   I have integrated this thermodynamics and kinetics of

6    developing catalysts of singly dispersed bimetallic sites into

7    teaching.

8    Q.   Is that talking about sort of how the PI is using the grant

9    to improve his or her teaching?

10   A.   Yes.

11   Q.   And then let's go to the next paragraph.  Can you read the

12   first sentence of that, please?

13   A.   In terms of high school educational component, I gave

14   lectures of energy chemistry at local public high school in the

15   town of Lawrence, Free State High School, to honor students

16   since they were learning honors chemistry.

17   Q.   Let's read the next sentence.

18   A.   My lectures were taken as a portion of this course.

19   Q.   And is this -- why, again, does NSF care if a PI is using

20   grant dollars to educate people in the public?

21   A.   It's actually an essential part of our mission and of what

22   we do, that we focus on the research and then we also focus on

23   the education and the outreach of that research.  Both are

24   extremely important.

25   Q.   Let's read the next sentence, the "I also"?

1   A.   I also recruited a high school student, Paul Peng Chen,

2   from Topeka Hayden Catholic High School.

3   Q.   Keep reading.

4   A.   As he stayed at Lawrence, he spent three after-class time

5   slots, each slot three hours each week, and three summers in

6   learning catalysis preparation and characterization in my

7   group.

8   Q.   Can you tell from this who Paul Peng Chen is?

9   A.   Just that he's a high school student.

10  Q.   Let's go to page 11.  And you can see this is similar to

11  the sections we've previously looked at where it describes the

12  folks who have worked on this grant during the relevant period?

13  A.   Yes.

14  Q.   And as a reminder, this reporting period is July 1, 2017

15  through June 30, 2018?

16  A.   Correct.

17  Q.   Okay.  And who is listed as the folks who worked on the

18  project?

19  A.   Franklin Tao is the PI.  Yuting Li, a graduate student

20  research assistant, and Yu Tang, a graduate student research

21  assistant.

22  Q.   You'll see there's two little fields for international

23  collaboration and international travel?

24  A.   Yes.

25  Q.   Have either Dr. Tao or Yu Tang or Yuting Li checked

1    anything other than no for any of those fields?

2    A.    No, they have not.

3    Q.    What about the next section or field, what organizations

4    have been involved as partners.  Is there an organization

5    listed there?

6    A.    Yes.  UCF, University of Central Florida.

7    Q.    Any other organizations listed?

8    A.    No.

9    Q.    Okay.  And then let's go to page 13.  We've looked at the

10   section similar to this before, right, the changes/problems?

11   A.    Yes.

12   Q.    Is there anything listed in there in terms of changes in

13   approach and reason for change?

14   A.    No, there's not.

15   Q.    What about the last page, the special requirements?

16   A.    No.

17   Q.    Anything listed there?

18   A.    No, nothing to report.

19   Q.    Okay.  You can put that one away.  I'd like to next show

20   you what's been marked as Government Exhibit 154.  Do you

21   recognize this document?

22   A.    Yes, I do.

23   Q.    What is it?

24   A.    It's an e-mail exchange describing about project -- a

25   project report, which is the final reports that's submitted at

1    the end of a project.

2    Q.   Is there someone on this e-mail chain who you recognize?

3    A.   Franklin Tao.

4    Q.   Anybody else?

5    A.   There's George Janini from NSF.

6    Q.   How can you tell he's from NSF?

7    A.   His e-mail address is gjanini@nsf.gov.

8         MR. BARRY:  The government moves to introduce into

9    evidence Government Exhibit 154.

10        MR. ZEIDENBERG:  No objection.

11        THE COURT:  154, admitted.

12   BY MR. BARRY:

13   Q.   Let's start at the bottom of this, so the last page.  We

14   can read it backwards -- not backwards, but in reverse order so

15   it's in chronological order.  Let's start at the very bottom

16   where there's a June 1st e-mail.  Can you read that for the

17   jury, please?  It's on page 3.

18   A.   The annual report for Award 1462121 has been returned by

19   George Janini on June 2, 2018.  Please sign in to research.gov

20   and go to Project Reports to see the report review comments for

21   necessary changes.

22   Q.   Let's go up to the response to that.  And the response

23   begins on page 1 actually.

24   A.   Yes.

25   Q.   And what is -- just broadly speaking, what is Dr. Janini

1    doing here?  Why is he sending a PI an annual report for an

2    award or asking for an annual report?

3    A.   The annual report and the final report are both

4    requirements of the grant and need to be submitted.  In this

5    case there was information that was incomplete or there was

6    some further questions in the report about the report.  And so

7    the program director, Dr. Janini in this case, is asking for

8    some clarification and further information.

9    Q.   Okay.  And then let's go to page 2.  You'll scroll down.

10   You'll see this is Dr. Tao's response.  And it looks like he's

11   proposing additional edits, right?

12   A.   That's right.

13   Q.   And I want to draw your attention to the bottom of page 2.

14   A.   Yes.

15   Q.   And I think we read some of this earlier where it says, in

16   terms of high school educational component, I gave lectures of

17   energy chemistry at local public high school in the town of

18   Lawrence, Free State High School, to honors student, et cetera.

19   And then you see where he says, I also recruited a high school

20   student, Paul Peng Chen, from Topeka, Hayden Catholic High

21   School, and talks about what they did together?

22   A.   Yes.

23   Q.   And that's similar to what we saw on the finalized annual

24   report, right?

25   A.   Correct.

1    Q.   Let's go back to the first page.  So after Dr. Tao -- if

2    you go to the bottom of this page, you'll see that's the

3    beginning of the page where Dr. Tao responds and then

4    Dr. Janini says, thank you for your quick response and

5    cooperation.  Best regards.  And what does Dr. Tao say in

6    response to that?

7    A.   He says, Dear Dr. Janini, thank you very much for reviewing

8    the project report and approving.  I highly appreciate your

9    support to my research group in the last years.  I expect we

10   will be very productive in the last year of this CAREER award

11   project, September 2018-September 2019, as we are submitting a

12   few manuscripts of this CAREER award project.

13   Q.   What does Dr. Janini say in response?

14   A.   Dear Franklin, you're welcome.  Best wishes for continued

15   success.  You have highlights submitted in the past, but please

16   think highlights whenever you have exciting results.  Best

17   regards, George.

18   Q.   Do you know, if you know, what Dr. Janini is referring to

19   when he talks about highlights?

20   A.   So this is for our public affairs office.  We regularly ask

21   program officers to ask their investigators to give us some

22   interesting things that occurred during an award, some

23   highlights, that we can then publicize out to the public about

24   what people are actually doing.

25        So for instance, if you made progress and discovered a new

1    substance or you did something else that's very interesting as

2    part of your project, you would submit that into the program

3    officer as a highlight.

4    Q.   Okay.  All right.  So I want to just go back real quick to

5    this Exhibit 48, which is -- I'm going to try to say the

6    acronym but the Proposal and Award Policies and Procedures

7    Guide.  I'm going to call it the policies guide.

8    A.   Yes.

9    Q.   Have there been changes to this or clarifications over the

10   last few years?

11   A.   Yes.

12   Q.   And in particular, have there been any clarifications or

13   changes to what is required to be disclosed in the current and

14   pending support section?

15   A.   There have been clarifications, yes, made.

16   Q.   When were those made?

17   A.   I think the clarifications that I recall were made in 2020,

18   the 2020 guide.

19   Q.   Do you --

20   A.   They're usually once every year, but that's the one I

21   recall.

22   Q.   What were those clarifications?

23   A.   There was additional language to provide clarification,

24   number one, that you needed to provide information on current

25   and pending support even if you didn't receive money.  If you

1    received equipment or lab support, et cetera, then you do need

2    to provide that in current and pending support.  So again, that

3    was always the case, but we wanted to be extremely clear about

4    that.

5        We did also provide another clarification expanding --

6    emphasizing that any support, again whether domestic or

7    international, needs to be provided.  As you saw, that was the

8    case in the 2017 guide, but we wanted to make that even more

9    clear in the 2020 guide.

10   Q.   Why did NSF want to clarify or make it more clear in your

11   words?

12   A.   It goes back to, again, we're not trying to pull the wool

13   over anyone's eyes.  We're not trying to trick anyone.  So

14   we're constantly looking for improvement in our language to be

15   as clear as possible.  So if there are ways that we can explain

16   things better, we do.  And we do that throughout the guide, so

17   that's why we have, at the beginning of every guide, a section

18   on clarifications, because we're always trying to clarify the

19   language to be as clear as possible.

20   Q.   You said earlier -- and we saw some in this 2017 guide that

21   there's also usually a Significant Changes section at the

22   beginning of the guide.

23   A.   Yes.

24   Q.   That's distinct from the Clarification section, right?

25   A.   Correct.  It's something that is new, something that is

1    very significant.  So an example is, in 2019 a significant

2    change was that if you proposed to NSF to hold a research

3    conference, you are required to have a code of conduct on

4    sexual harassment that you distribute to all participants of

5    the conference and that has to be included as part of your

6    proposal.  That's something new that we never required before,

7    so that's a significant change.

8    Q.    Okay.  So in the -- let's talk 2017 to 2019.  Before those

9    clarifications in 2020.

10   A.    Yes.

11   Q.    During that time period, and I'm going to call it the

12   relevant time period, did NSF expect PIs to disclose all

13   current and pending research support?

14   A.    Yes.  And the PAPP Guide language also said all, all

15   sources of current and pending support.

16   Q.    Did "all" include support from foreign governments?

17   A.    Yes, it did.

18   Q.    Did "all" include support from foreign universities?

19   A.    Yes.

20   Q.    Did "all" include research support to do research at a

21   foreign university?

22   A.    Yes.

23   Q.    Did "all" include all research support that had been

24   committed or that a PI had applied for that was just for that

25   PI, as opposed to the PI's institution?

1    A.    Yes.

2    Q.    Okay.  So I want to bring your attention back to Government

3    Exhibit 144.  And this is the current and pending from the

4    May 2018 disclosure.

5    A.    Yes, okay.

6    Q.    You got 144?

7    A.    Got it.

8    Q.    So this is from the -- 143 is the e-mail from May 18, 2018,

9    that in -- that attached this document, right?

10   A.    Correct.

11   Q.    I want you to go to the next page.  Actually, go to the

12   third page.  And you see the current and pending for Dr. Tao

13   there?

14   A.    Yes.

15   Q.    And we already went over this, but when you initially

16   reviewed this, you only saw current and pending support from

17   the Department of Energy and National Science Foundation,

18   right?

19   A.    Correct.

20   Q.    Did you see anything from the Chinese government?

21   A.    No, I do not.

22   Q.    Did you see anything from a university called Fuzhou

23   University?

24   A.    No.

25   Q.    Did you see anything from a Fertilizer and Catalyst

19-20052-JAR    USA v. Feng Tao    03.25.22    Day 5                798

1   Institute at Fuzhou University listed on that current and

2   pending support?

3   A.    No.

4   Q.    Did you see anything about a proposed contract between KU

5   and Fuzhou University listed in that report?

6   A.    No.

7   Q.    Okay.  And if that information had been listed in this

8   current -- any of the information I just told you about, would

9   that have mattered to NSF?

10  A.    Yes, it would have mattered.

11  Q.    Why?

12  A.    Because we need to look at that information again for

13  capacity, duplication, and overlap.  So if that information had

14  been disclosed, it might influence the considerations about

15  whether the researcher had the capacity to perform the grant,

16  if he had many other research obligations.  We would have to

17  look through it to see, again, if there was any concerning

18  overlap or duplication between what was being funded by the

19  other organizations and what NSF was funding.

20  Q.    So let's take each of those in part.  So I see the second

21  one first, the overlap and research.  So is one of the reasons

22  why NSF would have wanted to know the type of information that

23  we talked about is because it would want to make sure that it's

24  not funding something that another university or another

25  federal -- another government is funding?

1   A.   Correct.  That's a waste of taxpayer money.

2   Q.   And another reason I think you said, is because NSF wants

3   to ensure that the PI or researcher, him or herself actually

4   has the capacity to do the work performed at the quality and

5   level that NSF expects?

6   A.   Correct.

7   Q.   What would NSF do if it learned that someone failed to

8   disclose all of their current and pending support in one of

9   those forms?

10   A.   If they fail to disclose, we would refer it to our NSF

11   Office of Inspector General for investigation.  And they would

12   investigate into whether the failure to disclose was purposeful

13   and then make recommendations back to us or make a referral to

14   Department of Justice.

15   Q.   So when you say purposeful, why does that matter whether a

16   failure to disclose in this specific context is purposeful?

17   A.   Because if someone makes a mistake, we are all for

18   correcting a mistake.  If there's a misunderstanding and --

19   then certainly -- and the PI says, yes, I really didn't know I

20   needed to provide this information, but yes, I did have these

21   other commitments, then they can come forward with that

22   information.  We will then consider that information in the

23   same way, capacity, duplication, and overlap.  And it might

24   then impact the scope of the grant, but that is fine.  It's

25   fine to come forward and correct information.

1   Q.   But NSF needs the information in order to make a decision,

2   right?

3   A.   We need the information to make a decision.

4   Q.   And the decision may be, he can't work on this grant?

5   A.   It can be that you can't work on the grant or it might then

6   lead to a negotiation on the scope of the grant.  So we might

7   reduce the funding amount and the time spent on the grant or we

8   might decline the grant overall.  Many different

9   considerations.

10  Q.   All right.  I want to just go back to Exhibit 57.  And this

11  is the annual project report for one of the other grants that

12  we looked at from July 5, 2019.  Are you with me?

13  A.   Yes.  I have it.

14  Q.   Do you see anything in this report, whether it's the

15  collaboration section, the participants, the international

16  travel, anything having to do with any activity in China or in

17  particular an institution called Fuzhou University?

18  A.   Just looking through to make sure.  No, I do not.

19  Q.   I want to go to page 8.  This is the full details of

20  individuals who have worked on this project, and I want to

21  focus in on Dr. Tao.

22  A.   Okay.

23  Q.   And we already went over this, but it says no international

24  collaboration and no international travel, right?

25  A.   Correct.

1    Q.    So what would NSF have done if the international

2    collaboration on there said yes?

3    A.    Then we would expect some type of a change in scope to be

4    submitted to us.  So we saw before that there was this document

5    that requested a transfer of the grant to another institution.

6    If there were international collaborators, any type of

7    collaborator that were part of the project, we would request

8    that information also be sent to the program officer to let us

9    know, for the program officer to review, and make sure that

10   it's okay and consistent with the grant.

11   Q.    So is it kind of the same process we talked about with the

12   current and pending, which is that NSF had a variety of options

13   it might take, but it needs the information in order to assess

14   which option is most appropriate based on NSF's interests, the

15   university's interests, and the PI's interests?

16   A.    Correct.  So for instance, if there's a collaborator added,

17   that might be a really good thing and the program officer might

18   then say, you know, make sure that you amplify your results

19   even more because we want to highlight that collaboration.  It

20   could be that the collaboration means that the collaborator is

21   doing some of the work that NSF is paying the researcher to do,

22   and so in that case there might be a negotiation to reduce

23   again the scope and the amount of funding given to that

24   researcher.  So there are a variety of different things,

25   options.  That's why we need to know the information.

1   Q.   Didn't you say when we started, I think earlier today, that

2   your old job was to actually work on international

3   collaborations?

4   A.   Correct.

5   Q.   So the NSF supports international collaborations in certain

6   contexts, right?

7   A.   Absolutely.  When it is true collaboration, we're very

8   supportive.

9   Q.   And what do you mean by true collaboration?  What would be

10  sort of -- the opposite, I guess, would be false collaboration?

11  A.   Right.   True collaboration, and we think about it as

12  responsible internationalization.  And what that means is we

13  can very clearly identify the contributions of the U.S.

14  researcher and the international researcher and we can very

15  clearly identify the benefits to both.

16       And so the example I gave before of the Tokyo collaboration

17  where it was very clear that the Tokyo -- University of Tokyo

18  was doing the -- building the robots and the university doing

19  the modelling.  They shared and collaborated together.  That is

20  an instance of responsible collaboration.

21  Q.   That was a transparent relationship?

22  A.   It's open and transparent.  Everyone knew about it, it was

23  reported to NSF.  It was clear to us and to everyone.

24  Q.   Is that important to NSF that it be transparent?

25  A.   Yes, absolutely.  One of the big things -- I started by

1  talking about research integrity and the need to be very clear,

2  honest, and transparent about all parts of the research so that

3  we can trust the research.  And so it's very important to be

4  transparent about who you're working with, who you're

5  collaborating with, so that we can trust the research results

6  and make sure we're also responsibly giving out research

7  funding.

8          MR. BARRY:  Your Honor, may I have a minute, please?

9          THE COURT:  Yes.

10          MR. BARRY:  No further questions.

11          THE COURT:  Mr. Zeidenberg, would you like to start on

12  cross-examination or take a lunch break?  It's a quarter until

13  noon.

14          MR. ZEIDENBERG:  I mean, obviously we'll be going for

15  a while, so I mean, I can start and see how -- I mean --

16          THE COURT:  Okay.  We'll proceed for 15, 20 minutes

17  and when you think it's a good time to break for lunch, let me

18  know.

19          MR. ZEIDENBERG:  Thank you.

20                    CROSS-EXAMINATION

21  BY MR. ZEIDENBERG:

22  Q.   Good morning.

23  A.   Good morning.

24  Q.   I want to start, as we have been with a lot of the

25  witnesses in this case, by asking you when it was you first got

1    interviewed by the FBI in connection with this investigation.

2    Do you know when that was?

3    A.    I'm sorry, but I do not recall.

4    Q.    I'm sorry?

5    A.    Sorry.  I don't recall.

6    Q.    I'll help you, because I don't expect you to pull up a date

7    off the top of your head.  If I told you it was January 7,

8    2021, would that sound about right?

9    A.    Yes.

10    Q.    Okay.  And if I told you that Dr. Tao was arrested in this

11    case in August of 2019, that would have been -- January 2021

12    would have been about a year and a half after he was indicted,

13    correct?

14    A.    Correct.

15    Q.    Are you aware of anyone else at the NSF that was

16    interviewed about disclosure obligations that NSF expected to

17    be made, anyone else at NSF asked those questions prior to

18    Dr. Tao being arrested?

19    A.    I'm not aware.

20    Q.    And when you were interviewed that first time, did you have

21    a chance to go over your first -- the interview memorandum with

22    the FBI recently about the topics that you covered?

23    A.    I don't recall.  I think there was a request for the

24    interview provided to me with the topics, but I don't recall

25    the contents.

1    Q.   Okay.  And that's, again, fair enough.  It's been quite a

2    while since you were first interviewed, January 2020.  It's now

3    March of 20 -- I'm sorry, January 7, 2021 was when you were

4    interviewed, a year and a half later.  And it's now been more

5    than a year since then?

6    A.   Correct.

7    Q.   And if I were to tell you that, at least based on the

8    interview memorandum, there weren't -- doesn't appear that

9    there were any questions about how the disclosure rules changed

10   from 2017 or 2018 to 2020.  Does that sound right?

11   A.   That sounds right, yes.

12   Q.   You weren't asked about the evolution of the disclosure

13   obligations?

14   A.   I believe there was a question about what is -- what is

15   required in current and pending support and how we use the

16   information.  But I don't recall a question about any, you

17   know, revisions.

18   Q.   Right.  So when they asked you about that, they just said,

19   what are the rules about current and pending support, and you

20   were being interviewed in January 7, 2021, and you weren't

21   asked to focus necessarily on, all right, I want to take you

22   back in time to 2017, put on your 2017 lens and tell me how

23   things might have changed?

24   A.   I wasn't because, as I said, in my view, it has always been

25   this requirement to disclose all.

1   Q.   Okay.  And I didn't see -- and you tell me if I missed it

2   or it wasn't written in the report.  I didn't see any questions

3   asked of you about whether unpaid adjunct professorships needed

4   to be disclosed?

5   A.   I don't think there was a question, but I'm quite sure that

6   I did say when they asked me what needed to be disclosed in

7   current and pending support that it was all support, whether it

8   was paid or unpaid.

9   Q.   Specifically adjunct professorships, you don't recall that

10  being discussed?

