```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,

 4        Plaintiff,
                                      Case No. 19-20052-JAR
 5        v.

 6   FENG TAO, a/k/a "Franklin      Kansas City, Kansas
     Tao,"                          Date:  1 April, 2022
 7
          Defendant.                Day 10
 8                                  Pages 1750 - 1989

 9   .........................

10                    TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE JULIE A. ROBINSON
11            SENIOR UNITED STATES DISTRICT COURT JUDGE

12                   A P P E A R A N C E S
13
     For the Plaintiff:
14
     Mr. Adam Barry               Mr. Christopher Oakley
15   U.S. DEPARTMENT OF JUSTICE   U.S. ATTORNEY'S OFFICE
     950 Pennsylvania Avenue, NW  500 State Avenue
16   Washington, D.C. 20530       Suite 360
                                  Kansas City, Kansas 66101
17
     For the Defendant:
18
     Mr. Michael F. Dearington
19   Mr. Peter R. Zeidenberg
     ARENT FOX, LLP
20   1717 K Street NW
     Washington, D.C. 20006
21

22

23

24
     _____
25        Proceedings recorded by machine shorthand,
        transcript produced by computer-aided transcription.
```

```
 1                        I N D E X

 2
        Government's Witnesses:                      Page
 3
        JAMES CHURCHILL
 4        Direct Examination by Mr. Barry            1772
          Voir Dire Examination by Mr. Dearington   1809
 5        Continued Direct Examination by Mr. Barry 1813
          Cross-Examination by Mr. Dearington       1846
 6        Redirect Examination by Mr. Barry         1910
        DR. GLENN TIFFERT
 7        Direct Examination by Mr. Barry           1920
          Voir Dire Examination by Mr. Dearington   1944
 8        Cross-Examination by Mr. Dearington       1952
          Redirect Examination by Mr. Barry         1979
 9

10

11                    E X H I B I T S

12      Government's
        Exhibits              Offered         Received
13
           121                                   1771
14         121A                                  1771
           121X                                  1771
15         155               1790                1790
           156               1790                1790
16         156A              1790                1790
           158               1797                1797
17         158A              1797                1797
           159               1796                1796
18         159A              1796                1796
           161               1791                1791
19         162               1791                1791
           174               1792                1792
20         174A              1792                1792
           177               1793                1794
21         177A              1793                1794
           179               1794                1795
22         183               1795                1795
           183A              1795                1795
23         195               1797                1797
           195A              1797                1797
24         196               1798                1798
           196A              1798                1798
25         198               1799                1799
           203               1799                1799
```

| | Government's Exhibits Continued | Offered | Received |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | 208 | 1803 | 1803 |
| | 212 | 1805 | 1805 |
| 4 | 213 | 1805 | 1805 |
| | 213A | 1806 | 1806 |
| 5 | 217 | 1807 | 1807 |
| | 220 | 1825 | 1825 |
| 6 | 222 | 1829 | 1829 |
| | 226 | 1825 | 1826 |
| 7 | 227 | 1826 | 1826 |
| | 228 | 1828 | 1828 |
| 8 | 234 | 1830 | 1830 |
| | 238 | 1832 | 1832 |
| 9 | 240 | 1831 | 1831 |
| | 240A | 1831 | 1831 |
| 10 | 241 | 1832 | 1832 |
| | 241A | 1832 | 1832 |
| 11 | 242 | 1832 | 1832 |
| | 242A | 1832 | 1832 |
| 12 | 243 | 1832 | 1832 |
| | 244 | 1832 | 1832 |
| 13 | 246 | 1832 | 1832 |
| | 246A | 1832 | 1832 |
| 14 | 253 | 1836 | 1836 |
| | 310 | 1802 | 1802 |
| 15 | 311 | 1806 | 1806 |
| | 312 | 1828 | 1828 |
| 16 | 313 | 1838 | 1838 |
| | 314 | 1838 | 1838 |
| 17 | 314A | 1838 | 1838 |
| | 315 | 1840 | 1840 |
| 18 | 316 | 1840 | 1840 |
| | 322 | 1774 | 1774 |
| 19 | 322A | 1774 | 1774 |
| | 332 | 1776 | 1776 |
| 20 | 333 | 1776 | 1776 |
| | 333A | 1776 | 1776 |
| 21 | 334 | 1776 | 1776 |
| | 334A | 1776 | 1776 |
| 22 | 335 | 1787 | 1787 |
| | 336 | 1787 | 1787 |
| 23 | 336A | 1787 | 1787 |
| | 337 | 1787 | 1787 |
| 24 | 337A | 1787 | 1787 |
| | 619 | 1944 | 1951 |
| 25 | 758 | 1784 | -- |
| | 759 | 1784 | -- |

```
 1      Government's
        Exhibits
 2      Continued                   Offered              Received

 3          760                      1784                   --
           1463                      1851                  1851
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2       (The following proceedings occurred outside the presence of

3   the jury.)

4       MR. ZEIDENBERG:  Your Honor, the government and the

5   defense thought it would be helpful if we could get some

6   guidance from the Court on this.  So just to remind the Court,

7   when Rebecca Keiser from the National Science Foundation

8   testified, I started asking her some questions about this

9   e-mail from this woman Susannah Scott who was a Changjiang

10  Scholar at the University of California Santa Barbara and she

11  had laid out this, I'm this, I'm that, I've done -- I did these

12  things in China, you know, I got some stipends, I did research,

13  I did collaborating, what do you want me to do?  This was in

14  September of 2020.

15      And just to put it in context, earlier than that she

16  sent an e-mail in 2018 saying I was just appointed a Changjiang

17  Scholar and the response was congratulations.  And then two

18  years later, she followed up apparently at the direction of her

19  university, you know, make a disclosure, and she made a

20  disclosure at the same time to NSF and DOE.

21      Now, switching quickly to DOE, one of the people she

22  wrote to at DOE was Viviane Schwartz who testified and so we

23  were able to admit the e-mail because Viviane Schwartz got the

24  e-mail and Viviane Schwartz was on the reply to her.

25      When we were doing the NSF, the witness on the stand

1    was Ms. Keiser who was not on the e-mail chain, and so I did it

2    in kind of a somewhat convoluted hypothetical fashion as the

3    Court had directed because there was an objection on hearsay

4    grounds.

5         We have subpoenaed the individual at the -- the NSF

6    witness who is at the end of this string who responded on the

7    last page.  His name is Robert McCabe, and he said, we checked

8    with Tim Patten, our deputy division director and ethics

9    officer and he noted no specific guidance has been released

10   regarding responses to disclosures of the type you sent.

11   There's nothing to the disclosure that would give us pause.

12        We want to admit this e-mail.  And Mr. McCabe is under

13   subpoena.  He's in Washington.  He's accepted -- they've

14   accepted service of process.  We've talked to the government.

15   I'm not going to speak for them other than to say I think

16   they're trying to be accommodating in not requiring us to bring

17   Mr. McCabe in if all he's going to say is I got this e-mail, I

18   responded thusly, but yet they have maintained that they want

19   to object to the admissibility of the document.

20        We're not asking them to stipulate as to its relevance

21   or anything else.  We're just trying to see if there's a way we

22   can avoid unnecessarily having these NSF witnesses come, fly to

23   Kansas, simply to say I got this e-mail and this is what I

24   replied.

25        So, you know, Mr. Oakley can reply for the government

1    and then maybe the Court can say -- I think what we're looking

2    for is whatever the ruling is so that it's not hinging on what

3    we all expect Mr. McCabe to say.  So I think the question would

4    be, if Mr. McCabe -- if we can get agreement that Mr. McCabe

5    would say I got the e-mail, this is what I sent out, then maybe

6    we can avoid that process and we can have the relevance or

7    hearsay or whatever objections, we can do without necessitating

8    that witness appearing.

9             THE COURT:  I understand.  So in other words, you're

10   thinking that the government may stipulate that Mr. McCabe

11   would testify that he got this, he received this, but it

12   doesn't necessarily cure any other objections they might have,

13   so you want to talk about those other objections at this point?

14            So you handed me Defendant's Exhibit 1429, but I

15   assume there's some other exhibits that are like this involving

16   folks from the NSF or DOE?

17            MR. ZEIDENBERG:  This is the only one.

18            THE COURT:  Okay.

19            MR. ZEIDENBERG:  So it would be -- Mr. McCabe would

20   presumably testify I got this and this is what I responded.

21            THE COURT:  Okay.  So what's the government's

22   objections to Exhibit 1429?

23            MR. ZEIDENBERG:  Given, Your Honor, that this is, you

24   know, we think a perfectly parallel situation to what happened

25   with DOE and Susannah Scott -- I mean Viviane Schwartz, that

1   the logic and the arguments and, you know, Viviane Scott [*sic*]

2   was in that case just a cc on the reply to Susannah -- Viviane

3   Schwartz was just cc'd on the reply to Susannah Scott.  In this

4   case Mr. McCabe actually wrote the reply.

5           THE COURT:  Okay.  Mr. Oakley.

6           MR. OAKLEY:  Your Honor, first of all, I think -- my

7   understanding of Mr. McCabe if he were called to testify would

8   simply say it appears I sent this e-mail, but I have no

9   recollection of this.

10          But the government's concern is the hearsay statement

11  from Susannah Scott.  The defense is seeking to offer that for

12  the truth of the matter.  That was the foundation of the

13  objection that we provided that led to the Court's *limine*

14  instruction and the Court's direction to counsel to ask it in a

15  hypothetical type question.

16          The other concern with this -- and since that time and

17  I think today the Court will hear further evidence, Ms. Scott,

18  who is an endorsed witness on their list, but I understand they

19  don't intend to call her, she was a Changjiang chair, and the

20  commitment and the obligation is completely different than the

21  distinguished professor, and I think that's set out in this

22  e-mail from Ms. Scott where she says that counsel at her

23  university reviewed it and thought that it included at most a

24  two-month annual time commitment.

25          So the 104, 103 analysis, the jury is going to be

1   confused.  Assuming that evidence of a decision or an e-mail in

2   one situation that's equivalent to the defendant's situation

3   would be admissible, it would be extremely confusing for the

4   jury to introduce evidence of a situation that is not the same,

5   completely different.

6         MR. ZEIDENBERG:  If I may, Your Honor, Susannah

7   Scott's portion of this e-mail is not being admitted for the

8   truth of the matter.  This is so clearly not hearsay because we

9   don't know if anything she said -- and we don't care if

10  anything she said is actually truthful.  She's -- I mean, I

11  don't know if she was lying or she was telling the truth.  I

12  don't know if she was being accurate or inaccurate or just, you

13  know -- it simply doesn't matter.

14        What we're trying to admit this for is the response to

15  NSF to these -- such a factual pattern that was presented to

16  them, true or not.  And frankly, the fact that they didn't do

17  any investigation into whether it was true is also telling

18  because notably, although she says I've got a written contract,

19  but I'm not really working as I'm told, the contract requires

20  me to do X, but I'm not doing X; they say, oh, well, in that

21  case, you're fine.  And they don't ask to say, well, we need to

22  see a translated version, we'd want to see the original, we

23  want to see your travel records.  They just said, carry on.

24        And that's the significance is the -- it's not even so

25  much the response.  It's the lack of a response.

1        MR. OAKLEY:  Your Honor, the response itself from

2   Mr. McCabe says, no specific NSF guidance has been released

3   regarding response to disclosures of the type you sent.  So

4   it's clear that he's dealing with what Ms. Scott's description

5   of her award is.  So absolutely it's being offered for the

6   truth of the matter because McCabe's response relies on that.

7        THE COURT:  All right.  So this is -- this is similar

8   to what happened when Ms. Schwartz was here and I think I did

9   not admit the exhibit but allowed a hypothetical question to be

10   posed to Ms. Schwartz as a representative of -- she's DOE?

11        MR. ZEIDENBERG:  Schwartz was DOE and you did admit

12   the exhibit with her.

13        THE COURT:  She was on the exhibit.

14        MR. ZEIDENBERG:  She was on the e-mail, and so she

15   said, yeah, I got this e-mail and, yes, this was the response.

16   And this was admitted.  Frankly this would be the identical

17   parallel situation.  And to the extent the government wants a

18   limiting instruction that it's not to be taken for the truth of

19   the matter, you know, we have no objection to that.

20        We're not arguing that Susannah Scott actually did

21   these things, only that when told about these types of

22   activities, the NSF -- their hair was not collectively on fire,

23   notwithstanding that there were differences which the

24   government can point out between these two situations.  Well,

25   one was a distinguished chair versus another chair.  The point

1  is that as opposed to what Rebecca Keiser testified, that, oh,

2  you have to disclose everything, you have to disclose

3  everything, everything has to get disclosed.  Here they get

4  something with quite a few disclosures including stipends and

5  collaborations and lectures, and they say, no, you don't have

6  to disclose.

7       THE COURT:  I do think the better way to do this is to

8  have Mr. McCabe -- ask him.  I mean, even if he doesn't have

9  any recollection, he's given a response to this, whether it's a

10  hypothetical or not, just as Ms. Schwartz did.  I do think it's

11  relevant.  It's in 2020, even though it's not exactly the same,

12  there's disclosures.  Ms. Scott at least purportedly, you know,

13  had certain connections with a Chinese university.  They're

14  somewhat similar.

15       I don't -- I'm trying to process how to admit this, I

16  mean, and then how it would be presented to the jury any way

17  other than the truth of the matter asserted without Mr. McCabe

18  explaining, I don't know if this is true or I don't know, but

19  based on this hypothetical, yes, or these set of facts

20  presented to me, yes, this is the response I gave.

21       MR. ZEIDENBERG:  Well, I mean, again, we wouldn't be

22  arguing that Susannah Scott did this.  It's just that again,

23  when presented with these types of factual scenarios, the

24  National Science Foundation did not respond with any

25  requirement that -- it goes to the materiality of this whole

1    situation.

2         THE COURT:  It's definitely relevant.  I just think

3    the government should be able to then cross-examine Mr. McCabe

4    what about this, what about that, since it's somewhat

5    different.  But I do think it's admissible with him testifying

6    for sure because he's on this chain and it provides context for

7    his answer.

8         Did you have something more?

9         MR. OAKLEY:  Your Honor, if the defense isn't offering

10   Ms. Scott's statement for the truth of the matter, then redact

11   her entire statement.  That's what they've asked to do on ours.

12        THE COURT:  But it provides no context then for what

13   he says.

14        MR. OAKLEY:  That's my point.  So I think they are

15   offering it for the truth of the matter.

16        THE COURT:  There is a distinction.  I mean, and I

17   think -- I'm trying to remember how I handled this before, but

18   I thought there was at least some exhibit that I didn't allow

19   in, but I allowed the defense to pose as a hypothetical

20   question to the government witness and then they proceeded to

21   talk about what their advice would have been at that particular

22   time period.  This is very much the same.

23        So it may not be exactly true.  I mean, it could be --

24   I just -- I think it's better to have a live witness because

25   then if there's a challenge to whether this is true or not or

1    whether it's different than Dr. Tao's situation, that's

2    something that could be fleshed out in direct or

3    cross-examination of Mr. McCabe.

4         MR. ZEIDENBERG:  Just to further that point, Susannah

5    Scott, to the point that we're not admitting it for her truth,

6    I mean, she could have been -- she could have been lying about

7    this whole thing.  Her involvement could have been far more

8    extensive than what she reported.  I don't imagine why she

9    would say it was less, you know, that she would exaggerate it,

10   but I could see why she would minimize it.  I'm not suggesting

11   that she did that.  I'm just saying hypothetically.

12        The point is they didn't require any further

13   investigation, that they didn't say, you know, the Office of

14   Inspector General will come by and talk to you about this and

15   we'd like to see copies of all your travel records.

16        THE COURT:  Right.  But they were responding

17   specifically to the fact pattern that she set out.

18        MR. ZEIDENBERG:  Right, right.  That fact pattern, and

19   that's why it's nothing more than a fact pattern.  If presented

20   with this fact pattern, this is how the National Science

21   Foundation responded.

22        THE COURT:  But what I'm saying is it's not Dr. Tao's

23   fact pattern, it's different, and I think the government should

24   have the right to cross-examine about what about this, what

25   about that.  I mean, if this is a hypothetical, then what about

1    a different hypothetical.

2          So I think it's better to bring Mr. McCabe in.  I will

3    admit this with him here, and I do think that it will be -- it

4    will be far less confusing to the jury for him to -- even if he

5    doesn't remember, I just -- I just think this exhibit alone

6    doesn't explain enough.

7          MR. ZEIDENBERG:  We understand, Your Honor.

8          THE COURT:  Okay.

9          MR. OAKLEY:  And, Your Honor, if that occurs could we

10   have a limiting instruction related to Ms. Scott's portion that

11   it's not to be considered for the truth of the matter?

12         THE COURT:  Yes, but I think again that's why it's

13   important to have Mr. McCabe here, to say whether it's true or

14   not, based on what she said, this is the response.  And then,

15   you know, develop it further if it needs to be developed

16   further.

17         Is he subpoenaed to be here Monday?

18         MR. ZEIDENBERG:  Yeah.  That would be the plan.  We'll

19   e-mail his NSF counsel now to alert him that he should

20   probably --

21         THE COURT:  Is there anybody else in -- I mean, any

22   other NSF or DOE witnesses or anybody like that that you're

23   also --

24         MR. ZEIDENBERG:  I don't think so, Your Honor.

25         THE COURT:  Okay.  And we can certainly take him out

1    of order or in the middle of your examination of Special Agent

2    Lampe to accommodate his travel schedule.

3              MR. ZEIDENBERG:  Okay.

4              THE COURT:  Do you want this back, 1439?

5              MR. ZEIDENBERG:  Thank you.

6              THE COURT:  Are we ready otherwise?

7              MR. DEARINGTON:  Sorry, I had one question for the

8    Court.  I think maybe the Court mentioned for the certificate

9    that has been proposed to which we object to the translation,

10   there may be an opportunity to *voir dire* the witness; is that

11   the Court's intention?

12             THE COURT:  Yeah, when it's offered, if you want to

13   *voir dire* I assume the linguist on -- the linguist on his

14   translation, problems with the translation or something that

15   might go to whether or not I'm going to admit it.

16             MR. DEARINGTON:  Would that be outside the presence of

17   the jury?

18             THE COURT:  Usually not, but I mean, do you think it

19   needs to be?

20             MR. BARRY:  I don't think it should be, Your Honor.

21             MR. DEARINGTON:  I think our preference would be to do

22   it outside the presence of the jury if it's going to be a legal

23   ruling on it, and then we would be able to -- in front of the

24   jury it would go to the weight and veracity of the translation

25   if the Court is going to admit the translation.

1    THE COURT:  Will it be a legal ruling?  I think it's a

2    fact question, isn't it?

3        MR. BARRY:  I think it is, Your Honor.

4        MR. DEARINGTON:  Your Honor, if that's your

5    inclination, that would be fine too.

6        THE COURT:  What are you challenging about his

7    translation?

8        MR. DEARINGTON:  We think the translation states you

9    are authorized -- the Ministry of Education has authorized or

10   approved Dr. Tao to be appointed.  The government thinks it

11   says this certifies that Dr. Tao has been appointed.

12       THE COURT:  Okay.  I think that's a weight over

13   admissibility.  I think that's something the jury needs to hear

14   you -- because the jury may decide that your translation is

15   right, not his.  The exhibit still comes in, but we're not --

16   it still comes in, but the jury will then have heard that maybe

17   this isn't correct, maybe we should consider this a different

18   way, and I think they need to hear that interchange.

19       MR. DEARINGTON:  Okay.  Thank you, Your Honor.

20       MR. BARRY:  There is one --

21       THE COURT:  Is there something else?

22       MR. BARRY:  Yeah.  There's one other thing just

23   because the first exhibit we're going to introduce will likely

24   draw an objection, so I thought we could talk about it now

25   rather than have the jury in and immediately go to a bench

1    conference.

2            THE COURT:  Okay.  What's that?

3            MR. BARRY:  So yesterday there were a series of

4    e-mails in which someone from Fuzhou sent the defendant some

5    documents relating to the Changjiang defense program -- or the

6    defense of his application.  And defendant objected based on

7    hearsay grounds and the objection was sustained.  And that was

8    for Exhibits 119, 119A, 120, 120A, 121, and 121A.  And during

9    the bench conference Your Honor asked whether there was any

10   indication of the defendant doing anything with the materials

11   that he sent.

12           So we have marked what we're going to call

13   Exhibit 121X, and Your Honor, may I approach to just hand this

14   to you?

15           THE COURT:  Yes.

16           MR. BARRY:  So this is -- this is an e-mail forwarding

17   that bottom e-mail from someone at Fuzhou that was sent to the

18   defendant where we redacted that.  And this is the defendant at

19   the top forwarding it from his Gmail to the Chinese Consulate

20   e-mail address, so we would seek to admit 121X as an adoptive

21   admission, and then we're going to seek to introduce -- there's

22   two attachments you'll see on there, there's a spreadsheet and

23   a PDF and the PDF is the same document as 121.

24           THE COURT:  Okay.  Wait.  So 121X is just one sheet.

25   There's no attachments.

1          MR. BARRY:  Correct.  So 121X is an e-mail chain, and
2   you'll see there's two -- in the metadata there's two
3   attachments.
4          THE COURT:  Yes.
5          MR. BARRY:  And the second attachment that has two
6   Chinese characters 2017 and it goes on, if you look at 121, the
7   title of that document is the same string of characters, it's
8   that PDF.
9          THE COURT:  Will you tell her not to bring them in?  I
10  thought I heard her out there.
11         After 2017?
12         MR. BARRY:  Yes, Your Honor.
13         THE COURT:  Oh, I see.
14         MR. BARRY:  The jury is coming in.
15     (The jury entered the courtroom, after which the following
16  proceedings were had.)
17     (The following proceedings were had at the bench.)).
18         THE COURT:  All right.  So we're only talking about --
19  we're only talking about exhibit -- I sustained on 119, 120.
20  What we're talking about is 121 and 121A, correct?
21         MR. BARRY:  Correct.
22         THE COURT:  Which I sustained an objection.
23         MR. BARRY:  Correct.
24         THE COURT:  121 -- where is the e-mail -- I mean, 121
25  is an attachment.  What was it attached to?

```
1              MR. BARRY:  If you look at 121X.

2              THE COURT:  Right.

3              MR. BARRY:  And you see the second document, the PDF.

4              THE COURT:  Yes.

5              MR. BARRY:  Compare that to this.

6              THE COURT:  Yes, I did that.

7              MR. BARRY:  So we're seeking to admit this e-mail as

8      an adoptive admission, and then we're seeking to admit the

9      attachment as an adoptive admission or under 803(8) as a public

10     record.

11             THE COURT:  Okay.  So when I sustained the objection

12     to these, these were not presented in the form of an e-mail or

13     attachment.  They were just presented in the form of a

14     document.

15             MR. BARRY:  They were presented as an attachment to an

16     earlier in time e-mail.

17             THE COURT:  Okay.

18             MR. BARRY:  Which did not show what the defendant did

19     after receiving e-mails so the hearsay objection -- my

20     understanding it was sustained because it was just another

21     party e-mailing something to the defendant.  We didn't know

22     what he did afterwards.

