1          UNITED STATES DISTRICT COURT
                DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,

4         Plaintiff,
                                    Case No. 19-20052-JAR
5         v.

6    FENG TAO, a/k/a "Franklin        Kansas City, Kansas
     Tao,"                            Date:  5 April, 2022
7
          Defendant.                  Day 12
8                                     Pages 2231 - 2424

9    ........................

10              TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE JULIE A. ROBINSON
11         SENIOR UNITED STATES DISTRICT COURT JUDGE

12                  A P P E A R A N C E S
13
     For the Plaintiff:
14
     Mr. Adam Barry                  Mr. Christopher Oakley
15   U.S. DEPARTMENT OF JUSTICE      U.S. ATTORNEY'S OFFICE
     950 Pennsylvania Avenue, NW     500 State Avenue
16   Washington, D.C. 20530          Suite 360
                                     Kansas City, Kansas 66101
17
     For the Defendant:
18
     Mr. Michael F. Dearington
19   Mr. Peter R. Zeidenberg
     ARENT FOX, LLP
20   1717 K Street NW
     Washington, D.C. 20006
21

22

23

24

25  _____
           Proceedings recorded by machine shorthand,
       transcript produced by computer-aided transcription.

1                          I N D E X

2

3     Defendant's Witnesses:                              Page

4     JOSEPH TING
        Direct Examination by Mr. Zeidenberg          2284
5     HONG PENG
        Direct Examination by Mr. Zeidenberg          2292
6       Cross-Examination by Mr. Barry                2334
        Redirect Examination by Mr. Zeidenberg        2354
7

8                        E X H I B I T S

9

      Defendant's
10    Exhibits              Offered              Received

11          1114              2308                 2309
            1116              2310                 2310
12          1304              2356                 2356
            1462              2325                 2325
13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2        (The following proceedings occurred outside the presence of

3    the jury.)

4              THE COURT:  Let's talk about instructions.  Start with

5    the easy things.  Any objections to the verdict form?

6              MR. BARRY:  No, Your Honor.

7              MR. DEARINGTON:  No, Your Honor.

8              THE COURT:  Okay.  Ms. Gave you an additional

9    instruction and I realized we should have included in the set

10   since the indictment charges aiding and abetting in every

11   count.  So if you've had a chance to look at that, it's

12   literally taken right from the statutory language on 18 U.S.C.

13   2(b).  I don't think 2(a) -- 2(a) applies, but 2(b) does.  So

14   we'll include that right after -- so the elements instruction

15   on wire fraud and there's the elements instruction on false

16   statements, so that would come right after the elements

17   instruction on false statement.

18             Okay.  And then of course we omitted a number of the

19   stock instructions as not being applicable in this case.  I

20   think Ms. Merklen went through all those with you and there was

21   a meeting of the minds on that.  No one thought we needed to

22   give any of those.  But we've left in of course the instruction

23   for the defendant not testifying and the instruction for the

24   defendant testifying.

25             Mr. Dearington, do you know where you're at on that

1    yet?  We'll pull out the one that doesn't apply of course.

2         MR. DEARINGTON:  I don't think a final decision has

3    been rendered yet, but I can say it's unlikely that Dr. Tao

4    will be testifying.

5         THE COURT:  When you've made a final decision, I'll

6    want to make a record with him about his decision.  Okay.

7         All right.  So let's run through these, pretty much

8    using the Court's proposed jury instructions in that order.  So

9    the first is the -- what to read to the jury in terms of the

10   indictment itself, and I know there's some objections or

11   requests for additions, so let's talk about that.

12        So the first is the second superseding indictment

13   filed on whatever date, charges substantially as follows.

14   Defendant objects to the date it was filed.  In my stock

15   instruction I don't typically put the date the indictment was

16   filed because it's immaterial, so I'll sustain that objection.

17        And the next, under the purpose of the scheme -- and

18   I'm running through these because it's my understanding other

19   than what I'm addressing, you all have agreed to everything

20   else the Court proposed in terms of what to read from the

21   indictment.

22        The next dispute or issue, I guess, is under the

23   purpose of the scheme, defendant objects to "and to conceal the

24   scheme."  Anything from you on that, Mr. Dearington?

25        MR. DEARINGTON:  Yes, Your Honor.  There has to be, as

1   the object of a fraud scheme under 1343, the intent to deprive

2   someone of money or property.  That's well established in

3   Supreme Court case law for several decades now.  It's not a

4   proper object of a scheme under a wire fraud statute to conceal

5   something.  That's just not a proper object of a scheme.  It's

6   in fact circular because you're concealing the scheme and that

7   is the scheme, so I'm not sure it would really make sense and

8   would confuse the jury.

9         THE COURT:  Anything more from the government?

10        MR. BARRY:  The purpose of the scheme and the manner

11  and means of the scheme we've proposed are straight from the

12  second superseding indictment.  We think it's appropriate to

13  include because it provides context and it permitted, under the

14  statute, in terms of not only seeking to obtain grant money and

15  salary under false pretenses.  With that necessary purpose was

16  to also conceal the scheme, and it's relevant to provide

17  context for manner and means.

18        I do want to note, and I'm sorry to go back, but to

19  the issue of the date at the beginning, we agree that generally

20  it's not relevant when an indictment was returned from the

21  grand jury.  We do think that in this particular case the

22  defense, through their line of questioning with many questions

23  where they've asked when was the first time you were

24  interviewed by the FBI, and they focused on DOE and NSF

25  witnesses, has left an inaccurate impression that the original

1    indictment had anything to do with NSF and DOE current and

2    pending disclosures, which is inaccurate.

3          So the original indictment from August 2019 was a

4    four-count indictment; one for wire fraud and three counts of

5    program fraud under 18 U.S.C. 666.  And the scheme alleged in

6    that indictment was solely based on the failure to disclose

7    conflicts of interest.  It didn't have anything to do with

8    current and pending research support or other disclosures or

9    failures to disclose or inaccurate disclosures that have

10   subsequently become relevant in the second superseding

11   indictment.

12         And so for this particular case, while typically we

13   would say that the date -- we agree it's not relevant.  The

14   defendant has made it relevant here in their line of

15   questioning and argument, and we think there's a risk that if

16   the date is not included in there, it would leave the jury with

17   a misimpression about what Dr. Tao was originally charged in

18   August 2019, as opposed to what he was charged with in the

19   second superseding indictment.

20         MR. DEARINGTON:  Your Honor, this is what

21   cross-examination and redirect are for.  If they wanted to make

22   a point to the jury, that was the time to do it.  It's not

23   through asking Your Honor to try to make their points through

24   them by adding extraneous information that's not appropriate

25   for allegations to the allegations read to the jury.  They had

1    ample opportunity.  In fact, they did redirect their witnesses

2    about the chronology and the different timing and the different

3    charges that were at issue here.  So there's no point -- it's

4    not appropriate, Your Honor, for the indictment to try to

5    suffuse the allegations when their arguments that are really

6    proper for closings and proper for cross-examination and

7    redirect.

8         THE COURT:  I'm not going to include it, although I

9    think it is in the record, and the government can certainly

10   make that point to the jury, that that came later in 2020.  And

11   the jury has heard specifically there was a second superseding

12   indictment.

13        All right.  In terms of purpose of the scheme to

14   conceal the scheme, I'm not going to include that language.

15   The purpose of the scheme -- and I do think it's always a

16   purpose to conceal, so I mean, that's what fraud is, so -- and

17   includes, so I will not include that language, although

18   certainly the government can argue that, because it goes to

19   intent to defraud.  That's relevant evidence.

20        The manner and means of the scheme, the government

21   objected to language in there that says in or around March 2018

22   Dr. Tao entered into a contract with Fuzhou to serve as a

23   Changjiang Distinguished Professor for a period of five years

24   from May 1, 2018 until April 30th, '23.  The government objects

25   to this.  This language does appear in the indictment in

1    paragraph 29 under the section entitled Defendant's Employment

2    At Fuzhou.  I'm not sure why the government objects to that

3    language.

4         MR. BARRY:  So the objection is based on trying to

5    tailor the indictment to the way that the manner and means of

6    the scheme is portrayed exactly in the second superseding

7    indictment.  It's the government's view we get to craft the

8    shape of the scheme and what the scheme is.  What the defense

9    has tried to do, in our view, is they've tried to insert facts

10   that support their view of the case.  They've tried to cut out

11   things from the indictment that don't support their view.

12         For example, as you noted, the first paragraph that

13   they've asked to include this March date is in a factual

14   allegation background titled Defendant's Employment At Fuzhou.

15   They haven't included any of the other allegations in that

16   section and neither have we, and then they've struck in the

17   next paragraph or proposed to strike sections of the manner and

18   means of the scheme that are described in the second

19   superseding indictment.

20         So we think that if you allow the manner and means of

21   the scheme to vary from what's in the second superseding

22   indictment or you include some things and you exclude other

23   things, it shapes the way in which the manner and means is

24   described in a way that, firstly, takes away the government's

25   prerogative to describe the way in which we alleged Dr. Tao has

1    orchestrated a scheme to defraud and, secondly, it deviates

2    from the second superseding indictment and there's not really a

3    clear line drawing, or rather, there's not a clear line to say,

4    well, we should include these other factual allegations from

5    this other section, but we should exclude these other ones.

6    Like, it's a little bit of a cherry-picking exercise and we

7    think that that is unnecessary, could confuse the jury, and so

8    as we initially proposed it, we've simply taken the manner and

9    means from the second superseding indictment, included it in

10   here, and the only thing we pulled out per the judge's

11   instructions is that the initial purpose of -- actually, that

12   was the purpose of the scheme.  We took out the part about

13   benefitting the PRC government for various reasons.  So that's

14   why we would say it should just be as alleged in the manner and

15   means of the scheme laid out in the indictment.

16           THE COURT:  I'm going to leave the manner and means as

17   drafted.  I, again -- you know, it's the government's burden of

18   proof and that includes, you know, presenting evidence,

19   providing explanation and background, and I don't think I

20   should sort of editorialize or pick or choose or change

21   language or interpret things differently.  So I'm going to

22   leave the manner and means of the scheme intact.

23           MR. DEARINGTON:  Your Honor --

24           THE COURT:  That means I'm overruling the government's

25   objection to in or around March 2018 Dr. Tao entered into a

1   contract, because this language did appear in paragraph 29 of

2   the indictment under defendant's employment at Fuzhou

3   University.  And I'm going to leave intact the language "had a

4   full-time job as provided at Fuzhou with technical training,

5   scientific expertise and research."  That comes right from the

6   language manner and means, correct?

7           MR. BARRY:  No, Your Honor.  Are you looking at the

8   redline version?

9           THE COURT:  Yes, I am.

10          MR. BARRY:  So basically what this is, is the

11  government's proposal and then the redlining, whether it's the

12  underlining, which is in addition, or the strikethrough, those

13  are the defense's proposed edits to the government's proposal.

14          THE COURT:  Let me go back to the actual indictment

15  then.

16          MR. BARRY:  If you go to page 9 of the actual

17  indictment, the second superseding, you'll see where the manner

18  and means comes from.

19          THE COURT:  Let me go back and look in context.

20          I'm going to leave the manner and means of the scheme

21  completely intact, and so I'm going to leave in, because the

22  superseding indictment says that.  I'm going to start with the

23  purpose of the scheme.  It does say, And to conceal the scheme

24  and the manner and means of the scheme except for -- and I

25  don't think there are any statements in here that need to be

1    redacted because of my *limine* rulings about the -- about

2    benefitting China.  This is what the indictment charges.  This

3    is what the indictment explains, and I think this is what the

4    indictment should say in terms of being read to the jury rather

5    than editorializing, adding in additional things the defendant

6    wants to point to, which the defendant perceives as perhaps

7    weaknesses in the evidence.  The defendant is obviously free to

8    organize those, but this is not an element section.  It's the

9    government's contextual background for the charges, and we

10    should read it as is.  Obviously the defendant can argue that

11    the evidence doesn't show this or that, but to just import new

12    language that the defendant wants to point that wasn't in the

13    original indictment, I think, is error.

14            MR. DEARINGTON:  Your Honor --

15            THE COURT:  I'm going to overrule the defendant's

16    objection to the purpose of the scheme and leave back in the

17    language "and to conceal the scheme," and then under the manner

18    and means, I'm both overruling the government's objection,

19    because the defendant has asked for certain languages to be

20    included and I'm not allowing "and that will be in and around

21    March 2018 Dr. Tao entered into a contract with Fuzhou

22    University to serve as a Changjiang Distinguished Professor for

23    a period of five years from May 1, 2018 until April 30, 2023."

24    I'm not going to include that language.  It's not in there.  As

25    part of the scheme to defraud KU and USG, as part of the scheme

1    in paragraph 34, I'm going to leave that as is in the second

2    superseding indictment.

3            MR. DEARINGTON:  Your Honor, may I clarify something?

4            THE COURT:  Yes.

5            MR. DEARINGTON:  Just maybe the Court already

6    understands this, but the language that we added is from the

7    indictment.  It's just not from a section that the government

8    has called manner and means, so we think that if the

9    government's -- one of their key allegations here is that --

10   and I'm quoting from the indictment, in or around March 2018

11   Tao entered into a contract with FZU to serve as a Changjiang

12   Distinguished Professor for a period of five years, and it

13   continues, that's one of the top two allegations in their whole

14   indictment as -- I would say as far as the core of their case.

15           THE COURT:  That's from the introductory section,

16   right?

17           MR. DEARINGTON:  Paragraph 29.  It's not in the

18   section that the government has called manner and means, but

19   I'm not sure that the government can restrict the allegations

20   just by labeling something manner and means.  We would contend

21   it risks a variance.  Dr. Tao could be convicted on a charge

22   that's different from the one in this indictment if the jury

23   were to find he entered into a contract much later than

24   March 2018.  There are multiple versions of the contract draft,

25   in fact, in this case.  So for the government to walk away from

1   its own allegation and be so defensive about its primary

2   allegation in this case, we think could lead to a conviction on

3   a charge not in here.

4          And moreover, Your Honor, the notion that "conceal a

5   scheme or to provide technical information to Fuzhou," which

6   the government has already shown in evidence is related to the

7   Chinese government, I mean, that itself would taint a verdict,

8   a conviction, because now you have a scheme to deprive someone

9   of something that's not money or property, but rather to

10  benefit Fuzhou with technical science and information.  And --

11         THE COURT:  I don't think that follows at all as far

12  as the technical expertise.  Here's where I'm at, I'm either

13  going to read this indictment and extract the language that I

14  said I don't want said to the jury about the China Initiative,

15  about benefitting China.  And providing technical expertise to

16  the university is not one in the same as benefitting China.

17  I'm either going to read it in its entirety or not.  But I'm

18  not going to give this paragraph, not that paragraph, add

19  language, move language, I'm not going to do that.

20         So, I mean, I summarize this thing to the jury very

21  bare bones at the outset, they're entitled to hear more at this

22  point, but I'm about to go back to the drawing board and say,

23  you know what, I'm going to read everything except the things

24  that I excluded at the *limine* conference stage.  That way the

25  language the defendant wants read gets read, the government

1    wants gets read as written and not editing, not editorializing
2    except to extract those things that I was concerned about and
3    so it's primarily in the introductory allegations.
4          So, Mr. Barry, what's your view of that?  I realize
5    nobody has asked for big chunks of this to be read, but now
6    Mr. Dearington is asking me to take something that's in another
7    section and import it into the manner and means of the scheme
8    when that's not the way it was structured in the indictment.
9    That gives me pause frankly.
10         MR. BARRY:  It gives us pause too.  Our view, we think
11   the way we've proposed it, meaning you just take the manner and
12   means from the second superseding indictment and you give that
13   to the jury, would be sufficient.  If we don't -- we would see
14   it as problematic if there is -- I agree with your
15   characterization of the sort of editorializing of picking and
16   choosing.  That would be worst-case scenario.  If the Court is
17   inclined to read the entire indictment, we don't think it's
18   necessary, but we're not opposed to that.  I mean, it's a long
19   indictment.
20         THE COURT:  Here, let me do this, let's start from the
21   beginning.  I think we can reach agreement on some of this.  So
22   the introductory allegations, we all agree, not going to be
23   read, introductory allegations, correct?  That section, it's
24   the first section in the indictment, introductory allegations.
25         MR. BARRY:  I mean, I think our view is, if you're

1    going to read the indictment, then I think we need to read

2    everything except the stuff that's been cut out from the *limine*

3    motions.  Or we do this sort of compressed that we've talked

4    about, but what we want to avoid is the kind of picking and

5    choosing of allegations which could editorialize or shape what

6    the defendant has been charged with.

7              THE COURT:  I agree with you on that.  I'm not going

8    to pick and choose.  I came into this conference understanding

9    you all had agreed to a compressed version with certain

10   objections and so that's what I started with.  And that

11   compressed version doesn't include the introductory allegations

12   section.  It doesn't include the University of Kansas conflict

13   policy section.  It does not include the U.S. Department of

14   Energy grant section.  It does not include the People's

15   Republic of China talent plan section.  It does not include

16   defendant's PRC talent plan applications.  It does not include

17   defendant's employment at Fuzhou University section, although

18   paragraph 29 is something the defendant now wants me to read.

19             It really begins with the defendant's scheme to

20   defraud, but even that compressed.  So what I think I'm going

21   to do is I'm going to begin with the defendant's scheme to

22   defraud and not read any of those prior sections and I'm

23   essentially going to read them as alleged in the indictment

24   except to the extent it violates my *limine* rulings because it's

25   the government's allegations, it's the government's burden of

1    proof.

2              So we're going to move on.  We're not going to spend

3    an hour on this.  So here's how I'm ruling consistent with what

4    I just said.  I am sustaining defendant's objection in striking

5    June 24, 2020 as the charging date.  I am sustaining -- no, I'm

6    overruling defendant's objection.  I am not striking from the

7    purpose of the scheme, quote, to conceal the scheme.  I am

8    sustaining the government's objection and not including the

9    language that would be imported from paragraph 29 into the

10   manner and means of the scheme.

11             I am -- that section that begins on -- well, paragraph

12   34, as part of the scheme to defraud, I'm reading that as

13   stated in the second superseding indictment without editing or

14   editorializing.  I am not adding the language that defendant

15   proposes between on or about May 5th and May 8th Dr. Tao

16   traveled to the PRC, because that is not in the -- that is not

17   in the manner and means section.

18             And then the next objection was defendant's objection

19   where it says it was further part of the scheme to defraud KU

20   and the USG that Dr. Tao fraudulently maintained his employment

21   with KU to obtain access to KU's research facilities and

22   equipment and USG grant funds.  Defendant objected to obtain

23   access to KU's research facilities and equipment and wanted it

24   replaced to maintain his KU salary.  Again, I'm not going to

25   monkey with the way the defendant [sic] describes the manner

1    and means of the scheme.  So I'm going to overrule that

2    objection.

3            I believe that covers the manner and means, and then

4    we get to the actual counts.  The next objection I see is -- or

5    Count 7 alleges -- let me find that.  And it's a little

6    confusing because there's two counts that have dropped out.  So

7    Count 7 is actually a false statement count, correct?

8            MR. BARRY:  Yes, Your Honor.

9            THE COURT:  Used to be Count 8.

10           MR. BARRY:  Yes.  And I do want to flag just in the

11   manner and means section, paragraph 39A and 39B should be

12   stricken.  Those relate to the two dismissed counts that used

13   to be Counts 3 and 8.

14           THE COURT:  A and B are stricken.  It's no longer part

15   of the case.

16           Okay.  So new Count 7, used to be Count 8,

17   defendant -- whose objection is this?  Defendant objects to the

18   language, quote, and omissions, end quote, in Count 7 and 8

19   because this language is included in the indictment.  I

20   don't -- I don't know.  So defendant objects to in Count 7

21   where it says on or about September 25th, blah, blah, blah,

22   Dr. Tao willfully and knowingly made materially false,

23   fictitious, and fraudulent statements and representations and

24   omissions.  So it's the "and omissions" that the defendant

25   objects to.

1          Okay.  Here we go.  I mean, I think that's consistent

2     with the statute and the law for false statement, so I'm not

3     understanding why to strike that.  That's the way it's charged.

4          MR. DEARINGTON:  Your Honor, actually the background

5     here is the government didn't select a 1001 charge provision in

6     its indictment, at the motion to dismiss hearing it confined

7     its charge to (a)(2), which is the false representation prong.

8     That's a different charge from the omission with a duty prong,

9     so while the government drafted the indictment without having

10    made a selection at least in the indictment of what it was

11    charging, it has subsequently selected the (a)(2) provision in

12    order to avoid presumably some of our arguments at motion to

13    dismiss.  So it's -- I think it's beyond dispute at this point

14    that it's an (a)(2) charge and (a)(2) doesn't involve an

15    omission.

16          THE COURT:  Do you agree?

17          MR. BARRY:  No, I think an (a)(2) can involve an

18    omission.  I agree on the -- it's been selected as (a)(2) and

19    we don't object to them specifying it as an (a)(2) charge.

20          MR. DEARINGTON:  And (a)(2) states, makes any

21    materially false, fictitious, or fraudulent statement or

22    representation.

23          THE COURT:  Yeah, it doesn't say omission

24    specifically.  As opposed to A1 which says falsely conceals or

25    covers up.

1          MR. DEARINGTON:  Correct, Your Honor.

2          THE COURT:  All right.  I'll leave out the omissions

3    language.  Sustain defendant's objection on that, Count 7 and

4    8.

5          All right.  So that's it for the indictment.  We are

6    adding the aiding and abetting count.  Have you looked at that,

7    is that okay?  Just tracks the statutory language.

8          MR. BARRY:  No objection from the government.

9          MR. DEARINGTON:  Just for the record, Your Honor, I

10   see that 18 U.S.C. 2 is listed in the indictment, but --

11         THE COURT:  On every count.

12         MR. DEARINGTON:  Right.  But I guess our objection

13   just for the record would be that the allegations themselves

14   don't actually support that.  It seems common in indictments to

15   just have 18 U.S.C. 2 added to whatever the substantive count

16   is, but the allegations don't make out an 18 U.S.C. 2 charge,

17   so that would be our objection.

18         THE COURT:  Well, there's no motion to dismiss 18

19   U.S.C. 2.  It was charged.  It's part of the case so I'm going

20   to instruct on it.

21         Okay.  Get back to my -- okay.  So the next issue -- I

22   understand there's certain things we're going to -- I'm only

23   talking about the things that you have not agreed to, so next

24   one you don't agree to is on page 18 of the Court's set of

25   instructions.  And so defendant objects.  It's the first

1   paragraph on page 18, a matter is within the jurisdiction of

2   the executive branch of the United States if an agency has the

3   power to exercise authority in a particular situation.  This

4   particular sentence was proposed by the defendant.

5          The government proposed the next statement, which is a

6   false statement or representation falls within that

7   jurisdiction when it concerns the authorized functions of a

8   federal agency or department rather than matters peripheral to

9   the business of that body.  Defendant does object to that

10  statement.

11         I'm going to sustain the defendant's objection.  I

12  don't think the second statement is necessary.  It's rather

13  redundant, and it's not consistent with the stock or pattern

14  instructions I've seen.

15         The government also requests the modification as to

16  the fifth element with respect to each count.  The statement

17  was material specifically for -- Count 7, the alleged false

18  statement was material to energy.  The government wants it to

19  say "or National Science Foundation" not "and."  I'm going to

20  sustain that and grant that because, as you know, the statute

21  charges in the conjunctive, but the government can prove in the

22  disjunctive.  That's a situation with virtually every federal

23  statute so I think that's good.  So we'll change "and" to "or."

24         MR. DEARINGTON:  And just for the record, Your Honor,

25  we would object just because of the language in the indictment.

19-20052-JAR    USA v. Feng Tao    04.05.22    Day 12        2251

```
 1              THE COURT:  Because of what?
 2              MR. DEARINGTON:  The language of the indictment I
 3     believe states and --
 4              THE COURT:  Right.  Indictments always usually charge
 5     in the conjunctive.  The government is only required to prove
 6     in the disjunctive.  When we instruct, that's one change that
 7     is typically made from the indictment language, because the
 8     government is only held to having to prove in the disjunctive,
 9     not conjunctive, although they charge it that way in the
10     indictment.
11              Mr. Barry.
12              MR. BARRY:  The only other thing we'd note with "and"
13     versus "or" is on the next page where it starts with, a fact is
14     material if it has a natural tendency to influence, and it says
15     specifically for Count 7 we would request that the "and" there
16     be switched to "or" consistent with the prior ruling.
17              THE COURT:  Got it.  I think that's consistent and
18     I'll note the defendant's objection to that for the record and
19     overrule that.  We'll change "and" to "or" on that page 18 as
20     well.
21              Good faith instruction page 20.  The government
22     objects.  I think this case, really the heart of the defense is
23     good faith, so I'm going to overrule the government's objection
24     to that and give the good faith instruction that's on page 20.
25              Any other record you want to make on that, Mr. Barry?
```

1        MR. BARRY:  Nothing other than what has been in our

2    papers.  I'd also note, just a matter of clarity, the last

3    paragraph on that instruction assumes multiple defendants, so

4    it should be switched from each defendant to the defendant.

5        THE COURT:  Okay.  You got that, Ms. Merklen?

6        LAW CLERK:  Yeah.  I addressed it.

7        THE COURT:  All right.  Let's go to pages 27 and 28.

8    There's two instructions I think proposed by the defendant.

9    One is a good character instruction.  One is an instruction on

10   evidence for representation and honesty.  The government

11   objects to both.  I'm going to overrule the government's

12   objection to the good character instruction and I think we've

13   heard evidence about good character, work ethic, hard work, et

14   cetera.  But I'm going to sustain the government's objection to

15   the instruction for honesty and integrity.  I don't think we've

16   heard evidence specifically to honesty and integrity.  I

17   understand the defendant's case is not over.  Should we hear

18   that, we'll include it and we can make a record on that at the

19   close of the defendant's case.

20       All right.  Next is, defendant has proposed a wire

21   fraud elements instruction, and the first difference between

22   the one the Court has in its set is the defendant wants on the

23   first element for it to read, the defendant devised or intended

24   to devise a scheme to defraud another of money or property,

25   specifically to defraud KU of salary and to defraud DOE and NSF

1    of grant funds.

2        The defendant also wants to add language to the third

3    element specifically that Dr. Tao transmitted or caused to be

4    transmitted by wire communication and interstate and foreign

5    commerce writing signs and signals, to-wit, and include the

6    counts of -- in chart form as laid out in the indictment.

7        So the Court's wire fraud elements instruction of

8    course includes that chart, and the Court's wire fraud

9    instruction essentially is based on the Tenth Circuit pattern

10   instruction, and I am going to sustain the government's

11   objection to the language the defendant wants to add in the

12   element and instead it's going to say "as alleged in the

13   indictment" rather than pointing or editorializing or

14   summarizing or paraphrasing what's in the indictment.  That

15   leaves the parties free to argue what's alleged in the

16   indictment.  I'm concerned very much about introducing error

17   into the case for me to then extract from the indictment some

18   summary or explanation of the charges.

19        I mean, these charges are complicated in the sense

20   that we're talking about three punitive victims, perhaps

21   different ways of -- I mean, different allegations with respect

22   to how this works.  Yet it's intertwined with the conflict of

23   interest forms and what that meant in terms of the obligations

24   KU did or did not have to NSF and DOE.  I'm very concerned that

25   it would be inviting error to start changing the language "as

1   alleged in the indictment."  So I'm going to sustain the

2   government's objection to that.

3           And similarly, the third element I think the jury is

4   adequately instructed that the defendant is -- the government

5   must prove that he used interstate or foreign wire

6   communications, et cetera.  So I think that additional language

7   is redundant with the Court's instructions.  The pattern

8   instruction doesn't include that additional language in element

9   three either.  The table itself will be included in the

10  instruction that sets forth the indictment, so that's

11  unnecessarily duplicative.

12          Next is defendant's proposed unanimity instruction on

13  the wire fraud counts.

14          MR. DEARINGTON:  Your Honor, just for clarity, did

15  Your Honor overrule the defense request to include the specific

16  object of the scheme in the first element?

17          THE COURT:  Yes.

18          MR. DEARINGTON:  Okay.  Thank you, Your Honor.

19          THE COURT:  I think what you're talking about is you

20  wanted language that said specifically "to defraud KU of

21  salary" and "to defraud DOE and NSF of grant funds."

22          MR. DEARINGTON:  Yes, Your Honor.  Just to ensure that

23  the jury isn't convicting on an improper object of the scheme

24  in light of the language in the allegations that we just

25  discussed.

