# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| |
|---|
| United States of America, |
| v. |
| FENG TAO, |
| Defendant. |

Case No. 19-CR-20052-JAR

## DEFENDANT FENG ("FRANKLIN") TAO'S SENTENCING MEMORANDUM

Dr. Franklin Tao, by and through the undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing and requests a sentence of time-served.

## I. <u>INTRODUCTION</u>

A little more than three years ago, in August, 2019, Dr. Tao was a widely respected, incredibly productive, award-winning professor in the Chemical Engineering department at the University of Kansas. His twin children were in middle school, happy and well-adjusted. His wife, Hong Peng, was excited about their recent move into their new home in Lawrence. All that changed on August 21, 2019, when Dr. Tao was placed in handcuffs and arrested and a team of FBI agents searched his home and office. Every day since his arrest, Dr. Tao and his family have lived in turmoil, not knowing if he would spend years in prison, be required to pay millions in restitution or fines, as well as face deportation to a country, China, that he voluntarily left decades ago. Dr. Tao's professional reputation, built over the past twenty years by routinely working nearly 16 hours per day, seven days per week, rarely taking a day off and virtually never taking a vacation, is in tatters. Dr. Tao has had to read news accounts of his arrest—sometimes falsely reporting that he was accused of being a spy—and the allegations that he defrauded the government agencies that funded his research, as well as his employer, the University of Kansas, of the salary that he worked so hard to earn – news that circled the globe until it landed with his family in China, who reacted with grief and distress.

In the three and one-half years since his arrest, while Dr. Tao has been on electronic monitoring with his travel tightly restricted, Dr. Tao has been on administrative leave without pay from KU. His family has been drained of all its resources in order to defend against these allegations. Hong has had to shoulder the entire burden of financially supporting the family since Dr. Tao has been unable to earn a salary. Hong has struggled to keep the family afloat by

working as many as three jobs as a frontline healthcare staff at hospitals, sometimes working 24 hours straight and often forced to work past the point of exhaustion. The small savings that the family had accumulated after two decades of hard work is long gone. Dr. Tao and Hong have borrowed from their friends and family and still owe well over $1 million in legal bills. It is a debt that they likely will never be able to pay back.

And Dr. Tao fears that his reputation, which he deeply cares about, is irreparably damaged because of the grave nature of the allegations against him. Even though he was found Not Guilty of defrauding the government or KU, the news accounts and stories about him repeated these allegations and now abound all over the internet. He understandably worries how, if ever, he will get that reputation back, let alone return to cutting edge scientific research that has motivated and inspired him his entire adult life.

All of these consequences are the result of a false statement on an institutional responsibilities form that Dr. Tao submitted to the Human Resources (HR) Department at KU. [1] On that form, Dr. Tao did not disclose that he had a relationship with Fuzhou University (FZU) in China as a Chang Jiang Distinguished Professor. The Court found that while the form was not false insofar as it failed to disclose any significant financial interest -- since there was no evidence that Dr. Tao received any payment from FZU -- the disclosure was false because Dr. Tao had conflicts of time or interest. ECF 306 at 55.

---

[1] Dr. Tao was originally charged with eight counts of wire fraud and two counts of false statements. After the government voluntarily dismissed one wire fraud and one false statement count before trial, the jury acquitted Dr. Tao of three additional wire-fraud charges and one false statement charge. The Court subsequently granted Dr. Tao's Motion for Judgment of Acquittal and acquitted Dr. Tao on the three remaining wire fraud counts. ECF 306. The lone remaining count is Count 9, false statements, in violation of 18 U.S.C. § 1001.

As a result of this conviction, Dr. Tao faces a sentencing guideline range of 0-6 months. In light of the sentencing factors set forth in 18 U.S.C. § 3553(a), and for the reasons set forth below, Dr. Tao respectfully suggests that a sentence of time-served[2] would be sufficient, but not greater than necessary, to satisfy the sentencing factors set forth in § 3553(a). *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (noting that the objective in sentencing is that it be "sufficient, but not greater than necessary" to meet the ends of justice).

