# UNITED STATES DISTRICT COURT

## District of Kansas

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                     Case No.  **19-20052-01-JAR**

FENG TAO,

        Defendant.

## GOVERNMENT'S SENTENCING MEMORANDUM

> *Since World War II, America's research enterprise has been second to none, and it has delivered profound benefits for our health, economy, and national security. This leadership has been rooted in the core commitment of our shared research environment to openness, transparency, honesty, equity, fair competition, objectivity, and democratic values.*

> National Science and Technology Council
> Executive Office of the President of the United States[1]

Defendant Dr. Feng Tao broke that core commitment. For nearly two years, he lied to his colleagues, the University of Kansas ("KU"), and the federal government. He used his brilliance and diligence to deceive people who had worked with him for years and trusted him. As explained in the victim impact statements, Tao's lies harmed the National Science Foundation

---

[1] *Guidance for Implementing National Security Presidential Memorandum 33 (NSPM-33) on National Security Strategy for United States Government-Supported Research and Development*, Report on Research Security by Joint Committee on the Research Environment, https://www.whitehouse.gov/wp-content/uploads/2022/01/010422-NSPM-33-Implementation-Guidance.pdf (Jan. 2022).

("NSF") and KU.  NSF is not able to rely on *any* of the research produced by Tao and the KU community has lost hundreds of thousands of dollars in federal research dollars because of Tao's criminal conduct.  Tao's damage has also had a very personal impact on the people he betrayed and then blamed.  At nearly every turn in this hard-fought prosecution, Tao has sought to place the blame on others.  Whether it was publicly outing the former colleague who initially reported him to KU and claiming that she framed him, accusing the FBI of lying to the Court, or arguing that KU should have trained him better, Tao has never accepted responsibility for his deception and continues, despite a jury conviction, to proclaim his innocence and tout his victimhood.[2]

Tao's crime crossed continents and was well-planned and sophisticated.  It took advantage of the trust given to professors and principal investigators like him and likely would never have been discovered had Tao's former colleague not reported his crimes.  Tao's conduct justifies a sentence strong enough to reflect that his lies mattered, to affirm that KU's and NSF's disclosure requirements are necessary to ensure the integrity of fundamental research, and to

---

[2] According to Tao's fundraising website, this narrative has allowed him to raise nearly $750,000 to go towards his $1.9 million legal bill.  *See, e.g.*, Nov. 3, 2022 Post to *Legal Defense Fund for Franklin Tao* fundraising website ("We need your help.  We are so close to completely clearing Prof. Franklin Tao's name.  But we need your help to get him over the finish line. . . . In 2019, a vindictive former visiting scholar who was angry with Franklin . . . wrote anonymous complaints to KU and the FBI . . . .  The FBI followed Franklin and the rest of our family with teams of agents for 16 hours a day, seven days a week. . . . Of course, they found nothing . . . . The government dismissed two charges before trial.  The jury found him Not Guilty of four more charges.  In September, the Judge agreed that the jury should have also found him Not Guilty of the remaining fraud charges – all that is left is a single charge of false statements allegedly made to the HR department at KU.  We will win that one, too, on appeal. . . . Franklin told the truth when he said his outside interactions would not interfere with his KU duties. . . . If we can just get the funds to pay for our appeal, we know we can win to expunge this last charge, too, and finally and completely clear Franklin's name.  If we do, IT WILL BE A VICTORY NOT JUST FOR FRANKLIN, BUT FOR CHINESE-BORN SCIENTISTS ALL OVER THE UNITED STATES.  The government will finally have to realize that they need to prosecute real spies, not hard-working scientists and engineers over paperwork.") (emphasis in original), *available at* https://www.gofundme.com/f/Legal-Defense-Fund-for-Franklin-Tao (last visited Jan. 2, 2023).

deter other scientists who may be tempted to lie and cheat so that they can personally benefit at the expense of American taxpayers and the public servants working to be good stewards of taxpayer dollars.  The United States recommends a custodial sentence of 30 months imprisonment, followed by a year of supervised release, along with a $100,000 fine, and the $100 mandatory special assessment.  The low-end recommendation accounts for the Government's assessment of the 18 U.S.C. § 3553(a) factors as it concerns Tao's professional achievements, family circumstances, and lack of criminal history.

## I.        FACTUAL AND PROCEDURAL BACKGROUND

The Court is familiar with the factual and procedural background of this case provided by the Government in its Opposition to Defendant's Motion for Judgment of Acquittal or, in the Alternative, for a New Trial, ECF No. 302, and as articulated by the Court in its September 20, 2022 Memorandum and Order of Judgment of Partial Acquittal, ECF No. 306.  Therefore, the Government incorporates those background sections by reference rather than repeating them here.  Specific facts, however, are discussed when relevant to analyzing the sentencing factors.

In short, the jury convicted Tao of wire fraud and making a false, fictitious, or fraudulent statement in a matter within the jurisdiction of the U.S. government.  The Court granted in part and denied in part Defendant's Fed. R. Crim. Pro. 29 Motion for Judgment of Acquittal, entering a judgment of acquittal on the three wire fraud convictions.  Tao's false statement conviction under 18 U.S.C. § 1001 remains.  The offense carries a maximum sentence of five years and the Guidelines Manual reference for a violation of § 1001 is U.S.S.G. § 2B1.1.  Although the Guidelines are advisory, the Court must nonetheless begin its sentencing analysis by properly calculating the applicable range Tao faces.  *See United States v. Booker*, 543 U.S. 220, 245 (2005).  Under § 2B1.1, the base offense level for a § 1001 conviction is six.  According to the

draft Presentence Investigation Report ("PSR"), the Probation Office correctly calculated the base level offense as six.

