## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **United States of America,** | **Case No. 19-CR-20052-JAR** |
| **v.** | |
| **FENG TAO,** | |
| **Defendant**. | |

## DEFENDANT FENG ("FRANKLIN") TAO'S RESPONSE TO GOVERNMENT SENTENCING MEMORANDUM

Dr. Franklin Tao, by and through the undersigned counsel, respectfully submits this Response to the Government's Sentencing Memorandum:

**A.    An Undisclosed Time Commitment Does Not Impact the Validity of Dr. Tao's Research.**

The government asserts that "Tao's unreported support and affiliations call into question the validity of all of the research he has performed for NSF over the years. His conduct also distorted NSF's decision making process and distribution of finite taxpayer funds, thereby harming other worthy principal investigators who were honest, but who did not receive the funds that ultimately went to Tao to fund his research."

These assertions are without any factual support in the record and, indeed, the record contradicts them. First, Tao did not have any "unreported support"; as the Court found, there was no evidence that Dr. Tao received any payment from FZU ((ECF 306 at 10) ("There is no evidence of an executed employment agreement between Tao and FZU. Nor is there evidence

that Tao received any payments from FZU.")). Nor was there any evidence that Dr. Tao ever had

any foreign grants.[1]

Second, there is no basis to assert that all of Dr. Tao's research for NSF—dating back

more than a decade—was tainted by an Institutional Responsibility form submitted in 2018. Dr.

Tao worked on his first NSF grant in 2011; since then, he has worked on NSF grants awarded in

2013, 2014, 2015, and 2018. These grants resulted in approximately 40 publications in high-

impact journals that have been cited more than 2,500 times. There is simply no basis to claim

that an undisclosed time commitment that began in May, 2018, somehow retroactively taints

thoroughly vetted research completed years earlier.[2] The claim is untethered to reality,

particularly since, in this case, KU would not have shared the contents of the Institutional

Responsibility form with NSF even if Dr. Tao's time commitment had been disclosed.[3] In

addition, at trial, Rebecca Keiser of NSF "testified that she was unaware of any allegations that

Tao's research was not performed precisely in the manner prescribed[, and w]hile she expressed

some concern at the possibility that a researcher who fails to disclose an affiliation and research

---

[1] The government's own witnesses acknowledged that there was no evidence any grant proposals submitted in China or received funding. Day 10 Tr. at 157 (testimony of James Churchill, FBI linguist, that of "[a]ll of the grant proposals or purported grant proposals in China, none of them had the seal or signature you would expect prior to submission," and "none of the draft contracts or addenda all the way through May [2018] had any stamps or seals on them"); Day 10 Tr. at 214–15 (testimony of Special Agent Lampe confirming that there was no evidence of a funded grant in China). Thus, "overlap and time commitment [was] not an issue," Day 6 Tr. at 54, and any pending support Dr. Tao failed to disclose could not have been material.

[2] The claim also ignores the rigorous review process that any article must undergo before it is accepted for publication.

[3] "NSF never sees a principal investigator's KU Institutional Responsibilities forms, and there is no evidence that had Tao disclosed his foreign activities to KU, KU would have disclosed this information to NSF." ECF 306 at 56.

support might perform NSF-funded research using unapproved equipment, the Government never alleged, argued, or introduced any evidence that Tao performed his research for NSF using unapproved equipment outside of KU." ECF 306 at 37. The government still has not introduced any such evidence.

Third, as the Court correctly found, "[t]he evidence was that KU submitted all the grant proposals at issue *before* Tao was even selected as a Changjiang Scholar in January 2018. Moreover, neither Reed nor any other witness from KU testified or suggested that Tao's foreign affiliation and activities presented, or likely presented, a conflict of interest that would have led KU to not submit his grant proposals to DOE or NSF or to prohibit him from working on the grants once awarded….Thus, there is no evidence that Tao fraudulently induced DOE or NSF to award grant funds." ECF 306 at 35. These well-supported factual findings by the Court belie the government's claim that Dr. Tao's false statement on the Institutional Responsibilities form "distorted NSF's decision making process and distribution of finite taxpayer funds." Because NSF did not see the Institutional Form, and there was no evidence that KU would have informed NSF even if the time-commitment box had been checked, and because the grant at issue was awarded *before* there was any potential conflict, nothing about the grant-award process could have been affected, much less distorted.

