```
 1                   UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,

 4        Plaintiff,

 5        v.                          Case No. 19-20052-JAR

 6   FENG TAO, a/k/a "Franklin
     Tao,"                            Kansas City, Kansas
 7                                    Date:  January 18, 2023
          Defendant.
 8   ........................

 9
                        TRANSCRIPT OF SENTENCING
10        BEFORE THE HONORABLE JULIE A. ROBINSON
            SENIOR UNITED STATES DISTRICT COURT JUDGE
11

12                   A P P E A R A N C E S

13    For the Plaintiff:

14    Mr. Adam Barry                Mr. Christopher Oakley
      U.S. DEPARTMENT OF JUSTICE    U.S. ATTORNEY'S OFFICE
15    950 Pennsylvania Avenue, NW   500 State Avenue
      Washington, D.C. 20530        Suite 360
16                                  Kansas City, Kansas 66101

17    For the Defendant:

18    Mr. Michael F. Dearington
      Mr. Peter R. Zeidenberg
19    ARENT FOX, LLP
      1717 K Street NW
20    Washington, D.C. 20006

21

22

23

24   _____
              Proceedings recorded by machine shorthand,
25     transcript produced by computer-aided transcription.
```

```
 1              P R O C E E D I N G S
 2         THE COURT:  We're here in United States versus Feng
 3   Tao, 19-20052.  Your appearances, please.
 4         MR. BARRY:  Adam Barry and Chris Oakley on behalf of
 5   the United States.  Good morning, Your Honor.
 6         THE COURT:  Good morning.
 7         MR. ZEIDENBERG:  Good morning, Your Honor.  Peter
 8   Zeidenberg and Michael Dearington on behalf of Dr. Tao, who is
 9   present.
10         THE COURT:  Good morning.
11         All right.  So we're here for sentencing.  I have a
12   number of things that have been submitted that I've read and
13   rely upon.  Obviously the presentence report, the parties have
14   filed sentencing memoranda, there have been a lot of letters in
15   support of Dr. Tao submitted including some additional ones
16   that I received yesterday, the presentence report includes
17   victim impact statements of a representative of NSF and a
18   representative of KU.  So those are all of the things that I
19   have taken into consideration.
20         My understanding is the parties would like to make
21   some oral submissions as well; is that correct?
22         MR. BARRY:  Yes, Your Honor.  Dr. Keiser and Ms. Reed
23   are here to give statements in person.
24         THE COURT:  Okay.  And you as well, Mr. Zeidenberg?
25         MR. ZEIDENBERG:  Yes, Your Honor.  We're prepared.
```

1        THE COURT:  There are a number of objections to the

2   presentence report that I will need to rule upon as well, but

3   why don't we start with the parties' submissions, Mr. Hawk.

4        MR. BARRY:  I'm not as good looking as Mr. Hawk, who

5   is unfortunately not here, but I will pass on the note.

6        THE COURT:  Sorry about that, Mr. Barry.

7        MR. BARRY:  Ms. Reed will give her statement first.

8        THE COURT:  All right.

9        MS. REED:  May I come up?

10       THE COURT:  You can do that from the witness stand, or

11   if you'd rather do that from the lectern, that's fine too.

12       MS. REED:  Good morning, Your Honor.  Thank you so

13   much for hearing the statement from the university.  We put

14   some information in our statement, but I would just like to

15   reiterate the impact of Dr. Tao's actions on the university as

16   a whole both reputationally because of the lack of integrity he

17   showed as well as to the students he recruited and then was

18   unable to support at the university.

19       In addition to those pieces, the research enterprise

20   as a whole is based on integrity, the idea that the scientists

21   who receive funding from the federal government are going to

22   act in accord with what they have proposed to do.

23       I think that the work that has taken place in this

24   courtroom as well as the lack of final reporting done on

25   several of Dr. Tao's works indicates that he was unable to do

 1   what he had promised because of his lack of integrity, lack of

 2   disclosure of his other commitments.

 3        I think, you know, in the end it really is overall

 4   just the violation of process and policy at KU.  We base our

 5   ability to do science and impact the nation on the fact that we

 6   have controls in place to ensure that the funding from the

 7   federal government goes to support science.  His actions not

 8   only didn't follow what we set at KU as process, but also did

 9   not follow the funding expectations of the Department of Energy

10   and the National Science Foundation.

11        I'm not here to talk about his science or the

12   greatness of his science.  I'm here to talk about the

13   fundamental integrity that he didn't show and in the support

14   that he failed to give to the research enterprise, KU students,

15   and KU as an institution of higher education.

16        Thank you.

17        THE COURT:  Thank you.

18        MR. BARRY:  And then Dr. Keiser from the National

19   Science Foundation would also like to make a statement.

20        DR. KEISER:  Thank you, Your Honor.

21        I think a great deal about the NSF mission.  Our

22   mission established in 1950, just after World War II, is to

23   promote the progress of science; to advance the national

24   health, prosperity, and welfare; and to secure the national

25   defense and for other purposes.

1        NSF envisions a nation that capitalizes on new

2   concepts in science and engineering and provides global

3   leadership in advancing research and education.

4        This mission is accomplished through the funding of

5   the U.S. researchers who produce knowledge to maintain U.S.

6   leadership in science and innovation and for the public good.

7   We're trusted with this mission by the U.S. taxpayer, and due

8   to our successful accomplishment of it, we have bipartisan

9   support, and of course that has led to increased funding, which

10  we're very grateful for from congress.

11       We're entrusted by the public to use this budget

12  honestly and with integrity, to deliver trustworthy research

13  for the public benefit.  We also expect this trust in the

14  researchers we fund.  We expect them to propose for the

15  research and conduct it transparently and objectively.  We do

16  not dictate to them how they should perform their research.  We

17  do not tell them how they should do it.  We give them the

18  freedom to pursue it as they deem most appropriate as experts

19  if their field.

20       In exchange for this trust in them, we expect them to

21  be transparent and objective in all aspects of the conduct of

22  the research from the research application, to their use of the

23  funding, to the conduct of the research itself.

24       Breaches in this trust either through undisclosed

25  conflicts, through commitments that could bring bias, or

1    through dishonest use of our funding compromise this trust that

2    we have in our researchers and, therefore, compromise the trust

3    in those research results.  In fact, the United Kingdom calls

4    their research enterprise and the pursuit of transparency and

5    integrity trusted research for this reason.

6              In this particular case I have heard the argument that

7    NSF got what it paid for.  After all, Dr. Tao published his

8    articles in peer-reviewed journals and other researchers have

9    cited those articles.  However, NSF did not get what it paid

10   for.  Certainly the articles were published.  However, given

11   what we now know about these potential conflicts that were not

12   disclosed and other issues regarding false statements, we

13   cannot trust that the research was performed objectively and

14   without bias.

15             For research to be trusted, we need to have confidence

16   not only in the research results that are published but that

17   the researcher designed the research in an unbiased manner and

18   selected the results to be published honestly and

19   scientifically.  We do not know what results in data were

20   selected for publication and what might have been influenced by

21   any bias that could have been caused by undisclosed

22   affiliations.  We do not know who may have been involved in the

23   research who also might have had influence that we were not

24   aware.

25             NSF places great trust in its researchers to pursue

1    these things objectively and honestly.  Another example of an

2    issue like this was National Institutes of Health funded heart

3    research, and it was disclosed that those researchers were

4    accepting funding and had affiliations with alcohol companies.

5    They looked into the design of the research, and it was found

6    that the design of the research was flawed in that design

7    caused the results to hide potential ill effects on the heart

8    from alcohol.  That research had been published in

9    peer-reviewed journals, but the discovered conflict called it

10   into question.

11           NSF's policies regarding disclosure were established

12   to ensure that NSF receive objective, unbiased research.

13   Researchers who do not fully disclose may have incentives to

14   design conduct and report the research in a biased manner.  The

15   only way to determine the validity of Dr. Tao's research and

16   its objectivity would be to complete a retrospective review of

17   the research effectually requiring a third party to recreate

18   it, which would cause additional time and money dedicated to

19   the project.

20           Had NSF been aware that Dr. Tao's applications and

21   actions taken under the award were not true, complete, and

22   accurate to the best of his knowledge, which constitutes a

23   violation of NSF's grants policy, NSF likely would have sought

24   to have Dr. Tao removed as principal investigator and/or taken

25   other compliance actions.

1            I also would like to address the claim that Dr. Tao

2    was not hiding anything as he cited his foreign affiliations in

3    his publications.  First, the citing of these foreign

4    affiliations was not in plain sight.  Rather, NSF found these

5    acknowledgments through big data analytics that the agency has

6    been compelled to put into place because of these issues

7    regarding nondisclosure.