11  A.   No, sir, I don't.

12  Q.   Do you remember -- because, again, I didn't see it in the

13  report -- any questions about foreign talent programs and

14  disclosures regarding them?

15  A.   There was not a question, but I did tell them that, again,

16  all support, whether it's a talent program, whether it's

17  research support from a domestic entity, that all needed to be

18  disclosed, and I do recall saying that.

19  Q.   But if it's an unpaid position, let's assume an unpaid

20  foreign talent position, an honorary position?

21  A.   If there was research involved in it, then yes, it does

22  need to be disclosed.

23  Q.   And you weren't asked that question, though, during the

24  interview, were you?

25  A.   I was not asked, but I did make it clear that -- as one of

1    my examples.

2    Q.    And there were no questions at all about honorary

3    positions?

4    A.    No, sir, there were no questions.

5    Q.    And I didn't see any questions at all about training that

6    were provided to PIs?

7    A.    Correct.

8    Q.    And you mentioned current and pending support and your view

9    that everything needs to be disclosed.

10    A.    Correct, if it's research support, yes.

11    Q.    And even if it's not intended for use on the project?

12    A.    Yes, correct.

13    Q.    And your view is that's always been the case?

14    A.    Yes.

15    Q.    And is it your view that that's always been understood by

16    researchers and people at NSF?

17    A.    I can't speak of course for the community, but certainly

18    that has always been clear in my view in the language of "all."

19    Q.    Are you aware that there are frequently asked questions on

20    current and pending support?

21    A.    Yes.

22    Q.    Available on the Internet?

23    A.    Yes.

24    Q.    Okay.  Do you know what it says there about in-kind

25    contributions?

1    A.    So in-kind contributions -- what year is this frequently

2    asked questions?

3    Q.    2020.

4    A.    2020.  Yes.

5    Q.    What does it say about in-kind contributions?

6    A.    In-kind contributions, if they are to be used on the

7    project, they need to be reported in the budget, right, in the

8    facilities and other equipment that's being -- that's part of

9    the proposal.  So -- and if it's in-kind research support,

10   again, whether it's monetary or not, it needs to be in current

11   and pending support.

12   Q.    What if it's not to be used on the project?

13   A.    Then it needs to be in current and pending support if it's

14   research support.

15   Q.    I want to show you what's been marked Exhibit 1460.  Do you

16   recognize that?

17   A.    Yes, I do.

18   Q.    This is the frequently asked questions available currently

19   on the Internet?

20   A.    Correct.

21         MR. ZEIDENBERG:  Your Honor, I move to introduce

22   Defense Exhibit 1460.

23         MR. BARRY:  No objection.

24         THE COURT:  1460, admitted.

25   BY MR. ZEIDENBERG:

1    Q.    Going down to number three, do I report in-kind

2    contributions with no associated time commitment in current and

3    pending support?  The answer:  If the in-kind contributions are

4    not intended for use on the project/proposal being proposed to

5    NSF and have no associated time commitment, the information is

6    not required to be reported.  Correct?

7    A.    Correct.

8    Q.    You agree with that?

9    A.    Yes.

10   Q.    At the end of your direct examination you said to

11   Mr. Barry, you said if NSF is alerted to possible

12   nondisclosure, that you need to determine, first, whether or

13   not the nondisclosure was intentional or whether it was

14   inadvertent or accidental, right?

15   A.    Correct.

16   Q.    Because you would agree that a nondisclosure, just because

17   it occurs, isn't necessarily a willful and intentional

18   nondisclosure?

19   A.    That's right.

20   Q.    The rules are complicated, right?

21   A.    I don't know how complicated.  I mean, to me, all means

22   all.  So it's not so complicated.  But again, if there's a

23   mistake, then we -- I allow it to be corrected.

24   Q.    And these researchers are incredibly busy --

25   A.    Yes.

1  Q.    -- people and they work extraordinarily hard and some of

2  them are not native English language speakers?

3  A.    Correct.

4  Q.    And their focus is necessarily on the science and not

5  necessarily on the paperwork, correct?

6  A.    Yes.

7  Q.    You would agree that mistakes can be made innocently?

8  A.    Yes.

9  Q.    And that before you assume the worst and assume just by,

10  you know, something missing, assume has to be intentional, you

11  want to do some investigation and ask some questions?

12  A.    Yes.

13  Q.    And talk to the person?

14  A.    Well, yes.  I wouldn't exactly.

15  Q.    Not you personally.  Not you personally.

16  A.    Right.

17  Q.    I mean, you said OIG would do it?

18  A.    That's right.

19  Q.    The program manager might be contacted and said, look, you

20  talk to your guys, this has been flagged, you know, let's see

21  what he says, sends him an e-mail.

22  A.    Yes.  And if it is something like that, the usual process

23  is to go to the awardee institution for that contact, because

24  of course we want -- everything goes through the awardee

25  institution.

1  Q.  Okay.  So in this case it would be the University of Kansas

2  research office?

3  A.  Correct.

4  Q.  And they would reach out and say, Franklin, could you come

5  in, we have some questions or, you know -- there's anomalies

6  here, there's things that aren't -- we think should be

7  reported.  Is there a reason why they're not here?

8  A.  Of course, and we expect the awardee institution to look

9  into it, but we don't usually have clarity, you know -- we

10  don't have visibility into how they look into it.

11  Q.  Are you aware that that never occurred here?

12  A.  I was not aware.

13  Q.  Are you aware that the first time Dr. Tao was alerted that

14  there was a problem with these grants was when he was placed in

15  handcuffs?

16       MR. BARRY:  Objection, misstates the record and

17  assumes facts not in evidence.

18       THE COURT:  I'll sustain and ask the jury to disregard

19  that question.

20  BY MR. ZEIDENBERG:

21  Q.  Are you aware that the first notification he got was when

22  he was arrested and indicted?

23       MR. BARRY:  Same objection.

24       THE COURT:  Is there support for that question -- or

25  that framing in the record?

1    BY MR. ZEIDENBERG:

2    Q.    Are you aware that he was never interviewed by anyone at

3    the University of Kansas or the National Science Foundation

4    before he was arrested?

5    A.    I'm not aware.

6    Q.    Now, you said -- the other night before you were getting

7    ready to testify, it appears you did a little Google research

8    just to -- you know, I guess you were interested or curious

9    about what you could find about Dr. Tao in China and these

10   allegations, which I can imagine you were curious?

11   A.    Yes.

12   Q.    And that you found some results on the Internet and you

13   sent them to Agent Lampe?

14   A.    Yes.

15   Q.    And I'm going to show you what's been marked Exhibit 1459.

16   Are these the Internet search results you came up with?

17   A.    Yes.

18           MR. ZEIDENBERG:  And I move to introduce Government

19   [sic] Exhibit 1459.

20           MR. BARRY:  I have a question about where

21   Mr. Zeidenberg -- my understanding is this is attached to an

22   e-mail?

23       (Confer with government counsel.)

24           MR. BARRY:  No objection.

25           THE COURT:  Exhibit 1459, admitted.

1    BY MR. ZEIDENBERG:

2    Q.   And you sent an e-mail with this screenshot or link and you

3    said to Agent Lampe, Hi Stephen, it may not be allowable -- by

4    the way, that's fine, you're allowed to do whatever you want to

5    do, so you're not in trouble.  At least from me.

6        It may not be allowable, but I just want to let you know in

7    doing a simple literature search I found the following.  And

8    you noted that these were public -- publicly available

9    websites.

10   A.   Correct.

11   Q.   Government websites?

12   A.   Publicly available.

13   Q.   American Chemical Society publication from 2019.  I'll put

14   the e-mail -- I don't have --

15       (Defense counsel confer with government counsel.)

16           MR. ZEIDENBERG:  We'll make this part of 1460.  It's

17   just the e-mail.

18           THE COURT:  Exhibit 1460?

19           MR. BARRY:  I think it should be 1459, unless you want

20   to combine it.

21           MR. ZEIDENBERG:  We'll combine it.  Mr. Barry corrects

22   me, it's 1459 is the e-mail and the screenshot.

23           THE COURT:  1460 is the attachment.

24           MR. ZEIDENBERG:  1459 is the attachment and the

25   e-mail.

1          THE COURT:  So we don't need to mark -- what you just

2    gave me is part of 1459?

3          MR. ZEIDENBERG:  Yeah.  I misspoke.  I move to

4    introduce the other part of 1459.

5          THE COURT:  Any objection?

6          MR. BARRY:  No objection.

7          THE COURT:  1459, admitted.

8    BY MR. ZEIDENBERG:

9    Q.   This is what you found with your Internet sleuthing.  You

10   said that, I just wanted to let you know in doing a simple

11   literature search I found the following.  And by the way, how

12   do you -- what did you Google to do that?

13   A.   I went into Web of Science, which is an open -- open

14   database that anyone can access.

15   Q.   Then what did you do?

16   A.   I just searched for this gentleman's name because I knew I

17   was -- I wanted --

18   Q.   Feng Tao?

19   A.   Uh-huh.

20   Q.   Tell us what came up.

21   A.   So publications came up and I looked into the affiliations

22   that were listed with the publications about -- from the

23   coauthors.

24   Q.   And I'll show you that.  Why don't we start with -- what do

25   you see there?

1  A.    So I see, you know, authors with international

2  affiliations.

3  Q.    This is Understanding Catalyst Surfaces During Catalysis

4  Through Near Ambient Pressure X-ray Photoelectron Spectroscopy?

5  A.    Yes.

6  Q.    And it lists Franklin Tao and it lists two affiliations,

7  one University of Kansas and one Fuzhou University?

8  A.    Correct.

9  Q.    And then another paper, synergy of single atom -- and I

10  won't read the rest of it.  Author, Franklin Tao.  Institution,

11  University of Kansas.  Country, country also list People's

12  Republic of China?

13  A.    Correct.

14  Q.    I'm sorry.  Franklin Tao, it says -- right under author,

15  Fuzhou University, University of Kansas?

16  A.    Correct.

17  Q.    And the third one, Studies of Surface Metal Nanoparticles

18  in a Flowing Liquid with XPS.  It lists Franklin Tao.

19  Institution -- author.  Fuzhou University, University of

20  Kansas?

21  A.    Correct.

22  Q.    And the fourth one, In Situ Formation of Isolated

23  Bimetallic, and I won't read the rest of that.  And it lists

24  again, Franklin Tao, author.  Fuzhou University, University of

25  Kansas?

1    A.    Correct.

2    Q.    How long did your investigation take?

3    A.    30 minutes.

4    Q.    Okay.  And you said you could just go -- anyone could go to

5    that website and people -- I take it people who are in the

6    field of science know these -- this is a go-to place?

7    A.    They would.  Usually they would not look in detail at the

8    acknowledgment section.  They want the content of the

9    publication, but yes.

10   Q.    But going back to what we were just talking about being

11   deliberately hiding versus just failing to understand the rules

12   and not reporting things that should have been reported, does

13   the fact that Dr. Tao had these listed on publicly-available

14   websites, would that be one of the things that you would be

15   considering whether this was intentional or whether it was

16   inadvertent failure?

17   A.    So the concern that I would have is that these publications

18   came out after NSF gave the funding to Dr. Tao, so they weren't

19   in anything related to proposals or annual reports and they

20   just came up in publications after, after the fact.

21   Q.    But if you understood the rules, and you knew you couldn't

22   have dual and you were trying to hide that, certainly you --

23   the author can -- has authority over what acknowledgment --

24   what he puts in his acknowledgment?

25             MR. BARRY:  Objection, speculation and assumes facts

1  not in evidence.

2         THE COURT:  Overruled.

3  A.   I -- I don't think that I can speculate about what he knew

4  and what he didn't know.  I just can say that I sent this

5  because I was very surprised that this information was not

6  provided to us earlier and came up in a publication after the

7  funding.  So that was what very much concerned me.

8  BY MR. ZEIDENBERG:

9  Q.   And are you aware that the allegations in this case

10  involving FZU and when he took a position there was May of

11  2018, which was after these grants were funded?  Did you know

12  that?

13  A.   No, I did not.

14         MR. ZEIDENBERG:  Your Honor, I think this is a good

15  place to stop for lunch.

16         THE COURT:  Okay.  All right.  Let's reconvene at

17  1:15.

18     (Recess.)

19     (The following proceedings occurred outside the presence of

20  the jury.)

21         THE COURT:  Are we ready for the jury?

22         MR. BARRY:  Yes, Your Honor.

23     (The jury entered the courtroom, after which the following

24  proceedings were had.)

25         THE COURT:  You can be seated.

1      You can resume, Mr. Zeidenberg.

2  BY MR. ZEIDENBERG:

3  Q.   Good afternoon.

4  A.   Hello, good afternoon.

5      MR. ZEIDENBERG:  Ladies and gentlemen.

6  BY MR. ZEIDENBERG:

7  Q.   I want to go back to some questions you were asked about on

8  direct examination, and you were talking about disclosures, and

9  I believe you said that it was extremely important these

10 disclosures -- that they be made because, among other things,

11 that it's extremely important that PIs actually do what they

12 say they're going to do?

13 A.   Correct.

14 Q.   And are you aware of any allegations in this case that any

15 of the work on the NSF grants at issue was not done in the

16 manner prescribed?

17 A.   I'm not aware.  I think what's challenging, just to explain

18 a little bit more, is if someone has not disclosed that they

19 have an affiliation or are doing research somewhere else, then

20 they might be doing that NSF funded research in another place

21 using other equipment that they haven't told us either.

22      And so it makes it very difficult then to trust that the

23 research was done as the researcher had told us they were going

24 to do it.

25 Q.   I understand what the concerns are.  My question, again,

1    is, are you aware of any allegations in this case that the

2    research that was proposed was not done precisely as it was

3    supposed to be done?

4    A.    No, I'm not aware.

5    Q.    One of the things you said is the only way to trust

6    research results is if you know where the work is being done;

7    is that right?

8    A.    Correct.

9    Q.    And if a -- the -- is it fair to say that the scientists,

10   the PIs involved in a great many of these grants that NSF does,

11   for one thing, they have teaching responsibilities, correct?

12   A.    Correct.

13   Q.    And they often are working on multiple grants?

14   A.    Correct.

15   Q.    And they're extraordinarily busy, hard-working individuals,

16   generally speaking?

17   A.    Yes.

18   Q.    And that they speak at conferences all over the world?

19   A.    Yes.

20   Q.    They travel internationally extensively, collaborating with

21   other university and research facilities?

22   A.    Yes.

23   Q.    And that when they go and -- so they're away from their

24   lab; they're not in the lab necessarily behind, you know, doing

25   experiments themselves.  They have graduate assistants doing

1    that work, generally speaking, correct?

2    A.   Sometimes, yes.

3    Q.   And that they are supervising all the work and they are

4    responsible for directing the work and then helping get this

5    published?

6    A.   Depending on the research project.

7    Q.   And fair to say that a lot of that work can be done while

8    these PIs are on airplanes flying in far-corner places?

9    A.   It depends on the research project for sure.

10   Q.   Just because they're traveling while they're working on

11   that, they're e-mailing their graduate assistants and they're

12   getting results and they're looking at data and they're

13   directing how to do the next step, that's no reason to question

14   the integrity of the project that NSF has funded, correct?

15   A.   Depending, I think, on what they are doing internationally,

16   if they're doing something that might present a conflict, of

17   course that would be concerning and depending if the research

18   project needs that direct, in-person oversight.

19   Q.   You said that NSF rarely provides support for foreign

20   organizations?

21   A.   Correct.

22   Q.   And are you aware of any allegations in this case that NSF

23   funds were used to support foreign organizations?

24   A.   I'm not aware.

25   Q.   I can hear an echo when I get too close.  So I don't want

1  to drive them away.

2      Do you have any idea why Mr. Barry was asking you questions

3  about NSF, whether or not it funds -- provides support for

4  foreign organizations if it has nothing to do with any of the

5  allegations in this case?

6  A.   I'm not aware.

7  Q.   You talked a little bit about authorized organizational

8  representative?

9  A.   Yes.

10 Q.   And that is the person at the institution, correct?

11 A.   Correct.

12 Q.   And we've talked about this with the jury, and I'm sure

13 when you're talking to people about your work, that there's a

14 lot of misconceptions about how funding works?

15 A.   Uh-huh.

16 Q.   So let me just run through it with you and you tell me if

17 I've got it correct.

18 A.   Sure.

19 Q.   Even though in the vernacular PIs may refer to their grant,

20 it's not really the PI's grant, correct?

21 A.   It's not theirs, it is the institution's, the awardee's.

22 Q.   And the institution gets the money?

23 A.   Correct.

24 Q.   And then they -- the money is paid out to support the

25 research?

1    A.    Correct.

2    Q.    And the money, if you know, doesn't go from the research

3    institution to the PI for him to buy things; he tells the

4    organization -- or the institution what he needs and they buy

5    him the required supplies?

6    A.    Usually, yes.

7    Q.    And so the organizational representative is someone like --

8    in this case would be someone from KU?

9    A.    Yes.

10   Q.    And they sign and authorize and certify the actual

11   paperwork?

12   A.    Yes.

13   Q.    And does NSF rely on that authorization?

14   A.    Yes.  We rely on that authorization and we rely on the

15   institution to ensure that they are able to get all of the

16   information they need from the PIs.

17   Q.    And when there are questions about things, does NSF go to

18   the person who signed the authorized organizational

19   representative for that grant?

20   A.    So it depends.  So -- the reason I say that is the program

21   officer usually then works directly with the principal

22   investigator.  If from a -- an administration standpoint

23   somebody like me has a question, I would go to the institution.

24   But the program officer receives annual reports directly from

25   the principal investigator, not through the institution, the

1    program officer goes directly to the PI to do things like

2    update their current and pending support information.

3    Q.    And what obligations does the organization and the funding

4    institution -- are they supposed to work with the PIs to make

5    sure that everything is done properly?

6    A.    Yes.

7    Q.    Fair to say that that's a shared responsibility that this

8    is done correctly?

9    A.    Yes, a shared responsibility.

10   Q.    And if the research office is aware that there's a pending

11   funding grant with a foreign university, is that something that

12   the research office should be sure to flag for NSF?

13   A.    Yes.

14   Q.    You mentioned -- and by the way, when it comes to the

15   organizational -- what did we call it --

16   A.    AOR, authorized organizational representative.

17   Q.    When it comes to the AOR, is that AOR who signs supposed to

18   have personal knowledge of the information?

19   A.    Yes.

20   Q.    Or can they just delegate it to let someone else sign for

21   them?

22   A.    They're supposed to have personal knowledge if they're the

23   ones responsible for pushing the electronic signature, yes.

24   Q.    Mr. Barry asked at some point about collaborations and

25   other affiliations.

1    A.    Yes.

2    Q.    And we were looking at page 14 of the PAPP Guide from 2017.

3    Do you have that there?

4    A.    I do.

5    Q.    It's also on your screen if that's -- makes it easier.

6    A.    Okay.  Thank you.

7    Q.    So Mr. Barry was reading this or maybe having you read all

8    the things that need to be identified.  The following

9    information regarding collaborator and other affiliations must

10   be separately provided for each individual identified as a

11   senior project personnel, and he went through all these

12   different categories and showed you that nothing was listed for

13   Dr. Tao.  Do you remember that?

14   A.    Yes.

15   Q.    And at the bottom here, it says what the purpose is for

16   this section, and it says that the information is used to help

17   identify potential conflicts or bias in the selection of

18   reviewers?

19   A.    Correct.

20   Q.    So this section here is not meant to identify conflicts of

21   interest for the PI.  It's meant to identify -- help identify

22   conflicts of interest for the reviewers?

23   A.    Correct.

24   Q.    So if the reviewers happen to have an unduly close

25   relationship with the PI, that they're not biased in his favor?

1    A.    Correct.

2    Q.    And you're not aware of that being an issue in this case,

3    are you?

4    A.    I'm not.  I do have to say this is different than the

5    collaborator's information that's provided in annual reports,

6    just to make that clear.

7    Q.    Right.

8    A.    Yeah.

9    Q.    I want to see if you -- something you said about

10   biosketches jumped out at me and I wanted to know if maybe you

11   misspoke or if I just -- maybe I have some more questions to

12   ask you about it.

13       But is it fair to say the purpose of the biosketch is to

14   determine the qualifications of the PI?