23             So now 121X is what he did afterwards with this

24     particular document.  And the reason -- the only reason we

25     didn't renumber it is because it's the same document in 121A as
```

1    the summary translation of the document.

2            THE COURT:  Is there an objection to 121, 121A, and

3    121X?

4            MR. DEARINGTON:  Your Honor I think already sustained

5    the objection as to 121A.

6            THE COURT:  I did.

7            MR. DEARINGTON:  So I think that's out.

8            THE COURT:  Well, he's asking me to reconsider in

9    light of now offering 121X, which is the e-mail that --

10           MR. DEARINGTON:  Okay.

11           THE COURT:  -- that attaches 121.

12           MR. DEARINGTON:  Yes, Your Honor.  Our additional

13   objections are I don't think we have a translation of 121X.  I

14   have not -- I don't read Chinese, so I can't say these are the

15   same.  Also, there's this tendency by -- this argument by the

16   government that anything that's forwarded, whether it's a

17   minute later, whether he's accessed the attachments,

18   constitutes an adoptive admission, and that flouts the rules of

19   evidence.  There's no rule, no case law, there's nothing that

20   supports that argument that we've seen.  That's just not a rule

21   of evidence, Your Honor.

22           THE COURT:  So 121X is an e-mail from the defendant to

23   the Chinese Consulate General that attaches something that has

24   been translated as 121A.  I only say that because I've compared

25   the Chinese characters letters in this attachment list with

1   121, and as difficult as it may be, they do match.  If you look

2   at the two characters before 2017 on the attachment, they are

3   identical, and if you look at the characters after, they are

4   identical.  I've gone through them.  Except for the quotation

5   marks, they are identical before the PDF.

6          So it does appear to be one in the same as 121, so

7   irrespective of me not allowing those other exhibits in because

8   they didn't include an e-mail from Dr. Tao, this is an e-mail

9   from Dr. Tao with an attachment.  So just as a stand alone

10  exhibit, I think it is admissible.

11         MR. DEARINGTON:  Your Honor, if you can look at the

12  timestamps, it shows that if Dr. Tao forwarded this e-mail, not

13  even a minute had passed.

14         THE COURT:  I understand that.  But he did forward the

15  e-mail.  He is the source of this e-mail.

16         MR. DEARINGTON:  So he is the source of a forward of

17  an e-mail in the exact same minute, it's not plausible he could

18  have read the attachments, let alone adopted them given the

19  timeframe of a minute.

20         Again, we repeat our continuing objection there's no

21  rule of evidence that forwarding an e-mail is an adoptive

22  admission.  There would be no hearsay in the world of e-mails

23  if that were the case.

24         THE COURT:  I think that goes to weight rather than

25  admissibility.  He had a prior string of e-mails with the

1    Chinese Consulate.  Granted in a very short period of time he

2    forwards this on, but he does forward it on.  And I mean this

3    is in the context of him having had discussions with the Suc

4    Kingdom that I did not allow in because there was an e-mail

5    chain that involved this Suc Kingdom and others, not Dr. Tao.

6    And this is in the context of him trying to get a renewal of

7    his visa to travel, so I'm going to admit 121X as being the

8    attachment to -- I'm sorry, 121X as being the e-mail that

9    attaches 121 and 121A.  I don't think it's an adoptive

10   admission so much as it's Dr. Tao communicating with the

11   Chinese Consulate General in the context of having already

12   communicated with them and passing on information to them.  So

13   I will admit 121X and 121 and 121A on that basis.

14          MR. DEARINGTON:  Understood, Your Honor.

15      (Thereupon, the proceedings continued in open court.)

16          THE COURT:  All right.  Well, welcome back.  We're

17   sorry for the delay.  And as you can see, we're still dealing

18   with some legal matters out of your hearing, but I think we're

19   ready to proceed now.

20          MR. DEARINGTON:  Your Honor?

21          THE COURT:  Are these admitted from yesterday?

22          MR. BARRY:  Yes, Your Honor.  Those are just the

23   redacted versions.

24          THE COURT:  Okay.  Are you talking about 121X?

25          MR. DEARINGTON:  121A is a paragraph that appears to

1    someone's summary of the document.  It's not actually a

2    translation.  I thought it was the document as we were talking

3    about it.

4              THE COURT:  Let's take this up later.

5              MR. DEARINGTON:  Okay.  Yes, Your Honor.

6              THE COURT:  Let's move on.

7         So don't go into this exhibit yet until we can talk

8    about it later, but I don't want to waste any more time.  I'm

9    not wasting but spend any more time.  We need to get going.

10             MR. BARRY:  Yes, Your Honor.

11             THE COURT:  Mr. Churchill, you're still under oath to

12   tell the truth.

13                        JAMES CHURCHILL,

14   called as a witness on behalf of the government, having

15   previously been duly sworn, testified as follows:

16                        DIRECT EXAMINATION

17   BY MR. BARRY:

18   Q.   Good morning, Mr. Churchill.

19   A.   Good morning.

20   Q.   So I'm going to -- instead of going document by document or

21   exhibit by exhibit, I'm going to hand you a stack of documents,

22   a stack of exhibits.  I'm going to refer to them hopefully in

23   order so you can refer to them and pull them out as we go.

24   Okay?

25   A.   Understood.

1    Q.   And first --

2         MR. BARRY:   Bonnie, can we please switch to the --

3    BY MR. BARRY:

4    Q.   I first would like to draw your attention to an exhibit

5    that's already been admitted into evidence which is 146A.  And

6    again, this is a document that was found on the defendant's

7    work computer at KU.

8         Does this appear to be a mentor selection form for Fuzhou

9    University between Dr. Tao and a student?

10   A.   Yes.

11   Q.   And what's the student's name?

12   A.   Yang Yu.

13   Q.   Can we pull up 495A which is an exhibit that was already

14   admitted and found on Dr. Tao's computer.

15        Can we scroll down, please.  To the next page.  And does

16   this also appear to be a student advisor selection form between

17   Dr. Tao and another student?

18   A.   Yes.

19   Q.   And what's the other student's name?

20   A.   Zhu Caixia.

21   Q.   What's the date?

22   A.   March 28, 2018.

23   Q.   I'd like you to turn to the first document in your stack,

24   which is 322.  Do you see that?

25   A.   I do.

1    Q.    I want you to take 322, 322A, 323, 323A and pull them out

2    and look at them as a single stack, please.

3    A.    Is it 332 rather than 322?

4    Q.    It is 322, 322A, 323, and 323A.

5    A.    I'm not seeing 323.

6    Q.    Right here.

7    A.    I apologize.

8    Q.    What do those documents appear to be?

9    A.    322 and 322A is an e-mail titled *A Letter to My Preferred*

10    *Advisor*, and 323 is another of these mentor-student mutual

11    selection forms between Dr. Tao and a student.

12    Q.    Are those English translations of these documents as well?

13    A.    Yes.

14         MR. BARRY:  Government moves to introduce 322, 322A,

15    323, 323A.

16         THE COURT:  I think 323 and 323A are already admitted.

17    322, 322A, any objection?

18         MR. DEARINGTON:  Continuing objection, Your Honor.

19         THE COURT:  322 and 322A admitted over continuing

20    objection.

21         MR. BARRY:  Can we pull up 322A, please.  Let's look

22    at that bottom e-mail first.

23    BY MR. BARRY:

24    Q.    And this is from March 29, 2018, right?

25    A.    Yes.

1  Q.   Okay.  And can you read those first few sentences for me?

2  A.   First two sentences?

3  Q.   Yes, sir.

4  A.   *Dear Professor Tao:  Hello!  My name is Xu Kaiyang.  I am*

5  *from Youxi, Fujian.*

6  Q.   Do you see later on where it says, *I am very interested in*

7  *your research focus.  I hope to follow you and your team in*

8  *studying and researching photocatalysis.  I sincerely ask that*

9  *you give me this opportunity to join your team.*  Did I read

10 that right?

11 A.   Yes.

12 Q.   And then let's --

13          THE COURT:  I will caution the jury that this e-mail

14 from Xu Kaiyang, you're not to consider for the truth.  It's

15 only being admitted so you can find the context for Dr. Tao's

16 response.

17 BY MR. BARRY:

18 Q.   And then Dr. Tao responds, *please send over your two-way*

19 *selection form.*

20     Can we pull up 323A which is that attachment, please?

21     Is this another selection form like we've seen before?

22 A.   Yes.

23 Q.   And can we look at 323.

24     And can you read those two signatures at the bottom for me,

25 please?

1   A.   Left is Xu Kaiyang, the right is Tao Feng.

2   Q.   Let's go to 332.  So this is another batch.  I want you to

3   look at 332, 333, 333A, 334, and 334A.  So look at all those,

4   sort of put those in a batch because it's another e-mail from

5   the defendant with a number of attachments.

6          MR. BARRY:  The government moves to introduce

7   Government's Exhibits 332, 333, 333A, 334, 334A.

8          THE COURT:  Any objection?

9          MR. DEARINGTON:  No objection, Your Honor.

10          THE COURT:  All right.  332, 333, 333A, 334, and 334A

11   admitted.

12   BY MR. BARRY:

13   Q.   And while we're looking at those, Mr. Churchill, can we

14   pull up 332, please.  This is the e-mail.

15          Can you read for the jury what -- so it says it's from

16   Dr. Tao's Gmail April 29th, 2018.  Is there a name or a word in

17   the to line?

18   A.   It reads Yizhi Hen Anjing.  Y-I-Z-H-I.  Next word H-E-N,

19   next word A-N-J-I-N-G.

20   Q.   What does that mean in English?

21   A.   Always silent.

22   Q.   What's the -- can you just -- for the subject, what does

23   that say in English?

24   A.   Contract.

25   Q.   And then there's two attachments on there?

1    A.    Yes.

2    Q.    What do each of those say in English?

3    A.    First is Changjiang Scholar contract.  Second is Changjiang

4    Scholar contract addendum.

5    Q.    Let's first go to 333A which is one of those attachments.

6    Does this appear to be a draft contract?

7    A.    Yes.

8    Q.    Okay.  And what's the term of the contract for this one?

9    A.    February 1, 2018, to January 31, 2023.

10    Q.    If we could scroll through the objectives.  One is teach

11    physical chemistry.  Let's scroll a little bit.  All right.  I

12    want to stop right there.

13         What's the second bullet point under talent training?

14    A.    *Recruit and advise at least three to four new doctoral*

15    *students and at least three to four new master's students per*

16    *year.*

17    Q.    Can we keep scrolling to the third page.  Let's stop right

18    there.

19         Can you please read these two bullets under scientific

20    research?

21    A.    One, *actively apply for the nation's major scientific*

22    *research projects:  During the term of appointment, undertake*

23    *and lead at least three national-level scientific research*

24    *projects.*

25         Two, *carry out original and significant research on both*

1  *theoretical and applied topics in the field of physical*

2  *chemistry:  During the term of appointment, apply for and*

3  *strive to achieve National Natural Science awards and other*

4  *significant landmark results, and publish more than 60 research*

5  *articles in* -- I'm sorry.  I lost the -- okay -- *60 research*

6  *articles in domestic or foreign publications with Party A as*

7  *the primary employer and Party B as the primary author (or*

8  *corresponding author), of which 30 must be published in*

9  *important academic publications either domestic or foreign.*

10  Q.   Let's go to the next page.  So there's -- and for this it

11  says *Party A's Rights and Obligations*.  And Party A is Fuzhou

12  University, right?

13  A.   That's correct.

14  Q.   Instead of reading through all these, can you just kind of

15  summarize based on your interpretation and translation of this

16  kind of the high level rights and obligations laid out in this

17  section?

18  A.   Sure.  Fuzhou University must respect the rights of Party

19  B, which is Dr. Tao, and that includes providing him laboratory

20  and equipment with specific room numbers and building numbers

21  provided.  Providing 25 million Yuan for scientific research

22  and for assisting in his recruitment of graduate students or

23  graduate researchers.

24  Q.   Let's go to the next page, please.  Can you summarize the 5

25  through 6, 6?

1   A.   So Fuzhou University will also promote the building of the

2   discipline to which Dr. Tao will apply his research.  They will

3   provide 10 million Yuan for purchase of a device for in situ

4   characterization, and they will provide housing on campus

5   that's sized at 200 square meters while also providing a

6   relocation allowance.

7   Q.   The relocation allowance that's at least in this draft is

8   500,000 Yuan?

9   A.   That's correct.

10  Q.   About how many dollars is that?  I know the currency

11  exchange rate is changing, but how many U.S. dollars is $500

12  Yuan?

13  A.   Approximately $70,000 perhaps.

14  Q.   There's Party B, that's Dr. Tao, right?

15  A.   Correct.

16  Q.   And it says he has a job incentive of 550,000 Yuan

17  including the Ministry of Education's Distinguished Professor

18  Award of 200,000 Yuan and shall be entitled to a base salary

19  stipulated by the country, a base performance salary as well as

20  a reformed allowance.

21       Let's go to page 7.  And I want you to -- at the bottom of

22  the addenda, does it say -- can you read that last sentence for

23  me, please?

24  A.   *This contract is effective from the date it is signed and*

25  *stamped by both parties.*

1    Q.   And then let's pull up 334A.  This is another attachment to

2    that April 29th e-mail that we were talking about.  And what

3    is -- can you summarize what this purports to be?

4    A.   This is an addendum to the contract we just looked at.

5    Q.   And can you summarize what the key points of this addenda

6    are?

7    A.   The Fuzhou University will additionally, in addition to the

8    contract, help Dr. Tao apply for and secure admission to the

9    Hundred Talents Plan.  They'll provide an additional 15 million

10   Yuan in startup funds.  They will help him hire researchers and

11   give him permission to hire researchers on his own, and the

12   contract also stipulates that the purpose to which he's used

13   his startup funds, namely for purchase of supplies.

14   Q.   All right.  Let's put those away.

15        The next batch I want you to look at are 758, 759, and 760.

16   Tell me when you have those in front of you, please.

17   A.   Okay.  I'm ready.

18   Q.   Do you recognize these three exhibits, 758, 759, and 760?

19   A.   I do.

20   Q.   What are they?

21   A.   758 is a web page from the Beijing municipal government web

22   page --

23             MR. DEARINGTON:  Your Honor?

24             THE COURT:  Yes.

25             MR. DEARINGTON:  The Court deferred ruling on these

1  and we're afraid that if he starts reading from what we've

2  objected to as hearsay, we're going to go down a path we

3  can't --

4        THE COURT:  Just lead him on what the identity -- are

5  you offering these at this time or just having him identify

6  them?

7        MR. BARRY:  I'm going to lay foundation and offer

8  them.

9        THE COURT:  Lead him in terms of the identity and then

10  I'll hear the objection.

11        MR. BARRY:  Okay.

12  BY MR. BARRY:

13  Q.  So I don't want to talk about the content of what's in

14  these three exhibits.  I want to talk about where they came

15  from, how you know that, what the source of the information is.

16  Okay?

17  A.  Sure.

18  Q.  All right.  So you -- these are three documents from a

19  Beijing municipal website, right?

20  A.  That's correct.

21  Q.  Do you know that at the top of the document there's a URL?

22  A.  Yes.

23  Q.  Is that URL jw.beijing.gov.cn?

24  A.  Correct.

25  Q.  Have you visited that website before?

1   A.   Yes.

2   Q.   In the course of your work as a linguist do you regularly

3   visit Chinese government websites?

4   A.   Yes.

5   Q.   In the course of your investigation of this case did you --

6   if you go to the bottom of page 758, you'll see there's a

7   specific URL down there that says jw.beijing.gov.cn.

8   A.   Yes.

9   Q.   So from looking at that, how do you know that that's a

10  Chinese government website?

11  A.   Because of the .gov extension.

12  Q.   Does the .cn tell you it's the Chinese government that

13  controls that website domain?

14  A.   And the language of the website is in Chinese.

15  Q.   And then on Document 758 there is a sort of a sub file path

16  under that domain or sub page?

17  A.   Yes.

18  Q.   Did you visit that specific sub page?

19  A.   Yes.

20  Q.   Okay.  And did you click on anything on that sub page?

21  A.   Click on anything on Exhibit 759?

22  Q.   Yes, sir.

23  A.   I may have.  I can't recall.

24  Q.   Okay.  And does it appear on 758 that there are a number of

25  HTML links?

1    A.    Yes.

2    Q.    And those are in Chinese?

3    A.    Yes.

4    Q.    Okay.  And then I want to turn to 759.  And is 759 another

5    sub page from that jw.beijing.gov.cn website?

6    A.    It is.

7    Q.    And again, how do you know that that's the Chinese

8    government website?

9    A.    Again because the .gov.cn extension.

10    Q.    For Government's Exhibit 759 have you seen that exhibit

11    live?

12    A.    Yes.

13    Q.    And how did you -- did you get to that page, what's shown

14    as 759, by clicking on one of the links that's on Exhibit 758?

15    A.    Yes.

16    Q.    And then I'd like to go to 760.  Okay.  Government's

17    Exhibit 760, is this another document that's from that

18    jw.beijing.gov.cn website?

19    A.    I believe so, yes.

20    Q.    Have you seen this document live on that Chinese government

21    website?

22    A.    I don't recall.

23    Q.    Okay.  And do you -- if you look back to 759, does this

24    appear that there's a little hyperlink at the bottom of that

25    page that says something, something, something .pdf?

1  A.  Yes.

2  Q.  If you click on that hyperlink, does that bring up

3  Government's Exhibit 760?

4  A.  I believe so, yes.

5  Q.  And again, 758, 758, and 760 are printouts of a website you

6  personally viewed, correct?

7  A.  Yes.

8  Q.  And these are printouts of web pages that you personally

9  went to a Chinese government website to view?

10  A.  Correct.

11         MR. BARRY:  Government moves to introduce into

12  evidence Government's Exhibit 758, 759, and 760.

13         THE COURT:  All right.

14     (The following proceedings were had at the bench).

15         THE COURT:  So of course these are exhibits that we

16  talked about in the hearing earlier, and there were a number of

17  objections to them.  But one preliminary thing is I don't have

18  translations of any of these.

19         MR. ZEIDENBERG:  Nor do we.

20         MR. BARRY:  So I'm not planning to have him translate

21  the vast majority of these.  He's just going to translate on

22  the stand the title of this document, the title of this

23  document, and then the fact that there is a list of people who

24  have been announced as Changjiang Distinguished Professors.

25         THE COURT:  But the defense has never discovered the

1    translations.

2          MR. BARRY:  We've provided -- this document has been

3    provided to them, I don't know, probably one to two years ago.

4          THE COURT:  But you didn't translate it?

5          MR. BARRY:  We didn't translate the entire document

6    because it's just a list of names.

7          THE COURT:  But even the -- even the titles, I mean,

8    haven't been translated.

9          MR. BARRY:  These are -- these basically just say --

10   this is a very similar title to the document we looked at

11   earlier, 121X.  It's an announcement from the Ministry of

12   Education announcing --

13         THE COURT:  I'm not going to admit these because I

14   don't think they've had fair notice of what these purport to

15   be.  They should have been translated and they could determine

16   whether they think the translation is correct or not.  I'm not

17   in the position if there is that kind of -- I mean, do you all

18   concede that these translations are correct?

19         MR. ZEIDENBERG:  No.  We haven't seen the

20   translations.  We don't have a translation.

21         THE COURT:  I'm not going to admit these.

22       (Thereupon, the proceedings continued in open court.)

23         THE COURT:  Objection sustained to 758, 759, and 760.

24   BY MR. BARRY:

25   Q.  You can put those away, Mr. Churchill.

1    MR. BARRY:  Can I please switch back to the ELMO,

2  Bonnie?

3  BY MR. BARRY:

4  Q.   I want to just update us in terms of where we're at with

5  some of those exhibits we looked at, and this is Demonstrative

6  Exhibit 774.  These are the exhibits we just -- Mr. Churchill

7  just introduced.  And this is the phone call with Dr. Liu from

8  yesterday.  All right.  Can we please switch back to the

9  computer?

10    I'm going to hand you another stack of exhibits.  I'm going

11  to do the same thing, so I'm going to give you these all at the

12  same time so that we can hopefully go through them a little

13  quicker.  And the vast majority of these are e-mails with the

14  defendant.  So these should be in order.  If you can hand me

15  those, please.

16    Let's start with -- again, we're going to do these in

17  batches so that we can try to move through them.  I want you to

18  first look at 335, 336, 336A, 337, and 337A.  And this is an

19  e-mail with a number of attachments.  Tell me when you're

20  ready.  Are you ready?

21  A.   I'm ready.

22  Q.   What does 335 purport to be?

23  A.   335 is an e-mail from Always Silent or Always Quiet to

24  Dr. Tao.

25  Q.   What do the attachments purport to be?

1    A.   One is titled Tao Feng Changjiang Scholar contract, revised

2    version.   One is titled Changjiang Scholar contract addendum

3    revised version.

4    Q.   Do these appear to be revisions of the draft contract and

5    draft addendum that we looked at in the 332 through 334 series?

6    A.   Yes.

7             MR. BARRY:   Government moves to introduce into

8    evidence Government's Exhibit 335, 336, 336A, 337, and 337A.

9             MR. DEARINGTON:   No objection, Your Honor.

10             THE COURT:   335, 336, 336A, 337, 337A all admitted.

11   BY MR. BARRY:

12   Q.   Can we please pull up 335.   And this is the e-mail that you

13   were talking about?

14   A.   Yes.

15   Q.   And are those Chinese characters at the top with the

16   attachments, that's what you were saying said revised contract,

17   revised addendum?

18   A.   Correct.

19   Q.   And let's look at 336A.   Does this appear to be a similar

20   contract to the one we looked at earlier, but it has some

21   revisions?

22   A.   Yes.

23   Q.   And do you see the revisions are in red?

24   A.   Yes.

25   Q.   Okay.   So let's scroll a little bit.   And when we see any

1   red text, if we can kind of go a little slower.  Let's keep

2   going.  Keep going.  Okay.  Keep going.

3      So do these all, based on your interpretation and

4   translation of 333A and 334, which was that earlier set of

5   contract and addendum that the defendant sent to somebody else

6   and this is the return set, so does the red text appear to be

7   changes to let's call that version one set that we just saw?

8   A.   That's correct.

9   Q.   Let's pull up 337A, please.  This is the addendum.  And if

10  you remember -- well, first of all, do you see where it says

11  that *this contract addendum is set forth through equal*

12  *consultation to both parties in accordance with related*

13  *stipulations of the Teachers Law of the People's Republic of*

14  *China and Methods of Implementation for the Changjiang Scholar*

15  *Award Program*?

16  A.   Yes.

17  Q.   Does this -- if you remember, does this draft addendum

18  appear to have any differences or revisions from the prior

19  draft addendum that we looked at which was 334A?  I can show it

20  to you, if you'd like.

21  A.   Yes.  So -- thank you.  So this version of the addendum

22  says that Fuzhou University will support recommendation of

23  Party B's application to the Hundred Talents Plan rather than

24  secure his admission into the talent plan.

25     This version also indicates that 10 million Yuan will be

1    invested for research funds rather than 15 million Yuan.  And

2    this version also says that Dr. Tao may conduct hiring on his

3    own according to the needs of the research group.

4    Q.  Okay.  All right.  Let's -- I next want to show you what's

5    already been admitted as Government Exhibit 503A, and this is a

6    document found in Dr. Tao's computer.

7        And I just want to focus on the very top paragraph.  Can

8    you see where it says in August 2014 --

9            MR. DEARINGTON:  Objection, Your Honor.

10           THE COURT:  What exhibit is this?

11           MR. BARRY:  503A.

12           THE COURT:  I don't think it's admitted.

13           COURTROOM DEPUTY:  I don't see it admitted.

14           THE COURT:  It's not admitted.  Was it displayed?

15           MR. DEARINGTON:  It was, Your Honor.

16           MR. BARRY:  The top paragraph was displayed.

17           THE COURT:  It's not admitted.

18           MR. BARRY:  I think this is one that you took under

19   advisement.  I'm sorry.

20           THE COURT:  Right.

21           MR. BARRY:  Do you want me to -- I'll put it aside.

22   BY MR. BARRY:

23   Q.  Let's go to 155, 156, and 156A.  Do you recognize these

24   documents?

25   A.  Yes.

1    Q.   What do they appear to be?

2    A.   The first is an e-mail from Dr. Tao to Huimin Liu about

3    hiring for Changjiang Scholar position.

4         MR. BARRY:  Government moves to introduce Exhibits

5    155, 156, and 156A.

6         MR. DEARINGTON:  Just noting our continued objection

7    to the non-Dr. Tao e-mails.

8         THE COURT:  All right, 155 and the attachments, 156,

9    and 156 are admitted.  155 is admitted as an adoptive

10   admission.  It's clear this was a response to the prior e-mail

11   from Dr. Liu.  And it's clear from the response that it was in

12   the context of responding to that prior e-mail, so I will admit

13   155, 156 and 156A.

14   BY MR. BARRY:

15   Q.   Can we pull up 155, please.  Can we go to the bottom

16   e-mail?  And it says -- someone named Huimin Liu says, "Dear

17   Professor Tao, I wrote a draft for the advertisement.  Could

18   you please check" --

19        And could we go to the top, please?

20        Dr. Tao responding, "Hi, Huimin.  Please use the attached

21   one to ad."

22        Let's go to 162 and don't pull that up, please.

23        I'd like you to look at 162, Mr. Churchill.  What does this

24   purport to be?  And just without getting into the content.

25   A.   This is an e-mail from Dr. Tao to Rohit Kumar copying