1          THE COURT:  Okay.  Yes.  I'm overruling the

2     defendant's objection to that and I'm sticking with "as alleged

3     in the indictment" because, as I said, I think it's inviting

4     error for the Court to paraphrase and change the language in

5     the indictment.

6          MR. DEARINGTON:  Understood, Your Honor.

7          THE COURT:  All right.  So Ms. Merklen pointed out to

8     me maybe what you're concerned about is the language that

9     says -- this is the first element.  The defendant devised or

10    intended to devise a scheme to defraud another of or money or

11    property, I'm keeping that language.  That's what I'm

12    instructing in the Court's -- the Court's elements instruction.

13    Is that what you were speaking to or are you speaking to the

14    language you wanted to add?

15         MR. DEARINGTON:  May have misspoke and said the second

16    element, but it was the language to specify what the object

17    could be.

18         THE COURT:  Right.  That's what I'm overruling and

19    denying.  I'm going to use "as alleged in the indictment."

20         Okay.  Let's talk about the unanimity instruction on

21    the wire fraud counts.  As I've said, it's complicated.

22    There's KU, there's Department of Energy, there's NSF,

23    different or at least different submissions of disclosures to

24    these three.  As the government argues, it is one scheme that's

25    charged, not three.  The unit of prosecution as the government

1  argues for wire fraud is each use of the wires, yet I am

2  concerned that -- I am concerned that there not be a unanimity

3  instruction despite that because there's these three

4  different -- there's two government agencies and KU, all of

5  which there was disclosure requirements involved that were

6  interwoven nonetheless and I think it will avoid jury confusion

7  if they understand that they need to agree at least with

8  respect to one of the three, but let me hear your arguments on

9  that, Mr. Barry.

10      MR. BARRY:  So a lot of this is just going to

11  reiterate what's in the papers, but as we argue, there's a

12  single scheme to defraud.  You're right in that it involves

13  three victims.  It's interconnected, but the single scheme to

14  defraud is to obtain money or property by concealing a variety

15  of things.

16      The jury instruction -- the pattern jury instruction,

17  the unanimity of theory that the defendant cites to in the

18  legal authority that they sent over the weekend distinguishes

19  between a scenario in which this would be appropriate, which is

20  not this case, and a scenario in this case in which we're

21  seeking -- we've introduced evidence concerning various means

22  of committing the crime.  That's in the pattern instruction.

23  That's the note where it tells you to -- it provides guidance

24  for the distinction between when a unanimity instruction would

25  be appropriate and when it wouldn't.  We think a unanimity

1    instruction here would unnecessarily confine the jury and make

2    the scheme to defraud narrower than it's been alleged.

3            For example, the scheme to defraud NSF is

4    intrinsically linked to the scheme to defraud KU.  Part of

5    that, the government believes, is the failure to disclose

6    potential or actual conflicts of interest or commitments of

7    time pursuant to KU policies, but KU has those policies because

8    that's one of the requirements that NSF has for universities,

9    right?  They can't get grant funds if they don't have those

10   policies.

11           So we think if you have unanimity instruction and the

12   jury thinks, oh, we have to all agree on which specific scheme

13   we think the defendant allegedly defrauded, whether it's the

14   current and pending or the failure to disclose conflicts of

15   interest to KU or failure to say certain things to DOE or NSF

16   that that convolutes the issue.  The focus should be on the

17   single issue of fraud, which is as alleged in the indictment

18   and that's the indictment they'll be getting, the scheme to

19   defraud lays out here is the single scheme, here are the manner

20   and means which the scheme was orchestrated.  Part of this

21   scheme was directed towards KU.  Part of it was directed

22   towards NSF.  Part of it was directed towards KU [sic] and the

23   unit should be the counts which are the use of the wires which

24   provides the federal jurisdiction.

25           So we have serious concern that a unanimity

1    instruction specifically on the wire fraud count would create

2    jury confusion.  And we think that there's also no case law to

3    support the defendant's position here.  If you -- I already

4    talked about the Tenth Circuit pattern instruction, but even if

5    you looked at some of these unpublished out of circuit district

6    court opinions, I think there's one published opinion, but

7    they're talking about duplicity of charges.  It's a different

8    context.

9         So for that reason we -- as I said, we think a

10   unanimity instruction would actually be more harmful here and

11   would be a deviation from the scheme as it's going to be -- as

12   it has been alleged in the indictment and as it will be

13   presented to the jury.

14        THE COURT:  So do you think it would introduce

15   confusion if the jury was told that they must agree that

16   Dr. Tao committed wire fraud with respect to at least one,

17   either KU, NSF, or DOE?

18        MR. BARRY:  We think that would be fine.

19        THE COURT:  All right.  I think that's the unanimity

20   instruction I'll give.  The jury must unanimously agree that

21   Dr. Tao committed wire fraud with respect to at least one:  KU,

22   NSF, or DOE in order to find the defendant guilty.  And that's

23   actually language proposed by you, Mr. Dearington.

24        MR. DEARINGTON:  Yes, Your Honor, with respect to each

25   count, Your Honor, yes.

1          THE COURT:  So we will give that.  I think the best

2     place to put that, Joy, is after the aiding and abetting

3     instruction because we've got elements of the two crimes,

4     aiding and abetting and unanimity.

5          We'll put it after the wire fraud element instruction

6     because this really goes to the wire fraud elements, not the

7     false statement, et cetera.

8          Okay.  All right.  Next the government proposed an

9     intent to defraud instruction defining intent to defraud can be

10    inferred from circumstantial evidence considered in its

11    totality, et cetera.  Defendant objects.  The Court gives an

12    appropriate instruction -- a standard instruction regarding

13    appropriate inferences, so I think this is redundant in that

14    sense.

15         Defendant also objects on the basis that the proposed

16    language ignores the government's theory of the case which is

17    that Dr. Tao successfully defrauded KU, NSF, and DOE.  I don't

18    know that -- I don't know if that's the theory or not.  I'm not

19    going to speak to that, but I do think this is redundant of the

20    inference.  Actually there's two places in my stock

21    instructions where I talk about they may draw inferences from

22    the evidence, as well as talk about circumstantial evidence, so

23    I will sustain as to that objection and not include this

24    additional intent to defraud instruction.

25         And the language about the government is not -- the

1    government proposes that the government is not required to

2    prove actual or contemplated harm or gain, rather proof of

3    actual or contemplated harm or gain is simply one means of

4    establishing.  That's not in the Tenth Circuit's pattern

5    instruction for wire fraud, so I'm not going to include that

6    either.  So I will sustain the objection to that government

7    proposed intent to defraud instruction.

8          The defendant proposes an object of a scheme to

9    defraud instruction, which starts with saying the wire fraud

10   statute does not criminalize dishonesty or deceit, not designed

11   to punish all acts of wrongdoing, dishonorable practices, et

12   cetera.  The government objects, arguing the instruction is

13   misleading because the wire fraud statute does criminalize

14   dishonesty and deceit as it relates to a scheme to defraud

15   using the wires.  Government also objects that this proposed

16   instruction inappropriately suggests to the jury that it should

17   consider punishment.

18         I'm going to sustain the government's objection.  I

19   think this proposed instruction is argumentative.  Obviously

20   the defendant's free to make this argument to the jury, but I

21   think the elements instruction sufficiently instructs the jury

22   about what the elements are of wire fraud, and so I'm not going

23   to give that instruction.

24         Defendant has also proposed a materiality instruction,

25   which the government objects to.  I'm going to sustain the

1    government's objection and give the materiality instruction

2    that I've proposed, which comes from the Tenth Circuit pattern

3    instruction.

4            The government has requested a false statement

5    elements instruction that adds to the elements, for example,

6    this law makes it a crime to knowingly and willfully make blah,

7    blah, blah statement or to cause someone else to do so, and

8    that "or cause to be made" language shows up in the first

9    element.  I'm not inclined to give that.  That triggered me to

10   remember that I needed to instruct on aiding and abetting.  And

11   I think aiding and abetting -- that statute which the

12   indictment charges essentially gets you there.  So I'm not

13   inclined to add this language, but obviously when you argue

14   those two together, the aiding and abetting means that --

15   causing to be made or causing someone else to do something is

16   also violative of the statute.

17           Anything more from the government on that?

18           MR. BARRY:  No, Your Honor.

19           THE COURT:  All right.  Defendant requests a breach of

20   contract is not fraud instruction.  I'm going to sustain the

21   government's objection to that.  The government argues the

22   proposed instruction misstates the charges and the law and

23   would confuse the jury.  Obviously the defendant is free to

24   argue that breach of contract is not a crime.  They're not

25   getting an instruction telling them that breach of contract is

1    a crime.  But the Tenth Circuit pattern instruction for wire

2    fraud does not suggest a breach of contract would be sufficient

3    to convict him, so I do not think this instruction is

4    necessary.

5            Defendant also proposes -- I'm going to save that for

6    last.  Let me skip ahead to one other thing.  Defendant

7    proposes a Paperwork Reduction Act instruction.  I'm sustaining

8    the government's objection to that.  This is the type of legal

9    argument that should have been brought up before in a motion to

10   dismiss or otherwise, not proper to include it in an

11   instruction.  No case law that has said, oh, yes, this is a

12   proper jury instruction.

13           MR. DEARINGTON:  Your Honor, just for the record, the

14   statute itself, I believe, says it can be raised any time.

15   It's akin to a jurisdictional argument in that respect.

16           THE COURT:  So you're raising it in the middle of an

17   instruction conference?

18           MR. DEARINGTON:  Well, Your Honor, to be fair, the

19   government made a lot of arguments about the fact that its

20   indictment just needs to recite the simple elements of the

21   case.  They didn't give -- and the Court can't look outside the

22   four corners of the indictment and the Court agreed effectually

23   in denying the entirety of our motion to dismiss by not looking

24   outside the indictment even at documents cited in the

25   indictment.  So there's no practical way we could have argued

1    that the agency documents they're talking about don't have the

2    proper OMB language on them.  If we had done that, the

3    government would have just said, that's outside the indictment,

4    the Court can't look at it, and based on the Court's rules, the

5    Court would have agreed.  This is the first opportunity we've

6    had to raise this argument.

7            THE COURT:  You didn't raise it at the time of motion

8    to dismiss.

9            MR. DEARINGTON:  In part we had a motion to dismiss

10   prior to that where the government strenuously argued and the

11   Court seemed inclined to agree, though it's been mooted, that

12   anything outside the indictment is not fair game for our

13   argument.

14           THE COURT:  You didn't raise this, so I can't rule on

15   something that's not raised.  So raise in a post-trial motion,

16   but it's not proper to instruct on it at this point.

17           MR. DEARINGTON:  Understood, Your Honor.

18           THE COURT:  Let's go back to defendant's proposed

19   ambiguity of alleged disclosure requirements.  And so defendant

20   relies on *United States versus Migliaccio*, a case in which two

21   doctors were convicted of mail fraud after they sought

22   reimbursement for certain procedures.  I'd like to hear

23   argument on this, but here's my concern that sets this case

24   apart from the *Migliaccio* thing.  I've heard a lot of

25   questioning of government witnesses and KU witnesses, I guess

1    about, you know, particularly with respect to the current and

2    pending, but maybe with respect to other disclosure elements,

3    you know, ongoing clarifications in annual or whatever

4    publications by the government, but I've not heard, I don't

5    think, any evidence that says, here's one reasonable

6    interpretation of this particular language versus here's

7    another reasonable interpretation of this particular language,

8    and I think that's the context in which this ambiguity

9    instruction is made when there's evidence of "foreign" could

10   mean this or "foreign" could mean that and, you know, evidence

11   that reasonable interpretations of the word or phrase or

12   something like that.

13        I don't think that's the way the evidence has come in

14   in this case.  This evidence has come in, the defendant has

15   asked a lot of questions about isn't this ambiguous, although I

16   don't think any of the government witnesses conceded that

17   except to say you can always make things clearer.  But what I'd

18   like to hear is what specifically -- what terms or phrases does

19   the defendant rely upon that the record would illustrate that

20   there's evidence that, you know, could be reasonably

21   interpreted one or two or three different ways?

22        MR. DEARINGTON:  Sure, Your Honor.  I'd be happy to

23   address that.  So starting with the conflict of interest forms,

24   the very first government witness, Chancellor Girod,

25   acknowledged that the language related to your KU

1    responsibilities with respect to the significant financial

2    interest disclosure was undefined and could be interpreted in

3    multifarious ways.  That would be the first example.  There's a

4    second example in the very same form, the time commitment

5    language, which the defendant has elicited testimony from

6    witnesses to the effect that it has to interfere with your

7    university responsibilities.  The government apparently thinks

8    that that's not a -- may think that's not a requirement to

9    trigger a disclosure there.

10           Moving to the current and pending support, the

11    government's own witnesses appear to be in some sort of

12    disagreement as to the two agencies and what they require in

13    that regard.  So Dr. Schwartz, for example, says that a lab

14    funded in China does not need to be disclosed as current and

15    pending support, whereas Dr. Keiser seemed to say -- well, with

16    Dr. Schwartz at least the government has alleged that that does

17    need to be disclosed, so at the very least that creates

18    ambiguity.  We would argue it's actually the DOE agreeing with

19    our interpretation, but at most they're saying there's

20    ambiguity and disagreement there.

21           And then turning to NSF, Dr. Keiser acknowledged there

22    were numerous questions posed about the requirements in 2018

23    and 2019 which triggered the need for them to, quote, clarify

24    and, quote, revise their disclosure obligations.  So

25    respectfully, Your Honor, this whole case is about whether

1   these disclosure requirements were clear.

2        And in terms of *Migliaccio* and *Schultze*, (sp), it's a

3   mandate that so long as the Court thinks that there's evidence

4   to support the defendant's position of ambiguity, not agrees

5   with defendant's position as to what our interpretation is, but

6   evidence of ambiguity which we've far surpassed here citing,

7   for example, Dr. Schwartz agreeing with our interpretation.

8   Then it says the jury must be instructed concerning reasonable

9   interpretations of ambiguous requirements and the government's

10   ensuing burden.

11        THE COURT:  That's what I'm focusing on.  If that

12   happens, if that's the case, the jury must be instructed about

13   reasonable interpretations.  What happened in that case, is the

14   instruction included, here's the two reasonable interpretations

15   of this particular phrase or language.  That's not the way the

16   evidence has come in this case.  I've heard evidence that, you

17   know, maybe there's ambiguity, there's evolving, you know,

18   views of what this or that mean, but no clear evidence that

19   that this particular term could be reasonably interpreted this

20   way or that way, because in the *Migliaccio* case that was

21   included substantively in the instruction telling the jury,

22   look, it could be interpreted this way or that way, you decide.

23        But what you're asking for is just some generic

24   instruction like there's ambiguity in this case and here's what

25   you need to consider and do or not do with it.  And that's

1   different than what happened in that case.  So that's why I was

2   asking you specifically what are we talking about here, because

3   if there is evidence suggesting specific different reasonable

4   interpretations of some term or terms, then if I'm going to

5   follow what happened in the *Migliaccio* case and what the Tenth

6   Circuit advised, then I need to include substantively what

7   those reasonable interpretations are in the instruction, is the

8   way I read the case, but you're not offering me that language

9   so that's why I was asking you about that.

10          MR. DEARINGTON:  And, Your Honor, if that's the way

11  Your Honor is inclined to rule, we'd be happy to quickly put

12  together language.  But I would add the *Schulte* case, which was

13  20 years later in 2014, articulates the reason for this

14  importance.  And we cited in our footnote 38, because 1001,

15  quote, criminalizes making false statements to a government

16  agency and the government bears the burden to negate any

17  reasonable interpretation that would make a defendant's

18  statement factually correct.  And the Third Circuit had a

19  recent ruling that adopted this very provision in throwing out

20  a conviction in fact.  Because if Your Honor is going to

21  instruct the jury that there are two reasonable

22  interpretations, the charge already cannot lay.

23          The government has to negate any reasonable

24  interpretation.  The very notion that there's two

25  interpretations, and one would render the submission correct,

1    means the charge is invalid.

2         THE COURT:  It's not what the Tenth Circuit indicated

3    in *Migliaccio*, because that's exactly what happened in that

4    case.

5         MR. DEARINGTON:  In *Schulte* the Court said government

6    bears a burden to negate any reasonable interpretation.  So if

7    there isn't a reasonable interpretation, they have to prove

8    that Dr. Tao's statement was false in light of that

9    interpretation.  Again, Your Honor, we're happy to quickly put

10   together language if you're inclined to want to write out the

11   reasonable interpretation that we think is appropriate here.

12        THE COURT:  All right.  Mr. Barry.

13        MR. BARRY:  So couple problems.  Number one is, there

14   is no evidence of what that other reasonable interpretation

15   would be.  The defense has made arguments related to ambiguity,

16   but as the Court seems to suggest under *Migliaccio*, it's a

17   two-step analytical process.  There's demonstrating the

18   ambiguity and then providing evidence of what the other

19   interpretation is, and that's necessary so that you can present

20   that to the jury and say, here's the ambiguity instruction,

21   here's the evidence, you've heard about two different

22   interpretations.  You, the jury, are permitted to decide which

23   interpretation you accept.

24        In this case that hasn't happened.  At most -- I mean,

25   we obviously disagree with Mr. Dearington's characterization of

1   the testimony of Dr. Schwartz and Dr. Girod and Keiser, but

2   none of them testified there is some other reasonable

3   interpretation out there and what that interpretation is and

4   the defense has not provided any testimony or pointed to any

5   other type of evidence to show what that interpretation is.  So

6   that's the first distinction from *Migliaccio*.

7          Second is that if you were to instruct the jury on an

8   ambiguity instruction with the absence of a second reasonable

9   interpretation, that presents a real opportunity for confusion

10  because the jury may be left with saying, well, if this is

11  ambiguous, what am I supposed to do?  They don't have an

12  alternative interpretation to point to.

13         Number three, *Schulte* is not an applicable case.  As

14  we said in our objection, the appellate challenge there was

15  sufficiency of evidence, didn't have anything to do with the

16  jury instruction, so I don't know what section of the case

17  Mr. Dearington is quoting from, but from our view it's not

18  guiding law.

19         So in summary we would argue that an ambiguity

20  instruction here is not appropriate.  It could at -- I mean, at

21  worst it confuses the jury and doesn't really give them the

22  appropriate guide they would need to make a decision.  And at

23  best, there's just -- they haven't presented evidence of what

24  that alternative interpretation is.  They have witnesses on

25  their witness list.  They could have called them to try to

1   present evidence about these other folks who may have had some

2   lack of clarity or different interpretation and they chose,

3   which they're entitled to, to not do that.  And this is one of

4   the consequences.

5         MR. DEARINGTON:  Your Honor, I've pulled up *Migliaccio*

6   and at the risk of quoting on the ad hoc here, the instruction

7   appears to be that you may find that ambiguity exists in these

8   Champus, which I believe is a health care program, reporting

9   requirements as to which procedures are to be reported to

10  Champus.  If you find that ambiguity exists, then to prove the

11  defendants knew their statements to Champus were false, the

12  government must prove beyond a reasonable doubt that there's no

13  reasonable interpretation of the situation that would make the

14  defendant's statement factually correct.

15        So I'm not sure that the Court there actually

16  presented multiple interpretations for the jury to choose.

17  It's more if you think that there's ambiguity, then the jury

18  has to find that no reasonable interpretation would render the

19  defendant's statement true.

20        THE COURT:  The entire instruction, you're leaving out

21  the important part, in my view, as it pertains to this issue,

22  so here's what the instruction said, the proposed instruction

23  in *Migliaccio*.  You read the second paragraph.  The first

24  paragraph pointed out -- it said, the program integrity

25  supervisor for Champus testified that providers, meaning the

1    defendants, are required to report all procedures performed

2    regardless of whether the procedures are covered by Champus.

3    However, the program integrity supervisor for Champus also

4    testified that the Champus regulations do not provide for

5    coverage of any related treatment if any service is provided or

6    not covered.  The Champus regulations and provider handbook

7    state that doctors may charge patients for services determined

8    to be noncovered.

9          Then it goes on to say, you may find that ambiguity

10   exists in these Champus reporting requirements as to which

11   procedures are to be reported to Champus.  If you find that

12   ambiguity exists, then to prove defendants knew their

13   statements to Champus were false, the government must prove

14   beyond a reasonable doubt that there is no reasonable

15   interpretation of the situation that would make the defendant's

16   statements factually correct.  So the instruction itself

17   pointed to the competing evidence about how to interpret

18   something specific.  We don't have that here.

19         So I'm going to sustain the objection to this

20   ambiguity instruction because we lack that specificity, and the

21   way I view this, read this decision, if we had competing

22   reasonable interpretations, my job is to instruct the jury

23   here's -- the evidence showed this, the evidence also showed

24   that, ambiguity, the government has to prove beyond a

25   reasonable doubt there is no reasonable interpretation of the

1    situation that would make the defendant's statements factually

2    correct.  We don't have that situation here.

3         Now, of course ambiguity has been a big theme in this

4    case and it goes directly to knowledge, intent to defraud.

5    This is a specific intent crime charged, wire fraud.  So

6    ambiguity, I'm not suggesting that you can't argue all of these

7    things.  It's just that under our record it would not be proper

8    for me to give a generic ambiguity instruction.  So I'm going

9    to sustain the government's objection to that proposed

10   ambiguity instruction.

11        MR. DEARINGTON:  Your Honor, we understand the Court's

12   ruling.  Again, just for the record, we'd ask for the second

13   part of the *Migliaccio* instruction, and our fear here is that

14   that's a legal instruction.  So if -- it's conceivable the jury

15   could just say, well, it's ambiguous, but the government's

16   interpretation seems plausible and if we adopt that as our

17   favorite interpretation, despite the ambiguity, we think that

18   the statement is false.  And that would be an improper

19   conviction and that's our concern, Your Honor.

20        THE COURT:  Of course the government has to not

21   only -- the government has to prove that the defendant knew and

22   intended and the defendant understood that to be the rule, and

23   that's what this case is all about so -- and there's certainly

24   evidence suggesting the defendant did not know.  And there's

25   evidence suggesting that maybe he did.  So anyway, I think

1    that's not a proper instruction to give under the evidence we

2    have in this case.  So I'll overrule and deny that.  So I think

3    I have covered everything.

4         What's left open of course is character for honesty,

5    integrity depending on how the remaining defense witnesses come

6    in and of course whether or not Dr. Tao's testifying.  And

7    we'll make a record on that at the close of the defendant's

8    evidence.  All right.

9         MR. DEARINGTON:  Does Your Honor mind if we take a

10   quick look to make sure we didn't miss anything?

11        THE COURT:  Okay.  Sure.

12        MR. OAKLEY:  Your Honor, while they're doing that, can

13   I bring up one thing as it relates to closing argument?  I

14   think yesterday I asked for 60 minutes after -- I would ask for

15   another 15 minutes.  I'd ask for 75 minutes total.

16        THE COURT:  Okay.  Let us know how you'd like to split

17   that, and that means the defendant gets 75 minutes, if they'd

18   like.

19        MR. ZEIDENBERG:  I have one issue on closing I just

20   want to highlight.  The parties -- just a little background.

21   The government, leading up to trial and shortly before trial,

22   indicated that they were going to be putting on evidence

23   regarding the purchase of the Tao home in June or July 2019,

24   that the money came for that house from China and was $200,000

25   from a bunch of different sources, and clearly it was -- there

1   was a lot of forensic accountant evidence about the purchase

2   and obviously it was to apparently tie that to perhaps Fuzhou

3   University money.

4          After the Court ordered the government to give back

5   the electronic -- the iPhone or the Cricket phone of Hong Peng,

6   Dr. Tao's wife, she was able to download contemporaneous text

7   messages and voicemails with friends back from 2019 when she

8   was borrowing money from family and friends to send to her to

9   purchase the home.  So it was contemporaneous with these

10  discussions.

11         We provided all that to the government in the last

12  couple weeks.  There was a lot of issues about translations and

13  whatnot.  And it was a lot of stuff to -- that we were going to

14  potentially have to present in a lot of different formats

15  because it was on the phone and we had to get it off the phone.

16  It was a lot of technical issues with that.

17         We had a discussion with the government and they

18  indicated that they were not going to be putting on evidence

19  about -- if we didn't put on evidence -- you know, all this

20  evidence, then they weren't going to put on their evidence.

21  Our evidence was to rebut the government's proposed evidence.

22  Okay.  This was a long way of background but just so you know.

23         The government had told us they were not going to put

24  on any evidence of the house in their case-in-chief.  Yesterday

25  on cross-examination of Agent Lampe, there was a quick

1    reference to a house, purchased in cash, and it kind of came

2    out of nowhere and it disappeared.  We're a little bit on the

3    fence about whether we should now put on all this evidence.

4    Not really interested in doing that because I don't know how it

5    was left with the jury about what to make of it.

6            I spoke with government counsel yesterday evening, and

7    I suggested that, look, if they're not going to make an

8    argument about it in closing, then we won't -- when we call

9    Ms. Peng this morning, then we won't go back and put in all

10   this evidence because I don't want to put in a bunch of

11   evidence if it's not going to be argued, and the government

12   agreed.  And I have no reason to distrust they've been --

13   they've lived up to all their representations they've made to

14   us throughout the trial and I've had no issues with that

15   whatsoever, but I want it clear that if in the midst of

16   Mr. Oakley or Mr. Barry's closing there is a reference to that

17   house being purchased after we forewent doing this in our

18   case-in-chief, then I'm going to be up at the bench and I'm

19   going to be objecting and I'm going to be making -- raising a

20   big stink, which I don't want to do, and I don't want to have

21   to explain all this to the Court at that juncture.  And so

22   that's just, you know, where I'm thinking.  I don't want to

23   spend an hour putting in this tedious text messages that are

24   not translated and voicemail message that she then has to

25   translate for the jury.  It will take all morning, and I think

1    it's about an issue that's not live.

2            THE COURT:  All right.  Mr. Oakley.

3            MR. OAKLEY:  We didn't present evidence related to the

4    purchase of the house in our case-in-chief.  It came up

5    yesterday in response to questions about other bank accounts.

6    I don't intend to argue to the jury that the purchase of the

7    house was evidence.

8            THE COURT:  So no mention in closing at all of the

9    house, the purchase of the house.

10           MR. BARRY:  Can I raise one other thing about closing

11   since we're sort of --

12           THE COURT:  But we agree no mention in closing about

13   the purchase of the house?

14           MR. OAKLEY:  Correct.

15           MR. BARRY:  Yes, the government agrees.

16           THE COURT:  Okay.  Go ahead, Mr. Barry.

17           MR. BARRY:  So the other thing we wanted to raise is,

18   there have been a few instances in which, in our view, the

19   defense has violated the *limine* order related to references to,

20   I'd sort of say a blended sort of selective prosecution

21   argument having to do with the reason why Dr. Tao was

22   investigated, was because of the connection to China.

23   Mr. Zeidenberg said that in his opening -- as well as he's used

24   the term of espionage.

25           We talked about that a little bit yesterday, and when

1  we had our bench conference yesterday about sort of how Huimin

2  Liu's initial tip and her allegations against Dr. Tao led to

3  the FBI making certain decisions.  Our understanding of what

4  you said was, in the *limine* order, it needed to be tied --

5  questions about that had to be tied to the reliability of a

6  specific piece of evidence and Mr. Zeidenberg said he was going

7  to do that.  We did not see him do that yesterday.  We did not

8  see a specific piece of evidence in which he tried to connect

9  those arguments having to do with espionage to the reliability

10  of a particular piece of evidence.

11       And so we would ask -- we don't think that's

12  appropriate to make that argument at closing, to have -- and we

13  also think it would prejudice the government because as we have

14  done, as demonstrated by the testimony of Dr. Tiffert and

15  Dr. Keiser and others, we have tried to stay very far from that

16  line.  Even when questioning Dr. Tiffert I did not elicit the

17  title of the project, the China Sharp Power Project that he

18  co-leads, I kept it generic, a project having to do with China

19  for the reasons the Court gave in terms of, this is a fraud

20  case.

21       We're concerned that there have been a few instances.

22  I frankly wanted to -- I think Mr. Zeidenberg and I wanted to

23  be polite to each other in opening and not object, but we would

24  probably object if he made a similar argument in closing in

25  terms of saying the reason why the FBI did what it did was

1    because of China.  That's what he said almost verbatim in

2    opening.  A lot of it is just I don't think either of us wanted

3    to interrupt each other in closing and going to the bench and

4    making a stink about this.

5        But for us, those two issues of raising concerns

6    having to do with espionage or economic espionage or tech spy

7    or whatever you want to call it, and the reliability of the

8    investigation.  It hasn't been tethered to the reliability of a

9    specific piece of evidence throughout the case.  We don't think

10   it's appropriate to argue that in closing.