II.     **BACKGROUND**

    A.     **Dr. Tao's early life and education.**

Dr. Tao was born in a rural village in Southwestern China in 1971. His childhood was one marked by deprivation, as famine was widespread where he grew up and Dr. Tao was undernourished and frequently went to bed hungry. Dr. Tao never drank a glass of milk, enjoyed an apple or tasted beef until he left for college. This extremely limited diet was likely responsible for his small stature. His parents were forcibly relocated from the city, where they had lived, to the countryside where they were forced to farm a tiny plot of land assigned by their local government. Their home was a small cottage made of clay and straw, consisting of two small bedrooms where seven people – grandparents, parents, Dr. Tao and his siblings – all lived. The cottage had no living room and no indoor bathroom, running water or electricity. The only light source was a kerosene lamp.

Growing up, Dr. Tao's diet largely consisted of corn powder. The only fruit he consumed was from local orange trees. He rarely ate meat.

Dr. Tao intuitively understood at a very young age that education could be his way out of this difficult life, and he made it his goal to gain admittance to a university, something that only

---

[2] Dr. Tao spent one week in jail after his arrest.

one per cent of children who lived in the countryside were able to obtain. Dr. Tao was inspired to be a chemist after a high school chemistry teacher told him that chemistry can create foods even from trash. Dr. Tao had a dream of making foods for his family and neighbors so that they would not be hungry. Dr. Tao was an exceptional student and, after he took the national admission examination at the end of his sophomore year of high school, he was admitted to Chongqing Normal University.

College was a time of firsts for Dr. Tao. Not only was he able to finally get sufficient food, he dove into the chemistry library and was soon one of the best students at his college. After his graduation in 1992, he was recruited by Chongqing Technology and Business University to teach chemistry, which he did for three years. After Dr. Tao took and passed the national exam of graduate admission, he was admitted to Sichuan University in 1995, where he obtained his Masters' degree in materials science.

Dr. Tao noticed in his studies that the best scientists were all in the West, so he decided to pursue a Ph.D. in the United States and was admitted to Princeton University in 2002. At Princeton, Dr. Tao chose surface science, an area in the subject of physical chemistry as his field of research. Dr. Tao worked 16 hours a day during his four years at Princeton. His creativity and hard work were recognized by a national graduate student award of the American Vacuum Society in 2004, Graduate student silver award of Materials Research Society in 2005, and Harold W. Dodds Honorific Fellowship of Princeton University in 2005. In 2006 he was chosen as one of the four recipients of Young Chemists Award across all countries by the International Union of Pure and Applied Chemistry (IUPAC) based on his PhD research and thesis.

Several pharmaceutical companies tried to recruit Dr. Tao as an analytical chemist, but Dr. Tao was focused on doing fundamental research, not making money and, instead, in 2006, he

decided to take a post-doctoral researcher position at the University of California, Berkeley, in the field of catalysis. Dr. Tao and Hong moved to California, where he worked in a group of a pioneer of catalysis in the world. Dr. Tao's creativity was soon recognized when two of his research works were published in the magazine Science – a remarkable accomplishment for someone so young. Dr. Tao was again offered prestigious positions of senior scientists in private industry, including Dow Chemical, and a tenure-track faculty position in McGill University in Canada, but, again, he chose to remain in academia of the United State and instead took a faculty position at University of Notre Dame in 2010.

In 2014, Dr. Tao was recruited by KU to leave Notre Dame and become a tenured associate professor. At Kansas, Dr. Tao built a world-class research lab. He was recognized with the Miller Research Award[3] by KU in 2014-2015. In 2017, Dr. Tao was elected as an honorary fellow of the American Association for the Advancement of Science (AAAS), becoming one of the only twenty AAAS fellows in all disciplines at KU. In 2018, Dr. Tao was given the Bellow Scholar Award[4] from KU. In 2019, Dr. Tao received the KU Scholarly Achievement Award, KU's highest award for professors in the middle of their careers. At the award ceremony, Chancellor Douglas Girod proclaimed that Tao's research contributions had "far exceeded expectations in his field in terms of his productivity and level of ingenuity" and noted that Dr. Tao had "175 publications with over 6,000 citations, which really speaks to the novelty and the relevance of his work." (The award came with a $10,000 prize; Dr. Tao donated half of that

---

[3] The Miller Research Award is awarded by the Dean of the School of Engineering to recognize professional development.