## II.        DISCUSSION REGARDING 18 U.S.C. § 3553 FACTORS

18 U.S.C. § 3553(a) specifies factors that courts must consider when imposing a sentence.  The Government addresses the relevant § 3553(a) factors below:

### A.        Nature and Circumstances of the Offense

Evidence at trial proved that between 2018 and 2019 Tao knowingly concealed his second job at Fuzhou University ("FZU") from KU and the federal government and, specifically, on September 25, 2018, submitted an Institutional Responsibilities form that, among other things, falsely certified that the form was "true, correct, and complete"; that Tao had complied with KU policies on commitment of time, conflict of interest, consulting, and other employment; that Tao would secure prior approval before engaging in any consulting or outside employment; and that Tao would report any changes to the form as soon as they became known to him.  These false statements form the basis of Tao's 1001 conviction, but Tao's deception and efforts to conceal the false statements in the September 2018 Institutional Responsibilities form were more widespread.  As proven at trial, after formally joining FZU as a Chang Jiang Distinguished Professor sometime around May 2018, Tao continued to deceive KU, NSF, and the U.S. Department of Energy ("DOE") about his job at FZU, his research support from the Chinese Government, and his activities in China during 2019.  Tao's lies were numerous and the victims of his falsehoods ranged from KU administrators in the Office of Research, to NSF and DOE program managers, to Tao's own department chair and mentor.

The evidence at trial and the jury's verdict leaves no question that Tao chose to lie and knew that his conduct was illegal.  Before deciding to accept the FZU job, Tao sought advice

from his colleagues at KU and the Georgia Institute of Technology, who told him to be upfront and honest with KU about the second job at FZU.  Instead of heeding their advice, however, Tao chose to lie and follow the example of people who "don't say anything."  In one of the many phone calls that Tao surreptitiously recorded, Tao also agreed with FZU's President when he instructed Tao not to leave any trace of his job at FZU "in writing or anything.  Because that would be evidence."  Testimony and documentary evidence at trial further proved that Tao repeatedly told researchers whom he was trying to recruit to FZU to hide his connection to FZU and, in at least one instance, to actively lie for Tao should anyone else ask about FZU.

While only Tao knows his true motive in committing this crime, the evidence showed that Tao went out of his way to apply for the Chang Jiang Distinguished Professor position, to negotiate his employment agreement with FZU, and then to conceal his activities from KU and the federal government.  He chose to commit this crime despite earning over $100,000 a year, having the security of a tenured professorship at KU and the possibility of further promotion to full professor, and working as a principal investigator on prestigious federal government research grants.  For whatever reason, this was not enough for Tao and, as a result, he chose to commit a crime and then attempt to cover it up.

Tao also took elaborate steps to try to conceal his illegal conduct.  He developed elaborate cover stories to explain why he was absent from KU's campus.  He used his subordinates at FZU to create the appearance that they were acting independently of Tao so that he could conceal the true nature of his involvement with FZU.  When requesting grant funds from the Chinese Government, however, he clearly stated that he was in charge and worthy of research funds.  He told others to lie for him and conceal his work at FZU.  He used multiple electronic accounts, many of them based in China and beyond the reach of U.S. law

enforcement, to facilitate his crimes. And, after Tao was arrested, many of the public announcements and photographs of his affiliation with FZU and appointment as a Chang Jiang Distinguished Professor were mysteriously removed from the internet. This factor weighs in favor of a significant sentence.

**B.      Defendant's History and Characteristics**

Tao is a 51-year-old Chinese citizen and U.S. legal permanent resident. He is married, has two minor children, and has lived in the U.S. since 2002. Tao has a Ph.D. from Princeton University and after working at the University of California, Berkeley and the University of Notre Dame, he joined KU as a tenured associate professor in 2014. KU placed Tao on paid administrative leave in August 2019 after he was arrested. Tao later agreed to go on unpaid administrative leave in exchange for KU staying termination proceedings pending the outcome of the criminal prosecution. It is the Government's understanding that based on his agreement with KU, Tao agreed that if he was convicted, he would not contest his termination. The Government further understands, however, that after Tao was convicted at trial and KU contacted Tao's employment counsel to proceed with his termination, Tao's counsel told KU that based on post-conviction comments from the Court, in his view, Tao had not been convicted and the criminal proceeding had not concluded. Nonetheless, the Government understands that KU has proceeded with terminating Tao's employment.