Fourth, the government has not advanced a cogent rationale how the nondisclosure of a time commitment could actually affect the validity of research—let alone in this case. The existence of a time commitment is important to NSF principally because it wants to know if the principal investigator has too little time to complete the required research. It does not render research invalid. For instance, it is not equivalent to a *financial* conflict of interest, such as where a cancer researcher conducts and publishes research into the health effects of tobacco use that

was funded by a cigarette company, without disclosure of the conflict, and thus where the public has reason to doubt the validity of the research due to the undisclosed conflict of interest. There is no dispute that Dr. Tao completed all of the required research.

**B.    KU Suffered No Economic or Reputational Harm.**

The claim that Dr. Tao's "conduct caused KU to suffer direct economic harm, including $460,000 in grant funds" and that "Tao's conduct also damaged KU's reputation" fares no better.

The government comes up with the $460,000 figure by adding together: i) KU's "lost [ ] ability to expend more than $336,000 in federal research dollars that had been appropriated for Dr. Tao's research in 2019 and beyond"; ii) $87,000 from the National Science foundation and $60,000 that KU "is still working to get reimbursed for"; and iii) $123,000 in salary paid to Dr. Tao between May 1, 2018 and August 21, 2019. *See* KU victim-impact statement. These alleged loss figures are wholly unsupported by the record.

First, the claim that KU is no longer able to expend $336,000 in federal research money that had been ear-marked for Dr. Tao is the direct result of KU's unilateral decision to place Dr. Tao on administrative leave without pay and bar him from campus. Dr. Tao was – and remains – fully able and willing to continue his work on these grants if KU would permit him to do so. But KU cannot bar Dr. Tao from working on grants and then claim that it is somehow being harmed as a result of its own decision to place Dr. Tao on administrative leave and bar him from campus.

Second, KU states[4] that the Office of Research is still waiting to be reimbursed $147,000 by NSF and DOE; it does *not* claim that NSF or DOE has refused to make this reimbursement –

---

[4] The identity of who from KU is making this claim is unknown, as the statement is unsigned.

4

only that it is waiting for this to happen. Awaiting reimbursement does not mean KU has

suffered any pecuniary loss, and certainly none that can be attributed to Dr. Tao.

Finally, the claim that Dr. Tao did not earn his KU salary is a canard. Dr. Tao, worked

tirelessly at KU, routinely working 16-hour days, rarely taking days off and never taking

vacation. He was, by a wide-measure, the most productive member in his department, as he

published many times more papers than his peers. Dr. Tao traveled to scientific conferences at

his own expense in order to avoid using precious research dollars from his department.

Moreover, the Court has already found that Dr. Tao earned his salary:

> KU also received what it bargained for. Tellingly, in April 2019 – almost a year
> into the alleged scheme—Tao was one of four professors at KU to receive the
> University Scholarly Achievement Award, in recognition of his significant
> research contribution. At the awards ceremony, Dr. Girod lauded Tao's
> accomplishments, noting that Tao had 'far exceeded expectations in his field in
> terms of his productivity and really his level of ingenuity.' Dr. Girod also
> commended Tao for his external service and for developing a 'world[-]class lab'
> and 'a very strong team' of researchers at KU. FBI Special Agent Stephen Lampe
> conceded at trial that Tao's recognition suggested he 'was performing his duties at
> [KU].' Dr. Weatherly, Tao's supervisor and department chair, testified that Tao
> was a solid faculty member and that he had supported Tao's nomination for the
> University Scholarly Achievement Award. Tao's wife, and Nguyen, one of Tao's
> graduate students, testified that Tao never missed a day of work. Tao worked
> seven days a week, and except for Sundays, he typically worked fourteen to
> sixteen-hour days. To Nguyen's knowledge, Tao never took any vacations.. . . *In*
> *sum, a reasonable jury could not conclude that, had Tao told the truth, he would*
> *not have received his salary, access to KU facilities and equipment, or the federal*
> *grant funds. The evidence was also insufficient to allow a reasonable jury to*
> *conclude that DOE, NSF and KU did not get what they bargained for.*

ECF 306 at 39-40 (emphasis added). Thus, the claim that KU suffered a financial loss is simply

without basis.