8            NSF has had to spend hundreds of thousands of dollars

9    to purchase the raw data from large databases to identify these

10   nondisclosures.  They are difficult to uncover, but the other

11   entity being cited knows that the acknowledgment is there.

12   That other entity then can claim ownership of the research,

13   even though NSF funded a U.S. university and their employee, in

14   this case KU, to perform the research.

15           I would also like to address the claim that there's no

16   proof that Dr. Tao was provided compensation for his foreign

17   affiliations.  There are many incentives besides financial

18   compensation that compel U.S. researchers to claim foreign

19   affiliations without disclosing them.  These were cited in the

20   2019 JASON report on fundamental research security, and in

21   fact, the foreign government talent recruitment programs that

22   often compel this type of behavior that U.S. researchers agree

23   to are now prohibited by law under CHIPS and Science if you

24   receive federal funding.

25           These programs were not prohibited in 2018, but

1    certainly the behaviors that are agreed to under the program

2    were concerning for the reasons that I said.  There could be

3    very generous in-kind contributions provided such as

4    well-equipped labs and access to very qualified collaborators.

5    In exchange for this prestige and these well-equipped labs, the

6    researcher may agree to cite the non-U.S. institution supplying

7    these benefits in their publications rather than their U.S.

8    institution or in addition to their U.S. institution.

9         The 2019 Senate Homeland Security and Government

10   Affairs Permanent Subcommittee on Investigations report also

11   provides more information about these concerning efforts.

12        Regarding prestige, the CAREER program from NSF that

13   funded Dr. Tao is intended to provide funding support to early

14   career researchers to advance their research and academic

15   careers.  Dr. Tao directly benefitted from this program to

16   advance his own career.

17        In funding Dr. Tao's research, NSF did not fund other

18   research.  I've talked about this quite a bit, but it certainly

19   is concerning overall regarding fairness to these other

20   researchers who were not funded as well as to the integrity of

21   the system overall and the harm to the reputation of the

22   federal agency, National Science Foundation.

23        Thank you very much for listening to me.  I appreciate

24   it.

25        THE COURT:  Thank you.

1        Mr. Barry.

2        MR. BARRY:  If you would, we just have a few

3  additional comments for Your Honor.

4        THE COURT:  Go ahead.

5        MR. BARRY:  Your Honor is very familiar with the facts

6  of this case already, so I'm going to keep this relatively

7  brief and just focus on a few things that the government wants

8  to make sure that the court is thinking about at the forefront.

9        First, as noted in the Rule 29 order -- or in the PSR

10  and in the sentencing guidelines, the scope of relevant conduct

11  that the court should be considering in imposing a just

12  sentence is beyond just a single submission of an institutional

13  responsibilities form in September of 2018.  Under the

14  guidelines it includes "all acts and omissions committed,

15  aided, abetted, counselled, commanded, induced, procured, or

16  willfully caused by the defendant and that occurred during the

17  commission of the offense of conviction, in preparation for

18  that offense, or in the course of attempting to avoid detection

19  or responsibility of that offense."

20        Importantly here, that means that when the court is

21  trying to determine a just sentence, it should consider the

22  actions and choices that Dr. Tao made before the commission of

23  his crime and after in order to try to avoid detection of the

24  falsity of those statements that he made to KU.

25        The court's acquittal of the wire fraud convictions

1  does not change this.  It's black letter law that judges can

2  consider acquitted conduct in sentencing, and so it's

3  appropriate for the court to just consider those other acts of

4  deceit that furthered his efforts to conceal the falsity of his

5  institutional responsibilities form.

6          Second, the 3553 factors counsel in favor of a

7  significant custodial sentence and fine here.  In particular we

8  want to emphasize two to three factors.  Number one is

9  defendant's characteristics, and number two/three are the need

10  for deterrence and respect for the law.

11         Defendant's characteristics.  Throughout these

12  proceedings and even in the sentencing memoranda that have been

13  submitted to the court, the defendant has shown an utter lack

14  of remorse.  Lack of remorse can be considered as an individual

15  characteristic and in this case is important when considering

16  specific deterrence.

17         Dr. Tao still claims that he's the victim here and

18  that he did nothing wrong.  He minimizes the offense by falsely

19  claiming that he simply checked the wrong box, and he even

20  continues, despite a jury conviction, to claim that the

21  institutional responsibilities form itself wasn't even

22  incorrect.

23         This is one of the main reasons that the court should

24  make clear to the defendant, to Dr. Tao, and to the public at

25  large that he's been convicted of a felony and that the conduct

1   that led him here and the choices that led him here should not

2   happen again.  This is relevant to specific deterrence in a

3   context in which he has stated that because he does not believe

4   he did anything wrong, he hopes to continue to do research and

5   he needs to be told that the way that he did the research here

6   is unacceptable and illegal.

7         It's also important for general deterrence.  Other

8   similarly-situated defendants or scientists should be told that

9   the degree of deceit and misconduct here causes real harm, it

10  will be rooted out, and it will be punished accordingly.

11        Undisclosed participation in foreign talent

12  recruitment programs is a larger issue that needs to be

13  stopped.  The truth is important, especially in federal grant

14  making, and a custodial sentence here would show that.

15        Defendant argues in his sentence -- one of his

16  sentencing memoranda that we're trying to punish his lack --

17  punishing him for lack of remorse is trying to punish his

18  constitutionally-protected activity.  That's incorrect.  The

19  case law says that lack of remorse can be considered under the

20  3553 factors that I mentioned earlier.

21        Furthermore, the cases that the defendant cites in his

22  briefing don't actually stand for the support that he claims I

23  think, for example, the *Gall v. United States* case that he

24  cites doesn't have anything to do with constitutionally-

25  protected activity.

1          The case that you should look at is *Bordenkircher v.*

2    *Hayes*, which is a Supreme Court case from 1978 and its progeny.

3    That's where the language actually comes from, and what that's

4    talking about is a situation in which the government decides to

5    supersede or indict somebody for a more serious crime as a

6    result of either a failure in plea negotiations or defendant's

7    insistence on not providing incriminating statements or seeking

8    a jury trial.  It's about whether the government is vindictive

9    and vindictively prosecuting somebody.

10         That's not what's going on here.  The lack of remorse

11   is important just to demonstrate that this matters, that these

12   were lies that mattered to people that were real victims, that

13   there was harm here, that this isn't something that's just a

14   paperwork error to H.R.  That's the conduct that we're seeking

15   to punish here, and it's not something that's constitutionally

16   protected.  It's not like we're seeking to punish him for

17   statements he didn't make or choosing to go through with a jury

18   trial.

19         A lot of the citations in the government's briefing

20   actually focuses on statements that Dr. Tao made outside of the

21   courtroom either to the press or in other forums in which he

22   tries to minimize the charges that were pending against him and

23   his conduct.

24         The third and final thing I want to emphasize is there

25   are two factual issues that are talked about in the defendant's

1    memos that I just want to clarify.  The first is the sequence

2    of funding the grants.  So the two grants that are still at

3    issue are an NSF grant and a Department of Energy grant, and

4    those grants were both received after Dr. Tao received the

5    Changjiang Distinguished Professor program award and started

6    working at Fuzhou.

7           Now, the court's Rule 29 order and the PSR recognize

8    this sequence, but there is a discussion in the salary

9    maintenance analysis in the court's order on page 44 where the

10   court appears to have confused the date and said that the

11   grants were actually not granted until -- that they were

12   granted before he started working at Fuzhou.  That's factually

13   inaccurate.

14          The truth is that he submitted the grant in late 2017.

15   He began performing services for Fuzhou in March 2018.  He

16   accepted the position in May 2018.  He made disclosures in May

17   and June of 2018, false disclosures related to current and

18   pending support, and then in July of 2018 he was rewarded the

19   Department of Energy grant and in September -- or sorry, the

20   National Science Foundation grant and in September he was

21   awarded the Department of Energy grant.  So just a factual

22   thing that I wanted to clarify for the record.

23          The second factual point I just want to make is the

24   foreign research support that should have been disclosed that

25   we're talking about in our briefing in that the facts proved at

1    trial is the $3 million in funding that Fuzhou University and

2    PRC government promised to Dr. Tao as a result of becoming a

3    Changjiang Distinguished Professor.  That's in the last draft

4    contract that was admitted into evidence.  It's what Dr. Tao

5    told one of his colleagues in a recorded call, and it's

6    consistent with the way that the Changjiang program works.