15   A.    Yes.

16   Q.    And to see whether they are qualified to do the work?

17   A.    Yes.

18   Q.    Okay.  And that's -- that is it, that is why it's there,

19   correct?

20   A.    That's why it's there.

21   Q.    Okay.  And I thought you had mentioned something about

22   conflict of interest, but that's something else, correct?

23   A.    So as a program officer's overall responsibilities, if they

24   see anything in the proposal, which is what I meant, so if they

25   find anything in any of the sections of the proposal that

1  raises a red flag to them about a potential conflict of

2  interest, it's their responsibility to raise that.

3  Q.    Okay.  But it's not ambiguous.  The purpose of the

4  biosketch is to determine qualifications?

5  A.    That's right.

6  Q.    And current and pending support, you said that you would

7  expect foreign research money to be reported.  It would matter

8  to NSF.  What about in a situation where there was no actual

9  foreign research dollars flowing, but there were pending

10  support?  Is that a little bit different?

11  A.    A pending as well is also required to be disclosed.

12  Q.    It's different, right?

13  A.    It's in the same section.

14  Q.    We'll get to it.  Is it fair to say there's a difference

15  between active support and pending support?

16  A.    Yes.  That is why of course the program officer asks for

17  updates.

18  Q.    And it's fair to say that, as we talked about, PIs would,

19  generally speaking, have a lot of pending matters or frequently

20  would have pending grants outstanding because only one in five

21  grants get funded?

22  A.    That's correct.

23  Q.    So they have to have sort of a lot of lines in the water at

24  all times hoping, knowing that a small number are going to get

25  funded?

1    A.   Correct.

2    Q.   So there was another section of the PAPP Guide that

3    Mr. Barry went over with you on collaborative proposals where

4    two organizations are getting NSF research funds.  Do you

5    remember being asked about that?

6    A.   Yes.  It's a collaborative proposal if you're getting

7    research funds or if you're just having more than one

8    participant in the research, one entity participate in the

9    research.

10   Q.   Okay.  This is on page 34.  And Mr. Barry went over this

11   with you, and it said a collaborative proposal is one in which

12   investigators from two or more organizations wish to

13   collaborate on a unified research project.  Collaborative

14   proposals may be submitted to NSF in one of two methods.

15       Are you aware of any allegations in this case that NSF was

16   funding a second research project?

17   A.   I'm not aware.

18   Q.   There was another matter that Mr. Barry covered with you

19   talking about changes in objective or scope of an NSF grant

20   cannot be done without NSF approval?

21   A.   Correct.

22   Q.   And went over and did some Googling over the lunch break,

23   and on the NSF website, it said change of scope, and it gave

24   the definition or a description of that and it said neither the

25   phenomena under study, nor the objectives of the proposal or

1    agreed modifications thereto should be changed without prior

2    NSF proposal -- approval, I'm sorry.  Does that make sense?

3    A.    Yes.

4    Q.    Okay.  Is that your understanding as well?

5    A.    That's my understanding of scope, but there are also of

6    course other changes in the grant where you request -- need to

7    request approval as well.

8    Q.    Okay.  When you're talking about change of scope, you're

9    talking about the phenomena under study or the objectives of

10    the proposal, the end result, what the proposal is all about?

11    A.    Correct.

12    Q.    Scientific goals.

13        And are you aware of any allegations in this case that for

14    the NSF proposals that there was any change in the phenomena

15    under study or the objectives of the proposal?

16    A.    I'm not aware.

17    Q.    Mr. Barry asked you about a progress report in Exhibit 57.

18    I want to give you a chance or let the jury see that exhibit

19    again.  Do you have 57 there?

20    A.    Yes, I do.

21    Q.    And this is what it looks like.  And this was the NSF grant

22    on which Dr. Tao was listed as a co-PI?

23    A.    Yes.

24    Q.    And this is one of those progress reports; it's a -- the

25    grant was submitted some years earlier and you have to do an

1    update?

2    A.    That's right, every year.

3    Q.    Every year.  And I'm going to skip ahead to the questions

4    that were asked.  First it asks what individuals have worked on

5    the project.  And then on the next page it lists the

6    individuals, and it lists Philippe Sautet, who is the PI, and

7    Franklin Tao and a bunch of other people.

8        And then it asks a series of questions.  And it asks what

9    is the impact on the development of the principal disciplines

10   of the project?  What is the impact on other disciplines?  What

11   is the impact on development of human resources?  What is the

12   impact on physical resources that form infrastructure?  What is

13   the impact on institutional resources that form infrastructure?

14   Do you see those?

15   A.    Yes.

16   Q.    What is the impact on information resource that form

17   infrastructure?  What is the impact on technical transfer?

18   What is the impact on society beyond science and technology?

19   I'm almost done.  And then there's -- that's it.

20   A.    Yes.

21   Q.    And there are no questions in that progress report about

22   current and pending support, correct?

23   A.    No.  There are not.  There are things of course in the back

24   about changes that might have an impact on expenditures, but

25   not changes in current and pending support.

1   Q.   And there were -- somewhere in here there was a question

2   about foreign travel?

3   A.   Yes.

4   Q.   I'd like to ask you about that.  I take it the foreign

5   travel applies to -- NSF is concerned about foreign travel done

6   in connection with this grant?

7   A.   Correct.

8   Q.   Okay.  If someone goes on a honeymoon to Cancun, don't need

9   to report it?

10  A.   That's right.

11  Q.   If they go to a conference in Belgium, don't need to report

12  that international travel?

13  A.   Right.  Only if you're away from your grant for a

14  significant amount of time.

15  Q.   Or paying for the travel?

16  A.   Exactly.

17  Q.   And Mr. Barry asked you at one point about an intern, high

18  school intern?

19  A.   Yes.

20  Q.   And that you said is actually important, surprisingly

21  enough, that NSF wants that to happen?

22  A.   Yes.

23  Q.   And if that unpaid intern happens to be Dr. Tao's nephew,

24  is that something that, in your experience, would be material

25  in a decision whether or not to fund a grant?

1    A.   Not material in a decision, but I think it's concerning

2    because it's not really the intent of that type of education,

3    educational outreach.

4    Q.   But it's an unpaid position, so that that would

5    obviously -- it would be very different, we would agree -- or I

6    assume you would say, if there were money flowing to a relative

7    of anyone involved in the grant, that was something that would

8    matter to NSF?

9    A.   That would be a conflict.

10   Q.   At the end you were talking about the clarifications to the

11   PAPP Guide and you said there was additional language to

12   provide clarification to listing current and pending support

13   even if no money was involved?

14   A.   Correct.

15   Q.   And I take it -- and let me go on to some of the other

16   things that you said were -- you called it clarifications.  Any

17   support, domestic or international, needed to be made more

18   clear, correct?

19   A.   Yes.  We always want to be more clear, so yes.

20   Q.   And overlap in research, you wanted there to be sure

21   there's no overlap.  So at the risk of stating the obvious, it

22   is fair to say that some determination was made that the

23   language you were using could be improved upon and that's what

24   you tried to do?

25   A.   Always, yes.  Absolutely.  We try in all sections to do

1    that.

2    Q.   And I take it the reason you determined that -- you may

3    have thought it was clear before?  Did you think it was clear

4    before?

5    A.   I did.

6    Q.   But I take it there was some internal reasons where your

7    organization determined that perhaps it wasn't as clear as

8    maybe you thought it was and it should be made more clear?

9    A.   I think there's always that feedback, so -- and usually it

10   happens because somebody from the community will ask a question

11   of a program officer, do I need to disclose this grant, even if

12   it comes to me as an individual and not to the institution, and

13   the program officer will clarify, yes, you do and then of

14   course they will disclose it.  And so we think, oh, you know,

15   they asked that question, so we better make that more clear in

16   the requirements.

17   Q.   And that example that you just gave is one that is

18   important, right?  And to clarify for the jury since I know it

19   took me a long time to understand the distinction, and I'm sure

20   just going by once that it may go by too fast.  Normally

21   speaking, you know, and let's say we're talking about this

22   case, KU is the funding institution -- well, NSF is the funding

23   institution.  The recipient of the grant is KU and they

24   administer the grant?

25   A.   Uh-huh.

1    Q.  But there are also situations -- and it's -- I think

2    it's -- it's probably fairly unambiguous or easier -- that's

3    sort of the paradigm case, would be another grant coming to --

4    administered to KU to the same PI from the Department of Energy

5    or from NIH?

6    A.  Yes.

7    Q.  And it could be similar to something that NSF was doing,

8    correct?

9    A.  Correct, it would be similar.

10   Q.  And so then that would be a high priority to know about,

11   because you've got two federal agencies involved and the

12   potential for U.S. taxpayer dollars to pay for the same

13   research twice, the potential, correct?

14   A.  Yes.  But we would want -- even if it's not another U.S.

15   government agency, if anyone is paying for the same research,

16   then we wouldn't want to pay for the same thing.

17   Q.  Right.  Okay.  But in any event, if it's coming through the

18   same institution, first of all, it would be easier for the

19   institution to be aware of what they're administering?

20   A.  Correct.

21   Q.  So they should help flag those, correct?

22   A.  One would hope.  As I said, it's a shared responsibility.

23   Q.  So for instance, if KU were administering foreign grants on

24   behalf of Dr. Tao where he's the PI and they're administering

25   them, then it would be a shared responsibility between KU and

1    Dr. Tao to inform NSF if there's a grant proposal?

2    A.    Yes, correct.

3    Q.    And it's not all Dr. Tao's responsibility and it's not all

4    KU's responsibility?

5    A.    Correct.

6    Q.    But both of them should know?

7    A.    If it comes through the institution, yes.

8    Q.    And although errors get made and people overlook things,

9    but that's one somebody should know about?

10    A.    One would hope.

11    Q.    Right.  And then there's another situation that's different

12    than this paradigm, which is probably infrequent, but not

13    unheard of, and that would be when the PI has an independent

14    relationship with another institution, right?

15    A.    Correct.

16    Q.    And so he's getting a funding grant, but it's not -- it's

17    not associated.  It would be a foreign grant.  I think -- I

18    guess it would be sometimes from private institutions?

19    A.    Sometimes.

20    Q.    Like a corporation, Dow Chemical or, I don't know,

21    something like that?

22    A.    That's right.

23    Q.    Ford Foundation?

24    A.    Correct.  Absolutely.

25    Q.    Or it could be some prestigious Scotland -- some university

1    in England and they're in Oxford and they're funding something.

2    And NSF would not know about that and KU would know not about

3    that?

4    A.   Correct.

5    Q.   And I take it there was a period of time, was there not,

6    during -- before 2020 when it was less than -- you found

7    instances when PIs were unaware of their obligation to report

8    that type of funding support?

9    A.   I found that there were times questions about that that

10   were asked, that do I need to report this or not.  So there

11   were questions.  I don't know if there was a lack of

12   understanding, but certainly they wanted clarification.

13   Q.   And then you endeavored to make it more clear?

14   A.   Exactly.

15   Q.   Okay.  So back in the timeframe of 2015 to 2018 or 2019,

16   did NSF provide any mandatory training to PIs on their

17   disclosures obligations?

18   A.   NSF did not, no.

19   Q.   So someone like Dr. Tao is left to -- or to read through

20   this PAPP Guide and read those instructions?

21   A.   Yes, it is a responsibility that we expect of the

22   researchers in exchange for the obligations that are part of

23   receiving federal funding.

24   Q.   The 2017 PAPP Guide is 154 pages.  It's a long document?

25   A.   Yes.

1    Q.   Okay.  Lots of provisions?

2    A.   Yes.

3    Q.   And we've already talked about the fact that because it's a

4    lengthy document and it's a lot of different provisions and

5    there is no training, the mere fact standing alone that there

6    was a -- something wasn't followed isn't in your mind proof

7    that it was done deliberately?

8    A.   Correct.  We provide a checklist to help even more, right,

9    knowing that there are a substantial amount of responsibilities

10   for disclosure, so we do have that checklist to assist in that.

11       But certainly we offer the opportunity to correct mistakes.

12   Q.   And you're aware that many of your PIs are not native

13   English speakers, correct?

14   A.   Yes.

15   Q.   And just the table of contents alone in this PAPP Guide,

16   Mr. Barry sort of flipped through it, but I want to just -- so

17   everyone can see it, this is page 1, this is page -- and I

18   mean, there's just topic after topic after topic.  And some of

19   these look pretty important.  I suppose maybe they're all

20   important.

21   A.   Yes.

22   Q.   I mean, grant administration, award administration, and

23   monitoring of grants.  Grantee standards, allowability of cost

24   of other post-award requirements and considerations, and

25   anyway, a lot of stuff?

 1    A.    Yes.  And we make it available of course on the web with

 2    HTML so you can click on the sections as well.

 3    Q.    But we've already talked about how incredibly busy these

 4    PIs are.  Do you think -- or have you talked to any PI that

 5    have actually confessed to have read that entire document?

 6                MR. BARRY:  Objection, calls for hearsay.

 7                THE COURT:  I'll sustain to the form of the question.

 8    BY MR. ZEIDENBERG:

 9    Q.    Do you believe that your PIs are actually reading the whole

10    thing?

11    A.    I hope so.  We try to make it as clear as possible.  We

12    also hold several outreach sessions to the community every year

13    where we go through and we explain all of the different

14    sections.

15    Q.    But some sections -- is it fair to say some sections are

16    more important than others?

17    A.    It's hard to prioritize, as you can imagine.  For me

18    they're all important.  I'm the policy person.

19    Q.    You're like the mom.  They're all -- all your children are

20    important.  All those sections are important?

21    A.    That's right.

22    Q.    But to -- well, if they're all important, then it's hard to

23    tell anyone to -- which ones to focus on where you can most

24    likely get tripped up?

25    A.    Correct.  I think we put an emphasis on the fact that

1  they're all important and we also are very clear about why we

2  need the information.

3  Q.   Did you say something about you offer the opportunity to

4  correct mistakes?

5  A.   Yes.

6  Q.   And tell us about that.

7  A.   So at any point, and that's why there's the close

8  relationship between the program officer and the PI on an

9  ongoing basis, so that relationship is an opportunity to always

10  provide information back to the program officer to correct

11  information that wasn't there or was wrong in the first place.

12  It's always a thing.

13      And as we saw through these regular interactions, such as

14  right before award, being able to update your current and

15  pending support, that's an opportunity, but there's always that

16  communication path with the program officer.

17  Q.   But you got a situation where you say you can always

18  correct things that you've gotten wrong, but sometimes, you'd

19  agree with me, you don't know you've gotten something wrong

20  until someone tells you you've gotten something wrong?

21  A.   Correct.  If somebody tells you you've gotten something

22  wrong and you say, you're right, I really should have told you

23  this, then we consider that a good opportunity as well.

24  Q.   Okay.  And if that opportunity wasn't provided to Dr. Tao

25  in this case to address any of these alleged mistakes, then

1  that would be different than what you typically do in your

2  cases?

3         MR. BARRY:  Objection, facts not in evidence and

4  misstates the record.

5         THE COURT:  Sustain to the form of the question.

6  BY MR. ZEIDENBERG:

7  Q.  If that wasn't done in this case, then there wasn't an

8  opportunity, like you're talking about, to correct mistakes,

9  right?

10 A.  Well, often we don't know what we don't know, and so if the

11 information had not been provided to us, we are -- we don't

12 even know to approach the PI to correct it.  So that's the

13 challenge we have.

14 Q.  Okay.  And if -- once there's a criminal case pending and

15 someone has been indicted, it's a little late for NSF to come

16 in, the program officer, and say, you want to sit down with us

17 and talk about why this wasn't included on your current and

18 pending support?

19 A.  Correct, correct.

20 Q.  Going back to this precise issue we talked about, about

21 whether foreign grants needed to be disclosed, and I want to --

22 well, you've only been in this position since 2020, correct?

23 A.  Correct.

24 Q.  And remind me where were you immediately prior to that?

25 A.  I was at the National Science Foundation heading the

1    international office, Office of International Science and

2    Engineering.

3    Q.    That was one in Japan?

4    A.    That was actually the main one at NSF.  So I oversaw all of

5    international.

6    Q.    How familiar were you with these issues that we're talking

7    about now back in -- prior to your current position?

8    A.    I've always been aware of the requirements as long as I've

9    been at NSF, of the requirements to disclose this information

10   in these different areas, because in the international office

11   of course I ran funding programs, and so I was very aware of

12   the need to disclose and how we assess this information.  I was

13   also part of the leadership team and we all worked together on

14   developing the best policy possible.

15   Q.    I mean, do you feel like you -- the reason I'm asking, I'm

16   trying to get a sense for what -- how familiar you were with

17   what was going on sort of out in the field in 2017, 2018, 2019,

18   before you took this position, because you may not have been

19   getting the same amount of feedback that you get now.

20   A.    Can you clarify about -- what was the question about what

21   was going on?

22   Q.    Yeah.  So the question about -- that we were talking about

23   earlier about foreign -- well, grants that -- foreign grants

24   that don't go through the same institution, that issue in

25   particular.  And so the requirement that that be disclosed and

1  whether -- how widely known that was or how much confusion

2  there might have been then, versus, you know, 2020, 2021, 2022.

3  Do you feel like you were -- have a sense back then or not?

4  A.   I had a sense that there certainly was funding -- actually

5  more than a sense.  Knowledge that there certainly was funding

6  coming from a lot of international institutions directly to the

7  researcher, and I was not aware of the level of nondisclosure

8  of those grants.  But of course in my international role I was

9  learning more and more about that direct funding from

10  international universities and trying to focus on international

11  policies to address that.

12  Q.   And so when you say you were unaware of the amount -- were

13  you saying that you were unaware that it was -- that that many

14  grants were being funded internationally or about whether you

15  were aware whether that was not being disclosed or wasn't --

16  people didn't realize it needed to be disclosed?

17  A.   I was unaware that these grants -- that there was a rate of

18  nondisclosure of these foreign sources of funding.  I certainly

19  was aware that there was funding going to individuals.  I

20  wasn't aware until around the 2018-2019 timeframe that there

21  was this issue of nondisclosure of especially these foreign

22  sources of funding.

23  Q.   So you did subsequently become aware that that was sort of

24  a blind spot?

25  A.   Somehow it was happening, and we wanted to understand why.

1   That's really why we commissioned this report that you've

2   probably heard of, called the JASON report which is a group of

3   scientific experts in the community.  And they do studies for

4   the government in areas of the intersection of science and

5   security.  So they did a study for us in 2019 because we were

6   finding this out, like, hmm, there are these foreign

7   affiliations and sources of funding that aren't being disclosed

8   to us, what is going on here?  So they did a study for us to

9   help us understand what was happening.

10  Q.   What did you learn?

11  A.   We learned that the study found that there were actions,

12  unfortunately from some other governments, to provide funding

13  directly to individuals in exchange for them having to sign

14  contracts that looked a lot like employment contracts and that

15  these were not being disclosed and so they found this in the

16  study.

17  Q.   And do you happen to know who Prakash Balan is?

18  A.   The name sounds familiar.

19  Q.   He's a program director at NSF.

20  A.   Yes.

21  Q.   Is he someone familiar to you?

22  A.   Not that familiar.  I've seen his name.

23  Q.   Okay.  Are you aware that Prakash Balan, as I said, the

24  program director, he testified as an expert witness at a trial

25  against someone named Percival Zhang.  Do you know who Percival

1    Zhang is?

2    A.    Yes, I knew through our Office of Inspector General.

3    Q.    That was a criminal case in Roanoke, Virginia involving an

4    allegation that the individual, among other things, didn't

5    disclose foreign grants, correct?

6    A.    That was one of the things.  It was really a combination,

7    as you know, of many different issues.

8    Q.    Right.  But this was one of the issues.  Was that a

9    nondisclosure of a foreign grant?

10   A.    Nondisclosure and then repeatedly lying about that

11   affiliation, yes.

12   Q.    And I don't know if you're aware or not, but are you aware

13   that Dr. Balan testified as an expert witness for NSF in that

14   case?

15   A.    No, I'm not.

16   Q.    Okay.  So this -- this case you probably do know was in --

17   September 2018 was that prosecution.  So this is just the

18   timeframe that you and I have been talking about?