```
 1   Huimin.
 2          MR. BARRY:  Government moves to introduce into
 3   evidence 162.
 4          THE COURT:  Objection?
 5          MR. DEARINGTON:  Continuing objection.
 6          THE COURT:  162 is admitted.  It's clear this is in
 7   the context of a response, and it is an adoptive admission in
 8   that the -- Dr. Tao either adopted the content or believed in
 9   the truth of the content, so Exhibit 162 is admitted.
10   BY MR. BARRY:
11   Q.   And does this appear to be someone named Rohit Kumar
12   e-mailing Dr. Tao to express interest in his group?
13   A.   Yes, in that first e-mail, yes.
14   Q.   And that Dr. Tao responds from his KU group and he says, "I
15   have a collaborative project with Dr. Huimin Liu at Fuzhou
16   University in China"?
17   A.   Correct.
18   Q.   I'd like you to look at Exhibit 161.  What does this appear
19   to be?
20   A.   This is an e-mail chain between Dr. Tao and Tomoko Shimizu.
21          MR. BARRY:  Government moves to introduce into
22   evidence Government's Exhibit 161.
23          THE COURT:  Any objection?
24          MR. DEARINGTON:  Just continuing, Your Honor.
25          THE COURT:  All right.  161 is admitted.  Same
```

1   analysis, adoptive admission as either adopted or believed to

2   be the truth as indicated by the nature of the response of

3   Dr. Tao, so Exhibit 161 admitted.

4   BY MR. BARRY:

5   Q.   I want to go to the bottom here where it's an e-mail that

6   Dr. Tao sends on May 31, 2018, to Tomoko Shimizu and he says,

7   "I need STM people.   The position will be associate or full

8   professor in one university of China."

9       Based on this context do you know what STM refers to?

10  A.   No.

11  Q.   Let's go to the top of the e-mail, please.   This is another

12  e-mail from Dr. Tao, and he appears to be asking Mr. Shimizu to

13  forward an ad for people who might be interested in a faculty

14  position at STM, correct?

15  A.   Correct.

16  Q.   I'd like you to look at 174 and 174A.   What do these appear

17  to be?

18  A.   E-mail chains between Dr. Tao and Feng Jiagui.

19          MR. BARRY:   Government moves to introduce 174 and

20  174A.

21          MR. DEARINGTON:   Same objection, Your Honor.

22          THE COURT:   174, 174A admitted as adoptive admissions.

23  The e-mails are indicative that Dr. Tao in responding either

24  adopted the content or believed in the truth of the content of

25  the other speaker.

1          MR. BARRY:  Will you publish 174A, please.

2    BY MR. BARRY:

3    Q.  Can we go to the bottom of the chain, please.  This is from

4    July 2018.

5          Mr. Churchill, just generally speaking, does this appear to

6    be another e-mail about Dr. Tao, you know, talking to folks

7    about trying to help him recruit some folks for a team?

8    A.  Yes.

9    Q.  And can we go up to the e-mail on -- it's on the first

10   page.  It says -- so I want to start at that bottom e-mail

11   where someone is talking to Dr. Tao.  They just say, as to the

12   contact list of people in STM who plan to go back to China, I'm

13   not familiar with that.

14         Can we scroll up to Dr. Tao's response.

15         He says, what I'm trying to say was that I'm looking for

16   young scholars with STM experience, new Ph.D. graduates or

17   post-docs to join a team that's led by a Changjiang Scholar.

18   The work involves using STM to do catalytic surface structure

19   research.

20         Next I want you to look at 177 and 177A.  Can you tell us

21   what these appear to be?

22   A.  An e-mail chain between Dr. Tao and Su Siwen copying Zhang

23   Xiaoyan.

24         MR. BARRY:  Government moves to introduce into

25   evidence Government's Exhibit 177 and 177A.

1          MR. DEARINGTON:  Same objection, Your Honor.

2          THE COURT:  177 and 177A admitted under the adoptive

3    admission analysis that Dr. Tao either adopted the content or

4    believed the prior content in this e-mail chain to be true.

5    Exhibit 177, 177A admitted.

6    BY MR. BARRY:

7    Q.   177A, I want you to look at the middle of the page.  Does

8    it look like someone is e-mailing Dr. Tao?

9    A.   Yes.

10   Q.   They're e-mailing a taofeng@fzu.edu.cn address?

11   A.   Correct.

12   Q.   Does it appear that they're asking him about a piece of

13   equipment for the Fuzhou University's National Engineering

14   Research Center of Chemical Fertilizer Catalysts?

15   A.   Yes.

16   Q.   If you go up, does he respond to that e-mail?

17   A.   Yes.

18   Q.   And the e-mail address used to respond, is that the

19   fzu.edu.cn e-mail address?

20   A.   Correct.

21   Q.   Next I want you to look at Government's Exhibit 179.

22        What does this appear to be?

23   A.   An e-mail chain between Dr. Tao and Hiumin Lui.

24          MR. BARRY:  Government moves to introduce into

25   evidence Exhibit 179.

1    MR. DEARINGTON:  Same objection.

2    THE COURT:  Exhibit 179 admitted as an adoptive

3    admission based on what I stated before.

4    BY MR. BARRY:

5    Q.  Does this appear to be a back and forth between someone and

6    Dr. Tao about a post-doc position?

7    A.  Yes.

8    Q.  Next I want you to look at Government Exhibit 183 and 183A.

9    What do these appear to be?

10    A.  E-mail chain between Dr. Tao and Su Siwen copying Zhang

11    Xiaoyan.

12    Q.  Are these e-mails again from the domain name fzu.edu.cn?

13    A.  They are.

14    MR. BARRY:  Government moves to introduce Government

15    Exhibits 183, 183A.

16    MR. DEARINGTON:  Continuing objection, Your Honor.

17    THE COURT:  Exhibit 183 and 183A admitted as an

18    adoptive admission of Dr. Tao.

19    BY MR. BARRY:

20    Q.  Can we publish 183A, please.

21    And, Mr. Churchill, does this appear to be another e-mail

22    exchange involving Dr. Tao related to purchasing some equipment

23    or at least getting quotes for some equipment?

24    A.  Yes.

25    Q.  I want you to look at Government's Exhibit 159 and 159A.

1    Are these e-mails between Dr. Tao and somebody else?

2  A.  Yes.

3       MR. BARRY:  Government moves to introduce Government

4  Exhibits 159 and 159A.

5       MR. DEARINGTON:  Same objection.

6       THE COURT:  Exhibit 159 and 159A admitted as an

7  adoptive admission of Dr. Tao that he believed in the truth of

8  the content or adopted the content.

9       MR. BARRY:  Can we publish 159A, please?

10  BY MR. BARRY:

11  Q.  You'll see the subject line is from someone named Xiaoyan

12  Zhang to Dr. Tao.  Subject, Fuzhou University.  Does it look

13  like that person is essentially saying I'm not going to accept

14  a job at Fuzhou University?

15  A.  Correct.

16  Q.  And then Dr. Tao responds, *I am shocked to hear this.  To*

17  *secure you, the school also invited your boyfriend to work at*

18  *Fuzhou University.  Could you answer my call so we can discuss*

19  *this?*

20  A.  Correct.

21  Q.  Mr. Churchill, can you please look at Government's Exhibit

22  158, 158A, 195, 195A.  Do these appear to be continuations of

23  that e-mail chain we looked at in 159?

24  A.  Yes.

25       MR. BARRY:  Government moves to introduce 158, 158A,

1   195, and 195A.

2          MR. DEARINGTON:  Same objection, Your Honor.

3          THE COURT:   158, 158A admitted as adoptive admissions.

4   195 and 195A, the same.

5   BY MR. BARRY:

6   Q.   Let's publish 158A, please.  Does this appear to be the

7   same e-mail chain where someone named Ms. Zhang is saying I'm

8   going to turn down that job offer?

9   A.   Correct.

10  Q.   Dr. Tao says, *It seems that you have shut down*

11  *communication channels.  Please carefully reconsider your*

12  *decision.*

13       And let's pull up 195A, please.

14       This is similar.  Does this appear to be a similar back and

15  forth between the two of them about whether Ms. Zhang is going

16  to accept that job?

17  A.   Correct.

18  Q.   The defendant says, I am very upset.  I feel as if I've

19  been made a fool.  It's very painful.  I helped you write the

20  ACS sustainable paper, which you never participated in and then

21  published.  I spent so much time and energy on guiding you step

22  by step from discussions to getting results.  All were done on

23  the premise that you agreed to join the team and continue to

24  make contributions to scientific research.  To get you your job

25  title, people at all levels had helped, and the school even

1  planned to have your boyfriend join Fuzhou University.

2      Did I read that correctly?

3  A.   Yes.

4  Q.   Next I want to turn your attention to Government's Exhibit

5  196 and 196A.  Do these appear to be communications between the

6  defendant and somebody else?

7  A.   Yes.

8          MR. BARRY:  Government moves to introduce Government's

9  Exhibits 196 and 196A.

10         MR. DEARINGTON:  Continuing objection, Your Honor.

11         THE COURT:  Admitted as adoptive admissions for the

12 reasons stated before.

13 BY MR. BARRY:

14 Q.   Can we pull up 196A, please.  I want to go to the very

15 bottom of the e-mail chain.  There's an e-mail from Dr. Tao on

16 July 16, 2018.

17     And can you please read the first few sentences up through

18 *to join my team*?

19 A.   *Hi, Professor Wang.  This is Franklin.  I am currently*

20 *thinking of ways to build a group.  My team will have in situ*

21 *XPS, in situ STM, and other characterization methods for*

22 *catalysis research.  It is difficult to recruit people in*

23 *Fuzhou.  Would you be able to recommend two graduating Ph.D.*

24 *students or post-docs to join my team?*

25 Q.   Mr. Churchill, I'd like you to look at Government's Exhibit

1   198.  Does this appear to be an e-mail from Dr. Tao to Dr. Tao

2   cc'ing Dr. Tao?

3   A.  Yes.

4         MR. BARRY:  Government moves to introduce Government's

5   Exhibit 198.

6         THE COURT:  Any objection?

7         MR. DEARINGTON:  198, no objection, Your Honor.

8         THE COURT:  198 admitted.

9   BY MR. BARRY:

10  Q.  Can we go to the header.  What's the e-mail address that's

11  copied here?

12  A.  Taofeng@fzu.edu.cn.

13  Q.  I next want you to, Mr. Churchill, look at Government's

14  Exhibit 203.  And does this appear to be an e-mail that Dr. Tao

15  forwards to somebody else?

16  A.  Yes.

17  Q.  And this is dated August 27, 2018?

18  A.  Yes.

19         MR. BARRY:  Government moves to introduce Government's

20  Exhibit 203.

21         MR. DEARINGTON:  Continuing objection, Your Honor.

22         THE COURT:  Exhibit 203 admitted as an adoptive

23  admission.

24         MR. BARRY:  Can we pull up 203, please.

25  BY MR. BARRY:

1    Q.   I want to start at this bottom e-mail chain.

2         Mr. Churchill, does this appear to be an e-mail from

3    someone named Trung Van Nguyen to a number of individuals

4    including Dr. Tao?

5    A.   Yes.

6    Q.   And you see his name second bottom from the right:  Tao,

7    Franklin Feng?

8    A.   Yes.

9    Q.   Can you please read, not the hyperlinks, but can you read

10   what this Mr. Nguyen says?

11   A.   I'm sorry.  Read what what says?

12   Q.   Mr. Nguyen, who's the author of this e-mail, can you read

13   from all to rejected?

14   A.   *All, here are some interesting news on NSF grant fraud.*

15   *The person in the first case came to NSF when I was there as a*

16   *program director seeking funding support and complained when*

17   *his proposal was rejected.*

18   Q.   And does it look like there's two hyperlinks there?

19   A.   Yes.

20   Q.   Can we scroll up, please.  Appears that Dr. Tao forwarded

21   that to an e-mail address hpengtao02@gmail.com, correct?

22   A.   Correct.

23   Q.   I'd like you to next look at what's been marked as

24   Government's Exhibit 207.  What does this appear to be?

25   A.   An e-mail chain between Dr. Tao and Huimin Liu and others.

1  Q.   Between Huimin Liu and Dr. Tao?

2  A.   And others, yes.

3         MR. BARRY:  Government moves to introduce Government's

4  Exhibit 207.

5         THE COURT:  Any objection?

6         MR. DEARINGTON:  Continuing objection, Your Honor.

7         THE COURT:  Counsel approach.

8     (The following proceedings were had at the bench).

9         THE COURT:  In this e-mail chain everything after,

10  meaning above the e-mail from Dr. Tao to Mahak saying that he

11  was -- that his collaborator Dr. Liu in China has an opening,

12  everything above that are conversations between people other

13  than Dr. Tao.  Dr. Tao doesn't appear anymore, doesn't appear

14  to adopt what happens thereafter.

15         So I'm going to redact all but the last part the

16  e-mail string which begins with Mahak Dhiman, that begins with

17  that person's June 30th e-mail to Dr. Tao and then another

18  e-mail from that person reminding Dr. Tao of his earlier e-mail

19  and then Dr. Tao's response which comes on, looks like,

20  July 13, 2018.

21         So above that is other third-party conversations, no

22  more indication of Dr. Tao is involved.  There are some ccs but

23  no other response, so I'll redact above that.  But otherwise

24  admit it as an adoptive admission.

25         MR. BARRY:  Okay.  I'll put this aside since the

 1    redaction will be different.

 2        (Thereupon, the proceedings continued in open court.)

 3    BY MR. BARRY:

 4    Q.  All right.  Let's take a break from that.  So I want to

 5    update the timeline with some of the documents that we have

 6    introduced.

 7            MR. BARRY:  Bonnie, can we please switch to the ELMO.

 8    Thank you.

 9            This is one of the draft contracts that we looked at.

10    One of the recruitment e-mails.  E-mail about equipment.

11    E-mail about NSF fraud.  E-mail to a Fuzhou account.  Another

12    recruitment e-mail.  Okay.  And that's it for now.

13            All right.  Can we please switch back to the computer?

14    Thank you.

15    BY MR. BARRY:

16    Q.  I'd next like you to look at Government's Exhibit 310.

17    What does this purport to be, Mr. Churchill?

18    A.  An e-mail from Dr. Tao and someone he addresses as Jiabao.

19            MR. BARRY:  Government moves to introduce into

20    evidence Government's Exhibit 310.

21            MR. DEARINGTON:  Continuing objection, Your Honor.

22            THE COURT:  Exhibit 310 admitted as an adoptive

23    admission.

24    BY MR. BARRY:

25    Q.  Can we please publish 310.

1    Can you just read the first sentence of the top e-mail that

2    Dr. Tao sends to this other person?

3    A.    "Hi, Jiabao.  Are you interested in working as a post-doc

4    at my group at Fuzhou University (also opportunity in USA)"?

5    Q.    I want you to look at Government Exhibit 208.  Does this

6    appear to be an e-mail between Dr. Tao and other folks?

7    A.    Yes.

8    Q.    And at the top Dr. Tao responds and he responds in -- sort

9    of the first e-mail in time is his e-mail and then someone

10    responds and he responds again?

11    A.    Yes.

12        MR. BARRY:  Government moves to introduce Government's

13    Exhibit 208.

14        MR. DEARINGTON:  Same objection.

15        THE COURT:  Exhibit 208 admitted as an adoptive

16    admission.

17    BY MR. BARRY:

18    Q.    Can we publish 208, please?  Okay.  I want to go to the

19    bottom e-mail, please.

20        Mr. Churchill, this is an e-mail from Dr. Tao to someone

21    named Celine Richard on October 15, 2018.  Can you please read

22    this entire bottom e-mail for the jury?

23    A.    Sure.  "Dear Celine, good morning.  I hope this e-mail

24    finds you very well.  As you may know, my term of editorship is

25    August 1, 2017, to January 31, 2019.  I got a joint appointment

1  at Fuzhou University (China) other than the current one.  The

2  package of this appointment is to have two supporting staff

3  members with master's degree in chemistry to help me on daily

4  office work at Fuzhou.  Starting from January 2019 I would

5  assign one of them to help me check the format of manuscripts

6  before I pick up reviewers, help me to organize the review

7  process of manuscript, and routinely check review process

8  before I make decision on manuscripts.

9      With help of a staff member at Fuzhou University, I expect

10  I can definitely do better and efficient work of an editor of

11  Applied Surface Science.  I am trying to make a plan for the

12  work of 2019.  Could you please note me whether my term of

13  editorship of Applied Surface Science could be renewed?

14  (Absolutely I really hope my term can be renewed).  Thank you

15  very much.  All the best, Franklin (Feng) Tao."

16  Q.  So do you understand this to be Dr. Tao e-mailing somebody

17  about renewing his editorship for a journal called Applied

18  Surface Science?

19  A.  Yes.

20  Q.  Can we scroll down a little bit to his signature block.  Is

21  the first line of his signature block he's editor of Applied

22  Surface Science?

23  A.  Yes.

24  Q.  If we scroll up a little bit, does Ms. Richard respond?

25  A.  Yes.

1   Q.   Okay.  And what's the gist of what -- how she responds?

2   Does she say, yes, we're going to renew your editorship or does

3   she say no?

4   A.   It appears that the answer is no.

5   Q.   I'd next like you to look at what's been marked as

6   Government's Exhibit 212 and 213.  Does the -- first 212, does

7   that appear to be an e-mail from Dr. Tao to Dr. Tao?

8   A.   Yes.

9   Q.   And then 213 is the attachment?

10  A.   Yes.

11          MR. BARRY:  Government moves to introduce Exhibits 212

12  and 213.

13          MR. DEARINGTON:  No objection, Your Honor.

14          THE COURT:  Exhibits 212 and 213 admitted.

15  BY MR. BARRY:

16  Q.   And is 213A your translation of 212 -- or sorry.  Is 213A,

17  Mr. Churchill, a translation of 213?

18  A.   I'm not seeing a 213A.

19  Q.   Let's put that one aside.  I next want you to look at

20  Government's Exhibit 311.  What does this purport to be?

21  A.   An e-mail between Dr. Tao and someone else.

22  Q.   Okay.

23          MR. BARRY:  Government moves to introduce Government's

24  Exhibit 311.

25          MR. DEARINGTON:  No objection, Your Honor.

1          THE COURT:  311 admitted.

2          MR. BARRY:  Can we publish that for the jury, please.

3    BY MR. BARRY:

4    Q.  At -- so this is an e-mail that the defendant sends to

5    somebody else?

6    A.  Correct.

7    Q.  And at the top does he say -- he says -- can you read that

8    first sentence for me, please?

9    A.  "Hi, Yuli.  This is Franklin from Fuzhou University and

10   University of Kansas."

11   Q.  Let's go back to 213 and 213A, and now I have --

12   A.  Thank you.

13   Q.  -- 213A is a translation of 213?

14   A.  Yes.

15   Q.  And 213, for context, this is a document attached to an

16   e-mail that the defendant sends to himself?

17   A.  Correct.

18          MR. BARRY:  Government moves to introduce 213A which

19   is the translation of 213.

20          MR. DEARINGTON:  No objection.

21          THE COURT:  213A admitted.

22          MR. BARRY:  Can we please publish 213A?  Can we just

23   scroll through this, please.

24   BY MR. BARRY:

25   Q.  Okay.  I'd next like you -- and this is going to be the

1   last one in this series.  Exhibit 217, can you please take a

2   look at that for me, Mr. Churchill?  What does this appear to

3   be?

4   A.   An e-mail between Dr. Tao and someone named Chen Yaxin.

5        MR. BARRY:  Government moves to introduce into

6   evidence Government's Exhibit 217.

7        MR. DEARINGTON:  No objection.

8        THE COURT:  217 admitted.

9   BY MR. BARRY:

10  Q.   I want to go to the top e-mail.  This is dated December 13,

11  2018, and does Dr. Tao say, I'm currently in China; I'll call

12  you from a Fuzhou number?

13  A.   Yes.

14  Q.   I next want to go back -- can we switch back to the ELMO,

15  please?

16       I want to go back to where we were.  Our middle timeline

17  from May 2018 to December 2018.  And there are just a few more

18  exhibits that we just looked at that I want to peel off for us.

19  So this is the -- one of the e-mails about an appointment.

20  This is the lab PowerPoint, the photographs that we just looked

21  at.  This is an e-mail about recruitment that we just looked

22  at.  And then this is another e-mail about recruitment that we

23  just looked at.

24       All right.  I next want to -- Mr. Churchill, I want to move

25  to something a little more engaging.  Do you remember yesterday

1    when we talked about the Court-authorized search of the

2    defendant's residence?

3    A.    Yes.

4    Q.    So you said that you participated in that search?

5    A.    I did.

6    Q.    You said you helped identify documents or items of interest

7    by providing onsite translation for other members of the search

8    team?

9    A.    Correct.

10    Q.    You said that in one of the upstairs offices attached to

11    the defendant's bedroom, another member of the search team

12    found a document in a drawer?

13    A.    I don't recall if it was in a drawer, but it was in that

14    room attached to the bedroom, yes.

15    Q.    And did you see the item in that room?  Did someone else

16    show it to you?

17    A.    Yes.

18    Q.    Was it this item which is marked as Government's Exhibit

19    619?

20    A.    Yes.

21    Q.    And have you read the inside of this item before?

22    A.    I have.

23    Q.    And have you translated it?

24    A.    Yes.

25    Q.    I'd like to show you what's been marked as Government's

1  Exhibit 619 and 619A.  Is 619A your translation of Government

2  Exhibit 619?

3  A.   Yes.

4  Q.   And does Government's Exhibit 619 fairly and accurately

5  translate the Chinese characters in Government's Exhibit 619

6  into English?

7  A.   Yes.

8         MR. BARRY:  The government moves to introduce

9  Exhibit 619 and 619A.

10         MR. DEARINGTON:  Your Honor, we have an objection on

11  hearsay grounds, and then with the Court's permission, we'd

12  like to *voir dire* the witness as well on the translation.

13         THE COURT:  All right.  Go ahead.

14                    VOIR DIRE EXAMINATION

15  BY MR. DEARINGTON:

16  Q.   Good morning, Mr. Churchill.

17  A.   Good morning.

18  Q.   I'm going to show you this page here.  I'd like you to

19  translate those characters for me.

20  A.   Pizhun can mean a number of things depending on context.

21  Approve, certify, authorize, sanction.

22  Q.   Okay.  And one more for you.  Let's do this one, please.

23  A.   Zhengming, Z-H-E-N-G-M-I-N-G, can mean to certify or

24  authorize.

25  Q.   In your translation you saw these characters, correct?

1    A.  Correct.

2    Q.  Which you just said can mean authorize as one of the --

3    authorize, approve, or certify?

4    A.  Correct, or sanction.

5    Q.  And you saw these characters which you said can mean

6    certify?

7    A.  Or authorize.

8    Q.  Or authorize.  In your translation you saw these characters

9    which you said can mean certify, authorize, or approve?

10   A.  Correct.

11   Q.  And you didn't see these characters which mean certify?

12   A.  Right, or authorize, correct.

13   Q.  But you selected certify and did not select authorize or

14   approve as the meaning of this translation?

15   A.  That's correct.

16   Q.  And if I were to tell you that we had a professional

17   certification company --

18            MR. BARRY:  Objection, hearsay.

19            MR. DEARINGTON:  This is just *voir dir*ing the witness

20   here about whether he has doubts about his certification in

21   light of some of his certifications which I'm happy to show

22   that we conducted.

23            THE COURT:  I don't think you should introduce into

24   the record what somebody else told you.

25            MR. DEARINGTON:  Hypothetically perhaps, Your Honor?

1    THE COURT:  Go ahead.

2  BY MR. DEARINGTON:

3  Q.   If someone were to have a professional certification that

4  said approve or authorized or to appoint instead of certify as

5  an appointment and another native Chinese speaker agreed with

6  that and no one came up with this is to certify, would that

7  give you doubt about your translation that this says certify

8  and not authorize or appointment?

9  A.   No, it would not give me doubt.

10  Q.   And when you were in the search, you translated this

11  document on the spot, correct?

12  A.   No, I did not translate it on the spot.  I translated it

13  later when I had time to read over and research it.

14  Q.   Did you review the document on the spot?

15  A.   Yes.

16  Q.   So you translated it informally when it was seen?

17  A.   I don't know that I provided a full translation of the

18  entire document, but I did translate enough to identify what it

19  was.

20  Q.   You were able to speak with Special Agent Lampe afterwards

21  before you translated it for this case, right?

22  A.   We spoke, yeah.

23  Q.   Did you speak about your translation?

24  A.   No.

25  Q.   So you found the document, you did some informal

1    translation, and then how long after did you render your

2    translation of what this document says?

3    A.    I don't recall.  I want to say it was a couple months.

4    Q.    And at that point you were aware of the allegations against

5    Dr. Tao, right?

6    A.    I was.

7    Q.    So you were aware of the allegations and you have this

8    piece of evidence and you're thinking -- in the context of what

9    the government is alleging, you're certifying this document,

10   right?

11   A.    That's correct.

12   Q.    And you came out with a translation that says this is to

13   certify that, instead of this authorizes or approves that,

14   correct?

15   A.    Correct.

16   Q.    Even though you just testified that there were three

17   options for you:  Certify, authorize, or approve, right?

18   A.    Or sanction, yes.

19   Q.    Or sanction.  And you decided to go with the certify one?

20   A.    Correct.

21   Q.    And you had options; you just selected one, right?

22   A.    Right, based on context.

23   Q.    And the context was everything that Special Agent Lampe

24   told you he believes to be true in this case, right?

25   A.    No, there was more context than that.

1    MR. DEARINGTON:  Your Honor, I think that satisfies

2    our *voir dire*, but our objection remains on the hearsay

3    grounds, Your Honor.

4    THE COURT:  All right.  Based on where this was found

5    and based on other evidence in the case, I think that it

6    overcomes the hearsay objection as an adoptive admission, and

7    with respect to the dispute about the translation, I think that

8    goes to weight over admissibility.

9    I would be interested, though, in hearing further

10    about the context and why that particular translation was

11    selected among the three or four words that it could be.

12    MR. BARRY:  Happy to do that, Your Honor.

13    CONTINUED DIRECT EXAMINATION

14    BY MR. BARRY:

15    Q.   So, Mr. Churchill, Mr. Dearington asked you about the

16    context in which you made the decision to translate that

17    document in a particular way.  And you responded as saying part

18    of it was based on conversations you had with Agent Lampe, but

19    there was a larger context.  Did you say that?

20    A.   Yes.

21    Q.   Can you please explain for the jury what that larger

22    context was that helped you, based on your experience and

23    understanding of the Chinese language, reach the translation

24    that you did?

25    A.   Sure.  So first of all, the word can be translated

1    certified.  That is an accurate translation in its own right.

2    However, I also believe that this is the best word in context.

3        And so I think there are three layers of context we can

4    look at here.  The first is the immediate context.  This is a

5    certification, that is to say certifies something.  We can know

6    that it's a certification because of the official stamp and

7    signature of the Ministry of Education, because of the serial

8    number that's at the bottom, which means that this has been

9    filed for official recordkeeping, and because of the official

10   manner or binding in which this certificate has been placed.

11       Secondly, I think we can look at the context of the Chinese

12   system at large.  The Changjiang Scholar Award Program

13   management guidelines --

14           MR. DEARINGTON:  Objection, Your Honor.  He's

15   respectfully a linguist.  They have an expert on the Changjiang

16   Scholar.

17           THE COURT:  All right.  I understand.

18           MR. DEARINGTON:  As far as authenticity, unless he can

19   establish he's seen Changjiang certificates before, he's not --

20   it's not permissible for him to say this is a Changjiang

21   certificate because I saw it and it looks like it.

22           THE COURT:  At this point the issue is the translation

23   itself, and I think sufficient ground has been laid for this

24   translation to be admitted and that is Exhibit 619A.

25           There remain authenticity concerns, and I think you're

1    going to address that with another witness, so for now, I will

2    admit the translation, 619A, but the 619, the certificate

3    itself I think you're going to lay additional groundwork

4    through your other witness.

5         MR. BARRY:  So that's in addition to the possession

6    plus for the hearsay?

7         THE COURT:  Yeah, it's overcome that.  But I thought

8    there was going to be more testimony about the seal or other

9    indicia on this.

10        MR. BARRY:  Okay.

11        THE COURT:  So I'll defer ruling on 619, but I do

12   think 619A is admitted at this point.

13        MR. BARRY:  May I publish 619A for the jury?

14        THE COURT:  Yes.

15   BY MR. BARRY:

16   Q.   And, Mr. Churchill, is this just your translation of that

17   cover page of the leather binding?

18   A.   Yes.

19        MR. BARRY:  And can we go to the next page, please.

20   Can we zoom in a little bit to allow the jury to read it?

21        THE COURT:  There still remains, of course, a question

22   about the authenticity of the certificate that underlies this,

23   so I'm allowing this to be admitted and published to the jury

24   at this time, but if ultimately I do not admit Exhibit 619, I

25   will not allow the jury to see 619A during their deliberations

 1   either.

 2        MR. BARRY:  Okay.  So at this time, Your Honor, I have

 3   one final batch of e-mails to go through with Mr. Churchill.

 4   Would you like me to do that now or take a break first and try

 5   to wrap it up after that?

 6        THE COURT:  What time is it?  Let's take a break for

 7   15 minutes.

 8      (Recess.)

 9      (The following proceedings occurred outside the presence of

10   the jury.)

11        MR. DEARINGTON:  Your Honor, if we could address this

12   without the presence of the witness as well, please.

13        THE COURT:  Okay.

14        MR. DEARINGTON:  So, Your Honor, we asked for *Jencks* a

15   long time ago.  It's under a case management order a long time

16   ago, and twice since the trial started I asked the government,

17   you got us the *Jencks* for Mr. Churchill, right, especially the

18   certificate, that's what at issue here, and it was represented

19   to us that we got all the *Jencks* for him.

20        And after he got *voir dire*d, we got an e-mail from the

21   government with *Jencks* about the very issue we *voir dire*d him

22   about, just dumped on us after my *voir dire*.  And it's 120

23   pages, and I'll show you exactly what the e-mail is, it's on

24   point, and it was given to us seven months after the e-mail

25   occurred after he went, minutes after he went, about this

 1    issue.

 2              Your Honor, may I approach?

 3              THE COURT:  Yes.

 4              MR. DEARINGTON:  I just got this e-mail.  We haven't

 5    been through all this stuff.  We're scrolling on phones.  It's

 6    not only *Jencks,* it's material to our defense.  It's *Brady*

 7    material.

 8              MR. OAKLEY:  Are you referring to Mr. Hawk's e-mail?

 9    What page are we on?

10              MR. DEARINGTON:  You guys -- I think it's 14, 15.

11              THE COURT:  So this was November 8, '21, e-mail from

12    James Churchill to Stephen Lampe, the FBI agent, and part of

13    this e-mail addresses the translation on the Changjiang Scholar

14    certificate.  And you just discovered this when?

15              MR. DEARINGTON:  After he testified about it.  And we

16    had multiple representations from the government they got us

17    all statements about the certificate, in the last couple days

18    even.

19              MR. OAKLEY:  Your Honor, Mr. Hawk sent this.  This is

20    a PDF, and it's Mr. Lampe's e-mail exchange.  And it was sent

21    this morning.  We don't intend to call Mr. Lampe, but in the

22    e-mail Mr. Hawk says out of an abundance of caution, since we

23    provided you other e-mails, we're providing you these.  This

24    comes from a system that required the government to take

25    certain steps.

1          This particular e-mail, this information was provided

2    to the defense, first of all.  There was back and forth related

3    to the translation of Government's 116, so the defense has had

4    this.

5          MR. DEARINGTON:  Your Honor, may I respond?

6          THE COURT:  So if -- they had this specific e-mail?

7          MR. OAKLEY:  I don't know if it was provided in this

8    form, but the content was provided.

9          MR. DEARINGTON:  If I may read it for the record, Your

10   Honor, and state my personal experience here.

11         THE COURT:  Read slowly, please.

12         MR. DEARINGTON:  First of all, this is not an e-mail

13   from Special Agent Lampe; this is an e-mail from James

14   Churchill.  It states, "I'm replying on the high side in case

15   any of the AUSAs don't want any of my comments made

16   discoverable."

17         THE COURT:  I've read this.  I know why you want to

18   admit this into evidence or at least cross-examine about this.

19   My question is the government has said that this particular

20   language -- I guess that first sentence you're saying you've

21   never seen.

22         MR. DEARINGTON:  None of this, Your Honor, we've seen

23   none of this.

24         THE COURT:  So the *Jencks* Act requires there be

25   discovery before the witness is cross-examined.  That's what

1    the statute requires.  The witness has not been cross-examined,

2    although the witness has been *voir dire*d, which essentially is

3    sort of a cross-examination on a particular piece of evidence.

4          So at this point I think the best course is if you

5    choose to *voir dire* him some more, return to this issue and you

6    can *voir dire* him some more.  You can put this into evidence if

7    you want to or wait until you cross-examine him altogether.

8    It's your choice.

9          MR. DEARINGTON:  Your Honor, that makes sense to us.

10   We would add there's 160 pages of materials here we haven't had

11   a chance to review.  I'm not sure, maybe the government --

12         THE COURT:  What do you mean, 160 pages of what?

13         MR. DEARINGTON:  106 pages that we just received.

14         MR. OAKLEY:  Of Agent Lampe's e-mails?

15         MR. DEARINGTON:  Which include apparently James

16   Churchill's e-mails.

17         THE COURT:  Okay.  So when you say -- but this one

18   particular e-mail is really -- it's James Churchill's

19   statement.  It's not Special Agent Lampe's statement.  So the

20   rest of the e-mails, are they statements of Mr. Lampe or others

21   or both?  I'm confused.

22         Because if we're talking about *Jencks* Act, the first

23   one, which is what Mr. Dearington pointed me to, it's actually

24   a statement of Mr. Churchill, not Mr. Lampe.  It's from James

25   Churchill to Stephen Lampe.  Mr. Lampe at some point forwarded

1  it to Mr. Hawk and Mr. Barry.  But the content of the e-mail

2  itself that is at issue is a statement of Mr. Churchill in the

3  form of an e-mail.

4          So now apparently there's more stuff in this -- that

5  was forwarded.  And the next one I see, it's from Lampe to

6  Schmidt and it looks like it's from Lampe.  So if it's a *Jencks*

7  Act statement, I'm not saying it is, but it's a statement.  And

8  of course if he's going to testify, probably is *Jencks* Act, but

9  I'm just asking -- I don't want to go through 106 pages at this