11       THE COURT:  If that comes up in closing do you have a

12   proposed curative instruction?

13       MR. BARRY:  I mean, we can come up with something

14   certainly.  We would rather have it not come up, but certainly

15   if Mr. Zeidenberg brings it up we can propose a curative

16   instruction for you.

17       MR. ZEIDENBERG:  Your Honor, the way this case came in

18   according to our theory explains all the failures of this

19   investigation:  The rushed nature of it, the failure to do due

20   diligence, the failure to investigate properly.  Everything

21   they did and everything they didn't do.  So, you know, they go

22   and have drones and surveillance vehicles following the family

23   16 hours a day and people in his family getting pattern of

24   life.  But they don't pick up the phone and talk to the NSF or

25   DOE to ask them what are the rules.  I mean, there's got to be

1    an explanation that ties it all together.

2          And the fact is they got, you know -- our theory is

3    they got taken -- they got taken in by this woman who told them

4    she had a vendetta against him, that she was extorting him, and

5    she waived around this contract and then she gave them this

6    Chinese, you know, grant which they introduced yesterday.  And,

7    you know, I've got to be able to say the only place this came

8    from was this woman who said she could hack into his e-mail and

9    it's filled with errors and she took them for a ride, from our

10   perspective, and they bought it all hook, line, and sinker and

11   they ran out in less than two months and arrested him without

12   interviewing almost a single witness that came into this trial.

13         THE COURT:  All right.  So if that's your closing

14   argument, then that does not violate my *limine* order.  What

15   would violate is to talk about -- I mean, to -- well, talk

16   about espionage, talk about her specifically without tying it

17   to something, but I mean, what you've just articulated I don't

18   think violates the *limine* order.  I think, though, that there

19   were questions yesterday specifically about her and her

20   accusing Dr. Tao of espionage.  I mean the jury has heard that.

21   What would violate the *limine* order, I think, is to argue to

22   the jury that this was an investigation about espionage, this

23   was, you know, essentially selective prosecution because he's

24   Chinese and he was -- they thought he was committing economic

25   espionage.  That would violate the *limine* order.

1         MR. ZEIDENBERG:  To be clear, I just want to make

2    sure -- I think we're saying the same thing.  It's not a

3    question of selective prosecution from our perspective because,

4    you know, they're not going after him because he's Chinese.  I

5    mean, I'm not making that -- I wouldn't make that argument.  I

6    don't think that's the case.  I think the case is, though, they

7    had a woman come in and they believed her story that he was a

8    tech spy and he was involved in economic espionage, and, you

9    know, they pinned their ears back and they put their blinders

10   on and they went after him full speed ahead without doing an

11   appropriate investigation first.  That's the case.  That's our

12   explanation.

13        THE COURT:  I've heard that theme, but all I'm saying

14   is you're going to need to tread to carefully if what you're

15   saying to the jury is this is -- the government's motive was

16   they thought he was a spy because of what she told him.  Now I

17   think you're crossing the line in terms of what my concerns

18   were.  I mean, and I precluded you from doing that and I

19   precluded the government from doing what it wanted to do, which

20   was essentially to suggest that there was a problem along those

21   lines or at least it was reasonable to think so.

22        This case has charged wire fraud about a bunch of

23   forms submitted to KU and these two agencies, and there's no

24   hint of -- in the evidence of espionage or economic espionage

25   or intellectual property theft or any of that.  That's why I

 1   wanted the record to be clear and I didn't let you or the

 2   government do what you wanted to.

 3        MR. ZEIDENBERG:  That's how it's been charged, but it

 4   wasn't how it was investigated and that's what I want to point

 5   out, is they used the wrong tools to investigate a grant.  They

 6   used the espionage tools.  They're looking for a spy, but what

 7   they should have been doing is simply picking up the phone or

 8   going to these agencies and doing what you would normally

 9   expect to do which is -- the very first thing is to talk to

10   them, what are the disclosure requirements.  And that -- you

11   know, instead they have 16 agents working around the clock

12   following them around.

13        THE COURT:  And you have pointed all of that out and I

14   am sure you're going to go into the particulars of your

15   defense, which is in part, this was government overkill in

16   terms of, you know, the investigative tools they used.  All I'm

17   saying is if you go further and tell the jury it's because they

18   thought he was a spy or they were really investigating him like

19   a spy, now you're treading into territory I essentially told

20   you all to stay away from and I'm sure I'll hear an objection

21   and I'll have to figure out whether you've gone too far or not.

22   I'm not at all suggesting you can't do what you've been doing

23   which is to attack the means of government investigation and

24   the things they did versus the things they did not do.

25        MR. ZEIDENBERG:  Okay.

1              THE COURT:  All right.  Anything more?

2              MR. BARRY:  No, Your Honor.

3              THE COURT:  Okay.  Let's bring the jury in and we'll

4    call the defense's next witness.

5              MR. ZEIDENBERG:  What time did you say?  Are we taking

6    a break or they --

7              THE COURT:  Do you want a break?

8              MR. ZEIDENBERG:  If we could have ten minutes.

9              THE COURT:  It's been an hour and a half for us.

10   Let's have ten minutes, a break.  I'll stand by, but you all

11   take a break.

12        (Recess.)

13             THE COURT:  Ready to bring the jury in?

14             MR. DEARINGTON:  Yes, Your Honor.  We were talking

15   about how we're going to start by introducing one exhibit and

16   then our next witness.

17             THE COURT:  Okay.  But we can bring them?

18             MR. BARRY:  Yeah.  We don't know if we're going to

19   object to it or not.

20             THE COURT:  What's the exhibit number?

21             MR. DEARINGTON:  1304.  It's a compilation of the

22   journal articles that Dr. Tao published at KU, and it's also --

23   in the stipulation as to authenticity on periodic grounds.

24             THE COURT:  Let me ask you something quick.  I meant

25   to ask you during the jury instruction conference.  I think

1    we've had three or four stipulations read to the jury.  Most of

2    them I think had to do with admission, authenticity,

3    stipulations, so my intention was not to include them in the

4    final instructions, but just let me confirm if that's all right

5    with you all?

6            MR. OAKLEY:  The government sees no reason to include

7    them in the instructions.

8            THE COURT:  Any of the stipulations?

9            MR. OAKLEY:  No.

10           MR. DEARINGTON:  Agreed, Your Honor.

11           THE COURT:  Okay.  1304.  Should we take up an

12   objection now to 1304?

13           MR. BARRY:  Yeah, we didn't know they were planning to

14   introduce this.  We don't have an electronic copy with us right

15   now.

16           THE COURT:  You don't have a paper copy?

17           MR. BARRY:  No, Your Honor.

18           THE COURT:  I have one in my notebook, if you want to

19   look at it.

20           MR. DEARINGTON:  We can represent they're all journal

21   articles, if that helps.

22           THE COURT:  It's about 800 pages.

23           MR. BARRY:  I think since it sounds like this is not

24   tethered to a particular witness, we'd ask to look through the

25   800 pages, and before the defense rests, maybe we can take it

 1    up then.

 2              THE COURT:  Okay.

 3              MR. DEARINGTON:  Sounds fine to the defense.

 4              THE COURT:  Now are we ready for the jury?

 5              MR. DEARINGTON:  Yes, Your Honor.

 6              MR. BARRY:  Yes, Your Honor.

 7         (The jury entered the courtroom, after which the following

 8    proceedings were had.)

 9              THE COURT:  You can be seated.

10              Call your next witness.

11              MR. ZEIDENBERG:  Yes, Your Honor.  The defense calls

12    Pastor Joseph Ting.

13                          JOSEPH TING,

14    called as a witness on behalf of the defendant, having first

15    been duly sworn, testified as follows:

16                       DIRECT EXAMINATION

17    BY MR. ZEIDENBERG:

18    Q.   Good morning, sir.

19    A.   Good morning:

20    Q.   Could you please identify yourself for the ladies and

21    gentlemen of the jury and spell your first and last name?

22    A.   My name is Joseph Ting, yeah.

23    Q.   How do you spell your last name?

24    A.   J-o-s-e-p-h.

25    Q.   Last name?

 1    A.   T-i-n-g.

 2    Q.   And how are you employed?

 3    A.   I'm the full-time pastor in a church.

 4    Q.   And, Pastor Ting, how old are you?

 5    A.   Sixty-six.

 6    Q.   How long have you been a pastor?

 7    A.   It's about 42 years.

 8    Q.   Where have you worked as a pastor?

 9    A.   20 years in Taiwan.  Then around 2000 I came to America

10    here.  It's about 22 years.

11    Q.   So you've been a pastor here in the United States for

12    22 years?

13    A.   Yes.

14    Q.   And where is it that you live?

15    A.   Right now I live in Princeton, New Jersey.

16    Q.   How long have you lived in Princeton, New Jersey?

17    A.   21 years.

18    Q.   And can you tell us a little bit about your congregation in

19    Princeton?

20    A.   You know, I there -- it's -- every time I working for the

21    Lord, I go into the Bible, yeah, so I visit -- I service all

22    the student and community people and take care of many churches

23    in New Jersey.

24    Q.   And how many people in your congregation?

25    A.   It's about -- in New Jersey we have 1,000.

1    Q.   How much?

2    A.   1,000.

3    Q.   1,000.

4    A.   We have ten churches in New Jersey.

5    Q.   And I want to take you back and direct your attention to

6    2002.  Did you become acquainted with Dr. Tao and his wife,

7    Hong Peng?

8    A.   In 2002 they come to -- they came to the Princeton from

9    China.  My work is take care of all -- once I take over the

10   student in the Princeton University, I visited them in

11   dormitory.  So I know them, yeah.

12   Q.   And after you met them the first time, can you tell us

13   about how your relationship developed?

14   A.   You know, my work -- I work in the church with many

15   different people.  The student and my wife, we visit every

16   student.  When he come to Princeton University, they're

17   freshmen, so I visit, knock on the door to know each other.

18   When the first time I met Franklin, he's so nice, so we say we

19   comfort you, you can -- I invite to go to my house, we have a

20   bible study.  They say, oh, it's okay.

21        (The reporter interrupted for clarification).

22   BY MR. ZEIDENBERG:

23   Q.   She's asking if you could repeat your answer a little more

24   slowly.

25   A.   It's about a bible study.  We have my house, it's open for

1    the student.  My house is near the dormitory.  So I invite the

2    student into my house every Friday night.  My wife and the

3    song, we have a song for the church.  We provide food for them.

4    After this we eat all the food.  After maybe the -- eat the

5    food, so we have to read the bible.  We eat the food about a

6    half hour.  One hour is for bible study.  We read one chapter,

7    then we would discuss it, something about it.

8    Q.    And how many people would attend Friday night bible

9    studies?

10   A.    It's usually 20, more 20, all student -- most of them

11   Princeton University student.

12   Q.    And were Franklin and his wife regulars?

13   A.    Yes, yes.

14   Q.    And in addition to seeing them Friday nights on the

15   regular, did you also see them at other points during the

16   weekend?

17   A.    Yeah.  You know, the meetings -- only the meetings, half

18   hour, right?  Sometimes they have many need.  You know, they

19   can to America here, many need.  And my wife, I usually go to

20   his house on Sunday night to -- we have -- together see the

21   television, something, and if you have any need, I can help you

22   usually.  This is -- I go to his house.  Friday he come to my

23   house.

24   Q.    And just so I get this straight, Friday nights they'd come

25   to your house for bible studies?

1   A.   Yes.

2   Q.   Sunday nights you typically go their house?

3   A.   Yes.

4   Q.   That was more social or also bible study?

5   A.   It's only social, yeah.

6   Q.   And did that relationship with Franklin and his wife

7   continue during the four years you were at Princeton?

8   A.   Yes.  You know, when he came to the Princeton, two years

9   they regularly join us bible study.  After two years they

10  baptized.  After baptized, they -- not only the Friday into my

11  house and I went to their house, and sometimes they come to the

12  worship, four years, yeah, four years.

13  Q.   Sunday worship?

14  A.   Sunday, yeah.

15  Q.   Where was Franklin -- where were Franklin and Hong

16  baptized?

17  A.   It's 2004.

18  Q.   Where was that?

19  A.   In a church in Franklin.  You know, New Jersey many time

20  the Princeton University is town.  You know, Princeton

21  University is Princeton city.  But our church, not in the

22  Princeton University.  It's near about 5 miles, it's a town

23  called Franklin.  So our church is a church in Franklin.  All

24  the students, they're baptized in our church, big church.  It's

25  a big one, so they're baptized in a church in Franklin.

1   Q.   And can you tell the ladies and gentlemen how it was that

2   Franklin Tao became -- took the name of Franklin?

3   A.   Yeah, you know, Franklin, he love the law.  After two year

4   he believe into the law, so our church is Franklin, so in

5   memory he change his English name, it's Franklin Tao.

6   Q.   And after the four years, the Taos, Franklin and Hong, move

7   to California; is that right?

8   A.   Yes, go to Berkeley for post-doctor.

9   Q.   Did you continue staying in touch with them once they moved

10  to Berkeley?

11  A.   Okay.  Yes.  So when he -- his family move to UC Berkeley,

12  he's in the post-doctor there, so all our church, we have --

13  it's center in California in Anaheim.  It's a big campus.  We

14  all responsible one, like an elder or coworker or a pastor, we

15  have ten times in the -- we will meet in Anaheim.  So every

16  time when we go there, by the way to stop by California, and

17  then I visit this family.

18  Q.   So how often would you see Franklin and Hong after they

19  moved to California?

20  A.   Five times at least per year with their family in Berkeley,

21  five times.

22  Q.   Five times during that four-year period?

23  A.   Yes.

24  Q.   In addition to visiting them in person five times, did you

25  also stay in touch with them otherwise?

1   A.   Yes.  I live in his house and we -- fellowship, you know,

2   many times it's very precious time because I only -- so I live

3   in his house sometime, sometime I live in another hotel.

4   Q.   If you could move the microphone a little bit closer to

5   you.  You can slide it closer or you can --

6          THE COURT:  It bends.  It bends down too.

7          THE WITNESS:  Okay.

8   BY MR. ZEIDENBERG:

9   Q.   I was asking you in addition to visiting them in

10  California, when you were -- after they moved, did you stay in

11  touch by phone, by e-mail?  How did you do that?

12  A.   Yes, except when I can come in person, I will usually call,

13  use a phone or e-mail.  We have multimedia we can contact.  You

14  know, my work is not only say you baptized, no, I will take

15  care of them whole life.

16  Q.   Your whole life?

17  A.   Not only Franklin, many students in Princeton University.

18  My work is for the many students.  He is one of them.

19  Q.   After California the Taos moved to -- Franklin and Hong and

20  their children move to Indiana?

21  A.   Yes.

22  Q.   Can you tell us about whether or not you --

23         MR. OAKLEY:  Your Honor, at this point I'd object to

24  relevance.

25         THE COURT:  Well, I think it has to do with the length

```
 1   and nature of their relationship, so I'll overrule.
 2           MR. ZEIDENBERG:  Exactly.  I mean, I want to show the
 3   nature of their relationship, the basis for his opinion.
 4   BY MR. ZEIDENBERG:
 5   Q.   Can you tell us about how often or how you were able to
 6   stay in touch with the Taos once he moved to Indiana?
 7   A.   Yeah.  When he move in South Bend, Indiana, so I usually
 8   use a phone.  Many times we talk each other.  And then I visit
 9   him three times when he live in South Bend in person.
10   Q.   And then in 2014 Franklin and Hong, as we've all heard,
11   came to Lawrence, Kansas.  And can you tell us whether you
12   stayed in touch with them even after they moved from Indiana?
13   A.   Yes.  He told me, yeah.  When he moved there -- he will
14   move there, he told me.  We pray together.
15   Q.   And how do you do that?
16   A.   When he moved there, so we pray and then he told me.  So he
17   said he make a decision, we go there.  So we usually use a
18   phone and e-mail or some multimedia, we talk each other like
19   this.
20   Q.   And based on the 20-plus years that you've known Franklin,
21   did you come to have an opinion about his character for
22   honesty?
23   A.   Yes, I am.
24   Q.   And what is your opinion?
25   A.   Franklin, he honor God and honor his parents.  He is
```

1    honest.  Franklin, he is a simple-minded person.  He focus

2    religion and the labor in his academical research only.

3    Q.   And did you -- based on your time with Franklin and seeing

4    him in the community, did you come to an opinion about his

5    reputation in the community --

6    A.   Yes, I did.  Sorry.

7    Q.   -- what his reputation in the community was for honesty?

8    A.   He is a very good person, and he -- he spends many time and

9    money to the church and to the community.  He helped many

10   student and young one.  He's a good person.

11   Q.   And his reputation in the community for honesty is what?

12   A.   Help others.  He -- he is kindness person.

13           MR. ZEIDENBERG:  Your Honor, I have no further

14   questions.

15           MR. OAKLEY:  No cross-examination, Your Honor.

16           THE COURT:  All right.  Thank you Pastor Ting.

17           THE WITNESS:  Okay.  Thank you.

18           THE COURT:  You can call your next witness.

19                       HONG PENG,

20   called as a witness on behalf of the defendant, having first

21   been duly sworn, testified as follows:

22                   DIRECT EXAMINATION

23   BY MR. ZEIDENBERG:

24   Q.   Good morning.

25   A.   Good morning.

1    Q.   Can you please identify yourself for the jury?

2    A.   Okay.  My name is Hong Peng.  I'm Franklin Tao's wife.

3    Q.   Can you spell your last name?

4    A.   My last name is P-e-n-g.

5    Q.   How old are you?

6    A.   I'm 46.

7    Q.   How long have you been married?

8    A.   This year, 20 years.

9    Q.   Do you have children?

10   A.   We have a set of twins.

11   Q.   Sorry.  Could you pull that microphone up a little bit.

12   You can slide it towards you, the microphone stand.

13   A.   Oh, okay.

14   Q.   Much better.

15   A.   We have a set of twins.  They are 16-year old.  Actually it

16   is their birthday tomorrow.  They're going to be 17-year old

17   tomorrow.

18   Q.   Do you work?

19   A.   Yes.

20   Q.   Can you tell the ladies and gentlemen where you work?

21   A.   I work as ultrasound tech.  I'm working and has worked in

22   Advent Health, Shawnee Mission; Lawrence Memorial Hospital;

23   Olathe Medical Center; Stormont Vail Hospital in Topeka; and

24   iCardio diagnostic imaging company.

25   Q.   And how many different jobs is that?

1    A.   It's five different jobs.

2    Q.   Five jobs?

3    A.   Yes.

4    Q.   How many hours a week are you working?

5    A.   I normally work 60 to 80 hours a week.

6    Q.   60 to 80?

7    A.   Yes.

8    Q.   And how long have you been doing that?

9    A.   Since August 2019.

10   Q.   And that was when --

11   A.   Well, when Franklin was arrest.

12   Q.   And is that because he hasn't been working?

13   A.   Yes.  And I had to work extra to pay our bills and also to

14   pay for the legal defense.

15   Q.   And where have you been the last two weeks?

16   A.   I have actually been right outside of the courtroom, and I

17   come to the court with Franklin every day.

18   Q.   And how come you haven't been in the courtroom?

19   A.   Because I'm the witness of the case.  For my knowledge, I'm

20   not allowed to be in the courtroom during the other witness

21   testify.

22   Q.   Can you tell us where you grew up?

23   A.   I grew up in a town in Chongqing, China.

24   Q.   Can you spell that?

25   A.   C-h-o-n-g-q-i-n-g.

1  Q.  Tell us a little bit about your education and background.

2  A.  I went to medical school in China, so I got my M.D. degree

3  in 2000.  So I went back to our hometown, worked in a hospital

4  that's one of the -- that's actually the biggest hospital in

5  our hometown.  At that time it was over 1,000-bed hospital.  I

6  work as a radiologist.

7  Q.  That's what I was going to ask you, that's your specialty?

8  A.  Yes.

9  Q.  Radiology?

10  A.  Yes.

11  Q.  Where did Franklin grow up?

12  A.  Franklin actually grow up in same hometown as me, but

13  Franklin grew up in the rural village area, was pretty poor.

14  Q.  Can you tell us how you and Franklin met?

15  A.  So my dad actually grew up where Franklin grew up, from the

16  same village.  Actually my dad and Franklin's dad went to

17  school, they were classmates.  So Franklin kind of like a role

18  model for all the parents who will ask your kids, yeah, you

19  need start as he, you need to go his path, and he's like role

20  model for a lot of us, so I was one of them.

21      So my dad always tell me since my dad know his dad, and we

22  -- at that time we have our relative actually in the same

23  villages, so when we went back to visit our relatives and we

24  were past Franklin's house, so every single time my dad would

25  point it and say, oh, yeah, remind me I need to follow his

1    path.

2    Q.   What was Franklin like as a young man when you knew him?

3    A.   Actually because he was -- he's oldest of his family, so I

4    know he start to like help his parents do a lot of house chore

5    even and he had to stand up -- he was short at that time, was

6    small, and he had to stand up on the stool and help chop, you

7    know, vegetables and cook meals when his parents were working

8    the farm.

9        And I know he worked really hard, and he's -- he's -- his

10    teachers whoever met him always say he was the best they ever

11    met.  He was the hardest worker -- working student, you know,

12    they ever met.  And they do say he was the smartest.

13    Q.   So at some point you and Franklin began a romantic

14    relationship, I take it?

15    A.   Yes.

16    Q.   And can you tell us when it was that the two of you --

17    where and when it was the two of you got married?

18    A.   Okay.  So actually I know Franklin since we were like kids,

19    but we are not like really close.  So after I graduate from

20    medical school, I went back to work.  So I was single and

21    Franklin was single, so basically his aunt hook us together so

22    we start to date and we got married in 2002.

23    Q.   Where was that?

24    A.   It was in Chongqing, our hometown.

25    Q.   Now, the same year you got married -- 2002, that was the

1    year you got married?

2    A.    Yes.

3    Q.    Did Franklin come to the United States?

4    A.    Yes.

5    Q.    When did he come and when did you follow and where did he

6    go?

7    A.    Okay.  So he came to Princeton University to pursue his

8    Ph.D. in August 2002.  So I came two months later in

9    October 2002.

10   Q.    And where did you and Franklin live in Princeton?

11   A.    We lived in the residence -- graduate residence housing.

12   Q.    Can you tell us what life was like for you and Franklin

13   when you got to Princeton?

14   A.    Yeah.  Actually there are a lot of precious memory for me

15   to talk about Princeton, so Franklin actually no matter where

16   he worked, he's always the hardest working, but at that time

17   before we have kids, I normally go to library with him, I study

18   in the library and also I will go to some of the -- like the

19   university provide like English as a second language for the

20   spouse, and I have a tutor and her name is Hannah, and I will

21   have a chat with her, like meet with her like once a week.  And

22   also I have bible study actually with Pastor Ting's wife, and

23   also Catherine and Jane, they are from American churches, they

24   help us with our English, we read bible together.

25   Q.    And we just, ladies and gentlemen, heard about Pastor Ting.

1    But can you tell the jury about how -- when you and Franklin

2    spend time with him and when?

3    A.    Yeah.  We actually start to -- actually Pastor Ting

4    approach to us when we arrived in Princeton, so we know he and

5    his family since 2002, and then he often visit us even Franklin

6    was so busy, we were maybe at home for short period of time and

7    he and his wife will come to visit us.  We'll read maybe a

8    short verse and we like pray maybe for a short pray and then we

9    have bible study actually most of the time pastor Ting's house,

10   sometimes if I have too big -- the group is too big, it will be

11   in room in residence area.

12        And also, you know, there was -- Pastor Ting, he came to

13   our house Saturday night evening, very late evening when we

14   were watching -- there was a Chinese show I remember at that

15   time and spend time with us.  So we went to bible study every

16   Friday evening and then we had a great time.  And we were so

17   looking forward to it.  I think for Franklin it's a release

18   kind of from his work, very intense work, and for me I was very

19   looking forward.

20        You know, we had dinner together.  I'm looking forward the

21   delicious food and also we chat with our sisters and brothers,

22   and the most important we enjoy the bible song and we enjoy the

23   bible words and also they shared stories.  It's all very

24   precious moments for me.

25   Q.    I'm sorry.  I don't want your voice to drop so we can hear

 1    you, everything you have to say.

 2    A.   It's very precious.  You know, whenever I think about

 3    Princeton, it's special.  It's a lot of precious memory for us.

 4    Q.   And in fact your children were born there, correct?

 5    A.   Yes.

 6    Q.   What year was that?

 7    A.   That was 2005.

 8    Q.   Did you name your children after that?

 9    A.   Yes.  We gave both of them middle name as ████████ because

10    it means a lot.  Franklin and I, we both baptized in Princeton,

11    so we got our new life in Princeton.  We got our children in

12    Princeton.  Franklin went to Princeton and Princeton is the

13    first place we settled down in the United States.

14    Q.   And your children's first name, were their significance

15    when you picked their first names?

16    A.   Yes, actually Franklin, you know, studied in Professor

17    ████████████████'s lab.

18    Q.   It was ████████████████?

19    A.   Yes.

20    Q.   ████████████████?

21    A.   Yes.

22    Q.   So who was he?

23    A.   He's Franklin's Ph.D. adviser.  And Franklin is one -- he's

24    strongest student and I think he had probably -- he had 50

25    graduate students and 30 post-docs.  Franklin is one of the

1    strongest.  He always said he has nothing but pride of Franklin

2    and the work he has done.  And Franklin keep -- he's a great

3    mentor and Franklin keep very good relationship with him, and

4    they actually have had collaboration I think even right before

5    Franklin was arrest.

6    Q.   And you were going to say how you named your children.

7    A.   Sorry.  And we actually -- actually my son carried

8    Professor ██████'s first name, S.T.  And my daughter, her

9    name has the same meaning as ████, so we named her L.T.  They

10   both have the same meaning as successful people.

11   Q.   After Princeton you moved to California.  Well -- let me

12   stop you, before we get to California, while you were in

13   Princeton, can you tell us about what Franklin was doing and

14   what his work hours were like?

15   A.   No matter where Franklin works, he works all the time.  And

16   he always, you know, the first one in the lab, got into the

17   lab, and the last one left.  He works like probably 16 hours a

18   week [*sic*] seven days a week.

19   Q.   You say 16 hours a week?

20   A.   I'm sorry, 16 hours a day, seven days a week.  And no

21   matter where he works, he's always most hard working person.

22   And he works really hard.  And then he -- whatever he did for

23   his Ph.D. thesis, I think it's considered two Ph.D.

24   Q.   I'm sorry.  Two --

25   A.   Consider the quantity of like -- quantity of two Ph.D.

1    Q.  Two Ph.D.'s, I got you.

2        So then you moved to Berkeley?

3    A.  Yes.

4    Q.  With the children?

5    A.  Yes.

6    Q.  And Franklin was a post-doc there?

7    A.  Yes.

8    Q.  And just briefly, can you tell us about how things were in

9    California?

10   A.  Yeah.  We had -- we had a really good time in California

11   because the weather is good and there are so many resource

12   around, around Berkeley, so we had -- the kids kind of have a

13   lot of activities and the rules and the amusement park,

14   everything is like very close, but Franklin still works --

15   worked all the time.

16   Q.  Similar hours as in Notre Dame -- I mean as at Princeton?

17   A.  Yes.  Maybe even more.  And he actually -- he publish a lot

18   of papers, but he published two papers in Science Magazine.

19   That's considered the top of the research journals.

20   Q.  Science Magazine?

21   A.  Yes.

22   Q.  All right.  After California, where are you off to?

23   A.  So after California we move to Notre Dame, Indiana.

24   Q.  South Bend?

25   A.  Yes, South Bend, Indiana.  Franklin start as a tenure track

1  university professor at University of Notre Dame.

2  Q.  And how was Notre Dame for you and the family and Franklin?

3  A.  We settle down pretty well, and the kids at that time they

4  were five.  They start kindergarten and they made friends

5  there.  And Franklin still worked all the time.

6  Q.  And when you say he's working all the time, can you tell us

7  about family vacations?  Did you ever take those?

8  A.  We only took one vacation.

9  Q.  All these years?

10  A.  Yes.

11  Q.  When was that and where did you go?

12  A.  I believe that was December 2016.  I'm sorry.  Not 2016,

13  2012 and we went to Miami.

14  Q.  With other families?

15  A.  With other -- yeah, with other two families, and Franklin

16  of course, you know, he's still working and in the evening.

17  Q.  And did he -- would Franklin try to come home occasionally

18  for dinner with the family or how often did he manage to do

19  that?

20  A.  He actually -- he barely come for dinner, and a lot of time

21  he will call me asking me bring dinner to his office to save

22  his time.