[4] The Bellow Scholar Award is awarded by the Dean of the School of Engineering to recognize professional development.

after-taxed prize money back to the KU engineering department to fund additional research, and donated $1000 of the remaining portion to his Christian church at Lawrence.)

Dr. Tao's productivity at KU was truly breathtaking, as he was, by a wide measure, the most productive professor in his department. Although he was just one of the 26 professors in that department, Dr. Tao was responsible for 25% of the publications of his department between 2015 and the time of his arrest, in 2019. During that time frame, Dr. Tao published an average of nearly twenty papers per year, whereas the average number of publications of a faculty member at the department is about 3-4 papers per year.

Even this prosecution has not stopped Dr. Tao's commitment to his research. Since his arrest, Dr. Tao has essentially worked for KU for free, as he has been on administrative leave without pay after May 2020. In the last three years, he has published 16 research articles for KU, including influential works in leading journals including Nature Catalysis and the Journal of the American Chemical Society. In the last three years he wrote a book (title: Application of Ambient Pressure X-ray Photoelectron Spectroscopy in Heterogeneous Catalysis, ISBN: 9781119845447) in the field of catalysis, which is being published by Wiley. In addition, he recently started work on a second book, this one in the field of chemistry, entitled "Activation and Catalytic Transformation of Methane at Low Temperature."

**B.     The offense conduct.**

There is little need for a detailed recounting of the evidence adduced at trial, as the Court's Order partially granting Dr. Tao's Motion for Judgment of Acquittal detailed the testimony of all of the critical witnesses. In summary, the evidence showed that Dr. Tao applied for the Chang Jiang Scholars Program and, after being chosen as a finalist, considered taking a position that would have required him to leave his position at KU and work at Fuzhou University ("FZU") full-

6

time. While Dr. Tao gave full consideration to the offer, he ultimately decided not to accept it for a number of reasons. For one thing, Dr. Tao's wife and family did not want to leave the United States and they had just purchased a home. His twin children were about to enter high school, did not want to leave their friends and activities, and were not fluent in Chinese and unable to write any Chinese characters. And although Dr. Tao was frustrated with the KU administration because he had not yet been promoted to a full professor as he believed he was promised, he was extremely reluctant to cut ties and leave the United States, as this would have been an irrevocable break with his career built up in the last 17 years in the United States, something he had always wanted.[5] In addition, Dr. Tao was extremely skeptical that FZU would, in fact, provide the research funding that was promised and also worried that the type of talented graduate students that he would need to assist with his research would not want to move to FZU, which had a mediocre reputation among in the universities of China.

Dr. Tao decided to test this last proposition by trying to see if it would even be possible to successfully pursue his research there. As the Court heard at the trial, despite numerous calls and entreaties, every graduate student he approached with the offer to study at FZU turned him down. Because of FZU's relatively low ranking, Dr. Tao eventually came to realize that despite his best efforts, it simply was not going to be possible to build a world-class research team at FZU. The effort that Dr. Tao spent attempting to explore whether he could build a research team – all of which was unpaid and done without the benefit of any signed employment agreement.

In September, 2018, Dr. Tao submitted his KU Institutional Responsibilities form and did not report that he had any conflicts of time or interest. Dr. Tao did not believe it was necessary to

---

[5] During this same time frame that Dr. Tao was considering the position at FZU, he also applied for professorships at more than one dozen U.S. universities.