Throughout the more than three years of proceedings, Tao has shown a complete lack of remorse. In motion after motion, Tao has insisted that he did nothing wrong and tried to redirect the blame for his misdeeds onto others. First, he blamed his former colleague who reported him to KU and the FBI and publicly accused that colleague of misconduct in court filings and press statements. Tao painted himself as the victim and argued that the FBI should have investigated

his colleague instead of him.[3]  Then, Tao alleged that the FBI agent and prosecutor misled the

grand jurors in seeking an indictment in the first place.[4]  When those attacks failed, Tao claimed

that the Government was preventing him from obtaining exculpatory evidence from witnesses at

FZU in China.[5]  Even though Tao failed to follow the appropriate procedures for obtaining

foreign evidence, the Government submitted a request for evidence on Tao's behalf pursuant to

the Mutual Legal Assistance Agreement between the U.S. and China.  After the Government and

the Court went through the effort of adjudicating Tao's Rule 15 motion, however, Tao claimed

that the Government's request was futile.  Next, Tao repackaged his attack on his former

colleague and claimed that the FBI and the colleague had formed an "unlikely partnership" and,

as a result, the Government had made intentional or reckless material misrepresentations in the

search warrant affidavits that led to the seizure of the bulk of evidence used against Tao at trial.[6]

Even after all of his pretrial legal challenges failed, Tao turned to the press to push his

narrative.  In the days leading up to his March 2022 trial, *The New Yorker* and *National Public

Radio* published stories about Tao's case, including numerous statements attributed to Tao and

his wife.[7]  In both interviews, Tao and/or his wife claimed that Tao had done nothing illegal and

---

[3] *See, e.g.*, Mot. to Dismiss, ECF No. 30, at 6 ("Rather than prosecute [Student #1] for extortion, false statements, and computer fraud – and notifying Dr. Tao that he was the victim of a federal computer crime under the Computer Fraud and Abuse Act – the government has instead charged Dr. Tao with fraud for allegedly failing to disclose a job offer to KU.").

[4] *See* Mot. to Dismiss Second Superseding Indictment, ECF No. 83.

[5] *See* Mot. for Rule 15 Depositions, ECF No. 112.

[6] *See Franks* Motion, ECF No. 127, at 1.

[7] G. Lewis-Kraus, *Have Chinese Spies Infiltrated American Campuses*, The New Yorker (Mar. 14, 2022); J. Ruwitch, *Arrested under a Trump-era China Initiative, Franklin Tao heads to trial*, NPR (Mar. 22, 2022).

that he was unfairly being singled out.  In addition to press interviews, Tao has a website (justiceforfranklintao.com) and a GoFundMe website.  According to the GoFundMe, Tao has raised over $750,000 for his legal defense.  In post after post, Tao's GoFundMe website proclaims his innocence and accuses the Government of unfairly targeting him.[8]  Two days after a jury convicted him of wire fraud and false statements, Tao's wife posted to the GoFundMe page that Tao's counsel was "already preparing to draft the motion to overturn this unjust verdict" and that they have "4 counts to go until Franklin is finally free of this injustice!"[9] Despite his conviction, Tao has also continued to write and publish academic articles and books, appearing to act as if he has done nothing wrong.  PSR ¶ 93.[10]

In sum, Tao's lack of remorse warrants a significant sentence.  *See United States v. Verdin-Garcia*, 516 F.3d 884, 899 (10th Cir 2008) (considering lack of remorse among other sentencing factors); *see also United States v. Dotson*, 574 F. App'x 821, 827 (10th Cir. 2014) (same).  His intelligence, education, work ethic, and apparently stable and supportive family, however, suggest that he has above prospects for success upon release from custody.  These characteristics are part of the reason that the Government recommends a sentence at the low-end of the Guidelines range.

---

[8] https://www.gofundme.com/f/Legal-Defense-Fund-for-Franklin-Tao (last visited Jan. 3, 2023).

[9] *Id.* at Apr. 9, 2022 Post.

[10] *See also, e.g.*, https://www.nature.com/articles/s41929-022-00741-2 (published Feb. 24, 2022); https://pubs.rsc.org/en/content/articlelanding/2022/cs/d1cs00783a (published Dec. 14, 2021); *see also* https://www.google.com/books/edition/Application_of_Ambient_Pressure_X_ray_Ph/QJ1_zgE ACAAJ?hl=en (book scheduled to be published in July 2023) (last visited Jan. 3, 2023).

### C.      Seriousness of the Offense, Just Punishment, and Respect for Law

Tao's conduct here is serious.  As a result of his false statements, Tao harmed NSF, KU, and the broader U.S. research enterprise.  Tao's unreported support and affiliations call into question the validity of all of the research that he has performed for NSF over the years.  His conduct also distorted NSF's decision-making process and distribution of finite taxpayer funds, thereby harming other worthy principal investigators who were honest, but did not receive the funds that ultimately went to Tao to fund his research.  As described in KU's victim impact statement, Tao's conduct also caused KU to suffer direct economic harm, including the loss of nearly $460,000 in grant funds.  Tao's conduct also damaged KU's reputation.  As both victim impact statements exmplain, the U.S. research enterprise is premised on trust and transparency and once that trust is lost, it is very difficult to get it back.

Fraudulent conduct in fundamental scientific research, like Tao's, also chips away at the integrity and effectiveness of the U.S. research enterprise, which is critical to U.S. national security.  As described in National Security Presidential Memorandum-33:

> Much of United States Government-supported R&D is broadly shared and includes fundamental research as defined in National Security Decision Directive (NSDD)-189 as well as scientific research using publicly available data.  The open and collaborative nature of the United States R&D enterprise underpins America's innovation, S&T leadership, economic competitiveness, and national security.
>
> Unfortunately, some foreign governments, including the People's Republic of China, have not demonstrated a reciprocal dedication to open scientific exchange, and seek to exploit open United States and international research environments to circumvent the costs and risks of conducting research, thereby increasing their economic and military competitiveness at the expense of the United States, its allies, and its partners.  While maintaining an open environment to foster research discoveries and innovation that benefit our Nation and the world, the United States will also take steps to protect intellectual capital, discourage research misappropriation, and ensure responsible management of United States taxpayer dollars.  This includes steps to ensure that participants with significant influence on

the United States R&D enterprise fully disclose information that can reveal potential conflicts of interest and conflicts of commitment.[11]

On a microlevel, Tao's crime may only concern KU and NSF.  But, on a macrolevel, his deception harmed the entire U.S. research enterprise and, if replicated by others, has the potential to dismantle one of this country's engines of economic prosperity, scientific discovery, and international security.