The same can be said for the alleged harm to KU's reputation. As the Court found, "[a]t

trial, Alicia Reed forcefully denied the suggestion that Tao's conduct exposed KU to any risk"

and Reed also denied that Dr. Tao's conduct caused any harm to KU's reputation:

Q. . . . [I]f agencies think that your office isn't doing a good job at [complying with federal funding requirements], KU could lose hundreds of millions of dollars; is that fair?

A. True. But we are audited every year to ensure that we have controls in place, so I'm not concerned about them thinking we're doing a good job.

Q. You weren't concerned at all when the FBI came knocking and your office was under a microscope as to whether there were compliance issues and you were responsible?

…

A. I think anybody would be concerned but we often work with auditors.

Q. I'm talking about the FBI . . .

A. Honestly, to me the FBI and auditors have very similar questions because they want to know if our controls are adequate and in this case I believe they are.

…

Q. And fair to say that notwithstanding everything that's been alleged against Dr. Tao. . . *KU's reputation is quite strong?*

A. *I would agree.*

Q. In fact, after the investigation, KU funding went up dramatically several million dollars, tens of millions of dollars, correct?

A. I do believe that we increased five places in the [NSF's] HERD survey, yes.

ECF 306 at 42-43 (emphasis added).

## C.     The Government Seeks to Improperly Punish Dr. Tao for Exercising his Constitutional Right to Trial.

The government complains that throughout the pre-trial litigation, Dr. Tao "insisted he did nothing wrong." ECF 330 at 6. This complaint is particularly startling given that Dr. Tao, who was charged with ten counts in the Second Superseding Indictment, has been now been acquitted on all but one count.[5] The government's memorandum makes clear that it would have greatly preferred if Dr. Tao had simply pleaded guilty to the charges brought against him and

---

[5] The government voluntarily dismissed two counts shortly before trial.

agreed that he "scheme[d] to defraud KU and the USG to obtain money and property from KU,

DOE, and NSF, to include USG grant funds and his KU salary" in order to "benefit the PRC by

participating in a 'talent plan' to obtain USG grant funds and his KU salary under false

pretenses"( ECF 75 at 9). But, of course, doing so would have would have been a lie, because, as

the jury and Court found, Dr. Tao did not do what the government accused him of doing. Dr.

Tao's repeated insistence that he did not defraud KU or the government was, as it turns out,

correct. And it was only by vigorously contesting the government's evidence that this became

clear.

  In addition, the government complains that Dr. Tao filed many pre-trial motions, such as

ones that sought exculpatory evidence and which cited the failure of the FBI to disclose relevant

information in its search warrant affidavit. The government also complains that Dr. Tao's wife

has continued to proclaim her husband's innocence and sought to raise money for his defense. *Id.*

at 8. All of this, according to the government, is evidence of a "lack of remorse" justifying a

"significant sentence."

  The government's argument is that the Court should impose an additional, "significant"

punishment on Dr. Tao for proclaiming his innocence and exercising his Constitutional right to

trial, and it is deeply disturbing. In the first place, Dr. Tao did not file the motions that the

government now complains of; his counsel did, based on counsel's  experience and duty to

vigorously defend a client. Seeking extra punishment for Dr. Tao because of trial counsel's

litigation strategy is wholly unjust. *See Gall v. United States,* 552 U.S. 38, 49-51 (2007) ("[t]o

punish a person because he has done what the law plainly allows him to do is a due process

violation of the most basic sort.'"); *United States v. Hernandez,* 894 F.3d 1104 (9th Cir. 2018) ("a

sentencing court cannot consider *against* a defendant any constitutionally protected conduct."