7         Furthermore, as noted in our Rule 29 briefing, Dr. Tao

8    even touts the fact that his source of funding is Fuzhou in one

9    of his National Science Foundation of China proposals.

10        In closing, the government just wants to emphasize

11   that this was a serious crime that deserves a serious

12   punishment.  Dr. Tao was convicted of lying to KU and the

13   federal government about his second job at Fuzhou University as

14   a Changjiang Distinguished Professor.  These lies were

15   elaborate, they were numerous, and they were long-lasting.

16   They matter to KU and the federal government, and as a result,

17   both victims have been injured.

18        Like many white collar criminals, Dr. Tao worked

19   really hard; we don't dispute that.  But he didn't work

20   honestly.  He didn't work with integrity.  Instead, he lied to

21   the very people and institutions who had trusted him and helped

22   him build his reputation as a scientist.

23        So after considering the appropriate enhancements and

24   the 3553 factors, the government respectfully recommends that

25   Dr. Tao be given a custodial sentence and a fine.

1            Thank you, Your Honor.

2            MR. ZEIDENBERG:  Good morning, Your Honor.

3            THE COURT:  Good morning.

4            MR. ZEIDENBERG:  I want to correct a number of things

5    that the government just represented including the fact that

6    Dr. Tao was convicted of lying to KU.  He was not convicted of

7    lying to KU.  He was convicted of lying to the federal

8    government, one count, National Science Foundation.

9            It was a false statement on a KU H.R. form.  He failed

10   to disclose not a financial conflict of interest but a time

11   commitment.  The NSF regulations don't even require that

12   universities have a time commitment conflict in their policies.

13   All this talk about how this is such an egregious and harmful

14   lie, they don't even have a policy on time commitments.  They

15   only care about the example that you were given, which is when

16   you have a conflict of interest in the normal sense, which is

17   if you're being funded by the tobacco company and you're doing

18   research into lung cancer or smoking, then that is something

19   that the NIH needs to know.

20           But it's very different than having a time commitment,

21   particularly when, as the court found in this case, all of the

22   work got done.  The court found that Dr. Tao did not indicate

23   on the form that he had a time commitment conflict, but that

24   even if he had disclosed it, he would still have been able to

25   keep his KU job and still have been a PI on the grants that

1    were awarded.

2          The court found -- Your Honor found that the

3    nondisclosure did not affect any of the granting agencies

4    because the grants at issue were all awarded prior to the

5    nondisclosure on the conflict of interest.  The sequence that

6    the government just recited does not contradict that, Your

7    Honor.  At the time he applied for the grants, he did not have

8    the conflict.

9          The court found correctly that KU does not even share

10   the conflict of interest form, the institutional

11   responsibilities form with the granting agencies.  Your Honor

12   found that Dr. Tao was able to do all of his KU work and all of

13   his grant work.  Your Honor found that the agencies received

14   high quality work from Dr. Tao and were fully satisfied.

15         Your Honor found that KU received what it paid for

16   regarding Dr. Tao's work as a professor, which is really

17   irrefutable because in April of 2019, a year into this, as the

18   court recounts in its order, he was one of four professors to

19   receive an award from -- the Scholarly Achievement Award for

20   his outstanding work.  I mean, if that isn't proof that he's

21   doing his job at KU, then, you know, nothing is.  He was lauded

22   by Chancellor Girod for his incredible accomplishments and

23   output.

24         Your Honor, as a result of this conviction his

25   guidelines are zero to six months, and the appropriate sentence

in this case we submit is time served, a week in jail which is
what he spent awaiting trial -- I mean, when he was arrested
for failing to disclose on an employer's institutional
responsibility form a time commitment that ultimately did not
impact his work, is sufficient but not greater than necessary
to accomplish the purposes of sentencing.

        I want to talk about the price that Dr. Tao has
already paid.  For three and a half years, Your Honor, while
this case has continued since his arrest, Dr. Tao and his
family have lived in anguish that he would spend years in
prison, pay millions of dollars in restitution and fines, and
then be deported.

        For three and a half years he's had an ankle monitor
on his ankle.  He's had to bathe every day with his leg
sticking out of the bathtub because it can't get wet.  He
hasn't taken a bath or a shower as a normal -- you know, the
way that the rest of us do for three and a half years.

        He's been unable to leave the jurisdiction without the
court's permission.  For three and a half years he's been under
the supervision of probation, subject to checks, phone calls,
and visits.  He's not had a single violation in three and a
half years.

        KU is either moving to terminate him or has terminated
him.  He has a letter saying he's been terminated, so he's
unemployed.  The job that he worked for the last two decades to

1    obtain, the position that means so much to him has been taken

2    from him.  He's lost it.  That is a consequence of not filling

3    out his time commitment.  That is a harm that he has already

4    suffered and will suffer regardless of what the court imposes.

5        His reputation has been ruined.  His name has been

6    dragged through the mud and all over the Internet.  He's been

7    accused of being a spy.  He's gotten e-mails from people

8    wishing that he be executed for treason.  His family's finances

9    have been destroyed.  He has nothing left.  He's borrowed all

10   that he can borrow.  He's unemployed.  He hasn't been paid for

11   three years.  He owes over a million dollars in legal fees.

12   He's borrowed everything he can from everyone he knows.  He

13   will never be able to pay this back.

14       So in deciding what is a just sentence and if he's

15   paid a high enough price, the court should consider all of

16   these factors and consider them in light of what he was

17   actually convicted of, a false statement on an employer's

18   institutional responsibilities form.

19       Now, Dr. Tao's a unique individual as we all are, but

20   his story is one that is just remarkable.  He grew up literally

21   dirt poor, unimaginable poverty.  Seven people living in

22   basically a two-room hut, no electricity, no running water, no

23   lights, no plumbing, no central heating, obviously no

24   air-conditioning.  He was malnourished as a child.  He never

25   had a glass of milk until he went to college, rarely ate meat,

1    had no fruit, and believed that's why he's of small stature

2    now.

3            But it was through incredibly hard work that he got to

4    a college in China, and somehow, because of his grit, his

5    determination, and his smarts, he made it to Princeton

6    University and in four years got his PhD.  Then went to

7    Berkeley, then he went to Notre Dame, excelling everywhere.

8            Your Honor got -- received and we submitted probably

9    two dozen letters of support, and when you sit back and you

10   read all these letters, you get a distinct impression because

11   there's common themes that run through these letters and that

12   is that Dr. Tao is the hardest working, most dedicated

13   scientist that all of these people have ever met.

14           He was single-minded in his dedication to science.  He

15   was not interested in money.  He's not interested in material

16   things.  Even on a college professor's salary he would pay out

17   of his own pockets to go to conferences rather than dip into

18   research funds because he wanted to save that money for

19   research.  He would, when traveling, rather than stay in a

20   hotel, sleep overnight in the airport because he wanted to save

21   those research funds for his group so that they could do

22   research.

23           And even after his arrest in this case, Your Honor,

24   he's continued to publish -- 16 publications and a book in the

25   last three and a half years.  And the government actually

1    mentions that as an aggravating factor that you should hold

2    against him.  Apparently the government would prefer Dr. Tao to

3    be curled up into a ball, unresponsive, depressed, not being

4    productive, not using his mind, not contributing to science.

5    Instead he has been working with all that's been going on,

6    publishing -- and those results are published.  They're listed

7    today on the KU websites.

8           And I want to talk about that research because there's

9    never been a legitimate question about the integrity of the

10   research or his scholarship.  All of these articles are peer-

11   reviewed, Your Honor.  It's not just Dr. Tao writing an article

12   and posting it on the Internet and now the government says --

13   NSF says all of this is now under question.

14          I mean, think about this, how disingenuous this claim

15   is, that they say in 2018 he didn't report a time conflict,

16   which NSF doesn't even require a time commitment, and somehow

17   that calls into question the legitimacy of research he did in

18   2011, 2012, in 2013, 2014 and '15.  How or why does that logic

19   follow?

20          I want to point the court's attention to one of the

21   letters that we filed yesterday from a physics professor for

22   40 years at the University of Central Florida because I think

23   he makes a couple really important points about how research

24   works.  And he says, "The prosecution would have you agree" --

25   for the record, Your Honor, this is the letter from Talat

1  Rahman.

2       "The prosecution would have you agree that Tao's

3  unreported support and affiliations call into question the

4  validity of all the research that he has performed for NSF over

5  the years.  This claim reveals profound ignorance of how

6  peer-reviewed journals choose to accept or reject papers

7  submitted for their consideration.  It takes no account of the

8  expert judgment of the scientists those journals appointed to

9  review the papers Dr. Tao submitted who recognize scientific

10  merit and recommended their publication.  These are the proper

11  judges of the validity of the research that he has performed

12  for NSF over the years.