19   A.    Yes.

20   Q.    And are you aware that during the preparation for that

21   case, Dr. Balan was interviewed by the FBI and asked whether it

22   was required -- NSF required foreign -- researchers of the

23   United States to report foreign sources of funding that went to

24   him directly, did you know that?

25            MR. BARRY:  Objection, relevance, and he's getting

```
 1   pretty close to asking for hearsay.
 2            THE COURT:  I'll sustain.
 3   BY MR. ZEIDENBERG:
 4   Q.  Would it surprise you to know that a program director
 5   called as an expert witness --
 6            MR. BARRY:  Same objection.
 7            THE COURT:  Counsel, approach the bench.
 8       (The following proceedings were had at the bench.)
 9            MR. BARRY:  The objection would be relevance.  It's
10   not relevant what some other NSF employee said in another
11   unrelated criminal matter.  The objection would also be calling
12   for hearsay.  Mr. Zeidenberg -- part of why I objected in the
13   middle of his question is because it seemed like he was about
14   to say, were you aware that this other witness said, and then
15   to introduce hearsay evidence into this -- not hearsay
16   evidence, but hearsay into this trial through his questions.
17            MR. ZEIDENBERG:  Your Honor, it's not hearsay.  I have
18   a good faith basis to ask this witness a question if she would
19   be surprised or would agree with Dr. Balan, what he told the
20   FBI.  Now, he was in error, so I'm not introducing it for --
21   just so I can back up and tell you.
22            When Dr. Balan was interviewed by the FBI, he was
23   asked, do you need to report -- should he have reported and
24   would you have expected to have seen an individual like
25   Dr. Zhang to report foreign funding that came to him directly?
```

1    And Dr. Balan said, no, I would not.

2              Now, at trial he was -- the FBI sent him the

3    regulations and he read them and he corrected his testimony and

4    he said, actually the regulations do require it.  And then he

5    said it's confusing.  And I don't expect researchers to

6    understand these rules better than I do.

7              Now, what I'd like to do is -- I'm not introducing it

8    for the truth of the matter, because what he said was false.

9    What I'm trying to do is ask this witness, if she would agree

10   that the rules are confusing, as he said, and that even

11   experienced program directors who are called as expert

12   witnesses by the government do not know these rules back in

13   2018 and --

14             THE COURT:  Let me stop you.  To the extent you're

15   asking her about the content of his out-of-court statements,

16   whether they're given to an investigator or sworn testimony,

17   that's hearsay.  And I think that's -- that's where it sounded

18   like you're headed, because you named him.  You spoke about him

19   being interviewed.  And I think you were beginning to speak

20   about him testifying, and so that was soliciting, in my view,

21   hearsay statements.

22             I think it's appropriate, though, for you to ask

23   whether she's aware that within her own organization there may

24   have been conflicting statements or views about this particular

25   issue.  I mean, because you're not asking for the content of

1    what somebody had said, just there have been conflicting

2    statements made by program directors or otherwise around this

3    particular issue demonstrates, perhaps, some confusion.  I

4    think that's a fair question.  It's not a fair question what

5    this person said to this FBI or what that person said or the

6    sworn testimony.

7            MR. ZEIDENBERG:  To be clear, Your Honor, obviously I

8    know the Court knows it's hearsay if it's being admitted for

9    the truth of the matter.  It's the opposite.  He did not know

10   the truth.  He had a wrong answer.  And that is what is

11   significant, is he didn't know the rules.  Not what he is

12   saying is true and he said it didn't need to be disclosed.  And

13   so that's the rule.  It's -- first he said it didn't and then

14   he said it did and then he said it's confusing.  So it's not

15   being admitted -- I'm not trying to prove anything other than

16   that the experts don't know the rules.

17           THE COURT:  Okay.  So I return to what I said before,

18   which is what he said at any particular point is not -- is not

19   important.  The point you're trying to get to is that he said

20   inconsistent things and demonstrated some confusion.  I think

21   that's an appropriate -- but to ask her to solicit or to speak

22   to what he said on this date versus what he said on that date

23   is asking her -- and, you know, one of those two statements, I

24   think, you are offering for the truth of the matter asserted.

25   You're trying to demonstrate, though, that he's giving

1    inconsistent answers.  I think you can do that without getting

2    to the content of his conflicting statements.

3                MR. ZEIDENBERG:  Okay.  Very well.

4         (Thereupon, the proceedings continued in open court.)

5    BY MR. ZEIDENBERG:

6    Q.   If I were to represent to you that in 2018 when Dr. Balan

7    was called as an expert, would it surprise you to know that he

8    expressed confusion about what the rules were?

9    A.   It does surprise me.

10   Q.   I'm sorry?

11   A.   It does surprise me, yes.

12   Q.   Because you think that they should have been clear enough

13   that an expert would have known them?

14   A.   I would certainly hope so.  Certainly we do now provide

15   training to program officers, which we started in 2019 to make

16   absolutely sure.

17   Q.   So this would have been subsequent?

18   A.   Correct.

19   Q.   So it was probably well-advised?

20   A.   It is surprising to me.

21   Q.   Now, going back to the changes in the PAPP Guide.  Would

22   you agree that there's something of a back and forth between

23   the community and your field about whether these are actually

24   clarifications or changes?

25   A.   I can't speak to the community's perspective, but certainly

1    that's why at the beginning of every PAPP Guide we do have this

2    section of what are significant changes and what are

3    clarifications.

4    Q.    So if -- do you know Alicia Reed at KU?

5    A.    No, I don't.

6    Q.    Okay.  If Alicia -- strike that.

7          So there's an expert panel that KU put on that's available

8    online.  I take it a lot of research universities do this; is

9    that correct?

10   A.    Yes.  Because of course they're serious about their

11   obligations too, absolutely.

12   Q.    Right.  So I want you to listen to what was said and I want

13   to ask you if you agree with this as being accurate or not

14   during that presentation.  Another institution has granted you

15   adjunct unpaid --

16             MR. BARRY:  Objection, hearsay.

17             THE COURT:  Wait a minute.  I'm sorry?

18             MR. BARRY:  Objection, hearsay.  He's reading an

19   out-of-court statement by a witness that's not here.

20             THE COURT:  Whose statement is that?

21             MR. ZEIDENBERG:  Your Honor, I'm asking her if she

22   agrees with the statement.  I'm not introducing this for the

23   truth of the matter.  I'm asking her if she agrees with the

24   statement.

25             THE COURT:  All right.  There's no official

 1    transcript, so just to be clear, this is a paraphrase of

 2    something you say someone said?

 3              MR. ZEIDENBERG:  Correct.

 4    BY MR. ZEIDENBERG:

 5    Q.   She says online another institution has granted you adjunct

 6    unpaid faculty status for the purpose of collaboration with

 7    their faculty member, you are required in this new wider

 8    disclosure to disclose any position that you hold, paid or

 9    unpaid, that's related to your research, so any adjunct or

10    honorary position that you hold is now to be disclosed.  I know

11    this is a much broader interpretation.

12         First, well, do you agree this is a broader interpretation?

13    A.   I do not.  I don't agree with that.

14    Q.   Okay.  So you think it's been clear all along?

15    A.   Yes.

16    Q.   If institutions are now under the belief that it was -- it

17    is much broader, does that suggest they did not understand

18    their previous obligations?

19    A.   I can't speak for whether they understood or not,

20    certainly.  But we, again, try to be as clear as possible about

21    what's new and what's a clarification, so certainly the

22    language was a clarification, as we stated.

23    Q.   And during that same panel, Ms. Reed's boss -- I'd like to

24    ask if you agree with this, an indication that he said that the

25    landscape is changing very quickly.  The federal government is

1    paying a lot of attention to conflicts of interest and

2    conflicts of commitment issues and we're constantly getting new

3    information and new requirements from the government.  Is that

4    fair?

5    A.    I don't agree.

6    Q.    You think that's unfair?

7    A.    I think that certainly these were not new requirements.

8    Q.    Okay.  Are you familiar with the Government Accountability

9    Office, otherwise known as the GAO, put out a report about some

10   of these issues back in late 2020?

11   A.    Yes, I'm aware.

12   Q.    And you've reviewed it in the past?

13   A.    Yes, I have.

14   Q.    And talking specifically about the NSF, the GAO said that

15   the NSF only has financial conflict of interest policies which

16   do not address foreign affiliations or activities.  Do you know

17   that?

18   A.    Yes.  And we actually have a response in that report where

19   we said we do not agree with the GAO because we do not

20   differentiate between domestic and foreign conflicts of

21   interest.  For us, a conflict of interest is a conflict of

22   interest.

23   Q.    Okay.  So the GAO did -- and that's the Government

24   Accountability Office.  You want to tell the jury what that is?

25   A.    It -- sure.  The Government Accountability Office works for

1    the United States Congress and so a member of congress will ask

2    them to do a study and analysis, sometimes an audit of

3    government agencies based on a particular question.  And so the

4    question that was asked by some congressional members was, what

5    is the policy about foreign conflicts of interest, and that's

6    what they wrote about.

7    Q.    Okay.  And they said GAO -- I mean NSF only has financial

8    conflicts of interest, which do not address foreign

9    affiliations, associations, or activities.  And you're entitled

10   to your opinion.  You disagreed with that assessment?

11   A.    Yes.  And in fact, it's in writing in our response to the

12   report.

13   Q.    That was from the director?

14   A.    From the director that we do not agree.

15   Q.    But fair to say they looked at it and they came to a

16   different conclusion?

17   A.    They did.  And of course that's why we're in a democracy,

18   we can disagree.  And so we did disagree on the distinguishing

19   between the domestic and international conflicts of interest.

20   Q.    In that response the NSF director indicated that the mere

21   holding of a professional appointment at an organization other

22   than one's own organization is not a per se conflict of

23   interest?

24   A.    That's correct.

25   Q.    And you agree with that?

1   A.   I agree.

2   Q.   And in that GAO report they talked also about foreign

3   talent programs?

4   A.   Yes.

5   Q.   And that universities found that they agreed that being a

6   member of a foreign talent recruitment program might not be

7   considered a nonfinancial conflict of interest if the

8   membership does not interfere with the researcher's

9   responsibilities to the university?

10  A.   Correct.

11  Q.   Okay.  And do you agree with that?

12  A.   Yes.  I agree with the "may."  That of course that talent

13  program needs to be disclosed to the home university and

14  assessed for conflict of interest, so it may or may not be one.

15  Q.   And there's no prohibition on a researcher who receives

16  grant funding from NSF being a member of a foreign talent

17  program?

18  A.   Correct, as long as it's disclosed.

19  Q.   And in fact, after you were interviewed -- you were

20  interviewed by the FBI in January, we talked about it, a year

21  and a half after the arrest, and at that time you told the FBI

22  there's no prohibition to a researcher being funded by a

23  foreign entity, correct?

24  A.   Correct, correct.

25  Q.   And you also told the FBI there was no prohibition on a

1    researcher participating in a foreign talent program?

2    A.   Correct.

3    Q.   And the GAO report stated there's no government-wide,

4    non-financial conflict of interest policy or guidance regarding

5    foreign academic appointments?

6    A.   They did conclude that.  We disagreed.

7    Q.   So you disagree with the GAO on that point?

8    A.   Correct.

9    Q.   Okay.  Do you -- well, I take it you -- do you agree or

10   disagree with this one, that the GAO said the absence of such

11   policy -- well, let me go back.

12        Do you agree with the GAO when it stated there's no

13   government-wide, non-financial conflict of interest policy or

14   guidance regarding the disclosing of foreign affiliations or

15   activities?

16   A.   So let me say that there is no government-wide policy.  I

17   agree with that.  I do agree that every funding agency,

18   including NSF, has conflicts of interest policy.  And I

19   disagree with the part of the GAO statement that says that

20   foreign affiliations are a conflict of interest.  So I think,

21   as we wrote in our response, I'm challenged by the overall

22   framing of that statement.

23   Q.   Okay.  And in that response, among other things, the NSF

24   director stated that the mere fact that an individual may hold

25   multiple appointments does not necessarily mean that he or she

1    necessarily lacks capacity to fulfill research?

2    A.    That's correct.  It has to be assessed.

3    Q.    Okay.  Let's talk about the grant approval process.

4    Actually I think we went through it.  I'll go through it with

5    you really quickly in case I missed anything.  The grants are

6    applied for by the institution, not the PI?

7    A.    Correct.

8    Q.    And Dr. Tao does not submit the paperwork to NSF, KU does?

9    A.    Correct.

10   Q.    And Dr. Tao does not receive the grant funds, KU does?

11   A.    Correct.

12   Q.    And NSF gets the grant application, in this case from the

13   research office at KU, and the NSF -- you have to say yes or

14   no.

15   A.    Yes.  Yes.

16   Q.    Thank you.  The NSF grant application then is looked at by

17   evaluators to look at the scientific merit?

18   A.    Correct.

19   Q.    And then they -- the evaluators look at the biosketch to

20   determine if the PI is qualified?

21   A.    Correct.

22   Q.    And to see if he has the capacity to do the work?

23   A.    The reviewer doesn't look at that.  The program officer

24   looks at that.

25   Q.    Fair enough.  The grant application does not include the

1   Kansas -- University of Kansas conflict of interest H.R. form,

2   correct?

3   A.   The written conflict of interest policy?

4   Q.   The one that's internal to KU.

5   A.   It does not include that.  We just require that they have

6   one in writing, yes.

7   Q.   Okay.  So NSF would never have seen the KU conflict of

8   interest form?

9   A.   Correct.

10  Q.   So in June 2020 NSF revised the current and pending support

11  section of its PAPP Guide, correct?

12  A.   Correct.

13  Q.   And before 2020 NSF did not state that current and pending

14  support included, quote, all resources made available to an

15  individual in support of and/or related to all of his/her

16  research efforts, correct?

17  A.   In 2017 we do say "all."  I'd have to look at the exact

18  wording, but "all" is in there.

19  Q.   Do you know what page that would be?

20  A.   Let's see.

21  Q.   What page?

22  A.   Let's see.  So it's page 30 in this -- in the dark table of

23  contents.

24  Q.   On page 30, did you say?

25  A.   Yes.  But I'm not sure the red numbers.

1    Q.    I'm going with the dark numbers.  Okay.  Okay.  I see it.

2    A.    Red page 56.

3    Q.    Can I see what you're --

4    A.    Sure.

5    Q.    So this is what it said in 2017?

6    A.    Uh-huh, correct.

7    Q.    It says, this section of the proposal calls for information

8    on all current and pending support for ongoing projects and

9    proposals, including this project and any subsequent funding in

10   the case of continuing grants.  All current projects' support

11   from whatever source, e.g., federal, state, local, foreign

12   government agencies, public or private foundations, industrial

13   or other commercial organizations must be listed.  Correct?

14   A.    Correct.

15   Q.    Now that language became broader, correct?

16   A.    It was clarified to make sure --

17   Q.    All right.  And the 2020 language says all resources made

18   available to an individual in support of and/or related to all

19   of his/her research efforts, correct?

20   A.    Correct.

21   Q.    Okay.  So whether you call that a clarification or a

22   broadening, it's different?

23   A.    Well, I think it's, again, the same.  You know, here we

24   have from all sources.  And anything that requires a portion of

25   time of the PI and any other senior personnel must be included

1    even if they receive no salary support from the projects.  So I

2    think that I read the language as very much the same.

3    Q.   The 2021 PAPP Guide was added and it said current and

4    pending includes in-kind contributions such as

5    office/laboratory space, equipment, supplies, employees,

6    students, correct?

7    A.   Correct.

8    Q.   So that was a further clarification?

9    A.   Yes.

10   Q.   Because I take it there was a determination made that

11   people didn't know that in-kind contributions such as

12   office/laboratory space needed to be disclosed?

13   A.   We got questions about it because when we have language

14   here saying that current and pending support needs to be

15   disclosed even if there's no salary, then we would get

16   questions like, well, what about office space, what about these

17   things, and our answer would be, yes, it has to be disclosed.

18   And so, again, in the spirit of wanting to be as clear as

19   possible, we did add that clarification.

20   Q.   And it did not state -- there was another change that said

21   that in 2021 you added "irrespective of whether such support is

22   provided through the proposing organization or is provided

23   directly to the individual"?

24   A.   Correct.

25   Q.   And that, again, was because of a disconnect between some

1    people that you learned that were confused about that or

2    unclear about that?

3    A.    We got questions again.    And when we would get the

4    questions again we would say, yes, it always has been the case

5    that you had to disclose if it comes to the individual.    And

6    again, to be as clear as possible we added that clarification

7    language.

8    Q.    And before 2020, biographical sketches did not state that

9    any titled academic, professional, or institutional position,

10   whether or not remuneration is received, must be disclosed,

11   correct?

12   A.    Right.    It said all professional appointments.    We wanted

13   to clarify whether you got financial support or not, it had to

14   be disclosed.

15   Q.    I take it, given the reason for the clarification, is there

16   were questions raised saying, well, what if I don't get paid,

17   what if it's just an honorary position?

18   A.    That's right.    We got questions.    And again, our response

19   was, yes, you do need to tell us this.    And so, again, to be as

20   clear as possible, we added that clarification.

21   Q.    But the question suggested to you that the previous

22   language might not have been as clear as it might have been?

23   A.    I think we're always looking.    If you look through any

24   document, we can always be clearer.    That's why we're

25   constantly improving and that's why we issue the PAPPG every

1    year.

2    Q.   And the earlier version that we were talking about in 2017

3    did not state that appointments, whether full-time, part-time,

4    or voluntary, including adjunct, visiting, or honorary, needed

5    to be disclosed?

6    A.   Right.  It did say all professional appointments and so we

7    had thought that all professional appointments was clear

8    enough.  Again, to be absolutely clear, we added that

9    clarification language.

10   Q.   And it was not until March 21, 18 months after Dr. Tao was

11   arrested, that NSF required the disclosure of foreign

12   appointments?

13   A.   We've always required the disclosure of foreign

14   appointments.  We've required the disclosure of all

15   professional appointments.

16   Q.   And there's nothing in any version of the PAPP Guide that

17   requires disclosure of job offers, correct?

18   A.   Correct.

19   Q.   Because for obvious reasons, people don't want to disclose

20   that they're getting a job offer unless and until they take it?

21   A.   Correct.  If there's pending research support that's being

22   negotiated, that's a different story.  That does need to be

23   reported.

24   Q.   But not a job offer, correct?

25   A.   Correct.

1    Q.    And I want to go back to 1460, which was the frequently

2    asked questions.

3    A.    Yes.

4    Q.    And again, this is on the web and it says if the in-kind

5    contributions are not intended for use on the project proposal

6    being proposed to NSF and have no associated time commitment,

7    you don't need to disclose that?

8    A.    Correct.

9    Q.    You think this is completely consistent with what you've

10    been saying, that everything needs to be disclosed, because

11    this is something that doesn't need to be disclosed, correct?

12    A.    So if it's in-kind contribution and it has no associated

13    time commitment, then it's not research, because you're not

14    doing anything with it, right?

15    Q.    What if you're doing research, but there's no specific time

16    commitment associated with it?

17    A.    So there has to be -- what this language means is there has

18    to be some time, right, associated with that equipment.  That's

19    what we're interested in.  And again, of how we use current and

20    pending support, we're interested in the time and the effort

21    spent on research.  So if something is given to you and you

22    spend any amount of time on it, there's any associated time,

23    then you need to report it.

24    Q.    Well, I mean, don't you think someone might interpret this

25    as saying that it's okay -- if I'm getting an in-kind

1  contribution unrelated to my NSF grant, but I'm not required a

2  specific time commitment, I can sort of do it when I have time

3  and I'm free on the weekends, then I don't have to report that?

4  A.   Well, I think if you're spending any time, even if you

5  don't know exactly how much time, you do need to report it.

6  You're spending time using that.

7  Q.   I understand that's what you think.  I'm asking you if you

8  think this language says what you are just saying how you

9  interpret it?

10 A.   I think so.  And certainly if we can be clearer, we always

11 want to be clearer.

12 Q.   I mean, there's no specific mandatory training provided on

13 this and people, you know, like Dr. Tao, if they went on the

14 Internet and they read this, they've got to figure this out and

15 understand this and then look at the PAPP Guide and then look

16 at the changes.  Fair to say there's a lot to navigate?