10  point.  Are most of these others -- are all of these others

11  e-mails authored by Mr. Lampe?

12          MR. OAKLEY:  That's my understanding, Your Honor.

13  There may be -- you know, the way e-mails work, there may be --

14  these are Agent Lampe's e-mails.

15          THE COURT:  Are there any more in here that are

16  statements, responses from Mr. Churchill?  Because I'm now to

17  one where Mr. Lampe sent to Mr. Churchill, I don't see that

18  Mr. Churchill responded because while we have Mr. Churchill on

19  the stand to the extent there's any e-mails from him discussing

20  with Mr. Lampe or anyone else, those are *Jencks* Act, and

21  something that the defense is entitled to discover.

22          MR. OAKLEY:  Yes, Your Honor.  And going back to the

23  e-mail from Mr. Churchill to Lampe, on December 6th at

24  11:44 a.m., Mr. Hawk sent an e-mail to Mr. Dearington and

25  Mr. Zeidenberg:  "Mike, we wanted to follow up and see where

1    the defense stands on our request to stipulate as to the

2    accuracy of the translations."

3          And then in a highlighted portion, "regarding the

4    certification, according to the FBI linguist, the certificate

5    reads:  This is to certify that Fuzhou University appoints Tao

6    Feng as...  Alternatively, it could be translated as follows:

7    This approves Fuzhou University to appoint Tao Feng as...  The

8    word appoint is in there, but it could also be translated as

9    hire."

10          So the information, the statement from the linguist,

11    Mr. Churchill, was provided back on December 6, 2021, at

12    11:24 a.m.

13          THE COURT:  Okay.  That covers this main paragraph of

14    Mr. Churchill's e-mail.  I'm trying to find -- here it is.  But

15    obviously it didn't cover that first sentence, which I'm sure

16    the defense wants to cross-examine him about.  So, yeah, they

17    did not -- it sounds like they received the content or the --

18    essentially the same language that's in here in terms of how he

19    went about or how he translates this, but they didn't receive

20    the entire e-mail until shortly before now, I guess.

21          MR. DEARINGTON:  So, Your Honor, I do see the e-mail

22    where there was a representation.  I mean, I don't know if they

23    said it was Churchill or not or if they said a linguist.  I

24    think there's two linguists here.

25          In any event, we certainly want the first sentence and

1   we certainly want the "no getting around that one" sentence in

2   there.  And we'd also like to know since we're receiving this

3   now -- *Jencks* isn't covered by these e-mails without authors

4   with little excerpts -- whether Special Agent Lampe or anyone

5   else was texting with Mr. Churchill.  It seems like there was a

6   concern about keeping things off the books.

7           THE COURT:  How much longer are you going to have

8   Mr. Churchill on direct?

9           MR. BARRY:  Probably 30 minutes.

10          THE COURT:  Okay.  So this particular e-mail is

11  something that the defense has now discovered.  They have

12  discovered it before its cross-examination.  I'm just trying to

13  figure out if there's more in this set that was just sent to

14  him that you can highlight right now because they need to be

15  able to read this before they start cross-examining

16  Mr. Churchill.

17          MR. DEARINGTON:  And we'd also like to know, Your

18  Honor, if they're willing to let us know if there was any texts

19  involving Mr. Churchill.  That would be *Jencks* as well.  Or any

20  other communications.  I mean this is *Brady* too.

21          THE COURT:  I agree.  You can take your --

22          MR. DEARINGTON:  Thank you, Your Honor.

23          THE COURT:  I might keep it.  It's nicer than mine.

24  How about we do this:  Why don't we keep examining.  That will

25  take us maybe to an early lunch hour.  We'll take an extended

1   lunch hour unless you could have Special Agent Lampe or

2   somebody at your table to see if there's any more in that

3   category.  Rather than you have to go through 106 of them, if

4   the government could point to you any other e-mails in there

5   that are authored by Mr. Churchill they need to point them out

6   to you so you can get ready for cross-examination of

7   Mr. Churchill.

8           MR. BARRY:  We can do that, Your Honor.

9           THE COURT:  And you'll have the weekend with respect

10  to ones I guess authored by Mr. Lampe if you hadn't already

11  discovered them.  I think it's a fair question to ask.

12           Anything else, any other communications that go to the

13  subject matter of this case, the defense is entitled to

14  discover statements of any witnesses under *Jencks* Act before

15  they are called upon to cross-examine or direct examine

16  government witness.

17           MR. BARRY:  There's nothing else we're aware of, Your

18  Honor, but we will double-check.

19           THE COURT:  Okay.  Are you okay with proceeding that

20  way?  We'll continue with direct examination of Mr. Churchill.

21           MR. DEARINGTON:  Yes, Your Honor.

22           THE COURT:  Okay.  All right.  And then once the

23  direct exam is concluded, we'll break for an early lunch.  Is

24  that how you want to proceed, Mr. Dearington?  Or do you want

25  to start cross-examination?

1      MR. DEARINGTON:  It's up to Your Honor.

2      THE COURT:  I leave it up to you.

3      MR. DEARINGTON:  Depending on I guess when

4  Mr. Churchill ends, we defer.

5      THE COURT:  I'll ask you then.

6      MR. DEARINGTON:  Thank you, Your Honor.

7      MR. BARRY:  And, Your Honor, just to -- I was just

8  talking to defense counsel before, the last two exhibits I plan

9  on talking with Mr. Churchill about are two different websites

10  from a Chinese university.

11      THE COURT:  Okay.  What are the numbers?

12      MR. BARRY:  770, 770A, 752 and 752A.

13      THE COURT:  770 and 752?

14      MR. BARRY:  Yes, Your Honor.  But I'm going to do

15  those last.

16      (The jury entered the courtroom, after which the following

17  proceedings were had.)

18      THE COURT:  You can be seated.

19  BY MR. BARRY:

20  Q.  Mr. Churchill, we're going to do our last batch of

21  documents.  And these are items -- we've gone through 2017,

22  2018.  Now we're in 2019.

23  A.  Understood.

24  Q.  So I first would like you to look at what has been marked

25  as Government's Exhibit 220, and can you please tell us what

1    that is?

2    A.   It's an e-mail between Dr. Tao Feng and a couple other

3    individuals.

4           MR. BARRY:  Government moves to introduce into

5    evidence Government's Exhibit 220.

6           MR. DEARINGTON:  Court's indulgence.  Continuing

7    objection, Your Honor.

8           THE COURT:  Exhibit 220 admitted as an adoptive

9    admission.

10          MR. BARRY:  Can we please publish 220.  We're good.

11   Thank you.

12   BY MR. BARRY:

13   Q.   Is that a January 1, 2019, e-mail and at the top Dr. Tao

14   says, "I am currently in China"?

15   A.   Correct.

16   Q.   I'd like to next show you what's been marked as

17   Government's Exhibit 226.  Do you recognize this document,

18   Mr. Churchill?

19   A.   No, I don't believe I do.

20   Q.   What does it appear to be?

21   A.   It appears to be an e-mail between Dr. Tao Feng and another

22   individual.

23          MR. BARRY:  Government moves to introduce Exhibit 226.

24          MR. DEARINGTON:  Continuing objection, Your Honor.

25          THE COURT:  Admit as an adoptive admission from the

1    content of Dr. Tao either adopts it or believes in the truth of

2    the content of the other individual, so admitted as an adoptive

3    admission.

4         MR. BARRY:  Publish 226, please.

5    BY MR. BARRY:

6    Q.   Mr. Churchill, does this appear -- if you look at the first

7    two sentences of Karim Khan, is he e-mailing Dr. Tao to ask

8    about a job in his group?

9    A.   Yes.

10   Q.   And Dr. Tao responds from his KU address and he says, "Are

11   you interested in a post-doc position at Fuzhou University in

12   China?"

13   A.   Correct.

14   Q.   I'd like you to look at Government Exhibit 227.  This is

15   another e-mail chain between Dr. Tao and another individual

16   named Ruben Palacio?

17   A.   Yes.

18   Q.   That's R-U-B-E-N P-A-L-A-C-I-O?

19   A.   Yes.

20        MR. BARRY:  Government moves to introduce Exhibit 227.

21        MR. DEARINGTON:  Continuing objection, Your Honor.

22        THE COURT:  Exhibit 227 admitted as an adoptive

23   admission.

24   BY MR. BARRY:

25   Q.   Let's start at the bottom.  This is an e-mail from

1    Mr. Palacio to Dr. Tao.  And again, does this appear to be

2    someone corresponding with Dr. Tao about a job opportunity?

3    A.    Yes.

4    Q.    And does it appear from this e-mail that they're talking

5    about a job in China?

6    A.    Yes.

7    Q.    And then at the bottom do you see where it says, "If you

8    publish an article in JACS or Angew at Fuzhou University,

9    you'll receive a cash prize of about 2500 U.S."?

10   A.    Yes.

11   Q.    If you go up, does it appear that Dr. Tao is including the

12   bolded text in response to Mr. Palacio's e-mail?

13   A.    The bolded text, I'm sorry.

14   Q.    So there's two e-mails here.  There's one from someone

15   named Ruben Palacio to Dr. Tao.  And Dr. Tao responds.  And he

16   says please read the following reply.

17   A.    Yes.

18   Q.    Does it looks like Dr. Tao's responses are the bolded reply

19   sections?

20   A.    Yes, it appears so.

21   Q.    I next want you to look at Government's Exhibit 228.  This

22   is again from January 2019.  Does this appear to be another

23   e-mail chain between Dr. Tao and some other individuals?

24   A.    Yes.

25           MR. BARRY:  Government moves to introduce Government's

1  Exhibit 228.

2          MR. DEARINGTON:  Continuing objection.

3          THE COURT:  228 admitted as an adoptive admission.

4  BY MR. BARRY:

5  Q.  I just want to look at the top.  This is January 28, 2019.

6  And Dr. Tao says, "Dear Celine and Carina, I just called my

7  wife.  (I am currently in China)."

8  A.  Yes.

9  Q.  I'd next like you to turn to Government's Exhibit 312.  Is

10  this an e-mail from Dr. Tao and an individual named Shouyun

11  Cheng?

12  A.  Yes.

13  Q.  How do you spell Shouyun Cheng?

14  A.  S-H-O-U-Y-U-N.  C-H-E-N-G.

15          MR. BARRY:  Move to admit Government's Exhibit 312.

16          MR. DEARINGTON:  Continuing objection, Your Honor.

17          THE COURT:  Admitted as an adoptive admission, 312.

18  BY MR. BARRY:

19  Q.  And does this -- if we can just highlight that top portion

20  and maybe the first paragraph of the second e-mail.

21      Does this appear to be another person reaching out to

22  Dr. Tao saying they're interested in a group, and Dr. Tao says,

23  "Thank you for your interest.  I collaborate with one group in

24  China.  I supervise some post-docs in the group at Fuzhou

25  University.  If you are interested, you can be hired there and

1   work as a post-doc under my supervision"?

2   A.   Yes.

3   Q.   And this is on February 10, 2019, right?

4   A.   Correct.

5   Q.   I next want you to look at Government's Exhibit 222.  Is

6   this another e-mail chain on that same day, February 10, 2019?

7   A.   Yes.

8   Q.   And does this appear to be e-mail correspondence between

9   Dr. Tao and some other people?

10  A.   Yes.

11          MR. BARRY:  Government moves to introduce Exhibit 222.

12          MR. DEARINGTON:  Continuing objection, Your Honor.

13          THE COURT:  I'm looking at the ones where there were

14  more than one person -- or more than two people in the e-mail

15  chain, just for your edification.

16          Admit it as an adoptive admission.

17  BY MR. BARRY:

18  Q.   I want to focus on the top.  So this is the same day that

19  we just looked at, right, February 10, 2019?

20  A.   Correct.

21  Q.   And does this appear to be Dr. Tao following up on a

22  potential award at KU?

23  A.   Yes.

24  Q.   I next want you to turn to Government's Exhibit 234.  This

25  is -- is this another e-mail between Dr. Tao and that

1    individual we looked at earlier named Ruben Palacio?

2    A.   Yes.

3    Q.   Does it appear to be an e-mail where Mr. Palacio e-mails

4    Dr. Tao and Dr. Tao forwards that e-mail to somebody else?

5    A.   Correct.

6         MR. BARRY:   Government moves to introduce Government's

7    Exhibit 234.

8         MR. DEARINGTON:   Continuing objection.

9         THE COURT:   Exhibit 234 admitted as an adoptive

10    admission.

11    BY MR. BARRY:

12    Q.   And I just want to go to the top part of Mr. Palacio's

13    e-mail.  In the subject line is "information on a post-doc" --

14    if we can scroll down -- "information on a post-doc fellow

15    position in China."

16         Does this appear to be Mr. Palacio, the individual we

17    looked at earlier, appearing to accept some sort of job at

18    Fuzhou University?

19    A.   Yes.

20    Q.   If we go to the top, it has Dr. Tao e-mailing it to

21    somebody with a fzu.edu.cn e-mail account, right?

22    A.   Correct.

23    Q.   I next want you to look at Government's Exhibit 240 and

24    240A.  And do these similarly appear to be e-mails between

25    Dr. Tao and some other individuals?

1    A.    Yes.

2            MR. BARRY:    Government moves to introduce Government's

3    Exhibit 240 and 240A.

4            MR. DEARINGTON:    Continuing objection.

5            THE COURT:    Admitted as an adoptive admission.

6            MR. BARRY:    Can we please publish 240A?

7    BY MR. BARRY:

8    Q.    At the top does it look like this is an e-mail chain

9    involving some other folks and then Dr. Tao forwards it from a

10   KU e-mail address to a fzu.edu.cn e-mail address?

11   A.    Correct.

12   Q.    I next -- we're almost there.   I next want you to look at a

13   batch.   So this is going to be a batch because it's a series of

14   e-mails that are related to each other.   So it's going to be

15   238, 241, 241A, 242, 242A, 243, 244, and then I think you just

16   have 246A, which is the translation, but 246 is the original in

17   Chinese.   Do you have that batch?

18   A.    Yes.

19   Q.    And you can take a minute, but do these appear to be a

20   series of e-mails between Dr. Tao and a number of other e-mail

21   addresses including an individual named Yu-Wen Chen, Y-U dash

22   W-E-N, Chen, C-H-E-N, on the first 238?

23   A.    238, yes.

24   Q.    Okay.   And then is 241 an e-mail from someone with the

25   e-mail address Alex and then a bunch of numbers at yahoo.com.tw

1    to Dr. Tao?

2    A.   Yes.

3    Q.   And then 242, does that appear to be an attachment with

4    some signatures to 241?

5    A.   Yes.

6    Q.   And then 243, does that appear to be an e-mail from Dr. Tao

7    responding to an e-mail from that Alex @yahoo.com.tw e-mail

8    address?

9    A.   Yes.

10   Q.   And 246, is this another e-mail chain between Dr. Tao and a

11   Yu-Wen Chen?

12   A.   Yes.

13          MR. BARRY:  Government moves to introduce 238, 241,

14   241A, 242, 242A, 243, 244, 246, and 246A.

15          MR. DEARINGTON:  Your Honor, we have no objection to

16   248, and the rest we are expressing our continuing objection

17   to, Your Honor.

18          THE COURT:  Okay.  You mean 238?

19          MR. DEARINGTON:  Oh, this is 238.  Okay.  Continuing

20   objection as to all, Your Honor.

21          THE COURT:  Okay.  Understood.  All these exhibits,

22   238, 241, its translation 241A, 242, 242A, 243, 244, and 246

23   its translation 246A are all admitted as adoptive admissions.

24   Some of these exhibits involve statements of Dr. Tao himself.

25   Others involve statements of others, and from the content

1    Dr. Tao is adopting or is believing in the truth of the content

2    by virtue of the way he responds.  And then for some of these

3    are attachments as well, so those exhibits are admitted.

4    BY MR. BARRY:

5    Q.  Let's first pull up 238, please.  And actually -- so 238

6    the subject line is collaboration agreement, right?

7    A.  Correct.

8    Q.  And does it appear to be a series of correspondence

9    between -- well, the bottom chain is someone named Yu-Wen Chen

10   e-mailing Dr. Tao, right?

11   A.  Correct.

12   Q.  And then it looks like Dr. Tao forwards that e-mail to

13   somebody at -- with a Fuzhou e-mail account?

14   A.  Correct.

15   Q.  And if you go to the top, there's Dr. Tao's response to

16   Professor Chen where he says, Thank you very much for agreeing

17   to collaborate; I need your birthday for filling out the table.

18   This is March 10, 2019, correct?

19   A.  Correct.

20   Q.  Let's publish 241A.  So this is two days later.  And this

21   is an e-mail that says, "Hello, Professor Tao, attached is the

22   commitment letter."

23       And then the attachment is 242A.  Let's look at that,

24   please.  And do you see -- if we can scroll down real quick, do

25   you see that name Yu-Wen Chen, is that the same name we were

1  looking at where Dr. Tao is corresponding with that Professor

2  Chen?

3  A.   Yes.

4  Q.   And then can you please read if we go up, the first

5  sentence, please, in that paragraph.

6  A.   *I and the team members I lead (Associate Professor Liu*

7  *Qingyuan and Ph.D. student Lin Weishao) agree to participate in*

8  *the project "single metal atom and precision preparation of*

9  *small clusters of catalytic materials and low temperature*

10  *methane activation performance," the "joint fund for*

11  *cross-strait science and technology cooperation" project*

12  *applied for by Fuzhou University Professor Tao Feng.  And shall*

13  *be --*

14  Q.   Sorry.  I should have said the first clause.

15  A.   Understood.

16  Q.   Can we go back to 241, please.  Can we look at the subject

17  line.  What does that subject line mean?

18  A.   *Subject, project collaboration commitment letter.*

19  Q.   Can we go to 243, please.  This is another e-mail from the

20  same day, right, from March 12th?

21  A.   Correct.

22  Q.   And is that -- does that say RE:  and that same project

23  commitment letter?

24  A.   Project collaboration commitment letter, correct.

25  Q.   That's Dr. Tao saying "Thank you very much for your great

1    help"?

2    A.    That's correct.

3    Q.    Let's go to 246A, please.    And first let's go to -- so the

4    e-mails that we just looked at were from March 12, 2019, so

5    this is five days later, March 17, 2019.    And can we please

6    look at that bottom e-mail where it's from

7    report@pro.nsfc.gov.cn.    And it says Yu-Wen Chen.    That's the

8    person who we started this little chain of e-mails with, right,

9    another professor?

10   A.    Correct.

11   Q.    It says, *You have a project application waiting to be*

12   *confirmed.*

13       And then can we please scroll down.

14       Does it look like this is just a list of sort of

15   commitments?

16       Scroll to the bottom, please.

17   A.    Yes.

18   Q.    And then right here on the bottom, if we can scroll down a

19   little bit more, it says, *Hello, Teacher Yu-Wen Chen.*

20   *Professor Tao Feng will add you as a project participant*, and

21   then it lists an alphanumeric number, U190520049, and does that

22   look like kind of like a project or grant proposal description?

23   A.    Yeah, project name.

24   Q.    And it says, *Tao Feng, Fuzhou University*, and it has an

25   e-mail address there, right?

1    A.    Correct.

2    Q.    All right.  I next want you to look at Government's Exhibit

3    253.  And this is a long e-mail chain, but I just want you to

4    look at the first page.  Does it appear that this is a series

5    of correspondence between some other folks and Dr. Tao is

6    copied on those?

7    A.    That's correct.

8    Q.    And then the top e-mail, does it appear to be an e-mail

9    where Dr. Tao sends an e-mail to somebody else named Yu Tang?

10   A.    Correct.

11          MR. BARRY:  Government moves to introduce Exhibit 253.

12          MR. DEARINGTON:  Continuing objection.

13          THE COURT:  All right.  Admit it as an adoptive

14   admission.

15   BY MR. BARRY:

16   Q.    Will you please publish 253, and I just want to focus on

17   the first half of the first page.

18          So this bottom e-mail, does that appear to be an e-mail

19   between a number of individuals including Dr. Tao?

20   A.    Yes.

21   Q.    And it looks like at least in this e-mail they're talking

22   about finishing a manuscript related to some sort of research

23   project?

24   A.    Correct.

25   Q.    And then you see at the top there's sort of like this group

1    e-mail and then there's a broken off e-mail where Dr. Tao

2    e-mails Yu Tang?

3    A.    Correct.

4    Q.    Can you read that for the jury, please?

5    A.    "Yu, you should use your Fuzhou address instead of Kansas.

6    Please send your address.  I will only use my Kansas.  No need

7    to mention my address.  Franklin (Feng) Tao."

8    Q.    All right.  I next want you to look at Government's Exhibit

9    313, 314, and 314A.  Are you with me?

10    A.    Yes.

11    Q.    What does 313 appear to be?

12    A.    An e-mail from Dr. Tao.

13    Q.    To another person?

14    A.    Correct.

15    Q.    Do you know who that e-mail address is, the

16    hpengtao02@gmail.com?

17    A.    I believe it's Dr. Tao's wife.

18    Q.    Are Exhibits 314 -- 314 is an attachment to that e-mail?

19    A.    That's correct.

20    Q.    What's the date of this e-mail?

21    A.    August 3, 2019.

22    Q.    And then 314 is a translation of -- 314A is a translation

23    of 314?

24    A.    Correct.

25          MR. BARRY:  Government moves to introduce into

1    evidence 313, 314, and 314A.

2          MR. DEARINGTON:  No objection, Your Honor.

3          THE COURT:  313, 314, 314A admitted.

4    BY MR. BARRY:

5    Q.   Let's publish 313 first, please.  And the subject line is

6    "Fwd: Contract" in English.  What is that attachment file name?

7    A.   It translates to Tao Feng Changjiang Scholar contract

8    revised version.doc.

9    Q.   Can we go to 314A, please.  This is a translation, right?

10   A.   Correct.

11   Q.   Can we scroll through this, please?  You see how there's

12   this red text again?

13   A.   Yes.

14   Q.   Do you remember earlier when we were looking at a couple

15   different versions of the contract that were sent back and

16   forth and I pointed you to Exhibit 336, which was an e-mail

17   that someone had sent to Dr. Tao in May of 2018?

18   A.   Yes.

19   Q.   Is -- and that e-mail that someone else sent to Dr. Tao

20   that had some attachments to it?

21   A.   Correct.

22   Q.   And one of those was a contract or draft contract that had

23   red text?

24   A.   Correct.

25   Q.   And then this is what we're looking at right now.  This is

1    an e-mail from August 2019, right?

2    A.    Correct.

3    Q.    From the defendant to his wife?

4    A.    Correct.

5    Q.    Attaching a document that appears to be a draft contract?

6    A.    Yes.

7    Q.    And is this draft contract the same draft contract that was

8    attached to that May 2018 e-mail?  If you like, I can hand

9    you -- it's 336A.

10   A.    Yes, if you don't mind.

11   Q.    Actually, let's do this, can we please pull up 336 on the

12   screen.  And you have the other document in front of you,

13   right, the one that is attached to the August 2019 e-mail?

14   A.    Correct, 314.

15   Q.    314A.  So would you like the Chinese version or English

16   translation?

17   A.    Chinese is fine.

18         Can we see the second page?  And the third page?  So far

19   these are identical.

20   Q.    Okay.  All right.  I next want to turn your attention to

21   Government's Exhibit 315 and 316.  Do these appear to be an

22   e-mail from Dr. Tao's Gmail account to a taofeng@fzu.edu.cn

23   account?

24   A.    Yes.

25   Q.    And does the -- is the subject line of 315 the same subject

 1  line as 313?

 2  A.  Yes.

 3  Q.  And does it appear that the e-mails were sent very close in

 4  time, both on August 3, 2019?

 5  A.  That's correct.

 6          MR. BARRY:  Government moves to introduce 315 and 316.

 7          MR. DEARINGTON:  No objection, Your Honor.

 8          THE COURT:  315 and 316 admitted.

 9  BY MR. BARRY:

10  Q.  And 316 is the -- is 316, the document attached to this,

11  the same document that was attached to the prior e-mail between

12  the defendant and his wife that we just looked at?

13  A.  Yes, it appears to be.

14  Q.  Okay.  You can put those aside.

15      All right.  The last thing I want to do is I want you to

16  look at what's been marked as Government's Exhibit 770 and

17  770A.  And I just want you to look at the first page of 770A.

18  It should be two pages if you can pull the second page off and

19  give that to me.

20  A.  770A?

21  Q.  Yes.

22  A.  Pull the second page off?  Pull this off?

23  Q.  Yes.  Thank you.

24      Look at 770.  And I don't want you to talk about the

25  content at all.  I want to talk about kind of what this appears

1   to be on the surface, okay?  So 770, have you seen this

2   document before?

3   A.   Yes.

4   Q.   And, again, without getting into what's in the content of

5   this, what does it appear to be?

6   A.   A web page.

7   Q.   Let's look at the top.  Do you see a URL up there?

8   A.   I do.

9   Q.   And what's that URL?

10  A.   In its entirety, hgxy.cqu.edu.cn/info/1181/3657.htm.

11  Q.   Have you viewed that website before?

12  A.   Yes.

13  Q.   And is that a website of a Chinese university?

14  A.   Yes.

15  Q.   And how do you know it's a Chinese university website by

16  just looking at the URL?

17  A.   It has the extension .edu.cn.

18  Q.   And you said that you studied in China at some point,

19  right?

20  A.   I have.

21  Q.   Are Chinese universities private entities?

22  A.   No.

23  Q.   Are they controlled by the Chinese government?

24       MR. DEARINGTON:  Objection, Your Honor.  This is a

25  linguist testifying.

1          MR. BARRY:  I'm laying a foundation.

2          THE COURT:  Proceed.

3          THE WITNESS:  Can you repeat the question?

4    BY MR. BARRY:

5    Q.   Sure.  Universities in China, you said they're not

6    privately owned, right?

7    A.   That's correct.

8    Q.   Are they considered public institutions?

9    A.   Yes.

10         MR. DEARINGTON:  Objection.

11         THE COURT:  Parties approach the bench.

12         (The following proceedings were had at the bench).

13         MR. DEARINGTON:  Your Honor, he's a linguist.  He's

14   here to translate documents and talk about what he translated.

15   If they want to call an expert about how Chinese universities

16   work, we would have had a chance to object to the

17   qualifications of that expert and so forth.  This is surprise

18   testimony about how universities in China work.  He's not an

19   expert in that matter.  I studied abroad in Italy.  I'm not an

20   expert in Italian universities.

21         MR. BARRY:  I can authenticate through personal

22   knowledge.  Mr. Churchill has personally viewed this website.

23   He's familiar with domains used by Chinese universities and

24   he's familiar with the fact that in the Chinese system there is

25   no such thing as a private university.  I'm laying foundation

 1    in order to withstand a hearsay objection based on a public

 2    record.

 3              MR. DEARINGTON:  Your Honor, may I respond?

 4              THE COURT:  Go ahead.

 5              MR. DEARINGTON:  I think this is hopefully going to be

 6    moot anyway.  These are hearsay websites with no translation,

 7    just summaries.  They're also objectionable on that ground

 8    anyway.

 9              THE COURT:  Let's talk about the admission of this

10    anyway.  This is 770, and 770A is the translation.  So you're

11    laying the groundwork.  I mean, if he says he has personal

12    knowledge as to whether institutions are public or private

13    based on his having attended a university in China, I can

14    accept that.  I don't know if you can go further than that.

15              You're also laying foundation that he's actually been

16    on this website and viewed it.  I've heard that already.  I

17    think it gets -- that gets us past the point of me determining

18    that this is in fact a sufficient foundation to show that this

19    comes from a Chinese university because it has the edu -- it

20    has the edu.cn in the URL.

21              So if he has personal knowledge, you can inquire

22    further that this is a public institution.  I think it next

23    gets us to the analysis of whether this is a hearsay exception

24    under 803(8).

25              MR. ZEIDENBERG:  Your Honor --

1           THE COURT:  I understand that the translation itself

2    is not verbatim, but I've looked at 770 and it's not like a

3    narrative document.  It's not text.  It's a website.  It's got

4    depictions.  So the way to translate this in my view is not a

5    line by line because there is no line by line but to say what

6    elements of this say.  In other words, you have to translate

7    elements of it.  So I don't think that's a legitimate

8    exception.

9           What I'm down to, though, is is this a public

10   activity.  803(8) requires that it be an activity -- let me --

11   just a minute.  It's two prongs.  803(8) requires that the

12   government establish that it is -- it is a statement of a

13   public office of the office's activities.  Assuming the

14   government can establish that, then the defendant's burden is

15   to show that with this -- that there's a lack of

16   trustworthiness.

17          MR. ZEIDENBERG:  Your Honor, this is -- they're

18   reporting -- this is a different university.  So they would be

19   having to rely on hearsay from another university to put it on

20   their website.  It's not news or information from the Chongqing

21   University website.  It's layer upon layer upon layer of

22   hearsay.

23          THE COURT:  So 770 is a website of Fuzhou or of

24   Chongqing?

25          MR. BARRY:  This is a public announcement.  It's a

1  website of Chongqing, which is the university in the

2  defendant's hometown, and it announces that he's scheduled to

3  give a talk at that university on a topic of scientific

4  interest.  So it's an announcement from Chongqing University.

5        THE COURT:  Of a lecture at Chongqing?

6        MR. DEARINGTON:  Your Honor, it's come to my attention

7  that that's not -- all of the translation covers a lot more

8  material than that.  There's something missing from this

9  exhibit that they're translating.  So now we have a translation

10 that relates to material that's not in the principal exhibit.

11       MR. BARRY:  So what I was just trying to tell them,

12 there were -- the translation is a summary translation.  There

13 were two web pages that were translated.  When I first started

14 talking to Mr. Churchill, I asked him to pull the second page

15 off because that's a summary translation of a different website

16 that we're not seeking to admit.

17       THE COURT:  I can't admit 770 yet.

18       MR. BARRY:  You can't admit 770 as it is.  It would

19 have to be redacted, and that's what I would move to --

20       THE COURT:  I'm not going to admit it at this point.

21       MR. DEARINGTON:  It doesn't spell his name correctly I

22 understand as well to the point of reliability.

23       THE COURT:  I'm not going to admit it.

24       MR. BARRY:  We can move on.

25     (Thereupon, the proceedings continued in open court.)

1   BY MR. BARRY:

2   Q.   Okay.  The last thing I want to do is I just want to update

3   -- if we can switch to the ELMO, please.  I'm sorry.

4             THE COURT:  Version of an April fool's joke, I guess.

5             MR. BARRY:  So I'm just going to update the -- some of

6   the last batch of exhibits from 2019 that we just went through.

7   So the first is Exhibit 220, one of the e-mails about the

8   defendant's location.  228, similar e-mail.  222, this was an

9   e-mail related to KU.  312, e-mail from the same day.  240,

10  e-mail to Fuzhou account.  241 and 242 related to the

11  collaboration with Professor Chen.  And then 253, which was one

12  of those last e-mails we saw with an individual by the name of

13  Yu Tang.

14            No further questions.

15            THE COURT:  Would you like to get started on

16  cross-examination?

17            MR. DEARINGTON:  Yes, Your Honor.  I think we could

18  probably do about 10, 15 minutes.

19            THE COURT:  Okay.

20                      CROSS-EXAMINATION

21  BY MR. DEARINGTON:

22  Q.   Hello again, Mr. Churchill.

23  A.   Hello.

24  Q.   So I think when we last spoke, you testified that you had

25  never spoken with Special Agent Lampe about your translation of

1    the certificate; is that correct?

2    A.    I believe your question was in between the acquisition of

3    the certificate and my translation of it.  Not in between that

4    time, no.

5    Q.    So you had actually spoken with Special Agent Lampe after

6    that time.  You were just limiting your response to the time

7    between your translation and when it was found?

8    A.    Correct.

9    Q.    So have you spoken with Special Agent Lampe after that time

10   about what your translation should be?

11   A.    Not about what it should be.  The only discussion that was

12   ever had was what the defense had objected to in my

13   translation.

14   Q.    Wouldn't that be a conversation about what the translation

15   should be?

16   A.    Yeah, but he wasn't offering advice on what it should be.

17   Q.    That wasn't my question, Mr. Churchill.

18   A.    Okay.  Sure.

19   Q.    So you did discuss with Special Agent Lampe, the case

20   agent, what your translation is, should be, what the defense's

21   objections were to it, you discussed with him a potential

22   response, right?

23   A.    What do you mean by potential response?

24   Q.    What your position is on what the defense believes the

25   defense translation should be.

 1   A.   Yeah, I discussed my linguistic opinion versus the

 2   defense's linguistic opinion.

 3   Q.   And your linguistic opinion I believe was that -- when I

 4   showed you those Chinese characters, you said it could be

 5   "certify," it could also be "appoint" or "approve," but you

 6   thought certify was the best?

 7   A.   That's correct.

 8   Q.   I'm going to show you -- I'm not going to show the jury,

 9   but I'd like to show you four Chinese -- three Chinese language

10   dictionaries, Chinese to English, and one Google Translate just

11   for fun.  And I'm going to show you the four translations that

12   these authorities state those characters mean, and I want you

13   to again tell me whether you think the word "certify" is the

14   best translation.

15   A.   Sure.

16          MR. DEARINGTON:  May I approach, Your Honor?

17          THE COURT:  Yes.

18   BY MR. DEARINGTON:

19   Q.   Okay.  I'll give you a moment to examine those.  And then

20   please look up when you've reviewed them.

21   A.   Okay.

22   Q.   Okay.  And you don't see the word "certify" on any of

23   those, do you?

24   A.   No.

25   Q.   Would you like to correct your testimony that you think

1    certify is the best translation of those characters?

2    A.    No.

3    Q.    You stand by it?

4    A.    I do.

5    Q.    Are you part of the FBI team would you say when it comes to

6    translating?

7    A.    Can you define what you mean by team?

8    Q.    What would you think of when I say team?

9    A.    Team, group of people.

10    Q.    That's it.

11    A.    Yes.

12    Q.    Okay.  Well, allow me to narrow the question.

13    A.    Sure.

14    Q.    Do you think you have a unified interest with Special Agent

15    Lampe in this case?

16    A.    Unified interest in what way?

17    Q.    Tell me what unified interest means to you.

18    A.    Unified meaning of the same mind, identical.  Interest

19    meaning -- I think interest can have a number of meanings, so I

20    think this is where I'm getting caught up.

21    Q.    Do you want to see Special Agent Lampe succeed in this

22    case?

23    A.    Do I want to see him succeed?