23  Q.  And so his schedule like that was consistent in Notre Dame

24  as it was in Berkeley and Princeton?

25  A.  Yes.

1    Q.   And what have you learned about why Franklin works all the

2    time?  Is he motivated by money or by being famous?  What is

3    it?

4    A.   No.  Franklin is very -- he's very simple person.  The only

5    thing he wants to do, it's research to make the contribution to

6    the world, to make the betterment for the society.  He doesn't

7    care about money.  And honestly too he paid out of his own

8    pockets for so many conference.  He represent for University of

9    Kansas, University of Notre Dame, and at the beginning -- and

10   we have argument and I just don't think this is right for our

11   family, but for the point I just gave up because you cannot

12   just persuade this man to change.

13   Q.   And how is it that you know that he wasn't getting

14   reimbursed for these conferences?

15   A.   Because I book the flights, I book the hotel, and I, you

16   know, I saw all those bills.

17   Q.   And these are conferences that he's going to where he's at

18   University of Kansas or Notre Dame?

19   A.   Yes.  But I remember for University of Kansas, in 2017 he

20   went to ACS American Chemistry Society spring conference, and

21   then there's a conference in the summer and it's North American

22   Catalysis conference and there is Applied Surface Science in

23   the summer of 2017, and also there is -- I'm sorry, I can't

24   remember the name, but there's another conference in 2017 in

25   the fall.

1        And then he went to ACS in -- American Chemistry Society

2    the spring conference in 2018 and ACS American -- four

3    conference in 2018.  And 2019 he went to the ACS spring

4    conference and also in the summer he went to like three

5    conferences.  There is natural gas, you know, and that

6    conference in San Antonio, Texas.  And there is a conference in

7    Chicago, that's North American Catalysis conference.  And also

8    the DOE PI meeting in Washington, D.C., that's in 2019 summer.

9    All these conference he didn't get reimburse.

10   Q.  Was he entitled to be reimbursed?

11   A.  As I family member I feel like, yes, he should, but

12   Franklin always put his research first.  And he -- when he

13   budgeted, he will budget what for his research first, what for

14   his student travel first.  He always put himself last.

15   Q.  So he would end up going to these conferences on his own

16   dime?

17   A.  Yes.

18   Q.  When was the last time you saw Franklin buy himself

19   anything nice?

20   A.  I would say never.

21   Q.  What kind of cars do you and Franklin own?

22   A.  2006 Toyota Camry, 2006 Toyota Sienna.

23   Q.  Now, I want to talk about your time in Kansas.  You came

24   here in 2014?

25   A.  Yes.

1    Q.   And how was it once you got here?

2    A.   Yeah, actually this move at beginning we definitely thought

3    it's a good move.  At that time there were like a few reasons

4    for us to move because at that time I think Franklin only start

5    his career since in 2010 so he was only four years, so

6    University of Kansas, you know, early promoted him to be

7    tenured associate professor with title, and plus they promised

8    him they're going to promote him full professor in two years if

9    he is as productive as he was in Notre Dame.  And then also

10   Professor Steve Bernasek, he's actually Kansas native, so it's

11   -- Kansas kind of like a special bond for Franklin.  So also at

12   that time he -- one of his colleague kind of recruit him here.

13   It end up he didn't come, but all these reasons combined

14   together that we thought it was a good move.

15   Q.   When he came here in 2014 and started working, first of

16   all, am I correct in guessing that his work schedule was

17   similar as it had been for the last -- since you had known him?

18   A.   Yes.

19   Q.   And what did that mean?

20   A.   He never changed.  And he always be -- I think every state

21   when we were -- if I have anything to say and he was oh, yeah,

22   I probably will be better, but you never get him better.  I

23   feel like it's even getting worse.  And when he works at, you

24   know, University of Kansas, where his office is is actually

25   very close to where we live.  A lot of time I drop his lunch

 1   and drop his dinner.

 2       And he did come home sometimes, and then sometimes it's

 3   make us feel like so -- I should not say irritated, but we have

 4   to be very patient to wait for him because you had to call him,

 5   oh, the dinner is ready.  And then I call, the kids call and

 6   ask him to, you should have a dinner with us.

 7   Q.  In 2015 did something happen while you were in Kansas that

 8   required Franklin to leave his teaching responsibilities and go

 9   back to China?

10   A.  Yes.  Actually Franklin's dad has emphysema for years, so

11   every winter it's really hard for him, but he has like --

12   almost like every winter he had been hospitalized, but for that

13   winter 2014 and 2015, that winter he has been in hospital many

14   times.

15       But Franklin just start teach in spring 2015, and it was a

16   pretty big class I think.  And so we called them and check, you

17   know, how he was doing.  I think one day in March his mom

18   called because his dad had to be transferred to ICU, the

19   intensive unit care, care unit.  So his mom said, you have to

20   come back, this may be the last time you saw your dad.

21       So Franklin has been left home so many years and he is

22   oldest in his family and he had to go.  So he asked -- he had

23   to, you know, take off, so went back to our hometown.  So

24   actually it was really sad because he didn't even make -- he --

25   he didn't have chance to talk to his dad because when he was --

1  when he went back, he was -- his dad was already in coma.

2  Q.  And how long did he end up having to stay in China?

3  A.  So his dad didn't make it that time so passed away, so he

4  stayed after the funeral.  So when he come back, he was already

5  probably about a month he was gone from his work.

6  Q.  And was there negative response from the Kansas

7  administration when he came back from his class, students,

8  teachers?

9  A.  Yes.  I think there were students complaining because they

10  had to switch, you know, different instructors.  But I don't

11  think his administration provided, you know, enough support for

12  Franklin.  And that was his first time to teaching the

13  university for that big class.  Plus, you know, it was so hard

14  I think emotionally and mentally for Franklin.

15       Honestly, I don't even -- I didn't find out how hard for

16  him and how harsh that situation for him until one day I found

17  a card from his pocket, a card from a student in that class,

18  and then said I'm very sorry for your loss, and I'm very sorry

19  for some students being mean to you, and I want you to know, we

20  are here to support you, we are here to understand you.

21       And that was -- Franklin, he's a man.  He tried to be

22  strong.  He -- we have very good communication, but he didn't

23  really talk too much how hard, you know, from in his heart, but

24  when I saw that card, you know, it was just really...

25  Q.  Well, directing your attention to a happier time at Kansas,

1   and I want to direct your attention to April of 2019 when you

2   and the children were called to go to a ceremony that was

3   honoring Franklin.  Do you remember that?

4   A.   Yes.  That was end of April 2019.  That was called

5   Scholarly Achievement Award.  That's one of the like top award

6   for the mid-career professor in University of Kansas.  Every

7   year only select four candidates, most of them are full

8   professors.  Yeah.

9        Franklin actually had went to a conference in South Korea

10  and he was -- they even said, you know -- they really

11  complimented that, he's a hard worker.  And even at that time

12  he was in South Korea to represent, you know, the University of

13  Kansas.

14       Yeah, my kids and I were there for the ceremony.  We were

15  really proud.

16  Q.   Was that ceremony videotaped?

17  A.   Yes.

18  Q.   Have you watched the videotape of it?

19  A.   Yes.

20       MR. ZEIDENBERG:  Your Honor, I'd like to introduce

21  just a small segment, Exhibit 1114 of that presentation.

22       THE COURT:  Has this been admitted, 1114?  Any

23  objection?

24       MR. BARRY:  It depends on which portion.  Assuming

25  they're going to --

1      MR. ZEIDENBERG:  It's the portion -- the last minute

2  or two.

3          MR. BARRY:  No objection.

4          THE COURT:  Exhibit 1114 admitted.

5  BY MR. ZEIDENBERG:

6  Q.  Was that a happy event for you and the kids?

7  A.  Yes.  We are so proud of him.

8  Q.  And in connection with this particular award, was there a

9  cash prize?

10  A.  Yes.  It comes with $10,000 cash prize.  And after the tax

11  I think, you know, we received close to $7,000.

12  Q.  And what did Franklin do with that $7,000?

13  A.  Franklin actually donated 3,500 to the department, chemical

14  and petroleum engineering, his department.  And also he donated

15  a thousand to our church.

16  Q.  I want to show Exhibit 1116.

17          MR. ZEIDENBERG:  We'll pull that up, Your Honor, 1116.

18  BY MR. ZEIDENBERG:

19  Q.  Is that the bank record that shows --

20  A.  Yes.

21          MR. ZEIDENBERG:  Once we pull that up.

22          COURTROOM DEPUTY:  Which one are you pulling up, 1116?

23          MR. ZEIDENBERG:  Has that been admitted yet?  I want

24  to show that to the witness.

25  BY MR. ZEIDENBERG:

1  Q.  Can you see it?

2  A.  Yeah, I can see.  This is the first page.

3          MR. BARRY:  Your Honor, it's still being displayed to

4  the jury.

5          THE COURT:  It's still on that --

6          COURTROOM DEPUTY:  Okay.  We can't do it.

7          THE WITNESS:  I actually saw it before.

8          THE COURT:  Let's take it off the screen.  Is there

9  any objection to this?

10          MR. BARRY:  No objection.

11          THE COURT:  All right.  Exhibit 1116 admitted.

12          MR. ZEIDENBERG:  I think it's 1116.

13          THE COURT:  I called it 1116.

14          MR. ZEIDENBERG:  I'm sorry?

15          THE COURT:  Not 1106.

16          MR. ZEIDENBERG:  I thought you said 1150.

17          THE COURT:  No, I said it wrong.  Admitted.

18          MR. ZEIDENBERG:  If you could scroll down.

19          THE WITNESS:  Yes, I saw it, 479 and 485.

20  BY MR. ZEIDENBERG:

21  Q.  What is 485, the one in the bottom corner?

22  A.  The one on the bottom corner is the one he donated to

23  University of Kansas to his department.

24  Q.  That's for $3,500?

25  A.  That's -- yes.

1    Q.  And right above that, that check is for $1,000.  Who is

2    that to?

3    A.  That's to our church.

4    Q.  Would $7,000 have meant a lot to your family back in

5    2018 -- I'm sorry, 2019?

6    A.  Yes, it does.  I have been married to Franklin for so many

7    years, so this meant I cannot change him.  So I basically just

8    accept him and I, you know -- I'm with him, I support him.

9            MR. ZEIDENBERG:  You can take that down.  Thank you.

10   BY MR. ZEIDENBERG:

11   Q.  Now, I want to direct your attention to late 2017, going

12   into 2018.  And I want to talk about the Changjiang Scholar

13   Program and application and tell us whether you became aware --

14   whether and when you became aware of Franklin wanting to apply

15   to be a Changjiang Scholar.

16   A.  Okay.  Yes.  Because, you know, in 2017 actually he was --

17   he was in University of Kansas already three years.  He worked

18   really hard.  He was not even as productive as he was in Notre

19   Dame; he was even more productive than he was in Notre Dame

20   when he worked in the University of Kansas.  He still didn't

21   get promoted, so it just -- for him, it's frustrating.  For us,

22   you know, as our family, we are frustrated.  So he was looking

23   for some options.  Maybe he can find a better place, if they're

24   going to promote him, so that's why he started.

25           And for this Changjiang Scholar, I can't remember when

1    exactly he applied, but I know he want to get -- he was --

2    basically tried to, you know, maybe get -- get the type of

3    award and get, you know, like -- get kind of like he has

4    something he can negotiate with the University of Kansas.

5        So I know in November 2017, he got a notice and they said

6    he was selected for the oral defense.  So at that time I think

7    his passport was expired.  I was actually helping him to apply

8    for travel document, so he -- I think he went back to China

9    twice at that time in November.  He went to kind of like help,

10   you know, prepare for the oral defense.  And he went back

11   December 2017 for the real oral defense.

12   Q.  And were you thinking at the time that you might actually,

13   the family might actually move back to China?

14   A.  I don't think so.  I don't even think he take serious to,

15   you know -- he -- it's more like he has something he can use to

16   negotiate.

17       But for our family, at that time our kids already middle

18   school.  And they cannot read and write Chinese.  There's --

19   it's impossible for them to study in China.  It's just too --

20   it's too much, way too much for them.  So I was prepared for my

21   medical board.  So I want to be a doctor.  That's my American

22   dream.

23   Q.  And when did you become a U.S. citizen?

24   A.  March 2019.

25   Q.  Okay.  So that was in process as well, I take it?

1    A.   I didn't -- you know, I think, you know, I didn't like, you

2    know, send my paperwork, but I was definitely, you know --

3    that's in my thought, you know, for sure and I would do it,

4    yeah.

5    Q.   And what was your understanding about how the process would

6    work in terms of doing the oral defense and getting the award

7    and negotiating and how was that whole process supposed to work

8    as far as you understood?

9         MR. BARRY:  Objection, hearsay and impermissible lay

10   opinion testimony.

11        THE COURT:  I'll overrule to the extent she had an

12   understanding.

13        THE WITNESS:  It's okay?

14   BY MR. ZEIDENBERG:

15   Q.   Yes.

16   A.   So he went -- he went for the oral defense, and I think he

17   got the candidate list at the beginning of 2018, so basically

18   at that time, you know, he -- and they kind of like start to

19   negotiate, and if they can make agreement and then, you know,

20   he would, you know, work there, and if not, you know, he would

21   not.

22        So actually that was 2018.  Because I didn't mention that,

23   after my father-in-law passed away, my mother, you know, she

24   had really -- she had -- she has depression.

25   Q.   This is Franklin's mother you're talking about?

1    A.    Yes.  And so basically Franklin is the oldest in the family

2    and his mother like mentally, emotionally really depends on

3    him, like needs a lot -- needs a lot from him.  So at that

4    time I think Franklin taught like two courses in fall 2017, so

5    he didn't have teaching duty in spring 2018, so we were already

6    talk, you know, we like spend -- we're going to spring festival

7    2018 with his mother, basically tried to comfort her and make

8    her happy and make her like depression like less.

9         So because he got the -- in that list, so, you know, Fuzhou

10   University ask him, you know, you should visit, you know.  So

11   we think -- since we're going back to China to spend the spring

12   festival with my mother-in-law so we went to visit Fuzhou

13   University as -- we went together as a family.

14   Q.    And so you, the kids, Franklin, all went to Fuzhou?

15   A.    Yes.  We spend like two days there.

16   Q.    And what did the children think of it?

17   A.    My kids don't -- didn't like it at all.  They didn't like

18   the food.  They didn't -- basically they didn't like anything

19   there.  And for us, you know, we grew up in Chongqing, so we

20   eat Sichuan food.  So it's spicy.  So they eat very light.

21   It's quite different from, you know -- so we don't like it

22   either.

23        And plus I went to dinner with some of the like

24   administration person --

25   Q.    Let me just back you up so we get oriented.

 1    A.   Okay.

 2    Q.   Other than the visit with the children, did you actually

 3    participate in meetings with Franklin with people from Fuzhou

 4    University?

 5    A.   Yes.

 6    Q.   How many?

 7    A.   I went twice, one is like at a dinner.  You know, they had

 8    some of the talk.  And then when it's in the office, I went

 9    with him.

10    Q.   And can you tell us about, first of all, like the dinner,

11    how many people were present besides you and Franklin?

12    A.   I think six or eight.

13    Q.   Tell us about that.

14    A.   So the dinner of course, you know, they have -- a lot of

15    casual talk.  And then I remember one thing --

16         (Court reporter interruption for clarification).

17    BY MR. ZEIDENBERG:

18    Q.   What is --

19    A.   Sorry, excuse my English.

20    Q.   You have to talk into the microphone, Hong.

21    A.   Casual.

22    Q.   What is candle [*sic*] talk?

23    A.   No.  Casual, casual.  Sorry, excuse my English.

24    Q.   Can you spell that?

25    A.   C-A-S-U-A-L.  Sorry.

1    Q.   I still didn't hear you.

2          MR. ZEIDENBERG:  Did you get it?

3          THE REPORTER:  Yes.

4          MR. ZEIDENBERG:  Okay.

5          THE WITNESS:  Excuse me.

6    BY MR. ZEIDENBERG:

7    Q.   Tell us about the dinner.

8    A.   I remember -- so when they started talking about set up

9    research fund, so Franklin insist, you know --

10         MR. BARRY:  Objection, hearsay.

11         THE COURT:  I'll sustain.

12   BY MR. ZEIDENBERG:

13   Q.   Did you hear the discussions between Franklin and the --

14   were there negotiations going back and forth?

15   A.   Yes.

16         MR. BARRY:  Objection, hearsay.

17         THE COURT:  Didn't ask for the contents, so I'll

18   overrule.

19   BY MR. ZEIDENBERG:

20   Q.   Were there negotiations going on?

21   A.   Yes.

22   Q.   And from what you could see, were the people at Fuzhou

23   receptive?  Were they agreeable?

24   A.   I really don't think so because Franklin puts, you know,

25   pretty high, it's like 50 million Chinese Yuan --

1          MR. BARRY:  Objection, hearsay.

2          THE COURT:  Okay.  Hold on.  Why don't you lead her

3    through these questions?

4          MR. ZEIDENBERG:  Okay.

5    BY MR. ZEIDENBERG:

6    Q.  Were they -- from what you could see, were the people at

7    Fuzhou wanting to engage on the details of these -- of what

8    Franklin wanted to discuss about?

9          THE COURT:  He's going to ask you a series of

10   yes-or-no questions because you cannot say what other people

11   said that aren't here to testify.  So he's going to ask you, I

12   think, yes-or-no questions at this point.  Okay.  Go ahead.

13   BY MR. ZEIDENBERG:

14   Q.  Were they willing to engage?  Were they discussing back and

15   forth or were they trying to push him off?

16   A.  They tried to push him off.

17   Q.  And at any point did you see them come to agreement or

18   shake hands or anything like that that would indicate to you

19   that there was an agreement?

20   A.  No.  And every single time, you know, I think when the

21   heated topic, they try to direct him to another person.  You

22   know, it's -- they don't want, you know -- they don't even want

23   to talk about it.

24   Q.  And you said you went to a second meeting.  Who was that

25   with?

19-20052-JAR    USA v. Feng Tao    04.05.22    Day 12                2318

1    A.    I think that was -- I can't remember.  I cannot remember

2    the exactly title, but that's pretty high, pretty high level

3    of, you know, the administration.

4    Q.    Was that in a more formal setting?

5    A.    It's, you know, conference room, but only like a few people

6    there.

7    Q.    Okay.  And how did that go?

8    A.    Still the same.

9    Q.    So there was discussions about negotiations or there's

10   negotiations going on?

11   A.    Yes.

12   Q.    And from what you could see, was there any agreement?

13   A.    No.

14   Q.    Did you at that point have any interest in moving back to

15   China with the children?

16   A.    No.

17   Q.    And did you express that to Franklin?

18   A.    He knows.

19   Q.    You made that clear?

20   A.    Yes, very clear.

21   Q.    So nevertheless Franklin spent a good deal of time in China

22   during this summer of 2018 and spring 2019.  Do you know why?

23   A.    For the 2018 actually he spent, you know -- he was a

24   visiting professor in University of Nagoya.

25   Q.    What was that?

1    A.   Nagoya.

2    Q.   Nagoya?

3    A.   Yes.  So he spent time in China and in Japan.  And then he

4    spent a lot of time with his mom actually because she needs a

5    lot of -- she needs a lot of attention from him, and then I

6    know he -- I know he spends some time, you know -- because

7    they're pushing him so much Fuzhou University, so he feel like

8    he have obligation, you know, even he -- he didn't agree to go,

9    but he kind of like have obligation to help them.

10   Q.   And do you know what he was doing at Fuzhou when he was

11   there?

12   A.   I don't know exactly.  I think he, you know, he has

13   collaboration.

14         MR. BARRY:  Objection, calls for hearsay.  He needs to

15   lay a foundation.

16         THE COURT:  Lay a foundation for personal knowledge

17   other than hearsay.

18   BY MR. ZEIDENBERG:

19   Q.   Let me -- while Franklin was away, did you see any signs of

20   money coming into the family, new money?

21   A.   No.

22   Q.   There's no extra money that you saw?

23   A.   No.

24   Q.   By the way, when you and Franklin traveled to China

25   together, how did you pay for things?

1  A.   So we used -- we travel basically the same way, everybody

2  carry a phone and you use WeChat Pay.  And for Franklin when he

3  visits some of the universities, he gets some honoring.  So

4  when we go back to Chongqing, our --

5  Q.   Go a little bit slower.  So tell us how you use WeChat to

6  pay for things.

7  A.   So basically you use WeChat to scan the barcode and then

8  you just pay it or you scan their barcode and you pay it.

9  Q.   Is that something like Venmo in this country?  Are you

10  familiar with Venmo or Apple Pay?

11  A.   It's kind of, you know, similar.

12  Q.   Do you know what the source of the funds were that comes

13  off of that?

14  A.   It's -- well, he visit universities, you know, normally he

15  gets -- he give a talk, you know, he get some honoring.

16       And when we go back to our hometown, we basically live in

17  home and they cook -- our family cook food for us.  And then

18  when he spends some time, visit some of the universities, they

19  provide him like a -- where he can stay.

20  Q.   And do you have a bank account in China?

21  A.   Myself?

22  Q.   Well, do you or Franklin have a bank account?

23  A.   Just Bank of China, you know, has Franklin's name.

24  Q.   And I want to show you Government's Exhibit 637.

25       THE COURT:  This has been admitted.

1          MR. ZEIDENBERG:  It has been introduced.

2          THE COURT:  It's been admitted.

3    BY MR. ZEIDENBERG:

4    Q.    Okay.  Do you see this?  This was introduced by the

5    government a few days ago.  Do you know what that is?

6    A.    Yes.  That's a Bank of China under Franklin's account.

7    Q.    And this is -- this was a -- I'll represent to you

8    introduced this as an image that was found on one of the

9    Franklin's electronic devices.  Do you see that number in blue

10   at the top, 11305293476?

11   A.    Yes.

12   Q.    Do you have a bank account or does Franklin have a bank

13   account with that number?

14   A.    Yes.

15   Q.    I want to show you Defense Exhibit 1462.  What is 1462?

16   A.    Yes, this is the bankbook, you know, for this account.

17   Q.    And where was that bankbook as far as you know in August of

18   2020 when the FBI came and searched your house?  First of all,

19   was it taken when the FBI came and searched your house?

20   A.    No.  I don't think -- this is -- you know, this is at

21   Franklin's suitcase, you know, like outside of the cover.  So I

22   don't -- I don't --

23   Q.    It wasn't even in your house when they came to do the

24   search the day before Franklin's arrest; is that right?

25   A.    Yes.

1    Q.   And after Franklin was arrested and he was released and you

2    found this bankbook -- or it was found in the house?

3    A.   Found in the suitcase not too long ago actually because I

4    think the government send the exhibits and then...

5    Q.   And the book that you had in August of 2020 or when you

6    found this, you see the other number?  We're looking at the

7    screen, do you see 113052934967, is that the same account

8    number as the bankbook you have there?

9    A.   Yes.

10   Q.   Do you see the other number on the screen in 1637 which is

11   37 -- 31724796?

12   A.   Yes.

13   Q.   And is that the bankbook number?

14   A.   Yes.

15   Q.   And is that the same as the one in your hand?

16   A.   Yes.

17   Q.   Are you sure?

18   A.   Yes.

19   Q.   Did you send that bankbook back to China to get it updated?

20   A.   Yes.

21   Q.   Can you tell us about that and why you did it and when you

22   did it?

23   A.   So this was like just in February, this month, and we found

24   the book.  And then so --

25   Q.   When you found the book, what dates approximately were

1    reflected in the bankbook?  What dates of entries were

2    reflected in the original book that you found that was left

3    behind after the search?

4    A.   I think when we found it, it was in -- I don't remember in

5    February 2018, that was the last transaction there.

6    Q.   So when you got the book, the last transaction you saw was

7    February 2018?

8    A.   Yes.

9    Q.   And what did you do?

10   A.   We thought because, you know, we -- we want to, you know,

11   get this book updated so they can show all the transactions to

12   clearly tell what's exactly the transactions with this book, so

13   I send this back to China.

14   Q.   And back to the bank?

15   A.   Back to China, yes.  Not -- you know, to our relative can

16   help us, you know, go to a bank and then to update this

17   bankbook.  But they found out that this is magnets, you know,

18   so this does not -- does not work in the old one.  So they had

19   to replace the bankbook.  So when they replaced the bankbook,

20   they had to take the old one back.  But, you know, I was -- we

21   were afraid this maybe get lost on the way, you know, like

22   doing the -- you know, on the way back and forth, so we did

23   take the picture and did take video just making sure, you know,

24   everything -- it's definitely that one.

25   Q.   Okay.  And did they in fact -- did the bank in fact update

1    the transactions in there?

2    A.   Yes.

3    Q.   And what dates does it cover now?

4    A.   It covers December 21, 2021.

5    Q.   And that's the last one.  And what's the one before that?

6    A.   The one --

7    Q.   The earliest?  Like how long does it cover?

8    A.   The earliest it's September 22, 2016.

9    Q.   Okay.  So from 2016 to 2021?

10   A.   Yes.

11   Q.   And the transactions after August of '19 when Franklin's

12   been, you know, here in the United States and hasn't been able

13   to travel, what is the nature of the transactions you see

14   there?

15   A.   It just interest.

16   Q.   Just interest payments?

17   A.   Yes.  They update -- it look like they update it like every

18   quarter.

19   Q.   Can you summarize for the jury the most that that account

20   has shown in those five years?  What is the typical balance

21   that's reflected in there?

22   A.   The maximum balance is -- it's 2,500.  That's the maximum.

23   And then the -- mostly it's like 1,100.

24   Q.   That would be 2,500 USD?

25   A.   Yes.

1    Q.   Or about -- and it's usually about 1100?

2    A.   Yes.

3         MR. ZEIDENBERG:  Your Honor, I move to introduce

4    Exhibit 1462.

5         THE COURT:  Any objection?

6         MR. BARRY:  Can I see it, please?  Peter, can I see

7    it, please?

8         We would object on authenticity and hearsay.

9         THE COURT:  Can I see it, please?  Can I see it?

10        All right.  Exhibit 1462 admitted.

11        MR. ZEIDENBERG:  If we could turn on the ELMO.

12        There we go.  It took two weeks.

13        COURTROOM DEPUTY:  There we go.  Okay.

14   BY MR. ZEIDENBERG:

15   Q.   Is that the first -- what the cover looks like?  Do you see

16   that?  I want to go to the dates, and this first date, does

17   that appear to be -- they reverse the numbers like they do in

18   the United States.  Is that September 22, 2016?

19   A.   Yes.

20   Q.   So I want to go down to just take a look.  This is where it

21   starts.  And these amounts showing the balance, that's 2,010

22   Yuan?

23   A.   Yeah, that's in Chinese Yuan.

24   Q.   How much is that approximately in U.S.?

25   A.   Close to 300.

1   Q.   $300?

2   A.   Yeah.

3   Q.   And so this amount, 7,105 would be approximately a thousand

4   dollars U.S.?

5   A.   Yes.

6   Q.   And goes all the way up to 15,845 Yuan, and that would be

7   -- or 17,000, that would be a little over $2,000?

8   A.   Yes.

9   Q.   And looking at the deposits, you see the largest deposit

10   is -- appears to be 4,000 -- or no.  There's a 7,000 Yuan --

11   A.   Yes.

12   Q.   -- deposit?

13      And that would be about $1,000?

14   A.   Yes.

15   Q.   Now, I want to talk to you about -- during this time

16   frame -- and I'm going to take you back to late 2018 and early

17   2019.  Do you know if Franklin was applying for professorship

18   positions in U.S. schools?

19   A.   Yes.

20   Q.   How do you know?

21   A.   Because I even -- I help him look for if there is any

22   opening and I even forward the openings to him.

23   Q.   And do you know why he was doing that?

24   A.   Yeah.  Because -- because he was not happy in KU because

25   they didn't keep their promise, and he want to look, you know,

 1    if he can find any other better options, you know, he can have

 2    better opportunities.

 3    Q.   And in August -- the beginning of August 2019, do you

 4    recall Franklin sending you a draft of one of the draft

 5    contracts that he had with Fuzhou University?

 6    A.   Yes.

 7    Q.   And do you know why he was sending it to you?

 8    A.   Yes.

 9         MR. BARRY:  Objection, hearsay.

10         THE COURT:  Lay foundation.

11    BY MR. ZEIDENBERG:

12    Q.   Are you aware of what was going on with Franklin and KU at

13    the time he sent that to you in August 2019?

14    A.   Yes.  He has -- he has -- actually he has a meeting set up

15    with -- to meet the provost in University of Kansas on

16    August 21st, the day he was arrest.  So he actually sends that

17    contract, you know, to me, want me to take a look, you know.