report his interactions related to FZU because, among other reasons, the form asked whether the signatory had a time commitment in an entity with which he "engage[d] in personal professional activities that take time away from your university responsibilities." This question required the signatory to make a subjective judgment as to whether his/her outside professional activities would take time away from their university responsibilities, and Dr. Tao did not believe that to be the case. And given that Dr. Tao was, in fact, able to not only fulfill his KU duties but to far surpass the average output of his peers—ultimately leading to his Scholarly Achievement Award—Dr. Tao's subjective opinion in this regard was not unreasonable. In addition, as Chancellor Girod noted, the signatory must also believe that the outside conduct is related to one's university responsibilities, because "if the [outside activity] is unrelated one's university responsibilities, there is nothing to report." ECF 306 at 57. As Chancellor Girod acknowledged, the form did not explain what it meant to be "related to one's university responsibilities", and there was no formal training about how to properly complete the form and even the listed informative websites on COI policies were inoperative and KU witnesses at trial were unable to say how long they had not worked.[6] Given Dr. Tao's prodigious work output, and the fact that his FZU interactions were, in

---

[6] Incredibly – particularly in light of KU's victim impact statement alleging the supposedly devastating impact of an incorrect conflict of interest form – as of January 4, 2023, the Board of Regents Policy Commitment of Time, Conflict of Interest, Consulting and Other Employment on-line manual still contains the inoperable links that the defense demonstrated in real-time during the cross-examination of KU witnesses. Given that trial occurred almost nine months ago, it appears that KU still has an extremely "relaxed" view of compliance, notwithstanding their current claims of the dangers that non-compliance poses to KU. And given KU's belated claims of harm resulting from an erroneous conflict of interest form, it is remarkable that the form itself contains no appropriate warning of the ramifications that could flow from an incorrect form. It is also noteworthy that the KU compliance office felt it unnecessary to provide any training to professors like Dr. Tao on what the form required, instead merely directing employees to the KU website – with the inoperable links – if they had questions.

his mind, unrelated to his KU responsibilities, Dr. Tao subjectively felt that there was nothing to report.

The KU Institutional Responsibilities form was never shared with the National Science Foundation or the Department of Energy, and Dr. Tao was never informed that the form played any role whatsoever in the grant approval process. This is a relevant consideration at sentencing because there is nothing unusual or surprising for an employee to fail to disclose to his employer – even when asked – information related to ongoing job searches. Dr. Tao was considering taking another position and, while he was exploring that option, he did not want KU to know about his dalliance with FZU. There is nothing about such a non-disclosure that should be considered sinister or even unusual.

Dr. Tao had no reason to believe that the Institutional Responsibilities form had any connection with the grant approval process, particularly because the form is not provided to the agencies. And, but for the fact that, unbeknownst to him, the NSF required grantee organizations to maintain a financial conflict of interest policy, the Court has ruled that this non-disclosure would not be within the jurisdiction of a federal agency and would not be a federal offense. ECF 306 at 52-3. There is nothing unusual about not telling one's employer that one is hunting for a new job. Employers have a wide range of options in deciding how such non-disclosures may be disciplined, if at all, ranging from verbal reprimands all the way to – in egregious cases – dismissal. It is also noteworthy that the form contained no warning of potential criminal penalties for non-compliance. Instead, the form merely states that intentionally filing a false statement may result in disciplinary action. Having the Department of Justice step in to investigate and punish such employee misconduct with a felony punishable by a five-year prison sentence and $250,000 fine was unwarranted and unnecessary.

**C.    The Guidelines are advisory, and the sentence should be no greater than necessary to satisfy the statutory purposes under § 3553(a).**

At the outset of sentencing, the Court must determine the applicable Sentencing Guidelines range. *See Molina-Martinez v. United States*, 136 S. Ct. 1338, 1342 (2016). Although the Guidelines were once mandatory, following *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines no longer carry the force of law, federal judges are no longer bound to strictly apply them, and "[a] district court may not presume that a Guidelines sentence is reasonable." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Guidelines are now purely advisory, and the Court has significant discretion to vary from the Guideline range. *See id.* at 187–88. Instead of applying the Guidelines as compulsory, the Court has discretion to impose a non-Guideline sentence as long as the sentence is reasonable and justified. *See United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc) ("*Booker*'s remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness."), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007); *see also Koon v. United States*, 518 U.S. 81, 96–97 (1996) (determining that a district court is vested with broad discretion to depart from the Guidelines); U.S.S.G §5K2.0 (2018).