Tao's lack of remorse and minimization of his crime also demonstrate why a significant sentence is warranted to remedy his lack of respect for the law.  Tao is certainly entitled to a zealous defense, but in continuing to characterize his crime as nothing more than a paperwork error (even after conviction), he has shown that he has no respect for the law.  He does not think that the rules apply to him and, after he was caught red handed, instead of admitting his misdeeds and accepting responsibility, he doubled down and claimed that the rules were not clear enough, that it was unfair because others had similarly lied and not gotten in trouble, and that he is the true victim who has suffered.  In light of these factors, a sentence of 30 months is appropriate, just, and not greater than necessary.

### D.    Adequate Deterrence and Protecting the Public

Deterrence is an important consideration when fashioning a sentence to dissuade both the defendant (individualized deterrence) and others (general deterrence) from engaging in similar criminal behavior.  Here, there is a need for both individualized and general deterrence.  First, Tao needs to understand that lying to the federal government as a recipient of grant funds is not acceptable and will not be tolerated.  Specific deterrence is especially important here where Tao

---

[11] https://trumpwhitehouse.archives.gov/presidential-actions/presidential-memorandum-united-states-government-supported-research-development-national-security-policy/ (last visited Jan. 3, 2022)

continues to believe that he did not do anything wrong and continues to fundraise hundreds of thousands of dollars from the public based on proclamations of his innocence. Tao has also repeatedly stated that above all, he wants to get back to doing scientific research, so there is a high likelihood that even after Tao serves his sentence, he will seek work either in academia or industry in which honesty, transparency, and research integrity remain paramount.

Second, general deterrence is particularly important in cases like this because "[w]hite collar criminals may be particularly susceptible to general deterrence" since they "often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (quoting *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)). "Because economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Roughen*, Case No. 18-cr-135-WJM, 2021 WL 1947342, at *1 (D. Colo. May 14, 2021) (quoting *Martin*, 455 F.3d at 124). If there were no significant sentences of imprisonment imposed with crimes, like making false or fraudulent statements to the U.S. government, then "would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *United States v. Peppel*, 707 F.3d 627, 638 (6th Cir. 2013). Tao's own conduct demonstrates the truth of this sentiment. Before deciding whether to accept the second job at FZU and begin to lie to KU and the federal government, Tao researched similar criminal cases and weighed the prospect of getting caught against the potential upside of engaging in the criminal conduct. *See, e.g.*, Gov. Ex. 512A (Tao responding to Georgia Tech Professor's advice to tell KU with "some people don't say anything, that's for certain. But if I don't say anything, then . . . it would definitely be problematic if this thing were ever looked

into.").

There are many individuals, like Tao here, who perform scientific research funded by the U.S. government and may not be truthful in their disclosures to their universities and government agencies. The seriousness of Tao's crime warrants a sentence that will deter others from undermining the U.S. research enterprise and the integrity of fundamental research funded by the federal government by flouting funding disclosure requirements and lying to the sponsoring university and federal funding agency about foreign activities that could compromise the research funding process and the scientific research itself.

### E.      Avoidance of Unwarranted Sentencing Disparities

The Guidelines instruct courts to consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Here, defendants who pled guilty to similar conduct have received sentences ranging from 12 to 37 months and/or paid significant amounts of restitution or fines. For example, in *United States v. Ang*, the defendant, an electrical engineering professor and researcher at the University of Arkansas, pled guilty to 18 U.S.C. § 1001 for making a false statement related to his research activities in China that was material to the FBI's investigation of whether the defendant had violated university policies regarding intellectual property, notice of invention, conflict of interest, and outside employment. *See United States v. Ang*, Case No. 5:20-cr-50029-TLB, ECF No. 71 (W.D. Ark.) (plea agreement). Ang was sentenced on June 28, 2022 to 12 months and a day in prison followed by a year of supervised release, a $5,500 fine, and a $100 special assessment. *Id.* at ECF No. 85 (Judgment). Similarly, in *United States v. Zheng*, the defendant, a rheumatology professor and researcher at Ohio State University ("OSU"), pled guilty to 18 U.S.C. § 1001 for making false statements in grant applications to the

National Institutes of Health ("NIH") regarding his participation in a Chinese Government talent program and affiliation and collaboration with a Chinese university.  *See United States v. Zheng*, Case No. 2:20-cr-00182-ALM, Nov. 12, 2020 Dkt. Entry (S.D. Ohio) (guilty plea).  Zheng was sentenced on May 18, 2021 to 37 months in prison and two years of supervised release, and was ordered to pay over $3.8 million in restitution to NIH and OSU.  *Id.*