(internal citations omitted)). The government's argument that by insisting on his innocence, filing motions, and going to trial Dr. Tao has signified a lack of remorse warranting a more significant sentence is patently unconstitutional. Dr. Tao was, by insisting on his right to trial, exercising his constitutional right to trial – a right that resulted in his being exonerated on all but one count against him.

The government also wants the Court to punish Dr. Tao because his wife believes in her heart that her husband is innocent and has tried to publicize what she feels is an unjust prosecution in order to raise funds to pay for his defense. Again, this is wrong. The government has a legal right to bring charges against a defendant; defendants – and defendants' families – have the right to proclaim their innocence and defend themselves, vigorously and ethically. That this needs to be explained to lawyers from the Department of Justice is profoundly concerning.

**D.      A Sentence of Time-Served Is Commensurate with Similar Cases.**

The government contends that a significant prison sentence for Dr. Tao is required to avoid sentencing disparities. The cases it cites in support of its argument demonstrate just how misguided its prosecution of Chinese-born scientists and professors for failure to disclose foreign affiliations has been, and why the Department of Justice, recognizing the harm caused by its overzealous pursuit of Chinese-born scientists, has now changed its policies such that cases like Dr. Tao's will no longer be prosecuted criminally. Instead, administrative or civil sanctions are to be pursued.

Dr. Tao's prosecution, like the other cases cited by the government in its sentencing memorandum, was borne of the China Initiative, which was announced with great fanfare in November, 2018, and which was supposed to combat the national security threat posed by China by focusing prosecutorial attention on "identifying and prosecuting those engaged in trade secret

theft, hacking and economic espionage." According to then-Attorney General Sessions, "Chinese economic espionage against the United States has been increasing and it has been increasing rapidly. Enough is enough. We're not taking it anymore." Sessions announced a task force dedicated to rooting out the suspected malefactors who were targeting American intellectual property.

But it quickly became apparent that cases of economic espionage or theft of intellectual property were exceedingly rare, especially among university professors. Yet, instead of shelving the initiative, it morphed into a search for paperwork errors – reams of paper submitted in connection with federal grants was scrutinized in the hopes of finding an omission about a Chinese affiliation. Aggressive prosecutors contended that any failure to report such an affiliation justified charges of wire fraud. Dr. Tao's was the test case – the very first charged against a university professor for allegedly concealing an affiliation with a Chinese university. The cases cited by the government as examples that this Court should now follow are, instead, prototype examples how under-resourced college professors who fail to disclose a foreign affiliation on a conflict-of-interest form are typically unable to defend themselves when charged with dozens of felonies and are ultimately forced to plead guilty to lesser-charges.

For example, Simon Ang, a professor at the University of Arkansas, who received federal grants, was charged in a 59-count Indictment for his failure to disclose an affiliation he had in China on his conflict-of-interest form. Ultimately, Ang pled guilty to a single count of false statements – not for failing to disclose his foreign affiliations but, instead, for making a false statement to the FBI when interviewed about his conduct.

Similarly, Zhengdong Cheng, a professor at Texas A&M, was charged in a 32-page, 17-count Indictment for failure to disclose a foreign affiliation on grant paperwork. The government

successfully moved for the pre-trial detention and Dr. Cheng spent thirteen months in jail awaiting trial. But a few months after the end of the China Initiative was announced, Dr. Cheng was permitted to plead guilty to two misdemeanors and given a sentence of time-served. That the government was able to wrangle a plea to two misdemeanors and a sentence of time-served after holding Dr. Cheng in pre-trial detention for thirteen months is hardly an example of a just prosecution. Similar prosecutions involving other professors have been dismissed in their entirety prior to trial.