13       "The prosecution would have you believe that Dr. Tao

14  distorted NSF's decisionmaking process and distribution of

15  finite taxpayer funds, thereby harming other worthy principal

16  investigators who were honest but did not receive the funds

17  that ultimately went to Tao to fund his research.  But there

18  was no such distortion in funding research, since NSF made its

19  decision about continuing support of Professor Tao's research

20  on the basis of its quality as demonstrated to the judges

21  relied on by those publications.  Had Professor Tao been shown

22  to have been misrepresented his lab findings, the case would be

23  different, but that is not the variety of honesty the

24  prosecution convinced the jury about.

25       "NSF and American taxpayers were abundantly rewarded

1   by the quality of Professor Tao's research as judged by the

2   relevant experts of that quality."

3           Your Honor, AASF, Asian American Scholar Forum, said

4   something very similar in a letter they submitted.

5           And it is just amazing, in light of what the NSF said

6   to you and what the government has represented, that if you go

7   on the NSF website today, you will see papers -- Franklin Tao.

8   These papers -- this is from 2014.  This is from 2018.  This is

9   from 2015.  This is National Science Foundation on their

10  websites today touting this research.

11          The Center for Environmentally Beneficial Catalysis at

12  KU lists under recent publications Tao, F.  That's Franklin

13  Tao, Your Honor, 2022.

14          Page 507, Franklin Tao.  Franklin Tao.

15          Your Honor, they can't have it both ways, claim that

16  this research is no good and yet post it on their websites so

17  they can get that reflected glory of look at all the work that

18  we have done.

19          And, Your Honor -- I mean, Your Honor found -- and

20  these are some quotes from Your Honor's order on this that

21  touch on this subject that Your Honor found -- this was from

22  your order, page 35 -- neither Reed or any witness from KU

23  testified or suggested that Tao's foreign affiliation and

24  activities presented or likely presented a conflict of interest

25  that would have led KU to not submit his grant proposals to DOE

1   or NSF or to prohibit him from working on the grants once

2   awarded.  There is no evidence that Tao fraudulently induced

3   DOE or NSF to award grant funds.

4          You also found that there was no evidence that NSF did

5   not receive what it bargained for.  Keiser was unaware of any

6   allegations that Tao's research was not performed precisely in

7   the manner prescribed.  While she expressed some concern that

8   the possibility that a researcher who fails to disclose an

9   affiliation and research support might perform NSF-funded

10  research using unapproved equipment, the government never

11  alleged, argued, or introduced any evidence that Tao performed

12  his research for NSF using unapproved equipment outside of KU.

13         Your Honor also found that there was no evidence that

14  had Tao told the truth, he would not have received his salary,

15  access to KU facilities and equipment, or the federal grants.

16  And Your Honor's findings were well supported, we submit, by

17  the record.

18         Your Honor, I think it's worth asking why the

19  government is trying to send and asking the court to send

20  Dr. Tao to prison for two and half years when the guidelines in

21  this case are zero to six months and the offense is a false

22  statement on an institutional responsibility form reporting a

23  time conflict when all of the work was ultimately done.

24         And I think it's worth bearing in mind the context in

25  which this case came to them and how they approached it and how

1    they have prosecuted it and how they are still treating it.

2    The woman, the visiting scholar that the government in its

3    papers calls a former colleague and thanks her for her

4    volunteering this information to save them by reporting on

5    Dr. Tao was actually extorting him.  She demanded $300,000 from

6    Dr. Tao for her spiritual hurts; that's her quote from an

7    e-mail.

8              She said that -- she e-mailed saying that she would

9    accuse him of severe academic misconduct and forged authorship,

10   not that he had done that.  She said that's what I'm going to

11   accuse you of if you don't pay me.  And when he didn't pay her,

12   she then e-mailed him saying being a tech spy is a very popular

13   term these days, and she lied to the FBI and she made up

14   aliases which she admitted to.  She made up aliases and she

15   accused him of economic espionage which was not true but which

16   the government believed and as a result of that belief had

17   drones following Dr. Tao and his family and he had surveillance

18   on him, his wife, his children, and the people who worked in

19   his lab for 16 hours a day because they thought he was a spy.

20   And of course he wasn't.

21             But they have still handled this case as if -- as if

22   there's all this nefarious smoke that they constantly are

23   injecting into the case.

24             Your Honor, what we take issue with in the sentencing

25   memo is the government asked the court for an enhanced sentence

1    because Dr. Tao had the temerity to insist on his innocence and

2    his counsel filed too many motions and Dr. Tao's wife extolled

3    her husband's innocence and believes in him and to this day

4    believes in him.  And wouldn't all of us here want our spouse

5    to believe in us?  And somehow her saying that publicly that

6    she believes in her husband and she wants his name to be

7    cleared and she's fighting for him and is trying to raise money

8    for him, all of that is an aggravating factor that the court

9    should somehow consider and punish him for?

10           That would be unconstitutional.  That is what we're

11   talking about.  Insisting on your innocence is your

12   constitutional right, and I shouldn't have to remind the

13   government that he was indicted for ten felonies; he was

14   convicted of one.  He was indicted for defrauding these

15   government agencies, and as the court found, he didn't.  So he

16   had a reason to insist on his innocence.  And of course even if

17   he didn't have a reason, that is his right to put the

18   government to the trial.

19           Your Honor, the research got done; the work got done.

20   This was not a conflict.  There was no evidence, and there was

21   no other foreign grants to report.  He didn't receive any other

22   foreign grants.  There was no other foreign money.  It was a

23   time commitment which he ultimately was able to handle on his

24   own.  Should have reported it, as the court found, if you have

25   a time commitment.

1          But he was able to do the work.  There was no harm

2     caused.  That's why there was no loss.  That's why his

3     guidelines are zero to six.  And a guideline sentence or a

4     sentence of time served is more than appropriate when the court

5     looks in the full context of the impact that this case has had

6     on Dr. Tao's life, the irretrievable life that is now lost, the

7     future that he had which is now gone, all is a direct

8     consequence of his conduct, all factors the court can consider

9     when deciding whether or not a sufficient price has been paid,

10    and we submit that it has.

11         Thank you, Your Honor.

12         THE COURT:  All right.  Thank you.

13         All right.  I'm going to start by ruling on the

14    objections to the presentence report.  They're all objections

15    filed by the government.  The defendant has not filed any

16    objections to the presentence report.  And then I will proceed

17    with announcing proposed findings of fact and a tentative

18    sentence and then hear any final objections or recommendations,

19    requests, et cetera, from the parties before I announce a final

20    sentence.

21         So let me rule on the objections.  Dr. Tao has a right

22    to allocute, and so I will -- after I rule on objections, I'll

23    call on him if there's anything, Dr. Tao, that you would like

24    to say to me directly in your own behalf before I proceed with

25    sentencing, that is your right, so I will call on you and give

1    you the opportunity to do that as well.

2         All right.  So let me run through the objections by

3    the government to the PSR.  The first is to paragraph 17.  And

4    many of these objections, in fact most of them, have to do with

5    factual statements in the presentence report that was authored

6    by the probation officer, but frankly I think by and large

7    lifted from my memorandum order and opinion that granted the

8    defendant -- that mostly granted the defendant's motion for

9    judgment.  And I'm not going to revisit that decision.  I gave

10   very lengthy and detailed explanations for my ruling in that

11   order, and so I'm going to stand on that.

12        But so the first objection is to paragraph No. 17, and

13   this has to do with whether or not there was an executed

14   employment agreement.  The government asked that the language

15   in that paragraph be amended.  The objection is denied.  Again,

16   this finding comes from my decision granting Dr. Tao's motion

17   for judgment of acquittal on the wire fraud counts.  Also this

18   does not impact the guidelines calculations in any event.

19        The second objection also pertains to paragraph No.

20   17.  There's a statement in there that says nor is there

21   evidence that Tao received any payments from FZU.  The

22   government asked that that be amended.  That objection is

23   denied.  Again, this comes from my decision.  I think -- there

24   was no evidence that he received payments from Fuzhou.  At most

25   there was evidence -- and I actually think it was the testimony

1    of Dr. Tao's wife -- that, you know, he may have received, you

2    know, housing and, you know, dinners or something in part while

3    he was there, but he also stayed with family, but there was no

4    evidence of direct payments to Dr. Tao despite the government's

5    best efforts in getting bank account information and doing a

6    search on his house and seizing devices and that sort of thing.