17          MR. BARRY:  Objection, asked and answered.

18          THE COURT:  I'll overrule.  I think you have asked

19 this.

20 A.   There is a lot to navigate but I do need to emphasize that

21 this is the receipt of federal money and that entails

22 responsibility, and so we do certainly expect our researchers

23 and our research organizations to take these responsibilities

24 seriously.

25 BY MR. ZEIDENBERG:

1  Q.  How would you use equipment if you weren't doing research?

2  A.  Exactly.  So if you're doing research on the equipment, you

3  need to report it.  So what this is meant to say is that --

4  let's say someone is given a gift and the gift happens to be, I

5  don't know, a photograph for their lab or something, certainly

6  you would never spend time on that.  It's a gift and that does

7  not need to be reported.

8  Q.  The question says, do I report in-kind contributions with

9  no associated time commitment?  So what if the in-kind

10  contribution is access to a lab, but there's no time commitment

11  to the lab?  Why wouldn't a reasonable interpretation of that

12  be, I don't have to report it because I'm not getting paid,

13  they're just letting me use the lab when I want to, I don't

14  work 24/7 for NSF, I only work on that, you know, X many days,

15  weeks, months, per year, why would that be anything that's

16  disclosable based on this?

17  A.  Because if you're spending any time in that lab, as you

18  said, even if you choose and you do it when you want to, you're

19  still spending time in that lab and that's still a spending of

20  time that you can't spend doing your NSF funded research.

21  Q.  Well, then wouldn't it make much more sense to simply say

22  any work in any laboratory for any reason, whether associated

23  with NSF or not, needs to be disclosed?

24  A.  That's exactly right.

25  Q.  But it doesn't say that?

1   A.    I think it does, but that's great feedback.  Thank you.

2   Q.    Biosketches.  We talked about, those are where they list

3   their qualifications.  The page limit is limited to two pages?

4   A.    It's been expanded but, yes, I think in 2017 it was two

5   pages.

6   Q.    And we already talked about when you explained to the FBI

7   when you were interviewed, they're used to determine whether

8   they're qualified?

9   A.    Yes.

10  Q.    They put down positions, they put them in the best possible

11  light in light of the proposal?

12  A.    Yes, but they do need to disclose all.

13  Q.    But the most outstanding researchers have CVs that go on

14  for dozens of pages?

15  A.    Correct.

16  Q.    So out of those 50 pages, they have to select what to put

17  in there?

18  A.    They need -- so the CVs that go on for many pages are

19  because they list a lot of their publications.  That's usually

20  the longest part of a CV, and that's why we limit them to

21  provide five products only, right, and not everything.  But

22  that part that's professional appointments they do have to

23  disclose.

24  Q.    There's no requirement that PIs update their biosketch?

25  A.    No.  There's not.

1   Q.   And that makes sense because the reviewers are just trying

2   to see if you're qualified.  And if you get a new position,

3   they already know you're qualified?

4   A.   Correct.

5   Q.   And the NSF grants at issue in this case were applied for

6   in March 2015 and October 2017, correct?

7   A.   Correct.

8   Q.   And the government's indictment in this case alleges that

9   Dr. Tao was accepted into the Changjiang Scholar Program in

10  late December 2017, two months after he applied for the NSF

11  grant?

12  A.   So --

13  Q.   I don't have a question yet.

14  A.   Okay.

15  Q.   Is that correct?

16  A.   Yes.

17  Q.   And so if the government is correct that he received the

18  Changjiang Award in 2017 after he applied for his NSF grant,

19  there would have been no reason for that to appear in his

20  biosketch, correct?

21  A.   I would have to look at the timing.  I can't really comment

22  because I don't have it all in front of me.

23  Q.   And there was no requirement that Dr. Tao update his

24  biosketch regarding his Changjiang Scholarship Award, correct?

25  A.   Not in the biosketch, no.  If there was research related

1    support, then, yes, he needed to tell us that.

2    Q.   But if you get the award after you submit your grant, then

3    you don't have to update your biosketch, correct?

4    A.   You have to -- you don't have to update your biosketch,

5    correct, after you submit your award.

6              MR. ZEIDENBERG:   The Court's indulgence.

7    BY MR. ZEIDENBERG:

8    Q.   And current and pending support, that is used to assess the

9    capacity of the individual to carry out the research, right?

10   A.   Correct.

11   Q.   And to help determine potential overlap and duplications?

12   A.   Correct.

13   Q.   And you aware that the NSF in this case did an analysis of

14   his NSF grants and the Chinese grant proposals that were found

15   on his office computer and determined there was no overlap?

16             MR. BARRY:   Objection, misstates the record.

17             THE COURT:   Reframe the question.

18   BY MR. ZEIDENBERG:

19   Q.   Are you aware there was an analysis done of Dr. Tao's NSF

20   grants and the Chinese grant proposals found on his office

21   computer and there was no overlap found?

22             MR. BARRY:   Same objection.

23             THE COURT:   Is there a basis for that question in the

24   record?

25             MR. ZEIDENBERG:   I'm sorry?

1    THE COURT:  Is there an evidentiary basis for that

2  question?

3    MR. ZEIDENBERG:  I do, Your Honor.

4    THE COURT:  I'll overrule.

5  BY MR. ZEIDENBERG:

6  Q.  Are you aware of that?

7  A.  No, because if the information had not been provided to the

8  program officer -- it's the program officer who needs to do

9  that analysis.

10  Q.  Okay.  Fair enough.  That's the way it would normally be

11  done, but I'm talking about an after-the-fact analysis done?

12  A.  I'm not aware.

13  Q.  And once a grant has been approved by NSF, would you agree

14  that they -- they -- the program officer does not need to know

15  about new pending support?

16  A.  Once -- once the award has gone out, then no, at that time

17  we did not need to know about new support unless -- and this is

18  a big unless -- there's a term and condition that says if you

19  have any new obligation, research obligation that's going to

20  impact your capacity to perform the grant, you do then need to

21  report it.

22  Q.  But fair to say that that doesn't come to pass unless

23  there's an active award?

24  A.  Correct.

25  Q.  As opposed to a pending award?

1    A.    Correct.

2    Q.    And just so the jury understands what we're talking about,

3    so NSF issues a grant and the researcher is very pleased and

4    gets the work, but he knows this is going to run out in two

5    years and he's applying because his guys are very industrious

6    for three or four or five other pending grants --

7    A.    Yes.

8    Q.    -- NSF does not want to be reading all these other grant

9    proposals unless and until something happens with them?

10   A.    That's correct.

11   Q.    And then they can decide whether there's a commitment --

12   time commitment issue and there is an overlap issue?

13   A.    Correct.

14   Q.    Let's talk about progress reports.   The NSF publishes

15   guidance which is made available on the Internet, correct?

16   A.    Correct.

17   Q.    And in that guidance -- and I don't know that I need to

18   show this to you because it seems like we're not going to be

19   disagreeing about this, but it indicates that what NSF is

20   interested in on -- once a grant is funded is active support,

21   new active support?

22   A.    Correct.

23   Q.    That's what we just talked about?

24   A.    Correct.

25   Q.    So if you have a new thing you're going to be working on,

1  we need to know, but don't bother me about every application

2  you put out?

3  A.   Correct.

4  Q.   Now, I want to talk a little bit about foreign talent

5  programs.  Okay?

6  A.   Okay.

7  Q.   Now, is it fair to say that the sensitivity of

8  organizations like NSF have gone -- in regards to foreign

9  talent programs has gone way up?

10  A.   We do communicate out that we do consider it a risk.

11  Q.   Okay.

12  A.   Again, it's not illegal.

13  Q.   Okay.  And is it fair to say that that sensitivity has gone

14  up over time?

15  A.   Yes.  As we learned more about these programs, yes.

16  Q.   So going back to 2017 and 2018, that risk factor, the

17  sensitivity was much lower than it is in 2021 or 2022?

18  A.   I would agree with that, yes.

19  Q.   And would it surprise you to know that back in 2018 a

20  response from a program officer about finding out one of their

21  PIs was named a Changjiang scholar would be to say

22  congratulations?

23  A.   It doesn't surprise me at all.  It's just nice that it was

24  disclosed and they knew.

25  Q.   But would it surprise you if they said congratulations and

1    there's no "but you need to disclose this or you need to

2    disclose that or let me see a copy of the contract or just

3    congratulations"?

4    A.   No, I think -- of course I don't know the situation, but if

5    I understand it, that there was a notification, one of these

6    scholars.  I would hope that then the time commitments and the

7    topic of what's being researched would also be disclosed so it

8    could be assessed for these capacity duplication and overlap

9    issues, but there's nothing wrong with saying congratulations

10   as well.  And that is how we would view it today as well.

11   Q.   What if it was just congratulations and nothing else?

12   A.   I can't really say.  I can't say a hypothetical.  But one

13   -- the responsibility of the program officer would have been to

14   assess it for these issues.

15   Q.   If a program officer in 2018 didn't see the need to ask any

16   of the questions you're asking about how much is this going to

17   impact or where are you going to be or what are you going to

18   do, then that might suggest that in 2017-2018 this was, as we

19   said, not considered a big deal?

20   A.   It's hard for me to say because honestly those same

21   questions that I talked about should have been asked.  If the

22   notification was being a von Humbolt Fellowship recipient from

23   Germany, those same questions should have been asked.

24   Q.   So I want to make this a little bit more specific and ask

25   you if in September of 2020 a researcher e-mails six NSF

1   program directors to ask them a question about her disclosure

2   obligations in regards to being a Changjiang scholar and if she

3   tells them she's collaborating with researchers in China since

4   2005, that in 2017 the Dollyon University of Technology

5   nominated her for a Changjiang International Visiting Scholar

6   Award, that the award provided travel funding and a small

7   stipend of less than $4,500 per year to visit.  She gives

8   occasional seminars based on research interests and on

9   scientific writing.  She said she didn't list the award on any

10  current and pending documents because it has no monetary value

11  in terms of research support --

12          MR. BARRY:  Objection, Your Honor, relevance.  He's

13  trying to insert a hearsay statement through his own testimony.

14          THE COURT:  I'm not sure -- what is the -- approach

15  the bench, counsel, and let's take a 15-minute recess for the

16  jury, and then we'll talk about this and then take a break as

17  well.

18      (The following proceedings occurred outside the presence of

19  the jury.)

20          THE COURT:  So is this a -- at first I thought you

21  were asking questions about Dr. Tao, but it sounds like it's

22  not about him.  It's a hypothetical or what?

23          MR. ZEIDENBERG:  Well, and we've given the government

24  this e-mail.  Another scientist, a researcher at another

25  university, e-mailed in 2020 the facts, that she e-mailed this

1    to -- to six program directors at NSF and she outlined a bunch

2    of activities she was involved in in China, involving being a

3    Changjiang scholar and traveling and having a contract that she

4    hadn't read.

5            And the response was that -- she was told by Tim

6    Patton, the deputy division director and ethics officer, that

7    he noted no specific NSF guidance has been released regarding

8    response to disclosures of the type you sent.  There's nothing

9    in the disclosure that would give us pause with respect to the

10   awards that you have through our programs.

11           And so I'm asking -- want to ask her about those

12   circumstances.  And this guy, Mr. Patton, is the CAREER award

13   program officer on Dr. Tao's CAREER grant, the CAREER award

14   that he has through NSF.  And it goes to materiality.  And I'd

15   like to hear if she agrees that the NSF program officers don't

16   care about this type of information and it wouldn't matter to

17   them.

18           They're telling this researcher that it wouldn't have

19   mattered and I'd just like to hear if she says, well, they were

20   way out of their lane or they don't know the rules or I

21   interpret the rules differently or whatever she has to say.

22   But I think it's -- obviously I have a good faith basis to ask

23   the question.  I have the e-mail, the government does too.

24   We've turned it over to them.

25           THE COURT:  This is similar to what we talked about

1    before.  You have a good faith basis, it sounds like.  But is

2    the objection to hearsay?  Because where you were at in your

3    questioning, you were obviously reading something and I thought

4    it was being framed as a hypothetical.  But if you're asking

5    her about statements -- statements -- out-of-court statements

6    that you're going to identify, then that's a different analysis

7    for me to undertake then because it's a hearsay analysis, and

8    as well as asking her about responses received from somebody

9    else at NSF.

10          MR. ZEIDENBERG:  But, Your Honor, to be clear, I'm not

11   introducing it for the truth of the matter because I don't know

12   if she was really a Changjiang scholar.  I don't know if she

13   was really working at Dollyon University.  I don't know what

14   she was doing.  What's relevant is that she stated these facts

15   to program officers and you can consider it a hypothetical.

16          THE COURT:  You're not stopping there, right?  So you

17   set up this hypothetical and then you follow up by saying,

18   would you be surprised, or whatever, that somebody from your

19   shop gave an opinion X.  That would be a hearsay statement

20   because you would be relying on, again, whether -- if they gave

21   an inconsistent response like this other situation that we

22   talked about earlier, you're wanting her to rely on one or the

23   other, whether it's material or not material.  You're wanting

24   to rely on whatever response this NSF person made to this

25   researcher to show that indeed it is not material to them.  So

1   you are wanting the truth of the matter asserted.  So you're

2   not there yet.  But if that's where you're headed, that would

3   be my concern.

4          MR. ZEIDENBERG:  No, because I'm not saying that --

5   I'm not introducing -- first of all, their answer was -- what I

6   want to know is what she thinks based on this factual scenario

7   whether they are right or they are wrong.  I'm not saying that

8   any of these facts are true.  I want to know whether she agrees

9   or disagrees.

10         THE COURT:  With what?

11         MR. ZEIDENBERG:  With -- if she would come up with the

12  same answer.

13         THE COURT:  Okay.  So you are going to -- you are

14  going to rely on an out-of-court statement.  In other words,

15  somebody else from NSF gave X answer, does she agree with that

16  or not.  That's how you're setting this up.

17         MR. ZEIDENBERG:  Correct.  But it's a hypothetical as

18  far as she's concerned.  It's not being admitted to be true or

19  to be false because we don't know if any of these facts are

20  true, and the jury can be told that.

21         THE COURT:  I do think it's all about how you frame

22  this.  So you lay out this hypothetical and apparently you have

23  an evidentiary basis for it, but any event you're laying out a

24  hypothetical and your next step is, I think, if this person got

25  a response from NSF of X, do you or do you not agree with that

1   response?  So it's still sort of phrased as a hypothetical.

2   You're not going to read into the evidence what this NSF person

3   said or identify them by name or anything like that, right?

4          MR. ZEIDENBERG:  I mean, I can't -- I had planned to

5   do it that way, but --

6          THE COURT:  Because here's the problem if you do do it

7   that way.  If you then say, well, whatever this person's name

8   is, said X, Y, and Z, that is an out-of-court statement and you

9   are potentially offering for truth of the matter asserted

10  because you want to rely on that statement.  You want to know

11  whether she agrees with the statement that's favorable to you,

12  right?

13         MR. ZEIDENBERG:  I understand the Court's view on that

14  and I will abide by that and do it the way you suggested, the

15  way we did before.

16         THE COURT:  Okay.

17         MR. ZEIDENBERG:  Just FYI, you have not asked, but I'm

18  almost done.

19         THE COURT:  I think, again, it's how you frame it.  I

20  don't think you should be able to give an out-of-court

21  statement as if this is what this person actually said and, you

22  know, is this true or not.  I mean, but I do think you can set

23  it up in a way that she can render an opinion as to whether or

24  not it was disclosable or not.  And then I think you can ask

25  her, like you similarly did before, you know, would you be

1    surprised if somebody from NSF gave a different opinion?  I

2    mean, that would just -- if you want that other person to come

3    in here and testify to the -- that's a whole other -- you can

4    bring that witness in, but you can't get their statement in in

5    the way that you, I think, were headed.  So I think we're clear

6    on how to do it?

7              MR. ZEIDENBERG:  Yes.

8              MR. BARRY:  Your Honor, now I have a better

9    understanding, I just want to make -- first, for the record, I

10   do think he's still trying to elicit hearsay statement.  And in

11   particular, now that I know the e-mail that he's referencing,

12   he's trying to reference a hypothetical for Susannah Scott, who

13   is a witness on their witness list.  And he's trying to elicit

14   what she apparently said to the NSF and then get Dr. Keiser's

15   opinion on that, as well as elicit what NSF said in response.

16             Secondly, I think there's a relevance objection.  Our

17   understanding, based on the evidence, is that the Changjiang

18   award or position that Susannah Scott had was very distinct

19   from the position that Dr. Tao is alleged to have had.

20   Dr. Scott had something called the Changjiang chair position,

21   which if you remember back to October when Dr. Tiffert

22   testified, he talked about the differences between the chair

23   position and the distinguished professor position, which the

24   government has alleged Dr. Tao participated in.  So based on

25   that, well, I think there's a 403 issue because the way that

1    Mr. Zeidenberg is framing the question is he's trying to

2    analogize it to his characterization of the allegations against

3    Dr. Tao without giving Dr. Keiser the benefit of this pretty

4    detailed four-paragraph description of the details of the

5    position, and he's trying to get Dr. Scott's e-mail in here

6    basically without having Dr. Scott testify to it.

7          If he wants to talk about Dr. Scott's interactions

8    with NSF, presumably they've subpoenaed her.  She's on their

9    witness list.  Why not have her talk about it when she gets

10   here?

11         THE COURT:  I made a comment about before when we were

12   talking about another issue, I said something like, this not a

13   transcript, I don't want you reading something to the jury

14   that's not in evidence, and that would include transcribed

15   testimony because it's not -- well, you do have dailies, but

16   it's not -- you paraphrase.  So as you're posing this

17   hypothetical, I don't think you should be reading it, because

18   it gives the jury an impression that you're giving them

19   everything.

20         At the same time, if there's some distinction between

21   this position and what Dr. Tao applied for in terms of time

22   commitment, I think that's something you can cover on redirect,

23   that it's not truly a legitimate hypothetical because perhaps

24   the chair has a different time commitment or somehow different

25   than what Dr. Tao was doing.

1          But, I mean, I do think it's all right to pose a

2    hypothetical and ask her whether she agrees that this would or

3    would not be disclosable as a prelude to bringing this woman in

4    and then asking her -- well, it will be hearsay but, you know,

5    if you want to ask her about posing the same situation, I don't

6    know, I'm not going to prejudge how that's done.

7          For now, don't read it into the record, but pose a

8    paraphrased hypothetical.  You can challenge the legitimacy of

9    that hypothetical by adding additional facts, if you wanted, on

10   redirect.  But what I'm saying you can't solicit from this

11   witness, statements made by this person or by the NSF itself,

12   but I do think you can ask her, you know, what she thinks the

13   correct response would be, would she be surprised if someone

14   gave a different response.  I think you can go that far.

15              MR. ZEIDENBERG:  Okay.

16              THE COURT:  Okay.

17              MR. BARRY:  Okay.

18              THE COURT:  All right.  About 10 minutes, 15 at most.

19              MR. ZEIDENBERG:  What time?

20              THE COURT:  When did we break?  We broke about five

21   'til.  I told them 15 minutes.  Let's say 3:15 for all of us.

22       (Recess.)

23       (The jury entered the courtroom, after which the following

24   proceedings were had.)

25              THE COURT:  You can be seated.

1    BY MR. ZEIDENBERG:

2    Q.   Good afternoon.

3    A.   Good afternoon.

4    Q.   I'm almost done.  You've been very patient.  A couple more

5    questions before we wrap up.  I'd like to ask you a

6    hypothetical and ask you -- at the end I'm going to ask you

7    whether you'd be surprised by such a reaction.  Okay?  And this

8    is going back to September 2020, so after you've made

9    significant changes -- well, significant clarifications, we'll

10   say that, in your view.  I would argue they're more than

11   clarifications, but in any event, they're changes, correct?