24    Q.    Answer truthfully, please.

25    A.    Yes.

1    Q.    When you're doing your translations, that's in the back of

2    your mind, isn't it?

3    A.    It's not in the forefront of my mind.

4    Q.    In the back of your mind I said, Mr. Churchill.

5    A.    Sure.

6    Q.    And when you provide something that you think is a good

7    translation for the government to Special Agent Lampe, isn't it

8    true he would sometimes say great work or great find and things

9    like that?

10    A.    That I would say that to him?

11    Q.    No, that Special Agent Lampe would say that to you.

12    A.    Yeah, something like that maybe.

13          MR. DEARINGTON:  If you could please show just to the

14    witness, Ms. Wiest -- we're going to pull up what's been marked

15    as Exhibit 463.

16          COURTROOM DEPUTY:  Sorry, this is so sensitive.  I

17    just want to make sure.  This thing is so silly.  Let me make

18    sure again.

19          MR. DEARINGTON:  Are you able to see it,

20    Mr. Churchill?

21          THE COURT:  I'm not.

22          COURTROOM DEPUTY:  It's not working right for some

23    reason.

24          MR. DEARINGTON:  Your Honor, we'd like to publish this

25    e-mail.  The government has represented it doesn't have an

1    objection to the authenticity.

2              THE COURT:  So you're -- you want 1463?

3              MR. DEARINGTON:  Would like to admit it, Your Honor.

4              MR. BARRY:  No objection.

5              THE COURT:  1463 admitted.

6    BY MR. DEARINGTON:

7    Q.   Do you recognize this e-mail, the second one down, is that

8    an e-mail from you to Special Agent Lampe?

9    A.   It is.

10   Q.   And if you could just let me know, is this about -- the

11   first numeral, is this about the certification that we were

12   just discussing?

13   A.   It is.

14   Q.   Could you please read from "Hi, Steve," your e-mail to

15   Special Agent Lampe?

16   A.   "Hi, Steve.  I'm replying on the high side in case the

17   AUSAs don't want any of my comments made discoverable."

18   Q.   Let's pause there for a moment.  What did you mean by that?

19   A.   By -- I meant by it that e-mails sent -- you know,

20   concerning the case can be presented as evidence in a court of

21   trial.

22   Q.   Such as this one, for example?

23   A.   Correct.

24   Q.   And -- okay.  So continue.  What did you mean by this

25   statement then?

1  A.   I'm sorry?

2  Q.   What did you mean by I'm relying on -- "I'm replying on the

3  high side in case the AUSAs," which is Mr. Barry and Mr. Oakley

4  -- or Mr. Barry and Mr. Oakley, "don't want any of my comments

5  made discoverable"?

6  A.   We use different e-mail clients that are sent to different

7  classifications so --

8  Q.   This one you knew you weren't e-mailing about something

9  classified.  You were talking about a translation.

10  A.   I'm explaining the comment.  I didn't know if the jury

11  would know what high side meant.

12  Q.   And I guess what I mean more is "in case the AUSAs don't

13  want any of my comments made discoverable," does that -- fair

14  to say that that means you didn't want the defense to know what

15  you were telling the AUSAs about the certification, some things

16  about the certification?

17  A.   It didn't mean that I didn't want it.  It meant that I

18  wasn't sure if they would want it.

19  Q.   And that was because some things you would think the AUSAs,

20  with respect to your translation, wouldn't want us to know,

21  right?

22  A.   Potentially, yeah.

23  Q.   If you could read from "my translation," please.

24  A.   To?

25  Q.   Just that number one.  I'll pause you if I think we should

1    stop to elaborate.

2    A.   "My translation on the Changjiang Scholar certificate is a

3    good one.  My translation reads:  This is to certify that

4    Fuzhou University appoints Tao Feng as a... alternatively, you

5    could also translate something like, this approves Fuzhou

6    University to appoint" -- I lost it.  Here it is -- "to appoint

7    Tao Feng as a... that gets in the word approved that the

8    defense is mentioning, but I don't see what difference that

9    makes."

10   Q.   Let's pause right there.  You were saying both translations

11   are fine; you just didn't understand what the difference was?

12   That's what you said, right?

13   A.   The translations are similar, yeah.

14   Q.   Right.  So you would be okay also, just putting aside this

15   case, just as a -- in a vacuum you would be okay with a

16   translation that said, of the certificate, this approves Fuzhou

17   to appoint Dr. Tao or Tao Feng, correct?

18   A.   Not -- because we can't remove the comment from the context

19   of the certificate itself.  So no.

20   Q.   Well, you didn't say that, though.  You said alternatively

21   you could also translate it like this and you just don't see

22   what difference it is, right?

23   A.   Right.

24   Q.   So you didn't understand that there might be a significance

25   to "this approves Fuzhou University to appoint" versus "this is

1    to certify that Fuzhou appoints."  To appoint, appoints.  You

2    didn't get that there was a difference there that mattered to

3    you, right?

4    A.   My -- I didn't get there was a difference between approved

5    and certified in this case.

6    Q.   I'm sorry?

7    A.   I did not get that there was a difference between approved

8    and certified.

9    Q.   Right.  It's all the same; you would be okay just the same

10   with "approves Fuzhou University to appoint" and if someone

11   presented that to you, you wouldn't say you're wrong about

12   that, right?

13   A.   No.  But I still maintain that it's not -- it is not the

14   best translation, though it can be an accurate translation.

15   Q.   Not the best for the government you mean?

16   A.   No, that's not what I mean.

17   Q.   So let's continue.  If you could read the next sentence,

18   please.

19   A.   "The word appoint, however, is definitely in there either

20   way.  Appoint could also be translated hire.  No getting around

21   that one."

22   Q.   So let's start with "appoint could be translated as hire."

23   So alternatively, fair to say, it could mean this approves

24   Fuzhou University to hire Tao Feng, right?

25   A.   Could you repeat that?

1  Q.   Yeah.  If you use your suggestion of hire, it would mean

2  this approves Fuzhou University to hire Dr. Tao, right?

3  A.   Or this certifies that Fuzhou University hires Dr. Tao.

4  Q.   Sure.  Sure.  In the former case we're talking about a

5  certificate that you noted looks like May 2018 could say, this

6  approves Fuzhou University to hire or appoint Dr. Tao, and that

7  would be a fair translation, right?

8  A.   Correct.

9  Q.   And when you said "no getting around that one," what did

10 you mean by that?

11 A.   In the original complaint that the defense submitted, their

12 translation did not include the word "appoint" or the word

13 "hire," which is in the translation.

14 Q.   I'm sorry.  I'm not understanding though.  You said "no

15 getting around that one."  Did you mean by that defense has a

16 fair point here, can't escape that fact?

17 A.   No, that's not what I meant.  I meant that the word

18 "appoint" is in the translation, whereas the defense did not

19 include that word in its translation.

20 Q.   I guess there's a disconnect for me here.  I'm trying to

21 understand.  What is it you were trying to get around?

22 A.   My implication was that the defense was trying to get

23 around using the word "appoint" in the translation.  Because

24 when the defense submitted its translation, it's alternative

25 translation, their translation did not include the word

 1    "appoint."  So I said the word "appoint" is definitely in there

 2    either way.  There's no getting around that one.

 3    Q.   So your position is we got around the other one, but no

 4    getting around this one; appoint might mean to hire, to

 5    appoint, right?

 6    A.   Not that we got around it, no.

 7    Q.   Okay.  And then all the way at the bottom, "I hope that

 8    helps."  What did you mean by that?

 9    A.   Because the -- when the defense was sending over

10    alternative translations that they were proposing, the AUSAs

11    and/or Steve Lampe had solicited my opinion on their

12    alternative translation.  So when I said, I hope that helps, I

13    hope my explanation helps.

14    Q.   Just to be clear, did you have any text messages, phone

15    calls with Special Agent Lampe about this?

16    A.   No.

17    Q.   So this is the e-mail where you are discussing what to do

18    about the defense's translation, right?

19    A.   Correct.

20    Q.   And you hope that your positions here helped?

21    A.   Hoped that my explanation helped.

22    Q.   That your explanation helped?

23    A.   Correct.

24         MR. DEARINGTON:  Your Honor, I think this is an okay

25    time to pause if Your Honor would like to do so for lunch.

1        THE COURT:  Let's take a lunch break until 1:15.

2     (The following proceedings occurred outside the presence of

3  the jury.)

4        THE COURT:  Mr. Dearington, any idea how long you

5  think you'll have him on cross?

6        MR. DEARINGTON:  My best guess, Your Honor, would

7  probably be about 30 to 45 minutes.

8        THE COURT:  And then you're ready with, is it

9  Dr. Tiffert that's next?

10        MR. BARRY:  Yes, Your Honor.

11        THE COURT:  He's ready to go this afternoon?

12        MR. BARRY:  Yes, Your Honor.

13        THE COURT:  All right.

14        MR. DEARINGTON:  Mr. Zeidenberg informs me I take

15  longer than I think I do.  Maybe a bit longer.

16        THE COURT:  That seems to be endemic to attorneys.

17        MR. DEARINGTON:  Thank you, Your Honor.

18     (Recess.)

19     (The following proceedings occurred outside the presence of

20  the jury.)

21        THE COURT:  Are you ready for the jury?  Ready for the

22  jury?

23        MR. ZEIDENBERG:  Your Honor, I don't know if this is

24  the appropriate time to address it.  I do want to have an

25  opportunity to address the website issue.  We don't have any

1    that are coming in right this moment, but the jury isn't in the

2    courtroom right this second so...

3         MR. BARRY:  Peter, this might moot it.  We're only

4    going to seek to introduce 771 and 772 through Dr. Tiffert.

5         MR. ZEIDENBERG:  I don't think that -- I appreciate

6    that.  And I don't want to rehash what we've said before except

7    to say this, Your Honor.  I think that when the government

8    indicted this case and the way they've decided to try the case,

9    it sort of hinges on the way -- their strategy has been they

10   want -- they feel it's incumbent upon them to prove what was

11   happening in China as opposed to what was happening in the

12   United States, and that's difficult when you don't have

13   witnesses from China.

14        Now, that was their decision in indicting the case and

15   in charging that case.  And they have e-mails and they have

16   inferences and they have circumstantial evidence, things that

17   they can argue.  But to try to go from that to say, we are

18   going to prove this by pulling down websites and then showing

19   them to the jury or letting the expert testify about them I

20   think is injecting error into this case that is reversible, and

21   we cannot -- it is the heart of the government's prosecution is

22   that he took a job in China, and the way -- their best piece of

23   evidence is going to be websites that we can't cross-examine.

24        They were pulled down after Dr. Tao was indicted in

25   this case.  All Dr. Tiffert can say is the website says the

 1    date on it.  That's hearsay.  It's hearsay on top of hearsay to
 2    prove the truth of the matter asserted.
 3          And, you know, there is a mechanism to get these
 4    government websites into evidence in the courtroom.  We've
 5    given you an example of what the same office, the National
 6    Security Division of the Department of Justice did very
 7    recently in the case in the Northern District of California.
 8    They got appropriate certifications.
 9          The government in this case has been on notice since
10    October when we raised this statute with them, and apparently
11    they're just trying to say never mind.  Even though it
12    obviously applied in the Northern District of California, they
13    don't feel it is necessary here and the Court can just let it
14    in because someone said I looked at it and it looks like a
15    government website to me and that -- and therefore, all the
16    content of it is in for the truth.  And, you know, I think
17    there's a blatant Sixth Amendment violation because Dr. Tao
18    can't cross-examine this.
19          And finally, Your Honor, I think --
20          THE COURT:  Let me just ask you -- are there any
21    websites in evidence now?  Because I sustained the objection to
22    758 and 759.
23          MR. ZEIDENBERG:  No.
24          THE COURT:  I so far sustained the objection to 770,
25    and what's left I think is what Mr. Barry just said they're

1  going to try to get in, 771 and 772.  That's it, right?

2          MR. BARRY:  Yes, Your Honor.

3          MR. ZEIDENBERG:  So the last point about the

4  reliability of these websites, and this goes to the defense

5  theory in this case, which is Dr. Tao was offered this

6  position, he got the Changjiang scholarship.  He then had to

7  negotiate this position.  Fuzhou University --

8          THE COURT:  Do you want Mr. Churchill here for this?

9          MR. ZEIDENBERG:  He can step out.

10         THE COURT:  Okay.

11         MR. ZEIDENBERG:  Thank you.  Fuzhou was in a difficult

12 position because they had given up a slot.  They nominated him.

13 He got the award.  Now they wanted him to work there.  And you

14 saw, you know, we've had this back and forth that they were

15 trying to negotiate with him, and, you know, we think that a

16 reasonable inference from the evidence is that Fuzhou was the

17 one who was touting this even though it wasn't true.  And

18 that's why the President Zhang was saying we don't have to put

19 this in writing.  And they had a motive and an incentive to

20 basically fabricate or boast or sort of inflate this

21 accomplishment that we've got this Changjiang Scholar working

22 here full-time.

23         And so they have a reason to -- this wasn't the normal

24 course.  They had a reason to want to inflate this because they

25 were in an awkward position because they were supposed to sign

1    this guy up, but they were quite a distance away from their

2    negotiations.

3            And so, look, the government has got e-mails.  They've

4    got conduct.  They can make their argument.  They can draw

5    their inferences.  But I think that trying to use a website to

6    prove that this happened is a bridge too far and it's -- there

7    isn't an exception.  And if they wanted to get this in, there

8    was a mechanism to do it, which they for whatever reason

9    decided not to pursue it.

10           THE COURT:  All right.  Understood.

11           Mr. Barry.

12           MR. BARRY:  Yes, Your Honor.  So first of all, to make

13   clear what we're talking about here, it's two exhibits, 771,

14   772 and the translations.  Those are both exhibits from the

15   Ministry of Education's website, which Dr. Tiffert has

16   personally visited, which Mr. Churchill has personally visited.

17   From an evidentiary standpoint, we plan to seek to introduce

18   those under the public records exception to hearsay.  We plan

19   to use Dr. Tiffert to authenticate and lay a foundation to

20   establish the elements under that hearsay exception.

21           In terms of the motion *in limine* brief that the

22   defense provided to us yesterday from the *Jinhua* case in the

23   Northern District of California, that's a very different

24   circumstance.  If you read that brief, what it's about is in

25   that case the Taiwanese legal authorities seized a variety of

1    physical evidence in Taiwan, and they sought a pretrial ruling

2    from the court to allow that evidence to self-authenticate so

3    that they did not have to bring witnesses from Taiwan to

4    establish chain of custody.  It is not an analogous situation.

5    It's not even relevant.  I mean what the Justice Department

6    does in a different case is not the same as this case.

7         And we think that the public records analysis, which

8    the Court went over yesterday when we raised this issue,

9    initially sets out the requirements, that a record or statement

10   of a public official can be admitted because as not -- as an

11   exception to hearsay if it sets out the office's activities,

12   which we plan to do with Dr. Tiffert.  Once we've done that,

13   the defendant is obviously entitled to show that the source of

14   information or other circumstances indicate a lack of

15   trustworthiness.

16        THE COURT:  Frankly, I think that Mr. Zeidenberg has

17   articulated a pretty good argument against -- in favor of

18   finding of lack of trustworthiness.  There is evidence in the

19   record where, as he reminded me, of President Zhang sort of

20   cautioning Dr. Tao to, you know -- let's keep this kind of on

21   the down low, the negotiations continue, et cetera, et cetera.

22        So -- and I think, you know, to be sure, Fuzhou

23   University, like any university I suppose, would have an

24   incentive to tout Dr. Tao or some renowned scientist as having

25   joined their faculty.  But so far there's a lot of evidence

1  that suggest that the negotiations were continuing.  There's

2  some evidence obviously to the contrary too, but I do think

3  it's problematic that, you know, 771 and 772 are sort of

4  announcements or Fuzhou University saying, you know, look what

5  we've got here without any ability to really cross-examine

6  anyone from that university as to does that mean you'd really

7  nailed down the contract or does that mean you had said this

8  hoping it would happen, because there's a number of

9  communications that are along those lines.

10         So I do think there's a question of trustworthiness

11  with respect to these two exhibits, 771 and 772.

12         MR. BARRY:  And, Your Honor, just to be clear, 771 and

13  772 are from the Chinese government's Ministry of Education

14  website.  They are not from Fuzhou University.  They are not

15  announcements from Fuzhou University.  I understand

16  Mr. Zeidenberg's defense in terms of, you know, explaining

17  Fuzhou University's different incentives and how they might be

18  motivated to do certain things, but 771 and 772 are from the

19  Ministry of Education so the sort of equivalent of our U.S.

20  Department of Education.

21         THE COURT:  But there's this -- you've also told me

22  all along there's sort of this helix of interaction between the

23  Department of Education or the Ministry of Education and the

24  institutions themselves in terms of how these things were

25  approved.  Maybe I need to hear more from Dr. Tiffert on that.

1    But I am inclined to sustain the objection because I think

2    there is a big question as to the trustworthiness of what

3    whoever authored this stuff on the website is saying, whether

4    in fact we can trust that it definitely means they entered into

5    an employment contract with Dr. Tao.

6          Okay.  I think -- all right.  So I was thinking -- the

7    771 and 772 were announcements from whether it is Ministry of

8    Education or Fuzhou University, but they are Ministry of

9    Education implementing measures?

10          MR. BARRY:  Yes.  So these are implementing measures.

11    In the draft contracts that we've looked at, each one has in

12    the beginning -- it says both parties will abide by, and it

13    lists a couple authorities that they need to abide by.  One of

14    the authorities that they say they need to abide by is the

15    implementing measures from the Ministry of Education.  And

16    that's what 771 and 772 are.

17          THE COURT:  Okay.  So, Mr. Zeidenberg, I mean, were

18    you talking about these exhibits when you talked about the

19    authenticity issues with the website or were you referring me

20    to something else?

21          MR. ZEIDENBERG:  About the authenticity and the

22    reliability because it applies to both.  The information that

23    they would have been getting would have been from Fuzhou

24    because Fuzhou is the one who's negotiating this contract and

25    is supposed to sign up this new Changjiang Scholar, this

1   awardee.

2          THE COURT:  So I'm looking at these and I haven't

3   studied them at any length, but it doesn't -- these aren't

4   specific to Dr. Tao, they're not specific to Fuzhou University,

5   are they?

6          MR. BARRY:  No, Your Honor.  These are not specific to

7   the defendant.  They're not specific to any candidates.  We

8   would -- in the government's view if you look at *U.S. versus*

9   *Iverson*, which is a Tenth Circuit case, uses -- the citation is

10  818 F.3d 1015 from 2016.  It applies 803(8) to an FDIC website,

11  and that's the analysis we think applies here strictly to 771

12  and 772.

13          Mr. Zeidenberg's arguments may apply to some of the

14  other arguments we've discussed, but 771 and 772 are not

15  specific to the defendant and they're not specific to Fuzhou or

16  any other university.

17          THE COURT:  They're akin to the NSF and the Department

18  of Energy exhibits that have come in that kind of set out

19  here's what our requirements are, here's what our evolving view

20  is on current and pending support, et cetera, et cetera.  These

21  are rules of how the scholar program works I think.

22          MR. BARRY:  Yes, Your Honor.

23          MR. DEARINGTON:  Yes, Your Honor.  So I can kind of

24  cut to the chase because we've been talking around this

25  document a little bit.  The government plans to have

1  Dr. Tiffert take the stand I believe and state that there's a

2  website on the Ministry of Education and that he found -- I

3  don't even think from the home page but found somewhere in that

4  website server or domain an implementing measure from 2011.

5  And the reason he thinks it's from 2011 is because the web page

6  says 2011 on it, which is hearsay.

7        They're trying to say this is an official activity.

8  The Ministry of Education is not the FDIC where you can have

9  someone from the FDIC get on the stand and say, yes, this was

10  something we reported out and you can meet the hearsay

11  exception because it's something that -- the FDIC had a witness

12  saying it was something that's reported out and it's now being

13  used to show the office's activities.

14        They never sought to use the MLAA to get anyone from

15  the Ministry of Education to say this is a regulation in effect

16  in 2018, in 2017.  They just found it on the Internet.  And

17  maybe it's from a Ministry of Education website, but they don't

18  have a witness we can cross who can say this was in effect at

19  this time, this was enforced at this time.

20        And in fact, Your Honor, there's a lot of evidence

21  that this wasn't enforced, which questions -- draws into

22  question whether this is an appropriate hearsay.  And

23  specifically, the Ministry of Education shall -- this is

24  Article 19 -- in accordance with the contract signed by the

25  institution of higher learning and appointee publish the annual

1    hiring -- sorry, I have the wrong one.

2           There's essentially a provision that they want to say

3    we found a certificate and that means he signed the contract.

4    A huge issue in this case.  And yet there's other provisions in

5    here that clearly haven't -- aren't true, like you have to give

6    up all other work.

7           And so if they're going to use that for the truth of

8    the matter asserted, then certainly that provision should also

9    be true, but it's clearly not here.  And that draws into

10   question the truth of these matters being asserted.

11          And they're not just public activities.  These appear

12   to be some sort of expectation that isn't going to be the case

13   in all instances, and so Dr. Tao shouldn't be convicted on what

14   usually happens based on the Ministry of Education website

15   found on the Internet.

16          MR. BARRY:  I think a lot of those arguments go to

17   weight and not admissibility.  That Dr. Tiffert will be on the

18   website.  They can ask him about these other situations in

19   which certain regulations may not -- may or may not be

20   enforced.  But as an expert witness who's withstood the *Daubert*

21   challenge, Dr. Tiffert is allowed to rely on hearsay in the

22   course of forming his expert opinions.

23          THE COURT:  Are these regulations?

24          MR. DEARINGTON:  Nobody knows.

25          MR. BARRY:  Implementing measures.

1        MR. DEARINGTON:  Nobody knows what they are, Your

2   Honor.

3        THE COURT:  I would not allow regulations of United

4   States Governmental entity to come in.  All I can do at this

5   point is listen to the foundation that Dr. Tiffert lays and

6   then decide (1) whether this is a public activity; (2) whether

7   it's trustworthy; (3) whether it's got embedded hearsay; (4)

8   whether this relates to the relevant time period.  So there's a

9   lot of questions I now have based on what you all have argued

10  to me.

11       So raise contemporaneous objections, we'll come talk

12  about it further as Dr. Tiffert -- be very careful obviously as

13  you're walking Dr. Tiffert through this, but at the same time

14  what I'm understanding is you're going to ask Dr. Tiffert

15  questions that aren't necessarily based on this being admitted

16  as an exhibit here, correct?

17       MR. BARRY:  Correct, Your Honor.

18       MR. DEARINGTON:  I suspect these regulations are the

19  linchpin of Dr. Tiffert's testimony.  It's just a guess.  They

20  can correct me if I'm wrong.  But --

21       THE COURT:  But an expert can rely on documents that

22  are not admitted into evidence.

23       MR. DEARINGTON:  Your Honor, not when they're hearsay

24  that isn't related to the qualifications.  This is the issue in

25  the case.  They can't --

1    THE COURT:  Well, I think you can *voir dire* him or we

2  can talk about it at the bench.  And then I'll decide.

3    MR. DEARINGTON:  Thank you, Your Honor.

4    THE COURT:  All right.  Let's bring the jury in.

5    (The jury entered the courtroom, after which the following

6  proceedings were had.)

7    THE COURT:  You can be seated.

8  BY MR. DEARINGTON:

9  Q.  Good afternoon, Mr. Churchill.

10  A.  Good afternoon.

11  Q.  I think to refresh where we left off is you were agreeing

12  that one correct translation of the certificate is this

13  approves Fuzhou University to appoint or hire Dr. Tao, right?

14  A.  Out of context, yes.

15  Q.  Context is important to what you're doing, right?

16  A.  It is.

17  Q.  When you translate things?

18  A.  It is.

19  Q.  But you're not the case agent, right?

20  A.  I'm not.

21  Q.  Special Agent Lampe is the case agent?

22  A.  That's correct.

23  Q.  He's the one who told you about the case, right?  He has

24  told you about the case?

25  A.  Yeah.

1   Q.   And he's probably the one who would know the most about the

2   evidence and the documents you've been testifying about today?

3   A.   Correct.

4   Q.   Okay.  So I want to get into this context a bit because it

5   sounds like it's -- you've stated that it's coloring or forming

6   your opinion, right?

7   A.   Correct.

8   Q.   So I want to get into what you knew when you were

9   translating these documents.  When you joined the team, Special

10  Agent Lampe filled you in on the allegations, right?

11  A.   Yes.

12  Q.   And this was important because there's some subjectivity to

13  translating, correct?

14  A.   Some subjectivity, yes.

15  Q.   Before you translated these documents did Special Agent

16  Lampe state to you that Dr. Tao had completed all the work for

17  DOE and NSF that was required of him?

18  A.   Repeat the question.

19  Q.   Sure.  When Special Agent Lampe was reading you into the

20  case, did he indicate to you that Dr. Tao had completed all DOE

21  and NSF grant work that was required of him?

22  A.   I don't recall.  I don't think so.

23  Q.   Did he tell you -- did he indicate to you that DOE and NSF

24  were completely satisfied with Dr. Tao's grant work up to the

25  date of his arrest?

1   A.   No.

2   Q.   Did Dr. Tao -- did he tell you or indicate to you that

3   Dr. Tao's department chair, Laurence Weatherley, had approved a

4   buyout so Dr. Tao could collaborate with Fuzhou University?

5   A.   No.

6   Q.   Did he tell you or indicate to you that Dr. Tao -- or that

7   Dr. Weatherley thought Dr. Tao was a solid faculty member at

8   the time in question?

9   A.   No.

10   Q.   Did he indicate to you that Dr. Tao was one of the four

11   recipients of the Chancellor's Award in 2019, months before his

12   arrest?

13   A.   No.

14   Q.   Did he indicate to you that Dr. Tao was paid anything by

15   Fuzhou University?

16   A.   I don't recall.

17   Q.   Did he indicate to you that there was no evidence that

18   Dr. Tao had ever received Chinese grant funding?

19   A.   I don't think so.

20   Q.   That Dr. Tao was actively applying for a new job in the

21   United States in 2019?

22   A.   No.

23   Q.   That Dr. Tao and his family had just bought their first

24   house in Lawrence, Kansas, a few months before he was arrested?

25   A.   Yes.

1    Q.    He did inform you of that?

2    A.    I believe so.

3    Q.    And that Dr. Tao had flown back to Kansas to teach classes

4    in the fall of 2019 when he was arrested?

5    A.    That I don't recall.

6    Q.    And do you think if you had had that context, it might have

7    informed any of your translations?

8    A.    No, not at all.

9    Q.    So only what Special Agent Lampe did tell you is what

10    informed your translations?

11    A.    No.

12    Q.    Well, you just stated your translations were informed by

13    what Special Agent Lampe told you, correct?

14    A.    No, I did not say that.  I said that my translations are

15    informed by context, but not what Special Agent Lampe told me.

16    Q.    But you're not a criminal investigator, are you?

17    A.    I'm not.

18    Q.    So your context has to come from somewhere, doesn't it?

19    A.    Yes.

20    Q.    And you're not out on the Internet conducting your own

21    investigations, right?

22    A.    No.

23    Q.    So your context came from Special Agent Lampe?

24    A.    No, because that's not the context of what I'm translating.

25    The context of what I'm translating is the immediate context,

1  which is the certificate itself, which I think is what's in

2  question here.  Correct?

3  Q.  So it wouldn't have mattered if Special Agent Lampe filled

4  you in on the allegations or not?

5  A.  That's correct.

6  Q.  But he did fill you in on the allegations, didn't he?

7  A.  He did.

8  Q.  You thought that was gratuitous?

9  A.  Had no effect on my translation.

10  Q.  He thought you must -- he'd like you to know the

11  allegations, right?

12  A.  I'm sorry?

13  Q.  He must have thought you would like to know the

14  allegations, right?

15           MR. BARRY:  Objection, speculation.

16           THE COURT:  Sustained.

17  BY MR. DEARINGTON:

18  Q.  Was your impression that Special Agent Lampe wanted you to

19  know the allegations?

20  A.  I believe that I asked what the allegations were without

21  him offering that information of his own accord.  So I guess I

22  would say no.

23  Q.  I'd like to walk you through some of the documents that you

24  translated and possibly some of them you didn't translate but

25  you testified about.  Starting with Exhibit 484, which was the

 1   Changjiang Scholar application.

 2       So yesterday you were reading through this document, I'm

 3   showing you 485A to be precise.  I'll mostly be showing you the

 4   English version of documents.

 5   A.   Okay.

 6           COURTROOM DEPUTY:  Are you presenting on the cart?

 7           MR. DEARINGTON:  Yes, please.

 8   BY MR. DEARINGTON:

 9   Q.   So on page 30 or around page 30 you were asked to read out

10   loud some of Dr. Tao's tentative work plan should he be

11   selected as a Changjiang Scholar and then take the position.

12   And one part that you didn't read, if I recall correctly --

13   I'll circle it for now -- was that Dr. Tao had planned to

14   collaborate and strengthen cooperation with world class

15   universities and also with the Brookhaven National Lab in the

16   United States.

17       Are you aware what the Brookhaven National Lab in the

18   United States is?

19   A.   No.

20   Q.   If I were to represent to you it was a DOE-run lab, would

21   that suggest to you that Dr. Tao, should he follow all the way

22   through, be selected, enter into an employment relationship and

23   carry it out, planned to collaborate with the Department of

24   Energy lab?

25           MR. BARRY:  Objection, scope.

1              THE COURT:  Overruled.

2              THE WITNESS:  I'm sorry.  Could you repeat the

3      question?

4      BY MR. DEARINGTON:

5      Q.   Sure.  So you read through this section, not this sentence,

6      and I'm asking you if I represent to you that the Brookhaven

7      National Lab is a Department of Energy-run laboratory and if

8      Dr. Tao, had he been selected as a Changjiang, then signed an

9      employment agreement and became a full-time professor at

10     Fuzhou, fair to say the plan would have been to collaborate

11     between Fuzhou and DOE Brookhaven National Lab?

12     A.   Yes, according to this document, yes.

13     Q.   And page 31, on the top line there had to be a commitment

14     here and it says, do you commit yourself to the full-time

15     position and promise to work full-time every year in the

16     profession and he says yes, right?

17     A.   Yes.

18     Q.   Just to remind the jury, this is an application to be

19     selected as a Changjiang professor, right?

20     A.   Correct.

21     Q.   Submitted in 2017 I think was the testimony.  So if I were

22     to represent to you it was submitted in 2017, that would mean

23     that the plan would be to work full-time, if selected and if

24     Dr. Tao had gone through, signed a contract and became a

25     full-time professor, correct?

1  A.   Correct.  According to this document, yes.

2  Q.   Would your inference be if Dr. Tao didn't work full-time at

3  Fuzhou, that he didn't carry out that plan?

4  A.   Yes, correct.  Didn't carry out this plan.

5  Q.   I'm sorry?

6  A.   Correct, that he did not carry out this plan.

7  Q.   Okay.  Thank you.  And I think you stated, but I just want

8  to confirm, that you were not aware that Dr. Tao was about to

9  teach in the fall of 2019 prior to his arrest?  He was about to

10 teach at Kansas?

11 A.   I don't recall.  I may have been aware at the time, but I

12 do not recall now.  It's possible I was unaware.

13 Q.   Sure.  You walked through a number of what you called

14 contracts.  Do you remember that?

15 A.   I do.

16 Q.   And just to clarify, when you said "contract," you really

17 meant a draft contract, right?

18 A.   I do believe most of the examples we looked at were drafts.

19 Q.   Were there any that weren't drafts?

20 A.   I don't recall.

21 Q.   You don't recall any that were not drafts?

22 A.   Correct.

23 Q.   And the first one was from February 5, 2018.  So I'd like

24 to show you just to refresh your recollection what's been

25 marked as 131A.  And this was an e-mail from Su Siwen on

1    February 5, 2018, to Dr. Tao at his KU address, and it says

2    there's an attachment called a hiring contract from Changjiang

3    Scholar Distinguished Professor Tao Feng template, right?

4    A.   Correct.

5    Q.   So February 5th we have a template.  And now I'm going to

6    show you the attachment translation, which is 132A.  And as a

7    reminder, this was sent by Fuzhou to Dr. Tao, right?

8    A.   By Su Siwen, yes.