18    He wants to show that contract to the provost basically to

19    negotiate if they could promote him as they promised.

20         So he want me to look at the contract, see if I can find

21    some, you know, like points I can point out, you know, he can

22    show to the provost.  He wants to ask, you know, if I have my

23    opinion and some suggestions.

24    Q.   In August 2019 are you aware that you and your children

25    were under surveillance?

1   A.   No.

2   Q.   Did you ever see people following you as you were doing

3   errands?

4   A.   No.

5   Q.   Did you notice an airplane or drone flying over your house?

6   A.   No.

7   Q.   On August 20, 2019, what was the significance -- a lot of

8   things happened that day.  But in the morning what was the

9   significance of that morning to you?

10  A.   Yes.  Actually that's the first day of my kids' high

11  school.  And they were so excited, we were all excited because

12  it's like a milestone for them.  They were very excited,

13  looking forward to it and so do we.  So I drop them off at

14  school I think before 8:00.

15  Q.   And did you know you were being followed by an airplane or

16  drone at that time?

17  A.   No.

18  Q.   When you came home from school, dropping the kids off, can

19  you tell the ladies and gentlemen what happened?

20  A.   So after I dropped my kids off, I came home, and I start to

21  study my board, medical board.  So I actually have appointment

22  with a handyman coming at 9:30, so I was waiting for the

23  handyman and starting for my board.

24       And so I think around 9:00 I just hear pounding on the

25  door, so I went to open the door.  I saw FBI wear the vest and

1   they have the gun, and then there were so many cars parked

2   outside, you know, on the street and there was even a truck.

3   So later on I found out that's a forensic lab.  And after they

4   didn't even drove one to Lawrence, they drove two, I didn't

5   find out later from the newspapers they actually search

6   Franklin's lab at the same time and there was another truck, it

7   was a forensic lab outside of his working place.

8   Q.   And what happened -- how many people -- how many agents

9   came into your house?

10  A.   I think close -- about 20.

11  Q.   20 agents?

12  A.   Yes.  And they just came in and took my phone.  So I feel

13  like, you know, I should call the handyman and tell him don't

14  come.  So they didn't even allow me to call the handyman.  So I

15  didn't get a chance to talk to him any way.  So they were --

16  there were -- basically I could not be outside of their sight.

17  They start to search every corner of the house.  They took all

18  the electronics away, and also everything with Chinese

19  character, they took it.  Most -- I should say most of it was

20  Chinese characters they took it.

21      There was one CD, the name, there were like two characters

22  called, you know, return home.  It's a bible song.  My brothers

23  in our old church burned for me and I was able to put in my car

24  to listen to it.  They took -- they even took that CD too

25  because that was Chinese characters.

1  Q.  Have any of those devices or any of those things been

2  returned to you over the past two and a half years?

3  A.  Only right before the trial because as the Court ordered,

4  so they only returned my cell phone at that time I use.

5      I want to, you know, mention one device is a Surface Pro,

6  my daughter used that for her study.  Franklin didn't even know

7  we have it.  He never touch it, but they took it.  They never

8  return it.

9  Q.  So this is August 20th.  Where was Franklin at that time?

10  A.  He was on the flight back to home.

11  Q.  And did something happen with his flight that delayed him?

12  A.  Yes.  He supposed to come home in -- at night of

13  August 20th, but the flight get cancelled in Chicago.  So he

14  had stayed in the airport for the whole night.

15  Q.  And why didn't he get a hotel?

16  A.  Save money.  That's how his life is.

17  Q.  And how long had he been traveling before he ended up

18  spending the night at O'Hare Airport?

19  A.  I think 36 or 24 or 36 hours because he has transferred in

20  Japan.

21  Q.  And then you picked him up at MCI?

22  A.  Yes.

23  Q.  What time was that?

24  A.  I think 8:00 a.m.

25  Q.  And what happened at that point?

1   A.   So I told him what happened at home, and then we were

2   driving home.

3   Q.   Let me just back up a little bit because I forgot to ask

4   you, during the search of your home, were you interviewed?

5   A.   Yes.

6   Q.   How many agents interviewed you?

7   A.   Three.

8   Q.   And do you remember what they were asking you about?

9   A.   They did ask me if he -- did he teach in Fuzhou University.

10  I said no.  And then they ask me -- I think they ask me if he

11  has a job.  I said a side job.  So I consider myself and I

12  help -- I graduate from medical school, so a lot of my

13  classmates they have to publish papers.

14  Q.   They what?

15  A.   They had to publish papers in the journal, so whenever they

16  do that, they send to me, I help, you know, can I proofread or

17  help edit, but I just volunteer do it.  I consider he does

18  that.  He did the same thing.  So I consider -- I -- that's my

19  side job.

20  Q.   And that's what you meant when you said side job?

21  A.   Yes.

22  Q.   And going back to the end of that search, when did they

23  finish up?

24  A.   I think 1:00.

25  Q.   And at some point did you have to go pick up your kids?

1   A.    Yes.

2   Q.    What happened then?

3   A.    So I -- so I had -- after they left so I went to pick up my

4   kids.  You know, I don't even know how to explain to them

5   because it was their first day of high school.  And I just

6   thought, you know, I tried to think about what I need to tell

7   them before they get home because all of the searches they can

8   tell, you know, easily.

9        So after I was late, I didn't -- when I got to the school,

10  they were not even there.  So one of I think, you know, our

11  friend gave them a ride.  So when I came back, they were

12  sitting on the floor and ask me, mom, why didn't you come to

13  pick up us?  So I had to really hesitate to tell them but I had

14  to tell them because when they get into the house, they will

15  see everything.  I thought it's so cruel.  That's how they

16  start your high school, they're still in high school, this is

17  the high school period.

18  Q.    Going to August 21st you picked up Franklin at MCI.  He

19  comes back, and how long before he gets arrested then?

20  A.    I think they arrest him around 2:00.

21  Q.    And the house that this all happened in, you had just

22  decided to buy it?  I mean, you decided to put down roots in

23  Lawrence?

24  A.    Yes.

25  Q.    And why was that?  Why Lawrence?

1   A.   So I know Franklin was looking for a position, but nothing

2   really settled, you know, and you don't know when you can get

3   it.  So my kids start high school and then that's their age, if

4   everybody have kids, how hard for them to move.  I don't want

5   my kids to really face it because when we moved from Notre Dame

6   to University of Kansas, it was pretty hard for them.  So I

7   don't -- I just want them, at least they can go through high

8   school without us, you know, moving.  I want to settle down.

9            MR. ZEIDENBERG:  I have no further questions, Your

10  Honor.

11           THE COURT:  All right.  This would be a good time to

12  take a lunch break unless you think you'll be very brief on

13  cross-examination.

14           MR. BARRY:  I think we should take a lunch break, Your

15  Honor.

16           THE COURT:  All right.  Let's take a break then until

17  1:15.

18       (Recess.)

19       (The following proceedings occurred outside the presence of

20  the jury.)

21           THE COURT:  Are we ready to bring the jury?

22           MR. BARRY:  Yes, Your Honor.

23       (The jury entered the courtroom, after which the following

24  proceedings were had.)

25           THE COURT:  You can be seated.

1          Mr. Barry.

2          MR. BARRY:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4   BY MR. BARRY:

5   Q.   Good afternoon.

6   A.   Good afternoon.

7   Q.   I want to start by talking about the FBI interview when

8   they executed the search warrant.  Do you remember talking

9   about that?

10  A.   Yes.

11  Q.   And you said that three FBI personnel interviewed you,

12  correct?

13  A.   Yes.

14  Q.   And this was during a period when your husband was flying

15  back from China, correct?

16  A.   Yes.

17  Q.   And you spoke to those FBI personnel about a variety of

18  topics, correct?

19  A.   Can you say that again?

20  Q.   Sure.  When you spoke with those three FBI agents, you

21  talked about a variety of topics, correct?

22  A.   I would think so.

23  Q.   Okay.  And Mr. Zeidenberg asked you a couple questions

24  about some of the topics you talked about, correct?

25  A.   Yes.

1  Q.  And I want to talk to you about some of the other things

2  you talked about with those agents.

3  A.  Okay.

4  Q.  First is those agents asked you whether they could record

5  that interview, correct?

6  A.  Yes.

7  Q.  And you declined to give them permission to record the

8  interview, correct?

9  A.  Yes.

10  Q.  During that interview you said that your husband had

11  received a Changjiang Scholar award, correct?

12  A.  Yes.  He was selected as a Changjiang Scholar.

13  Q.  And you said that that was a really big deal, correct?

14  A.  Yes.

15  Q.  And you also said that he had a job at Fuzhou University,

16  correct?

17  A.  I didn't say he has a job, you know.

18  Q.  So let me rephrase it, okay?  You said that he had a job at

19  Fuzhou University, correct?

20  A.  I can't recall that part.

21  Q.  Okay.  And you said -- with Mr. Zeidenberg you said that

22  you characterize it as a side job, correct?

23  A.  I think I said side job.

24  Q.  Okay.  So you recall sitting here today that when the FBI

25  interviewed you, you told them that your husband had a job at

1    Fuzhou University, correct?

2    A.    I didn't say have a job.  Side job is different than job

3    from my definition.  Thank you.

4    Q.    So let me finish the question.  When you spoke to the FBI,

5    you said he had a job at Fuzhou University, correct?

6    A.    No, not correct.

7    Q.    When you spoke to the FBI, there were three agents there,

8    correct?

9    A.    Yes.

10    Q.    And are you familiar when agents interview witnesses, they

11    take notes?

12    A.    Yes.

13    Q.    Okay.  And so if I represent to you that those agents in

14    their notes said that when they interviewed you, you said that

15    your husband worked at Fuzhou University for his side job,

16    would that be an accurate statement?

17    A.    Probably.

18    Q.    You also said to the FBI in that interview that your

19    husband works so much that the family never saw him, correct?

20    A.    Yes.  I never saw him -- I don't know if I said that, you

21    know.  You know, he definitely work a lot.  He comes home and

22    then he works a lot.

23    Q.    So he worked a lot and he's off occasionally, correct?

24    A.    Not occasionally.  We saw him every day he comes home.

25    Q.    Okay.  During that FBI interview, you also said that you

1   were familiar with somebody named Luan Nguyen, correct?

2   A.   I'm familiar with the name, yes.

3   Q.   So during that interview you said I'm familiar with Luan

4   Nguyen?

5   A.   Can I -- if I don't have anything in front of me, that was

6   -- happened two years ago and I was very nervous, scared, and

7   frightened, and I just don't know, you know, if I can say

8   everything you ask me I can answer, you know -- you know, I can

9   recall completely.

10  Q.   Sure.   I'm going to hand you what's called a 302.   It's

11  just an interview memo that the FBI writes after it interviews

12  witnesses.   I'm going to hand this to you to see if you can

13  refresh your memory, okay?

14  A.   Okay.   Thank you.

15         MR. BARRY:  May I approach?

16         THE COURT:  Yes.

17         THE WITNESS:  Thank you.

18  BY MR. BARRY:

19  Q.   And so I'm asking if you flip the first page, you'll see

20  there's a third page that's highlighted.   And I'm asking when

21  the FBI interviewed you on August 20, 2019, you told them that

22  you were familiar with somebody named Luan Nguyen, correct?

23  A.   Yes.

24  Q.   And you said that he was a graduate student who worked in

25  your husband's lab, correct?

1  A.  Yes.

2  Q.  During that Court-authorized search, the FBI found this

3  certificate in your house, correct?

4  A.  They didn't show me, but I guess if you found that in our

5  home, then yes.

6  Q.  Before the FBI searched your home, did you know that this

7  was in your home?

8  A.  Honestly we moved so I really don't know.  This is

9  definitely not outside of the box or, you know, on the shelf, I

10  know that for sure.

11  Q.  Before today have you seen this before?

12  A.  Today, yes.

13  Q.  Before today?

14  A.  Yes.

15  Q.  So you've seen this before?

16  A.  Yes.

17  Q.  Okay.  So I want to next talk about the day that your

18  husband was arrested on August 21, 2019.  Okay?

19       So you said that that morning you picked your husband up at

20  the airport, correct?

21  A.  Yes.

22  Q.  And you said that your husband had been traveling for over

23  36 hours or I think three days and was very exhausted, correct?

24  A.  Yes.

25  Q.  And you said that you picked him up at the airport and then

1    you drove home, correct?

2    A.   I know we did saw Luan I think, you know, and I think after

3    we get home and we saw Luan once.

4    Q.   Sorry?

5    A.   I think we did meet Luan once.

6    Q.   Let me go through the sequence.  Okay.  So you picked up

7    your husband at the airport, correct?

8    A.   Yes.

9    Q.   And he was very exhausted, correct?

10   A.   Yes.

11   Q.   Because he hasn't slept in three days, correct?

12   A.   It's probably about like 36 hours I would say.

13   Q.   Still a lot of time, 36 hours he hasn't slept, right?

14   A.   Yes.

15   Q.   That was MCI, the airport in Kansas City, Missouri,

16   correct?

17   A.   Yes.

18   Q.   And then you drove directly from that airport home,

19   correct?

20   A.   I drove home and directly home, yes.

21   Q.   And so you picked him up at the airport and you drove

22   directly home, correct?

23   A.   I can't remember if we saw Luan first or we saw Luan after.

24   Q.   And then with Mr. Zeidenberg you also said that after you

25   went home, your husband went to sleep and then the next thing

1   that happened was the FBI knocked on the door to arrest him,

2   correct?

3   A.   I don't think Mr. Zeidenberg said that.  Did Mr. Zeidenberg

4   say that?

5   Q.   So let's take a step back so I get the sequence right.  So

6   when you were being examined on direct examination, you said

7   that you picked your husband up at the airport, correct?

8   A.   Yes.

9   Q.   And you said he was very exhausted, correct?

10  A.   Yes.

11  Q.   And then you said he went home and went to sleep, correct?

12  A.   I don't recall that.

13  Q.   Okay.  So that's what I heard.  Then you said that he was

14  woken by the FBI knocking on the door, correct?

15  A.   Yes.  That was about 2:00.

16  Q.   Okay.  And he then went downstairs and that's when he was

17  arrested, correct?

18  A.   I don't recall if I said that.

19  Q.   On direct examination though you didn't mention any meeting

20  with Luan Nguyen, did you?

21  A.   I don't think Mr. Zeidenberg asked me.  Did he ask me?

22  Yeah, if he ask, I would say yes.

23  Q.   So earlier today when we were talking about the sequence of

24  events, you did not mention anything about Luan Nguyen, did

25  you?

1    A.    Because, you know, Mr. Zeidenberg didn't ask me.  And I

2    think Mr. Zeidenberg ask me really shortly, just ask me, I pick

3    up my husband and you, know, husband got home and when my

4    husband was arrested if I remember clearly.

5    Q.    But you don't -- so I don't want to know why Mr. Zeidenberg

6    asked you things.  I want to know earlier today so just an hour

7    ago when you were testifying, you did not mention a meeting

8    with Luan Nguyen, correct?

9    A.    Why should I mention?

10    Q.    I'm not asking why.  I want to know --

11    A.    I didn't, yes.

12    Q.    So you did not mention a meeting with Luan Nguyen, correct?

13    A.    Yes.

14    Q.    Okay.  So let's talk about that meeting.  You said your

15    husband got home from the airport and you picked him up,

16    correct?

17    A.    Yes.

18    Q.    And later that morning you met with Luan Nguyen, correct?

19    A.    Yes.

20    Q.    And did you and your husband meet with Luan Nguyen at a

21    Miller Mart in Lawrence, Kansas?

22    A.    Yes.

23    Q.    And you picked Luan up, you picked Mr. Nguyen up and he got

24    in your mini-van with you and your husband, correct?

25    A.    I didn't pick him up.  I didn't.

1  Q.  Did you and your husband and Mr. Nguyen get in a vehicle?

2  A.  Yes.

3  Q.  Okay.  And then in that -- this is in between when the

4  execution of the search warrant occurred and when your husband

5  was arrested, correct?

6  A.  Can you say that again?

7  Q.  Sure.  The execution of the search warrant on your home was

8  on August 20th, right?

9  A.  Yes.

10  Q.  And your husband was arrested the next day, on the 21st,

11  right?

12  A.  Yes.

13  Q.  And so this meeting with Mr. Nguyen where you, your

14  husband, and Mr. Nguyen met in a vehicle or a car was the

15  morning of the 21st, correct?

16  A.  Yes.

17  Q.  Okay.  And you were aware at that point that Mr. Nguyen had

18  been interviewed by the FBI the day before, correct?

19  A.  Honestly, I can't recall.  But, you know, I think my

20  husband, he just got back from China and I heard, you know -- I

21  heard his lab was searched and our home was searched.  And

22  Luan, he's a graduate student I think at this point, he ask

23  Luan.  If I would be -- if I would be him, I would ask too

24  because I'm worried.  Because everybody get frightened.

25  Q.  So when you met with Luan Nguyen, you were aware that he

1    had been interviewed by the FBI the day before, correct?

2    A.    I don't -- I don't recall.

3    Q.    Do you remember when you were talking to Mr. Nguyen in the

4    car with your husband that you and your husband asked

5    Mr. Nguyen what the FBI had asked him the day before?

6    A.    It's very possible.

7    Q.    Okay.  And Mr. Nguyen had been offered a job to work at

8    Fuzhou University, correct?

9    A.    I think so.

10   Q.    And Mr. Nguyen had been working with your husband to

11   purchase equipment for Fuzhou University, correct?

12   A.    I don't know.

13   Q.    Okay.  So in that car at the Miller Mart, it's you,

14   Mr. Nguyen, and your husband, and you and your husband asked

15   Mr. Nguyen what the FBI was interested in, correct?

16   A.    I don't think, you know, we particularly -- I honestly too

17   -- I was there, I didn't say -- I didn't say anything or I

18   really didn't pay attention because, you know, for that moment

19   I didn't even know why, you know, my husband get investigated,

20   why all of this happened to us.  I -- honestly what I can

21   remember, I thought what happened to us is just happened on the

22   movie, but it's happened in real life to us.  And I don't know

23   what you want to ask me.

24   Q.    So I'm sorry.  I'll try to rephrase it.  So when you and

25   your husband met with Mr. Nguyen the morning of the 21st of

1   August, did you and your husband ask him what the FBI had been

2   asking him about the day prior?

3   A.   I don't think I asked any question.  I don't think I really

4   talked directly.  I don't know.  I can't recall.

5   Q.   Okay.  You were in the car though with your husband and

6   Mr. Nguyen, correct?

7   A.   Yes, I was.

8   Q.   So did you or your husband ask Mr. Nguyen what the FBI had

9   been asking him about the day before?

10  A.   I would think so because if there is a conversation, you

11  know, what would talk about.

12  Q.   Okay.  Did you or your husband also tell Mr. Nguyen that

13  the job at Fuzhou could still be an option for him?

14  A.   I can't recall.  I don't know.

15  Q.   Okay.  Are you aware that Mr. Nguyen was interviewed by the

16  FBI two days after that meeting?

17  A.   That was very late, you know.  I think, you know, when I

18  helped my husband, you know, to organize, you know, all this

19  stuff, you know, I knew that later.

20  Q.   So you're aware that two days after this Mr. Nguyen was

21  interviewed by the FBI, correct?

22  A.   Later on, yes.

23  Q.   And you're aware that that interview was recorded?

24  A.   I didn't know.

25  Q.   Okay.  You talked about -- let me actually shift topics.

1      You said that you and your children and your husband
2   visited Fuzhou University in 2018, correct?
3   A.   Yes.
4   Q.   And that was a trip in February of 2018, correct?
5   A.   Yes.
6   Q.   Okay.  And that was the only trip that the four of you took
7   to Fuzhou, right?
8   A.   Yes.
9   Q.   Okay.  And your husband went back in May 2018, just for a
10  three-day trip, correct?
11  A.   Can you state again?
12  Q.   Sure.  So your husband went back to Fuzhou in May of 2018
13  for a three-day trip, correct?
14  A.   What day was that?
15  Q.   So I'll pull something up that should help us.
16       MR. BARRY:  Can I please have the computer?
17       COURTROOM DEPUTY:  You want the computer?
18       MR. BARRY:  Yes, ma'am.
19       Can we please pull up Exhibit 677.
20  BY MR. BARRY:
21  Q.   So this is an Expedia -- can you see it there on the
22  screen?
23  A.   Yes.
24  Q.   This is an Expedia travel itinerary that was found on one
25  of the devices in your home.  And if you scroll down, you'll

1    see it's for your husband to travel to Fuzhou in early

2    May 2018.  Does that refresh your recollection that --

3    A.    Yeah.

4    Q.    -- in early May 2018 your husband took a trip to Fuzhou?

5    A.    Yes.

6    Q.    Okay.  Then let's pull up 678, which is the return trip.

7         And this is the return trip from that May trip to Fuzhou,

8    correct?

9    A.    Yes.

10    Q.    Okay.  And you did not accompany him on this trip, correct?

11    A.    Can you say that again?

12    Q.    Sure.  You didn't go with him on this trip, right?

13    A.    No.

14    Q.    And your husband took -- subsequent to this or after this,

15    your husband took many additional trips to China, correct?

16    A.    Yes, because my mother-in-law was sick.

17    Q.    And on those trips you did not accompany him on any of

18    them, did you?

19    A.    Can you say again?

20    Q.    For those other trips to China after May 2018 --

21    A.    Yeah.

22    Q.    -- your husband went alone, right?  He didn't -- you didn't

23    go with him?

24    A.    In the summer of 2018 we were in China too, you know.  I

25    took my kids to Yingxiu, it's an earthquake place that was ten

1   years after the earthquake.  I took -- our kids were there

2   doing volunteer.

3   Q.   So that was the second trip that you took with your family

4   to China in 2018?

5   A.   Yeah.

6   Q.   So there's the February trip to Fuzhou and then there's a

7   summer trip that you all took together to a different region,

8   correct?

9   A.   Yeah.

10  Q.   You said earlier that you did not accompany your husband to

11  Fuzhou again after that February 2018 trip, correct?

12  A.   Yes.

13  Q.   And you said that -- you testified that your understanding

14  is that he had some sort of job or relationship with Fuzhou,

15  but you weren't quite sure on the specifics, correct?

16          MR. ZEIDENBERG:  Objection.  He's misstated the

17  evidence on that three times.  She said side job.  He said job.

18          THE COURT:  All right.  Understood.  You can clarify

19  on redirect.

20          MR. BARRY:  I'll ask it a different way.

21  BY MR. BARRY:

22  Q.   You told the FBI that your understanding was that your

23  husband had a side job with Fuzhou, correct?

24  A.   Can I have that?

25  Q.   Yeah.  Sure.

1    A.    Yes.

2    Q.    And you said that you did not accompany him to Fuzhou after

3    February 2018, correct?

4    A.    Yes.

5    Q.    Okay.  I'd like to show you what has been marked as

6    Government's Exhibit 781.  This is a photograph of your

7    husband, correct?

8    A.    Yes.

9    Q.    You said earlier that when you went to Fuzhou in

10    February 2018 --

11    A.    Yes.

12    Q.    -- you met with a number of individuals at Fuzhou, correct?

13    A.    Yeah.

14    Q.    Does this photo, Government's Exhibit 781, this shows your

15    husband meeting with the party secretary of Fuzhou, correct?

16            MR. ZEIDENBERG:  Objection.

17            THE WITNESS:  I don't know.

18            MR. ZEIDENBERG:  Objection.

19            THE WITNESS:  I don't even know this person.

20            THE COURT:  Wait, wait, wait.  Approach the bench.

21        (The following proceedings were had at the bench).

22            THE COURT:  I thought we had -- I thought we had a

23    hearing -- I thought we had talked about this during the *limine*

24    conference.

25            MR. BARRY:  I'm just asking her about the photo.  I

1    didn't know if she knew this person.  I'm asking her about this

2    photo and that's it.

3    　　　　THE COURT:  All right.  But if you're going to ask her

4    to identify, I don't think you should suggest because now the

5    jury thinks it is what it is.  If she can identify them, ask

6    her to identify the people in the photo.

7    　　　　MR. BARRY:  Okay.

8    　　(Thereupon, the proceedings continued in open court.)

9    BY MR. BARRY:

10   Q.   I'm going to hand you a different document.  This is

11   Government's Exhibit 781.  Do you see your husband in this

12   photograph?

13   A.   Yes.

14   Q.   Do you know -- do you recognize where this photograph was

15   taken or any of the other people in the photograph?

16   A.   No.

17   Q.   I want to talk about this bank document that we looked at.

18   You said -- this is Defense Exhibit 1462.  And this has an

19   issue date -- actually, can I have the ELMO, please?

20   　　Can you see it on the screen there?  This has an issue date

21   of March 10, '22, correct?

22   A.   That's what I mentioned.  We mailed this back at end of

23   February.

24   Q.   This is a new document, correct?

25   A.   This is a new book, but this is the replace the old one.

1    Q.    Okay.  So is there another -- do you -- do you or your

2    husband possess any other bankbooks for this account?

3    A.    Can you say again?

4    Q.    So this is a bankbook with passport number █████5976,

5    correct?

6    A.    Yes.  I want to explain this.

7    Q.    I'll let you explain in a minute.  So that's the passport

8    number for this bankbook, correct?

9    A.    Yes.

10   Q.    Do you have any other bankbooks for this account?

11   A.    When they gave us this renew one, the replacement, they

12   took the old one.  That's a bank rule.  We cannot control that.

13   Q.    That's the only bankbook that you or your husband possess

14   for this account, correct?

15   A.    Yes.

16         MR. BARRY:  Let's pull up -- can we switch to the

17   computer again, please?

18         Can we please pull up Government's Exhibit 637.

19         THE COURT:  That monitor is not working so we have IT

20   coming up to hopefully get it working.

21   BY MR. BARRY:

22   Q.    Can we zoom in on the passport number, please?  So the

23   passport number for the Defendant Exhibit 1462, the first seven

24   digits are █████, correct?  That's the one we just looked at?

25   A.    Yes.  The passbook number is different.  It's a different

1    book.

2    Q.    So the -- so this photograph that was found on your

3    husband's KU computer, this is a photograph of a different

4    bankbook for this account, right?

5    A.    Yes.

6    Q.    Okay.  And is that the bankbook that you sent to Bank of

7    China that they kept?

8    A.    We send back to our relatives.  They had to help us go to

9    the bank to, you know -- at the beginning I thought I'll send

10   it back and then they're going to, you know, print out all the

11   activities.  We didn't know the magnetic -- you can see the bar

12   does not work, dysfunction.  That's why they had to replace it.

13   Q.    So the one that's on the screen, the passbook number

14   ████████, that's the passbook that you sent to your relative who

15   went to the Bank of China branch in China and that's the

16   version that was kept by them?

17   A.    Yes.

18   Q.    Other than that version which you have testified you don't

19   have and this, do you or your husband have any other bankbooks

20   for this account?

21   A.    No.

22   Q.    Okay.  And you and your husband don't have any other bank

23   accounts in China other than this Bank of China account,

24   correct?

25   A.    I don't think so.

1    Q.   Okay.  Do you -- are you sure?

2    A.   Yeah, I don't think so.

3    Q.   Okay.  So to your knowledge, the only bank account that

4    either you or your husband has access to or uses in China is

5    this Bank of China account ending in 4967, correct?

6    A.   I have relatives.  We have extensive relatives.  I have a

7    brother and sister and Franklin have a brother and sister.  And

8    I have very good friends.  So if we -- so if we do need money,

9    like I went to Yingxiu where my kids did volunteer there, my

10   friend send me all the money.

11   Q.   So are you testifying that you're able to -- well, let me

12   clarify.  So let's just focus on accounts that are either in

13   your name or your husband's name, okay?

14   A.   Okay.

15   Q.   So other than this Bank of China account that's 4967, do

16   either you or your husband have any other bank accounts in

17   China that are in either of your names?

18   A.   No.

19   Q.   Okay.  And you said that you have relatives who you're able

20   to use their accounts sometimes?

21   A.   We don't use their accounts, but, you know, they provide

22   food and if we really need like urgency, you know, need we

23   could ask.  All right?

24   Q.   You don't use anybody's account in China other than this

25   account?

1   A.   Yes.  I use WeChat.

2   Q.   But just bank accounts, there's no other bank accounts you

3   or your husband use in China, correct?

4   A.   No.

5   Q.   Can we please pull up Government's Exhibit 526.

6        This is a China Construction Bank account that was found on

7   one of the devices.  Is this an account number that you

8   recognize?

9   A.   No.

10  Q.   Have you ever seen this before?

11  A.   I don't think so.

12  Q.   You said earlier that on direct examination that sometimes

13  your husband would travel to conferences and he'd get

14  reimbursed, correct?