The Guidelines are now but a "starting point and initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 39 (2007). After calculating the Guidelines range, the Court must then "make an individualized assessment based on the facts presented" by the parties. *Id.* Post-*Booker* sentencing involves two steps. After the first step of calculating the Guideline range, the Court must then engage in the second step of considering the § 3553(a) factors to determine a reasonable sentence. *See United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005), *abrogated*

10

*on other grounds by Rita*, 551 U.S. at 338; *United States v. Hung*, 459 F.3d 1180, 1185 (11th Cir. 2006). Just as the Court has discretion to impose a non-Guidelines sentence, "the weight to be afforded any § 3553(a) factor is a matter firmly committed to the discretion of the sentencing judge." *United States v. Verkhoglyad*, 516 F.3d 122, 131 (2d Cir. 2008) (internal quotation marks omitted). Furthermore, the Court has discretion to decide whether any § 3553(a) factor justifies a downward variance. *See Gall*, 552 U.S. at 51. When imposing a sentence outside the Guidelines range, the Court applies a non-mathematical formula with individualized assessments based on facts presented by the parties. *Id.* at 47, 50.

This Court must be guided by the fact that the ultimate sentence should be "not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)(2)." *Kimbrough*, 552 U.S. at 111.

**D.** **A sentence of time-served is appropriate in light of Dr. Tao 's personal history and characteristics (§ 3553(a)(1)).**

Dr. Tao has led a remarkable life. Born into poverty in rural China, he has, through incredibly hard work and commitment, been able to graduate with honors from some of the finest universities in the United States, was a rising star in his chosen field of chemistry, and was an educator of a dozen of graduates with doctoral or Master's degrees at University of Notre Dame and University of Kansas. As the letters from his colleagues all note, he is a uniquely talented and productive scientist, one who combines tremendous drive with remarkable humility and modesty about his own achievements and he has made significant contributions in the last twenty years to the science enterprise of the United States.

He has never been in trouble of any kind at any prior point in his life. In the three years and one-half years since his arrest, he has had to abide by the terms of his pretrial release, including

having to wear an ankle bracelet, and has done so without a single reported violation. Essentially, he has already been on probation for more than three years. Those who have known Dr. Tao best know him to be a good and decent man, a devoted husband and father, and a mentor to other young scientists and engineers. He poses no threat to society. He is not a danger to reoffend. For these and the reasons listed below, a sentence of time-served is appropriate.

      **1.**     **Dr. Tao's conduct was inconsistent with an otherwise law-abiding and rule-following life.**

Dr. Tao has lived a life of accomplishment by virtue of an incredible work ethic, his innate intelligence and his drive to achieve. He is a devoted husband, father, and, as the letters[7] of support document, a tremendously talented scientist as well as a mentor to countless others. The themes that run through these letters are consistent: Dr. Tao is a man who cared little about money or material things, and, instead, has always been focused on scientific achievement while, at the same time, mentoring and helping others. Dr. Tao has already paid an enormous price for his conduct.

Even before serving whatever sentence the Court imposes, Dr. Tao has already suffered the consequences for his conduct. Dr. Tao has been labeled a fraudster and possible spy in press reports.[8] He has been forced to wear an ankle monitor which he has not removed for the past three and one-half years. As a result of wearing that ankle monitor, Dr. Tao has not been able to even shower or bathe normally, as the monitor cannot get wet. He has not been permitted to leave this district without court permission. In other words, Dr. Tao has not been at liberty to move freely since his arrest three and one-half years ago. And, in that time, Dr. Tao has not had a single

---

[7] See **Ex. 1**, for collection of letters of support.

[8] After his arrest, Dr. Tao received an email calling him a traitor and expressed the hope he would receive a sentence of death.

infraction or issue with pre-trial. To the contrary, he has been an exemplary defendant, doing everything that has been required of him, and always being in full compliance.

The sterling reputation Dr. Tao spent decades building is no more. His family's finances are teetering on the brink. His children have spent their high school years in fear of losing their father to a lengthy prison sentence. The stress this family has lived under since August, 2019 is unimaginable.