Other similarly situated defendants have received comparable sentences.  *See, e.g.*, *United States v. Cheng*, Case No. 4:20-cr-455, ECF Nos. 92 & 93 (S.D. Tex.) (Texas A&M professor pled guilty to violating NASA funding requirements and submitting a false official writing or certificate, and was sentenced to approximately 13 months in prison (time served), a $20,000 fine, and $86,876 in restitution); *but see United States v. Zhang*, Case No. 7:17-cr-00073, ECF No. 222 (W.D. Va.) (Virginia Tech professor convicted after a bench trial of, *inter alia*, false statements regarding his receipt of small business grants and affiliation with a Chinese university and sentenced to approximately three months (time served) in prison and two years of supervised release); *United States v. Lewis*, Case No. 1:20-cr-00008 (N.D. W.Va.), ECF Nos. 13 & 19 (West Virginia University professor pled guilty to federal program fraud regarding his fraudulent request to university for an alternate/parental work assignment in which he stated that he would be his newborn child's "primary caretaker," but, in fact, he used his parental work assignment to work in China for an entire semester and fulfill his Chinese Government talent plan contract while his child remained in the U.S.; sentenced to three months in prison, a year of supervised release, $20,189 in restitution, and a $9,363 fine).

Moreover, according to JSIN, 411 offenders were sentenced under 2B1.1 at Offense Level 19 (which, as discussed below, is the appropriate offense level after enhancements) and Criminal History Category I between FY 2017 and 2021.  For the 88% of offenders who

received a custodial sentence, the average length of imprisonment was 22 months, with a median sentence of 24 months.

## III.    GOVERNMENT'S OBJECTIONS

As of the filing of this memorandum, a final PSR has not been submitted.  Based on the draft PSR, however, the Government made the following objections.  Because the Government does not know the Probation Office's position on these enhancements at the time of this filing, the Government has included its position on the enhancements for the Court's convenience.

### A.    Specific Offense Characteristic, U.S.S.G. § 2B1.1(b)(1) – Calculating Loss

Tao's base offense level should increase based on the amount of pecuniary harm he caused.  "Loss" for purposes of the Guidelines is the greater of actual or intended loss.  U.S.S.G. § 2B1.1, cmt. n.3(A).  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."  *Id.*  "Intended loss" is the "pecuniary harm that the defendant purposefully sought to inflict."  *Id.*  "Pecuniary harm" means "harm that is monetary or that otherwise is readily measurable in money."  In calculating loss, the Court is not limited to conduct underlying the offense of conviction, but may consider all of the defendant's relevant conduct.  *United States v. Griffith*, 584 F.3d 1004, 1011 (10th Cir. 2009).  In cases involving government benefits such as grants, "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be." U.S.S.G. § 2B1.1, cmt. n.3(F)(ii).

If the Court determines there was a loss, but cannot reasonably determine its amount, the Court should use the defendant's gain from the offense as an alternative measurement.  *Id.* at cmt. n.3(B).  However, a defendant's gain does not support an enhancement on its own if there otherwise is no loss to the victim.  *United States v. Washington*, 634 F.3d 1180, 1184 (10th Cir.

2011).  In making its loss calculation, the Court may use information that is supported by a preponderance of evidence.  *Id.*  Loss shall also, however, be reduced by the fair market value of the services rendered by the defendant "to the victim before the offense was detected."  U.S.S.G. § 2B1.1, cmt. n.3(E)(i).  The Guidelines do not require precision when determining loss, but provide that the Court "make a reasonable estimate of the loss."  *Id.* at cmt. n.3(C).

The evidence and victim impact statements prove that there was a loss in this case.  For NSF, the research that it paid Tao to perform has become worthless because the "validity of his entire research effort" has been called into question.  NSF Victim Impact Statement at 2.  "NSF is not able to rely on *any* of the research produced by Tao and the NSF funds used for this research result in no value return to the U.S. taxpayer."  *Id.* (emphasis added).  Tao's conduct not only caused a loss to the American taxpayer by delivering untrustworthy research, but also by unlawfully diverting finite government resources to him that could have otherwise been given to other, worthy researchers.  *Id.*; *see also* Trial Tr. Day 5 at 95:16-24; 111:6-16.  While an NSF program manager wished Tao in June 2018 "continued success" and other KU professors testified that Tao's scholarly output was strong, Judgment of Partial Acquittal at 38 (ECF No. 306), both of those opinions were based on the false premise that Tao had made truthful disclosures to KU and NSF regarding his outside activities, foreign research support, commitments of time, and conflicts of interest.  NSF's point is that now that Tao's true relationship and activities with FZU have been revealed, the value that NSF earlier placed on his research has been significantly diminished such that, from NSF's perspective, the hundreds of thousands of dollars that it granted to Tao over the years are now a total loss.  At a minimum, the NSF funds that Tao fraudulently used to pay for his spring 2019 course buyout should be treated as a loss.  As stated in its victim impact statement, based on the evidence presented at trial, NSF

is now aware that Tao, without authorization and contrary to NSF funding requirements, "changed the manner in which the [NSF] money was being used by buying out teaching duties so that he could travel overseas to do research."  NSF Victim Impact Statement at 1.  Tao used approximately $18,000 in NSF funds to pay for his spring 2019 course buy out.  (Gov. Ex. 254).