It is an unattractive but undeniable aspect of the criminal justice system that defending oneself, particularly in a complex, white-collar case, is enormously expensive. Anyone who is not rich or indemnified usually is unable to mount a defense against lengthy Indictments involving multiple, and sometimes dozens, of felonies. The fact that under-resourced college professors charged in this way are typically forced to plead guilty to reduced charges rather than go to trial does not mean that justice has been served.[6] The opposite is true.

---

[6] On the only occasions where Chinese-born professors charged with multiple felonies for failing to disclose an affiliation in China while obtaining and working on federal grants – but who have performed all of the required work – have actually gone to trial, they have been acquitted. *See United States v. Anming Hu*, 3:20-CR-21-TAV-DCP-1, 2021 WL 4130515, at *13–*20 (E.D. Tenn. Sept. 9, 2021), (district court acquitted university professor charged with defrauding NASA of grant funds by concealing a second position at Beijing University of Technology from his university and NASA while working on NASA grants where there was "no evidence that NASA did not receive exactly the type of research that it bargained for [and] … NASA was satisfied with defendant's work on their grants.") *Id.* at *18; *United States v. Mingqing Xiao*, No. 4:21-cr-40039 (S.D. Ill. May 3, 2022), (district court acquitted a university professor of wire fraud for allegedly causing his university (SIUC) to apply for an NSF grant without disclosing an active Chinese grant or a second position at a Chinese university as Current and Pending Support, where there was evidence of deceit, but "one can deceive without defrauding'" and to constitute fraud, "the deceit must be coupled with a contemplated harm to the victim that affects the very nature of the bargain itself," such as where "there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *Mingqing Xiao,* at 7 (May 3, 2022).

More pertinent for the Court's considerations is how the Department of Justice, recognizing the great harm caused by its overzealous approach to these types of non-disclosure cases, will handle such cases in the future.

In February 2022, just weeks before the commencement of Dr. Tao's trial, the Department of Justice announced the formal end the China Initiative because, according to Assistant Attorney General Matthew Olsen, he "had concluded that this is not the right approach" and that going forward, the Department would review academic integrity cases with a focus on "evidence of intent and materiality, as well as the nexus to our national security. These considerations will guide our decisions – including whether criminal prosecution is warranted or whether civil or administrative remedies are more appropriate."[7]

As this Court found, fraudulent intent was absent from this case, and no "nexus to our national security" was ever alleged. There was no allegation of trade secret theft or economic espionage, and the government itself repeatedly acknowledged at trial that Dr. Tao only did "fundamental research," the results of which were published in scientific journals. Given this, there is no reason to suspect that Dr. Tao's case, if presented to DOJ for review today, would even be prosecuted. Given this, the government recommendation of a 30-month sentence – where the sentencing guidelines calls for 0-6 months – is not just misguided, it is wholly unjust.

---

[7] https://www.justice.gov/opa/speech/assistant-attorney-general-matthew-olsen-delivers-remarks-countering-nation-state-threats

Dated:  January 11, 2023                          Respectfully submitted,


                                                   */s/ Thomas H. Johnson*
                                                  Thomas H. Johnson #13688
                                                  Petefish, Immel, Hird, Johnson,
                                                  Leibold & Sloan, LLP
                                                  842 Louisiana St.
                                                  Lawrence, KS 66044
                                                  Tel: (785) 843-0450
                                                  Fax: (785) 843-0407
                                                  tjohnson@petefishlaw.com

                                                  Peter Zeidenberg
                                                  Michael F. Dearington
                                                  Laura Zell
                                                  ARENTFOX SCHIFF LLP
                                                  1717 K Street, NW
                                                  Washington, DC 20006
                                                  Tel: (202) 857-6000
                                                  Fax: (202) 857-6395
                                                  Peter.Zeidenberg@arentfox.com
                                                  Michael.Dearington@arentfox.com
                                                  Laura.Zell@arentfox.com

                                                  *Attorneys for Defendant Franklin Tao*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 11, 2023January 11, 2023, a true and correct copy of the foregoing has been electronically filed with the Court and served to all counsel of record via CM/ECF.


                                                   */s/ Thomas H. Johnson*
                                                  Thomas H. Johnson