7            The third objection is to paragraph No. 52, and the

8    language specifically that comes from my order is that NSF

9    never saw a principal investigator's KU institutional

10   responsibilities form, and there is no evidence that had Tao

11   disclosed his foreign activities to KU, KU would have disclosed

12   this information to NSF.  Again, I'm going to stand on my

13   written decision.

14           There was evidence from NSF, DOE as well, that had

15   certain information been disclosed -- and there was evidence

16   from KU as well, its office of -- headed by Ms. Reed and by

17   others ahead of her -- that if there had been certain

18   disclosures made, it did not mean he would lose his principal

19   investigator status.  It did not mean the application wouldn't

20   have been submitted.  It didn't even necessarily mean it would

21   have been disclosed to the funding agencies because it would

22   have been a conflict that would have been investigated to see

23   if they could work around it and avoid there even being the

24   existence of a conflict.  So I think that language is

25   appropriate.  Also, like the other objections, it does not

1    impact the guideline calculation.

2          The fourth objection is to paragraph No. 85.  This

3    paragraph relates to Dr. Tao's daughter's medical issues.  I'm

4    going to deny that objection.  There's a reason that it's

5    there.  Probation and the court need to have an entire picture

6    of Dr. Tao's medical issues, his family's medical issues.  All

7    of this may be relevant to supervision, which will happen with

8    somebody from the probation office actually coming to the home

9    to supervise.  It also may affect Dr. Tao's ability to --

10   financial ability to pay a fine.  It may go to the length of

11   the term and appropriate conditions of any supervision.  So all

12   of that is relevant to the court -- the court's sentencing

13   decision.

14         Objection No. 5 is paragraph 94, financial ability to

15   pay.  The court will deny that objection.  There is no evidence

16   to suggest that Dr. Tao can afford to pay a fine.  The

17   government questions whether he still owes money on his legal

18   bills.  Absent any evidence that there's anything wrong with

19   the numbers that are in the presentence report, the court is

20   not going to sustain that objection.

21         To be sure, this case was filed in 2019.  It was

22   heavily litigated by both parties.  There were substantive

23   motions, a lengthy trial, post-judgment motions that were

24   largely favorable to Dr. Tao.  Dr. Tao received effective

25   assistance of counsel and rigorous defense as he's entitled to,

1   and the court has no reason to believe that he didn't incur

2   significant legal fees as represented.

3          The next objection, it's actually styled as an

4   objection.  The others were more styled as clarifications, but

5   there's an objection to paragraph 64, and that has to do with

6   no enhancement for loss.  The government argues that the

7   evidence and the victim impact statements prove that there was

8   a loss in this case.  As my lengthy order detailed, Dr. Tao did

9   not -- there was no evidence to prove that he obtained money or

10  property for the conduct or the scheme that's charged in the

11  wire fraud counts.  That's why I acquitted him because Supreme

12  Court law is that absent someone actually obtaining money or

13  property for fraudulent conduct, there is no crime under the

14  wire fraud or mail fraud statutes.

15         Mr. Barry argued this morning that the government does

16  not dispute that Dr. Tao worked hard, but the government argues

17  that he worked dishonestly and without integrity.  As I've said

18  and as I said in my written order, this was an honest services

19  case, and that's why I acquitted Dr. Tao of the wire fraud

20  counts.  Honest services is not a basis for wire fraud or mail

21  fraud.  At one point in federal jurisprudence it was many years

22  ago, but it is no longer.

23         There's actually been several evolutions of the law on

24  this, but as it stands now and as it stands at the time that

25  Dr. Tao was charged with committing these crimes, honest

1   services was not a basis.  Someone has to obtain money or

2   property from their fraud.  The Supreme Court has held that,

3   you know, employment issues are not properly the basis for

4   federal convictions for wire fraud or mail fraud.

5           Failing to do certain things, failing for example to

6   conduct the office hours that you're supposed to conduct during

7   your buyout semester, or being in contact with your students

8   who need your mentorship as they're enrolling for class, things

9   that Dr. Tao was accused of doing, things that the evidence

10  demonstrated that he did, those are not actionable crimes and

11  frankly they shouldn't be.

12          Maybe they're a reason to fire somebody.  Maybe

13  they're a reason to take employment action.  But they're not a

14  reason to convict someone of a federal felony and certainly not

15  a reason to send someone to prison.

16          So I deny that objection.  There was no loss.  There

17  was no loss proved at trial.  The things that the government

18  argues now in terms of being a loss, there was no evidence of

19  such, and they don't constitute loss.

20          I went into this trial frankly thinking I was going to

21  hear evidence that there was a loss, that's why I denied the

22  defendant's pretrial motion to dismiss because I thought and

23  because the government was telling me I thought that there was

24  going to be evidence that Dr. Tao obtained money or property by

25  fraud.  I thought frankly what I might hear at trial and I

1    never heard was that he wasn't entitled to his salary at KU

2    because during the semester or whenever he was in China, he

3    wasn't doing any work for KU so he was double-dipping so to

4    speak and pulling a salary from KU that he didn't earn.

5         But I didn't hear that.  I heard the contrary.  I

6    heard that this is a man that is obsessed with his work.  He

7    always has been.  I heard from his graduate students.  I heard

8    even when he was in China, Germany, or wherever he might be, he

9    worked them to death and he worked himself to death.  And he

10   earned his salary at KU.

11        So there's no loss from the fact that KU paid him a

12   salary.  There was no loss in federal research dollars.  There

13   was no evidence that the research wasn't conducted, that NSF

14   and DOE for that matter did not receive what they paid for in

15   terms of research and all that that entailed.

16        What I heard on the contrary was that wherever Dr. Tao

17   was, China or -- mostly China during that one semester and

18   summer, he was on the phone, he was e-mailing his post-docs and

19   his graduate students and he worked them to death, and it was

20   as if he was there full-time.  The research was conducted, so

21   there was no loss associated with that nor was there any gain

22   to Dr. Tao from fraudulent conduct.  He earned what he

23   received.  He did the work he was supposed to do.  It's a

24   separate question obviously about research integrity and all of

25   that, and I'll talk about that, but just in terms of did he

1    produce the work that was anticipated and the answer is yes.

2          So I'll deny and -- overrule and deny this objection

3    for all of the reasons stated.

4          The second objection which is actually styled as an

5    objection is to paragraph No. 64 and that's an objection for

6    not including a two-level enhancement for sophisticated means

7    and a substantial part of the scheme occurring outside of the

8    U.S.  Either one of those would support an enhancement under

9    guideline 2B1.1(b)(10).  This enhancement would apply if the

10   fraudulent scheme was committed outside of the U.S. or if it

11   otherwise involved sophisticated means and the defendant

12   intentionally engaged in or caused the conduct constituting

13   sophisticated means.

14         The government argues that the evidence supports both

15   grounds for the enhancement.  The defendant spent a significant

16   amount of time in China during his scheme and often used his

17   distance from the United States and lack of transparency into

18   his activities in China to execute and conceal his scheme and,

19   second, because the scheme was sophisticated, including the

20   cover story about collaborating with Fuzhou, the Fritz Haber

21   Institute collaboration cover story, using Fuzhou team members,

22   using multiple e-mail accounts located in the U.S. and China to

23   conceal illegal activity, and that after he was charged, many

24   public documents were scrubbed to remove references of his

25   collaboration with Fuzhou from the Internet and that he

1  partitioned his hard drive to conceal electronic evidence of

2  his conduct.  So those are all of the arguments that the

3  government gives in favor of his enhancement.

4      Dr. Tao responds he was acquitted of fraudulent

5  conduct, and he argues his only crime was concerning the

6  institutional responsibility form and failing to check a box,

7  which is not a sophisticated action.

8      I'm going to deny this objection for the reasons

9  stated in probation's response.  Essentially, although the

10  conduct described by the government is arguably relevant

11  conduct under guideline 1B1.3, Dr. Tao's acts were not

12  particularly sophisticated.  They could be accomplished by an

13  average adult with little difficulty.

14      Now, Internet scrubbing could be considered

15  sophisticated, but there was no evidence presented at trial and

16  no evidence now that Dr. Tao was responsible for any scrubbing

17  of the Internet.  And of course his time spent in China is not

18  related to the false statement charge at all.

19      The third objection under paragraph 66 is failure to

20  include a two-level enhancement for abuse of position of trust.

21  This enhancement applies if the defendant abused a position of

22  public or private trust or used a special skill in a manner

23  that significantly facilitated the commission or concealment of

24  the offense.