12   A.   Revisions.

13   Q.   Okay.  They were definitely revisions.  Okay.  I want you

14   to tell me if you'd be surprised if a PI at a big university

15   here in the United States e-mails a bunch of NSF program

16   directors and says that she's been told that, you know, her

17   university wants her to, you know, send an e-mail and keep them

18   all up to date, you know, update them on what's going on.  And

19   she says that, I've been collaborating with China for many

20   years and that I have been nominated -- I was nominated three

21   years ago for a foreign talent program, and that I -- the award

22   comes with a travel stipend of several thousand dollars a year,

23   and gives seminars, give talks, gives lectures, that she didn't

24   list the award previously because she didn't think she needed

25   to because it didn't have any monetary value, and that she's

1    been told -- although she had never read the contract that she

2    has, because it's in Chinese, she's been told that it involves

3    a two-month commitment of time, but that's not what she's been

4    doing, and she didn't know that it had a two-month commitment

5    of time.  And she says, you know, FYI, what do I need to do?

6    And the response from NSF is, there's nothing that is required

7    and nothing in our rules that requires any of this to be

8    disclosed.  Would that surprise you?

9    A.    That does surprise me.

10   Q.    It does surprise you?

11   A.    It does surprise me that's what she was told, yes.

12   Q.    Because you think -- what about that should have been

13   disclosed in your view?

14   A.    So in my view, if she signed a contract that requires two

15   months of time, even if she says she doesn't do that two months

16   of time, that contract says it, and so in my view she still

17   should have disclosed that she has a contract obligating her to

18   two months of time.

19        Now if she's really not spending two months of time there,

20   then I wonder why she has a contract that says that.  So in

21   other words, if there's something in writing that says she has

22   two months of time dedicated to research, she should have

23   disclosed it.

24   Q.    Hypothetically speaking, if that was the response from the

25   NSF program director, then in your view they don't understand

1    the disclosure obligations?

2    A.    Well, perhaps.  It's hard for me to say without knowing, of

3    course, the whole situation.

4    Q.    Okay.  So we haven't -- I guess Mr. Barry touched on this a

5    little bit, about the purpose of NSF grants.  Fair to say that

6    NSF hopes and expects that the research will be done and that

7    the results will be published?

8    A.    Yes.

9    Q.    And that one of the measures of a successful grant is that

10   a lot of papers are published in high-quality journals?

11   A.    Yes.

12   Q.    And that's because you're doing fundamental research and

13   the whole point is that it's meant to be shared with the

14   scientific community widely?

15   A.    Correct.

16   Q.    And the hopes and expectation is that members of the

17   scientific community will read these publications, will learn

18   from them, and science will be advanced?

19   A.    Correct.

20   Q.    And that's going to benefit -- the idea would be it

21   benefits everybody, we all gain?

22   A.    Correct.

23   Q.    And the more widely disseminated the results, the better?

24   A.    Correct.

25   Q.    And what is a satisfactory number of publications for a

1  particular grant?

2  A.   There really isn't one because it depends not on the

3  number, but again, on the quality of the journal, and then we

4  look at how many times that that publication is then referenced

5  or cited by other researchers.  So those are the important

6  factors.

7  Q.   Okay.  Are you aware that Dr. Tao's NSF Grant 1539105

8  resulted in 13 publications?

9  A.   I'm not aware.  I was not aware.

10  Q.   Is that a pretty impressive number?

11  A.   Again, it's not really number, but it's the level of the

12  publication itself, the quality of the publication, how many

13  times it's cited.  And, you know, honestly if things are

14  uncovered that might look at any bias in the research, then the

15  number of publications themselves don't really matter.  It's

16  whether you can actually trust the results and the research.

17  Q.   Well, if the -- there's no allegation that the research

18  wasn't done properly.

19  A.   It's hard to tell because if we don't know all the

20  different obligations and potential conflicts out there, we

21  can't tell.  It might be biased, it might not.

22  Q.   Well, when the publication reviews it for deciding whether

23  or not this is worth publishing, they have a team that looks at

24  the research and how it was done, right, and they look at the

25  data that was generated and they look at the methodology that

1    was used, and they make a decision whether this is good,

2    interesting, and important research that the results of which

3    should be published, correct?

4    A.   They assume that, of course, it was done without bias.  And

5    they assume it was done objectively, because of course those

6    are the basic principles of integrity.  So based on that they

7    then can look at the content and make that determination, but

8    if they don't have any information about -- if there were any

9    concerns about objectivity and they don't know about that, then

10   it's hard for them to take that into account.

11   Q.   Are you familiar with a journal, Nature Catalysis?

12   A.   I'm not familiar with it, but I can -- I mean, assume from

13   its name that it's a journal about catalysis.

14   Q.   Are you aware of any allegation of research bias in this

15   case?

16   A.   I'm not aware of any because it couldn't have been

17   assessed.

18   Q.   I just want to sum up to make sure I got the takeaways or

19   at least some of the takeaways.  And there's no need to update

20   one's biosketch, correct?

21   A.   Correct.

22   Q.   And there's no need to list pending support on a current

23   and pending -- on a progress report, correct?

24   A.   Correct, on an annual report.

25   Q.   And if someone forgot to include pending support and it

19-20052-JAR    USA v. Feng Tao    03.25.22    Day 5              883

1    ended up not getting funded, then it couldn't impact on-time

2    commitment or overlap, correct?

3    A.    Correct.

4    Q.    And pending support is only important to know about because

5    if it gets funded, then it could impact things in terms of

6    commitment and overlap?

7    A.    Correct.

8    Q.    But if it doesn't get funded, then you dodged one?

9    A.    Correct.

10   Q.    Okay.

11         MR. ZEIDENBERG:  I think I'm done.  Let me

12   double-check.  We'll find out if I'm right.

13         THE WITNESS:  Sure.

14         MR. ZEIDENBERG:  I have no further questions, Your

15   Honor.  Thank you.  Thank you very much.

16         THE COURT:  Not yet.

17         THE WITNESS:  Sorry.

18         THE COURT:  You're the second witness that tried to

19   run out of here.  Mr. Barry.

20         MR. BARRY:  Channelling some feelings.

21                        REDIRECT EXAMINATION

22   BY MR. BARRY:

23   Q.    Hi, Dr. Keiser.

24   A.    Hello.

25   Q.    So first I want to talk about the GAO report.  You're

1  familiar with this, right?

2  A.  Yes.

3  Q.  And what -- you said the GAO is an entity that helps the

4  United States Congress?

5  A.  Correct.

6  Q.  And do you know what the purpose of this GAO report was?

7  A.  They were -- they were asked by members of congress to look

8  at non -- to look at foreign -- potential foreign nonfinancial

9  conflicts of interest.

10  Q.  And was the title -- did the title of report have to do

11  with addressing foreign influence?

12  A.  Yes, I believe it did.  I don't recall the exact title.

13  Q.  What does foreign influence or undue foreign influence in

14  the research enterprise context mean?

15  A.  It means --

16        MR. ZEIDENBERG:  Objection.

17        THE COURT:  Approach the bench, please.

18     (The following proceedings were had at the bench).

19        THE COURT:  I'm concerned that her answer may stray

20  into my *limine* rulings.

21        MR. BARRY:  So I am planning to keep it limited to the

22  risk of the research enterprise.  I believe the defense opened

23  the door by referencing the GAO report and quoting from it.

24  I'm not going to talk about any sections of the GAO report that

25  have to do with export control or IP.  It's going to be very

1    limited.  I'm going to ask two or three more questions and

2    that's it.

3         THE COURT:  I'm going to sustain to the question

4    because the question asked about undue foreign influence which

5    could elicit an answer.  What are you going to ask her?  Are

6    you going to talk about the integrity of her research

7    enterprise?  What are your questions specifically?

8         MR. BARRY:  It's to give the jury context.  The title

9    of the report that Mr. Zeidenberg quoted from is Agencies Need

10   to Enhance Policies to Address Foreign Influence.

11        MR. ZEIDENBERG:  We haven't gone into that.  I didn't

12   ask her that.  I asked about specific findings that had to do

13   with the disclosure obligations.  The larger reason for why

14   congress asked for the investigation isn't material and

15   certainly wasn't gone into on direct examination.

16        THE COURT:  So what I heard in cross-examination were

17   questions about the GAO's opinion, if you will, as to whether

18   NSF has conflict of interest policies related to foreign

19   universities or organizations.  And then the answer was no

20   based on a discreet area of that.

21        I'm just concerned that if we start talking about

22   foreign influence and concerns that congress or anyone else may

23   have about that broaches into the whole idea of stealing

24   research and that sort of thing.  So I think at this point the

25   scope of your redirect has to be limited to what they asked,

1    which is whatever the GAO said in this study about NSF's

2    policing, if you will, of foreign conflicts of interest.

3         MR. BARRY:  Okay.  I'll keep it limited.  Thank you.

4         (Thereupon, the proceedings continued in open court.)

5    BY MR. BARRY:

6    Q.   Dr. Keiser, do you remember Mr. Zeidenberg asking you about

7    some of the conflict of interest policies at various federal

8    agencies?

9    A.   Yes.

10   Q.   In particular, he was asking you about your disagreement

11   with some of the GAO's assessment of your National Science

12   Foundation's policies?

13   A.   Yes.

14   Q.   You said on direct that the National Science Foundation --

15   part of its policy is to ensure that or to require that

16   universities have their own policies, correct?

17   A.   Correct.

18   Q.   And did -- in the hypothetical of this case where KU is the

19   educational institution, is NSF's conflict policy to require

20   that KU have its own policy that meets certain baseline

21   minimums that NSF sets?

22   A.   Yes, that's exactly right.

23   Q.   Is it fair to say that essentially NSF's conflict policy is

24   to set a floor so that educational institutions that want to

25   receive NSF funding have to meet that floor, but that those

1   universities are, of course, free to add on any additional

2   conflict disclosure requirements that they deem appropriate?

3          MR. ZEIDENBERG:  Objection, leading, Your Honor.

4          THE COURT:  Overruled.  Go ahead.

5   A.  Yes, that is correct, that there is a basis.  There's basic

6   standards that NSF requires, and if a university would like to

7   go beyond those standards in its conflict of interest policy,

8   it may do so.

9   BY MR. BARRY:

10  Q.  Are you aware of the GAO report making any assessment of

11  KU's conflict policies?

12  A.  No, I'm not.

13  Q.  The next thing I want to ask you about is -- again, this is

14  a document that you were sort of hypothetically asked about.

15  You weren't actually shown the document, but you were asked if

16  it would surprise you if in this particular case there was an

17  evaluation of the NSF grant funding and the available

18  information related to the defendant's alleged research

19  proposals abroad.  Do you remember that?

20  A.  Yes, I do.

21  Q.  And would it surprise you if the person who did that

22  assessment concluded that based on the level of details that

23  they had, it was difficult to actually determine whether there

24  was any overlap?

25  A.  That -- that would be an appropriate assessment.  That

1    would not surprise me if somebody said we can't assess

2    something because we don't have the appropriate level of

3    detail, because of course to assess overlap you have to know

4    the specifics about research that is being conducted, and then

5    see if whatever else is being funded, if that research that is

6    being conducted, if technically they're the same, and so you

7    need that level of technical detail to determine that overlap.

8    Q.   So do you need to be -- you need to have a level of detail

9    in whatever the discipline is, whether it's catalysis or

10   battery technology --

11   A.   Correct.

12   Q.   -- in order to assess whether the specific proposals that

13   NSF are funding or is funding overlap with whatever other

14   proposals somebody may or may not have submitted?

15   A.   That's correct.

16   Q.   Okay.  So the last thing I want to ask you about, again

17   hypothetical.  So this was this hypothetical about what some

18   other scientist may or may not have asked someone at NSF in

19   2020.  Okay?  So what I want to do is I want to -- I'm going to

20   give you three hypotheticals so -- and I just want to get your

21   view of whether or not -- sort of what you would expect NSF's

22   response to be.

23   A.   Okay.

24   Q.   So in the first hypothetical you have a professor who

25   discloses to his or her university that they're participating

1    in a foreign talent.  Okay?

2    A.  Yes.

3    Q.  You also have that professor saying that the commitment is

4    non-salaried.  You have them saying they're not an employee of

5    the foreign institution.  You have them saying that they didn't

6    have a research lab, that they never used office space or had

7    office space, that they never received research funding, that

8    they didn't have any graduate student supervision

9    responsibilities or any teaching responsibilities.  Okay?  So

10   that's eight facts for the hypothetical.

11        And then two more facts to round it out.  So Fact No. 9 of

12   the hypothetical is that they said they -- from the -- for a

13   two-year period -- in year one they spent about 20 days in this

14   foreign country and in year two they spent about six days.

15   Okay?  So those are the ten facts.

16        And this is somebody who has gone to their university,

17   disclosed this, and now is coming to NSF and saying, hey, my

18   university said I should tell you about this.  Okay?  So in

19   that scenario what would you expect NSF to do in response?

20   A.  So if -- if the university is aware of that and that's the

21   scope of what was said, if it's not salaried, if there is no

22   research time being spent as part of this program, if -- if the

23   university feels comfortable that this does not meet the

24   requirements of what needs to be disclosed in current and

25   pending support, then the university won't disclose it to us.

1    Q.    Okay.  And then I want to give you -- I'm going to actually

2    give one other hypothetical.  Keep it limited to two.  Let's

3    say hypothetical two.  And again, I want to ask in hypothetical

4    two, what would you expect NSF to do.

5        In hypothetical two you have a scientist who is

6    participating in a foreign talent plan.  They don't disclose

7    that to their university.  The foreign talent plan requires a

8    five-year commitment.  The foreign talent plan gives the person

9    a title of distinguished professor at a foreign university.

10   The plan promises the scholar research funds from the

11   university.  The plan or the agreement also has that researcher

12   setting up a laboratory at that foreign university.  That

13   researcher is also applying for foreign research funding from a

14   foreign government.  That researcher is also promised salary or

15   at least some sort of monetary payment that's more than a few

16   thousand dollars.  That researcher is mentoring students at

17   that foreign university and that researcher is also recruiting

18   students to join that foreign university.

19       So that's the thing that NSF learns about that

20   hypothetical, those ten facts.  What would you expect NSF to do

21   in that circumstance?

22   A.    NSF would say that needs to be reported to us and it should

23   have been reported to us in both the biosketch as a

24   professional appointment, as well as in the current and pending

25   support part of the proposal, and then of course the PO usually

1    asks for an update prior to award.  And so if it wasn't

2    disclosed the first time, it should have been disclosed a

3    second time.

4              MR. BARRY:  Thank you.  No further questions.

5                        RECROSS EXAMINATION

6    BY MR. ZEIDENBERG:

7    Q.  Well, as far as that last hypothetical, let me just put

8    another little gloss on it.  That those events occurred, the

9    submission of the NSF grants, okay?  And so -- and the position

10   is unpaid -- or the job is declined, is never accepted.

11   Certainly it's not going to be disclosed on a biosketch because

12   that happens -- it's already happened, correct?

13   A.  Correct.  If it was declined, then certainly it shouldn't

14   have been on the biosketch.

15   Q.  But regardless, if the biosketch gets sent in before the

16   position, whether it was accepted or not, there's nothing to

17   disclose on a biosketch, correct?

18   A.  Correct.

19             MR. ZEIDENBERG:  Thank you.

20             MR. BARRY:  No further questions.

21             THE COURT:  All right.  Now may Dr. Keiser be excused?

22             MR. BARRY:  Yes, Your Honor.

23             THE COURT:  All right.  You're excused.

24             THE WITNESS:  Thank you.

25             THE COURT:  Are you ready with your next witness?

1       MR. BARRY:  Before we call our next witness, I'd like

2   to update the demonstrative exhibit, please.

3       THE COURT:  Okay.  And please go slowly.

4       MR. BARRY:  Okay.  So this is the second page of the

5   timeline and I'm going to update a few of these.  So these are

6   exhibits that have been admitted into evidence since we last

7   looked at this.  So this is Exhibit 148 concerning the

8   sub-award.  It's May 17, 2018.  Exhibits 143 and 144, May 18,

9   2018, those are exhibits we just discussed with Dr. Keiser.

10      June 28, 2018, Exhibit 56; July 16, 2018, Exhibits 193

11  and 194 which we discussed yesterday; November 9, 2018,

12  Exhibit 211 concerning the sub-award.  We also discussed that

13  yesterday.

14      It feels a little like grade school.  Look up when

15  you're done with your work.

16      And then the last one, and I'm going to just do this

17  one, 257 from yesterday.

18      The government calls as its next witness, Dr. Viviane

19  Schwartz.

20                  DR. VIVIANE SCHWARTZ,

21  called as a witness on behalf of the government, having first

22  been duly sworn, testified as follows:

23                  DIRECT EXAMINATION

24  BY MR. BARRY:

25  Q.  Good afternoon, Dr. Schwartz.

1       Would you please state and spell your name for the record?

2   A.   Sure.  My name is Viviane Schwartz.  It's spelled

3   V-i-v-i-a-n-e.  Schwartz is S-c-h-w-a-r-t-z.

4   Q.   Where do you work, Dr. Schwartz?

5   A.   I work for the Department of Energy.

6   Q.   What's your job there?

7   A.   I'm a program manager for the Basic Energy Science within

8   the DOE.

9   Q.   And what is the Basic Energy Science's office or group or

10  program?

11  A.   Sure.  Basic Energy Science, or BES as we call it, is

12  within the Office of Science, and the mission is to fund and

13  support fundamental science in several disciplines of physical

14  science that promotes energy-relevant mission.

15  Q.   Okay.  And you said your title is program manager?

16  A.   Correct.

17  Q.   What does a program manager do in the Office of Basic

18  Energy Science?

19  A.   It oversees grants and -- from universities and projects

20  from national labs.

21  Q.   What's the difference between a university and a national

22  lab?

23  A.   I'm trying to -- a national lab, you don't have any

24  teaching assignment.  National labs are owned by the

25  government, but they are managed by private companies or

1  corporations or -- universities don't -- are not owned by the

2  government and they have an education also mission, right.

3  Q.  Can you give some examples of some national laboratories?

4  A.  There are several national labs in U.S.  There's Oak Ridge

5  National Lab, Pacific Northwest -- Northwestern National Lab,

6  Brookhaven National Lab.  They're spread across the United

7  States and each have their specific strengths, missions, and

8  expertise.

9  Q.  So I just want to -- I know that you worked in the Office

10 of Science and the Basic Energy Sciences group, but can you

11 just kind of give the jury a 30,000-foot overview of what the

12 Department of Energy does, what its mission does?

13 A.  The Department of Energy is pretty -- the scope is pretty

14 large.  The mission is to promote energy relevant -- I think --

15 let me put it this way.  There are several portions of DOE that

16 I'm not even the expert to talk about.  There is the nuclear

17 side, which I'm not related at all.  And then there are the

18 research side and other portions including more applied

19 research.

20    Where I reside is the Office of Science, which is really on

21 the fundamental research side of DOE.  So I wouldn't like to

22 respond for the entire DOE because the mission is much broader

23 than the mission for the Office of Science.  I'm more familiar

24 with specifics of the Office of Science.

25 Q.  So is it fair to say that, just big picture, Department of

1    Energy is a big department.  There's sort of the nuclear side,

2    there's the applied science side, and then there's the

3    fundamental research/Office of Science side and you're in that

4    third bucket?

5    A.    Yeah, there is the environmental management side that I

6    missed there, but it's a quite -- I would say those three

7    buckets, nuclear side, environmental management, and science

8    side, those are probably the three general large buckets.

9    Q.    Okay.  And your specialty, let's say, within the Office of

10   Science, within the Basic Energy Sciences component is

11   catalysis?

12   A.    Correct.  I'm within the chemical science, bioscience, and

13   geoscience division, which again also encompasses several

14   programs.  The program that I oversee is called catalysis

15   science.

16   Q.    And what is, generally speaking, for sort of Luddites like

17   me, what is catalysis science?

18   A.    Catalysis science is a branch of chemical engineering and

19   chemistry discipline that deals with how reaction

20   transformations can be promoted by what is called catalyst,

21   meaning that most of the things that we see in our every day

22   life, from the gasoline to plastics, many of the products that

23   we use, even pharmaceuticals, to be produced they need to go

24   through a chemical process that requires -- most of the time

25   requires what's called a catalyst for that chemical process to

1    happen.

2    Q.   How long have you been a program manager in the catalysis

3    program at DOE?

4    A.   Since 2015.

5    Q.   What did you do before that?

6    A.   I worked for 12 years for Oak Ridge National Lab, which is

7    also one of the national labs that DOE, the Department of

8    Energy, owns, and I worked as a researcher doing research on

9    the same discipline, on catalysis science.