9    Q.   And page 5 shows the salary that Dr. Tao would receive if

10   he entered into this, correct?

11   A.   Correct.

12   Q.   And that salary is 550,000 Yuan?

13   A.   Correct, annually.

14   Q.   Annually.  And so I think you testified that that's about a

15   7 to 1 conversion rate so that's about $78,000.  Does that

16   sound right?

17   A.   Yes.  Sounds about right.

18   Q.   Are you aware that Dr. Tao was then making $105,000 at KU?

19   A.   Yes.

20   Q.   So this would be a significant pay cut if Dr. Tao were to

21   leave KU and take this job, right?

22   A.   If only the salary were being offered on its own, yeah.

23   Q.   Well, are you aware of other salary that this contract

24   includes besides this $550,000?

25   A.   Not salary but benefits.

1    Q.    Okay.  Understood.  And page 7, I'm not going to run

2    through these provisions in every version, there are a couple

3    I'd like to pick that are consistent throughout, but for this

4    one, which was from February -- and we can walk through this

5    one.

6        It states this contract is produced in triplicate, both

7    parties each holding one copy, a third to be submitted to the

8    Department of Education.  The contract is effective from the

9    date it is signed and stamped by both parties.

10       So just to level set, you've never seen a Changjiang

11   employment contract involving Dr. Tao that was signed and

12   stamped by both parties, right?

13   A.    Not a contract but an addendum.

14   Q.    And the addendum, which we'll get to, you're referring to

15   is from March 2018 and was signed only by Dr. Tao and no other

16   party, right?

17   A.    That I don't recall.  I recall it being signed by Zhang

18   Xing, but again I'd have to look to see.

19   Q.    You recall it being signed by who?

20   A.    Zhang Xing.

21   Q.    Could you spell that, please?

22   A.    Z-H-A-N-G, X-I-N-G.

23   Q.    Is this the same person you misremembered having signed the

24   contract in the Su Siwen [sic] call?

25   A.    I don't know.

1    Q.   Because that was also I can represent to you Zhang.  I can

2    tell you now Zhang did not sign that contract, but we'll get to

3    it.

4    A.   Okay.

5    Q.   And you can see in 2 it says both parties shall strictly

6    abide by each article in this contract, right?

7    A.   Correct.

8    Q.   So that leads you to believe that if someone did enter into

9    this contract, they would have to abide by the whole thing,

10   right, not pick and choose?

11   A.   Correct.

12   Q.   And this contract, just to be clear, shows -- Court's

13   indulgence.

14        I think we can move from this version.

15        So the same date Dr. Tao received from Fuzhou an addendum,

16   right?  And this addendum showed 50 million Yuan in startup

17   funds, right?

18   A.   Correct.

19   Q.   And just to clarify, because we didn't create this, you

20   created this translation.  When it says signature there, that

21   doesn't mean there was an actual signature, right?  It's the

22   word "signature" signifying this is where you would sign were

23   you to sign?

24   A.   That's correct.

25   Q.   This was not signed by either Zhang or Dr. Tao?

1   A.   That's correct.

2   Q.   So we've got 50 million Yuan proposed at that time.  And no

3   one signed, right?

4   A.   Correct.

5   Q.   So the next one I'd like to show you is March 2018,

6   specifically March 9, 2018.  And here we have an addendum that

7   Dr. Tao sent to whom?  Do you see who that --

8   A.   To Su Siwen.

9   Q.   That's dated March 9, 2018, right?

10  A.   Correct.

11  Q.   In this addendum Dr. Tao -- this is the one that you think

12  Dr. Tao did sign because you see his signature there, correct?

13  A.   Yes.

14  Q.   But this version has no one signing from Fuzhou, right?

15  A.   Correct.

16  Q.   No seals, no stamps?

17  A.   Correct.

18  Q.   And this version, I'll show the English version again,

19  shows that Dr. Tao has requested 50 million Yuan in startup

20  funds, right?

21  A.   Right.

22  Q.   And two days ago you testified about a call you translated

23  between Dr. Tao and Su Siwen, do you remember that?

24  A.   Yesterday you said?

25  Q.   I think it was two days ago.

1    A.    Two days ago, yeah.

2    Q.    And I'm not going to walk through them all if you can

3    recall the high levels.  We can go to them if you can't recall.

4    But on March 16th I can represent to you is when the Su Siwen

5    call happens, so one week after Dr. Tao sent a request for an

6    addenda that he proposed 50 million Yuan and then a week later

7    was the Su Siwen call.  Do you recall that?

8    A.    I do recall the call, yes.

9    Q.    And during that call do you recall that Dr. Tao was told by

10   Su Siwen that Zhang said he's 90 percent sure he could do 30

11   million in startup, but he needs to reconfirm before he can

12   sign.  Do you remember that?

13   A.    I do.

14   Q.    Do you remember Su Siwen told Dr. Tao he's not trying to

15   trick Dr. Tao into joining Fuzhou, right?

16   A.    Right.

17   Q.    And during the call Dr. Tao said 20 million in startup

18   isn't enough and it's less than he had in his lab at KU, right?

19   A.    I don't remember if it was less than he had at his lab at

20   KU, but the first part of your statement I would agree with.

21   Q.    And Dr. Tao says he's not a fool and Su Siwen recommends

22   that he call Zhang, do you remember that?

23   A.    I do.

24   Q.    And that was the one I think you testified that you had

25   misremembered, but there actually was no signature by Zhang

1    discussed in that call, right?

2    A.    Right.

3    Q.    And then you also testified about a call on April 26, 2018,

4    so a few weeks later, between Dr. Tao and Zhang, right?

5    A.    Correct.

6    Q.    So Dr. Tao appears to have taken Su Siwen's advice and try

7    to go up the chain and talk to Zhang and see if he can get more

8    startup funds?

9    A.    Correct.

10    Q.    And during that call Zhang acknowledged that Dr. Tao needed

11    50 million Yuan in startup funds if he was going to come to

12    Fuzhou, right?

13    A.    Correct.

14    Q.    And Zhang reiterated he can only give him 20 million Yuan

15    right now, right?

16    A.    Right.

17    Q.    And they hung up, I think as Mr. Zeidenberg said, very far

18    apart, 30 million Yuan, more than 100 percent, right?

19    A.    Correct.

20    Q.    So three days later is when we have another draft contract

21    that I'd like to show you.  And this is one -- I'll show you

22    332, which is Chinese.  This is one that Dr. Tao sent to

23    someone at Fuzhou, right?

24    A.    I don't know that's it's someone at Fuzhou.

25    Q.    What is the name there again?  It was like Always Silent or

1  something?

2  A.  Always Silent or Always Quiet.

3  Q.  Fair to say Dr. Tao sent someone in Chinese another version

4  of this contract, you're just not sure who it is?

5  A.  Correct.

6  Q.  And in this version, which was three days after the call

7  with Zhang -- actually I'll start by showing you the other

8  e-mail or reminding you rather there's also an addendum here.

9  So we have a draft contract and a draft addendum?

10  A.  I think that's correct, yeah.

11  Q.  And in this draft contract, the translation of which should

12  appear, we still have a total of 50 million Yuan between the

13  contract and the addendum.  Do you recall that?

14  A.  I'm sorry.  Can you restate that?

15  Q.  Sure.  So the contract plus the addendum -- and I'll walk

16  through it, but I want to see if you remember first for ease of

17  reference -- have a total of 50 million Yuan in startup funds

18  requested?

19  A.  I think that's right.

20  Q.  Okay.  So page 2 of the draft contract.  And again, none of

21  these are signed, right?

22  A.  I don't believe so.

23  Q.  So we had a March addendum that was signed seeking 50

24  million Yuan and then the next iteration we're back to unsigned

25  by anyone, right?

1  A.  I believe that's correct.

2  Q.  So here, if the person, Dr. Tao, were to enter into the

3  contract, he would have to publish more than 60 research papers

4  in domestic or foreign publications over the course of the five

5  years, right?

6  A.  Right.

7  Q.  So that's about 12 papers a year?

8  A.  Correct.

9  Q.  And you can see here we have 10 million in funds, startup

10  funds in paragraph 6, right?

11  A.  Right.

12  Q.  And the same salary, 550,000 Yuan.  And I actually mislead

13  you.  I think this one actually results in -- no, no.  Okay.

14  Never mind.  Strike that.

15      Okay.  And so in those 60 papers Dr. Tao would in theory

16  have to sign that he was affiliated with Fuzhou in those

17  papers, right?

18  A.  I'm sorry.  Restate the question.

19  Q.  He would have to -- if he abided -- if he were to enter

20  into this contract and abide by it, he would have to

21  exclusively affiliate in those papers with Fuzhou, right?

22  A.  Correct.

23  Q.  Are you aware that there are papers Dr. Tao disclosed to

24  the Department of Energy that listed a dual affiliation with KU

25  and Fuzhou?

1    A.    Sounds familiar, but I don't recall.

2    Q.    Are you aware those are published on the Internet for the

3    world to see?

4    A.    Right.

5    Q.    Major periodicals?

6    A.    I believe so, yes.

7    Q.    In those papers it was Fuzhou and KU, right, so not

8    exclusively?

9    A.    Yes.

10   Q.    Not exclusively Fuzhou, right?

11   A.    I believe that's correct.

12   Q.    A few more from this one.  Paragraph 5 states he has to

13   work full-time for Fuzhou were he to sign the contract,

14   correct?

15   A.    Correct.

16   Q.    So you can't abide by all the terms of this contract if you

17   enter into it by working with two universities, right?

18   A.    I suppose, yeah.

19   Q.    Okay.  And finally again, looks like the same provision

20   that if this is going to be signed, everyone signs it and

21   everyone stamps it, right?

22   A.    Correct.

23   Q.    And everybody -- sorry, and everybody gets a copy?

24   A.    Correct.

25   Q.    Just for the ladies and gentlemen of the jury, no

1    signatures, no dates here.

2        Okay.  And now here we have the addendum.  And this shows

3    an additional 15 million in proposed startup funds, right?

4    A.  Correct.

5    Q.  And this addendum, just to remind, was associated with the

6    April 2018 e-mail, right, in late April?

7    A.  That I don't recall.

8    Q.  Okay.  I can show you the -- I can represent to you that it

9    was and show you the e-mail again, if you like.  See there,

10   April 29th?

11   A.  Okay.

12   Q.  Okay.  And I forgot a key point here, which is in the

13   original template -- going back to the template sent the same

14   day, I missed some startup funds.  So we have 25 million there

15   and 10 million there proposed by Dr. Tao, which is 35 million

16   in startup.  And the addendum we said -- would get us to 50

17   million, right?

18   A.  Perhaps.  I'm not following all the math, but that sounds

19   right.

20   Q.  I know.  My papers are really out of order now.  Okay.  So

21   15 million there.  10 million here.  So we're up to 25 million.

22   And 25 million there.  So Dr. Tao is proposing 50 million,

23   again he was sticking to his guns after this call with Zhang

24   and saying I want 50 million in startup funds, right?

25   A.  Correct.

1    Q.    And I think we just have one more version we went over.

2    And this was a May 4, 2018, version that you reviewed a couple

3    versions of it I believe, but here's the high-level e-mail.

4    And who sent that e-mail as far as you're aware?

5    A.    Always Quiet.

6    Q.    This is Exhibit 335, for the record.

7          And I want to back up one day because there was -- before

8    this e-mail was sent from -- from someone using the Chinese

9    language writing at qq.com to Dr. Tao, there was a call you

10   testified about on May 3rd in which Dr. Tao can be heard

11   referring to, quote, the issue with the Changjiang Scholar.  Do

12   you remember that?

13   A.    I don't.

14   Q.    That was Exhibit 516A.  Refresh your recollection?

15          MR. DEARINGTON:  May I approach, Your Honor?

16   BY MR. DEARINGTON:

17   Q.    Mr. Churchill, do you recall a call dated May 3rd, so the

18   day before this new version emerges, in which Dr. Tao states

19   that there's, quote, an issue with the Changjiang Scholar?

20   A.    Yes.

21   Q.    And do you recall generally at least that Dr. Tao had

22   stated in that call that his family may not agree to him going

23   to China full-time, especially because his kids are about to

24   start high school, and it may not be possible for him to work

25   there full-time despite having the opportunity?

1    A.    I believe that's correct.

2    Q.    Okay.  So then the next day is when Dr. Tao receives a new

3    version of the contract on May 4th, right?

4    A.    Correct.

5    Q.    And a new version of the draft addendum as well, right?

6    A.    Yes.

7    Q.    Okay.  So I assure you we will only be going through this

8    contract and no more at least at this time.  I'm going to show

9    you what each of the contract draft and the addendum look like.

10   So this is the first page.

11        And here on page 5 of the draft contract, and I want to

12   pause to recall your testimony.  I think you testified that

13   this looked very much like a draft because there's red writing

14   that appeared to be new, right?  It's not a final version of

15   the draft as far as you're aware?

16   A.    Yeah, as far as I'm aware.  I don't know.

17   Q.    And here you can see that the funds for scientific

18   research, the startup funds are listed as 10 million Yuan,

19   right?

20   A.    Correct.

21   Q.    And that was written in red, meaning it's a term that's

22   still under negotiations it appears?

23   A.    Potentially.  I also think the red text may have indicated

24   change from the previous contract, so it's not necessarily to

25   say that the red text meant that it was not finalized.

1  Q.  Understood.  And down here it says ten more million, right?

2  A.  Right.

3  Q.  As a reminder these are Yuan, not dollars, with a 7 to 1

4  ratio, correct?

5  A.  Correct.

6  Q.  So that's 20 million in startup funds total, right, in this

7  version?

8  A.  I think that's right.

9  Q.  Okay.  And same provisions we've examined on page 6 for

10  instance, Party B, that's Dr. Tao, shall work full-time for

11  Party A and not hold or draw salary from any concurrent post

12  nor change his employer, right?

13  A.  Correct.

14  Q.  So under this contract Dr. Tao couldn't comply by having a

15  job at KU and a job at Fuzhou, right?

16  A.  Correct.

17  Q.  If he were to enter into it, right?

18  A.  Correct.

19  Q.  And the same type of provision about drafting -- about

20  publishing articles and assigning Fuzhou as the sole

21  affiliation, right?

22  A.  Does it say the sole affiliation?

23  Q.  Exclusively as Party A.

24  A.  Yes.

25  Q.  Okay.  And again, we have the addenda that states this

1  contract is produced in triplicate.  Again, it's a draft.  Were

2  they to enter into it, they're required to each hold one copy

3  and a third being submitted to the Ministry of Education,

4  right?

5  A.  Correct.

6  Q.  And it requires that the contract be signed and stamped,

7  right?

8  A.  Correct.

9  Q.  And is a stamp in this context, it that like a seal?

10  A.  Could be, yeah.

11  Q.  And, again, just like all the other ones -- or just like

12  the other template contract version we reviewed, no signature,

13  no stamp, no dates here?

14  A.  Correct.

15  Q.  Turning to the addendum from May 2018, this shows a request

16  of 10 million -- or a proposed 10 million Yuan in startup

17  funds, right?

18  A.  Yeah.

19  Q.  So that in total between the contract template that we just

20  looked at and this would be 30 million Yuan, right?

21  A.  Correct.

22  Q.  We had 20 and 10?

23  A.  Correct.

24  Q.  And, again, no stamps, no dates, no signatures, right?

25  A.  Correct.

1    Q.    And fair to say Dr. Tao was using his e-mail, his Gmail,

2    his KU e-mail to do these negotiations because that's where

3    they were found?

4    A.    I believe that's correct.

5    Q.    And do you recall -- well, let me ask you this:  In light

6    of the phone call between Dr. Tao and Su Siwen and President

7    Zhang where Dr. Tao was sticking to his guns and saying he

8    needs 50 million in startup funds, this isn't 50 million we're

9    talking about.  This is Fuzhou sending, after that, a proposed

10   30 Yuan, right?

11   A.    That sounds right.

12   Q.    Fair to say it missed the mark as far as what Dr. Tao

13   expected, at least at the time of the phone calls, to get this

14   done, correct?

15   A.    I think that's correct.

16   Q.    And fair to say that the government never found or never

17   presented to you for translation a fully signed contract

18   between Dr. Tao and Fuzhou?

19   A.    I think that's correct.

20   Q.    Or even any version that was signed by Fuzhou University,

21   right?

22   A.    That I don't recall.

23   Q.    Okay.  And if I represented to you that the indictment

24   alleges that Dr. Tao signed a contract in March 2018, that

25   would probably overlook the fact that he had still been

1    negotiating all the way up until May with no signatures, right?

2    A.    Perhaps.

3    Q.    So if Dr. Tao did have a single signature on an addendum in

4    March 2018 but then the next couple versions had no signatures

5    and he asked for a lot more funding, it might even be

6    misleading to say a contract was signed in March 2018, right?

7    A.    That I don't know.

8    Q.    You wouldn't say that's misleading?

9    A.    I don't know.

10   Q.    Okay.  I want to talk about some of these recruiting

11   e-mails that you testified about.  But before we do that, do

12   you recall a phone call that you translated involving Dr. Tao

13   and a professor at Georgia Tech named Meilin Liu?

14   A.    Yes.

15   Q.    Do you recall during that phone call that Dr. Tao remarked

16   that Fuzhou was not a top-tier university?

17   A.    I believe that's correct.

18   Q.    And that he was unsure if he could build a team there?

19   A.    That I don't recall.

20   Q.    And do you recall that Professor Liu said essentially why

21   don't you go for the summer and give it a try and see if it

22   works out and then you can make an ultimate decision?

23   A.    I think that's correct.

24   Q.    Okay.  You then testified -- or you testified about an

25   e-mail a couple months after the contract wasn't signed where

1    someone named Xiaoyan Zhang in July 2018 said she was not going

2    to go work at Fuzhou University, do you remember that?

3    A.   Yes.

4    Q.   And Dr. Tao seemed pretty upset about it.  He said I feel

5    it's -- been made a fool and it's painful, right?  He was

6    pretty bummed out about Xiaoyan saying she was not going to

7    come to Fuzhou and work there, fair?

8    A.   Correct.

9    Q.   And another one, 196A, also in July, the very same day that

10   Xiaoyan turned him down he writes to a Professor Wang -- Wang

11   and he says, I am currently working on building a team.  My

12   team will have this equipment.  It's difficult to recruit

13   people in Fuzhou.  And he asked for recommendations, right?

14   A.   Correct.

15   Q.   Do you know a person or have you heard the name Weixin

16   Huang?

17   A.   Huang Weixin, yeah.

18   Q.   Are you aware that Huang Weixin also turned Dr. Tao down to

19   go to Fuzhou?

20   A.   Yes.

21   Q.   Do you know the name Luan Nguyen?

22   A.   Yes.

23   Q.   Do you know that he also turned Dr. Tao down to be employed

24   by Fuzhou?

25   A.   I did not know that.

1  Q.  Shiran Zhang, do you know him?

2  A.  I'm familiar with the name.

3  Q.  Did you know that Shiran Zhang also turned down an

4  opportunity to go to Fuzhou?

5  A.  No.

6  Q.  Are you aware in the calls you listened to that Dr. Tao is

7  concerned about whether he would be able to recruit and

8  establish a team at Fuzhou?

9  A.  To which call?  I'm sorry.

10  Q.  Just the calls you listened to as a composite.  Are you

11  aware that he was concerned about whether he would be able to

12  build a team at Fuzhou?

13  A.  I don't remember him expressing concern on the calls.

14  Q.  What about the e-mail we just went over?

15  A.  Sure, yeah, on the e-mail.  Not on the call.

16  Q.  And certainly there was a concern about whether Dr. Tao

17  would be able to build a team at Fuzhou, right?

18  A.  Potentially, yeah.

19  Q.  And this was a concern that he had expressed to Meilin Liu

20  when Meilin Liu advised him, well, try it out, see if you can

21  make it work, and if not, leave it there, right?

22  A.  You're saying that that portion of that call referred to

23  his recruitment of research students?

24  Q.  Well, I guess broader to whether you can find a place at

25  Fuzhou and if it looks like a good opportunity for you to

1    actually go through with?

2    A.    Right.

3    Q.    You were shown an Exhibit 213.  And by the way, for the

4    record, I'm not sure if I just said, but the last two we looked

5    at were 195 and 196A.  And now we're going to turn to 212,

6    which is an e-mail from Dr. Tao to himself that you testified

7    about in which he attaches a PowerPoint.  And I'm going to show

8    you 213A, which is the translation of the PowerPoint.  And

9    that's dated November 2018, right?

10    A.    That's correct.

11    Q.    Just zoom out here.  Okay.  And it says lab, right?

12    A.    It does.

13    Q.    I want to show you a picture and I can assure you there are

14    many like this because I think you scrolled through these with

15    the government and I wasn't sure why, and I want to ask you, is

16    there anything odd about this picture?

17    A.    I guess I would need more context to be able to answer that

18    question.

19    Q.    Anything jump out at you about this picture that looks a

20    little off?

21    A.    No.

22    Q.    You don't notice that there's no equipment, no computers,

23    no people in this lab?

24    A.    I'm unfamiliar with what a scientific research lab looks

25    like, so I have no context for knowing how to answer that.

1  Q.   I don't fault you for my question, but you must know this

2  is not what a lab looks like, right?

3  A.   I don't know that.

4  Q.   So it might be the case that labs are operated by, I don't

5  know, no people, no equipment, no books, no computers?

6  A.   It might be possible that a laboratory that's about to be

7  built or currently in development would be in that state, yeah.

8  Q.   You mean we would call that a room, right?

9  A.   I don't know.

10  Q.   An empty room.  Something that hasn't been built but that

11  has a room in it could be called a future lab, could be called

12  a future video game room, could be called a future anything,

13  right?  It's just a room we're looking at though, right?

14  A.   I don't think we would use the term future to describe it.

15  I think it would be described as a laboratory if that was the

16  intention for it.

17  Q.   How do you know what the intention for this was other than

18  the fact that it's just a PowerPoint that says lab on it?

19  A.   I don't know.

20  Q.   And same thing here, right?  There's some empty desks,

21  empty rooms, a couple of chairs.  Here we have a chair that is

22  found its way to the door.  This is a room that has a folding

23  chair in it on the top left there, right?  This is one of the

24  larger desks I've ever seen, but no chairs made it there,

25  right?  So far you agree with my characterizations?

1    A.    That there were no chairs at the desk, yes.

2    Q.    I think we've covered that.

3          And this was November 2018, right?

4    A.    Yes.

5    Q.    So three months after Dr. Tao didn't sign the contract,

6    right?

7    A.    I'm sorry.  Could you repeat that?

8    Q.    Three months after the contract that was unsigned by any

9    parties that we reviewed roughly?

10    A.    Three months after?

11    Q.    The e-mail that we had discussed, the latest version,

12    May 2018, with no signatures, no stamps, no seals?

13    A.    Okay.

14    Q.    That's roughly three months after?

15    A.    Okay.

16    Q.    You would agree?

17    A.    Yeah.

18    Q.    Do you get a sense from listening to these calls, looking

19    at these draft versions and looking at the e-mails and the

20    calls of people turning Dr. Tao down that things weren't really

21    panning out in a way that would be sustainable at Fuzhou for

22    Dr. Tao were he to decide to take the job at least as of this

23    time?

24    A.    At least as of this time.

25    Q.    I did want to show you, because I know you're not a

1    scientist, what a lab looks like according to prior testimony.

2    See that?

3    A.    Yes.

4    Q.    Okay.  And so that was 454.  Now we're looking at -- I'm

5    going to turn to 465.  These are a lab, right, as far as you're

6    aware?

7    A.    I believe so.

8    Q.    And this looks pretty different from the pictures that we

9    just showed you, right?

10    A.    Sure.

11    Q.    One that has for some reason popped up a lot --

12    A.    Yes.

13    Q.    -- this is KU.  You didn't see anything like that in the

14    lab at Fuzhou, right?

15    A.    No.

16    Q.    You just saw chairs and empty desks in rooms?

17    A.    Yes.

18    Q.    And that was November 2018, right?

19         You mentioned a person named Huimin Liu.  Do you remember

20    that?

21    A.    I do.

22    Q.    There were some e-mails with Huimin Liu?

23    A.    Yes.

24    Q.    And you translated some e-mails involving Huimin Liu,

25    right?

1  A.  I believe so.

2  Q.  You're generally familiar with who she is?

3  A.  Generally, yes.

4  Q.  Are you aware she was a visiting scholar for a short period

5  at KU?

6  A.  Yes.

7  Q.  Are you aware she was dissatisfied over the amount of

8  authorship credit Dr. Tao had given her?

9  A.  I believe so.

10  Q.  Are you aware she extorted or attempted to extort him for

11  $300,000?

12  A.  No.

13       MR. BARRY:  Objection.  Facts not in evidence and he's

14  getting close to violating the *limine* order.

15       THE COURT:  I'll sustain as to this question and ask

16  the jury to disregard that question.

17  BY MR. DEARINGTON:

18  Q.  You didn't translate any e-mails relating to a dispute

19  between Dr. Tao and Huimin Liu?

20  A.  Well --

21       MR. BARRY:  Same objection, Your Honor.

22       MR. DEARINGTON:  I can move on.

23       THE COURT:  I think the question is whether he

24  translated.  But again, I think it's -- I wouldn't let him go

25  any further than that at this point anyway.

1           MR. DEARINGTON:  Understood, Your Honor.

2    BY MR. DEARINGTON:

3    Q.   I want to talk -- just a few more questions about some of

4    these grant proposals that you were asked about in China.  So

5    just for high level, you're aware that none of the grant

6    proposal drafts or whatever you want to call them had

7    signatures and seals on them?

8    A.   Which grant proposal drafts?

9    Q.   Any of them that you testified about.

10   A.   Do you mean the ones referring to DOE and NSF?

11   Q.   I understand my error.  You testified about some -- what

12   you thought were grant proposals in China, right?

13   A.   You mean the application to the Changjiang Scholar Program?

14   Q.   No.  I'll walk you through these.

15   A.   I apologize.

16   Q.   No, no problem.  It's my lack of clarity here.  I think you

17   testified that you translated -- 491A was the translation.

18   I'll show you a copy of it.  Did you translate this?  Is this a

19   translation you created?

20   A.   I don't think it's a translation that I personally created.

21   Q.   Okay.  But you testified about this --

22   A.   I remember looking at this, yes.

23   Q.   I just want to show you a couple pages that jumped out at

24   me.  So page 4, for example, shows as people who would be

25   working on this proposal, were it to be submitted even, and it

1  shows someone named Xiaoyan Zhang, correct?

2  A.  Correct.

3  Q.  And it shows that person working at Fuzhou University?

4  A.  Correct.

5  Q.  And, again, this was dated March 4, 2018, right?

6  A.  I believe so.

7  Q.  And were you aware that Xiaoyan Zhang in the fall of 2018

8  was just a KU graduate student?

9  A.  No.

10  Q.  But you recall seeing the e-mail we talked about where

11  Xiaoyan Zhang decided not to take a job at Fuzhou, right?

12  A.  I do.

13  Q.  And the second person listed is someone named Yu Tang.  And

14  it states that person is also at Fuzhou, correct?

15  A.  Correct.

16  Q.  Were you aware that Yu Tang was still studying at KU as of

17  March 2018?

18  A.  No.

19  Q.  If I were to represent to you those facts, would you agree

20  that this proposal appears to have some errors or anomalies?

21  A.  I don't know that I would call it -- characterize them as

22  errors or anomalies.

23  Q.  Inconsistencies with reality, is that fair to say?

24  A.  Or perhaps the names were included at a time in which they

25  did intend to work with Dr. Tao.

1  Q.  But that's just your speculation, right?

2  A.  Right.

3  Q.  And page 57 shows no signature, right?  And here is where

4  you would expect to see seals and dates if this were to

5  actually be formalized and submitted, correct?

6  A.  Correct.

7  Q.  You don't see any seals and dates here, right?

8  A.  I do not.

9  Q.  So that was one of the purported proposals that you covered

10 with the government.  I'd like to turn to a different one.  And

11 fair to say based on your knowledge of seals and signatures in

12 China, that wouldn't have been submitted without a necessary

13 seal, right?

14 A.  Not likely.

15 Q.  The government showed you what's been marked as 493A.  This

16 also purports to be some sort of draft of a National Science

17 Foundation of China grant proposal, right?  Correct?

18 A.  Yes.

19 Q.  And did you translate the original of this?

20 A.  I don't recall.

21 Q.  Okay.  And you can see here the date is August 2018, right?

22 A.  Yes.

23 Q.  And that would be a few months before the date of the

24 PowerPoint showing empty rooms in the PowerPoint, right?

25 A.  I suppose so, yes.

 1   Q.   Probably fair to say it's difficult to do research if you

 2   don't have lab equipment, right?

 3   A.   Correct.

 4   Q.   Just a few more pages from this one.  So we just covered

 5   that as of May 2018 Dr. Tao didn't have a fully signed contract

 6   with Fuzhou that had any seals or any signatures on it, right?

 7   A.   Right.

 8   Q.   I want to show you on page 40 of this.  And page 40 appears

 9   to show Dr. Tao's CV as working at Fuzhou from March 2018,

10   right?

11   A.   Correct.

12   Q.   And given the calls that we talked about and the state of

13   negotiations, that's not accurate, right?

14   A.   I don't know.

15   Q.   Okay.  Are you aware that in March and in the fall of 2018

16   Dr. Tao was largely on campus working at KU?

17   A.   I believe so.

18   Q.   And then finally the last page, which is starting to look

19   familiar, is an unsigned, unsealed final page, right?

20   A.   I don't know that it's the final page, but it is unsigned

21   and unsealed.

22   Q.   I can represent to you it's page 59, which is the final

23   page.

24   A.   Understood.

25   Q.   Trying to remember, was -- did -- did the government ask

1   you about these unsigned pages at the end?

2   A.  I don't recall.

3   Q.  I don't either.  Okay.

4       You have no knowledge of who drafted the last two proposals

5   we looked at, do you?

6   A.  No.

7   Q.  Okay.  Another one that you looked at was 504A.  And this

8   one, did you translate this one?

9   A.  I don't believe so.

10  Q.  And this is called proposal to submit an application,

11  right?

12  A.  Correct.

13  Q.  Okay.  And the second page shows the date as, were it to be

14  submitted, as September 20, 2018, right?

15  A.  Correct.

16  Q.  That's a few days before the date of the lab presentation

17  we looked at, right?

18  A.  I think so.

19  Q.  And you don't know who authored this one either, do you?

20  A.  I don't.

21  Q.  Okay.  And here you can see that it represents, whatever

22  this document is, that there's 50 people on Dr. Tao's team at

23  Fuzhou; is that right?

24  A.  Yeah, I think that's correct.

25  Q.  You didn't see 50 people in that empty room that we talked

1    about, did you?

2    A.    No.

3    Q.    And then it says just a blank for the amount of Yuan,

4    right?

5    A.    Correct.

6    Q.    Oh, and going back a little bit, blank of whom have the

7    title of associate professor, right?

8    A.    Correct.

9    Q.    So fair to say whoever drafted this didn't know how many of

10    those 50 purported people would have the title of associate

11    professor or above?

12    A.    Correct.

13    Q.    And they didn't know how much of Yuan there would be of

14    hardware equipment?

15    A.    Yeah.

16    Q.    Open questions, right?

17         And then here -- let me know, by the way, if the government

18    asked you about any of these as we go, if you can remember.  I

19    see there's a lot of Xs like remarks, XX company.  And project

20    XX, big data platform.  That's the way you read that in context

21    is probably that someone should fill that in if they can,

22    right?

23    A.    I suppose.  I don't recall.

24    Q.    And, again, here we have the same thing again on page 20,

25    right?  There's this 50 people on the team, and unsure how many

1  of them are associate professors and we're unsure of the amount

2  of the equipment?

3  A.   Correct.

4  Q.   And this is a couple months before the November 2018

5  PowerPoint that Mr. Barry asked you about showing no equipment,

6  right?

7  A.   I didn't see the date, so I don't know.

8  Q.   The November 2018 PowerPoint we've been talking about?

9  A.   I didn't see the date of this, what you just showed me.

10 Q.   Sorry.  My apologies.  September 2018, right?

11 A.   Okay.

12 Q.   And, finally, at the risk of being repetitive -- well,

13 let's start here.  There's just all these blanks on page 45 for

14 award-winning achievements and articles published on direct

15 application of technology and then works on direct application,

16 there's just nothing listed, right?

17 A.   Correct.

18 Q.   And then this is actually the last page.  I don't know if

19 it's cut off, but -- the exhibit is not, I can tell you that,

20 but this document.  And no signatures, no seals on this

21 document that you see, right?

22 A.   Understood, yes.

23 Q.   And the 50 people thing, by the way, do you have some

24 doubts over the -- in context the veracity of that given the

25 e-mails we looked at where Dr. Tao said he was having trouble

1    recruiting?

2    A.    What do you mean doubts about the context?

3    Q.    Well, this proposal seems to suggest, if it were true and

4    if it were even a proposal, that there's some 50-person lab

5    with an unknown amount of hardware and an unknown number of

6    those are associate professors.  But we looked at an e-mail

7    from the same period where he says I'm having trouble

8    recruiting anyone, right?

9    A.    Correct.

10   Q.    A few more here.  I think you looked at a 246A, which was

11   from March 2019, and it was yuwenchen@gmail.  And this has come

12   up a few times I think.  And it shows that Yu-Wen Chen had

13   added -- purports to show that Yu-Wen Chen had added Dr. Tao as

14   a participant and it's an application form that's referenced.

15   See there, application form?

16   A.    Yes.

17   Q.    Okay.  And you're not aware of any -- this is a reminder --

18   of any grant being funded related to that application form

19   referenced I showed you, right?

20   A.    Yeah, I don't recall.

21   Q.    Almost through them all.  489 I believe you translated.

22   Did you testify about this document?

23   A.    I don't recall.

24   Q.    I want to make sure I'm not getting ahead of the government

25   here.

19-20052-JAR    USA v. Feng Tao    04.01.22    Day 10    1908