15  A.   Get like honoring, yes.

16  Q.   Like a small amount of money, correct?

17  A.   Yes.

18  Q.   So I'd like to show you what's been marked as Government's

19  Exhibit 500A.  This is a document that was found on your

20  husband's KU computer.

21  A.   Okay.

22  Q.   Can we please keep that exhibit that was -- I think it was

23  676 -- what was it, 526?

24       Okay.  Do you see the document that I sent you that's

25  marked 500A, does that have your husband's name on it?

1    A.    Yes.

2    Q.    And does it have a bank account number?

3    A.    Yes.

4    Q.    And can you read that bank account number, please?

5            MR. ZEIDENBERG:  Objection.

6            THE COURT:  I'll sustain.  It's not in evidence.

7            MR. BARRY:  The government moves to introduce into

8    evidence Exhibit 500A.

9            MR. ZEIDENBERG:  Objection.

10           THE COURT:  I don't know that this witness has

11   personal knowledge of this document.  I'll sustain.

12           MR. BARRY:  The Court's indulgence.

13   BY MR. BARRY:

14   Q.    So you testified that you're not familiar with this

15   account, correct?

16   A.    No.

17   Q.    Were you aware that your husband had honorariums deposited

18   into that account?

19           MR. ZEIDENBERG:  Objection.

20           THE COURT:  I think -- I'll overrule and you can

21   answer if you know.

22           THE WITNESS:  I don't know.

23           MR. BARRY:  No further questions.

24                       REDIRECT EXAMINATION

25   BY MR. ZEIDENBERG:

1  Q.  Just a couple questions.  The day your husband was

2  arrested, you picked him up at the airport, and that was the

3  day after your house had been searched, right?

4  A.  Yes.

5  Q.  And was there news stories that day, the following day

6  after the search, the day you picked up your husband?  Were

7  there a lot of news stories about the search of both your house

8  and the University of Kansas in the lab?

9  A.  In the news?

10  Q.  Yes.

11  A.  Yes.

12  Q.  And was there discussion in the car when you picked up

13  Franklin about his lab having been searched?

14  A.  Yes.

15  Q.  And was the reason to go meet Luan Nguyen is to find out

16  what was going on at the lab?

17  A.  Yes.

18  Q.  And at any point during the meeting with Mr. Nguyen, was

19  there any discussion about -- from Franklin about what Luan

20  should tell the FBI or if he should lie or anything like that?

21  A.  No.

22        MR. ZEIDENBERG:  I have no further questions.

23        THE COURT:  Anything more?

24        MR. BARRY:  Nothing further, Your Honor.

25        THE COURT:  You're excused.  Thank you.

1           MR. DEARINGTON:  Your Honor, we just have one exhibit

2    that we'd like to seek to introduce.  We're not going to read

3    through it all, but we'd like to seek to introduce it, show the

4    first page, and then to the extent it is introduced into

5    evidence, send it back with the jury.

6           THE COURT:  All right.

7           MR. DEARINGTON:  That's Exhibit 1304.

8           THE COURT:  Oh, yes, uh-huh.

9           MR. DEARINGTON:  I'll allow the government to say

10   whether they object before we pull it up.

11          MR. BARRY:  No objection.

12          THE COURT:  Exhibit 1304 admitted.

13          MR. DEARINGTON:  Ms. Kessler, do you mind pulling up

14   Exhibit 1304 so the jury can identify it when they deliberate?

15          You can see here this is 800-plus pages of what appear

16   to be Dr. Tao's articles while working -- published by Dr. Tao

17   while working at KU, many of which include acknowledgments to

18   various federal grants he was working on.  If you could scroll

19   through a few pages to get a feel.

20          And now that that's been admitted, Your Honor, we

21   don't have anything more on this exhibit.

22          THE COURT:  All right.

23          MR. ZEIDENBERG:  With that, Your Honor, the defense

24   rests.

25          THE COURT:  All right.  Approach the bench, please.

1          (The following proceedings were had at the bench.)

2          THE COURT:  All right.  Defendant has rested.  You're

3     renewing your motion for judgment.

4          MR. ZEIDENBERG:  Yes, Your Honor.

5          THE COURT:  For the reasons stated before, in addition

6     to any argument you may make in written submission, the

7     government will have an opportunity to respond.  I'll take that

8     under advisement.  Does the government have any rebuttal

9     evidence?

10          MR. OAKLEY:  No, Your Honor.

11          THE COURT:  So I believe we have the instructions

12    ready to go with the revisions.  We need to make record on

13    whether Dr. Tao's decided not to testify.  Gosh, I prefer doing

14    that by talking to him directly so we can either let the jury

15    go or bring him up.  Are you comfortable with him coming up

16    here?

17          MR. ZEIDENBERG:  Yeah.

18          (The defendant approached the bench.)

19          THE COURT:  Dr. Tao, so you have a right to testify in

20    your own defense, if you choose to.  I understand that that's a

21    decision that's very important and one that you may want to

22    discuss with your lawyer and I'm sure you have.  But ultimately

23    it's your decision to make.  Do you understand that?

24          THE DEFENDANT:  Yeah, I understand.

25          THE COURT:  And have you decided not to testify in

```
 1    your own defense?

 2              THE DEFENDANT:  I decided not to testify.

 3              THE COURT:  Okay.  And that's something you decided

 4    voluntarily and of your own free will, that decision?

 5              THE DEFENDANT:  Yeah.

 6              THE COURT:  All right.

 7              THE DEFENDANT:  Thank you.

 8              THE COURT:  Anything more?

 9              MR. DEARINGTON:  Your Honor, just a reminder, now

10    we've introduced evidence of Dr. Tao's character for honesty,

11    we'd like that instruction to be included.

12              THE COURT:  It's in there.

13              MR. DEARINGTON:  Great.

14              THE COURT:  I think that's the only -- we got the

15    one -- we put in the one about the defendant not testifying, of

16    course.  Okay.  I think what we ought to do is -- do you need

17    to key up for -- why don't we tell the jury we're going to have

18    now closing arguments and we're going to start those at 2:30,

19    give them 30 minutes off, and you all can get ready.  Does that

20    sound good?  We're talking -- 75 minutes, so we're talking --

21              MR. ZEIDENBERG:  We should just make it --

22              THE COURT:  Just make it --

23              MR. ZEIDENBERG:  I don't think I'm going to take

24    75 minutes.

25              MR. OAKLEY:  Promise?
```

1          MR. ZEIDENBERG:  No, I don't promise.

2          THE COURT:  An hour and a half.

3          MR. ZEIDENBERG:  I don't imagine that I would.

4          THE COURT:  Gosh.  I don't know if I want to break

5   until 2:30, because they may need a break in between also.  Can

6   we get ready in 15 or do you need 30?

7          MR. OAKLEY:  I have a PowerPoint and I referenced some

8   of the instructions.  I think they're here, but I want to

9   double-check.

10          THE COURT:  I'll tell them 20 minutes.

11       (Thereupon, the proceedings continued in open court.)

12          THE COURT:  All right.  So that completes the

13   evidence, and we are now going to move into jury instructions

14   and closing arguments.  Actually, the more I think about it,

15   for the time it's going to take me to read the instructions, we

16   will probably go past 5:00.  We should have talked about that

17   further.  If you'd like to, we can.

18          But is anyone not able to stay past 5:00?  I'm

19   thinking we may not get out of here until 5:20.  We may have to

20   come back tomorrow if we're not able to get through by 5:00.

21   Because we've got about an hour and half closing arguments.

22   No, about two and a half hours of closing arguments, I'm sorry.

23          MR. ZEIDENBERG:  Can we just approach on a scheduling

24   matter?

25          THE COURT:  Sure.

 1          (The following proceedings were had at the bench).

 2          THE COURT:  I think it will take me a good 30 minutes

 3   to read the instructions and then we're going to -- now, the

 4   one man that can't stay is an alternate, but he's got to stay

 5   here through closing arguments at least.

 6          MR. ZEIDENBERG:  I mean, I desperately want to get

 7   this done today.  I don't want to have another night like last

 8   night or the night before.  That said, I don't want to break up

 9   closing arguments so that I finish today and the government

10   gets its rebuttal tomorrow.  I think that's very unfair.  So,

11   you know, I'm hoping we can figure out a way to get it all in

12   today, would be my -- I don't want to take another day off to

13   think about it.

14          THE COURT:  He has to leave.  He's got a child to pick

15   up.  So if he has to leave -- I mean, there's several things we

16   could do.  We could release him now.  I don't think we're going

17   to need him, if you all will consent to it.

18          MR. ZEIDENBERG:  Far right.  He's the last alternate.

19          THE COURT:  The four on the front on that side are the

20   four alternates.

21          MR. ZEIDENBERG:  And he's the last of the four.

22          THE COURT:  He's the last of the alternates.  Are you

23   all okay with that and we can stay past 5:00?

24          MR. OAKLEY:  Are you thinking of releasing him now or

25   seeing how far we get and releasing him?  My concern would be

19-20052-JAR    USA v. Feng Tao    04.05.22    Day 12                2361

1   if you send a message to the other three sitting next to them,

2   they're also alternates.

3          THE COURT:  That's true.  They don't know who's an

4   alternate.

5          MR. OAKLEY:  I don't know how they would infer because

6   that guy is gone, the guy next to them.  I would never make

7   that connection.

8          THE COURT:  I would prefer to get this in.  Otherwise

9   what you're suggesting is you come back tomorrow morning and do

10  yours, right?

11         MR. ZEIDENBERG:  Yeah.  We'd all do them.  Yeah, I

12  think we should all be the same day.  I don't think they should

13  sit with the government's.

14         THE COURT:  Let's bring him up here.  Let's take a

15  break and let's ask him to stay or somehow do a way he's not

16  embarrassed.  Let's take a break.

17     (Thereupon, the proceedings continued in open court.)

18         THE COURT:  We're going to take a 20-minute break and

19  we'll come back for instructions and closing.

20     (The following proceedings occurred outside the presence of

21  the jury.)

22         THE COURT:  The parties want to get this case in

23  today, but we don't want you to not have your child picked up

24  because when they're 35, like my kids, they'll still be

25  reminding you about it, believe me.

1          We're going to go ahead and release you, and we didn't

2    want to release all the alternates at once, but we're going

3    to -- you're the last of the alternates.

4          I will tell you this, if something happens during

5    deliberation and we lose a juror or two or three or four and we

6    have to call one or more of the alternates back, what will

7    happen is you'll come back and deliberations will start fresh

8    and anew so that, you know, the alternate has the complete

9    benefit of deliberations, so you're still under the admonition

10   to not talk, research, press coverage, all of that.

11         JUROR NO. 0211:  That sounds good.

12         THE COURT:  You'll get a call from the clerk's office

13   or from Bonnie, someone, that will tell you when the jury has

14   reached a verdict and you're released from the admonition and

15   you're free to talk.

16         The other thing I'll tell you is we have a rule in

17   this district where the attorneys cannot initiate contact with

18   you after the verdict unless they first get permission from the

19   judge.

20         JUROR NO. 0211:  Okay.

21         THE COURT:  If I give that permission, you'll also

22   hear that from us first.  You're always free to talk -- once

23   you're released from the admonition, you're always free to talk

24   to -- to initiate contact with anyone, including the lawyers

25   and parties, if you want to.  Anyway, your next contact from us

1  will likely be you're released from the admonition, but we'll

2  let you go home today.

3          JUROR NO. 0211:  Thank you for all the day care.

4          COURTROOM DEPUTY:  We have something for you and if

5  you want to go back to the jury room and I'll be back down and

6  I can give him the certificate and he gets certificate.

7          THE COURT:  Okay.

8          JUROR NO. 0211:  All right.

9          THE COURT:  In fact, I will meet you -- he can get his

10  things and I'll make sure you get that before you leave the

11  building.

12      (Recess.)

13      (The following proceedings occurred outside the presence of

14  the jury.)

15          THE COURT:  Are we ready?

16          MR. BARRY:  Yes, Your Honor, one thing.  During my

17  closing I'd like to provide the jury with the demonstrative

18  exhibit and collect it before they go back to deliberate.

19          THE COURT:  All right.

20      Okay.  I think we're ready, Bonnie.

21          LAW CLERK:  I'm missing some jury instructions.  I

22  will be right back.

23          THE COURT:  There's some sets missing?

24          LAW CLERK:  I'm missing one.

25          THE COURT:  Here.  I don't know if I have one more

1    than -- let's just give them a set that one of you have and we

2    can always print another one.

3            LAW CLERK:  I don't have -- yeah.

4            THE COURT:  Okay.  Let's go and we'll give them their

5    sets later, Joy.  The parties have a set, right?

6        (The jury entered the courtroom, after which the following

7    proceedings were had.)

8            THE COURT:  You can be seated.  We're still missing a

9    set, right?

10           COURTROOM DEPUTY:  I think she went to go get it.

11           THE COURT:  All right.  Don't start reading yet.

12   We've got another set coming.  Are you missing one?  Okay.

13   Yeah, we're getting it printed.

14       (Instructions read.)

15           THE COURT:  We're going to stop at this point.  The

16   final instructions I will read to you after we finish reading

17   the closing arguments.  You can put the instructions away for

18   now and we will turn to the government.  The government

19   will have an opening -- I'm sorry, a closing argument.  The

20   defendant will have a closing argument, and because the

21   government has the burden of proof, they will get one final

22   chance to address you with the final closing argument.

23           Mr. Oakley.

24           MR. OAKLEY:  Thank you, Your Honor.

25           You've now seen and heard the lies, omissions, the

1    concealment.  You now know the reason that caused the defendant

2    to call his friend Professor Liu to discuss the problem the

3    defendant had, and you now know what that problem was.  The

4    defendant had been offered the Changjiang Distinguished

5    Professor award, a very prestigious award that carries with it

6    the requirement that the defendant work full-time at Fuzhou

7    University; that he develop and build a research ecosystem at

8    Fuzhou University; that he recruit post-docs to Fuzhou

9    University; that he conduct research at Fuzhou University; and

10   that he build a lab at Fuzhou University.

11        You know this was a problem for the defendant because

12   the defendant was committed full-time to the University of

13   Kansas.  And the defendant calls Professor Liu for advice, and

14   you've heard the advice that Professor Liu gave the defendant,

15   if you're honest with them, if you explain to KU what's going

16   on, maybe you can work out a way to do both things.

17        You also know that Professor Liu wasn't the only

18   friend that the defendant called because he called another

19   professor at KU and he asked for advice.  Now, the defendant

20   lied to the KU professor because he presented it as an

21   opportunity in Germany, but we'll get to that lie later, but

22   you know that he asked that KU professor advice as well and he

23   was provided the same advice that he received from Dr. Liu,

24   talk to your chair, explain what's going on, maybe you can work

25   something out.

1          But the defendant chose not to heed that advice.  The

2    defendant chose not to talk to KU.  The defendant chose to lie,

3    to mislead, and to conceal.

4          At the end of his opening statement Mr. Barry told you

5    that the government would be back in front of you at the end of

6    the evidence, after you had received the law from Judge

7    Robinson, and would ask you to render a verdict that is

8    consistent on the facts, that is consistent on the evidence,

9    and that is consistent with the law.  And those verdicts are

10   that the defendant's guilty of six counts of wire fraud and the

11   defendant is guilty of two counts of making a false statement

12   to the United States Government.

13         Now, throughout the course of the trial we've been

14   referring to the timeline, so I'd like to provide that to you

15   during closing arguments so you can refer to it.

16         Ms. Wiest, could we please switch to the computer?

17   COURTROOM DEPUTY:  Uh-huh.

18   MR. OAKLEY:  I want to talk to you a little bit about

19   the instructions and I want to highlight some of the evidence.

20   Now, this has been a two-week trial.  There's no way that in

21   the time that I have that I can go over every single piece of

22   evidence with you, but I know that you've been paying attention

23   and I know that there's no need.  But I want to highlight some

24   of the pieces of evidence and I want to discuss those with you

25   when we're talking about the law.

1          The first six counts that you're to consider are the

2     wire fraud, and there's six counts and they all have the same

3     elements.  So I want to discuss them together.  The first

4     element is that the defendant devised or intended to devise a

5     scheme to defraud KU, the National Science Foundation, or the

6     Department of Energy of money or property.  And the scheme was

7     this:  The defendant lied and he concealed and he misled KU as

8     to his involvement with Fuzhou University in order that he

9     could continue to receive his salary, in order that he could

10    continue to have access to his KU lab, and through the same

11    lies and concealment and omissions, he caused KU -- and he

12    directly lied to DOE as it relates to federal grants in order

13    to obtain those federal grant monies that went to KU that the

14    defendant used for his research, in order to obtain those

15    grants that he was the PI on so that he could receive the

16    prestige of being a recipient of federal grant funding.

17          Let's talk about the fact the defendant worked for

18    Fuzhou University without telling KU, DOE, or the National

19    Science Foundation.  We know that because the defendant tells

20    you.  He tells you in his e-mails.  Government's Exhibit 211 --

21    excuse me, 311.  This is Franklin from Fuzhou University and

22    the University of Kansas.

23          Government's Exhibit 208, as you may know, my term of

24    editorship is August 1, 2017, to January 31, 2019.  This is the

25    letter to the journal that he was editor of.  I got a joint

1   appointment at Fuzhou University, China.

2          You know that the defendant worked for Fuzhou

3   University because he discusses it in the phone calls that he

4   recorded.  Government's Exhibit 512A, which is the translation

5   to one of the phone calls, I got the Changjiang Scholar

6   Distinguished Professor.  And he says for that position the

7   requirement they've set is nine months.

8          But it's not just the e-mails.  It's not just the

9   phone calls the defendant recorded.  You heard testimony of

10  Dr. Huang and Dr. Zhang and they told you that the defendant

11  contacted them and tried to recruit both of them to work for

12  him, for his team at Fuzhou University.

13         In addition to their testimony where they told you

14  that the defendant personally contacted them, you know through

15  other means.  For example, on the phone that was seized from

16  the search of the defendant's residence, someone had saved a

17  screenshot -- and this is Government's Exhibit 498A.  This is a

18  screenshot, the translation of which shows that it was from

19  Fuzhou University and that this was an advertisement for

20  students to come work in the defendant's Fuzhou research group.

21  It's dated May 20, 2018.

22         And in May the statement is Professor Tao Feng, our

23  newly-introduced Changjiang Scholar, will soon report to the

24  school.  He is in urgent need of Ph.D. students.

25         But it's just not the ads, it's just not the calls to

1    Drs. Huang and Zhang, you've seen the recruiting e-mails that

2    the defendant sent to others, and there's many of them.  This

3    is one example.  This is Government's Exhibit 195A and this is

4    an e-mail that defendant sends stating I'm very upset.  It's a

5    recruitment e-mail.

6              But it's just not the defendant's statements, it's not

7    just the defendant's recruitment of post-docs to come work in

8    his group at Fuzhou, you've seen his work.  You've seen the

9    defendant's work that the defendant chose to store on his KU

10   computer that was obtained by the FBI here in the execution of

11   the search warrant at his KU office.  You've seen what the

12   defendant had in his pocket at the time of his arrest, work

13   that he was doing for Fuzhou University.

14             From his KU computer you have the PowerPoint

15   presentation that the defendant prepared as part of his defense

16   to earn the Changjiang Scholar Distinguished Professor Award in

17   2017.  It's Government's Exhibit 484 and 484A.  The defendant

18   stored the materials, the Changjiang award program candidate

19   materials attachments on his computer at KU.

20             In Government's Exhibit 351A, which is the translation

21   of the PowerPoint presentation that the defendant had in his

22   pocket at the time of his arrest in August of 2019, is a

23   PowerPoint presentation that he prepared related to research

24   that he was doing and that he was proposing to do at Fuzhou

25   University.

1          You've seen evidence of the defendant building his

2     lab.  You've also heard evidence of this from Dr. Luan Nguyen,

3     but you've seen as an attachment to an e-mail Government's

4     Exhibit 213.  There's a couple things I want to point out.

5     First of all is the date, November of 2018.  And I want to

6     pause here a moment and I want to talk about this particular

7     PowerPoint presentation.

8          You might remember that this is the one that

9     Mr. Dearington on cross-examination showed there's photographs

10    of a room that's set up but there's not equipment in.  I want

11    to point out something else to you.  The contract, the draft

12    contract that the defendant ends up sending himself and his

13    wife in August of 2019 has -- it's Government's Exhibit -- the

14    translation of which is Government's Exhibit 314A.  If you look

15    in there on one of the pages towards the back, there's a

16    description laboratory and equipment requirements, and it

17    identifies specific rooms that Fuzhou University would provide

18    for the defendant's use.  It talks about the Quangang Building

19    North 102, 103, et cetera.  You know what you see when you look

20    at that PowerPoint presentation from November 2018?  You see

21    Room 102, 103, 104, 105, 203, and 204.

22          That's not the only evidence you have that the

23    defendant was building a lab.  Talked a little bit about

24    Dr. Nguyen.  He told you what he was doing, he was ordering

25    equipment, him and Yu Tang.  You have the e-mails to support

1    that.  You have the e-mails from the defendant sending the

2    schedule to get the lab up and going.  And when is that e-mail

3    sent?  December of 2018.  And what's he doing?  He's trying to

4    get his lab set up so that he can start work.

5          The scheme to defraud is to defraud KU or the federal

6    government, the NSF, or the DOE of money or property.  As it

7    relates to KU, it's his salary, it's the defendant's use of his

8    KU lab, and it's the grant money from NSF and DOE and the

9    prestige that comes with receiving those grants.

10         The government is not required to show that the

11   defendant was paid by Fuzhou University.  It's not required to

12   show that the defendant personally received that grant money.

13   What's required to be proved is that the defendant defrauded

14   KU, NSF, or DOE of money or property.

15         Again, we're not required to prove that the defendant

16   was paid by Fuzhou University, but you've heard the

17   instructions.  You've heard the law, you're able to use your

18   common sense.  What do you know?  You know that people

19   typically don't work most certainly for nine months for free.

20   You know that the defendant was in China from December 2018 to

21   August 2019, almost exclusively.  And do you remember the FBI

22   accountant testifying?  You look at the defendant's United

23   States bank accounts, $300 over that course of time.

24         Do you remember when Dr. Tiffert testified?  Part of

25   the cross-examination is how much money are you being paid and

1    part of that was receipts.  Dr. Tiffert was in Kansas City for

2    three days, and he had more than $300 in his expenses, right?

3              The government is not required to prove that the

4    defendant received payment from Fuzhou University, but you're

5    entitled to use your common sense and you're entitled to come

6    to your own conclusion.

7              Exhibit 15 is the Excel spreadsheet that has all of

8    KU's payments from when he joined in 2014 up through his arrest

9    in August of 2019, and when you look at 2019, you will see that

10   the defendant continued to receive payments despite the fact

11   that he was at Fuzhou University.  And that includes the summer

12   payments.

13             It wasn't just the money.  The defendant needed to

14   remain a full-time employee at the University of Kansas because

15   he needed access to his lab while he got the FZU lab up and

16   running, but he also needed access to the federal grant money.

17   You heard testimony that that money belonged to the university,

18   it doesn't go to the PI.  The only way that the defendant had

19   access to that grant money is if he remained at a university in

20   the United States.

21             The second element that you must find for each of the

22   wire fraud counts is that the defendant acted with a specific

23   intent to defraud.  What do you look at to determine whether or

24   not the defendant had specific intent to defraud?  You look at

25   the lies, you look at the omissions, and you look at the

1    concealment.  That tells you what the defendant's intent was.

2         You know -- you've seen, and I'm not going to go

3    through all the KU policies that we did the first week of

4    trial.  We talked about those.  We talked about the Board of

5    Regents' policies as it relates to both conflicts -- potential

6    conflicts of interest, potential conflicts of time.

7         The lies.  You know that the defendant told KU through

8    his chair, Dr. Weatherley, that he had this arrangement with

9    the German university.  You remember Dr. Schlögl coming in?  We

10   talked initially, but the defendant never came to Germany.  You

11   know that when the defendant tells Dr. Weatherley, I apologize

12   for missing the upcoming faculty retreat due to trips in

13   Germany, you know that's a lie because he's in China.

14        You know that he had a 40/40/20 obligation.

15   Researching and teaching are just as important to KU, and the

16   20 percent, the service, the service to the university is

17   important as well.  And the defendant wasn't providing service

18   to the university, at least not the University of Kansas.

19        You know Government's Exhibit 231 is an e-mail -- this

20   is related to the ABET.  Do you remember Dr. Weatherley

21   testifying that he had this certification and they needed to

22   receive this certification from ABET and it was very important

23   for KU to receive that?  So there were certain tasks he needed

24   the defendant to do, and so he sent the defendant an e-mail

25   stating you need to get this done.  And the defendant lies, I'm

1    traveling in Germany.

2         You know because Dr. Weatherley told you that he does

3    an annual faculty evaluation and preCOVID Dr. Weatherley

4    preferred to do that in person, and you know that he wasn't

5    able to do the evaluation with the defendant in person, he did

6    it by the phone, and the defendant lied to Weatherley and said

7    I'm visiting FHI in Germany.

8         It's not just the lies.  You know from the defendant's

9    own words that he couldn't do both.  You have the transcripts

10   of the phone calls.  You've seen them, you'll have them

11   available to you.  You will see the defendant talk about they

12   want me to do nine months, it's a requirement of the Changjiang

13   Scholar that I do nine months.  He had the same commitment at

14   KU.  The defendant knew he couldn't do both, and that's why he

15   lied and that's why he concealed and that's why he deceived.

16        You know, we talked about the phone calls.  He was

17   told talk to KU, talk to your chair, try and work something

18   out.  Dr. Liu told him, talk to them, try to work something

19   out.

20        Do you know how else you know intent?  Because the

21   defendant knew of his obligation to let KU know of potential

22   conflicts of interest.  You know that in Government's

23   Exhibit 292, which is March 2017.  March 2017 the defendant

24   sends an e-mail to the very same KU e-mail address that's set

25   up for the purpose of conflicts of interest.  What does that

1    tell you?  That the defendant knew he had an obligation to

2    report potential conflicts of interest to KU and he chose not

3    to.

4          You know that in July of 2017 the defendant sends an

5    e-mail to both chairs, at the time he's in two different

6    departments, a full-time employee, but he's in two different

7    departments, CP & E and engineering [sic], and so he sends an

8    e-mail to both chairs, Laurence and Brian, and he includes his

9    mentor Dr. Subramaniam who you've heard testify.  He said, hey,

10   I was invited to be an editor of this journal, please note if

11   there's any potential issue conflicting with KU policy.

12         The defendant knows of his obligation to let KU know.

13   Every year the defendant had to fill out the form.  Every time

14   he did the grant, he was reminded of it.  But you know the

15   defendant knew that he had that obligation.

16         It's the concealment.  Government's Exhibit 511A.

17   Hey, you know if someone else mentions it to you, pretend you

18   don't know, right?  You don't need to go saying I got the

19   Changjiang Scholar award or anything like that.

20         This in a profession in which talking about your

21   accomplishments and your awards is not only expected, but you

22   know that promotion was important to the defendant.  So why

23   would he not want people to talk about this prestigious award?

24   Because he needed to lie about it, he needed to conceal it,

25   because he needed to work two full-time jobs.

1          The defendant in 512A says, you know, some people
2    don't say -- I know some people don't say anything, that's for
3    certain.  But if I don't say anything, then it would definitely
4    be problematic if this thing were ever looked into.

5          Do you remember the phone call with President Zhang?
6    And this is prior to the defendant flying to Fuzhou University
7    at the beginning of May and leading up.  It's part of the
8    negotiations, you have this call, right?  You can't leave it in
9    writing or anything because that would be evidence.  And does
10   the defendant respond, evidence?  What are you talking about?
11   I'm not doing anything wrong.  No.  He said I understand.
12   Understood, understood.

13         Conversation with Su Siwen, they're talking about
14   recruiting.  And the defendant says don't put this on the home
15   page, that would be bad because, because, because when the time
16   comes, you know, in case anyone else might think I'm up to
17   something.

18         The third element is that the defendant used
19   interstate or foreign wire communication facilities as part of
20   the scheme -- carrying out the scheme to defraud.  You saw the
21   instruction that if the defendant caused someone else to do it,
22   he's responsible.  So the interstate nexus -- you heard from
23   the KU IT person, right?  All of KU's e-mails are served --
24   excuse me, are contained on a server in Lawrence.  Because they
25   use Microsoft, they hit a Microsoft server that's not located

1    in Kansas, so every KU e-mail has an interstate nexus.