The devastating impact of this conviction is wide-ranging. The notoriety and opprobrium associated with a criminal conviction of this nature for a scientist means that Dr. Tao is unlikely to be able to work as a professor again. The life he once had is over. And that is the case regardless of the sentence ultimately imposed. These consequences, too, are a form of punishment. *See, e.g.*, *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (upholding below-Guidelines sentence in part because district court found that "defendant had suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming a below-Guidelines sentence in part because defendant suffered loss to his professional reputation and lost his high-paying job); *United States v. Jasen*, 15-CR-00214, (M.D. Fla. Jan. 28, 2016), ECF No. 86 at pp. 53-54 (imposing probation because, in part, "one who makes a mistake in judgment…should be, in my judgment, absent other aggravating circumstances, be able to go on with their life and suffer the humiliating and devastating effects of being prosecuted…which will… harm your reputation, your social status…"); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming a below-Guidelines sentence in part because the defendant "was punished by the reputational harm he suffered as a result of the criminal action"); *United States v. Redemann*, 295 F. Supp. 2d 887, 894–97 (E.D. Wis. 2003) (downward departure warranted where defendant suffered serious collateral consequences from

conviction); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (imposing below-Guideline sentence in part because, "as a consequence of his conviction and sentence, defendant lost a good public-sector job, a factor not considered by the Guidelines."); *United States v. Anghaie*, 09-CR-0037 (N.D. Fla. Nov. 29, 2011), ECF No. 238 (imposing below-Guidelines sentence and noting that defendants "received significant punishment through financial loss, loss to reputation and career opportunities.");*United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (in considering justness of sentence, "it is important to consider all other forms of punishment [defendant] has already suffered," including loss of job and damage to his personal and professional reputation); *United States v. Olis*, Criminal No. H-03-217-01, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (substantial variance warranted in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct.").

E.    **A sentence of time-served affords adequate deterrence to professors who fail to correctly fill out their universitity's conflict-of-interest forms.**

It seems inconceivable that other professors would intentionally fail to correctly fill out their university's conflict-of-interest form even if Dr. Tao receives a guideline, non-custodial sentence. Being branded a felon, facing the prospect of prison, losing one's career and reputation is far more deterrence than required. No professor would consider these consequences and believe that falsely filling out a conflict-of-interest form was worth this type of risk. Any rational being would be deterred by these consequences. (And irrational actors cannot, by definition, be deterred, as they will not consider the consequences of their conduct.) Thus, this factor does not support a custodial sentence.

**F.** **A sentence of time-served is warranted because Dr. Tao poses no threat to the public (§ 3553(a)(2)(C)).**

With the exception of the present criminal proceeding, Dr. Tao has never been accused of wrongdoing. As such, nothing in his past suggests any criminal tendencies. There is no legitimate risk of recidivism. Thus, this factor does not support a custodial sentence.

**G.** **A sentence of time-served is warranted because Dr. Tao requires no correctional treatment (§ 3553(a)(2)(D)).**

Dr. Tao does not require any educational or vocational training, medical care, or other correctional treatment that would warrant a custodial sentence, let alone one within the Guidelines range. This supports a sentence without incarceration.

**H.** **The COVID-19 Pandemic must me considered before imposing a sentence.**

Additionally, when determining the types of sentences available, the Court should consider the COVID-19 pandemic that has ravaged not just the nation, but, also, in particular, the prison system. Although vaccines have obviously helped significantly in reducing the number of cases and deaths from COVID-19, the fact remains that COVID-19 has dramatically changed how prisons must operate to the detriment of inmates.

Although the health threat of COVID-19 has significantly lessened in the past two years, the Bureau of Prisons has taken aggressive steps to help avoid the spread of the disease. While these preventive measures are understandable and can be at least moderately effective, the result is a draconian sentence for inmates committed to minimum security facilities compared to the "normal" minimum security experience.