For KU, Tao's fraudulent conduct also caused a pecuniary loss to the university.  First, from May 2018 to August 2019, KU paid Tao over $120,000 in salary for work that he was supposed to solely perform for KU.  KU Victim Impact Statement at 1.  Unbeknownst to KU, during that time Tao was actually spending most of his effort in furtherance of his job at FZU, including spending nearly all of the first eight months of 2019 in China working at FZU.  This estimate does not include the other financial benefits that Tao received from KU during his criminal conduct, including benefit contributions and retirement savings.  Second, Tao's deceit caused KU to lose the federal research dollars that KU had been awarded with Tao as a principal investigator.  *Id.*  After Tao's deceit was uncovered, the NSF and DOE grants that he had been working on at KU were suspended and KU was unable to spend further funds from those grants. KU also is still working on being reimbursed from NSF and DOE for approximately $147,000 in grant funds that Tao used.  In total, Tao's conduct caused KU to lose nearly $460,000.  *Id.*

Based on this, it is reasonable to conclude that the total loss caused by Tao's criminal conduct is (1) all of the NSF grant funds he received during his career; (2) the KU salary he received from May 2018 to August 2019; and (3) the federal grant funds that KU was awarded, but unable to use as a result of Tao's conduct.  This figure would be in the $500,000 to $1,000,000 range.  Tao did, however, deliver some value to KU and NSF during the period of his criminal conduct.  He taught a class during the fall 2018 semester and continued to perform research while at KU and FZU.  He should receive some form of credit against the loss for these

services.  Because the full truth of Tao's activities at FZU is unknown though, it is difficult, if not impossible, to determine which of his research activities benefited KU or NSF versus FZU. This murkiness is one of the reasons why KU and the federal funders require principal investigators to disclose the types of activities and other funding sources that Tao concealed.

As an alternative, if the Court concludes that it cannot reasonably determine the loss amount, Tao's gain from his criminal conduct should be used instead.  Although Tao benefited enormously, professionally and financially, from receiving prestigious and highly competitive federal research dollars, his receipt of those grants also benefited KU and the other people working on Tao's research team.  The simplest way to calculate Tao's direct gain, therefore, is by using the salary that he received from May 2018 to August 2019.  Because Tao was on a nine-month academic contract and he was a principal investigator working on federally funded research, his salary came from multiple sources: KU, NSF, and DOE.  Between May 1, 2018 and August 21, 2019, Tao was paid $123,795.48 in salary.  Under § 2B1.1, because that amount is more than $95,000, but is less than $150,000, a 9-level enhancement should apply, resulting in a base offense level of 15.

### B.  Enhancement for Sophisticated Means/Substantial Part Outside of the U.S., U.S.S.G. § 2B1.1(b)(10)

The offense level should also be increased by two more levels under U.S.S.G.

§ 2B1.1(b)(10).  The relevant portion of that subsection states:

> If…(B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels.  If the resulting offense level is less than level 12, increase to level 12.

As described above, Tao spent a significant amount of time in China during the relevant time period and often used his distance from the U.S. and lack of transparency into his activities in China to execute his lies and conceal the falsity of his statements.  Between June 2017 and August 2019, Tao spent approximately 321 calendar days in China, including 116 days in 2018 and 170 days in 2019 (from January to the date of his arrest in August).  Gov. Ex. 354 (travel records).  In 2019, in particular, Tao spent approximately 170 of the 232 days of the year in China (or 73% of the year to date) until he was arrested in August 2019.  Tao's increased commitment and travel to China is consistent with the evidence that proved that Tao became a Chang Jiang Distinguished Professor at FZU sometime around May 2018, that he was given a transition period before beginning to work full-time at FZU, and that beginning in December 2018 Tao effectively moved to China to work there for a nine-month academic calendar.  Tao failed to disclose any of this activity to KU or his federal funders, including in his September 25, 2018 Institutional Responsibilities form.  He also continued to lie to KU while working in China, repeatedly telling his faculty chair, Dr. Laurence Weatherley, that he was in Germany in 2019. PSR ¶ 47.  The Government's timeline that was introduced as a demonstrative exhibit at trial provides a helpful overview of the overlap between Tao's criminal conduct and his travel to China.  *See* Gov. Ex. 774.  Because "a substantial part" of Tao's crime was committed from outside the United States, subsection (B) applies, and the offense level should increase by two levels and, at a minimum, increase to 12.

Alternatively, § 2B1.1 subsection (C) applies, as Tao's crime involved sophisticated means.  "Sophisticated means" is defined by the Guidelines as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  U.S.S.G. § 2B1.1, cmt. n.10.  In order for the sophisticated means enhancement to apply, every step of the

scheme need not be particularly sophisticated as "the enhancement applies when the execution or concealment of a scheme, viewed as a whole, is 'especially complex or especially intricate.'" *United States v. Snow*, 553 F.3d 1156, 1164 (10th Cir. 2011) (quoting *United States v. Weiss*, 630 F.3d , 1263 1279 (10th Cir. 2010)).

The Guidelines' Commentary provides examples of the use of sophisticated means, such as "[i]n a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction…"  U.S.S.G. § 2B1.1, cmt. n.8(B).  The Commentary further states, "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also indicates sophisticated means."  *Id.*  These examples, however, are not exhaustive and other specific offense characteristics can warrant the sophisticated means enhancement.  *See United States v. Snow*, 468 F. App'x 830, 2012 WL 401621, at *10 (10th Cir. 2012) ("Clearly, the latter is an example of conduct involving the use of sophisticated means; it by no means says the use of fictitious entities, corporate shells or offshore financial accounts is necessary for the sophisticated means enhancement to apply.")