25      This enhancement requires the court to make two

1  findings:  First, that he possessed a position of trust and,

2  secondly, that he abused the position to significantly

3  facilitate the commission or concealment of the offense.  And

4  the court can consider relevant conduct when imposing this

5  enhancement, but in the Tenth Circuit the first prong of the

6  test requires that the position of trust must be found in

7  relation to the victim of the offense.

8          The question of whether an individual occupied a

9  position of trust is evaluated from the victim's perspective.

10  The government argues this enhancement applies because KU

11  trusted Dr. Tao by giving him autonomy to devote his time to

12  research as needed and did not micromanage him and this allowed

13  him to take advantage and conceal his activities in China.

14          The government argues that NSF places trust in its

15  principal investigators, otherwise it cannot trust the

16  research.  The defendant responds that he was not in a position

17  of trust vis-a-vis the federal government, which is the victim

18  of the crime of conviction, and there is no evidence that NSF

19  even had access to the form, much less reviewed it.

20          I'm going to deny this objection.  Any problems with

21  position of trust that was abused was in relation to KU, which

22  is not the victim of the crime.  It's NSF.

23          Objection No. 4 is that under guideline 5K2.5 I should

24  apply an upward departure if I find that the loss is zero,

25  which I do find that the loss is zero.  The government urges me

1   to impose an upward departure to reflect the loss described in

2   the victim impact statements that were submitted by KU and NSF,

3   which if I find that there is loss in the victim impact

4   statements, that would warrant an upward departure perhaps.

5   The extent of the increase ordinarily should depend on the

6   extent the harm was intended or knowingly risked and on the

7   extent to which the harm to property is more serious than other

8   harm caused or risked by the conduct relevant to the offense of

9   conviction.  I'm going to deny this objection.

10          Although the court can and does take into

11   consideration the victim impact statements when sentencing the

12   defendant, these statements do not demonstrate that there's

13   property and harm sufficient to justify an upward departure.

14          I'll give you an example.  One of the arguments was

15   that there was harm to the students, and I understand that.

16   Students come into this academic environment at this level and

17   often apply for a PhD program and certainly post-doctoral work

18   based on the researcher's -- the people that they hope to work

19   for and with.

20          And Dr. Tao was put on I believe administrative leave

21   without pay after he was charged, and those students no longer

22   had access to him at least under the auspices of KU, so I

23   understand that a PhD student or post-doctoral student

24   certainly was affected by this, but they would have been

25   affected had Dr. Tao gone to Fuzhou or gone to another

1    university.  That's the risk they take.  They understand that.

2         Dr. Tao did not leave KU willingly obviously.  He left

3    because KU put him on administrative leave as a consequence of

4    these charges.  So that's a risk they take.  I'm not

5    diminishing that.  I feel bad for the students.  But it's not

6    really a loss in that sense.

7         Similarly, when we talk about federal funding, and I

8    don't know -- I glean from the victim impact statements that

9    there's an argument that because of Dr. Tao being charged and

10   all that happened, he was no longer the principal investigator

11   and no longer the person that that funding was tied to, whether

12   it was NSF or DOE, I understand that.

13        But I'm also reminded that Dr. Tao comes to KU with

14   money from -- government money that funded him while he was at

15   Notre Dame, so as these principal investigators go from

16   academic institution to academic institution, that seems to me

17   as something that happens.  They may take government funding

18   with him that's tied to them.

19        So, again, I understand this all comes back to the

20   fact that Dr. Tao was charged with a crime and put on

21   administrative leave, and I don't know if he's terminated or

22   what the situation is now, but to the extent NSF, DOE, or other

23   funders were put in a position now of not wanting to fund

24   research because the principal investigator left, I understand

25   that.

1          But I also understand that the way this all works is
2     it's tied to a particular investigator.  Had he left and gone
3     to China, same thing would have happened.  Had he been hit by a
4     bus and died, the same thing would have happened.  I mean, had
5     he gone back to Notre Dame, maybe he would have been able to
6     take the research money with him or maybe he wouldn't have.  It
7     is tied to him individually; that I understand.  But it's not a
8     basis for loss.  It's not a basis for an upward departure.
9          So where we're at is -- and I'll make the following
10    proposed findings about the guidelines themselves.
11         The total offense level is six.  And the criminal
12    history category is one.
13         The government asks for -- they ask for both an upward
14    departure or variance.  I've denied an upward departure, but
15    they also ask for a variance upward to I believe a 30-month
16    sentence, which is quite a variance upward from a guideline
17    range of zero to six months, arguing that under the 3553(a)
18    factors it's warranted.  And I'm going to address those
19    factors.
20         The defendant is arguing for a guideline sentence
21    also, arguing under the 3553(a) factors the court should not
22    grant a variance.  I'm going to address that as well.
23         But before I go further, Dr. Tao, you have the right
24    to address me directly before I make any sentencing decisions.
25    Is there anything that you'd like to say directly to the court

1   at this time?

2        MR. ZEIDENBERG:  Your Honor, I've spoken with Dr. Tao,

3   and he is satisfied with my representations.  He doesn't wish

4   to address the court directly.

5        THE COURT:  Okay.  All right.  I'm going to make the

6   following findings, and as part of the findings and as part of

7   my announcing a tentative sentence, I'm going to address the

8   3553(a) factors.

9        So the total offense level in this case is six and the

10  criminal history category is one.  The statute sets a maximum

11  sentence of five years of prison, a maximum three years of

12  supervised release, a range of one to five years of probation,

13  a maximum $250,000 fine.

14       There is no restitution in this case under the

15  statute, and the sentence must include under statute or

16  guidelines a $100 mandatory assessment for the Crime Victims

17  Fund.

18       The guidelines, which of course are discretionary, not

19  mandatory, advise as follows:  For custody a range of

20  zero months to six months, for supervised release a range of

21  one to three years, for probation a range of one to five years,

22  for a fine a range of 1,000 to 9,500, no restitution, a $100

23  special assessment mandated under the Crime Victims Fund.

24       Again, the government is seeking a 30-month sentence.

25  The defendant is seeking a sentence of time served, which in

1    this case means a one-week imprisonment sentence because

2    Dr. Tao did serve one week in jail.

3           The government I believe seeks a one-year term of

4    supervised release.  The defendant seeks no term of supervised

5    release.  The government also seeks a $100,000 fine.

6           The court's tentative sentence is as follows:  A

7    custodial sentence of time served, a two-year term of

8    supervised release, no probation because there has been a

9    custodial sentence, no fine, no restitution, a $100 special

10   assessment for the Crime Victims Fund.

11          The court is required pursuant to 18 U.S.C. Section

12   3553(a) to impose a sentence that is sufficient but not greater

13   than necessary to comply with the purposes of sentencing

14   identified in that statute.  In determining the particular

15   sentence to be imposed the court has considered the sentencing

16   guidelines, which promote uniformity in sentencing and assist

17   the court in determining an appropriate sentence by weighing

18   the basic nature of the offense as well as aggravating and

19   mitigating factors.

20          The court has considered the statements of the

21   parties, the arguments of the parties, the presentence

22   investigation report, the written and oral victim impact

23   statements, and the sentencing memoranda provided to the court

24   as well as the numerous -- I think it's several dozen or a

25   couple dozen letters written in support of Dr. Tao.

1          After reviewing the presentence report, the court

2    finds that the guideline range of zero to six months is

3    correctly calculated based on a total offense level six and

4    criminal history category of one.

5          This offense involves the defendant making a false

6    statement on an institutional responsibilities form submitted

7    to the University of Kansas.  He has no prior criminal history

8    and has been compliant on bond since his arrest in August 2019.

9          After considering all of the 3553(a) factors and the

10   advisory guidelines, the nature and circumstances of the

11   offense, and Dr. Tao's history and characteristics, the court

12   intends to sentence him to a term of time served followed by

13   two years of supervised release for these reasons:

14         First, the nature and circumstances of the offense.

15   This is not a case about espionage.  This is not a case about

16   industrial espionage.  This is not a case where there was any

17   evidence that Dr. Tao stole anything from KU, NSF, DOE, or the

18   American taxpayers.  This is not a case where there's any

19   evidence that the time that he spent in China was spent to

20   share intellectual property, proprietary information, inside

21   information that was funded by the taxpayers or anyone else

22   with the People's Republic of China.