10   Q.   What's your educational background?  I should have asked

11   that at the beginning.

12   A.   So I did my bachelor, master, and Ph.D. in chemical

13   engineering.

14   Q.   So I want to kind of dive into the grant process.  And

15   first I just want to understand for a program manager like you

16   in the Office of Science, what's your role in the grant-making

17   process at DOE?

18   A.   I might give input on what is called fund announcement,

19   fund opportunity announcement.  We call it FOA.  I might help

20   give an input of what are the areas that might be emphasized or

21   might be asked on this FOA.  We talk about the areas that we

22   should be supporting.  So we have strategic component and

23   discussions about which areas of science we should be

24   supporting.

25       I -- on the grant process specifically then, I would

1   receive proposals from different PIs, we call principal

2   investigators, from universities and national labs.  We look at

3   those proposals and we don't decide ourselves which proposals

4   to fund without going through review, external peer review of

5   those proposals where we send those proposals -- or we put

6   together a panel of experts to look at those proposals and

7   evaluate them.  And then based on those evaluations, based on

8   our programmic balance, we look at how much we fund in

9   different areas.  We make then recommendations.  I don't fund

10  directly.  I recommend funding on those grants.  So I'll make

11  recommendations.

12       And of course there are several people within the

13  organization that we will oversee and we will look at those

14  recommendations.  And once the grant is then awarded, if the

15  grant is successfully awarded, then I oversee that.  I don't

16  directly manage the research that is being carried out.  I

17  oversee if what is in the proposal, if this is being

18  successfully done by receiving yearly reports of that.  And

19  usually those grants might last for about three years.

20  Q.   So you said you don't directly oversee the research, but

21  you kind of get updates and an overview?

22  A.   Yeah.  I don't manage the research or develop operation of

23  that research.  I oversee if that proposal and if that work is

24  being done as expected.

25  Q.   In the -- so let's put aside national labs.  I don't want

1    to talk about that.  So let's just talk about universities,

2    right, the grant process for universities.

3        In that context who typically is the one actually managing

4    the research?

5    A.    The principal investigator.

6    Q.    And that would be sort of the scientist who is --

7    A.    Yes.

8    Q.    -- submitting a proposal in the first place?

9    A.    Correct.

10   Q.    So I just want to kind of break it into steps to make sure

11   I have it right.  So the first step you said was DOE --

12   especially Basic Energy Sciences, you'll work with other folks

13   to come up with the funding announcement which kind of lays out

14   what you're interested in finding, right?  So that's step one.

15   And then step two is the submission process?

16   A.    Yeah.

17   Q.    Okay.  And in that submission process, how do PIs

18   typically -- or their home institutions typically submit

19   proposals to DOE?

20   A.    Well, there are instructions on the funding announcement of

21   how to submit the proposal indicating formats.  Of course other

22   than that, the principal investigator also oftentimes tried to

23   get in touch with us and talk to us and show their interest and

24   discuss if that would perhaps fit the funding announcement.

25   Q.    And is that okay for the principal investigator before

1    submitting a proposal to talk to the program manager about what

2    he or she might be -- you know, what might be attractive to

3    them so the PI can kind of tailor their proposal?

4    A.   Yeah, it does happen quite often.

5    Q.   And once the PI is ready to submit the proposal, do they

6    use a website or do they put it in the mail or do they --

7    A.   Yeah, there is a website platform for that.

8    Q.   Do you know what that website is called?

9    A.   So the universities use what's called grants.gov to submit

10   the proposal.

11   Q.   And then what happens once a university submits the

12   proposal, where does it go?

13   A.   So it goes through other platforms and eventually they also

14   indicate the program manager that should be looking at that

15   proposal based on the funding announcement.  And then it

16   eventually comes to the program manager that is assigned to

17   that proposal.

18   Q.   So if someone were -- if a PI were to submit a proposal to

19   you, it would eventually end up on your desk or your computer,

20   right?

21   A.   Correct.

22   Q.   What state do you work in?

23   A.   Yes.

24   Q.   What state?

25   A.   Maryland.

1    Q.   Okay.  I'd like to show you what's been previously

2    introduced into evidence as Exhibit 33.  If we could please

3    pull that up.  I think we might need to --

4            MR. BARRY:  Can we switch over?

5    BY MR. BARRY:

6    Q.   Do you recognize this document?

7    A.   Yeah, it's a typical document of proposal application.

8    Q.   So this is one of the proposals that is typically submitted

9    to DOE in response to a funding announcement?

10   A.   Correct.

11   Q.   And do you see at the top of this one, on the front page it

12   says Renewal under Type of Request?

13   A.   Yes.  I see.

14   Q.   What does that mean?

15   A.   There are two types of proposals, generally speaking.  New

16   proposals or renewal.  Renewal means that it's a continuation

17   of a prior grant.

18   Q.   So that means somebody already has some funding from DOE

19   and they're just applying to renew their funding for some other

20   project related to that grant?

21   A.   If it's exactly the same scope, it's renewal.  Principal

22   investigator can basically put a different proposal for a

23   different subject and that would be a new proposal.

24   Q.   Okay.  And this -- who is the PI on this renewal?

25   A.   That's Franklin Tao.

1    Q.    Do you know Dr. Tao?

2    A.    Yes.

3    Q.    Do you see him in this courtroom?

4    A.    Yes, I see.

5    Q.    Have you met him in person before?

6    A.    Yes.

7    Q.    When did you meet him?

8    A.    I wouldn't know exactly the first instance I met because I

9    met many, many principal investigators, but I can certainly say

10   that he was present in one -- at least one of our, we call PI

11   meetings, which is we usually -- one of my activities is to

12   have a conference with all my principal investigators once a

13   year, and we invite most of them for those meetings and he was

14   present in one of those for sure.

15   Q.    And I want to draw your attention -- so we're going to just

16   go to a few pages in this renewal.  I'm going to refer -- at

17   the bottom there's red numbers, page numbers.  So, for example,

18   I'm going to say, let's look at page 4, and it will pop up on

19   the screen, but you can just rely on the paper copy in front of

20   you, Dr. Schwartz, if that's easier.

21        And I really just want to kind of understand the skeleton

22   of this proposal.  So on page 4 you'll see at the bottom it has

23   a signature of an authorized representative.  Do you see that?

24   A.    A signature?

25   Q.    Sorry.  Rather, it says signature of authorized

1   representative and it has a typed name?

2   A.   Yeah, I see now.

3   Q.   Do you know what that means, authorized representative in

4   this context?

5   A.   In this context is a person from the research office from

6   the university that is filing the application on behalf of the

7   university and the principal investigator.

8   Q.   All right.  Let's go to page 18.  And tell me when you're

9   there, please.

10  A.   Yes.

11  Q.   So you see at the top it says "progress report" and has a

12  date range of September 15, 2015 to September 14, 2018?

13  A.   Yes.

14  Q.   And then it has below that Renewal Proposal, and it has

15  another three-year date range from 2018 to 2021?

16  A.   Yes, I see.

17  Q.   Is this showing that sort of renewal aspect of this

18  submission that we talked about earlier?

19  A.   Correct.

20  Q.   And your name is at the bottom, right, as the program

21  manager for this particular project?

22  A.   Yes.

23  Q.   Okay.  All right.  I want to go to page 44.  Are you there?

24  A.   Yes.

25  Q.   Okay.  And what are -- it looks like that's a bunch of

1    different things listed here on these three pages on 44, 45,

2    and 46.  What are these?

3    A.   Those are the publications that acknowledge financial

4    support from this grant that is being renewed.  So acknowledge

5    financial support from not the proposal, but from the prior

6    period of the grant.

7    Q.   So what do you mean by acknowledge?  Just sort of break

8    that down, what does that mean to acknowledge that DOE funded a

9    particular project that resulted in a publication?

10   A.   Yeah.  Every publication had some funding source, so when

11   it acknowledges, it says who funded that work that is being

12   reported in the publication.

13   Q.   Why does DOE want PIs to acknowledge when DOE funds or

14   particular DOE grants are used to fund research that results in

15   publications within the scientific community?

16   A.   So publications in basic science is the product of the

17   work.  It's how we, as program managers -- it's one of the ways

18   that we measure their productivity.

19   Q.   Okay.  I want to take your attention to page 82.  And I'd

20   like to ask you -- at the top it says biographical sketch,

21   Franklin Feng Tao.  What is a biographical sketch in this

22   context from a DOE perspective?

23   A.   It gives the information about where the PI works, what was

24   his information, his background, his degrees.  It shows what

25   kind of publications and areas of research the PI works on,

1    what kind of -- is a short curriculum -- is a short CV type of

2    thing.

3    Q.   It's pretty short.  It's only two pages or so?

4    A.   Yeah.

5    Q.   Let's go to the next one on page 84.  It looks like this is

6    another biographical sketch.  Do you see this one?

7    A.   Yes, I see.

8    Q.   And I want to scroll down to the second page on there.  See

9    where it lists collaborator and coeditors?  Can you read some

10   of the universities that are listed on there?

11   A.   In the collaborators?

12   Q.   Yes, ma'am.

13   A.   King Abdullah University, University of Puerto Rico,

14   Vanderbilt University, Drexel University, Carnegie Mellon,

15   Yonsei University, University of Padova, Utah State University,

16   University of Kansas, Boston College, Tsinghua University.

17   Q.   I'll stop you on that one since that one is tough.

18       So why is it important for DOE to know about collaborators

19   or coeditors that a PI may have?

20   A.   It is important so when I select the reviewers to look and

21   evaluate the proposal, I make sure I avoid those names.

22   Q.   So you're talking about the process and the review of a

23   proposal?

24   A.   Correct.

25   Q.   Where you have independent experts kind of evaluate the

1    merits of the science?

2    A.    Yes.

3    Q.    And why do you want to make sure that you know if any of

4    those folks have a potential or apparent conflict with a PI?

5    A.    We want to make sure that the review process is fair so

6    there is no possibility of bias on the evaluation.

7    Q.    Let's go to page 101, and the sub-heading is Equipment and

8    Facilities.  And you'll see it looks like -- if you kind of

9    flip through that in the next few pages, it lists a variety of

10   equipment that is going to be used in the proposal if it's

11   granted.  Is that accurate?

12   A.    Correct.

13   Q.    Why is DOE asking for the PIs to tell them details about

14   what equipment and what facilities will be used to conduct the

15   research?

16   A.    So that the program managers and reviewers make sure that

17   the PI have the means to conduct the research that is being

18   proposed.

19   Q.    All right.  And then let's go to page 110.  We're almost

20   done with this one.  Do you see how it recommended reviewers at

21   the top?

22   A.    Yes.

23   Q.    Okay.  And if you scroll to the next page, 111, do you see

24   at the bottom it says, exclude the following people due to

25   conflict of interest, right?

1   A.   Correct.

2   Q.   And why would a PI, if you know, want to identify people

3   who should be excluded from that independent, third-party

4   panel?

5   A.   Again, it's to make sure that there is no bias on the

6   evaluation, so the PI might perceive that person as having a

7   conflict of interest.

8   Q.   All right.  Let's go to page 112, and this is the last

9   question I'll ask you about this one.  So I want -- Ms. Boyd,

10  if you could kind of scroll through the next few pages.

11       And, Dr. Schwartz, I'd like you to look through the next

12  11 pages here of publication detail and just kind of after

13  you've looked through that give me a sense of what these pages

14  list.

15  A.   It's exactly the same thing as those first pages listed,

16  products of the research, meaning the articles and

17  dissertations that use knowledge funded from DOE.

18  Q.   Does DOE double-check all of this and make sure that they

19  have the acknowledgment and check the affiliations and do any

20  of that?

21  A.   We check most of it.  I wouldn't say that I check every

22  single one.

23  Q.   All right.  So I'd like to show you what's been previously

24  marked as Government Exhibit 32.

25  A.   Should I keep this?

1    Q.    You can stack it.

2          Do you recognize this document?

3    A.    That's what I call the funding opportunity announcement or

4    FOA.

5    Q.    So this is what we talked about earlier.  This is the

6    initial document that DOE publishes and says, hey, if you're

7    interested in a proposal, here are the guidelines?

8    A.    Correct.

9          MR. BARRY:  The government moves to introduce into

10   evidence Government Exhibit 32.

11         THE COURT:  Any objection?

12         MR. ZEIDENBERG:  No objection.

13         THE COURT:  32, admitted.

14   BY MR. BARRY:

15   Q.    So I first want to just show you page 2, and if you could

16   go to page 2, which is the table of contents.  You see there's

17   a number of kind of subsections in here, right?  So let's go to

18   page 7.  And see at the bottom where it says Basic Energy

19   Sciences, is that the group that you work in?

20   A.    Correct.

21   Q.    And then if you turn the page, sub 0 within Basic Energy

22   Sciences is catalysis science?

23   A.    Correct.

24   Q.    That's your specific specialty?

25   A.    Yes.

1  Q.  All right.  So let's go to page 58.  And the sub-heading is

2  Project Summary Abstract, field seven on the form.  Tell me

3  when you're there.

4  A.  Yes.

5  Q.  Okay.  And can you describe to the jury just what this is

6  asking for, this project summary section?

7  A.  Basically asks for a summary of what you're proposing on

8  this application and also gives the title, the name of the

9  investigators and the name of the institutions.

10  Q.  The example that's given is titled:  A Really Great Idea.

11  Lead institution:  A. Smith, principal investigator.  And

12  that's kind of like a format that someone can follow?

13  A.  Correct.

14  Q.  Let's go to the next page on 59.  And if you look halfway

15  down where it says Collaborative Applications.  It says Cover

16  Page Supplement for Collaborations.  Would you please read the

17  first three sentences of that paragraph that starts with

18  collaborative applications?

19  A.  Collaborative applications submitted from different

20  institutions must clearly indicate that they are part of

21  collaborative project/group.

22  Q.  Can you read the next two sentences, please?

23  A.  Every partner institution must submit an application

24  through its own sponsored research office.  Each collaborative

25  group can have only one lead institution.

1    Q.    And then let's scroll down a little more.  Do you see where

2    it says if the project is a collaboration?  Is that instructing

3    the PI to list certain information about the proposed

4    collaboration?

5    A.    Yes.

6    Q.    What is -- in this context when someone is talking about

7    potentially doing a collaborative application, what does that

8    mean?

9    A.    It means that more than one principal investigator is --

10   has substantial contribution to that proposal and will

11   substantially do work based on that proposal.

12   Q.    So would an example be if there's two different

13   universities and each university has a scientist who's going to

14   work on the project?

15   A.    Yes.

16   Q.    And they're going to work at it together.  One scientist is

17   better at one aspect of the research and the other is better at

18   a different aspect, they jointly submit a collaborative

19   proposal to DOE?

20   A.    Correct.

21   Q.    Let's go to page 61, and this is again the red number.  And

22   again, these are the instructions that are with the funding

23   opportunity announcement, right?

24   A.    Yes.

25   Q.    And this has that biographical sketch requirement that you

1    talked about earlier?

2    A.    Correct.

3    Q.    And what's the biographical sketch used for from a DOE

4    perspective?

5    A.    To give information about education, training, research

6    activities, publications, also collaborators.

7    Q.    Does it also -- see the -- I don't know if it's the second

8    or the third paragraph, but the one that's titled Research and

9    Professional Experience?  Can you read what that says?

10   A.    Beginning with the current position, list in chronological

11   order professional academic positions with a brief description.

12   Q.    Is that asking the PI to list in chronological order all

13   professional and academic positions that they have with a brief

14   description of each position?

15   A.    That's my understanding.

16   Q.    Let's go to the bottom of the page where it says

17   Identification of Potential Conflicts of Interest or Bias in

18   Collection of Reviewers.  Is this the section that you were

19   referencing earlier about identifying potential conflicts for

20   the purpose of assigning third party reviewers?

21   A.    Yes.

22   Q.    If you go to the next page, it continues in terms of other

23   folks who DOE wants PIs to disclose, right?

24   A.    Yes.

25   Q.    And the purpose of that identification of potential

1    conflicts of interest or bias has to do with the review process

2    or the selection of proposals, right?

3    A.    Yes.

4    Q.    Okay.  And so, for example, would DOE want to know if

5    someone who was applying for a grant happened to have a

6    position at a university of one of their reviewers?

7    A.    I'm sorry.  Can you repeat so I can think about again?

8    Q.    Sure.  Sure.  It's a bad question.  So focus specifically

9    on the conflict of interest disclosure related to the

10   third-party review.

11   A.    Uh-huh.

12   Q.    Let's say the hypothetical is the principal investigator

13   who is applying for the grant has a job at Boise State.  Okay?

14   They're a professor at Boise State.  Would DOE want to know if

15   one of the reviewers who has been considered also had a job at

16   Boise State?

17   A.    Not necessarily.  We want to know if they collaborate.

18   Q.    Okay.  And what do you mean if they collaborate?

19   A.    If they have done work together, if that reviewer would

20   have any reason to give a positive or a negative assessment

21   other than what the reviewer is reading.

22   Q.    So it goes back to what you said earlier, which is about

23   making sure that the scientific proposal is evaluated on the

24   merits, not some sort of personal, undisclosed interest?

25   A.    Exactly.

1   Q.   I next want to focus on appendix two, this is on page 62,

2   the current and pending support section.  And I'd like you to

3   first just read that first paragraph that starts with "provide

4   a list."

5   A.   Provide a list of all current and pending support, both

6   federal and nonfederal, for the project director, principal

7   investigator, or principal investigators (PD/PI) and senior key

8   persons including sub-awardees for ongoing projects and pending

9   applications.  List all sponsored activities or awards

10  requiring a measurable commitment of effort, whether paid or

11  unpaid.

12  Q.   So let's -- I want to break that into chunks.  So the first

13  is, what is current and pending support?  What does the word

14  support mean?

15  A.   It means other grants that the PI might have currently or

16  might be applying for.

17  Q.   So these are other research grants or research dollars that

18  a PI either currently is receiving or may be receiving based on

19  some pending application?

20  A.   Correct.

21  Q.   Why does DOE want to know the current and pending research

22  support that a PI has when they ask DOE for money?

23  A.   We want to make sure there is no overlap of research from

24  what the PI has currently or might receive in the future in

25  comparison to what the PI is writing on this proposal.

1  Q.  Are there any other reasons why DOE wants to know that

2  information?

3  A.  We also want to know if the PI would have the time or if

4  he's not overly committed, for instance.

5  Q.  Why would DOE want to know if a PI was overcommitted and

6  wouldn't be able to do the research that they're proposing?

7  A.  To make sure that he or she is able to perform the work

8  that is being proposed.

9  Q.  One question, and I apologize, it's a little out of order,

10  but where does DOE get its money for all these grants?

11  A.  It's public money, taxpayer money, right?  Yeah.

12  Q.  Okay.  So then I want to also look at the second sentence

13  which says, list all sponsored activities or awards requiring a

14  measurable commitment of time, whether paid or unpaid.  What

15  does that mean?

16  A.  It means research activities that the PI might have

17  currently or is applying to have.

18  Q.  So it's similar to what you just talked about in terms of

19  wanting to know whether there's a risk of overlap of research

20  or whether the PI has the time necessary to perform the actual

21  research if they're funded?

22  A.  Correct.

23  Q.  So going back to the top where it says, provide a list of

24  all current and pending support, why does DOE want to know

25  about all support?

1    A.    To -- again, it's about scope of the research and

2    commitment of the PI.  So those two factors, knowing that we

3    are not paying for the same research that another agency or

4    another entity is paying and that the PI has time available to

5    do the research that he or she is proposing.

6    Q.    Would the word "all current and pending support" include

7    other support from NSF or DOD?

8    A.    Yes.

9    Q.    Would it include support from foreign governments?

10   A.    Yes, as long as it's research, right?

11   Q.    Sorry.  Go ahead.

12   A.    No.  Sorry.  That's it.

13   Q.    What do you mean by research?

14   A.    I mean that it has to be -- I mean if the PI is teaching

15   aerobic classes, that is not relevant to this activity, I don't

16   care.

17   Q.    So if it's a foreign government or foreign entity giving a

18   PI money to support research, that's something that DOE would

19   want to be disclosed in the current and pending section?