```
 1              COURTROOM DEPUTY:  Which one was it?
 2              MR. DEARINGTON:  489A.
 3              COURTROOM DEPUTY:  I have it.
 4              MR. DEARINGTON:  It is admitted?
 5              COURTROOM DEPUTY:  Uh-huh.
 6              MR. DEARINGTON:  Okay.  Thank you.
 7    BY MR. DEARINGTON:
 8    Q.   489, do you see that signature in the top right?
 9    A.   Yes.
10    Q.   And can you read what that says?
11    A.   Tao Feng.
12    Q.   That would be Dr. Tao's name, correct?
13    A.   That's correct.
14    Q.   I'm going to try to find that addendum that Dr. Tao signed
15    and then later submitted empty.  We're going to look at that
16    signature and we're going to compare them.  I want you to take
17    a good look at that signature, which apparently says -- I take
18    your word at, says Tao Feng.  And the addendum which the -- I
19    think you testified Dr. Tao did sign before sending a new one
20    that was unsigned with additional funds, and that's the
21    signature.
22         So if I put these side by side, fair to say those are
23    different signatures?
24    A.   They're not completely identical, but they're similar.
25    They have the same characters.
```

1    Q.   Right.  It's the same name, but it's a different signature,

2    right?

3    A.   I don't know.

4    Q.   Okay.  You're not a handwriting expert, right?

5    A.   I am not a handwriting expert.

6    Q.   You're not aware of the government hiring a handwriting

7    expert in this case, right?

8    A.   I am not aware of that.

9    Q.   So I just want to kind of sum up all these proposals that

10   the government walked you through, these draft contracts the

11   government walked you through, and then the same ones that I

12   walked you through, and we were obviously focusing on different

13   parts than the government.

14        But the parts I'd like to focus your attention on, looking

15   at them from a composite are the following:  Isn't it true that

16   none of the draft contracts and none of the draft addenda

17   except the one in March, which was later unsigned and submitted

18   again, had any signatures on them?

19   A.   I believe that's correct.

20   Q.   And isn't it true that a seal or stamp would be expected in

21   China to formalize a document?

22   A.   That's correct.

23   Q.   Isn't it true that none of the draft contracts or addenda

24   all the way through May had any stamps or seals on them?

25   A.   That's correct.

1  Q.  And it is true, too, that none of the reported grant

2  proposals, all of which appear to be missing information, had

3  any stamps or any seals on them?

4  A.  We did look at a document that had a seal from Fuzhou

5  University on it.  I don't know that it was a grant proposal.

6  Q.  So the one with what appeared to be a signature, you're

7  unsure if it was Dr. Tao's signature?

8  A.  Right.

9  Q.  Putting whatever that -- whatever that was aside, isn't it

10  true that all the grant proposals that we were talking about in

11  China and all of the contracts -- well, we covered the

12  contracts.  All of the grant proposals or purported grant

13  proposals in China, none of them had the seal or signature you

14  would expect prior to submission?

15  A.  That's correct.

16        MR. DEARINGTON:  No further questions.  Thank you,

17  Mr. Churchill.

18        THE WITNESS:  Thank you.

19                    REDIRECT EXAMINATION

20  BY MR. BARRY:

21  Q.  Hi, Mr. Churchill.

22  A.  Hey there.

23  Q.  I want to first focus on the grant applications that

24  Mr. Dearington had you talk about.

25  A.  Sure.

1   Q.   And specifically, there's a lot of numbers, so this is 491,

2   483, and 505.  Do you remember when I told you that these were

3   all grant applications found on the defendant's KU computer?

4   A.   Yes.

5   Q.   And so -- and Mr. Dearington asked you about some

6   statements that were written in those documents that were found

7   in the defendant's computer?

8   A.   Correct.

9   Q.   So whoever saved those documents onto the defendant's

10  computer believed that the statements --

11          MR. DEARINGTON:  Objection, leading.

12          THE COURT:  Overruled.

13  BY MR. BARRY:

14  Q.   So whoever saved those grant applications, whether they're

15  draft or not, onto that computer, is it reasonable to conclude

16  that they at least believed they were true statements?

17          MR. DEARINGTON:  Objection, speculation.

18          THE COURT:  Overruled.  You can answer if you know.

19          THE WITNESS:  Yeah, I think it's reasonable to assume

20  that, yes.

21  BY MR. BARRY:

22  Q.   Going to -- just to be clear, the last questions that

23  Mr. Dearington asked you, you said that in China a seal is very

24  important?

25  A.   That's correct.

1  Q.   Is that because a seal usually is one of the ways in which

2  people finalize legal documents?

3  A.   That's correct.

4  Q.   Now, talking about the various draft contracts that went

5  back and forth, I want to make sure I have the timeline right.

6  So do you remember we looked first at an e-mail transmission

7  from someone else to the defendant from February 2018 where a

8  contract, a template, and an addendum were attached?

9  A.   I think that's correct, yes.

10 Q.   And then do you remember there was -- a month later in

11 March 2018 that's when the defendant e-mailed a partially

12 signed addendum to someone else?

13 A.   Yes.

14 Q.   Do you remember in April 2018, another month later, the

15 defendant sent a draft addendum and a draft contract again to

16 somebody else?

17 A.   Yes.

18 Q.   And then a few days later in May 2018, that somebody else

19 sent back a re -- what appeared to be a revised version of the

20 contract and revised version of the addendum?

21 A.   I think that's correct, yes.

22 Q.   And that May 2018 version, those were the versions that had

23 that red text in there?

24 A.   I think that's correct.

25 Q.   And then did you testify that that version, that May 2018

1    version that someone else sent to the defendant, that 15 months

2    later in August 2019, the defendant sent that same version of

3    the contract to himself?

4    A.    That's correct.

5    Q.    And did you also testify that in August 2019, 15 months

6    later, the defendant sent the same version of that contract to

7    his wife?

8    A.    Yes.

9    Q.    All right.  Last question, did you say earlier that all FBI

10    translations have at least two certified linguists review them?

11    A.    I didn't say that, but that is true.

12        MR. BARRY:  Okay.  No further questions.

13        MR. DEARINGTON:  Nothing further, Your Honor.

14        THE COURT:  May Mr. Churchill be excused?

15        MR. BARRY:  Yes, Your Honor.

16        THE COURT:  You're excused.

17        THE WITNESS:  Thank you.

18        THE COURT:  You ready to get started with the next

19    witness?

20        MR. BARRY:  Yes, Your Honor.  The government calls as

21    its next witness Dr. Glenn Tiffert.  He's in the restroom.

22        THE COURT:  Will this be a good time to take a break?

23        MR. BARRY:  Yes, that would be great, Your Honor.

24        THE COURT:  Let's take a break for 15 minutes.

25        (The following proceedings occurred outside the presence of

19-20052-JAR    USA v. Feng Tao    04.01.22    Day 10    1914

1    the jury.)

2        THE COURT:  A couple things I want to talk to you all

3    about before Dr. Tiffert gets on the stand.  The first is to

4    remind you of the *limine* rulings, what he can and cannot

5    testify to.  So I've ruled that he may not offer testimony on

6    China's national development goals and industrial policies, nor

7    the role that Chinese talent recruitment programs play in

8    advancing those goals, nor PRC plans and initiatives not at

9    issue in this case, nor what sets the PRC's talent recruitment

10   programs apart from those of other countries, nor the prestige

11   and goals of the Changjiang Scholars program, nor the

12   transparency and censorship in the People's Republic of China.

13       I ruled that he may offer the following testimony on

14   the Changjiang Scholar Programs administration -- I ruled that

15   he may offer testimony as follows:  (1) on the Changjiang

16   Scholar Programs administration and operations; (2) the dual

17   government structure under which Fuzhou University operates;

18   (3) the requirements; (4) and benefits of participating in the

19   Changjiang Scholars program; (5) the expectations for

20   Changjiang Distinguished Professors, and of course all of this

21   is based on whether his testimony establishes that he has

22   knowledge about these things; and finally, the use of seals or

23   stamps in the People's Republic of China to finalize formal

24   documents.

25       The other thing is, I want to return to Exhibits 771

1    and 772.  I was confused about -- I was confused when we -- I

2    think you know I was initially confused when I was entertaining

3    argument about this before with these being other websites, but

4    actually what they are, from the Ministry of Education.  And in

5    reviewing them, they're not activities of the Ministry of

6    Education.  What they are -- maybe they're regulations, maybe

7    they're rules or policies.  There's implementation.  It's

8    basically saying this is how this program is implemented, which

9    is not one in the same as being an activity of a governmental

10   organization.

11        Now, we had that kind of evidence come in through

12   Department of Energy and NSF, but there were representatives of

13   them that testified about that as well.  So I do not think it

14   meets the requirement of 803(8).  But even if it could be

15   interpreted as being the activities of the Ministry of

16   Education, which I don't think it is, I think the defendant

17   established a lack of trustworthiness given that there's no

18   witness to really authenticate these particular documents that

19   comes from the Ministry of Education or some other entity in

20   China.

21        So I'm not going to admit 771, 771A, 772, or 772A,

22   which are the implementing measures of the Changjiang Scholar

23   Program purportedly in 2011 and 2018.  So I will sustain the

24   objection to those documents.

25        I think as we talked about before, I'm not necessarily

1    precluding Dr. Tiffert from testifying to his understanding of

2    how these programs work assuming he establishes that he has

3    that expertise.

4        MR. DEARINGTON:  Your Honor, on that last point, can I

5    confirm he can't use this unauthenticated hearsay as the

6    foundation for that testimony, right?  He would need a separate

7    understanding?

8        THE COURT:  Well, I mean, he can rely on it, but he

9    probably needs to rely on something more than that unless he

10   has some personal knowledge as to its accuracy, its genesis.  I

11   don't know.  I don't know what the bases for his expert opinion

12   are, and we may need to take that up if there's a

13   contemporaneous objection by *voir diring* him.

14       MR. DEARINGTON:  Okay.

15       THE COURT:  And let me just say one final thing about

16   his testimony.  I mean, I've ruled at least, you know, based on

17   my understanding at the *limine* stage that he can testify that

18   he does have expertise in these areas is my understanding, he

19   can testify about how these programs work, et cetera, et

20   cetera.  But I do not think he should be offering some ultimate

21   opinion on whether Dr. Tao was a Changjiang Scholar.  He can

22   certainly testify about his understanding.  He can testify

23   about the import of the seal on the certificate, but I think

24   it's an ultimate conclusion and it's a fact issue as to whether

25   or not Dr. Tao really was appointed as a scholar.  That's

1  something the jury will have to determine ultimately.

2        MR. DEARINGTON:  Understood, Your Honor.  And just to

3  clarify because I don't want to open the door on some highly

4  objectionable material, but if he were to testify about the

5  operation and it were to be established he's relying on this,

6  that wouldn't mean it's coming in, I could just -- we could

7  cross-examine him about whatever he's relying on without it

8  actually being admitted for any reason, right?

9        THE COURT:  Correct.

10       MR. DEARINGTON:  Okay.  Thank you, Your Honor.

11       MR. BARRY:  Can I raise one other thing?  I'm trying

12  to anticipate issues so we don't have to have a break.

13       THE COURT:  Sure.

14       MR. BARRY:  So my understanding is that part of the

15  basis of his opinion is based on the implementing measures, but

16  it's also based on talking to individuals who have administered

17  these programs.  This came up in October.  And I think when he

18  was cross-examined at the *Daubert* hearing, one of the questions

19  was to ask to identify those individuals and we objected

20  because of the sensitivity and the risk to those people

21  especially if they're still located in China.  So I don't quite

22  know -- I don't know if they're going to do that, but I just

23  want to try to get ahead of that because, you know, we view

24  that as similar to a confidential informant or at minimum a

25  news source for a reporter.

1    MR. DEARINGTON:  Your Honor, he's an expert.  He's not

2    a criminal investigator.  He's relying on other people with

3    expertise.  He can't have a sword and a shield at the same

4    time.

5         THE COURT:  I don't know if it's relevant what their

6    names are, but perhaps their positions or their areas of

7    expertise would be relevant.

8         MR. BARRY:  I think we could do that.  We just want to

9    eliminate any risk if they're able to be identified.

10        MR. DEARINGTON:  And presumably that would be hearsay.

11   It's not like -- unless he's talked to these people for the

12   last ten years or something, establishes his qualifications,

13   certainly after the indictment that would just be hearsay.

14        MR. BARRY:  He can rely on hearsay.

15        THE COURT:  He can rely on hearsay.  Experts often

16   rely -- I mean, they've built up a body of knowledge based on

17   reading out-of-court statements that aren't admitted into

18   evidence, whether they're in the form of journals or

19   publications.  They've done that through their own experience,

20   they've done that through talking to people.  That's what

21   experts do.  So the expert opinion is not excluded simply

22   because they've relied on sources that are themselves hearsay.

23        MR. DEARINGTON:  Your Honor, I guess the situation I'm

24   highly concerned about would be essentially a loophole here

25   where the government is going to have Tiffert -- Dr. Tiffert

1    say that someone from the Ministry of Education told him we

2    would never give a certificate out unless we first had a signed

3    contract in hand and we wouldn't be able to cross-examine that

4    person.  It's not science --

5        THE COURT:  Right.  And I don't expect the -- I mean,

6    if the government asks questions and he starts testifying about

7    hearsay statements made to him, I think that's a good

8    objection, but I think he can testify that through, you know --

9    not sure how to articulate it, but he has expertise based on

10   years of doing X, Y, or Z, which presumably would include

11   talking to people but without saying what they told him.

12        If you start examining him about the basis of his

13   experience, I mean, it may elicit that kind of testimony, I

14   don't know.  But I don't think you should be -- anybody should

15   be eliciting hearsay statements from him.  And either trying to

16   prove that he's got expertise or not.  I mean, I've already

17   ruled, you know, that he has expertise to testify to the

18   matters that I'm allowing him to.  That doesn't preclude you

19   from cross-examining him and questioning whether the jury

20   should -- you know, trying to demonstrate to the jury they

21   shouldn't give much weight to these opinions for whatever

22   reason.

23        MR. DEARINGTON:  Understood, Your Honor.  Thank you.

24        MR. BARRY:  Understood.

25   (Recess.)

1    (The jury entered the courtroom, after which the following

2  proceedings were had.)

3           THE COURT:  You can be seated.  Call your next

4  witness.

5           MR. BARRY:  Government calls Dr. Glenn Tiffert.

6                   DR. GLENN TIFFERT,

7  called as a witness on behalf of the government, having first

8  been duly sworn, testified as follows:

9                   DIRECT EXAMINATION

10 BY MR. BARRY:

11 Q.   Good afternoon, Dr. Tiffert.

12 A.   Hello.

13 Q.   Would you please state and spell your name for the record?

14 A.   Sure.  Glenn Tiffert.  G-l-e-n-n, T-i-f-f-e-r-t.

15 Q.   Where do you work, Dr. Tiffert?

16 A.   At the Hoover Institution, a think tank at Stanford

17 University.

18 Q.   What do you mean by a think tank?

19 A.   A think tank is an institution and what we try to do is

20 take the best of rigorous academic research and translate it

21 into policy outcomes.

22 Q.   What's your title at the Hoover Institute?

23 A.   I'm a research fellow.

24 Q.   Do you co-lead a project relating to China?

25 A.   I co-lead and co-chair our project on China, yes.

1    Q.   What's your educational background?

2    A.   So I have a Ph.D. from the University of California,

3    Berkeley in Chinese history, and I taught history at the

4    University of Michigan where I did a post-doc before

5    transitioning to the Hoover Institution.

6    Q.   How long have you worked at Hoover?

7    A.   I'm going on four years now.

8    Q.   And you said you have a Ph.D.?

9    A.   Yes.

10   Q.   What was your Ph.D. in?

11   A.   Chinese history.

12   Q.   And you said you co-lead a project at Hoover having to do

13   with China?

14   A.   Correct.

15   Q.   At a very high level, does that project focus on studying

16   various activities related to China?

17   A.   Yes, it does.

18   Q.   And in the course of your work co-leading that project,

19   have you worked on projects or research issues related to what

20   are called talent recruitment programs?

21   A.   I have.

22   Q.   And generally speaking what is a talent recruitment

23   program?

24   A.   Broadly speaking a talent recruitment program is a program,

25   generally state-sponsored, that seeks to identify especially

 1    promising or capable scholars and researchers and give them a

 2    guaranteed set of resources that frees them a little bit or

 3    reduces the pressure for them to hustle for grants so that they

 4    can focus on being more productive.

 5    Q.    Are there multiple countries that offer talent recruitment

 6    programs?

 7    A.    There are.

 8    Q.    Is China among the numerous countries that offer such

 9    programs?

10    A.    China is among the most active.

11    Q.    In the course of your research have you published any

12    articles?

13    A.    Yes, I have.  I have published academic articles on Chinese

14    history as well as books and articles dealing with China's

15    engagement in the world and China's engagement in academic

16    programs.

17    Q.    In the course of that research have you studied Chinese

18    government-sponsored talent recruitment programs?

19    A.    Yes, I have.

20    Q.    And can you describe a little bit about what that research

21    has entailed?

22          MR. DEARINGTON:  Objection, Your Honor.  It's outside

23    the scope of the specific talent program at issue.

24          MR. BARRY:  I'm trying to lay a foundation while

25    staying within the --

1       THE COURT:  Overruled.

2       THE WITNESS:  Could you repeat the question?

3   BY MR. BARRY:

4   Q.   Sure, if I can remember it.

5       Can you please talk a little bit about the research that

6   you've done to learn about Chinese government-sponsored talent

7   recruitment programs?

8   A.   Yes.  We have a major stream of research that focuses on

9   research security and integrity in the United States.  Talent

10  recruitment programs are a major focus of that and an area of

11  concern, and so we've done deep empirical research on it.

12  Q.   I want to focus on the details of the research.  So in

13  doing that research to learn about those programs, do you --

14  what do you do?  Do you read books?  Do you read articles?  Do

15  you talk to people?  What do you do?

16  A.   So we talk to other people in the field who are working on

17  similar lines of research in order to share what we've

18  discovered and what they have discovered.  We obviously do a

19  great deal of open source research in Chinese sources by

20  reading Chinese articles, Chinese books, visiting university

21  websites, trying to understand the way Chinese universities

22  implement talent programs in trying to build data collection so

23  that we understand what we're looking at.

24  Q.   And do you read and speak Chinese?

25  A.   I do.

1   Q.   How long approximately have you been able to read and speak

2   Chinese?

3   A.   I would say about 20 years ago I began the study of Chinese

4   and I've been at it ever since.

5   Q.   During your career have you had occasion to live in China?

6   A.   Yes.  I've lived in China cumulative about five years.

7   Q.   And in the course of your research focused on China, have

8   you had the opportunity to testify before congress?

9   A.   Yes, I have.

10   Q.   How many times?

11   A.   Once.

12   Q.   And was it related to some of the research that you've been

13   doing at the Hoover Institution?

14   A.   It was related to China's engagement in academic programs,

15   so yes.

16   Q.   Do you hold any other memberships related to your work

17   involving China?

18   A.   So I'm on the executive committee of an organization called

19   the Academic Security and Counter-Exploitation Group, which is

20   an association of U.S. universities and their research security

21   officers that exist to raise consciousness about risk in the

22   research enterprise to help universities achieve better

23   compliance with the regulatory regime that governs them.

24   Q.   So you work full-time at Hoover, right?

25   A.   I do.

1    Q.   Do you also engage in any consulting work?

2    A.   From time to time I do, but it's a small part of my overall

3    work.

4    Q.   Okay.  And in this matter has the U.S. government retained

5    you as an expert?

6    A.   Yes.

7    Q.   And when did the government retain you?

8    A.   March of last year, so it's been slightly more than one

9    year.

10   Q.   And as part of that retention agreement does the government

11   pay you for your time and your work on that case?

12   A.   Yes, they do at an hourly rate.

13   Q.   What does the government pay you per hour?

14   A.   $450 an hour.

15   Q.   How did you come up with that rate of $450 an hour?

16   A.   This having been the first time that I've engaged in this

17   type of work, I canvassed some of my colleagues and asked them

18   what they charge.

19   Q.   And in the course of about -- I guess you said March, so

20   it's about a year approximately, how much have you billed the

21   government for your work on this case?

22   A.   So I've worked a total of about 55 hours.  And so that

23   works out -- I would have to do the math very quickly -- I

24   think about -- just under 25,000.

25   Q.   So over the course of about a year you've worked about

19-20052-JAR    USA v. Feng Tao    04.01.22    Day 10    1926

1    55 hours on this case?

2    A.    Correct.

3    Q.    So on average about four or so hours a month?

4    A.    Yes.

5    Q.    And just at a high level because this is a public record so

6    I don't want you to put your salary out there, but what

7    percentage of your annual income do you attribute to the work

8    for the government that you've been billing for this case?

9    A.    I'd like to slightly amend the answer that I gave you a

10   moment ago of 25,000.  That includes reimbursement for plane

11   tickets and hotel and travel.  So the actual income for the

12   hours I've spent would be lower than that.  But if I did the

13   calculation right, I think it represents about 15 percent of my

14   income for the year, 1-5.

15   Q.    Sorry.  I cut you off.

16   A.    1-5, 15 percent.

17   Q.    So I want to focus specifically on Chinese

18   government-sponsored talent programs.  You said that there

19   are -- the Chinese government is one of the most active

20   countries in this space?

21   A.    Yes.

22   Q.    And are there dozens or hundreds of these programs?

23   A.    So there's no master list of these programs, but by the

24   best count of those who try to track them and follow them

25   closely, the estimate is somewhere between 3 and 600 of these

1    programs at every level of the Chinese government:  Local,

2    provincial, and national.

3    Q.    So at least within the China context, there's a couple

4    hundred programs and they're offered at the national level.

5    What is the provincial level, what's that mean?

6    A.    China has provinces much like the United States has states

7    and so they offer talent programs as well.

8    Q.    And then the local level, is that sort of analogous in our

9    federal system to a municipality?

10    A.    Exactly.

11    Q.    So I want to talk about a specific program and it's called

12    the Changjiang Scholars program.  Are you familiar with that

13    program?

14    A.    Yes, I am.

15    Q.    And within the Changjiang Scholars program, are there

16    different kinds of subprograms?

17    A.    Yes.  There are and the current incarnation of the

18    Changjiang Scholars program there are three levels.

19    Q.    What are the three levels?

20    A.    So there's a chaired professor level.  Those are for the

21    most senior researchers.  Then there's a mid level, the

22    distinguished professor level.  And then there's a youth level

23    for people who are early career.

24    Q.    Okay.  So I want to talk about each one of those levels.

25    So first let's talk about the chair level.  So this is the

1  chair level of the Changjiang Scholars program, right?

2  A.    Correct.

3  Q.    Is the Changjiang program sometimes called the Yangtze

4  River program?

5  A.    Yes.   Those are interchangeable names for the same river.

6  Q.    So the Changjiang chair program, you said that's the most

7  senior?

8  A.    Yes.

9  Q.    Okay.   What is the type of candidate who qualifies to

10 participate in that chair program?

11 A.    So they're looking for people who are at the peak of their

12 careers and who will visit only for a short time and help to

13 kind of inspire people in China, Chinese universities, with

14 where the cutting edge in their field is and share that

15 knowledge and share that research.   It's a part-time

16 commitment, it's not a full-time commitment, and the term of

17 service is shorter than some of the others.

18 Q.    When you say that the chair program is designed for people

19 who are senior in their career, what do you mean by that?

20 A.    So the age limit, for example, is I believe up to 55,

21 65 years old in some fields, and it also recruits people from

22 abroad to come visit for two or three months at a time per year

23 during the term of this fellowship.   It's people who have

24 really distinguished themselves at the top of their fields.

25 Q.    Did you say there's a certain time commitment for that

1    chair program?

2    A.    Yes, that's right.  It's a minimum of two months annually.

3    Q.    And does the program -- if you are accepted into it, is it

4    for a certain period of time?

5    A.    Yes.  I believe, if I recall the regulations correctly,

6    it's a three-year commitment at that level.

7    Q.    So that's the chair program, right?

8    A.    Right.

9    Q.    Now I want to talk about the middle program, the

10    distinguished professor program.

11    A.    Uh-huh.

12    Q.    For the Changjiang Distinguished Professor program, what is

13    the typical profile of someone who would qualify for that

14    program?

15    A.    This is somebody who is mid career but who's been a program

16    builder, someone who's distinguished themselves.  Depending on

17    the field, their age is -- does not exceed 45 years old in the

18    sciences.  And what they're looking for is somebody who is not

19    only a strong researcher but has been a good administrator, can

20    run labs if you're in the sciences, can build a program.  And

21    most importantly can teach core courses in a university.  This

22    is somebody who has a full-year, full-time commitment.

23    Q.    And then let's talk about that third tier, the youth

24    program.

25    A.    Uh-huh.

1   Q.   What is the typical profile of someone who would be

2   qualified to operate in that program?

3   A.   The goal here is to give people who are very promising and

4   young and just getting started on their careers a leg up.  The

5   age limit there is 35.  So it's an opportunity to identify sort

6   of promising people in the field.

7   Q.   So I want to narrow in on that middle program.  So put the

8   chair program aside, put the youth program aside.  I want to

9   focus on the distinguished professor program.  How competitive

10  is it to be accepted into that program?

11  A.   It's extremely competitive and very prestigious.  The

12  Changjiang fellowship is a national level fellowship, it's one

13  of these national level talent programs, and it's among the

14  most prestigious in China.  And that level of the distinguished

15  professor level is a tremendous accolade for someone to have;

16  it recognizes they've achieved a lot in their career.

17  Q.   And you said for that distinguished program that the --

18  what they're looking for are people who know how to build a

19  program?

20  A.   That's right.

21  Q.   What do you mean by that?

22  A.   They're looking for proven researchers and proven

23  administrators who can run labs, who can train post-docs, who

24  can train graduate students and build an ecosystem underneath

25  them.  It isn't just about recruiting the individual, it's

1   about recruiting an individual who can catalyze a program and

2   run it.

3   Q.   Is that distinct from the youth program?

4   A.   Yes, it is.  Because someone at that level would not have

5   had the experience or the track record to run a lab, to run a

6   program, to run a center.  Someone at the distinguished

7   professor level has demonstrated that they have that

8   capability.

9   Q.   And is it distinct from the chair program as well in that

10  sense?

11  A.   Correct.  The chair program, again, because they visit for

12  only a short time every year, is not going to be hands-on in

13  that way and they're not asked to teach core courses in the

14  curriculum of the departments the way the distinguished

15  professors are.

16  Q.   I want to touch on something you said a minute ago.  You

17  said that the Changjiang program is a national program.  Did I

18  hear you right?

19  A.   Correct.

20  Q.   What do you mean by it's a national program?

21  A.   So the sponsor of the Changjiang fellowship is the Ministry

22  of Education, the national Ministry of Education of the PRC

23  government.

24  Q.   So does that mean that the national Ministry of Education

25  is the organization that decides whether to award someone with

1    a distinguished professor position or not?

2    A.    That's correct.  And they're the ones who are the ultimate

3    gatekeeper.

4    Q.    If someone were to be -- receive the distinguished

5    professor award, does that mean they'd work at the Ministry of

6    Education?

7    A.    No.  It means they work at a Chinese university, but their

8    appointment to that fellowship has been approved by the

9    Ministry of Education.

10    Q.    So how does that work?  I mean, in the United States, if I

11    were to get a position at KU, it's not like the Department of

12    Education would need to approve my job there.  So when you say

13    that the Ministry of Education has to approve whether someone

14    can be appointed as a Changjiang distinguished professor at a

15    particular university, what do you mean by that?

16    A.    So the Changjiang fellowship, as I said at the beginning of

17    my testimony, is a funding stream that's made available by the

18    Chinese Ministry of Education which enables a Chinese

19    university to then take this funding stream potentially,

20    identify a candidate that works very well for their strengths,

21    whatever, you know -- for example, if they have a strength in

22    chemical engineering or physical chemistry, they would perhaps

23    seek a candidate like that.  And this funding stream then makes

24    it possible for them to go out and select the candidate that

25    they want and then, you know, put a portfolio together, an

1933

1  application portfolio together and submit it to the Ministry of

2  Education.

3      The Ministry of Education then vets the candidate, puts

4  them through a peer review process.  And if they come out the

5  other end, they get the fellowship which then facilitates the

6  hiring of that person by the university.

7  Q.   And does the Ministry of Education provide some of the

8  funding for Changjiang Distinguished Professors?

9  A.   Yes, it does.

10 Q.   So is it fair to say that at least for this Changjiang

11 Distinguished Professor program, one way to think about it is

12 that the Ministry of Education has a pot of money and they set

13 certain guidelines, and then among the hundreds of universities

14 in China, they can kind of compete amongst themselves to

15 attract candidates who would qualify for the position and then

16 they can assist in that application process?

17 A.   That's a great way to describe it.  In a sense it's like

18 seed money.

19 Q.   Can an individual apply to be a Changjiang in China without

20 the support of a Chinese university?

21 A.   No.

22 Q.   Does the Chinese Ministry of Education set any rules or

23 requirements that Chinese universities have to follow in

24 attracting folks to be Changjiang Distinguished Professors?

25 A.   So the Chinese university submits the application portfolio

1  on behalf of the applicant and that portfolio includes a

2  description of what role the applicant would play, the

3  strengths of that university, why they're seeking this

4  individual to join their university, why they're so great at

5  what they do.

6      And then part of the application is generated by the -- by

7  the scholar themselves where they submit their past research,

8  any patents they might have, evidence of their teaching record,

9  accolades that they've won over the years.  That portfolio is

10 packaged by the university and submitted up to the Ministry of

11 Education for review.

12 Q.  Let's talk about that process.  It sounds like step one is

13 applicant and Chinese university put together a package and

14 then they submit that to the Ministry of Education, right?

15 A.  Correct.

16 Q.  What happens next?

17 A.  So the Ministry of Education reviews it.  They put it

18 through a peer review process, and it's a kind of quality

19 control on the applicant.  And if they decide that the

20 applicant meets the criteria for eligibility in the Changjiang

21 fellowship program and they're selected, then they pass the

22 file back to the university, and it's up to the university and

23 the candidate then to negotiate the terms of their contract.

24     When they negotiate the terms of their correct, that

25 contract is then submitted back to the Ministry of Education

1  for approval to ensure that it's consistent with the

2  requirements of the program, and if it is, then they're issued

3  a certificate that formalizes their receipt and their

4  participation in the program.

5  Q.  So let's break that down.  So first is the application

6  process that we talked about, right?

7  A.  Uh-huh.

8  Q.  And then what did you say was the second step after it's

9  submitted to the Ministry of Education?

10  A.  So the Ministry of Education does a vetting of the

11  candidate and that includes a peer review of their academic

12  research.  They constitute a committee of experts in that field

13  who go over the portfolio of the applicant and decide whether

14  they're truly as good at what they do as they say they are and

15  what the submitting university says.  And then after that peer

16  review process, if they pass muster, they're selected on a

17  preliminary list that's published.

18  Q.  So application, peer review, selected, put on a preliminary

19  list.  What's the next step after that list?

20  A.  So that preliminary list is published, and then because

21  it's published, the academic community and the public are

22  invited to comment on it just in case there's something that

23  comes to light about the applicant that the committee should

24  know, that the Ministry of Education should know.  So there's

25  this comment period.  And during that period also the

1  university and the applicant are negotiating to arrive at a

2  contract with the exact terms of their employment at that

3  university.

4  Q.  So I want to pause on this -- I'm going call this step

5  four, this sort of comment period/negotiating the contract.

6  Did you say that the university is the entity that has the

7  ability to negotiate with the individual applicant?

8  A.  Correct.

9  Q.  And does the Ministry of Education provide any requirements

10  that the university follow or do they provide them with some

11  flexibility?

12  A.  So there are governing regulations issued by the Ministry

13  of Education that lay out the terms, the minimum requirements

14  for the Changjiang fellows at every level.  And so, yes, the

15  negotiated contract between the university and the applicant

16  have to meet certain standards.

17  Q.  And is it -- is it a net positive for a Chinese university

18  to have someone on their faculty who's a Changjiang

19  Distinguished Professor?

20  A.  It's extremely prestigious and in fact they boast about it.

21  Q.  That's because it's a really competitive program to get

22  into, right?

23  A.  Absolutely.

24  Q.  So step one is application.  Step two is peer review.  Step

25  three is preliminary list publish.  Step four is comment period

1  and negotiation of contract between the university and the

2  applicant.  What's step five?

3  A.    Step five is if they've concluded a contract, that contract

4  is submitted to the Ministry of Education for approval.  Again,

5  they make sure that it meets all of the regulatory requirements

6  on the program, and if it does, then the applicant is issued a

7  formal certificate that ratifies they've received the

8  fellowship, and the names are published in an official list.

9  Q.    So for step five, you say concluding the contract that's

10  submitted to the Ministry of Education to make sure all the

11  regulatory requirements are met, how do the Chinese

12  universities know which regulatory requirements to meet?

13  A.    Right.  So the regulations are published and they're

14  available on the Ministry of Education's website.

15  Q.    And then you said the last step is that a certificate is

16  issued?

17  A.    Correct.

18  Q.    And then presumably after that, whatever employment

19  relationship had been negotiated would commence?

20  A.    Yes.  Exactly.  Under the regulations they have a period of

21  several months with which they're required to begin the

22  fellowship and take residence at the university, the

23  expectation being that they're employed somewhere else because,

24  again, this is a mid career person.  So you're attracting them

25  to this new university and they need some time to unwind their

1    relationship wherever they're currently employed.

2    Q.   How did you learn all of that about the Changjiang

3    Distinguished Professor program?

4    A.   I learned about it by reading the regulations and by

5    speaking to people both in China and outside China who are

6    knowledgeable about the program and reading Chinese

7    publications on the subject.

8    Q.   So let's sort of put that in three buckets.  So there's

9    the -- you've read regulations online, right, that's one

10   bucket; is that correct?

11   A.   Correct.

12   Q.   And then the second bucket is you say you've spoken with

13   some people about it?

14   A.   Correct.

15   Q.   Without getting into any specifics, can you just talk

16   generally about the types of people who you've spoken to about

17   this?

18   A.   Yes.  I've spoken to people who have been on the peer

19   review committees for the Changjiang fellowship and similar

20   talent program fellowships, and I've spoken to recipients as

21   well.

22   Q.   Did you have those conversations in the context of your

23   research and just gaining a better understanding of how these

24   programs actually operate?

25   A.   Yes.

1   Q.   Okay.  And then the third one is you said you read

2   publications?

3   A.   Correct.

4   Q.   What are some of the types of publications that you read to

5   learn about what you just testified about?

6   A.   So in the Chinese language educational literature there are

7   debates about whether the Changjiang fellowship program and

8   other talent programs are meeting their goals, whether they

9   need to be adjusted, for example.  You know, the -- there's

10  also considerable discussion about whether the programs are

11  actually helping China achieve what it's meant to achieve.

12  Q.   And are these -- are these like publications written by

13  other academics or people in the think tank space?

14  A.   So the Chinese publications are written by academics who

15  study and work in the educational sectors.  Sometimes they're

16  written by governmental officials who are considering policy

17  changes, and then the English language publications are

18  generally published by people like me who do deep dives into

19  the subject.

20  Q.   Okay.  So you said you did your Ph.D. in Chinese legal

21  history?

22  A.   Chinese history.

23  Q.   History.

24  A.   I happen to have focused on legal history, but my training

25  is from the mid Seventeenth Century all the way up to the

1  present.

2  Q.  Do seals in the Chinese legal system or within Chinese

3  society have any significance that at least in the American

4  legal system might not be as apparent?

5  A.   In traditional Chinese legal culture a seal was roughly

6  equivalent to a signature on a document.  And in fact in

7  contemporary Chinese the seal is still evidentiary and

8  equivalent to a signature on a lot of documents in particular

9  for organizations.  Individuals will sign their name to

10  contracts, but organizations, particularly official

11  organizations like firms or government entities, will almost

12  always use their official seal to indicate -- you know, to seal

13  a contract.

14  Q.  And when you say in your -- based on your experience and

15  knowledge in this space, seals within the Chinese system are

16  evidentiary.  What is like a non-legal way to explain what that

17  means?

18  A.  Well, they're treated as equivalent to a signature, as

19  binding yourself to the terms of the contract or ratifying,

20  putting your official imprimatur on the document.

21  Q.  You said that's especially true for Chinese organizations?

22  A.  Yes.

23  Q.  Okay.  I'd like to show you what's been marked as

24  Government's Exhibit 619.  Do you recognize this?

25  A.  Yes, I do.

1    Q.    What is it?

2    A.    This is the certificate ratifying that Fuzhou University

3    has -- let's see, I'll tell you, has selected the defendant in

4    the 2017 class of Changjiang Scholars and it ratifies that

5    selection.  This is the document that's issued at the end of

6    the contract process that formalizes the recipient's status as

7    a Changjiang Scholar.  And this comes directly from the

8    Ministry of Education, and it bears the Ministry of Education's

9    seal at the bottom.

10   Q.    So what about that document tells you based on your

11   experience and expertise that that is what it purports to be

12   and it hasn't been fabricated or I didn't print it off line or

13   something?

14   A.    Right.  So the document uses official language, for

15   example, and exactly the format -- and I've seen one of these

16   before.  Same type of language.  It bears the red seal

17   identical to other government seals and it is the seal of the

18   Ministry of Education from the PRC.  It bears a serial number

19   on it and the date of issue.

20   Q.    So I want to break those down.  You said, number one is it

21   uses official language?

22   A.    Correct.

23   Q.    What do you mean by that?

24   A.    So, for example, it uses the formal language typical of

25   legal documents.  The first character on it, for example, is a

1   more formal literary form that is not generally used in spoken

2   Chinese.  It's typical of a formal government document.

3          And similarly, the language, for example, pizhun, these two

4   characters are exactly what a higher governmental authority

5   would say when they're ratifying a decision made by a lower

6   organ which in this case would be Fuzhou University.

7          So literally it says this formalizes or ratifies Fuzhou

8   University's selection of Tao Feng by the Ministry of Education

9   as a member of the 2017 Changjiang Scholars scholarship plan,

10  Distinguished Professor program for term of five years.

11  Q.   So that's official language?

12  A.   Yes.

13  Q.   I want to -- you also said red seal?

14  A.   Correct.

15  Q.   So what about that seal on that document tells you that

16  it's what it purports to be?

17  A.   So it's funny.  I mean, I've looked at a lot of government

18  seals, including Ministry of Education seals before, so this is

19  exactly what they appear as.  This is what they look like.

20  Q.   When you say you've looked at other examples of the Chinese

21  government Ministry of Education seals, where have you seen

22  those other examples?

23  A.   So as part of my research in China as an academic, I spent

24  a lot of time in government archives working with government

25  documents, looking at original government documents that bear

1  seals on them, including Ministry of Education seals.  And I've

2  also engaged with bureaucrats from the Ministry of Education

3  over the years and received documents from them that bear

4  exactly this seal.

5  Q.   Okay.  So official language, red government seal of the

6  Ministry of Education.  The third thing you said that to you

7  indicated this is what it purports to be is the serial number?

8  A.   Correct.

9  Q.   What about that serial number tells you that this is an

10  authentic document?

11  A.   The serial number is important because in principal it

12  allows one to actually follow up with the Ministry of Education

13  and check the authenticity of the document.  And so that I have

14  not done for this particular document, but it would be possible

15  to do so.  And I think it's -- it's a verifiable piece of

16  information.

17  Q.   Okay.  So official language, seal, serial number.  And then

18  you said date is another indicator to you?

19  A.   Yes.

20  Q.   Why?

21  A.   Because it bears a date that is consistent with the timing

22  in the regulations published by the Ministry of Education at

23  the end of the process that concludes in generating this

24  certificate, and it's consistent with I believe the history of

25  the defendant's participation in the Changjiang Scholars

1    program.

2            MR. BARRY:  Government moves to introduce into

3    evidence Government's Exhibit 619.

4            MR. DEARINGTON:  Objection, Your Honor.  Request to

5    *voir dire* the witness as to the authenticity.

6            THE COURT:  Go ahead.

7                        VOIR DIRE EXAMINATION

8    BY MR. DEARINGTON:

9    Q.   Good afternoon, Dr. Tiffert.

10   A.   Hello.

11   Q.   I'm going to keep this portion fairly limited to the

12   certificate that -- purported certificate that you just

13   testified about.  Okay.  So there was a conference in

14   October 2021 in which I had the opportunity to ask you a few

15   questions, right?

16   A.   Correct.

17   Q.   And you conceded at that conference you had never seen a

18   Changjiang certificate before, didn't you?

19   A.   Correct.

20   Q.   And you just testified you've seen one Changjiang

21   certificate since then?

22   A.   Yes.

23   Q.   That would be what you believe to be this one plus one

24   other?

25   A.   Correct.

1  Q.  Okay.  And that was from the year what?

2  A.  That was a 2015 certificate I believe.

3  Q.  And fair to say Changjiang certificates actually look

4  different from year to year, if you know?

5  A.  I couldn't say.

6  Q.  But you know that the 2015 one looked different from this

7  one, right?

8  A.  Not significantly, no, and it bore the same hallmarks.

9  Q.  Well, I guess the question was:  There are differences

10  between the 2015 Changjiang certificate or what you believed to

11  be a Changjiang certificate and this one?

12  A.  There would be textual differences, yes.  For example, the

13  university was a different university.  It would have said

14  participation in the 2015 class as opposed to the 2017 class of

15  the fellowship.

16  Q.  But you're aware that the actual language in the purported

17  certification is different in 2015 than it is in whatever

18  you're looking at here, right?

19  A.  I couldn't testify to that without having them both in

20  front of me to verify every character and to verify, you know,

21  every detail about it.

22  Q.  So this is the first Changjiang certificate you've ever

23  seen, right?

24  A.  This is the first.

25  Q.  Purported Changjiang certificate.

1    A.    Yes.

2    Q.    And when we talked about the certificate back in October,

3    you were pretty confident it was a Changjiang certificate,

4    right?

5    A.    It purports to be, yes.

6    Q.    But at that time you had never seen one before, right?

7    A.    I had no reason to doubt that it wasn't authentic.

8    Q.    Anything you don't doubt being authentic to you is

9    authentic, is that your testimony?

10    A.    I had other sources that confirmed the participant's

11    participation in this program.  For example, the published list

12    of participants in the Changjiang scholars program that was

13    published by the Ministry of Education.  And so -- so that in

14    conjunction with the certificate led me to believe that this

15    certificate was likely authentic.

16    Q.    You're not saying this is a certificate though,

17    Dr. Tiffert.  In fairness, you're saying this is a certificate

18    that would be issued after a contract process.  That was your

19    testimony, right?

20    A.    Correct.  And that's exactly what the regulations require.

21    Q.    And it's possible that there would be a certificate that

22    did not mean that, right?  It's an honor to be elected for a

23    Changjiang and you have to engage in the negotiation and

24    there's a published list you said just for having been selected

25    prior to the contract negotiation, right?

1    A.   So I suppose in theory anything is possible, but the

2    regulations demand that this be published at the end of the

3    process, and Chinese academia and the Ministry of Education is

4    deeply concerned about academic misconduct within China, and so

5    there's tremendous attention given to ensuring that these kinds

6    of regulations are honored and respected because if they're

7    not, then anyone can claim to be a Changjiang Scholar.

8    Q.   Right.  And so you stated that there would be a published

9    list upon whatever this contract negotiation -- if it was

10   finalized and submitted to the Ministry of Education, right?

11   A.   Correct.

12   Q.   So if this certificate is dated May, you would expect to

13   see a May list with Dr. Tao's name on it?

14   A.   And I did find such a list.

15   Q.   Did you give it to the government?

16   A.   Yes, I did.

17        MR. DEARINGTON:  One moment, Your Honor.

18   BY MR. DEARINGTON:

19   Q.   Dr. Tiffert, you're confident that the list, the purported

20   list you had wasn't dated January and was an initial list of

21   selections prior to that process?

22   A.   I believe that the list that I have was dated subsequent to

23   that, and beyond that there is an article from Fuzhou

24   University --

25        MR. DEARINGTON:  Your Honor --

1    BY MR. DEARINGTON:

2    Q.    I'm going to stop you right there because it sounds like

3    you're heading down a path that's inadmissible.  I'm asking you

4    about a list that would have been published it sounded like in

5    May or thereafter that had Dr. Tao's name on it.  And I can

6    tell you I haven't seen one, but if you're aware of one, I'd

7    like to hear about it.

8    A.    I'd like to verify my sources, I don't have them in front

9    of me, before answering with confidence.

10   Q.    In fairness, you're here as an expert and so you're

11   supposed to come aware of sources and what they say.  You're

12   telling me you can't testify today that there's a list from May

13   or after that listed Dr. Tao as a Changjiang Scholar?