2    You heard from the Huron representative, that's the

3    contractor that KU uses for the institutional responsibilities

4    form.  You heard their servers are located in Illinois, so the

5    institutional responsibilities form traveled from Lawrence to

6    Illinois and then back to Lawrence whenever KU needs to access

7    them electronically.

8    You heard from the DOE and the NSF witnesses that

9    their servers, they're located outside the state of Kansas.

10    And so the wires, the specific wires.  Count 1, this

11    is Exhibit 124, this is an e-mail exchange from the defendant's

12    KU account with the Chinese Consulate, and this is in November

13    of 2017.  The defendant needs to travel to China because he

14    needs to defend his application for the Changjiang award.  So

15    he sends an e-mail seeking a visa.  This is an interstate wire

16    that's in furtherance of the scheme to defraud.

17    Count 2 is the submission in 2017 of the DOE grant

18    renewal application from Kansas.  It goes to DOE located

19    outside the state of Kansas.

20    Count 3.  This is an e-mail that the defendant sends

21    from his KU account to Kim Wittman.  Now, you know at the time

22    that the defendant was located outside the United States,

23    June 26, 2018.  You know this from the text records that have

24    been admitted.  And so this is an interstate wire.  This

25    relates to the FZU contract proposal, and I want to take just a

1    minute to talk about that.

2         There's a couple of important things to understand

3    about that FZU contract that never goes anywhere.  And the

4    first thing to understand is simply that, it doesn't go

5    anywhere.  Right?  You know, I think it's Government's

6    Exhibit 211, the defendant -- people at the contract office

7    keep pinging him, what's going on, what's going on, what's

8    going on and he finally says there was a lot of competition for

9    that.

10        So you know that that contract, that there never was a

11   subcontract between KU and Fuzhou University.  What's the whole

12   point?  Because if there was never an actual subcontract, the

13   defendant couldn't use it for his buyout, he couldn't use it

14   for his summer salary.  What's the whole point?  You heard the

15   testimony from the people at the contract office, it's a little

16   weird the way that it came up.  It was part of the scheme to

17   defraud because the defendant thought that would give him cover

18   in dealing if anyone asked, why are you dealing with somebody

19   from Fuzhou University so much?  He was trying to create cover.

20        But the important thing to know is it was never

21   entered into.  There was no reason most certainly after the

22   defendant sends that e-mail saying it didn't go through for him

23   to have any contact with Fuzhou University.

24        But that e-mail was part of the scheme to defraud.

25   Exhibit 170, which is Count 3, one of the wire fraud counts,

1    it's part of the scheme to defraud.

2           Count 4.  This is also -- we're going to talk about

3    the 1001, the counts of lying to government, this is one of

4    those two counts, but it's also this e-mail in which the

5    defendant sends to DOE and he responds with this current and

6    pending support and it's sent in July of 2018.  It's an

7    interstate wire because it's from KU to the DOE located outside

8    of Kansas and it's in furtherance of the scheme to defraud

9    because it's part of the grant.  It's also a false statement.

10   We'll talk about that here in a minute.

11          Count 5 is the defendant's 2019 institutional

12   responsibilities form.  And again, we talked about Huron so

13   this is a form that goes from Kansas to Illinois.

14          I want to talk about one thing while we have this up.

15   The date of this is September 25, 2018.  It's on the timeline.

16   It's on the second page.  And if you look at the top, kind of

17   in the middle, August 27, 2018, that's an e-mail that the

18   defendant -- the defendant gets an e-mail from somebody else

19   related to an NSF grant fraud investigation and he forwards it

20   to his wife, just about a month earlier, a month prior to

21   filling out his professional responsibilities form.

22          The defendant knew of his obligation and the defendant

23   knew what could happen if he didn't provide his obligations,

24   and the defendant chose to lie, to conceal, and to deceive

25   anyway.

1         Count 6.  This is an e-mail the defendant sends in

2    March of 2019.  This is the e-mail application confirmation

3    that the defendant sends from his KU e-mail account, so it's an

4    interstate wire.  And it's related to the NSFC grant

5    application.  It's in furtherance of the scheme to defraud.

6         The fourth count -- excuse me, the fourth element of

7    the first six counts of the wire fraud counts is that the

8    scheme employed false or fictitious pretenses, representations

9    or promises that were material.  We've been talking about the

10   lies, we've been talking about the omissions, we've been

11   talking about the concealment.  And so you know that the

12   defendant's scheme employed false or fictitious pretenses,

13   representations or promises that were material.

14        You know, the concealment and the lies and the

15   information that the defendant was required to provide to NSF

16   as part of the grant application process, it's more than just

17   checking a box.  You heard from Dr. Keiser from NSF.  Do you

18   remember her testimony?  There's a limited amount of federal

19   grant money available to universities and to PIs.  And because

20   it's federal tax dollars, NSF and DOE have an obligation to see

21   it gets spent wisely, and part of that obligation is to make

22   sure that they're not funding another project that's being

23   funded by someone else.

24        You heard that the nature of fundamental research is

25   built on a system of trust, right?  You heard Dr. Keiser

1    testify.  Do you remember her explanation of Google?  This is

2    research that isn't going to be able to be monetized for a

3    period of time.  It's research that is typically funded by the

4    United States Government for that purpose.  And any conflict of

5    interest or potential conflict of interest calls into question

6    research that's done under those grants.

7              Do you remember the analogy that she used?  Even if

8    you have good research into cancer research, you later find out

9    that the PI was receiving funding from the tobacco industry, it

10   calls it into question.

11             The current and pending reporting is critical to

12   federal agencies when they're making these funding decisions.

13             I want to talk about Count 7 and 8.  And these are the

14   making of a false statement.  Count 7 relates to that

15   institutional responsibilities form, and so this is the count

16   that the defendant caused KU to make a false statement.  Do you

17   remember KU's obligated as part of the grant process to have

18   conflict of interest policies that they enforce?  And you heard

19   the testimony that it's KU's responsibility and the part of the

20   way that KU effects that responsibility is through the annual

21   reporting forms.

22             Now, you also heard in addition to the annual forms

23   that employees have an obligation on an ad hoc basis, right, as

24   potential conflicts arise, they're expected to raise those.

25             And so September 2018, the time when the defendant had

1    already received the Changjiang Distinguished Professor Award,

2    when you look at -- it's the second page, that means everything

3    to the left the defendant had already done for Fuzhou

4    University, right?  All the recruitment e-mails, all the

5    equipment that he was working on obtaining, the building the

6    lab, the building of the research ecosystem the defendant had

7    already started by the time he submitted his institutional

8    responsibilities form in September of 2018.  And he reports

9    none of it.  And he causes KU to make a false statement.

10         And you know that because the disclosure is under

11   review, you heard the testimony of Alicia Reed.  There are no

12   items to display.  There are no items to display means the

13   defendant hadn't previously reported any of those potential

14   conflicts and he didn't report it on this one.

15         Count 8 is the e-mail that the defendant sent to DOE

16   related to his current and pending where he sends the e-mail

17   and an attachment that is his and his co-PI's current and

18   pending.  It's July 2018 -- July 16, 2018.  So if you look at

19   everything to the left of that, you know that the defendant was

20   obligated to report that he expected to receive funding as a

21   Changjiang Distinguished Professor and he chose not to.

22         The defendant made or caused to be made the statements

23   knowing that they were false.  He knew he didn't report his

24   affiliation with Fuzhou University either on the current and

25   pending or on the institutional responsibilities form.

1          The willfulness, the willfulness element, the

2     defendant made the statements willfully, that is deliberately,

3     voluntarily and intentionally.  This was not a mistake.  You

4     know this wasn't a mistake because of the lies, because of the

5     misstatements, because of the concealment.  That's how you know

6     it was willful.

7          The defendant knew he was committing a crime.  The

8     search warrant at his house, the phones, the phone from the

9     search warrant, do you remember the testimony?  The defendant

10    had a screenshot related to an investigation related to Emory.

11    This was not a mistake.

12         For both Count 7 and 8, you have to find that the

13    statement was made in a matter within the jurisdiction of the

14    executive branch of the United States.  You heard testimony

15    that both NSF and DOE are executive branches of the United

16    States, that the head of each agency is appointed by the

17    president.

18         The statements were material.  Count 8.  His current

19    and pending submission.  You heard both Dr. Keiser and

20    Dr. Schwartz talk about the materiality, why the current and

21    pending support is important.  You heard about the

22    institutional responsibilities form, because the federal

23    agencies required KU to have and enforce a conflict of interest

24    policy.

25         Here in a moment I'm going to sit down and you're

1    going to hear from the defense.  Then I'll have a chance when

2    they're done to come back up and to address some things with

3    you.

4            The fact of the matter is that this case has been

5    about the defendant's conduct.  It's been about the defendant's

6    lies and the defendant's omissions and the defendant's

7    misstatements.  And no matter how much the defense has tried to

8    refocus your attention, your job, your role, your obligation is

9    to look at the defendant's conduct.

10            Thank you.

11            MR. ZEIDENBERG:  Can we approach one moment, Your

12    Honor?

13            THE COURT:  I'm sorry?

14            MR. ZEIDENBERG:  Can we approach for one moment?

15            THE COURT:  Yes.

16        (The following proceedings were had at the bench).

17            MR. DEARINGTON:  We're not positive, we're scrambling,

18    but we weren't sure if 498A which was shown to the jury was

19    actually admitted.  We wanted to double-check that.

20            THE COURT:  Bonnie, was 498A admitted?  No, it was

21    not.

22            MR. DEARINGTON:  We objected.  I think it was

23    sustained, so I don't know if we need an instruction or what

24    the best course of action here is.

25            THE COURT:  I know that it was identified but never

1    admitted.

2         MR. DEARINGTON:  Fairly prejudicial.  It's like

3    hearsay I think that just says he was working as a Changjiang

4    or something like that.

5         THE COURT:  All right.  I can instruct them now to

6    disregard and to disregard any notes they took about

7    Exhibit 498A.  It wasn't admitted.

8         MR. OAKLEY:  I apologize, Your Honor.  I made a

9    mistake.

10        MR. ZEIDENBERG:  Your Honor, can we get five minutes

11    so I can set up my materials?  I won't take longer than that.

12        THE COURT:  Okay.  And I was thinking we're probably

13    going to need to give them at least 5 or 10 minutes anyway.

14    What we'll try to do is go completely through yours and then

15    yours and then the final instructions.

16        (Thereupon, the proceedings continued in open court.)

17        THE COURT:  All right.  Ladies and gentlemen of the

18    jury, one of the exhibits that was shown to you just now was

19    498A.  It was never admitted into evidence, so disregard

20    Exhibit 498A, and if you took notes about it, just strike those

21    through.  That's not for your consideration.

22        All right.  I told -- we need -- we probably need to

23    take a break so we don't go three-plus hours straight through,

24    so I would suggest we take a very quick break at this point, no

25    more than 10 minutes.  Then we'll come back and hear the

1    defense's closing.  We'll go right into the government's

2    closing and I'll read these last few instructions.  Then we'll

3    send you to the jury room and probably, unless you want to

4    stick around, have you go home and come back in the morning and

5    the bailiffs will give you instructions about how to proceed in

6    the mornings, 9:00 or 9:30, whenever you think would be best.

7    Let's try to be real quick and take a ten-minute break at this

8    point.

9         (Recess.)

10        (The jury entered the courtroom, after which the following

11   proceedings were had.)

12             THE COURT:  You can be seated.

13             Mr. Zeidenberg.

14             MR. ZEIDENBERG:  Thank you, Your Honor.

15             Ladies and gentlemen, good afternoon.  Well, there you

16   have it.  Three years, almost three years of investigation, two

17   weeks of evidence, 28 government witnesses by our count,

18   hundreds and hundreds of exhibits, and not one word about loss.

19   This is a fraud case, ladies and gentlemen.

20             My client, Dr. Tao, is alleged to have defrauded the

21   National Science Foundation and the Department of Energy of

22   money and KU of salary.  No one came in to tell you that they

23   lost anything.

24             You didn't hear from a victim in this case to say we

25   were tricked, we were deceived, we're out money, he's got our

1  money.  I mean, think about this, ladies and gentlemen.  Two

2  witnesses from the Department of Energy and National Science

3  Foundation, one witness each, and what did they tell you?  That

4  Dr. Tao performed on those grants.  They gave grant money to

5  KU.  KU gave it to him.  And he did it.  He did the work.  He

6  published the articles.  They were happy.

7          Maybe that's why Rebecca Keiser and Viviane Schwartz

8  looked so uncomfortable up there, like why are we even here?

9  They never said we were victimized.  They never said we lost

10  money.

11         I told you in the opening, ladies and gentlemen, that

12  the government didn't know the difference between an H.R. case

13  and a fraud case, but that you, ladies and gentlemen, needed to

14  know and remember there's a difference.

15         Mr. Oakley is showing you pictures, exhibits about

16  missed faculty meetings.  You didn't go to your faculty retreat

17  (tsk, tsk, tsk).  You weren't on time for an office meeting.

18  Bad.

19         Well, there's a place to discipline professors.  I

20  mean, let's just start with this, the idea that Dr. Tao was

21  somehow depriving KU of salary, this man was a working machine,

22  16 hours a day, seven days a week, no days off.

23         Every single witness, the government witnesses told

24  you that.  People should kill to have an employee like that

25  work for them.  Wouldn't you all want Dr. Tao working for you?

1    Because you know he would be tireless.  He would be

2    single-minded and focused on getting his job done.  And they're

3    saying the man who never takes a vacation, who never takes a

4    day off, who never calls in sick, who doesn't even get

5    compensation for the trips he takes, the -- for KU.  All of

6    those conferences he goes to he doesn't ask for compensation

7    for it, which he's entitled to.

8            He gets an award and what's he do with it?  He donates

9    half of it back to the University of Kansas for research.  And

10   he's defrauding KU?  They should thank their lucky stars they

11   ever had him work for them.

12           What do teaching evaluations have to do with a fraud

13   case?  It's not an H.R. case.  If KU wants to take disciplinary

14   action for Dr. Tao because he told Dr. Weatherley he was in

15   Germany when he was really in China because he had gotten in

16   trouble for spending time in China in 2015 when his father

17   died, well, that's something the H.R. department can take up.

18   But that's not what he's charged with.  He's charged with

19   defrauding federal agencies.

20           And what do they say?  Before I get to the agencies, I

21   just got to stop on this H.R. thing because it's just driving

22   me nuts.

23           Do you remember the first witness in this case,

24   Dr. Girod, the chancellor?  In addition to saying what a

25   remarkable, remarkable accomplishment Dr. Tao had done by

1   publishing such an extraordinary output, do you remember I

2   asked him -- can we turn on the ELMO?

3           Do you remember when I asked him about the -- all the

4   KU policies?  These were just the academic policies.  Page

5   after page after page after page after page.  And then we get

6   to the financial policies, page after page after page after

7   page.  And I'm not showing you all of them.

8           And what did you hear about the training that was

9   provided to Dr. Tao and anyone else at KU?  No, we didn't do

10  that.  We make the -- you know, those policy books, you know,

11  they're available, and by the way, it's your first day of work,

12  sign here if you want a job, and you have to certify you've

13  read and understood all those policies.

14          Ladies and gentlemen, we've all rented cars, right,

15  and you go there and you want that car and you want to go to

16  that hotel and you want to get on your vacation and you're

17  checking every single box they put in front of you, and it's

18  the same way on the first day of work at any job.  And they say

19  here's your policy, here's your H.R. thing, here's this, here's

20  that, sign all this, and you sign.

21          They don't give you any training.  And you hope

22  everything is okay.  And you are damn sure that if you make a

23  mistake, the FBI is not going to come crashing through your

24  door and handcuff you and take you away and put you on trial in

25  federal court like this.

1          And what's happened?  They say, well, we make those

2     resources available so they can study up on this stuff on their

3     own.  We don't give them training, but, you know, it's

4     available online.  Do you remember what happens when they go

5     online to try and see if the training works?  Who can forget

6     when the H.R. witness from KU who's bragging about how

7     everything is available online.

8          COURTROOM DEPUTY:  It's on.  It's on.  It's on.

9          MR. ZEIDENBERG:  Well, I guess we'll have to go by our

10    memories.  But you remember.  I think it was Kim Wittman.

11    Yeah, do you think those links still worked?  What happened?

12          COURTROOM DEPUTY:  Got it.

13          MR. ZEIDENBERG:  There we go.  Let's see what happens.

14    Let's look at the policy manual.  Oops.  Oops.  She had no idea

15    how long this had been inoperable.  And what does that tell

16    you?  Nobody ever called to say those links don't work.  Of

17    course they don't because nobody goes on and reads these

18    things.

19          Anyway, it's not an H.R. case.  I mean, this is just

20    an example of why no one should ever be subject to this based

21    on H.R. policies, which is what the government has been

22    spending this almost entire trial showing you.  Twenty-eight

23    witnesses, most of them were from KU, from the H.R. department.

24    Policy after policy after regulation after regulation.  Where's

25    the fraud?

1          Two federal agencies and the government brings in just

2    one witness from each and what do they tell you?  All the work

3    was done.

4          Is the ELMO on?

5          Viviane Schwartz -- these are the government's

6    witnesses.  These are the witnesses from the victim agencies,

7    the only two that testified.  Viviane Schwartz.  Well, fair to

8    say, that this wasn't -- that the DOE grant at issue here, the

9    research was done, correct?

10         Yes.

11         And it appeared to have been done satisfactorily?

12         Yes.

13         Rebecca Keiser.  And are you aware of any allegations

14   in this case that any of the work on the NSF grants was not

15   done in the manner prescribed?

16         I'm not aware.

17         But there's more.  Viviane Schwartz, this is from a

18   government exhibit, Exhibit 36.  This is the first year after

19   the renewal and the PI continues -- the PI, remember, is

20   Dr. Tao -- continues to report nicely.  Their recent advances

21   with an output of at least four new applications on which our

22   grant was the major contributor.  The publications are (as

23   usual with this PI) in high impact journals.  In addition, the

24   PI has also contributed to very comprehensive review in the

25   field published this year at Chem Review.  The output is very

1    good and supportive of continued funding.  That's the

2    Department of Energy, a victim, according to these gentlemen,

3    of fraud.

4            But there's more.  Viviane Schwartz went on to say

5    that a measure of success is the quality of the journals and

6    agrees that his 56 publications with 36 citations [*sic*] is very

7    impressive and the research for DOE was a success.  That's DOE.

8            Here's NSF.  Not aware of any allegation that he did

9    not do all the work in the prescribed manner.

10           That is the state of the evidence about the work on

11   the grants.  The victim agency says we're happy.  I mean,

12   that's it, that's the end of the case, there's no fraud.

13   They've just said it to you.  I mean, it's in black and white,

14   they're saying it out loud.  I mean, sometimes you feel like

15   you've got to shout it from the ceilings, like, what are we

16   doing here?

17           Let's just back up a minute and look at the big

18   picture, okay?  The government doesn't seem to understand how

19   the grant process works.  Agent Lampe, in fact, admitted that

20   on the stand, he was a little fuzzy on the details.  After all

21   this time, still fuzzy on the details.

22           But unlike what it said in the indictment, the grant

23   money doesn't go to Dr. Tao; it goes to KU.  So I want you to

24   try to wrap your heads around this theory because it's mind

25   boggling.  The government wants you to believe that Dr. Tao

1   lied, cheated, and deceived and connived to get grant money

2   sent from NSF and DOE to his employer.  He's lying to benefit

3   KU, and then he works 16 hours a day on those grants and does

4   stellar publications.

5           What kind of a fraud scheme is that?  Who comes up

6   with a scheme so that you work all this money -- all this time

7   and benefit your employer?  And the agencies are happy.  Does

8   it make any sense?

9           What would be the motive?  I mean, we all understand

10  greed, right?  Everybody understands it.  Most of us have a

11  little bit of envy or greed in us and we can at least relate to

12  it.  This man apparently does not.  He gets -- he gets a prize,

13  his family depending on his salary, and he gives it back to his

14  employer who he's already breaking his back for.

15          But you could understand a scheme to defraud if the

16  money was going into your pocket or if you were getting

17  kickbacks, but the money never touches his hands.  The money

18  goes to KU.  If there's something to spend it on, he tells KU,

19  they look at the quote, they decide if the quote is reasonable,

20  they send the quote right to the vendor.  He doesn't touch it.

21  All he does is work.

22          So what is the motive?

23          That is all you need to know to acquit Dr. Tao.  You

24  don't have to take my word for it.  You can't -- you don't have

25  to take his wife's word for it or his pastor's.  You can rely

1    entirely on the testimony of the government's own witnesses.

2           Viviane Schwartz and Rebecca Keiser, they told you the

3    work was done.  And what did they tell you about Dr. Tao's work

4    in China and whether they cared?  Viviane Schwartz:  So we

5    talked about foreign research -- this is a question from

6    Mr. Barry, the government, on direct examination, right out of

7    the box -- so we talked about foreign research support.  So

8    when you were evaluating Dr. Tao's renewal proposal, would you

9    have wanted to know if he had a second job at a Chinese

10   university while having his full-time job at KU?

11          Since I'm not his employer, I really don't verify, you

12   know, jobs per se.  That is not my role as a program manager.

13          You know, that's it.  That's all she wrote.  That's

14   the only witness you heard from from the Department of Energy

15   on the issue of do they care if he had a second job.  She told

16   you they don't.  If Agent Lampe had asked her that question two

17   and a half years ago, we would have all saved two and a half

18   weeks of our lives.

19          But Mr. Barry didn't stop there with his questioning.

20   Direct exam, Viviane Schwartz:  And when you were reviewing his

21   renewal, would you have wanted to know whether he had been

22   promised or received funding from a foreign research university

23   or institution to build a laboratory?

24          To build a laboratory?  I don't think that would be my

25   concern.

1          I mean, you know, it's like the slaughter roll, just

2     stop the trial.  The witnesses just said they don't care.  Do

3     we really have to go through two more weeks of this?

4          The alleged victims said this didn't matter to them.

5     He did the work.  We were happy with the work.  I don't care

6     what he's doing in China.  I just want him to work on our

7     grants.

8          And they told you PIs can supervise grant work from

9     anywhere.  It doesn't have to be -- it doesn't have to be

10    hovering over his graduate students in the lab.  He can be in

11    China.  He could be in France.  He could be on an airplane.

12    He's on his phone, he's on the computer.  They both told you

13    that it is perfectly fine to supervise grants.  Now, Agent

14    Lampe didn't know that because he never asked.  But now you all

15    know it.  There was no problem supervising that work from afar.

16         There was nothing to report.  Mr. Oakley spent his

17    closing argument showing you a lot of e-mails and a lot of

18    exhibits, but he didn't show you any grant proposals with any

19    false statements or omissions on it.  I mean, think about this,

20    he's charged with grant fraud.  He's charged with committing

21    wire fraud to obtain grants by making false representations.

22    Well, why aren't we seeing grants with false statements in

23    them?  Because there was nothing to report.  Those grants were

24    accurate.

25         Let's look at these dates.  It's so important.  He had

1    an NSF CAREER grant on 2013.  He had an NSF grant in 2015,

2    another NSF grant in October 2017, and another DOE grant

3    December 11, 2017.

4        What do you notice about those dates?  Government's

5    alleged he took a job in China in May of 2018.  There was

6    nothing to report on those grants.  And remember, you don't

7    have to update your biosketch.  That's where you talk about

8    your qualifications.  Viviane Schwartz and Rebecca Keiser both

9    said you don't have to update your biosketch.  Now, that's

10   something Agent Lampe didn't know because he never asked them.

11   But you heard it.

12       So those grant submissions were 100 percent accurate.

13   You never have to write down or to report a job offer.  I'm

14   thinking about taking another job, should I put that somewhere?

15   No, you don't have to do that.

16       And there were no progress reports that were false

17   either because you don't have to report pending grants.  Both

18   Rebecca Keiser and Viviane Schwartz told you that, you only

19   have to report active support.

20       You saw no evidence that Dr. Tao had any active grants

21   in China.  You saw a couple unsigned applications for grants,

22   no signatures, no stamps, lots of errors, one of which was

23   provided by Huimin Liu that doesn't appear on his -- Dr. Tao's

24   computer, the woman who somehow according to Agent Lampe was

25   negotiating with Dr. Tao but by any other consideration was

1    extorting him, she came up with one of these Chinese grant

2    proposals, but there was no evidence they were funded.

3           So you can't speculate.  You can't guess.  You can't

4    say, well, perhaps he got one.  You have to have evidence.  You

5    have to have proof.  The government has the burden of proof

6    beyond a reasonable doubt.  There's none.  And if there's no

7    Chinese grants, there was nothing to report on his current and

8    pending support.  The case is over.  There is nothing false.

9           The grants were accurate.  The grant applications were

10   accurate because they all predated the job at Fuzhou.  We're

11   not saying he took the job, but I'm saying even if the

12   government was right, he had nothing to report.  And because no

13   Chinese grants were funded, there was nothing to report on his

14   current and pending support.

15          Let's look at the conflict of interest form.  I've

16   been waiting to talk about this conflict of interest form for

17   two years.  This is Government's Exhibit 25.  You know,

18   Mr. Oakley said this was false, but he never showed you what

19   was false in it according to the government.  He didn't want

20   you to look at the actual language.

21          There was nothing in this document that's false.

22   Disclosure criteria, this is what they said.  You have to

23   report if you or anyone in your family, including your spouse,

24   reasonably appears -- disclose financial interests held by you

25   or family members, dependent children or anyone else in your

1    family, reasonably appears to be related to your university

2    responsibilities.

3         Well, you can stop right there and say I don't know

4    that anything he was doing in China was reasonably related to

5    his university responsibilities, and Chancellor Girod agreed

6    with me that if there's not, there's nothing to disclose.  But

7    even if you said it was, a financial interest worth 5,000 or

8    more.  Now, they're talking about the previous 12 months.  See

9    that?  Any remuneration from the entity in the 12 months

10   preceding the disclosure.  This was submitted in September of

11   2018.  There is no evidence, proof, that Dr. Tao was paid more

12   than $5,000 before September of 2018.

13        Mr. Oakley says use your common sense, but you can't

14   guess and you can't speculate and you can't say perhaps he got

15   paid.  There's no proof, and there was nothing to report.  So

16   that is not false.  And then the other one, I mean, give me a

17   break.  Disclose any entity with which you engage in personal

18   professional activities that take time away from your

19   university responsibilities.

20        All right.  I mean, look, Dr. Tao -- do you see these

21   binders that we have in front of you on the floor?  That's the

22   e-mails from when he was away.  Okay?  That work was going on

23   constantly.  He was working on his grants and NSF and DOE were

24   satisfied with those grants.

25        In April of 2019, one year after he purportedly took

1  this job in China that's causing so much -- you know, this

2  whole case is about, he gets the award in Kansas for being one

3  of the four most outstanding professors based on his incredible

4  output and his productivity.  I mean, whatever he was doing,

5  they should -- they should bottle it and have all the

6  professors drink that because he was outperforming everyone in

7  the chemistry department.  And he's making a false statement

8  because he says nothing I was doing will take away from my KU

9  job responsibilities?

10        I mean, remember, ladies and gentlemen, in May of 2018

11  it's the end of the school year.  After that is the summer.  He

12  can go wherever he wants.  He's not tied to Kansas.  He's not

13  tied.  Then he spends the next fall at KU.  Then you have

14  winter break.  Again, he can go wherever he wants.  The fact

15  that he's in China is no moment.  They don't know if he's in

16  Chongqing visiting his mother or he's at Fuzhou collaborating,

17  that's fine.  And then he has a buyout and Dr. Weatherley

18  agreed, he approved the buyout.

19        Dr. Weatherley said, go on your buyout.  He had a

20  buyout, it was going to be paid by Fuzhou University, that

21  grant fell through, and Dr. Weatherley and every other witness

22  who was asked said the same thing.  Well, that fell through,

23  you can buy for a buyout with any grant.  It's not required it

24  has to be any particular grant, any grant can pay for a buyout,

25  which is what he did.

1          And there is no requirement, Dr. Weatherley said that,

2    there is no policy that requires a professor to stay on campus

3    during their buyout.  So he left and he did work and he

4    supervised his graduate students.

5          And let me touch on Government's Exhibit 25 again, the

6    conflict of interest form, because it's a very important

7    document in this case.  It's submitted to the H.R. department,

8    okay?  This is what your -- at your job everyone has these

9    forms, you send it in.  Not only did DOE and NSF never see it

10   because they told you we don't look at them, there's been no

11   evidence that KU ever sent it on or forwarded it in any way.

12         Mr. Oakley showed you some language saying he

13   caused -- caused KU to make a false statement to the United

14   States Government by issuing this.  Where is the evidence of

15   that?  Why haven't we seen that false statement from Kansas to

16   the United States Government saying something that was false

17   because of that?  You haven't seen that.  There's no evidence

18   of that.