If a period of incarceration is ordered, the Bureau of Prisons would almost certainly designate Dr. Tao as "low risk" given his lack of criminal history and the nature of his offense. As a result, he could expect to be designated to a minimum security facility. Typically, such facilities

permit inmates to work, exercise, and move about with relative freedom, and family is permitted to visit weekly. However, this is no longer the case. The vast majority of federal prisons are now operating at Level 3, meaning maximum precautions are being taken. This means that social distancing is required in all areas, which dramatically limits recreation and any social interactions. New inmates to a facility must quarantine for a substantial period, which essentially requires that the inmate be locked down 24 hours a day for three weeks, and no calls to family or visits are permitted. Nor are inmates permitted to leave their cells to recreate, and they are only allowed to shower thrice per week. After the initial quarantine, movement is much more restricted and work opportunities are very limited, and most critically, family visits are prohibited indefinitely. Given the current spread of COVID-19 in society, it is highly unlikely that any family visits will be permitted until far into the future. Instead, inmates are locked down most of the day.

In sum, any period of incarceration that this Court imposes will be far more onerous than what would be typical for an inmate like Dr. Tao. This reality was recently recognized by the Court in *United States v. Shi*, 1:17-cr-00110 (CRC) (D.D.C. Sept. 14, 2020), which, after considering all of the Section 3553 factors, ordered Dr. Shi released from prison early because of the onerous COVID-related restrictions imposed by the Bureau of Prisons:

> "[T]he Court fashioned [its original, 16-month] sentence on the assumption that Dr. Shi would be designated to a minimum- (or at least low-) security facility, as has been the Court's experience with similarly–situated defendants. Consistent with that assumption, BOP initially designated him to a minimum-security camp at FCI Three Rivers. The landscape looks far different now. . . . The unexpected severity of Dr. Shi's prison experience has upset the careful balance the Court attempted to strike at sentencing: The harsh conditions do not fit his crime. . . Requiring him to serve out the remaining months of his term is unnecessary to deter future potential offenders. Finally, alternatives to incarceration exist to achieve the purposes of the original sentence, namely, home confinement until the beginning of his term of supervised release."

Mem. Op. & Indicative Ruling, *Shi*, 1:17-cr-00110 (CRC), ECF No. 380.

16

The rationale of the Court in *Shi* applies here as well: viable alternatives to incarceration—such as probation—are available to the Court instead of a severe, potentially life-threatening sentence that would require isolation and almost certainly no family visits for the duration of the sentence.

**III.**     **CONCLUSION**

Dr. Tao not only has no criminal history; he has no prior *arrests*. There can be no serious suggestion that Dr. Tao is at risk to re-offend. Given that Dr. Tao has essentially been on probation for the past three and one-half years, required to wear an ankle-bracelet and unable to travel without Court permission; given the ruinous effect of this prosecution on his career, his life, and his family and his finances, a sentence of time-served is appropriate and justified. This conviction, alone, is enough, and is no "slap on the wrist": the life that Dr. Tao knew prior to his arrest is over, forever. He was convicted of a felony—a label that he will be forced to wear for the rest of his life. He and his family have already endured great psychological trauma during the last three and one-half years, with everlasting consequences for all of them. His family is one the brink of bankruptcy. No pecuniary harm resulted from Dr. Tao's conduct. In the circumstances of this case, a sentence of time-served is sufficient to satisfy the statutory purposes of sentencing.

Dated:  January 4, 2023                              Respectfully submitted,

                                                               */s/ Thomas H. Johnson*
                                                               Thomas H. Johnson #13688
                                                               Petefish, Immel, Hird, Johnson,
                                                               Leibold & Sloan, LLP
                                                               842 Louisiana
                                                               Lawrence, KS 66044
                                                               Tel: (785) 843-0450
                                                               Fax: (785) 843-0407
                                                               tjohnson@petefishlaw.com

Peter Zeidenberg
Michael F. Dearington
Laura Zell
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395
Peter.Zeidenberg@arentfox.com
Michael.Dearington@arentfox.com
Laura.Zell@arentfox.com

*Attorneys for Defendant Franklin Tao*

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of January, 2023, I electronically filed the foregoing

Sentencing Memorandum with the Clerk of the Court using the CM/ECF system.

*/s/ Thomas H. Johnson*
Thomas H. Johnson