The evidence of Tao's utilization of sophisticated means to execute and conceal his crime includes the following:

- FZU Collaboration Cover Story: From May to November 2018, Tao concealed his true relationship with FZU by misleading KU into believing that he was collaborating with another professor at FZU instead of working there himself as a professor.  *See* Gov. Exs. 148, 149, 152, 153.  This deceit continued until November 2018 when, after repeated follow up requests from KU's Office of Research, Tao claimed that he did not receive the proposed funding for the collaboration.  This sophisticated cover story allowed Tao to conceal the fact that his 2018 Institutional Responsibilities form was false.

- FHI Cover Story: Tao also lied to his department chair, Dr. Weatherley, about his whereabouts in 2019 and falsely told him that he was collaborating with the Fritz Haber Institute ("FHI") in Germany when, in fact, he was in China working at FZU.  To create this cover story, Tao obtained invitation letters signed by the proposed German

collaborator Dr. Robert Schlögl and showed those to KU as proof that he was planning to collaborate with FHI in German.  Gov. Exs. 145-147.  As Dr. Schlögl testified, however, after he sent Tao the letters, Tao ceased corresponding and never traveled to Germany in 2019 or collaborated with Dr. Schlögl.  These lies are uncontested.  Tao admitted to a journalist for *The New Yorker* that he, "lied to Kansas administrators about his whereabouts for the spring semester of 2019."[12]  Tao's use of genuine documents to create a false cover story was sophisticated and prevented KU, and ultimately the federal government, from discovering that Tao's September 2018 Institutional Responsibilities form was false.

- Use of Subordinate FZU Team Members to Hide FZU Position:  In multiple instances, Tao directed subordinate members of his FZU team to pretend that they were leading Tao's FZU research team so that the true nature of his involvement with FZU remained a secret.  For example, in some recruiting emails in which Tao was trying to convince other scientists to join his team at FZU, he falsely described his relationship with FZU as a "collaborative project with [Student #1] at Fuzhou University."  Gov. Ex. 162.  Student #1 is Tao's former colleague who ultimately reported him to the FBI.  Tao recruited Student #1 to join his FZU team in the first place and evidence at trial showed him repeatedly instructing Student #1 on how to recruit members to join his FZU team.  Gov. Exs. 137, 138, 155, 179.  This was another elaborate attempt to conceal his criminal conduct.

- Use of Multiple Accounts in the U.S. and China:  Tao also used multiple electronic accounts to conceal his illegal activity and prevent KU and the federal government from discovering that his September 2018 disclosures were false.  He had multiple U.S. email accounts at KU and Google and often forwarded FZU-related documents between the accounts.  He also had at least one foreign FZU email account and used the Chinese messaging application WeChat to correspond with others about his activity at FZU.  The FZU email account and WeChat are hosted in China and beyond the reach of KU and U.S. legal process.  As a result, discovering the falsity of Tao's statements was made more difficult.

- Partitioned KU Hard Drive:  Tao also partitioned his hard drive to conceal electronic evidence of his illegal conduct.  An FBI forensic computer examiner from FBI's Regional Computer Forensic Lab testified that Tao's KU hard drive was partitioned such that the FZU material was kept separate from his KU material and would not be readily viewable unless a user specifically opened the separate partition,.  This is further evidence that Tao took extraordinary steps to conceal his criminal conduct from KU and the federal government.

- Post-Arrest Deletion of Public Information about Tao's Work at FZU:  After learning of Tao's undisclosed work at FZU, KU identified multiple Chinese language online articles, FZU press statements, and Chinese Government documents that described Tao as a

---

[12] *See* https://www.newyorker.com/magazine/2022/03/21/have-chinese-spies-infiltrated-american-campuses (published March 14, 2022).

Chang Jiang Distinguished Professor at FZU.  Some of these articles included photographs of Tao meeting with senior members of FZU.  For example, an article from June 2018 described Tao as a Chang Jiang Distinguished Professor at FZU and purported to show him meeting with the Party Secretary of FZU (which is roughly the equivalent to the president of a U.S. university):



In another webpage on FZU's website, Tao was listed as a FZU professor of physical chemistry:



The Government identified numerous other webpages, many from Chinese Government websites, identifying Tao as a Chang Jiang Distinguished Professor at FZU. After Tao's indictment became public, however, many of these webpages were removed from the internet. According to the Government's expert Dr. Glenn Tiffert, such scrubbing has occurred, "largely because the Chinese government is aware of the scrutiny of Changjiang fellows by others." Trial Tr. Day 10 at 215:4-16. The Government produced these webpages to Tao in discovery and although they were not admitted at trial on hearsay grounds, the Court can, and should, consider them at sentencing. *See United States v. Dazey*, 403 F.3d 1147, 1177 n.7 (10th Cir. 2005) ("sentencing courts may consider hearsay evidence provided that the evidence has sufficient indicia of reliability"); *United States v. Todd*, 515 F.3d 1128, 1136 n.6 (10th Cir. 2008) (same). The post-indictment removal of these webpages further frustrated KU's and the federal government's efforts to discern whether Tao's 2018 Institutional Responsibilities form was true.

In conclusion, Tao committed a substantial part of his crime in China and utilized sophisticated means in both committing and concealing his crime. Accordingly, a two-level enhancement under U.S.S.G. § 2B1.1(b)(10) is warranted.