23         Frankly, I thought going into this case I was going to

24   hear evidence that whatever Dr. Tao's research was about, it

25   was something that it would hurt our taxpayer-funded research

1    agency, science agencies, it would hurt the taxpayers that he

2    went to China and spent time there working with them because he

3    was sharing information that taxpayers had funded for him to

4    share with KU and with the federal government or whatever, but

5    that's not what the evidence was.

6              The evidence was that Dr. Tao's research -- first of

7    all, it's not the type of research that is monetized or

8    commercialized.  It's too -- I would call it esoteric.  I'm not

9    a scientist, probably the wrong word.  But it's academic.  I

10   think one person testified that if it's ever going to be usable

11   commercially, we're probably I think they said maybe 50 years

12   out or maybe 20 years, a long time out.  It's the type of

13   research that's fundamental research I think someone called it,

14   and it's the type of research that it's freely shared in the

15   scientific community in all of these hundreds of articles, over

16   200 articles that Dr. Tao has published during his academic

17   career, 16 that he's published since the charges have been

18   filed.

19             It's shared globally.  It's shared within the

20   scientific community, which is an interesting community that

21   we've all benefited from and a community that largely doesn't

22   recognize borders, and that's been a good thing over the course

23   of human history.

24             That's not to say that there cannot be concerns about

25   sharing certain types of scientific research with frankly our

1    enemies.  People's Republic of China is not an ally of the

2    United States in any sense.  But that's not what was happening

3    here.  That's not what the evidence demonstrated.  That was not

4    the type of research that Dr. Tao was performing, and it was

5    the type of research that was freely shared in scientific

6    journals and shared globally.

7           And so that's not what was happening here.  This is

8    not an espionage case.  Maybe that's what the Department of

9    Justice thought what was going on, but that's not what was

10   going on.  If it was, they presented absolutely no evidence

11   that that's what was going on.  Believe me, if that was going

12   on, there would be a very different sentence being imposed

13   today.

14          Now, scientific integrity is critically important.

15   Dr. Keiser gave us all a really good example in her victim

16   impact statement about the importance of scientific integrity.

17   You've got, you know, a researcher that's researching and

18   producing data that is peer reviewed and accepted as being

19   research of integrity being shared in the scientific community

20   having to do with the heart, but failing to disclose that

21   they're being funded by tobacco companies, something that

22   everyone could understand should be disclosed and that would

23   cause all of us, even lay people, some concern about the

24   integrity of the data.  Is the data real?  Is it bias?  Is it

25   changed?  Is it -- are certain things not disclosed?  In other

1    words, real questions about the integrity of the research

2    itself.

3              And so that's why NSF, DOE, and these other funding

4    agencies and the universities that they work in partnership

5    with, that's why it's so important to them that forms be filled

6    out, that conflicts be disclosed, that people operate without

7    bias and integrity.

8              But, again, Dr. Tao argues -- and this is true --

9    there was no evidence that there was any conflict of interest

10   in that sense in this case.  What there was concern about was a

11   conflict of time.  Dr. Tao is over in China, but yet he's

12   supposed to be supervising research at KU even during that

13   buyout semester.  And it turns out he was; he was supervising

14   the research at KU because apparently he's somebody that can

15   work 70 or 80 hours a week consistently.

16             Should he have disclosed these things?  Absolutely.

17   There was question -- I heard a lot of evidence that called

18   into question how much did anybody understand as to what they

19   were supposed to disclose when certain things happened after

20   the fact, after the application process.  But there was

21   certainly at least a concern about a commitment of time.  And

22   maybe there was a concern about conflict of interest otherwise

23   as well.  It should have been disclosed.

24             That's why I denied the motion for judgment of

25   acquittal on the false statement count.  That particular

1    institutional responsibilities form wasn't fully accurate, and

2    that's why Dr. Tao sits here today as a convicted felon and

3    having suffered the consequences over the last three and a half

4    years and the consequences of that going forward.

5            But he did not commit wire fraud.  He did not obtain

6    money or property for this.  He engaged in deception.  If you

7    read my order, there's no question about that.  He was

8    deceptive with KU about what he was doing and where he was.

9            It was interesting because his department chair said I

10   wouldn't have cared if he was in China; I didn't care if he was

11   in Germany; I didn't care where he was as long as the work got

12   done.  And, frankly, I think if Dr. Tao had disclosed what he

13   was doing exactly, maybe we wouldn't be here.  I don't know.

14   Maybe the government would have pursued him anyway.  I don't

15   know.

16           But he was deceptive.  He didn't let them know exactly

17   where he was and what he was doing.  He asked his graduate

18   students to kind of help him conceal this.  There was

19   definitely deception, but it didn't constitute wire fraud.  It

20   did constitute a false statement on this one particular count.

21   So I've taken all of that into consideration.

22           Frankly, based on all of the evidence I heard, I think

23   a reasonable jury could have found that what Dr. Tao was trying

24   to do was he was trying to figure out where he goes from KU.

25   He's a mid-career researcher.  He's gotten this huge reward

1    from KU.  They love this man, and they should; he's brought in

2    a claim and probably students to KU and certainly a lot of

3    federal research dollars to KU, which in a research institution

4    is important.

5           But he's trying to figure out what his next steps are.

6    And so he, you know, gets involved with this China talent

7    program.  There's, you know, evidence going both ways as to

8    whether -- you know, he definitely got the scholar award.

9    There was the certificate in evidence.  There's some evidence

10   about he had a contract.  There's evidence that suggested maybe

11   he didn't finalize the contract.  I don't know.

12          But the bottom line is he was deceptive.  He didn't

13   want to tell KU exactly what he was up to.  He talked to some

14   colleagues about, you know, how can I accomplish this?  How can

15   I go over there and test the waters, so to speak, with them?

16          And I think that's what he was doing; he was over in

17   China testing the waters, you know, starting to build a lab

18   during the buyout semester or during the semester that he was

19   able to be off campus, although he didn't fulfill all of his

20   responsibilities.  He didn't go to some faculty meetings, and,

21   you know, he was slow in responding to some students who wanted

22   some advising, but, again, I don't think that's a basis for a

23   felony conviction.

24          But I think he was testing the waters and he was being

25   deceptive about it, and that's not a basis for a custodial

1    sentence in my view.  Deception, yes.  Wire fraud, no.  False

2    statement, yes.  No loss.  All of these I think go to the

3    nature and circumstances of the offense.

4         His history and characteristics.  Dr. Tao has had no

5    conviction, no prior criminal history whatsoever.  He's been on

6    bond in this case since his arrest.  He served a week in jail,

7    and then he's been on bond for three and a half years, since

8    August of 2019.  He's been on home detention, which is somewhat

9    custodial, home detention, wearing an ankle bracelet.  He's not

10   had any violations of his conditions of pretrial release.  Not

11   the same as being in prison by any means, but it has -- it has,

12   you know -- it has affected his ability to live in the world,

13   no doubt.

14        I've taken into consideration the fact that Dr. Tao's

15   continued to do research.  I don't view that as a negative.

16   I'm like him; I view it as a positive.  I don't view it as a

17   lack of remorse to tell someone who has spent their entire life

18   doing this kind of research that if you now do this research

19   while you're under pending charges or after you've been

20   convicted, that proves you're not remorseful.

21        He's not getting federal funding.  He's not filling

22   out NSF and DOE and KU forms, but he's still getting published.

23   As one of the authors -- the one author from one of the letters

24   from I think the University of Central Florida pointed out, you

25   know, everybody knows that he's under these charges; everybody

1   in the community knows that he's been convicted now I guess,

2   but nobody else has questioned the integrity of his research.

3   His own peers -- he's still getting published in peer-reviewed

4   journals.  He's still probably working 70 or 80 hours a week at

5   home to do that.

6           All of that I think is a positive.  I don't think it

7   shows a lack of remorse.  I think it shows a commitment to the

8   work, and that was his failing I think.  He was afraid that if

9   he, I guess, was completely transparent, you know, maybe he

10  wouldn't be able to test the waters, maybe he wouldn't be able

11  to build a world class lab as being a Changjiang scholar as

12  part of the Chinese talent program.

13          He should not have lied about it.  He should not have

14  been deceptive.  I think he knows that because that's why he's

15  here now.

16          And when I say testing the waters, the evidence was he

17  went there, and there's e-mails and sort of communications

18  about this, they didn't come through.  People's Republic of

19  China did not come through.  They weren't going to give him

20  enough money to build the lab that he needed that would come

21  even close to what he had at KU.  He had one student that acted

22  like he might be willing to come over there, but another one,

23  no.  His family did not want to move there.  His children were

24  born in the United States.  They're Americans.  They didn't

25  want to go there.