20   A.    Yes.

21   Q.    And this funding announcement that we looked at is from --

22   the issue date is 2016, right?  If you look at the first page?

23   A.    Correct.

24   Q.    I'm going to show you what's been marked as Government

25   Exhibit 125.  Do you recognize this document?  And take your

```
 1  time, it's a couple pages long.

 2  A.   Yes, it's e-mails being exchanged between me, my coworker,

 3  the PI and their sponsor office.

 4  Q.   Who's the PI?

 5  A.   Franklin Tao.  And also the co-PI.

 6  Q.   What's his name?

 7  A.   De-en Jiang.

 8       MR. BARRY:  The government moves to introduce into

 9  evidence Government Exhibit 125.

10       MR. ZEIDENBERG:  No objection.

11       THE COURT:  125, admitted.

12  BY MR. BARRY:

13  Q.   So let's -- the way that these are printed is that the

14  oldest-in-time e-mail is going to be at the bottom of the

15  chain.  So let's go to the back of the document and I want to

16  walk through this e-mail chain to understand what's going on.

17  So you'll see there's a November 30, 2017 e-mail from Dr. Tao

18  to you, correct?

19  A.   Yeah, correct.

20  Q.   And do you remember what he was -- he says, could I ask,

21  the deadline is 5:00 p.m. on December 4th or 11:59 p.m. of

22  December 4th?  Do you remember what he was asking you about

23  here?

24  A.   Yeah.  We typically -- our program, we put a deadline to

25  receive the proposals.  So each year we might change that due
```

1    date.  And apparently in this year it was December 4th that we

2    ask all our PIs, our investigators to submit their new or

3    renewal proposals by then.

4    Q.    So your interpretation is he's asking you about the

5    deadline to submit a proposal to DOE?

6    A.    Yes.

7    Q.    Let's scroll up to your response.  And you say, Dear

8    Franklin, we're not strict about the time.  Any time on

9    December 4th is fine with us.  Thanks for checking.  Viviane.

10   Did I read that accurately?

11   A.    Yes.

12   Q.    Dr. Tao responds later that day, thank you very much for

13   the reply, that helps.

14        Let's go a little bit more to the top of the page.  It

15   looks like Dr. Tao is just asking you a question about the

16   format of the proposal; is that accurate?

17   A.    Yes.

18   Q.    And then let's keep going.  And then Chris Bradley, is that

19   somebody else from the Department of Energy?

20   A.    Yes.  He co-manages with me the catalysis science program.

21   Q.    And he tells Dr. Tao, he just says, no page restriction.

22        And let's go up one more.  Dr. Tao says thanks.

23        Keep going up.

24        And then I want you to -- so this is -- if you go up to the

25   prior page, this is an e-mail from December 5th that Dr. Tao is

1  sending to you and Dr. Bradley, right?

2  A.   Yes.

3  Q.   And in the first e-mail we looked at in the chain he was

4  asking you about the deadline on December 4th, right?

5  A.   Yes.

6  Q.   So this is a day later, and could you please read just the

7  first sentence after -- where it says, Dear Dr. Schwartz and

8  Dr. Bradley?

9  A.   Due to the technical problem when I transferred file from

10  my computer to Cynthia of our research office right before

11  midnight, we couldn't submit it on time.

12  Q.   Then does it look like he's just asking if he can have a

13  little bit of extra time to submit the proposal?

14  A.   That's correct.

15  Q.   And then let's go up to your response.  You say, no

16  problem.  Make sure all is submitted no later than the end of

17  this week.  And that's on December 5th, right?

18  A.   Yes.

19  Q.   Okay.  So that would be -- the end of the week would be

20  December 8th?

21  A.   Correct.

22  Q.   Let's go up to the next e-mail.  Okay.  And I'd like you to

23  just read -- do you know who Cynthia Walker is?

24  A.   I don't know her, but I saw on her signature that she's the

25  research specialist from University of Kansas.

1    Q.    Okay.  And you can see that in that little signature block?

2    A.    Yes.

3    Q.    It says Cynthia R. Walker, KU, Office of Research, grant

4    specialist?

5    A.    Yes.

6    Q.    Can you please read what Ms. Walker states in the first

7    three sentences of that paragraph?

8    A.    Thank you for speaking with me today regarding Dr. Franklin

9    Tao's renewal proposal referenced below.  As we discussed,

10   Dr. Tao is currently traveling in Asia and is having some

11   difficulty with Internet access.  Therefore, he has been unable

12   to send me his final proposal narrative for submission via

13   grants.gov.

14   Q.    And then you respond that -- you just say, no later than

15   Monday?

16   A.    Yes.

17   Q.    You had previously extended it to Friday, right?

18   A.    Yes.

19   Q.    Okay.  So let's -- I'm going to show you what's been marked

20   as Government Exhibit 126.  Do you recognize this document?

21   A.    That's the typical document that we automatically receive

22   from our system indicating a proposal has been submitted.

23   Q.    And do you see that it's from a doe.gov e-mail account?

24   A.    Yes.

25           MR. BARRY:  Government moves to introduce into

1    evidence Government Exhibit 126.

2            MR. ZEIDENBERG:  No objection.

3            THE COURT:  126, admitted.

4    BY MR. BARRY:

5    Q.  So can you please just explain -- so this is from

6    December 15th, right, the e-mail, of 2017?

7    A.  Yes.

8    Q.  And it's saying that -- well, let me take a step back.

9    What is this confirming or what is this a receipt of?

10   A.  That confirms to the PI that DOE received the proposal that

11   the PI submitted.

12   Q.  And when was this particular proposal submitted?

13   A.  On December 11th of 2017.

14   Q.  And is that the Monday that was referenced in Exhibit 125

15   where you said you can have until Monday to submit it?

16   A.  Probably.  Would have to calculate.

17   Q.  I'll represent that it's Monday.

18       Okay.  All right.  I'd like to show you what's been marked

19   as Government Exhibit 34.  And what is this?

20   A.  That's the annual progress report that principal

21   investigator who receives a grant from DOE submits.

22   Q.  And is this a grant that was received pursuant to that

23   proposal we looked at earlier, Exhibit 32?  You can take your

24   time if you want to compare.

25   A.  Yes, it is correct.

1    Q.   So you said this is the annual report?

2    A.   Yes.

3              MR. BARRY:   The government moves to introduce into

4    evidence Government Exhibit 34.

5              MR. ZEIDENBERG:   No objection.

6              THE COURT:   34, admitted.

7    BY MR. BARRY:

8    Q.   When was this report submitted to DOE?

9    A.   It was submitted in 6/15/2019.

10   Q.   What was the reporting period for this report,

11   September 15, 2018 to September 19, 2019?

12   A.   Yes.

13   Q.   And who is the principal investigator on this project or

14   grant?

15   A.   Dr. Franklin Tao.

16   Q.   This is for a grant that he was receiving while working at

17   KU?

18   A.   Yes.

19   Q.   Okay.  So I want to go first to page -- well, let me take a

20   step back.  So what is a progress report?  Why does DOE --

21   first, what is a progress report and why does DOE require

22   progress reports?

23   A.   So that's one of the ways we oversee the grant.  So we want

24   to learn what the PI have been doing during that period of

25   time, during that year, what has been accomplished, what if

1   there were some difficulties, what are the products which are

2   the papers and publications, and if the PI had also given

3   talks, conference talks on the project.  So it gives us a

4   description of what the PI has done during that period.

5   Q.   Is it accurate to sort of say that the progress report is

6   the document that you used to assess, in part, how the DOE

7   money has been spent over the last year by the principal

8   investigator?

9   A.   Yes, correct.

10  Q.   So let's go to page 34, please.  Why is DOE asking about

11  participants in other collaborating organizations in the

12  progress report?

13  A.   We want to learn who is being funded or who is being -- who

14  is working with the PI on this project during this period.

15  Q.   And why does DOE want to know that?

16  A.   Well, it gives an idea of what the grant is covering in

17  terms of personnel.

18  Q.   And do you see in this section there's two fields next to

19  each participant that lists international collaboration and

20  international travel?

21  A.   Yes.

22  Q.   And do you see -- I want you to sort of -- if Ms. Boyd can

23  scroll through, and you can look at it while we're doing this,

24  if any of those participants have marked yes for international

25  collaboration or international travel?

1    A.    No.  They all say no.

2    Q.    So last question about this one, let's go to page 38.  And

3    you see this question that says, what is the impact on society

4    beyond science and technology?  And if -- I'd first like you to

5    just read the first three sentences of that response.

6    A.    Shale gas is an abundant energy resource.  Maturation of

7    horizontal drilling and hydraulic fracturing technology brings

8    this energy resource from shale to global society in a safe and

9    reliable manner.  It has unlocked vast energy resource located

10   in shale and other tight rocks in many states of the USA.

11   Should I continue?

12   Q.    If you could just go to the second paragraph where it says

13   aromatization?

14   A.    Aromatization of ethane has been one of the most important

15   channels for utilization of shale gas.  There were a large

16   number of studies of aromatization of ethane in the last three

17   decades.  Motivated by the increase of shale gas in energy

18   sector in this decade and continuous increase in next decades,

19   aromatization of ethane has attracted new attention of

20   catalysis community in recent years.

21   Q.    You can stop there.  So why is DOE in an annual progress

22   report asking how the research it's funding may or may not

23   impact society beyond science and technology?

24   A.    It's part of DOE showing how the public money is being

25   spent and what are the impacts on society and how we contribute

1    to our society.

2    Q.   I'd like to show you what's been marked as Government

3    Exhibit 31.  Do you recognize this document?

4    A.   It's a proposal, an application from the same PI, but it

5    was the first application from University of Kansas in 2015.

6    Q.   So is this the DOE application that Dr. Tao initially

7    submitted to DOE that he renewed in 2017-2018?

8    A.   Yes.

9         MR. BARRY:  Government moves to introduce into

10    evidence Government Exhibit 31.

11         THE COURT:  Any objection?

12         MR. ZEIDENBERG:  No objection.

13         THE COURT:  Exhibit 31 admitted.

14    BY MR. BARRY:

15    Q.   Okay.  I want to show you other documents.  I want to show

16    you first what's been marked as Government Exhibit 37.  Do you

17    recognize this document?

18    A.   Yes.

19    Q.   What is it?

20    A.   It's an assistance agreement.

21    Q.   What is an assistance agreement?

22    A.   It's the contractual part of the grant.  It's when the

23    grant is awarded and the DOE then -- and that's the contracting

24    office that releases this document.

25    Q.   So this is the contract between DOE and --

1    MR. BARRY:  Well, the government moves to introduce

2    into evidence Government Exhibit 37.

3    MR. ZEIDENBERG:  No objection.

4    THE COURT:  37, admitted.

5    BY MR. BARRY:

6    Q.  So if we could just go to the middle real quick where it

7    says -- actually the top part.  Okay.  So is this the contract

8    between DOE and the University of Kansas for the research

9    proposal that Dr. Tao is granted by DOE that we looked at?

10   A.  Yes.

11   Q.  Okay.  I'd like to show you what's been marked as

12   Government Exhibit 38.  Do you recognize this document?

13   A.  It's another assistance agreement.

14   Q.  Is this one for a different time period?

15   A.  It starts in September 9, 2016.

16   MR. BARRY:  The government moves to introduce into

17   evidence Government Exhibit 38.

18   THE COURT:  Any objection?

19   MR. ZEIDENBERG:  No objection.

20   THE COURT:  38, admitted.

21   BY MR. BARRY:

22   Q.  And this is just another assistance agreement between KU

23   and DOE for the grant for a different time period?

24   A.  Yes.

25   Q.  I'd like to show you what's been marked as Government

1   Exhibit 39.  Do you recognize this document?

2   A.   Yes.  It's another assistance agreement.

3          MR. BARRY:  Government moves to introduce into

4   evidence Government Exhibit 39.

5          THE COURT:  Any objection?

6          MR. ZEIDENBERG:  No.  No, Your Honor.  No objection.

7          THE COURT:  39, admitted.

8   BY MR. BARRY:

9   Q.   I'm going to do two this time to try to save time.  So I'm

10  going to show you what's been marked as Government Exhibit 40

11  and Government Exhibit 41.  Do you recognize these documents?

12  A.   They're all assistance agreements from different periods.

13  Q.   For the same grant?

14  A.   Yes.  It might have been the renewal part of the grant.

15         MR. BARRY:  The government moves to introduce into

16  evidence Government Exhibit 40 and 41.

17         MR. ZEIDENBERG:  No objection.

18         THE COURT:  40, 41, admitted.  Close out in a few

19  minutes.

20         MR. BARRY:  Pardon?

21         THE COURT:  You can close the line of questioning in

22  another few minutes.

23         MR. BARRY:  Yes, I will try to get us out of here.

24  BY MR. BARRY:

25  Q.   I'm going to show you what's been marked as Government

1    Exhibit 36.  Do you recognize this document?

2    A.   It's one of the reports that we get from our web-based

3    system giving us an action history on a grant.

4            MR. BARRY:  Government moves to introduce into

5    evidence Government Exhibit 36.

6            MR. ZEIDENBERG:  No objection.

7            THE COURT:  36, admitted.

8    BY MR. BARRY:

9    Q.   And if we could zoom in on the middle.  Is this showing the

10   different actions related to Dr. Tao's grant that we've been

11   talking about?

12   A.   Correct.

13   Q.   Okay.  And see how it has a little internal DOE comment

14   right there?

15   A.   Correct.

16   Q.   Is that a comment that you wrote?

17   A.   Yes.

18   Q.   Can you just read the first sentence for us, please?

19   A.   This is the first year after the renewal and the PI

20   continues reporting -- reports nicely their recent advances

21   with an output of at least four new publications on which our

22   grant was the major contributor.

23   Q.   Okay.  So he -- at least at this point in time your

24   assessment was that he was doing a pretty good job from a

25   publication perspective?

1    A.    Yes.

2    Q.    So I'd like to show you what's already been admitted into

3    evidence as Government Exhibit 193.  And if you look at the top

4    of this e-mail, can you just describe for us what's going on

5    here?

6    A.    You want me to read?

7    Q.    Just tell us what's going on.  It looks like an e-mail from

8    Dr. Tao to you.  What is he submitting to you?

9    A.    He's submitting an updated current and pending.

10   Q.    Okay.  And then I'd like you to just look at -- you see how

11   it says "attachments" right there and the first one is current

12   and pending Tao and Jiang July 2018?

13   A.    Yeah.  He also submitted the budget and budget

14   justification.

15   Q.    I'd like to show you what's already been admitted into

16   evidence as Exhibit 194.  Is this the current and pending that

17   was attached to that e-mail?

18   A.    Most likely.

19        MR. BARRY:  No further -- I have some -- a few more,

20   but if you'd like to take a break.

21        THE COURT:  Yeah, I think this would be a good time

22   for a break.  These two were already admitted, 193 and 194?

23        MR. BARRY:  Yes, Your Honor.

24        THE COURT:  Yeah.  I see.  We're going to be in recess

25   for the weekend.  We'll see everyone back at 9:00 on Monday

1    morning.  Remind the jury over this weekend to not research,

2    read, look up, and talk to anyone and expose yourself to any

3    media coverage of any of the issues or people in this case.

4    Have a great weekend.  We'll see you Monday, 9:00 a.m.

5              We'll see you back, Dr. Schwartz, as well.

6         (The following proceedings occurred outside the presence of

7    the jury.)

8              THE COURT:  Law Clerk Joy Merklen -- hang around for

9    just a minute.  She's going to give you all a set of court

10   instructions that we've been working on.  I thought over the

11   weekend would be a good time for you all to review those.  And

12   then the next step will be to schedule an informal conference

13   with you all with her just so she can figure out if anything is

14   agreed to among you all and what will be the remaining issues

15   for me to decide.  And so she -- Bonnie, do you know, is she --

16             COURTROOM DEPUTY:  She went to get the jury

17   instructions.

18             THE COURT:  She'll be here shortly with a set for you

19   each.

20             MR. OAKLEY:  Could we raise something else for the

21   weekend?

22             THE COURT:  Sure.

23             MR. OAKLEY:  This morning, both before lunch and after

24   lunch, on cross-examination with Dr. Keiser, counsel asked

25   questions related to getting the defendant's side of the story

1    and I think it was phrased, wouldn't you expect the federal

2    government would want to talk to Dr. Tao before he was

3    indicted?

4              The facts of this case are, the night before the grand

5    jury indictment FBI encountered the defendant at Chicago O'Hare

6    Airport and attempted to interview the defendant.  The

7    defendant asserted his rights to remain silent and asked for an

8    attorney.  Obviously we have no intention of bringing that into

9    evidence.  However, now that the defendant has argued they

10   didn't give me a chance to get my side of the story, he's

11   opened the door for the purpose solely of saying he had that

12   opportunity.

13        MR. ZEIDENBERG:  Your Honor, they had an indictment at

14   that time.  This was going to be an -- they wanted to see what

15   else they could get.  But what we had been talking about --

16   that I had been talking about with Ms. Keiser was, she said,

17   well, you know, we -- normally we would expect someone at KU to

18   come and talk to them.  We would talk to the program officer.

19   We would try and find out why there were deficiencies so they

20   could be corrected because innocent mistakes happen.

21             We're not talking about interviews with the FBI at

22   O'Hare Airport when you're getting off the plane with an

23   indictment waiting for you.  It's a totally different

24   situation.  At this point the investigation was done.  They

25   were ready to arrest him.  They executed a search warrant at

1    his house that day.  Unbeknownst to him.  So, you know, this

2    isn't like if only he had told us what the whole story was we

3    would have made this go away.  It was already baked.  They were

4    trying to put some icing on the cake.

5        MR. OAKLEY:  The indictment was the next day, Your

6    Honor.  He was encountered the night before the grand jury

7    issued its indictment, the next day after.

8        THE COURT:  I understand that temporally.  As you know

9    we're treading on very risky ground given the defendant has a

10   constitutional right to remain silent.  There were questions

11   about whether -- that really ask of every one of these

12   witnesses when was the first time the FBI or anyone from the

13   government talked to them about this and they all indicated

14   that it was trial prep.

15       MR. OAKLEY:  Your Honor, I know we're butting up

16   against a weekend, and as the Court I think knows, we're

17   getting daily transcripts.  I can put together -- because I

18   have some case law too.  I can take a look at the transcript

19   and we can get something to the Court over the weekend that

20   just -- a very brief bench brief that shows the questions and

21   the related case law.  And obviously if we look at the

22   transcript and my recollection is different, then we may not

23   decide to seek that.  But my recollection is that it was --

24   that it opened the door.

25       THE COURT:  All right.  You can file a bench brief.

1   Do you think you can get that filed by tomorrow?  I want to

2   give the defendant a chance to respond.  I'm guessing I don't

3   need to rule on Monday necessarily, because if I were to allow

4   this, it would come in later through an agent's testimony.  I

5   guess, I don't know.

6          MR. BARRY:  We intend -- for another purpose we intend

7   to call that same agent and we expect he'll testify probably

8   Tuesday or Wednesday.

9          THE COURT:  All right.  Make your submission.

10  Obviously the defense should have time to respond in writing or

11  not, but either way I'll hear oral argument about it.  Okay.

12  All right.  Anything else?

13         MR. ZEIDENBERG:  Nothing for the defense.

14         THE COURT:  All right.  We'll be in recess.  I'll be

15  available at 8:30 Monday morning, so if there's time to take it

16  up then, I don't know if there will be time.  If you don't file

17  it until, say Sunday night, I doubt, Mr. Zeidenberg, you'll be

18  able to respond Monday morning, but we'll see where we're at at

19  this point.  Okay.  All right.  We'll be in recess.

20     (Evening recess.)

21

22

23

24

25

1                    C E R T I F I C A T E

2        I, Danielle R. Murray, a Certified Court Reporter and the

3    regularly appointed, qualified, and acting official reporter of

4    the United States District Court for the District of Kansas, do

5    hereby certify that the foregoing is a true and correct

6    transcript from the stenographically reported proceedings in

7    the above-entitled matter.

8        SIGNED 17th of November, 2022

9

                            /s/Danielle R. Murray
10                          DANIELLE R. MURRAY, RMR, CRR
                            United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25