14   A.    I have read thousands of pages of documents related to this

15   case, and the date of each one I don't have a command of.

16   Q.    And that's fair, Dr. Tiffert, and no one is perfect.  But

17   what it means is you can't say that there was a list you would

18   expect to be published to validate that that certificate means

19   what you think it means, which is that a contract negotiation

20   process is completed, right?

21   A.    Could you repeat that?

22   Q.    Yeah.  So I'm not faulting you for not remembering the

23   documents you reviewed, but you also have to be able to rely on

24   things to give your testimony.

25   A.    Correct.

1   Q.   And it sounds like you're not confident that there was such

2   a list in May or after that Dr. Tao was listed as a Changjiang

3   Scholar on, right, May 2018 or after?

4   A.   I'd have to verify that before testifying to the date of

5   that particular document.

6   Q.   Dr. Tiffert, you have to -- if you could please listen to

7   the question.  You would have to verify it, which means you're

8   unaware right now if -- of such a list from May or after,

9   you're unsure?

10  A.   I am not aware of any theory that suggests that this

11  document is other than what it purports to be.

12  Q.   Dr. Tiffert, these are not answers to my questions.  You're

13  answering a question I didn't ask.

14          MR. BARRY:  Objection.  We're beyond the scope.  This

15  is *voir dire* for the authenticity of a particular exhibit, not

16  cross-examination.

17          THE COURT:  The questions need to be confined to the

18  authenticity because that's what you're objecting to.  So any

19  other questions about?

20          MR. DEARINGTON:  Yes, I'm trying to set the record

21  straight here.

22  BY MR. DEARINGTON:

23  Q.   You're not certain that there was a published list in

24  May 2018 or after that listed Dr. Tao as a Changjiang Scholar,

25  correct?

1    A.   I couldn't tell you right now here on the spot.

2    Q.   And part of the basis for your believing that that

3    certificate was part of the same process as the

4    post-negotiation of contract period is because you usually see

5    a list and it would include Dr. Tao's name on it.  And that's

6    dated May 2018 and you would expect to see a list dated

7    May 2018, and that's how you would reach the conclusion that's

8    post-contract negotiation, right?

9    A.   That's putting words in my mouth.

10   Q.   Well, Dr. Tiffert, there's nothing in there that says

11   Dr. Tao signed a contract, right?

12            MR. BARRY:  Objection, scope.  This is *voir dire* about

13   the authenticity.  Mr. Dearington is welcome to cross-examine

14   later.

15            MR. DEARINGTON:  I can rephrase.

16            THE COURT:  I'll sustain.

17   BY MR. DEARINGTON:

18   Q.   Dr. Tiffert, are you relying on press releases and things

19   to decide that that's -- that Dr. Tao had a contract with

20   Fuzhou University or --

21            THE COURT:  The question is not about the contract.

22   The question is about the certificate itself.

23   BY MR. DEARINGTON:

24   Q.   What is the basis --

25   A.   I am relying on the 2018 regulations governing the

1    Changjiang fellows program which stipulate that issuance of the

2    certificate occurs after the contract is signed.

3    Q.   Yes, Dr. Tiffert, I understand that.  I guess what I'm

4    wondering is there could conceivably be a certificate that says

5    you've got the Changjiang selection, you've been selected, and

6    then another one that signifies that a contract has been

7    entered.  And it sounds like you have a certificate there, and

8    you're very confident that this would be one that is

9    post-contract negotiations --

10              THE COURT:  I think that's appropriate for

11   cross-examination, but at this point the only question is

12   whether this certificate, which has to do with the Changjiang

13   scholarship application program, being accepted into that,

14   whether that's admissible.  It's a totally different line of

15   questioning as to whether there was a contract or not.

16              MR. DEARINGTON:  Understood, Your Honor.  We would

17   maintain our authenticity and hearsay objection.

18              THE COURT:  All right.  I think it does go to weight

19   rather than admissibility.  Exhibit 619 is admitted.

20              MR. DEARINGTON:  Thank you, Your Honor.

21              MR. BARRY:  I'd like to show the jury 619.

22              THE COURT:  Go ahead.

23              MR. BARRY:  Actually can we switch over to the

24   computer.  Ms. Boyd, would you please pull up 619A, and I'd

25   like the jury while they're looking at 619A to look at 619.

1  Can you please go to the second page and zoom in?

2         THE COURT:  I think we can proceed.  It did go down

3  both rows.  I didn't realize you were passing it.  It went down

4  both rows.

5         MR. BARRY:  Yes, Your Honor.  Everybody saw it.

6         No further questions.

7                         CROSS-EXAMINATION

8  BY MR. DEARINGTON:

9  Q.  All right.  Hello again, Dr. Tiffert.

10  A.  Hi.

11  Q.  Okay.  When was the first time that the government

12  interviewed you in connection with this case?

13  A.  March of last year.

14  Q.  March of 2021?

15  A.  I believe so, yes.

16  Q.  Sure it wasn't June 2021?

17  A.  No, I believe I was engaged in March of 2021.

18  Q.  Okay.  I might have misheard you.  You didn't say you

19  charge 450 an hour, did you?

20  A.  No, I did.

21  Q.  You said $450?

22  A.  Correct.

23  Q.  Okay.  Fair to say that that's more than you charge your

24  employer Hoover per hour?

25  A.  I've not done that math.

1   Q.   How many hours a week do you work?

2   A.   Too many.

3   Q.   Fair enough.  And did you work on this case ever while you

4   were -- during Hoover business hours?

5   A.   Yes, I believe so.

6   Q.   Okay.  So you were at that time kind of receiving funding

7   from Hoover and also working for the U.S. Government and

8   charging $450 an hour or did you have a discount during those

9   times?

10  A.   Excuse me?

11  Q.   Did you discount the charge to the government while you

12  were also being paid by Hoover during the day?

13  A.   No, this was independent consulting.

14  Q.   And I think you said that the way that you came up with

15  your fees was by asking someone in your office what they

16  charge?

17  A.   I asked several people what they charge, yes.

18  Q.   Were those all people who had testified as experts for many

19  years or were they all first-time experts at 450 an hour?

20  A.   There was a diversity actually and the range was wider, and

21  so I set myself at the lower end actually of the range because

22  I'm newer at this.

23  Q.   Were any of them people who charged 450 for an hour for

24  their first or second time testifying as an expert?

25  A.   I don't recall.

1  Q.  This is your first time testifying in a trial as an expert,
2  right?
3  A.  Correct.
4  Q.  And I think because Mr. Barry asked you about it, you said
5  that you charged 25,000 in fees and expenses thus far?
6  A.  Correct.
7  Q.  Okay.  And when you told the government you planned to
8  charge 450 an hour, did you get any pushback?
9  A.  As I recall, the government took a week or two to get back
10  to me on that.  I imagine that they had to get approval and
11  then they came back to me.
12  Q.  And they said, that's fine, 450 is good with us, right?
13  A.  Correct.
14  Q.  Okay.  And 25,000 I think is what you said, but I want to
15  clarify because I may be misreading some of these records, but
16  in July 2021 you charged roughly 15,000 for your time?
17  A.  Correct.
18  Q.  In this case, right?
19  A.  Correct.
20  Q.  And then you testified for about an hour in October, hour,
21  two hours?
22  A.  Correct.
23  Q.  And you billed around $10,000 for your preparation of that
24  testimony including $1,200 of hotel charges?
25  A.  Correct, and airfare.

1    Q.   1200 plus airfare?

2    A.   Yes.

3    Q.   And some of those were over $100 at the Marriott Downtown

4    Bar Central?

5    A.   That's where I ate my meals, yes.

6    Q.   And March 13th you charged another 5,000 for your time?

7    A.   Correct.

8    Q.   And that just gets us to March 13th I think.  So since

9    March how many hours would you say?

10   A.   Since March let me think.  Since March 13th?

11   Q.   Yeah.  What are the unbilled hours we're talking about

12   here?

13   A.   Unbilled hours are literally the number of hours that I've

14   been sitting in the witness room waiting to be called.

15   Q.   Let's just go up until March 13th.  Are you aware that

16   actually comes out to, for fees and expenses, about $30,000?

17   A.   Okay.  I'll accept that.

18   Q.   Are you aware that Dr. Tao is accused of improperly

19   obtaining less than $30,000 in salary from the agencies?

20   A.   I was not aware of that.

21   Q.   So you're slightly higher I guess, fair to say, than what

22   Dr. Tao is accused of in getting federal salary in this case,

23   right?

24   A.   If you say so.

25   Q.   And when you were retained, did the government get a

1    preview of what your opinion might be before they signed you

2    up?

3    A.    No.

4    Q.    It was just sight unseen, no conversations had?

5    A.    I could not have rendered an opinion without looking at the

6    evidence.

7    Q.    You look at the evidence and you had an initial call and

8    kind of talked through it and then were retained?

9    A.    Well, the initial call was about my expertise and my

10   qualifications to interpret this evidence.

11   Q.    I guess it's a little different, right, than if the

12   government came to you and said we're thinking about bringing

13   charges, we want to get your opinion, we want to kind of run

14   some things by you, see if maybe we're on the right track,

15   maybe we're misreading this a little bit.  They retained you

16   for a trial that was already scheduled against Dr. Tao, right?

17   A.    Yes.

18   Q.    So fair to say you were aware that they were looking for an

19   opinion that supported their theory, right, whether you agree

20   with it or not?

21   A.    I wouldn't give them an opinion just to agree with them.

22   I'm data driven.  I would look at the evidence.  And if I

23   disagreed with their theory, I would have told them so.

24   Q.    Certainly, certainly.  And when you were in Kansas in

25   October 2021 -- let me start with this.  Do you view yourself

1    as a Changjiang Scholar expert?

2    A.   I regard that as being within the scope of my expertise,

3    yes.

4    Q.   Okay.  And were you aware at the October hearing -- I want

5    to see if you agree with this -- that Mr. Barry stated that the

6    government is, quote, not proposing Dr. Tiffert as a Changjiang

7    Distinguished Professor expert.  Do you agree with that?

8    A.   I agree.  I guess that the government was not proposing me

9    as a Changjiang Scholar expert, sure.

10   Q.   So you think you have some expertise in this area, putting

11   aside whatever you're being proposed for, right?

12   A.   Yes.

13   Q.   So let's talk about some of that expertise.  So I think you

14   said your dissertation or your Ph.D. covered a couple hundred

15   years of Chinese history?

16   A.   Yes.

17   Q.   Not Changjiang Scholar Program?

18   A.   I'm not aware of any academic scholar program that focuses

19   on the Changjiang Scholars Program.

20   Q.   There's coursework that touches on it, fair?

21   A.   I'm not aware of any coursework in the history department

22   on that, no.

23   Q.   You did testify in October that there are courses that

24   touch on these types of talent programs, didn't you?

25   A.   Correct, but not in the scope of a history program.  Let's

1    not forget that the Changjiang fellows program was introduced

2    in 1998.

3    Q.    Okay.  And the time you testified about in Congress that

4    Mr. Barry asked you about, you were identified as a modern

5    legal history expert, right?

6    A.    Correct.

7    Q.    Not Changjiang or talent program expert?

8    A.    That wasn't the scope of my testimony, correct.

9    Q.    And if we can just -- if it's a yes or no answer and you

10   think you can answer yes or no, let's try to do that to see if

11   we can finish today.

12        Never served as an expert on Changjiang Scholar before this

13   case, right?

14   A.    This is the first time.

15   Q.    Never done any coursework regarding Changjiang?

16   A.    Correct.

17   Q.    Never written a book about the Changjiang Scholar Program?

18   A.    Correct.

19   Q.    Never written a paper on the Changjiang Scholar Program?

20   A.    Correct.

21   Q.    You're not a professor?

22   A.    No, not anymore.

23   Q.    I think we already covered this, but you had never seen a

24   Changjiang certificate before this case, right?

25   A.    This certificate was the first certificate I looked at.

1    Q.    That you believed to be a Changjiang certificate, correct?

2    And you had never seen a Changjiang application before this

3    case?

4    A.    Correct.

5    Q.    And you never read the Ministry of Education regulations

6    before this case that you're relying upon?

7    A.    I had -- I believe I had read the regulations before.  I

8    never looked at an application before because they're not

9    public documents.  They're between the Chinese university and

10   Chinese Ministry of Education.

11   Q.    I'd like to refresh your recollection about some testimony

12   you gave back in October about whether you've reviewed these

13   regulations before.

14          MR. DEARINGTON:  May I approach, Your Honor?

15          THE COURT:  Yes.

16   A.    Okay.  I stand corrected.

17   BY MR. DEARINGTON:

18   Q.    So you've never read these regulations that you're relying

19   on before until you were retained at 450 an hour by the

20   government in this case, right?

21   A.    Yes.  Correct.

22   Q.    Okay.  And there have been thousands of Changjiang Scholars

23   around the world, right?  They're not in hiding.  This is a

24   publicly announced thing you said?

25   A.    So the quotas are 500 a year.

1    Q.    500 a year.  And Dr. Tao is alleged to have been named a

2    Changjiang Scholar in 2017.  How many 2017 scholars have you

3    spoken to?

4    A.    None.

5    Q.    How many 2017 certificates have you seen?

6    A.    None.

7    Q.    Are you aware that one of your --

8    A.    Other than the one that was presented to me just a few

9    moments ago.

10    Q.    Are you aware that there was a fellow in the last year or

11    two who's a Changjiang Scholar named Huping Ling, according to

12    open source?

13    A.    Excuse me.

14    Q.    Huping Ling who was a fellow at Hoover.  Are you aware of

15    her?

16    A.    No, I'm not familiar with her.

17    Q.    You didn't know there was a Changjiang Scholar in your

18    midst in the last couple years at Hoover?

19    A.    What was the formal title she had, visiting fellow?

20    Q.    Changjiang Scholar is what the website told me.

21    A.    No, at the Hoover Institution.

22    Q.    Fellow.  I'm not sure.

23    A.    We have visiting fellows, some of whom are not in

24    residence.  So I may never have met her.

25    Q.    Okay.  Do you know who Joseph Stiglitz is?

1    A.    Excuse me?

2    Q.    Joseph Stiglitz?

3    A.    I'm aware of who he is.

4    Q.    Who is he?

5    A.    The economist, Nobel Prize winner.

6    Q.    He was a fellow at Hoover for a while, right?

7    A.    Yes.

8    Q.    Did you know he was a Changjiang Scholar?

9    A.    I did not.

10    Q.    Do you know who Gary Becker is?

11    A.    Yes.

12    Q.    Do you know he was a Changjiang Scholar?

13    A.    It's interesting.

14    Q.    James Heckman?

15    A.    Also?

16    Q.    Are you aware of James Heckman?

17    A.    James?

18    Q.    Heckman from the University of Chicago?

19    A.    No, actually not.

20    Q.    Who is Gary Becker?

21    A.    Gary Becker is a Nobel Prize winning economist.

22    Q.    You didn't know that any of those people were Changjiang

23    Scholars?

24    A.    I did not.

25    Q.    I want to talk through this process we were talking about.

1  So one would apply through a university to be a Changjiang

2  Scholar.  The university then submits the application you

3  testified to the Ministry of Education.  It gets reviewed,

4  there's a publication online, on the Internet, and then some

5  peer review would go on.  And then if the Ministry of Education

6  is okay, then a contract can be negotiated.

7      And if the professor agrees to the contract, that goes back

8  up to the Ministry of Education, and then there's another

9  publication on the Internet listing those who got it.  And then

10  your testimony is a certificate would be issued, right?

11  A.  You got the sequence slightly wrong but broadly speaking,

12  yes.

13  Q.  What part did I have wrong?

14  A.  So the publication happens after the peer review.  The peer

15  review would have been in December.  The publication --

16  assuming the candidate passes the peer review, that preliminary

17  list of candidates is generated and that's published in January

18  for public comment.

19      MR. DEARINGTON:  Court's indulgence for a moment.

20  BY MR. DEARINGTON:

21  Q.  I'd like to refresh your recollection because I think

22  you're relying on a regulation for this sequence, right?

23  A.  Not just the regulation but also my investigation of the

24  facts of this specific matter.

25  Q.  If you could look at Article 19 and please don't read it

1    out loud but review the sequence there, and when you're done,

2    I'd like to ask you if -- your understanding of the regulation

3    that a list is published after a contract is negotiated and

4    entered into.

5    A.   So there is a preliminary list published in January.

6    That's open to comment period.  The negotiations occur.  When

7    the negotiations are concluded and sent back to the Ministry of

8    Education for review to ensure that the contract meets the

9    regulatory requirements and they generate their final list,

10   that is published and the certificate is issued.

11   Q.   Got it.  You would expect to see a published list -- you

12   would expect to see a published list if someone entered into a

13   contract that showed their name on it, right?

14   A.   Yes.

15   Q.   So if I were to represent to you there was no contract

16   signed in evidence --

17            MR. BARRY:  Objection, facts not in evidence.

18            THE COURT:  Overruled.

19   BY MR. DEARINGTON:

20   Q.   If I were to represent to you that all of the versions of

21   an alleged contract between Dr. Tao and Fuzhou ending -- up

22   until May had no signatures and seals on it, that would lead

23   you to believe at that point no contract had been signed,

24   right?

25   A.   Not necessarily.

1    Q.   If in May I represent to you there's no contract in

2    evidence here that has been signed, if in fact a contract had

3    been signed, then according to your testimony there should be a

4    published list that shows Dr. Tao on it in May or after, right?

5    A.   Well, a published list would have been issued in May.

6    Whether it is still accessible remains in question.

7    Q.   Well, you testified that you were conducting searches

8    online?

9    A.   Yes.

10   Q.   And it was your testimony you're unsure that one of those

11   lists even exists with Dr. Tao on it, right?

12   A.   So, again, because I take this very seriously, I'd want to

13   verify the date of the list I have and I don't have that before

14   me right now.

15   Q.   Sure.  Fair to say it's pretty important you have such a

16   list before you if there was one?

17   A.   Yes.

18   Q.   And you don't have one before you, right?

19   A.   Not in front of me right now.

20   Q.   And fair to say that if such a list existed, it would have

21   been shown to you and brought to your attention?

22   A.   I would have -- if such a list had been listed and had been

23   accessible, I would have found it.

24   Q.   And if I were to represent to you that there's no such

25   list, hypothetically, would you then conclude that the person

1    hasn't been named a Changjiang Scholar or hasn't been --

2    entered into a full contract ratified by the Ministry of

3    Education?

4    A.  Well, if I accepted those facts, I would conclude that no

5    one in 2017 had been named a Changjiang Scholar.  And I believe

6    that that would be highly irregular.

7    Q.  You just said that the Ministry of Education regulations

8    state that a list should be published.  Now are you saying that

9    the regulations aren't followed by the Ministry of Education?

10   A.  If you're alleging that no such list was published in May,

11   then you're also logically suggesting that there were no

12   candidates selected that year.

13   Q.  Dr. Tiffert, to be clear, I'm not alleging anything.  I'm

14   asking you whether there was a list with Dr. Tao's name on it,

15   not whether there was a list.  And you're not aware of a list

16   with Dr. Tao's name on it, correct?

17   A.  I couldn't stipulate to that right now because I don't have

18   the date in front of me.

19   Q.  Doesn't that give you some concerns about whether you

20   understand what it is you're looking at there when you talk

21   about this certificate?

22   A.  No.

23   Q.  So if there is no list with the person who allegedly must

24   have signed a contract in order to get a certificate but a list

25   would exist if they did sign a contract, that doesn't give you

1    pause as to whether the certificate you're looking at might

2    mean something different from what you think it does?

3    A.    I have no reason to doubt the authenticity of the

4    certificate, and the Ministry of Education would not issue a

5    certificate ratifying the selection of an individual as a

6    Changjiang Scholar until the end of the process.  So the only

7    conceivable -- to my mind there are two options.  One, the

8    certificate is not authentic; two, the individual was in fact

9    selected as a Changjiang Scholar and this certifies the

10    completion of that process and it's final.

11    Q.    And you're basing that on regulation you accessed for the

12    first time two years after Dr. Tao was indicted?

13    A.    The regulation is the regulation published by the Ministry

14    of Education.

15    Q.    Well, you're calling it a regulation, but this is a

16    website, in fairness, that you found on the Internet on what

17    you believed to be the Ministry of Education website two years

18    after Dr. Tao was indicted?

19    A.    This is the Ministry of Education's official website of the

20    PRC government.

21    Q.    So I guess what I'm confused about, Dr. Tiffert, is there

22    seems to be inconsistency here and the inconsistency, as I

23    understand it, is the conditions in your testimony that to you

24    would suggest someone has fully signed a contract are a list

25    published by the Ministry of Education with all the people who

1   signed the contract and a certificate.  And one of those things

2   is missing here, so doesn't that lead you to believe that

3   Dr. Tao didn't sign the contract?

4   A.   No.

5   Q.   Okay.  You're sure about that answer?

6   A.   Yes.

7   Q.   Let me try this again.  If you sign a contract and it's

8   ratified by the Ministry of Education, a list is published on

9   the Internet including the person who signed the contract.  So

10  far so good?

11  A.   Correct.

12  Q.   So if a list is published on the Internet that doesn't

13  include someone, they probably didn't sign a contract, right?

14  A.   I'm not aware of any such list.  So your statement is

15  hypothetical.

16  Q.   If you didn't find a list with Dr. Tao's name on it or if

17  you did find a list or if you didn't find a list at all,

18  wouldn't you want to know if that list exists and if Dr. Tao's

19  name is on it before you give an opinion like you did today?

20  A.   I had been asked to review a fixed universe of documents

21  submitted as evidentiary records and I rendered an opinion on

22  those.  And then I did some supplemental research on top of

23  that.

24  Q.   And that fixed group of documents that were given to you

25  and that supplemental research never included a list published

1    including Dr. Tao's name on it by the Ministry of Education as

2    of May 2018 or after, right?

3    A.    So, you know, the unfortunate thing is if you go to the

4    Ministry of Education's website today -- in months past, those

5    lists were publicly accessible.  They've all been scrubbed.

6    Q.    Well, I guess I'm curious about this because it sounds like

7    you're relying on something from the Ministry of Education to

8    bolster your testimony that you found in 2021 and now you're

9    saying the Ministry of Education website can't be trusted.

10   A.    No.  The Ministry of Education keeps the regulations public

11   because Chinese universities need to rely on them.  The lists

12   of recipients of the Changjiang fellows scholarship have since

13   been scrubbed largely because the Chinese government is aware

14   of scrutiny of Changjiang fellows by others and this is a cause

15   of great concern within Chinese academia.

16   Q.    We're getting a little outside the scope of my question,

17   Dr. Tiffert.  You looked in 2021, correct?

18   A.    Correct.

19   Q.    And now you're saying it was scrubbed, but surely you can't

20   be confident something was scrubbed that you had never known

21   was there in the first place, right?

22        MR. BARRY:  Objection, asked and answered multiple

23   times.

24        THE COURT:  All right.  I'll sustain.

25        MR. DEARINGTON:  I think we can move on from there.

1   BY MR. DEARINGTON:

2   Q.   So are you aware of the sequence of contract negotiations

3   in this case?

4   A.   Broadly.

5   Q.   Are you aware that there was a contract proposal exchanged

6   between the parties in February 2018, another one in March that

7   had a similar signature on it, and another one in April with no

8   signatures, no seals, and another one in May with no signatures

9   and no seals?

10  A.   I've seen multiple versions of the contract and as to the

11  date of each one, again, I don't have a command of that in my

12  working memory at this point.

13  Q.   And your testimony was that you would expect to see a seal

14  if an organization was involved and it was a final agreed to

15  agreement, right?

16  A.   So the contracts that I have looked at say the contracts

17  are issued --

18  Q.   Draft contracts?

19  A.   The draft contracts say that they are issued in triplicate

20  and the executed version of the contract might lie in the

21  Ministry of Education offices in Beijing for all I know.

22  Q.   It's interesting you say that because you're speculating

23  about an executed version you've never seen before, right?

24  A.   For all I know.

25  Q.   So you base your opinion at times on speculation?

1    A.   Well, what I'm saying is the fact that one of the -- at --

2    any given draft of the contract was -- that's in the

3    defendant's possession may not be the one that was executed.

4    Q.   Sure.  We can all speculate about whether things happened,

5    but we're talking about evidence and we're talking about

6    specifics drafts that were going back and forth, and none of

7    them had a signature, none of them had a seal.  One of them, an

8    addendum, had signature that was then unsigned.  And in those

9    there was a discourse in which Dr. Tao demanded 50 million Yuan

10   in startup funds and FZU was only willing to give -- or propose

11   20 million or at times maybe 30 million, if I remember

12   correctly, and they were far apart, right?

13   A.   The versions of the draft contract that I saw are

14   consistent with what you just described.

15   Q.   I want you to limit your testimony to the evidence and so

16   I'm going to stipulate to you that there are drafts and none of

17   them are fully signed or sealed.  So with that hypothetical,

18   does that lead you to believe of those documents we're talking

19   about, none of them were formally binded or agreed to?  I don't

20   want you to speculate about other documents that could exist,

21   these documents.

22   A.   An unsigned contract does not bind any party.

23   Q.   You would expect to see a seal on it if it were agreed to

24   in that version, right?

25   A.   So I would expect an executed contract to bear the

1    signature of party B and the seal of the university.

2    Q.    And you are aware that the Ministry of Education

3    regulations that you accessed for the first time in 2021 state

4    that Changjiang Scholars must be employed exclusively full-time

5    by the university that has appointed them, correct?

6    A.    Correct.

7    Q.    And are you aware that Dr. Tao openly had a job at KU in

8    2018 and 2019?

9    A.    I believe that's the issue at this case.

10    Q.    And so does that suggest to you that if such a regulation

11    existed, Dr. Tao either wasn't complying with it or it didn't

12    apply to him?

13    A.    Could you repeat that, please?

14    Q.    Sure.  So if Dr. Tao had worked -- was working at -- for KU

15    in 2018 and 2019 and the Ministry of Education only allows its

16    Changjiang Scholars to work for the university that appoints

17    them, does that suggest to you that Dr. Tao either wasn't

18    complying with whatever the requirements of the Ministry of

19    Education are or he didn't have a Changjiang employment

20    contract?

21    A.    It suggests to me that if Dr. Tao had been in full

22    compliance with the regulations, that he was expected to have a

23    full-time exclusive appointment at Fuzhou by the Ministry of

24    Education.

25    Q.    And you told the FBI it would be inconceivable, were your

1    words, that someone wouldn't follow a Ministry of Education

2    regulation, right?

3    A.    That the university or the Ministry of Education wouldn't

4    follow those regulations, yes.

5    Q.    So just the university?

6    A.    Correct.

7    Q.    But if the university knew that someone had another

8    appointment at another university, that would mean they're not

9    in compliance with the regulation, right?

10   A.    I can't speculate as to what the university knew.

11   Q.    Well, I'm -- in this hypothetical if the university knew

12   that Dr. Tao was working for KU, if in fact they had signed a

13   contract with him, that would mean they're violating a

14   regulation, which is inconceivable, right?

15   A.    There's a period of several months after the signature of

16   the contract and the receipt of the certificate in which the

17   candidate is allowed to unwind their relationship with their

18   former employer.  And so there's a transition period.

19   Q.    But the transition period doesn't allow you to still be

20   appointed in -- full-time at the other university, does it?

21   A.    It does.

22   Q.    Can you point me to which article of the regulations?

23   A.    Sure.  You have six months from your receipt of the --

24   could I have the regulations?

25   Q.    I'd like for you to tell me.

1        MR. BARRY:  Your Honor, he's asking him about detailed

2   regulations and they're refusing to provide him a copy.

3        MR. DEARINGTON:  He's relying on the regulations; he

4   should know what they are.

5        THE WITNESS:  I've not memorized the content of each

6   article.

7        THE COURT:  He's asked to see them.  If you have them,

8   show him.

9        THE WITNESS:  Give me a moment to quickly review them.

10  These are not the right regulations, the 2018 version.

11  BY MR. DEARINGTON:

12  Q.  You testified that Dr. Tao was a 2017 Changjiang Scholar,

13  did you not?

14  A.  Correct.  But it's clear that the 2018 regulations are

15  governing judging from the terms of the draft contract.

16  Q.  So you're not seeing anything in the 2011 ones that support

17  your testimony a moment ago?

18  A.  I'd have to review them very quickly.  The 2015 regulations

19  clearly stipulate you have a period of six months.

20  Q.  Let's assume -- well, I'd like to start by asking why you

21  think the 2011 regulation versus 2018 regulation would apply

22  and specifically whether it seems like you're just making these

23  judgments on your own?

24  A.  Sure.  So if you look at the preliminary list of Changjiang

25  selectees that was published let's say in January, the

1    preliminary list, it includes that tier of selectees in the

2    youth program that I described, the early career entrance.

3    That is not provided for in the 2011 regulations, but it is

4    provided in the 2018 regulations.

5        Similarly, the 2018 regulations include voluminous content

6    that has to do with politics and ideology that are not present

7    in the 2011 version of the regulations.  Those provisions from

8    the regulations are replicated largely verbatim in the draft

9    contracts.

10   Q.   I guess what I'm wondering as an initial matter is if

11   Dr. Tao is alleged to have applied in 2017, he wouldn't have

12   seen these 2018 regulations and formed his expectation based on

13   them, right?

14   A.   Excuse me?

15   Q.   He wouldn't have seen future regulations and formed any

16   expectations based on those, right?

17   A.   Well, it's clear they would have been part of the

18   negotiating process though because, again, the terms of the

19   draft contract reflect the content of those regulations.

20   Q.   So you said six months in this hypothetical where the 2018

21   -- I think you said the 2018 ones might have some six-month

22   requirement for transition, right?

23   A.   Correct.

24   Q.   And so if Dr. Tao had signed a contract in May 2018 or

25   whenever that -- when that certificate has a date, according to

1  your view then he would have six months to unwind from his

2  current employer, right?

3  A.   That's what the regulations call for.  So it would be the

4  end of the year.

5  Q.   It's inconceivable to you that a university like Fuzhou

6  would deviate from a regulation, right?

7  A.   Not materially, no.

8  Q.   So November 2018 are you aware that Dr. Tao had a full-time

9  position at KU?

10 A.   No.

11 Q.   Are you aware he had a full-time position at KU and he was

12 about to teach classes in the fall of 2019 when he was

13 arrested?

14 A.   I was aware because I believe that's at issue in this case.

15 Q.   So you're aware that Dr. Tao, long after he's alleged to

16 have signed some contract that isn't in evidence, still had a

17 full-time position at KU and was about to teach classes like a

18 year and a half later, right?

19 A.   I believe that is what the issue in this case revolves

20 around, yes.

21 Q.   In this hypothetical world where he does sign a contract,

22 he's blatantly flouting Ministry of Education regulations which

23 is inconceivable, right?

24 A.   Inconceivable for the Ministry of Education and the

25 university to blatantly flout materially those regulations.

1    For the individual candidate, I can't speculate.

2    Q.    And you're aware that Dr. Tao was publishing works with KU

3    affiliation at that time for the world and his field to see?

4    A.    I am now.

5    Q.    So I'd like to ask you about a conversation, a phone call

6    that came into evidence, and I can represent to you that this

7    is part of the record.  And it's between Dr. Tao and someone at

8    Fuzhou.  I want to get your thoughts on it because in the phone

9    call, this is during a contract negotiation in which Fuzhou was

10   willing to offer less -- 20 million Yuan in startup funds and

11   Dr. Tao demanded 50 and was holding to that.

12        In this conversation someone from Fuzhou says, if we invest

13   such a huge effort and resources in it, we're not only wanting

14   a title, that's really to be honest as far as we're

15   concerned -- well, let me skip ahead.

16        To put it crudely, many experts and academicians are

17   optimistic about you and want to train you up to the level of

18   Teacher CU moving toward an academician.  So actually the

19   strength of the whole school and the resources of the president

20   and all the old friends were used.  This may affect those

21   participating in the future.  In other words, favors were owed.

22   I used all the favors of people who owed me.  So it was very

23   crude but very honest, you know.

24        Tao:  I understand.

25        So something you said earlier reminded me of this passage

1  in this phone call and it was that there's a great amount of

2  prestige for a university when they have a Changjiang Scholar,

3  right?

4  A.  Yes.

5  Q.  And they're only, under the regulation, allowed to put up

6  one for a particular position, right?

7  A.  No.

8  Q.  You aren't aware of that?

9  A.  I don't believe it's in the regulations.

10  Q.  You're going to make me find it, aren't you?

11  A.  Again I'm talking about the 2018 versions.

12  Q.  You wouldn't be aware if the 2011 regulations stated that?

13  A.  Correct.

14  Q.  Okay.  So where we were is this is a highly prestigious

15  thing if a university can get it, right?

16  A.  Yes.

17  Q.  Are you aware that Fuzhou University was not a top-tier

18  university in China?

19  A.  Correct.

20  Q.  And if a university like Fuzhou, which is not top-tier, is

21  getting one of these elite appointments, puts someone forward

22  and lots of favors are called in, and it actually comes

23  through, they probably wouldn't want to let that go, would

24  they?

25  A.  No.  In fact, they would boast about it and they would

1   probably do everything they could to make it happen.

2   Q.   And if the professor had a change of heart and realized he

3   wasn't getting the research funds he needed, wasn't able to

4   recruit anyone to this non-top-tier university, the school

5   would still want to try -- it's conceivable that the school may

6   still want to try to maintain some sort of outward appearance

7   of having a Changjiang Scholar on their ranks, right?

8   A.   I think that would constitute dishonesty or fraud and the

9   Ministry of Education would begin to start asking questions

10  about why that scholar had not reported for duty.

11  Q.   Well, I guess I'm not getting at fraud, I'm not talking

12  about someone stealing money.  I'm talking about an

13  announcement.  So you announce someone as a Changjiang, then

14  they have to engage in a lengthy negotiation process or

15  sometimes it's quick.  But if they don't actually reach an

16  ends, they may not come out and report, hey, so-and-so decided

17  that our university is not elite enough and there's going to be

18  too much trouble recruiting so we're going to make an

19  announcement that the person is not a Changjiang Scholar.  Not

20  something you'd probably see, would you?

21  A.   I couldn't speculate as to that.

22  Q.   Okay.  I just have a couple more questions for you because

23  you testified as an expert about the meaning of seals.  So if I

24  were to represent to you that some draft Chinese grant

25  proposals to be submitted by a university like Fuzhou didn't

1  have a signature, didn't have a seal on it, fair to say that

2  wouldn't be a final binding document that was submitted?

3  A.   It could be a draft that was submitted.

4  Q.   Well, you wouldn't just ignore a signature and seal space

5  and submit something, right?

6  A.   You might if it wasn't a final document.

7  Q.   Well, let's say there's missing language in it and there's

8  gaps.  What I'm getting at, this seems a little inconsistent

9  from your testimony that if you're willing to be bound, then

10  you would have a seal on it, right?

11  A.   You wouldn't sign any document until it was the final

12  document that you were prepared to be bound by.  If it's

13  missing language, it might not bear the signature and the seal.

14  Q.   Missing seal, you're not ready to be bound by it, right?

15  Right?

16  A.   Yes.

17  Q.   Okay.

18        MR. DEARINGTON:  No further questions, Your Honor.

19        THE COURT:  Redirect?

20        MR. BARRY:  Yeah.  Just real quick.

21                   REDIRECT EXAMINATION

22  BY MR. BARRY:

23  Q.   Dr. Tiffert, do you remember Mr. Dearington asking you

24  about your expenses?

25  A.   Yes.

1   Q.   And do you remember we had a hearing in October to talk

2   about some of your testimony?

3   A.   Yes.

4   Q.   And how many days were you here for that hearing?

5   A.   I was here I believe for three days all together.  The

6   hearing was one day, but travel time was flying from the west

7   coast the day before, and then the day after I flew out.

8   Q.   Did you have to fly here and back a couple times or was it

9   just one trip?

10  A.   Indeed I had to fly twice in one week.

11  Q.   Why was that?

12  A.   Once was that -- well, let me recall.  Once was for

13  preparation for the hearing and once was for the hearing

14  itself.

15  Q.   Okay.  So total you were here for maybe three days?

16  A.   Yes.

17  Q.   Okay.  So I want to just show you -- these are your

18  expenses that Mr. Dearington asked you about.  And there's some

19  highlighted items on there.  And what I'd like you to do, this

20  is just three days --

21  A.   Sure.

22  Q.   -- is I'd like you to just read for me each of your

23  expenses and tell me what the amount is and then you can -- you

24  don't have to be specific but you can say like food, hotel,

25  flight, whatever it is.

1   A.   Sure.  All right.  Dates?

2   Q.   I don't need dates.  Just three days, right?

3   A.   So $29 food.  That was dinner one night.

4   Q.   Can I have the cents too, I've already done the math.

5   A.   $29.91 -- no, 28 --

6   Q.   Oh, 28, okay.

7   A.   Then there was lunch, $23.88.  My introduction to barbecue

8   here.

9        Then there was dinner, $31.10 at the hotel.  Then there was

10  another meal at the hotel, $29.68.  Then there was my hotel

11  charge, $592.92.

12  Q.   Okay.

13  A.   Then there was the second hotel charge that week, $560.97.

14  And then there was airport parking, $69.98.  That was the first

15  trip.  The second trip airport parking, $50.66.

16       Southwest Airlines the first trip, $609.97.  That was the

17  weekend the airlines all melted down, so it was a 12-hour trip.

18  Then there are my tickets.  The second trip that week, $724.96.

19  Both economy fare, sadly.

20       Then there was an Uber I believe for -- right, Uber to and

21  from the airport, $35.88.  Another Uber to and from airport,

22  $28.94.  Another Uber, 36.74.  Again two trips that week, so

23  there are four Ubers I imagine.  $30.90, again an airport Uber.

24  And then an Uber back from the courthouse to my hotel one day,

25  $9.93.

1  Q.   Okay.  So obviously sounds like you had to take two trips

2  that week, but three days total --

3  A.   Uh-huh.

4  Q.   -- of travel.  And this is approximately $2,700 for three

5  days of expenses in Kansas City, Kansas; is that right?

6  A.   I'll assume so.

7           MR. BARRY:  No further questions.

8           THE COURT:  May Dr. Tiffert be excused?

9           MR. DEARINGTON:  Yes, Your Honor.

10          THE COURT:  All right.  Dr. Tiffert, you're excused.

11          All right.  I want the lawyers to stick around.  We

12  have some matters to take up, but we will recess the jury for

13  the weekend.

14          Don't read, study, listen, expose yourself to any

15  media coverage.  We'll see you back at 9:00 Monday morning.

16  We're still on track to get the case submitted to you for

17  deliberation by the end of the day on Tuesday or Wednesday

18  morning at the latest is what it's looking like.

19          Have a good weekend.

20     (The following proceedings occurred outside the presence of

21  the jury.)

22          THE COURT:  Okay.  So I always have the parties rest

23  in the hearing of the jury, but at this point is it your

24  intention to rest?

25          MR. OAKLEY:  Your Honor, yes.  I think we'll take the

1    weekend and make sure all the exhibits that we expect have been

2    admitted have been admitted, but I think first thing Monday

3    morning we anticipate we will rest.

4            THE COURT:  Okay.  So what I'd like to do is at 8:30

5    you tell me that you're going to rest.  You'll still do it in

6    the hearing of the jury.  Then I will take the defendant's

7    motion for judgment up at that time.  I'd like to get this part

8    accomplished before 9:00.  My practice is -- I mean, you can --

9    you can do it in writing, you can do it orally.  It doesn't

10   have to, you know, touch upon everything, but just to make a

11   record that I will take under advisement, then renew.

12           And then, if necessary, after the verdict we can talk

13   about written post-trial motions on those motions for judgment,

14   which I'm pretty sure I'm going to want some pretty significant

15   briefing on.  So yeah.  I think that's where we're at.

16           Where are you at at this point, Mr. Zeidenberg?  Do

17   you plan to put Special Agent Lampe on on Monday?

18           MR. ZEIDENBERG:  Yes, Your Honor.

19           THE COURT:  And you're going to spend the weekend

20   evaluating and hopefully Monday morning let me know whether you

21   think we're going to go into Tuesday and if so, how long?

22           MR. ZEIDENBERG:  I imagine we will go into Tuesday.  I

23   don't know exactly how long Agent Lampe will be.

24   Mr. Dearington did cover a lot of the ground that I would have

25   covered with Mr. Churchill, so that shortens.  But I don't want

1    to overpromise or make you think that it's still going to be

2    lengthy.  And we have -- well, we have the witness from

3    National Science Foundation.  I don't think that's going to be

4    lengthy.  It won't be lengthy.  And one or two other witnesses

5    who will be fairly compact.

6        THE COURT:  Okay.  And we'll need to make a record on

7    Dr. Tao and his decision whether he testifies or not.  And so

8    what I'd like to do now is have you all talk informally to

9    Ms. Merklen so she can brief me over the weekend on what issues

10   remain on the jury instructions and -- so start with the

11   Court's instructions.  You will see that I have adopted and

12   included some of the things defendant wanted, some of the

13   things government wants.  There are instructions that do

14   neither because I'm relying on my own stock instructions, et

15   cetera.

16        But if you can just tee up for her without arguing the

17   issue just what the objections are that remain, then I can work

18   on those between now and the formal conference.  So probably

19   need a restroom break for 5 or 10 minutes and then she'll be

20   here with you.

21        MR. OAKLEY:  Your Honor, can we bring up one thing

22   that might save us time on Monday?  In the Court's order

23   related to the pretrial motions as it related to the

24   government's motion *in limine*, the Court acknowledged that

25   defendant's entitled to cross-examine witnesses on their

1    possible biases and motives as a means of attacking their

2    credibility, but as explained in *United States versus Yagman*, a

3    case defendant relies on, he may not use his ability to

4    cross-examine witnesses to introduce impermissible evidence of

5    prosecutorial motive or belabor the details of the

6    investigation's chronological development which have no bearing

7    on innocence or guilt.  The Court goes on, but at the end of

8    that paragraph -- in other words, defendant must show a

9    connection between the quality of the investigation and the

10   reliability of specific evidence produced by the investigation.

11   And I would argue he has not done so yet as it relates to all

12   of the arguments of the timing of the particular investigation.

13   So we expect that we're -- we will object if the defendant

14   seeks to get into the timing-related issues based on the

15   Court's order.

16        THE COURT:  Yeah.  My recollection -- it has been a

17   while since I read that order.  My recollection was I was

18   really I think speaking more to the evidence that I heard at

19   the suppression hearing about -- I can't remember her name, is

20   it Ms. Liu?

21        MR. BARRY:  Yes.

22        THE COURT:  And that I think I was -- maybe I was --

23   maybe it was broader than that, but I do remember addressing

24   that particular issue in this circuit law that says, you know,

25   when you're attacking the investigation itself, you have to --

1    there has to be some nexus, some connection, so I think that's

2    what that went to.  I don't have it in front of me.

3           Do you have that order?  Is it in my trial notebook?

4    It's in my trial notebook.  Let's see.  Is this the one

5    November 2nd?

6           MR. OAKLEY:  January 27th, Your Honor.

7           THE COURT:  Yeah.  I am going to have to entertain

8    this as contemporaneous objections because I don't know what

9    Mr. Zeidenberg and Mr. Dearington are going to do, but I do --

10   and I don't have that order in here unless it's under another

11   tab, but my recollection is I was focusing in on the

12   government's concerns about attacking the credibility of this

13   former student of Dr. Tao's.  Okay.

14          MR. ZEIDENBERG:  Your Honor, you haven't asked, but

15   that's going to be a very small portion of this.  I'm not going

16   to say it's not coming up, but that is not going to be the

17   central focus of the -- my examination.  And I don't mind

18   telling you, it will be going through the documents and what is

19   and isn't in them and introducing a number of other documents

20   that haven't been introduced.

21          THE COURT:  Okay.  Well, until I hear where you're

22   going, it's hard to talk about it in a vacuum.  I was trying to

23   find the section that you were talking about, Mr. Oakley,

24   though.  Do you know what page that was on?

25          MR. OAKLEY:  Yes, Your Honor.  It's at the bottom of

1    31 and the top portion of 32.

2            THE COURT:  Okay.

3            MR. OAKLEY:  And it is in the portion that the Court

4    was --

5            MR. ZEIDENBERG:  I think it's also on page 38.

6            MR. DEARINGTON:  38 has the summary of the ultimate

7    ruling.

8            THE COURT:  Okay.  Yeah.  So I said he may be

9    permitted to cross-examine FBI agents or I guess in this case

10   examine FBI agents about the espionage investigation to attack

11   the reliability of specific evidence introduced at trial.  In

12   other words, there has to be a nexus to evidence.  May not,

13   however, cross-examine any agent about the espionage

14   investigation to suggest that he was the victim of selective

15   prosecution or outrageous government conduct.  That's what I

16   said on 38.

17           And then on page 30, 31, 32 I was addressing the

18   *limine* motions that went to evidence about or suggestion of

19   being a victim of an unjust government dragnet under the China

20   Initiative and again an investigation in seeking to catch a

21   spy, and I did quote from this *Yagman* case which was a case out

22   of the Central District of California, that if you're going to

23   attack prosecutorial motive or the investigation's

24   chronological development or something like that, the Tenth

25   Circuit has held that this is admissible and the government's

1  investigation is admissible or relevant only if the bias or

2  quality of the investigation bears on the reliability of

3  particular evidence, not just, you know, some broad attack on

4  the investigation itself.  It has to touch on the reliability

5  of specific evidence that's been admitted at trial.  In other

6  words, a connection between the quality of the investigation

7  and the reliability of specific evidence that was produced by

8  the investigation.

9        MR. ZEIDENBERG:  We would just -- don't disagree with

10  that, but also the quality of the evidence that was produced

11  and not produced because it's within the discovery, but I think

12  the jury has only seen a partial part of the picture.  So, you

13  know, we think there's a lot of other evidence that contradicts

14  the government's theory that we want to explore.

15        THE COURT:  That's always fair game.  That's always

16  fair to discuss in defense, assuming of course it's not

17  evidence that I've excluded for some reason.

18        Okay.  All right.  So why don't you all take about a

19  five-minute break and rejoin Ms. Merklen here.  And I will -- I

20  will be in the building.  Joy, I'll be upstairs if you need me.

21  Otherwise have a good weekend.

22        (Evening recess.)

23

24

25

1    C E R T I F I C A T E

2        I, Danielle R. Murray, a Certified Court Reporter and the

3    regularly appointed, qualified, and acting official reporter of

4    the United States District Court for the District of Kansas, do

5    hereby certify that the foregoing is a true and correct

6    transcript from the stenographically reported proceedings in

7    the above-entitled matter.

8        SIGNED 1st of December, 2022

9

                             /s/Danielle R. Murray
10                           DANIELLE R. MURRAY, RMR, CRR
                             United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25