19         And the idea -- think about this, the government has

20   said that this false statement, this false conflict of interest

21   statement, is part and is submitted as furtherance of the

22   scheme to defraud.  Okay?  So their idea is, he's trying to get

23   this grant money, so he's going to fill in this form and send

24   it in to the H.R. department.  But what's missing?  There's no

25   evidence that anyone ever told Dr. Tao that that grant form

1    would be considered by anyone related to the grant.  There is

2    no evidence about that.

3          I mean, it would be one thing if they said, we need

4    that conflict of interest form because we need to approve your

5    grants and send them off to these agencies and if you want to

6    get that grant money, we need to see your conflict of interest

7    form.  Nothing like that ever happened.  There's no evidence

8    about that, so why in a million years would he ever be thinking

9    when he still had a conflict of interest form how this could

10   impact his federal grants?  Makes no sense.  He wasn't thinking

11   about his federal grants.  There's no reason for him to.  He

12   had no idea that it would have any role.  Why would he think

13   that?  It's an H.R. matter.

14         How in the world did we get here?  Like, I mean, I'm

15   going through this with you and you're like, it's just so

16   bizarre.  You've got the victim saying we're not victims.  He

17   did the work.  There was nothing to disclose.  They're not

18   showing you what was supposedly false on these grant

19   applications.  How did we get here?

20         If the FBI had done its job correctly two and a half

21   years ago, we wouldn't be here.  The mistake number one was

22   believing Huimin Liu and finding her credible.  She wanted

23   revenge on Dr. Tao.  She was extorting him.  She wanted

24   $300,000 and she said if he didn't pay it, she was going to

25   accuse him of being a tech spy because that's a popular term

1    with the FBI and they pinned their ears back and they put their

2    blinders on and they became focused on getting Dr. Tao.  And

3    they ignored all of this exculpatory information.

4         I mean, instead of putting up a drone over his house,

5    pick up the phone and call the NSF and ask them, what needs to

6    be disclosed instead of rummaging through the bank accounts of

7    church members that lent him money and their children.  Call

8    the DOE and ask them, do you need to disclose this stuff?  Do

9    you care if he had a second job?  Do you care if he was working

10   on a lab in China?

11        Let's just recap.  I just want to recap with you all

12   the things that the FBI did not know when they started -- at

13   the time they arrested Dr. Tao.  Again, did not know and

14   apparently still does not know according to his testimony,

15   that's Agent Lampe, exactly how the money flow on federal

16   grants work; did not know the DOE and NSF disclosure rules; did

17   not know that the NSF and DOE were changing their disclosure

18   language because there was confusion over what was required;

19   did not know or care that there was no training provided to PIs

20   like Dr. Tao regarding disclosure requirements; did not know

21   that the NSF had a 154-page PAPP Guide that provided no

22   training on its requirements; did not understand how the money

23   flowed on federal grants, the government thought the money went

24   directly to Dr. Tao; did not know the DOE program manager

25   didn't even care if Dr. Tao had a second job outside of Kansas;

1   did not know and did not care that the DOE program manager

2   doesn't care if PIs had been promised or received funding from

3   a foreign research university or institution to build a lab;

4   did not know and did not care that PIs had no obligation to

5   update their biosketch; did not know and did not care that

6   Franklin Tao had completed all of his research for NSF and DOE;

7   and in fact claimed only to have learned that he did all his

8   work during this trial.

9           And I got to stop here because, ladies and gentlemen,

10  none of us had the benefit of going to Quantico and becoming

11  trained agents.

12          But I just want you to imagine, you were tasked with a

13  case, you're being asked to investigate whether someone

14  defrauded grant agencies, whether they were victims, okay?

15  What would be the first two things you wanted to know?

16          First, well, what are the rules?  What are the rules?

17  What do you need to disclose?  I mean, come on, you got to know

18  the framework.  Let's see what the framework is and then we'll

19  see if he did it.  How do you skip that step?

20          And what's the second thing you want to know?  Was the

21  work done?  It's a fraud.  Gave him money but we didn't get

22  work; we were defrauded.  And Agent Lampe didn't know until

23  this trial, until a couple days ago when you all learned that

24  NSF and DOE were happy with the work two and a half years

25  later, after all this agony?

1        I mean, how can that be?  Did not know and did not

2    care that neither NSF or DOE had no objection if PIs supervise

3    research when they were out of the country; did not know and

4    did not care that DOE disclosure rules were evolving in 2018

5    and were not always clear even to experienced program managers.

6    That was what Ms. Schwartz -- Dr. Schwartz testified about.

7    I'm almost done but not quite.

8        Did not know and did not care that Franklin Tao had

9    listed three papers in his DOE progress report that listed his

10   Fuzhou University affiliation.  Again, I got to stop.  Agent

11   Lampe told us that he learned that during this trial.  Now,

12   wouldn't you think -- go back to my hypothetical that you're

13   the agents on a case.  After asking about the rules and asking

14   about the work, wouldn't you want to see the grant paperwork

15   that was submitted in connection with these grants?  I mean,

16   wouldn't that just seem like a logical first step?

17       And if he had done that, he would have looked at the

18   progress reports, and the progress reports listed papers that

19   listed an affiliation for Dr. Tao with Fuzhou.  No one made him

20   include those papers.  He did that himself.  DOE never raised

21   an eyebrow.  They never asked a question.

22       Now, there's got to be an intent to defraud, okay?

23   All this secrecy, all the machinations he was doing to hide,

24   what kind of hiding is that?  You're telling the granting

25   agency you're supposedly defrauding I've got an affiliation

1   with these guys, look at these papers I wrote, it's out on the

2   Internet.

3           I mean, remember Rebecca Keiser, she said the night

4   before she testified she just Googled him and she found four

5   papers?  What kind of a fraud scheme is this?  It's on the

6   Internet.  He published this.

7           Agent Lampe said, well, it's all part of the scheme,

8   it's all part of the assignment with Fuzhou, but Fuzhou said

9   you've got to be exclusive with us and you can't work anywhere

10  else, you've got to work just for Fuzhou.  How is that part of

11  the scheme?  It's contrary to this purported contract he's

12  supposedly has.

13          Did not know and did not care that KU research office

14  was lax and sloppy in enforcing its own rules; didn't know and

15  didn't care that Dr. Tao had applied for positions at

16  universities all over the U.S. in the exact same timeframe as

17  the Fuzhou purported contract.  I mean, ladies and gentlemen,

18  Mr. Oakley says use your common sense.  Okay, please, please,

19  I'm begging you, use it.

20          A guy just takes a job in China and he's looking for

21  new jobs in the U.S.?  The job in China, remember, has to be

22  exclusive.  He can't have another job.  And he's out casting

23  about to a dozen different places.  What does that tell you?

24  Isn't that something you'd like to know before you indict a

25  case like this?

1          Didn't know Dr. Tao was trying to get a promotion at

2    KU to full professor; didn't know that Dr. Tao had been awarded

3    the chancellor award for his outstanding productivity.  He

4    didn't know that.  Here he is, the government is charging

5    Dr. Tao for not fulfilling his KU responsibilities, for

6    shirking his duties at KU, and they don't even know that he's

7    one of the four best most productive professors on campus for

8    that year?

9          Didn't know and didn't care that he was the most

10   productive member of the KU chemistry department.  Dr. Tao

11   can't win in this investigation.  Anything he does that the

12   government says is consistent with this purported contract

13   proves the contract was signed, proves it was agreed to.  But

14   if there's something that's inconsistent, and most of it was,

15   namely he kept his employment at KU and was looking for other

16   employment, he didn't publish anything when he was supposed to

17   be publishing 60 articles in five years, he published 0 in

18   15 months.  He was supposed to be teaching chemistry at Fuzhou,

19   wasn't doing that.  He was supposed to send his personnel file,

20   hadn't done that.  So none of those things happened.

21          So what does that show?  Well, maybe he negotiated

22   some other contract we just don't even know about.  Well, come

23   on.  You can't convict someone on maybe and perhaps.  I mean,

24   there's got to be evidence.  There's got to be proof beyond a

25   reasonable doubt.  Not, well, maybe there's another contract

1    that we don't know anything about.

2            And while Glenn Tiffert, the government's expert, says

3    everything in China is done by the book, it's by the book,

4    there's no freelance.  If it says this in the regs, this is

5    what happens.  Except when it comes to Dr. Tao.  Well, he

6    probably has some kind of agreement.  He can't win.  If there's

7    evidence of money coming in, that must be from Fuzhou.  If

8    there's no money coming in, well, that's evidence too of

9    something, some other kind of payment scheme.  We just don't

10   know where it is.  But perhaps it happened.  There's no proof.

11           There's no proof at all, much less proof beyond a

12   reasonable doubt.

13           Ladies and gentlemen, you remember that bankbook I

14   introduced with Ms. Peng today?  Before that bankbook came in,

15   what you saw was a screenshot, remember?  Think about what

16   would have happened if they -- if that bankbook, they hadn't

17   been able to find that bankbook and send it back to China two

18   weeks ago and just get it back before trial.  I guarantee you

19   -- and you know in your bones that this is true -- they would

20   have taken that screenshot on the computer with that account

21   number and said, that Fuzhou money, probably all in there, it's

22   probably all in that bank account.  We just can't get at it

23   because it's hidden away in China.

24           I mean, thank God.  Now you have the bankbook.  You

25   can look at it.  It's in evidence.  There was never more than a

1    couple thousand dollars in this bank.  There is no evidence of

2    money, none.

3         I'm going to just run through these counts for you.

4    Oh, here they are, right in front of me, bad place.

5         Count 1, e-mail from Kansas to the Consulate General

6    to get a passport to go to China.  Look at the date,

7    November 17th.  How is that in furtherance of a scheme to

8    defraud Kansas, '17, or DOE or NSF of money or property?

9    Because he wants to get a visa to go to China?  So he's

10   defending his Changjiang scholarship, so what?  He could go to

11   China.  He can do that.  There's no law against that.  There's

12   nothing wrong with that.  That's not part of a scheme to

13   defraud anybody.

14        Now, two, electronic submission of Dr. Tao's U.S.

15   Department of Energy grant application to location outside of

16   Kansas.  Look at the date.  December 11, 2017.  Have they shown

17   you anything false?  No.  There was nothing to report.

18        June 16, 2018, e-mail from outside the U.S. regarding

19   Dr. Tao's proposal for collaborative research project.  How

20   would trying to get Fuzhou to give grant money to KU be part of

21   a scheme to defraud KU and NSF and DOE?

22        Four, e-mail from the United States through Kansas to

23   the Department of Energy regarding his updated current and

24   pending support.  Okay.  I want to pause on that because that's

25   the same count that has to do with Viviane Schwartz because she

1    sent an e-mail to him and she said, I need an update on your

2    current and pending support.  And the government made that two

3    counts.  It was an e-mail back and he sent her -- he didn't say

4    anything about anything in -- any Chinese grants.  But what did

5    she say about that?

6            Viviane Schwartz only cared about active support.

7    Active versus pending, that means a grant got funded.  I just

8    want to run through that with you.

9            Okay.  I just want to dive into that a little further.

10   You're looking at a grant application.  You want to know about

11   current and pending support because of the overlap in time

12   commitment issue, correct?

13           Yes.

14           And ultimately if something is left off, but it is not

15   funded, then in a way it's a situation where the problem is

16   averted because there can be no overlap and there can be no

17   time commitment issue on an unfunded grant?

18           Yes.

19           Okay.  And as far as scientific and your concern about

20   overlap, I just want to emphasize, if the other grants are not

21   funded, overlap is not an issue?

22           Can you repeat the question?

23           Yes.  If other pending support is not funded, then

24   overlap and time commitment is not an issue?

25           Correct.

1           That's it.  You have to find guilt, there has to be

2   proof of materiality.  That means the statements weren't

3   important and were relevant to the agency.  It could affect

4   their decision-making process.  What she's saying there is I

5   don't care and we don't care about unfunded grants.  So even if

6   you believe that there were unfunded grants in China, there's

7   no evidence they were funded.  There was nothing to report.

8   She doesn't care about unfunded.  She only cares if they are

9   funded.

10          Same thing Rebecca Keiser said.  All right.

11  Electronic submission of his -- that is Count 5 is the

12  institutional responsibilities form, that's a conflict of

13  interest form, I've already talked to you about it.  It wasn't

14  false.  It wasn't within the jurisdiction of DOE or NSF because

15  they never saw it.  They didn't need it, and there's no

16  evidence that Kansas ever shared anything with them.  It was

17  not told to Dr. Tao that it would be used in the grant process.

18  It cannot be conceived as something that's in furtherance of a

19  scheme to defraud.

20          E-mail from outside -- Count 6, outside Kansas to a

21  location regarding his application for National Science

22  Foundation of China funding.  How is applying for a Chinese

23  grant furthering a scheme to defraud NSF and DOE?  You can

24  apply for grants anywhere.  If you get them, there may be

25  ramifications.  You may have to report them.  Applying for a

1   grant, that doesn't further a scheme to defraud anybody.

2           And then Count 7 is the false statements, again, in

3   the conflict of interest form, I went through it with you and

4   explained why that isn't false.

5           Count 8 is a false statement regarding the e-mail to

6   Ms. Schwartz about the updated support.  And again, same rule

7   of materiality applies to both.  It has to be material.  She

8   didn't care about unfunded grants.

9           Ladies and gentlemen, the government here is

10  apparently unwilling or unable to acknowledge and admit that

11  they made a huge mistake here.  They've dug in their heels and

12  they just are plunging ahead, no matter how many witnesses get

13  up there and say we were happy with the work.

14          But now, finally we get a chance to have you all make

15  a judgment and speak the truth, verdict.  That's what it means,

16  it means to speak the truth.  You have the power now to put an

17  end to this.  You have the power to say that if you want to

18  charge someone with grant fraud, we need victims coming in here

19  and saying we were defrauded, that we lost money.

20          In the jury instructions you will see an instruction

21  that I want you to pay attention about because I think it's a

22  really important one.  An intent to defraud, what does that

23  mean?  It means to act with an intent to deceive or cheat

24  someone, ordinarily for the purpose of causing financial loss

25  to another or bringing financial gain to oneself.

 1        No financial loss to anyone in this case, none.  No

 2   financial gain to Dr. Tao, none.  There is no intent to

 3   defraud.  There was no fraud.  This case is based on air.

 4   There's nothing there.  You just push and your hand goes right

 5   through.

 6        I'm confident, ladies and gentlemen, on behalf of

 7   Dr. Tao, that when you go back and deliberate and you think

 8   about the timing and you think about the sequence of events,

 9   and you don't just go by, well, he sent an e-mail to his H.R.

10   department or his department chair or he lied about where he

11   was so he missed a faculty meeting, that's not what the case is

12   about.  It's about fraud and we are confident that you will

13   find there was no fraud, there was no intent to defraud, no one

14   lost a dime.

15        There's not just reasonable doubt.  Dr. Tao is an

16   innocent man.  He's innocent of these charges.  And there's no

17   reasonable way that anyone could find beyond a reasonable doubt

18   to the contrary, that he was guilty.  I'm confident you'll come

19   back with a verdict consistent with that, and that is a verdict

20   of not guilty.

21        Thank you.

22        MR. OAKLEY:  I want to address the

23   mischaracterizations in the evidence that you heard.  I don't

24   know if I have enough time to address them all.  You heard the

25   witnesses testify, you know what they say.  Current and

1    pending, all means all.  It's not current and current.

2          For defense counsel to say that there was no

3    obligation to report grants that were in the application

4    process, it's contrary to the evidence that you heard both from

5    Dr. Schwartz and Dr. Keiser and it's contrary to common sense.

6          What's the purpose of the notifications in the current

7    and pending?  The federal agencies have a limited amount of

8    money.  They have to determine which grants they're going to

9    fund, and they want to know at least two things, right?  They

10   want to know if the PI has the capability to carry out the

11   research, the time commitment, but they also want to know if

12   there's any other grants at any other stage that are funding

13   the same research.

14         It's not current and current.  It's current and

15   pending.

16         You know, the defendant wants to define his

17   obligations and what matters to others based on his point of

18   view, and it's this argument that KU got what it bargained for

19   because of the research.  Well, you heard the testimony, it's a

20   40/40/20 split.  The teaching component is just as important as

21   the research component and the service component is important,

22   right?  About half, 20 percent.

23         And the fact of the matter is the defendant can't

24   provide the teaching component because he's fulfilling his

25   obligations to Fuzhou University.  There are 22 KU students

1    paying tuition that can't enroll because the defendant is at

2    Fuzhou University and he lied to KU about it and he concealed

3    that fact to KU and he omitted it on his conflict of interest

4    report.

5          He's recruiting post-docs who reach out that want to

6    join his group at KU.  And what does he say to them?  Do you

7    want a position in China?  These are people who could be

8    excellent researchers, could be excellent scientists, could be

9    excellent students, and these are people who could provide a

10   service to the University of Kansas where the defendant owes

11   his responsibility.  And does he evaluate that, make that

12   determination?  No.  He diverts them to Fuzhou.

13         The course buyout, I think I heard counsel say that

14   there was no obligation for the defendant to be on campus.

15   This is the e-mail wherein Dr. Weatherley grants the proposed

16   buyout, which as you know is based on a lie.  But even if it

17   weren't, what does Dr. Weatherley tell the defendant?  You are

18   expected to be in attendance on campus during the semester in

19   accordance with KU policy.  Your other duties will continue as

20   usual, including advising, committee work and service to the

21   department, school, and university.

22         He shows you a portion of Dr. Schwartz's testimony,

23   right?  You remember what she said?  She doesn't say that the

24   conflict of interest issue is not important to her.  She said,

25   that's a policy for KU and under the rules we expect KU to have

1    a policy and to enforce the policy.

2            Let's clear up some of the things he said about wire

3    fraud on Counts 1 through 6.  You have the law, you have the

4    instructions.  The use of interstate wire communications was

5    closely related to the scheme in that the defendant either

6    wired something or caused to be wired something in an attempt

7    to execute or carry out the scheme.

8            The wire fraud counts, the wires are in furtherance of

9    the scheme to defraud.  It was part of the scheme to defraud

10   that the defendant obtained the Changjiang Distinguished

11   Professor award.  The Count 1 is the e-mail he sends so he can

12   get the visa so he can go defend his presentation so he can get

13   that award.  It's in furtherance.

14           I don't have time to go through each and every other

15   count, but they are all in furtherance of a scheme to defraud

16   KU of salary, of NSF -- of salary and also the use of the lab

17   because the defendant needed that; NSF of grant funding that

18   would go to KU that would be gone unless the defendant could

19   lie and conceal and scheme to keep his KU job despite the fact

20   that he committed himself to be a full-time professor at

21   Fuzhou.  Each of the wires were in furtherance and part of the

22   scheme.

23           I don't know if you noticed, in one hour he spent ten

24   minutes talking about the law and the facts, the last ten

25   minutes.  Before that what he did want to talk about?  He

1    wanted to talk about the FBI.  He wanted to talk about the

2    prosecutors.  He wanted to talk about broken links in a 2011

3    form at KU.  Why does the defense want to point you to this

4    table?  Because he knows what you'll find when you look at this

5    table.

6         But the fact of the matter is, you're the jury in the

7    United States of America versus Franklin Feng Tao.  Why doesn't

8    he want you looking at the defendant's conduct?  Why doesn't he

9    want to talk to you about what it was that the defendant was

10   doing in December of 2018 all the way up to August of 2019?

11        You know, he talks about the defendant can do whatever

12   he wants in the summer, he can go wherever he wants.  You heard

13   the testimony.  Well, if he has a buyout so he's receiving

14   summer salary, he's expected to be working on the grants that

15   are funding that summer salary.

16        This is Exhibit 15.  This is his pay, his 2018.  This

17   is all the salary that the defendant earned in the summer of

18   2018.

19        You know that he went to China to work at Fuzhou to

20   build his lab, to work at his lab, to recruit students, to

21   build that research ecosystem in December of 2018, all the way

22   up to the date of his arrest, right?

23        Still drawing that salary.  He draws it February,

24   March, April, May, June, July, August up to and through the

25   date of his arrest.

1           You know, if you think the FBI could have acted

2     differently, if you think the prosecutors could have acted

3     differently, fine, fine.  That's your right.  You can contact

4     the FBI.  You can contact your congressmen.  You can contact

5     the attorney general.  That's fine.  You don't have to agree

6     with what happened or the way things were done.  But the fact

7     of the matter is, your obligation is to look at the facts and

8     the evidence and the law and apply the facts and the evidence

9     to the law and determine whether or not you believe that

10    there's proof that the defendant committed these crimes.

11          The instructions tell you, keep constantly in mind

12    that it would be a violation of your sworn duty to base a

13    verdict upon anything but the evidence in and the law

14    applicable in this case.  And if you base your verdict on

15    anything else, you shirk your duty.  There's already one person

16    in this courtroom that violated his duty and the evidence, and

17    the law and the facts of this case show you that.

18          Now I want to talk about the binders.  He talked to

19    you about these binders.  But do you remember how those came --

20    were introduced as a demonstrative exhibit?  He had Special

21    Agent Lampe on the stand.  He brings out all these binders,

22    they make a showing of all these binders, and then they never

23    ask Special Agent Lampe what's in the binders.

24          Do you remember that line of questioning?  I represent

25    to you that this binder contains e-mails from this, this binder

1    contains e-mails from that.  Well, what were you told in the

2    law by Judge Robinson?  Statements of counsel are not evidence.

3    The evidence comes from the witness stand.  And that's

4    deceptive and that's misleading.

5        You heard the evidence, you heard the testimony from

6    Dr. Tiffert.  You don't get this unless you commit to being a

7    professor, in this case at Fuzhou University, and the whole

8    purpose is for bringing researchers over so that they can build

9    a lab, build a research ecosystem, so they can recruit better

10   people and do the research.  The fact of the matter is the

11   defendant received this.  And the defendant accepted these

12   obligations, which would be fine except at the time he had

13   obligations to the University of Kansas and through the

14   University of Kansas he had obligations to the federal

15   government, the NSF, and the DOE.

16       The fact of the matter was there was no way for him to

17   do both.  He couldn't fulfill 18 months of obligations in a

18   12-month period.  Now, Dr. Liu gave him sound advice, try and

19   work it out with your employer, talk to them, be upfront, be

20   honest, explain what's going on, maybe you can work something

21   out.

22       Ladies and gentlemen, you're not here because of

23   anything that the FBI did.  You're not here because of anything

24   that Huimin Liu who you haven't even heard from did.  You're

25   here because of what the defendant did, and what the defendant

1    did was choose to lie, he chose to conceal, and he chose to

2    mislead.  And when you apply the law to the facts and the

3    evidence, the only verdict that would fulfill your obligation

4    as jurors would be verdicts of guilty for each and every count.

5         Thank you.

6         THE COURT:  All right.  I have a few remaining

7    instructions that I will read to you.  You'll take the

8    instructions back to the jury room with you, but do not take

9    the chart, the timeline.  Yes?

10        JUROR NO. 0068:  I left my jury instructions back in

11   the other room.

12        THE COURT:  And that's --

13        JUROR NO. 0068:  Can I listen or should I get --

14        THE COURT:  Yeah, that's fine.  Are you okay with

15   that?

16        JUROR NO. 0068:  I'm okay with that.

17        COURTROOM DEPUTY:  We've got an extra set.

18        THE COURT:  Oh, you do, great.

19        All right.  We are now on Instruction No. 36.

20      (The remaining instructions were read.)

21        THE COURT:  The parties come forward.

22      (The following proceedings were had at the bench).

23        THE COURT:  All objections to the instructions are

24   preserved for the record.  Are there any objections to the

25   reading of the instructions?

1          MR. OAKLEY:  No, Your Honor.

2          MR. ZEIDENBERG:  None from us.

3          THE COURT:  Thank you.

4     (Thereupon, the proceedings continued in open court.)

5          THE COURT:  Will the bailiffs come forward?

6     (The bailiffs were duly sworn.)

7          THE COURT:  All right.  So we are going to send you

8     all back in the jury room.  You're going to have a folder that

9     contains the verdict form that has prepared forms if you should

10    have questions.  The foreperson can fill out and sign and date

11    and send out for us to answer to.

12         Given the lateness of the day, I don't know if you

13    want to elect your foreperson tonight or you want to wait until

14    the morning.  You're pretty much on your own schedule during

15    deliberations.  We just need to know what that schedule is so

16    that we are available if there are questions or if there's a

17    verdict, we want to make sure everybody is here and waiting.

18         So three of you remain that are selected as

19    alternates.  That would be Juror No. 00088, Juror No. 0093, and

20    Juror No. 0078.  We thank you, the three of you, for your

21    service.  You are off the hook in the sense you can go home

22    now, you don't have to return for deliberations.  But you're

23    not off the hook in the sense that the admonition to not

24    discuss, communicate, look things up, you're still under that

25    until there is a jury verdict.  And the reason is, if one of

1  the 12 jurors or more should get sick or be incapacitated for

2  some reason, can't complete deliberations, we will call you

3  back.

4       And should you be called back to replace a juror,

5  deliberations begin anew because it's important that every

6  single juror, all 12 completely participate in all

7  deliberations and discussion.  So the jury goes back to the

8  drawing board, and you would be fully incorporated into the

9  jury panel of 12.

10       We will call you when a verdict is reached to let you

11  know the verdict has been reached and you're released from the

12  admonition, just like the 12 jurors are as well.

13       And one other thing I want to tell the alternates, and

14  I'll remand the other 12 later, we have a local rule in this

15  district that prevents the parties and their counsel from

16  initiating contact with you.  Obviously, they can't do it

17  during deliberations, but after deliberations they're not

18  allowed to initiate contact with you unless they first get

19  permission from me.

20       So if I give them permission, we'll let you know that,

21  and then you're free to talk to them.  You're always free to

22  initiate contact with them.  It's just that they can't approach

23  you and initiate contact with you without court permission

24  first.

25       So for the alternates, thank you so much for your

1    service.  I will join you very briefly.  We have certificates

2    to give to you and send you on your way.

3           And then I don't know if you want to stick around to

4    elect a foreperson or you want to go home.  Do you have a sense

5    when you might want to return in the morning?  Have you all

6    talked about that at all?  No?  Okay.

7           If you could at least let us know that tonight and

8    then we'll communicate that to the parties so they'll know when

9    they should be in the courthouse tomorrow morning.  And when

10   you do show up tomorrow, you will report to the jury room.  You

11   won't -- well, you've been doing that anyway.

12          Any other questions you have, just about the

13   logistics, Bonnie and Joy and Lauren will be available this

14   evening.  So safe travels.  Thanks again to the alternates, and

15   we'll perhaps hear from you sometime tomorrow.  We'll be in

16   recess.

17       (The following proceedings occurred outside the presence of

18   the jury.)

19          THE COURT:  We'll communicate to you by e-mail as soon

20   as we know when they plan to arrive and deliberate tomorrow.

21   Leave your cell phone numbers, whatever your contact number is

22   with Bonnie, if you will, so if you're not right here in the

23   witness room, we can find you somewhere in the building if need

24   be.

25          MR. ZEIDENBERG:  Your Honor, where were you -- how

```
 1    close do you expect us or need us to be at all times during

 2    deliberations?

 3            THE COURT:  I'd prefer minutes because, you know,

 4    sometimes we get questions and -- I prefer for you to be in the

 5    building if at all possible.

 6            MR. ZEIDENBERG:  Okay.

 7            THE COURT:  I would say no more than five minutes

 8    away.

 9            MR. ZEIDENBERG:  Okay.

10            THE COURT:  And obviously only -- you don't

11    necessarily all have to be here, but Dr. Tao needs to in case

12    there's a verdict.  And of course we're not going to have a

13    verdict until everybody is gathered.  But in other words, if

14    you didn't want to both be here at all times for questions, you

15    could just choose which one of the team is going to do that.

16            So -- okay.  And make sure we have a contact number

17    for at least one member of the team.  Okay?  Anything else?

18            So, yeah, we'll communicate with you as soon as we

19    know what time they plan to show up in the morning.  And we'll

20    be in recess.

21        (Evening recess.)

22

23

24

25
```

1                    C E R T I F I C A T E

2       I, Danielle R. Murray, a Certified Court Reporter and the

3    regularly appointed, qualified, and acting official reporter of

4    the United States District Court for the District of Kansas, do

5    hereby certify that the foregoing is a true and correct

6    transcript from the stenographically reported proceedings in

7    the above-entitled matter.

8       SIGNED 2nd of December, 2022

9

                            /s/Danielle R. Murray
10                           DANIELLE R. MURRAY, RMR, CRR
                             United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25