## C.     Enhancement for Abuse of Position of Trust, U.S.S.G. § 3B1.3

The Guidelines provide for a two-level enhancement, "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. "'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *Id.* cmt. n.1. For this enhancement to apply, the Government must prove both that the defendant occupied a position of trust and that the position of trust was used to facilitate either the commission or the concealment of the crime. *United States v. Spear*, 491 F.3d 1150, 1153 (10th Cir. 2007).

The abuse of position of trust enhancement applies here. Tao was a tenured university professor and principal investigator with great autonomy. He was not required to use a time

clock, nor was he managed in such a way that dictated his daily activities. He was required to perform the 40-40-20 split, devoting his time to research, teaching, and service to the university, but was free to decide how he fulfilled those obligations.

Tao also was given a great deal of trust by KU and the federal government that funded his research. He was expected to work fulltime at KU and to perform his research honestly and in accordance with applicable funding requirements. But he was not micromanaged. KU's Office of Research and Tao's colleagues provided him with ample support should be need it, but they trusted that he would make honest and transparent decisions and disclosures. Indeed, as defense counsel pointed out when cross-examining Dr. Weatherley, "Q. You have a lot of professors working with you, and it's not your job to track all the professors and take notes when they tell you where they are? A. That's correct." Trial Tr. Day 3 at 179:16-20. Dr. Weatherley also testified that, "For faculty members there is no kind of 8-to-5 policy if that's what you mean." *Id.* at 421. To drive home the point that faculty such as Tao have autonomy, defense counsel pointed out to Dr. Weatherley:

> Q. And they're not small children. They don't need to be micromanaged about where they are at any given time, correct?
> A. Correct.
> Q. Conferences around the world, correct?
> A. Correct, yes.
> Q. And if a professor had no courses, there's no policy that says they need to hold office hours for people who – they don't have students in those courses for those people to attend, right?
> A. That's correct.

*Id.*

Dr. Keiser's testimony and NSF's victim impact statement also make clear that NSF places a great deal of trust in its principal investigators such as Tao and that if it cannot trust the principal investigators, it cannot trust their research. Trial Tr. Day 5 at 95:16-24. In many ways, trust is essential to the proper functioning of the federal government's funding of fundamental

research in America and that is why criminal conduct like Tao's is so corrosive and harmful.

The nature of Tao's job as a tenured university professor and principal researcher placed him in a position of public and private trust.  Tao abused that trust and used it to commit and conceal his offense.  Tao lied on his September 2018 Institutional Responsibilities form and then continued to deceive his colleagues and the federal government to prevent them from learning the truth.  His position of trust allowed him to do that because he could selectively conceal certain parts of his activities and mislead people into drawing inaccurate conclusions about what he was actually doing.  For example, Tao spent almost the entire spring 2019 semester in China working at FZU, unbeknownst to KU or the federal government at the time.  But for occupying a position of trust, Tao would not have been able to conceal his full-time work at FZU.  A KU book-store employee, a cafeteria worker, or even KU's General Counsel would not be able to spend a semester abroad without KU knowing what they were doing.  The only reason Tao was able to work for FZU while in China was due to the enormous amount of trust given to him by KU and the federal government.  Tao broke that trust and used it to facilitate and conceal his criminal conduct.  Accordingly, the two-level enhancement for abuse of position of trust should apply and Tao's total offense level should be 19 (6 (base level) + 9 (loss) + 2 (sophisticated/international means) + 2 (abuse of position of trust)).

### D.       In the Alternative, the Court Should Depart Upward

Should the Court determine that, for purposes of U.S.S.G. § 2B1.1 there was no pecuniary loss, then the Court should consider an upward departure under U.S.S.G. § 5K2.5.  U.S.S.G. § 5K2.5 states:

> If the offense caused property damage or loss not taken into account within the guidelines, the court may increase the sentence above the authorized guideline range.  The extent of the increase ordinarily should depend on the extent to which the harm was intended or knowingly risked and on the extent to which the harm to

property is more serious than other harm caused or risked by the conduct relevant to the offense of conviction.

As described above, Tao's criminal conduct caused losses to both KU and NSF.  If the Court determines, however, that the pecuniary loss or gain cannot be reasonably determined, then it should give an upward departure to account for the significant loss and harm that Tao's conduct caused KU and NSF.  Although the Court concluded that for the purpose of determining whether the evidence supported Tao's wire fraud convictions, NSF and KU received the "benefit of their bargain" with Tao, the victims' own words explain in detail how Tao's conduct harmed KU and NSF and should be given significant weight in determining the appropriate sentence.

IV.     CONCLUSION

"Tao clearly engaged in deceitful conduct."  Judgment of Partial Acquittal at 50 (ECF No. 306).  That conduct violated 18 U.S.C. § 1001.  For the reasons stated above, the United States recommends that the Court impose a sentence of 30 months in prison followed by one year of supervised release and a $100,000 fine.

Respectfully submitted,

*/s/ Adam P. Barry*
Adam P. Barry
Trial Attorney
National Security Division
U.S. Department of Justice

*/s/ Christopher Oakley*
D. Christopher Oakley
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas

**CERTIFICATE OF SERVICE**

I hereby certify that on the January 4, 2023, I caused the foregoing pleading to be filed with

the Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

>*/s/ Christopher Oakley*
>D. Christopher Oakley
>Assistant United States Attorney
>United States Attorney's Office for the
>District of Kansas