1          So he tested the waters and probably figured out

2    pretty quickly this wasn't going to work, but apparently he

3    thought it made sense to be deceptive with KU and not let them

4    know he was doing that.  And frankly a lot of people go out in

5    the world and apply for other jobs and don't tell their

6    employers what they're up to for obvious reasons.  It doesn't

7    constitute a federal crime if they lie to their employers that

8    they were over interviewing in China or Norway or wherever when

9    they were supposed to be at work, unless they obtained money or

10   property from their employer that they weren't entitled to.

11   But that's not what happened here.

12         So I've taken into consideration the nature and

13   circumstances of the offense, Dr. Tao's history and

14   characteristics.  I do not want to suggest that I think it is

15   not serious that researchers of any sort not comply with these

16   requirements of NSF, DOE, and their sponsoring academic

17   institutions.  It's important, that's why those rules are in

18   place.

19         I've taken into consideration general and specific

20   deterrence.  I have a hard time believing that a custodial

21   sentence is necessary to specifically deter Dr. Tao now when

22   he's lost his job or is in the process of losing, he suffered

23   everything that we've heard about here in this courtroom today.

24         And as far as general deterrence, I think that's

25   interesting.  I don't remember the name of the letter, but

1   there was a letter from a researcher that knows Dr. Tao who is

2   from the University of Nebraska at Lincoln.  And that person

3   said, you know, my institution -- I assume he was talking about

4   University of Nebraska -- he said I've been worried about these

5   conflict of interest forms for several years, and I have asked

6   for more clarity from the organization and I never get it and

7   I'm terrified.

8            And I think general deterrence is in play here.  I

9   think not only that person but probably other researchers have

10   seen what happened to Dr. Tao and perhaps some other people

11   that were prosecuted as part of this Department of Justice

12   initiative and are terrified that it could happen to them.

13            Apparently now the Chinese talent programs are not

14   going to be an issue anyway, one, because NSF and DOE or

15   whoever aren't going to fund people if they do disclose that,

16   and, two, in any event the Department of Justice apparently is

17   no longer pursuing these prosecutions that are solely on that

18   basis anyway.  I don't know.

19            But the point is, I think the scientific community is

20   generally deterred to see somebody of Dr. Tao's acclaim and

21   accomplishment go down the tubes like he has because of this,

22   so I don't think a custodial sentence is necessary to further

23   deter people.

24            The need to avoid unwanted disparities in sentencing.

25   The government has cited a number of cases.  That's an

1   important consideration under the 3553(a) factors, although the

2   government doesn't consider that the most important.  They've

3   said it's who Dr. Tao is and the nature and circumstances of

4   the offense that are the primary considerations.  But the need

5   to avoid unwanted disparities in sentencing is appropriate.

6   Every case is different.  Some of these folks were convicted of

7   more serious activity.

8           But I come back to the guidelines.  I'm offering --

9   imposing a sentence within the guidelines, and the guidelines

10  are designed for this very purpose, and I do not think a

11  variance upward to a custodial sentence is necessary to avoid

12  unwanted disparities in this case.

13          So also I've considered whether there's a need for

14  correctional treatment and find that Dr. Tao requires no

15  educational or vocational training.  He may require some

16  medical care which is consistent with the condition that I'm

17  imposing as part of his supervised release.

18          I will say that the defendant is asking for no term of

19  supervised release.  Given that I'm not imposing any additional

20  custodial sentence, I think supervised release is warranted but

21  without a condition for home detention.  I do not think Dr. Tao

22  should have an ankle bracelet anymore.  I don't think he needs

23  to be home detained anymore.  Otherwise the conditions of

24  supervision that are in the probation office will -- in the

25  presentence report will be imposed with one exception.

1        There's a recommendation in there for a community

2   service condition.  That pertains when somebody is given a

3   probation sentence.  I'm actually giving him a supervised

4   release sentence, so in paragraph 109 that condition will not

5   be imposed as part of the supervised release.  Frankly, I think

6   what he is doing is community service, continuing to provide

7   scientific research.  If somebody doesn't want to accept it

8   because of his conviction, that's fine.  But he continues to

9   work for the better of the scientific community whether it's

10  accepted or not.

11       So the court believes based on all of this that the

12  sentence as tentatively announced is sufficient but not greater

13  than necessary to reflect the seriousness of the offense, to

14  promote respect for the law, to provide just punishment, to

15  afford adequate deterrence, and to protect the public from

16  further crimes.

17       The court intends to order a special assessment of

18  $100 to the Crime Victims Fund but no fine due to Dr. Tao's

19  inability to pay.

20       Again, I'm intending to impose a two-year term of

21  supervised release.  I will say it's the policy of this court,

22  the entire District of Kansas, that if someone serves

23  50 percent of the term of supervised release without any

24  problems, we will early terminate them.

25       So a year from now if Dr. Tao continues being without

1    blemish on his conditions as he's been for the last three and a

2    half years, this court will be inclined upon motion to

3    terminate the supervised release at the one-year mark.

4            The court intends to impose the mandatory and special

5    conditions of supervision set forth in part D of the

6    presentence report with the exception again of paragraph 109.

7            The drug testing condition is suspended based on the

8    court's determination that the defendant poses a low risk of

9    substance abuse in the future.

10           As directed by 18 U.S.C. Section 3561(c)1, when

11   someone is granted probation, the court can impose a fine,

12   restitution, or community service.  But I'm not granting

13   probation, and so that's why I'm taking out the condition for

14   community service.

15           Because Dr. Tao is not a United States citizen, a

16   condition ordering compliance with ICE is warranted.

17           Dr. Tao reported being depressed since his arrest.  A

18   special condition requiring mental health treatment will allow

19   him to receive counselling to address mental health issues and

20   provide him with needed medical care.

21           Voluntary surrender of course is not an issue given

22   the noncustodial sentence.

23           I'll hear objections or anything else from the parties

24   now.  First for the government.

25           MR. BARRY:  Nothing from the government, Your Honor.

1          THE COURT:  From the defendant.

2          MR. ZEIDENBERG:  Nothing from the defense, Your Honor.

3     Thank you.

4          THE COURT:  All right.  The court determines that the

5     presentence investigation report as corrected or modified by

6     the court and the previously stated findings are accurate and

7     orders those findings incorporated in the following sentence:

8          Pursuant to the Sentencing Reform Act of 1984 it is

9     the judgment of the court that the Defendant Feng Tao is hereby

10    sentenced to two years of supervised release -- time served and

11    two years of supervised release.

12         While on supervised release, Dr. Tao shall comply with

13    the mandatory and standard conditions adopted by this court and

14    the special conditions of supervision set forth in part D of

15    the presentence report as amended, meaning no paragraph 109.

16         It is ordered Dr. Tao shall pay the United States a

17    special assessment of $100 to the Crime Victims Fund pursuant

18    to 18 U.S.C. Section 3013.  Payment of assessment is due

19    immediately.  Imposition of a fine is waived.

20         Both the government and defendant are advised as to

21    their respective rights to appeal this sentence and conviction.

22    An appeal taken from this sentence is subject to 18 U.S.C.

23    Section 3742.

24         Dr. Tao is advised it is your right to appeal the

25    conviction and sentence, but you can lose your right to appeal

1   if you do not timely file a notice of appeal in the district

2   court.  Rule 4(b) of the Federal Rules of Appellate Procedure

3   gives you 14 days after the entry of judgment to file a notice

4   of appeal.  If you request, the clerk of the court shall

5   immediately prepare and file a notice appeal on your behalf,

6   and if you are unable to pay the cost of an appeal, you have

7   the right to apply for leave to appeal in forma pauperis.

8          All right.  I think that completes our hearing today.

9   Thank you, counsel.

10          MR. ZEIDENBERG:  Your Honor, I'm sorry.  On the

11   special assessment, is it -- I know it's due immediately.  Is

12   it possible -- I don't know if they have a check with them.

13   Can we have two days to pay that?

14          THE COURT:  Sure.  That's fine.

15          MR. ZEIDENBERG:  Thank you.

16          THE COURT:  I wish you the best, Dr. Tao.  We'll be in

17   recess.

18      (The proceedings were adjourned.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2        I, Danielle R. Murray, a Certified Court Reporter and the

3    regularly appointed, qualified, and acting official reporter of

4    the United States District Court for the District of Kansas, do

5    hereby certify that the foregoing is a true and correct

6    transcript from the stenographically reported proceedings in

7    the above-entitled matter.

8        SIGNED 23rd of January, 2023

9

                          /s/Danielle R. Murray
10                        DANIELLE R. MURRAY, RMR, CRR
                          United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25